UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X
                                                                :
In re:                                                          :    Chapter 11
                                                                :
GENCO SHIPPING & TRADING LIMITED, et al.,                       :    Case No.
                                                                :
                                Debtors.                        :    Joint Administration Pending
                                                                :
----------------------------------------------------------------X

## DECLARATION OF JOHN C. WOBENSMITH
## PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND
## IN SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS

John C. Wobensmith declares as follows:

1.      I am the Chief Financial Officer of Genco Shipping & Trading Limited

("**Genco**"), a corporation organized under the laws of the Marshall Islands (together with its

fifty-seven (57) affiliated debtors and debtors in possession in the above-captioned chapter 11

cases, the "**Debtors**"[1]).  I have been the Debtors' Chief Financial Officer since 2005 and I am

generally familiar with the Debtors' day-to-day operations, business affairs, books, and records.

---

[1] The Debtors and, if applicable, the last four digits of their taxpayer identification numbers are as follows: Genco Shipping & Trading Limited (9758), Genco Investments LLC, Genco Management (USA) LLC (3865), Genco RE Investments LLC, Genco Ship Management LLC (7604), Genco Acheron Limited (9293), Genco Aquitaine Limited (8217), Genco Ardennes Limited (8215), Genco Augustus Limited (3622), Genco Auvergne Limited (8233), Genco Avra Limited (5557), Genco Bay Limited (5558), Genco Beauty Limited (9761), Genco Bourgogne Limited (8236), Genco Brittany Limited (8237), Genco Carrier Limited (9763), Genco Cavalier LLC (9764), Genco Challenger Limited (6074), Genco Champion Limited (6073), Genco Charger Limited (6072), Genco Claudius Limited (3620), Genco Commodus Limited (3619), Genco Constantine Limited (3617), Genco Explorer Limited (9764), Genco Hadrian Limited (3608), Genco Hunter Limited (6158), Genco Knight Limited (9773), Genco Languedoc Limited (8238), Genco Leader Limited (9774), Genco Loire Limited (8239), Genco London Limited (3610), Genco Lorraine Limited (8242), Genco Mare Limited (5641), Genco Marine Limited (9775), Genco Maximus Limited (3613), Genco Muse Limited (5276), Genco Normandy Limited (8243), Genco Ocean Limited (5645), Genco Picardy Limited (8244), Genco Pioneer Limited (9767), Genco Predator Limited (6075), Genco Progress Limited (9776), Genco Prosperity Limited (9777), Genco Provence Limited (8246), Genco Pyrenees Limited (8599), Genco Raptor LLC (9767), Genco Reliance Limited (9768), Genco Rhone Limited (8248), Genco Spirit Limited (5650), Genco Success Limited (9769), Genco Sugar Limited (9778), Genco Surprise Limited (9385), Genco Thunder LLC (9769), Genco Tiberius Limited (3614), Genco Titus Limited (3615), Genco Vigour Limited (9770), Genco Warrior Limited (6076), and Genco Wisdom Limited (9771). The Debtors' business address is 299 Park Avenue, New York, NY 10171.  Neither Baltic Trading Limited ("**Baltic Trading**") nor its subsidiaries are Debtors.

I also serve as the Manager for certain Debtors and Secretary and Treasurer for certain other Debtors.  As discussed more fully below, the Debtors are one of the world's leading providers of international seaborne transportation services for drybulk cargo (including iron ore, coal, and grain) owning and operating a fleet of fifty-three (53) vessels (the "**Vessels**") as well as managing vessels for Baltic Trading and Maritime Equity Partners.

2.    On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Chapter 11 Cases**").    The Debtors operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

## I. **INTRODUCTION**[2]

3.    The Debtors have a highly leveraged capital structure – with over $1.3 billion of senior secured debt (held in three separate Credit Facilities) and $125 million of unsecured Convertible Notes due in August 2015.  It is well-recognized that the global economy, in general, and the drybulk shipping industry, in particular, has been turbulent over the past few years.   To avoid potential defaults under their Credit Facilities during this time period, the Debtors entered into several amendments and waiver agreements with their senior secured creditors.  However, despite the additional time afforded by these waivers and modifications, the Debtors' remain significantly overleveraged.  The liquidity constraints imposed by continuing to amortize this debt burden, along with generally reduced vessel values due to plummeting freight market earnings and decreased shipping rates, all would impair the Debtors' ongoing operations

---

[2] All defined terms used in this Introduction will have the meaning ascribed to them below in this Declaration or in the Prepack Plan.

and long-term viability.  In fact, based upon regularly scheduled amortization payments due in March 2014 and September 2014 under the three secured Credit Facilities, the Company would deplete its operational cash by the second quarter of 2014, thereby not being able to conduct business as usual.  Conservation of operational cash became critical to the Debtors' long-term success.

4.      The Debtors commenced these prepackaged Chapter 11 Cases to implement a consensual debt conversion restructuring supported by the parties to the Restructuring Support Agreement which was executed by approximately 98% of the lenders under the 2007 Credit Facility, 100% of the $100 Million Facility Lenders and $253 Million Facility Lenders and approximately 82% of the holders of the Convertible Notes.  Despite significant consensual impairment of claims as part of the restructuring terms, the Company obtained overwhelming support from their creditor constituencies for a consensual restructuring of its balance sheet alleviating significant cash burden. Thereafter, the Company commenced solicitation of votes on the Prepackaged Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code (the "**Prepack Plan**") prior to the Petition Date.  The purpose of these Chapter 11 Cases is to implement a financial restructuring, which by virtue of the consensual impairment of supporting creditors, leaves operational creditors unimpaired and allows for an expeditious emergence from Chapter 11 as a stronger competitor in the drybulk shipping industry, all in accordance with the agreed upon Milestones in the Restructuring Support Agreement.

5.      Specifically, through the consensual impairment of the 2007 Credit Facility claims and the Convertible Notes claims, the global settlement embodied in the Prepack Plan provides for the following: (a) approximately $1.2 billion of debt converted into equity in

the reorganized Genco; (b) favorable new terms for the amendment and restatement of the two remaining secured facilities; (c) a $100 million investment through a rights offering to provide new capital; (d) and because of foregone value otherwise distributable to the senior and other creditors, (i) payment in full of all allowed claims of other general unsecured creditors and (ii) the issuance of warrants to current equity holders in exchange for the cancellation or surrender of current equity interests.  The hallmark of the Prepack Plan is to facilitate this global settlement that allows for the Company's international operations to remain unaffected by the financial restructuring and, in exchange for proceeding on an expeditious basis, provide a recovery to all stakeholders, including equity holders, through a voluntary reallocation of value. The Prepack Plan also deleverages the balance sheet for the Company to withstand future rate fluctuation.

6.      The Company's restructuring process over the past several months has been widely publicized in the financial press, industry reports, and the Company's own public SEC reporting.  In fact, over the past two years the Company's financial status has been publicly reported when the lenders provided amendments and waivers to the Credit Facilities and lenders traded their debt to new holders.  Despite the current progress made with creditors, the Company currently faces risk of disruption and dislocation with some of its charterers and customers due to the uncertainty inherent in the restructuring process and the international nature of its business. The Company believes that the recent vessel arrest it suffered was a reaction to the publicized financial restructuring.  Without prompt confirmation of the Prepack Plan, the Company faces the risk of an adverse impact on its operations, including potential loss of charters, the deterioration of trade terms, customers withholding payment, the threat of arrested vessels, among other operational disruption – any of which could result in a loss of revenues for the

Company.  In light of the uncertainty they believe exists with a bankruptcy process, certain sub-charterers and other customers of some of our charterers have recently expressed reluctance to use the Company's Vessels, risking the loss of key charter relationships the Company established over the past ten years.  Without assurances of the Prepack Plan and that the Company is operating in a "business as usual" fashion, charterers may shift their business to other drybulk shippers, who have the capacity to absorb these customers.

7.     The Prepack Plan and the attendant Milestones mitigate these disruption concerns because the reasonable timeframes they establish provide for expeditious Chapter 11 Cases while being as minimally invasive to the Company's operations as possible.  By lessening the risks attendant to a "free-fall" or nonconsensual bankruptcy, the Prepack Plan creates operational stability for the Company's internationally based charter parties, customers, vendors and suppliers and reduces the destabilizing effect of "bankruptcy" upon these critical parties.  Given the disruption *already being suffered* by the Company, an organized, stable and expedited chapter 11 process is imperative to maintain the key relationships with the Company's customers and charterers.

8.     In addition to customer concerns, protracted bankruptcy cases could also lead to key employee attrition because of the uncertainty inherent in a nonconsensual chapter 11.  The Company is very leanly staffed, managing its worldwide business with less than a few dozen direct employees.  Without its thirty-three employees, the Company cannot sustain its international operations.  Alternatively, the consummation of the Prepack Plan on the terms and timetable established by the RSA minimizes the adverse impact of these concerns and provides a stable environment for these key employees to focus on operations, thereby preserving stakeholder value.  The Prepack Plan allows for a substantial and beneficial restructuring of the

Company's balance sheet and positions it as an efficient and competitive business going forward and preserves value for all stakeholders.

9.    In addition to seeking to proceed with these cases on an expeditious basis, to minimize disruption to their international operations and preserve the value of their assets and going-forward businesses, the Debtors request various types of "first-day" relief (collectively, the "**First Day Motions**").  I am familiar with the contents of each First Day Motion (including the exhibits thereto).

10.    I submit this declaration pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York and in support of the First Day Motions.  Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management and professionals, my review of relevant documents, or my experience with, and knowledge of, the Debtors' operations and financial condition.  If called upon, I could and would testify competently to the facts set forth herein.  I am authorized to submit this declaration.

11.    This declaration describes the Debtors' businesses, their capital structure, and the circumstances surrounding the commencement of these Chapter 11 Cases as required by Local Bankruptcy Rule 1007-2(a)(1).  Annexed to this declaration are schedules providing additional information about the Debtors, as required by Local Bankruptcy Rule 1007-2(a)(3)-(12) and (b)(1)-(3).[3]

---

[3] Local Bankruptcy Rule 1007-2(a)(2) is inapplicable because this case was not originally commenced under chapter 7 or chapter 13 of the Bankruptcy Code.

## II.  THE DEBTORS' OPERATIONS AND BUSINESSES

### A.  The Debtors' Corporate Structure

12.     Since its founding in 2004, Genco, through various of its subsidiaries, has owned and operated a fleet of Vessels as a leading provider of international seaborne transportation services for drybulk cargo, including iron ore, coal, grain, and steel products.  The Debtors' fifty-three (53) Vessels are contracted (the industry term is "chartered") by third-party customers through (a) "fixed-rate-time charters" – which are charters for specified time periods which can range from months to years in duration at set rates; (b) "spot-market related time charters" – which are charters for specific time periods ranging from months to years at rates that fluctuate based on the spot-market; and (c) vessel pools – whereby the Vessels participate in a charter "pool" with other vessels managed by third-party pool managers.  The Debtors' largest customers include Cargill International S.A., Pacific Basin Chartering Ltd., and Swissmarine Services S.A. While the Debtors' Vessels operate internationally, their principal place of business is, and they conduct their business out of Genco's global headquarters, located in Manhattan, New York.

13.     A corporate organizational chart is attached as **Exhibit A**.  Genco is the direct or indirect parent company of all the other Debtors, which are Genco's wholly-owned subsidiaries except for Genco Management (USA) LLC ("**GMU**'), which is a wholly-owned subsidiary of Genco Ship Management LLC ("**GSM**").  Since its initial public offering in 2005, Genco's common stock has traded on the New York Stock Exchange (the "**NYSE**") under the symbol "GNK."[4]  Genco files annual, quarterly, and current reports, proxy statements, and other documents with the SEC, under the Securities Exchange Act of 1934, as amended.  The function of each of the Debtors can be categorized as follows:

---

[4] Genco's common stock previously traded on the Nasdaq until it was transferred to the NYSE.

a. <u>Parent and Operating Entity</u>:  Genco is the ultimate parent of each of the Debtors. Genco is a registered SEC filing entity and is the borrower under the  Credit Facilities and the issuer of the Convertible Notes. Genco has nineteen (19) employees involved in the   strategic and administrative management of certain Vessels.   Genco is the counterparty to a management contract with Baltic Trading.  The Debtors' operations and finances are managed by Genco.  Genco is a corporation organized under the laws of the Marshall Islands and is a foreign business corporation registered to do business in New York.

b. <u>Operating Subsidiary</u>: Genco Ship Management LLC ("**GSM**"), a Delaware wholly-owned subsidiary of Genco, has fourteen (14) employees involved in the commercial and technical  management of certain Vessels and they also oversee certain operations and finances.

c. <u>Vessel-Owning Subsidiaries</u>:    Each Vessel is owned by a separate Marshall   Islands   wholly-owned   subsidiary   ("**Vessel-Owning Subsidiary**") of Genco.  In total, there are fifty-three (53) Debtor entities that own Vessels.  Attached as **Exhibit B** is a list of each vessel-owning Debtor and the Vessel owned by that Debtor.  Each Vessel serves as first lien collateral for one of the three Credit Facilities (defined below) with certain Vessels also securing the 2007 Credit Facility on a second lien basis (as discussed in further detail below in the section entitled "Capital Structure").[5]

d. <u>Management Subsidiary</u>:  Genco Management (USA) LLC ("**GMU**"), a wholly-owned subsidiary of GSM formed in Delaware, is party to an agency agreement with Maritime Equity Partners LLC ("**MEP**")[6] pursuant to which Genco provides MEP with oversight of technical management services for vessels owned by MEP.   These services include crew management, drydocking, and ship operation.  GMU collects management fees under the third-party management or agency agreements with each of MEP and Baltic Trading.  Certain shared management costs relating to vessels managed by the Debtors under these agreements are allocated to MEP and Baltic Trading under their respective contracts.

e. <u>Investment Subsidiary</u>: Genco Investments LLC ("**Genco Investments**") is a Marshall Islands wholly-owned subsidiary of Genco that holds an investment in the capital stock of Jinhui Shipping and Transportation Limited ("**Jinhui**"), a drybulk shipping owner and operator focusing on the Supramax (defined below) segment.  Genco Investments also owns all

---

[5] In addition to owning a Vessel, Debtor Genco Success holds 3,335 shares of Korea Lines Corporation as of February 28, 2014.  Similarly, Debtor Genco Cavalier owns a small number of shares of Samsun Logix Corporation.

[6] Peter C. Georgiopoulos, Genco's Chairman, controls and holds a minority interest in MEP. The agency agreement between Genco and MEP was previously approved by an independent committee of Genco's Board of Directors.

of the Class B Stock of Baltic Trading, which has fifteen votes per share compared to one vote per share for Baltic Trading's common stock.  As a result, Genco Investments holds 11.05% of the total number of shares and 65.08% of the aggregate voting power of Baltic Trading's outstanding capital stock.  Under generally accepted accounting principles ("**GAAP**"), Baltic Trading's financial information is included with Genco's for purposes of Genco's public reporting, although Baltic Trading files its own public reports and filings.

f.   <u>Real Estate Subsidiary</u>:  Genco RE Investments LLC ("**Genco RE**") is a Marshall Islands wholly-owned subsidiary of Genco.  Under Genco's various corporate headquarters' leases, certain security was provided to the landlord in the form of a letter of credit.  Genco RE secured the reimbursement claim of the issuing bank (DnB) under this letter of credit.

g.   <u>Publicly Traded Non-Debtor Subsidiaries</u>:  Baltic Trading and its wholly-owned subsidiaries have been subsidiaries of Genco since their formation with operations and financing independent from Genco.[7]  As discussed above, Genco Investments holds capital stock giving it a controlling interest in Baltic Trading.  Baltic Trading operates a fleet of thirteen (13) drybulk vessels with an additional four (4) vessels scheduled to be delivered by 2015.  Genco is party to a management agreement with Baltic Trading where Genco provides commercial, technical, administrative and strategic services to Baltic Trading, either through GMU or third-party subcontractors.  The management fees associated with this management agreement are collected by GMU.

## B.  **The Debtors' Vessels**

14.     The Debtors own and operate one of the largest fleets engaged in the drybulk carrier industry worldwide.  As of the Petition Date, the fleet consisted of fifty-three (53) wholly-owned Vessels.  Each Vessel is owned by a separate entity.  The Debtors operate in over 1,000 ports of call located in over 110 countries, including in the Far East, China, Brazil, Australia, Europe, South and Central America, the United States, West Africa, the

---

[7] Baltic Trading was a wholly-owned subsidiary of Genco until Baltic Trading completed its initial public offering on March 15, 2010.  Neither Baltic Trading nor its subsidiaries are Debtors.  Peter C. Georgiopoulos, Genco's chairman, has served as chairman of the board of directors and as a director of Baltic Trading since March 2010.  Since 2010, I have served as President, Chief Financial Officer, Principal Accounting Officer, Secretary and Treasurer of Baltic Trading.  While I have an employment agreement with Genco, I am also party to an employment agreement with Baltic Trading which does not have an effective date of employment with Baltic Trading unless and if I am terminated by Genco following a "Change in Control" at Genco.

Mediterranean, the Caribbean, and the North Sea.[8]  Substantially all of the Debtors' tangible material assets consist of the Vessels, which are routinely located and operate outside of the United States.

15.    Drybulk cargo vessels are categorized partly by cargo-carrying capacity, by type of cargo carried, by weight, and/or by dimensions, often with reference to the various canals and canal locks that they can traverse.  For example, a "Panamax" vessel is constructed with a maximum width (*i.e.*, beam) of 32.2 meters, can traverse the Panama Canal and can carry between 65,000 and 100,000 deadweight ("**DWT**").[9]  "Major bulk" constitutes the vast majority of drybulk cargo by weight including iron ore, coal and grain.  "Minor bulk" includes agriculture products, minerals, cement, forest products and steel products.  The Debtors' fleet includes: (a) nine (9) Capesize vessels[10]; (b) eight (8) Panamax vessels[11]; (c) seventeen (17) Supramax vessels[12]; (d) six (6) Handymax vessels[13]; and (e) thirteen (13) Handysize vessels.[14]

16.    International maritime law provides that every country has the right to maintain a merchant fleet under its flag and requires that vessels engaged in commerce be registered under the laws of a state that is tasked with enforcing certain regulations in connection

---

[8] Although the Debtors' Vessels call on ports located in the United States, they are not permitted to provide cargo transportation services between two ports in the United States.  As such, voyages for the Debtors' vessels do **not** involve both a loading and unloading of cargo in ports in the United States, as the Debtors are not qualified to do so under provisions of 46 U.S.C. § 12103 and 46 U.S.C. § 50501 (together, the "**Jones Act**").  The Jones Act, among other things, governs the transport of goods or passengers *between* ports in the United States.

[9] Deadweight tonnage is a measure of the carrying capacity of a vessel.

[10] Capesize vessels carry over 100,000 DWT and focus on long-haul iron ore and coal trade routes.  Due to their large size, there are a small number of ports worldwide with infrastructure to accommodate these vessels.

[11] Panamax vessels carry coal, grain, and minor bulks including steel products.

[12] Supramax vessels carry between 50,000-65,000 DWT and are primarily used for iron ore, coal and minor bulks.

[13] Handymax vessels carry between 40,000-50,000 DWT and are primarily used for grains and minor bulks. Handymax vessels can operate in countries and ports with limited infrastructure because they use a crane loading system.

[14] Handysize vessels carry up to 40,000 DWT and are exclusively used for minor bulk cargoes mainly for regional trading and at small ports with limited infrastructure.

with the vessel.[15]  Therefore, each Vessel is registered in a specific country, which is referred to

as the "flag state" for that Vessel.  The Vessels are flagged in Hong Kong, the Marshall Islands

and Liberia.  Attached hereto as **Exhibit B** is a chart detailing each Vessel, the relevant Genco

Entity owner, its deadweight tonnage, its class, and its "flag" country.

### C.  The Debtors' Charters and Operations

17.    The Debtors generate substantially all of their revenues by employing their

Vessels on "fixed-rate time charters," "spot-market related time charters," or under pool

agreements with third-party pool managers.  The majority of the Vessels in the fleet are engaged

using one of these types of charters, which contracts presently expire prior to November 2015.

The charterers include Cargill International S.A., Pacific Basin Chartering Ltd., Swissmarine

Services S.A., Global Maritime Investments Ltd., D'Amico Dry Ltd., Pioneer Navigation Ltd.,

Thoresen Shipping Singapore Pte. Ltd.  The Debtors also participate in the following third-party

managed pools: LB/IVS Pool, in which Lauritzen Bulkers A/S acts as the pool manager, and

Clipper Logger Pool, in which Clipper Group acts as the pool manager.

18.    As of the Petition Date, the Debtors employed twelve (12) Vessels under

fixed-rate time charters.  A "fixed-rate" time charter is a contract under which a Genco entity, as

ship owner, charters (leases) a Vessel to a contract counterparty (the charterer) for a fixed period

of time, rather than for a specific voyage.  Vessels operating on time charters may be chartered

for several months or years.  Under fixed-rate time charters, the Debtors are generally paid a set

daily rate for the use of the Vessel and the charterer pays voyage expenses such as port, canal,

and fuel costs.  The owner of the fixed-rate time chartered Vessels remains responsible for the

operating expenses and capital costs of each Vessel.

---

[15] See, e.g., United Nations Convention on the Law of the Sea, Art. 94 (providing for the registration of vessels and
regulation of vessels by flag states).

19.     The Debtors employ thirty-six (36) Vessels under spot-market related time charters.  A "spot-market" related time charter is similar to a fixed-rate time charter with a set duration, *however*; the charter rates are not fixed and, instead, are based upon the Baltic Exchange Indices which fluctuate daily.

20.     Fixed-rate time charters provide the Debtors with stable revenues and spot-market related time charters provide the Debtors with fluctuating market-based revenues, both of which provide high fleet utilization.  The charterer typically determines the type and quantity of cargo to be transported and the ports of loading and discharging.   Given the unfavorable market conditions for the past several years, the Debtors have been focused on short-term or spot-market related charters with charterers to capitalize on future rate increases.  If market conditions improve, the Debtors may seek new fixed-rate time charters and may also seek to acquire additional vessels that will be accretive to cash flows.

21.     In addition to directly entering into fixed-rate charters or spot-market charters, the Debtors also participate in "pools" with other non-debtor, third-party vessel owners who have "pooled" together their vessels for chartering opportunities.   Pools provide cost-effective management for groups of similar vessels providing the benefits of large-scale operations to smaller fleets and increases fleet utilization.  Five (5) Vessels are currently subject to pooling agreements (the "**Pooling Agreements**") under which these Vessels are combined with similar vessels owned by other shipping companies into a single pooled fleet where the Vessels operate under time charter agreements.   Fuel and port expenses are shared by the pool and the operating costs are paid by the Vessel owner.   The Debtors have Pooling Agreements for the LB/IVS Pool[16] and the Clipper Logger Pool[17] and the members of these pools generally share

---

[16] Genco Reliance and Genco Explorer participate in the LB/IVS Pool.

in revenue generated by the group. The pools operate in the spot-market, so revenues fluctuate. The Debtors receive their share of net voyage revenue of the pool after accounting for expenses and pool manager fees calculated based on the relative trading values of the Vessels established under the Pooling Agreements.

### D.  The Debtors' Offices

22.    The Debtors' corporate headquarters are located in Manhattan, New York. The personnel in these headquarters are responsible for all major corporate, strategic and operating decisions by the Debtors, including arranging for charters of the Vessels and monitoring fleet operations, Vessel positions, and spot-market charter rates across the world. Most of the books, records, and original organizational documents for each of the Debtors are also located in New York.[18]

### E.  The Debtors' Employees and Technical Management

23.    The Debtors directly employ thirty-three (33) people (the "**Employees**"), all located in their New York corporate headquarters. The Employees manage the Debtors' financial, technical, commercial and administrative operations. Specifically, the Employees provide the Debtors with commercial and strategic management.[19] Of these Employees, Genco employs nineteen (19) and GSM employs fourteen (14). The Employees also provide services to Baltic Trading and MEP under management or agency agreements.[20] The Debtors also use the services of one non-employee independent contractor based out of China.

---

[17] Genco Sugar and Genco Pioneer participate and Genco Progress will participate in the Clipper Logger Pool.

[18] Various records may be located outside of the United States with third-party technical managers who, per agreements with the Debtors, provide day-to-day technical management for the Vessels.

[19] Commercial management includes the negotiation of and managing the types of charters and monitoring the performance of the Vessels. Strategic management includes the purchase and financing of the Vessels.

[20] Certain of the Employees perform internal audit services on behalf of General Maritime Corporation, an unaffiliated company for which Peter C. Georgiopoulos, Genco's chairman, also serves as Chairman of the board of directors and as a director. General Maritime was, itself, a chapter 11 debtor before this Court and emerged from

24.     The Debtors rely exclusively upon third-party technical managers to provide for the actual day-to-day operations of the Vessels, including their entire seaborne crew of approximately 1,200 crewmembers (the "**Crew**").  These agencies provide each crewmember with training, travel, and payroll and ensure that the Crew has the requisite licensing and qualifications to comply with applicable regulations.  These technical managers also conduct the day-to-day management of the Vessels, including routine maintenance and addressing operational issues, such as procuring supplies from vendors and contracting with other service providers to provide port agents, chemicals, electrical appliances, and other hardware.  The Employees monitor and oversee the activities of, and the expenses incurred by, the technical managers.  The Employees also directly oversee all drydocking activities for the Vessels – a critical part of maintaining and preserving Vessel values.  From time to time, the Employees also conduct business directly with other vendors to provide, amongst other things, fuel bunkers, lube oil and insurance.  These Employees have a unique skill set attractive to other drybulk shippers and a protracted bankruptcy process could result in Employees leaving the Company for other opportunities.  The Milestones agreed to by the Company to confirm and implement the Prepack Plan also allay the Company's attrition concerns.

---

Chapter 11 as a privately held company in May 2012.  Although Mr. Georgiopoulos serves as Chairman and a director of each company, General Maritime and Genco are not affiliates.

F. **Recent Financial Information**

25.    As of February 28, 2014, the Debtors[21] had consolidated assets totaling approximately $2.448 billion and consolidated liabilities totaling approximately $1.475 billion.[22]

## III.  **CAPITAL STRUCTURE**[23]

26.    Genco currently has approximately 44,449,407 shares of common stock outstanding.  As of the Petition Date, the substantial majority of the Debtors' liabilities—in excess of $1.4 billion—consisted of funded debt (*i.e.*, not trade debt or derivative liability) comprised of the following: (a) the 2007 Credit Facility (as defined below); (b) the $100 Million Credit Facility (defined below); (c) the $253 Million Credit Facility (defined below) (together with the 2007 Credit Facility and the $100 Million Credit Facility, the "**Credit Facilities**"); and (d) the $125 million 5% Convertible Notes due 2015 (the "**Convertible Notes**").  In addition, the Debtors are party to one interest rate swap agreement (the "**Interest Rate Swap**"), which guards against the risk of rising interest rates, which would increase interest expense on the 2007 Credit Facility.  Each Credit Facility and other funded liabilities are generally described below noting the collateral securing each facility (if any), the material terms, and the outstanding amounts. The amendments and waivers obtained by the Debtors to the Credit Facilities over the past five years are described in the section entitled "Events Leading to the Chapter 11 Cases."

---

[21] Under GAAP, the Debtors publically report certain financial information including Baltic Trading and its subsidiaries.  The financial information in this Declaration *excludes* Baltic Trading and its subsidiaries (which, as noted, are not Debtors).

[22] This reflects the "book value" of the Vessels, which is calculated as the cost of purchase less accumulated depreciation over a 25-year useful life prepared in accordance with GAAP.  However, "book value" is not indicative of market value.  Figures are presented as of February 28, 2014 and are preliminary and unaudited.

[23] Nothing herein constitutes a concession or acknowledgment of any amount owed or on the validity of any debt, claim or lien.  The descriptions of the collateral securing the underlying obligations are intended to provide brief summaries.  In the event of any inconsistencies between the summaries set forth herein and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

## A. **The 2007 Credit Facility**

27.     By far, this is the Debtors' largest credit facility, which has a first or second lien on substantially all of the Debtors' assets. Equitizing the entirety of this secured facility is the key driver and linchpin to the Restructuring Support Agreement and consensual de-leveraging of the Debtors' balance sheet. Absent consensual impairment of this claim, the allowed amount of this secured claim would need to be paid in full.

28.     By way of background, Genco, as parent and borrower, and thirty-five (35) Vessel-Owning Subsidiaries[24] and Genco Investments, as guarantors, entered into that certain credit agreement (entered on July 20, 2007 and as amended on September 21, 2007, February 13, 2008, June 18, 2008, January 26, 2009, December 21, 2011, and July 31, 2012, the "**2007 Credit Agreement**") with DnB Nor Bank ASA, New York Branch (now known as DNB Bank ASA, New York Branch, ("**DnB**") as Administrative Agent and Collateral Agent, Mandated Lead Arranger and Bookrunner and certain other lenders party thereto (collectively with Wilmington Trust (defined below), the "**2007 Facility Lenders**"). On January 17, 2014, DnB, Wilmington Trust, National Association ("**Wilmington Trust**"), Genco and a majority of lenders under the 2007 Credit Agreement executed a Successor Agent Agreement providing for Wilmington Trust to become the Successor Administrative Agent and Collateral Agent for the 2007 Credit Facility.

---

[24] The 35 Vessel-Owning Subsidiaries that guaranteed the 2007 Credit Facility ("**2007 Subsidiary Guarantors**") are: Genco Acheron Limited, Genco Augustus Limited, Genco Beauty Limited, Genco Carrier Limited, Genco Cavalier LLC, Genco Challenger Limited, Genco Charger Limited, Genco Champion Limited, Genco Claudius Limited, Genco Commodus Limited, Genco Constantine Limited, Genco Explorer Limited, Genco Hadrian Limited, Genco Hunter Limited, Genco Knight Limited, Genco Leader Limited, Genco London Limited, Genco Marine Limited, Genco Maximus Limited, Genco Muse Limited, Genco Pioneer Limited, Genco Predator Limited, Genco Progress Limited, Genco Prosperity Limited, Genco Raptor LLC, Genco Reliance Limited, Genco Success Limited, Genco Sugar Limited, Genco Surprise Limited, Genco Thunder LLC, Genco Tiberius Limited, Genco Titus Limited, Genco Vigour Limited, Genco Warrior Limited, Genco Wisdom Limited.

29.     The 2007 Credit Agreement provides for a $1.377 billion senior secured credit facility ("**2007 Credit Facility**") maturing on July 20, 2017.  The proceeds from the 2007 Credit Facility were used to (a) acquire nine (9) drybulk capesize vessels; (b) refinance the outstanding balance under the Debtors' prior financing agreements; and (c) for working capital.

30.     After repayments in 2011 and 2012, as of the date hereof, the maximum borrowing capacity under the 2007 Credit Facility is approximately $1.056 billion with the full amount being borrowed and outstanding.  Currently, the rate of interest on borrowings under the 2007 Credit Facility is the London Interbank Offered Rate ("**LIBOR**") plus the Applicable Margin (as that term is defined in the 2007 Credit Agreement), which is currently 3%.   In addition, the Company pays (a) an annual 1% facility fee on average daily outstanding principal payable quarterly in arrears and (b) a one-time facility fee is owed under the 2007 Credit Facility equal to 1.25% of the amount outstanding on July 31, 2012.

31.     The 2007 Credit Facility is secured on a first lien basis by a pledge (a) by Genco of its (x) operating accounts and (y) equity interests in each 2007 Subsidiary Guarantor's equity interests,[25] and (b) by each 2007 Subsidiary Guarantor of (x) its interest in its Vessel and (y) related collateral, among other things.   In connection with the July and August 2012 amendments to the Credit Facility Agreements (discussed in more detail below), the 2007 Credit Facility is also secured (a) on a first lien basis by the Class B stock of Baltic Trading Limited and (b) on a second lien basis by the vessels securing the CA Facility (as defined below) and the DB Facility (as defined below) and certain related collateral.  As of the Petition Date, approximately $1.056 billion[26] remains outstanding.

---

[25] In addition to the stock of the Subsidiary Guarantors, in September 2007, Genco amended the 2007 Credit Facility and  pledged the Jinhui stock and also guaranteed the 2007 Credit Facility.

[26] The outstanding amount reflects only the outstanding principal amount and does not include any other fees and/or claims.

### B.  The $100 Million Credit Facility

32.    On August 12, 2010, Genco, as parent and borrower, and five (5) Vessel-Owning Entities ("**CA Subsidiaries**"),[27] as guarantors, entered into that certain loan agreement (the "**$100 Million Term Loan Agreement**") with Crédit Agricole Corporate and Investment Bank, as agent and security trustee and certain other lenders party thereto (collectively, the "**$100 Million Credit Facility Lenders**").  The $100 Million Term Loan Agreement provides for a $100 million senior secured facility (the "**$100 Million Credit Facility**") and its proceeds were used to acquire five (5) Vessels.  The $100 Million Credit Facility was drawn down in five equal tranches of $20 million with one tranche per vessel.  The $100 Million Credit Facility has a final maturity date of August 17, 2017 and bears interest at LIBOR plus 3% per year.  Borrowings under the $100 Credit Million Facility are repaid quarterly.  The $100 Million Credit Facility is secured on a first lien basis by the five (5) Vessels purchased with the proceeds of the $100 Million Credit Facility and is also guaranteed by CA Subsidiaries.  As of the date hereof, approximately $73.6 million in principal amount remains outstanding plus accrued and unpaid interest, fees, costs and other expenses.

### C.  The $253 Million Credit Facility

33.    On August 20, 2010, Genco, as parent and borrower, and thirteen (13) Vessel-Owning Entities ("**DB Subsidiaries**"),[28] as guarantors, entered into that certain loan agreement (as amended by a first side letter dated August 24, 2010 and a waiver letter dated December 21, 2011 and as amended and restated by a second supplemental agreement dated

---

[27] The CA Subsidiaries that guaranteed the $100 Million Credit Facility are: Genco Avra Limited, Genco Bay Limited, Genco Mare Limited, Genco Ocean Limited, and Genco Spirit Limited.

[28] The DB Subsidiaries that guaranteed the $253 Million Credit Facility are: Genco Aquitaine Limited, Genco Ardennes Limited, Genco Auvergne Limited, Genco Bourgogne Limited, Genco Brittany Limited, Genco Languedoc Limited, Genco Loire Limited, Genco Lorraine Limited, Genco Normandy Limited, Genco Picardy Limited, Genco Provence Limited, Genco Pyrenees Limited, and Genco Rhone Limited.

August 1, 2012, the "**$253 Million Term Loan Agreement**") with (i) the banks and financial institutions party thereto, as lenders (collectively, the "**$253 Million Credit Facility Lenders**"); (ii) Deutsche Bank Luxembourg S.A., as agent; (iii) BNP Paribas, Crédit Agricole Corporate and Investment Bank, DVB Bank SE, Deutsche Bank AG Filiale Deutschlandgeschäft, Skandinaviska Enskilda Banken AB (publ) as Mandated Lead Arrangers; and (iv) BNP Paribas, Crédit Agricole Corporate and Investment Bank, DVB Bank, Deutsche Bank AG, Skandinaviska Enskilda Banken AB (publ) as swap providers and (v) Deutsche Bank AG Filiale Deutschlandgeschäft, as security agent and bookrunner (collectively, the "**$253 Million Credit Finance Parties**"). The $253 Million Term Loan Agreement provides for a $253 million senior secured credit facility (the "**$253 Million Credit Facility**") and its proceeds were used to acquire or refinance the acquisition costs of thirteen (13) Vessels. The $253 Million Credit Facility was drawn down in thirteen vessel tranches. The $253 Million Credit Facility has a final maturity date of August 14, 2015 and bears interest at LIBOR plus 3% per year. Borrowings under the $253 Million Credit Facility are repaid quarterly. The $253 Million Credit Facility is secured on a first lien basis by the thirteen (13) Vessels purchased or refinanced with the proceeds of the $253 Million Credit Facility and is also guaranteed by the DB Subsidiaries. As of the date hereof, approximately $175.7 million in principal amount remains outstanding plus accrued and unpaid interest, fees, costs and other expenses.

### D. The Convertible Notes

34.     Excluding ordinary course operational liabilities, Genco's largest unsecured claim relates to $125 million of Convertible Senior Notes ("**Convertible Notes**") issued by Genco under that certain Indenture (as supplemented from time to time, the "**Convertible Notes Indenture**") between Genco and the Bank of New York Mellon ("**BNYM**") as Trustee on July 27, 2010. The Convertible Notes accrue interest at a rate of 5%. The

19

Convertible Notes mature on August 15, 2015, with the interest on the Convertible Notes payable semi-annually on February 15 and August 15 of each year.  Holders of the Convertible Notes could convert their notes before February 15, 2015 under certain circumstances based upon the market price of Genco's common stock, the trading price of the Convertible Notes or the occurrence of specified events.  After February 15, 2015, the Convertible Notes may be converted at any time until the second scheduled trading day preceding maturity.

35.     The Convertible Notes are unsecured obligations of Genco only and are not guaranteed by any of the other Debtors.  The claims arising from the Convertible Notes rank equally in right of payment with only the other unsecured indebtedness at Genco.  As of the date hereof, the entire $125 million remains outstanding under the Convertible Notes plus interest that accrued but remains unpaid as of the Petition Date.

### E.  The Swap Agreement

36.     As of March 1, 2014, the Debtors have one interest rate swap agreement outstanding with DnB to manage interest rate costs and risk associated with changing interest rates related to the 2007 Credit Facility.  On September 5, 2005, Genco entered into that certain ISDA Master Agreement (the "**DnB ISDA**") with DnB as well as an interest rate swap on September 7, 2005 (the "**DnB Swap**").  The DnB Swap provides a hedge against the three-month LIBOR interest rate risk at a swap rate of 4.485% on a notional amount of $106.233 million, with an expiration date of July 29, 2015.

37.     Pursuant to the 2007 Credit Agreement and related security documents, claims arising in connection with the DnB Swap are secured by the collateral securing the loans under the 2007 Credit Facility; *however*, such security documents provide that the 2007 Facility

Lenders are entitled to receive payment in full from their collateral before any payments are made under the DnB Swap.[29]

## IV.  EVENTS LEADING TO THE COMMENCEMENT OF THE PREPACKAGED CHAPTER 11 CASES

### A.  The Debtors' Industry and Key Considerations From 2003-2009

38.    The shipping industry, an industry that has historically displayed significant volatility, – and in particular drybulk shipping – has suffered an extraordinary downturn during the past several years.  China's economic growth and urbanization starting in 2003 led to an extended period of substantial growth in demand for drybulk shipping vessels. An unprecedented infrastructure boom commenced in China at that time requiring large amounts of commodities, including iron ore and coal.  As resources available in China could not keep up with increased raw material needs, growing demand for the transportation of drybulk commodities far outweighed the number of vessels available to import commodities into the country.  Orders for the construction of new vessels were placed during this period, but the long lead time associated with their construction meant that they would not enter the market for a number of years.  Drybulk freight rates increased steadily since the middle of 2005 and peaked in the middle of 2008.

39.    Following this growth cycle came an extended period of distress, beginning in 2008, due to a record amount of newly constructed vessels - "newbuildings" - entering the market over the past five years.  Companies ordered vessels during the peak period, with the pending orders –"orderbook"–peaking at approximately 80% of the existing world fleet in 2008. Vessels started delivering after 2008 and have since created a situation of excess supply

---

[29] Nothing in this Declaration purports to characterize the relative rights and claims of the 2007 Facility Lenders and DnB with respect to the priority of payment and other distributions on account of claims to be made consistent with the credit agreement waterfall.

which continues to affect our business today. The Baltic Dry Index,[30] which measures the cost to move dry freight like coal and iron ore, has fallen to approximately 930 in April 2014 from close to 12,000 in mid-2008.  The decline in the industry directly impacted vessel values and earnings on charters that, in turn, impacted liquidity, cash flows and the Debtors' ability to comply with credit agreement covenants.

40.    The drybulk shipping industry has historically been cyclical – primarily due to its nature of following a variety of macroeconomic indicators – and is subject to significant volatility due to continuously evolving dynamics as they relate to the supply of vessels and demand for shipping services.  The combination of assets (vessels) with a long useful life[31] and the lengthy construction lead times (of up to 2-3 years) generally results in pronounced troughs and peaks in the industry, with cycles that could last for extended periods of time.

41.    Key influences affecting the demand for drybulk vessels include (a) the pace of world economic growth with a focus on infrastructure development and other raw material intensive industries, (b) international demand for energy resources and commodities, (c) location of global energy consumption and resources, and (d) weather.  Indicators that affect the supply side include the (a) number of vessels currently on the water, (b) number of newbuilding vessels due to deliver in the future and (c) rate of vessel disposals, known as "scrapping," as they reach the end of their useful life. The unpredictable nature of certain of these factors, including weather, seasonal demand for resources, and asymmetrical timing of vessel deliveries results in significant short term volatility.  Over a two year period, the Baltic Dry Index recorded a low of 661 and a high of 2,337 while it currently stands at 930.

---

[30] Baltic Exchange Limited, a London-based membership organization, publishes the daily Baltic Dry Index which is a daily average of charter rates for key drybulk routes.  This is a key indicator of the drybulk shipping market.

[31] A typical vessel may have a useful life of 25 years.

42.     Peak demand for drybulk vessels and their earnings in the middle to end of 2008 coincided not only with peak new vessel orders, but more importantly with the beginning of the global economic downturn.  Weak economic conditions affected the growth prospects for many regions of the world – including the Far East, where the Debtors operate a significant part of their business.  The immediate effects on demand were a lack of trade credit, increased commodity inventories, and a lack of time charter activity.  Tight credit markets not only impacted drybulk shippers' ability to obtain financing for vessels but also affected traders' ability to satisfy liquidity/working capital needs, thereby creating a ripple effect and eventual liquidity crunch across the freight supply chain.  These economic challenges also impacted charterers who, in turn, drive industry revenue.  A continuously growing fleet of vessels coupled with the above factors resulted in an imbalanced supply and demand environment detrimentally impacting the shipping industry.

43.     After the extreme lows of the end of 2008 following the financial crisis, a rebound in the industry began in 2009 driven by a substantial stimulus package in China and the return of trade credit after the global financial crisis.  Reacting to conditions at the time, the Chinese government implemented a series of stimulus packages including a $586 billion stimulus plan aimed at housing and transportation infrastructure and a $292 billion investment on the country's railways which inherently increases the demand for drybulk shipping.  As a measure of comparison, a more recent stimulus package contemplated a $24 billion investment to build railways in central and western regions.  The Baltic Dry Index increased to 4,291 in June 2009 and then declined to 2,163 in September 2009.  In 2009, Chinese iron ore imports increased by 41% compared to 2008 and coal imports rose by 395% in the same period.  This rebound and growth of commodity imports into China suggested, at the time, a recovery for the demand for

drybulk vessels. However, the improvement in the market also led to new vessels being delivered on the water.

44.    To weather some of the adverse factors affecting the industry, on January 26, 2009, Genco amended the 2007 Credit Facility to waive the collateral maintenance financial covenant for the year ending December 31, 2008 and until Genco could comply with all financial covenants and demonstrate an ability to pay a dividend or redeem common stock issued prior to 2009. From March 31, 2009 through March 31, 2012, the indebtedness under the 2007 Credit Facility was required to be reduced quarterly by $12,500,000, and beginning on June 30, 2012 through maturity, the indebtedness under the 2007 Credit Facility was required to be reduced quarterly by $48,195,000. In consideration of the requested waivers and amendments, Genco agreed to an increase in the Applicable Margin and paid each lender a commitment commission of 0.70% per annum of the daily average unutilized commitment of such lender.

### B.  2010 Vessel Acquisitions and 2011 Credit Facility Amendments

45.    With an improving economy and more positive global outlook occurring in 2010, the Debtors, like many of their competitors, sought to expand their fleet. On June 3, 2010, Genco entered into agreements with companies within the Metrostar Management Corporation ("**Metrostar**")[32] to purchase five (5) Handysize drybulk Vessels, including four (4) newbuildings (*i.e.* ships under construction) for an aggregate purchase price of $166.3 million ("**Metrostar Transaction**"). Thereafter, on June 24, 2010, Genco entered into a Master Agreement with Bourbon SA ("**Bourbon**") to purchase sixteen (16) drybulk vessels, including two newbuildings, for an aggregate purchase price of $545 million, with the Debtors acquiring thirteen (13) Vessels and three (3) vessels being resold to MEP at the same cost ("**Bourbon**

---

[32] Metrostar Management Corp. is one of the world's leading ship management companies and is based in Athens, Greece.

**Transaction**").[33]  By year-end 2010, the Debtors received all but four (4) Vessels, which were scheduled to be delivered in March and November 2011.

46.    To fund the Vessels being acquired under the Metrostar Transaction and the Bourbon Transaction, in July 2010, the Debtors closed on an equity offering of 3,593,750 shares of common stock at an offering price of $16 per share, which was done concurrently with the issuance of the Convertible Notes.  The Debtors also entered into the $100 Million Credit Facility and the $253 Million Credit Facility in August 2010 to provide further funding for these Vessel acquisitions.

47.    These Vessel acquisitions expanded the fleet by 31% on a deadweight tonnage basis, creating a young fleet with an average age of 6.5 years, well below the industry average of 15 years.  At that time, the Debtors believed that the new Vessel acquisitions would position the Debtors to take advantage of the long-term demand for dry bulk shipping.

48.    However, as the new Vessels were being delivered, the market conditions did not rebound as quickly as anticipated, with vessel supply growth continuing to outpace demand growth.  Late 2010 through 2011 saw a suppressed charter rate environment largely caused by increased new vessel construction and delivery coupled with severe weather-related disruptions at major exporting ports hampering drybulk cargo availability.  Consequently, vessel values started reducing significantly.  The overall Baltic Dry Index showed depressed rates led by deterioration in Capesize freight rates (which have historically been the most volatile class). The more versatile Supramax and Handysize vessels maintained more stable earnings; *however*, the Debtors' time charter equivalent ("**TCE**") daily revenue[34] decreased from $30,248 per vessel

---

[33] MEP paid for their own vessels.

[34] TCE rates are commonly used in the industry to measure performance by comparing daily earnings generated by vessels on time charters with daily earnings generated by vessels on voyage charters, because charterhire rates for vessels on voyage charters are generally not expressed in per-day amounts, while charterhire rates for vessels on

per day in the first quarter of 2010 to $17,005 per vessel per day for the fourth quarter of 2011. The phenomenon of slippage in vessel deliveries (which is an unpredictable delay of newbuilding vessel deliveries) developed post-financial crisis, thereby reducing visibility into the number of vessels that would be in the market in the long-term. This slippage resulted from a combination of factors, including lack of financing sources, defaults by shipyards and vessel owners, and renegotiation of existing contracts to extend vessel delivery dates. Some ship owners terminated contracts for vessels in their entirety either through renegotiation or termination of the contract with the ship builder.

49.     Additionally, Vessels acquired by the Debtors in 2007 and 2008 tended to be on fixed, long-term time charters with rates set at the high point of the market. At the time, approximately 70% of the Debtors' charters were fixed-rate and 30% were spot-market related time charters. Like their competitors, at that time, the Debtors entered into fixed-rate time charters at favorable rates. Starting in 2011, though, many of these fixed-rate time charters began expiring while the oversupplied market maintained downward pressure on charter rates.

50.     Recognizing the industry difficulties and liquidity constraints to meet debt service requirements, the Debtors entered into further amendments and waivers to their Credit Facilities on December 21, 2011. These amendments provided for the following, among other things: (a) compliance with the maximum leverage ratio covenant[35] was waived from October 21, 2011 through March 31, 2013; (b) compliance with the minimum consolidated interest ratio

---

time charters generally are expressed in such amounts. The Debtors define TCE rates as net voyage revenue (voyage revenues less voyage expenses) divided by the number of our available days during the period, which is consistent with industry standards. The Company historically reported its financials on a consolidated basis with Baltic Trading . For purposes of this Declaration, the numbers are for the Company on a standalone basis and therefore differ from those on the publicly reported financials.

[35] The maximum leverage covenant ratio is the Debtors' net debt to EBITDA (as defined in the agreements providing the Credit Facilities).

covenant[36] was also waived for the same time period; (c) addition of a gross interest-bearing debt to total capital covenant[37] of 62.5% applicable for the same time period; and (d) payment of an upfront fee of 0.25% of the amount of outstanding loans to each of the lenders under the Credit Facilities.  The Debtors prepaid $52.5 million under the 2007 Credit Facility, $3 million under the $100 Million Credit Facility, and $7 million under the $253 Million Credit Facility, and the prepayments were applied in inverse order of maturity.

51.     The commitment and flexibility from the Debtors' lenders in December 2011 allowed for the balance sheet to be strengthened – at least on an interim basis.  At the same time, the acquisitions completed in 2010 and 2011 allowed for increased scale and scope of the operations.  The Debtors believed that they were positioned to capitalize on anticipated long-term shipping demand in the Far East and developing countries.

## C.  Industry Instability in 2012 Led to 2012 Credit Facility Amendments

52.     In the first quarter of 2012, the Debtors continued to improve the balance sheet through a 7.5 million share, $53 million common stock offering to be used for general corporate purposes.  This offering satisfied a condition in the December 2011 amendments allowing for a reduction in the facility fee on the 2007 Credit Facility to 1% from 2%.  The applicable margin on the interest rate remained the same.  Reducing borrowing costs would also reduce ongoing interest expense.

53.     Despite this improvement, pressure on charter rates occurred due to the continuous delivery of newbuilding vessels – thereby deepening an oversupply of vessels industry-wide – at a time when demand grew at a slower pace.  Drybulk freight rates suffered in

---

[36] The minimum consolidated interest ratio is the Debtors' EBITDA to consolidated interest expense.

[37] The gross interest-bearing debt to total capital covenant is the ratio of the Debtors' interest-bearing indebtedness to the sum of its interest-bearing indebtedness and its consolidated net worth.

2012 even though use of seaborne transportation continued to grow. This led to a market view that oversupply of vessels was the main factor negatively affecting the industry. Throughout 2012, iron ore imports into China increased by 8.5%. Both China and India also experienced improved demand for coal, with India importing a record high of 157 million tons on an annualized basis. Despite this growth, the Debtors' TCE continued to decline in the third quarter of 2012 to $9,437 per vessel per day, down from $17,058 per vessel per day for third quarter 2011.

54.    In July and August 2012, faced with continued reduced drybulk charter rates, the Debtors negotiated further amendments and waivers with their lenders to obtain relief under their Credit Facilities. The August 1, 2012 amendments provided the following, among other things: (a) the waiver of the maximum leverage ratio and the minimum consolidated interest ratio was extended through December 31, 2013; (b) scheduled amortization payments through and including the quarter ending December 31, 2013 were deferred until maturity under the 2007 Credit Facility and were prepaid under the $100 Million Credit Facility and the $253 Million Credit Facility; and (c) the lenders under the Credit Facilities each received an upfront fee of 0.25% of the amount of outstanding loans. The Debtors also agreed to certain restrictions on indebtedness they could incur under the Credit Facilities and also agreed that maturity dates would remain the same. The Debtors prepaid $57.9 million under the 2007 Credit Facility applied to the final maturity payment, $11.538 million under the $100 Million Credit Facility and $30.45 million under the $253 Million Credit Facility applied in order of maturity. Therefore, the next scheduled amortization payments under the three Credit Facilities were to be made in the first quarter of 2014.

55.    Commencing September 30, 2012, under the August 2012 amendments, the Debtors were also required to repay the 2007 Credit Facility on a quarterly basis using excess cash over $100 million in the accounts pledged to the 2007 Credit Facility to be allocated 25% to the final maturity payment and 75% to each scheduled mandatory principal repayment beginning on March 31, 2014 by means of a cash sweep.  These payment obligations were required to continue until the later of December 31, 2013 or the date on which the appraised value of certain mortgaged vessels equals 100% of the aggregate obligations under the 2007 Credit Facility.  The Applicable Margin over LIBOR for the 2007 Credit Facility was increased to 3% and the minimum cash balance required was increased by $250,000 to $750,000 per Vessel mortgaged under the 2007 Credit Facility.  Genco also agreed to pay a $13.5 million fee to the 2007 Facility Lenders on the earlier of the maturity date and the date when the facility obligations are paid in full.[38]  As consideration for the required waivers and amendments, (a) Genco Investments pledged the Class B stock of Baltic Trading and Jinhui stock and (b) the Crédit Agricole and Deutsche Bank Vessel-Owning Subsidiaries granted a second lien on their Vessels to the 2007 Facility Lenders.

### D.  **2013's Events Set Stage for 2014's Financial Restructuring**

56.    The foregoing amendments and related actions were intended to allow the Debtors to continue operations despite turbulence in the shipping industry.  However, the Debtors experienced lower revenues in the first quarter of 2013 largely due to lower charter rates.  Revenues were $35.2 million compared to $54.2 million for the first quarter of 2012.  The operating loss for the first quarter of 2013 was $26.4 million as compared to $9.2 million for the first quarter of 2012.  Based on the weakness in the industry caused by vessel oversupply, the

---

[38] As a result, this fee is included in the indebtedness owing under the 2007 Credit Facility.

Debtors determined that it was probable that they would not be in compliance with the financial covenants by March 31, 2014. Therefore, in accordance with accounting principles, the Debtors reclassified the funded debt under the three Credit Facilities and swap liability as current liabilities. Consequently, as of March 31, 2013, the Debtors had current liabilities of $1.5 billion compared to $249.3 million as of March 31, 2012.

57.    The Baltic Dry Index during the first quarter of 2013 remained at relatively low levels. Nonetheless, the Debtors believed that the supply side pressures would improve in 2013 for the following reasons: (a) the vessel orderbook as a percentage of fleet had fallen to approximately 20%, which was the lowest level in eight years; (b) slippage of newbuilding deliveries continued at a substantial rate; and (c) the continued weakness in the freight market led to record vessel scrapping levels through 2012, a trend which continued into 2013. The Debtors believed these supply side developments along with strengthened demand could lead to a more balanced industry supply and demand.

58.    Lower charter rates continued to put downward pressure on the Debtors' revenues in the second quarter of 2013 with quarterly revenues being $16 million less than the same period for 2012. The TCE for the second quarter of 2013 was $7,505 per vessel per day compared to $11,435 per vessel per day for the second quarter of 2012. The Baltic Dry Index remained at similar levels as the first quarter of 2013, but as new vessel deliveries showed a pause and the expansion of iron ore exports out of Australia increased, the Baltic Dry Index reached a 2013 high of 1,171 – a level not seen since January 2012.

59.    Beginning in the second half of 2013, the drybulk shipping industry demonstrated positive indications that "supply and demand" could rebalance for the first time in several years. The industry as a whole had an optimistic outlook because of this realignment.

The third quarter of 2013 saw a strong increase in freight rates due to moderate supply growth and increased iron ore volumes and steel production.   Improvement in market-wide fleet utilization – coupled with continued deceleration of newbuilding deliveries to 41% lower than the same period in 2012 – allowed the drybulk shipping market to project improvement. Additionally, high quality shipyards had limited availability to construct new vessels, which effectively created a ceiling on fulfilling pending orders.

60.    Despite the positive sentiment in 2013, since the beginning of 2014, and leading up to today, the freight market continues to be impacted by volatility as a result of macroeconomic developments which are out of the Company's control. Among other factors, a slowdown in Chinese lending and the deceleration of China's money supply growth has resulted in wide spread concerns about the country's growth prospects.   These factors have resulted in a tightening of credit availability for Chinese commodity importers.   Currently, a significant amount of iron ore inventories are held by commodity traders at Chinese ports instead of being sold to end users.   Furthermore, an export ban of unprocessed raw materials imposed in Indonesia by its government has stalled exports limiting trade.   At the same time, orders for newbuilding vessels for future delivery increased by 50% in the first quarter of 2014 as compared to the same period last year leading to concerns of an oversupply situation continuing over the next five year period.   The effect of the uncertainty posed by these events has been evident on daily rates for Capesize vessels as quoted on Baltic Dry Index, which decreased by over two-thirds from a level of approximately $35,000 per vessel per day in January of this year to $10,266 on April 15, 2014.   Inherent industry volatility and uncertainty on continued growth of industry supply and demand could further depress charter rates.   This uncertainty highlighted the need for a permanent restructuring that would result in a sustainable debt burden.

31

61.    The Debtors believed that rather than continuing on a prior course of periodic amendments to the Credit Facilities, a comprehensive and consensual financial restructuring aimed at deleveraging the balance sheet and converting a significant portion of the 2007 Credit Facility into equity was necessary.  Among other factors, the Debtors needed to address significant upcoming debt payments that would affect operational liquidity.  Progress towards such a restructuring began in earnest after March 2013, when one of the Company's then-significant lenders sold approximately $200 million of its holdings in the 2007 Credit Facility.  By the second half of 2013, subsequent additional sales had resulted in substantially all of the 2007 Credit Facility having changed hands from the original lenders to new lenders, who (unlike the original lenders) were amenable to compromising their claims.  This shift in lenders permitted the Debtors to explore structures for negotiating a permanent restructuring of the Company, including through the potential equitization of all or a portion of the 2007 Credit Facility.  In early 2014, Wilmington Trust replaced DnB as the Administrative Agent and Collateral Agent under the 2007 Credit Facility.

62.    After the change in the composition of the 2007 Facility Lenders at the end of 2013, the Debtors hired Blackstone Advisory Partners L.P. to serve as their financial advisor to work with their long-time counsel, Kramer Levin Naftalis & Frankel LLP, to assess restructuring options, including a more extensive deleveraging of their balance sheet and preservation of cash.  The Debtors faced approximately $221 million in annual amortization payments starting in 2014 with $55.2 million in amortization payments coming due in the first quarter – which (if paid) would severely impair the Debtors' liquidity and ability to operate and result in a breach of certain financial covenants under the Credit Facilities.  In fact, the Debtors would have breached their minimum liquidity covenants under their Credit Facilities by the first

32

quarter of 2014 and the Debtors projected they would have completely used their cash balances by the second quarter of 2014. Simply hemorrhaging cash resources to pay accruing bills without securing a permanent debt reduction did not provide a meaningful solution. The Debtors concluded that they could not sustain the adverse impact upon their liquidity and ability to operate on a long-term basis under the status quo and without a more extensive financial restructuring.

### E. Negotiations with Secured Lenders and Convertible Noteholders

63.     Starting in January 2014, the Debtors engaged in extensive negotiations with their lenders under their three Credit Facilities, including with a steering committee of 2007 Facility Lenders, and started discussions with representatives for an ad hoc group of holders of the Convertible Notes. These discussions and negotiations focused on a consensual framework to significantly reduce the Debtors' $1.4 billion funded debt burden and restructure the balance sheet without affecting ongoing operations. Each of these creditor constituencies retained counsel and, in certain cases, financial advisors, and entered into non-disclosure agreements with the Debtors to facilitate discussions and negotiating a consensual restructuring.

64.     While continuing discussions on the framework of an overall consensual restructuring, Genco did not make a semi-annual interest payment of approximately $3.1 million under the Convertible Notes due on February 18, 2014. Notably, Genco had a 30-day grace period before the missed payment resulted in an event of default under the notes.[39] While significant progress was made during the grace period, there were material hurdles that needed to be overcome for the Debtors to reach an agreement with each of the lenders under the Credit

---

[39] Despite the grace period under the Senior Convertible Notes, the failure to make the interest payment could have constituted an event of default under the $100 Million Credit Facility. Therefore, the Debtors negotiated a waiver with the lenders under that credit facility to avoid an immediate default, which waiver would have expired on March 21, 2014. In consideration, the Debtors prepaid approximately $1.9 million of the principal amount due on March 31, 2014. The Debtors believe that the $100 Million Credit Facility is oversecured.

Facilities and representatives for the Convertible Noteholders.  Given the substantial progress made, the Debtors determined that it was prudent to pay the semi-annual interest to the Convertible Noteholders prior to the expiration of the grace period to obtain ten (10) additional days to finalize a consensual deal.  The next deadline was March 31, 2014 when the Debtors were required to make an amortization payment to the 2007 Facility Lenders in the amount of $48,195,000 and failure to do so would result in cross-defaults under the other secured facilities and the Convertible Notes Indenture.

65.    While negotiations progressed significantly, the Company required additional time to finalize a consensual deal.  Therefore, the Company simultaneously negotiated waivers and forbearance agreements with their Credit Facility lenders to avoid a free fall into chapter 11.  On March 31, 2014, prior to the deadline to make the $48 million amortization payment, the Debtors entered into thirty-six-hour forbearance or waiver agreements (as applicable) with the lenders under their Credit Facilities.  Immediately prior to their expiration on April 1 at 11:59 p.m., the Debtors and their lenders entered into another set of forbearance or waiver agreements (as applicable) that would expire on either April 4 at 11:59 p.m., or, if the parties entered into a restructuring support agreement supported by 66 2/3% of each creditor constituency party to such agreement, would be extended until April 21, 2014 at 11:59 p.m.  As discussed further below, the Debtors entered into the Restructuring Support Agreement on April 3, 2014 triggering the automatic extension of the forbearance or waivers under the Credit Facilities to April 21, 2014 – and, more importantly, establishing the basis for the Prepack Plan.

66.    Throughout these vigorous and extensive negotiations, the Company was focused on reaching a global settlement that would (i) convert a significant portion of the 2007 Credit Facility and Convertible Notes into new equity, (ii) amend the terms of the $100 Million

34

Credit Facility and $253 Million Credit Facility, (iii) minimize disruption to operations by leaving ordinary course of business claims unimpaired, (iv) provide a fully committed infusion of $100 million of new equity, and (v) provide an opportunity for existing equity interest holders to participate in a long-term recovery of the Debtors. The initial negotiations – while converting a substantial portion of the 2007 Credit Facility to equity – left sizable amount of secured debt on the balance sheet of the Reorganized Debtors through either a new exit facility or "take-back" debt in the amount of $360 million. The initial recovery proposed for the Convertible Notes was also far less than the ultimately agreed upon amount.

67.     Over the course of several weeks, the negotiations between the creditor constituencies evolved with (i) the recovery of the Convertible Noteholders improving and (ii) the 2007 Facility Lenders agreeing to convert the entirety of their claims into equity, thereby eliminating the requirement of a new exit facility or "take-back" debt, further enhancing the balance sheet restructuring. The effect of this change was to eliminate nearly $1.2 billion of secured and unsecured obligations.

68.     As negotiations progressed, the parties focused on obtaining sufficient support to propose a "prepackaged" chapter 11 plan that would minimize the time required in bankruptcy and mitigate the potential adverse effects of "bankruptcy" on the Company's global operations (as more fully noted below). At the Company's request, the 2007 Facility Lenders and ad hoc group of Convertible Noteholders agreed to voluntarily forego portions of their distributions so that the Debtors, in turn, could provide warrants to the current equity holders in exchange for the surrender or cancellation of their equity interests. This voluntary distribution permits current equity holders to participate in the restructuring at a level where all debt was paid in full.

69.    The Prepack Plan provides for a significant recovery for the Convertible Noteholders, General Unsecured Creditors and current equity holders, which the Company did not believe was likely in an asset sale scenario.  Therefore, the Company believed that entry into the Restructuring Support Agreement and pursuing confirmation of the Prepack Plan was in the best interest of all stakeholders and was a sound exercise of its business judgment.

### F.  The Restructuring Support Agreement[40]

70.    On April 3, 2014, after weeks of intensive negotiations, the Company, certain lenders under its Credit Facilities and certain Convertible Noteholders (the "**Supporting Creditors**") entered into the Restructuring Support Agreement.   As mentioned above, the effectiveness of the Restructuring Support Agreement prior to April 4, 2014 triggered an automatic extension of the forbearance and waivers provided under the Credit Facilities to April 21, 2014.

71.    The Restructuring Support Agreement bound the Supporting Creditors to support a restructuring that would substantially reduce the Company's debt burden, enhance its liquidity, and solidify the Company's long-term growth and operating performance. Specifically, the parties agreed to support the Prepack Plan that embodied the terms set forth in a term sheet annexed to the Restructuring Support Agreement.   These terms provided for the following:

- A $100 million rights offering for 8.7% of the pro forma equity in the reorganized Genco (subject to dilution), 80% of which will be backstopped by certain 2007 Facility Lenders, and 20% of which will be backstopped by certain Convertible Noteholders.

- Conversion of 100% of the debt outstanding under the 2007 Credit Facility into 81.1% of the New Genco Common Stock (subject to dilution).

---

[40] Capitalized terms used in this section but not defined herein have the meaning ascribed to them in the Prepack Plan.

- At the Company's option, replacement of the $253 Million Credit Facility and the $100 Million Credit Facility with new senior secured credit facilities, or amending the $253 Million Credit Facility and the $100 Million Credit Facility to provide for extended maturity dates through August 2019 and certain other modifications.

- Payment of any Claim pursuant to the Company's outstanding interest rate hedging agreement in full in Cash.

- Conversion of 100% of the Convertible Note Claims into 8.4% of the New Genco Common Stock (subject to dilution).

- Unimpairment of all other General Unsecured Claims under section 1124 of the Bankruptcy Code.[41]

- Equity Interests in Genco will be cancelled as of the Effective Date and holders of such Equity Interests in Genco will receive no distribution other than the New Genco Equity Warrants, which are being provided to holders of Equity Interests in exchange for the surrender or cancellation of their Equity Interests in Genco. This value is being provided to holders of Equity Interests solely from amounts that would otherwise be distributable to the Prepetition 2007 Facility Lenders and the Convertible Noteholders. The New Genco Equity Warrants will be warrants to purchase 6% of New Genco Common Stock (subject to dilution) exercisable for a period of 7 years from the Effective Date at a cash-less strike price of $20.99 at a total implied equity value of $1,295 million.

- Establishment of a Management Incentive Program that provides officers, directors and other management with 1.8% equity of the New Genco Common Stock (subject to dilution) and three tiers of warrants with staggered strike prices based on increasing equity values.

- The lenders under the Credit Facilities also agreed, on certain specified terms, to the Debtors' consensual use of cash collateral to provide the Debtors with adequate liquidity through confirmation of the Prepack Plan.

72.    Under the Restructuring Support Agreement, the Company is obligated to comply with the following Milestones:

- The solicitation of votes on the Prepack Plan from the lenders under the Prepetition Credit Facilities and the holders of Convertible Notes must begin on or before *April 16, 2014* ("**Solicitation Commencement Date**");

---

[41] The Company is in the process of finalizing its Schedules and Statements of Financial Affairs and intends to file them on or about April 28, 2014 which will include a listing of the Company's unsecured claims that will be left unimpaired to the extent of their Allowed amount (as defined in the Prepack Plan).

- Voluntary petition(s) and motions seeking approval of the Prepack Plan, the Disclosure Statement, and the solicitation procedures must be filed in the Court (the date such petitions are filed, the "**Petition Date**") must be filed on or before the *fifth calendar day after the Solicitation Commencement Date*;

- The Debtors' interim use of cash collateral and the Debtors' assumption of the Restructuring Support Agreement must be approved by the Bankruptcy Court on or before the *fifth business day after the Petition Date*;

- The Disclosure Statement, the solicitation procedures, the Prepack Plan, and final use of cash collateral must be approved by the Bankruptcy Court (such date, the "Confirmation Date") on or before the *forty-fifth day after the Petition Date*; and

- The Prepack Plan must be consummated on or before the later of (i) 10 days following the Confirmation Date, (ii) completion of the Rights Offering, or (iii) notice from the respective lenders that the conditions to the closing of the Amended and Restated $253 Million Facility and Amended and Restated $100 Million Facility have been satisfied or waived.

73.    Notably, in addition to other customary termination rights, the Company's board of directors may terminate the Restructuring Support Agreement upon a good faith determination that pursuing the contemplated restructuring is inconsistent with the applicable fiduciary duties – otherwise known as a "fiduciary out."  The board of directors can also terminate the Restructuring Support Agreement if it receives an *unsolicited* proposal for Alternative Transaction (as that term is defined in the Restructuring Support Agreement), such that the continued performance by the Company under the Restructuring Support Agreement would be inconsistent with the applicable fiduciary duties.  Importantly, although the Company cannot actively solicit alternative proposals, it may receive proposals or offers from third parties and negotiate, provide due diligence, discuss and/or analyze such Alternative Transactions without breaching or terminating the Restructuring Support Agreement.  If the Company consummates an alternative transaction, then the Prepetition 2007 Facility Lenders and holders of Convertible Notes that are parties to the Restructuring Support Agreement would share a termination fee of $26.5 million.

74.     After extensive negotiations, the Company exercised sound business judgment when entering into the Restructuring Support Agreement.  Given the disruption and dislocation the restructuring has caused, the Company sought a consensual process with its main creditor constituencies and provided for favorable treatment for all of its creditors and equity holders.  The provision of a termination fee in exchange for the fiduciary out and the expedited timetable which is key to maintaining and stabilizing operations and customer relationships, all also support the Debtors' reasonable business decision.  Additionally, the $100 million fully-backstopped rights offering provides the Company with the liquidity cushion it needs to weather the rate fluctuations inherent in the drybulk shipping industry.

75.     On April 16, 2014, the Company commenced the solicitation process for the Prepack Plan.  As of the Petition Date, the Allowed Claims in impaired Classes 3, 4, and 5 comprising the three Credit Facilities have voted to accept the Prepack Plan.  The Company is continuing to solicit acceptance or rejection from the holders of Convertible Notes in Class 8, although at least 82% of the holder of such impaired claims are Supporting Noteholders under the Restructuring Support Agreement.  The solicitation of votes in Class 8 will continue postpetition.

**G.   Need for Expeditious Chapter 11 Cases to Avoid Any Adverse Impact Upon Operations**

76.     Prompt emergence from chapter 11 is in the best interests of the Debtors and all of their stakeholders.  A prolonged stay in chapter 11 directly threatens the continuing operations of the Company's international business.   The Company's operations are overwhelmingly outside the United States, as are a majority of its customers, vendors and suppliers.  Its Vessels sail throughout the world and are directly impacted by the international community's perception of "bankruptcy."   While Chapter 11 may be accepted in the United

39

States as a customary means of restructuring a company's balance sheet or operations, bankruptcy is not widely accepted as "business as usual" in many other countries where the Company regularly operates.

77.    The Company believes negative perceptions caused by (i) the uncertainty of the Company's financial restructuring process and (ii) speculation about a bankruptcy filing have already impacted its business operations.   In the last month, one of the Company's Vessels was arrested in South Africa, as a result of a charter dispute.  Arresting a vessel due to a charter dispute is a highly unusual action.  As part of the arrest, the Vessel was not permitted to port, forcing it into "off-hire" with our charter party, reducing revenues and subjecting the Company to potential damage claims for failure to timely load the ship.   Arranging release of the Vessel, moreover, diverted substantial resources from other pressing management tasks.

78.    Also potentially disruptive to the Company's operations, a few sub-charterers and other customers of some of our charterers have recently expressed concerns regarding the use of the Company's Vessels given the perceived negative consequences of a bankruptcy filing (e.g. the fear of additional arrests or operational disruptions which may interfere with timely delivery of their cargo).  If customers decline to use the Company's Vessels, the Company will lose new charters to other shippers – negatively impacting revenues. There is oversupply of ships on the market (approximately 10,000 drybulk vessels controlled by competitors) and charterers and customers have a choice in shippers that they use.   If not promptly resolved, continued negative perceptions about the Company's financial condition and ability to perform under charters threaten to drive their current charterers and the charterer's customers to competitors on an interim – if not permanent – basis.   In fact, the near-term expiration of about eighteen of the Company's charters or the customer's choice to use an

alternative transportation source all could negatively impact the Company's viability.  To avoid this potential loss of customers, among other reasons, the Company strongly believes that the short stay in chapter 11 contemplated by the Prepack Plan and the current Milestones are essential to preserving the Debtors' operations.

79.     Based upon the entry into the Restructuring Support Agreement and the acceptance of the Prepack Plan by the lenders under the Credit Facilities, the Debtors intend to emerge from Chapter 11 expeditiously with a right-sized balance sheet which will allow for go-forward competitive business operations.  Certain of the creditors are accepting significant impairment as part of a global settlement of these Chapter 11 Cases paving the path for the significant deleveraging of the balance sheet and conversion of nearly $1.2 billion of debt to new equity – coupled with a $100 million fully committed rights offering – allows for a restructuring that is in the best interests of the Debtors and their constituencies.

## V.  FIRST DAY MOTIONS

80.     To minimize the adverse effects of the Chapter 11 Cases on their businesses and on the reorganization process, the Debtors have requested various types of relief in the First Day Motions, which have been filed concurrently with this declaration.  I believe that the success of these Chapter 11 Cases hinges on the Debtors obtaining approval of the First Day Motions and Applications.  I have reviewed the factual background in support of each First Day Motion and Application and certify that the facts contained therein are true and correct to the best of my information, knowledge, and belief.

81.     The First Day Motions allow the Debtors to perform those obligations necessary to fulfill their duties as debtors in possession.  In addition, the relief sought in each First Day Motion:  (a) enables the Debtors to operate in chapter 11 with minimal disruption to their international operations, loss of vessel productivity, and/or loss of value of their material

assets (which, by nature of the Debtors' shipping business, are mobile, and continually operate in various ports located throughout the world); (b) constitutes a critical element in preserving ongoing value necessary to achieve a successful reorganization of the Debtors; and (c) is in the best interests of the Debtors' estates and creditors.  I believe that the relief requested in the First Day Motions is necessary and appropriate and in the best interest of the Debtors' estates, creditors, and other parties-in-interest.

## VI.  <u>LOCAL BANKRUPTCY RULE 1007-2 SCHEDULES</u>

82.     Attached hereto and incorporated herein by this reference are various schedules setting forth information required pursuant to Local Bankruptcy Rule 1007-2(a)(3)-(12) and (b)(1)-(3).  The information requested in Local Rule 1007-2(a)(1) is set forth in Section I through III above.  The capitalized terms used in the attached schedules that are not otherwise defined therein shall have the meanings ascribed to them in preceding paragraphs of this Declaration.

*     *     *

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.  Executed on this 21st day of April, 2014 at New York, New York.

By: /s/ John C. Wobensmith
    John C. Wobensmith
    Chief Financial Officer and Manager (as applicable)

**Schedule A-1** [1]

List of Committees Formed Prior to the Petition Date

To the best of the Company's knowledge and pursuant to Local Rule 1007-2(a)(3), the following financial institutions formed the following ad hoc committee(s) prior to the Petition Date:

| Type of Committee | Names of Committee Members | Date of Formation | Counsel for Committee |
|---|---|---|---|
| Steering Committee of 2007 Facility Lenders | Wilmington Trust, National Association, (administrative and collateral agent)<br><br>Apollo Capital Management, LP<br><br>CCP Credit Acquisition Holdings, LLC<br><br>Midtown Acquisitions, LP<br><br>Panning Capital Management, LP<br><br>Solus Alternative Asset Management, LP | January 7, 2014 | Milbank, Tweed, Hadley & McCloy, LLP<br>1 Chase Manhattan Plaza<br>New York, NY 10005<br>Attn: Dennis F. Dunne, Esq.<br>Samuel Khalil, Esq. |

---

[1] Capitalized terms used but not defined in these schedules shall have the same meanings ascribed to them in the Declaration of John C. Wobensmith Pursuant to Local Bankruptcy Rule 1007-2 and in Support of First Day Motions and Applications.

| Type of Committee | Names of Committee Members | Date of Formation | Counsel for Committee |
|---|---|---|---|
| Informal Group of 5.00% Convertible Senior Notes due August 15, 2015 | The Bank of New York Mellon (trustee)<br><br>Advantage Capital Management<br><br>Fidelity Investments<br><br>Kayne Anderson Capital Advisors, L.P.<br><br>Phoenix Investment Adviser LLC<br><br>Wilfrid Advisors AG | November 18, 2013 | Akin Gump Strauss Hauer & Feld, LLP<br>One Bryant Park<br>Bank of America Tower<br>New York, NY 10036-6745<br>Attn: Michael S. Stamer, Esq.<br><br>1700 Pacific Avenue, Suite 4100<br>Dallas, TX 75201-4624<br>Attn: Sarah Link Schultz, Esq. |

**Schedule A-2**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| GENCO SHIPPING & TRADING LIMITED, <u>et al.</u>, | : | Case No. _____ |
| | : | |
| | : | |
| Debtors. | : | Joint Administration Pending |

-----------------------------------------------------------------x

## CONSOLIDATED LIST OF CREDITORS
## HOLDING 40 LARGEST UNSECURED CLAIMS[1]

Contemporaneously with the filing of the petitions, the Company filed a motion requesting, among other things, authority to file a consolidated list of the 40 largest unsecured creditors (the "**Top 40 List**") in lieu of separate lists of each entity's 20 largest unsecured creditors. Attached hereto is the Top 40 List which is based on the Company's books and records as of approximately April 21, 2014, unless indicated otherwise. The Top 40 List was prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in the Chapter 11 Cases. The Top 40 List does not include: (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101(31); or (2) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 40 largest unsecured claims.

Following is the list of the Company's creditors holding the forty (40) largest unsecured claims. The list has been prepared on a consolidated basis for all entities, based upon the Company's consolidated books and records.

Except as set forth above, the list of creditors has been prepared in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure and Local Rule 1007-2(a)(4).

The information contained herein shall not constitute an admission of liability by, nor is it binding, on the Company. The Company reserves all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

---

[1] The Debtors are currently paying for certain professionals under its three secured credit facilities and the indenture for its convertible senior notes. Any claims held by these professionals are part of the claims associated with those facilities or indenture and are not included in this Top 40 List

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| *Name of creditor and complete mailing address, including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed, or subject to setoff[2]* | *Amount of claim (if secured also state value of security)* |
| The Bank of New York Mellon Corporate Finance Division 525 William Penn Place 38th Floor Pittsburgh, PA 15259 | The Bank of New York Mellon Corporate Finance Division 525 William Penn Place 38th Floor Pittsburgh, PA 15259 Attention: Corporate Trust Division — Corporate Finance Unit Facsimile: (412) 234-1209 | Bond Debt | | $125,000,000.00 (exclusive of interest) |
| Wallem Ship Management Limited 12/F Warwick House East Taikoo Place 979 King's Road Quarry Bay, Hong Kong | Wallem Ship Management Limited 12/F Warwick House East Taikoo Place 979 King's Road Quarry Bay, Hong Kong Phone: 852-2876-8200 Fax: 852-2876-1234 Email: wsmhk@wallem.com rms@wallem.com | Trade | | $7,766,104.13[3] |
| Chengxi Shipyard and Co Ltd. No 1 Hengshan Road Jiangyin Jiangsu, China | Chengxi Shipyard and Co Ltd. No 1 Hengshan Road Jiangyin Jiangsu, China | Trade | | $2,584,900.00 |
| Anglo Eastern Ship Management 23rd Floor 248 Queen's Road East Wanchai, Hong Kong | Anglo Eastern Ship Management 23rd Floor 248 Queen's Road East Wanchai, Hong Kong Phone: 852-2863-6111 Fax: 852-2861-2419 Email: Notices.hkg@angloeasterngroup.com | Trade | | $2,175,785.98[4] |

---

[2] All claims may be subject to offsets, discounts, reconciliations, credits, and adjustments, which are not reflected on this list.

[3] As of March 31, 2014.

[4] As of March 31, 2014.

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| *Name of creditor and complete mailing address, including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed, or subject to setoff[2]* | *Amount of claim (if secured also state value of security)* |
| V.Ships UK<br>1st Floor<br>63 Queen Victoria Street<br>London EC4N 4UA<br>United Kingdom | V.Ships UK<br>1st Floor<br>63 Queen Victoria Street<br>London EC4N 4UA<br>United Kingdom<br>Phone: 44-141-243-2435<br>Fax: 44-141-243-2436<br>Email: john.brechin@vships.com | Trade | | $1,394,381.19[5] |
| Leeds & Leeds Inc.<br>74 Trinity Place<br>New York, NY 10006 | Leeds & Leeds Inc.<br>74 Trinity Place<br>New York, NY 10006 | Insurance | | $455,375.42 |
| United Kingdom Mutual Steamship Assurance<br>90 Fenchurch Street<br>London EC3M 4ST<br>United Kingdom | United Kingdom Mutual Steamship Assurance<br>90 Fenchurch Street<br>London EC3M 4ST<br>United Kingdom | Insurance | | $99,378.13 |
| Skuld<br>Rådhusgaten 27, 0158<br>Oslo, Norway | Skuld<br>Rådhusgaten 27, 0158<br>Oslo, Norway | Insurance | | $78,468.00 |
| Gard As<br>PO Box 789 Stoa No-4809<br>Arendal, Norway | Gard As<br>PO Box 789 Stoa No-4809<br>Arendal, Norway | Insurance | | $58,196.83 |
| NYSE Market, Inc.<br>11 Wall Street<br>New York, NY 10005 | NYSE Market, Inc.<br>11 Wall Street<br>New York, NY 10005<br>Phone: 212-656-4944<br>Fax: 212-656-5549<br>Email: lcbilling@nyse.com<br>InvestorRelations@nyx.com | Regulatory | | $45,016.00 |
| Thomson Reuters (Markets) LLC<br>610 Opperman Drive<br>Eagan, MN 55123 | Thomson Reuters (Markets) LLC<br>610 Opperman Drive<br>Eagan, MN 55123<br>Attn: Alex Hunt<br>Alex.hunt@thomsonreuters.com | Trade | | $41,701.00 |

---

[5] As of March 31, 2014.

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| *Name of creditor and complete mailing address, including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed, or subject to setoff[2]* | *Amount of claim (if secured also state value of security)* |
| Winter Scott Solicitors<br>St Olave's House<br>Ironmonger Lane<br>London, EC2V 8EY | Winter Scott Solicitors<br>St Olave's House<br>Ironmonger Lane<br>London, EC2V 8EY<br>Attn: Glenn Winter<br>gwinter@winterscott.co.uk<br>Fax: +44 (0) 20 7726 2371 | Trade | | $39,381.52 |
| Hyundai Express Co., Ltd.<br>Sunhwa-dong, Jung-gu<br>Seoul, South Korea | Hyundae Express Co., Ltd.<br>Sunhwa-dong, Jung-gu<br>Seoul, South Korea<br>Phone: 82-2-753-0311 | Trade | Contingent | $28,861.95 |
| ICAP Shipping USA Inc.<br>850 Canal Street<br>Stamford, CT 06902 | ICAP Shipping USA Inc.<br>850 Canal Street<br>Stamford, CT 06902<br>Phone: 203-487-7000<br>Fax: 203-487-7070<br>Email: dry@us.icapshipping.com | Trade | Contingent | $25,096.88 |
| Rs Platou<br>Haakon Vll's Gate 10<br>PO Box 1604<br>Vika N-0119<br>Oslo, Norway | Rs Platou<br>Haakon Vll's Gate 10<br>PO Box 1604<br>Vika N-0119<br>Oslo, Norway | Trade | Contingent | $15,474.61 |
| Bancosta<br>26 Rue Adrien-Lachenal, 1207<br>Geneva, Switzerland | Bancosta<br>26 Rue Adrien-Lachenal, 1207<br>Geneva, Switzerland | Trade | Contingent | $15,385.54 |
| DNV GL AS<br>NO-1322<br>Hovik, Norway | DNV GL AS<br>NO-1322<br>Hovik, Norway<br>Phone: 47-87-57-99-00 | Trade | | $11,365.27 |
| BBT Tradeship LLC<br>2115 Linwood Avenue<br>Fort Lee, NJ 07024-5020 | BBT Tradeship LLC<br>2115 Linwood Avenue<br>Fort Lee, NJ 07024-5020 | Trade | Contingent | $10,471.15 |
| Peraco Chartering (USA) LLC<br>2187 Atlantic Street<br>Stamford, CT 06902 | Peraco Chartering (USA) LLC<br>2187 Atlantic Street<br>Stamford, CT 06902 | Trade | Contingent | $7,018.86 |

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| *Name of creditor and complete mailing address, including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed, or subject to setoff[2]* | *Amount of claim (if secured also state value of security)* |
| Wallem Shipbroking (HK) Ltd.<br>12/F Warwick House East Taikoo Place<br>979 King's Road<br>Quarry Bay, Hong Kong | Wallem Shipbroking (HK) Ltd.<br>12/F Warwick House East Taikoo Place<br>979 King's Road<br>Quarry Bay, Hong Kong<br>Phone: 852-2876-8800<br>Email: wcshk@wallem.com | Trade | Contingent | $6,448.84 |
| Clarkson<br>St. Magnus House<br>3 Lower Thames Street<br>London EC3R 6HE<br>United Kingdom | Clarkson<br>St. Magnus House<br>3 Lower Thames Street<br>London EC3R 6HE<br>United Kingdom<br>Phone: 44 (0) 20-7334-0000<br>Email: Accounts.drycargo@clarksons.com | Trade | Contingent | $4,413.98 |
| SSY London<br>1 Portsoken Street<br>London E1 8PH<br>United Kingdom | SSY London<br>1 Portsoken Street<br>London E1 8PH<br>United Kingdom<br>Phone: 44 (0)20-7977-7400<br>Fax: 44 (0)20-7488-2770<br>Email: admin@ssy.co.uk<br>commish@ssy.co.uk | Trade | Contingent | $3,359.90 |
| JF Dillon & Co, LLC<br>300 First Stamford Place<br>2nd Floor<br>Stamford, CT 06902 | JF Dillon & Co, LLC<br>300 First Stamford Place<br>2nd Floor<br>Stamford, CT 06902<br>Phone: 203-327-2900<br>Fax: 203-975-7722<br>Email: ops@jfd.com | Trade | Contingent | $711.09 |
| Venepandi<br>C.C.C.T. Ciudad Centro Comercial<br>Tamanaco, Piramide Invertida<br>Piso, 3, Oficina 311-A, Av.<br>Ernesto Blohm<br>Venezula | Venepandi<br>C.C.C.T. Ciudad Centro Comercial<br>Tamanaco, Piramide Invertida<br>Piso, 3, Oficina 311-A, Av.<br>Ernesto Blohm<br>Venezula | Trade | | $531.11 |
| Staples<br>500 Staples Dr.<br>Framingham, MA 01702 | Staples<br>500 Staples Dr.<br>Framingham, MA 01702<br>Phone: 1-800-767-1291<br>Fax: 1-801-779-7425 | Trade | | $437.48 |
| Penguin Maintenance<br>26 West Street<br>Brooklyn NY 11222 | Penguin Maintenance<br>26 West Street<br>Brooklyn NY 11222 | Trade | | $381.28 |

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| *Name of creditor and complete mailing address, including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed, or subject to setoff[2]* | *Amount of claim (if secured also state value of security)* |
| W.B. Mason Co. Inc<br>535 Secaucus Rd<br>Secaucus, NJ 07094 | W.B. Mason Co. Inc<br>535 Secaucus Rd<br>Secaucus, NJ 07094 | Trade | | $318.07 |
| Fedex<br>3875 Airways<br>Module H3 Dept 4634<br>Memphis TN 38116 | Fedex<br>3875 Airways<br>Module H3 Dept 4634<br>Memphis TN 38116 | Trade | | $239.99 |
| Arrow Ship<br>Trust Company Complex<br>Ajeltake Road<br>Majuro, Marshall Islands | Arrow Ship<br>Trust Company Complex<br>Ajeltake Road<br>Majuro, Marshall Islands | Trade | Contingent | $150.71 |
| VS Chartering Inc.<br>1319, Gwanghwamun Officia Building<br>163 Sinmunno 1 GA<br>Jongno-gu, South Korea | VS Chartering Inc.<br>1319, Gwanghwamun Officia Building<br>163 Sinmunno 1 GA<br>Jongno-gu, South Korea | Trade | Contingent | $129.49 |
| Western Bulk Carriers<br>Henrik Ibsensgt. 100<br>PO Box 2868<br>Solli, 0230 Oslo | Western Bulk Carriers<br>Henrik Ibsensgt. 100<br>PO Box 2868<br>Solli, 0230 Oslo | Customer Claim | Contingent | Contingent |
| Trafigura Beheer BV<br>20th Floor ITO Tower Gustav<br>Mahlerplein 102 1082<br>MA Amsterdam | Trafigura Beheer BV<br>20th Floor ITO Tower Gustav<br>Mahlerplein 102 1082<br>MA Amsterdam | Customer Claim | Contingent | Contingent |
| Pacific Basin Chartering Ltd<br>7/F Hutchinson House<br>10 Harcourt Road<br>Hong Kong | Pacific Basin Chartering Ltd<br>7/F Hutchinson House<br>10 Harcourt Road<br>Hong Kong<br>Phone: 852-2233-7000<br>Fax: 852-2865-2810<br>Email: imosaccounts@pacificbasin.com | Customer Claim | Contingent | Contingent |
| Pioneer Navigation Ltd<br>The Peek Building, George Street<br>Nassau, New Providence<br>Bahamas | Pioneer Navigation Ltd<br>The Peek Building, George Street<br>Nassau, New Providence<br>Bahamas | Customer Claim | Contingent | Contingent |

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| *Name of creditor and complete mailing address, including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed, or subject to setoff[2]* | *Amount of claim (if secured also state value of security)* |
| Lauritzen Bulkers A/S<br>28 Sankt Annae Plads<br>DK-1291<br>Copenhagen, Denmark | Lauritzen Bulkers A/S<br>28 Sankt Annae Plads<br>DK-1291<br>Copenhagen, Denmark | Customer Claim | Contingent | Contingent |
| Thoresen Shipping Singapore<br>78 Shenton Way<br>Singapore 079120 | Thoresen Shipping Singapore<br>78 Shenton Way<br>Singapore 079120 | Customer Claim | Contingent | Contingent |
| ED & F MAN SHIPPING<br>Cottons Centre, Hay's Lane<br>London SE1 2QE<br>United Kingdom | ED & F MAN SHIPPING<br>Cottons Centre, Hay's Lane<br>London SE1 2QE<br>United Kingdom<br>Phone: 44-020-7089-8482<br>Fax: 44-020-7089-8010<br>Email: shipops@manshipping.co.uk | Customer Claim | Contingent | Contingent |
| Hamburg Bulk Carriers<br>GMBH KG<br>Neumühlen 13, 22763<br>Hamburg, Germany | Hamburg Bulk Carriers<br>GMBH KG<br>Neumühlen 13, 22763<br>Hamburg, Germany<br>Phone: 49-40-800-982-0<br>Fax: 49-40-800-982-99<br>Email: ops@hbc-hamburg.com<br>    chartering@hbc-hamburg.com | Customer Claim | Contingent | Contingent |
| Cargill International SA<br>14 chemin de-Normandie<br>CH-1206<br>Geneva, Switzerland | Cargill International SA<br>14 chemin de-Normandie<br>CH-1206<br>Geneva, Switzerland<br>Phone: 41-22-703-2111<br>Fax: 41-22-703-2710 | Customer Claim | Contingent | Contingent |
| NYK Bulkship Europe Ltd.<br>1 Ropemaker, Ste<br>London  C2Y 9NY<br>United Kingdom | NYK Bulkship Europe Ltd.<br>1 Ropemaker, Ste<br>London  C2Y 9NY<br>United Kingdom | Customer Claim | Contingent | Contingent |

## **Schedule A-3**

Schedule Regarding Holders of the Five Largest Secured Claims

Pursuant to Local Rule 1007-2(a)(5), the following is a schedule of the holders of the five largest secured claims for the Company on a consolidated basis, prepared in accordance with the Company's books and records as of April 21, 2014.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Company.  The Company reserves all rights to assert that any debt or claim listed herein is a disputed claim or debt, or that a claim amount exceeds the value of the collateral securing such claim.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Name/Address of Secured Creditor | Approximate Claim Amount | Description of Collateral | Debtor |
|---|---|---|---|
| 2007 Credit Facility Wilmington Trust, National Association (administrative and collateral agent) 50 South Sixth Street Suite 1290 Minneapolis, MN 55402  Attn: Josh James | $1,055,911,525 (exclusive of interest) | First lien on Genco's operating account and certain of its subsidiaries' stock, limited liability company interests, partnership interests, and vessels  First lien on the Class B stock of Baltic Trading Limited and capital stock Jinhui Shipping and Transportation Limited held by Debtor Genco Investments  Second lien on vessels securing the $253 Million Credit Facility and the  $100 Million Credit Facility | Genco and 35 of its vessel-owning subsidiaries |
| $253 Million Credit Facility Deutsche Bank Luxembourg S.A. 2, Bvd Konrad Adenauer, L-1115, Luxembourg Attn: Franz-Josef Ewerhardy and Sven Walther | $175,718,000 (exclusive of interest) | First lien on the thirteen vessels purchased with the proceeds of the $253 Million Credit Facility | Genco and 13 of its vessel-owning subsidiaries |

| Name/Address of Secured Creditor | Approximate Claim Amount | Description of Collateral | Debtor |
|---|---|---|---|
| $100 Million Credit Facility Crédit Agricole Corporate and Investment Bank (Agent & Security Trustee) 9 quai du Président Paul Doumer, 92920 Paris, La Défense Cedex, France Attn: Shipping Department | $73,561,132 (exclusive of interest) | First lien on the five vessels purchased with the proceeds of the $100 Million Credit Facility | Genco and 5 of its vessel-owning subsidiaries |
| DnB Swap DnB Nor Bank ASA c/o DnB NOR Markets 200 Park Avenue New York, NY 10166-0396 Attn: Ahelia Singh | $6,696,809 | Same collateral as 2007 Credit Facility, subordinated in payment right to 2007 Credit Facility | Genco |
| Skandinaviska Enskilda Banken AB Shipping Finance, KA3 Kungstradgardsgatan 8 106 40 Stockholm Sweden Attn:  Arnell Juesll-Skielse Fax: 46 8 678 02 06 | $900,000 | $900,000 bank guarantee, held in escrow, for the release of Genco Auvergne from its arrest due to a disputed claim | Genco Auvergne |

## Schedule A-4

### Summary of the Company's Assets and Liabilities[1]

Pursuant to Local Rule 1007-2(a)(6), the following financial data is the latest available information and reflects the Company's financial condition, on a consolidated basis, as of February 28, 2014. All amounts are reported gross, without the eliminations or adjustments required for consolidated financial statements. The estimated assets and liabilities stated herein are estimated on a consolidated basis for Genco Shipping & Trading Limited and its 57-Debtor subsidiaries.

The following financial data shall not constitute an admission of liability by the Company. The Company reserves all rights to assert that any claim or debt listed herein as liquidated or fixed is in fact a disputed claim or debt. The Company reserves all rights to challenge the priority, nature, amount or status of any claim or debt.

|  |  |
|---|---|
| **Total Assets** | $2,448,000,000 |
| **Total Liabilities** | $1,475,000,000 |

---

[1] This reflects the "book value" of the Vessels, which is calculated as the cost of purchase less accumulated depreciation over a 25-year useful life prepared in accordance with GAAP. However, "book value" is not indicative of market value. Figures are presented as of February 28, 2014 and are preliminary and unaudited.

Even though the Company's financial statements are filed on a consolidated basis with non-Debtors Baltic Trading Limited and its subsidiaries, the total assets and liabilities set forth above exclude those amounts and only reflect the assets and liabilities of the Company.

## Schedule A-5

Schedule of Publicly Held Securities

Pursuant to Local Rule 1007-2(a)(7), the following is a schedule of the Company's shares of stock, debentures and other securities that are publicly held, and the approximate number of holders thereof.

| Issuance | Issue Amount | Maturity | Secured/ Unsecured | Number of Shares Outstanding | Approx. Number of Holders |
|---|---|---|---|---|---|
| Common Stock | N/A | N/A | N/A | 44,449,407[1] | 131[2] |
| 5.00% Convertible Senior Notes | $125,000,000 | August 15, 2015 | Unsecured | N/A | 195[3] |

The Debtor's Voting Securities

Pursuant to Local Rule 1007-2(a)(7), the following chart sets forth a list of the names of the Company's officers and directors who own shares of stock, debenture, or other securities of the Company, and the amounts so held, based on the Company's most recent Form 4 filings with the United States Securities and Exchange Commission:

| Name | Shares Beneficially Owned | Percent of Outstanding Stock |
|---|---|---|
| Peter C. Georgiopoulos[4] | 4,733,978 | 10.65% |
| John C. Wobensmith | 299,469 | 0.65% |
| Robert Gerald Buchanan | 119,078 | 0.27% |

---

[1] As of April 21, 2014.

[2] Based on the Company's most recent Form 10-K filed with the United States Securities and Exchange Commission for the fiscal year ended December 31, 2012.

[3] Known noteholders as of January 30, 2014.

[4] Includes stock owned through Fleet Acquisition LLC.

| Name | Shares Beneficially Owned | Percent of Outstanding Stock |
|---|---|---|
| Basil G. Mavroleon | 53,562 | 0.06% |
| Rear Admiral Robert C. North, USCG (ret.) | 55,362 | 0.12% |
| Harry A. Perrin | 52,162 | 0.12% |
| Mark F. Polzin | 55,362 | 0.12% |
| Alfred E. Smith, IV | 38,662 | 0.09% |
| Nathaniel Kramer | 53,562 | 0.12% |

## Schedule A-6

### List of Company's Property in the Possession of Third Parties

Pursuant to Local Rule 1007-2(a)(8), the following schedule lists property of the Company in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or any agent for any such entity.  The Company is working to confirm that no other such party is in possession of any of the Company's property and reserves the right to supplement this schedule if additional property is identified.  The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Company.  The Company reserves all rights to challenge the priority, nature, amount or status of any claim or debt.

To the best of the Company's knowledge, it does not have any property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or any agent for any such entity, other than, if any:

  i.   bank accounts that may be subject to control agreements or claims of setoff by certain of the Company's lenders under the 2007 Credit Agreement, the $253 Million Term Loan Agreement, and the $100 Million Term Loan Agreement;

  ii.  stock and membership interests of certain of Genco's direct and/or indirect subsidiaries pledged for the benefit of the 2007 Facility Lenders, the $253 Million Facility Lenders and the $100 Million Facility Lenders;

  iii. bank account of Genco RE Investments LLC held by DnB NOR Bank to secure a letter of credit for the Company's landlord in lieu of a security deposit;

  iv.  various other security deposits held by certain lessors, utility companies, regulatory agencies and others; and

  v.   property that may be owned by the Company that may be in the possession of third parties for purposes of storage, repair, and/or delivery in the ordinary course of business.[1]

---

[1] The arrangements described in this clause (v) do not affect the Company's ownership interest in such property. Further, in light of the movement of this property and size of the Company's business operations (including their Vessels which are subject to third-party charters with customers), providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property, would be impractical if not impossible

**Schedule A-7**

List of Premises Owned and Leased From Which the Company Operates

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following table lists the premises owned, leased, or held under other arrangement from which the Company operates its businesses:[1]

| Premises Location | Nature of Company's Property Interest | Use of Premises |
|---|---|---|
| 299 Park Avenue, 12th Floor New York, New York 10171 | Leased | Global Headquarters – Company's businesses are run out of this office space |

---

[1] The classification of the contractual arrangements pertaining to the premises listed herein shall not be binding upon the Company.

## **Schedule A-8**

Location of Company's Substantial Assets and Books and Records and
Nature, Location and Value of Assets Held Outside the United States

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Company's substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Company outside of the territorial limits of the United States.

**Location of the Company's Substantial Assets**:

The Company's substantial assets consist of the Vessels.  Generally, the Vessels are located in international waters or at ports between countries in international waters.  Due to the nature of the Company's businesses, Vessels may cross between U.S. territorial waters and international waters on a regular basis.

**Location of the Company's Books and Records**:

299 Park Avenue, 12th Floor
New York, New York 10171

Some of the Company's books and records are also stored at the offices of its technical managers (i) Wallem Ship Management Limited; (ii) Anglo-Eastern Group; and (iii) V.Ships UK Limited, and at the offices of:

Archive Systems, Inc.
2010 & 2067 Route 57
Washington, NJ  07882

**Nature, Location and Value of Assets Held Outside the United States**:

Please see the Location of the Company's substantial assets above.  Due to the nature of the Company's businesses, the value of the assets outside the United States is unknown as of the Petition Date.

**Schedule A-9**

**Schedule of Pending Litigation**

Pursuant to Local Rule 1007-2(a)(11), to the best of the Company's knowledge, belief and understanding, there are no actions or proceedings pending or threatened against the Company or its property, as of the Petition Date, where a judgment against the Company or a seizure of their property may be imminent.

## Schedule A-10

## Schedule of Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following table sets forth the names of the individuals who comprise the Company's existing senior management, their tenure with the Company, and a brief summary of their relevant responsibilities and experiences.

| NAME | TITLE | EXPERIENCE/RESPONSIBILITIES |
|------|-------|------------------------------|
| Robert Gerald Buchanan | President | Mr. Buchanan has served as President of the Company since June 2005. Mr. Buchanan has over 40 years of shipping experience, holding various senior operating, engineering and management positions since receiving his education at Glasgow Nautical College, where he obtained a First Class Engineers license for both steam and motor ships. |
| John C. Wobensmith | Chief Financial Officer, Secretary, Treasurer and Manager | Mr. Wobensmith has served as the Company's Chief Financial Officer since April 2005. He also serves as the Manager for certain Company entities and the Secretary and Treasurer for others. Mr. Wobensmith is responsible for overseeing the Company's accounting and financial matters. He has over 16 years of experience in shipping industry related work with American Marine Advisors, Inc. and The First National Bank of Maryland. Mr. Wobensmith has a B.A. in economics from St. Mary's College of Maryland and holds the Chartered Financial Analyst designation. |

**Schedule B-1**

**Estimated 30-Day Weekly Payroll**
**(Excluding Directors, Officers, Stockholders and Partners)**

Pursuant to Local Rule 1007-2(b)(1), the estimated consolidated amount of the weekly payroll to all of the Company's employees (exclusive of directors, officers, stockholders and partners) for the 30-day period following the Petition Date is approximately $306,000.[1]

---

[1] Because virtually all of the Company's employees hold stock, this number includes all wage estimates, but excludes senior management wages.

**Schedule B-2**

**Estimated 30-Day Weekly Payroll
for Directors, Officers and Stockholders**

Pursuant to Local Rule 1007-2(b)(2), the estimated consolidated amount of the weekly payroll to the Company's officers for the 30-day period following the Petition Date is approximately $82,000.[1]   In addition, the Company will not make any payroll-related payments to their directors or stockholders (in their capacity as stockholders) during the 30-day period following the Petition Date.

---

[1] Virtually all of the Company's employees are stockholders. This number therefore represents the estimated weekly payroll of the Company's senior management.  No directors receive a salary.

**Schedule B-3**

**Estimated 30-Day Fees for
the Company's Financial and Business Consultants**

Pursuant to Local Rule 1007-2(b)(2), the Company anticipates making payments to their financial and business consultants, for the 30-day period following the Petition Date, in accordance with their previously entered prepetition engagement agreements and any orders of this Court requested contemporaneously herewith, as follows:

| Name of Financial Advisor/Business Consultant | Estimated Fees for the 30-day period following the Petition Date |
|---|---|
| Blackstone Advisory Partners L.P. | $175,000 |
| Deloitte Financial Advisory Services LLP | $150,000 |

## Schedule B-4

### Schedule of 30-Day Estimated Cash Receipts and Disbursements, Net Cash Gain or Loss, and Accrued Obligations and Receivables (Excluding Professional Fees)

Pursuant to Local Rule 1007-2(b)(3), the following schedule provides, for the 30-day period following the Petition Date, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the Company on a consolidated basis:[1]

| Category | Estimated Amount for the 30-day period following the Petition Date |
|---|---|
| Cash Receipts[2] | $8,100,000 |
| Cash Disbursements | $25,800,000 |
| Net Cash Gain (Loss) | $(17,700,000) |
| Unpaid Obligations | $28,000,000 |
| Unpaid Receivables | $7,400,000 |

---

[1] Rounded to the nearest $100,000.  The information contained herein shall not constitute an admission of liability by, nor is it binding, on the Company.  All numbers listed herein are approximations and are subject to further reconciliation.

[2] Cash receipts from revenues are net of voyage expenses consistent with 13-week cash flow.

**EXHIBIT A TO THE FIRST DAY DECLARATION**

**CORPORATE ORGANIZATIONAL CHART**

**Genco Organizational Chart**



*All entities are incorporated in the Marshall Islands unless otherwise noted*

**EXHIBIT B TO THE FIRST DAY DECLARATION**

**LIST OF THE COMPANY'S VESSELS**

| Vessel Name | Deadweight Tonnage | Class | Year Built | Flag (Registration) | Owner/Lessee |
|---|---|---|---|---|---|
| Genco Augustus | 180,151 | Capesize | 2007 | Hong Kong | Genco Augustus Limited |
| Genco Tiberius | 175,874 | Capesize | 2007 | Hong Kong | Genco Tiberius Limited |
| Genco London | 177,833 | Capesize | 2007 | Hong Kong | Genco London Limited |
| Genco Titus | 177,729 | Capesize | 2007 | Hong Kong | Genco Titus Limited |
| Genco Constantine | 180,183 | Capesize | 2008 | Hong Kong | Genco Constantine Limited |
| Genco Hadrian | 169,025 | Capesize | 2008 | Marshall Islands | Genco Hadrian Limited |
| Genco Commodus | 169,098 | Capesize | 2009 | Marshall Islands | Genco Commodus Limited |
| Genco Maximus | 169,025 | Capesize | 2009 | Marshall Islands | Genco Maximus Limited |
| Genco Claudius | 169,001 | Capesize | 2010 | Marshall Islands | Genco Claudius Limited |
| Genco Beauty | 73,941 | Panamax | 1999 | Hong Kong | Genco Beauty Limited |
| Genco Knight | 73,941 | Panamax | 1999 | Hong Kong | Genco Knight Limited |
| Genco Leader | 73,941 | Panamax | 1999 | Hong Kong | Genco Leader Limited |
| Genco Vigour | 73,941 | Panamax | 1999 | Hong Kong | Genco Vigour Limited |
| Genco Acheron | 72,495 | Panamax | 1999 | Hong Kong | Genco Acheron Limited |
| Genco Surprise | 72,495 | Panamax | 1998 | Hong Kong | Genco Surprise Limited |
| Genco Raptor | 76,499 | Panamax | 2007 | Marshall Islands | Genco Raptor LLC |
| Genco Thunder | 76,588 | Panamax | 2007 | Marshall Islands | Genco Thunder LLC |
| Genco Predator | 55,407 | Supramax | 2005 | Marshall Islands | Genco Predator Limited |
| Genco Warrior | 55,435 | Supramax | 2005 | Marshall Islands | Genco Warrior Limited |
| Genco Hunter | 58,729 | Supramax | 2007 | Marshall Islands | Genco Hunter Limited |
| Genco Cavalier | 53,617 | Supramax | 2007 | Marshall Islands | Genco Cavalier LLC |
| Genco Lorraine | 53,417 | Supramax | 2009 | Marshall Islands | Genco Lorraine Limited |
| Genco Loire | 53,430 | Supramax | 2009 | Marshall Islands | Genco Loire Limited |
| Genco Aquitaine | 57,981 | Supramax | 2009 | Marshall Islands | Genco Aquitaine Limited |
| Genco Ardennes | 58,018 | Supramax | 2009 | Marshall Islands | Genco Ardennes Limited |
| Genco Auvergne | 58,020 | Supramax | 2009 | Marshall Islands | Genco Auvergne Limited |
| Genco Bourgogne | 58,018 | Supramax | 2010 | Marshall Islands | Genco Bourgogne Limited |
| Genco Brittany | 58,018 | Supramax | 2010 | Marshall Islands | Genco Brittany Limited |
| Genco Languedoc | 58,018 | Supramax | 2010 | Marshall Islands | Genco Languedoc Limited |
| Genco Normandy | 53,596 | Supramax | 2007 | Marshall Islands | Genco Normandy Limited |
| Genco Picardy | 55,257 | Supramax | 2005 | Marshall Islands | Genco Picardy Limited |
| Genco Provence | 55,317 | Supramax | 2004 | Marshall Islands | Genco Provence Limited |
| Genco Pyrenees | 58,018 | Supramax | 2010 | Marshall Islands | Genco Pyrenees Limited |
| Genco Rhone | 58,018 | Supramax | 2011 | Marshall Islands | Genco Rhone Limited |
| Genco Success | 47,186 | Handymax | 1997 | Hong Kong | Genco Success Limited |
| Genco Carrier | 47,180 | Handymax | 1998 | Hong Kong | Genco Carrier Limited |

| Vessel Name | Deadweight Tonnage | Class | Year Built | Flag (Registration) | Owner/Lessee |
|---|---|---|---|---|---|
| Genco Prosperity | 47,180 | Handymax | 1997 | Hong Kong | Genco Prosperity Limited |
| Genco Wisdom | 47,180 | Handymax | 1997 | Hong Kong | Genco Wisdom Limited |
| Genco Marine | 45,222 | Handymax | 1996 | Hong Kong | Genco Marine Limited |
| Genco Muse | 48,913 | Handymax | 2001 | Hong Kong | Genco Muse Limited |
| Genco Sugar | 29,952 | Handysize | 1998 | Hong Kong | Genco Sugar Limited |
| Genco Pioneer | 29,952 | Handysize | 1999 | Hong Kong | Genco Pioneer Limited |
| Genco Progress | 29,952 | Handysize | 1999 | Hong Kong | Genco Progress Limited |
| Genco Reliance | 29,952 | Handysize | 1999 | Hong Kong | Genco Reliance Limited |
| Genco Explorer | 29,952 | Handysize | 1999 | Hong Kong | Genco Explorer Limited |
| Genco Charger | 28,398 | Handysize | 2005 | Hong Kong | Genco Charger Limited |
| Genco Challenger | 28,428 | Handysize | 2003 | Hong Kong | Genco Challenger Limited |
| Genco Champion | 28,445 | Handysize | 2006 | Hong Kong | Genco Champion Limited |
| Genco Ocean | 34,409 | Handysize | 2010 | Liberia | Genco Ocean Limited |
| Genco Bay | 34,296 | Handysize | 2010 | Liberia | Genco Bay Limited |
| Genco Avra | 34,391 | Handysize | 2011 | Liberia | Genco Avra Limited |
| Genco Mare | 34,428 | Handysize | 2011 | Liberia | Genco Mare Limited |
| Genco Spirit | 34,432 | Handysize | 2011 | Liberia | Genco Spirit Limited |

## EXHIBIT C TO THE FIRST DAY DECLARATION

## RESTRUCTURING SUPPORT AGREEMENT

*Execution Version*
*Confidential*

## RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (the "<u>Agreement</u>") is entered into as of the Effective Date (as defined below) by and among (i) Genco Shipping & Trading Limited ("<u>Genco</u>") and certain of its subsidiaries listed on <u>Schedule 1</u> hereto (the "<u>Genco Subsidiaries</u>" and, together with Genco, the "<u>Company</u>"), (ii) the undersigned lenders under the 2007 Facility (as defined below) (the "<u>Supporting 2007 Facility Lenders</u>"), (iii) the undersigned lenders under the $253 Million Facility (as defined below) (the "<u>Supporting $253 Million Facility Lenders</u>"), (iv) the undersigned lenders under the $100 Million Facility (as defined below) (the "<u>Supporting $100 Million Facility Lenders</u>" and together with the Supporting 2007 Facility Lenders and the Supporting $253 Million Facility Lenders, the "<u>Supporting Lenders</u>"); and (v) the undersigned holders of, or investment manager for holders of, the Convertible Notes (as defined below) (the "<u>Supporting Noteholders</u>," and together with the Supporting Lenders, the "<u>Supporting Creditors</u>"). Each of the Company, the Supporting Creditors, and each other person that becomes a party to this Agreement in accordance with its terms shall be referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>."

## RECITALS

WHEREAS, the Company entered into that certain Credit Agreement, dated as of July 20, 2007 (as amended to date, the "<u>2007 Credit Agreement</u>"), by and among Genco as borrower, the banks and other financial institutions named therein as lenders, Wilmington Trust, N.A., as successor administrative and successor collateral agent (the "<u>2007 Facility Agent</u>"), and the other mandated lead arranger and bookrunner parties thereto, by which the lenders made available to Genco a senior secured credit facility in the amount of $1,377,000,000 (as amended, the "<u>2007 Facility</u>");

WHEREAS, the Company entered into that certain Loan Agreement, dated as of August 20, 2010 (as amended to date, the "<u>$253 Million Loan Agreement</u>"), for a loan not exceeding $253 million, among Genco as borrower, the banks and financial institutions named therein as lenders, BNP Paribas, Credit Agricole Corporate and Investment Bank, DVB Bank SE, Deutsche Bank AG Filiale Deutschlandgeschaft, Skandinaviska Enskilda Banken AB (publ) as mandated lead arrangers, BNP Paribas, Credit Agricole Corporate and Investment Bank, DVB Bank SE, Deutsche Bank AG, Skandinaviska Enskilda Banken AB (publ) as swap providers, and Deutsche Bank Luxembourg S.A. as agent for the lenders (the "<u>$253 Million Facility Agent</u>") and Deutsche Bank AG Filiale Deutschlandgeschaft as security agent (the "<u>$253 Million Facility Security Agent</u>") (as amended, the "<u>$253 Million Facility</u>");

WHEREAS, the Company entered into that certain Loan Agreement, dated as of August 12, 2010 (as amended to date, the "<u>$100 Million Loan Agreement</u>"), for a loan facility of up to $100 million among Genco as borrower, Genco Ocean Limited and the other companies named therein as guarantors, the banks and financial institutions named therein as lenders, and Credit Agricole Corporate and Investment Bank as agent and security trustee (the "<u>$100 Million Facility Agent</u>" and together with the 2007 Facility Agent, the $253 Million Facility Agent, and the $253 Million Facility Security Agent, the

*Execution Version*
*Confidential*

"Prepetition Agents") (as amended, the "$100 Million Facility," together with the 2007 Facility and the $253 Million Facility, the "Credit Facilities"));

WHEREAS, the Company issued 5.00% Convertible Senior Notes due August 15, 2015 (the "Convertible Notes") pursuant to that certain First Supplemental Indenture, dated as of July 27, 2010, between Genco as issuer and The Bank of New York Mellon (the "Indenture Trustee") as trustee (as amended, the "Indenture" and, together with the 2007 Credit Agreement, the $253 Million Loan Agreement, the $100 Million Loan Agreement, and the Convertible Notes, the "Debt Instruments"));

WHEREAS, the Parties have negotiated in good faith at arm's-length and agreed to support a restructuring of the Company's capital structure and financial obligations (the "Restructuring") that is mutually acceptable to the Company and the Supporting Creditors subject to and consistent with the terms and conditions set forth in this Agreement and the Restructuring Term Sheet attached hereto as Exhibit A (the "Restructuring Term Sheet"));

WHEREAS, it is contemplated that Genco and, unless all creditors in respect of the Credit Facilities vote in favor of the Plan prior to the Petition Date (as defined below), the Genco Subsidiaries will commence a voluntary bankruptcy case (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (each entity filing a Chapter 11 Case, a "Company Party");

WHEREAS, each Party desires that the Restructuring be implemented through a prepackaged chapter 11 plan of reorganization filed in the Chapter 11 Cases implementing the terms and conditions of the Restructuring Term Sheet (such chapter 11 plan of reorganization, the "Plan"), consistent with this Agreement and otherwise in form and substance mutually acceptable to the Company and the Required Supporting Creditors (as defined below) as provided in section 1(b) of this Agreement;

WHEREAS, the Company has obtained the agreement for the consensual use of "cash collateral" pursuant to the terms and conditions of an interim and final order to be entered by the Bankruptcy Court (each, a "Cash Collateral Order") consistent with the form of order attached hereto as Exhibit B (the "Form of Cash Collateral Order") or otherwise in form and substance mutually acceptable to the Company, the Required Supporting 2007 Facility Lenders (as defined below), the Required Supporting $253 Million Facility Lenders (as defined below), the Required Supporting $100 Million Facility Lenders (as defined below), and the Prepetition Agents, and which changes (if any) will be made in consultation with the Supporting Noteholders;

WHEREAS, certain of the Supporting 2007 Facility Lenders and the Supporting Noteholders have agreed to backstop a $100 million rights offering to be offered by Genco in accordance with the terms and conditions specified in this Agreement and the Restructuring Term Sheet; and

*Execution Version*
*Confidential*

NOW, THEREFORE, in consideration of the recitals stated above and the premises and mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each of the Parties agree as follows:

1.    ***Definitive Documentation and Exhibits.***

(a)    <u>Incorporation of the Exhibits</u>.  The Restructuring Term Sheet, the Form of Cash Collateral Order, and the Transferee Acknowledgment (each as defined herein) (collectively, the "<u>Exhibits</u>") are expressly incorporated herein by reference and are made part of this Agreement.  References to "the Agreement," "this Agreement," "herein," or "hereof" include this Agreement and each of the Exhibits.  In the event the terms and conditions as set forth in the Exhibits and this Agreement are inconsistent, the terms and conditions as set forth in  this Agreement shall govern.

(b)    <u>Definitive Documents</u>.  All (i) documents (other than motions or pleadings) implementing, achieving, and relating to the Restructuring, including, without limitation, the Plan, a disclosure statement describing the Plan (the "<u>Disclosure Statement</u>"), the plan supplement and its exhibits, solicitation procedures, commitment agreements, exit financing agreements or related documents, organizational and governance documents (including, without limitation, the organizational and governance documents for the reorganized Company), shareholder and member related agreements, or other related transactional or corporate documents (including, without limitation, any agreements and documents described in the Restructuring Term Sheet and the Exhibits thereto), (ii) the motions or pleadings seeking approval or confirmation of any of the foregoing transactional or corporate documents, including the motion to approve the Disclosure Statement, confirm the Plan, ratify the solicitation procedures, and scheduling a joint hearing, and (iii) the orders approving the Company's assumption of this Agreement and approving the Disclosure Statement, ratifying the solicitation procedures, confirming the Plan, and scheduling a joint hearing (items (i)-(iii), collectively, the "<u>Definitive Documents</u>"), shall  be consistent with this Agreement and the Restructuring Term Sheet in all respects.  The Definitive Documents shall be negotiated in good faith by the Company and the applicable Required Supporting Creditors.  The Definitive Documents with respect to items (i) and (iii) shall be mutually acceptable to the Company and the Required Supporting 2007 Facility Lenders and with respect to item (ii) above, shall be reasonably acceptable to the Required Supporting 2007 Facility Lenders.  The Definitive Documents with respect to items (i), (ii) and (iii) solely with respect to any term in any Definitive Document that will affect their respective economic interests, shall be mutually acceptable to the Company, the Required Supporting $253 Million Facility Lenders (as defined below) and the Required Supporting $100 Million Facility Lenders (as defined below).  The Definitive Documents with respect to item (iii), the Plan, the Disclosure Statement, and the plan supplement documents[1] (excluding, if applicable,

---

[1]    The plan supplements shall consist of the following documents: the documentation for the management incentive plan, the documentation for the New Genco Warrants, the documentation for the exit financing facilities, the charters and bylaws for the reorganized Company, the equity commitment agreement, the registration rights agreement, any new employment contracts for

*Execution Version*
*Confidential*

registration rights agreements, new employment contracts for management of the reorganized Company, schedule(s) of contracts to be rejected pursuant to the Plan, the schedule of directors and officers for the reorganized Company, and schedule(s) of retained causes of action) shall  be reasonably acceptable to the Required Supporting Noteholders and all other Definitive Documents shall be negotiated in consultation with the Supporting Noteholders.  Notwithstanding anything to the contrary in this paragraph, absent the prior consent of the Required Supporting Noteholders (as defined below), no Definitive Document shall alter the treatment of the Required Supporting Noteholders specified in the Restructuring Term Sheet.

(c)     The Parties shall use their reasonable best efforts to negotiate and execute all Definitive Documents reasonably necessary or otherwise required to commence solicitation for the Plan as promptly as possible following the Effective Date of this Agreement and, in any case, no later than April 13, 2014.  The Parties shall use their reasonable best efforts to, if applicable, provide each other with drafts of and consent to Definitive Documents in a timely manner so as to permit the Company to comply with its obligations under the Milestones.

2.      ***Restructuring and Related Support***.

(a)     *The Company's Obligations.*  For so long as this Agreement has not been terminated in accordance with its terms, the Company covenants and agrees:

(i)     To support and use commercially reasonable efforts to (A) complete the Restructuring and all transactions contemplated under this Agreement, including, without limitation, those described in the Restructuring Term Sheet (and once filed, the Plan) in accordance with the deadlines specified in the milestones set forth in section 8 below (collectively, as the same may be modified in accordance with the terms of this Agreement, the "Milestones"), (B) take any and all reasonably necessary actions in furtherance of the Restructuring and the transactions contemplated under this Agreement, including, without limitation, as set forth in the Restructuring Term Sheet (and once filed, the Plan), and (C) obtain any and all required regulatory and/or third-party approvals necessary to consummate the Restructuring;

(ii)     To take no action that is inconsistent with this Agreement, the Restructuring Term Sheet, or the Plan, or that would unreasonably delay approval of the Disclosure Statement, the Cash Collateral Order, or the solicitation procedures, or confirmation of the Plan; including soliciting or causing or allowing any of their agents or representatives to solicit any agreements relating to any chapter 11 plan or restructuring transaction (including, for the avoidance of doubt, a transaction premised on an asset sale under section 363 of the Bankruptcy Code) other than the Restructuring (an "Alternative Transaction");

---

management of the reorganized Company, schedule(s) of contracts to be rejected pursuant to the Plan, the schedule of directors and officers for the reorganized Company, and schedule(s) of retained causes of action.

*Execution Version*
*Confidential*

(iii)    To not directly or indirectly (A) join in, support, or vote for any alternative plan or transaction, including, without limitation, express support in writing of, or enter into any form of plan support agreement with respect to, any alternative plan or restructuring, or (B) take any action to alter, delay, or impede approval of the Disclosure Statement and confirmation and consummation of the Plan and any related documents;

(iv)    To (A) pay the reasonable and documented fees and expenses of Akin Gump Strauss Hauer & Feld LLP and Jefferies LLC in accordance with the applicable fee letter, as incurred by the Supporting Noteholders between the Effective Date and the earlier of (x) the termination of this Agreement with respect to the Supporting Noteholders in accordance with the terms hereof and (y) the effective date of the Plan and (B) pay the fees and expenses incurred by the Supporting Lenders in the manner, and to the extent, provided for in the Cash Collateral Order; and

(v)    To not, nor encourage any other person or entity to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Restructuring.

Notwithstanding anything to the contrary contained in this Agreement, the Company's obligations hereunder (including without limitation the obligations of the Company Parties' directors and officers) are subject at all times to the fulfillment of their respective fiduciary duties; provided, that any action with respect thereto that results in a Termination Event (as defined below) shall be subject to the provisions set forth in section 11 hereof.

(b)    *The Supporting Creditors' Obligations.*  Each Supporting Creditor (severally and not jointly) covenants and agrees to perform and comply with the following obligations (including in its capacity as an owner, manager, or holder of any interest in a Debt Instrument) for so long as (x) the Supporting Creditor controls an interest in a Debt Instrument; (y) this Agreement has not been terminated in accordance with its terms with respect to each Debt Instrument that such Supporting Creditor holds; and (z) such Supporting Creditor has not terminated this Agreement pursuant to section 11(g) hereof:

(i)    Each Supporting Creditor shall (A) timely vote to accept the Plan and not thereafter withdraw or change such vote, and (B) to the extent such election is available, not elect on its ballot to preserve claims, if any, that each Supporting Creditor may own or control that may be affected by any releases expressly contemplated by the Plan;

(ii)    Each Supporting Creditor shall (A) support approval of the Disclosure Statement, the Cash Collateral Order, and the solicitation procedures and confirmation of the Plan, (B) neither oppose nor object to the Disclosure Statement, the Plan, the Cash Collateral Order, or the solicitation procedures, (C) neither join in nor support any objection to the Disclosure Statement, the Cash Collateral Order, the

5

*Execution Version*
*Confidential*

solicitation procedures, or the Plan, or (D) otherwise commence any proceeding to oppose or alter any of the terms of the Plan or any other document filed by Genco in connection with the confirmation of the Plan;

(iii)    Each Supporting Creditor shall use commercially reasonable efforts to execute any document and give any notice, order, instruction, or direction necessary or reasonably requested by the Company to support, facilitate, implement, or consummate or otherwise give effect to the Restructuring;

(iv)    Each Supporting Creditor shall use commercially reasonable efforts to support, consent, and take other actions in connection with the Restructuring and the Chapter 11 Case and any other actions or proceedings related to the Chapter 11 Case (including, without limitation, proceedings in non-U.S. jurisdictions) to the extent consistent with the Restructuring Term Sheet (and once filed, the Plan) or as reasonably requested by the Company to facilitate, implement, consummate, or otherwise give effect to the Restructuring, including, without limitation any motion filed by Genco or any Genco Subsidiary seeking a temporary restraining order and/or injunction to stay proceedings against Genco or any Genco Subsidiary;

(v)    Other than as provided in the Restructuring Term Sheet (and once filed, the Plan), each Supporting Creditor shall, as of the effective date of the Plan, waive and release any rights to exercise remedies against any collateral of Genco or any Genco Subsidiary in connection with the applicable Debt Instrument or otherwise, applicable non-bankruptcy law, or applicable non-U.S. insolvency law in any jurisdiction;

(vi)    Other than as provided in the Restructuring Term Sheet (and once filed, the Plan) each Supporting Creditor shall not take or instruct the taking of, under or relating to the applicable Debt Instrument or otherwise, any action against or in respect of Genco or any Genco Subsidiary or any collateral provided by Genco or any Genco Subsidiary that constitutes or would constitute an enforcement action or remedy;

(vii)    To not directly or indirectly (A) join in, support, or vote for any alternative plan or transaction, including, without limitation, express support in writing of, or enter into any form of plan support agreement with respect to, any alternative plan or restructuring, or (B) take any action to alter, delay, or impede approval of the Disclosure Statement and confirmation and consummation of the Plan and any related documents; and

(viii)    To not, nor encourage any other person or entity to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Restructuring.

For the avoidance of doubt, nothing in this Agreement will (A) prohibit instruction to the Prepetition Agents to take or not to take any action relating to the maintenance, protection and preservation of their security interests, and liens on collateral under the

*Execution Version*
*Confidential*

Debt Instruments and related security documents; (B) prohibit the Prepetition Agents from taking any action relating to the maintenance, protection and preservation of such security interests and liens; (C) prohibit the Prepetition Agents or the Supporting Creditors from objecting to any motion or pleading filed with the Bankruptcy Court seeking approval to use cash collateral inconsistent with the terms of this Agreement; (D) limit the rights of the Parties under the applicable Debt Instruments or related security documents, and/or applicable law to appear and participate as a party in interest in any matter to be adjudicated in any case under the Bankruptcy Code (or otherwise) concerning the Company (including, without limitation, the Supporting Creditors' rights to oppose, challenge, or credit bid in connection with a sale under section 363 of the Bankruptcy Code in the event that this Agreement is terminated in accordance with its terms), so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement; (E) prohibit the Prepetition Agents or any Supporting Creditor or any of their respective officers or representatives from appearing as a party in interest (i) in any matter to be adjudicated in the Chapter 11 Case provided any positions taken by such party are not inconsistent with this Agreement or (ii) in proceedings for the purpose of contesting whether any matter or fact is or results in a breach of, or is inconsistent with, this Agreement; or (F) prohibit the Indenture Trustee from filing a proof of claim, if required.

3.     ***Withdrawal of Plan Support*.**    Each Supporting Creditor shall not withdraw or revoke (a) its support of the Restructuring Term Sheet (and once filed, the Plan) pursuant to this Agreement, and (b) any properly solicited vote to accept the Plan, in each case, unless this Agreement has been terminated in accordance with its terms, or, with respect to subparagraph 3(a) only, such Supporting Creditor is no longer subject to this Agreement.

4.     ***Acknowledgements*.**    Each Party acknowledges that (a) no securities of the Company are being offered or sold hereby and this Agreement neither constitutes an offer to sell nor a solicitation of an offer to buy any securities of the Company and (b) that this Agreement is not, and shall not be deemed to be, a solicitation of a vote for the acceptance of the Plan pursuant to section 1125 of the Bankruptcy Code.

5.     ***Limitations on Transfer of Interests in the Debt Instruments*.**

(a)     Each Supporting Creditor shall not (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Supporting Creditor's interest in a Debt Instrument, or any other claim against the Company, in whole or in part, or (ii) grant any proxies, deposit any of such Supporting Creditor's interests in a Debt Instrument, or any other claim against the Company, into a voting trust, or enter into a voting agreement with respect to any such interest (collectively, the actions described in clauses (i) and (ii), a "Transfer"), unless such Transfer is to another Supporting Creditor or any other entity that first agrees in writing to be bound by the terms of this Agreement by executing and delivering to Genco (and, with respect to claims under the 2007 Facility, the $253 Million Facility, or $100 Million Facility, with a copy to the agent under the applicable facility) a transferee acknowledgment substantially in the form attached hereto as Exhibit C (the

*Execution Version*
*Confidential*

"Transferee Acknowledgment").  With respect to Debt Instruments, and any other claim against the Company, held by the relevant transferee upon consummation of a Transfer, such transferee is deemed to make all of the representations and warranties of a Supporting Creditor set forth in section 12 of this Agreement.  Upon compliance with the foregoing, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement solely to the extent of such transferred rights and obligations but shall otherwise remain party to this Agreement as a Supporting Creditor with respect to any interest in a Debt Instrument or other claim not so transferred.  Any Transfer made in violation of this section 5 shall be deemed null and void and of no force or effect, regardless of any prior notice provided to Genco, and shall not create any obligation or liability of the Company to the purported transferee (it being understood that the putative transferor shall continue to be bound by the terms and conditions set forth in this Agreement).

(b)     Notwithstanding the foregoing, (i) a Supporting Creditor may Transfer any claim to an entity that is acting in its capacity as a Qualified Marketmaker (defined below) (a "Qualified Transfer") without the requirement that the Qualified Marketmaker be or become a Supporting Creditor, provided that such Qualified Transfer shall only be valid if the Qualified Marketmaker subsequently Transfers such claim to a transferee that is a Supporting Creditor (or becomes a Supporting Creditor at the time of the Transfer pursuant to a Transferee Acknowledgment) either (A) prior to the voting record date for the Plan (the "Voting Record Date"), if the Qualified Transfer is made prior to the Voting Record Date, or (B) after the Voting Record Date, if the Qualified Transfer is made after the Voting Record Date, and (ii) if a Supporting Creditor, acting in its capacity as a Qualified Marketmaker, acquires a claim from a holder of claims that is not a Supporting Creditor, it may Transfer such claim without the requirement that the transferee be or become a Supporting Creditor.  For purposes hereof, a "Qualified Marketmaker" shall mean an entity that (a) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Company (including debt securities or other debt) or enter with customers into long and short positions in claims against the Company (including debt securities or other debt), in its capacity as a dealer or market maker in such claims and (b) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

*Execution Version*
*Confidential*

6.     ***Further Acquisition of Indebtedness, Claims, and Interests.***   This Agreement shall in no way be construed to preclude any Supporting Creditor or any of its affiliates from acquiring additional interests in the Debt Instruments or any other claim against or equity interest in the Company.  Any such additional interests in the Debt Instruments or any other claims shall automatically be subject to the terms of this Agreement and such acquiring Supporting Creditor shall promptly (and, in no event later than five (5) business days) inform Genco of such acquisition of claims; provided, however, in no event shall this sentence apply to any affiliate of the Supporting Creditors listed on Schedule 2 to this Agreement other than an affiliate that is a Supporting Creditor.

7.     ***Effectiveness of the Agreement.***

(a)     This Agreement shall become effective as to the Company and each individual Supporting Creditor upon the execution and delivery of counterpart signature pages to this Agreement by and among (i) Supporting Lenders holdings claims equal to at least 66 2/3% of the aggregate principal outstanding under each of the 2007 Facility, the $253 Million Facility, and the $100 Million Facility, (ii) Supporting Noteholders holding claims equal to at least 66 2/3% of the aggregate principal outstanding under the Convertible Notes, and (iii) the Company (such date, the "Effective Date").

(b)     For purposes of this Agreement, the term (i) "Required Supporting 2007 Facility Lenders" shall mean Supporting 2007 Facility Lenders owning more than 66 2/3% of the aggregate principal outstanding under the 2007 Facility held by the Supporting 2007 Facility Lenders, (ii) "Required Supporting $253 Million Facility Lenders" shall mean Supporting $253 Million Facility Lenders owning more than 66 2/3% of aggregate principal outstanding under the $253 Million Facility held by the Supporting $253 Million Facility Lenders, (iii) "Required Supporting $100 Million Facility Lenders" shall mean Supporting $100 Million Facility Lenders owning more than 66 2/3% of aggregate principal outstanding under the $100 Million Facility held by the Supporting $100 Million Facility Lenders, (iv) "Required Supporting Noteholders" shall mean 66 2/3%, measured by claim size, of the Supporting Noteholders who are (A) not Supporting Lenders on the Effective Date and (B) members of the ad hoc group of Noteholders represented by Akin, Gump, Strauss, Hauer & Feld LLP and (v) "Required Supporting Creditors" means (A) with respect to the 2007 Facility, the Required Supporting 2007 Facility Lenders, (B) with respect to the $253 Million Facility, the Required Supporting $253 Million Facility Lenders, (C) with respect to the $100 Million Facility, the Required Supporting $100 Million Facility Lenders, and (D) with respect to the Convertible Notes and the Indenture, the Required Supporting Noteholders.

8.     ***Milestones.***   The Company Parties will comply with the following Milestones within the periods specified herein, unless otherwise agreed in writing with the Required Supporting 2007 Facility Lenders, the Required Supporting $253 Million Facility Lenders, the Required Supporting $100 Million Facility Lenders, and Required Supporting Noteholders:

(a)    solicitation of the 2007 Facility Lenders, the $235 Million Facility Lenders, the $100 Million Facility Lenders, and the holders of 5.00% Convertible Senior Notes due August 15, 2015 (the "Convertible Notes") pursuant to that certain First Supplemental Indenture, dated as of July 15, 2007, between Genco as issuer and The Bank of New York Mellon as trustee (such date, the "Solicitation Commencement Date") regarding the Plan shall begin on or before April 16, 2014;

(b)    voluntary petition(s) in the Bankruptcy Court and motions seeking approval of the Plan, the Disclosure Statement, and the solicitation procedures shall be filed (such date, the "Petition Date") on or before the fifth calendar day after the Solicitation Commencement Date;

(c)    the Cash Collateral Order shall have been approved (i) on an interim basis, on or before the fifth business day after the Petition Date and (ii) on a final basis, on or before the forty-fifth day after the Petition Date;

(d)    the order approving the assumption of this Agreement shall have been approved on or before the fifth business day after the Petition Date;

(e)    the order approving the Disclosure Statement and the solicitation procedures and confirming the Plan shall be entered (such date, the "Confirmation Date") on or before the forty-fifth day after the Petition Date; and

(f)    the effective date of the Plan shall occur on or before the later of (i) 10 days following the Confirmation Date, (ii) completion of the Rights Offering (as defined in the Restructuring Term Sheet), or (iii) notice from the respective lenders that the conditions to the closing of the New $253 Million Facility and New $100 Million Facility (each as defined in the Restructuring Term Sheet) have been satisfied or waived.

9.    ***Enforceability.***  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning the Restructuring and in contemplation of the potential commencement of the Chapter 11 Case, and the rights granted in this Agreement are enforceable by each signatory hereto without approval of the Bankruptcy Court.

10.    ***Further Assurances.***  From and after the date hereof, each of Parties agrees to execute and deliver all such agreements, instruments, and documents and to take all such further actions as the Parties may reasonably deem necessary from time to time to carry out the intent and purpose of this Agreement and the Plan, and to consummate the transactions contemplated thereby.

11.    ***Termination.***

(a)    *Automatic Termination.*    This Agreement shall terminate automatically upon the occurrence of any of the following events (each such event, along with the events described in subsections (b), (c), (d), and (e), a "Termination Event"):

*Execution Version*
*Confidential*

(i)        an order denying confirmation of the Plan is entered;

(ii)        an order confirming the Plan is reversed or vacated;

(iii)        any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable; or

(iv)        occurrence of the effective date of the Plan.

(b)        *The Company's Right to Terminate.*  The Company may, in its sole discretion, terminate this Agreement as to all Parties upon five (5) days' prior written notice to the Supporting Creditors setting forth the basis for termination, delivered in accordance with this Agreement, following the occurrence of any of the following events:

(i)        a material breach by any Supporting Creditor of any of its obligations under this Agreement that would reasonably be expected to have a material adverse impact on confirmation or consummation of the Plan, provided that such breach may be cured during the five-day notice period;

(ii)        the Company's  board(s) of directors determines, in good faith and upon the advice of its advisors, in its sole discretion, that (A) continued pursuit of the Restructuring is inconsistent with its fiduciary duties or (B) having received an unsolicited proposal or offer for an Alternative Transaction, that such Alternative Transaction is likely to be more favorable than the Restructuring and that continued support of the Restructuring pursuant to this Agreement would be inconsistent with its fiduciary obligations; or

(iii)        the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling, or order preventing consummation of a material portion of the Restructuring;

provided, that upon a termination of this Agreement pursuant to section 11(b)(ii), (x) all obligations of each Supporting Creditor hereunder shall immediately terminate without further action or notice by such Supporting Creditor, and (y) the Company (and its directors, officers, employees, advisors, subsidiaries, and representatives) shall not have or incur any liability under this Agreement or otherwise on account of such termination.

For the avoidance of doubt, and notwithstanding any provisions to the contrary herein but subject to the remainder of this paragraph, in order to fulfill the Company Parties' fiduciary obligations, the Company may receive (but not solicit) proposals or offers for Alternative Transactions from other parties and negotiate, provide due diligence, discuss, and/or analyze such Alternative Transactions received without breaching or terminating this Agreement; provided that the Company shall provide a copy of any written offer or proposal (and notice of any oral offer or proposal) for an Alternative Transaction received to the legal counsel to and the financial advisors to the Supporting Creditors

*Execution Version*
*Confidential*

within one (1) business day of the Company Parties' or their advisors' receipt of such offer or proposal.

(c)    *The Supporting Creditors' Right to Terminate*.    This Agreement may be terminated upon five days' prior written notice (the "Notice Period") to Genco setting forth the basis for termination, delivered in accordance with this Agreement by the parties identified below, following the occurrence of any of the following events:

(i)    by any Required Supporting Creditors solely in respect of its Debt Instrument, if the Definitive Documents and any amendments, modifications, or supplements thereto filed by the Company include terms that are inconsistent with the Restructuring Term Sheet and are not otherwise acceptable to the Required Supporting Creditors in respect of the applicable Debt Instrument as provided in section 1(b) hereof, provided that such filing was not modified or withdrawn during the Notice Period;

(ii)    by any Required Supporting Creditors solely in respect of its Debt Instrument, if the Company has breached any of its material obligations under this Agreement, and such breach remains uncured during the Notice Period;

(iii)    by any Required Supporting Creditors solely in respect of its Debt Instrument, if the Company has (A) withdrawn the Plan, (B) publicly announced their intention not to support the Plan, (C) filed a motion with the Bankruptcy Court seeking the approval of an alternative plan or transaction, or (D) agreed (including, for the avoidance of doubt, as evidenced by a term sheet, letter of intent, or similar document) or publicly announced its intent to pursue an Alternative Transaction;

(iv)    by any Required Supporting Creditors solely in respect of its Debt Instrument, if the Company seeks to sell any material assets without the prior written consent of the applicable Required Supporting Creditors in respect of the applicable Debt Instrument as provided in section 1(b) hereof;

(v)    by any Required Supporting Creditors solely in respect of its Debt Instrument, in the event that the Company fails to meet a Milestone, which has not been waived or extended consistent with section 8 hereof;

(vi)    by any Required Supporting Creditors solely in respect of its Debt Instrument, upon the filing by the Company of any motion or other request for relief seeking to (A) voluntarily dismiss the Chapter 11 Case, (B) convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (C) appoint a trustee or examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in the Chapter 11 Case;

(vii)    by the Required Supporting Creditors solely in respect of a Debt Instrument, if a Company Party loses the exclusive right to file and/or solicit acceptance of a chapter 11 plan;

*Execution Version*
*Confidential*

(viii)    by the Required Supporting Noteholders if a Definitive Document alters the treatment of the Noteholders specified in the Restructuring Term Sheet and the Required Supporting Noteholders have not consented to such Definitive Document;

(ix)    by any Required Supporting Creditors solely in respect of its Debt Instrument, upon the entry of an order by the Bankruptcy Court, which order is not subject to a stay of its effectiveness pending appeal, (A) dismissing the Chapter 11 Case, (B) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (C) appointing a trustee or examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in the Chapter 11 Case; or (D) the effect of which would render the Plan incapable of consummation on the terms set forth herein;

(x)    by any Required Supporting Creditors solely in respect of its Debt Instrument, upon a Termination Event under the Cash Collateral Order; or

(xi)    by any Required Supporting Creditors solely in respect of its Debt Instrument, if any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order, which order is not subject to a stay of its effectiveness pending appeal, making illegal or otherwise restricting, preventing, or prohibiting the Restructuring in a manner that cannot be reasonably remedied by Genco.

Notwithstanding anything to the contrary herein, following the commencement of the Chapter 11 Case and unless and until there is an unstayed order of the Bankruptcy Court providing that the giving of notice under and/or termination of this Agreement in accordance with its terms is not prohibited by the automatic stay, the occurrence of each of the Termination Events in subsection (c) above shall result in an automatic termination of this Agreement, to the extent the Required Supporting Creditors would otherwise have the ability to terminate this Agreement in accordance with subsection (c) above, three (3) business days following such occurrence unless waived in writing by the Required Supporting Creditors.

(d)    *The Supporting 2007 Facility Lender Terminations*.

(i)    Notwithstanding anything to the contrary in subsection (c) above, this Agreement shall automatically terminate with respect to the Supporting 2007 Facility Lenders five (5) business days following the occurrence of any of the following events, unless such event is cured or waived in writing by the Required Supporting 2007 Facility Lenders during such five (5) business day period:

A. the Company has (w) withdrawn the Plan, (x) publicly announced their intention not to support the Plan, (y) filed a motion with the Bankruptcy Court seeking the approval of an alternative plan or transaction, or (z) agreed (including, for the avoidance of doubt, as evidenced by a term sheet, letter of intent, or similar document)

*Execution Version*
*Confidential*

or publicly announced its intent to pursue an Alternative Transaction;

B.   the Company seeks to sell any material assets without the prior written consent of the applicable Required Supporting Creditors in respect of the applicable Debt Instrument as provided in section 1(b) hereof;

C.   the Company fails to meet a Milestone, which has not been waived or extended consistent with section 8 hereof;

D.   the filing by the Company of any motion or other request for relief seeking to (x) voluntarily dismiss the Chapter 11 Case, (y) convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (z) appoint a trustee or examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in the Chapter 11 Case;

E.   a Company Party loses the exclusive right to file and/or solicit acceptance of a chapter 11 plan;

F.   entry of an order by the Bankruptcy Court, which order is not subject to a stay of its effectiveness pending appeal, (w) dismissing the Chapter 11 Case, (x) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (y) appointing a trustee or examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in the Chapter 11 Case; or (z) the effect of which would render the Plan incapable of consummation on the terms set forth herein;

G.   a Termination Event under the Cash Collateral Order; or

H.   any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order, which order is not subject to a stay of its effectiveness pending appeal, making illegal or otherwise restricting, preventing, or prohibiting the Restructuring in a manner that cannot be reasonably remedied by Genco.

(ii)      Notwithstanding anything to the contrary in subsection (c) above, upon a notice given by Supporting 2007 Facility Lenders that (x) own more than 33 1/3% of the aggregate principal outstanding under the 2007 Facility held by the Supporting 2007 Facility Lenders and (y) consisting of at least three (3) Supporting 2007 Facility Lenders (counting all affiliated and managed funds as one Supporting 2007

*Execution Version*
*Confidential*

Facility Lender)[2] (collectively, the "<u>Nonconsenting 2007 Facility Lenders</u>") to Genco and the 2007 Facility Agent of the occurrence of the event below, this Agreement shall automatically terminate with respect to the Supporting 2007 Facility Lenders five (5) business days following the giving of such notice, unless such event is cured by the Company or waived in writing by the Required Supporting 2007 Facility Lenders, such waiver to be provided by the 2007 Facility Agent during such five (5) business days:

    A.  if the Definitive Documents and any amendments, modifications, or supplements thereto filed by the Company include terms that are inconsistent with the Restructuring Term Sheet and are not otherwise acceptable to the Nonconsenting 2007 Facility Lenders, provided that such filing was not modified or withdrawn during the Notice Period.

    (e)   *Mutual Termination.*  This Agreement and the obligations of the Company and the Supporting Creditors in respect of a particular Debt Instrument may be terminated by mutual written agreement of the Company and the Required Supporting Creditors in respect of such Debt Instrument.

    (f)   *Termination Fee*

    (i)   If this Agreement is terminated pursuant to sections 11(b)(ii) or 11(c)(iii), and the Company consummates an Alternative Transaction, the Company shall pay to the Supporting 2007 Facility Lenders and Supporting Noteholders a termination fee equal to $26,500,000 plus any expense reimbursements owing under this Agreement (collectively, the "<u>Termination Fee</u>"), in cash via wire transfer or other treatment acceptable to the applicable Supporting 2007 Facility Lender or Supporting Noteholder for their pro rata share of the Termination Fee (based on the amount of their holdings of claims under the 2007 Facility and Convertible Notes as against the aggregate amount of 2007 Facility claims and Convertible Notes held by all Supporting Creditors); <u>provided</u>, that in such event, other than the Termination Fee, notwithstanding anything to the contrary contained in this Agreement, the Company (and its directors, officers, employees, representatives, and advisors) shall not have or incur any liability to the Supporting 2007 Facility Lenders or Supporting Noteholders under this Agreement on account of such termination.

    (ii)   The Termination Fee shall constitute an administrative expense obligation of the Company pursuant to sections 503 and 1129(a)(4) of the Bankruptcy Code, or otherwise.

    (iii)   Notwithstanding anything to the contrary herein, if the Termination Fee is owed pursuant to this section, such fee shall constitute the sole and

---

[2]    If there are fewer than five (5) Supporting 2007 Facility Lenders (counting all affiliated and managed funds as one Supporting 2007 Facility Lender), then such notice need only be given by two (2) Supporting 2007 Facility Lenders (counting all affiliated and managed funds as one Supporting 2007 Facility Lender).

*Execution Version*
*Confidential*

exclusive remedy of the Supporting 2007 Facility Lenders and the Required Supporting Noteholders, respectively, on account of the termination of this Agreement.

(g)    *Outside Date*.  Any individual Supporting Creditor shall have the right to terminate this Agreement, as to itself only, if the effective date of the Plan shall not have occurred by August 1, 2014.  In the event a Supporting Creditor terminates pursuant to this paragraph 11(g), such termination shall be effective as to such Supporting Creditor only and shall not affect any the rights or obligations of any other party to this Agreement.

(h)    *Effect of Termination*.

(i)    Upon termination of this Agreement by the Company, all obligations hereunder of the Company and the Supporting Creditors shall terminate and shall be of no further force and effect.

(ii)    Upon termination by the Required Supporting Creditors in respect of a particular Debt Instrument, all obligations hereunder between, on the one hand, the Supporting Creditors in respect of such Debt Instrument and, on the other, Genco and other Supporting Creditors shall terminate and shall be of no further force and effect.  Any and all consents and ballots tendered by the Supporting Creditors whose obligations to Genco have been terminated, as applicable, prior to such termination shall be deemed, for all purposes, automatically to be null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Plan and this Agreement or otherwise and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission).

(iii)    For the avoidance of doubt, the Parties agree that it shall not be a violation of the automatic stay provisions set forth in section 362 of the Bankruptcy Code, to the extent applicable, to deliver notice of termination of the Agreement pursuant to its terms.  Nothing in this section 10(e)(iii) shall prejudice any Party's right to assert that termination was not proper under the terms of this Agreement.

(iv)    Notwithstanding anything to the contrary contained herein, any claim for breach of this Agreement shall survive termination and all rights and remedies with respect to such claims shall be neither waived nor prejudiced in any way by termination of this Agreement.  Termination shall not relieve any Party from liability for its breach or non-performance of its obligations hereunder prior the date of termination.

12.    ***The Supporting Creditors' Representations and Warranties.***  To induce the Company to enter into and perform their obligations under this Agreement, each Supporting Creditor, severally but not jointly, represents, warrants, and acknowledges as follows:

*Execution Version*
*Confidential*

(a)    *Authority*.  (i) The Supporting Creditor is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and has all the requisite corporate, partnership, or other power and authority to execute, deliver, and perform their obligations under this Agreement, and to consummate the transactions contemplated herein; and (ii) the execution, delivery, and performance by the Supporting Creditor of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action (corporate, partnership, or otherwise) on the part of the Supporting Creditor and no other proceedings on the part of the Supporting Creditors are necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

(b)    *Validity*.  This Agreement has been duly executed and delivered by the Supporting Creditor and constitutes the legal, valid, and binding agreement of the Supporting Creditor, enforceable against the Supporting Creditor in accordance with its terms.

(c)    *No Conflict*.  The execution, delivery, and performance by the Supporting Creditor (when such performance is due) of this Agreement does not and shall not (i) violate any provision of law, rule, or regulation applicable to it or, in the case of an entity, any of its subsidiaries or its or their certificates of incorporation or bylaws or other organizational documents, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it, or, applicable, any of its subsidiaries is a party.

(d)    *Authorization of Governmental Authorities and Creditors*.  No action by (including any authorization, consent, or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery, and performance by the Supporting Creditor pursuant to this Agreement.

(e)    *No Reliance*.  The Supporting Creditor (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon the Company or any officer, employee, agent, or representative thereof, and based on such information as the Supporting Creditor has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that the Supporting Creditor has relied upon the Company's express representations, warranties, and covenants in this Agreement, and the Supporting Creditor acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress.

(f)    *Title*.  The Supporting Creditor is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to the debt outstanding under the Debt Instruments in the aggregate principal amount set forth in Exhibit D (and in the case of a nominee, it has due and proper authorization to act on behalf of, and to bind, the beneficial owner of such Debt

*Execution Version*
*Confidential*

Instruments).  The Supporting Creditor's interest in the Debt Instrument is free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrances of any kind that would adversely affect in any way the Supporting Creditor's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

13.    ***The Company's Representations and Warranties.***  In order to induce the Supporting Creditors to enter into and perform their obligations under this Agreement, the Company hereby represents, warrants, and acknowledges as follows:

(a)    *Authority*.  The Company (i) has the power and authority to execute, deliver, and perform its obligations under this Agreement, and to consummate the transactions contemplated herein and (ii) the execution, delivery, and performance by the Company under this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action on the part of the Company Party.

(b)    *Validity*.  This Agreement has been duly executed and delivered by the Company and constitutes the legal, valid, and binding agreement of the Company, enforceable against the Company in accordance with its terms.

(c)    *No Conflict*.  The execution, delivery, and performance by the Company (when such performance is due) of this Agreement does not and shall not (i) violate any provision of law, rule, or regulation applicable to it or, in the case of an entity, any of its subsidiaries or its or their certificates of incorporation or bylaws or other organizational documents, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under its certificate of incorporation or by-laws (or other organizational documents).

(d)    *Authorization of Governmental Authorities*.  No action by (including any authorization, consent, or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery, and performance by the Company of this Agreement; provided that, notwithstanding anything in this section to the contrary, the Restructuring (and the authority of the Company to consummate the Restructuring, including without limitation, the Plan and related Definitive Documents) shall be subject to approval by the Bankruptcy Court in the Chapter 11 Case.

(e)    *No Reliance*.  The Company (i) is a sophisticated party with respect to the matters that are the subject of this Agreement, (ii) has had the opportunity to be represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon the Supporting Creditors, and based on such information as the Company has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that the Company has relied upon the Supporting Creditors' express representations, warranties and covenants in this

*Execution Version*
*Confidential*

Agreement, which it enters, or as to which it acknowledges and agrees, voluntarily and of its own choice and not under coercion or duress.

14.     ***Certain Additional Chapter 11 Related Matters.***   Except as otherwise required pursuant to paragraph 1(b) of this Agreement, Genco shall provide draft copies of the "first day" motions to counsel for the Supporting Creditors and the Prepetition Agents, if reasonably practicable, at least two (2) days prior to the date when Genco intends to file any such pleading, motion, or other document (and, if not reasonably practicable, as soon as reasonably practicable prior to filing) and shall consult in good faith with such counsel regarding the substance of any such proposed filing with the Bankruptcy Court.

15.     ***Governing Law; Jurisdiction.***

(a)     THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

(b)     By its execution and delivery of this Agreement, each of the Parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, shall be brought, to the extent possible, in either the United States District Court for the Southern District of New York or any New York State court sitting in New York City or following the Petition Date, the Bankruptcy Court (the "Chosen Courts"). By execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of the Chosen Courts, generally and unconditionally, with respect to any such action, suit, or proceeding, and waives any objection it may have to venue or the convenience of the forum.

16.     ***Entire Agreement.***   This Agreement (including, for the avoidance of doubt, the Exhibits) constitute the entire agreement with respect to the Restructuring and supersedes all prior and contemporaneous agreements, representations, warranties, terms sheets, proposals, and understandings of the Parties, whether oral, written, or implied, as to the subject matter hereof; provided, however, that any confidentiality agreement, waiver, indemnity letter, or working fee letter executed by a Supporting Creditor and the Company shall survive this Agreement and shall remain in full force and effect in accordance with its terms.

17.     ***Required Supporting Lenders.***   Notwithstanding anything to the contrary in this Agreement, the Required Supporting Creditors with respect to a Debt Instrument (other than the Convertible Notes and the Indenture) shall not exercise any rights conferred upon them in this Agreement if the exercise of such rights would have disproportionate adverse effect on the rights of a particular Supporting Lender pursuant to such Debt Instrument under this Agreement, in which case, the agreement in writing of

**Execution Version**
*Confidential*

such affected Supporting Lender shall be required for the Required Supporting Creditors under the applicable Debt Instrument to exercise such rights.

18.      ***Amendment or Waiver.***  Except as otherwise specifically provided herein, this Agreement may not be modified, waived, amended, or supplemented unless such modification, waiver, amendment, or supplement is in writing and has been signed by the Company and the Required Supporting Creditors in respect of each Debt Instrument that is affected by such modification, waiver, amendment, or supplement; <u>provided</u> that any amendment to section 11(g) of this Agreement shall require the consent of each Supporting Creditor.  No waiver of any of the provisions of this Agreement shall be deemed to constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver (unless such waiver expressly provides otherwise).

19.      ***Specific Performance; Remedies Cumulative.***  This Agreement is intended as a binding commitment enforceable in accordance with its terms.  Each Party acknowledges and agrees that the exact nature and extent of damages resulting from a breach of this Agreement are uncertain at the time of entering into this Agreement and that any such breach of this Agreement would result in damages that would be difficult to determine with certainty.  It is understood and agreed that money damages would not be a sufficient remedy for any such breach of this Agreement, and that any non-breaching Party shall be entitled to obtain specific performance and injunctive relief as remedies for any such breach, and each Party further agrees to waive, and to cause each of their representatives to waive, any requirement for the securing or posting of any bond in connection with requesting such remedy.  Such remedies shall not be deemed to be the exclusive remedies for the breach of this Agreement by any Party or its representatives.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy by any Party hereto shall not preclude the simultaneous or later exercise of any other such right, power, or remedy hereunder.

20.      ***Construction.***  This Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any Party, and any rule or maxim of construction to such effect shall not apply to this Agreement.

21.      ***Receipt of Information; Representation by Counsel.***  Each Party acknowledges that it has received adequate information to enter into this Agreement and that it has been represented by counsel in connection with this Agreement and the transactions contemplated herein.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

22.      ***Binding Effect; Successor and Assigns.***  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors, assigns,

*Execution Version*
*Confidential*

heirs, transferees, executors, administrators, and representatives, in each case solely as such parties are permitted under this Agreement.

23.      ***Counterparts.***     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  The signatures of all of the Parties need not appear on the same counterpart.  Delivery of an executed signature page of this Agreement by facsimile or electronic mail shall be effective as delivery of a manually executed signature page of this Agreement.

24.      ***Headings; Schedules and Exhibits.***     The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.   References to sections, unless otherwise indicated, are references to sections of this Agreement.

25.      ***Severability and Construction.***   If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect if the essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

26.      ***Waiver of Jury Trial.***   EACH OF THE PARTIES HERETO HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY, AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY CLAIM, COUNTERCLAIM, OR OTHER ACTION ARISING IN CONNECTION THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN), OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RIGHTS UNDER THIS AGREEMENT OR IN ANY WAY RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND WITH RESPECT TO ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF THE PARTIES HERETO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION 26 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.  THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.

27.      ***Notices.***   All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the Party to be notified, (b) when sent by confirmed electronic mail if sent during normal business hours of the recipient, and if not so confirmed, then on the

*Execution Version*
*Confidential*

next business day, (c) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent:

To the Company at:

Genco Shipping & Trading Limited
299 Park Avenue, 12th Floor
New York, New York 10171
Attn: John C. Wobensmith, Chief Financial Officer

*With a copy (which shall not constitute notice) to:*

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of Americas
New York, New York 10036
Attn:  Kenneth H. Eckstein, Adam Rogoff, and Stephen Zide
keckstein@kramerlevin.com, arogoff@kramerlevin.com, and
szide@kramerlevin.com

To the Supporting 2007 Facility Lenders at:

The address set forth on each such Supporting 2007 Facility Lender's signature page (or as directed by any transferee thereof), as the case may be.

*With a copy (which shall not constitute notice) to counsel to the 2007 Facility Agent:*

Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005
Attn: Dennis F. Dunne, Samuel A. Khalil, and Michael W. Price
ddunne@milbank.com, skhalil@milbank.com, and mprice@milbank.com

*Execution Version*
*Confidential*

> To the Supporting $253 Million Facility Lenders at:
>
> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, New York 10019
> Attn: Alan W. Kornberg and Elizabeth McColm
> akornberg@paulweiss.com  and emccolm@paulweiss.com
>
> To the Supporting $100 Million Facility Lenders at:
>
> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, New York 10019
> Attn: Alan W. Kornberg and Elizabeth McColm
> akornberg@paulweiss.com  and emccolm@paulweiss.com
>
> To the Supporting Noteholders at:
>
> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park
> Bank of America Tower
> New York, New York 10036
> Attn:  Michael S. Stamer and Sarah Link Schultz
> mstamer@akingump.com and sschultz@akingump.com

or to such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.

28.      ***Consideration.***   The Company and each Supporting Creditor hereby acknowledge that no consideration, other than that specifically described in this Agreement, shall be due or paid to the Supporting Creditor for its agreement to vote to accept the Plan in accordance with the terms and conditions of this Agreement, other than the Company's representations, warranties, and agreement to use commercially reasonable efforts to seek to effectuate and consummate the Restructuring and the Plan.

29.      ***No Third-Party Beneficiaries***.   This Agreement shall be solely for the benefit of the Parties hereto (or any other party that may become a party to this Agreement pursuant to section 5 of this Agreement) and no other person or entity shall be a third-party beneficiary hereof.

30.      ***No Waiver of Participation and Reservation of Rights***.   Except as expressly provided in this Agreement and in any amendment among the parties, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including, without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries).   If the transactions contemplated by this Agreement are not

*Execution Version*
*Confidential*

consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights, remedies, or interests.

31.    ***No Admissions.***  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.  No Party shall have, by reason of this Agreement, a fiduciary relationship in respect of any other Party or any person or entity, and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon any Party any obligations in respect of this Agreement except as expressly set forth herein.  This Agreement and the Restructuring are part of a proposed settlement of a dispute among the Parties.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding involving enforcement of the terms of this Agreement.

32.    ***Public Disclosure of Agreement.***  The Company may, in its discretion, disclose this Agreement (including the signature pages hereto) in a press release or public filing; provided, however, that the Company shall not disclose to any person, other than legal, accounting, financial and other advisors to the Company, the principal amount or percentage of indebtedness or claims held by any Supporting Creditor or any of its respective subsidiaries or affiliates, unless such information is or becomes publicly available other than by the Company's breach of this section 32 or such information is required to be disclosed by law, rule, regulation, legal, judicial or administrative process, subpoena, or court order, or by a governmental, regulatory, or self-regulatory authority, or similar body.  For the avoidance of doubt, the Company shall be permitted to disclose at any time the aggregate amount of claims held by any class of Supporting Creditors.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date written above.


**GENCO SHIPPING & TRADING LIMITED**

By: _____
      Name: John C. Wobensmith
      Title: Chief Financial Officer

*Signature page to Restructuring Support Agreement*

**GENCO ACHERON LIMITED**
**GENCO BEAUTY LIMITED**
**GENCO KNIGHT LIMITED**
**GENCO LEADER LIMITED**
**GENCO MUSE LIMITED**
**GENCO VIGOUR LIMITED**
**GENCO CARRIER LIMITED**
**GENCO PROSPERITY LIMITED**
**GENCO SUCCESS LIMITED**
**GENCO WISDOM LIMITED**
**GENCO MARINE LIMITED**
**GENCO EXPLORER LIMITED**
**GENCO PIONEER LIMITED**
**GENCO PROGRESS LIMITED**
**GENCO RELIANCE LIMITED**
**GENCO SURPRISE LIMITED**
**GENCO SUGAR LIMITED**
**GENCO AUGUSTUS LIMITED**
**GENCO TIBERIUS LIMITED**
**GENCO LONDON LIMITED**
**GENCO TITUS LIMITED**
**GENCO CONSTANTINE LIMITED**
**GENCO HADRIAN LIMITED**
**GENCO COMMODUS LIMITED**
**GENCO MAXIMUS LIMITED**
**GENCO CLAUDIUS LIMITED**

**GENCO CHALLENGER LIMITED**
**GENCO CHAMPION LIMITED**
**GENCO CHARGER LIMITED**
**GENCO HUNTER LIMITED**
**GENCO PREDATOR LIMITED**
**GENCO WARRIOR LIMITED**
**GENCO BAY LIMITED**
**GENCO OCEAN LIMITED**
**GENCO AVRA LIMITED**
**GENCO MARE LIMITED**
**GENCO SPIRIT LIMITED**
**GENCO LORRAINE LIMITED**
**GENCO PYRENEES LIMITED**
**GENCO LOIRE LIMITED**
**GENCO CLAUDIUS LIMITED**
**GENCO BOURGOGNE LIMITED**
**GENCO PICARDY LIMITED**
**GENCO AQUITAINE LIMITED**
**GENCO NORMANDY LIMITED**
**GENCO AUVERGNE LIMITED**
**GENCO PROVENCE LIMITED**
**GENCO ARDENNES LIMITED**
**GENCO BRITTANY LIMITED**
**GENCO LANGUEDOC LIMITED**
**GENCO RHONE LIMITED**
**GENCO INVESTMENTS LLC**
**GENCO MANAGEMENT (USA) LLC**
**GENCO SHIP MANAGEMENT LLC**
**GENCO RE INVESTMENTS LLC**

By: _____
Name: John C. Wobensmith
Title: Chief Financial Officer

*Signature page to Restructuring Support Agreement*

**GENCO CAVALIER LLC**
**GENCO RAPTOR LLC**
**GENCO THUNDER LLC**

By: _____
      Name: John C. Wobensmith
      Title: Manager

*Signature page to Restructuring Support Agreement*

Alden Global Capital LLC

_____
Jason Pecora
Managing Director

Please send notices to:

Alden Global Capital on Behalf of the Funds
885 Third Avenue
34th Floor
New York, NY 10022

*[Supporting Creditor Signature Page to Restructuring Support Agreement]*

**APOLLO SPECIAL OPPORTUNITIES
MANAGED ACCOUNT, L.P.**, as Lender

BY: APOLLO SOMA ADVISORS, L.P., its
general partner

BY: APOLLO SOMA CAPITAL
MANAGEMENT, LLC, its general partner

By: _____
Name: Joseph D. Glatt
Title: Vice President

**AES (LUX) S.A R.L.**, as Lender

BY: APOLLO EUROPEAN STRATEGIC
MANAGEMENT, L.P., its investment manager

BY: APOLLO EUROPEAN STRATEGIC
MANAGEMENT GP, LLC, its general partner

By: _____
Name: Joseph D. Glatt
Title: Vice President

**AEC (LUX) S.A R.L.**, as Lender

BY: APOLLO EUROPEAN CREDIT
MANAGEMENT, L.P., its investment manager

BY: APOLLO EUROPEAN CREDIT
MANAGEMENT GP, LLC, its general partner

By: _____
Name: Joseph D. Glatt
Title: Vice President

*[Supporting Creditor Signature Page to Restructuring Support Agreement]*

**APOLLO CENTRE STREET PARTNERSHIP,**
**L.P.**, as Lender

BY: APOLLO CENTRE STREET
MANAGEMENT, LLC, its investment manager

By: _____
    Name:  Joseph D. Glatt
    Title:  Vice President

**ANS U.S. HOLDINGS LTD**, as Lender

BY: APOLLO SK STRATEGIC ADVISORS,
LLC, its sole director

By: _____
    Name:  Joseph D. Glatt
    Title:  Vice President

**APOLLO CREDIT OPPORTUNITY FUND III**
**LP**, as Lender

BY: APOLLO CREDIT OPPORTUNITY
ADVISORS III LP, its general partner

BY: APOLLO CREDIT OPPORTUNITY
ADVISORS III GP LLC, its general partner

By: _____
    Name:  Joseph D. Glatt
    Title:  Vice President

**APOLLO FRANKLIN PARTNERSHIP, L.P.**,
as Lender

BY: APOLLO FRANKLIN ADVISORS (APO
DC), L.P., its general partner

BY: APOLLO FRANKLIN ADVISORS (APO DC-
GP), LLC, its general partner

By: _____
Name: Joseph D. Glatt
Title: Vice President

**APOLLO ZEUS STRATEGIC
INVESTMENTS, L.P.**, as Lender

BY: APOLLO ZEUS STRATEGIC
MANAGEMENT, LLC, its investment manager

By: _____
Name: Joseph D. Glatt
Title: Vice President

Please send notices to:

Bill Schwartz
Apollo Capital Management, L.P.
9 West 57th Street, 37th Floor
New York, NY 10019

*[Supporting Creditor Signature Page to Restructuring Support Agreement]*

[INSERT NAME OF SUPPORTING CREDITOR]

By:
    Name: William M. Kelly
    Title: Chief Operating Officer
    Panning Capital Management, LP, as Investment
    Manager for Panning Master Fund, LP

Please send notices to:

    Panning Capital Management, LP
    510 Madison Ave, 24th Fl
    New York, NY 10022

## **Schedule D**

**Supporting Creditor Holdings by Debt Instrument**

*[Supporting Creditor Signature Page to Restructuring Support Agreement]*

CCP Credit Acquisition Holdings, L.L.C.,

Centerbridge Special Credit Partners II, L.P.

CCP II Acquisition Holdings, LLC

By: _____
    Name: Bao Truong
    Title: Senior Managing Director

Please send notices to:

Attn: Bank Debt Operations Team
Centerbridge Partners, L.P.
375 Park Avenue, 12th Floor
New York, NY 10152
Email: creditadmin@centerbridge.com

*[Supporting Creditor Signature Page to Restructuring Support Agreement]*

MIDTOWN ACQUISITIONS L.P.,

By: Midtown Acquisitions GP LLC, its General Partner

By: _____

   Name:
   Title: Manager

Please send notices to:

65 East 55th Street, 19th Floor | New York, NY 10022

SOLUS ALTERNATIVE ASSET MANAGEMENT LP,

On behalf of certain funds and managed accounts

By: _Christoph Pucillo / by SJB w/ permission_
    Name:  Christopher A. Pucillo
    Title:  Chief Investment Officer

Please send notices to:

Solus Alternative Asset Management LP
410 Park Avenue
New York, NY 10022
Att'n:  Tom Higbie
thigbie@soluslp.com
Att'n:  Stephen Blauner
sblauner@soluslp.com

[_Supporting Creditor Signature Page to Restructuring Support Agreement_]

SOL Loan Funding LLC

By: _____
    Name: Lauri Pool
    Title: Associate Director

Please send notices to:

SOL Loan Funding LLC

*[Supporting Creditor Signature Page to Restructuring Support Agreement]*

ULT Loan Funding 1 LLC

By: _Lauri Pool_____

Name: Lauri Pool

Title: Associate Director

Please send notices to:

ULT Loan Funding 1 LLC

[*Supporting Creditor Signature Page to Restructuring Support Agreement*]

**BNP PARIBAS**

By: _____
    Name:   PAUL BARNES
    Title:   M.D.

By: _____
    Name:   Delphine KAMBOU
    Title:

Please send notices to:

16, Rue de Hanovre
75078 PARIS CEDEX 02
France

Fax: +33(0)1 42 98 43 55
Attention: Paul BARNES

**SKANDINAVISKA ENSKILDA BANKEN AB (PUBL)**

By: _____

Name:

Title:  **Arne Juell-Skielse**

Olof Kajerdt

Please send notices to:

Skandinaviska Enskilda Banken AB (publ)
Shipping Finance, KA3
Kungsträdgårdsgatan 8
106 40 Stockholm
Sweden
Fax: +46 8 678 02 06
Attention: Arne Juell-Skielse

**DVB BANK SE**                                    **DVB BANK SE**

By: _____            By: _____
    Name: TARUN GULLATI                      Name: I. Monhemius
    Title: SENIOR VICE PRESIDENT             Title: SR. VICE PRESIDENT


Please send notices to:

DVB Bank SE
Platz der Republik 6
D-60325 Frankfurt-am-Main
Germany
Fax: +49 69 9750 4875
Attention: Shipping Loans Administration Department

**DEUTSCHE BANK AG FILIALE DEUTSCHLANDGESCHÄFT**

By:
Name: SEEFELD, KERSTIN
Title: Director

Please send notices to:

Deutsche Bank AG Filiale Deutschlandgeschäft
Adolphsplatz 7, 20457 Hamburg,
Germany
Fax: +49 40 3701 4550
Attention: Dirk Niedereichholz

CREDIT INDUSTRIEL ET COMMERCIAL

By: _____
    Name:  Adrienne Molloy
    Title:  Vice President

By: _____
    Name:  Marcus Edward
    Title:  Managing Director

Please send notices to:

Andrew McKuin
Credit Industriel et Commercial
520 Madison Avenue
New York, NY 10022

**CREDIT AGRICOLE CORPORATE AND
INVESTMENT BANK**

By: _____
    Name:   Jerome Salle
    Title:    Director

By: _____
    Name:   Eden Rahman
    Title:    Associate


Please send notices to:

Crédit Agricole Corporate and Investment Bank
9, quai du President Paul Doumer
92920 Paris la Defense
France
Fax: +33 1 41 89 29 87
Attention: Shipping Department

with a copy to

Crédit Agricole Corporate and Investment Bank, New York
Ship Finance Department
1301 Avenue of the Americas
New York, NY 10019
Attention: Jerome Duval / Michael Choina
Tel: 212-261-4039 / 212-261-7363
Fax: +1 917 849 6377
Email: jerome.duval@ca-cib.com / michael.choina@ca-cib.com

WILFRID ADVISORS AG

By:
Name: Nicholas W. Walsh
Title:   President


Please send notices to:

Wilfrid Global Opportunity Fund LP

c/o Wilfrid Aubrey LLC

405 Lexington Avenue Suite #3503

New York, NY 10174

KAYNE ANDERSON CAPITAL ADVISORS, L.P.,
ON BEHALF OF ITSELF AND FUNDS AND ACCOUNTS UNDER
MANAGEMENT WHO ARE CONTROLLED AFFILIATES

By: _____
     Name: Michael Schimmel
     Title: Portfolio Manager


Please send notices to:

Michael Schimmel
Email: mschimmel@kaynecapital.com

**Fidelity Securities Fund: Fidelity Leveraged Company Stock Fund**

By:

Name:                                    Joseph Zambello

Title:                                    Deputy Treasurer

**Fidelity Advisor Series I: Fidelity Advisor Leveraged Company Stock Fund**

By: _____

Name:                          Joseph Zambello

Title:                          Deputy Treasurer

JLP STRESSED CREDIT FUND LP

By: Phoenix Investment Adviser LLC, its Investment Manager

By: _____

    Name: ROBERT YOUREE

    Title: CFO

Please send notices to:

Phoenix Investment Adviser LLC
Attn: Alex Duncan
420 Lexington Avenue, Suite 2040
New York, NY 10170
aduncan@phoenixinvadv.com

cc: Jeffrey Schultz
jschultz@phoenixinvadv.com

JLP CREDIT OPPORTUNITY MASTER FUND LTD.

By: Phoenix Investment Adviser LLC, its Investment Manager

By: _____

    Name:   ROBERT YOUREE

    Title:    CFO


Please send notices to:

Phoenix Investment Adviser LLC
Attn: Alex Duncan
420 Lexington Avenue, Suite 2040
New York, NY 10170
aduncan@phoenixinvadv.com

cc: Jeffrey Schultz
jschultz@phoenixinvadv.com

ADVANTAGE OPPORTUNITIES FUND, L.P.


By:
      Name: Irvin Schlussel
      Title: Managing Partner


Please send notices to:

Merrill Lynch Pierce Fenner, & Smith, Incorporated

By: _____
    Name: Jonathan M Barnes
    Title: Vice President


Please send notices to:

Bank of America, N.A.
214 North Tryon Street
NC1-027-15-01
Charlotte, North Carolina 28255
Attn: Servicing Team TLC004
Tel: 980.388.8943
Fax: 704.409.0154
bas.infomanager@bankofamerica.com

Stone Lion Portfolio L.P.
By: Stone Lion Capital Partners L.P.,
Its Investment Manager

By:

Name:

Title:            Claudia Borg
                  General Counsel

Please send notices to:

Claudia Borg
c/o Stone Lion Capital Partners L.P.
555 Fifth Avenue, 18th Floor
New York, NY 10017
cborg@stonelioncapital.com

[*Supporting Creditor Signature Page to Restructuring Support Agreement*]

Permal Stone Lion Fund Ltd.
By: Stone Lion Capital Partners L.P.,
Investment Manager

By: _____

Name:

Title: **Claudia Borg**
**Authorized Signatory**

Please send notices to:

Claudia Borg
c/o Stone Lion Capital Partners L.P.
555 Fifth Avenue, 18th Floor
New York, NY 10017
cborg@stonelioncapital.com

[*Supporting Creditor Signature Page to Restructuring Support Agreement*]

P&S Credit Management, L.P.

By: _____
    Name: James Palmisciano
    Title: Chief Investment Officer


Please send notices to:

Gracie Asset Management
Attn: James Palmisciano
399 Park Avenue, 6th Floor
New York, NY 10022

Credit Value Partners, LP, for funds and accounts under management

By: Credit Value Partners, LP, as investment manager

By: _____

Name: DONALD POLLARD

Title: MANAGING PARTNER

Please send notices to:

Ryan Eckert
Credit Value Partners, LP
49 W. Putnam Ave.
Greenwich, CT 06830
P: (212)-493-4465
M: (860)-690-8409
E: reckert@cvp7.com

[*Supporting Creditor Signature Page to Restructuring Support Agreement*]

BANK OF AMERICA, N.A.


By: _____
     Name: Jonathan M Barnes
     Title: Vice President



Please send notices to:

Bank of America, N.A.
214 North Tryon Street
NC1-027-15-01
Charlotte, North Carolina 28255
Attn: Servicing Team TLC004
Tel: 980.388.8943
Fax: 704.409.0154
bas.infomanager@bankofamerica.com

NEW GENERATION ADVISORS, LLC

By: _____
    Name: Johan D. Goedkoop
    Title: Vice President

Please send notices to:

Johan D. Goedkoop
New Generation Advisors, LLC
49 Union Street
Manchester, MA 01944
T: 978.704.6202
daan@turnarounds.com

SPCP GROUP, LLC

By: _____
     Name: David Steinmetz
     Title: Authorized Signatory


Please send notices to:

SPCP Group, LLC
2 Greenwich Plaza
1st Floor
Greenwich, CT 06830
Attn: Adam DePanfilis
Phone: 203-542-4407
Fax: 201-719-2157
Email: 12017192157@tls.ldsprod.com

*[Supporting Creditor Signature Page to Restructuring Support Agreement]*

Scoggin LLC as Investment Advisor on behalf of;

Scoggin Capital Management II LLC and

Scoggin International Fund Ltd.

By: _____

Name: Dev Chodry
Title: Co-Chief Investment Officer for Scoggin LLC


Please send notices to:

Nicole Kramer
Scoggin LLC
660 Madison Ave.
New York, N.Y. 10065
nkramer@scogcap.com

Old Bellows Partners L.P. as Investment Advisor on behalf of;

Scoggin Worldwide Fund Ltd and as sub-advisor to the

 J.Goldman Master Fund L.P.

By: _____

      Name: Dev Chodry
      Title: Managing Member of the General Partner of Old Bellows Partners L.P.


Please send notices to:

Nicole Kramer
Scoggin LLC
660 Madison Ave.
New York, N.Y. 10065
nkramer@scogcap.com

Onex Debt Opportunity Fund, Ltd.

By: Onex Credit Partners, LLC., its investment manager

OCP Investment Trust

By: Onex Credit Partners, LLC., its manager

By: _____

    Name: Michael Gelblat
    Title: CEO

Please send notices to:

SGutman@onexcredit.com
KConnors@onexcredit.com
NTorraco@onexcredit.com
MGelblat@onexcredit.com

[*Supporting Creditor Signature Page to Restructuring Support Agreement*]

VENOR CAPITAL MASTER FUND LTD.
By:      Venor Capital Management LP
Its:      Investment Manager

By: _____
      Name:  Michael J. Wartell
      Title:    Co-Chief Investment Officer


Please send notices to:

Venor Capital Master Fund Ltd.
c/o Venor Capital Management LP
7 Times Square, Suite 4303
New York, NY  10036
(212) 703-2100
mwartell@venorcapital.com
jkrautmann@venorcapital.com
jroth@venorcapital.com

*[Supporting Creditor Signature Page to Restructuring Support Agreement]*

MAP 139 SEGREGATED PORTFOLIO OF LMA SPC
By:        Venor Capital Management LP
Its:        Investment Adviser


By: _____
        Name:  Michael J. Wartell
        Title:    Co-Chief Investment Officer


Please send notices to:

MAP 139 Segregated Portfolio of LMA SPC
c/o Venor Capital Management LP
7 Times Square, Suite 4303
New York, NY  10036
(212) 703-2100
mwartell@venorcapital.com
jkrautmann@venorcapital.com
jroth@venorcapital.com

*[Supporting Creditor Signature Page to Restructuring Support Agreement]*

By its execution of this agreement, the Distressed Debt Trading Desk of Citigroup Financial Products Inc. (the "Distressed Desk") binds only itself and not Citigroup Financial Products Inc., Citigroup Inc., or any of their respective desks (other than the Distressed Desk), business units, subsidiaries or affiliates (including any desk or business unit thereof). Moreover, the Distressed Desk shall have no obligation to cause Citigroup Financial Products Inc. or any of its affiliates or desks to take or to refrain from taking any action, provided, however, that Citigroup Financial Products Inc. shall be responsible for ensuring that the Distressed Desk complies with its obligations hereunder.

The Distressed Debt Trading Desk of Citigroup Financial Products Inc.

By: _____

Name:

Title:    Brian S. Broyles
          Authorized Signatory

Please send notices to:

Citigroup Financial Products Inc.
c/o Citibank, N.A.
1615 Brett Road Ops III
New Castle, DE 19720
Brian Blessing / Brian Broyles
Telephone Number: 302-324-6660 / 302-894-6175
Facsimile Number:  212-994-1591
E-Mail Address: brian.m.blessing@citi.com / brian.broyles@citi.com

[*Supporting Creditor Signature Page to Restructuring Support Agreement*]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[JOINING PARTY]**

By: _____
    Name:

    Title:

    Holdings: _____

**[SUPPORTING CREDITOR]**

By: _____
    Name: Jason Pecorra
    Title: Managing director

    Holdings: $12,044,427

Acknowledged:

**Genco Shipping & Trading Limited**

By: _____
    Name:
    Title:

**Genco Acheron Limited**
**Genco Beauty Limited**
**Genco Knight Limited**
**Genco Leader Limited**
**Genco Muse Limited**
**Genco Vigour Limited**
**Genco Carrier Limited**
**Genco Prosperity Limited**
**Genco Success Limited**
**Genco Wisdom Limited**
**Genco Marine Limited**
**Genco Explorer Limited**

STRATEGIC VALUE SPECIAL SITUATIONS MASTER FUND II, L.P.

By: SVP Special Situations II LLC, its Investment Manager

By: _____
      Name: Lewis Schwartz
      Title: Chief Financial Officer


Please send notices to:

**Albert K. Shin**
Managing Director
Strategic Value Partners, LLC
100 West Putnam Avenue
Greenwich, CT 06830
ashin@svpglobal.com

**John Brantl**
Strategic Value Partners (UK) LLP
5 Savile Row, Mayfair, London W1S 3PD
jbrantl@svpglobal.co.uk

**Vitaliy Ardislamov**
Strategic Value Partners (UK) LLP
5 Savile Row, Mayfair, London W1S 3PD
vardislamov@svpglobal.co.uk

[*Supporting Creditor Signature Page to Restructuring Support Agreement*]

STRATEGIC VALUE MASTER FUND, LTD.

By: Strategic Value Partners LLC, its Investment Manager

By: _____
    Name: Lewis Schwartz
    Title: Chief Financial Officer


Please send notices to:

**Albert K. Shin**
Managing Director
Strategic Value Partners, LLC
100 West Putnam Avenue
Greenwich, CT 06830
ashin@svpglobal.com

**John Brantl**
Strategic Value Partners (UK) LLP
5 Savile Row, Mayfair, London W1S 3PD
jbrantl@svpglobal.co.uk

**Vitaliy Ardislamov**
Strategic Value Partners (UK) LLP
5 Savile Row, Mayfair, London W1S 3PD
vardislamov@svpglobal.co.uk

*[Supporting Creditor Signature Page to Restructuring Support Agreement]*

Alden Global Capital LLC

_____
Jason Pecora
Managing Director

Please send notices to:

Alden Global Capital on Behalf of the Funds
885 Third Avenue
34th Floor
New York, NY 10022

*[Supporting Creditor Signature Page to Restructuring Support Agreement]*

## Schedule 1

**Genco Subsidiaries**

1.  Genco Acheron Limited
2.  Genco Beauty Limited
3.  Genco Knight Limited
4.  Genco Leader Limited
5.  Genco Muse Limited
6.  Genco Vigour Limited
7.  Genco Carrier Limited
8.  Genco Prosperity Limited
9.  Genco Success Limited
10. Genco Wisdom Limited
11. Genco Marine Limited
12. Genco Explorer Limited
13. Genco Pioneer Limited
14. Genco Progress Limited
15. Genco Reliance Limited
16. Genco Surprise Limited
17. Genco Sugar Limited
18. Genco Augustus Limited
19. Genco Tiberius Limited
20. Genco London Limited
21. Genco Titus Limited
22. Genco Constantine Limited
23. Genco Hadrian Limited
24. Genco Commodus Limited
25. Genco Maximus Limited
26. Genco Claudius Limited
27. Genco Challenger Limited
28. Genco Champion Limited
29. Genco Charger Limited
30. Genco Hunter Limited
31. Genco Predator Limited
32. Genco Warrior Limited
33. Genco Bay Limited
34. Genco Ocean Limited
35. Genco Avra Limited
36. Genco Mare Limited
37. Genco Spirit Limited
38. Genco Lorraine Limited
39. Genco Pyrenees Limited
40. Genco Loire Limited
41. Genco Bourgogne Limited
42. Genco Picardy Limited

43. Genco Aquitaine Limited
44. Genco Normandy Limited
45. Genco Auvergne Limited
46. Genco Provence Limited
47. Genco Ardennes Limited
48. Genco Brittany Limited
49. Genco Languedoc Limited
50. Genco Rhone Limited
51. Genco Investments LLC
52. Genco Management (USA) LLC
53. Genco Ship Management LLC
54. Genco RE Investments LLC
55. Genco Raptor LLC
56. Genco Cavalier LLC
57. Genco Thunder LLC

## **Schedule 2**

[To Be Redacted]

**Exhibit A**

**Restructuring Term Sheet**

*Execution Version*
*Confidential*

**GENCO SHIPPING AND TRADING LIMITED**
**RESTRUCTURING TERM SHEET**

*APRIL 3, 2014*

This term sheet (the "Restructuring Term Sheet") sets forth the principal terms of a financial restructuring (the "Restructuring") of the existing debt and other obligations of the Company (as defined herein). Subject in all respects to the terms of the Restructuring Support Agreement to which this Restructuring Term Sheet will be attached (the "Restructuring Support Agreement"), the Restructuring will be consummated through a case or cases under chapter 11 (the "Chapter 11 Case(s)") of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). This Restructuring Term Sheet has the support of the Supporting Creditors, as set forth in the Restructuring Support Agreement. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Restructuring Support Agreement, provided that any reference to Required Supporting Creditors in respect to a Debt Instrument shall only be applicable to the extent that such Required Supporting Creditors have not terminated the Restructuring Support Agreement with respect to such Debt Instrument.

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS.

THE TRANSACTIONS DESCRIBED HEREIN WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.[1]

| The Parties | |
|---|---|
| Company | Genco Shipping & Trading Limited ("Genco") and those of its subsidiaries set forth on Schedule 1 to the Restructuring Support Agreement, shall be collectively referred to as the "Company". Genco, and those of its direct and indirect subsidiaries that file chapter 11 cases, shall each be referred to as the "Debtors" or the "Company Parties." |
| 2007 Facility Lenders | Those lenders (collectively, the "2007 Facility Lenders") under that certain Credit Agreement, dated as of July 20, 2007 (as amended to date, the "2007 Credit Agreement"), by and among Genco as borrower, the banks and other financial institutions named therein as lenders, Wilmington Trust, N.A., as successor administrative and successor collateral agent (the "2007 Facility Agent"), and the other mandated lead arranger and bookrunner parties thereto, by which the lenders made available to Genco a senior secured credit facility in the amount of $1,377,000,000 (as amended, the "2007 Facility"). As of the date hereof, $1,055,911,525.00 |

---

[1] For the avoidance of doubt, approval of the Definitive Documents shall be subject to the terms of section 1(b) of the Restructuring Support Agreement.

*Execution Version*
*Confidential*

| | |
|---|---|
| | of the principal amount remains outstanding under the 2007 Facility, plus the 1.25% facility fee payable pursuant to the Amendment and Supplement No. 6 to the 2007 Credit Agreement and accrued and unpaid interest. |
| $253 Million Facility Lenders | Those lenders (collectively, the "$253 Million Facility Lenders") under that certain Loan Agreement, dated as of August 20, 2010 (as amended to date, the "$253 Million Loan Agreement"), for a loan not exceeding $253 million, among Genco as borrower, the banks and financial institutions named therein as lenders, BNP Paribas, Credit Agricole Corporate and Investment Bank, DVB Bank SE, Deutsche Bank AG Filiale Deutschlandgeschaft, and Skandinaviska Enskilda Banken AB (publ) as mandated lead arrangers, BNP Paribas, Credit Agricole Corporate and Investment Bank, DVB Bank SE, Deutsche Bank AG, and Skandinaviska Enskilda Banken AB (publ) as swap providers, and Deutsche Bank Luxembourg S.A. as agent for the lenders (the "$253 Million Facility Agent") and Deutsche Bank AG Filiale Deutschlandgeschaft as security agent (the "$253 Million Facility Security Agent") (as amended, the "$253 Million Facility"). As of the date hereof, $175,718,000.00 of the principal amount remains outstanding under the $253 Million Facility. |
| $100 Million Facility Lenders | Those lenders (collectively, the "$100 Million Facility Lenders") under that certain Loan Agreement, dated as of August 12, 2010 (as amended to date, the "$100 Million Loan Agreement"), for a loan facility of up to $100 million by and among Genco as borrower, Genco Ocean Limited and the other companies named therein as guarantors, the banks and financial institutions named therein as lenders, and Credit Agricole Corporate and Investment Bank as agent and security trustee (the "$100 Million Facility Agent" and, together with the 2007 Facility Agent, the $253 Million Facility Agent and the $253 Million Facility Security Agent, the "Prepetition Agents") (as amended, the "$100 Million Facility"). As of the date hereof, $73,561,132.60 of the principal amount remains outstanding under the $100 Million Facility. |
| Interest Rate Swap Counterparty | DNB Bank ASA (f/k/a DnB Nor Bank ASA), as counterparty under that certain ISDA Master Agreement (the "Interest Rate Swap Counterparty") as well as an interest rate swap on September 7, 2005 (the "Swap"), which provides a hedge against the three month LIBOR interest rate risk at a swap rate of 4.485% on a notional amount of $106.233 million, with an expiration date of July 29, 2015. The Swap is an Interest Rate Protection Agreement (as such term is defined in the 2007 Credit Agreement), which may give rise to claims secured by the collateral securing the 2007 Facility under, and in accordance with the priority scheme set forth in, the 2007 Facility security documents. |
| Convertible Noteholders | Those holders (collectively, the "Convertible Noteholders") of the 5.00% Convertible Senior Notes due August 15, 2015 issued pursuant to that certain Indenture, dated as of July 27, 2010, between Genco as issuer and The Bank of New York Mellon (the "Indenture Trustee") as trustee (the "Convertible Notes" and the claims thereunder, the "Convertible Note Claims"). As of the date hereof, $125 million of the principal amount |

*Execution Version*
*Confidential*

| | remains outstanding under the Convertible Notes. |
|---|---|
| **The Restructuring** | |
| Overview | The Plan will provide for, among other things:<br><br>• a $100.00 million rights offering (the "<u>Rights Offering</u>") for 8.7% of the pro forma equity in Reorganized Genco (the "<u>New Genco Equity</u>"), subject to dilution by the New Genco Warrants (defined below) and the MIP Warrants (defined below). Eligible 2007 Facility Lenders will have the right to participate in up to 80% of the Rights Offering, which portion will be backstopped by the Supporting 2007 Facility Lenders, and eligible Convertible Noteholders will have the right to participate in up to 20% of the Rights Offering, which portion will be backstopped by the Supporting Noteholders;<br><br>• conversion of the full 2007 Facility into 81.1% of the New Genco Equity (after allocation of MIP Primary Equity), subject to dilution by the New Genco Warrants and the MIP Warrants (the "<u>2007 Equity Conversion</u>");<br><br>• refinancing the $253 Million Facility and $100 Million Facility with new senior secured credit facilities or amending the facilities to provide for extended maturity dates through August 2019 and certain other modifications as described more fully below;<br><br>• payment of the Swap Claim (as defined below) in full through mutually acceptable treatment or other treatment consistent with the Bankruptcy Code;<br><br>• the unimpairment of all GUC Claims under section 1124 of the Bankruptcy Code, as described more fully below;<br><br>• the conversion of the Convertible Note Claims into 8.4% of the New Genco Equity (after allocation of MIP Primary Equity), subject to dilution by the New Genco Warrants and the MIP Warrants (the "<u>Note Equity Conversion</u>" and together with the 2007 Equity Conversion, the "<u>Equity Conversion</u>"); and<br><br>• the cancellation of all Equity Interests, with such Equity Interests receiving 7-year warrants for 6.0% of the New Genco Equity struck at $1,295 million equity valuation (the "<u>New Genco Warrants</u>"). |
| Rights Offering | • The Supporting 2007 Facility Lenders and the Supporting Noteholders shall execute an equity commitment agreement (the "<u>Equity Commitment Agreement</u>") mutually acceptable to each of the Company, the Required Supporting 2007 Facility Lenders, and the Required Supporting Noteholders providing for a backstop of the Rights Offering for 60 days.<br><br>• Under the Equity Commitment Agreement, the Supporting 2007 Facility Lenders shall backstop 80% of the Rights Offering and the Supporting Noteholders shall backstop 20% of the Rights Offering. |

*Execution Version*
*Confidential*

| | |
|---|---|
| | • The Equity Commitment Agreement shall provide for reimbursement of the reasonable fees and expenses incurred by the Supporting 2007 Facility Lenders and the Supporting Noteholders, but shall not require a commitment fee.<br><br>• The Equity Commitment Agreement shall be executed by no later than the Solicitation Commencement Date. |
| Exit Financing | • The prepetition $253 Million Facility will either be replaced with a new third-party facility, or rolled into an amended credit facility on the same terms as the prepetition $253 Million Facility, other than the modifications set forth on <u>Annex A</u> attached hereto (the "<u>New $253 Million Facility</u>"), and<br><br>• The prepetition $100 Million Facility will either be replaced with a new third-party facility, or rolled into an amended credit facility on the same terms as the prepetition $100 Million Facility, other than the modifications set forth on <u>Annex B</u> attached hereto (the "<u>New $100 Million Facility</u>").<br><br>• For the avoidance of doubt, the proceeds of any new third-party facility entered into by the Company on the Effective Date must be used to pay down the $253 Million Facility and the $100 Million Facility in cash. |
| Treatment of Claims/Equity Interests | The Plan will provide that each holder of an allowed claim will receive the following on or as soon as practicable after the effective date of the Plan (the "<u>Plan Effective Date</u>"), unless different treatment is agreed to by the holder of such allowed claim and the Company in consultation with the Supporting Creditors:<br><br>• *Administrative, Priority, and Priority Tax Claims:* Allowed administrative, priority, and tax claims will be satisfied in full, in cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.<br><br>• *2007 Facility Claims:* On the Plan Effective Date, the holders of 2007 Facility Claims shall have an allowed claim in the amount of $1,055,911,525.00 plus accrued interest and fees (including the 1.25% facility fee payable under Amendment and Supplement No. 6 to the 2007 Credit Agreement). Holders of allowed claims under the 2007 Facility (the "<u>2007 Facility Claims</u>") will receive their pro rata share of (i) the 2007 Equity Conversion, and (ii) the right to participate in up to 80% of the Rights Offering (for eligible holders) at a $1,128.5 million valuation.<br><br>• *$253 Million Facility Claims*: At the Company's option, holders of allowed claims under the $253 Million Facility (the "<u>$253 Million Facility Claims</u>") will be either (i) paid in full, in cash or (ii) receive their pro rata share of the New $253 Million Facility.<br><br>• *$100 Million Facility Claims*: At the Company's option, holders of allowed claims under the $100 Million Facility (the "<u>$100 Million Facility Claims</u>") will be either (i) paid in full, in cash or (ii) receive |

*Execution Version*
*Confidential*

|  | their pro rata share of the New $100 Million Facility. |
|  | • *Swap Claim:*  On account of the allowed claim arising under the Swap (the "<u>Swap Claim</u>"), the Interest Rate Swap Counterparty shall receive payment in full pursuant to treatment acceptable to the Company, the Required Supporting 2007 Facility Lenders, and the Interest Rate Swap Counterparty, or such other treatment as is consistent with the Bankruptcy Code. |
|  | • *GUC Claims*: Allowed general unsecured claims against the Debtors (other than the Convertible Note Claims) (collectively, the "<u>GUC Claims</u>") will either be reinstated or otherwise rendered unimpaired under the Plan. |
|  | • *Convertible Note Claims*:  On the Plan Effective Date, the holders of Convertible Note Claims shall have an allowed claim in the amount of $125,000,000, plus accrued interest. Holders of Convertible Notes Claims will receive their pro rata share of (i) the Note Equity Conversion, and (ii) the right to participate in up to 20% of the Rights Offering (for eligible holders) at a $1,128.5 million valuation. |
|  | • *Intercompany Claims*: At the Debtors' option, with the reasonable consent of the Required Supporting 2007 Facility Lenders, all intercompany claims and interests shall be either reinstated or receive no distribution on account of such claims and interests on the Effective Date. |
|  | • *Existing Equity*: All existing equity interests (including common stock, preferred stock and any options, warrants or rights to acquire any equity interests) shall be cancelled on the Effective Date.  Holders of equity interests will receive the New Genco Warrants under the Plan. |
| ***Other Plan Terms*** | |
| Conditions to Confirmation | Conditions precedent to Confirmation and/or the occurrence of the Effective Date, each of which may be waived in writing by the Company and the Required Supporting 2007 Facility Lenders, and subject to the consent rights of the Supporting Creditors as provided for in the Restructuring Support Agreement, shall include, without limitation, the following: |
|  | a) Each of the Plan, Disclosure Statement, plan supplement (including, with respect to any amendments, modifications, supplements and exhibits thereto related to the foregoing) and other Definitive Documents (as applicable) shall be approved consistent with the terms of section 1(b) of the Restructuring Support Agreement; |
|  | b) The Confirmation Order shall have been entered and not stayed, and shall be approved consistent with the terms of section 1(b) of the Restructuring Support Agreement; |
|  | c) All actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed |

*Execution Version*
*Confidential*

| | |
|---|---|
| | with the applicable government units in accordance with applicable law; |
| | d) The Restructuring Support Agreement shall have been assumed; and |
| | e) All governmental or other approvals required to effectuate the terms of this Plan shall have been obtained. |
| Releases and Exculpation | The Plan and Confirmation Order shall provide customary release and exculpation provisions for the benefit of the Debtors, the Supporting 2007 Facility Lenders, the Supporting $253 Million Facility Lenders, the Supporting $100 Million Facility Lenders, the Prepetition Agents, the Supporting Noteholders, the Indenture Trustee, and their respective agents, affiliates, principals, officers, directors, attorneys, financial advisors or other professionals or representatives, each in their capacity as such. |
| Cancellation of Notes, Instruments, Certificates and Other Documents | On the Plan Effective Date, except to the extent otherwise provided under the Plan, all notes, instruments, certificates, and other documents evidencing claims against or interests in the Debtors shall be cancelled and the obligations of the Debtors related thereto shall be discharged. |
| Issuance of New Securities; Execution of Plan Documents; Registration Rights | On the Plan Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan. It is the intent of the parties that any "securities" as defined in section 2(a)(1) of the Securities Act of 1933 issued under the Plan, except with respect to any entity that is an underwriter, shall be exempt from registration under U.S. state and federal securities laws pursuant to section 1145 of the Bankruptcy Code and the Reorganized Debtors will use their commercially reasonable efforts to utilize section 1145 of the Bankruptcy Code, or to the extent that such exemption is unavailable, shall use their commercially reasonable efforts to utilize any other available exemptions from registration, as applicable.

On the Plan Effective Date, the Company and any recipient of shares who (together with its affiliates and related funds) receives 10% or more of the New Genco Equity issued under the Plan or who otherwise reasonably believes that it may be an "affiliate" of Reorganized Genco (such stockholders executing the agreement, the "Registration Rights Parties") will enter into a registration rights agreement. The registration rights agreement shall provide Registration Rights Parties who receive 10% or more of New Genco Equity issued under the Plan with demand and piggyback registration rights. All other shareholders party thereto shall have piggyback registration rights only. The registration rights agreement will also provide that on or before the date that is 90 days after the Plan Effective Date, the Company shall file, and shall thereafter use its reasonable best efforts to cause to be declared effective as promptly as practicable, a Registration Statement on Form S-1 for the registration and sale of the New Genco Equity received by the Registration Rights Parties under the Plan pursuant to the public secondary offering (which offering shall be, if requested by one or more selling Registration Rights Parties holding at least 15% of the outstanding shares held by all Registration |

*Execution Version*
*Confidential*

| | |
|---|---|
| | Rights Parties, an underwritten public offering); provided that the Company shall not be required to file such Registration Statement unless at least the Registration Rights Parties, in the aggregate, choose to include at least 15% of the outstanding shares held by all Registration Rights Parties in such Registration Statement. The registration rights agreement shall contain customary terms and conditions, including, but not limited to, the ability by one or more selling Registration Rights Parties holding a majority of the outstanding shares held by all Registration Rights Parties to waive or postpone the filing of the Registration Statement upon the Company's request and provisions with respect to blackout periods. |
| Executory Contracts/Unexpired Leases | The Plan will provide that the executory contracts and unexpired leases that are not assumed or rejected as of the Plan Effective Date pursuant to the Plan or a separate motion will be deemed *assumed*. |
| Management Incentive Plan | The Plan will provide for the establishment of a management equity incentive plan (the "MIP") pursuant to which the directors, officers, and other management of Reorganized Genco will receive the following: (i) 1.8% of the shares of the New Genco Equity (the "MIP Primary Equity"), subject to dilution by the MIP Warrants (as defined below) and the New Genco Warrants, and (ii) the following three tiers of warrants (the "MIP Warrants"): (a) 6-year warrants struck at a $1,618 million equity valuation exercisable for a number of shares equal to 3.5% of the New Genco Equity outstanding (calculated on a fully-diluted basis) as of the Plan Effective Date, (b) 6-year warrants struck at a $1,810 million equity valuation, exercisable for a number of shares equal to 3.5% of the New Genco Equity outstanding (calculated on a fully-diluted basis) as of the Plan Effective Date, and (c) 6-year warrants struck at a $2,195 million equity valuation, exercisable for a number of shares equal to 5.0% of the New Genco Equity outstanding (calculated on a fully-diluted basis) as of the Plan Effective Date. The New Genco Equity issued under the MIP and the MIP Warrants will vest over three years in equal proportions. The holder of any MIP Primary Equity will be entitled to receive all dividends paid with respect to such shares as if such MIP Primary Equity had vested on the grant date (subject to forfeiture by the holder in the event that such grant is terminated prior to vesting unless the administrator of the MIP determines otherwise). The MIP Warrants will be exercisable on a cashless basis and will contain customary anti-dilution provisions (including, but not limited to, dilution as a result of stock-splits, stock dividends, stock buybacks and cash dividends), but will be subject to dilution by future equity issuances including the exercise of subsequent tranches of warrants. |
| Corporate Governance | The terms and conditions of the new corporate governance documents of the Reorganized Debtors (including the bylaws, certificates of incorporation, among other governance documents) shall be approved in accordance with section 1(b) of the Restructuring Support Agreement. For the avoidance of doubt, the new corporate governance documents shall provide for a requirement that affiliate transactions be approved by a majority of the non-affiliated directors or shares (as the case may be). The Plan will provide that upon the Plan Effective Date, the organizational documents of Reorganized Genco shall not provide for transfer restrictions or limitations, provided, however that such corporate governance |

*Execution Version*
*Confidential*

documents may include (a) customary restrictions intended to ensure that transfers will not violate applicable securities laws (but shall not require a legal opinion from the transferor or transferee unless Reorganized Genco reasonably believes that it may involve a transfer to or from an affiliate) and (b) any transfer restrictions deemed reasonably necessary to preserve, to the maximum extent possible, the value of any net operating losses, credits and other tax attributes, and Reorganized Genco's qualification for exemption under Section 883 of the Internal Revenue Code and the Treasury Regulations promulgated thereunder.

The Plan will provide that (a) in the event that Reorganized Genco ceases to be a reporting Company at any time following the Plan Effective Date, then until the date that is 12 months after such event, Reorganized Genco will use commercially reasonable efforts to make the following information available to common stockholders who beneficially own at least 1.0% of the total outstanding shares of Reorganized Genco's common stock (and who provide evidence of such ownership that is reasonably satisfactory to Reorganized Genco), in each case solely to the extent that such information is otherwise available, by posting such information to a secure website or data site to which such stockholders (and potential transferees of such stockholders who affirmatively agree to the terms of a "click through" confidentiality agreement posted by Reorganized Genco on such website or data site) are given access: (i) within 120 days after the end of Reorganized Genco's fiscal year, audited consolidated annual financial statements, and (ii) within 45 days after the end of each of the first three calendar quarters of Reorganized Genco's fiscal year, unaudited quarterly financial statements and (b) until the date that is 12 months after the Plan Effective Date, such provision cannot be amended or modified in any respect without the prior consent of holders of a majority of the outstanding shares of Reorganized Genco's common stock that are held by non-affiliates of Reorganized Genco.

| | |
|---|---|
| Board of Directors | The initial directors of the New Board shall consist of Peter C. Georgiopoulos and 6 other directors to be disclosed in the plan supplement, including (a) 2 directors selected by Centerbridge Partners, L.P., on behalf of one or more of its affiliated investment funds ("Centerbridge"); provided, that if at any time prior to the Plan Effective Date Centerbridge's aggregate holdings (together with its affiliated funds and managed accounts) would not entitle it to a pro forma allocation of (i) at least 20% but more than 10% of the New Genco Equity, then Centerbridge shall only be entitled to select 1 initial director and the 4 directors referenced in subparagraph (b) shall be increased to 5 and (ii) at least 10% of the New Genco Equity, then Centerbridge shall not be entitled to select any directors and the 4 directors referenced in subparagraph (b) shall be increased to 6 and (b) 4 directors selected by a committee consisting of the following entities that own, manage, direct, or have investment authority with respect to indebtedness under the 2007 Credit Facility: (a) Apollo Management Holdings LP; (b) Centerbridge; (c) Midtown Acquisitions L.P.; (d) Panning Capital Management, LP; and (e) Solus Alternative Asset Management LP (collectively, the "Board Selection Committee"), in consultation with the Company and the |

*Execution Version*
*Confidential*

|  | Supporting Noteholders, by majority vote, with each member of the Board Selection Committee having one vote with respect to each initial board seat; provided, that in the event that at any time prior to the Plan Effective Date, any member of the Board Selection Committee's aggregate holdings (together with its affiliated funds and managed accounts) under the 2007 Facility and the Convertible Notes would not entitle such member (together with its affiliated funds and managed accounts) to a pro forma allocation of at least 6.25% of the New Genco Equity, such member shall thereupon automatically cease to be a member of the Board Selection Committee. |
|---|---|
| Management Agreements | The Plan will provide that, on the Plan Effective Date, members of the Debtors' current management team will either (i) continue to be employed under the terms of any existing employment agreements (as assumed) or enter into a new employment agreement on terms no less favorable to such individual than the current employment agreement, or (ii) in the event of a new employment agreement for any member of the management team who is not presently subject to a management agreement, then any such new employment agreement shall be mutually acceptable to the Required Supporting 2007 Facility Lenders and the Debtors, in consultation with the Supporting Noteholders. |
| Initial Officers | All initial officers of Reorganized Genco shall be disclosed in the plan supplement, shall be mutually acceptable to the Debtors and the Required Supporting 2007 Facility Lenders, and shall include John C. Wobensmith. |
| Indemnity | The treatment of all of the Company's indemnification provisions currently in place (whether in the bylaws, certificates of incorporation or employment contracts) for the current directors, officers, employees, managing agents, and attorneys, and such current directors and officers respective affiliates will be assumed by the Company. |
| SEC Registration and Stock Listing | As of the Plan Effective Date, Reorganized Genco will be a reporting company under the Securities Exchange Act and the parties intend that Reorganized Genco will remain a reporting company under the Securities Exchange Act. In the event that, during the one-year period immediately following the Plan Effective Date, Reorganized Genco meets the applicable listing standards, then Reorganized Genco will use commercially reasonable efforts to cause the New Genco Equity to be listed on the New York Stock Exchange or the NASDAQ Stock Market within a reasonable time after the Plan Effective Date. |
| Tax Issues | The Company, in a manner satisfactory to the Required Supporting 2007 Facility Lenders and after consultation with the Supporting Noteholders, will seek to effectuate the terms and conditions outlined herein in a tax efficient manner. |

**<u>Annex A</u>**

**GENCO SHIPPING AND TRADING LIMITED**
**NEW $253 MILLION FACILITY**
**ANNEX A TO RESTRUCTURING TERM SHEET[1]**

| | |
|---|---|
| Final Maturity Date | August 31, 2019[2] |
| Repayment Installments | Quarterly repayment installments in accordance with the terms of the $253 Million Facility, except any repayment(s) missed during the Chapter 11 Cases shall be paid on the effective date of the Plan, which shall be the same date as the effective date of the New $253 Million Facility (as used in this Term Sheet, the "Effective Date"). |
| Financial Covenants (clauses 12.2.1-12.2.5) | (a) The Consolidated Interest Coverage Ratio (clause 12.2.2), Maximum Leverage Ratio (clause 12.2.3) and the Minimum Consolidated Net Worth (clause 12.2.4) shall: <br><br> (i) be waived during the period between the Effective Date and March 31, 2015 (the "Financial Covenant Holiday"); and <br><br> (ii) after the Financial Covenant Holiday, be effective as follows (for the avoidance of doubt, the first test will occur on June 30, 2015): <br><br> (A) Consolidated Interest Coverage Ratio to continue at a minimum of 2.00:1.00;[3] <br> (B) Maximum Leverage Ratio to continue at a maximum of 5.5x;[4] and <br> (C) Minimum Consolidated Net Worth covenant to apply as per clause 12.2.4, except the definition of Minimum Consolidated Net Worth shall be amended as follows: "**Minimum Consolidated Net Worth** shall mean not less than 75% of the Post-Reorganization Equity Value plus 50% of the Net Proceeds received as a result of any new equity issues by the Borrower after the Effective Date." <br><br> (b) With respect to interest-bearing Consolidated Indebtedness (clause 12.2.5), during the Financial Covenant Holiday, interest-bearing Consolidated Indebtedness to be amended so that it cannot exceed 70% of the aggregate amount of interest-bearing Consolidated Indebtedness plus Consolidated Net Worth. Such covenant shall not apply after the Financial Covenant Holiday. <br><br> (c) For the avoidance of doubt, the Minimum Liquidity |

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet or the $253 Million Facility, as applicable.

[2]   Subject to most favored lender provision as set forth below.

[3]   Calculation to be determined and be mutually acceptable.

[4]   Calculation to be determined and be mutually acceptable.

|  | requirement (clause 12.2.1) to remain in effect at all times from and after the Effective Date. |
|---|---|
|  | (d) New fleet-wide minimum liquidity covenant:   New requirement for free cash of at least $750K per vessel for all vessels owned by the Company to be added (with the $750K for each of the 13 vessels pledged as security under the New $253 Million Facility counting toward this calculation). |
|  | (e) For the avoidance of doubt, the definitions, calculations and methodology in the $253 Million Facility to apply with respect to the financial covenants described above unless otherwise provided herein, except for changes which are mutually acceptable. |
| Financial Indebtedness | Clause 12.3.10(b):  Restriction on Financial Indebtedness in connection with the acquisition of a vessel to continue to apply during the Financial Covenant Holiday.  Such restriction not to apply thereafter. |
| Vessels Required to be Under Fixed Rate Time Charters | Delete clause 12.5.18 requiring at least 4 vessels to be under fixed rate time charters. |
| Dividends | No dividends by Genco shall be payable during the Financial Covenant Holiday, and thereafter dividends by Genco shall only be payable if the Company is in compliance with the financial covenants and no breach of the financial covenants will result from such dividend payment. |
|  | Clause 12.3.13(b) shall be modified to reflect that dividends are only permitted if no Default or Event of Default has occurred and is continuing at the time of declaration or payment (clause 12.3.13(b)), with such modifications being acceptable to the Supporting $253 Million Facility Lenders. |
|  | All limitations based on the Permitted Dividend Amount to be deleted. |
|  | Delete clause 12.3.13(a)(iv) regarding Capped Call Arrangements. |
| Interest Rate | LIBOR + 350 bps |
| Upfront Fee | The lenders under the New $253 Million Facility will receive on the Effective Date an upfront fee of 100 bps and Deutsche Bank Luxembourg S.A., as agent, and Deutsche Bank AG Filiale Deutschlandgeschäft, as security agent (together, and in such capacities, the "DB Term Loan Agents") will receive a structuring fee on the Effective Date as detailed in a separate fee letter, each based on the principal amount of the Loans outstanding immediately prior to effectiveness of the New $253 Million Facility. |

| | |
|---|---|
| Most Favored Lender Provision (clause 12.2.6) | Modify to reflect most favored lender provision applicable to financial covenants and interest margin to be set forth in the New $100 Million Facility or any Additional Facility entered into by the Company.  Additional modifications to reflect that this provision is applicable to the maturity dates set forth in the New $100 Million Facility or any new third-party facility entered into by Genco as of the Effective Date.  As of the Effective Date, no credit agreement or other debt instrument shall mature prior to the New $253 Million Facility.  Delete references to Waiver Period in clause 12.2.6 and any related definitions, including Additional Facility. |
| Loans or Advances (clause 12.3.12.(b)) | Delete clause 12.3.12(b)(iii) regarding loans or advances in connection with any joint venture and/or dry bulk shipping operation. |
| Second Liens | Release second liens on any collateral securing the New $253 Million Facility. |
| Other Modifications | Additional modifications to the $253 Million Facility which are necessary, and which shall be in form and substance reasonably acceptable to the Supporting $253 Million Facility Lenders and the Borrower, solely to reflect the occurrence of the Chapter 11 Cases and the terms described herein. |

**Annex B**

**GENCO SHIPPING AND TRADING LIMITED**
**NEW $100 MILLION FACILITY**
**ANNEX B TO RESTRUCTURING TERM SHEET[1]**

| | |
|---|---|
| Final Maturity Date | August 31, 2019[2] |
| Repayment Installments | Quarterly repayment installments in accordance with the terms of the $100 Million Facility, except any repayment(s) missed during the Chapter 11 Cases shall be paid on the effective date of the Plan, which shall be the same date as the effective date of the New $100 Million Facility (as used in this Term Sheet, the "Effective Date"). |
| Financial Covenants (clauses 12.2(d)-(f); 10.2(c)) | (a) The Minimum Consolidated Interest Coverage Ratio (clause 12.2(e)), Maximum Leverage Ratio (clause 12.2(d)) and the Minimum Consolidated Net Worth (clause 12.2(f)) shall: <br><br>(i) be waived during the period between the Effective Date and March 31, 2015 (the "Financial Covenant Holiday"); and <br><br>(ii) after the Financial Covenant Holiday, be effective as follows (for the avoidance of doubt, the first test will occur on June 30, 2015): <br><br>(A) Minimum Consolidated Interest Coverage Ratio to continue at a minimum of 2.00:1.00;[3] <br>(B) Maximum Leverage Ratio to continue at a maximum of 5.5x[4]; and <br>(C) Minimum Consolidated Net Worth covenant to apply as per clause 12.2(f), except the definition of Minimum Consolidated Net Worth shall be amended as follows: "**Minimum Consolidated Net Worth** shall mean not less than 75% of the Post-Reorganization Equity Value plus 50% of the Net Proceeds received as a result of any new equity issues by the Borrower after the Effective Date." <br><br>(b) With respect to interest-bearing Consolidated Indebtedness (clause 4(b) of First Amendment to $100 Million Facility), during the Financial Covenant Holiday, interest-bearing Consolidated Indebtedness to be amended so that it cannot exceed 70% of the aggregate amount of interest-bearing Consolidated Indebtedness plus Consolidated Net Worth. Such covenant shall not apply after |

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet or the $100 Million Facility, as appropriate.

[2]    Subject to, as of the Effective Date, any new third-party facility not maturing prior to the New $100 Million Facility and the New $253 Million Facility (if any).

[3]    Calculation to be determined and mutually acceptable.

[4]    Calculation to be determined and mutually acceptable.

| | |
|---|---|
| | the Financial Covenant Holiday. |
| | (c) For the avoidance of doubt, the Minimum Liquidity requirement (clause 10.2(c)) to remain in effect at all times from and after the Effective Date. |
| | (d) New fleet-wide minimum liquidity covenant:   New requirement for free cash of at least $750K per vessel for all vessels owned by the Company to be added (with the $750K for each of the 5 vessels pledged as security under the New $100 Million Facility counting toward this calculation). |
| | (e) For the avoidance of doubt, the definitions, calculations and methodology in the $100 Million Facility to apply with respect to the financial covenants described above unless otherwise provided herein, except for changes which are mutually acceptable. |
| Financial Indebtedness | Clause 12.2(l):  Restriction on Financial Indebtedness in connection with the acquisition of a vessel to continue to apply during the Financial Covenant Holiday.  Such restriction not to apply thereafter. |
| Dividends | No dividends by Genco shall be payable during the Financial Covenant Holiday.  Thereafter, revert to existing dividend formulation in $100 Million Facility, except that all limitations based on the Permitted Dividend Amount shall be eliminated.  For the avoidance of doubt, after the Financial Covenant Holiday dividends by Genco shall only be payable if the Company is in compliance with the financial covenants and no breach of the financial covenants will result from such dividend payment.  Delete clause 12.2(g)(v) regarding Capped Call Arrangements. |
| Interest Rate | LIBOR + 350 bps |
| Upfront Fee | The lenders under the New $100 Million Facility will receive on the Effective Date an upfront fee of 100 bps and Credit Agricole Corporate and Investment Bank, as agent and security trustee, will receive a structuring fee on the Effective Date as detailed in a separate fee letter, each based on the principal amount of the Loans outstanding immediately prior to effectiveness of the New $100 Million Facility. |
| Most Favored Lender Provision | Add most favored lender provision applicable to financial covenants and interest margin, to be set forth in the New $253 Million Facility or any other Additional Facility entered into by the Company.  Delete references to "Ratio Suspension Period" or "Amended Facility" in the definition of Additional Facility.  For the avoidance of doubt, as of the Effective Date, no credit agreement or other debt instrument shall mature prior to the New $100 Million Facility. |

| Second Liens | Release of second liens on any collateral securing the New $100 Million Facility. |
| Other Modifications | Additional modifications to the $100 Million Facility which are necessary, and which shall be in form and substance reasonably acceptable to the Supporting $100 Million Facility Lenders and to the Borrower , solely to reflect the occurrence of the Chapter 11 Cases and the terms described herein. |

**<u>Exhibit B</u>**

**Form of Cash Collateral Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                                        :
In re:                                                  :    Chapter 11
                                                        :
GENCO SHIPPING & TRADING LIMITED, et al.,               :    Case No.
                                                        :
                                    Debtors.            :    [Joint Administration Pending]
                                                        :
-------------------------------------------------------------------X

**INTERIM ORDER (I) AUTHORIZING USE OF CASH COLLATERAL
PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE
PROTECTION TO SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361,
362, AND 363, (III) SCHEDULING FINAL HEARING PURSUANT TO
BANKRUPTCY RULE 4001(b) AND (IV) GRANTING RELATED RELIEF**

Upon the motion of Genco Shipping & Trading Limited and its affiliated debtors,

as debtors-in-possession (collectively, the "Debtors"[1]) in the above-captioned chapter 11 cases

(the "Chapter 11 Cases"), dated [_____], 2014 (the "Motion"),[2] for an interim order (this

"Interim Order") and a final order (a "Final Order," and together with this Interim Order, the

---

[1]    The Debtors and, if applicable, the last four digits of their taxpayer identification numbers are as follows:
Genco Shipping & Trading Limited (9758), Genco Investment LLC, Genco Management (USA) LLC
(3865), Genco RE Investments LLC, Genco Ship Management LLC (7604), Genco Acheron Limited
(9293), Genco Aquitaine Limited (8217), Genco Ardennes Limited (8215), Genco Augustus Limited
(3622), Genco Auvergne Limited (8233), Genco Avra Limited (5557), Genco Bay Limited (5558), Genco
Beauty Limited (9761), Genco Bourgogne Limited (8236), Genco Brittany Limited (8237), Genco Carrier
Limited (9763), Genco Cavalier LLC (9764), Genco Challenger Limited (6074), Genco Champion Limited
(6073), Genco Charger Limited (6072), Genco Claudius Limited (3620), Genco Commodus Limited
(3619), Genco Constantine Limited (3617), Genco Explorer Limited (9764), Genco Hadrian Limited
(3608), Genco Hunter Limited (6158), Genco Knight Limited (9773), Genco Languedoc Limited (8238),
Genco Leader Limited (9774), Genco Loire Limited (8239), Genco London Limited (3610), Genco
Lorraine Limited (8242), Genco Mare Limited (5641), Genco Marine Limited (9775), Genco Maximus
Limited (3613), Genco Muse Limited (5276), Genco Normandy Limited (8243), Genco Ocean Limited
(5645), Genco Picardy Limited (8244), Genco Pioneer Limited (9767), Genco Predator Limited (6075),
Genco Progress Limited (9776), Genco Prosperity Limited (9777), Genco Provence Limited (8246), Genco
Pyrenees Limited (8599), Genco Raptor LLC (9767), Genco Reliance Limited (9768), Genco Rhone
Limited (8248), Genco Spirit Limited (5650), Genco Success Limited (9769), Genco Sugar Limited (9778),
Genco Surprise Limited (9385), Genco Thunder LLC (9769), Genco Tiberius Limited (3614), Genco Titus
Limited (3615), Genco Vigour Limited (9770), Genco Warrior Limited (6076), and Genco Wisdom
Limited (9771). The Debtors' business address is 299 Park Avenue, New York, NY 10171. Neither Baltic
Trading Limited nor its subsidiaries are Debtors.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
Motion.

"Cash Collateral Orders") under sections 105, 361, 362, 363, 506(c), 507(b), and 552 of title 11

of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"),

Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as

amended, the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of the United States

Bankruptcy Court for the Southern District of New York (the "Local Rules"), and having sought,

among other things, the following relief:

     (a)    authorization of the Debtors' use of property constituting Cash Collateral (as

defined below), subject to and pursuant to the terms and conditions set forth in this

Interim Order;

     (b)    the granting of adequate protection on account of the Debtors' use of Cash

Collateral and any diminution in value of the Prepetition Secured Parties' (as defined

below) respective interests in the Prepetition Collateral (as defined below), subject to and

pursuant to the terms and conditions set forth in this Interim Order, to:

     i.    the 2007 Facility Secured Parties (as defined below) under that certain

Credit Agreement, dated as of July 20, 2007 (as amended, restated, supplemented, or

otherwise modified, the "2007 Credit Agreement," and collectively with all

agreements, documents, notes, mortgages, security agreements, pledges, guarantees,

subordination agreements, deeds, instruments, indemnities, indemnity letters, working

fee letters, assignments, charges, amendments, and any other agreements delivered

pursuant thereto or in connection therewith, including the "Credit Documents" as

such term is defined in the 2007 Credit Agreement, the "2007 Facility Documents")

by and among Genco Shipping & Trading Limited ("GS&T"), as borrower, the

various guarantor parties thereto, as guarantors (the "2007 Facility Guarantors," and

2

collectively with GS&T, the "2007 Facility Obligors"), the mandated lead arranger and bookrunner parties thereto, the banks and financial institutions party thereto, as lenders (the "2007 Facility Lenders"), and Wilmington Trust, National Association, as successor administrative agent and successor collateral agent (in such capacities, the "2007 Facility Agent," and collectively with the 2007 Facility Lenders and any other "Secured Creditors" (as defined in the 2007 Credit Agreement), the "2007 Facility Secured Parties");

ii.      the DB Term Loan Secured Parties (as defined below) under that certain $253,000,000 Secured Loan Agreement, dated August 20, 2010 (as amended, restated, supplemented, or otherwise modified, the "DB Term Loan Agreement," and collectively with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, deeds, instruments, indemnities, indemnity letters, working fee letters, assignments, charges, amendments, and any other agreements delivered pursuant thereto or in connection therewith, the "DB Term Loan Documents") by and among GS&T, as borrower, the mandated lead arranger and bookrunner parties thereto, the banks and financial institutions party thereto, as lenders and swap providers (respectively, the "DB Term Loan Lenders" and the "DB Term Loan Swap Providers") and Deutsche Bank Luxembourg S.A., as agent and Deutsche Bank AG Filiale Deutschlandgeschäft, as security agent (together, and in such capacities, the "DB Term Loan Agents," and collectively with the DB Term Loan Lenders and the DB Term Loan Swap Providers, the "DB Term Loan Secured Parties") and the guarantees by certain parties named therein as

guarantors (the "<u>DB Term Loan Guarantors</u>," and collectively with GS&T, the "<u>DB Term Loan Obligors</u>"); and

  iii.  the CA Term Loan Secured Parties (as defined below) under that certain Loan Agreement, dated as of August 12, 2010 (as amended, restated, supplemented, or otherwise modified, the "<u>CA Term Loan Agreement</u>," and collectively with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, deeds, instruments, indemnities, indemnity letters, working fee letters, assignments, charges, amendments, and any other agreements delivered pursuant thereto or in connection therewith, the "<u>CA Term Loan Documents</u>") by and among GS&T, as borrower, the various subsidiary guarantor parties thereto, as guarantors (the "<u>CA Term Loan Guarantors</u>," and collectively with GS&T, the "<u>CA Term Loan Obligors</u>"), the banks and financial institutions party thereto, as lenders (respectively, the "<u>CA Term Loan Lenders</u>") and Credit Agricole Corporate and Investment Bank, as agent and security trustee (in such capacities, the "<u>CA Term Loan Agent</u>," and collectively with the CA Term Loan Lenders, the "<u>CA Term Loan Secured Parties</u>") (the 2007 Facility Secured Parties, the DB Term Loan Secured Parties, and the CA Term Loan Secured Parties, collectively, the "<u>Prepetition Secured Parties</u>") (the CA Term Loan Agent, the DB Term Loan Agent, and the 2007 Facility Agent, the "<u>Prepetition Agents</u>");

(c)  approving certain stipulations by the Debtors as set forth in this Interim Order with respect to the 2007 Facility Documents, the DB Term Loan Documents and the CA Term Loan Documents (each as defined below), and the liens and security interests arising therefrom;

(d)      subject to entry of the Final Order and to the extent set forth herein and therein, waiving any right to surcharge the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or other applicable law;

(e)      modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors and the Secured Parties to implement the terms of the Cash Collateral Orders;

(f)      scheduling a final hearing (the "Final Hearing") on the Motion no later than the forty-fifth day following entry of this Interim Order to consider entry of the Final Order granting the relief requested in the Motion on a final basis; and

(g)      waiving any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Interim Order.

Upon due and sufficient notice of the Motion and the interim hearing on the Motion (the "Interim Hearing") having been provided by the Debtors; and the Interim Hearing having been held on [_____], 2014; and after considering all the pleadings filed with this Court; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper in this District pursuant to 28 U.S.C. § 1408; and upon the record made by the Debtors at the Interim Hearing; and the Court having found and determined that the relief sought in the Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and is otherwise fair and reasonable and in the best interests of the Debtors, their estates and creditors, and is essential for the continued operation of the Debtors' businesses; all objections, if any, to the entry of this

5

Interim Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and consideration and good and sufficient cause appearing therefor,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    <u>Petition Date</u>.  On [_____], 2014 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>").  On [_____], 2014, this Court entered an order approving the joint administration of the Chapter 11 Cases. The Debtors are continuing in the management and operation of their business and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner or official committee of unsecured creditors (a "<u>Creditors' Committee</u>," and together with any other statutory committee, the "<u>Committees</u>" and each, a "<u>Committee</u>") has been appointed in these Chapter 11 Cases.

B.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    <u>Debtors' Stipulations</u>.  The Debtors admit, acknowledge, agree and stipulate to the following (collectively, the "<u>Debtors' Stipulations</u>"), subject to the provisions of paragraph 7 of this Interim Order:

1.    <u>Description of Prepetition Secured Obligations.</u>

(a) *2007 Credit Facility Obligations*.  Prior to the Petition Date, pursuant to the 2007 Credit Agreement and the other 2007 Facility Documents, the 2007

Facility Lenders made available to GS&T as borrower, a senior secured credit facility (the "2007 Facility") in the principal amount of $1,377,000,000. Each of the 2007 Facility Guarantors became party to a Guaranty (as defined in the 2007 Credit Agreement), pursuant to which it provided an unconditional joint and several guaranty of the 2007 Facility Obligations (as defined below) arising under the 2007 Facility Documents. As of the Petition Date, the 2007 Facility Obligors were truly and justly indebted to the 2007 Facility Secured Parties pursuant to the 2007 Facility Documents, without defense, counterclaim, offset, claim or cause of action of any kind, in the aggregate principal amount of not less than (i) $1,055,911,525.00 outstanding under the 2007 Facility, plus (ii) accrued and unpaid interest with respect thereto, fees, costs and expenses (including any attorneys', financial advisors', and other professionals' fees and expenses that are chargeable or reimbursable under 2007 Facility Documents), and all other "Obligations" (as defined in the 2007 Credit Agreement or any security document related thereto) under the 2007 Credit Facility Documents (collectively, the "2007 Facility Obligations").[3]

(b) *DB Term Loan Obligations.* Prior to the Petition Date, pursuant to the DB Term Loan Agreement and the other DB Term Loan Documents, the DB Term Loan Lenders made available to GS&T as borrower, a term loan (the "DB Term Loan") in the principal amount of $253,000,000. Each of the DB

---

[3]    The 2007 Facility Secured Parties include the counterparties to an Interest Rate Protection Agreement (as such term is defined in the 2007 Credit Agreement), which may give rise to claims secured by the 2007 Facility Prepetition Collateral under (and in accordance with the priority scheme set forth in) the 2007 Facility Documents.

Term Loan Guarantors provided an unconditional guarantee of the DB Term Loan Obligations (as defined below) arising under the DB Term Loan Documents.  As of the Petition Date, the DB Term Loan Obligors were truly and justly indebted to the DB Term Loan Secured Parties pursuant to the DB Term Loan Documents, without defense, counterclaim, offset, claim or cause of action of any kind, in the aggregate principal amount of not less than  (i) $175,718,000.00  outstanding  under  the  DB  Term  Loan  plus (ii) accrued and unpaid interest with respect thereto, fees, costs and expenses (including any attorneys', financial advisors', and other professionals' fees and expenses that are chargeable or reimbursable under the DB Term Loan Documents), and all other obligations under the DB Term Loan Documents (collectively, the "DB Term Loan Obligations").

(c)    *CA Term Loan Obligations*.  Prior to the Petition Date, pursuant to the CA Term Loan Agreement and the other CA Term Loan Documents, the CA Term Loan Lenders made available to GS&T as borrower, a term loan (the "CA Term Loan") in the principal amount of $100,000,000.  Each of the CA Term Loan Guarantors provided an unconditional joint and several guaranty of the CA Term Loan Obligations (as defined below) arising under the CA Term Loan Documents.   As of the Petition Date, the CA Term Loan Obligors were truly and justly indebted to the CA Term Loan Secured Parties pursuant to the CA Term Loan Documents, without defense, counterclaim, offset, claim or cause of action of any kind, in the aggregate principal amount of not less than (i) $73,561,132.60 outstanding under the

CA Term Loan plus (ii) accrued and unpaid interest with respect thereto, fees, costs and expenses (including any attorneys', financial advisors', and other professionals' fees and expenses that are chargeable or reimbursable under the CA Term Loan Documents), and all other obligations under the CA Term Loan Documents (collectively, the "<u>CA Term Loan Obligations</u>," and collectively with the 2007 Facility Obligations and the DB Term Loan Obligations, the "<u>Prepetition Secured Obligations</u>").

2. <u>Validity of Prepetition Secured Obligations and Prepetition Loan Documents</u>. The Prepetition Secured Obligations, constitute legal, valid and binding obligations of the 2007 Facility Obligors, the DB Term Loan Obligors and the CA Term Loan Obligors, as applicable (collectively, the "<u>Obligors</u>"). No offsets, defenses, or counterclaims to, or claims or causes of action that could reduce the amount or ranking of, the Prepetition Secured Obligations exist. No portion of the Prepetition Secured Obligations is subject to set-off, avoidance, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity. The 2007 Facility Documents, the DB Term Loan Documents, and the CA Term Loan Documents (collectively, the "<u>Prepetition Loan Documents</u>") are valid and enforceable by each of the Prepetition Secured Parties, as applicable, for the benefit of the Prepetition Secured Parties against each of the applicable Obligors. The Prepetition Secured Obligations constitute allowed claims against the applicable Obligors' estates. As of the Petition Date, no claim of or cause of action held by the

Debtors or their estates exists against any of the Prepetition Secured Parties or their

agents, in such capacities, whether arising under applicable state, federal, or foreign law

(including, without limitation, any recharacterization, subordination, avoidance, or

other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the

Bankruptcy Code), or whether arising under or in connection with any of the

Prepetition Loan Documents (or the transactions contemplated thereunder), the

Prepetition Secured Obligations, or the Prepetition Liens (as defined below).

3.    <u>Description of Prepetition Liens and Prepetition Collateral</u>.

(a)    Pursuant to and as more particularly described in the 2007 Facility

Documents, the 2007 Facility Obligations are secured by, among other

things, (i) first priority liens or mortgages on, security interests in, and

assignments, charges, or pledges of (the "<u>2007 Facility First Liens</u>"), certain

property, including, without limitation, certain cash collateral as defined in

section 363 of the Bankruptcy Code (the "<u>Cash Collateral</u>"), vessels owned

by the 2007 Facility Obligors, and other "Collateral" as such term is defined

in the 2007 Credit Agreement (collectively, the "<u>2007 Facility First Lien</u>

<u>Collateral</u>") and (ii) second priority liens or mortgages on, security interests

in, and charges or assignments of (the "<u>2007 Facility Second Liens</u>," and

collectively with the 2007 Facility First Priority Liens, the "<u>2007 Facility</u>

<u>Prepetition Liens</u>"), certain vessels and insurances owned by the DB Term

Loan Obligors and the CA Term Loan Obligors, respectively (collectively,

the "<u>2007 Facility Second Lien Collateral</u>," and together with the 2007

Facility First Lien Collateral, the "<u>2007 Facility Prepetition Collateral</u>").

10

(b) Pursuant to and as more particularly described in the DB Term Loan Documents, the DB Term Loan Obligations are secured by first priority liens or mortgages on, security interests in, and assignments, charges, or pledges of (the "<u>DB Term Loan Prepetition Liens</u>"), certain property described in the DB Term Loan Documents, including, without limitation, certain Cash Collateral, and vessels owned by the DB Term Loan Guarantors (collectively, the "<u>DB Term Loan Prepetition Collateral</u>").

(c) Pursuant to and as more particularly described in the CA Term Loan Documents, the CA Term Loan Obligations are secured by first priority liens or mortgages on, security interests in, and assignments, charges, or pledges of (the "<u>CA Term Loan Prepetition Liens</u>," and collectively with the 2007 Facility Prepetition Liens and the DB Term Loan Prepetition Liens, the "<u>Prepetition Liens</u>"), certain property described in the CA Term Loan Documents, including, without limitation, certain Cash Collateral and vessels owned by the CA Term Loan Guarantors (collectively, the "<u>CA Term Loan Prepetition Collateral</u>," and collectively with the 2007 Facility Prepetition Collateral and the CA Prepetition Collateral, the "<u>Prepetition Collateral</u>").

(d) The respective rights to, and priority of security interests with respect to any DB Term Loan Prepetition Collateral that also constitutes 2007 Facility Second Lien Collateral, among (i) the 2007 Facility Secured Parties, on the one hand, and (ii) the DB Term Loan Secured Parties, on the other, are set forth in the Deed of Coordination, dated as of August 1, 2012, among

11

GS&T, the collateral owners party thereto, Deutsche Bank AG Filiale Deutschlandgeschäft, in its capacity as the "First Mortgagee," and the 2007 Facility Agent, in its capacity as the "Second Mortgagee" (as amended, modified, or otherwise supplemented, the "<u>DB Term Loan Deed of Coordination</u>").

(e) The respective rights to, and priority of security interests with respect to any CA Term Loan Prepetition Collateral that also constitutes 2007 Facility Second Lien Collateral among  (i) the 2007 Facility Secured Parties, on the one hand, and (ii) the CA Term Loan Secured Parties, on the other, are set forth in the Deed of Coordination, dated as of August 1, 2012, among GS&T, the collateral owners party thereto, Credit Agricole Corporate and Investment Bank, in its capacity as the "First Mortgagee," and the 2007 Facility Agent, in its capacity as the "Second Mortgagee" (as amended, modified, or otherwise supplemented, the "<u>CA Term Loan Deed of Coordination</u>," and together with the DB Term Loan Deed of Coordination, the "<u>Deeds of Coordination</u>").

4.  <u>Validity and Perfection of Prepetition Liens.</u>   The Prepetition Liens are (i) valid, binding, perfected and enforceable liens on and security interests in the applicable Prepetition Collateral; (ii) not subject to, pursuant to the Bankruptcy Code or other applicable law (foreign or domestic), avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual, or otherwise), attachment, offset, counterclaim, defense, "claim" (as defined in the Bankruptcy Code), impairment or any other challenge of any kind by any person or

entity; and (iii) subject and subordinate only to (a) the Carve-Out (as defined below) and (b) valid and enforceable liens and encumbrances in the Prepetition Collateral that were made expressly senior to the applicable Prepetition Secured Parties' liens under the applicable Prepetition Loan Documents, that are valid, perfected, enforceable and non-avoidable as of the Petition Date and that are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law ("Permitted Liens"), and each Debtor irrevocably waives, for itself and its estate, any right to challenge or contest in any way the perfection, validation and enforceability of the Prepetition Liens or the validity or enforceability of the Prepetition Secured Obligations and the Prepetition Loan Documents.  The Prepetition Liens were granted to the respective Prepetition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with the making of loans, commitments, and/or other financial accommodations under the Prepetition Loan Documents.

5.   Releases by Debtors.  Each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries, and assigns (collectively, the "Releasors") shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the Prepetition Secured Parties, in such capacities, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the

"Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof relating to any of the Prepetition Loan Documents, or the transactions contemplated under such documents, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Secured Parties.  The Debtors' acknowledgments, stipulations, waivers, and releases shall be binding on the Debtors and their respective representatives, successors and assigns and, subject to any action timely commenced before the Investigation Termination Date (as defined below), on each of the Debtors' estates and all entities and persons, including any creditors of the Debtors, and each of their respective representatives, successors and assigns, including, without limitation, any trustee or other representative appointed in these Chapter 11 Cases, whether such trustee or representative is appointed under chapter 11 or chapter 7 of the Bankruptcy Code.  For the avoidance of doubt, the foregoing release shall not act to release any independent, non-derivative claims of third parties against the Releasees.

6. <u>Indemnification</u>.  The Prepetition Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by any of them in connection with or related in any way to negotiating, implementing, documenting or obtaining requisite approvals of the use of Cash Collateral, including in respect of the granting of the Adequate Protection Liens (as defined below), the use of Cash Collateral under this Interim Order, and all documents related to and all transactions contemplated by the foregoing.  Accordingly, the Prepetition Secured Parties shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto; <u>provided</u> that no such party will be indemnified for any cost, expense or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such party's bad faith, gross negligence, or willful misconduct.  No exception or defense in contract, law or equity exists as to any obligation set forth, as the case may be, in this paragraph C.6 or in the Prepetition Loan Documents to indemnify and/or hold harmless any Prepetition Agent or Prepetition Secured Party, as the case may be, and any such defenses are hereby waived; <u>provided</u>, that any fees and expenses incurred by or on behalf of the Prepetition Secured Parties pursuant to this paragraph shall be paid in accordance with paragraph 4(c) hereof.

D.    <u>Approved Budget</u>.  Attached hereto as <u>Exhibit A</u> is an initial 13-week cash flow forecast setting forth all projected cash receipts and cash disbursements on a weekly basis (as revised from time-to-time in accordance with paragraph 4.e of this Interim Order, the "<u>Approved Budget</u>").  The Approved Budget is an integral part of this Interim Order and

15

has been relied upon by the Prepetition Secured Parties in consenting to this Interim Order and to permit the use of the Cash Collateral. The Debtors represent and warrant to the Prepetition Secured Parties and this Court that the Approved Budget includes and contains the Debtors' best estimate of all operational receipts and all operational disbursements, fees, costs, and other expenses that will be payable, incurred and/or accrued by any of the Debtors during the period covered by the Approved Budget and that such operational disbursements, fees, costs, and other expenses will be timely paid in the ordinary course of business pursuant to and in accordance with the Approved Budget unless such operational disbursements, fees, costs, and other expenses are not incurred or otherwise payable. The Debtors further represent that, to the best of their knowledge as of the date hereof, the Approved Budget is achievable and will allow the Debtors to operate in the Chapter 11 Cases and pay postpetition administrative expenses as they come due. The Debtors shall be required to update the Approved Budget and provide to the Prepetition Agents a Budget Variance Report (as defined below) in accordance with the provisions of paragraph 4.e of this Interim Order.

E.  <u>Use of Cash Collateral</u>.  An immediate and critical need exists for the Debtors to use the Cash Collateral, consistent with the Approved Budget, for (i) working capital purposes; (ii) other general corporate purposes of the Debtors; and (iii) the satisfaction of the costs and expenses of administering the Chapter 11 Cases.

F.  <u>Consent by Prepetition Secured Parties</u>.  The Prepetition Agents have consented to, conditioned on the entry of this Interim Order, the Debtors' proposed use of Cash Collateral, on the terms and conditions set forth in this Interim Order, and such consent is binding on all Prepetition Secured Parties.

16

G.    <u>Adequate Protection</u>.    The adequate protection provided to the Prepetition Secured Parties, as set forth more fully in paragraph 4 of this Interim Order, for the imposition of the automatic stay and any diminution in the value of the Prepetition Secured Parties' interest in the Prepetition Collateral from and after the Petition Date resulting from the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, the use, sale, or lease of the Prepetition Collateral (including any Cash Collateral) under section 363 of the Bankruptcy Code is consistent with, and authorized by, the Bankruptcy Code and is offered by the Debtors to protect such parties' interests in the Prepetition Collateral in accordance with sections 361, 362, and 363 of the Bankruptcy Code.    The adequate protection provided herein and other benefits and privileges contained herein are necessary in order to (i) protect the Prepetition Secured Parties from the diminution of their respective interests in the value of their Prepetition Collateral and (ii) obtain the foregoing consents and agreements.

H.    <u>Good Cause Shown; Best Interest</u>.    The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and Local Rule 4001-2. Absent entry of this Interim Order, the Debtors' businesses, properties, and estates will be immediately and irreparably harmed.    This Court concludes that good cause has been shown and entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for a successful reorganization.

I.    <u>No Liability to Third Parties</u>.    The Debtors stipulate and the Court finds that none of the Prepetition Secured Parties shall (i) have liability to any third party or be deemed

to be in control of the operation of any of the Debtors or to be acting as a "controlling person," "responsible person," "owner or operator, " or "participant" with respect to the operation or management of any of the Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any other Federal, state, or applicable international statute or regulation) or (ii) owe any fiduciary duty to any of the Debtors, their creditors or estates, or shall constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.

J.      Section 552(b). Each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.  Subject to the Final Hearing and entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits with respect to any of the Prepetition Collateral (including any charter-hire receipts, earnings, insurance proceeds, or similar payments received by an applicable Obligor after the Petition Date).

K.      Notice. The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001 and S.D.N.Y. Local Bankruptcy Rule 4001-2.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided to (a) the Office of the United States Trustee for the Southern District of New York; (b) the Debtors' material prepetition secured lenders or any agent therefor; (c) counsel to the Debtors' material prepetition secured lenders; (d) Akin Gump Strauss Hauer & Feld, LLP, as counsel to certain holders of the Debtors' 5.00% Convertible Senior Notes due August 15, 2015 (such holders, the "Supporting Noteholders"); (e) the indenture trustee for the Debtors' convertible notes;

(f) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis;

(g) the Internal Revenue Service; (h) the United States Attorney for the Southern District of

New York; (i) the U.S. Securities and Exchange Commission; and (j) any such other party

entitled to notice pursuant to Local Rule 9013-1(b).  Under the circumstances, such notice of

the Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy

Rules 4001(b), (c), and (d), and the Local Rules.

Based upon the foregoing, and upon the record made before this Court at the

Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

1.      <u>Approval of Interim Order</u>.  The Motion is approved on the terms and

conditions set forth in this Interim Order.  Any objections that have not previously been

withdrawn are hereby overruled.  This Interim Order shall become effective immediately upon

its entry.

2.      <u>Authorization to Use Cash Collateral</u>.  Pursuant to this Interim Order, the

Debtors are authorized on an interim basis to use Cash Collateral for:  (i) working capital

purposes; (ii) other general corporate purposes of the Debtors; and (iii) the satisfaction of the

costs and expenses of administering the Chapter 11 Cases in accordance with the Approved

Budget (subject to the Permitted Variances (as defined below)) through and including the

Termination Date (as defined below) (the "<u>Cash Collateral Period</u>").

3.      <u>Termination Events</u>.  Notwithstanding anything contained herein, the

authority for use of Cash Collateral under this Interim Order shall terminate (the "<u>Termination</u>

<u>Date</u>") upon the earlier to occur of (each of the following, a "<u>Termination Event</u>"):  (i) 11:59

p.m. on the forty-fifth day after the Petition Date, to the extent the Final Order (in form and

19

substance acceptable to the Prepetition Agents) has not been approved by this Court by such date; (ii) five (5) days after notice of the date upon which any Event of Default (as defined below) occurs and is continuing; (iii) the date this Interim Order ceases to be in full force and effect for any reason to the extent the Final Order has not been entered at such time; (iv) the date the Court enters an order dismissing any of the Chapter 11 Cases; (v) the date the Court enters an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; and (vi) the date that any Debtor shall file a motion seeking any modification or extension of this Interim Order without the prior written consent of each of the Prepetition Agents.

4.    <u>Prepetition Secured Parties' Adequate Protection</u>.    The Prepetition Secured Parties are entitled pursuant to sections 361 and 363(c) of the Bankruptcy Code to adequate protection of their interests in the Prepetition Collateral (including Cash Collateral) for any diminution in the value of the Prepetition Secured Parties' interest in the Prepetition Collateral from and after the Petition Date in any way, including resulting from the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, or the use, sale, or lease of the Prepetition Collateral (including Cash Collateral) under section 363 of the Bankruptcy Code. The Prepetition Agents, as applicable and on behalf of themselves and for the benefit of the respective Prepetition Secured Parties, are hereby granted, to the extent of any diminution in value of their interests in the Prepetition Collateral from and after the Petition Date, the following:

a. <u>Adequate Protection Liens</u>.  To the extent set forth below, valid, binding, enforceable and perfected security interests in and liens upon (the "<u>Adequate Protection Liens</u>") all property, whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy

Code), property of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, vessels, charter-hire receipts, earnings, insurance policies and proceeds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, and causes of action (other than causes of action arising under sections 502(d), 544, 545, 547, 548, 550 (unless related to an action under 549), 551 (unless related to an action under 549), or 553 of the Bankruptcy Code (the "Avoidance Actions")) and, subject to entry of the Final Order, the proceeds of Avoidance Actions, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, documents, vehicles, intellectual property, securities, partnership or membership interests in limited liability companies and capital stock, including, without limitation, the products, proceeds and supporting obligations thereof, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located (all such property, other than the Prepetition Collateral in existence immediately prior to the Petition Date and proceeds, rents, products, profits, and offspring of such Prepetition Collateral, being collectively referred to as, the "Postpetition Collateral" and

21

collectively with the Prepetition Collateral, the "Collateral") without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements;

    i.    With respect to Collateral of GS&T, Genco Investments LLC, Genco Ship Management LLC, Genco Management (USA) Ltd., and Genco RE Investments LLC (collectively, the "Non-Silo Debtors"), the Adequate Protection Liens shall be granted to all Prepetition Secured Parties on a *pari passu* basis and shall be senior liens, subject only to (A) the Carve-Out (as defined below), (B) Permitted Liens, and (C) Prepetition Liens; provided that the Adequate Protection Liens granted to those Prepetition Secured Parties with Prepetition Liens on the Prepetition Collateral of the Non-Silo Debtors shall be senior to the Adequate Protection Liens granted to the Prepetition Secured Parties who do not hold Prepetition Liens on Prepetition Collateral of the Non-Silo Debtors;

    ii.    With respect to Collateral of the 2007 Facility Guarantors, the Adequate Protection Liens shall be granted only to the 2007 Facility Secured Parties and shall be senior liens, subject only to (A) the Carve-Out, (B) Permitted Liens, and (C) Prepetition Liens;

    iii.    With respect to Collateral of the DB Term Loan Guarantors, the Adequate Protection Liens shall be granted only to the DB Term Loan Secured Parties and the 2007 Facility Secured Parties and shall be senior liens, subject only to (A) the Carve-Out, (B) Permitted Liens, and (C) Prepetition Liens; provided that the Adequate Protection Liens granted to the DB Term Loan Secured Parties with respect to the DB

Term Loan Guarantors shall be senior to the Adequate Protection Liens granted to the 2007 Facility Secured Parties;

iv.    With respect to Collateral of the CA Term Loan Guarantors, the Adequate Protection Liens shall be granted only to the CA Term Loan Secured Parties and the 2007 Facility Secured Parties and shall be senior liens, subject only to (A) the Carve-Out, (B) Permitted Liens, (C) Prepetition Liens; <u>provided</u> that the Adequate Protection Liens granted to the CA Term Loan Secured Parties with respect to the CA Term Loan Guarantors shall be senior to the Adequate Protection Liens granted to the 2007 Facility Secured Parties; and

v.    Subject to entry of the Final Order, the Adequate Protection Liens shall include any lien, and attach to any collateral associated therewith, that is avoided for the benefit of the estate pursuant to section 551 of the Bankruptcy Code;

b. <u>Superpriority Claims</u>.    To the extent set forth below, allowed superpriority administrative expense claims pursuant to sections 503(b), 507(a) and 507(b) of the Bankruptcy Code as provided for in section 507(b) of the Bankruptcy Code (the "<u>Superpriority Claim</u>").  Any Superpriority Claims shall be subject to the Carve-Out, and shall be allowed claims against the applicable Debtors (jointly and severally) with priority over any and all administrative expenses and all other claims against such Debtors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or

claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment. Subject to the Final Order, the Superpriority Claims shall be payable from and have recourse to the proceeds of the Avoidance Actions. The allowed Superpriority Claims shall be payable from and have recourse to all unencumbered pre- and post-petition property of the applicable Debtors (subject to the foregoing sentence). Other than the Carve-Out, no cost or expense of administration under sections 105, 503 or 507 of the Bankruptcy Code or otherwise, including any such cost or expense resulting from or arising after the conversion of the any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code, shall be senior to, or *pari passu* with, the Superpriority Claims;

i.    With respect to the 2007 Facility Guarantors and their estates, the Superpriority Claims shall be granted only to the 2007 Facility Secured Parties;

ii.    With respect to the DB Term Loan Guarantors and their estates, the Superpriority Claims shall be granted only to the DB Term Loan Secured Parties and the 2007 Facility Secured Parties; provided that such Superpriority Claims granted to the DB Term Loan Secured Parties shall be senior to those granted to the 2007 Facility Secured Parties;

iii.    With respect to the CA Term Loan Guarantors, the Superpriority Claims shall be granted only to the CA Term Loan Secured Parties and the 2007 Facility Secured Parties; provided that such Superpriority Claims granted to the CA Term Loan Secured Parties respect to the CA Term Loan Guarantors shall be senior to those granted to the 2007 Facility Secured Parties; and

iv.    With respect to the Non-Silo Debtors, the Superpriority Claims shall be granted all Prepetition Secured Parties on a *pari passu* basis;

24

c. <u>Fees and Expenses</u>.  Fourteen (14) days following receipt by the Debtors and the United States Trustee of invoices therefor, payment, without further order of, or application to, the Bankruptcy Court or notice to any other party, of all outstanding prepetition and all postpetition reasonable and documented fees and expenses incurred by the Prepetition Agents, including, without limitation,[4]

i.    the fees and expenses incurred by (a) Milbank Tweed, Hadley & M<sup>c</sup>Cloy LLP ("<u>Milbank</u>"), as counsel to the 2007 Facility Agent, including payment of fees and expenses of Milbank in accordance with the terms set forth in the fee letter dated as of January 7, 2014, (b) Seward & Kissel LLP ("<u>Seward</u>"), as maritime and local counsel to the 2007 Facility Agent, including payment of fees and expenses of Seward in accordance with the terms set forth in the fee letter dated as of February 7, 2013, (c) Houlihan Lokey Capital, Inc., ("<u>Houlihan</u>") as financial advisors to the 2007 Facility Agent, under the engagement letter dated as of January 7, 2013 (including, without limitation, the "Deferred Fee" in accordance with the terms described therein), and (d) any local, maritime, or foreign counsel retained by the 2007 Facility Agent whose services are discrete and not duplicative of the services of any other counsel of the 2007 Facility Agent; and

ii.    the fees and expenses incurred under the DB Term Loan Documents or CA Term Loan Documents, including, without limitation, by (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP as counsel to the CA Term Loan Agent and the DB Term Loan Agent, (b) Orrick, Herrington & Sutcliffe LLP, as English counsel to the CA Term Loan Agent, (c) Stephenson Harwood, LLP, as English counsel to the

---

[4]    To the extent any party has an objection to the fees and expenses requested, they shall so advise applicable Prepetition Agent(s).  If any such objection is raised and not resolved and/or withdrawn, the parties shall submit any dispute to this Court for adjudication

DB Term Loan Agents, (d) Poles, Tublin, Stratakis & Gonzalez, LLP, as Marshal

Islands counsel to the DB Term Loan Agents, and (e) such other maritime or foreign

legal advisors that may be retained pursuant to the letter dated as of February 19,

2014 between the CA Term Loan Agent and GS&T and the letter dated as of

February 12, 2014 between the DB Term Loan Agents and GS&T, respectively.

 d. Interest.  The Prepetition Agents (on behalf of the Prepetition Secured Parties) shall

receive from the Debtors (x) on the next date on which payment would be due, in the absence

of any default, under the applicable Loan Documents, cash payment of all accrued and unpaid

interest on the Prepetition Secured Obligations at the non-default rates provided for in the

applicable Prepetition Loan Documents, (y) upon entry of this Interim Order, all other accrued

and unpaid fees and disbursements (other than legal and advisory fees and expenses, which

shall be paid in accordance with paragraph 4.c of this Interim Order) owing to the Prepetition

Agents or the Prepetition Secured Parties under the applicable Loan Documents and incurred

prior to such date (including fees and disbursements arising before the Petition Date), and (z)

thereafter, monthly in arrears, payment in cash of all interest and letter of credit, unused

commitment and other fees that had accrued on and after the date of the initial payment

provided for in (x) and (y) above, as applicable, at the non-default rate provided for under the

applicable Prepetition Loan Documents; provided that default interest and compounded

interest shall accrue on the Prepetition Secured Obligations to the extent permitted under

applicable law, subject to the right of parties-in-interest to object to the allowance of such

amounts.

 e. Reporting and Budget Compliance.  Every two weeks (beginning with the second

full week after the Petition Date), on the third day of such week, the Debtors shall deliver to

the advisors to the Prepetition Agents an updated budget for the prospective 13 week period beginning the week following delivery of such updated budget. The Prepetition Agents shall have until three business days from receipt of such updated budget to reasonably object to such budget. If no Prepetition Agent reasonably objects during such time, such budget shall become the Approved Budget for purposes of this Interim Order. Pending resolution of any objection, the Approved Budget for purposes of this Interim Order shall remain the Approved Budget (including any previously updated Approved Budget). Every two weeks (beginning with the fourth full week after the Petition Date), on the third business day of such week, the Debtors shall deliver to the advisors to the Prepetition Agents and the Supporting Noteholders, a variance report from the previous four week period comparing the actual cash receipts and disbursements of the Debtors with the receipts and disbursements in the Approved Budget (the "Budget Variance Report") with respect to the following line items in the Approved Budget (i) interest expenses  over the prior four week period ("Interest Expense"), (ii) general and administrative expenses over the prior four week period ("G&A"), (iii) vessel operating expenses over the prior four week period, with pro forma treatment of costs reasonably expected to be reimbursed by insurance (the "Vessel Operating Expenses"), and (iv) total cash balance, subject to credits for any difference between projected and actual drydock expenses and restructuring costs and the pro forma treatment of costs reasonably expected to be reimbursed by insurance (the "Cash Balance"). The Debtors shall ensure that at no time shall the Budget Variance Report show (w) an unfavorable variance of more than 15% for any Interest Expense or G&A, (x) an unfavorable variance of the greater of $1 million or 15% for actual Vessel Operating Expenses, (y) a Cash Balance less than $22.5 million, or (z) an unfavorable variance of more than $7 million with respect to the Cash Balance ((w)-(z),

collectively, the "Permitted Variance").  The Debtors shall also provide the Prepetition Agents with (a) the monthly financial reporting given to the U.S. Trustee, (b) financial reporting required under (and consistent with the requirements contained in) the Prepetition Loan Documents, and (c) a bi-weekly charter report.

f. Access to Records and Collateral.  In addition to, and without limiting, whatever rights to access the Prepetition Secured Parties have under their respective Prepetition Loan Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the Prepetition Secured Parties (i) to have access to the Debtors' properties and other Collateral of any Debtor against whom they are granted Adequate Protection Liens or Superpriority Claims under this Interim Order for the purposes of inspection, (ii) to examine the Debtors' books and records, and (iii) to discuss the Debtors' affairs, finances, and condition with the Debtors' officers and financial advisors.

g. Right to Seek Additional Adequate Protection.  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to request additional forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.

5.    Events of Default.  The occurrence of any of the following events shall constitute an event of default (collectively, the "Events of Default"):

a.    the termination of the prepetition restructuring support agreement entered into by the Debtors and certain consenting creditors dated on or about April 1, 2014 (the "Restructuring Support Agreement") by the Debtors (other than a termination pursuant to section 11(b)(i) of the Restructuring Support Agreement), the Required Supporting 2007 Facility Lenders (as

defined in the Restructuring Support Agreement) (other than a termination pursuant to section 11(d) of the Restructuring Support Agreement), the Required Supporting $253 Million Facility Lenders (as defined in the Restructuring Support Agreement), or the required $100 Million Facility Lenders (as defined in the Restructuring Support Agreement);

b.      any Debtor shall have asserted, in a pleading filed with the Court (or another court of competent jurisdiction), a claim or challenge against any of the Prepetition Secured Parties contrary to the Debtors' acknowledgements, stipulations and releases contained herein;

c.      the Court shall have entered an order appointing a chapter 11 trustee, responsible officer, or any examiner with enlarged powers relating to the operation of the businesses in the Chapter 11 Cases, unless consented to in writing by the Prepetition Agents;

d.      the Court shall have entered an order, which order is not subject to a stay of its effectiveness pending appeal, granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any Collateral which has an aggregate value in excess of $5,000,000;

e.      the Court shall have entered an order granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any Collateral which has an aggregate value in excess of $20,000,000;

f.      the Court shall have entered an order (i) reversing, amending, supplementing, vacating, or otherwise modifying this Interim Order without the consent of the Prepetition Agents or (ii) avoiding or requiring repayment of any portion of the payments made pursuant to the terms hereof;

g.      five days after notice provided by, as applicable, a Prepetition Agent that the Debtors have failed to make any payment when due under section 4 of this Interim Order and the outstanding payment is not made within such five days;

h.      the date on which the Debtors produce a Budget Variance Report that shows that they have failed to comply with the Approved Budget (including any Permitted Variance);

i.      the Debtors shall have failed to comply with any other term hereof and the same is not remedied within five (5) business days' notice of such non-compliance by any of the Prepetition Agents;

j.      any relevant Debtor materially breaches any covenant or undertaking, after any applicable cure period, relating to the insurance, operation and maintenance of the vessels (including, without limitation, the terms regarding the expropriation, arrest, detention, capture, condemnation, confiscation, requisition, purchase, seizure or forfeiture of, or any taking of title to, the applicable vessels) as specified in the 2007 Facility Documents, the DB Term Loan Documents, or the CA Term Loan Documents;

k.      the Debtors shall have filed a motion seeking to create any postpetition liens or security interests other that those granted or permitted pursuant hereto; or

l.      the Debtors lose the exclusive right to file and solicit acceptances of a plan of reorganization.

6.      <u>Rights and Remedies Upon Event of Default or Termination Event</u>.  Upon occurrence of an Event of Default and following the giving of five (5) days' notice to the Debtors, the United States Trustee, the Supporting Noteholders, and the Committee (the "<u>Notice Period</u>") or otherwise immediately upon a Termination Event (other than the Termination Event specified in paragraph 3(ii)), the Prepetition Secured Parties may revoke the Debtors' right, if

30

any, to use Cash Collateral.  Upon occurrence of a Termination Event or an Event of Default and following the giving of seven (7) days' notice (or such shorter notice period as the Court may order due to the exigencies of the situation) to the Debtors, the United States Trustee, the Supporting Noteholders, and the Committee (the "Extended Notice Period"), unless the Court orders otherwise during the Extended Notice Period, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated without further notice or order of the Court, and the Prepetition Secured Parties shall be permitted to exercise all rights and remedies set forth in this Interim Order, and the Prepetition Loan Documents, including without limitation, collecting and applying any proceeds of the Prepetition Collateral in accordance with the terms of this Interim Order and the Prepetition Loan Documents, and as otherwise available at law without further order or application or motion to the Court, and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code.  Notwithstanding anything herein to the contrary, the automatic stay pursuant to section 362 of the Bankruptcy Code shall, as of the date hereof, be automatically modified and terminated for the purposes of giving any notice contemplated hereunder, under any of the Prepetition Loan Documents, or under the Restructuring Support Agreement by any party thereto.

7.    Effect of Stipulations on Third Parties.  The stipulations and admissions contained in this Interim Order, including, without limitation, in paragraph C of this Interim Order, shall be binding upon the Debtors and their affiliates and any of their respective successors (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any Debtor) in all circumstances.  The stipulations, releases, waivers, and admissions contained in this Interim Order, including, without limitation, in paragraph C of this Interim Order, shall be binding upon all other parties in interest, including, without limitation, any

31

Committee and any other person or entity acting (or purporting to act) on behalf of the Debtors'

estate, unless and except to the extent that, (i) upon three (3) days' prior written notice to the

Debtors and the Prepetition Agents, a party in interest with proper standing granted by order of

the Court (or another court of competent jurisdiction) has timely filed an adversary proceeding or

contested matter (subject to the limitations contained herein, including, *inter alia*, in paragraph

10) by no later than the date that is 60 days from the entry of the Final Order or such later date as

has been agreed to, in writing, by the applicable Prepetition Agent, in its sole discretion (the

"Investigation Termination Date"), (A) challenging the validity, enforceability, priority or extent

of the Prepetition Obligations or (B) otherwise asserting or prosecuting any action for

preferences, fraudulent transfers or conveyances, other avoidance power claims or any other

claims, counterclaims or causes of action, objections, contests or defenses to the extent released

by the Debtors under paragraph C of this Interim Order (collectively, "Claims and Defenses")

against any of the Prepetition Secured Parties or their affiliates, representatives, attorneys or

advisors in connection with matters related to the Prepetition Loan Documents or the Prepetition

Collateral, and (ii) such challenge or claim in any such timely filed adversary proceeding or

contested matter has (A) with respect to the plaintiff, not been dismissed or overruled and (B)

with respect to other parties-in-interest, been sustained in a final order; provided that any

challenge or claim shall set forth with specificity the basis for such challenge or claim and any

challenges or claims not so specified prior to the expiration of the Investigation Termination

Date shall be forever deemed waived, released and barred.  If no such adversary proceeding or

contested matter is timely filed, (x) the Prepetition Obligations shall constitute allowed claims,

not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization,

defense or avoidance, for all purposes in the Chapter 11 Cases and any subsequent chapter 7

case, (y) the liens and security interests securing the Prepetition Obligations shall be deemed to have been, as of the Petition Date, legal, valid, binding and perfected, not subject to recharacterization, subordination or avoidance, and (z) the Prepetition Obligations, the liens and security interests securing the Prepetition Obligations, and the Prepetition Secured Parties shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of any Debtor's estate, including, without limitation any successor thereto (including, without limitation, any chapter 7 or 11 trustee appointed or elected for the Debtor). If any such adversary proceeding or contested matter is timely filed, the stipulations and admissions contained in paragraph C of this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any Committee and on any other person or entity, except to the extent that such findings and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Investigation Termination Date. Nothing in this Interim Order vests or confers on any "person" (as defined in the Bankruptcy Code), including any Committee, standing or authority to bring, pursue, or settle any cause of action belonging to the Debtors or their estates, including, without limitation, Claims and Defenses with respect to the Prepetition Loan Documents or the Prepetition Secured Obligations, and an order of the Court conferring such standing on the Committee or other party-in-interest shall be a prerequisite for the prosecution of Claims and Defenses by the Committee or such other party-in-interest.

8.      Carve-Out.  The liens, security interests, and superpriority claims granted herein (including the Adequate Protection Lien and any Superpriority Claims), the Prepetition Liens, and any other liens, claims, or interest of any person, shall be subject and subordinate to the Carve-Out. "Carve-Out" shall mean, upon the Termination Date, the sum of (i) all fees

required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States

Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory

rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $75,000

incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice

set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order,

procedural order or otherwise, all unpaid fees, costs and expenses (the "Professional Fees")

incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the

Bankruptcy Code or any statutory committee appointed in these Chapter 11 Cases pursuant to

section 1102 of the Bankruptcy Code (collectively, the "Professional Persons"), before or on the

date of delivery by a Prepetition Agent of a Carve-Out Trigger Notice (as defined below),

whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger

Notice (the "Pre-Trigger Date Fees"); and (iv) after the date of delivery of the Carve-Out Trigger

Notice (the "Trigger Date"), to the extent incurred after the Trigger Date, the payment of

Professional Fees of Professional Persons in an aggregate amount not to exceed $2,500,000 (the

amount set forth in this clause (iv) being the "Post Carve-Out Trigger Notice Cap").  For

purposes of the foregoing, "Carve-Out Trigger Notice" shall mean notice by the Prepetition

Agents to the Debtors, its lead counsel, the United States Trustee, lead counsel to the Supporting

Noteholders, and lead counsel for any Committee, delivered upon the occurrence of a

Termination Date under the Interim Order, stating that the Post Carve-Out Trigger Notice Cap

has been invoked.

      9.     No proceeds of the Prepetition Collateral or the Carve-Out shall be used

for the purpose of:  (a) investigating, objecting to, challenging or contesting in any manner, or in

raising any defenses to, the amount, validity, extent, perfection, priority or enforceability of the

Prepetition Secured Obligations, or any liens or security interests with respect thereto, or any other rights or interests of any of the Prepetition Secured Parties, whether in their capacity as such or otherwise, including with respect to the Adequate Protection Liens, or in asserting any claims or causes of action against any of the Prepetition Secured Parties (whether in their capacity as such or otherwise), including, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; or (b) paying any amount on account of any claims arising before the Petition Date unless such payments are approved by an order of this Court; provided that up to $75,000 of Cash Collateral shall be made available to the Creditors' Committee for fees and expenses incurred in connection with any Lien Investigation (the "Committee Investigation Budget").  The Prepetition Secured Parties reserve the right to object to, contest, or otherwise challenge any claim for amounts incurred in connection with such activities (including amounts incurred in connection with a Lien Investigation in excess of the Committee Investigation Budget) on the grounds that such claim shall not be allowed, treated or payable as an administrative expense claim for purposes of section 1129(a)(9)(A) of the Bankruptcy Code.

10.     No Waiver of Prepetition Secured Parties' Rights; Reservation of Rights. Notwithstanding any provision in this Interim Order to the contrary, this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, any of the Prepetition Secured Parties' rights with respect to any person or entity other than the Debtors or with respect to any other collateral owned or held by any person or entity other than the Debtors.  The rights of the Prepetition Secured Parties are expressly reserved and entry of this Interim Order shall be without prejudice to, and does not constitute a waiver, expressly or implicitly, of:

a.     the Prepetition Secured Parties' rights under any of the Prepetition Loan Documents;

35

b.   the Prepetition Secured Parties' rights to seek any other or supplemental relief in respect of the Debtors;

c.   the Prepetition Secured Parties' rights to seek modification of the grant of adequate protection provided under this Interim Order so as to provide different or additional adequate protection at any time;

d.   any of the Prepetition Secured Parties' rights under the Bankruptcy Code or under non-bankruptcy law including, without limitation, to the right to:  (i) request modification of the automatic stay of section 362 of the Bankruptcy Code; (ii) request dismissal of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with extended powers; or (iii) propose, subject to section 1121 of the Bankruptcy Code, a chapter 11 plan or plans;

e.   any of the Prepetition Secured Parties' unqualified right to credit bid up to the full amount of any remaining Prepetition Obligations in the sale of any Prepetition Collateral or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code; or

f.   any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the Prepetition Secured Parties.

11.   <u>Recharacterization</u>.  Notwithstanding anything to the contrary herein, if any of the Prepetition Secured Obligations are determined by this Court to be undersecured, the payment of fees and expenses and interest permitted hereunder may be recharacterized and re-credited to the principal balance of such Prepetition Secured Obligations pursuant to further order entered by this Court.

12.      <u>Further Relief</u>.  Notwithstanding anything to the contrary herein, nothing herein shall limit (i) the Debtors' right to seek authority on a consensual or non-consensual basis, whether before or after a Termination Event or an Event of Default, to use Cash Collateral pursuant to further order of the Bankruptcy Court or (ii) the Prepetition Secured Parties' rights to object to, challenge, or oppose any such relief or to declare an Event of Default or a Termination Event hereunder.

13.      <u>Further Assurances</u>.   The Debtors shall execute and deliver to the Prepetition Agents all such agreements, financing statements, instruments, and other documents as they may reasonably request to evidence, confirm, validate, or evidence the perfection of the Adequate Protection Liens granted pursuant hereto.

14.      <u>506(c) Waiver</u>.  Subject to the entry of a Final Order, except as provided in this Interim Order, no costs or expenses of administration which have been or may be incurred in any of the Chapter 11 Cases at any time shall be charged against any Prepetition Secured Party, any of the Prepetition Secured Obligations, any of their respective claims, or the Collateral pursuant to sections 506(c) or 105(a) of the Bankruptcy Code, or otherwise, without the prior written consent of the affected Prepetition Agent, and no such consent shall be implied from any other action, inaction, or acquiescence by any of the Prepetition Secured Parties or their respective representatives.

15.      <u>Restrictions on Granting Postpetition Claims and Liens</u>.  Except with respect to the Carve-Out, no claim or lien that is *pari passu* with or senior to the claims and liens of any of the Prepetition Secured Parties shall be offered by any Debtor, or granted, to any other person, except in connection with any financing used to pay in full the claims of the Prepetition

Secured Parties or that would constitute a Permitted Lien with respect to the Debtor against whom such lien is granted.

16. <u>Automatic Effectiveness of Liens</u>. The Adequate Protection Liens shall not be subject to challenge and shall attach and become valid, perfected, enforceable, non-avoidable, and effective by operation of law as of the Petition Date, having the priority set forth in paragraph 4 of this Interim Order, without any further action by the Debtors or the Prepetition Secured Parties and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages (including ships' mortgages), filings with the U.S. Patent and Trademark Office, the U.S. Copyright Office, or the Library of Congress, or other documents or the taking of any other actions. If any Prepetition Agent hereafter requests that the Debtors execute and deliver to them financing statements, security agreements, collateral assignments, mortgages, or other instruments and documents considered by such agent to be reasonably necessary or desirable to further evidence the perfection of the Adequate Protection Liens, as applicable, the Debtors are hereby directed to execute and deliver such financing statements, security agreements, mortgages, collateral assignments, instruments, and documents, and the Prepetition Agents are hereby authorized to file or record such documents in their discretion without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

17. <u>No Marshaling/Application of Proceeds</u>. In no event shall any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral; <u>provided</u> that any Prepetition Secured Party

shall be entitled to seek to apply such marshaling or other similar doctrines with respect to another Prepetition Secured Party.

18.    <u>Proofs of Claim</u>.  None of the Prepetition Secured Parties shall be required to file proofs of claim in any of the in the Chapter 11 Cases for any Prepetition Secured Claim or any Superpriority Claim or other claim arising in connection with this Interim Order. Notwithstanding any order entered by the Court in relation to the establishment of a bar date, the Prepetition Agents, on behalf of themselves and Prepetition Secured Parties, as applicable, are hereby authorized and entitled, in each of their sole and absolute discretion, but not required, to file (and amend and/or supplement, as each sees fit) a proof of claim and/or aggregate proofs of claim in the Chapter 11 Cases for any such claims; for avoidance of doubt, any such proof of claim may (but is not required to be) filed as one consolidated proof of claim against all of the applicable Debtors, rather than as separate proofs of claim against each such Debtor.  Any proof of claim filed by a Prepetition Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the respective Prepetition Secured Parties.  Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation administrative claims) in any of the Chapter 11 Cases shall not apply to the Prepetition Secured Parties.

19.    <u>Additional Modification of Stay</u>.  To the extent the automatic stay provisions of Section 362 of the Bankruptcy Code would otherwise apply, such provisions are vacated for the limited purposes of permitting the transfer and assignment of any liens, pledges or security interests upon Prepetition Collateral from DNB Bank ASA, New York Branch (f/k/a DNB Nor Bank ASA, New York Branch) to Wilmington Trust, National Association, as

successor administrative agent and successor collateral agent under the 2007 Credit Facility Documents.

20. <u>Binding Effect</u>. Subject to paragraph 7 of this Interim Order, the provisions of this Interim Order shall be binding upon and inure to the benefit of the Prepetition Secured Parties to the extent and as set forth herein, the Debtors, any Committee, and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors). To the extent permitted by applicable law, this Interim Order shall bind any trustee hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event of the conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code. Such binding effect is an integral part of this Interim Order.

21. <u>Survival</u>. The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any plan of reorganization in any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a chapter 7 case, or (iii) dismissing any of the Chapter 11 Cases, and, with respect to the entry of any order as set forth in clause (ii) or (iii) of this paragraph 21, the terms and provisions of this Interim Order as well as the Adequate Protection Liens and Superpriority Claim shall continue in full force and effect notwithstanding the entry of any such order.

22. <u>Effect of Dismissal of Chapter 11 Cases</u>. If any of the Chapter 11 Cases is dismissed, converted, or substantively consolidated, such dismissal, conversion, or substantive consolidation of these Chapter 11 Cases shall not affect the rights of the Prepetition Secured

40

Parties under this Interim Order, and all of their rights and remedies thereunder shall remain in full force and effect as if the Chapter 11 Cases had not been dismissed, converted, or substantively consolidated.  If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide or be deemed to provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that:   (i) subject to paragraph 7 of this Interim Order, the Prepetition Liens, Adequate Protection Liens, and Superpriority Claims granted to and conferred upon the Prepetition Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order (and that such Superpriority Claims shall, notwithstanding such dismissal, remain binding on all interested parties) and (ii) to the greatest extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the Prepetition Liens, Adequate Protection Liens, and Superpriority Claims referred to in this Interim Order.

23.   _Order Effective_.  This Interim Order shall be effective as of the date of the signature by the Court.

24.   _Controlling Effect of Interim Order_.  To the extent any provision of this Interim Order conflicts or is inconsistent with any provision of the Motion or any prepetition agreement, the provisions of this Interim Order shall control to the extent of such conflict.

25.   _Final Hearing_.  The Final Hearing on the Motion shall be heard before the Honorable [_____] on [_____]  at [___] [a.m./p.m.] at the United States Bankruptcy Court, 1 Bowling Green, Courtroom [___], New York NY 10005.  Any objections shall be filed with the Bankruptcy Court on or before [_____], 2014 at 4:00 p.m., and served upon (i) Adam C. Rogoff, Stephen D. Zide, and Anupama Yerramalli of Kramer Levin Naftalis & Frankel LLP at 1177 Avenue of the Americas, New York, New York, 10036; (ii) Dennis F. Dunne, Samuel A. Khalil,

41

and Michael W. Price of Milbank, Tweed, Hadley & McCloy LLP at 1 Chase Manhattan Plaza,

New York, New York, 10005; (iii) Alan W. Kornberg and Elizabeth McColm of Paul, Weiss,

Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019;

and (iv) Michael S. Stamer of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New

York, New York 10036 and Sarah Link Schultz of Akin Gump Strauss Hauer & Feld LLP, 1700

Pacific Avenue, Suite 4100, Dallas, Texas 75201.


Dated: _____, 2014
          New York, New York

                                        _____
                                        [_____]
                                        United States Bankruptcy Judge

**<u>Exhibit C</u>**

**Form of Transferee Acknowledgement**

## Transferee Acknowledgement

This joinder (this "Joinder") to the Restructuring Support Agreement, dated as of the Effective Date, by and among Genco Shipping & Trading Limited ("Genco"), certain affiliates of Genco, and the Supporting Creditors parties thereto (the "Agreement") is executed and delivered by [_____] (the "Joining Party") as of [_____], 2014.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.    **Agreement to be Bound**.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Supporting Creditor" and a "Party" for all purposes under the Agreement.

2.    **Representations and Warranties**.  With respect to the aggregate principal amount of debt owed under the applicable Debt Instrument, the Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the debt outstanding under such Debt Instrument in the principal amounts as identified below its name on the signature page hereof, and (b) makes the representations and warranties set forth in section 12 of the Agreement to each other Party.

3.    **Governing Law**.  This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

4.    **Notice**.  All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:

[JOINING PARTY]
[ADDRESS]
Attn:
Facsimile: [FAX]
EMAIL:

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[JOINING PARTY]**

By: _____
       Name:

       Title:

       Holdings: _____

**[SUPPORTING CREDITOR]**

By: _____
       Name:
       Title:

       Holdings: _____

Acknowledged:

**Genco Shipping & Trading Limited**

By: _____
    Name:
    Title:

**Genco Acheron Limited**
**Genco Beauty Limited**
**Genco Knight Limited**
**Genco Leader Limited**
**Genco Muse Limited**
**Genco Vigour Limited**
**Genco Carrier Limited**
**Genco Prosperity Limited**
**Genco Success Limited**
**Genco Wisdom Limited**
**Genco Marine Limited**
**Genco Explorer Limited**

**Genco Pioneer Limited**
**Genco Progress Limited**
**Genco Reliance Limited**
**Genco Surprise Limited**
**Genco Sugar Limited**
**Genco Augustus Limited**
**Genco Tiberius Limited**
**Genco London Limited**
**Genco Titus Limited**
**Genco Constantine Limited**
**Genco Hadrian Limited**
**Genco Commodus Limited**
**Genco Maximus Limited**
**Genco Claudius Limited**
**Genco Challenger Limited**
**Genco Champion Limited**
**Genco Charger Limited**
**Genco Hunter Limited**
**Genco Predator Limited**
**Genco Warrior Limited**
**Genco Bay Limited**
**Genco Ocean Limited**
**Genco Avra Limited**
**Genco Mare Limited**
**Genco Spirit Limited**
**Genco Lorraine Limited**
**Genco Pyrenees Limited**
**Genco Loire Limited**
**Genco Bourgogne Limited**
**Genco Picardy Limited**
**Genco Aquitaine Limited**
**Genco Normandy Limited**
**Genco Auvergne Limited**
**Genco Provence Limited**
**Genco Ardennes Limited**
**Genco Brittany Limited**
**Genco Languedoc Limited**
**Genco Rhone Limited**
**Genco Investments LLC**
**Genco Management (USA) LLC**
**Genco Ship Management LLC**
**Genco RE Investments LLC**

By: _____
    Name:
    Title:


**Genco Raptor LLC**
**Genco Cavalier LLC**
**Genco Thunder LLC**


By: _____
    Name:
    Title:

**<u>Annex I</u>**

**Restructuring Support Agreement**

## **Exhibit D**

### **Holdings of Supporting Creditors**

[To be redacted]

| Supporting Creditor | Debt Instrument | Holdings |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |