THIS SOLICITATION IS BEING COMMENCED TO OBTAIN ACCEPTANCES OF THE PLANS OF THE DEBTORS *PRIOR* TO THE FILING BY THE DEBTORS OF ITS CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. BECAUSE NO CHAPTER 11 CASES HAVE BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE OR COMPLYING WITH APPLICABLE NON-BANKRUPTCY LAW, ALTHOUGH THE DEBTORS BELIEVE IT DOES. FOLLOWING THE COMMENCEMENT OF ITS CHAPTER 11 CASES, THE DEBTORS EXPECT TO PROMPTLY SEEK AN ORDER OF THE BANKRUPTCY COURT (I) APPROVING (A) THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION WITH RESPECT TO THE PLAN AND BEING IN COMPLIANCE WITH APPLICABLE NON-BANKRUPTCY LAW AND (B) THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN AS HAVING BEEN IN COMPLIANCE WITH SECTION 1126(B) OF THE BANKRUPTCY CODE AND (II) CONFIRMING THE PLAN. THE VOTING DEADLINE IS (I) **APRIL 18, 2014 AT 10:00 A.M. (PREVAILING NEW YORK TIME)** FOR THE PREPETITION 2007 FACILITY LENDERS, THE PREPETITION $253 MILLION FACILITY LENDERS, AND THE PREPETITION $100 MILLION FACILITY LENDERS AND (II) **MAY 16, 2014 AT 4:00 P.M. (PREVAILING NEW YORK TIME)** FOR THE CONVERTIBLE NOTEHOLDERS UNLESS EXTENDED BY ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK. THE DEBTORS MAY COMMENCE THEIR CHAPTER 11 CASES PRIOR TO THE VOTING DEADLINE. THESE MATERIALS HAVE NOT BEEN REVIEWED OR APPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR ANY SECURITIES REGULATORY BODY.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| GENCO SHIPPING & TRADING LIMITED, et. al., | : | Case No. |
| | : | |
| Debtors. | : | Joint Administration To Be Requested |
| | : | |

------------------------------------------------------------------ x

**DISCLOSURE STATEMENT FOR THE PREPACKAGED PLAN**
**OF REORGANIZATION OF THE DEBTORS PURSUANT**
**TO CHAPTER 11 OF THE BANKRUPTCY CODE**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
Stephen D. Zide
Anupama Yerramalli
1177 Avenue of the Americas
New York, New York 10036
Telephone:      (212) 715-9100
Facsimile:      (212) 715-8000
Counsel for the Debtors and Debtors in Possession

Dated: April 16, 2014

---

**NOTICE TO EMPLOYEES, TRADE CREDITORS
AND OTHER HOLDERS OF GENERAL UNSECURED CLAIMS**

---

THE DEBTORS INTEND TO CONTINUE OPERATING THEIR BUSINESS IN CHAPTER 11 IN THE ORDINARY COURSE OF BUSINESS AND TO SEEK TO OBTAIN THE NECESSARY RELIEF FROM THE BANKRUPTCY COURT TO HONOR THEIR OBLIGATIONS AND PAY THEIR EMPLOYEES, TECHNICAL SHIP MANAGERS, CUSTOMERS AND CHARTERERS, FOREIGN VENDORS AND OTHER TRADE CREDITORS IN FULL AND IN ACCORDANCE WITH EXISTING BUSINESS TERMS. ALL OTHER GENERAL UNSECURED CLAIMS WILL BE TREATED IN ACCORDANCE WITH THE PLAN.

---

**DISCLAIMER**

---

The information contained in this disclosure statement including the Exhibits attached hereto (collectively, the "**Disclosure Statement**") is included herein for purposes of soliciting acceptances of the Plan and may not be relied upon for any purpose other than to determine how to vote on the Plan. No person is authorized by the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation regarding this Disclosure Statement or the Plan other than as contained in this Disclosure Statement and the Exhibits, Appendices, and/or other Schedules attached hereto, incorporated by reference or referred to herein, and if given or made, such information or representation may not be relied upon as having been authorized by the Debtors.

The Disclosure Statement shall not be construed to be advice on the tax, securities or other legal effects of the Plan as to holders of Claims against, or Equity Interests in, the Debtors, the Reorganized Debtors, or any other person. Each holder should consult with its own legal, business, financial, and tax advisors with respect to any matters concerning this Disclosure Statement, the solicitation of votes to accept the Plan, the Plan, and the transactions contemplated hereby and thereby.

Each holder of an impaired Claim entitled to vote on the Plan should carefully review the Plan, this Disclosure Statement and the Exhibits, Appendices and/or Schedules to both documents in their entirety before casting a ballot. Plan summaries and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan and the Exhibits, Appendices, and/or Schedules annexed to the Plan and this Disclosure Statement. Please be advised, however, that the statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein, and holders of Claims reviewing this Disclosure Statement should not infer at the time of such review that there has not been any change in the information set forth herein since the date hereof unless so specified. *In the event of any conflict between the descriptions set forth in this Disclosure Statement and the terms of the Plan, the terms of the Plan shall govern.*

i

As to contested matters, existing litigation involving, or possible litigation to be brought by, or against, the Debtors, adversary proceedings, and other actions or threatened actions, this Disclosure Statement and Plan shall not constitute or be construed as an admission of any fact or liability, a stipulation, or a waiver, but rather as a statement made without prejudice solely for settlement purposes in accordance with Federal Rule of Evidence 408, with full reservation of rights, and is not to be used for any litigation purpose whatsoever by any person, party, or entity.

**The Board of Directors (or equivalent thereof, as applicable) of the Debtors have approved the Plan and recommend that the holders of Claims in all impaired classes entitled to vote (Classes 3, 4, 5 & 8), vote to accept the Plan.  The Plan has been negotiated with and has the support of an overwhelming percentage of the Debtors' secured lenders and major unsecured creditor constituency.  This Disclosure Statement, the Plan and the accompanying documents have been extensively negotiated with the legal and/or financial advisors to the Supporting 2007 Facility Lenders, the Supporting $253 Million Facility Lenders, the Supporting $100 Million Facility Lenders and the Supporting Noteholders. The votes on the Plan are being solicited in accordance with the Restructuring Support Agreement dated April 3, 2014, which was executed by the holders of approximately 93% of the principal amount of the Prepetition 2007 Facility, 100% of the principal amounts of the Prepetition $253 Million Facility and the Prepetition $100 Million Facility, and approximately 74% of the principal amount of the Convertible Notes.**

The Debtors intend to confirm the Plan and cause the Effective Date to occur promptly after confirmation of the Plan.  There can be no assurance, however, as to when and whether confirmation of the Plan and the Effective Date actually will occur.  The confirmation and effectiveness of the Plan are subject to material conditions precedent.  *See* Section VII.A -- "Conditions Precedent to Effectiveness."  There is no assurance that these conditions will be satisfied or waived.  Procedures for distributions under the Plan are described under Section VI.F -- "Distributions Under the Plan."  Distributions will be made only in compliance with these procedures.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all holders of Claims against, and Equity Interests in, the Debtors (including, without limitation, those holders of Claims and Equity Interests that do not submit ballots to accept or reject the Plan or that are not entitled to vote on the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.

If the financial restructuring of the indebtedness contemplated by the Plan is not approved and consummated, there can be no assurance that the Debtors will be able to effectuate an alternative restructuring or successfully emerge from its chapter 11 case, and the Debtors may be forced into a liquidation under chapter 7 of the Bankruptcy Code or under the laws of other

ii

countries.  As reflected in the Liquidation Analysis, ***the Debtors believe that if operations are liquidated under chapter 7 of the Bankruptcy Code or otherwise, the value of the assets available for payment of creditors would be significantly lower than the value of the distributions contemplated by and under the Plan.***

This Disclosure Statement contains projected financial information regarding the Reorganized Debtors and certain other forward-looking statements, all of which are based on various estimates and assumptions.  The management of the Debtors prepared the projections with the assistance of its professionals.  The Debtors' management did not prepare the projections in accordance with Generally Accepted Accounting Principles ("**GAAP**") or International Financial Reporting Standards ("**IFRS**") or to comply with the rules and regulations of the SEC or any foreign regulatory authority.

---

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

---

**As of the date of distribution, neither this Disclosure Statement nor the Plan has been filed with or reviewed by the Bankruptcy Court, and neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "SEC") or any state authority.  The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan.  Any representation to the contrary is a criminal offense.**

**This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) (but has not been approved by the Bankruptcy Court as complying with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b)).  The securities to be issued under the Plan on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act or any securities regulatory authority of any state under any state securities laws ("Blue Sky Laws").**

**Prior to the filing of the chapter 11 case, the Debtors will rely on the exemption provided by section 4(a)(2) of the Securities Act and applicable exemptions from Blue Sky Laws.  After the filing of the chapter 11 case, the Debtors intend to rely on the exemption from the Securities Act and Blue Sky Laws registration requirements provided by section 1145(a)(1) of the Bankruptcy Code to exempt the issuance of securities issued under or in connection with the Plan, except to the extent that any person receiving securities under the Plan may be deemed an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code, or with respect to the Backstop Shares, in which case the Debtors intend to rely on the exemption provided by section 4(a)(2) of the Securities Act and applicable exemption from Blue Sky Laws.**

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "will," "should," "could," "intend," "consider," "expect," "plan," "anticipate," "believe," "predict," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. You are cautioned that all forward-looking statements involve risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. Important factors that could cause or contribute to such differences include those in Article X: "Certain Risk Factors to be Considered," generally and in particular "Additional Factors to be Considered--Forward-Looking Statements are not Assured, and Actual Results May Vary." The Liquidation Analysis set forth in Exhibit I, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Any analyses, estimates or recovery projections may or may not turn out to be accurate.

# TABLE OF CONTENTS

Page

I. INTRODUCTION AND EXECUTIVE SUMMARY ...............................................1
    A.    Overview of Chapter 11.............................................................................4
    B.    Voting Rights............................................................................................5
    C.    Claims Entitled to Vote............................................................................6
    D.    Solicitation and Voting Process.................................................................6
    E.    Beneficial Owners of the Convertible Notes.............................................9
    F.    Brokerage Firms, Banks, and Other Nominees. .....................................10
    G.    Rights Offering Procedures.....................................................................10
    H.    The Confirmation Hearing.......................................................................11

II. SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER
    THE PLAN ...........................................................................................................12
    A.    Summary .................................................................................................12
    B.    Additional Information About General Unsecured Claims and Convertible
          Notes Claims ..........................................................................................16

III. COMPANY BACKGROUND ...............................................................................17
    A.    The Company's Businesses. ....................................................................17
    B.    The Company's Prepetition Capital Structure. ........................................18
          1.    The Prepetition 2007 Facility.....................................................18
          2.    The Prepetition $100 Million Facility.........................................19
          3.    The Prepetition $253 Million Facility.........................................20
          4.    The Swap Agreement...................................................................20
          5.    The Convertible Notes. ...............................................................21
    C.    Genco's Equity Holders...........................................................................21

IV. EVENTS LEADING TO THE  COMMENCEMENT OF THE CHAPTER 11
    CASES ..................................................................................................................21
    A.    The Company's Industry and Key Considerations From 2003-2009. ...................21
    B.    2010 Vessel Acquisitions and 2011 Prepetition Credit Facility
          Amendments. ..........................................................................................23
    C.    Industry Instability in 2012 Led to 2012 Prepetition Credit Facility
          Amendments. ..........................................................................................25
    D.    2013's Events Set Stage for 2014's Financial Restructuring..................................26
    E.    Negotiations with Secured Lenders and Convertible Noteholders........................28
    F.    The Restructuring Support Agreement. ..................................................28

V. THE ANTICIPATED CHAPTER 11 CASE ..........................................................31
    A.    Expected Timetable of the Chapter 11 Case............................................31
    B.    Significant First Day Motions and Retention of Professionals...........................32
          1.    Approval of Solicitation Procedures and Scheduling of
               Confirmation Hearing ..................................................................32
          2.    Cash Collateral............................................................................32
          3.    Stabilizing Operations.................................................................33

v

|  |  | 4. | Rejection of an Unexpired Non-Residential Real Estate Lease and Operational Initiatives Regarding Executory Contracts. | 34 |
|  |  | 5. | Procedural Motions and Professional Retention Applications | 35 |
|  | C. | | Summary of the Rights Offering | 35 |
|  | D. | | Value of the Rights and the New Genco Warrants | 36 |
|  | E. | | Amended and Restated Term Loan Facilities. | 36 |

VI. SUMMARY OF THE PREPACKAGED PLAN ............................................................38

|  | A. | | Classification and Treatment of Administrative and Priority Claims, Claims and Equity Interests in Genco Under the Plan | 38 |
|  |  | 1. | Description and Treatment of Unclassified Claims. | 38 |
|  |  | 2. | Classification and Treatment of Claims and Equity Interests | 40 |
|  | B. | | Means for Implementation of the Plan | 45 |
|  |  | 1. | General Settlement of Claims and Interests. | 45 |
|  |  | 2. | Exit Financing. | 46 |
|  |  | 3. | Voting of Claims. | 46 |
|  |  | 4. | Nonconsensual Confirmation. | 47 |
|  |  | 5. | Issuance of New Genco Common Stock and New Genco Equity Warrants and Entry into the Registration Rights Agreement. | 47 |
|  |  | 6. | The Rights Offering. | 49 |
|  |  | 7. | The New Genco Equity Warrants. | 51 |
|  |  | 8. | Continued Corporate Existence and Vesting of Assets. | 52 |
|  |  | 9. | Fee Claims Escrow Account. | 53 |
|  | C. | | Provisions Regarding Corporate Governance of the Reorganized Debtor | 53 |
|  |  | 1. | Amendments to Articles of Incorporation. | 53 |
|  |  | 2. | Appointment of Officers and Directors. | 53 |
|  |  | 3. | Powers of Officers. | 54 |
|  |  | 4. | New Employment Agreements, Existing Benefits Agreements and Retiree Benefits. | 54 |
|  |  | 5. | Management Incentive Program. | 55 |
|  |  | 6. | Indemnification of Directors, Officers and Employees. | 55 |
|  | D. | | Effect of Confirmation of the Plan | 55 |
|  |  | 1. | Discharge of the Debtor. | 55 |
|  |  | 2. | Injunction. | 56 |
|  |  | 3. | Preservation of Causes of Action. | 58 |
|  |  | 4. | Votes Solicited in Good Faith. | 58 |
|  |  | 5. | Supporting Creditors' Fees and Expenses. | 58 |
|  |  | 6. | Convertible Notes Indenture Trustee Fees and Expenses. | 59 |
|  |  | 7. | Cancellation of Existing Securities. | 59 |
|  |  | 8. | Claims Incurred After the Effective Date. | 60 |
|  |  | 9. | Releases, Exculpations and Injunctions of Released Parties. | 61 |
|  | E. | | Distributions Under the Plan | 65 |
|  |  | 1. | Procedures for Treating Disputed Claims | 65 |
|  |  | 2. | Allowed Claims. | 66 |
|  |  | 3. | Allocation of Consideration. | 68 |
|  |  | 4. | Estimation. | 68 |
|  |  | 5. | Insured Claims. | 69 |

F.      Retention of Jurisdiction. ...............................................................69
G.      Executory Contracts and Unexpired Leases. .................................70
        1.      Assumption of Executory Contracts and Unexpired Leases......70
        2.      Cure Claims. ...............................................................71
        3.      Reservation of Rights....................................................71
        4.      Rejection of Executory Contracts and Unexpired Leases........72
        5.      Assignment. ...............................................................72
        6.      Insurance Policies. .......................................................73
        7.      Post-Petition Contracts and Leases...................................73
H.      Miscellaneous Provisions................................................................73
        1.      Immediate Binding Effect.............................................73
        2.      Governing Law. ..........................................................73
        3.      Filing or Execution of Additional Documents...................73
        4.      Term of Injunctions of Stays..........................................74
        5.      Withholding and Reporting Requirements. .......................74
        6.      Exemption From Transfer Taxes. ....................................74
        7.      Plan Supplement. ........................................................74
        8.      Conflicts.....................................................................75

VII. CONFIRMATION AND EFFECTIVENESS OF THE PLAN ..........................75
A.      Conditions Precedent to Confirmation. ..........................................75
B.      Waiver of Conditions Precedent to Confirmation. ..........................76
C.      Conditions Precedent to Effectiveness.............................................76
D.      Waiver of Conditions Precedent to Effectiveness. ..........................77
E.      Effect of Failure of Conditions. .....................................................77
F.      Vacatur of Confirmation Order........................................................78
G.      Modification of the Plan.................................................................78
H.      Revocation, Withdrawal, or Non-Consummation. ..........................78
        1.      Right to Revoke or Withdraw. .......................................78
        2.      Effect of Withdrawal, Revocation, or Non-Consummation. ...................78

VIII. CONFIRMATION PROCEDURES ....................................................................79
A.      Combined Disclosure Statement and Confirmation Hearing...............79
B.      Confirmation of the Plan.................................................................79
        1.      Acceptance. ................................................................79
        2.      Standards for Confirmation............................................80
        3.      Feasibility...................................................................83
        4.      Best Interests Test. ......................................................84

IX. FINANCIAL PROJECTIONS AND VALUATION ............................................86
A.      Financial Projections......................................................................86
        1.      Scope of Financial Projections.......................................87
B.      Valuation of the Reorganized Debtors as of _June 30, 2014................88

X. CERTAIN RISK FACTORS TO BE CONSIDERED ...........................................89
A.      Certain Bankruptcy Law Considerations. .......................................90

|  | 1. | Parties in Interest May Object to the Debtors' Classification of Claims and Interests | 90 |
|  | 2. | Contingencies Not to Affect Votes of Impaired Classes to Accept or Reject the Plan | 90 |
|  | 3. | The Debtors May Fail to Satisfy the Solicitation Requirements Requiring a Re-Solicitation | 90 |
|  | 4. | Risk of Non-Confirmation, Non-Occurrence or Delay of the Plan. | 91 |
|  | 5. | Risk of Non-Occurrence of the Effective Date. | 92 |
|  | 6. | The Debtors' Cash Collateral May Be Insufficient to Fund the Debtors' Business Operations, or May Be Unavailable if the Debtors Do Not Comply with its Terms. | 92 |
|  | 7. | The Backstop Investment May Not Be Obtained and the Equity Commitment Agreement May Be Terminated. | 93 |
|  | 8. | Impact of the Chapter 11 Case on the Debtors. | 93 |
|  | 9. | The Plan is Based Upon Assumptions the Debtors Developed Which May Prove Incorrect and Could Render the Plan Unsuccessful | 93 |
| B. |  | Certain Risks Related to the Amended and Restated Term Loan Facilities. | 94 |
|  | 1. | Ability to Maintain Sufficient Liquidity. | 94 |
|  | 2. | Restrictive Covenants in the Amended and Restated Term Loan Facilities. | 94 |
| C. |  | Certain Risks Related to the Debtors' Businesses and Operations. | 95 |
|  | 1. | The Current Global Economic Downturn May Continue to Negatively Impact the Debtors' Businesses. | 95 |
|  | 2. | Failure to Successfully Employ Vessels. | 96 |
|  | 3. | Reliance on a Limited Number of Charterers. | 96 |
|  | 4. | Reliance on Third Party Managers. | 96 |
|  | 5. | Increased Operating Costs Could Adversely Affect Cash Flows and Financial Condition. | 96 |
|  | 6. | Highly Competitive Market for Drybulk Transportation Services and Ability to Effectively Compete. | 97 |
|  | 7. | Potentially Adverse Impact of Exchange Rate Fluctuations. | 97 |
|  | 8. | Inadequate Liquidity Could Materially Adversely Affect the Company's Future Business Operations. | 97 |
|  | 9. | Potential for Vessel Arrests. | 97 |
|  | 10. | Operational Hazards. | 98 |
|  | 11. | Laws and Regulation. | 98 |
|  | 12. | Dependence on Key Personnel and Ability to Attract and Retain Skilled Employees. | 99 |
|  | 13. | Potential Termination of Baltic Trading Management Agreement | 100 |
|  | 14. | Failure to Qualify Under IRC Section 883. | 100 |
|  | 15. | Treatment by United States Tax Authorities as a "Passive Foreign Investment Company." | 101 |
|  | 16. | Treatment by United States Tax Authorities as a "Controlled Foreign Corporation." | 102 |
|  | 17. | Discharge of Prepetition Claims and Related Legal Proceedings. | 102 |

D.    Certain Risks Relating to the Shares of New Genco Common Stock and
        the New Genco Equity Warrants Under the Plan. ...............................................102
        1.    Significant Holders. ....................................................................102
        2.    Restrictions on Transfer of New Genco Common Stock........................103
        3.    Lack of Established Market for New Genco Common Stock and
                the New Genco Equity Warrants. ...............................................103
        4.    Historical Financial Information of the Debtors May Not Be
                Comparable to the Financial Information of the Reorganized
                Debtors ..................................................................................103
        5.    The Projections Set forth in this Disclosure Statement May Not Be
                Achieved. ...............................................................................103
        6.    Incorporation under the Laws of the Republic of the Marshall
                Islands and Enforcement of United States Judgments by Investors. .......104
E.    Additional Factors to Be Considered. ...............................................................105
        1.    The Debtors Have No Duty to Update. ...........................................105
        2.    No Representations Outside this Disclosure Statement Are
                Authorized. .............................................................................105
        3.    Forward-Looking Statements Are Not Assured, and Actual Results
                May Vary. ...............................................................................105
        4.    No Legal or Tax Advice Is Provided to You by This Disclosure
                Statement. ...............................................................................106
        5.    Other Factors. ..........................................................................106

XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN .................................................................................................................106
        A.    Alternative Plan of Reorganization or Plan of Liquidation. ...............................106
        B.    Liquidation Under Chapter 7. ..............................................................107

XII. SECURITIES LAW MATTERS..............................................................................107
        A.    Bankruptcy Code Exemptions from Registration Requirements........................107
                1.    Securities Issued in Reliance on Section 1145 of the Bankruptcy
                        Code. .....................................................................................107
                2.    Subsequent Transfers of 1145 Securities .................................108
                3.    Subsequent Transfers of the New Genco Common Stock and New
                        Genco Equity Warrants Issued to Affiliates. ............................109
                4.    Backstop  Shares, New Genco MIP Primary Equity and New
                        Genco MIP Warrants. ...............................................................110
                5.    The New Genco Equity Warrants Are Only Exercisable on a
                        Cashless Basis, so that the Number of Shares Issuable upon
                        Exercise Cannot Now Be Determined. .......................................110
                6.    The Anti-Dilution Protection for the New Genco Equity Warrants
                        Does Not Cover All Transactions that Could Adversely Affect the
                        Warrants. ................................................................................111

XIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF
THE PLAN ........................................................................................................111
        A.    Introduction. .......................................................................................111

B.      Certain United States Federal Income Tax Consequences to the Company........112
        1.      Exemption of Operating Income from United States Federal
                Income Taxation. ...................................................................112
        2.      Taxation in the Absence of Section 883 Exemption................................113
        3.      Cancellation of Indebtedness. ..................................................114
        4.      Alternative Minimum Tax. ......................................................115
C.      Certain United States Federal Income Tax Consequences to Holders of
        Claims and Equity Interests in Genco.................................................115
        1.      Claims – In General. .............................................................115
        2.      Claims that Are Tax Securities. .............................................117
        3.      Amended and Restated $253 Million Facility and Amended and
                Restated $100 Million Facility.................................................117
        4.      Holders of Equity Interests In Genco.......................................118
D.      Information Reporting and Backup Withholding. ...............................119
E.      Certain United States Federal Income Tax Consequences to Recipients of
        New Genco Common Stock, New Genco Equity Warrants, Rights and/or
        Lender Oversubscription Rights. .......................................................119
        1.      Distributions......................................................................119
        2.      Sale, Exchange, or Exercise of New Genco Common Stock or New
                Genco Equity Warrants........................................................119
        3.      Rights and Lender Oversubscription Rights............................120
        4.      Passive Foreign Investment Company Status. ........................121
        5.      Controlled Foreign Corporation Status...................................123

XIV. CERTAIN MARSHALL ISLANDS TAX CONSEQUENCES .......................123

XV. RECOMMENDATION AND CONCLUSION.................................................123

## TABLE OF EXHIBITS

**Exhibit A:**     List of Debtors

**Exhibit B:**     Prepackaged Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code

**Exhibit C:**     The Company's Prepetition Corporate and Capital Structure

**Exhibit D:**     Equity Commitment Agreement

**Exhibit E:**     Rights Offering Procedures

**Exhibit F:**     Amended and Restated $253 Million Facility Term Sheet

**Exhibit G:**     Amended and Restated $100 Million Facility Term Sheet

**Exhibit H:**     Financial Projections

**Exhibit I:**     Liquidation Analysis

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

# I. **INTRODUCTION AND EXECUTIVE SUMMARY**

Genco Shipping & Trading Limited ("**Genco**") and certain of its direct and indirect subsidiaries, as chapter 11 debtors and debtors in possession (each a "**Debtor**" and collectively the "**Debtors**" or the "**Company**"[1]) in the above-referenced chapter 11 cases (the "**Chapter 11 Cases**") submits this Disclosure Statement pursuant to section 1126 of title 11 of the United States Code (the "**Bankruptcy Code**"), for use in the solicitation of votes on the Prepackaged Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code, dated as of April 16, 2014 (as the same may be amended from time to time) (the "**Plan**"). A copy of the Plan is annexed as **Exhibit B** to this Disclosure Statement.  **Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan.**  For the avoidance of doubt, Baltic Trading Limited and its direct and indirect subsidiaries will not be debtors in the Chapter 11 Cases.

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make informed decisions on whether to vote to accept or reject the Plan.  This Disclosure Statement sets forth certain information regarding the Company's prepetition operating and financial history, the need to seek chapter 11 protection, significant events that are expected to occur during the Chapter 11 Cases, and the Debtors' anticipated organization, operations, and liquidity upon successful emergence from chapter 11 protection.

The Plan and this Disclosure Statement are the result of months of discussions followed by extensive and vigorous negotiations among the Company, its primary secured lenders and an ad hoc group of Convertible Noteholders.  The culmination of these negotiations was the entry into a restructuring support agreement (the "**Restructuring Support Agreement**") upon which the Plan is premised, by the Company and the **holders of approximately 93% of the principal amounts of the Prepetition 2007 Facility, 100% of the principal amount of the Prepetition $253 Million Facility and the Prepetition $100 Million Facility, and approximately 74% of the principal amount of the Convertible Notes (collectively, the "Supporting Creditors").**  As described in more detail below, the Plan substantially deleverages the Company's balance sheet by converting approximately  $1.2 billion of debt into equity of the Reorganized Genco and will provide the Company with $100 million of additional liquidity through a fully-backstopped rights offering.  As part of the overall settlement embodied in the Restructuring Support Agreement and the Plan, the Prepetition 2007 Facility Lenders and the Convertible Noteholders are voluntarily foregoing their right to part of the distribution they are otherwise entitled to receive so that the Debtors can provide warrants to holders of Equity Interests in Genco in exchange for the surrender or cancellation of their Equity Interest in Genco. The key components of the Plan are as follows:

- Holders of Allowed General Unsecured Claims, including Allowed Claims of trade vendors, suppliers, customers and charterers, will not be affected by the filing of the bankruptcy cases and, subject to approval by the Bankruptcy

---

[1] All of the Debtors, including Genco, are set forth in **Exhibit A** attached hereto.

Court, are anticipated to be paid in full in the ordinary course of business during the pendency of the Chapter 11 Cases or reinstated and left unimpaired under the Plan in accordance with their terms as part of the overall settlement embodied in the Plan.

- Payment in full, in cash, of all Allowed Administrative Claims, Priority Tax Claims, statutory fees, Other Priority Claims and Other Secured Claims;

- The conversion of 100% of the Claims under the Prepetition 2007 Facility into 81.1% of the Reorganized Genco's new common stock (subject to dilution by the warrants issued under the Plan). Holders of Prepetition 2007 Facility Claims will also be entitled to subscribe to and purchase up to 80% of the New Genco Common Stock being offered under the Rights Offering.

- Entry into the Amended and Restated $100 Million Facility and the Amended and Restated $253 Million Facility, which extend the maturity dates of those prepetition facilities through August 2019 and provide other modifications to the existing credit agreements;

- The conversion of 100% of the Claims under the Convertible Notes into 8.4% of the Reorganized Genco's new common stock (subject to dilution by the warrants issued under the Plan). Holders of Convertible Note Claims will also be entitled to subscribe to and purchase up to 20% of the New Genco Common Stock being offered under the Rights Offering.

- Equity Interests in Genco will receive the New Genco Equity Warrants from amounts otherwise distributable to the Prepetition 2007 Facility Lenders and the holders of the Convertible Notes in exchange for the cancellation or surrender of Equity Interests in Genco. A $100 million Rights Offering, 80% of which will be backstopped by certain of the Prepetition 2007 Facility Lenders, and 20% of which will be backstopped by certain of the Convertible Noteholders (together, the "**Backstop Parties**").

The Company and the parties to the Restructuring Support Agreement believe that the proposed restructuring under the Plan is extremely favorable for all stakeholders because it achieves a substantial deleveraging of the Company's balance sheet (approximately $1.2 billion) through consensus with the overwhelming majority of the Company's creditors and eliminates potential deterioration of value – and disruptions to worldwide operations – that could otherwise result from a protracted and contentious bankruptcy case. This complete conversion of debt-to-equity (except for the Prepetition Term Loan Facilities Claims) generates over $200 million of cash flow annually due to the reduced interest and amortization expense. Importantly, the Company would not be able to implement the conversion of debt-to-equity proposed under the Plan without the support of its creditor constituents. In addition, as part of the Restructuring Support Agreement, the Supporting 2007 Facility Lenders and the Supporting Noteholders agreed to backstop a $100 million Rights Offering to ensure that the Company will have sufficient liquidity upon emergence from chapter 11. In sum, the Plan embodies a settlement, including a distribution to current equity holders on account of the surrender or cancellation of

their Equity Interests in Genco from value that would otherwise be distributable to the Company's creditors as part of an expeditious and consensual restructuring. This avoids potential litigation that could decrease value for all stakeholders and delay (and possibly derail) the restructuring process – including the cessation of international operations from Vessel arrests or loss of charter hires that, in turn, would devastate future revenues. The significant support obtained by the Company pursuant to the Restructuring Support Agreement provides a fair and reasonable path for an expeditious consummation of the Plan and the preservation of ordinary course of business.

**Additionally, as described in Section VI herein, the Plan provides for certain releases of Claims against, among others, the Debtors, the Reorganized Debtors, the parties to the Restructuring Support Agreement, the Prepetition Agents, the Convertible Notes Indenture Trustee, and each of their professionals, employees, officers and directors.**

FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS, APPENDICES, AND ANY SCHEDULES THERETO IN THEIR ENTIRETY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

**THE DEBTORS HAVE NOT COMMENCED BANKRUPTCY CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AT THIS TIME. THE DEBTORS EXPECT TO FILE THEIR BANKRUPTCY CASES AFTER THEY SOLICIT THE VOTES OF IMPAIRED CLASSES OF CLAIMS ENTITLED TO VOTE ON THIS PLAN.**

BECAUSE NO BANKRUPTCY CASES HAVE BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY ANY BANKRUPTCY COURT WITH RESPECT TO WHETHER IT CONTAINS ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. NONETHELESS, ONCE THE CHAPTER 11 CASES ARE COMMENCED, THE DEBTORS EXPECT TO PROMPTLY SEEK AN ORDER OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND DETERMINING THAT THE SOLICITATION OF VOTES ON THE PLAN BY MEANS OF THIS DISCLOSURE STATEMENT WAS IN COMPLIANCE WITH SECTION 1125(a) OF THE BANKRUPTCY CODE.

Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, and the instructions accompanying the Ballots, in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims for voting purposes and the tabulation of votes. The statements contained in this Disclosure Statement are made only as of the date hereof unless otherwise specified, and there can be no assurance that the statements contained herein will be correct at any time hereafter. All creditors should also carefully read Section X of this Disclosure Statement – the "Risk Factors" – before voting to accept or reject the Plan.

3

THE DEBTORS AND THE SUPPORTING CREDITORS BELIEVE THAT IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND ITS STAKEHOLDERS. FOR ALL OF THE REASONS DESCRIBED IN THIS DISCLOSURE STATEMENT, THE DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE, (*I.E.*, THE DATE BY WHICH YOUR BALLOT MUST BE **ACTUALLY RECEIVED**), WHICH IS (I) **APRIL 18, 2014 AT 10:00 A.M. (PREVAILING NEW YORK TIME)** FOR THE PREPETITION 2007 FACILITY LENDERS, THE PREPETITION $253 MILLION FACILITY LENDERS, AND THE PREPETITION $100 MILLION FACILITY LENDERS (the "**LENDERS VOTING DEADLINE**"), OR (II) **MAY 16, 2014 AT 4:00 P.M. (PREVAILING NEW YORK TIME)** FOR THE CONVERTIBLE NOTEHOLDERS (THE "**NOTEHOLDERS VOTING DEADLINE**"). THE CONVERTIBLE NOTEHOLDERS SOLICITATION PERIOD WILL CONTINUE AFTER THE PETITION DATE UNTIL THE NOTEHOLDERS VOTING DEADLINE.

### A.    Overview of Chapter 11.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and its equity interest holders. Another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code, with respect to the distribution of a debtor's assets. The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan of reorganization binding upon a debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan, and any holder of a claim or equity interest in a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose before confirmation of the plan of reorganization and substitutes the debt with the obligations specified under the confirmed plan of reorganization.

The Bankruptcy Code authorizes a debtor to solicit votes for the acceptance of a plan of reorganization prior to the filing of a chapter 11 case through a so-called "prepackaged" plan of reorganization process. Because solicitation of acceptances takes place all or in part before the bankruptcy filing, the duration of the bankruptcy case is often less than in conventional bankruptcy cases. Prior to soliciting acceptances of the proposed plan, sections 1125(a) and 1126(b) of the Bankruptcy Code require the plan proponent to prepare and distribute a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan. The Debtors are submitting this Disclosure Statement to, and soliciting votes

4

from, the Holders of Impaired Claims against them in order to satisfy the requirements of sections 1125(a) and 1126(b) of the Bankruptcy Code.

## B. <u>Voting Rights</u>.

Only administrative expenses, claims, and equity interests that are "allowed" may receive distributions under a chapter 11 plan. An "allowed" administrative expense, claim or equity interest means that a debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the administrative expense, claim or equity interest, including the amount thereof, is in fact a valid obligation of, or equity interest in, a debtor. The Bankruptcy Code also requires that, for purposes of treatment and voting, a plan of reorganization categorize the different claims against, and equity interests in, a debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are typically classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests that give rise to different legal rights, the holders of such claims and/or equity interests may find themselves as members of multiple classes of claims and/or equity interests.

Under a plan of reorganization, the separate classes of claims and equity interests must be designated either as "impaired" (*i.e.*, altered by the plan) or "unimpaired" (unaltered by the plan). If a class of claims or interests is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims or equity interests, such as the right to vote on the plan (unless the plan deems the holder to reject the plan), and the right to receive an amount under the plan of reorganization that is not less than the value that the holder would receive if the debtor against which such claims or equity interests are asserted were liquidated under chapter 7.

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is "impaired" unless, with respect to each claim or interest of such class, the plan of reorganization (i) does not alter the legal, equitable or contractual rights of the holders of such claims or interests or (ii) irrespective of the holders' right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable or contractual rights.

**<u>Only holders of allowed claims or equity interests in impaired classes of claims or equity interests that receive or retain property under a proposed plan of reorganization, but are not otherwise deemed to reject the plan, are entitled to vote on such a plan.</u>** Holders of unimpaired claims or equity interests are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote. Holders of claims or equity interests that do not receive or retain any property on account of such claims or equity interests are deemed to reject the plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote.

C.    <u>**Claims Entitled to Vote**</u>.

As discussed in further detail below, pursuant to the Plan:

- Holders of Claims in Classes 3, 4, 5 and 8 are impaired and will receive distributions under the Plan on account of such Claims.  As a result, Holders of Claims in those Classes are entitled to vote to accept or reject the Plan;

- Holders of Claims and Equity Interests in Classes 1, 2, 7, 9 and 10 are unimpaired.  As a result, Holders of Claims and Interests in those Classes are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

- Holders of Equity Interests in Genco in Class 11 are impaired, will not receive or retain any property on account of such Equity Interests, and are deemed to have rejected the Plan. As a result, Holders of Equity Interests in Class 11 are not entitled to vote to accept or reject the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims actually voted to accept or reject the plan. **Your vote on the Plan is important.** The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

Section 1129(b) permits confirmation of a plan of reorganization notwithstanding the non-acceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept a proposed plan.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.  The Debtors intend to pursue a "cram down" of the Holders of Equity Interests in Genco in Class 11, who are deemed to have rejected the Plan.

D.    <u>**Solicitation and Voting Process**</u>.

The following summarizes the procedures to accept or reject the Plan.  Holders of Claims entitled to vote are encouraged to review the relevant provisions of the Bankruptcy Code and Bankruptcy Rules and/or to consult their own attorneys.

1.    <u>**The "Solicitation Package**</u>."

The following materials are provided to each holder of a Claim that is entitled to vote on the Plan:

- the applicable Ballot and voting instructions;

- a Disclosure Statement with all exhibits; and

- the Plan.

The holders of Claims in Classes 3, 4, and 5 will receive the Solicitation Package, including the ballot, via electronic mail. The holders of claims in Class 8 will receive their Solicitation Package from their Nominee either via electronic mail or paper copy.

If you (a) did not receive a Ballot and believe you are entitled to one; (b) received a damaged Ballot; (c) lost your Ballot; (d) have any questions concerning this Disclosure Statement, the Plan, or the procedures for voting on the Plan, or the solicitation packet of materials you received; or (e) if you wish to obtain a paper copy of the Plan, this Disclosure Statement or any exhibits to such documents, **please contact GCG by (i) regular mail, delivery, or courier at Genco Shipping & Trading Limited, c/o GCG, P.O. Box 10054, Dublin, OH 43017-6654; (ii) toll-free telephone for U.S. callers at (888) 213-9318 and for international callers at (614) 763-6125; or (iii) email at GencoRestructuring@gcginc.com.**

2. **Voting Deadlines.**

**To be counted, your Ballot(s) must be actually received by GCG no later than:**

- **April 18, 2014 at 10:00 a.m.** (prevailing New York time) for holders of Prepetition 2007 Facility Claims, Prepetition $253 Million Facility Claims, and Prepetition $100 Million Facility Claims.

- **May 16, 2014 at 4:00 p.m.** (prevailing New York time) for holders of Convertible Note Claims.

3. **Voting Instructions.**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. Separate forms of Ballots are provided for the holders of Claims in different Voting Classes entitled to vote on the Plan. **A separate Ballot must be used for each Voting Class.** Any Person who holds Claims in more than one Voting Class is required to submit a separate ballot for its Claims in each Voting Class. Except as provided below, **holders of Claims are required to vote all of their Claims within a Class either to accept or reject the Plan and may not split their votes. Any Ballot received that does not indicate either an acceptance or rejection of the Plan or that indicates both acceptance and rejection of the Plan will not be counted. Any Ballot received that is not signed or that contains insufficient information to permit the identification of the holder will be an invalid Ballot and will not be counted.**

If you are the record holder of Claims that are beneficially owned by another party, you may submit a separate Ballot with respect to such portion of Claims that are beneficially owned by such third party, and the vote indicated on such separate Ballot may differ from the vote indicated on Ballots submitted with respect to Claims that you beneficially own yourself or that are beneficially owned by other parties. In no event may you submit Ballots with

respect to Claims in excess of the amount of Claims for which you are the record holder as of the Voting Record Date.

In accordance with Bankruptcy Rule 3018(c), the Ballots are based on Official Form No. 14, but have been modified to meet the particular needs of this Chapter 11 Case.

Please sign and complete a separate Ballot with respect to each Claim, and return your Ballot(s) directly to the Company's voting agent, GCG, Inc. ("**GCG**") **by one of the following methods**:

- by hand delivery or overnight courier to: Genco Shipping & Trading Limited, c/o GCG, Inc., 5151 Blazer Parkway, Suite A, Dublin, OH 43017;

- by first class mail to: Genco Shipping & Trading Limited, c/o GCG, Inc., P.O. Box 10054, Dublin, OH 43017-6654; or

- by e-mail to: GencoRestructuring@gcginc.com.

(If you are the beneficial owner of a Convertible Note Claim, please follow the directions listed on your Ballot and read Section E – "**Beneficial Owners of the Notes**").

**Only Ballots with a signature will be counted. Email submission of ballots is preferred. Only Ballots (including Ballots forwarded by a Master Balloting Agent (as defined below)) received by GCG by the applicable voting deadline will be counted.**

**If delivery of a Ballot is by mail, it is recommended that voters use an air courier with guaranteed next day delivery or registered mail, properly insured, with return receipt requested. In all cases, sufficient time should be allowed to ensure timely delivery. The method of such delivery is at the election and risk of the voter.**

A Ballot may be withdrawn by delivering a written notice of withdrawal to GCG, so that GCG receives the notice before the Lender Voting Deadline and the Noteholders Voting Deadline (as applicable). In order to be valid, a notice of withdrawal must (a) specify the name of the creditor who submitted the Ballot to be withdrawn, (b) contain a description of the Claim(s) to which it relates, and (c) be signed by the creditor in the same manner as on the Ballot. The Company expressly reserves the right to contest the validity of any withdrawals of votes on the Plan.

After the Lender Voting Deadline and the Noteholders Voting Deadline (as applicable), any creditor who has timely submitted a properly-completed Ballot to GCG or a Master Ballot Agent (defined below), which is then timely delivered to GCG by the applicable Voting Deadline, as applicable, may change or withdraw its vote only with the approval of the Bankruptcy Court. If more than one timely, properly-completed Ballot is received with respect to the same Claim and no order of the Bankruptcy Court allowing the creditor to change its vote has been entered before the Lender Voting Deadline and the Noteholders Voting Deadline (as applicable) (or, with respect to beneficial owners of the Convertible Notes in street name, the Noteholders Voting Deadline), the Ballot that will be counted for purposes of determining

whether sufficient acceptances required to confirm the Plan have been received will be the timely, properly-completed Ballot determined by GCG to have been received last.

EACH BALLOT ADVISES CREDITORS THAT, IF THEY VOTE TO REJECT THE PLAN AND **DO NOT ELECT** TO OPT OUT OF THE RELEASE PROVISIONS CONTAINED IN ARTICLE VI OF THE PLAN, THEY SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN. CREDITORS WHO VOTE TO ACCEPT THE PLAN SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN. EACH BALLOT ALSO ADVISES CREDITORS THAT, IF THEY **FAIL TO RETURN A BALLOT** VOTING EITHER TO ACCEPT OR REJECT THE PLAN, THEY SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN.

NON-VOTING CLASSES INCLUDE UNIMPAIRED CLAIMS AND EQUITY INTERESTS. THESE CLASSES ARE ALSO DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND/OR INTERESTS AND CAUSES OF ACTIONS AGAINST THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW.

E.     **Beneficial Owners of the Convertible Notes**.

If you are a beneficial owner of Convertible Notes, please use the Ballot for beneficial owners (a "**Beneficial Owner Ballot**") or the customary means of transmitting your vote to your broker, dealer, commercial bank, trust company or other nominee ("**Nominee**") to cast your vote to accept or reject the Plan. You must return your completed Beneficial Owner Ballot or otherwise transmit your vote to your Nominee so that your Nominee will have sufficient time to complete a Ballot summarizing votes cast by beneficial owners holding securities (each a "**Master Ballot**"), which must be forwarded to GCG by the Voting Deadline. If your Beneficial Owner Ballot or other transmittal of your vote is not received by your Nominee with sufficient time for your Nominee to submit its Master Ballot by the Voting Deadline, your vote will not count.

If you are the Beneficial Owner of the Convertible Notes and hold them in your own name, you can vote by completing either a Beneficial Owner Ballot or by completing and signing the enclosed Ballot..

Do not return your Convertible Notes or any other instruments or agreements that you may have with your Ballot(s).

9

You may receive multiple mailings of this Disclosure Statement, especially if you own Convertible Notes through more than one brokerage firm, commercial bank, trust company, or other nominee. If you submit more than one Ballot for a Class because you beneficially own the securities in that Class through more than one broker or bank, you must indicate in the appropriate item of the Ballot(s) the names of ALL broker-dealers or other intermediaries who hold securities for you in the same Class.

Authorized signatories voting on behalf of more than one beneficial owner must complete a separate Ballot for each such beneficial owner. Any Ballot submitted to a brokerage firm or proxy intermediary will not be counted until the brokerage firm or proxy intermediary (a) properly executes the Ballot(s) and delivers them to GCG, or (b) properly completes and delivers a corresponding Master Ballot to GCG.

By voting on the Plan, you are certifying that you are the beneficial owner of the Convertible Notes as of the Record Date being voted or an authorized signatory for the beneficial owner. Your submission of a Ballot will also constitute a request that you (or in the case of an authorized signatory, the beneficial owner) be treated as the record holder of those securities for purposes of voting on the Plan.

F.        **Brokerage Firms, Banks, and Other Nominees**.

A brokerage firm, commercial bank, trust company, or other nominee that is the agent on behalf of a Convertible Note for a beneficial owner, or an agent therefor, or that is a participant in a securities clearing agency and is authorized to vote in the name of the securities clearing agency pursuant to an omnibus proxy and is acting for a beneficial owner, can vote on behalf of such beneficial owner by: (a)(i) distributing a copy of this Disclosure Statement and all appropriate Ballots to the beneficial owners; (ii) collecting all such Ballots; (iii) completing a Master Ballot compiling the votes and other information from the Ballots collected; and (iv) transmitting the completed Master Ballot to GCG; or (b) pre-validating the Beneficial Owner Ballot, and addressing such ballot as returnable to GCG.

A proxy intermediary acting on behalf of a brokerage firm or bank may follow the procedures outlined in the preceding sentence to vote on behalf of the beneficial owner. If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please contact GCG in the manner set forth above.

G.        **Rights Offering Procedures**.

As discussed below, the Debtors will effectuate a Rights Offering in which holders of Prepetition 2007 Facility Claims will be permitted to acquire up to 80% of the Rights Offering Shares, and holders of Convertible Note Claims will be permitted to acquire up to 20% of the Rights Offering Shares. The record date for determining those holders of Claims that may participate in the Rights Offering will be set forth in the Rights Offering Procedures (the "**Rights Offering Record Date**").

The Rights Offering will be commenced within seven (7) Business Days following the Petition Date. All holders of Prepetition 2007 Facility Claims and Convertible Note Claims will be mailed (i) the Rights Offering Procedures, (ii) a form to exercise Rights and,

in the case of the holders of Prepetition 2007 Facility Claims, the Lender Oversubscription Rights (a "**Subscription Form**"), and (iii) other related rights offering documents.  To exercise their Rights and, in the case of the holders of Prepetition 2007 Facility Claims, Lender Oversubscription Rights, holders must return their Subscription Forms, together with applicable payment, by the Subscription Deadline, which will be a date certain specified in the Rights Offering Procedures which shall be the later of (i) twenty (20) Business Days following the commencement of the Rights Offering and (ii) five (5) Business Days prior to the anticipated Confirmation Date, subject to extension under certain circumstances. Following the Subscription Deadline, the Debtors will provide the Backstop Parties with a notice setting forth the number of shares, if any, and the aggregate purchase price for such shares to be purchased by the Backstop Parties pursuant to the Backstop Agreement.

For the avoidance of doubt, nothing herein constitutes an offer of Rights Offering Shares.

**H.**    **The Confirmation Hearing.**

The Company intends to file voluntary petitions to commence the Chapter 11 Case(s) and will request that the Bankruptcy Court schedule a hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), as soon as possible, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408. The Company will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code and consistent with the terms, conditions, consent and consultation rights set forth in the Restructuring Support Agreement, and has reserved the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## II.  SUMMARY OF TREATMENT OF CLAIMS AND
## EQUITY INTERESTS UNDER THE PLAN

The following table summarizes the classification and treatment of Claims and Equity Interests under the Plan and the estimated distributions to be received by the holders of Allowed Claims and Equity Interests thereunder.  The summaries in this table are qualified in their entirety by the description of the treatment of such Claims in Article III of the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, U.S. Trustee Fees, Fee Claims, and Priority Tax Claims have not been classified.

The classification and treatment of Claims will be deemed to apply to each Debtor.  Genco is the only Debtor that has a Class 8, because only Genco is obligated under the Convertible Notes Indenture.  Genco is also the only Debtor that has a Class 11 with respect to Equity Interests in Genco.  All Debtors, other than Genco, will have a Class 10 with respect to Subsidiary Equity Interests.  If there are no creditors in one or more Classes, then such Class will not apply to the Debtor.

### A.    Summary

| Class | Claims and Equity Interests | Treatment of Allowed Claims | Status | Voting Rights | Estimated Allowed Amount[2] | Projected Recovery[3] |
|---|---|---|---|---|---|---|
| **Class 1** | **Other Priority Claims** | Except to the extent that a holder of an Allowed Other Priority Claim agrees in writing to less favorable treatment, in full and final satisfaction, settlement, release and discharge and in exchange for each Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive payment in Cash in an amount equal to such Allowed Other Priority Claim as soon as practicable after the later of (i) the Effective Date and (ii) thirty (30) days after the date when such Other Priority Claim becomes an Allowed Other Priority Claim. | Unimpaired | Deemed to Accept | De Minimis/None | 100% |

[2] The estimated aggregate Allowed amount of the Claims in each Class does not include potential damages claims that may arise as a result of the rejection of executory contracts or unexpired leases.

[3] The projected recoveries described herein account for dilution from the New Genco Equity Warrants but are  prior to dilution from the warrants issued under the Management Incentive Program.

| Class | Claims and Equity Interests | Treatment of Allowed Claims | Status | Voting Rights | Estimated Allowed Amount[2] | Projected Recovery[3] |
|---|---|---|---|---|---|---|
| **Class 2** | **Other Secured Claims** | Except to the extent that a holder of an Allowed Other Secured Claim agrees in writing to less favorable treatment, at the option of the Debtors, in full and final satisfaction, settlement, release and discharge of and in exchange for such Other Secured Claim, each holder of an Allowed Other Secured Claim shall either: (i) have its Allowed Other Secured Claim Reinstated and rendered Unimpaired, (ii) receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim, if such interest is required to be paid pursuant to sections 506(b) and/or 1129(a)(9) of the Bankruptcy Code, as soon as practicable after the later of (a) the Effective Date, and (b) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim, or (iii) receive the Collateral securing its Allowed Other Secured Claim as soon as practicable after the later of (a) the Effective Date and (b) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim. | Unimpaired | Deemed to Accept | De Minimis/None | 100% |
| **Class 3** | **Prepetition 2007 Facility Claims** | In full and final satisfaction, settlement, release and discharge of and in exchange for the Prepetition 2007 Facility Claims, on or as soon as practicable after the Effective Date, each holder of an Allowed Prepetition 2007 Facility Claim shall receive its Pro Rata share of (i) the 2007 Lender Conversion Shares, and (ii) the Lender Rights. | Impaired | Entitled to Vote | $1,055,911,525.00[4] | 91.5% |

---

[4] Plus the 1.25% facility fee payable pursuant to the Amendment and Supplement No. 6 to the Prepetition 2007 Credit Agreement, and accrued but unpaid interest through the Effective Date to the extent legally permissible.

| Class | Claims and Equity Interests | Treatment of Allowed Claims | Status | Voting Rights | Estimated Allowed Amount[2] | Projected Recovery[3] |
|---|---|---|---|---|---|---|
| Class 4 | **Prepetition $253 Million Facility Claims** | In exchange for each Prepetition $253 Million Facility Claim, each holder of an Allowed Prepetition $253 Million Facility Claim shall receive on the Effective Date, at the Debtors' option, either (i) payment in full, in Cash, in full and final satisfaction, settlement, release and discharge and in exchange for each Prepetition $253 Million Facility Claim, or (ii) its Pro Rata share of the Amended and Restated $253 Million Facility, *plus* payment in full, in Cash, of accrued and unpaid interest, calculated in accordance with the Prepetition $253 Million Facility (i) at the non-default rate until May 30, 2014, and (ii) at the default rate from May 31, 2014, through the Effective Date, as and to the extent such default rate is applicable under the Prepetition $253 Million Facility. | Impaired | Entitled to Vote | $175,718,000.00[5] | 100% |
| Class 5 | **Prepetition $100 Million Facility Claims** | In exchange for each Prepetition $100 Million Facility Claim, each holder of an Allowed Prepetition $100 Million Facility Claim shall receive on the Effective Date, at the Debtors' option, either (i) payment in full, in Cash, in full and final satisfaction, settlement, release and discharge and in exchange for each Prepetition $100 Million Facility Claim, or (ii) its Pro Rata share of the Amended and Restated $100 Million Facility, *plus* payment in full, in Cash, of accrued and unpaid interest calculated in accordance with the Prepetition $100 Million Facility (i) at the non-default rate until June 29, 2014, and (ii) at the default rate from June 30, 2014, through the Effective Date, as and to the extent such default rate is applicable under the Prepetition $100 Million Facility. | Impaired | Entitled to Vote | $73,561,132.60[6] | 100% |
| Class 6 | **Prepetition Swap Claims** | On or as soon as practicable after the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for the Prepetition Swap Claim, the holder of the Allowed Prepetition Swap Claim shall receive payment in full, in Cash. | Unimpaired | Deemed to Accept | $6,689,041[7] | 100% |

---

[5] Plus accrued and unpaid interest calculated in accordance with the Prepetition $253 Million Facility (i) at the non-default rate until May 30, 2014, and (ii) at the default rate from May 31, 2014, through the Effective Date as and to the extent such default rate is applicable under the Prepetition $253 Million Facility.

[6] Plus accrued and unpaid interest calculated in accordance with the Prepetition $100 Million Facility (i) at the non-default rate until June 29, 2014, and (ii) at the default rate from June 30, 2014, through the Effective Date as and to the extent such default rate is applicable under the Prepetition $100 Million Facility.

14

| Class | Claims and Equity Interests | Treatment of Allowed Claims | Status | Voting Rights | Estimated Allowed Amount[2] | Projected Recovery[3] |
|-------|------------------------------|------------------------------|--------|----------------|------------------------------|------------------------|
| Class 7 | General Unsecured Claims | In full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed General Unsecured Claim against the Debtors, on the Effective Date, each holder of an Allowed Class 7 Claim shall, at the discretion of the Reorganized Debtor: (i) be Reinstated as an obligation of the Reorganized Debtors, and be paid in accordance with the ordinary course terms, (ii) receive such other treatment as may be agreed between such holder and the Reorganized Debtors, or (iii) receive such other treatment that will render it Unimpaired pursuant to section 1124 of the Bankruptcy Code. | Unimpaired | Deemed to Accept | $1,000,000 | 100% |
| Class 8 | Convertible Note Claims | On or as soon as practicable after the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for each Convertible Note Claim, each holder of an Allowed Convertible Note Claim that is an Eligible Noteholder shall receive its Pro Rata share of (i) the Convertible Notes Equity Distribution, and (ii) the Noteholder Rights; provided, however, that each holder of an Allowed Convertible Note Claim that is a Non-Eligible Noteholder shall receive a Cash payment equal to the value of the Pro Rata share of the Noteholder Rights and Convertible Notes Equity Distribution such Non-Eligible Noteholder would have received if it was an Eligible Noteholder. | Impaired | Entitled to Vote | $125,000,000[8] | 80.3% |
| Class 9 | Intercompany Claims | On the Effective Date, Intercompany Claims will be Reinstated in full.  On and after the Effective Date, the Debtors and the Reorganized Debtors will be permitted to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes to intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices. | Unimpaired | Deemed to Accept | N/A | 100% |

---

[7] The Prepetition Swap Claim amount is subject to further reconciliation and the "Allowed Claim" amount will be as agreed to by the Debtor or otherwise ordered by the Court.

[8] Plus interest calculated in accordance with the Convertible Notes Indenture that accrued but remains unpaid as of the Petition Date.

| Class | Claims and Equity Interests | Treatment of Allowed Claims | Status | Voting Rights | Estimated Allowed Amount[2] | Projected Recovery[3] |
|---|---|---|---|---|---|---|
| Class 10 | Subsidiary Equity Interests | On the Effective Date, Subsidiary Equity Interests shall be Reinstated. | Unimpaired | Deemed to Accept | N/A | 100% |
| Class 11 | Equity Interests in Genco | On the Effective Date, Equity Interests in Genco shall be cancelled and discharged and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and holders of Equity Interests shall not receive or retain any property under the Plan on account of such Equity Interests in Genco; provided however that in exchange for such cancellation or surrender, on or as soon as practicable after the Effective Date, holders of Equity Interests in Genco shall receive their Pro Rata share of the New Genco Equity Warrants from amounts which holders of Prepetition 2007 Facility Claims and Convertible Note Claims have forgone and such creditors are otherwise entitled to receive under the Plan. | Impaired | Deemed to Reject | 44, 449,407 Outstanding Shares | $32,900,000 |

B.     **Additional Information About General Unsecured Claims and Convertible Notes Claims**

The vast majority of the General Unsecured Claims are prepetition trade, insurance or other operational Claims that will be paid pursuant to the First Day Motions (as discussed below). Therefore, the General Unsecured Claims are estimated to be approximately $1 million subject to any claims asserted before the bar date to be established prior to Confirmation.

To comply with applicable securities laws, the treatment for holders of Convertible Note Claims depends on whether the holder is an Eligible Noteholder or a Non-Eligible Noteholder. Eligible Noteholders are those holders on the Claims Record Date that have demonstrated to the reasonable satisfaction of the Debtors or Reorganized Debtors (as applicable) that they are a QIB or an Accredited Investor. Non-Eligible Noteholders are those holders on the Claims Record Date that have demonstrated to the reasonable satisfaction of the Debtors or the Reorganized Debtors (as applicable) that they are not a QIB or an Accredited Investor. Procedures will be established to demonstrate compliance at a later date. If an Eligible Noteholder satisfies the requirements in the procedures then it will receive its share of the Convertible Notes Equity Distribution and the Noteholder Rights. If a Non-Eligible Noteholder satisfies the requirements in the procedures then it will receive a Cash payment equal to the value of the Pro Rata share of the Noteholder Rights and Convertible Notes Equity Distribution that the Non-Eligible Noteholder would have received if it was an Eligible Noteholder.

As set forth more fully in the Plan, until a Record Date Convertible Noteholder, which is the holder on the Claims Record Date, demonstrates its status to the reasonable

16

satisfaction of the Debtors or the Reorganized Debtors (as applicable), its distribution will be withheld for up to one (1) year from the Petition Date.  If any Record Date Convertible Noteholder does not respond within the one (1) year period, then its distribution will be forfeited.

## III.  **COMPANY BACKGROUND**

A.    **The Company's Businesses**.

Since its founding in 2004, the Company, through various of its subsidiaries, has owned and operated a fleet of vessels (each a "**Vessel**") as a leading provider of international seaborne transportation services for drybulk cargo, including iron ore, coal, grain, and steel products.[9]  The Company operates in over 1,000 ports of call located in over 110 countries, including in the Far East, China, Brazil, Australia, Europe, South and Central America, the United States, West Africa, the Mediterranean, the Caribbean, and the North Sea.  As of the date hereof, the Company's fleet consisted of fifty-three (53) wholly-owned Vessels.  The Company's Vessels are contracted (the industry term is "chartered") by third-party customers through: (a) "fixed-rate-time charters" – which are charters for specified time periods which can range from months to years in duration at set rates; (b) "spot-market related time charters" – which are charters for specific time periods ranging from months to years at rates that fluctuate based on the spot-market; and (c) vessel pools – whereby the Vessels participate in a charter "pool" with other vessels managed by third-party pool managers.  The Company's largest customers include Cargill International S.A., Pacific Basin Chartering Ltd., and Swissmarine Services S.A.

While the Company's Vessels operate internationally, its principal place of business is, and it conducts its business out of, its global headquarters, located in Manhattan, New York. As of the date hereof, the Company employed approximately 33 office personnel, who manage the Company's financial, technical, commercial and administrative operations. The Company also relies exclusively upon third-party technical managers to provide for the actual day-to-day operations of the Vessels, including its entire seaborne crew of approximately 1,200 crewmembers (the "**Crew**").

The Company's corporate structure is comprised of: (i) 57 directly wholly-owned subsidiaries, and (ii) 19 indirectly wholly-owned subsidiaries, including Baltic Trading and its direct and indirect subsidiaries.  Baltic Trading was previously a wholly-owned subsidiary of Genco until Baltic Trading completed its initial public offering on March 15, 2010.  Neither Baltic Trading nor its subsidiaries are a Debtor in the Chapter 11 Cases.

As of February 28, 2014, the Company had consolidated assets totaling approximately $2.448 billion and recorded consolidated liabilities totaling approximately $1.475 billion.  For the twelve months ending February 28, 2014, the Company's consolidated net voyage revenue was approximately $188.5 million.

---

[9] A corporate organizational chart is attached as **Exhibit C**.

B.    **The Company's Prepetition Capital Structure**.

As of the date hereof, the substantial majority of the Company's liabilities – in excess of $1.4 billion – consisted of funded debt (*i.e.*, not trade debt, derivative liability or warrants) comprised of the following: (a) the Prepetition 2007 Facility; (b) the Prepetition $100 Million Facility; (c) the Prepetition $253 Million Facility; and (d) the Convertible Notes.  In addition, the Company is a party the Prepetition Swap Agreement, which guards against the risk of rising interest rates, which would increase interest expense on the Prepetition 2007 Facility.

1.    **The Prepetition 2007 Facility**.

On July 20, 2007, Genco, as parent and borrower, and certain Vessel-Owning Subsidiaries[10] and Genco Investments,[11] as guarantors, entered into that certain credit agreement (as amended on September 21, 2007, February 13, 2008, June 18, 2008, January 26, 2009, December 21, 2011, and July 31, 2012, the "**Prepetition 2007 Credit Agreement**") with DnB Nor Bank ASA, New York Branch (now known as DNB Bank ASA, New York Branch), ("**DnB**"), as Administrative Agent and Collateral Agent, Mandated Lead Arranger and Bookrunner and certain other lenders party thereto (collectively with Wilmington Trust (defined below), the "**Prepetition 2007 Facility Lenders**").  On January 17, 2014, DnB, Wilmington Trust, National Association ("**Wilmington Trust**"), Genco and a majority of lenders under the Prepetition 2007 Credit Agreement executed a Successor Agent Agreement providing for Wilmington Trust to become the Successor Administrative Agent and Collateral Agent for the Prepetition 2007 Facility.

The Prepetition 2007 Credit Agreement provides for a $1.377 billion senior secured credit facility ("**Prepetition 2007 Facility**") maturing on July 20, 2017.  The proceeds from the Prepetition 2007 Facility were used to: (a) acquire nine (9) drybulk capesize vessels; (b) refinance the outstanding balance under the Company's prior financing agreements;  and (c) for working capital.

The Prepetition 2007 Facility is secured on a first-lien basis by a pledge (a) by Genco of its (x) operating accounts and (y) equity interests in each 2007 Subsidiary Guarantor's

---

[10] Currently, the thirty-five (35) Vessel-Owning Subsidiaries that guarantee the Prepetition 2007 Facility ("**2007 Subsidiary Guarantors**") are: Genco Acheron Limited, Genco Augustus Limited, Genco Beauty Limited, Genco Carrier Limited, Genco Cavalier LLC, Genco Challenger Limited, Genco Charger Limited, Genco Champion Limited, Genco Claudius Limited, Genco Commodus Limited, Genco Constantine Limited, Genco Explorer Limited, Genco Hadrian Limited, Genco Hunter Limited, Genco Knight Limited, Genco Leader Limited, Genco London Limited, Genco Marine Limited, Genco Maximus Limited, Genco Muse Limited, Genco Pioneer Limited, Genco Predator Limited, Genco Progress Limited, Genco Prosperity Limited, Genco Raptor LLC, Genco Reliance Limited, Genco Success Limited, Genco Sugar Limited, Genco Surprise Limited, Genco Thunder LLC, Genco Tiberius Limited, Genco Titus Limited, Genco Vigour Limited, Genco Warrior Limited and Genco Wisdom Limited.

[11] Genco Investments became a guarantor on September 21, 2007 in connection with the first amendment.

equity interests,[12] and (b) by each 2007 Subsidiary Guarantor of (x) its interest in its Vessel and (y) related collateral, among other things. In connection with the July and August 2012 amendments to the Prepetition Credit Facilities (defined and discussed in more detail below), the Prepetition 2007 Facility is also secured (a) on a first-lien basis by the Class B stock of Baltic Trading and (b) on a second-lien basis by the Vessels securing the Prepetition $100 Million Facility (defined below) and the Prepetition $253 Million Facility (as defined below) and certain related collateral. As of the date hereof, approximately $1.056 billion[13] remains outstanding. After repayments in 2011 and 2012, as of February 28, 2014, the maximum borrowing capacity under the Prepetition 2007 Facility is approximately $1.056 billion with the full amount being borrowed and outstanding. Currently, the rate of interest on borrowings under the 2007 Facility is the London Interbank Offered Rate ("**LIBOR**") plus the Applicable Margin (as that term is defined in the 2007 Credit Agreement), which is currently 3%. In addition, the Company pays (a) an annual 1% facility fee on average daily outstanding principal payable quarterly in arrears and (b) a one-time facility fee under the Prepetition 2007 Facility equal to 1.25% of the amount outstanding on July 31, 2012.

## 2. **The Prepetition $100 Million Facility**.

On August 12, 2010, Genco, as parent and borrower, and five (5) Vessel-Owning Entities (the "**CA Subsidiaries**"),[14] as guarantors, entered into the Prepetition $100 Million Credit Agreement with Crédit Agricole Corporate and Investment Bank, as agent and security trustee and certain other lenders party thereto (collectively, the "**Prepetition $100 Million Facility Lenders**"). The Prepetition $100 Million Credit Agreement provides for a $100 million senior secured facility (the "**Prepetition $100 Million Facility**") and its proceeds were used to acquire five (5) Vessels. The Prepetition $100 Million Facility was drawn down in five equal tranches of $20 million with one tranche per Vessel. The Prepetition $100 Million Facility has a final maturity date of August 17, 2017 and bears interest at LIBOR plus 3% per year. Borrowings under the Prepetition $100 Million Facility are repaid quarterly.

The Prepetition $100 Million Facility is secured on a first-lien basis by the five (5) Vessels purchased with the proceeds of the Prepetition $100 Million Facility and is also guaranteed by the CA Subsidiaries. As of the date hereof, approximately $73.6 million in principal amount remains outstanding plus accrued and unpaid interest, fees, costs and other expenses.

---

[12] In addition to the stock of the Subsidiary Guarantors, in September 2007, Genco amended the Prepetition 2007 Facility and caused the stock of Jinhui Shipping & Trading Transportation Limited ("**Jinhui**") to be pledged as collateral for the Prepetition 2007 Facility.

[13] The outstanding amount reflects only the outstanding principal amount and does not include any other fees and/or claims.

[14] The CA Subsidiaries that jointly and severally guarantee obligations under the Prepetition $100 Million Facility are Genco Bay Limited, Genco Ocean Limited, Genco Avra Limited, Genco Mare Limited and Genco Spirit Limited. Only two (2) Vessel-owning Debtors (Genco Ocean Limited and Genco Mare Limited) owned Vessels at closing.

3.    **The Prepetition $253 Million Facility**.

On August 20, 2010, Genco, as parent and borrower, entered into the Prepetition $253 Million Credit Agreement (as amended by a first side letter dated August 24, 2010 and a waiver letter dated December 21, 2011 and as amended and restated by a second supplemental agreement dated August 1, 2012) with: (i) the banks and financial institutions party thereto, as lenders (collectively, the "**Prepetition $253 Million Facility Lenders**"); (ii) Deutsche Bank Luxembourg S.A., as agent; (iii) BNP Paribas, Crédit Agricole Corporate and Investment Bank, DVB Bank SE, Deutsche Bank AG Filiale Deutschlandgeschäft, Skandinaviska Enskilda Banken AB (publ), as Mandated Lead Arrangers; (iv) BNP Paribas, Crédit Agricole Corporate and Investment Bank, DVB Bank, Deutsche Bank AG, Skandinaviska Enskilda Banken AB (publ), as swap providers; and (v) Deutsche Bank AG Filiale Deutschlandgeschäft, as security agent and bookrunner (collectively, the "**Prepetition $253 Million Credit Finance Parties**").[15]    The Prepetition $253 Million Credit Agreement provides for a $253 million senior secured credit facility (the "**Prepetition $253 Million Facility**") and its proceeds were used to acquire or refinance the acquisition costs of thirteen (13) Vessels.  The Prepetition $253 Million Facility was drawn down in thirteen Vessel tranches.  The Prepetition $253 Million Facility has a final maturity date of August 14, 2015 and bears interest at LIBOR plus 3% per year.  Borrowings under the Prepetition $253 Million Facility are repaid quarterly.

The Prepetition $253 Million Facility is secured on a first-lien basis by the thirteen (13) Vessels purchased or refinanced with the proceeds of the Prepetition $253 Million Facility and is also guaranteed by the DB Subsidiaries.  As of the date hereof, approximately $175.7 million in principal amount remains outstanding plus accrued and unpaid interest, fees, costs and other expenses.

4.    **The Swap Agreement**.

As of March 1, 2014, the Company has one interest rate swap agreement outstanding with DnB to manage interest rate costs and risk associated with changing interest rates related to the Prepetition 2007 Facility.  On September 5, 2005, Genco entered into that certain ISDA Master Agreement (the "**DnB ISDA**") with DnB as well as an interest rate swap on September 7, 2005 (the "**DnB Swap**").  The DnB Swap provides a hedge against the three-month LIBOR interest rate at a swap rate of 4.485% on a notional amount of $106.233 million, with an expiration date of July 29, 2015.

Pursuant to the 2007 Credit Agreement and related security documents, Claims arising in connection with the DnB Swap are secured by the collateral securing the loans under the Prepetition 2007 Facility; however, such security documents provide that the 2007 Facility

---

[15] The thirteen (13) Vessel-Owning Entities ("**DB Subsidiaries**") named in the $253 Million Term Loan Agreement that guarantee the obligations thereunder pursuant to separate guarantee agreements are: Genco Aquitaine Limited, Genco Ardennes Limited, Genco Auvergne Limited, Genco Bourgogne Limited, Genco Brittany Limited, Genco Languedoc Limited, Genco Loire Limited, Genco Lorraine Limited, Genco Normandy Limited, Genco Picardy Limited, Genco Provence Limited, Genco Pyrenees Limited and Genco Rhone Limited.

Lenders are entitled to receive payment in full from their collateral before any payments are made under the DnB Swap.

### 5.    The Convertible Notes.

On July 27, 2010, Genco issued $125 million of Convertible Notes ("**Convertible Notes**") under that certain Indenture (as supplemented from time to time, the "**Convertible Notes Indenture**") between Genco and the Bank of New York Mellon ("**BNYM**") as Trustee. The Convertible Notes accrue interest at a rate of 5%. The Convertible Notes mature on August 15, 2015, with the interest on the Convertible Notes payable semi-annually on February 15 and August 15 of each year. Holders of the Convertible Notes could convert their notes before February 15, 2015 under certain circumstances based upon the market price of Genco's common stock, the trading price of the Convertible Notes or the occurrence of specified events. After February 15, 2015, the Convertible Notes may be converted at any time until the second scheduled trading day preceding maturity.

The Convertible Notes are unsecured obligations of Genco only and are not guaranteed by any of the other Debtors. The Claims arising from the Convertible Notes rank equally in right of payment with only the other unsecured indebtedness at Genco. As of the date hereof, the entire $125 million remains outstanding under the Convertible Notes plus interest that accrued but remains unpaid as of the Petition Date.

### C.    Genco's Equity Holders.

As of the date hereof, 44,449,407 shares of Genco's common stock were issued and outstanding.

### IV.  EVENTS LEADING TO THE
### COMMENCEMENT OF THE CHAPTER 11 CASES

### A.    The Company's Industry and Key Considerations From 2003-2009.

The shipping industry – and in particular drybulk shipping – has suffered an extraordinary downturn during the past several years. China's economic growth and urbanization starting in 2003 led to an extended period of substantial growth in demand for drybulk shipping vessels. Following this growth cycle came an extended period of distress, beginning in 2008, due to a record amount of new vessel construction - "newbuilding" - entering the market over the past five years, increasing vessel supply. Companies ordered vessels during the peak period, which started delivering after 2008 with the pending orders –"orderbook"– peaking at approximately 80% of the existing world fleet in 2008. The Baltic Dry Index,[16] which measures the cost to move dry freight like coal and iron ore, has fallen to approximately 1,250 in February 2014 from close to 12,000 in mid-2008. The decline in the industry directly impacts vessel values and earnings on charters that, in turn, impact liquidity, cash flows and the Company's ability to comply with credit agreement covenants.

---

[16] Baltic Exchange Limited, a London-based membership organization, publishes the daily Baltic Dry Index which is a daily average of charter rates for key drybulk routes. This is a key indicator of the drybulk shipping market.

The drybulk shipping industry has historically been cyclical – primarily due to its nature of following a variety of macroeconomic indicators – and is subject to short-term volatility due to evolving supply of vessels and demand for shipping services. The combination of assets (vessels) with a long useful life[17] and the lengthy construction lead times (of up to 2-3 years) generally results in pronounced troughs and peaks in the industry, with cycles that could last for extended periods of time. Key influences affecting the demand for drybulk vessels include (a) the pace of world economic growth with a focus on infrastructure development and other raw material intensive industries, (b) international demand for energy resources and commodities, (c) location of global energy consumption and resources, and (d) weather. Indicators that affect the supply side include the (a) number of vessels currently on the water, (b) number of newbuilding vessels due to deliver in the future and (c) rate of vessel disposals, known as "scrapping," as they reach the end of their useful life.

Peak demand for drybulk vessels and their earnings in the middle to end of 2008 coincided not only with peak new vessel orders, but more importantly with the beginning of the global economic downturn. Weak economic conditions affected the growth prospects for many regions of the world – including the Far East, where the Company operates a significant part of its business. The immediate effects on demand were a lack of trade credit, increased commodity inventories, and a lack of time charter activity. Tight credit markets not only impacted drybulk shippers' ability to obtain financing for vessels but also affected traders' ability to satisfy short-term liquidity/working capital needs, thereby creating a ripple effect and eventual liquidity crunch across the freight supply chain. These economic challenges also impacted charterers who, in turn, drive industry revenue. A continuously growing fleet of vessels coupled with the above factors resulted in an imbalanced supply and demand environment detrimentally impacting the shipping industry.

After the extreme lows of the end of 2008, a short-term rebound in the industry began in 2009. The Baltic Dry Index increased to 4,291 in June 2009 and then declined to 2,163 in September 2009. In 2009, Chinese iron ore imports increased by 41% compared to 2008 and coal imports rose by 395% in the same period. This rebound and growth of commodity imports into China suggested, at the time, a recovery for the demand for drybulk vessels. However, the improvement in the market also led to new vessels on the water.

To weather some of the adverse factors affecting the industry, on January 26, 2009, Genco amended the Prepetition 2007 Facility to waive the collateral maintenance financial covenant for the year ending December 31, 2008 and until Genco could comply with all financial covenants and demonstrate an ability to pay a dividend or redeem common stock issued prior to 2009. From March 31, 2009 through March 31, 2012, the indebtedness under the Prepetition 2007 Facility was required to be reduced quarterly by $12,500,000, and beginning on June 30, 2012 through maturity, the indebtedness under the Prepetition 2007 Facility was required to be reduced quarterly by $48,195,000. In consideration of the requested waivers and amendments, Genco agreed to an increase in the Applicable Margin and paid each lender a commitment commission of 0.70% per annum of the daily average unutilized commitment of such lender.

---

[17] A typical vessel may have a useful life of 25 years.

**B.**      **2010 Vessel Acquisitions and 2011 Prepetition Credit Facility Amendments**.

              With an improving economy and more positive global outlook occurring in 2010, the Debtors, like many of its competitors, sought to expand its fleet.  On June 3, 2010, Genco entered into agreements with companies within the Metrostar Management Corporation ("**Metrostar**")[18] to purchase five (5) Handysize drybulk Vessels, including four (4) newbuildings (*i.e.* ships under construction) for an aggregate purchase price of $166.3 million ("**Metrostar Transaction**").  Thereafter, on June 24, 2010, Genco entered into a Master Agreement with Bourbon SA ("**Bourbon**") to purchase sixteen (16) drybulk Vessels, including two newbuildings, for an aggregate purchase price of $545 million, with the Company acquiring thirteen (13) Vessels and three (3) Vessels being resold to MEP at the same cost ("**Bourbon Transaction**").[19]  By year-end 2010, the Company received all but four (4) Vessels, which were scheduled to be delivered in March and November 2011.

              To fund the Vessels being acquired under the Metrostar Transaction and the Bourbon Transaction, in July 2010, Genco closed on an equity offering of 3,593,750 shares of common stock at an offering price of $16 per share, which was done concurrently with the issuance of the Convertible Senior Notes.  Genco also entered into the Prepetition $100 Million Facility and the Prepetition $253 Million Facility in August 2010 to provide further funding for these Vessel acquisitions.

              These Vessel acquisitions expanded the fleet by 31% on a deadweight tonnage basis, creating a young fleet with an average age of 6.5 years, well below the industry average of 15 years.  At that time, the Company believed that the new Vessel acquisitions would position the Company to take advantage of the long-term demand for drybulk shipping.

              However, as the new Vessels were being delivered, the market conditions did not rebound as quickly as anticipated, with vessel supply growth continuing to outpace demand growth.  Late 2010 through 2011 saw a suppressed charter rate environment largely caused by increased new vessel construction and delivery coupled with severe weather-related disruptions at major exporting ports hampering drybulk cargo availability.  Consequently, vessel values started reducing significantly.  The overall Baltic Dry Index showed depressed rates led by deterioration in Capesize freight rates (which have historically been the most volatile class).  The more versatile Supramax and Handysize vessels maintained more stable earnings; *however*, the Company's time charter equivalent ("**TCE**") daily revenue[20] decreased from $30,248 per Vessel

---

[18] Metrostar Management Corp. is one of the world's leading ship management companies and is based in Athens, Greece.

[19] MEP paid for their own vessels.

[20] TCE rates are commonly used in the industry to measure performance by comparing daily earnings generated by vessels on time charters with daily earnings generated by vessels on voyage charters, because charterhire rates for vessels on voyage charters are generally not expressed in per-day amounts, while charterhire rates for vessels on time charters generally are expressed in such amounts.  The Company defines TCE rates as net voyage revenue (voyage revenues less voyage expenses) divided by the number of our available days during the period, which is consistent with industry standards.   The Company historically reported its financials on a consolidated basis with Baltic Trading .  For purposes of this Disclosure Statement, the numbers are for the Company on a standalone basis and therefore differ from those on the publicly reported financials.

per day in the first quarter of 2010 to $17,005 per Vessel per day for the fourth quarter of 2011. The phenomenon of slippage in vessel deliveries (which is an unpredictable delay of newbuilding vessel deliveries) developed post-financial crisis, thereby reducing visibility into the number of vessels that would be in the market in the long-term. This slippage resulted from a combination of factors, including lack of financing sources, defaults by shipyards and vessel owners, and renegotiation of existing contracts to extend vessel delivery dates. Some ship owners terminated contracts for vessels in their entirety either through renegotiation or termination of the contract with the ship builder.

Additionally, Vessels acquired by the Company in 2007 and 2008 tended to be on fixed, long-term time charters with rates set at the high point of the market. At the time, approximately 70% of the Company's charters were fixed-rate and 30% were spot-market related time charters. Like its competitors, at that time, the Company entered into fixed-rate time charters at favorable rates. Starting in 2011, though, many of these fixed-rate time charters began expiring.

Recognizing the industry difficulties and liquidity constraints to meet debt service requirements, the Company entered into further amendments and waivers to the Prepetition 2007 Facility, the Prepetition $253 Million Facility and the Prepetition $100 Million Facility (the "**Prepetition Credit Facilities**") on December 21, 2011. These amendments provided for the following, among other things: (a) compliance with the maximum leverage ratio covenant[21] was waived from October 21, 2011 through March 31, 2013; (b) compliance with the minimum consolidated interest ratio covenant[22] was also waived for the same time period; (c) addition of a gross interest-bearing debt to total capital covenant[23] of 62.5% applicable for the same time period; and (d) payment of an upfront fee of 0.25% of the amount of outstanding loans to each of the lenders under the Prepetition Credit Facilities. The Company prepaid $52.5 million under the Prepetition 2007 Facility, $3 million under the Prepetition $100 Million Facility, and $7 million under the Prepetition $253 Million Facility, and the prepayments were applied in inverse order of maturity.

The commitment and flexibility from the Company's lenders in December 2011 allowed for the balance sheet to be strengthened – at least on an interim basis. At the same time, the acquisitions completed in 2010 and 2011 allowed for increased scale and scope of the operations. The Company believed that it was positioned to capitalize on anticipated long-term shipping demand in the Far East and developing countries.

---

[21] The maximum leverage covenant ratio is the Company's net debt to EBITDA (as defined in the agreements providing the Prepetition Credit Facilities).

[22] The minimum consolidated interest ratio is the Company's EBITDA to consolidated interest expense.

[23] The gross interest-bearing debt to total capital covenant is the ratio of the Company's interest-bearing indebtedness to the sum of its interest-bearing indebtedness and its consolidated net worth.

C.    **Industry Instability in 2012 Led to 2012 Prepetition Credit Facility Amendments**.

In the first quarter of 2012, the Company continued to improve the balance sheet through a 7.5 million share, $53 million common stock offering to be used for general corporate purposes. This offering satisfied a condition in the December 2011 amendments allowing for a reduction in the facility fee on the Prepetition 2007 Facility to 1% from 2%. The applicable margin on the interest rate remained the same. Reducing borrowing costs would also reduce ongoing interest expense.

Despite this improvement, pressure on charter rates occurred due to the continuous delivery of newbuilding vessels – thereby deepening an oversupply of vessels industry-wide – at a time when demand grew at a slower pace. Drybulk freight rates suffered in 2012 even though use of seaborne transportation continued to grow. This led to a market view that oversupply of vessels was the main factor negatively affecting the industry. Throughout 2012, iron ore imports into China increased by 8.5%. Both China and India also experienced improved demand for coal, with India importing a record high of 157 million tons on an annualized basis. Despite this growth, the Company's TCE continued to decline in the third quarter of 2012 to $9,437 per Vessel per day, down from $17,058 per Vessel per day for third quarter 2011.

In July and August 2012, faced with continued reduced drybulk charter rates, the Company negotiated further amendments and waivers with its lenders to obtain relief under its Prepetition Credit Facilities. The August 1, 2012 amendments provided the following, among other things: (a) the waiver of the maximum leverage ratio and the minimum consolidated interest ratio was extended through December 31, 2013; (b) scheduled amortization payments through and including the quarter ending December 31, 2013 were deferred until maturity under the Prepetition 2007 Facility and were prepaid under the Prepetition $100 Million Facility and the Prepetition $253 Million Facility; and (c) the lenders under the Prepetition Credit Facilities each received an upfront fee of 0.25% of the amount of outstanding loans. The Company also agreed to certain restrictions on indebtedness they could incur under the Prepetition Credit Facilities and also agreed that maturity dates would remain the same. The Company prepaid $57.9 million under the Prepetition 2007 Facility applied to the final maturity payment, $11.538 million under the Prepetition $100 Million Facility and $30.45 million under the Prepetition $253 Million Facility applied in order of maturity. Therefore, the next scheduled amortization payments under the three Prepetition Credit Facilities were to be made in the first quarter of 2014.

Commencing September 30, 2012, under the August 2012 amendments, the Company was also required to repay the Prepetition 2007 Facility on a quarterly basis using excess cash over $100 million in the accounts pledged to the Prepetition 2007 Facility to be allocated 25% to the final maturity payment and 75% to each scheduled mandatory principal repayment beginning on March 31, 2014 by means of a cash sweep. These payment obligations were required to continue until the later of December 31, 2013 or the date on which the appraised value of certain mortgaged Vessels equals 100% of the aggregate obligations under the Prepetition 2007 Facility. The Applicable Margin over LIBOR for the Prepetition 2007 Facility was increased to 3% and the minimum cash balance required was increased by $250,000 to

$750,000 per Vessel mortgaged under the Prepetition 2007 Facility.  Genco also agreed to pay a $13.5 million fee to the 2007 Facility Lenders on the earlier of the maturity date and the date when the facility obligations are paid in full.  As consideration for the required waivers and amendments, (a) Genco Investments pledged the Class B stock of Baltic Trading and (b) the Crédit Agricole and Deutsche Bank Vessel-Owning Subsidiaries granted a second lien on their Vessels to the 2007 Facility Lenders.

### D.    2013's Events Set Stage for 2014's Financial Restructuring.

The foregoing amendments and related actions were intended to allow the Company to continue operations despite turbulence in the shipping industry and avoid taking more permanent steps to deleverage its balance sheet.  However, the Company experienced lower revenues in the first quarter of 2013 largely due to lower charter rates.  Revenues were $35.2 million compared to $54.2 million for the first quarter of 2012.  The operating loss for the first quarter of 2013 was $26.4 million as compared to $9.2 million for the first quarter of 2012.  Based on the weakness in the industry caused by vessel oversupply, the Company determined that it was probable that it would not be in compliance with the financial covenants by March 31, 2014.  Therefore, in accordance with accounting principles, the Company reclassified the funded debt under the three Prepetition Credit Facilities and swap liability as current liabilities.  Consequently, as of March 31, 2013, the Company had current liabilities of $1.5 billion compared to $249.3 million as of March 31, 2012.

The Baltic Dry Index during the first quarter of 2013 remained at relatively low levels.  Nonetheless, the Company believed that the supply side pressures would improve in 2013 for the following reasons: (a) the vessel orderbook as a percentage of fleet had fallen to approximately 20%, which was the lowest level in eight years; (b) slippage of newbuilding deliveries continued at a substantial rate; and (c) the continued weakness in the freight market led to record vessel scrapping levels through 2012, a trend which continued into 2013.  The Company believed these supply side developments along with strengthened demand could lead to a more balanced industry supply and demand.

Lower charter rates continued to put downward pressure on the Company's revenues in the second quarter of 2013 with quarterly revenues being $16 million less than the same period for 2012.  The TCE for the second quarter of 2013 was $7,505 per vessel per day compared to $11,435 per vessel per day for the second quarter of 2012.  The Baltic Dry Index remained at similar levels as the first quarter of 2013, but as new vessel deliveries showed a short-term pause and the expansion of iron ore exports out of Australia increased, the Baltic Dry Index reached a 2013 high of 1,171 – a level not seen since January 2012.  The unpredictable nature of certain of these factors, including weather, seasonal demand for resources, and asymmetrical timing of vessel deliveries results in significant short term vessel volatility. Over the last two-year period, the Baltic Dry Index recorded a low of 661 and a high of 2,337 while it currently stands at 1,002.

Beginning in the second half of 2013, the drybulk shipping industry demonstrated positive indications that "supply and demand" could rebalance for the first time in several years. The industry as a whole had an optimistic outlook because of this realignment.  The third quarter of 2013 saw a strong increase in freight rates due to moderate supply growth and increased iron

ore volumes and steel production.  Improvement in market-wide fleet utilization – coupled with continued deceleration of newbuilding deliveries to 41% lower than the same period in 2012 – allowed the drybulk shipping market to project improvement.  Additionally, high quality shipyards had limited availability to construct new vessels, which effectively created a ceiling on fulfilling pending orders.

Since the beginning of 2014, and leading up to today, the freight market continues to be impacted by volatility as a result of macroeconomic developments which are out of the Company's control.  Among other factors, a slowdown in Chinese lending and the deceleration of China's money supply growth has resulted in wide spread concerns about the country's growth prospects.  These factors have resulted in a tightening of credit availability for Chinese commodity importers.  Currently, a significant amount of iron ore inventories are held by commodity traders at Chinese ports instead of being sold to end users.  At the same time, orders for newbuilding vessels for future delivery increased by 50% in the first quarter of 2014 as compared to the same period last year leading to concerns of a potential oversupply situation continuing over the next five year period. The effect of the uncertainty posed by these events has been evident on daily rates for Capesize vessels as quoted on Baltic Dry Index, which decreased by over two-thirds from a level of approximately $35,000 per vessel per day in January of this year to $10,266 on April 15, 2014.  Inherent industry volatility and uncertainty on continued growth of industry supply and demand could further depress charter rates.  This uncertainty highlighted the need for a permanent restructuring that would result in a sustainable debt burden.

The Company believed that rather than continuing on a prior course of periodic amendments to the Prepetition Credit Facilities, a comprehensive and consensual financial restructuring aimed at deleveraging the balance sheet and converting a significant portion of the Prepetition 2007 Facility into equity was necessary.  Progress towards such a restructuring began in earnest after March 2013, when one of the Company's then-significant lenders sold approximately $200 million of its holdings in the Prepetition 2007 Facility.  By the second half of 2013, subsequent additional sales had resulted in substantially all of the Prepetition 2007 Facility having changed hands from the original lenders to new lenders, who (unlike the original lenders) were amenable to compromising their claims.  This shift in lenders permitted the Company to explore structures for negotiating a permanent restructuring of the Company, including through the potential equitization of all or a portion of the Prepetition 2007 Facility.  In early 2014, Wilmington Trust replaced DnB as the Administrative Agent and the Collateral Agent under the Prepetition 2007 Facility.

After the change in the composition of the 2007 Facility Lenders at the end of 2013, the Company hired Blackstone Advisory Partners L.P. to serve as its financial advisor to work with its long-time counsel, Kramer Levin Naftalis & Frankel LLP, to assess restructuring options, including a more extensive deleveraging of its balance sheet.  As noted earlier, the Company's "loan-to-vessel" values are approximately one hundred and fifteen percent (115%) and well above the fifty percent (50%) preferred ratio in the industry.  The Company faced approximately $55.2 million in amortization payments and $15 million in interest payments coming due in the first quarter of 2014 – which (if paid) would severely impair the Company's liquidity, and ability to operate, and result in a breach of certain financial covenants under the Company's Prepetition Credit Facilities.  The Company concluded that it could not sustain the

adverse impact upon its liquidity and ability to operate on a long-term basis under the status quo and without a more extensive financial restructuring.

E.    **Negotiations with Secured Lenders and Convertible Noteholders**.

Starting in January 2014, the Company began negotiations with the lenders under its three Prepetition Credit Facilities, including a steering committee of 2007 Facility Lenders, and an informal group of holders of Convertible Notes to create a consensual framework that would reduce the Company's $1.4 billion funded debt burden and restructure the balance sheet. Each of these creditor constituencies retained counsel and, in certain cases, financial advisors, and entered into non-disclosure agreements with the Company to facilitate negotiating a consensual restructuring.

While continuing discussions on the framework of an overall consensual restructuring, Genco did not make a semi-annual interest payment of approximately $3.1 million under the Convertible Notes due on February 18, 2014. Notably, Genco had a 30-day grace period before the missed payment resulted in an event of default under the notes.[24] While significant progress was made during the grace period, there were material hurdles that needed to be overcome to finalize a deal between the Prepetition 2007 Facility Lenders, the Convertible Noteholders, and the Company. The Company determined that it was prudent to pay the semi-annual interest to the Convertible Noteholders prior to the expiration of the grace period to obtain ten (10) additional days to arrive at a consensual deal. The next deadline thereafter was March 31, 2014 when the Company was required to make an amortization payment to the Prepetition 2007 Facility Lenders in the amount of $48,195,000 and failure to do so would have resulted in cross-defaults under the other secured facilities and the Convertible Notes Indenture.

On March 31, 2014, prior to the deadline to make the $48 million amortization payment, the Company entered into thirty-six-hour forbearance and waiver agreements (as applicable) with the lenders under its Prepetition Credit Facilities. Immediately prior to their expiration on April 1 at 11:59 p.m., to continue negotiations and finalize a consensual restructuring framework, the Company and the Prepetition Credit Facilities' lenders entered into another set of forbearance and waiver agreements that would expire on either April 4 at 11:59 p.m. or, if the parties entered into a restructuring support agreement supported by 66 2/3% of each creditor constituency party to such agreement, on April 21, 2014 at 11:59 p.m.

F.    **The Restructuring Support Agreement**.

On April 3, 2014, after weeks of intensive negotiations, the Company, certain lenders under its Prepetition Credit Facilities and certain Convertible Noteholders entered into the Restructuring Support Agreement.    As mentioned above, the effectiveness of the

---

[24] Despite the grace period under the Convertible Notes, the failure to make the interest payment could have constituted an event of default under the Prepetition $100 Million Facility. Therefore, the Company negotiated a waiver with the lenders under that credit facility to avoid an immediate default, which waiver expired on March 21, 2014. In consideration for such waiver, the Company prepaid approximately $1.9 million of the principal amount due on March 31, 2014. The Company believes that the Prepetition $100 Million Facility is oversecured.

Restructuring Support Agreement prior to April 4 triggered an automatic extension of the forbearance and waivers provided under the Prepetition Credit Facilities to April 21, 2014.

The Restructuring Support Agreement bound the Supporting Creditors to support a restructuring that would substantially reduce the Company's debt burden, enhance its liquidity, and solidify the Company's long-term growth and operating performance. Specifically, the parties agreed to support the Plan that embodied the terms set forth in a term sheet annexed to the Restructuring Support Agreement. These terms provided for the following:

- A $100 million rights offering for 8.7% of the pro forma equity in the reorganized Genco (subject to dilution), 80% of which will be backstopped by certain of the Supporting 2007 Facility Lenders, and 20% of which will be backstopped by certain of the Supporting Noteholders.

- Conversion of 100% of the debt outstanding under the 2007 Facility into 81.1% of the New Genco Common Stock (subject to dilution).

- At the Company's option, replacement of the Prepetition $253 Million Facility and the Prepetition $100 Million Facility with new senior secured credit facilities, or amending the Prepetition $253 Million Facility and the Prepetition $100 Million Facility to provide for extended maturity dates through August 2019 and certain other modifications.

- Payment of any Claim pursuant to the Company's outstanding interest rate hedging agreement in full in Cash.

- Conversion of 100% of the Convertible Note Claims into 8.4% of the New Genco Common Stock (subject to dilution).

- Unimpairment of all other General Unsecured Claims under section 1124 of the Bankruptcy Code.

- Equity Interests in Genco will be cancelled as of the Effective Date and holders of such Equity Interests in Genco will receive no distribution other than the New Genco Equity Warrants, which are being provided to holders of Equity Interests in exchange for the surrender or cancellation of their Equity Interests in Genco. This value is being provided to holders of Equity Interests solely from amounts that would otherwise be distributable to the Prepetition 2007 Facility Lenders and the Convertible Noteholders. The New Genco Equity Warrants will be warrants to purchase 6% of New Genco Common Stock (subject to dilution) exercisable for a period of 7 years from the Effective Date at a cash-less strike price of $20.99 at a total implied equity value of $1,295 million.

- Establishment of a Management Incentive Program that provides officers, directors and other management with 1.8% equity of the New Genco Common Stock (subject to dilution) and three tiers of warrants with staggered strike prices based on increasing equity values.

After good faith negotiations, the parties to the Restructuring Support Agreement agreed to embody these terms in definitive documentation, including the Plan, the Disclosure Statement, the Equity Commitment Agreement, and the solicitation procedures. Each party agreed to certain consent and consultation rights with respect to some or all of the definitive documents.   Subject to the satisfaction of those consent rights, and other conditions, the Supporting Creditors are obligated to the support the Plan and other elements of the Chapter 11 Cases.

Under the Restructuring Support Agreement, the Company is obligated to comply with the following milestones, unless agreed otherwise with the requisite number of Supporting Creditors:

- The solicitation of votes on the Plan from the lenders under the Prepetition Credit Facilities and the holders of Convertible Notes must begin on or before April 16, 2014 ("**Solicitation Commencement Date**");

- Voluntary petition(s) and motions seeking approval of the Plan, the Disclosure Statement, and the solicitation procedures must be filed in the Court (the date such petitions are filed, the  "**Petition Date**") must be filed on or before the fifth calendar day after the Solicitation Commencement Date;

- The Debtors' interim use of cash collateral and the Debtors' assumption of the Restructuring Support Agreement must be approved by the Bankruptcy Court on or before the fifth business day after the Petition Date;

- The Disclosure Statement, the solicitation procedures, the Plan, and final use of cash collateral must be approved by the Bankruptcy Court (such date, the "**Confirmation Date**") on or before the forty-fifth day after the Petition Date; and

- The Plan must be consummated on or before the later of (i) 10 days following the Confirmation Date, (ii) completion of the Rights Offering, or (iii) notice from the respective lenders that the conditions to the closing of the Amended and Restated $253 Million Facility and Amended and Restated $100 Million Facility have been satisfied or waived.

Notably, in addition to other customary termination rights, the Company's board of directors may terminate the Restructuring Support Agreement upon a good faith determination that pursuing the contemplated restructuring is inconsistent with the applicable fiduciary duties – otherwise known as a "fiduciary out."   The board of directors can also terminate the Restructuring Support Agreement if it receives an *unsolicited* proposal for an alternative restructuring transaction that is likely more favorable than the restructuring embodied in the Plan, such that the continued performance by the Company under the Restructuring Support Agreement would be inconsistent with the applicable fiduciary duties.  Importantly, although the Company cannot actively solicit alternative proposals, it may receive proposals or offers from third parties and negotiate, provide due diligence, discuss and/or analyze such proposals without breaching or terminating the Restructuring Support Agreement.  If the Company consummates an alternative transaction, then the Prepetition 2007 Facility Lenders and holders of Convertible

Notes that are parties to the Restructuring Support Agreement would share a termination fee of $26.5 million.

Given the overwhelming consensus among creditors that is manifest in the Restructuring Support Agreement, the Company believes it will emerge from chapter 11 expeditiously, with an optimized balance sheet that will allow the reorganized Debtors to succeed in a competitive industry.  This outcome would be in the best interests of the Debtors and their stakeholders.

## V.  <u>THE ANTICIPATED CHAPTER 11 CASE</u>

Under the terms of the Restructuring Support Agreement and the milestones set forth therein, the Debtors anticipate filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code on or before April 21, 2014.  Solicitation of acceptances from the Convertible Noteholders will commence prior to the Petition Date but will continue until the postpetition Noteholders Voting Deadline.

The filing of a petition will commence the Chapter 11 Case.  At the time, all actions and proceedings against the Debtors and all acts to obtain property from the Debtors will be stayed under section 362 of the Bankruptcy Code.  The Debtors will continue to operate their businesses and manage their property as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors expect to proceed expeditiously through this Chapter 11 Case.  To facilitate the Chapter 11 Case and to minimize disruption to its operations, the Debtors will file motions seeking from the Court, among other relief, the relief detailed below.  These requests will include, but are not limited to, orders permitting the Debtors to pay certain employee obligations, pay certain foreign operations obligations, and to maintain its cash management system.  Such relief, if granted, will assist in the administration of the Chapter 11 Cases.  There can be no assurance, however, that the Bankruptcy Court will grant any or all of the relief sought.

Commencing the Chapter 11 Cases will enable the Debtors to implement a financial restructuring with little to no disruption of its global drybulk shipping business.  The Debtors believe that the transactions contemplated by the Plan will deleverage its balance sheet, improve go-forward liquidity and position the Company for flexibility and future growth in the industry.

### A.    <u>Expected Timetable of the Chapter 11 Case</u>

The Company is required to proceed expeditiously through chapter 11 and will use commercially reasonable efforts to confirm the Plan no later than forty-five days after the Petition Date – which is a requirement of the Restructuring Support Agreement.  The Company has been extensively negotiating with the Prepetition 2007 Facility Lenders, the Prepetition $253 Million Facility Lenders, the Prepetition $100 Million Facility Lenders, and the Convertible Noteholders to deleverage the balance sheet and consummate a financial restructuring.

While the Company will request that the Bankruptcy Court approve the timetable set forth in the Plan Scheduling Motion on the Petition Date, no assurances can be made that such an order will be entered.  The failure to meet the milestones and deadlines set forth in the Restructuring Support Agreement could result in termination of the agreement by some or all of the Supporting Creditors that, in turn, could derail the orderly restructuring of the Company's massive financial obligations. If the Plan is confirmed within the required schedule, the Company anticipates that the Effective Date will be the later of (i) 10 days following the Confirmation Date, (ii) completion of the Rights Offering, or (iii) notice from the respective lenders that the conditions to closing the Amended and Restated $253 Million Facility and the Amended and Restated $100 Million Facility have been satisfied or waived.

### B.      Significant First Day Motions and Retention of Professionals.

On the Petition Date, the Debtors intend to file several motions requesting that the Bankruptcy Court enter orders authorizing the Debtors to continue operating in the ordinary course (the "**First Day Motions**").  These First Day Motions are designed to facilitate a smooth transition into chapter 11 and ease the strain on the Debtors' businesses as a consequence of the filing of the Chapter 11 Cases.  There is no guarantee that the Bankruptcy Court will grant any or all of the requested relief.  The following summary highlights certain of the First Day Motions that are expected to be filed.

### 1.      Approval of Solicitation Procedures and Scheduling of Confirmation Hearing

The Debtors will be seeking confirmation of the Plan and emergence from chapter 11 as soon as possible.  To that end, the Debtors intend to file a motion on the Petition Date requesting that the Bankruptcy Court set a date and time for the Combined Hearing to, among other things: (a) approve the adequacy of the Disclosure Statement, (b) approve retroactively the procedures for the solicitation of the votes on the Plan, and (c) confirm the Plan.  The Debtors will seek the earliest possible date permitted by the applicable rules and the Bankruptcy Court's calendar for such hearing.

### 2.      Cash Collateral

The Debtors have sufficient cash to fund the Chapter 11 Case and its ongoing operations.  However, substantially all of the Debtors' cash is encumbered under the Prepetition Credit Facilities and constitutes the lenders' "cash collateral" within the meaning of section 363 of the Bankruptcy Code. Without authorization to use this cash collateral, the Debtors would be unable to continue their operations and would not be able to reorganize as a going concern. Pursuant to the Restructuring Support Agreement, the Debtors have negotiated with the lenders under the Prepetition Credit Facilities the terms on which it may use the lenders' cash collateral. Accordingly, on the Petition Date, the Debtors will seek authority from the Bankruptcy Court (the "Cash Collateral Motion") (i) to use the lenders' cash collateral subject to an agreed-upon budget, (ii) to provide the lenders under the Prepetition Credit Facilities with agreed-upon adequate protection, and (iii) to grant certain other relief.

### 3.   Stabilizing Operations

Recognizing that any interruption of the Company's business, even for a short period, could negatively impact customer and vendor relationships, the Company's goodwill, revenue and profits, the Company intends to file certain First Day Motions to ensure stabilization of its operations.   The relief sought by these motions with respect to the treatment of the Company's ordinary course of business and operational (i.e., non-funded debt) creditors is consistent with the Restructuring Support Agreement.

### (a)   Cash Management System

The Company maintains a centralized cash management system to collect, track, aggregate and disburse cash on a daily basis between the Debtors.   To facilitate a smooth transition into the Chapter 11 Case, the Company will seek authority on an interim and final basis, to continue using its existing cash management system, bank accounts and business forms and to continue intercompany transactions.

### (b)   Employee Motion

The Company's ability to manage its international shipping business requires the continued focus and commitment of its thirty-three (33) talented and experienced employees who oversee the business, including the commercial and strategic management of the fleet of fifty-three (53) vessels.  These employees rely on their compensation and benefits to pay their daily living expenses; absent which they would be exposed to significant financial difficulties.  The Company will need the sole focus of its employees during the Chapter 11 Case and cannot afford for its employees to be distracted by unnecessary concern over the payment of their wages and other benefits in the ordinary course of operations.   Accordingly, the Company will seek authority to (a) honor and pay certain prepetition amounts due to its employees, directors (solely with regards to reimbursable expenses) and an independent contractor related to, among other things, compensation, benefit programs and reimbursable expenses; (b) continue certain benefit programs and policies, consistent with the ordinary course of business and past practices, on a postpetition basis, whether arising before or after the Petition Date; and (c) alter, modify or discontinue employee benefit programs as the Company deems necessary.

### (c)   Operations Motion

To operate its worldwide shipping business, the Company relies upon a variety of vendors and service providers (many of which are foreign).  Notably, the Company uses three (3) third-party technical managers to handle the day-to-day technical management of its fleet of fifty-three (53) Vessels, including the staffing and payment of seaborne crew and the procurement of supplies and services necessary to the operation of its Vessels. While the use of the technical managers obviates the need for the Company to transact directly with thousands of vendors, suppliers and employees, the Company does engage certain vendors directly.  In the ordinary course of business, the Company also owes certain amounts pertaining to customer performance related Claims, participation by some of the Company's Vessels in pooling agreements and ship broker commissions.  Failure to pay any of the aforementioned amounts would devastate the Company's operations.

Accordingly, on the Petition Date, the Company will request entry of interim and final orders authorizing it (a) to continue to honor and pay prepetition amounts owed to the technical ship managers and other vendors; (b) to make payments of prepetition amounts owed to brokers and customers under charter agreements; (c) to continue performance of the Company's obligations under prepetition pooling agreements; (d) to pay, in its discretion, in the ordinary course of business, obligations arising from prepetition delivery of goods received within twenty (20) days of the Petition Date (and confirming their administrative expense status). The relief requested is typical in international cases of this size and complexity and allows for the continuation of the Company's operations and preservation of estate value.

(d)    Postpetition Delivery of Goods

The Company's vendors, international ones in particular, may be concerned that they will not be paid for goods shipped or services ordered prepetition, but actually delivered or performed postpetition. The Company's ability to operate its businesses and reorganize could be jeopardized if these vendors stop doing business with the Company over payment concerns. Accordingly, the Company will, out of an abundance of caution, seek entry of an order (a) granting administrative priority status to undisputed obligations of the Company that are owed to vendors arising from the postpetition delivery of goods and services that may have been ordered prior to the Petition Date and (b) authorizing the Company to pay such obligations in the ordinary course of business.

(e)    Utilities

The Company contracts with certain utility provider for telecommunications services. Uninterrupted utility services are important to the Company's ongoing business operations and to the success of its restructuring. To that end, the Company will seek entry of an order approving procedures for, among other things, determining adequate assurance for utility providers and prohibiting utility providers from altering, refusing or discontinuing services without further order by the Bankruptcy Court.

(f)    Insurance

This motion would allow the Company to preserve its insurance coverage by authorizing the continued maintenance, administration and payment of premiums on prepetition insurance policies and authorize the payment of outstanding prepetition obligations on account of the Company's insurance policies.

**4.    Rejection of an Unexpired Non-Residential Real Estate Lease and Operational Initiatives Regarding Executory Contracts.**

While the focus of this Chapter 11 Case is to right-size the balance sheet, the Company also intends to pursue limited changes to enhance its operations in furtherance of that goal, including the ability to reject a lease, sublease, and related agreements for certain office space that is not currently being occupied or used by the Company. Although the Company vacated this space in 2012, it remained contractually obligated under the lease. To mitigate the burden of the payment of rent, the Company entered into a sublease with an affiliate of the landlord. Nonetheless, the Company suffers a monthly loss on this lease as the sublease

34

payments are less than the monthly lease obligation. The lease and the sublease terms have 7 more years remaining. The Company determined that, in its business judgment, rejection of the lease, sublease and related agreements are in its best interests and, on the Petition Date, will seek to reject such agreements. The rejection will have no impact upon ongoing operations since the space has not been occupied or utilized by the Company since 2012.

The Company will continue to review all of its unexpired leases and executory contracts following the commencement of the Chapter 11 Case and may seek rejection of additional leases and contracts, in accordance with the procedures described in the Plan, that the Company determines no longer provides benefits to its estates.

## 5.    Procedural Motions and Professional Retention Applications

The Company intends to file several procedural motions that are standard in chapter 11 cases of similar size and complexity, as well as applications to retain the various professionals who will be assisting the Company during the Chapter 11 Case.

## C.    Summary of the Rights Offering.

The Backstop Agreement and the Restructuring Support Agreement provide for a $100 Million Rights Offering through the Plan backstopped by certain Prepetition 2007 Facility Lenders and certain Convertible Noteholders. As discussed above, as part of the settlement with certain of the holders of Prepetition 2007 Facility Claims and Convertible Note Claims, the Debtors will conduct the Rights Offering to raise new capital which will be used for general corporate purposes following the Effective Date. Through the proposed Rights Offering, the Prepetition 2007 Facility Lenders will receive the right to participate in an aggregate investment of up to $80 million, and the Convertible Noteholders will receive the right to participate in an aggregate investment of up to $20 million, constituting an aggregate of up to 8.7% of the New Genco Common Stock (prior to dilution on account of the New Genco Equity Warrants and the New Genco MIP Warrants). The Backstop Agreement is annexed hereto as **Exhibit D** and the Rights Offering Procedures, which specify the procedures for properly exercising the Rights, are annexed hereto as **Exhibit E**.

The Rights will be distributed to holders of Prepetition 2007 Facility Claims and Convertible Note Claims as of the Rights Offering Record Date which will be a date after commencement of solicitation of the Plan (an "**Eligible Holder**"). The Rights are not assignable or detachable from the underlying Claims, and will only be transferable with their underlying Claims in accordance with the Rights Offering Procedures. After a Right has been exercised, the underlying Claim corresponding to the Right will cease to be transferable, even if the Right is exercised prior to the Claims Record Date. Rights will only be exercisable by holders that are QIBs or Accredited Investors.

The Rights Offering Procedures and the Plan provide certain Lender Oversubscription Rights, whereby each holder of Lender Rights will receive the right to subscribe for additional Rights Offering Shares, to the extent available on account of not all the Lender Rights having been exercised; provided that such holder has (i) exercised in full its Lender Rights, (ii) specified in the subscription form (provided for in the Rights Offering

35

Procedures) the number of additional Rights Offering Shares for which it is subscribing  and (iii) paid the full  purchase price for the New Genco Common Stock for which it is subscribing through the exercise of the Lender Rights and the Lender Oversubscription Rights.  There will be no oversubscription rights for the Noteholders.

On the Effective Date, Reorganized Genco will issue the Rights Offering Shares to those Eligible Holders that, in accordance with the Plan and the Rights Offering Procedures, have validly exercised their respective Lender Rights, Lender Oversubscription Rights and Noteholder Rights, as applicable.

The Rights Offering will be conducted prior to confirmation of the Plan. The Rights Offering will commence no later than seven (7) Business Days following the Petition Date and will terminate on the Subscription Deadline, which will be the later of (i) twenty (20) Business Days following commencement of the Rights Offering and (ii) five (5) Business Days prior to the Confirmation Date, subject to extension under certain circumstances.  Once an Eligible Holder has properly exercised its Lender Rights, Lender Oversubscription Rights or Noteholder Rights, as the case may be, such exercise will not be permitted to be revoked, rescinded or annulled for any reason unless the Effective Date has not occurred on or before forty-five (45) days following the Subscription Deadline, at which time an Eligible Holder may revoke the exercise of all, but not less than all, of the Rights it has exercised by delivery of a revocation notice pursuant to the Rights Offering Procedures.

In the event the shares offered pursuant to the Rights Offering are not fully subscribed for, the Backstop Parties will purchase their respective portion of the all Rights Offering Shares not acquired in the Rights Offering, in fulfillment of their obligation, pursuant to the Backstop Agreement.  The Rights Offering is further described in the Rights Offering Procedures.  The Company intends to seek Bankruptcy Court approval of the Rights Offering Procedures at the outset of the Chapter 11 Case, once commenced.

### D.    Value of the Rights and the New Genco Warrants

Based on the Rights Offering subscription price of $18.62537 per share and the assumed New Genco Common Stock price of $20.00 pre-dilution from any warrants, the estimated aggregate value of the Rights is approximately $7.4 million.  Given the estimated New Genco Common Stock price of $19.42 to $19.52, after accounting for the New Genco Equity Warrants, the estimated aggregate value of the Rights is approximately $4.3 million to approximately $4.8 million, after dilution from the New Genco Equity Warrants.

Using the Black-Scholes model, the New Genco Equity Warrants for 6.0% of the New Genco Common Stock are valued in the aggregate at approximately $30 million to $36 million, pre dilution for the New Genco MIP Warrants. Black-Scholes inputs include (a) warrant term of 7 years; (b) volatility of 35% to 45% (c) current equity value of $1,234 million; and (d) strike price reflecting a total implied equity value of $1,295 million.

### E.    Amended and Restated Term Loan Facilities.

The Company's exit financing will be provided through the Amended and Restated $253 Million Facility and the Amended and Restated $100 Million Facility.  The salient

terms of the Amended and Restated Term Loan Facilities are annexed hereto as Exhibits F and G.  The Amended and Restated Term Loan Facilities amend the Prepetition Credit Facilities and will include, among other things, (i) a paydown on the Effective Date of the Company's obligations thereunder with respect to payments which may become due under the Prepetition Term Loan Facilities between the Petition Date and the Effective Date and are deferred, as well as any previously waived payments due in 2014 (the "**Paydown**"), (ii) extensions of the maturity dates, (iii) a significant "holiday" with respect to compliance with financial covenants (the "**Financial Covenant Holiday**") and (iv) an  interest rate of LIBOR plus 3.50% per year.

Specifically, the Amended and Restated Term Loan Facilities shall be effective as of the Effective Date, and will mature on August 31, 2019.  The Amended and Restated Term Loan Facilities will contain certain financial covenants, including (x) the following financial covenant which will apply during to the Financial Covenant Holiday: a cap on interest bearing consolidated indebtedness such that it cannot exceed 70% of the aggregate amount of such interest bearing consolidated indebtedness plus consolidated net worth; (y) the following financial covenants which will apply after the Financial Covenant Holiday: (i) minimum consolidated interest coverage ratio of a minimum of 2.00:1.00, (ii) maximum leverage ratio of 5.50:1.00, and (iii) minimum consolidated net worth of not less than 75% of the post-reorganization equity value plus 50% of the net proceeds of any new equity issuances of the Borrower after the Effective Date; and (z) the following which will apply at all times: (i) minimum liquidity of at least $750,000 times the number of mortgaged vessels and (ii) unrestricted cash requirement of at least $750,000 with respect to each vessel owned by the Company.  The Amended and Restated Term Loan Facilities will require upfront fees of 100 basis points payable to the respective lenders, as well as structuring fees in amounts to be determined.

The Amended and Restated $253 Million Facility will be a senior financing facility in the aggregate principal amount of approximately $175.7 million (prior to giving effect to at least a $5,075,000 paydown on the Effective Date of the Reorganized Debtors' obligations under the Prepetition $253 Million Facility with respect to payments which may become due between the Petition Date and the Effective Date and are deferred, as well as any previously waived payments due in 2014, and excluding any  accrued and unpaid interest at the applicable rate on account of the Prepetition $253 Million Facility Claims through and including the Effective Date), the obligations under which will be secured by a first priority security interest in the Collateral securing the Prepetition $253 Million Facility.  The Amended and Restated $253 Million Facility will have quarterly repayment installments in accordance with the terms of the Prepetition $253 Million Facility.

The Amended and Restated $100 Million Facility will be a senior financing facility in the aggregate principal amount of approximately $73.6 million (prior to giving effect to at least a $1,923,075.00 paydown on the Effective Date of the Reorganized Debtors' obligations under the Prepetition $100 Million Facility with respect to payments which may become due between the Petition Date and the Effective Date and are deferred , as well as any previously waived payments due in 2014, and excluding any  accrued and unpaid interest at the applicable rate  on account of the Prepetition $100 Million Facility Claims through and including the Effective Date), the obligations under which will be secured by a first priority security interest in the Collateral securing the Prepetition $100 Million Facility.  The Amended and

Restated $100 Million Facility will have quarterly repayment installments in accordance with the terms of the Prepetition $100 Million Facility.

The Amended and Restated Term Loan Facilities will provide for mandatory prepayments with respect to (1) sale of a vessel, (2) total loss of a vessel, and (3) a change of control, consummated without prior consent from the respective agent.

## VI.  SUMMARY OF THE PREPACKAGED PLAN

THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT.  ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL IN THE PLAN.

### A.    Classification and Treatment of Administrative and Priority Claims, Claims and Equity Interests in Genco Under the Plan

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Fee Claims, as described below, have not been classified and thus are excluded from the classes of Claims and Equity Interests set forth in Article III of the Plan.

### 1.    Description and Treatment of Unclassified Claims.

(a)    Treatment of Administrative Claims (other than Fee Claims).

Administrative Claims means, at any given time, and regardless of whether such amounts are billed or unbilled, all accrued, contingent and/or unpaid fees and expenses (including success fees) for legal, financial advisory, accounting and other services and reimbursement of expenses by any Professional, except such fees and expenses that are reasonably incurred by the Prepetition Agents or that are awardable and allowable under section 503 of the Bankruptcy Code, that the Court  has not, as of the Effective Date, denied by Final Order (i) all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been filed for any such amount) and (ii) after applying the remaining balance of any retainer that has been provided by the Debtors to such Professional.  To the extent the Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts will no longer constitute Accrued Professional Compensation.

Each holder of an Allowed Administrative Claim (other than an Administrative Claim that is a Fee Claim) as of the Effective Date will receive from the applicable Debtor (i) Cash in an amount equal to the amount of such Allowed Administrative Claim as soon as practicable after the later of (a) the Effective Date if such Administrative Claim is Allowed as of the Effective Date, (b) thirty (30) days after the date such Administrative Claim becomes an

Allowed Administrative Claim if such Administrative Claim is Disputed as of or following the Effective Date, or (c) the date such Allowed Administrative Claim becomes or due and payable by its terms, or as soon thereafter as is practicable or (ii) such other treatment as the Debtor and such holder will have agreed upon in writing; provided, however, that Allowed Administrative Claims (other than Fee Claims) that arise in the ordinary course of the Debtors' business will be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

(b)    Fee Claims.

Fee Claims are Administrative Claims under section 330(a), 331 or 503 of the Bankruptcy Code for compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Effective Date.

All requests for compensation or reimbursement of Fee Claims will be filed and served on the Reorganized Debtors, counsel to the Reorganized Debtors, the U.S. Trustee, Counsel for the Supporting Creditors, and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court, no later than forty-five (45) days after the Effective Date.  Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims and that do not file and serve such applications by the required deadline will be forever barred from asserting such Claims against the Debtors, Reorganized Debtors or their respective properties, and such Fee Claims will be deemed discharged as of the Effective Date.  Objections to any Fee Claims must be filed and served on the Reorganized Debtors, counsel for the Reorganized Debtors, counsel for the Supporting Creditors, and the requesting party no later than thirty (30) days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Fee Claim).

The Reorganized Debtors will pay in Cash the reasonable legal, professional, or other fees and expenses incurred by the Professionals on and after the Effective Date, in the ordinary course of business and without any further notice to or action, order or approval of the Court.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and Professionals may be employed and paid in the ordinary course of business without any further notice to or action, order, or approval of the Court.

(c)    Priority Tax Claims.

Priority Tax Claims are any Claims entitled to a priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.  Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date will receive, at the option of the applicable Reorganized Debtor, in full satisfaction, settlement, release, and discharge, of and in exchange for such Priority Tax Claim one of the following treatments: (i) payment in full in Cash as soon as practicable after the Effective Date in an amount equal to the amount of such Allowed Priority Tax Claim, plus statutory interest on any outstanding balance from the Effective Date, calculated at the prevailing rate under applicable nonbankruptcy law for each taxing authority

39

and to the extent provided for by section 511 of the Bankruptcy Code, and in a manner not less favorable than the most favored nonpriority Unsecured Claim provided for by the Plan (other than cash payments made to a class of creditors pursuant to section 1122(b) of the Bankruptcy Code); (ii) payment in full in Cash payable in equal Cash installments made on a quarterly basis in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, over a period not to exceed five (5) years following the Petition Date, plus statutory interest on any outstanding balance from the Effective Date, calculated at the prevailing rate under applicable nonbankruptcy law for each taxing authority and to the extent provided for by section 511 of the Bankruptcy Code, and in a manner not less favorable than the most favored nonpriority Unsecured Claim provided for by the Plan (other than cash payments made to a class of creditors pursuant to section 1122(b) of the Bankruptcy Code); or (iii) such other treatment as may be agreed upon by such holder and the Debtors or otherwise determined upon a Final Order of the Court.

(d)     U.S. Trustee Fees.

Notwithstanding anything to the contrary contained in the Plan, on the Effective Date, the Debtors will pay, in full, in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation.   On and after the Effective Date, the Reorganized Debtors will be responsible for filing required post-confirmation reports and paying quarterly fees due to the U.S. Trustee for the Reorganized Debtors until the entry of a final decree in such Debtors' Chapter 11 Case or until such Chapter 11 Case is converted or dismissed.

## 2.     Classification and Treatment of Claims and Equity Interests.

(a)     Classification of Claims and Equity Interests.

Except for those Claims addressed above, all Claims and Equity Interests are placed in the Classes set forth below.  A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled before the Effective Date.

(b)     Claims Record Date.

As of the close of business on the Claims Record Date, the claims register (for Claims) and transfer ledger (for Equity Interests) will be closed, and there will be no further changes in the record holders of any Claims or Equity Interests.  The Reorganized Debtors will have no obligation to, but may in consultation with the Supporting 2007 Facility Lenders and the Supporting Noteholders, recognize any transfer of any Claims or Equity Interests occurring after the Claims Record Date.  The Reorganized Debtors will instead be entitled to recognize and deal for purposes under the Plan with only those record holders stated on the claims register (for Claims) and transfer ledgers (for Equity Interests) as of the close of business on the Claims Record Date.

(c)     Summary of Classification and Class Identification.

Below is a chart identifying Classes of Claims and Equity Interests, a description of whether each Class is Impaired, and each Class's voting rights.  Genco is the only Debtor whose Plan has Class 8, because only Genco is obligated under the Convertible Notes Indenture. Genco is also the only Debtor that has a Class 11 with respect to Equity Interests in Genco.  Only the Debtor Subsidiaries will have a Class 10 with respect to Subsidiary Equity Interests.  If there are no creditors in one or more Classes, then such Class will not apply to that Debtor.

| **Class** | **Claim or Equity Interest** | **Status** | **Voting Rights** |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Prepetition 2007 Facility Claims | Impaired | Entitled to Vote |
| 4 | Prepetition $253 Million Facility Claims | Impaired | Entitled to Vote |
| 5 | Prepetition $100 Million Facility Claims | Impaired | Entitled to Vote |
| 6 | Prepetition Swap Claims | Unimpaired | Deemed to Accept |
| 7 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 8 | Convertible Note Claims | Impaired | Entitled to Vote |
| 9 | Intercompany Claims | Unimpaired | Deemed to Accept |
| 10 | Subsidiary Equity Interests | Unimpaired | Deemed to Accept |
| 11 | Equity Interests in Genco | Impaired | Deemed to Reject |

Section 1129(a)(10) of the Bankruptcy Code will be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; provided, however, that in the event no holder of a Claim with respect to a specific voting Class for a Debtor timely submits a Ballot indicating acceptance or rejection of the Plan, such Class (with respect to such Debtor) will be deemed to have accepted the Plan.  The Debtors will seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Equity Interests.  The Debtors reserve the right to modify the Plan in accordance with its provisions, including the right to withdraw the Plan at any time before the Effective Date.

(d)     Treatment of Classified Claims and Equity Interests.

(i)     *Class 1 – Other Priority Claims.* Other Priority Claims are Claims entitled to priority pursuant to section 507(a) of the Bankruptcy Code (other than Administrative Claims and Priority Tax Claims).

Except to the extent that a holder of an Allowed Other Priority Claim agrees in writing to less favorable treatment, in full and final satisfaction, settlement, release and discharge and in exchange for each Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will receive payment in Cash in an amount equal to such Allowed Other Priority

Claim as soon as practicable after the later of (i) the Effective Date and (ii) thirty (30) days after the date when such Other Priority Claim becomes an Allowed Other Priority Claim.

Class 1 is Unimpaired by the Plan, and each holder of a Class 1 Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

(ii)     *Class 2 – Other Secured Claims*.  Other Secured Claims are Claims, other than the Prepetition 2007 Facility Claims, Prepetition $253 Million Facility Claims, Prepetition $100 Million Facility Claims and Prepetition Swap Claims, to the extent reflected in the Schedules (to the extent the Debtors file Schedules in the Chapter 11 Cases or a proof of claim filed as a Secured Claim), which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

Except to the extent that a holder of an Allowed Other Secured Claim agrees in writing to less favorable treatment, at the option of the Debtors, in full and final satisfaction, settlement, release and discharge of and in exchange for such Other Secured Claim, each holder of an Allowed Other Secured Claim will either: (i) have its Allowed Other Secured Claim Reinstated and rendered Unimpaired; (ii) receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim, if such interest is required to be paid pursuant to sections 506(b) and/or 1129(a)(9) of the Bankruptcy Code, as soon as practicable after the later of (a) the Effective Date, and (b) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim, or (iii) receive the Collateral securing its Allowed Other Secured Claim as soon as practicable after the later of (a) the Effective Date and (b) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim.

Class 2 is Unimpaired by the Plan, and each holder of a Class 2 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject the Plan.

(iii)     *Class 3 – Prepetition 2007 Facility Claims*.  Prepetition 2007 Facility Claims are Claims evidenced by, derived from, based upon, relating to, or arising from the Prepetition 2007 Facility, provided, however, that the Prepetition Swap Claims shall not be included in the Prepetition 2007 Facility Claims. Each holder of a Prepetition 2007 Facility Claim, in full and final satisfaction, settlement, release and discharge of and in exchange for the Prepetition 2007 Facility Claims, on or as soon as practicable after the Effective Date, will receive its Pro Rata share of (i) the 2007 Lender Conversion Shares, and (ii) the Lender Rights.

Class 3 is Impaired and holders of Class 3 Prepetition 2007 Facility Claims are entitled to vote to accept or reject the Plan.

(iv)    *Class 4 – Prepetition $253 Million Facility Claims*. Prepetition $253 Million Facility Claims are Claims evidenced by, derived from, based upon, relating to, or arising from the Prepetition $253 Million Facility. In exchange for each Prepetition $253 Million Facility Claim, each holder of an Allowed Prepetition $253 Million Facility Claim will receive on the Effective Date, at the Debtors' option, either (i) payment in full, in Cash, in full and final satisfaction, settlement, release and discharge and in exchange for each Prepetition $253 Million Facility Claim, or (ii) its Pro Rata share of the Amended and Restated $253 Million Facility, *plus* payment in full, in Cash, of accrued and unpaid interest, calculated in accordance with the Prepetition $253 Million Facility (i) at the non-default rate until May 30, 2014, and (ii) at the default rate from May 31, 2014, through the Effective Date, as and to the extent such default rate is applicable under the Prepetition $253 Million Facility.

Class 4 is Impaired and holders of Class 4 Prepetition $253 Million Facility Claims are entitled to vote to accept or reject the Plan.

(v)    *Class 5 – Prepetition $100 Million Facility Claims*. Prepetition $100 Million Facility Claims are Claims evidenced by, derived from, based upon, relating to, or arising from the Prepetition $100 Million Facility.  In exchange for each Prepetition $100 Million Facility Claim, each holder of an Allowed Prepetition $100 Million Facility Claim will receive on the Effective Date, at the Debtors' option, either (i) payment in full, in Cash, in full and final satisfaction, settlement, release and discharge and in exchange for each Prepetition $100 Million Facility Claim, or (ii) its Pro Rata share of the Amended and Restated $100 Million Facility, *plus* payment in full, in Cash, of accrued and unpaid interest calculated in accordance with the Prepetition $100 Million Facility (i) at the non-default rate until June 29, 2014, and (ii) at the default rate from June 30, 2014, through the Effective Date, as and to the extent such default rate is applicable under the Prepetition $100 Million Facility. Class 5 is Impaired and holders of Class 5 Prepetition $100 Million Facility Claims are entitled to vote to accept or reject the Plan.

(vi)    *Class 6 – Prepetition Swap Claims*.  Prepetition Swap Claims are Claims under the Prepetition Swap Agreement.  Each holder of a Prepetition Swap Claim, on or as soon as practicable after the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for the Prepetition Swap Claim, will receive payment in full, in Cash.

Class 6 is Unimpaired and holders of Class 6 Prepetition Swap Claims are not entitled to vote to accept or reject the Plan.

(vii)    *Class 7 – General Unsecured Claims*.  General Unsecured Claims are Claims that are not Secured or entitled to priority under the Bankruptcy Code or an order of the Court.  Each General Unsecured Claim, on the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed General Unsecured Claim against the Debtors, at the discretion of the Reorganized Debtors: (i) will be Reinstated as an obligation of the Reorganized Debtors, and be paid in accordance with the ordinary course terms, (ii) receive such other treatment as may be agreed between such holder and the Reorganized Debtors, or (iii) receive such other treatment that will render it Unimpaired pursuant to section 1124 of the Bankruptcy Code.

Class 7 is Unimpaired.  Therefore, holders of Class 7 General Unsecured Claims are not entitled to vote to accept or reject the Plan.

(viii)   *Class 8 – Convertible Note Claims*.  Convertible Note Claims are Claims under or evidenced by the Convertible Notes.  Holders of Convertible Note Claims, on or as soon as practicable after the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for each Convertible Note Claim, each holder of an Allowed Convertible Note Claim that is an Eligible Note Holder will receive its Pro Rata share of (i) the Convertible Notes Equity Distribution, and (ii) the Noteholder Rights; provided, however, that each holder of an Allowed Convertible Note Claim that is a Non-Eligible Noteholder will receive a Cash payment equal to the value of the Pro Rata share of the Noteholder Rights and Convertible Notes Equity Distribution such Non-Eligible Noteholder would have received if it was an Eligible Noteholder.

Class 8 is Impaired and holders of Class 8 Convertible Note Claims are entitled to vote to accept or reject the Plan.

(ix)   *Class 9 – Intercompany Claims*.  Intercompany Claims are any Claim held by a Debtor against another Debtor.  Intercompany Claims, on the Effective Date, will be Reinstated in full.  On and after the Effective Date, the Debtors and the Reorganized Debtors will be permitted to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth in the Plan, any changes to intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices.

Class 9 is Unimpaired and holders of Class 9 Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, as applicable and not entitled to vote to accept or reject the Plan.

(x)   *Class 10 – Subsidiary Equity Interests*.  Subsidiary Equity Interests are the Equity Interests in the Debtor Subsidiaries.  Subsidiary Equity Interests will be reinstated on the Effective Date and will not receive any distribution on account of such Equity Interests.

Class 10 is Unimpaired and holders of Class 10 Subsidiary Equity Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

(xi)   *Class 11 – Equity Interests in Genco*.  Equity Interests in Genco means any equity security as such term is defined in section 101(16) of the Bankruptcy Code, or any other instrument evidencing an ownership interest in Genco, whether or not transferable, and any Claim subordinated pursuant to section 510(b) of the Bankruptcy Code.  On the Effective Date, Equity Interests in Genco will be cancelled and discharged and will be of no further force and effect, whether surrendered for cancellation or otherwise and holders of Equity Interests will not receive or retain any property under the Plan on account of such Equity Interests in Genco.  Notwithstanding the foregoing, on or as soon as practicable after the

44

Effective Date, holders of Equity Interests in Genco will receive, in exchange for the surrender or cancellation of their Equity Interests in Genco, their Pro Rata share of the New Genco Equity Warrants, which warrants shall come from amounts which holders of Prepetition 2007 Facility Claims and Convertible Note Claims would otherwise be entitled to under the Plan.  Class 11 is Impaired and holders of Class 11 Equity Interests in Genco are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

(e)       Special Provision Regarding Unimpaired and Reinstated Claims

Except as otherwise specifically provided in the Plan, nothing in the Plan will be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including, but not limited to, legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing in the Plan will be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claim left Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Reorganized Debtors will have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Reinstated Claim or Claim left Unimpaired by the Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

## B.       **Means for Implementation of the Plan**

### 1.       **General Settlement of Claims and Interests.**

As discussed in detail in the Disclosure Statement, the provisions of the Plan will, upon consummation, constitute a good faith compromise and settlement, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, among the Debtors, the Backstop Parties, the Supporting 2007 Facility Lenders, the Supporting $253 Million Facility Lenders, the Supporting $100 Million Facility Lenders, and the Supporting Noteholders of numerous disputes arising from or related to (i) the Prepetition 2007 Facility Claims, (ii) the Prepetition $253 Million Facility Claims and the Prepetition $100 Million Facility Claims, (iii) the total enterprise value of the Debtors' estates and the Reorganized Debtors for allocation purposes under the Plan, (iv) the Convertible Note Claims, and (v) the treatment and distribution to holders of Equity Interests.  In the event that, for any reason, the Confirmation Order is not entered or the Effective Date does not occur, the Debtors, the Backstop Parties, the Prepetition 2007 Facility Lenders, the Prepetition $253 Million Facility Lenders, the Prepetition $100 Million Facility Lenders, and the Convertible Noteholders reserve all of their respective rights with respect to any and all disputes resolved and settled under the Plan. The entry of the Confirmation Order will constitute the Court's approval of each of the compromises and settlements embodied in the Plan, and the Court's findings will constitute its determination that such compromises and settlements are in the best interests of the Debtors, their estates, creditors, and other parties-in-interest, and are fair,

equitable, and within the range of reasonableness. The provisions of the Plan, including, without limitation, its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

### 2.    Exit Financing.

On or before the Effective Date, the Debtors will be authorized without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable, to enter into at the Debtors' option, either (i) the New Exit Financing Facility Credit Agreement, or (ii) the Amended and Restated $253 Million Credit Agreement and the Amended and Restated $100 Million Credit Agreement, and any ancillary documents necessary or appropriate to satisfy the conditions to effectiveness of the New Exit Financing Facility or the Amended and Restated Term Loan Facilities, as applicable.

(a)    The New Exit Financing Facility.

If entered into, the New Exit Financing Facility will be used to pay the Prepetition $253 Million Facility Claims and Prepetition $100 Million Facility Claims in full, plus all unpaid reasonable fees, expenses, costs, and other charges of the Prepetition $100 Million Facility Agent and the Prepetition $253 Million Facility Agents as required under the Prepetition $100 Million Facility and the Prepetition $253 Million Facility, respectively, and otherwise for general corporate purposes. The New Exit Financing Facility will be Secured by some or all of the collateral securing the Prepetition $253 Million Facility and the Prepetition $100 Million Facility.

(b)    The Amended and Restated $253 Million Facility.

If entered into, the Amended and Restated $253 Million Facility will be used to satisfy the Prepetition $253 Million Facility Claims in accordance with the Plan. The Amended and Restated $253 Million Facility will be secured by the same collateral in the same priority as the Prepetition $253 Million Facility, subject to the terms of the Amended and Restated $253 Million Credit Agreement.

(c)    The Amended and Restated $100 Million Facility.

If entered into, the Amended and Restated $100 Million Facility will be used to satisfy the Prepetition $100 Million Facility Claims in accordance with the Plan. The Amended and Restated $100 Million Facility will be secured by the same collateral in the same priority as the Prepetition $100 Million Facility, subject to the terms of the Amended and Restated $100 Million Credit Agreement.

### 3.    Voting of Claims.

Each holder of an Allowed Claim as of the Voting Deadline in an Impaired Class of Claims or Equity Interests that is not (a) deemed to have rejected the Plan or (b) conclusively presumed to have accepted the Plan, and that held such Claim as of the Voting Record Date, will be entitled to vote to accept or reject the Plan. The instructions for completion of the Ballots are set forth in the instructions accompanying the Ballot. Approval for the procedures with respect to

the solicitation and tabulation of votes to accept or reject the Plan will be sought in the Plan Scheduling Motion. The procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan are described in this Disclosure Statement.

### 4.    Nonconsensual Confirmation.

The Debtors intend to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any impaired Class that has not accepted or is deemed to have rejected the Plan pursuant to section 1126 of the Bankruptcy Code, including Class 11 Equity Interests in Genco.

### 5.    Issuance of New Genco Common Stock and New Genco Equity Warrants and Entry into the Registration Rights Agreement.

(a)    Issuance of Securities.

Shares of New Genco Common Stock will be authorized under the New Genco Charter, and shares of New Genco Common Stock will be issued on the Effective Date and distributed as soon as practicable thereafter in accordance with the Plan. All stated amounts of New Genco Common Stock to be distributed as set forth in this Plan, and the number of shares of New Genco Common Stock issuable upon exercise of New Genco Equity Warrants and New Genco MIP Warrants and corresponding strike prices, are subject to adjustment by the Debtors in a manner that does not alter the respective percentages the outstanding New Genco Common Stock allocated to any Class or Claim holder, except for immaterial changes resulting from the treatment of fractional shares. To the extent that cash is issued to any Non-Eligible Noteholders, or distributions that would otherwise be made to any Record Date Convertible Holders are retained by the Reorganized Debtors in accordance with Article III, the respective percentages of the outstanding New Genco Common Stock allocated to each Class or Claim holder will be adjusted accordingly. All of the New Genco Common Stock issuable in accordance with the Plan, when so issued, will be duly authorized, validly issued, fully paid, and non-assessable. The issuance of the New Genco Common Stock, the New Genco Equity Warrants, and the New Genco MIP Warrants by Reorganized Genco is authorized without the need for any further corporate action and without any further action by any holder of a Claim or Equity Interest.

Except as provided in the Plan, the New Genco Common Stock distributed under the Plan, including pursuant to the Rights Offering, will be issued in book-entry form, and DTC, or its nominee will be the holder of record of such New Genco Common Stock. One or more global certificates representing such New Genco Common Stock will be registered with an agent for the New Genco Common Stock, in the name of, and will be deposited with, DTC or its nominee. The ownership interest of each holder of such New Genco Common Stock, and transfers of ownership interests therein, will be recorded on the records of the direct and indirect participants in DTC. To receive distributions of New Genco Common Stock, holders of Prepetition 2007 Facility Claims will be required to designate a direct or indirect participant in DTC with whom such holder has an account into which such New Genco Common Stock may be deposited. Purchasers of shares of New Genco Common Stock in the Rights Offering, including the Backstop Parties, will similarly be required to designate an account of a direct or indirect participant in DTC to receive their shares. The New Genco Common Stock issuable to

holders of Convertible Note Claims will be delivered by Reorganized Genco to the holders of Convertible Note Claims through DTC.

(b)    Entry into the Registration Rights Agreement.

On or as soon as practicable after the Effective Date, Reorganized Genco and the Registration Rights Parties will enter into the Registration Rights Agreement . The Registration Rights Agreement will provide the Registration Rights Parties who receive 10% or more of New Genco Common Stock under the Plan with demand and piggyback registration rights. All other Registration Rights Parties will have piggyback registration rights only.

The Registration Rights Agreement will also provide that, on or before the date that is ninety (90) days after the Effective Date, the Debtors will file, and will thereafter use its reasonable best efforts to cause to be declared effective as promptly as practicable, the Registration Statement; provided that the Reorganized Debtors will not be required to file such Registration Statement unless the Registration Rights Parties, in the aggregate, choose to include at least 15% of the outstanding shares held by all Registration Rights Parties in such Registration Statement.  The Registration Rights Agreement will contain customary terms and conditions, including, but not limited to, the ability of one or more selling Registration Rights Parties holding a majority of the outstanding shares held by all Registration Rights Parties to waive or postpone the filing of the Registration Statement upon the Reorganized Debtors' request and provisions with respect to blackout periods.

(c)    Exemption from Registration.

The offering, issuance, and distribution of the New Genco Common Stock and the New Genco Equity Warrants under Article III of the Plan, the Rights, the New Genco Common Stock issued in the Rights Offering, and the New Genco Common Stock issuable upon exercise of the New Genco Equity Warrants and New Genco MIP Warrants and the resale of any such New Genco Common Stock, will be exempt from the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration of an offer or sale of securities under section 1145(a) of the Bankruptcy Code, except with respect to any person that is deemed an "underwriter" under section 1145(b) of the Bankruptcy Code, in which case the New Genco Common Stock and the New Genco Equity Warrants will be issued pursuant to another available exemption from registration under the Securities Act and other applicable law. The New Genco Common Stock underlying the Management Incentive Program, the New Genco MIP Warrants, and the New Genco Common Stock issuable upon exercise of the New Genco MIP Warrants will be issued pursuant to another available exemption from registration under the Securities Act and other applicable law.

The New Genco Common Stock distributed or issued under the Plan to persons who may be deemed underwriters under section 1145(b) of the Bankruptcy Code ( which will not include the Backstop Parties solely on account of their participation in the Backstop Investment), and the Backstop Shares, if any, issued to the Backstop Parties, will, at the option of the recipient thereof, be issued either (i) in the form of registered stock certificates bearing a legend indicating that transfer may be restricted under federal and state securities laws or (ii) in

book-entry form and included in a ledger identified as "restricted" and indicating in such ledger that transfer may be restricted under federal and state securities laws.

        (d)     <u>SEC Reporting Requirements and Listing of New Genco Common Stock.</u>

        As of the Effective Date, Reorganized Genco will be, and it is the intention that Reorganized Genco will remain, a reporting company under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78(a) – 78(pp). If at any time during the one-year period immediately following the Effective Date, Reorganized Genco meets the applicable listing standards of either the New York Stock Exchange or the NASDAQ Stock Market, then Reorganized Genco will use commercially reasonable efforts to cause the New Genco Common Stock to be listed on such market as promptly as reasonably practicable.

        (e)     <u>Other Reporting Requirements.</u>

        In the event that Reorganized Genco ceases to be a reporting company at any time , then until the date that is twelve (12) months after such event, Reorganized Genco will use commercially reasonable efforts to make the following information available to stockholders who beneficially own at least 1.0% of the total outstanding shares of New Genco Common Stock (and who provide evidence of such ownership that is reasonably satisfactory to Reorganized Genco), in each case solely to the extent that such information is otherwise available, by posting such information to a secure website or data site to which such stockholders (and potential transferees of such stockholders who affirmatively agree to the terms of a "click through" confidentiality agreement posted by Reorganized Genco on such website or data site) are given access: (i) within one-hundred twenty (120) days after the end of Reorganized Genco's fiscal year, audited consolidated annual financial statements, and (ii) within forty-five (45) days after the end of each of the first three (3) calendar quarters of Reorganized Genco's fiscal year, unaudited quarterly financial statements. Until the date that is twelve (12) months after the Effective Date, Article IV.6 of the Plan will not be amended or modified by Reorganized Genco in any respect without the prior consent of holders of a majority of the outstanding shares of New Genco Common Stock that are held by non-affiliates of Reorganized Genco.

**6.**     <u>**The Rights Offering.**</u>

        (a)     <u>Generally.</u>

        The Rights Offering will be conducted, and the Rights Offering Shares will be issued to the holders of the Prepetition 2007 Facility Claims and Eligible Noteholders that exercise their respective Rights pursuant to the Rights Offering Procedures and the Plan. Notwithstanding anything contained in the Plan or the Rights Offering Procedures to the contrary, the Debtors may, with the consent of the Supporting Creditors in accordance with section 1(b) of the Restructuring Support Agreement, modify the Rights Offering Procedures or adopt such additional detailed procedures to more efficiently administer the exercise of the Rights. The closing of the Rights Offering is conditioned on the consummation of the Plan, the Rights Offering Procedures and any other condition specified in the Equity Commitment

Agreement.  Amounts held by the Subscription Agent with respect to the Rights Offering prior to the Effective Date will not be entitled to any interest on account of such amounts.

(b)      Subscription Ratio.

Each holder of a Prepetition 2007 Facility Claim that is a Rights Offering Record Date Holder will receive its Pro Rata share of the Lender Rights to purchase shares of New Genco Common Stock, and each Eligible Noteholder will receive its Pro Rata share of the Noteholder Rights to purchase shares of New Genco Common Stock.  Each Right will entitle its holder to purchase one share of New Genco Common Stock at a subscription price of $18.62537. Notwithstanding anything to the contrary in the Plan or in the Rights Offering Procedures, fractional Rights will not be issued and any such fractional Rights will be rounded up or down to the nearest whole number.

(c)      Transfer Restriction and Revocation.

The Rights will not be assignable or detachable, and will not be transferable other than in connection with the transfer of the corresponding Claims.  After a Right has been exercised, the underlying Claim corresponding to the Right will cease to be transferrable even if the Right is exercised prior to the Claims Record Date.  In addition, once a holder of a Prepetition 2007 Facility Claim or an Eligible Noteholder has properly exercised its Rights, such exercise cannot be revoked, rescinded or annulled for any reason unless the Effective Date has not occurred on or before one-hundred twenty (120) days following the Subscription Deadline, at which time any holder of a Prepetition 2007 Facility Claim or Eligible Noteholder may revoke the exercise of all, but not less than all, of the Rights it has exercised by delivery of a revocation notice pursuant to the Rights Offering Procedures.

(d)      Issuance of the Rights Offering Shares.

On or as soon as practicable after the Effective Date, Reorganized Genco will issue the Rights Offering Shares, in exchange for payment therefor, to those holders of Prepetition 2007 Facility Claims and those Eligible Noteholders,  that, in accordance with the Plan and the Rights Offering Procedures, validly exercised their respective Rights to participate in the Rights Offering.

(e)      Backstop Investment.

Pursuant to the terms and subject to the conditions set forth in the Plan and in the Equity Commitment Agreement, the Lender Backstop Parties will purchase 100% of the Lender Rights Offering Shares not acquired in the Rights Offering upon the exercise of the Lender Rights.  Pursuant to the terms and subject to the conditions set forth in the Plan and in the Equity Commitment Agreement, the Noteholder Backstop Parties will purchase 100% of the Noteholder Rights Offering Shares not acquired in the Rights Offering upon the exercise of the Noteholder Rights.

(f)      Refund of Payments.

If the Rights Offering will be terminated, including upon termination of the Equity Commitment Agreement, any payment made by a holder of a Prepetition 2007 Facility Claim or an Eligible Noteholder pursuant to the Rights Offering will be refunded as soon as practicable following thereafter, without interest or deduction. If a holder of a Prepetition 2007 Facility Claim or an Eligible Noteholder participating in the Rights Offering has made an overpayment, including in respect of the Rights, the amount of such overpayment will be refunded as soon as practicable following the Subscription Deadline, without interest or deduction.

(g)      Rights Offering Dates.

The Rights Offering will be commenced and completed in accordance with the dates set forth in the Rights Offering Procedures; provided, however, the Debtors may modify such dates and deadlines consistent with the Rights Offering Procedures, subject to the consent of the Supporting Creditors in accordance with section 1(b) of the Restructuring Support Agreement.

**7.      The New Genco Equity Warrants.**

(a)      Issuance.

The New Genco Equity Warrants will be issued pursuant to the terms of the New Genco Equity Warrant Agreement.

(b)      Exercise Price and Other Terms.

Each New Genco Equity Warrant will have a 7-year term (commencing on the Effective Date) and will be exercisable for one share of New Genco Common Stock, subject to anti-dilution protection as provided below, reflecting a total implied equity value of $1,295 million for Reorganized Genco.   The New Genco Equity Warrants will be exercisable on a cashless basis.

(c)      Anti-Dilution Protection.

The New Genco Equity Warrant Agreement will contain customary anti-dilution protection in the event of any stock split, reverse stock split, stock dividend, reclassification, dividend or other distributions (including, but not limited to, cash dividends), or business combination transaction.

(d)      Form.

Except as provided below, all New Genco Equity Warrants distributed under the Plan will be issued in book-entry form and DTC or its nominee will be the holder of record of New Genco Equity Warrants.   One or more global warrant certificates representing such New Genco Equity Warrants will be registered with a warrant agent for the New Genco Equity Warrants, in the name of, and will be deposited with, DTC or its nominee.   The ownership

interest of each holder of such New Genco Equity Warrants, and transfers of ownership interests therein, will be recorded on the records of the direct and indirect participants in DTC. Holder of Equity Interests in Genco that hold such Equity Interests in DTC will receive their New Genco Equity Warrants by deposit to the account of a direct or indirect participant in DTC in which such Equity Interests are held. Holders that do not hold their Equity Interests in Genco will be required to designate a direct or indirect participant in DTC with whom such holder has an account into which such New Genco Equity Warrants may be deposited. Beneficial owners of the New Genco Equity Warrants will be required to follow the procedures that DTC or its direct or indirect participants may establish for exercising their rights in respect of the New Genco Equity Warrants, including exercise and transfer thereof. New Genco Common Stock issuable upon exercise of such New Genco Equity Warrants will be issued in book-entry form and held through DTC.

The New Genco Equity Warrants distributed under the Plan to any persons who may be deemed underwriters under section 1145(b) of the Bankruptcy Code will be in the form of registered warrant certificates and will bear a legend indicating that transfer may be restricted under federal and state securities laws.

(e)     Restricted Genco Equity Interests.

Except as provided in the Plan, any unvested Restricted Genco Equity Interests will be deemed vested automatically on the Effective Date, and holders of Restricted Genco Equity Interests will receive their Pro Rata share of the New Genco Equity Warrants. With respect to any director, officer, or other employee holding Restricted Genco Equity Interests who is no longer serving in his/her respective role on the Effective Date, all unvested Restricted Genco Equity Interests will be deemed vested immediately prior to the Effective Date. The New Genco Equity Warrants issued on account of Restricted Genco Equity Interests will be in the form of registered warrant certificates, and will bear the same legend, if any, as the corresponding New Genco Equity Warrants. Holders of New Genco Equity Warrants issued on account of Restricted Genco Equity Interests will be required to follow such procedures as New Genco will establish for exercising their rights in respect of the New Genco Equity Warrants, including exercise and transfer thereof.

## 8.     Continued Corporate Existence and Vesting of Assets.

Except as otherwise provided in the Plan: (i) each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable law; and (ii) on the Effective Date, all property of its Estate, and any property acquired by such Debtor or Reorganized Debtor under the Plan, will vest in such Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, Equity Interests and other interests , except for the Liens and Claims established under the Plan (including in respect of the Amended and Restated Term Loan Facilities or the New Exit Financing Facility, as applicable).

On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and compromise or settle any claims

without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, subject only to those restrictions expressly imposed by the Plan or the Confirmation Order as well as the documents and instruments executed and delivered in connection therewith, including the documents, exhibits, instruments and other materials comprising the Plan Supplement. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur from and after the Effective Date for Fee Claims, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Court.

### 9.    Fee Claims Escrow Account.

On the Effective Date, Reorganized Genco will establish the Fee Claim Escrow Account in an amount equal to all Fee Claims of Professionals outstanding as of the Effective Date (including, for the avoidance of doubt, any reasonable estimates for unbilled amounts payable by Genco). Amounts held in the Fee Claims Escrow Account will not constitute property of Reorganized Genco. The Fee Claims Escrow Account may be an interest-bearing account. In the event there is a remaining balance in the Fee Claims Escrow Account following payment to all holders of Fee Claims under the Plan any such amounts will be returned to Reorganized Genco.

### C.    Provisions Regarding Corporate Governance of the Reorganized Debtor

### 1.    Amendments to Articles of Incorporation.

(a)    Reorganized Genco.

On the Effective Date, the New Genco Charter will prohibit the issuance of nonvoting equity securities only so long as, and to the extent that, the issuance of nonvoting equity securities is prohibited by the Bankruptcy Code. The New Genco Charter will be filed on or immediately before the Effective Date with the applicable authority in the jurisdiction of incorporation in accordance with the corporate laws of its jurisdiction of incorporation.

(b)    The Debtor Subsidiaries.

On the Effective Date, the article of incorporation of each Debtor Subsidiary will be amended (to the extent such provision is not already included in the applicable article of incorporation) to prohibit the issuance of nonvoting equity securities only so long as, and to the extent that, the issuance of nonvoting equity securities is prohibited by the Bankruptcy Code. The amended articles of incorporation of the Reorganized Debtor Subsidiaries will be filed with the applicable authorities in their respective jurisdictions of incorporation in accordance with the corporate laws of the respective jurisdictions of incorporation.

### 2.    Appointment of Officers and Directors.

As of the Effective Date, the term of the current members of the board of directors of the Debtor will expire without further action by any Person. The initial directors of the New Board will consist of Peter C. Georgiopoulos and six other directors to be disclosed in the Plan Supplement, including (a) two directors selected by Centerbridge and (b) four directors selected

by the Board Selection Committee, in consultation with the Reorganized Debtor and the Supporting Noteholders, by majority vote, with each member of the Board Selection Committee having one vote with respect to each position on the New Board to be filled in accordance with this clause (b); provided, however, that if at any time prior to the Effective Date, Centerbridge's Allowed Claims (together with those of its affiliated funds and managed accounts) would entitle it to a pro forma allocation of (i) at least 10%, but less than 20%, of the New Genco Common Stock issuable as of the Effective Date pursuant to the Plan (the "**Outstanding Effective Date Shares**"), then Centerbridge will only be entitled to select one initial director and the four directors referenced in sub clause (b) will be increased to five and (ii) less than 10% of the Outstanding Effective Date Shares, then Centerbridge will not be entitled to select any directors and the four directors referenced in sub clause (b) will be increased to six; and further provided, that in the event that at any time prior to the Effective Date, any member of the Board Selection Committee's Allowed Claims (together with those of its affiliated funds and managed accounts) under the 2007 Facility and the Convertible Notes would not entitle such member (together with its affiliated funds and managed accounts) to a pro forma allocation of at least 6.25% of the Outstanding Effective Date Shares, such member will thereupon automatically cease to be a member of the Board Selection Committee.

As of the Effective Date, the current members of the board of directors of the Debtor Subsidiaries will serve as the initial board of directors for the applicable Reorganized Debtor Subsidiaries.

The officers of Reorganized Genco on the Effective Date will be identified in the Plan Supplement, will be mutually acceptable to the Debtors and the Required Supporting 2007 Facility Lenders, and will include John C. Wobensmith.

### 3.    Powers of Officers.

The officers of the Debtors or the Reorganized Debtors, as the case may be, will have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan.

### 4.    New Employment Agreements, Existing Benefits Agreements and Retiree Benefits.

From and after the Effective Date, the Reorganized Debtors' officers will be employed and serve the Reorganized Debtors in accordance with the New Employment Agreements, except to the extent of the Debtors' assumption of any existing Executory Contract with any such officer. Except as set forth in the Rejection Schedule (or as such benefits are otherwise terminated by the Debtors under applicable law), all Existing Benefits Agreements will be deemed assumed as of the Effective Date. Notwithstanding anything to the contrary contained in the Plan, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, will continue to be paid in accordance with applicable law.

5.    **Management Incentive Program.**

On the Effective Date, Reorganized Genco will adopt the post-emergence Management Incentive Program, which will provide for the distribution of the New Genco MIP Primary Equity, and the New Genco MIP Warrants to the participating officers, directors, and other management of Reorganized Genco and the Management Incentive Program will be an obligation of the Reorganized Debtor.

The holder of any New Genco MIP Primary Equity will be entitled to receive all dividends paid with respect to such shares as if such New Genco MIP Primary Equity had vested on the grant date (subject to forfeiture by the holder in the event that such grant is terminated prior to vesting unless the administrator of the Management Incentive Program determines otherwise). The New Genco MIP Warrants will be exercisable on a cashless basis and will contain customary anti-dilution protection in the event of any stock split, reverse stock split, stock dividend, reclassification, dividend or other distributions (including, but not limited to, cash dividends), or business combination transaction.

6.    **Indemnification of Directors, Officers and Employees.**

Notwithstanding any other provisions of the Plan, from and after the Effective Date, indemnification obligations owed by the Debtors or Reorganized Debtors to directors, officers or employees of the Debtors who served or were employed by a Debtor  on or after the Petition Date, to the extent provided in the applicable articles or certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of such Debtor, will be deemed to be, and treated as though they are executory contracts that are assumed pursuant to the Plan and section 365 of the Bankruptcy Code.  All such indemnification obligations will survive confirmation of the Plan, remain unaffected thereby, and not be discharged, irrespective of whether indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before, on or after the Petition Date.

Indemnification obligations owed to any Professionals retained pursuant to sections 327 or 328 of the Bankruptcy Code and by order of the Court, to the extent that such indemnification obligations relate to the period after the Petition Date, will be deemed to be, and will be treated as though they are, executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code under the Plan, as and to the extent such indemnification was approved by order of the Court.

D.    **Effect of Confirmation of the Plan**

1.    **Discharge of the Debtor.**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan will be in complete satisfaction, discharge and release, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Equity Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against,

liabilities of, Liens on, obligations of, rights against and Equity Interests in, the Debtors or any of their assets or properties, regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Equity Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not:  (i) a Proof of Claim based upon such debt, right or Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Equity Interest based upon such debt, right or Equity Interest is Allowed; or (iii) the holder of such a Claim or Equity Interest has accepted the Plan or is entitled to receive a distribution hereunder.  Any default by the Debtors or their affiliates with respect to any Claim or Equity Interest that existed immediately before or on account of the filing of the Chapter 11 Cases will be deemed cured on the Effective Date.  The Confirmation Order will be a judicial determination of the discharge of all Claims and Equity Interests subject to the Effective Date occurring.

## 2.   Injunction.

FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN SECTION VI.E OF THE PLAN, THE RELEASING PARTIES WILL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, CAUSE OF ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO SECTION VI.E OF THE PLAN OR THE CONFIRMATION ORDER.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR EQUITY INTERESTS THAT HAVE BEEN RELEASED OR DISCHARGED PURSUANT TO ARTICLE VI OF THE PLAN OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VI OF THE PLAN ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS:  (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH RELEASED PARTIES ON

ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH RELEASED PARTIES OR THE PROPERTY OR ESTATES OF SUCH RELEASED PARTIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF OR SUBROGATION OF ANY KIND AGAINST ANY OBLIGATIONS DUE FROM THE DEBTORS OR THE REORGANIZED DEBTORS OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DEBTORS ON ACCOUNT OF ANY SUCH CLAIM; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND EQUITY INTERESTS IN THE PLAN WILL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND EQUITY INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS WILL BE FULLY RELEASED AND DISCHARGED EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN WITH RESPECT TO THE AMENDED AND RESTATED TERM LOAN FACILITIES, AND THE GENCO EQUITY INTERESTS WILL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS WILL BE FULLY RELEASED AND DISCHARGED, AND ALL EQUITY INTERESTS WILL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO WILL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS WILL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THEIR ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF ITS ASSETS AND PROPERTIES, AND EACH OF THE RELEASED PARTIES, ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

### 3.   Preservation of Causes of Action.

Section 1123(b)(3) of the Bankruptcy Code provides that a debtor's plan of reorganization may provide for the debtor to retain and enforce any claim or interest on behalf of the debtor's estate for the benefit of its creditors.

In accordance with section 1123(b) of the Bankruptcy Code, and except as expressly provided in the Plan (including Article VI.J.1 of the Plan), the Reorganized Debtors will retain all Causes of Action, including those Causes of Action listed as retained Causes of Action on an exhibit to the Plan Supplement.   Nothing contained in the Plan, the Plan Supplement or the Confirmation Order will be deemed a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense of the Debtors that is not specifically waived or relinquished by the Plan.   The Reorganized Debtors will have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses that the Debtor had immediately before the Petition Date as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any claim that is not specifically waived or relinquished by the Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.   No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against such Person.   The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, in accordance with the Plan. From and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, will have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any Cause of Action and to decline to do any of the foregoing without further notice to or action, order or approval of the Court.   The Reorganized Debtors are deemed a representatives of the Estates for the purpose of prosecuting any Claim or Cause of Action and any objections to Claims pursuant to 11 U.S.C. 1123(b)(3)(B).

### 4.   Votes Solicited in Good Faith.

The Debtors have, and upon entry of the Confirmation Order will be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.   The Debtors (and their respective affiliates, agents, directors, officers, members, employees and Professionals) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities offered and sold under the Plan and therefore have not been, and on account of such offer and issuance will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer or issuance of the securities offered and distributed under the Plan.

### 5.   Supporting Creditors' Fees and Expenses.

On the Effective Date, the Reorganized Debtors will pay, in full, in Cash, the unpaid reasonable fees, expenses, costs, and other charges of: (i) the Prepetition $253 Million

Facility Agents (including the fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Stephenson Harwood, LLP and Poles, Tublin, Stratakis & Gonzalez, LLP), (ii) the Prepetition $100 Million Facility Agent (including the fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP and Orrick, Herrington & Sutcliffe LLP), (iii) the Prepetition 2007 Facility Agent (including the fees and expenses of Milbank, Tweed, Hadley & McCloy LLP, Seward & Kissel LLP, and Houlihan Lokey Capital, Inc.), and (iv) the Supporting Noteholders (including the fees and expenses of Akin Gump Strauss Hauer & Feld LLP and Jefferies LLC), in each case in accordance with the cash collateral order approved by the Court, the Restructuring Support Agreement, and as required by the underlying credit agreement, indemnity, or fee letter.

## 6.      Convertible Notes Indenture Trustee Fees and Expenses.

In addition to any other Claim that may be filed by the Convertible Notes Indenture Trustee pursuant to the provisions set forth in the Plan, the Convertible Notes Indenture Trustee will have an Allowed Administrative Claim in an amount equal to the Convertible Notes Indenture Trustee Expenses. If the Debtors or the Reorganized Debtors disputes the reasonableness of the Convertible Notes Indenture Trustee Expenses, the Debtors, the Reorganized Debtors, or the Convertible Notes Indenture Trustee, as applicable, may submit such dispute to the Court for a determination of the reasonableness of such fees or expenses and the disputed portion of the Convertible Notes Indenture Trustee Expenses will not be paid until the dispute is resolved. The undisputed portion of the Convertible Notes Indenture Trustee Expenses will be paid as provided in the Plan. The Convertible Notes Indenture Trustee will not be entitled to payment of or assertion of its Convertible Notes Indenture Trustee Charging Lien for any disputed Convertible Notes Indenture Trustee Expenses to the extent the Court determines that such Convertible Notes Indenture Trustee Expenses are unreasonable under the terms of the Convertible Notes Indenture.  Nothing contained in the Plan will otherwise affect the right of the Convertible Notes Indenture Trustee from asserting its Convertible Notes Indenture Trustee Charging Lien, to the extent applicable under the terms of the Convertible Notes Indenture, provided, however, that upon the full and indefeasible payment of the Convertible Notes Indenture Trustee Expenses, the Convertible Notes Indenture Trustee Charging Lien will be deemed released and discharged in full.

## 7.      Cancellation of Existing Securities.

On the Effective Date, except as otherwise specifically provided for in the Plan: (i) the obligations of the Debtors under the Convertible Notes Indenture, and any other certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in a Debtor giving rise to any Claim or Equity Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligations of a Debtor that are specifically reinstated pursuant to the Plan), will be cancelled as to such Debtor, and the applicable Reorganized Debtor will not have any continuing obligations thereunder; and (ii) the obligations of a Debtor pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor

(except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of such Debtor that are specifically reinstated pursuant to the Plan or assumed by a Debtor) will be released and discharged; provided, however, that, notwithstanding the foregoing, to the extent the Debtors exercise their option to enter into the New Exit Financing Facility, the Debtors' obligations under the Prepetition $100 Million Credit Agreement and the Prepetition $253 Million Credit Agreement will be cancelled as to the Debtors, or if the Debtors enter into the Amended and Restated Term Loan Facilities, the Debtors' obligations under the Prepetition $100 Million Credit Agreement and the Prepetition $253 Million Credit Agreement will be amended and superseded by the obligations under the Amended and Restated Term Loan Facilities; provided, further, however, that notwithstanding the occurrence of the Confirmation Date or the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim will continue in effect solely for purposes of (a) allowing holders of such Claims to receive distributions under the Plan as provided in the Plan, (b) allowing the Prepetition Agents and/or the Convertible Notes Indenture Trustee to make distributions under the Plan as provided in the Plan, and deduct therefrom such reasonable compensation, fees, and expenses due thereunder or incurred in making such distributions, to the extent not paid by the Debtors and authorized under such indenture or agreement, (c) allowing the Prepetition Agents and/or the Convertible Notes Indenture Trustee to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the Plan, (d) allowing the Convertible Notes Indenture Trustee to exercise any charging liens it may have under the Convertible Notes Indenture against any such distributions and (e) preserving any charging lien or indemnification rights of the Convertible Notes Indenture Trustee under the Convertible Notes Indenture against the holders of the Convertible Notes. For the avoidance of doubt, nothing in Article VI.H of the Plan will affect the discharge of or result in any obligation, liability or expense of the Debtors or Reorganized Debtors or affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan, or result in any additional obligation, expense or liability of the Debtors or Reorganized Debtors. On and after the Effective Date, all duties and responsibilities of the Prepetition Agents and the Convertible Notes Indenture Trustee will be discharged except to the extent required to effectuate the Plan; provided that the Prepetition $100 Million Facility Agent and the Prepetition $253 Million Facility Agents, respectively, will continue in such capacities under the Amended and Restated $100 Million Facility Credit Agreement and the Amended and Restated $253 Million Facility Credit Agreement, respectively.

## 8.    Claims Incurred After the Effective Date.

Claims incurred by the Debtors after the Effective Date may be paid by the Reorganized Debtors in the ordinary course of business and without application for or Court approval, subject to any agreements with such holders of a Claim.

### 9.    Releases, Exculpations and Injunctions of Released Parties.

(a)    **Releases by the Debtors.**

**On the Effective Date, and notwithstanding any other provisions of the Plan, the Debtors and the Reorganized Debtors, on behalf of themselves and their Estates, will be deemed to unconditionally release the Released Parties[25] from any and all claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, assertable on behalf of or** derivative **from the Debtors, based in whole or in part upon actions taken solely in their respective capacities described in the Plan or any omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the Disclosure Statement, the Equity Commitment Agreement, the Restructuring Support Agreement, the documents included in the Plan Supplement, the Rights Offering, or the Plan or related agreements, instruments, or other documents, provided, however, that (a) no individual will be released from any act or omission that constitutes gross negligence or willful misconduct as determined by a Final Order, (b) other than with respect to the Prepetition 2007 Facility Claims, the Prepetition $100 Million Facility Claims, the Prepetition $253 Million Facility Claims, and the Convertible Note Claims, the Reorganized Debtors will not relinquish or waive the right to assert any of the foregoing as a legal or equitable defense or right of set-off or recoupment against any Claims of any such persons asserted against the Debtors, (c) the foregoing release will not apply to obligations arising under the Amended and Restated Term Loan Facilities or the New Exit Financing Facility, as applicable, and (d) the foregoing release applies to the Released Parties solely in their respective capacities described in the Plan.**

**The Debtors believe that the releases by the Debtors set forth in the Plan are in the best interests of the estates and represent an appropriate exercise of the Debtors' business judgment, as required under applicable law.** Among **other justifications for the releases by the Debtors: the Debtors do not believe that there are any viable estate causes of action against any of the Released Parties; the Released Parties have played an integral role in the formulation of the Plan and have expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure; the releases by the Debtors will eliminate the potential for post-effective date litigation against directors and officers that could threaten the viability of the reorganized company both**

---

[25] "Released Parties" is defined in the Plan as "each of, and solely in its capacity as such, (a) the Prepetition Agents and the Convertible Notes Indenture Trustee, (b) the holders of Impaired Claims or Equity Interests other than those who (i) have been deemed to reject the Plan, or (ii) voted to reject the Plan and have also checked the box on the applicable Ballot indicating that they opt not to grant the releases provided in the Plan, (c) the Supporting Creditors, and (d) with respect to the foregoing entities in clauses (a) through (d), such entity's current subsidiaries, officers, directors, principals, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, equity holders, partners, and other professionals, in each case solely in their capacity as such."

directly (by virtue of indemnification agreements) and indirectly (through the cost and distraction of potential third-party discovery); and the releases by the Debtors are similar in scope to those customarily approved by courts in this District. The Plan reflects the settlement and resolution of several complex issues, and the releases are an integral part of the consideration to be provided in exchange for the compromises and resolutions embodied in the Plan.

(b)        **Releases by Holders of Claims and Equity Interests.**

On the Effective Date, and notwithstanding any other provisions of the Plan, (i) each Releasing Party will be deemed to have forever released and covenanted with the Released Parties not to sue or otherwise seek recovery from any Released Party on account of any Claim, including any Claim or Cause of Action based upon tort, breach of contract, violations of federal or state securities laws or otherwise, based upon any act, occurrence, or failure to act from the beginning of time through the Effective Date in any way related to the Debtors or their businesses and affairs and (ii) each Releasing Party will be deemed to have forever released and covenanted with the Released Parties not to assert against any Released Party any Claim, obligation, right, Cause of Action or liability that any holder of a Claim may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction, or occurrence from the beginning of time through the Effective Date in any way relating to the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the Chapter 11 Cases, the documents included in the Plan Supplement, the Rights Offering, the Equity Commitment Agreement, the Restructuring Support Agreement, the Plan, or the Disclosure Statement or related agreements, instruments or other documents, provided, however, the foregoing release will not (i) apply to obligations arising under the Plan, (ii) apply to obligations arising under the Amended and Restated Term Loan Facilities or the New Exit Financing Facility, as applicable, (iii) be construed to prohibit a party in interest from seeking to enforce the terms of the Plan, and (iv) apply to any act or omission that constitutes gross negligence or willful misconduct as determined by a Final Order. The foregoing releases apply to the Released Parties solely in their respective capacities described in the Plan.

Under the Plan, the "Released Parties" means each of: (a) the Debtors and Reorganized Debtors; (b) the Supporting 2007 Facility Lenders; (c) the Supporting $253 Million Facility Lenders; (c) the Supporting $100 Million Facility Lenders; (d) the Backstop Parties; (e) the Supporting Noteholders; (f) the Convertible Notes Indenture Trustee; (g) the Prepetition Agents; and (h) with respect to each of the foregoing in clauses (a) through (g), such entities' predecessors, Professionals, successors and assigns, subsidiaries, funds, portfolio companies, and each of their respective current and former officers, directors, employees, managers, attorneys, financial advisors, accountants, investment bankers, consultants, management companies or other professionals or representatives, in each case solely in their capacity as such.

The "**Releasing Parties**" are defined under the Plan as each of: (a) the Prepetition Agents and the Convertible Notes Indenture Trustee, (b) the holders of Impaired Claims other than those who voted to reject the Plan and have also checked the box on the applicable Ballot indicating that they opt not to grant the releases provided in the Plan, (c) the Supporting Creditors, (d) to the fullest extent permissible under applicable law (i) holders of Unimpaired Claims, (ii) holders of Equity Interests, and (e) with respect to the foregoing entities in clauses (a) through (d), such entity's current subsidiaries, officers, directors, principals, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, equity holders, partners, and other professionals, in each case solely in their capacity as such. Thus, as indicated on the Ballots, holders of Claims entitled to vote on the Plan who either (i) submit a Ballot voting to accept the Plan, (ii) submit a Ballot voting to reject the Plan and do not opt out of the releases provided in the Plan, or (iii) do not return a Ballot with respect to the Plan, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Claims and Causes of Action against the Released Parties in accordance with the Plan. Holders of Equity Interests and Unimpaired Claims will likewise be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Claims and Causes of Action against the Released Parties in accordance with the Plan.

(c)      **Exculpation and Injunction.**

The Debtors, the Reorganized Debtors, and the other Released Parties (i) will have no liability whatsoever to any holder or purported holder of an Administrative Claim, Claim, or Equity Interest for any act or omission that occurred during and in connection with the Chapter 11 Cases or in connection with, or arising out of the preparation and filing of the Chapter 11 Cases, the preparation and negotiation of the Equity Commitment Agreement and the Restructuring Support Agreement, the preparation, negotiation, and filing of the Plan, the Disclosure Statement, the negotiation of the documents included in the Plan Supplement, the pursuit of approval of the Disclosure Statement or the solicitation of votes for confirmation of the Plan, the Chapter 11 Cases, the Rights Offering, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, or any transaction contemplated by the Plan or Disclosure Statement or in furtherance thereof except for any act or omission that constitutes willful misconduct or gross negligence as determined by a Final Order, and (ii) in all respects, will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability. Pursuant to section 105 of the Bankruptcy Code, no holder or purported holder of an Administrative Claim, Claim or Equity Interest will be permitted to commence or continue any Cause of Action, employment of process, or any act to collect, offset, or recover any Claim against a Released Party that accrued on or before the Effective Date and that has been released or waived pursuant to the Plan.

(d)    <u>Liabilities to, and Rights of, Governmental Units.</u>

As to the United States of America, its agencies, departments, or agents (collectively, the "United States"), nothing in the Plan or Confirmation Order will limit or expand the scope of discharge, release or injunction to which the Debtors or Reorganized Debtors are entitled to under the Bankruptcy Code. The discharge, release and injunction provisions contained in the Plan and Confirmation Order are not intended and will not be construed to bar the United States from, subsequent to the Confirmation Order, pursuing any police or regulatory action, except to the extent those discharge and injunctive provisions bar a Governmental Unit from pursuing Claims.

Notwithstanding anything contained in the Plan or Confirmation Order to the contrary, nothing in the Plan or Confirmation Order will discharge, release, impair or otherwise preclude: (1) any liability to a Governmental Unit that is not a Claim; (2) any Claim of a Governmental Unit arising on or after the Confirmation Date; (3) any valid right of setoff or recoupment of the United States against a Debtor; or (4) any liability of the Debtors or Reorganized Debtors under environmental law to any Governmental Unit as the owner or operator of property that such entity owns or operates after the Confirmation Date, except those obligations to reimburse costs expended or paid by a Governmental Unit before the Petition Date or to pay penalties owing to a Governmental Unit for violations of environmental laws or regulations that occurred before the Petition Date. Nor will anything in the Plan or Confirmation Order: (i) enjoin or otherwise bar the United States or any Governmental Unit from asserting or enforcing, outside the Court, any liability described as not discharged in the preceding sentence; or (ii) divest any court of jurisdiction to determine whether any liabilities asserted by the United States or any Governmental Unit are discharged or otherwise barred by the Plan, Confirmation Order, or the Bankruptcy Code.

Moreover, nothing in the Plan or Confirmation Order will release or exculpate any non-Debtor, including any Released Parties, from any liability to the United States, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the Released Parties, nor will anything in the Plan or Confirmation Order enjoin the United States from bringing any claim, suit, action or other proceeding against the Released Parties for any liability whatsoever; <u>provided</u>, <u>however</u>, that the foregoing sentence will not limit the scope of discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.

(e)    <u>Preservation of Insurance.</u>

The Debtors' discharge and release from all Claims as provided in the Plan will not, except as necessary to be consistent with the Plan, diminish or impair the enforceability of any insurance policy that may provide coverage for Claims against the Debtors, the Reorganized Debtors, their current and former directors and officers, or any other Person. Prior to the Effective Date, the Debtors will obtain directors' and officers' liability insurance tail coverage for all of their current and former directors and officers, which coverage will extend for a period of not less than six (6) years after the Effective Date and contain terms no less favorable to such

directors and officers as the terms of the existing directors' and officers' liability insurance policies issued to the Debtors.

### E.      Distributions Under the Plan

#### 1.      Procedures for Treating Disputed Claims

##### (a)      Filing Proofs of Claim.

Except as required by the Bar Date Order, holders of Claims need not file Proofs of Claim with the Court.  In the event that a holder of a Claim elects to file a Proof of Claim with the Court, it will be deemed to have consented to the exclusive jurisdiction of the Court for all purposes with respect to the determination, liquidation, allowance, or disallowance of such Claim.

##### (b)      Disputed Claims.

If the Debtors dispute any Claim as to which no Proof of Claim has been filed, such dispute will be determined, resolved, or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced, provided, however, that the Reorganized Debtors may elect, at their sole option, to object under section 502 of the Bankruptcy Code to any Claim or Proof of Claim filed by or on behalf of a holder of a Claim.

##### (c)      Objections to Claims.

Except insofar as a Claim is Allowed under the Plan, the Debtors, the Reorganized Debtors, and any other party in interest will be entitled to object to Claims.  Any objections to Claims will be filed and served by the Claims Objection Deadline.

##### (d)      Disallowance of Claims.

**With respect to each Claim not subject to the Bar Date Order, except as provided in the Plan or otherwise agreed, any and all Proofs of Claim will be deemed expunged from the claims register on the Effective Date without any further notice to or action, order, or approval of the Court and the Claim on which such Proof of Claim was filed will be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and will survive the Effective Date as if the Chapter 11 Cases had not been commenced.**

**With respect to each General Unsecured  Claim and Claim subordinated pursuant to section 510(b) of the Bankruptcy Code subject to the Bar Date Order, except as provided in the Plan or otherwise agreed, any and all Proofs of Claim filed after the Bar Date will be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Court, and holders of such Claims may not receive any distributions on account of such Claims.**

2.    **Allowed Claims.**

(a)    Delivery of Distributions.

Distributions under the Plan will be made by the Reorganized Debtors (or their agent or designee) to the holders of Allowed Claims in all Classes for which a distribution is provided in the Plan at the addresses set forth on the Schedules, unless such addresses are superseded by Proofs of Claim or transfers of Claim filed pursuant to Bankruptcy Rule 3001 by the Claims Record Date (or at the last known addresses of such holders if the Debtors or the Reorganized Debtors have been notified in writing of a change of address).

(b)    Distribution of Cash.

Any payment of Cash by the Reorganized Debtors pursuant to the Plan will be made at the option and in the sole discretion of the Reorganized Debtors by (i) a check drawn on, or (ii) wire transfer from, a domestic bank selected by the Reorganized Debtors.

(c)    Unclaimed Distributions of Cash.

Subject to Article VI.B.6 of the Plan, any distribution of Cash under the Plan that is unclaimed after six (6) months after it has been delivered (or attempted to be delivered) will, pursuant to section 347(b) of the Bankruptcy Code, become the property of the Reorganized Debtors against which such Claim was Allowed notwithstanding any state or other escheat or similar laws to the contrary, and the entitlement by the holder of such unclaimed Allowed Claim to such distribution or any subsequent distribution on account of such Allowed Claim will be extinguished and forever barred.

(d)    Distributions of New Genco Common Stock to the Prepetition 2007 Facility Lenders, and Issuance to the Backstop Parties.

On the Effective Date, the Reorganized Debtors (or their agent or designee) will distribute the 2007 Lender Conversion Shares to the holders of the Prepetition 2007 Facility Claims (or their designees) and the Convertible Notes Equity Distribution to the holders of Convertible Note Claims (or their designees), and will issue the Backstop Shares, if any, to the Backstop Parties.  The Rights Offering Shares will be issued on the Effective Date through the Subscription Agent or its designee.

(e)    Unclaimed Distributions of New Genco Common Stock and New Genco Equity Warrants.

Subject to Article VI.B.6 of the Plan, any distribution of New Genco Common Stock and New Genco Equity Warrants under the Plan that is unclaimed after six (6) months after it has been delivered (or attempted to be delivered) will be retained by the Reorganized Debtors, notwithstanding any state or other escheat or similar laws to the contrary, and the entitlement by the holder of such Allowed Claim to such distribution or any subsequent distribution on account of such Allowed Claim will be extinguished and forever barred.

       (f)       <u>Distributions to Record Date Convertible Noteholders Whose Status is Uncertain</u>

Unless and until the status of a Record Date Convertible Noteholder is demonstrated to the reasonable satisfaction of the Debtors or the Reorganized Debtors (as applicable ) as an Eligible Noteholder or Non-Eligible Noteholder, no distribution will be made to such Record Date Convertible Noteholder under the Plan on account of the respective Convertible Note Claim. If the status of a Record Date Convertible Noteholder is not demonstrated to the reasonable satisfaction of the Debtors or the Reorganized Debtors (as applicable) as an Eligible Noteholder or Non-Eligible Noteholder within one (1) year of the Effective Date, any distribution to which such Record Date Convertible Noteholder would be entitled under the Plan will be retained by the Reorganized Debtors, notwithstanding any state or other escheat or similar laws to the contrary, and the entitlement of such Record Date Convertible Noteholder to such distribution or any subsequent distribution on account of the respective Convertible Note Claim will be extinguished and forever barred. The Debtors or Reorganized Debtors (as applicable) will establish procedures in compliance with applicable securities laws for the determination of whether a Record Date Convertible Noteholder is an Eligible Noteholder or a Non-Eligible Noteholder. To the extent that the status of a holder of a Convertible Note Claim as an Eligible Noteholder or Non-Eligible Noteholder is determined after the Effective Date, such holder will be entitled to its applicable distribution under the Plan as soon as practicable following such determination.

---

**FAILURE TO PROVIDE EVIDENCE TO DEMONSTRATE ELIGIBLE NOTEHOLDER OR NON-ELIGIBLE NOTEHOLDER STATUS TO THE REASONABLE SATISFACTION OF THE DEBTORS OR THE REORGANIZED DEBTORS WILL RESULT IN A DELAY OR FORFEITURE OF A DISTRIBUTION.**

---

       (g)       <u>Distributions to Holders of Prepetition 2007 Facility Claims.</u>

The Debtors understand that all holders of Prepetition 2007 Facility Claims are or will be either Accredited Investors or QIBs. However, the Debtors shall undertake appropriate procedures to confirm that any holder of a Prepetition 2007 Facility Claim is in fact an Accredited Investor or QIB, including, but not limited to, requiring certifications by such holder to that effect, which may include applying minimum Claim thresholds and other diligence measures as the Debtors deem necessary.

       (h)       <u>Saturdays, Sundays, or Legal Holidays.</u>

If any payment, distribution or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and will be deemed to have been completed as of the required date.

(i)     <u>Fractional New Genco Common Stock and New Genco Equity Warrants and De Minimis Distributions.</u>

Notwithstanding any other provision in the Plan to the contrary, no fractional shares of New Genco Common Stock or fractional New Genco Equity Warrants will be issued or distributed pursuant to the Plan. Whenever any payment of a fraction of a share of New Genco Common Stock or a fractional New Genco Equity Warrant would otherwise be required under the Plan, the actual distribution made will reflect a rounding of such fraction to the nearest whole share or warrant (up or down), with half shares or warrants or less being rounded down and fractions in excess of a half of a share or warrant being rounded up. The Reorganized Debtors will not be required to, but may in their sole and absolute discretion, make any payment on account of any Claim in the event that the costs of making such payment exceeds the amount of such payment.

(j)     <u>Distributions to Holders of Claims.</u>

(i)     <u>*Initial Distribution to Claims Allowed as of the Effective Date*</u>.  On or as soon as reasonably practicable after the Effective Date, or as otherwise expressly set forth in the Plan, the Reorganized Debtors (or their agent or designee) will distribute Cash or Collateral, as the case may be, to the holders of Allowed Claims as contemplated by the Plan.

(ii)     <u>*Claims Allowed after the Effective Date*</u>.  Each holder of a Claim that becomes an Allowed Claim subsequent to the Effective Date will receive the distribution to which such holder of an Allowed Claim is entitled as set forth in Article III, and distributions to such holder will be made in accordance with the provisions of the Plan.  As soon as practicable after the date that the Claim becomes an Allowed Claim, the Reorganized Debtors will provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim. Distributions to holders of Convertible Note Claims will be set forth in Article III.

(iii)     <u>Interest on Claims</u>.  Except as specifically provided for in the Plan, no Claims, Allowed or otherwise (including Administrative Claims), will be entitled, under any circumstances, to receive any interest on a Claim.

**3.      Allocation of Consideration.**

The aggregate consideration to be distributed to the holders of Allowed Claims in each Class under the Plan will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such holders, and any remaining consideration as satisfying accrued, but unpaid interest, as applicable.

**4.      Estimation.**

The Reorganized Debtors may, at any time, request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors had previously objected to such Claim.  The Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim.  In the event that the Court estimates any Disputed Claim, such

estimated amount may constitute either (i) the Allowed amount of such Claim, (ii) the amount on which a reserve is to be calculated for purposes of any reserve requirement under the Plan or (iii) a maximum limitation on such Claim, as determined by the Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as the case may be, may elect to object to ultimate payment of such Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

### 5.   **Insured Claims.**

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan will be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies.  To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

### F.   **Retention of Jurisdiction.**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court will retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction: (i) to resolve any matters related to (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor or Reorganized Debtor is party or with respect to which a Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code, (b) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to the Plan, any Executory Contracts or Unexpired Leases to the Rejection Schedule or otherwise and (c) any dispute regarding whether a contract or lease is or was executory or expired; (ii) to determine, adjudicate, or decide any other applications, adversary proceedings, contested matters, and any other matters pending on the Effective Date; (iii) to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan; (iv) to resolve disputes as to the ownership of any Claim or Equity Interest; (v) to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests; (vi) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, reversed, modified or vacated; (vii) to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (viii) to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including the Confirmation Order; (ix) to hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code; (x) to hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of

the Plan; (xi) to hear and determine disputes arising in connection with the interpretation, implementation and consummation of the Rights Offering; (xii) to hear and determine any issue for which the Plan requires a Final Order of the Court; (xiii) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (xiv) to hear and determine disputes arising in connection with compensation and reimbursement of expenses of professionals for services rendered during the period commencing on the Petition Date through and including the Effective Date; (xv) to hear and determine any Causes of Action preserved under the Plan; (xvi) to hear and determine any matter regarding the existence, nature and scope of the Debtors' discharge; (xvii) to hear and determine any matter, case, controversy, suit, dispute, or Cause of Action (a) regarding the existence, nature, and scope of the discharge, releases, injunctions, and exculpation provided under the Plan, and (b) enter such orders as may be necessary or appropriate to implement such discharge, releases, injunctions, exculpations, and other provisions; (xviii) to enter a final decree closing the Chapter 11 Cases; (xix) to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan; (xx) to adjudicate any and all disputes arising from or relating to distributions under the Plan; (xxi) to enforce all orders previously entered by the Court; and (xxii) to hear any other matter not inconsistent with the Bankruptcy Code.

For the avoidance of doubt, the Court will not retain jurisdiction with respect to the following documents entered into by a Reorganized Debtor on or after the Effective Date: (i) the Amended and Restated $100 Million Credit Agreement, (ii) the Amended and Restated $253 Million Credit Agreement, (iii) the New Exit Financing Facility Credit Agreement, if applicable, (iv) the Registration Rights Agreement, (v) the New Genco By-Laws, (vi) the New Genco Charter, (vii) the by-laws and charter of the Reorganized Debtor Subsidiaries, (viii) the New Genco Warrant Agreement, and (ix) the New Genco MIP Warrant Agreement.

### G.    Executory Contracts and Unexpired Leases.

The Bankruptcy Code grants the Debtors the power, subject to the approval of the Court, to assume or reject executory contracts and unexpired leases. If an executory contract or unexpired lease is rejected, the other party to the agreement may file a claim for damages, if any, incurred by reason of the rejection. In the case of the Debtors' rejection of leases of real property, such damage claims are subject to certain caps imposed by the Bankruptcy Code.

### 1.    Assumption of Executory Contracts and Unexpired Leases.

Except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected will be deemed automatically assumed pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such executory contract or unexpired lease: (i) is expressly identified on the Rejection Schedule; (ii) has been previously rejected by the Debtors by Final Order or has been rejected by the Debtors by order of the Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to reject pending as of the Effective Date; or (iv) is otherwise rejected pursuant to the terms of the Plan.

The Confirmation Order will constitute an order of the Court approving such assumptions pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date or as otherwise set forth in the Plan Supplement.

### 2. Cure Claims.

At the election of the Debtors or the Reorganized Debtors, as applicable, any monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan will be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code in one of the following ways (i) payment of the Cure Claim in Cash on or as soon as reasonably practicable to occur of (A) thirty (30) days after the determination of the Cure Claim, and (B) the Effective Date or such other date as may be set by the Court, or (ii) on such other terms as agreed to by the Debtors or Reorganized Debtors and the non-Debtor counterparty to such Executory Contract or Unexpired Lease. In the event of a dispute pertaining to assumption or assignment, the Cure Claim payments required by section 365(b)(1) of the Bankruptcy Code will be made following the resolution of the dispute in accordance with Article IX of the Plan.

The only adequate assurance of future performance will be the promise of the applicable Reorganized Debtor to perform all obligations under any executory contract or unexpired lease under the Plan.

ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE WILL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE  THE DEBTORS OR REORGANIZED DEBTORS ASSUME SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE.  ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED WILL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE COURT.

Obligations arising under insurance policies assumed by the Debtors before the Effective Date will be adequately protected in accordance with any order authorizing such assumption.

### 3. Reservation of Rights.

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, as applicable, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  In the event a written objection is filed with the Court as to whether a contract or lease is executory or unexpired, the right of the Debtors or Reorganized Debtors to move to assume or reject such contract or lease will be extended until the date that is thirty (30) days after the entry of a Final Order by the Court

determining that the contract or lease is executory or unexpired, in which case the deemed assumptions and rejections provided for in the Plan will not apply to such contract or lease.

## 4. **Rejection of Executory Contracts and Unexpired Leases.**

(a)    Rejection Schedule.

The Debtors will file the Rejection Schedule with the Court no later than five (5) Business Days before the deadline to object to the Plan. The Rejection Schedule will include (a) the name of the non-Debtor counterparty, (b) the legal description of the contract or lease to be rejected, and (c) the proposed effective date of rejection. On or as soon as practicable thereafter, the Debtors will serve a Rejection Notice as well as notice of filing of the Rejection Schedule upon each non-Debtor counterparty listed thereon that will describe the procedures by which such parties may object to the proposed rejection of their respective Executory Contract or Unexpired Lease and explain how such disputes will be resolved by the Court if the parties are not able to resolve a dispute consensually.

The Confirmation Order will constitute an order of the Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date or as otherwise set forth in the Plan Supplement.

(b)    Rejection Damage Claims.

If the rejection by the Debtors, pursuant to the Plan or otherwise, of an Executory Contract or Unexpired Lease gives rise to a Rejection Damage Claim, a Proof of Claim must be filed with the Court within (i) thirty (30) days after the date of entry of an order of the Court approving such rejection, or (ii) if the Executory Contract or Unexpired Lease is listed on the Rejection Schedule, within thirty (30) days after the date of entry of the Confirmation Order. For the avoidance of doubt, all Allowed Rejection Damage Claims will be treated as Unsecured Claims.

(c)    Requirement to File a Proof of Claim for Rejection Damage Claims.

**ANY REJECTION DAMAGE CLAIMS THAT ARE NOT TIMELY FILED WILL BE DISALLOWED AUTOMATICALLY, FOREVER BARRED FROM ASSERTION, AND WILL NOT BE ENFORCEABLE AGAINST ANY REORGANIZED DEBTOR WITHOUT THE NEED FOR ANY OBJECTION BY THE REORGANIZED DEBTORS OR FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE COURT, AND ANY** REJECTION **DAMAGE CLAIM WILL BE DEEMED FULLY SATISFIED, RELEASED AND DISCHARGED, NOTWITHSTANDING ANYTHING IN THE SCHEDULES OR A PROOF OF CLAIM TO THE CONTRARY.**

## 5. **Assignment.**

Any Executory Contract or Unexpired Lease to be held by any Debtor or Reorganized Debtor and assumed hereunder or otherwise in the Chapter 11 Cases, if not expressly assigned to a third party previously in the Chapter 11 Cases, will be deemed assigned

to that Reorganized Debtor pursuant to section 365 of the Bankruptcy Code. If an objection to a proposed assumption, assumption and assignment or Cure Claim is not resolved in favor of the Debtors before the Effective Date, the applicable Executory Contract or Unexpired Lease may be designated by the Debtor or the Reorganized Debtor for rejection within five (5) Business Days of the entry of the order of the Court resolving the matter against the Debtor. Such rejection will be deemed effective as of the Effective Date.

### 6.    Insurance Policies.

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors will be deemed to have assumed all insurance policies and any agreements, documents and instruments related thereto.

### 7.    Post-Petition Contracts and Leases.

All contracts, agreements and leases that were entered into by a Debtor or assumed by a Debtor after the Petition Date will be deemed assigned by that Debtor to the applicable Reorganized Debtor on the Effective Date.

### H.    Miscellaneous Provisions.

### 1.    Immediate Binding Effect.

Subject to the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan will be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with any Debtor.

### 2.    Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of New York (without reference to the conflicts of laws provisions thereof that would require or permit the application of the law of another jurisdiction) will govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specified.

### 3.    Filing or Execution of Additional Documents.

On or before the Effective Date, the Debtors or the Reorganized Debtors will (on terms materially consistent with the Plan) file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further

evidence the terms and conditions of the Plan, which will be in form and substance acceptable to the Debtors and the Supporting Creditors in accordance with section 1(b) of the Restructuring Support Agreement.

### 4.     Term of Injunctions of Stays

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date.

### 5.     Withholding and Reporting Requirements.

In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Reorganized Debtors will comply with all withholding and reporting requirements imposed by any United States federal, state, local or foreign taxing authority and all distributions hereunder will be subject to any such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors will be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distribution pending receipt of information necessary or appropriate to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

### 6.     Exemption From Transfer Taxes.

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, all transfers of property pursuant to the Plan, including (i) the issuance, transfer or exchange under the Plan of New Genco Common Stock, the New Genco Equity Warrants, the Rights, the New Genco MIP Primary Equity, the New Genco MIP Warrants, and the security interests in favor of the lenders under each of the Amended and Restated Term Loan Facilities or the New Exit Facility, (ii) the making or assignment of any lease or sublease, or (iii) the making or delivery of any other instrument whatsoever, in furtherance of or in connection with the Plan, will not be subject to any stamp, conveyance, mortgage, sales or use, real estate transfer, recording or other similar tax, or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents will forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

### 7.     Plan Supplement.

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  The documents contained in the Plan Supplement will be available online at www.pacer.gov and www.GencoRestructuring.com. Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to counsel to the Debtors.  The Debtors reserve the right (subject to the consent and consultation rights set forth in paragraph 1(b) of the Restructuring Support Agreement), in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any part of

the Plan Supplement after they are filed and will promptly make such changes available online at www.pacer.gov and www.GencoRestructuring.com.

### 8.    Conflicts.

The terms of the Plan will govern in the event of any inconsistency between the Plan and the Disclosure Statement.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order will govern with respect to such inconsistency.

## VII.  CONFIRMATION AND EFFECTIVENESS OF THE PLAN

### A.    Conditions Precedent to Confirmation

The Plan provides that the following conditions are conditions to the entry of the Confirmation Order unless such conditions, or any of them, have been satisfied or duly waived in accordance with Article VI.B of the Plan:

1.    The Court will have approved the Disclosure Statement.

2.    The Confirmation Order will be in form and substance mutually acceptable to the Debtors and the Required Supporting 2007 Facility Lenders, reasonably acceptable to the Required Supporting Noteholders, and, solely with respect to any term that will affect their respective economic interests, be mutually acceptable to the Debtors, the Required Supporting $253 Million Facility Lenders and the Required Supporting $100 Million Facility Lenders, and, solely with respect to any term in the Confirmation Order that will affect the respective economic interests of the Prepetition $100 Million Facility Lenders and the Prepetition $253 Million Facility Lenders or is related to the Amended and Restated Term Loan Facilities will be mutually acceptable to the Debtors, the Prepetition $100 Million Facility Agent, and the Prepetition $253 Million Facility Agents.

3.    The Plan (which, for purposes of Article VI.A.3 of the Plan will exclude the Plan Supplement), will be in form and substance mutually acceptable to the Debtors and the Required Supporting 2007 Facility Lenders, reasonably acceptable to the Required Supporting Noteholders, and, solely with respect to any term that will affect their respective economic interests, be mutually acceptable to the Debtors, Required Supporting $253 Million Facility Lenders and the Required Supporting $100 Million Facility Lenders.

4.    The Plan Supplement will be in form and substance mutually acceptable to the Debtors and the Required Supporting 2007 Facility Lenders, reasonably acceptable to the Supporting Noteholders (except with respect to the Registration Rights Agreement, the New Employment Agreements, the Rejection Schedule, the New Board, and the initial officers of the Reorganized Debtor), and, solely with respect to any term that will affect

their respective economic interests, be mutually acceptable to the Debtors, the Required Supporting $253 Million Facility Lenders and the Required Supporting $100 Million Facility Lenders.

5.      The Restructuring Support Agreement will have been assumed by the Debtor.

## B.      Waiver of Conditions Precedent to Confirmation.

The Debtors, with the written consent of the Required Supporting 2007 Facility Lenders, and subject to the consent rights of the Supporting Creditors as provided for in the Restructuring Support Agreement, may waive the conditions set forth in Article VI of the Plan at any time without leave of or order of the Court and without any formal action.  Notwithstanding the foregoing nothing in the Plan will provide the Required Supporting Creditors with any consent rights that are not otherwise provided in the Restructuring Support Agreement or Equity Commitment Agreement.

## C.      Conditions Precedent to Effectiveness.

Pursuant to the Plan, the Plan will not become effective unless and until the Confirmation Date has occurred and the following conditions have been satisfied in full or waived as described below and as more fully set forth in the Plan:

1.      the Confirmation Order entered by the Court will be in form and substance mutually acceptable to the Debtors and the Required Supporting 2007 Facility Lenders, reasonably acceptable to the Supporting Noteholders, and, solely with respect to any term in the Confirmation Order that will affect the respective economic interests of the Prepetition $100 Million Facility Lenders and the Prepetition $253 Million Facility Lenders or is related to the Amended and Restated Term Loan Facilities, shall be mutually acceptable to the Debtors, the Prepetition $100 Million Facility Agent, and the Prepetition $253 Million Facility Agents;

2.      the Confirmation Order will not have been stayed, modified, or vacated on appeal;

3.      the Definitive Documents (as defined in the Restructuring Support Agreement) and any amendments, modifications, or supplements thereto, will be in form and substance mutually acceptable to the Debtors and the Supporting Creditors in accordance with section 1(b) of the Restructuring Support Agreement;

5.      all actions, documents, certificates and agreements necessary to implement the Plan will have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws;

6.     all authorizations, consents and regulatory approvals required (if any) for the Plan's effectiveness will have been obtained;

7.     the Reorganized Debtors will have executed either (i) the New Exit Financing Facility, or (ii)(x) the Amended and Restated $253 Million Credit Agreement, and (y) the Amended and Restated $100 Million Credit Agreement, and, in each case, all conditions precedent to effectiveness of the New Exit Financing Facility or the Amended and Restated Term Loan Facilities, as applicable, will have been satisfied or waived;

8.     the Fee Claims Escrow Account will be established and will have been funded in full, in Cash in accordance with, and in the amounts required by, the Plan;

9.     the Equity Commitment Agreement will be in full force and effect;

10.    the Debtors will have executed the New Employment Agreements, if any; and

11.    the Backstop Investment and the Rights Offering Proceeds, if any, will have been funded in accordance with the Plan and the Equity Commitment Agreement and the Rights Offering Procedures.

### D.    __Waiver of Conditions Precedent to Effectiveness.__

The Debtors, with the written consent of the Required Supporting 2007 Facility Lenders, and subject to the consent rights of the Supporting Creditors as provided for in the Restructuring Support Agreement, may waive conditions set forth in Section X of the Plan at any time without leave of or order of the Court and without any formal action. Notwithstanding the foregoing, nothing in the Plan will provide the Required Supporting Creditors with any consent rights that are not otherwise provided in the Restructuring Support Agreement or the Equity Commitment Agreement.

### E.    __Effect of Failure of Conditions.__

In the event that the Effective Date does not occur on or before sixty (60) days after the Confirmation Date but in no event later than August 1, 2014, upon notification submitted by the Debtors to the Court: (i) the Confirmation Order may be vacated, (ii) no distributions under the Plan will be made; (iii) the Debtors and all holders of Claims and Equity Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) the Debtors' obligations with respect to the Claims and Equity Interests will remain unchanged and nothing contained in the Plan will constitute or be deemed a waiver, release, or discharge of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtor or any person in any further proceedings involving the Debtors unless extended by Court order.

F.      **Vacatur of Confirmation Order.**

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan will be null and void in all respects, and nothing contained in the Plan will: (i) constitute a waiver, release or discharge of any Claims against or Equity Interests in the Debtor; (ii) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors; (iii) prejudice in any manner any right, remedy or claim of the Debtors; or (iv) be deemed an admission against interest by the Debtors.

G.      **Modification of the Plan.**

Subject to the limitations contained in the Plan, and subject to the consent of the Required Supporting Creditors as set forth in the Plan, in the Restructuring Support Agreement, or in the Equity Commitment Agreement, as applicable, (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code.

H.      **Revocation, Withdrawal, or Non-Consummation.**

1.      **Right to Revoke or Withdraw.**

The Debtors reserve the right to revoke or withdraw the Plan at any time before the Effective Date; provided, however, that such action will not modify or otherwise alter the rights of the non-Debtor parties to the Restructuring Support Agreement or the Equity Commitment Agreement.

2.      **Effect of Withdrawal, Revocation, or Non-Consummation.**

If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), the assumption or rejection of Executory Contracts, Unexpired Leases or benefit plans effected by the Plan, any release, exculpation or indemnification provided for in the Plan, and any document or agreement executed pursuant to the Plan will be null and void.  In such event, nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan will be deemed to constitute a waiver or release of any Claims by or against or Equity Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

## VIII.  CONFIRMATION PROCEDURES

### A.    Combined Disclosure Statement and Confirmation Hearing

Section 1129(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to hold a hearing on confirmation of a chapter 11 plan and section 1129(b) provides that any party in interest may object to the confirmation of the chapter 11 plan.  When the Debtors commence their Chapter 11 Cases, they will contemporaneously file a motion on the Petition Date to schedule a hearing on the adequacy of the Disclosure Statement, the sufficiency of the solicitation procedures, and confirmation of the Plan ("**Combined Hearing**").  Notice of the Combined Hearing will be provided to holders of Claims and Equity Interests or their agents or representatives as established in the order establishing the schedule for the Combined Hearing and related objections ("**Notice of Combined Hearing**").  Objections to the Disclosure Statement and confirmation of the Plan must be filed with the Bankruptcy Court by the date set forth in the Notice of Combined Hearing and will be governed by Bankruptcy Rules 3020(b) and 9014 and the local rules of the Bankruptcy Court.  UNLESS AN OBJECTION IS TIMELY FILED AND SERVED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### B.    Confirmation of the Plan.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan are that the plan is (i) accepted by all Impaired classes of Claims and Equity Interests or, if rejected by an Impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible and (iii) in the "best interests" of creditors and equity interest holders that are Impaired under the Plan.

### 1.    Acceptance.

Under section 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are conclusively deemed to have accepted a plan and their votes are not solicited. Holders of impaired claims and interests are entitled to vote on a plan (unless such claims or interests are in a class that is deemed to have rejected the plan pursuant to section 1126(g) of the Bankruptcy Code, and therefore, must accept a plan for it to be confirmed without application of the "unfair discrimination" and "fair and equitable" tests to such classes.  As class of claims or interests is deemed to accept a plan if accepted by at least two-thirds (2/3) in amount of each such class (other than any interests designated under section 1126(e) of the Bankruptcy Code) and a majority in number of holders that has voted to accept or reject a plan.

Classes 1, 2, 6, 7, 9 and 10 of the Plan are Unimpaired and, therefore, are conclusively presumed to have voted to accept the Plan.

Classes 3, 4, 5, 8 and 11 of the Plan are Impaired under the Plan and Class 11 is deemed to reject the Plan.  Thus, only Classes 3, 4, 5, and 8 are entitled to vote on the Plan.  The Debtors will seek nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code, with respect to Class 11.  Finally, the Debtors reserve their right to amend the Plan in accordance with Article X.E. of the Plan with respect to any rejecting Class(es).

79

2.    **Standards for Confirmation**.

(a)    Requirements of Section 1129(a) of the Bankruptcy Code.

The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a chapter 11 plan of reorganization:

(i)    The plan complies with the applicable provisions of the Bankruptcy Code.

(ii)    The proponent of the plan complies with the applicable provisions of the Bankruptcy Code.

(iii)    The plan has been proposed in good faith and not by any means forbidden by law.

(iv)    Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

(v)    The proponent of a plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy.

(vi)    The proponent of the plan has disclosed the identity of any insider (as defined in section 101 of the Bankruptcy Code) that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

(vii)    Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

(viii)    With respect to each impaired class of claims or interests (x) each holder of a claim or interest of such class (a) has accepted the plan; or (b) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or (y) if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim, property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

(ix)    With respect to each class of claims or interests, such class has (a) accepted the plan; or (b) such class is not Impaired under the plan (subject to the "cramdown" provisions discussed below; see "Requirements of Section 1129(b) of the Bankruptcy Code").

(x)    Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

(a)    with respect to a claim of a kind specified in sections 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of the claim will receive on account of such claim cash equal to the allowed amount of such claim;

(b)    with respect to a class of claim of the kind specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive (a) if such class has accepted the plan, deferred cash payments of a value, on the effective date of the plan, equal to the allowed amount of such claim; or (b) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

(c)    with respect to a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim, regular installment payments in cash:

(i)    of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii)    over a period ending not later than five (5) years after the date of the order for relief under sections 301, 302, or 303 of the Bankruptcy Code; and

(iii)    in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b) of the Bankruptcy Code); and

(d)    with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code, but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in the bullet points above.

(i)    If a class of claims is Impaired under the plan, at least one class of claims that is Impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider (as defined in section 101 of the Bankruptcy Code).

(ii)    Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

(iii)      All fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

(iv)      The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

The Debtors believe that the Plan meets all the applicable requirements of section 1129(a) of the Bankruptcy Code including those pertaining to voting as the Debtors obtained acceptance from Classes 3, 4, and 5 prior to commencing the Chapter 11 Case.

(b)      Requirements of Section 1129(b) of the Bankruptcy Code.

If less than all Impaired Classes accept the Plan, but at least one Class of Claims Impaired under the Plan has accepted the Plan (and which Class's acceptance is determined without inclusion of Claims of Insiders), the Debtors may seek to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

Section 1129(b) of the Bankruptcy Code sets forth the so-called "cramdown" provisions for confirmation of a plan even if it is not accepted by all Impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one Impaired class of claims has accepted it without taking into consideration the votes of any insiders in such class, and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any Impaired class that has not accepted the plan.

(i)      *Fair and Equitable*.

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting Impaired classes of secured creditors, unsecured creditors and equity interest holders as follows:

(e)      *Secured Creditors*.   A plan is fair and equitable to a class of secured claims that rejects the plan if the plan provides: (i) that each of the holders of the secured claims included in the rejecting class (A) retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (B) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan, at least equal to such holder's interest in the estate's interest in such property; (ii) that each of the holders of the secured claims included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (iii) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens with such liens to attach to the proceeds of the sale, and the treatment of such liens on proceeds in accordance with clause (i) or (ii) hereof.

(f)    *Unsecured Creditors*.  A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides that: (i) each holder of a claim included in the rejecting class receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan.

(g)    *Holders of Equity Interests*.  A plan is fair and equitable as to a class of equity interests that rejects the plan if the plan provides that: (i) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of (A) any fixed liquidation preference to which such holder is entitled, (B) the fixed redemption price to which such holder is entitled, or (C) the value of the interest; or (ii) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan.

The Debtors believe the Plan is fair and equitable as to all creditors.

(ii)    *Unfair Discrimination*.

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its Claims or Equity Interests.  The Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

### 3.    Feasibility.

Section 1129(a)(11) of the Bankruptcy Code permits a plan to be confirmed if it is not likely to be followed by liquidation or the need for further financial reorganization of the debtor.  For purposes of determining whether the Plan meets this requirement, the Debtors analyzed their ability to meet their obligations under the Plan.  Based upon the Debtors' Financial Projections annexed hereto and the assumptions set forth therein, the Debtors believe that it will be able to make all distributions required under the Plan and to fund their operations going forward and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

The Plan substantially deleverages the Debtors' balance sheet by converting 100% of the Prepetition 2007 Facility into equity.  The Debtors will (if they do not enter into the New Exit Financing Facility) also enter into the Amended and Restated $253 Million Facility and the Amended and Restated $100 Million Facility which amend certain covenants and extend the maturity date of those prepetition credit facilities leaving approximately $250 million in secured debt on the balance sheet.  This results in an approximately $1.2 billion reduction in funded debt with significantly improved cash flow of over $200 million per year due to the reduced interest expense and amortization coupled with the extensions of maturity on the

Amended and Restated Term Loan Facilities.  In addition, certain Prepetition 2007 Facility Lenders and certain Convertible Noteholders will backstop a Rights Offering in the amount of $100 million with an 80% and 20% backstop (respectively).  The Rights Offering combined with the Amended & Restated Term Loan Facilities and cash on hand of approximately $106 million will provide the Debtors with sufficient liquidity and cash flow to satisfy their debt service obligations, fund operations and provide for  flexibility and future growth.

### 4.      **Best Interests Test**.

With respect to each Impaired Class of Claims and Equity Interests, Confirmation of the Plan requires that each holder of an Allowed Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  To determine what holders of Claims and Equity Interests in each Impaired Class would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The Cash amount that would be available for satisfaction of Claims and Equity Interests would consist of the proceeds resulting from the disposition of the Debtors' unencumbered assets and properties, augmented by the unencumbered Cash, if any, held by the Debtors at the time of the commencement of the liquidation case.  Such Cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that might result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation.

The Debtors' costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that a trustee might engage.  In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases.  The foregoing types of claims and other claims that might arise in a liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors during the Chapter 11 Cases such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Allowed General Unsecured Claims, Allowed Convertible Note Claims and if applicable Allowed Equity Interests.

To determine if the Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the foregoing claims, are then compared with the value of the property offered to such Classes of Claims and Equity Interests under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors and Interest holders in the Chapter 11 Case, including (i) the increased costs and expenses of a liquidation under chapter 7 of the Bankruptcy Code arising from fees payable to a trustee in bankruptcy and professional advisors

to such trustee, (ii) the likely erosion in value of assets and vessels in a chapter 7 case in the context of an expeditious liquidation and the "forced sale" atmosphere that would prevail under a chapter 7 liquidation and (iii) the substantial increases in Claims which would be satisfied on a priority basis or on parity with creditors in the Chapter 11 Case, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim or Equity Interest with a recovery that is not less than such holder would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

In fact, in every instance, the Plan distributions exceed what any Claim or Equity Interest holder would receive in a chapter 7. For example, the Plan and the Liquidation Analysis demonstrate that (a) each holder of a Prepetition 2007 Facility Claim will receive value up to 91.5% of its Claim under the Plan compared to recoveries ranging from 54.7% to 78.6% in a hypothetical chapter 7 liquidation; (b) General Unsecured Claims will receive 100% of their claims and the Convertible Notes Claims will receive up to 80.3% of their Claims, compared to a *de minimis* distribution in a chapter 7; and (c) Equity Interests will receive warrants valued at $32.9 million as compared to the zero recovery that they would be entitled to in a chapter 7.

The Liquidation Analysis is attached hereto as **Exhibit I**. The information set forth in **Exhibit I** provides a summary of the liquidation values of the Company's assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates.

Underlying the Liquidation Analysis is a number of estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Company and its management. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected might not be realized if the Company was, in fact, to undergo such a liquidation. The chapter 7 liquidation period is assumed to be a period of 6 months, allowing for, among other things, the (i) discontinuation of the Company's operations, (ii) sale of assets and (iii) collection of receivables.

THE LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE DEBTORS' ASSETS. NUMEROUS ESTIMATES AND ASSUMPTIONS UNDERLIE THE LIQUIDATION ANALYSIS REGARDING PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE COMPANY'S MANAGEMENT AND ADVISORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES BEYOND THE CONTROL OF THE COMPANY OR A CHAPTER 7 TRUSTEE. ADDITIONALLY, VARIOUS LIQUIDATION DECISIONS UPON WHICH CERTAIN ASSUMPTIONS ARE BASED ARE SUBJECT TO CHANGE. THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS AND ESTIMATES EMPLOYED IN DETERMINING THE LIQUIDATION VALUES OF THE DEBTORS' ASSETS WILL RESULT IN AN ACCURATE ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS UNDERWENT AN ACTUAL LIQUIDATION.

NEITHER THE COMPANY NOR ITS ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS.  THE ACTUAL AMOUNT OF CLAIMS OR EQUITY INTERESTS AGAINST THE DEBTORS OR ITS ESTATE COULD VARY SIGNIFICANTLY FROM THE ESTIMATES SET FORTH HEREIN, DEPENDING ON THE CLAIMS ASSERTED DURING THE PENDENCY OF THE HYPOTHETICAL CHAPTER 7 CASE. ACCORDINGLY, THE COMPANY'S ACTUAL LIQUIDATION VALUE IS SPECULATIVE IN NATURE AND COULD VARY MATERIALLY FROM THE ESTIMATES PROVIDED HEREIN.

## IX.  FINANCIAL PROJECTIONS AND VALUATION

The Company, with the assistance of its advisors, developed a set of financial projections (as summarized in **Exhibit H**, the "Financial Projections") for the purposes set forth below.  The Financial Projections reflect the Company's most recent estimates of the financial position, results of operations and cash flows after confirmation of the Plan, based upon the Company's assumptions and judgments as to future market and business conditions, expected future operating performance, and the occurrence or nonoccurrence of certain future events, all of which are subject to change.  Actual operating results and values may vary.

### A.  Financial Projections.

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor.  In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Company's management has, through the development of the Financial Projections, analyzed the Debtors' ability to meet its obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct its business subsequent to its emergence from these Chapter 11 Cases.  The Financial Projections were also prepared to assist those holders of Allowed Claims entitled to vote on the Plan in determining whether to accept or reject the Plan.

For the purpose of demonstrating Plan feasibility, the Company prepared the Financial Projections with the assistance of its professional advisors. The Financial Projections present, to the best of the Company's knowledge, the Reorganized Debtors' projected financial position, results of operations, and cash flows for the four fiscal years 2014 through 2018 and reflect the Debtors' assumptions and judgments as of April 2014.

THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THE COMPANY'S INDEPENDENT ACCOUNTANT HAS NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND,

ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE COMPANY DOES NOT INTEND TO, AND DISCLAIMS ANY OBLIGATION TO (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO HOLDERS OF NEW GENCO COMMON STOCK OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, (B) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC, OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THESE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE COMPANY'S MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE COMPANY'S CONTROL. THE DEBTOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO THE COMPANY'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER.

## 1.    <u>Scope of Financial Projections</u>.

The Financial Projections are based on the assumption that the Effective Date will occur on or about June 30, 2014. If the Effective Date is significantly delayed, additional expenses, including professional fees, may be incurred and operating results may be negatively impacted. It is also assumed that the Reorganized Debtors will conduct operations substantially similar to their current businesses.

The Financial Projections do not fully reflect the application of fresh start accounting, which, if required pursuant to U.S. GAAP, is not anticipated to have a material impact on the underlying economics of the Plan. Any formal fresh-start reporting adjustments that may be required in accordance with Statement of Position 90-7 Financial Reporting by Entities in Reorganization under the Bankruptcy Code, including any allocation of the Company's reorganization value to the Company's assets in accordance with the procedures specified in Financial Accounting Standards Board Statement 141, will be made after the Company emerges from bankruptcy.

A Chapter 11 proceeding is viewed as a significant threat to the continuing operations of the Company's international business. The Company has recently experienced dislocation in its business operations caused by the uncertainty of its financial restructuring

process and the potential of a bankruptcy filing and there is no assurance that the Company will be able to avert loss or reduction in business from its customers.  Furthermore, the drybulk industry has historically been and continues to be subject to significant volatility due to continuously evolving dynamics as they relate to the supply of vessels and demand for shipping services. The unpredictable nature of factors, such as weather, seasonal demand for resources and asymmetrical timing of vessel deliveries results in significant freight rate volatility and could cause actual results to differ.

The Financial Projections include the (i) Projected Consolidated Balance Sheet of Reorganized Genco, (ii) Projected Consolidated Cash Income Statement of Reorganized Genco, and (iii) Projected Consolidated Cash Flow Statement of Reorganized Genco.

The Financial Projections are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Factors that could cause actual results to differ materially include, but are not limited to: the ability of Reorganized Genco to operate the Reorganized Debtors' business consistent with its projections generally, including the ability to maintain or increase revenue and cash flow to satisfy its liquidity needs, service its indebtedness and finance the ongoing obligations of its business, and to manage its future operating expenses and make necessary capital expenditures; the ability of the Reorganized Debtors to comply with the covenants and conditions under its credit facilities and its ability to borrower thereunder; the loss or reduction in business from the Debtors' significant customers or the failure of the Debtors' significant customers to perform their obligations to the Debtors; the loss or material downtime of major suppliers; material declines in demand for drybulk shipping services or the rates in the drybulk shipping market; changes in production of, or demand for, iron ore, coal, steel, grain or other drybulk, either generally or in particular regions; greater than anticipated levels of vessel new building orders or lower than anticipated rates of vessel scrapping; changes in the typical seasonal variations in drybulk charter rates; changes in the itineraries of the Debtors' Vessels; increases in costs including, without limitation, crew wages, insurance, provisions, repairs and maintenance; changes in rules and regulations applicable to the drybulk industry including, without limitation, legislation adopted by international organizations such as the IMO and the European Union or by individual countries; actions by the courts, the United States Coast Guard, the U.S. Department of Justice or other governmental or regulatory authorities, and the results of the legal proceedings to which the Reorganized Debtors or any of its affiliated vessels may be subject; changes in the condition of the Debtors' vessels or applicable maintenance or regulatory standards (which may affect, among other things, the Debtors' anticipated drydocking or maintenance and repair costs); the Reorganized Debtors' ability to attract and maintain key executives, managers and employees; changes in general domestic and international political conditions; and adverse changes in foreign currency exchange rates affecting the Debtors' expenses. See also Section X ("Certain Risk Factors to be Considered," generally and in particular "Additional Factors to be Considered--Forward-Looking Statements are not Assured, and Actual Results May Vary").

## B.    Valuation of the Reorganized Debtors as of June 30, 2014.

The Debtors' financial advisor, Blackstone Advisory Partners LP ("**Blackstone**"), has estimated the post-confirmation enterprise value of the Reorganized Debtors to be approximately $1.48 billion.  In developing this estimate, Blackstone considered, among other

things, vessel appraisals and other valuation methodologies as well as the Reorganized Debtors' equity interests in Baltic Trading and Jinhui Shipping and the $100 million of cash invested through the Rights Offering. Given the approximately $250 million of debt projected to be on the balance sheet of the Reorganized Debtors, the implied equity value of the Reorganized Debtors is approximately $1.23 billion. The Reorganized Debtors will issue approximately 61.7 million primary shares of New Genco Common Stock valued at $20.00 per share (prior to dilution) in order to satisfy claims pursuant to the Plan.

Under the Plan, Holders of Equity Interests are entitled to receive New Genco Equity Warrants to purchase 6% of New Genco Common Stock (subject to dilution). The New Genco Equity Warrants, which are effective for a period of 7 years from the Effective Date, are exercisable at a cash-less strike price of a total equity value of $1,295 million. This strike prices equates to approximately $20.99 per share of New Genco Common Stock. The estimated value of the New Genco Equity Warrants is approximately $30 million to $36 million based on the Black-Scholes pricing model. After accounting for the New Genco Equity Warrants, the implied share price of New Genco Common Stock would range from approximately $19.42 to $19.52 before accounting for any subsequent dilution from the Management Incentive Program.

The foregoing estimates of the post-confirmation equity value of the Reorganized Debtors and the share price of New Genco Common Stock are based on a number of assumptions, including no material adverse changes in the spot rate market, no further ship arrests, the continuing employment of the Debtors' vessels, the continuing service revenue from Baltic Trading and MEP, the completion of the Rights Offering, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

The valuation assumptions herein are not a prediction or reflection of post-confirmation trading prices of the Reorganized Debtors' common stock. Such securities may trade at substantially lower or higher prices because of a number of factors. The trading prices of securities issued under a plan of reorganization are subject to many unforeseen circumstances and therefore cannot be predicted.

## X.  CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

A.    **Certain Bankruptcy Law Considerations**.

1.    **Parties in Interest May Object to the Debtors' Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a debtor may only place a claim or an equity interest in a particular class under a plan of reorganization only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believes that the classification of Claims and Equity Interests in the Plan complies with the Bankruptcy Code requirements because the Debtors classified Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.    **Contingencies Not to Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether or not the Bankruptcy Court enters an order subordinating certain Allowed Claims to other Allowed Claims. The occurrence of any and all such contingencies, which could affect the distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

3.    **The Debtors May Fail to Satisfy the Solicitation Requirements Requiring a Re-Solicitation**

Section 1126(b) of the Bankruptcy Code provides that the holder of a claim against, or equity interest in, a debtor who accepts or rejects a plan of reorganization before the commencement of a chapter 11 is deemed to have accepted or rejected such plan under the Bankruptcy Code so long as the solicitation of votes was made in accordance with applicable non-bankruptcy law governing the adequacy of disclosure in connection with such solicitation or, if such laws do not exist, such acceptance was solicited after disclosure of "adequate information" as defined in section 1125 of the Bankruptcy Code.

Additionally, Bankruptcy Rule 3018(b) states that a holder of a claim or equity interest who has accepted or rejected a plan before commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the Bankruptcy Court finds that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for solicitation of creditors or equity security holders to accept or reject the plan, or that the solicitation was not in compliance with section 1126(b) of the Bankruptcy Code.

To satisfy the requirements of Bankruptcy Code section 1126(b) and Bankruptcy Rule 3018(b), the Debtors will be delivering the solicitation materials to all holders of Claims as of the Voting Record in the Classes entitled to vote. Accordingly, the Debtors believe that the solicitation is proper under section 1125 of the Bankruptcy Code. The Debtors cannot be certain,

however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court, and if such approval is not obtained, the confirmation of the Plan could be denied.  If the Bankruptcy Court was to conclude that the Debtors did not satisfy the solicitation requirements, then the Debtors may seek to re-solicit votes to accept or reject the Plan or to solicit votes from one or more Classes that were not previously solicited.  The Debtors cannot provide any assurances that such a re-solicitation would be successful.  Re-solicitation could delay or jeopardize Confirmation of the Plan and result in termination of the Restructuring Support Agreement.  Non-confirmation of the Plan and loss of the enormous benefits under the Restructuring Support Agreement could result in protracted Chapter 11 Cases which could significantly and detrimentally impact relationships with vendors and major customers.

### 4.    Risk of Non-Confirmation, Non-Occurrence or Delay of the Plan.

Because the Plan is proposed as a prepackaged plan, the Debtors will begin soliciting votes before the commencement of chapter 11 cases., but the Debtors will continue to solicit votes from holders of Convertible Note claims after the commencement of chapter 11 cases  If votes are received from holders of Prepetition 2007 Facility Claims, Prepetition $253 Million Facility Claims and Prepetition $100 Million Facility Clams in number and amount sufficient to satisfy the requirements to confirm a chapter 11 plan, then the Debtors will commence chapter 11 cases, complete the solicitation of votes from holders of Convertible Note Claims and seek Confirmation of the Plan as soon as reasonably practicable.  If insufficient votes are received, then the Debtors may seek to accomplish an alternative to the Plan.  There can be no assurance that the terms of an alternative plan would be similar to or as favorable to the Holders of Allowed Claims or Allowed Equity Interests as those proposed by the Plan.  Additionally, if the Plan is not accepted prior to the Petition Date by the requisite number of votes from the holders of Prepetition 2007 Facility Claims, Prepetition $253 Million Claims and Prepetition $100 Million Claims, then the Debtors may commence chapter 11 cases without the benefit of a pre-negotiated plan of reorganization or could pursue other out-of-court restructuring alternatives.

For the Debtors to emerge successfully from the Chapter 11 Cases as viable entities, the Debtors, like any other chapter 11 debtor, must obtain approval of the Plan from its creditors and confirmation of the Plan through the Bankruptcy Court, and then successfully implement the Plan.  The foregoing process requires the Debtors to (i) meet certain statutory requirements with respect to the adequacy of this Disclosure Statement, (ii) solicit and obtain creditor acceptances of the Plan and (iii) fulfill other statutory conditions with respect to the confirmation of the Plan.

Although the Debtors believe that the Plan satisfies all of the requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes to accept the Plan, as modified.  Additionally, by its terms, the Plan will not become effective unless, among other things, the conditions precedent described in Section VII.D of this Disclosure Statement have been satisfied or waived in accordance with Article X.B of the Plan.

5.    **Risk of Non-Occurrence of the Effective Date.**

Although the milestones require that the Effective Date occur by the later of ten (10) days following the Confirmation Date, completion of the Rights Offering, or notice from the respective lenders that the conditions to the closing of the Amended and Restated Term Loan Facilities have been satisfied or waived, there can be no assurance as to such timing or that the conditions to the Effective Date contained in the Plan will ever occur.   The Restructuring Support Agreement also provides for an outside Effective Date of August 1, 2014.   The impact that a prolonging of the Chapter 11 Cases may have on the Company's operations cannot be accurately predicted or quantified.  The continuation of the Chapter 11 Cases, particularly if the Plan is not approved, confirmed, or implemented within the time frame currently contemplated, could adversely affect operations and relationships between the Company and its customers and charterers, suppliers, service providers and creditors; result in increased professional fees and similar expenses; and threaten the Debtors' ability to obtain the Backstop Investment.  Failure to confirm the Plan could further weaken the Company's liquidity position, which could jeopardize the Company's exit from chapter 11.

6.    **The Debtors' Cash Collateral May Be Insufficient to Fund the Debtors' Business Operations, or May Be Unavailable if the Debtors Do Not Comply with its Terms**.

Although the Debtors project that they will have sufficient liquidity to operate its businesses through the Effective Date, there can be no assurance that the revenue generated by the Company's business operations and the cash made available to the Debtors under the cash collateral order will be sufficient to fund the Company's operations.  The Company has not sought financing in the form of a debtor in possession credit facility or DIP facility.  In the event that revenue flows are not sufficient to meet the Company's liquidity requirements, the Company may be required to seek additional financing.  There can be no assurance that such additional financing would be available or, if available, offered on terms that are acceptable to the Company or the Bankruptcy Court.  If, for one or more reasons, the Company is unable to obtain such additional financing, the Company's business and assets may be subject to liquidation under chapter 7 of the Bankruptcy Code and the Company may cease to continue as going concern.

The cash collateral order provides for affirmative and negative covenants applicable to the Company, including negative covenants restricting the ability of Genco and its subsidiaries to incur additional indebtedness, grant liens, as well as financial covenants applicable to the Debtors including compliance with a budget.  There can be no assurance that the Company will be able to comply with these covenants and meet its obligations as they become due or to comply with the other terms and conditions of the cash collateral order.

Any Event of Default under the cash collateral could result in a default of the Company's obligations under the Restructuring Support Agreement which could imperil the Company's ability to confirm the Plan.

7.    **The Backstop Investment May Not Be Obtained and the Equity Commitment Agreement May Be Terminated**.

The Equity Commitment Agreement is subject to specified conditions. For example, the Equity Commitment Agreement may be terminated by the Backstop Parties if a material adverse event occurs during the term of the Equity Commitment Agreement that would have an impact on the Company's post-Effective Date business. Since the Plan is predicated on the Debtors' receipt of the Rights Offering Proceeds, the Debtors will not be able to consummate the Plan in its current form if the Rights Offering is not fully subscribed and the Equity Commitment Agreement terminated.

8.    **Impact of the Chapter 11 Case on the Debtors**.

The Chapter 11 Cases may affect the Debtors' relationships with, and their ability to negotiate favorable terms with, creditors, customers, charterers, vendors, employees, and other personnel and counterparties. While the Debtors expect to continue normal operations, public perception of its continued viability may affect, among other things, the desire of new and existing charterers and customers to enter into or continue its charter or other agreements or arrangements with the Debtors. The failure to maintain any of these important relationships could adversely affect the Debtors' business, financial condition and results of operations. Because of the public disclosure of the Chapter 11 Cases and concerns foreign vendors may have about the liquidity, the Debtors' ability to maintain normal credit terms with vendors may be impaired. Also, the Debtors' transactions that are outside of the ordinary course of business are generally subject to the approval of the Bankruptcy Court, which may limit the Debtors' ability to respond on a timely basis to certain events or take advantage of certain opportunities. As a result, the effect that the Chapter 11 Cases will have on the Debtors' businesses, financial conditions and results of operations cannot be accurately predicted or quantified at this time. Additionally, the terms of the cash collateral order limit our ability to undertake certain business initiatives. These limitations include, among other things, our ability to: (a) sell assets outside the normal course of business; (b) consolidate, merge, sell or otherwise dispose of all or substantially all of our assets; (c) grant liens; and (d) finance our operations, investments or other capital needs or to engage in other business activities that would be in our interests.

9.    **The Plan is Based Upon Assumptions the Debtors Developed Which May Prove Incorrect and Could Render the Plan Unsuccessful**

The Plan affects both the Debtors' capital structure and the ownership, structure and operation of its businesses and reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including but not limited to (i) the ability to implement the substantial changes to the capital structure; (ii) the ability to obtain adequate liquidity and financing sources; (iii) the ability to maintain customers' confidence in our viability as a continuing entity and to attract and retain sufficient business from them; (iv) the ability to retain key employees, and (v) the overall strength and stability of general economic conditions of the financial and shipping industries, both in the United States and in

global markets. The failure of any of these factors could materially adversely affect the successful reorganization of our businesses.

In addition, the Plan relies upon financial projections, including with respect to revenues, EBITDA, debt service and cash flow.  Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate. In our case, the forecasts are even more speculative than normal, because they involve fundamental changes in the nature of our capital structure. Accordingly, the Company expects that its actual financial condition and results of operations will differ, perhaps materially, from what was anticipated.   Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization we may implement will occur or, even if they do occur, that they will have the anticipated effects on us and our subsidiaries or our businesses or operations.   The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of any plan of reorganization.

**B.**      **Certain Risks Related to the Amended and Restated Term Loan Facilities**.

**1.**      **Ability to Maintain Sufficient Liquidity**.

The Company is expected to incur up to an aggregate of approximately $249.3 million in indebtedness under the Amended and Restated Term Loan Facilities as of the Effective Date (prior to the paydown on the Effective Date of any missed amortization payments between the Petition Date and the Effective Date under the Prepetition $253 Million Facility and Prepetition $100 Million Facility) and will have to pay fees of approximately $2.4 million to the lenders under the Amended and Restated Term Loan Facilities.  The Company's substantial indebtedness and interest expense under the Amended and Restated Term Loan Facilities could have important consequences, including limiting the Company's ability to use a substantial portion of its cash flow from operations in other areas of its business, including for working capital, capital expenditures and other general business activities, because a substantial portion of these funds will be dedicated to servicing its debt.  The Company's ability to maintain adequate liquidity could depend on its ability to successfully implement the Plan, the successful operation of its business, the appropriate management of operating expenses and capital spending, and its ability to complete asset sales on favorable terms.

**2.**      **Restrictive Covenants in the Amended and Restated Term Loan Facilities**.

The negative and financial covenants in the Amended and Restated Term Loan Facilities may adversely affect the Reorganized Debtors' ability to finance future operations or capital needs or to engage in new business activities.  The Amended and Restated Term Loan Facilities will restrict the Reorganized Debtors' ability to, among other things, incur additional debt and provide additional guarantees, pay dividends or make other restricted payments, create or permit certain liens, sell vessels or other assets, make certain investments, engage in certain transactions with affiliates, and consolidate or merge with or into other companies or transfer all or substantially all of the Reorganized Debtors' assets.

In addition, the Amended and Restated Term Loan Facilities, after an approximately one-year financial covenant holiday period, will likely require the Reorganized Debtors to maintain (1) certain financial ratios, (2) minimum liquidity, and (3) a set level of consolidated net worth with respect to its fleet. During this financial covenant holiday, no dividends by the Reorganized Debtors will be payable. As a result of these financial covenants, the Reorganized Debtors will likely be limited in the manner in which they can conduct their business, and may be unable to engage in favorable business activities or finance future operations or capital needs. Accordingly, these restrictions may limit the Reorganized Debtors' ability to successfully operate their businesses.

There can be no assurance that the Reorganized Debtors will satisfy the affirmative, negative and financial covenants likely to be included in the Amended and Restated Term Loan Facilities. A breach of any of the covenants in, or the Reorganized Debtors' inability to maintain the required financial ratios under, the Amended and Restated Term Loan Facilities would prevent the Reorganized Debtors from borrowing additional money under the Amended and Restated Term Loan Facilities, to the extent such ability exists, and could result in a default under the Amended and Restated Term Loan Facilities. If a default occurred under any of the Amended and Restated Term Loan Facilities and continued beyond any grace or cure period with respect to such default set forth therein, the lenders could elect to declare that debt, together with accrued interest and other fees, to be immediately due and payable and proceed against the collateral securing that debt. Moreover, if the lenders under any of the Amended and Restated Term Loan Facilities were to accelerate the debt outstanding under the applicable facility, it could result in an event of default under the Reorganized Debtors' other debt obligations that may exist at that time, including the other Amended and Restated Term Loan Facilities, and if all or any part of the Reorganized Debtors' indebtedness were to be accelerated, the Reorganized Debtors may not have, or may not be able to obtain, sufficient funds available to repay it or to repay their other indebtedness.

C.      **Certain Risks Related to the Debtors' Businesses and Operations**.

1.      **The Current Global Economic Downturn May Continue to Negatively Impact the Debtors' Businesses.**

In the current global economy, operating businesses have been facing tight credit, weak demand for goods and services, deteriorating international liquidity conditions, and depressed markets. Lower demand for drybulk cargoes has led to decreased demand for drybulk vessels, which combined with increased supply of drybulk vessels has created downward pressure on charter rates. General market volatility has endured as a result of uncertainty about sovereign debt and government austerity measures and speculation about the growth rate of the Chinese economy. The economies of the United States, the European Union and other parts of the world continue to experience relatively slow growth or remain in recession and exhibit weak economic trends. If the current global economic environment persists or worsens, we may be negatively affected in the following ways, amongst others: (a) employment of vessels at lower or less favorable charter rates; (b) ability to operate vessels profitably; (c) continued depression of vessel market values despite recent increases; and (d) charterers failure to meet obligations under time charter agreements; and the (e) value of Jinhui investment could decline and a sale of the stock could result in impairment losses.

95

2.    **Failure to Successfully Employ Vessels**.

The Company believes that it will succeed in implementing and executing its business plan and financial restructuring.  However, there are risks that the goals of the going-forward business plan and financial restructuring strategy will not be achieved.  In particular, the Company will seek to deploy its vessels between fixed-time charters and spot-market related time charters to capture the rate fluctuations.  While fixed-time charters generally provide stable revenues, they also limit the portion of the Company's fleet available for spot-market related time charters during an upswing in charter rates, when spot-market time charters may generate higher revenues.  Charter rates are volatile and fluctuate dramatically based primarily on the worldwide supply of drybulk vessels available in the market for the transportation for the worldwide demand for drybulk shipping.  To the extent that the Company's Vessels trade in the spot charter market, we may experience fluctuations in revenue, cash flow and net income.  The Company can provide no assurance that future charterhire rates will enable it to operate its Vessels profitably.  In addition, standard time charter contracts with customers specify certain performance parameters, which if not met can result in customer claims.  Such claims may have a material adverse effect on the Company's business, results of operations, cash flows, financial condition and ability to pay dividends.

3.    **Reliance on a Limited Number of Charterers.**

The Company currently relies upon ten (10) charterers for a large part of its revenues and believes that it will continue to do so during and after the Chapter 11 Cases.  If the Company loses any of these charterers, or if any of these charterers significantly reduces its use of the Company's services or is unable to make charter payments, the Company's operating results, cash flows and profitability could be materially adversely affected.

4.    **Reliance on Third Party Managers.**

The Company contracted the technical management of its fleet, including crewing, maintenance and repair services, to third-party technical management companies.  The failure of these technical managers to perform their obligations could materially and adversely affect the Company's business, results of operations, cash flows, financial condition and ability to pay dividends.  Although the Company may have rights against the third-party managers if it defaults on its obligations to the Company, the holders of Claims and Equity Interests will share that recourse only indirectly to the extent that the Company recovers funds.

5.    **Increased Operating Costs Could Adversely Affect Cash Flows and Financial Condition.**

The Company's vessel operating expenses include the costs of crewing and insurance.  In addition, to the extent the Company enters the spot charter market, it needs to include the cost of bunkers as part of voyage expenses.  The price of bunker fuel may increase in the future.  If vessels suffer damage, they may need to be repaired at a drydocking facility.  The costs of drydock repairs are unpredictable and can be substantial.  Increases in any of these costs could have a material adverse effect on our business, results of operations, cash flows, financial condition and ability to pay dividends.

96

6.      **Highly Competitive Market for Drybulk Transportation Services and Ability to Effectively Compete**.

The Company's Vessels are employed in a highly competitive market that is capital intensive and highly fragmented.  Competition arises primarily from other vessel owners, some of whom have substantially greater resources than the Company.  Competition for the transportation of drybulk cargoes can be intense and depends on price, location, size, age, condition and the acceptability of the vessel and its managers to the charterers.  Due in part to the highly fragmented market, competitors with greater resources could enter and operate larger fleets through consolidations or acquisitions that may be able to offer better prices and fleets than the Company may be able to offer.

7.      **Potentially Adverse Impact of Exchange Rate Fluctuations**.

The Debtors generate all of their revenues in U.S. Dollars, but incur a significant portion of expenses, particularly crew and maintenance costs, in currencies other than the U.S. Dollar.  This difference could lead to fluctuations in net income due to changes in the value of the U.S. Dollar relative to other currencies, in particular the Euro.  A decline in the value of the U.S. Dollar could lead to higher expenses payable by the Debtors.

8.      **Inadequate Liquidity Could Materially Adversely Affect the Company's Future Business Operations.**

Given the current business environment, the Company's liquidity needs could be significantly higher than currently anticipated.  The Company's ability to maintain adequate liquidity through 2014 and beyond could depend on its ability to successfully implement the Plan or otherwise restructure its indebtedness, successful operation of its business, appropriate management of operating expenses and capital spending and its ability to complete asset sales on favorable terms if necessary.  The Company's expected liquidity needs are highly sensitive to changes in each of these and other factors.

9.      **Potential for Vessel Arrests.**

Crew members, suppliers of goods and services to a vessel, shippers of cargo and other parties may be entitled to a maritime lien against a vessel for unsatisfied debts, claims or damages. In many jurisdictions, a maritime lienholder may enforce its lien by "arresting" or "attaching" a vessel through foreclosure proceedings.  This occurred on March 28, 2014 when the Genco Auvergne was arrested due to a disputed claim with the charterer of one of our other vessels, namely the Genco Ardennes.  The vessel has since been released from its arrest and a cash collateralized bank guarantee the Company arranged for will remain in an escrow account until the arbitration related to this case is completed.  The arrest or attachment of one or more of our vessels could result in a significant loss of earnings for the related off-hire period and could impact future cash flow if the Company is required to post-additional bank guarantees or bonds. In addition, in jurisdictions where the "sister ship" theory of liability applies, a claimant may arrest the vessel which is subject to the claimant's maritime lien and any "associated" vessel, which is any vessel owned or controlled by the same owner. In countries with "sister ship" liability laws, claims might be asserted against us or any of our vessels for liabilities of other

vessels that we own.

### 10.    Operational Hazards.

The Company's Vessels and its cargoes are at risk of being damaged or lost because of events such as mechanical failure, collision, human error, war, terrorism, piracy, property loss, cargo loss or damage and business interruption due to political circumstances in foreign countries, hostilities and labor strikes.   Any of these events may result in loss of revenues, increased costs and decreased cash flows.  In addition, the operation of any vessel is subject to the inherent possibility of marine disaster, including oil spills and other environmental mishaps, and the liabilities arising from owning and operating vessels in international trade.  The Reorganized Debtors will carry insurance to protect against most of the accident-related risks involved in the conduct of their business.  However, the Reorganized Debtors cannot provide assurances that they will be adequately insured against all risks or that they will be able to obtain adequate coverage for the vessels in the future.  The insurers may not pay particular claims. Further, the Debtors cannot assure that their insurance policies will cover all losses that incurred, or disputes over insurance claims that arise with their insurance carriers.  Any claims covered by insurance would be subject to deductibles, and since it is possible that a large number of claims may be brought, the aggregate amount of these deductibles could be material, which may increase costs or lower revenue.

Furthermore, the total loss of any of the Company's vessels could harm the Company's reputation as a safe and reliable vessel owner and operator.  If the Company is unable to adequately maintain or safeguard its vessels, it may be unable to prevent any such damage, costs or loss, which could negatively impact its business, financial condition, results of operations and available cash.

The Company's Vessels are manned by masters, officers and crews that are employed by third parties.  If not resolved in a timely and cost-effective manner, industrial action or other labor unrest could prevent or hinder our operations from being carried out normally and could have a material adverse effect on our business, results of operations, cash flows, and financial condition.

### 11.    Laws and Regulation.

The shipping industry in general, and the Company's business and the operation of its Vessels in particular, are subject to international conventions, national, state and local laws, and national and international regulations in force in international waters and the jurisdictions in which the Vessels operate, as well as in the country or countries in which the Vessels are registered, relating to safety and health and environmental protection including the storage, handling, emission, transportation and discharge of hazardous and non-hazardous materials, and the remediation of contamination and liability for damage to natural resources.  Compliance with such laws, regulations and other requirements entails significant expense, including vessel modifications and implementation of certain operating procedures.

A variety of governmental and private entities subject the Vessels to both scheduled and unscheduled inspections.   These entities include the local port authorities,

98

(applicable national authorities such as the United States Coast Guard and harbor masters), classification societies, flag state administrations (countries of registry) and charterers. Some of these entities require the Company to obtain permits, licenses, certificates and other authorizations for the operation of its Vessels. Its failure to maintain necessary permits, licenses, certificates or authorizations could require it to incur substantial costs or temporarily suspend the operation of one or more of its Vessels.

In recent periods, heightened levels of environmental and operational safety concerns among insurance underwriters, regulators and charterers have led to greater inspection and safety requirements on all vessels and may accelerate the scrapping of older vessels throughout the drybulk shipping industry. Increasing environmental concerns have created a demand for vessels that conform to the stricter environmental standards. The Company believes that the operation of its Vessels is in substantial compliance with applicable environmental laws and regulations and that its Vessels have all material permits, licenses, certificates or other authorizations necessary for the conduct of our operations. However, because such laws and regulations are frequently changed and may impose increasingly stricter requirements, the Company cannot predict the ultimate cost of complying with these requirements, or the impact of these requirements on the resale value or useful lives of its Vessels. In addition, a future serious marine incident, such as one comparable to the 2010 Deepwater Horizon oil spill, that results in significant oil pollution or otherwise causes significant adverse environmental impact, could result in additional legislation or regulation that could negatively affect our profitability.

Additionally, the Company's Vessels undergo annual surveys, intermediate surveys and special surveys. The Company places its Vessel's on special survey cycles for hull inspection and continuous survey cycles for machinery inspection. Every Vessel is also required to be drydocked every five years during the special survey. For Vessels that are less than 15 years old, intermediate surveys can be performed in the form of in-water examination of its underwater parts every two to three years. For Vessels that are older than 15 years, the Vessel is required to be drydocked during the intermediate survey as well as the special survey. If any Vessel does not maintain its class or fails any annual, intermediate or special survey, the Vessel will be unable to trade between ports and will be unemployable and could be in violation of certain covenants in the Company's credit facilities, which could have a material adverse effect on the business, results of operations, cash flows, and financial condition.

## 12.     <u>Dependence on Key Personnel and Ability to Attract and Retain Skilled Employees</u>.

The loss of the services of any of the Company's key personnel (including, among others, John C. Wobensmith, the Company's Chief Financial Offer, and Peter Georgiopoulos, the Chairman of the Board of Directors of Genco since 2001) or the Company's inability to successfully attract and retain qualified personnel in the future could have a material adverse effect on the Company's business, financial condition and operating results. In particular, during the pendency of the Chapter 11 Cases, the Company may experience increased levels of employee attrition, and its employees are facing considerable distraction and uncertainty. The ability of the Company to engage, motivate and retain key employees or take other measures intended to motivate and incentivize key employees to remain through the pendency of the Chapter 11 Cases is limited during the Chapter 11 Cases by restrictions on implementation of

99

retention programs. The loss of services of members of the Company's senior management team could impair its ability to execute its strategy and implement operational initiatives, thereby having a material adverse effect on the Company's financial condition and results of operations. The restructuring has consumed and will continue to consume a substantial portion of management's time and attention leaving them with less time to devote to the business operations. This diversion may materially adversely affect the conduct of the Company's business and, as a result, on the Company's financial condition and results of operations, particularly if the Chapter 11 Cases are protracted.

### 13.   **Potential Termination of Baltic Trading Management Agreement**

The Company is party to a Management Agreement with Baltic Trading pursuant to which it provides Baltic Trading with certain commercial, technical, administrative, and strategic services. Baltic Trading is entitled to terminate the Management Agreement without payment of any termination fee upon the occurrence of certain events constituting a change of control of the Company. Some of these events may occur as a result of the transactions contemplated under the Restructuring Support Agreement and the Plan, including the consummation of any transaction that results in (i) any "person" (as such term is used in Section 13(d)(3) of the Exchange Act), other than Peter Georgiopoulos or any of his affiliates, becoming the beneficial owner of 25% of the Company's voting securities or (ii) the Company's stock ceasing to be traded on the New York Stock Exchange or any other internationally recognized stock exchange. If Baltic Trading were so to terminate the Management Agreement, it could result in a significant loss of earnings for the Company.

### 14.   **Failure to Qualify Under IRC Section 883**.

If Reorganized Genco does not qualify for an exemption pursuant to Section 883 ("**Section 883**") of the Internal Revenue Code of 1986, as amended (the "Tax Code"), then Reorganized Genco will be subject to United States federal income tax on its United States-source shipping income. If Reorganized Genco is subject to such tax, its results of operations and cash flows would be reduced by the amount of such tax.

A foreign corporation will be exempt from United States federal income taxation on its U.S.-source shipping income under Section 883 if, *inter alia*:

(a) its stock is "primarily and regularly traded on an established securities market" in a qualified foreign country or in the United States (the "**Publicly Traded Test**");

(b) more than 50% of the value of its stock is beneficially owned, directly or indirectly, by qualified shareholders, which include individuals who are "residents" of a qualified foreign country (the "**50% Ownership Test**"); or

(c) it is a "controlled foreign corporation", or CFC, and it satisfies certain other requirements (the "**CFC Test**").

Genco believes that, historically, it has qualified for an exemption pursuant to Section 883 based on satisfaction of the Publicly Traded Test. However, following the Effective Date, it is not entirely clear whether Reorganized Genco will satisfy the Publicly Traded Test,

because, among other things, there is uncertainty as to whether its shares will be traded on an established securities market and whether such shares will satisfy the regularly traded requirement.  It is also unclear whether Reorganized Genco will be able to satisfy either the 50% Ownership Test or the CFC Test.

If Reorganized Genco does not qualify for the Section 883 exemption, its gross shipping income derived from U.S. sources would be subject to a 4% tax, without allowance for deductions.  For more information, please refer to Sections XIII.B.1. Exemption of Operating Income from United States Federal Income Taxation and XIII.B.2. Taxation in the Absence of Section 883 Exemption.

## 15.    Treatment by United States Tax Authorities as a "Passive Foreign Investment Company."

A foreign corporation generally will be treated as a "passive foreign investment company" (a "**PFIC**") for United States federal income tax purposes if either (i) at least 75% of its gross income for any taxable year consists of passive income or (ii) at least 50% of its assets (averaged over the year and generally determined based upon either value or tax basis depending on the application of certain tests) produce or are held for the production of passive income. United States shareholders of a PFIC are subject to a disadvantageous United States federal income tax regime with respect to distributions they receive from the PFIC and gain, if any, they derive from the sale or other disposition of its stock in the PFIC.

For purposes of these tests, income derived from the performance of services does not constitute passive income.  By contrast, rental income, other than active rental income, would generally constitute passive income.  Based on Genco's past and anticipated future operations, the Debtors do not believe that Genco has been a PFIC or that Reorganized Genco will be a PFIC with respect to future taxable years.  In this regard, Genco has treated, and Reorganized Genco will treat, its income from the charter of vessels as services income, rather than rental income.

There is no direct legal authority under the PFIC rules addressing Reorganized Genco's planned method of operation.  Moreover, it should be noted that there is authority which characterizes charter income as rental income rather than services income for other tax purposes. Accordingly, no assurance can be given that the IRS or a court of law will accept Reorganized Genco's position, and there is a risk that the IRS or a court of law could determine that Reorganized Genco is a PFIC.  Moreover, because (i) there are uncertainties in the application of the PFIC rules, (ii) the PFIC test is an annual test, and (iii) although Reorganized Genco intends to manage its business so as to avoid PFIC status to the extent consistent with its other business goals, there could be changes in the nature and extent of its operations in future years, there can be no assurance that Reorganized Genco will not become a PFIC in any taxable year.

If Reorganized Genco were to be treated as a PFIC for any taxable year (and regardless of whether Reorganized Genco remains a PFIC for subsequent taxable years), Reorganized Genco's United States shareholders would face adverse United States tax consequences.  These adverse tax consequences could negatively impact Reorganized Genco's ability to issue additional equity in order to raise the capital necessary for its business operations.  Additionally, treatment of Reorganized Genco as a PFIC may negatively affect

shareholders' ability to sell stock in Reorganized Genco. For more information, please refer to Section XIII.E.4. Passive Foreign Investment Company Status.

16.     **Treatment by United States Tax Authorities as a "Controlled Foreign Corporation."**

If more than 50% of the Reorganized Genco common stock is owned, directly, indirectly or constructively, by United States holders, each of whom own, after applying attribution rules, 10% or more of the total combined voting power of all classes of the Reorganized Genco common stock (a "**10% U.S. Holder**"), Reorganized Genco would be treated as a "controlled foreign corporation" (a "**CFC**").  This classification would result in the application of many complex rules, including the required inclusion in income by 10% U.S. Holders of their pro rata share of any "Subpart F income" and any investments in "U.S. property" (each as defined by the Tax Code) of Reorganized Genco.  In addition, under Section 1248 of the Tax Code, if Reorganized Genco were to be considered a CFC at any time during the five-year period ending with the sale or exchange of Reorganized Genco common stock by a 10% U.S. Holder, gain from such sale or exchange would generally be treated as dividend income to the extent of Reorganized Genco's earnings and profits attributable to the shares sold or exchanged.  If Reorganized Genco were to become a CFC, the PFIC rules discussed above would generally not apply with regard to any 10% U.S. Holder.  For more information, please refer to Section XIII.E.5, Controlled Foreign Corporation Status.

17.     **Discharge of Prepetition Claims and Related Legal Proceedings**.

The Company may be subject to Claims in various legal proceedings and may become subject to other legal proceedings in the future.  Although any such Claims will be generally stayed while the Chapter 11 Case is pending, the Company may not be successful in ultimately discharging or satisfying such Claims.  The ultimate outcome of each of these matters, including the Company's ability to have these matters satisfied and discharged in the bankruptcy proceeding, cannot presently be determined, nor can the liability that may potentially result from a negative outcome be reasonably estimated presently for every case.  The liability the Company may ultimately incur with respect to any one of these matters in the event of a negative outcome may be in excess of amounts currently accrued with respect to such matters and, as a result, these matters may potentially be material to the Company's business, financial condition, and/or results of operations.

D.     **Certain Risks Relating to the Shares of New Genco Common Stock and the New Genco Equity Warrants Under the Plan**.

1.     **Significant Holders**.

After the Effective Date, the Prepetition 2007 Facility Lenders will receive up to 81.1% of the New Genco Common Stock and 80% of the Rights Offering Shares under the Plan (subject to dilution by the New Genco Equity Warrants and the New Genco MIP Warrants (as described in the Plan).  If such holders of New Genco Common Stock were to act as a group, such holders would be in a position to control the outcome of all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders.  This

concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Genco Equity Warrants and New Genco Common Stock.

### 2.    Restrictions on Transfer of New Genco Common Stock.

The recipients of the Backstop Shares (with respect to the Backstop Shares only) and recipients of other securities issued under the Plan to holders who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code will be restricted in their ability to transfer or sell their securities.  In addition, securities issued under the Plan to affiliates of Reorganized Genco will be subject to restrictions on resale.  These persons will be permitted to transfer or sell such securities only pursuant to the provisions of Rule 144 under the Securities Act, if available, or another available exemption from the registration requirements of the Securities Act.  These restrictions may adversely impact the value of the shares of New Genco Common Stock and make it more difficult for such shareholders to dispose of their shares, or to realize value on the shares, at a time when they may wish to do so.  See Section XI "Securities Law Matters" for additional information regarding restrictions on resales of the New Genco Common Stock.

### 3.    Lack of Established Market for New Genco Common Stock and the New Genco Equity Warrants.

A liquid trading market for the New Genco Common Stock and the New Genco Equity Warrants issued under the Plan does not exist. The future liquidity of the trading markets for New Genco Common Stock and the New Genco Equity Warrants will depend, among other things, upon the number of holders of such securities and whether such securities become listed for trading on an exchange or trading system at some future time.  If at any time during the one-year period immediately following the Effective Date, Reorganized Genco meets the applicable listing standards, then Reorganized Genco will use commercially reasonable efforts to cause the New Genco Common Stock to be listed on the New York Stock Exchange or the NASDAQ Stock Market, as promptly as reasonably practicable.   However, Reorganized Genco is under no obligation to list the New Genco Equity Warrants on any securities exchange and has no current intention to do so.  While a liquid trading market may develop in the future for the New Genco Common Stock, this is unlikely to be the case with respect to the new Genco Equity Warrants.

### 4.    Historical Financial Information of the Debtors May Not Be Comparable to the Financial Information of the Reorganized Debtors

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 5.    The Projections Set forth in this Disclosure Statement May Not Be Achieved.

The Projections cover the operations of the Reorganized Debtors through the 2017. The Projections are based on numerous assumptions that are an integral part thereof,

including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions, competition, adequate financing, absence of material claims, the ability to make necessary capital expenditures, the ability to establish strength in new markets and to maintain, improve and strengthen existing markets, customer purchasing trends and preferences, the ability to increase gross margins and control future operating expenses and other matters, many of which are beyond the control of the Reorganized Debtors. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the operations of the Reorganized Debtors. These variations may be material and adverse. Because the actual results achieved throughout the periods covered by the Projections will vary from the projected results, the Projections should not be relied upon as a guaranty, representation, or other assurance of the actual results that will occur.

6.  **Incorporation under the Laws of the Republic of the Marshall Islands and Enforcement of United States Judgments by Investors.**

Reorganized Genco will be incorporated in the Republic of the Marshall Islands and most of its subsidiaries will be organized in the Republic of the Marshall Islands. The corporate affairs of Reorganized Genco will be governed by its amended and restated articles of incorporation and by-laws (as described herein) and by the Republic of the Marshall Islands Business Corporations Act (the "**BCA**"). The provisions of the BCA resemble provisions of the corporation laws of a number of states in the United States. However, there have been few judicial cases in the Republic of the Marshall Islands interpreting the BCA. For example, the rights and fiduciary responsibilities of directors under the laws of the Republic of the Marshall Islands are not as clearly established as the rights and fiduciary responsibilities of directors under statutes or judicial precedent in existence in certain United States jurisdictions. Although the BCA does specifically incorporate the non-statutory law, or judicial case law, of the State of Delaware and other states with substantially similar legislative provisions, the shareholders of Reorganized Genco may have more difficulty in protecting their interests in the face of actions by management, directors or controlling shareholders than would shareholders of a corporation incorporated in a United States jurisdiction.

In addition, substantially all of Reorganized Genco's assets and those of its subsidiaries are located outside the United States. As a result, it may be difficult or impossible for United States investors to serve process within the United States upon Reorganized Genco or to enforce judgment upon Reorganized Genco for civil liabilities in United States courts. It should not be assumed that courts in the countries in which the Debtors are incorporated or where their assets are located (i) would enforce judgments of United States courts obtained in actions against the Debtor based upon the civil liability provisions of applicable United States federal and state securities laws or (ii) would enforce, in original actions, liabilities against the Debtors based upon these laws.

E.    **Additional Factors to Be Considered**.

1.    **The Debtors Have No Duty to Update**.

The statements contained in this Disclosure Statement are made by the Company as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Company has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

2.    **No Representations Outside this Disclosure Statement Are Authorized.**

No representations concerning or related to the Company, the Chapter 11 Case, once commenced, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

3.    **Forward-Looking Statements Are Not Assured, and Actual Results May Vary**.

This Disclosure Statement contains forward-looking statements. These forward-looking statements are based on the current expectations and observations of the Company's management, and include factors that could cause actual results to differ materially such as: those factors described in Section VII.A.1 of this Disclosure Statement; the Company's ability to meet current operating needs, including its ability to maintain contracts that are critical to its operation, to obtain and maintain acceptable terms with its vendors, customers and service providers and to retain key executives, managers and employees; the Company's ability to obtain Bankruptcy Court approval with respect to motions in the Chapter 11 Cases, once commenced; the effects of the Bankruptcy Court rulings in the Chapter 11 Cases and the outcome of the case in general; the length of time the Company will operate under the Chapter 11 Cases; the pursuit by the Company's various creditors, equity holders and other constituents of its interests in the Chapter 11 Cases; risks associated with third party motions in the Chapter 11 Cases, which may interfere with the ability to consummate the Plan; the adverse effects of the Chapter 11 proceedings on the Company's liquidity or results of operations generally; the increased administrative and restructuring costs related to the Chapter 11 Cases; the Company's ability to maintain adequate liquidity to fund operations during the Chapter 11 Cases and thereafter; the sufficiency of the  "exit" financing contemplated by the Plan; the Company's ability in the future to arrange and consummate financing or sale transactions or to access capital; the effects of changes in the Company's credit ratings; the timing and realization of the recoveries of assets and the payments of Claims and the amount of expenses projected to recognize such recoveries and reconcile such Claims; the occurrence of any event, change or other circumstance that could give rise to the termination of the Restructuring Support Agreement or the Equity Commitment Agreement; and the other factors described in this Section IX.

4.      **No Legal or Tax Advice Is Provided to You by This Disclosure Statement**.

The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each holder of Claims against the Company should consult his, her or its own legal counsel and accountants as to legal, tax and other matters concerning such holder's Claims.  This Disclosure Statement is not legal advice to you and may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

5.      **Other Factors**.

See "Risk Factors" in Genco's Annual Report on Form 10-K for the year ended December 31, 2013 for a list of other risk factors that could have a significant impact on the Company's operating performance.

## XI.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) an alternative plan of reorganization or a plan of liquidation.

A.      **Alternative Plan of Reorganization or Plan of Liquidation**.

The Bankruptcy Court could confirm a plan different from the Plan.  While the Plan provides for the reorganization of the Company's business as a going concern, a different plan might involve either a reorganization and continuation of the Company's business or, in the alternative, a liquidation of the Company's assets.   The Company believes that any reorganization of its business would require a substantial investment of capital by a third party in an amount at least as large as the Backstop Investment and the Prepetition 2007 Facility.  In the event that the Plan is not confirmed, there is no guaranty that the Company will be able to obtain any new investment at all, let alone one on terms as favorable to its stakeholders as the terms set forth in the Restructuring Support Agreement for the elimination of approximately $1.2 billion of secured debt, new liquidity under the Equity Commitment Agreement, and the relief provided under the Amended and Restated Term Loan Facilities.  The Company cannot impose (e.g., cram down) the significant conversion of secured debt into new equity upon the 2007 Facility Lenders and, as such, any alternative plan would need to either (i) provide for treatment acceptable to the 2007 Facility Lenders or (ii) repayment in full of the Allowed Secured Claim under the 2007 Credit Agreement.   As an alternative to a going concern reorganization, liquidation of the Company's assets would, in the Company's view, result in the termination of all of its employees and commercial agreements, and would be unlikely to provide returns equal or greater to the returns provided by the Plan.

The Company believes that any alternative to the Plan would provide far less certainty and could involve a larger Claims pool, diminished recoveries, significant delay, and larger administrative costs.  The Company believes that the Plan, as described herein, enables creditors to realize the highest and best value under the circumstances as compared to any foreseeable alternative.

106

**B.**    <u>**Liquidation Under Chapter 7.**</u>

If no plan is confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Equity Interests is set forth in the Liquidation Analysis attached as Exhibit I to this Disclosure Statement.  For the reasons above, the Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in smaller distributions being made to creditors than those provided for in the Plan.

## XII.  SECURITIES LAW MATTERS

No registration statement will be filed under the Securities Act of 1933, as amended (the "**<u>Securities Act</u>**"), or pursuant to any state securities laws with respect to the offer and distribution of securities under the Plan.  Prior to the filing of the Chapter 11 Cases, the Debtors will rely on the exemption provided by section 4(a)(2) of the Securities Act and applicable exemptions from Blue Sky Laws.  The Debtors believe that the provisions of section 1145(a)(1) of the Bankruptcy Code will exempt the issuance and distribution of securities (other than the Backstop Shares) issued under the Plan (the "**<u>1145 Securities</u>**") from federal and state securities registration requirements.  The 1145 Securities issued to affiliates of the Reorganized Genco will be treated as issued pursuant to section 1145(a)(1), but will be subject to the restrictions on resale of securities held by affiliates of an issuer.

**A.**    <u>**Bankruptcy Code Exemptions from Registration Requirements**</u>.

**1.**    <u>**Securities Issued in Reliance on Section 1145 of the Bankruptcy Code**</u>.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor or of a successor to the debtor under the plan; (ii) the recipients of the securities must each hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or other property.

The exemptions provided for in section 1145 do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code. Section 1145(b) defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":

(a)     purchases a claim against, an interest in, or a claim for administrative expense against, the debtor, with a view to distributing any security received in exchange for such a claim or interest ("accumulators");

(b)     offers to sell securities offered under a plan for the holders of such securities ("distributors");

(c)     offers to buy securities from the holders of such securities, if the offer to buy is (i) with a view to distributing such securities and (ii) made under a distribution agreement; and

(d)     is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act, which includes affiliates of the issuer, defined as persons who are in a relationship of "control" with the issuer.

Persons who are not deemed "underwriters" may generally resell the securities they receive that comply with the requirements of Section 1145(a)(1) without registration under the Securities Act or other applicable law.  Persons deemed "underwriters" may sell such securities without registration only pursuant to exemptions from registration under the Securities Act and other applicable law.  The Backstop Parties will not be deemed to be "underwriters" under section 1145(b) solely on account of their participation in the Backstop Investment.

## 2.    Subsequent Transfers of 1145 Securities

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to section 1145(a)(1) are deemed to have been issued in a public offering.  In general, therefore, resales of and subsequent transactions in the 1145 Securities will be exempt from registration under the Securities Act pursuant to section 4(a)(1) of the Securities Act, unless the holder thereof is deemed to be an "issuer," an "underwriter" or a "dealer" with respect to such securities.  For these purposes, an "issuer" includes any "affiliate" of the issuer, defined as a person directly or indirectly controlling, controlled by or under common control with the issuer.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.  A "dealer," as defined in section 2(a)(12) of the Securities Act, is any person who engages either for all or part of his or her time, directly or indirectly, as agent, broker or principal, in the business of offering, buying, selling or otherwise dealing or trading in securities issued by another person.  Whether or not any particular person would be deemed to be an "affiliate" of Reorganized Genco or an "underwriter" or a "dealer" with respect to any 1145 Securities will depend upon various facts and circumstances applicable to that person.

Notwithstanding the provisions of section 1145(b) of the Bankruptcy Code regarding accumulators and distributors, the staff of the SEC has taken the position that resales of securities distributed under a plan of reorganization by accumulators and distributors of securities who are not affiliates of the issuer of such securities are exempt from registration

108

under the Securities Act if effected in "ordinary trading transactions." The staff of the SEC has indicated in this context that a transaction by such non-affiliates may be considered an "ordinary trading transaction" if it is made on a national securities exchange or in the over-the-counter market and does not involve any of the following factors:

(a)    (i) concerted action by the recipients of securities issued under a plan in connection with the sale of such securities or (ii) concerted action by distributors on behalf of one or more such recipients in connection with such sales;

(b)    the use of informational documents concerning the offering of the securities prepared or used to assist in the resale of such securities, other than a bankruptcy court-approved disclosure statement and supplements thereto, and documents filed with the SEC pursuant to the Exchange Act; or

(c)    the payment of special compensation to brokers and dealers in connection with the sale of such securities designed as a special incentive to the resale of such securities (other than the compensation that would be paid pursuant to arm's-length negotiations between a seller and a broker or dealer, each acting unilaterally, not greater than the compensation that would be paid for a routine similar-sized sale of similar securities of a similar issuer).

The staff of the SEC has not provided any guidance for privately arranged trades. The views of the staff of the SEC on these matters have not been sought by the Debtors and, therefore, no assurance can be given regarding the proper application of the "ordinary trading transaction" exemption described above.  Any person intending to rely on such exemption is urged to consult their counsel as to the applicability thereof to their circumstances.

The 1145 Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of those states. However, the availability of such state exemptions depends on the securities laws of each state, and holders of Claims may wish to consult with their own legal advisors regarding the availability of these exemptions in their particular circumstances.

### 3.    Subsequent Transfers of the New Genco Common Stock and New Genco Equity Warrants Issued to Affiliates.

Securities issued under the Plan to affiliates of Reorganized Genco will be subject to restrictions on resale.  Affiliates of Reorganized Genco for these purposes will generally include its directors and officers and its controlling stockholders.  While there is no precise definition of a "controlling" stockholder, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "controlling person" of the debtor.

The Staff of the SEC has indicated that Rule 144 under the Securities Act is available for the immediate resale of securities issued under a plan of reorganization to affiliates of the issuing debtor that would otherwise be unrestricted under the Securities Act, and should be available for resale of the New Genco Common Stock and New Genco Equity Warrants issued to affiliates under the Plan.   This Rule is conditioned on the public availability of certain information concerning the issuer and imposes on selling stockholders certain volume limitations and certain manner of sale and notice requirements.[26]

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, AFFILIATE OR DEALER, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. THE DEBTOR RECOMMENDS THAT HOLDERS OF CLAIMS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

### 4.    **Backstop  Shares, New Genco MIP Primary Equity and New Genco MIP Warrants.**

The Backstop Shares, New Genco MIP Primary Equity, the New Genco MIP Warrants and the New Genco Common Stock issuable upon exercise of the New Genco MIP Warrants are being offered and issued pursuant to exemption from registration under the Securities Act and applicable state securities laws.   Such securities may be deemed restricted securities, and may only be resold pursuant to applicable exemptions from registration (but the ability of holders thereof to resell 1145 Securities shall not be affected).   Holders of such securities should consult their own counsel concerning resale.

### 5.    **The New Genco Equity Warrants Are Only Exercisable on a Cashless Basis, so that the Number of Shares Issuable upon Exercise Cannot Now Be Determined.**

The New Genco Equity Warrants are only exercisable on a cashless basis.   This means that upon exercise, a holder of a warrant will receive a number of shares of New Genco Common Stock equal to the number of shares for which the warrant is exercisable multiplied by a fraction, the numerator is the market price of the New Genco Common Stock at the applicable time less the then applicable exercise price and the denominator is such market price. Accordingly, the number of shares of New Genco Equity Common Stock that can be acquired upon exercise of the New Genco Equity Warrants cannot be determined at the present time, and will depend on the market price for the stock, and no such shares may be acquired unless the market price exceeds the warrant exercise price.

---

[26] To be included/revised if needed if any securities will be issued to affiliates of Genco.

6.     **The Anti-Dilution Protection for the New Genco Equity Warrants Does Not Cover All Transactions that Could Adversely Affect the Warrants.**

        The terms of the New Genco Equity Warrants will provide for anti-dilution protection in the event of a stock split, reverse stock split, stock dividend, reclassification, dividend or distribution (other than ordinary cash dividends) and business combination transaction.  However, there could be other transactions that adversely affect the New Genco Equity Warrants, such as the issuance of common stock at a price below the exercise price for the New Genco Warrants or below the market price for the New Genco Common Stock, that could adversely affect the value of the Warrants for which there will be no anti-dilution adjustment.  Also, if Reorganized Genco were to engage in a business combination transaction for cash at a time when the market value of the New Genco Equity Warrants was below the applicable exercise price, holders of these warrants would receive no value.

## XIII.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A.     **Introduction**.

        The following discussion summarizes certain United States federal income tax consequences of the Plan to the Debtors, and holders of Claims and Equity Interests in Genco.  The summary is provided for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), the Treasury Regulations promulgated thereunder, judicial authority and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect.  This summary does not address all aspects of United States federal income taxation that may be relevant to a particular holder of a Claim or an Equity Interest in Genco in light of its particular facts and circumstances or to particular types of holders of Claims or Equity Interests in Genco subject to special treatment under the Tax Code (for example, non-United States persons, financial institutions, broker-dealers, insurance companies, tax-exempt organizations, retirement plans or other tax-deferred accounts, mutual funds, real estate investment trusts, traders in securities that elect mark-to-market treatment, holders of Claims or Equity Interests in Genco subject to the alternative minimum tax, certain former United States citizens or long-term residents, persons who hold a Claim or an Equity Interest in Genco as part of a hedge, straddle, constructive sale, conversion or other integrated transaction, persons that have a functional currency other than the United States dollar, investors in pass-through entities that hold Claims or Equity Interests in Genco and, except as otherwise noted below, persons who received their Claim or Equity Interests in Genco upon exercise of employee stock options or otherwise as compensation) and also does not discuss any aspects of United States federal non-income, state, local, and non-U.S. taxation.  In addition, a substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution under the Plan.  Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, court decisions or administrative changes, could affect the United States federal income tax consequences of the Plan and the transactions contemplated thereunder.  No ruling will be sought from the Internal Revenue Service (the "**IRS**") with respect to any of the tax aspects of the Plan and no opinion of counsel has heretofore been obtained by the Debtors with respect thereto.

111

**Accordingly, each holder of a Claim or Equity Interest in Genco is strongly urged to consult with its own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan.**

If a partnership (including any entity treated as a partnership for United States federal income tax purposes) is a beneficial owner of a Claim or an Equity Interest in Genco, the treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership. Partnerships and their partners should consult their tax advisors about the United States federal income tax consequences of participating in the Plan, as to ownership and disposition of New Genco Common Stock and New Genco Equity Warrants received under the Plan, and as to the ownership of Rights and Lender Oversubscription Rights received under the Plan.

**Circular 230 Disclosure: This tax discussion was written to support the promotion or marketing of the Plan. To ensure compliance with requirements imposed by the IRS, we are informing you that this discussion was not intended or written to be used, and cannot be used, by any person for the purpose of avoiding tax-related penalties that may be imposed on the taxpayer under the Tax Code. Taxpayers should seek advice based on their particular circumstances from an independent tax advisor.**

B.    **Certain United States Federal Income Tax Consequences to the Company**.

1.    **Exemption of Operating Income from United States Federal Income Taxation**.

Genco has taken the position that its shipping income is not subject to United States federal income tax pursuant to an exemption from United States income taxation for income from the international operation of ships under Tax Code Section 883 ("**Section 883**") and applicable Treasury Regulations promulgated thereunder. It is unclear whether, after the Effective Date, Reorganized Genco will be entitled to claim an equivalent United States income tax exemption for future taxable years.

Under Section 883 and the Treasury Regulations thereunder, a foreign corporation will be exempt from United States federal income taxation on its U.S.-source shipping income if:

(1) it is organized in a "qualified foreign country," which is one that grants an "equivalent exemption" from tax to corporations organized in the United States in respect of each category of shipping income for which exemption is being claimed under Section 883 (the "**Country of Organization Test**"); and

(2) either:

(a) more than 50% of the value of its stock is beneficially owned, directly or indirectly, by qualified shareholders, which include individuals who are "residents" of a qualified foreign country (the "**50% Ownership Test**");

112

(b) its stock is "primarily and regularly traded on an established securities market" in a qualified foreign country or in the United States (the "**Publicly Traded Test**"); or

(c) it is a "controlled foreign corporation," or CFC, and it satisfies certain other requirements (collectively, the "**CFC Test**").

The Marshall Islands, the jurisdiction where Genco is, and Reorganized Genco will be, incorporated, has been officially recognized by the IRS as a qualified foreign country that currently grants the requisite equivalent exemption from tax in respect of each category of shipping income Reorganized Genco expects to earn in the future. Therefore, Reorganized Genco will satisfy the Country of Organization Test and will be exempt from United States federal income taxation with respect to its United States-source shipping income if it satisfies any one of the 50% Ownership Test, the Publicly Traded Test or the CFC Test.

Prior to the date hereof, Genco believes that it has satisfied the Publicly Traded Test. Following the Effective Date, it is not entirely clear whether Reorganized Genco will satisfy the Publicly Traded Test because, among other things, there is uncertainty as to whether its shares will be traded on an established securities market and whether such shares will satisfy the regularly traded requirement. It is also not clear whether Reorganized Genco will be able to satisfy either the 50% Ownership Test or the CFC Test.

## 2.   Taxation in the Absence of Section 883 Exemption.

If the exemption under Section 883 does not apply, Reorganized Genco's gross U.S.-source shipping income will be subject to a 4% tax, without allowance for deductions, unless such income is effectively connected with the conduct of a United States trade or business ("**effectively connected income**"), as described below. Under applicable sourcing rules and certain restrictions on Genco's ability to both begin and end voyages in the United States under the Merchant Marine Act of 1920, no more than 50% of Reorganized Genco's shipping income would be treated as United States-source shipping income. As a result, the maximum effective rate of United States federal gross income tax on Reorganized Genco's non-effectively connected shipping income should not exceed 2%.

To the extent Reorganized Genco's United States-source shipping income (or any non-shipping income Reorganized Genco may have) is considered to be effectively connected income, as described below, any such income, net of applicable deductions, would be subject to the United States federal corporate income tax, currently imposed at rates of up to 35%. In addition, Reorganized Genco may be subject to a 30% "branch profits" tax on such income, and on certain interest paid or deemed paid that is attributable to the conduct of a trade or business.

Reorganized Genco's United States-source non-shipping income would be considered "effectively connected" with the conduct of a United States trade or business under normal United States federal income tax rules. Reorganized Genco's United States -source shipping income would be considered "effectively connected" with the conduct of a United States trade or business only if:

113

- Reorganized Genco has, or is considered to have, a fixed place of business in the United States involved in the earning of United States -source shipping income; and

- Substantially all of Reorganized Genco's United States -source shipping income is attributable to regularly scheduled transportation such as the operation of a vessel that follows a published schedule with repeated sailings at regular intervals between the same points for voyages that begin or end in the United States (or, in the case of income from bareboat charters, is attributable to a fixed place of business in the United States).

Genco has not had any vessel sailing to or from the United States on a regularly scheduled basis (and does not charter out vessels on a bareboat basis). If future shipping operations and other activities are consistent with past practices, none of Reorganized Genco's United States -source shipping income should be "effectively connected" with the conduct of a United States trade or business, and any such United States-source shipping income could be subject to the 4% tax described above. In addition, Reorganized Genco may from time to time generate non-shipping income, such as income from sale of vessels, that may be treated as effectively connected income, in which case such non-shipping income would be subject to the 35% tax and the 30% tax described above.

### 3. __Cancellation of Indebtedness__.

Under the Tax Code, a United States taxpayer generally must include in gross income the amount of any discharged indebtedness (cancellation of debt or "__COD__") realized during the taxable year. COD is the amount by which the indebtedness of the Debtors discharged exceeds any consideration given in exchange therefor. COD generally equals the difference between (A) the "adjusted issue price" of the indebtedness discharged and (B) the sum of (i) the amount of Cash, (ii) the "issue price" of any new debt instrument, and (iii) the fair market value of any other property (such as New Genco Common Stock, New Genco Equity Warrants, Rights and Lender Oversubscription Rights) transferred in satisfaction of such discharged indebtedness.

In general, the Tax Code provides that a debtor in a bankruptcy case is not required to recognize COD income. In lieu thereof, the debtor must reduce certain of its tax attributes – such as net operating loss ("__NOL__") carryforwards, tax credits, tax basis in assets and the attributes and tax basis of its subsidiaries – by the amount of the excluded COD. Certain statutory or judicial exceptions can apply to limit the amount of COD and attribute reduction (such as where the payment of the cancelled debt would have given rise to a tax deduction). In addition, in general, to the extent the amount of COD exceeds the tax attributes available for reduction, the remaining COD is simply forgiven. As a result of the implementation of the Plan, it is likely that the Debtors will have COD, and potential attribute reduction. However, because any reduction in tax attributes does not effectively occur until the first day of the taxable year following the taxable year in which the COD is incurred, the resulting COD will not impair the Debtors' ability to use their tax attributes (to the extent otherwise available) to reduce their tax liability in the year of discharge, if any, otherwise resulting from the implementation of the Plan. To the extent COD causes attribute reduction in the basis of the Debtors' assets, gain from future

114

sales of such assets for United States federal income tax purposes, may be increased (or losses from future sales of such assets may be reduced).

### 4.    Alternative Minimum Tax.

A corporation may incur a United States federal alternative minimum tax ("**AMT**") liability even if its tax attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax.  In general, the AMT is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent that such tax exceeds the corporation's regular United States federal income tax.  For purposes of computing taxable income for AMT purposes, i.e., AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.

### C.    Certain United States Federal Income Tax Consequences to Holders of Claims and Equity Interests in Genco.

The discussion hereinafter applies only to a holder that is a beneficial owner of a Claim, Equity Interest in Genco, New Genco Common Stock, New Genco Equity Warrants, or Rights or Lender Oversubscription Rights that is for United States federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation (or other entity taxable as a corporation for United States federal income tax purposes) created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate the income of which is subject to United States federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more United States persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

### 1.    Claims – In General.

If a Claim is exchanged for Cash, New Genco Common Stock, Rights, Lender Oversubscription Rights, and/or other property, each holder of a Claim (other than (i) holders of Claims that constitute Tax Securities (as defined below), the treatment of which is discussed in Section 2 below, (ii) holders of Prepetition $253 Million Facility Claims and Prepetition $100 Million Facility Claims if such facilities are not refinanced by a new third-party facility, the treatment of which is discussed in Section 3, or (iii) Claims that relate to services provided to the Debtors by an employee or service provider), will recognize gain or loss measured by the difference between (i) the sum of the amount of Cash and the aggregate fair market value of other property received (including the fair market value of New Genco Common Stock, Rights and Lender Oversubscription Rights), and (ii) such holder's tax basis in the Claim.

To the extent that the Cash and/or property received by a holder of a Claim is attributable to accrued interest (instead of principal) on such Claim, the Cash and/or property received will be deemed made in payment of such interest.  Conversely, a holder of a Claim will recognize a deductible loss to the extent any accrued interest previously included in its gross income is not paid in full.  The allocation for United States federal income tax purposes between principal and interest of amounts received in exchange for the discharge of a claim at a discount is unclear.  However, as noted in the Plan, the Debtors intend to treat any amount received as first allocated to principal.

Where gain or loss is recognized by a holder in respect of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss, or as ordinary income or loss, will be determined by a number of factors, including but not limited to: (a) the nature or origin of the Claim; (b) the tax status of the holder; (c) whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held; (d) whether the Claim was acquired at a market discount (discussed below); and (e) whether and to what extent the holder had previously claimed a bad debt deduction with respect to the Claim.  Holders that recognize capital losses as a result of the receipt of distributions under the Plan may be subject to limitations on the utilization of such capital losses.

Each holder of a Claim that relates to services provided to the Debtors by an employee or a service provider generally will recognize ordinary income equal to the sum of the amount of Cash and the fair market value of the property received in exchange for its Claim.

A holder that purchased its Claim from a prior holder at a market discount (generally defined as the amount, if any, by which a holder's tax basis in a debt obligation immediately after its acquisition is less than the adjusted issue price of the debt obligation at such time, subject to a *de minimis* exception) may be subject to the market discount rules of the Tax Code.  Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

To the extent that a Claim, which is a Tax Security (as defined below) and was acquired with market discount, is exchanged for New Genco Common Stock, any gain recognized on the subsequent sale, exchange, redemption or other disposition of the New Genco Common Stock may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged Claims as of the date of the exchange.  In addition, any gain recognized by a holder upon a subsequent taxable disposition of New Genco Common Stock received pursuant to the Plan in satisfaction of a Claim (or any stock or other property received for them in a later tax-free exchange) may be treated as ordinary income to the extent of any bad debt deductions (or additions to a bad debt reserve) previously claimed with respect to its Claim and any ordinary loss deduction incurred upon satisfaction of its Claim, less any income (other than interest income) recognized by the holder upon satisfaction of its Claim.

Any Cash and/or property received by a holder of a Claim after the Effective Date may be subject to the imputed interest provisions of the Tax Code pursuant to which a portion of the amount received may be treated as interest.

The tax basis of property received pursuant to the Plan (other than New Genco Common Stock, Rights and/or Lender Oversubscription Rights received in exchange for the principal portion of Claims that constitute Tax Securities, which is discussed in section 2 below) will equal its fair market value and the holding period of such property will begin on the date following the Effective Date.

## 2. **Claims that Are Tax Securities**.

Notwithstanding the foregoing discussion, no loss will be recognized upon the exchange, in whole or in part, of a Claim that constitutes a "security" for United States federal income tax purposes (a "**Tax Security**") for New Genco Common Stock, Rights, Lender Oversubscription Rights, or interests in the Amended and Restated $253 Million Facility or the Amended and Restated $100 Million Facility (to the extent such interests constitute Tax Securities) (except to the extent attributable to accrued interest, as discussed above), and gain (except to the extent attributable to accrued interest, as discussed above) will only be recognized upon such an exchange to the extent of the fair market value of the Cash or property received other than New Genco Common Stock, Rights, Lender Oversubscription Rights, and interests in the Amended and Restated $253 Million Facility or the Amended and Restated $100 Million Facility (to the extent that such interests constitute Tax Securities).  The term "security" is not defined in the Tax Code.  While the determination whether a particular claim or debt constitutes a Tax Security depends upon an overall evaluation of the nature of the claim, in general, debt instruments with an original term of at least ten years qualify as securities, debt instruments with an original term of less than five years do not qualify as securities, and debt instruments with an original term of between five and ten years may qualify as securities.  Each holder should consult its tax advisor regarding the tax status of its Claim or Claims.

The tax basis of New Genco Common Stock, Rights, Lender Oversubscription Rights, and interests in the Amended and Restated $253 Million Facility or the Amended and Restated $100 Million Facility (to the extent such interests constitute Tax Securities) received pursuant to the Plan in exchange for Claims that constitute Tax Securities (other than the portion, if any, attributable to accrued interest) will equal the holder's tax basis in the Claims exchanged, decreased by the fair market value of any other property received in exchange for such Claims and increased by any gain recognized.  The holding period for such New Genco Common Stock, Rights, Lender Oversubscription Rights, and interests in the Amended and Restated $253 Million Facility or the Amended and Restated $100 Million Facility shall include the holding period of the Claims exchanged therefor.

## 3. **Amended and Restated $253 Million Facility and Amended and Restated $100 Million Facility.**

If the Prepetition $253 Million Facility Claims and/or Prepetition $100 Million Facility Claims are not refinanced by a new third-party facility, the tax consequences of the exchange of the Prepetition $253 Million Facility Claim for a pro rata portion of the Amended

and Restated $253 Million Facility and the exchange of the Prepetition $100 Million Facility Claim for a pro rata portion of the Amended and Restated $100 Million Facility depends in part on whether such exchanges are treated as significant modifications for United States federal income tax purposes.

Whether a modification or exchange of a debt instrument is treated for United States federal income tax purposes as an exchange of the debt instrument for a new debt instrument or alternatively as a continuation of the existing debt instrument depends on whether the modification or exchange is considered a "significant modification." Under applicable Treasury Regulations, a modification of a debt instrument is significant if, based on all facts and circumstances, the legal rights or obligations that are altered and the degree to which they are altered are economically significant. A modification that alters the timing of payments due under a debt instrument is a significant modification if the modification results in a material deferral of scheduled payments. Under a safe harbor, a deferral of one or more scheduled payments on a debt instrument is not a significant modification if such payments are not deferred beyond a specific period. The Debtors believe that it is likely that this safe harbor will not apply to the Prepetition $253 Million Facility, but may apply to the Prepetition $100 Million Facility depending on the deferral period of certain payments during the Chapter 11 Cases. However, notwithstanding the safe harbor, it is not entirely clear whether modifications to the yield on either the Prepetition $253 Million Facility or the Prepetition $100 Million Facility or other modifications to such facilities will result in a significant modification. Holders of the Prepetition $253 Million Facility and the Prepetition $100 Million Facility should consult their tax advisors.

If the modifications to either the Prepetition $253 Million Facility or the Prepetition $100 Million Facility are significant modifications, then for United States federal income tax purposes a deemed exchange of the "old" debt instrument for a "new" debt instrument will occur. In such case, if the interests in the Prepetition $253 Million Facility or the Prepetition $100 Million Facility are Tax Securities, see the discussion of the tax consequences in Section 2 above. Alternatively, if interests in the Prepetition $253 Million Facility or the Prepetition $100 Million Facility are not Tax Securities, see the discussion of the tax consequences in Section 1 above.

## 4.     Holders of Equity Interests In Genco.

Under the Plan, the New Genco Equity Warrants will be distributed to holders of Equity Interests in Genco in exchange for the surrender and cancellation of their Equity Interests in Genco. Consistent with the treatment of the exchange of Claims described in Section 1 above, holders of Equity Interests in Genco should be treated for United States federal income tax purposes as recognizing gain or loss upon the receipt of New Genco Equity Warrants in exchange for the cancellation and surrender of their Equity Interests in Genco. Holders of Equity Interest in Genco should consult their own tax advisors regarding the tax consequences of the receipt of New Genco Equity Warrants under the Plan, including the amount and character of any gain or loss, as well as the possible alternative characterizations of such transaction that could apply for United States federal income tax purposes.

D.      **Information Reporting and Backup Withholding**.

All distributions to holders of Claims under the Plan are subject to any applicable tax information reporting and withholding, including employment tax withholding. Under United States federal income tax law, interest and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if a non-exempt holder (a) fails to furnish its social security number or other taxpayer identification number ("**TIN**"), (b) furnishes an incorrect TIN, (c) fails to properly report interest or dividends, or (d) fails to provide certain certifications signed under penalty of perjury. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, generally, corporations and financial institutions.

E.      **Certain United States Federal Income Tax Consequences to Recipients of New Genco Common Stock, New Genco Equity Warrants, Rights and/or Lender Oversubscription Rights**.

1.      **Distributions**.

Subject to the discussion of passive foreign investment companies ("PFICs") below, any distributions made by Reorganized Genco with respect to New Genco Common Stock will generally constitute dividends to the extent of Reorganized Genco's current or accumulated earnings and profits, as determined under United States federal income tax principles. Distributions in excess of those earnings and profits will be treated first as a nontaxable return of capital to the extent of the holder's tax basis in his, her or its New Genco Common Stock, and thereafter as capital gain. Because Reorganized Genco is not a United States corporation, holders that are corporations will generally not be entitled to claim a dividends-received deduction with respect to distributions they receive from Reorganized Genco. In addition, dividends may not be eligible for a reduced rate of United States income tax for individual United States holders. Distributions taxable as dividends generally will be treated as foreign source "passive category income" for United States foreign tax credit purposes.

2.      **Sale, Exchange, or Exercise of New Genco Common Stock or New Genco Equity Warrants**.

Except as discussed above with respect to market discount, and subject to the discussion of PFICs below, gain or loss recognized on a sale, exchange or other taxable disposition of New Genco Common Stock or New Genco Equity Warrants will generally equal the difference, if any, between the amount realized and the holder's adjusted tax basis in the New Genco Common Stock or New Genco Equity Warrants, as applicable, at the time of such sale, exchange or other taxable disposition. Assuming such New Genco Common Stock or New Genco Equity Warrants are held as capital assets, any such gain or loss will be long-term capital gain or loss if the holding period for the New Genco Common Stock or New Genco Equity Warrants, as applicable, exchanged is more than one year at that time (which, as noted above, will include the holding period for the Claims exchanged for New Genco Common Stock if they are treated as Tax Securities). The deductibility of capital losses is subject to limitations.

119

The New Genco Equity Warrants are exercisable solely on a cashless basis. While not entirely clear under current law, a cashless exercise of a warrant generally should be treated as a non-taxable recapitalization for United States federal income tax purposes. Under this treatment, a holder's basis in the New Genco Common Stock received upon a cashless exercise generally would equal the holder's basis in the New Genco Equity Warrants, and the holding period of the New Genco Equity Common Stock received generally would include the holding period of the New Genco Equity Warrants. If the cashless exercise were not treated as a non-taxable recapitalization, but were otherwise treated as a non-taxable exercise of the New Genco Equity Warrants for United States federal income tax purposes, a holder's holding period in the New Genco Common Stock would likely be treated as commencing on the date following the date of exercise of the New Genco Equity Warrants. Alternatively, it is possible that a cashless exercise could be treated in whole or in part as a taxable exchange in which gain or loss would be recognized and a holder's holding period in the New Genco Common Stock would begin on the day following the date of exercise.

Due to the absence of authority on the United States federal income tax treatment of a cashless exercise of a warrant, there can be no assurance which, if any, of the alternative tax consequences and holding periods described above would be adopted by the IRS or a court of law. Accordingly, holders should consult their tax advisors regarding the tax consequences of such a cashless exercise.

If a New Genco Equity Warrant lapses unexercised, a holder generally would recognize a capital loss equal to such holder's basis in the New Genco Equity Warrant. Adjustment to the New Genco Equity Warrants, including adjustments to the number of shares of New Genco Common Stock for which the New Genco Equity Warrant may be exercised or to the exercise price of the New Genco Equity Warrant, may under certain circumstances result in a constructive distribution that could be taxable as a dividend to the holder of the New Genco Equity Warrants. Conversely, the absence of an appropriate adjustment may result in a constructive distribution that could be taxable as a dividend to holders of the New Genco Common Stock.

### 3.    Rights and Lender Oversubscription Rights.

No gain or loss will be recognized upon the exercise of the Rights and/or Lender Oversubscription Rights. A holder's basis in the New Genco Common Stock acquired upon exercise of the Rights and/or Lender Oversubscription Rights will be the holder's tax basis in the Rights and/or Lender Oversubscription Rights, increased by the exercise price thereof, and the holder's holding period in such New Genco Common Stock will likely commence on the day after the Rights and/or Lender Oversubscription Rights are exercised. If the Rights and/or Lender Oversubscription Rights lapse unexercised, a holder generally would recognize a capital loss equal to such holder's tax basis (if any) in the Rights and/or Lender Oversubscription Rights.

4.    **Passive Foreign Investment Company Status**.

Reorganized Genco will be a PFIC if either:

- 75% or more of its gross income in a taxable year consists of "passive income" (generally including dividends, interest, gains from the sale or exchange of investment property); or

- at least 50% of its assets in a taxable year (averaged over the year and generally determined based upon either value or tax basis depending on the application of certain tests) produce or are held for the production of passive income.

For purposes of determining whether Reorganized Genco will be a PFIC, Reorganized Genco will be treated as earning and owning a proportionate share of the income and assets, respectively, of its subsidiaries that have made special U.S. tax elections to be disregarded as separate entities as well as of any other corporate subsidiary in which it owns at least 25% of the value of the subsidiary's stock. For purposes of these tests, income derived from the performance of services does not constitute passive income. By contrast, rental income would generally constitute passive income unless Reorganized Genco were treated under specific rules as deriving its rental income in the active conduct of a trade or business. Based on Genco's past and anticipated future operations, the Debtors do not believe that Genco has been a PFIC or that Reorganized Genco will be a PFIC with respect to future taxable years. In this regard, Genco has treated, and Reorganized Genco intends to treat, its income from the charter of vessels as services income, rather than rental income. Accordingly, the Debtors believe that such income does not constitute passive income, and that the assets that Reorganized Genco will own and operate in connection with the production of that income, primarily its vessels, do not constitute passive assets for purposes of determining whether it is a PFIC.

There is, however, no direct legal authority under the PFIC rules addressing Reorganized Genco's method of operation that characterizes certain charter income as services income. Moreover, it should be noted that there is authority which characterizes charter income as rental income rather than services income for other tax purposes. Accordingly, no assurance can be given that the IRS or a court of law will accept Reorganized Genco's position, and there is a risk that the IRS or a court of law could determine that Reorganized Genco will be a PFIC. Moreover, there can be no assurance that Reorganized Genco will not become a PFIC in any future taxable year because (i) there are uncertainties in the application of the PFIC rules, (ii) the PFIC test is an annual test, and (iii) although Reorganized Genco intends to manage its business so as to avoid PFIC status to the extent consistent with its other business goals, there could be changes in the nature and extent of operations in future years.

Subject to the QEF and mark-to-market election discussions below, if Reorganized Genco was to be treated as a PFIC for any taxable year (and regardless of whether it remains a PFIC for subsequent taxable years), (i) each holder who is treated as owning New Genco Common Stock during such taxable year for purposes of the PFIC rules would be required to allocate any excess distributions received (i.e., the portion of any distributions received by the holder on New Genco Common Stock in a taxable year in excess of 125 percent

of the average annual distributions received by the holder in the three preceding taxable years, or, if shorter, the holder's holding period for the New Genco Common Stock) and any gain realized from the disposition of New Genco Common Stock ratably over the holder's holding period of the New Genco Common Stock; (ii) the amount allocated to the current taxable year, and any taxable year prior to the first taxable year in which Reorganized Genco was a PFIC, would be treated as ordinary income; and (iii) the amount allocated to each other taxable year will be subject to tax at the highest tax rate in effect for that year and the interest charge generally applicable to underpayments of tax will be imposed on the resulting tax attributable to each such taxable year.

A holder who holds New Genco Common Stock during a period when Reorganized Genco is a PFIC generally will be subject to the foregoing rules for that taxable year and all subsequent taxable years with respect to that holder's ownership of New Genco Common Stock, even if Reorganized Genco ceased to be a PFIC, subject to certain exceptions for holders of New Genco Common Stock who make a QEF election or mark-to-market election discussed below. Holders are urged to consult their tax advisors regarding the PFIC rules, including as to the advisability of choosing to make a QEF election or mark-to-market election.

The application of the PFIC rules, including the QEF and mark-to-market elections, to holders of New Genco Equity Warrants is subject to significant uncertainties because only limited guidance is available and much of it is in the form of proposed Treasury Regulations where the binding effect is unclear. Accordingly, each holder of New Genco Equity Warrants should consult such holder's tax advisor concerning the consequences of holding such securities acquired through the exercise of such securities if Reorganized Genco was a PFIC.

The above rules relating to the taxation of excess distributions and dispositions will not apply to a holder who has made a timely "qualified electing fund" ("**QEF**") election for all taxable years that the holder has held its New Genco Common Stock and Reorganized Genco was a PFIC. Instead, each holder who has made a timely QEF election is required, for each taxable year that Reorganized Genco is a PFIC, to include in income a pro rata share of Reorganized Genco's ordinary earnings as ordinary income and a pro rata share of Reorganized Genco's net capital gain as long term capital gain, regardless of whether Reorganized Genco has made any distributions of the earnings or gain.  The holder's basis in its New Genco Common Stock will be increased to reflect taxed but undistributed income. Distributions of income that had been previously taxed will result in a corresponding reduction in the basis of the New Genco Common Stock and will not be taxed again once distributed. A holder making a QEF election would generally recognize capital gain or loss on the sale, exchange or other disposition of New Genco Common Stock. If Reorganized Genco determines that it is a PFIC for any taxable year, it may provide each holder with all necessary information in order to make the QEF election described above. If Reorganized Genco does not provide such information, then a QEF election would not be available.

As an alternative to the tax treatment discussed above, a holder of PFIC stock which is "marketable stock" (i.e., "regularly traded" on a national securities exchange which is registered with the SEC or a national market system established under the 1934 Securities and Exchange Act) may in certain circumstances elect to mark–to–market its PFIC stock.  As a result of such election, in any taxable year Reorganized Genco is a PFIC, the holder would be required

to recognize gain or loss to the extent of the difference between the fair market value of the PFIC stock at the end of the taxable year and such holder's basis in the PFIC stock. The availability of the mark-to-market election to a holder will be dependent on whether the New Genco Common Stock is listed on a qualified exchange and whether such stock is regularly traded.

### 5. <u>Controlled Foreign Corporation Status</u>.

If more than 50% of the total value or total combined voting power of all classes of Reorganized Genco common stock is owned, directly, indirectly or constructively by U.S. holders, each of whom own, after applying attribution rules, 10% or more of the total combined voting power of all classes of the Reorganized Genco common stock (a "**<u>10% U.S. Holder</u>**"), Reorganized Genco would be treated as a "controlled foreign corporation" or "CFC." This classification would result in the application of many complex rules, including the required inclusion in income by 10% U.S. Holders of their pro rata share of any "Subpart F income" and any investments in "U.S. property" (each as defined by the Tax Code) of Reorganized Genco. Shipping income does not constitute Subpart F income provided that it is treated as services income and not as rental income (*see* the discussion above in Section E.4 above). In addition, under Section 1248 of the Tax Code, if Reorganized Genco was to be considered a CFC at any time during the five-year period ending with the sale or exchange of Reorganized Genco common stock by a 10% U.S. Holder, gain from such sale or exchange would generally be treated as dividend income to the extent of Reorganized Genco's earnings and profits attributable to the shares sold or exchanged. If Reorganized Genco was to become a CFC, the PFIC rules discussed above would generally not apply with regard to any 10% U.S. Holder. Because of the complexity of Subpart F, a more detailed review of these rules is beyond the scope of this discussion.

### XIV. <u>CERTAIN MARSHALL ISLANDS TAX CONSEQUENCES</u>

Reorganized Genco will be incorporated under the laws of the Marshall Islands. Under current Marshall Islands law and based on its contemplated activities, Reorganized Genco will not be subject to Marshall Islands tax on its income or capital gains. In addition, under current Marshall Islands law and based on its contemplated activities, Marshall Islands withholding tax will not be imposed upon payments of dividends by Reorganized Genco to its stockholders or upon payments of interest by Holdco.

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS IN GENCO ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES APPLICABLE TO THEM UNDER THE PLAN.

### XV. <u>RECOMMENDATION AND CONCLUSION</u>

**The Debtors believe that confirmation of the Plan is in the best interests of all Creditors and Equity Interest holders and urge all creditors in the Voting Classes to vote in favor of the Plan.**

Dated:  April 16, 2014

**GENCO SHIPPING & TRADING LIMITED**

By: _____
    Name: John C. Wobensmith
    Title: Chief Financial Officer

**GENCO ACHERON LIMITED**
**GENCO BEAUTY LIMITED**
**GENCO KNIGHT LIMITED**
**GENCO LEADER LIMITED**
**GENCO MUSE LIMITED**
**GENCO VIGOUR LIMITED**
**GENCO CARRIER LIMITED**
**GENCO PROSPERITY LIMITED**
**GENCO SUCCESS LIMITED**
**GENCO WISDOM LIMITED**
**GENCO MARINE LIMITED**
**GENCO EXPLORER LIMITED**
**GENCO PIONEER LIMITED**
**GENCO PROGRESS LIMITED**
**GENCO RELIANCE LIMITED**
**GENCO SURPRISE LIMITED**
**GENCO SUGAR LIMITED**
**GENCO AUGUSTUS LIMITED**
**GENCO TIBERIUS LIMITED**
**GENCO LONDON LIMITED**
**GENCO TITUS LIMITED**
**GENCO CONSTANTINE LIMITED**
**GENCO HADRIAN LIMITED**
**GENCO COMMODUS LIMITED**
**GENCO MAXIMUS LIMITED**
**GENCO CLAUDIUS LIMITED**

**GENCO CHALLENGER LIMITED**
**GENCO CHAMPION LIMITED**
**GENCO CHARGER LIMITED**
**GENCO HUNTER LIMITED**
**GENCO PREDATOR LIMITED**
**GENCO WARRIOR LIMITED**
**GENCO BAY LIMITED**
**GENCO OCEAN LIMITED**
**GENCO AVRA LIMITED**
**GENCO MARE LIMITED**
**GENCO SPIRIT LIMITED**
**GENCO LORRAINE LIMITED**
**GENCO PYRENEES LIMITED**
**GENCO LOIRE LIMITED**
**GENCO CLAUDIUS LIMITED**
**GENCO BOURGOGNE LIMITED**
**GENCO PICARDY LIMITED**
**GENCO AQUITAINE LIMITED**
**GENCO NORMANDY LIMITED**
**GENCO AUVERGNE LIMITED**
**GENCO PROVENCE LIMITED**
**GENCO ARDENNES LIMITED**
**GENCO BRITTANY LIMITED**
**GENCO LANGUEDOC LIMITED**
**GENCO RHONE LIMITED**
**GENCO INVESTMENTS LLC**
**GENCO MANAGEMENT (USA) LLC**
**GENCO SHIP MANAGEMENT LLC**
**GENCO RE INVESTMENTS LLC**

By: _____
Name: John C. Wobensmith
Title: Chief Financial Officer

**GENCO CAVALIER LLC**
**GENCO RAPTOR LLC**
**GENCO THUNDER LLC**

By: _____
Name: John C. Wobensmith
Title: Manager

## EXHIBIT A TO THE DISCLOSURE STATEMENT

### DEBTORS

| | |
|---|---|
| Genco Shipping & Trading Limited | Genco Management (USA) LLC |
| Genco Acheron Limited | Genco Mare Limited |
| Genco Aquitaine Limited | Genco Marine Limited |
| Genco Ardennes Limited | Genco Maximus Limited |
| Genco Augustus Limited | Genco Muse Limited |
| Genco Auvergne Limited | Genco Normandy Limited |
| Genco Avra Limited | Genco Ocean Limited |
| Genco Bay Limited | Genco Picardy Limited |
| Genco Beauty Limited | Genco Pioneer Limited |
| Genco Bourgogne Limited | Genco Predator Limited |
| Genco Brittany Limited | Genco Progress Limited |
| Genco Carrier Limited | Genco Prosperity Limited |
| Genco Cavalier LLC | Genco Provence Limited |
| Genco Challenger Limited | Genco Pyrenees Limited |
| Genco Champion Limited | Genco Raptor LLC |
| Genco Charger Limited | Genco RE Investments LLC |
| Genco Claudius Limited | Genco Reliance Limited |
| Genco Commodus Limited | Genco Rhone Limited |
| Genco Constantine Limited | Genco Ship Management LLC |
| Genco Explorer Limited | Genco Spirit Limited |
| Genco Hadrian Limited | Genco Success Limited |
| Genco Hunter Limited | Genco Sugar Limited |
| Genco Investments LLC | Genco Surprise Limited |
| Genco Knight Limited | Genco Thunder LLC |
| Genco Languedoc Limited | Genco Tiberius Limited |
| Genco Leader Limited | Genco Titus Limited |
| Genco Loire Limited | Genco Vigour Limited |
| Genco London Limited | Genco Warrior Limited |
| Genco Lorraine Limited | Genco Wisdom Limited |

**<u>EXHIBIT B TO THE DISCLOSURE STATEMENT</u>**

**PREPACKAGED PLAN OF REORGANIZATION OF THE DEBTORS UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE**

## EXHIBIT C TO THE DISCLOSURE STATEMENT

**THE COMPANY'S PREPETITION CORPORATE AND CAPITAL STRUCTURE**

# Genco Organizational Chart



*All entities are incorporated in the Marshall Islands unless otherwise noted*

## EXHIBIT D TO THE DISCLOSURE STATEMENT

## EQUITY COMMITMENT AGREEMENT

EXECUTION COPY

EQUITY COMMITMENT AGREEMENT

AMONG

GENCO SHIPPING & TRADING LIMITED

AND

THE COMMITMENT PARTIES PARTY HERETO

Dated as of April 16, 2014

#KL2 2841447.10

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ...................................................................................2
    Section 1.1   Definitions...............................................................................2
    Section 1.2   Additional Defined Terms ....................................................12
    Section 1.3   Construction.........................................................................13

ARTICLE II EQUITY COMMITMENT ................................................................14
    Section 2.1   The Rights Offering .............................................................14
    Section 2.2   The Equity Commitment.......................................................14
    Section 2.3   Commitment Party Default....................................................14
    Section 2.4   Subscription Escrow Account Funding. .................................15
    Section 2.5   Closing. ...............................................................................16
    Section 2.6   Designation and Assignment Rights.......................................17

ARTICLE III EXPENSE REIMBURSEMENT .......................................................18
    Section 3.1   Transaction Expenses...........................................................18

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY .................18
    Section 4.1   Organization and Qualification..............................................19
    Section 4.2   Corporate Power and Authority .............................................19
    Section 4.3   Execution and Delivery; Enforceability..................................20
    Section 4.4   Authorized and Issued Capital Stock......................................20
    Section 4.5   Issuance...............................................................................21
    Section 4.6   No Conflict...........................................................................21
    Section 4.7   Consents and Approvals .......................................................21
    Section 4.8   Arm's Length .......................................................................22
    Section 4.9   Financial Statements ............................................................22
    Section 4.10  Company SEC Documents and Disclosure Statement..............22
    Section 4.11  Absence of Certain Changes..................................................22
    Section 4.12  No Violation; Compliance with Laws ......................................22
    Section 4.13  Legal Proceedings................................................................23
    Section 4.14  Labor Relations....................................................................23
    Section 4.15  Intellectual Property.............................................................23
    Section 4.16  Title to Real and Personal Property .......................................24
    Section 4.17  No Undisclosed Relationships................................................24
    Section 4.18  Licenses and Permits............................................................25

i

TABLE OF CONTENTS

Page

Section 4.19    Environmental ........................................................................................25

Section 4.20    Tax Returns and Payments ....................................................................25

Section 4.21    Compliance with ERISA .......................................................................26

Section 4.22    Internal Control Over Financial Reporting ...........................................26

Section 4.23    Disclosure Controls and Procedures .....................................................26

Section 4.24    Material Contracts .................................................................................27

Section 4.25    No Unlawful Payments ..........................................................................27

Section 4.26    Compliance with Money Laundering Laws ............................................27

Section 4.27    Compliance with Sanctions Laws ..........................................................28

Section 4.28    No Broker's Fees ...................................................................................28

Section 4.29    No Registration Rights ..........................................................................28

Section 4.30    Takeover Statutes ..................................................................................28

Section 4.31    Investment Company Act ......................................................................28

Section 4.32    No Marshall Islands Filing Necessary ...................................................28

Section 4.33    Insurance ...............................................................................................28

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE COMMITMENT
            PARTIES ...............................................................................................29

Section 5.1     Incorporation .........................................................................................29

Section 5.2     Corporate Power and Authority .............................................................29

Section 5.3     Execution and Delivery .........................................................................29

Section 5.4     No Conflict ............................................................................................29

Section 5.5     Consents and Approvals ........................................................................30

Section 5.6     No Registration .....................................................................................30

Section 5.7     Purchasing Intent ..................................................................................30

Section 5.8     Sophistication; Investigation .................................................................30

Section 5.9     No Broker's Fees ...................................................................................31

Section 5.10    Votable Claims ......................................................................................31

Section 5.11    Sufficiency of Funds .............................................................................31

Section 5.12    Arm's Length ........................................................................................31

ARTICLE VI ADDITIONAL COVENANTS ................................................................31

Section 6.1     Confirmation Order and Plan ................................................................31

Section 6.2     Conduct of Business ..............................................................................32

## TABLE OF CONTENTS

Page

Section 6.3    Access to Information ..................................................................32

Section 6.4    Commercially Reasonable Efforts ............................................33

Section 6.5    Registration Rights Agreement..................................................33

Section 6.6    Blue Sky .....................................................................................34

Section 6.7    DTC Eligibility ..........................................................................34

Section 6.8    Share Legend ..............................................................................34

ARTICLE VII CONDITIONS TO THE OBLIGATIONS OF THE PARTIES...........................35

Section 7.1    Conditions to the Obligation of the Commitment Parties.............35

Section 7.2    Waiver of Conditions to Obligation of Commitment Parties ...................36

Section 7.3    Conditions to the Obligation of the Company ...........................36

ARTICLE VIII INDEMNIFICATION AND CONTRIBUTION .................................37

Section 8.1    Indemnification Obligations ......................................................37

Section 8.2    Indemnification Procedure .........................................................38

Section 8.3    Settlement of Indemnified Claims .............................................38

Section 8.4    Contribution ...............................................................................39

Section 8.5    Treatment of Indemnification Payments.....................................39

Section 8.6    No Survival .................................................................................39

ARTICLE IX TERMINATION...............................................................................39

Section 9.1    Termination Rights .....................................................................39

Section 9.2    Automatic Termination ...............................................................40

Section 9.3    Termination as to the Supporting Noteholders .........................40

Section 9.4    Outside Date Termination...........................................................41

Section 9.5    Effect of Termination..................................................................41

ARTICLE X GENERAL PROVISIONS..................................................................42

Section 10.1    Notices .......................................................................................42

Section 10.2    Assignment; Third Party Beneficiaries.....................................42

Section 10.3    Prior Negotiations; Entire Agreement ......................................43

Section 10.4    Governing Law; Venue...............................................................43

Section 10.5    Waiver of Jury Trial...................................................................44

Section 10.6    Counterparts...............................................................................44

Section 10.7    Waivers and Amendments; Rights Cumulative .........................44

Section 10.8    Headings .....................................................................................44

iii

# TABLE OF CONTENTS

Page

Section 10.9    Specific Performance ..................................................................44

Section 10.10   Damages.....................................................................................45

Section 10.11   No Reliance.................................................................................45

Section 10.12   Publicity; Public Disclosure of Agreement................................45

Section 10.13   Settlement Discussions ..............................................................46

Section 10.14   Additional Agreements ..............................................................46

## SCHEDULES AND EXHIBITS

Schedule 1          Company Subsidiaries

Schedule 2          Equity Commitment Percentages

Schedule 3          Beneficially Controlled Votable Claims

Schedule 4          Consents

Schedule 5          Notice Addresses for Commitment Parties


Exhibit A           Restructuring Term Sheet

Exhibit B           Form of Plan

KL2 2841447.10

## EQUITY COMMITMENT AGREEMENT

THIS EQUITY COMMITMENT AGREEMENT (this "**Agreement**"), dated as of April 16, 2014, is made by and among Genco Shipping & Trading Limited (the "**Company**") and certain of its subsidiaries listed on Schedule 1 hereto (collectively with the Company, the "**Debtors**"), on the one hand, and the Commitment Parties set forth on Schedule 2 hereto (each referred to herein, individually, as a "**Commitment Party**" and, collectively, as the "**Commitment Parties**"), on the other hand, which Commitment Parties are Lenders and/or Noteholders (each as defined below).  The Company and each Commitment Party is referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**".  Capitalized terms that are used but are not otherwise defined in this Agreement shall have the meanings given to them in Section 1.1 hereof or, if not defined therein, shall have the meanings given to them in the Plan.

## RECITALS

WHEREAS, the Debtors  and the Commitment Parties have entered into a Restructuring Support Agreement, dated as of April 3, 2014 (the "**Restructuring Support Agreement**"), which (a) provides for the restructuring of the Debtors' capital structure and financial obligations pursuant to a "prepackaged" plan of reorganization to be filed in jointly administered cases (the "**Chapter 11 Cases**") under Title 11 of the United States Code, 11 U.S.C. §§ 101- 1532, as may be amended from time to time (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), implementing the terms and conditions of the Restructuring Term Sheet attached as Exhibit A to the Restructuring Support Agreement (the "**Restructuring Term Sheet**") and (b) requires that such plan of reorganization be consistent with the Restructuring Support Agreement and otherwise in form and substance mutually acceptable to the Company and the Required Supporting Creditors (as defined in the Restructuring Support Agreement);

WHEREAS, the Debtors plan to file with the Bankruptcy Court, in accordance with the terms of the Restructuring Support Agreement, a motion seeking entry of the Plan Solicitation Order and one or more motions seeking entry of an order confirming the Plan pursuant to Section 1129 of the Bankruptcy Code and authorizing the consummation of the transactions contemplated hereby (the "**Confirmation Order**");

WHEREAS, pursuant to the Plan and this Agreement, and in accordance with the Rights Offering Procedures, the Company will conduct a rights offering for Rights Offering Shares for an aggregate purchase price of $100,000,000 and at a per-share purchase price equal to the Purchase Price (as defined below), with (x) $80,000,000 of such Rights Offering Shares (the "**Lender Rights Offering Shares**") offered to the eligible lenders  under that certain Credit Agreement, dated as of July 20, 2007, by and among the Company as borrower, the banks and other financial institutions named therein as lenders, Wilmington Trust, N.A., as successor administrative and successor collateral agent (in such capacity, the "**Prepetition 2007 Facility Agent**"), and the other mandated lead arranger and bookrunner parties thereto, as amended (the "**2007 Facility**"), and (y) $20,000,000 of such Rights Offering Shares (the "**Noteholder Rights Offering Shares**") offered to the eligible holders of the 5.00% Convertible Senior Notes due August 15, 2014 issued pursuant to that certain Indenture, dated as of July 27, 2010, between the Company as issuer and The Bank of New York Mellon as trustee (the "**Convertible Notes**");

WHEREAS, subject to the terms and conditions contained in this Agreement, each Commitment Party has agreed to purchase its Equity Commitment Percentage of the Unsubscribed Shares, if any; and

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, each of the Parties hereby agrees as follows:

ARTICLE I

**DEFINITIONS**

Section 1.1    Definitions.  Except as otherwise expressly provided in this Agreement, whenever used in this Agreement (including any Exhibits and Schedules hereto), the following terms shall have the respective meanings specified therefor below:

"**Action**" means any legal, governmental, administrative, regulatory or judicial actions, suits, arbitrations, audits, actions, demands, demand letters, directives, claims, liens, notices of noncompliance or violation, investigations or proceedings.

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made; provided that no Commitment Party shall be deemed an Affiliate of the Company or any of its Subsidiaries for any purpose under this Agreement.  For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person.

"**Articles of Incorporation**" means the amended and restated articles of incorporation of the Company as of the Closing Date, which shall be in accordance with the terms of the Plan.

"**Available Lender Shares**" means the Unsubscribed Lender Shares that any Commitment Party fails to purchase as a result of a Commitment Party Default by such Commitment Party.

"**Available Noteholder Shares**" means the Unsubscribed Noteholder Shares that any Commitment Party fails to purchase as a result of a Commitment Party Default by such Commitment Party.

"**Backstop Shares**" means all Unsubscribed Lender Shares and all Unsubscribed Noteholder Shares that are purchased by the Commitment Parties pursuant to this Agreement.

"**Board**" means the board of directors of the Company.

2

"**Business Day**" means any day, other than a Saturday, Sunday or legal holiday, as defined in Bankruptcy Rule 9006(a).

"**By-Laws**" means the amended and restated by-laws of the Company as of the Closing Date, which shall be in accordance with the terms of the Plan.

"**claim**" has the meaning given to such term in Section 101 of the Bankruptcy Code.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreements**" means any and all written agreements, memoranda of understanding, contracts, letters, side letters and contractual obligations of any kind, nature and description, that have been entered into between, or that involve or apply to, any employer and any Employee Representative.

"**Commitment Party Default**" means the failure by any Commitment Party to deliver and pay the aggregate Purchase Price for such Commitment Party's Equity Commitment Percentage of any Unsubscribed Shares by the Subscription Escrow Funding Date in accordance with Section 2.4(b).

"**Company Disclosure Schedule**" means the disclosure schedules delivered by the Company to the Commitment Parties on the date of this Agreement, which disclosure schedules may only be supplemented or amended by the Company prior to the Rights Offering Expiration Time (other than with respect to Section 4.11, which shall not be subject to amendment or supplement) with the prior written consent of the Required Commitment Parties (such consent not to be unreasonably withheld, conditioned or delayed); provided, however, that no such supplement or amendment shall be permitted to the extent the matters that would be set forth in such supplement or amendment have or would reasonably be expected to have a Material Adverse Effect.

"**Company Plan**" means any employee benefit plan as defined in Section 3(3) of ERISA, which is maintained or contributed to by (or to which there is an obligation to contribute of) the Company or a Subsidiary of the Company, and each such plan for which any such entity has liability.

"**Company SEC Documents**" means all of the reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) filed with the SEC by the Company on or after March 31, 2013.

"**Contract**" means any agreement, contract or instrument, including any loan, note, bond, mortgage, indenture, guarantee, deed of trust, license, franchise, commitment, lease, franchise agreement, letter of intent, memorandum of understanding or other obligation, and any amendments thereto, whether written or oral, but excluding the Plan.

"**Defaulting Commitment Party**" means, at any time, any Commitment Party that caused a Commitment Party Default that is continuing at such time.

3

"**Disclosure Statement**" means the Disclosure Statement for the Plan, as approved pursuant to the Plan Solicitation Order (including all exhibits and schedules thereto).

"**Effective Date**" has the meaning given to such term in the Plan.

"**Emergence Credit Facilities**" means, collectively, as applicable, (a) the New $253 Million Facility (as defined in the Plan), (b) the New $100 Million Facility (as defined in the Plan) and (c) subject to the terms and conditions set forth in the Restructuring Term Sheet, any new third party credit facility entered into by the Debtors on the Effective Date.

"**Employee Representatives**" means any of the Company's or any of its Subsidiaries' respective employees or such employees' labor organization, works council, workers' committee, union representatives or any other type of employees' representatives appointed for collective bargaining purposes.

"**Environmental Claims**" shall mean any and all Actions under any Environmental Law, including, without limitation, (a) any and all Actions by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) any and all Actions by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief in connection with alleged injury or threat of injury to health, safety or the environment due to the presence of Hazardous Materials.

"**Environmental Law**" shall mean any applicable international, regional, Federal, state, foreign or local statute, law, rule, regulation, ordinance, code, treaties, directives, protocols, codes, standards, binding and enforceable guideline, binding and enforceable written policy and rule of common law now or hereafter in effect and in each case as amended, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, to the extent binding on the Company or any of its Subsidiaries, relating to the environment (including, without limitation, ambient air, surface water, ground water, navigable waters, waters of the contiguous zone, coastal water, ocean waters and international waters), and/or Hazardous Materials or otherwise relating to the control, management, treatment or discharge of ballast water and effluents, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Hazardous Material Transportation Act, 49 U.S.C. § 1801 et seq.; the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq. (to the extent it regulates occupational exposure to Hazardous Materials); and any state and local or foreign counterparts or equivalents, in each case as amended from time to time.

"**Equity Commitment Percentage**" means, with respect to any Commitment Party, (a) with respect to any Unsubscribed Lender Shares, the percentage obtained by dividing the amount of such Commitment Party's Prepetition 2007 Facility Claims by the total of all Commitment Parties' Prepetition 2007 Facility Claims (each as determined on the date hereof) and (b) with respect to any Unsubscribed Noteholder Shares, the percentage obtained by dividing the amount of such Commitment Party's Convertible Note Claims by the total of all Commitment Parties' Convertible Note Claims (each as determined on the date hereof).

KL2 2841447.10

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**ERISA Affiliate**" means each person (as defined in Section 3(9) of ERISA) which together with the Company or a Subsidiary of the Company would be deemed to be a "single employer" within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any ERISA Plan (excluding those for which the provision for 30 day notice to the PBGC has been waived by regulation); (ii) the failure of any ERISA Plan to meet the minimum funding standard of Section 412 or Section 430 of the Code or Section 302 or 303 of ERISA, in each case whether or not waived, or the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any ERISA Plan or the failure of a Company or any of its ERISA Affiliates to make any required contribution to a Multiemployer Plan; (iii) the provision by the administrator of any ERISA Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by a Company  or any of its ERISA Affiliates from any Multiple Employer Plan or the termination of any such Multiple Employer Plan resulting in liability to the Company or any of its ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any ERISA Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any ERISA Plan; (vi) the imposition of liability on the Company or any of its ERISA Affiliates pursuant to Section 4062 or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of the Company or any of its ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefore, or the receipt by a Company or any of its ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the occurrence of an act or omission which could give rise to the imposition on the Company or any of its ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Code or under Section 406, Section 409, Sections 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Company Plan; (ix) the assertion of a material claim (other than routine claims for benefits) against any Company Plan other than a Multiemployer Plan or the assets thereof, or against a Company or any of its respective ERISA Affiliates in connection with any Company Plan; (x) the imposition of a Lien on the assets of a Company pursuant to Section 430(k) of the Code or pursuant to Section 303(k) of ERISA with respect to any ERISA Plan; (xi) a determination that any ERISA Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); or (xii) a determination that any Multiemployer Plan is, or is expected to be, in "critical" "endangered" status under Section 432 of the Code or Section 305 of ERISA.

"**ERISA Plan**" means any pension plan as defined in Section 3(2) of ERISA (other than a Multiemployer Plan), which is maintained or contributed to by (or to which there is an obligation to contribute of) the Company or a Subsidiary of the Company or any ERISA Affiliate, and each such plan for which any such entity has liability.

"**Event**" means any event, development, occurrence, circumstance or change.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulation of the SEC thereunder.

"**Foreign Pension Plan**" means any plan, fund (including, without limitation, any superannuation fund) or other similar program established or maintained outside the United States of America by the Company or any one or more of its Subsidiaries primarily for the benefit of employees of the Company or such Subsidiaries residing outside the United States of America, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"**Governmental Entity**" means any U.S. or non-U.S. international, regional, federal, state, municipal or local governmental, judicial, administrative, legislative or regulatory authority, entity, instrumentality, agency, department, commission, court, or tribunal of competent jurisdiction (including any branch, department or official thereof).

"**Hazardous Materials**" shall mean: (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing levels of polychlorinated biphenyls, ballast water and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous substances," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants," or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any governmental authority under Environmental Laws.

"**Intellectual Property**" means all U.S. or foreign intellectual or industrial property or proprietary rights, including any:  (a) trademarks, service marks, trade dress, domain names, social media identifiers, corporate and trade names, logos and all other indicia of source or origin, together with all associated goodwill, (b) patents, inventions, invention disclosures, technology, know-how, processes and methods, (c) copyrights and copyrighted works, (including software, applications, source and object code, databases and compilations, advertising and promotional materials, mobile and social media content and documentation), (d) trade secrets and confidential or proprietary information or content, and (e) all registrations, applications, renewals, re-issues, continuations, continuations-in-part, divisions, extensions, re- examinations and foreign counterparts of any of the foregoing.

"**IRS**" means the United States Internal Revenue Service.

"**Knowledge of the Company**" means the actual knowledge of Peter Georgiopoulos, Robert Gerald Buchanan and John C. Wobensmith.

"**Law**" means any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued or promulgated by any Governmental Entity.

6

"**Lender**" means any Person that holds a claim with respect to the 2007 Facility and satisfies the eligibility criteria set forth in the Rights Offering Procedures with respect to purchasing Lender Rights Offering Shares pursuant to the Rights Offering.

"**Lien**" means any lease, lien, adverse claim, charge, option, right of first refusal, servitude, security interest, mortgage, pledge, deed of trust, easement, encumbrance, restriction on transfer, conditional sale or other title retention agreement, defect in title or other restrictions of a similar kind.

"**Material Adverse Effect**" means any Event after December 31, 2013 which, together with all other Events, has had or would reasonably be expected to have a material adverse effect on (a) the business, assets, liabilities, finances, properties, results of operations, condition (financial or otherwise), in each case of the Post-Effective Date Business, or (b) the ability of the Company to perform its obligations under, or to consummate the transactions contemplated by, this Agreement or the Plan, including the Rights Offering, in each case, except to the extent such Event results from (i) any change after the date hereof in global, national or regional political conditions or in the general business, market and economic conditions affecting the industries and regions in which the Company and its Subsidiaries operate, including, in each case, natural disasters and acts of terrorism, war or piracy or other hostilities; (ii) the matters expressly identified or described in the Disclosure Statement as delivered on the date hereof (excluding any risk factor disclosure and disclosure included in any "forward-looking statements" disclaimer or other statements included in the Disclosure Statement, in each case, that are predictive, forward-looking, non-specific or primarily cautionary in nature) or the Company Disclosure Schedules as delivered on the date hereof; (iii) any changes after the date hereof in applicable Law, in GAAP or the interpretation or enforcement thereof; (iv) the execution, delivery, announcement or existence of, or performance of this Agreement or the transactions contemplated hereby, the Rights Offering, the Plan or the Restructuring Support Agreement, including, but not limited to the announcement of the identity of the Commitment Parties; (v) any act or omission of the Company or its Subsidiaries required or prohibited, as applicable, by this Agreement or consented to or requested by the Required Commitment Parties in writing; (vi) changes in the market price or trading volume of the securities of the Company (but not the underlying facts giving rise to such changes); (vii) the departure of officers or directors of the Company (but not the underlying facts giving rise to such departure); (viii) any failure, in and of itself, of the Company or any of its Subsidiaries to meet, with respect to any period or periods, any internal or industry analyst projections, forecasts, estimates of earnings or revenues, or business plans (it being understood and agreed that the facts and circumstances giving rise to or contributing to such failure shall be taken into account in determining whether a Material Adverse Effect has occurred); (ix) the fact of the delisting of the Company's equity securities from the New York Stock Exchange; (x) the pursuit, filing, pendency or prosecution of the Chapter 11 Cases; or (xi) any Event that has been specifically disclosed by the Company in the Company SEC Documents filed prior to the date hereof (excluding any risk factor disclosure and disclosure included in any "forward-looking statements" disclaimer or other statements included in the Company SEC Documents, in each case, that are predictive, forward-looking, non-specific or primarily cautionary in nature); provided, that the exceptions set forth in clauses (i) and (iii) shall not apply to the extent that such event, change, effect, circumstance or condition is disproportionately adverse to the Company and its Subsidiaries, taken as a whole, as compared to other companies in the industries in which the Company and its Subsidiaries operate.

7

"**Multiemployer Plan" or "Multiple Employer Plan**" means a plan which is defined in Section 3(37) of ERISA and which is contributed to by (or to which there is an obligation to contribute of) the Company or a Subsidiary of the Company or any ERISA Affiliate, and each such plan for which any such entity has liability.

"**NLRB**" means the U.S. National Labor Relations Board.

"**Noteholder**" means any Person that holds a claim with respect to the Convertible Notes and satisfies the eligibility criteria set forth in the Rights Offering Procedures with respect to purchasing Noteholder Rights Offering Shares pursuant to the Rights Offering.

"**Order**" means any judgment, order, award, injunction, writ, permit, license or decree of any Governmental Entity or arbitrator.

"**Owned Real Property**" means all real property and interests in real property owned, in whole or in part, directly or indirectly by the Company and its Subsidiaries, together with all buildings, fixtures and improvements now or subsequently located thereon, and all appurtenances thereto.

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"**Permitted Liens**" means (a) Liens for Taxes, assessments, and other governmental levies, fees or charges that (i) are not due and payable or (ii) are being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (b) mechanics liens and similar liens for labor, materials or supplies provided with respect to any Owned Real Property or personal property incurred in the ordinary course of business consistent with past practice and as otherwise not prohibited under this Agreement, for amounts that do not materially detract from the value of, or materially impair the use of, any of the Owned Real Property or personal property of the Company or any of its Subsidiaries; (c) zoning, building codes and other land use Laws regulating the use or occupancy of any Owned Real Property or the activities conducted thereon that are imposed by any Governmental Entity having jurisdiction over such real property; provided that no such zoning, building codes and other land use Laws prohibit the use or occupancy of such Owned Real Property; (d) easements, covenants, conditions, restrictions and other similar matters affecting title to any Owned Real Property and other title defects that do not or would not materially impair the use or occupancy of such real property or the operation of the Company's or any of its Subsidiaries' business; (e) after the occurrence of the Effective Date, Liens granted in connection with the Emergence Credit Facilities; and (f) Liens that, pursuant to the Confirmation Order, will not survive beyond the Effective Date.

"**Person**" means an individual, firm, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, associate, trust, Governmental Entity or other entity or organization.

"**Petition Date**" means the date that the Debtors file voluntary petitions in the Bankruptcy Court to commence the Chapter 11 Cases.

8

"**Plan**" means the Debtors' Joint Plan of Reorganization, in substantially the form attached as Exhibit B hereto (including the Plan Supplement and all other exhibits, schedules and annexes thereto) providing for, among other matters, the implementation of this Agreement, as may be further amended, supplemented or otherwise modified from time to time in a manner that is reasonably satisfactory to the Required Commitment Parties.

"**Plan Solicitation Order**" means an order entered by the Bankruptcy Court, in form and substance reasonably satisfactory to the Required Commitment Parties, (a) approving the Disclosure Statement; (b) approving the voting record date and procedures used for voting on the Plan in the Prepack Solicitation; (c) approving the forms of ballots, solicitation packages used in the Prepack Solicitation and the procedures used for the distribution thereof; (d) establishing notice and objection procedures for the confirmation of the Plan; and (e) approving the commencement of the Rights Offering in accordance with the Rights Offering Procedures.

"**Plan Supplement**" means the plan supplement to be filed by the Debtors with the Bankruptcy Court.

"**Post-Effective Date Business**" means the businesses, assets and properties of the Company and its Subsidiaries, taken as a whole, as of the Effective Date after giving effect to the transactions contemplated by the Plan, as described in the Disclosure Statement.

"**Prepack Solicitation**" means the solicitation of votes to accept or reject the Plan prior to the commencement of the Chapter 11 Cases.

"**Purchase Price**" means the price per share at which the Rights Offering Shares will be sold by the Company pursuant to the Rights Offering, in accordance with the Rights Offering Procedures.

"**Real Property Leases**" means those leases, subleases, licenses, concessions and other agreements, as amended, modified or restated, pursuant to which the Company or one of its Subsidiaries holds a leasehold or subleasehold estate in, or is granted the right to use or occupy, any land, buildings, structures, improvements, fixtures or other interest in real property used in the Company's or its Subsidiaries' business.

"**Registration Rights Agreement**" means a registration rights agreement, which shall be in form and substance consistent with the terms set forth in the Restructuring Term Sheet and otherwise reasonably acceptable to the Company and Commitment Parties owning more than 66 2/3% of the aggregate principal outstanding under the 2007 Facility held by all Commitment Parties, and which shall grant each Commitment Party registration rights with respect to all Backstop Shares purchased by it.

"**Related Party**" means, with respect to any Person, (a) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, member, manager or stockholder of such Person and (b) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, member, manager or stockholder of any of the foregoing.

KL2 2841447.10

"**Reorganized Genco Corporate Documents**" means, collectively, the By-Laws and the Articles of Incorporation.

"**Representatives**" means, with respect to any Person, such Person's directors, officers, members, partners, managers, employees, agents, investment bankers, attorneys, accountants, advisors and other representatives.

"**Required Commitment Parties**" means (a) Commitment Parties owning more than 66 2/3% of the aggregate principal outstanding under the 2007 Facility held by all Commitment Parties and (b) Commitment Parties who own more than 66 2/3% of the aggregate Convertible Notes claims held by all Commitment Parties who (i) were not Supporting Lenders (as defined in the Restructuring Support Agreement) on April 3, 2014 and (ii) are members of the ad hoc group of Noteholders represented by Akin, Gump, Strauss, Hauer & Feld LLP.

"**Rights**" means the subscription rights to purchase Rights Offering Shares distributed pursuant to and in accordance with the Rights Offering Procedures.

"**Rights Offering**" means the rights offering for Rights Offering Shares contemplated by the Rights Offering Procedures and otherwise reasonably satisfactory to the Required Commitment Parties.

"**Rights Offering Expiration Time**" means the time and the date on which the rights offering subscription form must be duly delivered to the Rights Offering Subscription Agent in accordance with the Rights Offering Procedures, together with the applicable Purchase Price.

"**Rights Offering Participants**" means those Persons who duly subscribe for Rights Offering Shares in accordance with the Rights Offering Procedures.

"**Rights Offering Procedures**" means the procedures with respect to the Rights Offering that are approved by the Bankruptcy Court pursuant to the Plan Solicitation Order, which procedures shall be in form and substance reasonably satisfactory to the Required Commitment Parties.

"**Rights Offering Shares**" means the shares of New Genco Common Stock (including all Unsubscribed Shares purchased by the Commitment Parties pursuant to this Agreement) distributed pursuant to and in accordance with the Rights Offering Procedures.

"**Rights Offering Subscription Agent**" means a subscription agent appointed by the Company and reasonably satisfactory to the Required Commitment Parties.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC thereunder.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture or other legal entity as to which such Person (either alone or through or together

with any other subsidiary), (a) owns, directly or indirectly, more than fifty percent (50%) of the stock or other equity interests, (b) has the power to elect a majority of the board of directors or similar governing body or (c) has the power to direct the business and policies.

"**Takeover Statute**" means any restrictions contained in any "fair price," "moratorium," "control share acquisition", "business combination" or other similar anti-takeover statute or regulation.

"**Taxes" or "Tax**" means all taxes, assessments, duties, levies or other mandatory governmental charges paid to a Governmental Entity, including all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, excise, severance, windfall profits, stamp, payroll, social security, withholding and other taxes, assessments, duties, levies or other mandatory governmental charges of any kind whatsoever paid to a Governmental Entity (whether payable directly or by withholding and whether or not requiring the filing of a Tax return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest thereon and shall include any liability for such amounts as a result of being a member of a combined, consolidated, unitary or affiliated group.

"**Transfer**" means sell, transfer, assign, pledge, hypothecate, participate, donate or otherwise encumber or dispose of.

"**Unfunded Current Liability**" means, with respect to any ERISA Plan, the amount, if any, by which the value of the accumulated plan benefits under the ERISA Plan determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

"**Unsubscribed Lender Shares**" means the Lender Rights Offering Shares that have not been duly subscribed for by Lenders (including the Commitment Parties) pursuant to the Rights Offering, in accordance with the Rights Offering Procedures and the Plan.

"**Unsubscribed Noteholder Shares**" means the  Noteholder Rights Offering Shares that have not been duly subscribed for by Noteholders (including the Commitment Parties)  pursuant to the Rights Offering, in accordance with the Rights Offering Procedures and the Plan.

"**Unsubscribed Shares**" means, collectively, the Unsubscribed Lender Shares and the Unsubscribed Noteholder Shares.

"**Votable 2007 Facility Claims**" means, collectively, all Prepetition 2007 Facility Claims.

"**Votable Claims**" means, collectively, all Votable 2007 Facility Claims and all Votable Convertible Note Claims.

11

"**Votable Convertible Note Claims**" means, collectively, all allowed claims arising under the Convertible Notes.

Section 1.2    Additional Defined Terms.  In addition to the terms defined in Section 1.1, additional defined terms used herein shall have the respective meanings assigned thereto in the Sections indicated in the table below.

| Defined Term | Section |
|---|---|
| 2007 Facility | Recitals |
| Agreement | Preamble |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Beneficially Controlled Votable Claims | Section 5.10(a) |
| Chapter 11 Proceedings | Recitals |
| Closing | Section 2.5(a) |
| Closing Date | Section 2.5(a) |
| Commitment Party | Preamble |
| Company | Preamble |
| Confirmation Order | Recitals |
| Convertible Notes | Recitals |
| Debtors | Preamble |
| Equity Commitment | Section 2.2 |
| Financial Statements | Section 4.9 |
| Funding Notice | Section 2.4(a) |
| GAAP | Section 4.9 |
| Indemnified Claim | Section 8.2 |
| Indemnified Person | Section 8.1 |
| Indemnifying Parties | Section 8.1 |
| Infringed | Section 4.15 |
| Legend | Section 6.8 |
| Lender Commitment Party Replacement | Section 2.3(a) |
| Lender Commitment Party Replacement Period | Section 2.3(a) |
| Lender Rights Offering Shares | Recitals |
| Losses | Section 8.1 |
| Material Contract | Section 4.24 |
| Money Laundering Laws | Section 4.26 |
| Noteholder Rights Offering Shares | Recitals |
| Outside Date | Section 9.4 |
| Party | Preamble |
| Pre-Closing Period | Section 6.2 |
| Prepetition 2007 Facility Agent | Recitals |
| Related Purchaser | Section 2.6(a) |
| Replacing Lender Commitment Parties | Section 2.3(a) |
| Restructuring Support Agreement | Recitals |
| Restructuring Term Sheet | Recitals |
| Subscription Escrow Account | Section 2.4(a) |
| Subscription Escrow Funding Date | Section 2.4(b) |

12

| Defined Term | Section |
|---|---|
| Tax Returns...................................................................... | Section 4.20 |
| Transaction Agreements ................................................ | Section 4.2(a) |
| Transaction Expenses..................................................... | Section 3.1(a) |
| Ultimate Purchaser.......................................................... | Section 2.6(b) |
| Unlegended Shares.......................................................... | Section 6.7 |
| willful or intentional breach............................................ | Section 9.5(a) |

Section 1.3    Construction.  In this Agreement, unless the context otherwise requires:

(a)    references to Articles, Sections, Exhibits and Schedules are references to the articles and sections or subsections of, and the exhibits and schedules attached to, this Agreement;

(b)    the descriptive headings of the Articles and Sections of this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement;

(c)    references in this Agreement to "writing" or comparable expressions include a reference to a written document transmitted by means of electronic mail in portable document format (pdf), facsimile transmission or comparable means of communication;

(d)    words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(e)    the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole, including all Exhibits and Schedules attached to this Agreement, and not to any provision of this Agreement;

(f)    the term this "Agreement" shall be construed as a reference to this Agreement as the same may have been, or may from time to time be, amended, modified, varied, novated or supplemented;

(g)    "include", "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words;

(h)    references to "day" or "days" are to calendar days;

(i)    unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder in effect on the date of this Agreement; and

(j)    references to "dollars" or "$" are to United States of America dollars.

13

# ARTICLE II

# EQUITY COMMITMENT

Section 2.1    <u>The Rights Offering</u>.  On and subject to the terms and conditions hereof, including entry of the Plan Solicitation Order by the Bankruptcy Court, the Company shall conduct the Rights Offering pursuant to and in accordance with the Rights Offering Procedures, this Agreement, and the Plan.

Section 2.2    <u>The Equity Commitment</u>.  On and subject to the terms and conditions hereof, including entry of the Confirmation Order by the Bankruptcy Court, each Commitment Party agrees, severally and not jointly, to fully exercise all Rights that are issued to it pursuant to the Rights Offering and to duly purchase all Rights Offering Shares issuable to it pursuant to such exercise, in accordance with the Rights Offering Procedures and the Plan; <u>provided</u> that any Commitment Party who fails to comply with such obligations shall be liable to each non-Defaulting Commitment Party as a result of such failure to comply.  On and subject to the terms and conditions hereof, including entry of the Confirmation Order, each Commitment Party agrees, severally and not jointly, to purchase, and the Company agrees to sell to such Commitment Party, on the Closing Date for the Purchase Price, (a) the number of Unsubscribed Lender Shares equal to such Commitment Party's Equity Commitment Percentage of the aggregate number of Unsubscribed Lender Shares, rounded among the Commitment Parties that hold Votable 2007 Facility Claims solely to avoid fractional shares as such Commitment Parties may determine in their sole discretion (provided that in no event shall such rounding reduce the aggregate commitment of such Commitment Parties) and (b) the number of Unsubscribed Noteholder Shares equal to such Commitment Party's Equity Commitment Percentage of the aggregate number of Unsubscribed Noteholder Shares, rounded among the Commitment Parties that hold Votable Convertible Note Claims solely to avoid fractional shares as such Commitment Parties may determine in their sole discretion (provided that in no event shall such rounding reduce the aggregate commitment of such Commitment Parties) (such obligation to purchase the Unsubscribed Shares, the "**Equity Commitment**").

Section 2.3    <u>Commitment Party Default.</u>

(a)    Upon the occurrence of a Commitment Party Default with respect to the Unsubscribed Lender Shares, the Commitment Parties that hold Votable 2007 Facility Claims (other than any Defaulting Commitment Party) shall have the right, but not the obligation, within five (5) Business Days after receipt of written notice from the Company to all such Commitment Parties of such Commitment Party Default, which notice shall be given promptly following the occurrence of such Commitment Party Default (such five (5) Business Day period, the "**Lender Commitment Party Replacement Period**"), to purchase all or any portion of the Available Lender Shares (such purchase, a "**Lender Commitment Party Replacement**"), on the terms and subject to the conditions set forth in this Agreement, which purchase shall be allocated pro rata among all such Commitment Parties electing to purchase all or any portion of the Available Lender Shares (such Commitment Parties, the "**Replacing Lender Commitment Parties**") based upon the relative applicable Equity Commitment Percentage of any such Replacing Lender Commitment Parties or as may otherwise be agreed upon by the Replacing Lender Commitment Parties.  Any such Available Lender Shares purchased by a Replacing Lender Commitment Party

14

shall be included in the determination of the Unsubscribed Lender Shares of such Replacing Lender Commitment Party for all purposes hereunder. If a Commitment Party Default occurs with respect to the Unsubscribed Lender Shares, the Outside Date shall be delayed only to the extent necessary to allow for the Lender Commitment Party Replacement to be completed within the Lender Commitment Party Replacement Period.

(b)      Upon the occurrence of a Commitment Party Default with respect to the Unsubscribed Noteholder Shares, the Commitment Parties that hold Votable Convertible Note Claims (other than any Defaulting Commitment Party) shall have the right, but not the obligation, within five (5) Business Days after receipt of written notice from the Company to all such Commitment Parties of such Commitment Party Default, which notice shall be given promptly following the occurrence of such Commitment Party Default (such five (5) Business Day period, the "**Noteholder Commitment Party Replacement Period**") to purchase all or any portion of the Available Noteholder Shares (such purchase, a "**Noteholder Commitment Party Replacement**") on the terms and subject to the conditions set forth in this Agreement, which purchase shall be allocated pro rata among all such Commitment Parties electing to purchase all or any portion of the Available Noteholder Shares (such Commitment Parties, the "**Replacing Noteholder Commitment Parties**") based upon the relative applicable Equity Commitment Percentage of any Replacing Noteholder Commitment Parties or as may otherwise be agreed upon by the Replacing Noteholder Commitment Parties.  Any such Available Noteholder Shares purchased by a Replacing Noteholder Commitment Party shall be included in the determination of the Unsubscribed Noteholder Shares of such Replacing Noteholder Commitment Party for all purposes hereunder. If a Commitment Party Default occurs with respect to the Unsubscribed Noteholder Shares, the Outside Date shall be delayed only to the extent necessary to allow for the Noteholder Commitment Party Replacement to be completed within the Noteholder Commitment Party Replacement Period.

(c)      Nothing in this Agreement shall be deemed to require a Commitment Party to purchase more than its Equity Commitment Percentage of the Unsubscribed Lender Shares and/or Unsubscribed Noteholder Shares, as applicable.

(d)      For the avoidance of doubt, notwithstanding anything to the contrary set forth in Section 9.4 but subject to Section 10.10, no provision of this Agreement shall relieve any Defaulting Commitment Party from liability hereunder in connection with such Defaulting Commitment Party's Commitment Party Default.

Section 2.4      Subscription Escrow Account Funding.

(a)      Funding Notice. No later than the second (2nd) Business Day following the Rights Offering Expiration Time, the Rights Offering Subscription Agent shall deliver to each Commitment Party a written notice (the "**Funding Notice**") of (i) the number of Lender Rights Offering Shares elected to be purchased by the Rights Offering Participants who are Lenders and the aggregate Purchase Price therefor; (ii) the number of Noteholder Rights Offering Shares elected to be purchased by the Rights Offering Participants who are Noteholders and the aggregate Purchase Price therefor; (iii) the aggregate number of Unsubscribed Lender Shares and the aggregate Purchase Price therefor; (iv) the aggregate number of Unsubscribed Noteholder Shares and the aggregate Purchase Price therefor; (v) the aggregate number of

15

Unsubscribed Lender Shares (based upon such Commitment Party's Equity Commitment Percentage) to be issued and sold by the Company to such Commitment Party and the aggregate Purchase Price therefor; (vi) the aggregate number of Unsubscribed Noteholder Shares (based upon such Commitment Party's Equity Commitment Percentage) to be issued and sold by the Company to such Commitment Party and the aggregate Purchase Price therefor; and (vii) the escrow account to which such Commitment Party shall deliver and pay the aggregate Purchase Price for such Commitment Party's Equity Commitment Percentage of the Unsubscribed Lender Shares and/or the Unsubscribed Noteholder Shares, as applicable (the "**Subscription Escrow Account**").  The Rights Offering Subscription Agent shall promptly provide any written backup, information and documentation relating to the information contained in the applicable Funding Notice as any Commitment Party may reasonably request.

(b)      Subscription Escrow Account Funding.  No later than the fifth (5th) Business Day following receipt of the Funding Notice (such date, the "**Subscription Escrow Funding Date**"), each Commitment Party shall deliver and pay the aggregate Purchase Price for such Commitment Party's Equity Commitment Percentage of the Unsubscribed Lender Shares and/or Unsubscribed Noteholder Shares, as applicable, by wire transfer in immediately available funds in U.S. dollars into the Subscription Escrow Account in satisfaction of such Commitment Party's Equity Commitment.  The Subscription Escrow Account shall be established with an escrow agent satisfactory to the Required Commitment Parties and the Company pursuant to an escrow agreement in form and substance reasonably satisfactory to the Required Commitment Parties and the Company.  The funds held in the Subscription Escrow Account shall be released, and each Commitment Party shall receive from the Subscription Escrow Account the cash amount actually funded to the Subscription Escrow Account by such Commitment Party, plus any interest accrued thereon, within two (2) Business Days following the earlier to occur of (i) the termination of this Agreement in accordance with its terms and (ii) the Outside Date if, by such date, the Closing Date has not occurred.

Section 2.5      Closing.

(a)      Subject to Article VII, unless otherwise mutually agreed in writing between the Company and the Required Commitment Parties, the closing of the Equity Commitment (the "**Closing**") shall take place on the Effective Date, simultaneously with the closing of the Rights Offering in accordance with the terms of the Rights Offering Procedures, at the offices of Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036; it being understood that the Closing shall not occur until all of the conditions set forth in Article VII shall have been satisfied or waived in accordance with this Agreement (other than conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions).  The date on which the Closing actually occurs shall be referred to herein as the "**Closing Date**".

(b)      At the Closing, the funds held in the Subscription Escrow Account shall be released and utilized as set forth and in accordance with the Plan.

(c)      At the Closing, issuance of the Unsubscribed Shares will be made by the Company to each Commitment Party (or its designee in accordance with Section 2.6(a)) against payment of the aggregate Purchase Price for the Unsubscribed Shares of such Commitment

16

Party. Unless a Commitment Party requests delivery of a physical stock certificate, the entry of any Unsubscribed Shares to be delivered pursuant to this Section 2.5(c) into the account of a Commitment Party pursuant to the Company's book entry procedures and delivery to such Commitment Party of an account statement reflecting the book entry of such Unsubscribed Shares shall be deemed delivery of such Unsubscribed Shares for purposes of this Agreement. Notwithstanding anything to the contrary in this Agreement, all Unsubscribed Shares will be delivered with all issue, stamp, transfer, sales and use, or similar transfer Taxes or duties that are due and payable (if any) in connection with such delivery duly paid by the Company.

Section 2.6    Designation and Assignment Rights.

(a)    Each Commitment Party shall have the right to designate by written notice to the Company no later than two (2) Business Days prior to the Closing Date that some or all of its Unsubscribed Shares be issued in the name of, and delivered to, one or more of its Affiliates or funds or accounts that are managed by such Commitment Party or its Affiliates (each, a "**Related Purchaser**") upon receipt by the Company of payment therefor in accordance with the terms hereof, which notice of designation shall (i) be addressed to the Company and signed by such Commitment Party and each Related Purchaser, (ii) specify the number of Unsubscribed Shares to be delivered to or issued in the name of each such Related Purchaser and (iii) contain a confirmation by each such Related Purchaser of the accuracy of the representations set forth in Sections 5.6 through 5.9 as applied to such Related Purchaser; provided that no such designation pursuant to this Section 2.6(a) shall relieve such Commitment Party from its obligations under this Agreement.

(b)    Each Commitment Party shall have the right to sell, transfer and assign all or any portion of its Equity Commitment (without transferring all or any portion of its Prepetition 2007 Facility Claims or Convertible Note Claims, which transfers shall be governed by Section 2.6(c)) to (i) a Related Purchaser or (ii) with the prior written consent of the Company (such consent not to be unreasonably withheld, conditioned or delayed), one or more Persons (other than a Related Purchaser) that is reasonably acceptable to the Required Commitment Parties (each such Related Purchaser or other Person, an "**Ultimate Purchaser**") and that, in each case agrees in a writing addressed to the Company (A) to purchase such portion of such Commitment Party's Equity Commitment, (B) to be fully bound by, and subject to, this Agreement and (C) to provide the representations and warranties set forth in Article V hereof; provided that no such sale, transfer or assignment pursuant to this Section 2.6(b) shall relieve any such Commitment Party from its obligations under this Agreement. In the event of a default by such transferee or assignee, as applicable, of its obligations hereunder to purchase any Unsubscribed Lender Shares or Unsubscribed Noteholder Shares, as applicable, the transferring or assigning Commitment Party shall be obligated to purchase such Unsubscribed Lender Shares or Unsubscribed Noteholder Shares, as applicable, within one (1) Business Day of receiving notice of such default.

(c)    In the event that any Commitment Party purports to sell, transfer or assign all or any portion of its Prepetition 2007 Facility Claims or its Convertible Note Claims (in each case before the Claims Record Date), then such transferee or assignee, as applicable, shall agree in a writing addressed to the Company (i) to assume a proportionate percentage of such Commitment Party's Equity Commitment, (ii) that such transferee or assignee shall be fully

17

bound by, and such Prepetition 2007 Facility Claims and/or Convertible Note Claims, as applicable, shall be fully subject to, this Agreement and (iii) to provide the representations and warranties set forth in Article V hereof; provided that no such sale, transfer or assignment pursuant to this Section 2.6(c) shall relieve such Commitment Party from any of its obligations under this Agreement.  In the event of a default by such transferee or assignee, as applicable, of its obligations hereunder to purchase any Unsubscribed Lender Shares or Unsubscribed Noteholder Shares, as applicable, the transferring or assigning Commitment Party shall be obligated to purchase such Unsubscribed Lender Shares or Unsubscribed Noteholder Shares, as applicable, within one (1) Business Day of receiving notice of such default.

ARTICLE III

**EXPENSE REIMBURSEMENT**

Section 3.1    Transaction Expenses.

(a)     On the Effective Date, the Company will reimburse or pay, as the case may be, the reasonable, actual and documented out-of-pocket costs and expenses incurred in connection with the Rights Offering, the Equity Commitment and the other transactions contemplated thereby and hereby (including investigating, negotiating and completing such transactions) of (i) in the case of the Supporting Lenders, Milbank, Tweed, Hadley & McCloy LLP and Houlihan Lokey Capital, Inc., in accordance with the applicable fee letter and (ii) in the case of the Supporting Noteholders, Akin Gump Strauss Hauer & Feld LLP and Jefferies LLC, in accordance with the applicable fee letter (collectively, "**Transaction Expenses**"), in each case to the extent that such fees and expenses are incurred on or prior to the earlier of (x) the termination of this Agreement and (y) the Effective Date.

(b)     The provision for the payment of the Transaction Expenses is an integral part of the transactions contemplated by this Agreement and without this provision the Commitment Parties would not have entered into this Agreement and such Transaction Expenses shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.  The payment of Transaction Expenses hereunder shall not limit the payment of fees and expenses as contemplated in the Restructuring Support Agreement or in any other agreement by and among the Parties hereto; provided, however, that the payment of any fee or expense pursuant to this Section 3.1 shall not be duplicative with the payment of any fee or expense pursuant to the Restructuring Support Agreement or any other agreement by and among the parties hereto.

ARTICLE IV

**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

Except as set forth in (i) the Company SEC Documents filed prior to the date hereof (excluding any risk factor disclosure and disclosure included in any "forward-looking statements" disclaimer or other statements included in such Company SEC Documents, in each case, that are predictive, forward-looking, non-specific or primarily cautionary in nature), (ii) the Disclosure Statement  (excluding any risk factor disclosure and disclosure of risks included in

18

any "forward-looking statements" disclaimer or other statements included in the Disclosure Statement, in each case, that are predictive, forward-looking, non-specific or primarily cautionary in nature), or (iii) the Company Disclosure Schedule, the Debtors, jointly and severally, hereby represent and warrant to the Commitment Parties  (unless otherwise set forth herein, as of the date of this Agreement and as of the Closing Date) as set forth below.  Any disclosure in the Company SEC Documents or the Disclosure Statement that is deemed to qualify a representation or warranty shall only so qualify a representation or warranty to the extent that it is made in such a way as to make the relevance of such disclosure to these representations and warranties reasonably apparent on its face.  Any reference in the Company Disclosure Schedule will be deemed to be an exception to (or, as applicable, a disclosure for purposes of) (x) the representations and warranties (or covenants, as applicable) that are contained in the corresponding Section of this Agreement and (y) any other representations and warranties that are contained in this Agreement if the relevance of that reference as an exception to (or a disclosure for purposes of) such representations and warranties is reasonably apparent on its face.

Section 4.1    Organization and Qualification.  Each of the Company and each of its Subsidiaries (i) is a duly organized and validly existing corporation, limited liability company or limited partnership, as the case may be, in good standing under the laws of the jurisdiction of its incorporation or formation, (ii) has the corporate or other applicable power and authority to own its property and assets and to transact the business in which it is currently engaged and presently proposes to engage and (iii) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the conduct of its business as currently conducted requires such qualifications.

Section 4.2    Corporate Power and Authority.

(a)    The Company has the requisite power and authority, subject to entry of the Confirmation Order, to enter into, execute and deliver this Agreement and perform each of its obligations hereunder and (ii) subject to entry of the Confirmation Order, to enter into, execute and deliver the Registration Rights Agreement and all other agreements to which it will be a party as contemplated by this Agreement and the Plan (this Agreement, the Registration Rights Agreement and such other agreements, collectively, the "**Transaction Agreements**") and to perform its obligations under each of the Transaction Agreements (other than this Agreement). Subject to entry of the Confirmation Order, the execution and delivery of this Agreement and each of the other Transaction Agreements and the consummation of the transactions contemplated hereby and thereby have been or will be duly authorized by all requisite corporate action on behalf of the Company, and no other corporate proceedings on the part of the Company are or will be necessary to authorize this Agreement or any of the other Transaction Agreements or to consummate the transactions contemplated hereby or thereby.

(b)    Subject to entry of the Confirmation Order, each of the other Debtors has the requisite power and authority (corporate or otherwise) to enter into, execute and deliver each Transaction Agreement to which such other Debtor is a party and to perform its obligations thereunder.  Subject to entry of the Confirmation Order, the execution and delivery of this Agreement and each of the other Transaction Agreements and the consummation of the transactions contemplated hereby and thereby have been or will be duly authorized by all

requisite corporate action on behalf of each other Debtor party thereto, and no other corporate proceedings on the part of any other Debtor party thereto are or will be necessary to authorize this Agreement or any of the other Transaction Agreements or to consummate the transactions contemplated hereby or thereby.

(c)    Subject to entry of the Confirmation Order, each of the Company and the other Debtors has the requisite corporate power and authority to perform its obligations under the Plan, and has taken all necessary corporate actions required for the due consummation of the Plan in accordance with its terms.

Section 4.3    Execution and Delivery; Enforceability.  Subject to entry of the Confirmation Order, this Agreement will have been, and each other Transaction Agreement will be, duly executed and delivered by the Company and each of the other Debtors party thereto, and the Debtors' obligations hereunder and thereunder will constitute the valid and legally binding obligations of the Company and, to the extent applicable, the other Debtors, enforceable against the Company and, to the extent applicable, the other Debtors in accordance with their respective terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general principles of equity whether applied in a court of law or a court of equity.

Section 4.4    Authorized and Issued Capital Stock.

(a)    On the Closing Date, (i) the issued and outstanding capital stock of the Company, including all Rights Offering Shares and all shares to be issued on the Effective Date pursuant to the Plan, will consist of 61,700,000 issued and outstanding shares of New Genco Common Stock, provided that the Company may adjust the number of shares to be issued in accordance with the terms of the Plan (ii) no shares of New Genco Common Stock will be held by the Company in its treasury, and (iii) no warrants to purchase shares of New Genco Common Stock will be issued and outstanding other than as provided under the Plan.

(b)    Except as set forth in Section 4.4(a), as of the Closing Date, no shares of capital stock or other equity securities or voting interest in the Company will have been issued, reserved for issuance or outstanding.

(c)    Except as described in this Section 4.4 and except as set forth in the Registration Rights Agreement, the Reorganized Genco Corporate Documents, the Emergence Credit Facilities or any employment agreement entered into as provided in the Plan or as otherwise specifically provided for by the Plan, as of the Closing Date, neither the Company nor any of its Subsidiaries will be party to or otherwise bound by or subject to any outstanding option, warrant, call, right, security, commitment, contract, arrangement or undertaking (including any preemptive right) that (i) obligates the Company or any of its Subsidiaries to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any shares of the capital stock of, or other equity or voting interests in, the Company or any of its Subsidiaries or any security convertible or exercisable for or exchangeable into any capital stock of, or other equity or voting interest in, the Company or any of its Subsidiaries, (ii) obligates the Company or any of its Subsidiaries to issue, grant, extend or enter into any such option, warrant, call, right,

KL2 2841447.10

security, commitment, contract, arrangement or undertaking, (iii) restricts the transfer of any shares of capital stock of the Company or any of its Subsidiaries or (iv) relates to the voting of any shares of capital stock of the Company.

Section 4.5    Issuance.  The shares of New Genco Common Stock to be issued pursuant to the Plan, including the shares of New Genco Common Stock to be issued in connection with the consummation of the Rights Offering and pursuant to the terms hereof, will, when issued and delivered on the Closing Date, be duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and free and clear of all Liens (other than transfer restrictions imposed hereunder or by applicable Law), preemptive rights, subscription and similar rights, other than any rights set forth in the Reorganized Genco Corporate Documents, and the Registration Rights Agreement.

Section 4.6    No Conflict.  Assuming the consents described in clauses (a) through (c) of Section 4.7 are obtained, the execution and delivery by the Company and, if applicable, its Subsidiaries of this Agreement, the Plan and the other Transaction Agreements, the compliance by the Company and, if applicable, its Subsidiaries with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein will not (a) materially conflict with, or result in a material breach, modification or violation of, any of the terms or provisions of, or constitute a material default under (with or without notice or lapse of time, or both), or result, except to the extent specified in the Plan, in the acceleration of, or the creation of any Lien under, or cause any material payment or consent to be required under any Contract to which the Company or any of its Subsidiaries will be bound as of the Closing Date after giving effect to the Plan or to which any of the property or assets of the Company or any of its Subsidiaries will be subject as of the Closing Date after giving effect to the Plan, (b) result in any violation of the provisions of the Reorganized Genco Corporate Documents or any of the organization documents of any of the Company's Subsidiaries or (c)  result in any material violation of any Law or Order applicable to the Company or any of its Subsidiaries or any of their properties.

Section 4.7    Consents and Approvals.  No consent, approval, authorization, order, registration or qualification of or with any Governmental Entity having jurisdiction over the Company or any of its Subsidiaries or any of their properties (each an "**Applicable Consent**") is required for the execution and delivery by the Company and, to the extent relevant, its Subsidiaries of this Agreement, the Plan and the other Transaction Agreements, the compliance by the Company and, to the extent relevant, its Subsidiaries with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (including compliance by each Commitment Party with its obligations hereunder and thereunder), except for (a) the entry of the Confirmation Order or any other order of the Bankruptcy Court reasonably necessary for the consummation of the transaction contemplated hereby, (b) such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or Blue Sky laws in connection with the purchase of the Unsubscribed Shares by the Commitment Parties and the issuance of the Rights and the Rights Offering Shares pursuant to the exercise of the Rights and (c) any other material Applicable Consent.

KL2 2841447.10

Section 4.8      Arm's Length.  The Company acknowledges and agrees that (a) each of the Commitment Parties is acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering) and not as a financial advisor or a fiduciary to, or an agent of, the Company or any of its Subsidiaries and (b) no Commitment Party is advising the Company or any of its Subsidiaries as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.

Section 4.9      Financial Statements.  The audited consolidated balance sheets of the Company as at December 31, 2013 and the unaudited consolidated balance sheets of the Company as at March 31, 2014 and the related consolidated statements of operations and of cash flows for the fiscal year or quarter, as the case may be, ended on such dates (collectively, the "**Financial Statements**"), present fairly the consolidated financial condition of the Company as at such dates, and the consolidated results of its operations and its consolidated cash flows for the respective fiscal period or quarter, as the case may be, then ended.  All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with U.S. generally accepted accounting principles ("**GAAP**") applied consistently throughout the periods involved (except as approved by the aforementioned firm of accountants and disclosed therein).

Section 4.10     Company SEC Documents and Disclosure Statement.  Since December 31, 2012, the Company has filed all reports, schedules, forms and statements with the SEC required to be so filed.  As of their respective dates, and giving effect to any amendments or supplements thereto filed prior to the date of this Agreement, each of the Company SEC Documents complied in all material respects with the requirements of the Securities Act or the Exchange Act applicable to such Company SEC Documents.  The Company has filed with the SEC all "material contracts" (as such term is defined in Item 601(b)(10) of Regulation S-K under the Exchange Act) that are required to be filed as exhibits to the Company SEC Documents.  No Company SEC Document, after giving effect to any amendments or supplements thereto and to any subsequently filed Company SEC Documents, in each case filed prior to the date of this Agreement, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.  The Disclosure Statement as approved by the Bankruptcy Court will conform in all material respects with Section 1125 of the Bankruptcy Code.

Section 4.11     Absence of Certain Changes.  From December 31, 2013 to the date hereof, no Event has occurred or exists that constitutes a Material Adverse Effect.

Section 4.12     No Violation; Compliance with Laws.  (i) The Company is not in violation of its articles of incorporation or by-laws, and (ii) no Subsidiary of the Company is in violation of its respective articles of organization or by-laws or similar organizational document in any material respect.  Neither the Company nor any of its Subsidiaries is or has been at any time since January 1, 2012 in material violation of any Law or Order.  There is and since January 1, 2012 has been no failure on the part of the Company to comply in all material respects with the Sarbanes-Oxley Act of 2002, as amended, and the rules and regulations promulgated by the SEC thereunder.

Section 4.13   <u>Legal Proceedings</u>.  Other than the Chapter 11 Cases and any adversary proceedings or contested motions commenced in connection therewith, there are no material Actions pending or threatened to which the Company or any of its Subsidiaries is a party or to which any property of the Company or any of its Subsidiaries is the subject which in any manner draws into question the validity or enforceability of this Agreement, the Plan or the Transaction Agreements.

Section 4.14   <u>Labor Relations</u>.

(a)      Neither the Company nor any of its Subsidiaries is engaged in any unfair labor practice and there is (i) no unfair labor practice complaint pending against the Company or any of its Subsidiaries or, to the Company's knowledge, threatened against any of them before the NLRB, and no grievance or arbitration proceeding arising out of or under any Collective Bargaining Agreement is so pending against the Company or any of its Subsidiaries or, to the Company's knowledge, threatened against any of them and (ii) no strike, labor dispute, slowdown or stoppage pending against the Company or any of its Subsidiaries or, to the Company's knowledge, threatened against the Company or any of its Subsidiaries which, in the case of clauses (i) and (ii) above, individually or in the aggregate, could result in material liability to the Company.

(b)      Section 4.14(b)(i) of the Company Disclosure Schedule lists all Collective Bargaining Agreements applicable to persons employed by the Company or any of its Subsidiaries in effect as of the date of this Agreement and the status of any negotiations, in each case as of the date of this Agreement.  Section 4.14(b)(ii) of the Company Disclosure Schedule lists any jurisdiction in which the employees of the Company or any of its Subsidiaries are represented by a works council or similar entity.  To the Knowledge of the Company, no union organizing efforts or Employee Representatives' elections are underway or threatened with respect to employees of the Company or any of its Subsidiaries.  Neither the Company nor any of its Subsidiaries is subject to any material obligation (whether pursuant to Law or Contract) to notify, inform and/or consult with, or obtain consent from, any Employee Representative regarding the transactions contemplated by this Agreement prior to entering into this Agreement.

(c)      The Company and its Subsidiaries are in material compliance with all Laws and requirements respecting employment and employment practices, terms and conditions of employment, collective bargaining, disability, immigration, health and safety, wages, classification of employees, hours and benefits, non-discrimination in employment, workers' compensation and the collection and payment of withholding and/or payroll taxes and similar taxes.  The Company and each of its Subsidiaries has complied in all material respects with its payment obligations to all employees of the Company and any of its Subsidiaries in respect of all wages, salaries, fees, commissions, bonuses, overtime pay, holiday pay, sick pay, benefits and all other compensation, remuneration and emoluments due and payable to such employees under any Company Plan or any applicable Collective Bargaining Agreement or Law, except, for the avoidance of doubt, for any payments that are not permitted by the Bankruptcy Court or the Bankruptcy Code.

Section 4.15   <u>Intellectual Property</u>.  (a) The Company and its Subsidiaries exclusively own, free and clear of all Liens (except for (i) Liens that are described in the

Company SEC Documents filed prior to the date hereof, (ii) Permitted Liens or (iii) Material Contracts), all of their (A) patents and registered Intellectual Property (and all applications therefor) and (B) proprietary unregistered Intellectual Property, in each case, that is owned or purported to be owned by the Company and its Subsidiaries and is material to the businesses of the Company and its Subsidiaries, and all of the items in clause (a) are subsisting, unexpired, and to the Knowledge of the Company are valid and enforceable; (b) the Company has not received any written notice that any material Intellectual Property owned by the Company or its Subsidiaries is being infringed, misappropriated or violated ("**Infringed**") by any other Person, and to the Knowledge of the Company, no such Intellectual Property is being Infringed; (c) the conduct of the businesses of the Company and its Subsidiaries as presently conducted does not Infringe any Intellectual Property of any other Person and no Person has alleged same in writing, except for allegations that have since been resolved or in connection with the Chapter 11 Cases and any adversary proceedings or contested motions commenced in connection therewith; and (iv) the Company and its Subsidiaries take commercially reasonable actions to maintain and protect (1) the confidentiality of their trade secrets and confidential information and (2) the integrity, security and continuous operation of their material software, systems, websites and networks (and all data therein), and, in the one year prior to the date of this Agreement, there have been no material outages, interruptions, or breaches of same.

Section 4.16   Title to Real and Personal Property.

(a)   Real Property.  Neither the Company nor any of its Subsidiaries owns any Owned Real Property.

(b)   Leased Real Property.  All material Real Property Leases necessary for the operation of the Post-Effective Date Business are valid, binding and enforceable against the Company or its relevant Subsidiary, and, to the Knowledge of the Company, the other parties thereto, and no written notice to terminate, in whole or part, any of such leases has been delivered to the Company or any of its Subsidiaries (nor, to the Knowledge of the Company, has there been any indication that any such notice of termination will be served).  Other than as a result of the filing of the Chapter 11 Cases, neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any other party to any material Real Property Lease necessary for the operation of the Post-Effective Date Business is in material default or breach under the terms thereof.

(c)   Personal Property.  The Company or one of its Subsidiaries has good title or, in the case of leased assets, a valid leasehold interest, free and clear of all Liens, to all of the tangible personal property and assets, except for (i) Liens that are described in (x) the Company SEC Documents filed prior to the date hereof, (y) the Plan or (z) the Disclosure Statement or (ii) Permitted Liens.

Section 4.17   No Undisclosed Relationships.  No relationship, direct or indirect, exists between or among the Company or any of its Subsidiaries, on the one hand, and the directors, officers, stockholders, customers or suppliers of the Company or any of its Subsidiaries, on the other hand, that is required by the Exchange Act to be described in the Company SEC Documents and that are not so described in the Company SEC Documents, except for the transactions contemplated by this Agreement.

24

Section 4.18    Licenses and Permits.  The Company and its Subsidiaries possess all material licenses, certificates, permits and other authorizations issued by, and have made all declarations and filings with, the appropriate Governmental Entities that are necessary for the ownership or lease of their respective properties and the conduct of the Post-Effective Date Business, in each case.  Neither the Company nor any of its Subsidiaries (i) has received notice of any revocation or modification of any such license, certificate, permit or authorization or (ii) has any reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course.

Section 4.19    Environmental.  Each of the Company and its Subsidiaries is, and all of their respective vessels are, in material compliance with all applicable Environmental Laws, and neither the Company nor any of its Subsidiaries is liable for any material penalties, fines or forfeitures for failure to comply with any of the foregoing.  All material licenses, permits, registrations or approvals required for the business of the Company and each of its Subsidiaries under any Environmental Law have been secured and each of the Company and each of its Subsidiaries is in material compliance therewith.  Neither the Company nor any of its Subsidiaries is in any respect in noncompliance with, breach of or default under any applicable writ, Order, judgment, injunction, or decree to which the Company or such Subsidiary is a party or which would affect the ability of the Company or such Subsidiary to operate any assets, property or other facility thereof and no event has occurred and is continuing which, with the passage of time or the giving of notice or both, would constitute a material noncompliance, breach of or default thereunder.  There are no material Environmental Claims pending or, to the Knowledge of the Company, threatened against the Company or any of its Subsidiaries, and within the past five (5) years have not been any such Environmental Claims.  There are no facts, circumstances, conditions or occurrences on any asset, property or other facility owned or operated by the Company or any of its Subsidiaries that is reasonably likely (a) to form the basis of a material Environmental Claim against the Company, any of its Subsidiaries or any asset, property or other facility owned by the Company or any of its Subsidiaries, or (b) to cause such assets, properties or other facilities to be subject to any material restrictions on its ownership, occupancy, use or transferability under any Environmental Law. All of the Company's and Subsidiaries' vessels are double hull tankers to the extent required to be double-hulled under applicable Environmental Law.

Section 4.20    Tax Returns and Payments.  Each of the Company and each of its Subsidiaries has timely filed all returns, statements, forms and reports for or relating to Taxes with respect to the income, properties or operations of the Company and/or any of its Subsidiaries (collectively, the "**Tax Returns**") and such Tax Returns are accurate in all material respects. The Company and each of its Subsidiaries have at all times paid Taxes that have become due and payable, except for Taxes that are being contested in good faith or Taxes for which an adequate reserve has been established (in accordance with GAAP).  There are no Actions now pending or, to the best Knowledge of the Company, threatened in writing by any authority regarding any Taxes relating to the Company or any of its Subsidiaries.  Neither the Company nor any of its Subsidiaries has entered into an agreement or waiver, or been requested to enter into an agreement or waiver, extending any statute of limitations relating to the payment or collection of Taxes of the Company or any of its Subsidiaries, or is aware of any circumstances that would cause the taxable years or other taxable periods of the Company or any of its Subsidiaries not to be subject to the normally applicable statute of limitations.

25

KL2 2841447.10

Section 4.21    Compliance with ERISA.

(a)        Section 4.21(a) of the Company Disclosure Schedule sets forth each Company Plan.  Each Company Plan, other than any Multiemployer Plan (and each related trust, insurance contract or fund), is in substantial compliance with its terms and with all applicable laws, including without limitation ERISA and the Code; each Company Plan, other than any Multiemployer Plan (and each related trust, if any), which is intended to be qualified under Section 401 (a) of the Code has received a determination letter, or is entitled to rely on an opinion letter, from the IRS to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code; no ERISA Event has occurred or is reasonably expected to occur; no ERISA  Plan has an Unfunded Current Liability in an amount material to the Company's operation; all contributions required to be made with respect to a Company Plan have been or will be timely made (except as disclosed on Section 4.21(a) of the Company Disclosure Schedule); using actuarial assumptions and computation methods consistent with Part 1 of subtitle E of Title IV of ERISA, the Company and its Subsidiaries and ERISA Affiliates would have no material liabilities to any Multiemployer Plans in the event of a complete withdrawal therefrom; each group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) which covers or has covered employees or former employees of the Company, any of its Subsidiaries, or any ERISA Affiliate has at all times been operated in material compliance with the provisions of Part 6 of subtitle B of Title I of ERISA and Section 4980B of the Code; and the Company and its Subsidiaries do not maintain or contribute to any employee welfare plan (as defined in Section 3(1) of ERISA) which provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or any Company Plan the obligations with respect to which could reasonably be expected to have a Material Adverse Effect.

(b)        Each Foreign Pension Plan, if any, has been maintained in substantial compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities.  All contributions required to be made with respect to a Foreign Pension Plan have been or will be timely made.  Neither the Company nor any of its Subsidiaries has incurred any material obligation in connection with the termination of or withdrawal from any Foreign Pension Plan.  Neither the Company nor any of its Subsidiaries maintains or contributes to any Foreign Pension Plan the obligations with respect to which could in the aggregate reasonably be expected to have a Material Adverse Effect.

Section 4.22    Internal Control Over Financial Reporting.  The Company has established and maintains a system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act) that complies in all material respects with the requirements of the Exchange Act and has been designed to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.  The Company is not aware of any material weaknesses in its internal control over financial reporting.

Section 4.23    Disclosure Controls and Procedures.  The Company (i) maintains disclosure controls and procedures (within the meaning of Rules 13a-15(e) and 15d-15(e) promulgated under the Exchange Act) designed to ensure that information required to be

26

disclosed by the Company in the reports that it files and submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, including that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is accumulated and communicated to management of the Company as appropriate to allow timely decisions regarding required disclosure, and (ii) has disclosed, based upon the most recent evaluation by the President and Chief Financial Officer of the Company of the Company's internal control over financial reporting, to its auditors and the audit committee of the Board (A) all significant deficiencies and material weaknesses in the design or operation of the Company's internal control over financial reporting which are reasonably likely to adversely affect its ability to record, process, summarize and report financial data and (B) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Section 4.24    Material Contracts.  All Material Contracts are valid, binding and enforceable against (a) the Company or its relevant Subsidiary and (b) to the Knowledge of the Company, each counterparty thereto, and no written notice to terminate, in whole or part, any Material Contract has been delivered to the Company or any of its Subsidiaries.  Other than as a result of the filing of the Chapter 11 Cases, neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any other party to any Material Contract, is in material default or breach under the terms thereof.  For purposes of this Agreement, "**Material Contract**" means any Contract necessary for the operation of the Post- Effective Date Business that is a "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K under the Exchange Act ) that the Company would be required to disclose on a Current Report filed with the SEC on Form 8-K.

Section 4.25    No Unlawful Payments.  Neither the Company nor any of its Subsidiaries nor any of their respective directors, officers or employees nor, to the Knowledge of the Company, any agent or other Person acting on behalf of the Company or any of its Subsidiaries, has in any material respect:  (a) used any funds of the Company or any of its Subsidiaries for any unlawful contribution, gift, entertainment or other unlawful expense, in each case relating to political activity; (b) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (c) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977; or (d) made any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment.

Section 4.26    Compliance with Money Laundering Laws.  The operations of the Company and its Subsidiaries are and have been at all times conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, as amended, the money laundering statutes of all jurisdictions, the rules and regulations thereunder and any related or similar Laws (collectively, the "**Money Laundering Laws**") and no material action, suit or proceeding by or before any Governmental Entity or any arbitrator involving the Company or any of its Subsidiaries with respect to Money Laundering Laws is pending or, to the Knowledge of the Company, threatened.

27

Section 4.27   <u>Compliance with Sanctions Laws</u>.  Neither the Company nor any of its Subsidiaries nor any of their respective directors, officers or employees nor, to the Knowledge of the Company, any agent or other Person acting on behalf of the Company or any of its Subsidiaries, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.  The Company will not directly or indirectly use the proceeds of the Rights Offering, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, for the purpose of financing the activities of any Person that, to the Knowledge of the Company, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.

Section 4.28   <u>No Broker's Fees</u>.  Except as set forth on Section 4.28 of the Company Disclosure Schedule, neither the Company nor any of its Subsidiaries is a party to any Contract with any Person (other than this Agreement or the) that would give rise to a valid claim against the Commitment Parties for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Unsubscribed Shares.

Section 4.29   <u>No Registration Rights</u>.  Except as set forth on Section 4.29 of the Company Disclosure Schedule and except as provided for pursuant to the Registration Rights Agreement, no Person has the right to require the Company or any of its Subsidiaries to register any securities for sale under the Securities Act.

Section 4.30   <u>Takeover Statutes</u>.  No Takeover Statute is applicable to this Agreement, the Equity Commitment and the other transactions contemplated by this Agreement. As of the entry of the Confirmation Order, the Board shall have authorized and approved the issuance of the New Genco Common Stock and the Rights Offering Shares pursuant to this Agreement, the Plan and the Rights Offering.

Section 4.31   <u>Investment Company Act</u>.  Neither the Company nor any of its Subsidiaries is any "investment company" or an "affiliated person" of, or a "promoter" or "principal underwriter" for or a company "controlled" by an "investment company" as such terms are defined in the U.S. Investment Company Act of 1940, as amended; neither the entry into of this Agreement, the Plan or the Transaction Agreements, nor the application of the proceeds nor the consummation of the other transactions contemplated hereby or thereby, will violate any provision of such act or any rule, regulation or order of the SEC thereunder.

Section 4.32   <u>No Marshall Islands Filing Necessary</u>.  To ensure the enforceability or admissibility in evidence of this Agreement, the Plan and each of the Transaction Agreements, it is not necessary that any of this Agreement, the Plan or any Transaction Agreement be filed or recorded with any court or any other authority in the Marshall Islands or any political subdivision thereof or that any stamp or similar tax be paid hereon or thereon or in respect hereof or thereof other than in connection with a proceeding brought to enforce the same; provided that the Articles of Incorporation must be filed with the Registrar of Corporations of the Republic of the Marshall Islands in order to become effective.

Section 4.33   <u>Insurance</u>.  The Company and its Subsidiaries have insured their properties and assets against such risks and in such amounts as are customary for companies

KL2 2841447.10

engaged in similar businesses. All premiums due and payable in respect of material insurance policies maintained by the Company and its Subsidiaries have been paid. The Company reasonably believes that the insurance maintained by or on behalf of the Company and its Subsidiaries is adequate in all material respects. As of the date hereof, to the Knowledge of the Company, neither the Company nor any of its Subsidiaries has received notice from any insurer or agent of such insurer with respect to any material insurance policies of the Company and its Subsidiaries of cancellation or termination of such policies, other than such notices which are received in the ordinary course of business or for policies that have expired on their terms.

ARTICLE V

**REPRESENTATIONS AND WARRANTIES OF THE COMMITMENT PARTIES**

Each Commitment Party represents and warrants, as to itself only (unless otherwise set forth herein, as of the date of this Agreement and as of the Closing Date) as set forth below.

Section 5.1    Incorporation. To the extent applicable, such Commitment Party is a legal entity duly organized, validly existing and, if applicable, in good standing (or the equivalent thereof) under the laws of its jurisdiction of incorporation or organization.

Section 5.2    Corporate Power and Authority. To the extent applicable, such Commitment Party has the requisite corporate, limited partnership or limited liability company power and authority to enter into, execute and deliver this Agreement and each other Transaction Agreements to which such Commitment Party is a party and to perform its obligations hereunder and thereunder and has taken all necessary corporate, limited partnership or limited liability company action required for the due authorization, execution, delivery and performance by it of this Agreement and the other Transaction Agreements.

Section 5.3    Execution and Delivery. This Agreement and each other Transaction Agreement to which such Commitment Party is a party (a) has been, or prior to its execution and delivery will be, duly and validly executed and delivered by such Commitment Party and (b) when executed and delivered, will constitute the valid and binding obligations of such Commitment Party, enforceable against such Commitment Party in accordance with their respective terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general principles of equity whether applied in a court of law or a court of equity.

Section 5.4    No Conflict. Assuming that the consents referred to in clauses (a) and (b) of Section 5.5 are obtained, the execution and delivery by such Commitment Party of this Agreement and, to the extent applicable, the other Transaction Agreements, the compliance by such Commitment Party with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (a) will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result in the acceleration of, or the creation of any Lien under, any Contract to which such Commitment Party is a party or by which such Commitment Party is bound or to which any of the properties or assets of such Commitment Party are subject,

29

(b) will not result in any violation of the provisions of the certificate of incorporation or by-laws (or comparable constituent documents) of such Commitment Party and (c) will not result in any material violation of any Law or Order applicable to such Commitment Party or any of its properties, except, in each case, for any conflict, breach, violation, default, acceleration or Lien which would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact such Commitment Party's performance of its obligations under this Agreement.

Section 5.5     Consents and Approvals.  No consent, approval, authorization, order, registration or qualification of or with any Governmental Entity having jurisdiction over such Commitment Party or any of its properties is required for the execution and delivery by such Commitment Party of this Agreement and, to the extent applicable, the Transaction Agreements, the compliance by such Commitment Party with all of the provisions hereof and thereof and the consummation of the transactions (including the purchase by such Commitment Party of its Equity Commitment Percentage of the Unsubscribed Shares) contemplated herein and therein, except any consent, approval, authorization, order, registration or qualification which, if not made or obtained, would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact such Commitment Party's performance of its obligations under this Agreement.

Section 5.6     No Registration.  Such Commitment Party understands that the Backstop Shares have not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends on, among other things, the bona fide nature of the investment intent and the accuracy of such Commitment Party's representations as expressed herein or otherwise made pursuant hereto.

Section 5.7     Purchasing Intent.  Such Commitment Party is acquiring the Backstop Shares for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities Laws, and such Commitment Party has no present intention of selling, granting any participation in, or otherwise distributing the same, except in compliance with applicable securities Laws.

Section 5.8     Sophistication; Investigation.  Such Commitment Party acknowledges that (i) the Backstop Shares have not been registered pursuant to the Securities Act and (ii) except as provided in the Registration Rights Agreement, the Company shall not be required to effect any registration or qualification of the Backstop Shares under the Securities Act. Such Commitment Party has made its own inquiry and investigation into the Company and has undertaken such investigation and had access to such information as it has deemed necessary to enable it to make an informed decision with respect to the execution, delivery and performance of this Agreement.  Such Commitment Party has not relied on any advice from the Company or its representatives regarding the tax consequences of an investment in the Backstop Shares.  Such Commitment Party has such knowledge and experience in financial and business matters such that it is capable of evaluating the merits and risks of its investment in the Backstop Shares being acquired hereunder.  Such Commitment Party is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act.  Such Commitment Party understands and is able to bear any economic risks associated with such investment (including the necessity of holding

the Backstop Shares for an indefinite period of time), including a complete loss of its investment in the Backstop Shares.  In evaluating the suitability of an investment in the Backstop Shares, such Commitment Party has not relied upon any representation or warranty of any Person by or on behalf of the Company other than those representations and warranties that are expressly set forth in this Agreement and the Restructuring Support Agreement, whether written or oral.

Section 5.9   No Broker's Fees.  Such Commitment Party is not a party to any Contract with any Person (other than this Agreement) that would give rise to a valid claim against the Company, for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Backstop Shares.

Section 5.10   Votable Claims.

(a)   As of the date of this Agreement, such Commitment Party (together with its applicable Affiliates) is the beneficial owner of, or the investment advisor or manager for the beneficial owner of, the aggregate principal amount of Votable Claims as set forth opposite such Commitment Party's name under the columns titled "Controlled 2007 Facility Votable Claims" and "Controlled Convertible Notes Votable Claims" on Schedule 3 attached hereto (such Votable Claims, the "**Beneficially Controlled Votable Claims**"); and

(b)   As of the date of this Agreement, such Commitment Party (together with its applicable Affiliates) has the full power to vote, dispose of and compromise the aggregate principal amount of the Beneficially Controlled Votable Claims.

(c)   As of the date of this Agreement, such Commitment Party has not entered into any other agreement to assign, sell, participate, grant, or otherwise transfer, in whole or in part, any portion of its right, title or interest in such Beneficially Controlled Votable Claims where such assignment, sale, participation, grant, conveyance or transfer would prohibit such Commitment Party from complying with the terms of this Agreement.

Section 5.11   Sufficiency of Funds.  Such Commitment Party has, and such Commitment Party on the Effective Date will have, sufficient immediately available funds to make and complete the payment of the aggregate Purchase Price for its Equity Commitment Percentage of the Backstop Shares.

Section 5.12   Arm's Length.  Such Commitment Party acknowledges and agrees that the Company is acting solely in the capacity of an arm's length contractual counterparty to such Commitment Party with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering).

ARTICLE VI

**ADDITIONAL COVENANTS**

Section 6.1   Confirmation Order and Plan.  The Company shall use its commercially reasonable efforts, consistent with the Restructuring Support Agreement, to (a) obtain the entry of the Plan Solicitation Order and the Confirmation Order and (b) cause the Plan Solicitation Order and the Confirmation Order to become final orders (including by

31

requesting that such orders be a final order immediately upon entry by the Bankruptcy Court pursuant to a waiver of Bankruptcy Rules 3020 and 6004(h), as applicable), in each case, as soon as reasonably practicable following the filing of the motion seeking entry of such orders.

Section 6.2    Conduct of Business.  Except (a) as explicitly set forth in this Agreement or otherwise contemplated by the Disclosure Statement and Plan or (b) with the express consent of Required Commitment Parties (such consent not to be unreasonably withheld, conditioned or delayed), during the period from the date of this Agreement to the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with its terms (the "**Pre-Closing Period**"), (i) the Company shall, and shall cause each of its Subsidiaries to carry on its business in the ordinary course and use its commercially reasonable efforts to (A) preserve intact its Post-Effective Date Business, (B) keep available the services of its officers and employees and (C) preserve its material relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with the Company or its Subsidiaries in connection with the Post-Effective Date Business and (ii) the Company shall not, and shall not permit any of its Subsidiaries to, enter into any transaction that is material to the Post-Effective Date Business other than (A) in the ordinary course of business to the extent necessary to conduct Company operations in a manner consistent with the financial and business projections provided to the Commitment Parties prior to the date hereof, (B) other transactions after prior notice to the Commitment Parties to implement tax planning which transactions are not reasonably expected to materially adversely affect any Commitment Party and (C) such other transactions disclosed to the Commitment Parties in writing prior to the date hereof. Notwithstanding any other provision in this Agreement, nothing in this Agreement shall give the Commitment Parties, directly or indirectly, any right to control or direct the operations of the Company and its Subsidiaries prior to the Closing Date.  Prior to the Closing Date, the Company and its Subsidiaries shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision of the business of the Company and its Subsidiaries.

Section 6.3    Access to Information.  Subject to applicable Law and appropriate assurance of confidential treatment, upon reasonable notice during the Pre-Closing Period, the Company shall (and shall cause its Subsidiaries to) afford the Commitment Parties and their Representatives upon request reasonable access, during normal business hours and without unreasonable disruption or interference with the Company's and its Subsidiaries' business or operations, to the Company's and its Subsidiaries' employees, properties, books, contracts and records and, during the Pre-Closing Period, the Company shall (and shall cause its Subsidiaries to) furnish promptly to such parties all reasonable information concerning the Company's and its Subsidiaries' business, properties and personnel as may reasonably be requested by any such party, provided that the foregoing shall not require the Company (a) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company would cause the Company or any of its Subsidiaries to violate any of their respective obligations with respect to confidentiality to a third party if the Company shall have used its commercially reasonable efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure, (b) to disclose any legally privileged information of the Company or any of its Subsidiaries or (c) to violate any applicable Laws; provided further that the Company shall deliver to the Commitment Parties a schedule setting forth a description of any requested information not provided to the Commitment Parties pursuant to clauses (a) through (c) above (in the case of clause (a), to the extent not prohibited from doing so).  All requests for information

and access made in accordance with this <u>Section 6.3</u> shall be directed to an executive officer of the Company or such person as may be designated by the Company's executive officers.

Section 6.4    <u>Commercially Reasonable Efforts</u>.

(a)    Without in any way limiting any other respective obligation of the Company or any Commitment Party in this Agreement, the Company shall use (and shall cause its Subsidiaries to use), and each Commitment Party shall use, commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement and the Plan, including using commercially reasonable efforts in:

(i)    timely preparing and filing all documentation reasonably necessary to effect all necessary notices, reports and other filings of such Party and to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party or Governmental Entity;

(ii)    defending any Actions challenging this Agreement, the Plan or any other Transaction Agreement or the consummation of the transactions contemplated hereby and thereby, including seeking to have any stay or temporary restraining order entered by any Governmental Entity vacated or reversed; and

(iii)    working together in good faith to finalize the Registration Rights Agreement and Reorganized Genco Corporate Documents for timely inclusion in the Plan and Plan Supplement and filing with the Bankruptcy Court.

(b)    Subject to applicable Laws relating to the exchange of information, the Commitment Parties and the Company shall have the right to review in advance, and to the extent practicable each will consult with the other on all of the information relating to Commitment Parties or the Company, as the case may be, and any of their respective Subsidiaries, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the transactions contemplated by this Agreement or the Plan; <u>provided</u>, <u>however</u>, neither the Company nor the Commitment Parties are required to provide for review in advance declarations or other evidence submitted in connection with any filing with the Bankruptcy Court.  In exercising the foregoing rights, each of the Company and the Commitment Parties shall act reasonably and as promptly as practicable.

(c)    Nothing contained in this <u>Section 6.4</u> shall limit the ability of any Commitment Party to consult with the Debtors, to appear and be heard, or to file objections, concerning any matter arising in the Chapter 11 Cases.

Section 6.5    <u>Registration Rights Agreement</u>.  The Plan will provide that from and after the Closing Date each Commitment Party (including any Related Purchaser or Ultimate Purchaser) who purchases Backstop Shares shall be a party to the Registration Rights Agreement and shall be entitled to registration rights thereunder with respect to all such Backstop Shares.  A form of the Registration Rights Agreement shall be filed with the Bankruptcy Court as part of the Plan Supplement.

Section 6.6    <u>Blue Sky</u>.  The Company shall, on or before the Closing Date, take such action, if any, as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify the Backstop Shares issued hereunder for, sale to the Commitment Parties at the Closing Date pursuant to this Agreement under applicable securities and "Blue Sky" Laws of the states of the United States (or to obtain an exemption from such qualification) and any applicable foreign jurisdictions, and shall provide evidence of any such action so taken to the Commitment Parties on or prior to the Closing Date.  The Company shall timely make all filings and reports, if any, relating to the offer and sale of the Backstop Shares issued hereunder required under applicable securities and "Blue Sky" Laws of the states of the United States following the Closing Date.  The Company shall pay all fees and expenses in connection with satisfying its obligations under this <u>Section 6.6</u>.

Section 6.7    <u>DTC Eligibility</u>.  The Company shall use commercially reasonable efforts to promptly make, when applicable from time to time upon and after the Closing, all Unlegended Shares eligible for deposit with the Depository Trust Company.  "**<u>Unlegended Shares</u>**" means any shares of New Genco Common Stock acquired by the Commitment Parties (including any Related Purchaser or Ultimate Purchaser) pursuant to this Agreement and the Plan, including all Backstop Shares and all shares issued to the Commitment Parties pursuant to the Rights Offering, that do not require, or are no longer subject to, the Legend.

Section 6.8    <u>Share Legend</u>.  Each certificate evidencing Backstop Shares that are issued hereunder, and each certificate issued in exchange for or upon the transfer, sale or assignment of any such shares, shall be stamped or otherwise imprinted with a legend (the "**<u>Legend</u>**") in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

In the event that any such Backstop Shares are uncertificated, such shares shall be subject to a restrictive notation substantially similar to the Legend in the stock ledger or other appropriate records maintained by the Company or agent and the term "Legend" shall include such restrictive notation.  The Company shall remove the legend (or restrictive notation, as applicable) set forth above from the certificates evidencing any such Backstop Shares (or the Company's stock records, in the case of uncertified shares) at any time after the restrictions described in such legend cease to be applicable, including, as applicable, when such shares may be sold under Rule 144.  The Company may reasonably request such opinions, certificates or other evidence that such restrictions no longer apply.

34

## ARTICLE VII

## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

Section 7.1    <u>Conditions to the Obligation of the Commitment Parties</u>.  The obligations of each Commitment Party to consummate the transactions contemplated hereby shall be subject to (unless waived in accordance with <u>Section 7.2</u>) the satisfaction of the following conditions.

(a)    <u>Plan Solicitation Order</u>.  The Bankruptcy Court shall have entered the Plan Solicitation Order, such order shall be in full force and effect, and such order shall not be subject to a stay.

(b)    <u>Confirmation Order</u>.  The Bankruptcy Court shall have entered the Confirmation Order, such order shall be in full force and effect, and not subject to a stay.

(c)    <u>Plan</u>.  The Company and all of the other Debtors shall have complied, in all material respects, with the terms of the Plan that are to be performed by the Company and the other Debtors on or prior to the Effective Date and the conditions to the occurrence of the Effective Date set forth in the Plan and the Confirmation Order shall have been satisfied or waived in accordance with the terms thereof and the Plan.

(d)    <u>Rights Offering</u>.  The Rights Offering shall have been conducted, in all material respects, in accordance with the Plan Solicitation Order and this Agreement, and the Rights Offering Expiration Time shall have occurred.

(e)    <u>Registration Rights Agreement</u>.  The Registration Rights Agreement shall have been executed and delivered by the Company and shall otherwise have become effective with respect to the Registration Rights Commitment Parties and the other parties thereto.

(f)    <u>Consents</u>.  All governmental and third party notifications, filings, consents, waivers and approvals set forth on <u>Schedule 4</u> and required for the consummation of the transactions contemplated by this Agreement and the Plan shall have been made or received.

(g)    <u>No Legal Impediment to Issuance</u>.  No Law or Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the transactions contemplated by this Agreement.

(h)    <u>Disclosure Schedules</u>.  Any Company Disclosure Schedules delivered by the Company after the date hereof shall be in form and substance reasonably satisfactory to the Required Commitment Parties.

(i)    <u>Representations and Warranties</u>.

(i)    The representations and warranties of the Debtors contained in <u>Sections 4.2</u>, <u>4.3</u>, <u>4.4</u>, <u>4.5</u> and <u>4.6(b)</u> shall be true and correct in all material respects at and as of the Closing Date with the same effect as if made on and as of the Closing Date

(except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(ii)    All other representations and warranties of the Debtors contained in this Agreement shall be true and correct (disregarding all materiality or Material Adverse Effect qualifiers) at and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and correct does not constitute a Material Adverse Effect.

(j)    Covenants.  The Debtors shall have performed and complied, in all material respects, with all of their respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance prior to the Closing Date.

(k)    Officer's Certificate.  The Commitment Parties shall have received on and as of the Closing Date a certificate of the chief executive officer or chief financial officer of the Company confirming that the conditions set forth in Sections 7.1(i) and (j) have been satisfied.

(l)    Material Adverse Effect.  From December 31, 2013 to the Closing Date, there shall not have occurred, and there shall not exist, any Event that constitutes a Material Adverse Effect.

Section 7.2    Waiver of Conditions to Obligation of Commitment Parties.  All or any of the conditions set forth in Section 7.1 may only be waived in whole or in part with respect to all Commitment Parties by a written instrument executed by each of the Required Commitment Parties in their sole discretion and if so waived, all Commitment Parties shall be bound by such waiver.

Section 7.3    Conditions to the Obligation of the Company.  The obligation of the Company and the other Debtors to consummate the transactions contemplated hereby with any Commitment Party is subject to (unless waived by the Company) the satisfaction of each of the following conditions:

(a)    Plan Solicitation Order.  The Bankruptcy Court shall have entered the Plan Solicitation Order, such order shall be in full force and effect, and such order shall not be subject to a stay.

(b)    Confirmation Order.  The Bankruptcy Court shall have entered the Confirmation Order, such order shall be in full force and effect, and not subject to a stay.

(c)    Conditions to the Plan.  The conditions to the occurrence of the Effective Date of the Plan as set forth in the Plan and in the Confirmation Order shall have been satisfied or waived in accordance with the terms thereof and the Plan.

(d)    No Legal Impediment to Issuance.  No Law or Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the transactions contemplated by this Agreement.

KL2 2841447.10

(e)      <u>Representations and Warranties</u>.  The representations and warranties of each Commitment Party contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(f)      <u>Covenants</u>.  The applicable Commitment Party shall have performed and complied, in all material respects, with all of its covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement.

(g)      <u>Restructuring Support Agreement</u>.  The Restructuring Support Agreement shall not have been terminated pursuant to a Termination Event (as defined therein) arising under Section 11(a), 11(b) or 11(e) thereof.

ARTICLE VIII

**INDEMNIFICATION AND CONTRIBUTION**

Section 8.1      <u>Indemnification Obligations</u>.  Indemnification Obligations.  The Company and the other Debtors (the "**Indemnifying Parties**" and each an "**Indemnifying Party**") shall, jointly and severally, indemnify and hold harmless each Commitment Party, the Prepetition 2007 Facility Agent, their Affiliates, shareholders, members, partners and other equity holders, general partners, managers and their respective Representatives, agents and controlling persons (each, an "**Indemnified Person**") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes of the Commitment Parties but subject to the last sentence of <u>Section 2.5(c))</u> (collectively, "<u>Losses</u>") that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with this Agreement, including the Equity Commitments, the Rights Offering, the use of the proceeds of the Rights Offering, any breach by the Debtors of this Agreement or the negotiation and documentation of the Plan, for any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, the other Debtors, their respective equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable and documented (subject to redaction to preserve attorney client and work product privileges) legal or other third-party expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Agreement or the Plan are consummated or whether or not this Agreement is terminated; <u>provided</u> that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (a) caused by a Commitment Party Default by a Commitment Party, (b) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person or (c) to the extent they arise from the breach by a Commitment Party of its representations, warranties, covenants or agreements set forth herein.

Section 8.2    Indemnification Procedure.  Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding (an "**Indemnified Claim**"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof, specifying in reasonable detail the Losses paid, incurred or otherwise arising; provided that (a) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure  and (b) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this Article VIII.  Such notice will be accompanied by copies of reasonably sufficient documentation with respect to such claim, challenge, litigation, investigation or proceeding, including any summons, complaint or other pleading that may have been served and any written demand or any other document or instrument directly relating thereto.  In case any such Indemnified Claims are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, to the extent that it may elect by written notice delivered to such Indemnified Person, to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Person; provided that if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims.  Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election to so assume the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Person, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required) and that all such expenses shall be reimbursed as they occur), (ii) the Indemnifying Party shall not have employed counsel reasonably acceptable to such Indemnified Person to represent such Indemnified Person within a reasonable time after notice of commencement of the Indemnified Claims, (iii) the Indemnifying Party shall have failed or is failing to defend such claim, and is provided written notice of such failure by the Indemnified Person and such failure is not reasonably cured within ten (10) Business Days of receipt of such notice, or (iv) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.  Notwithstanding anything herein to the contrary, the Company and its Subsidiaries shall have sole control over any Tax controversy or Tax audit and shall be permitted to settle any liability for Taxes of the Company and its Subsidiaries.

Section 8.3    Settlement of Indemnified Claims.  The Indemnifying Party shall not be liable for any settlement of any Indemnified Claims effected without its written consent (which consent shall not be unreasonably withheld).  If any settlement of any Indemnified

38

Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, the provisions of this Article VIII.  The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld in the Indemnified Person's sole discretion), effect any settlement of any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance reasonably satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

Section 8.4    Contribution.  If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are subject to indemnification pursuant to Section 8.1, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations.  The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their comparative or contributory negligence or otherwise to the Indemnifying Parties, any Person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other Person in connection with an Indemnified Claim.

Section 8.5    Treatment of Indemnification Payments.  All amounts paid by the Indemnifying Party to an Indemnified Person under this Article VIII shall, to the extent permitted by applicable Law, be treated as adjustments to the Purchase Price for all Tax purposes.

Section 8.6    No Survival.  All representations, warranties, covenants and agreements made in this Agreement shall not survive the Closing Date except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

ARTICLE IX

**TERMINATION**

Section 9.1    Termination Rights.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date (including at any time prior to entry of the Confirmation Order):

KL2 2841447.10

(a)      by mutual written consent of the Company and the Required Commitment Parties;

(b)      by the Company by written notice to each Commitment Party or by the Required Commitment Parties by written notice to the Company if any Law or Order shall have been enacted, adopted or issued by any Governmental Entity, that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement or the other Transaction Agreements;

(c)      by the Required Commitment Parties upon written notice to the Company if:

(i)      the Company or the other Debtors shall have breached any representation, warranty, covenant or other agreement made by the Company or the other Debtors in this Agreement or any such representation and warranty shall have become inaccurate after the date of this Agreement, and such breach or inaccuracy would, individually or in the aggregate, result in a failure of a condition set forth in Section 7.1(i) or Section 7.1(j), if continuing on the Closing Date, being satisfied and such breach or inaccuracy is not cured by the Company or the other Debtors by the earlier of (A) the tenth (10th) Business Day after the giving of notice thereof to the Company by any Commitment Party and (B) the third (3rd) Business Day prior to the Outside Date; provided that the Commitment Parties shall not have the right to terminate this Agreement pursuant to this Section 9.1(c)(i) if they are then in breach of any representation, warranty, covenant or other agreement hereunder that would result in the failure of any condition set forth in Section 7.3 being satisfied; or

(ii)      any of the Chapter 11 Cases shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or the Bankruptcy Court has entered an Order in any of the Chapter 11 Cases appointing an examiner or trustee with expanded powers to oversee or operate the Debtors in the Chapter 11 Cases; and

(d)      by the Commitment Parties owning more than 66 2/3% of the aggregate principal outstanding under the 2007 Facility held by all Commitment Parties, if any Event occurs or occurred on or after March 31, 2014 that, either alone or in combination with any other Event, has had or would reasonably be expected to have a Material Adverse Effect.

Section 9.2      Automatic Termination.  This Agreement shall terminate automatically upon the termination of the Restructuring Support Agreement either (a) by the Company pursuant to a Termination Event (as defined therein) arising under Section 11(a) or 11(b) thereof or  (b) with respect to the Supporting 2007 Facility Lenders (as defined in the Restructuring Support Agreement).

Section 9.3      Termination as to the Supporting Noteholders.

(a)      Upon the termination of the Restructuring Support Agreement with respect to the Supporting Noteholders (as defined in the Restructuring Support Agreement), the obligations of the Supporting Noteholders hereunder shall be automatically terminated and,

40

subject to Section 9.5(a)(iii), there shall be no further obligations or liabilities hereunder on the part of any Supporting Noteholder.

(b)    The Commitment Parties who own more than 66 2/3% of the aggregate Convertible Notes claims held by all Commitment Parties who (i) were not Supporting Lenders (as defined in the Restructuring Support Agreement) on April 3, 2014 and (ii) are members of the ad hoc group of Noteholders represented by Akin, Gump, Strauss, Hauer & Feld LLP may terminate the obligations of the Supporting Noteholders hereunder (in which case, subject to Section 9.5(a)(iii), there shall be no further obligations or liabilities hereunder on the part of any Supporting Noteholder), if any Event occurs or occurred on or after March 31, 2014 that, either alone or in combination with any other Event, has had or would reasonably be expected to have a Material Adverse Effect.

(c)    For the avoidance of doubt, in the event that any Commitment Party is both (i) a Supporting Noteholder and (ii) a Supporting 2007 Facility Lender, then a termination pursuant to this Section 9.3 shall only terminate such Commitment Party's obligations under this Agreement to (x) purchase Unsubscribed Noteholder Shares and (y) fully exercise all rights Rights that such Commitment Party received on account of its Convertible Notes Claims.

Section 9.4    Outside Date Termination.  Any Commitment Party (other than a Defaulting Commitment Party) may terminate its obligations hereunder and, subject to Section 9.5(a)(iii), there shall be no further obligations or liabilities hereunder on the part of any such terminating Commitment Party, if the Closing Date has not occurred by 11:59 p.m., New York City time on the date that is sixty (60) days from the Petition Date (the "**Outside Date**"); provided that upon the occurrence of a Commitment Party Default, the Outside Date shall be extended in accordance with Section 2.3(a).

Section 9.5    Effect of Termination.

(a)    Upon termination of this Agreement pursuant to this Article IX, this Agreement shall forthwith become void and there shall be no further obligations or liabilities on the part of the Debtors or the Commitment Parties; provided that (i) the obligations of the Debtors to pay the Transaction Expenses pursuant to Article III and to satisfy their indemnification obligations pursuant to Article VIII shall survive the termination of this Agreement indefinitely and shall remain in full force and effect, (ii) the provisions set forth in Article X shall survive the termination of this Agreement in accordance with their terms and (iii) subject to Section 10.10 and Section 2.3(d), nothing in Section 9.2, Section 9.3 or this Section 9.4 shall relieve any Party from liability for any willful or intentional breach of this Agreement.  For purposes of this Agreement, "**willful or intentional breach**" shall mean a breach of this Agreement that is a consequence of an act undertaken by the breaching Party with the knowledge (actual or constructive) that the taking of such act would, or would reasonably be expected to, cause a breach of this Agreement.

(b)    Notwithstanding anything to the contrary contained in Section 9.4(a), in the event this Agreement is terminated by the Company in conjunction with a termination of the Restructuring Support Agreement pursuant to Section 11(b)(ii) or 11(c)(iii) thereof and the

41

Company pays to the Commitment Parties the Termination Fee (as defined in the Restructuring Support Agreement), plus all expenses due and owing under Article III hereof, then this Agreement shall forthwith become void and there shall be no further obligations or liabilities hereunder on the part of the Debtors or the Commitment Parties, other than a Defaulting Commitment Party.

ARTICLE X

**GENERAL PROVISIONS**

Section 10.1    Notices.  All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses (or at such other address for a Party as will be specified by like notice):

(a)    If to the Company:

Genco Shipping & Trading Limited
299 Park Avenue
New York, New York 10171
Facsimile: (646) 443-8551
Attention: John C. Wobensmith

with a copy (which shall not constitute notice) to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Facsimile: (212) 715-8100
Attention: Thomas E. Molner

(b)    If to the Commitment Parties (or to any of them), to the address set forth opposite such Commitment Party's name on Schedule 5.

Section 10.2    Assignment; Third Party Beneficiaries.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by any Party (whether by operation of Law or otherwise) without the prior written consent of the Company and the Commitment Parties, other than an assignment by a Commitment Party expressly permitted by Sections 2.6(b), 2.6(c) or 10.7 or any other provision of this Agreement and any purported assignment in violation of this Section 10.2 shall be void *ab initio.*  This Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any Person any rights or remedies under this Agreement other than (a) the Parties hereto and (b) any Indemnified Party.

42

Section 10.3    Prior Negotiations; Entire Agreement.

(a)    This Agreement (including the agreements attached as Exhibits to and the documents and instruments referred to in this Agreement) constitutes the entire agreement of the Parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement, except that the Parties hereto acknowledge that any confidentiality agreements heretofore executed among the Parties and the Restructuring Support Agreement will continue in full force and effect.

(b)    Notwithstanding anything to the contrary in the Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (and any amendments, supplements or modifications thereto) or an affirmative vote to accept the Plan submitted by any Commitment Party, nothing contained in the Plan (including any amendments, supplements or modifications thereto) or Confirmation Order (including any amendments, supplements or modifications thereto) shall alter, amend or modify the rights of the Commitment Parties under this Agreement unless such alteration, amendment or modification has been made in accordance with Section 10.7.

Section 10.4    Governing Law; Venue.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD FOR ANY CONFLICTS OF LAW PRINCIPLES THAT WOULD APPLY THE LAWS OF ANY OTHER JURISDICTION, AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.  THE PARTIES CONSENT AND AGREE THAT ANY ACTION TO ENFORCE THIS AGREEMENT OR ANY DISPUTE, WHETHER SUCH DISPUTES ARISE IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE AGREEMENTS, INSTRUMENTS AND DOCUMENTS CONTEMPLATED HEREBY SHALL BE BROUGHT EXCLUSIVELY IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR ANY NEW YORK STATE COURT SITTING IN NEW YORK CITY, OR, AT ANY TIME FOLLOWING THE PETITION DATE SHALL BE BROUGHT EXCLUSIVELY IN THE BANKRUPTCY COURT (OR, SOLELY TO THE EXTENT THE BANKRUPTCY COURT DECLINES JURISDICTION OVER SUCH ACTION OR DISPUTE, IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR ANY NEW YORK STATE COURT SITTING IN NEW YORK CITY).  THE PARTIES CONSENT TO AND AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS.  EACH OF THE PARTIES HEREBY WAIVES AND AGREES NOT TO ASSERT IN ANY SUCH DISPUTE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (I) SUCH PARTY IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, (II) SUCH PARTY AND SUCH PARTY'S PROPERTY IS IMMUNE FROM ANY LEGAL PROCESS ISSUED BY SUCH COURTS OR (III) ANY LITIGATION OR OTHER PROCEEDING COMMENCED IN SUCH COURTS IS BROUGHT IN AN INCONVENIENT FORUM.  THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING TO AN ADDRESS PROVIDED IN WRITING BY THE RECIPIENT OF SUCH MAILING, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND

KL2 2841447.10

HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED.

Section 10.5   Waiver of Jury Trial.  EACH PARTY HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY JURISDICTION IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE AMONG THE PARTIES UNDER THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE.

Section 10.6   Counterparts.  This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the Parties and delivered to each other Party (including via facsimile or other electronic transmission), it being understood that each Party need not sign the same counterpart.

Section 10.7   Waivers and Amendments; Rights Cumulative.  This Agreement may be amended, restated, modified, or changed only by a written instrument signed by the Debtors and the Required Commitment Parties (other than a Defaulting Commitment Party); provided that each Commitment Party's prior written consent shall be required for any amendment that would have the effect of:  (a) modifying such Commitment Party's Equity Commitment Percentage, (b) increasing the Purchase Price to be paid in respect of the Backstop Shares, (c) extending the Outside Date; or (d) otherwise have a materially adverse and disproportionate effect on such Commitment Party.  The terms and conditions of this Agreement (other than the conditions set forth in Sections 7.1 and 7.3, the waiver of which shall be governed solely by Article VII) may be waived (i) by the Debtors only by a written instrument executed by the Company and (ii) by the Commitment Parties only by a written instrument executed by the Required Commitment Parties.  Notwithstanding anything to the contrary contained in this Agreement, the Commitment Parties may agree, among themselves, to reallocate their Equity Commitment Percentages, without any consent or approval of any other Party; provided, however, for the avoidance of doubt any such agreement among the Commitment Parties shall require the consent or approval of all Commitment Parties affected by such reallocation; provided, further that any reallocation (other than any reallocation contemplated by Section 2.2(a) or Section 2.2(b)) shall require the consent of the Company (such consent not to be unreasonably withheld, conditioned or delayed).  No delay on the part of any Party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.  Except as otherwise provided in this Agreement, the rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any Party otherwise may have at law or in equity.

Section 10.8   Headings.  The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

Section 10.9   Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to seek an injunction or injunctions without the

KL2 2841447.10

necessity of posting a bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.  Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.

Section 10.10  Damages.  Notwithstanding anything to the contrary in this Agreement, none of the Parties will be liable for, and none of the Parties shall claim or seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits, including, without limitation, with respect to Losses under Article VIII.

Section 10.11  No Reliance.  No Commitment Party or any of its Related Parties shall have any duties or obligations to the other Commitment Parties in respect of this Agreement, the Plan or the transactions contemplated hereby or thereby, except those expressly set forth herein.  Without limiting the generality of the foregoing, (a) no Commitment Party or any of its Related Parties shall be subject to any fiduciary or other implied duties to the other Commitment Parties, (b) no Commitment Party or any of its Related Parties shall have any duty to take any discretionary action or exercise any discretionary powers on behalf of any other Commitment Party, (c) (i) no Commitment Party or any of its Related Parties shall have any duty to the other Commitment Parties to obtain, through the exercise of diligence or otherwise, to investigate, confirm, or disclose to the other Commitment Parties any information relating to the Company or any of its Subsidiaries that may have been communicated to or obtained by such Commitment Party or any of its Affiliates in any capacity and (ii) no Commitment Party may rely, and confirms that it has not relied, on any due diligence investigation that any other Commitment Party or any Person acting on behalf of such other Commitment Party may have conducted with respect to the Company or any of its Affiliates or any of their respective securities and (d) each Commitment Party acknowledges that no other Commitment Party is acting as a placement agent, initial purchaser, underwriter, broker or finder with respect to its Backstop Shares or Equity Commitment Percentage of its Equity Commitment.

Section 10.12  Publicity; Public Disclosure of Agreement.

(a)      At all times prior to the Closing Date or the earlier termination of this Agreement in accordance with its terms, the Company and the Commitment Parties shall consult with each other prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public announcements with respect to the transactions contemplated by this Agreement.

(b)      Subject to Section 10.12(a), the Company may, in its discretion, disclose this Agreement (including the signature pages hereto) in a press release or public filing; provided, however, that the Company shall not disclose to any person, other than legal, accounting, financial and other advisors to the Company, the principal amount or percentage of indebtedness or claims held by any Commitment Party (including without limitation, the amounts or percentages set forth on Schedule 2 and Schedule 3) or any of its respective subsidiaries or affiliates, unless such information is or becomes publicly available other than by the Company's breach of this Section 10.12 or such information is required to be disclosed by

45

law, rule, regulation, legal, judicial or administrative process, subpoena, or court order, or by a governmental, regulatory, or self-regulatory authority, or similar body.  For the avoidance of doubt, the Company shall be permitted to disclose at any time the aggregate amount of claims held by any class of Commitment Parties.

Section 10.13  <u>Settlement Discussions</u>.  This Agreement and the transactions contemplated herein are part of a proposed settlement of a dispute between the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Section 408 of the U.S. Federal Rule of Evidence and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any Action, except to the extent filed with, or disclosed to, the Bankruptcy Court in connection with the Chapter 11 Cases (other than an Action to approve or enforce the terms of this Agreement).

Section 10.14  <u>Additional Agreements</u>.

(a)       While this Agreement is in effect with respect to any Commitment Party, such Commitment Party shall be automatically entitled to its pro rata share of any fees, expenses, compensation or benefits in the event that the Company or any of the Debtors agrees to pay any such fees, expenses or other compensation or grant any such benefits to any other Commitment Party in connection with or related to this Agreement (including in connection with any amendment, waiver or modification of this Agreement) or the Equity Commitments made herein.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.

**GENCO SHIPPING & TRADING LIMITED**

By: _____

Name: John C. Wobensmith
Title: Chief Financial Officer

GENCO ACHERON LIMITED
GENCO BEAUTY LIMITED
GENCO KNIGHT LIMITED
GENCO LEADER LIMITED
GENCO MUSE LIMITED
GENCO VIGOUR LIMITED
GENCO CARRIER LIMITED
GENCO PROSPERITY LIMITED
GENCO SUCCESS LIMITED
GENCO WISDOM LIMITED
GENCO MARINE LIMITED
GENCO EXPLORER LIMITED
GENCO PIONEER LIMITED
GENCO PROGRESS LIMITED
GENCO RELIANCE LIMITED
GENCO SURPRISE LIMITED
GENCO SUGAR LIMITED
GENCO AUGUSTUS LIMITED
GENCO TIBERIUS LIMITED
GENCO LONDON LIMITED
GENCO TITUS LIMITED
GENCO CONSTANTINE LIMITED
GENCO HADRIAN LIMITED
GENCO COMMODUS LIMITED
GENCO MAXIMUS LIMITED
GENCO CLAUDIUS LIMITED

GENCO CHALLENGER LIMITED
GENCO CHAMPION LIMITED
GENCO CHARGER LIMITED
GENCO HUNTER LIMITED
GENCO PREDATOR LIMITED
GENCO WARRIOR LIMITED
GENCO BAY LIMITED
GENCO OCEAN LIMITED
GENCO AVRA LIMITED
GENCO MARE LIMITED
GENCO SPIRIT LIMITED
GENCO LORRAINE LIMITED
GENCO PYRENEES LIMITED
GENCO LOIRE LIMITED
GENCO CLAUDIUS LIMITED
GENCO BOURGOGNE LIMITED
GENCO PICARDY LIMITED
GENCO AQUITAINE LIMITED
GENCO NORMANDY LIMITED
GENCO AUVERGNE LIMITED
GENCO PROVENCE LIMITED
GENCO ARDENNES LIMITED
GENCO BRITTANY LIMITED
GENCO LANGUEDOC LIMITED
GENCO RHONE LIMITED
GENCO INVESTMENTS LLC
GENCO MANAGEMENT (USA) LLC
GENCO SHIP MANAGEMENT LLC
GENCO RE INVESTMENTS LLC

By: _____

    Name: John C. Wobensmith
    Title: Chief Financial Officer

**GENCO CAVALIER LLC**
**GENCO RAPTOR LLC**
**GENCO THUNDER LLC**

By: _____
    Name: John C. Wobensmith
    Title: Manager

Alden Global Capital LLC

By: _____
Name: Jason Pecora
Title:   Managing Director

*[Signature Page to Equity Commitment Agreement]*

CCP Credit Acquisition Holdings, L.L.C.,

Centerbridge Special Credit Partners II, L.P.

CCP II Acquisition Holdings, LLC

By: _____
    Name:  Bao Truong
    Title:   Senior Managing Director
             Authorized Signatory

CITIBANK N.A.

By: _____

Name:

Title:
    Brian S. Broyles
    Attorney-In-Fact

CITIGROUP FINANCIAL PRODUCTS INC.

By: _____

Name:

Title:

Brian S. Broyles
Authorized Signatory

CITIGROUP GLOBAL MARKETS INC.

By: _____

      Name:

      Title:

          Brian S. Broyles
          Authorized Signatory

[*Signature Page to Equity Commitment Agreement*]

P Gracie, LTD

By: P&S Credit Management, LP

By: _____

    Name: Sam Koaz

    Title: CFO

[*Signature Page to Equity Commitment Agreement*]

Gracie Credit Opportunities Master Fund, LP

By: P&S Credit Management, LP

By: _____

Name: Sam Konz

Title: CFO

Onex Debt Opportunity Fund, Ltd.

By: Onex Credit Partners, LLC, its investment manager

By: _____

Name: Steven Gutman
Title: General Counsel

OCP Investment Trust

By: Onex Credit Partners, LLC, its manager

By: _____
Name: Steven Gutman
Title: General Counsel

*[Signature Page to Equity Commitment Agreement]*

Midtown Acquisitions LP

By: _____
      Name: Conor Bastable
      Title: Manager

BANK OF AMERICA, N.A.


By: _____
      Name:  Jonathan M Barnes
      Title: Vice President


[*Signature Page to Equity Commitment Agreement*]

Merrill Lynch Pierce, Fenner & Smith, Inc.

By: _____
     Name:  Jonathan M Barnes
     Title: Vice President

[*Signature Page to Equity Commitment Agreement*]

**Permal Stone Lion Fund Ltd.**
By: Stone Lion Capital Partners L.P.,
    Investment Manager

By: _____

Name:
Title:     **Claudia Borg**
        **Authorized Signatory**

**Stone Lion Portfolio L.P.**
By: Stone Lion Capital Partners L.P.,
Its Investment Manager

By: _____
Name:
Title:

Claudia Borg
General Counsel

[*Signature Page to Equity Commitment Agreement*]

STRATEGIC VALUE MASTER FUND, LTD.

By: Strategic Value Partners, LLC, its Investment Manager

By: _____
    Name: Lewis Schwartz
    Title: Chief Financial Officer

*[Signature Page to Equity Commitment Agreement]*

STRATEGIC VALUE SPECIAL SITUATIONS MASTER FUND II, L.P.

By: SVP Special Situations II LLC, its Investment Manager

By: _____
    Name: Lewis Schwartz
    Title: Chief Financial Officer

*[Signature Page to Equity Commitment Agreement]*

STRATEGIC VALUE SPECIAL SITUATIONS MASTER FUND III, L.P.

By: SVP Special Situations III LLC, its Investment Manager

By: _____
    Name: Lewis Schwartz
    Title: Chief Financial Officer

*[Signature Page to Equity Commitment Agreement]*

STRATEGIC VALUE SPECIAL SITUATIONS OFFSHORE FUND III-A, L.P.

By: SVP Special Situations III-A LLC, its Investment Manager

By: _____
    Name: Lewis Schwartz
    Title: Chief Financial Officer

[*Signature Page to Equity Commitment Agreement*]

Credit Value Partners, LP, for funds
and accounts under management

By: _____

Name: DONALD POLLARD
Title: MANAGING PARTNER

[*Signature Page to Equity Commitment Agreement*]

VENOR CAPITAL MASTER FUND LTD.
By:      Venor Capital Management LP
Its:      Investment Manager


By: _____
         Name:  Michael J. Wartell
         Title:   Co-Chief Investment Officer

*[Signature Page to Equity Commitment Agreement]*

MAP 139 SEGREGATED PORTFOLIO OF LMA SPC .
By:    Venor Capital Management LP
Its:    Investment Adviser

By: _____
       Name:  Michael J. Wartell
       Title:  Co-Chief Investment Officer

*[Signature Page to Equity Commitment Agreement]*

**PANNING MASTER FUND, LP**
By: Panning Capital Management, LP, its investment manager

By: _____
   Name: Kieran Goodwin
   Title: Authorized Signatory

*[Signature Page to Equity Commitment Agreement]*

SPCP GROUP LLC

By: _____

Name:
Title:    Frederick H. Fogel
          Authorized Signatory

*[Signature Page to Equity Commitment Agreement]*

**APOLLO SPECIAL OPPORTUNITIES MANAGED
ACCOUNT, L.P.**

BY: APOLLO SOMA ADVISORS, L.P., its general
partner

BY: APOLLO SOMA CAPITAL MANAGEMENT,
LLC, its general partner

By: _____
Name: Joseph D. Glatt
Title:  Vice President and Secretary

**AES (LUX) S.A R.L.**

BY: APOLLO EUROPEAN STRATEGIC
MANAGEMENT, L.P., its investment manager

BY: APOLLO EUROPEAN STRATEGIC
MANAGEMENT GP, LLC, its general partner

By: _____
Name: Joseph D. Glatt
Title:  Vice President and Assistant Secretary

**AEC (LUX) S.A R.L.**

BY: APOLLO EUROPEAN CREDIT MANAGEMENT,
L.P., its investment manager

BY: APOLLO EUROPEAN CREDIT MANAGEMENT
GP, LLC, its general partner

By: _____
Name: Joseph D. Glatt
Title:   Vice President and Assistant Secretary

*[Signature Page to Equity Commitment Agreement]*

**APOLLO CENTRE STREET PARTNERSHIP, L.P.**

BY: APOLLO CENTRE STREET MANAGEMENT,
LLC, its investment manager

By: _____
Name: Joseph D. Glatt
Title: Vice President and Assistant Secretary


**ANS U.S. HOLDINGS LTD**

BY: APOLLO SK STRATEGIC ADVISORS, LLC, its
sole director

By: _____
Name: Joseph D. Glatt
Title:  Vice President and Assistant Secretary


**APOLLO CREDIT OPPORTUNITY FUND III LP**

BY: APOLLO CREDIT OPPORTUNITY ADVISORS
III LP, its general partner

BY: APOLLO CREDIT OPPORTUNITY ADVISORS
III GP LLC, its general partner

By: _____
Name: Joseph D. Glatt
Title:  Vice President and Secretary


*[Signature Page to Equity Commitment Agreement]*

**APOLLO FRANKLIN PARTNERSHIP, L.P.**

BY: APOLLO FRANKLIN ADVISORS (APO DC),
L.P., its general partner

BY: APOLLO FRANKLIN ADVISORS (APO DC-GP),
LLC, its general partner

By: _____
Name: Joseph D. Glatt
Title: Vice President and Secretary


**APOLLO ZEUS STRATEGIC INVESTMENTS, L.P.**

BY: APOLLO ZEUS STRATEGIC MANAGEMENT,
LLC, its investment manager

By: _____
Name: Joseph D. Glatt
Title: Vice President and Secretary

*[Signature Page to Equity Commitment Agreement]*

SOLUS ALTERNATIVE ASSET MANAGEMENT LP,

On behalf of certain funds managed thereby

By: _C. J. Lanktree_
    Name: C.J. Lanktree
    Title: EVP/Portfolio Manager

*[Signature Page to Equity Commitment Agreement]*

ADVANTAGE OPPORTUNITIES FUND, L.P.


By: _____

Name:  Irvin Schlussel
Title:  Managing Partner

FIDELITY ADVISOR SERIES I FUND: FIDELITY ADVISOR LEVERAGED COMPANY
STOCK FUND

By:

Name:                Joseph Zambello
Title:                Deputy Treasurer

FIDELITY SECURITIES FUND: FIDELITY LEVERAGED COMPANY STOCK FUND

By: _____
    Name:
    Title:        Joseph Zambello
                  Deputy Treasurer

NEW GENERATION ADVISORS, LLC

By: _____
Name: Johan D. Goedkoop
Title: Vice President

JLP CREDIT OPPORTUNITY MASTER FUND LTD.

By: Phoenix Investment Adviser, LLC, its Investment Manager

By: _____
    Name: Jeff Peskind
    Title: CIO

JLP STRESSED CREDIT FUND LP

By: Phoenix Investment Adviser, LLC, its Investment Manager

By: _____
    Name: JEFF Peskind
    Title: CIO

WILFRID ADVISORS AG

By:

Name:  Nicholas W. Walsh
Title:  President

## Schedule 1

**Genco Subsidiaries**

1.  Genco Acheron Limited
2.  Genco Beauty Limited
3.  Genco Knight Limited
4.  Genco Leader Limited
5.  Genco Muse Limited
6.  Genco Vigour Limited
7.  Genco Carrier Limited
8.  Genco Prosperity Limited
9.  Genco Success Limited
10. Genco Wisdom Limited
11. Genco Marine Limited
12. Genco Explorer Limited
13. Genco Pioneer Limited
14. Genco Progress Limited
15. Genco Reliance Limited
16. Genco Surprise Limited
17. Genco Sugar Limited
18. Genco Augustus Limited
19. Genco Tiberius Limited
20. Genco London Limited
21. Genco Titus Limited
22. Genco Constantine Limited
23. Genco Hadrian Limited
24. Genco Commodus Limited
25. Genco Maximus Limited
26. Genco Claudius Limited
27. Genco Challenger Limited
28. Genco Champion Limited
29. Genco Charger Limited
30. Genco Hunter Limited
31. Genco Predator Limited
32. Genco Warrior Limited
33. Genco Bay Limited
34. Genco Ocean Limited
35. Genco Avra Limited
36. Genco Mare Limited
37. Genco Spirit Limited
38. Genco Lorraine Limited
39. Genco Pyrenees Limited
40. Genco Loire Limited
41. Genco Bourgogne Limited
42. Genco Picardy Limited
43. Genco Aquitaine Limited
44. Genco Normandy Limited
45. Genco Auvergne Limited
46. Genco Provence Limited
47. Genco Ardennes Limited
48. Genco Brittany Limited
49. Genco Languedoc Limited
50. Genco Rhone Limited
51. Genco Investments LLC
52. Genco Management (USA) LLC
53. Genco Ship Management LLC
54. Genco RE Investments LLC
55. Genco Raptor LLC
56. Genco Cavalier LLC
57. Genco Thunder LLC

## Schedule 2

**Equity Commitment Percentages**

## **Schedule 3**

**Beneficially Controlled Votable Claims**

## **Schedule 4**

**Consents**

**None.**

## **Schedule 5**

**Notice Addresses for Commitment Parties**

**<u>Exhibit A</u>**

**Restructuring Term Sheet**

# GENCO SHIPPING AND TRADING LIMITED
## RESTRUCTURING TERM SHEET

### *APRIL 1, 2014*

This term sheet (the "Restructuring Term Sheet") sets forth the principal terms of a financial restructuring (the "Restructuring") of the existing debt and other obligations of the Company (as defined herein). Subject in all respects to the terms of the Restructuring Support Agreement to which this Restructuring Term Sheet will be attached (the "Restructuring Support Agreement"), the Restructuring will be consummated through a case or cases under chapter 11 (the "Chapter 11 Case(s)") of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  This Restructuring Term Sheet has the support of the Supporting Creditors, as set forth in the Restructuring Support Agreement.  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Restructuring Support Agreement, provided that any reference to Required Supporting Creditors in respect to a Debt Instrument shall only be applicable to the extent that such Required Supporting Creditors have not terminated the Restructuring Support Agreement with respect to such Debt Instrument.

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS.

[THIS RESTRUCTURING TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES.]

THE TRANSACTIONS DESCRIBED HEREIN WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.[1]

| *The Parties* | |
|---|---|
| Company | Genco Shipping & Trading Limited ("Genco") and those of its subsidiaries set forth on Schedule 1 to the Restructuring Support Agreement, shall be collectively referred to as the "Company".  Genco, and those of its direct and indirect subsidiaries that file chapter 11 cases, shall each be referred to as the "Debtors" or the "Company Parties." |
| 2007 Facility Lenders | Those lenders (collectively, the "2007 Facility Lenders") under that certain Credit Agreement, dated as of July 20, 2007 (as amended to date, the "2007 Credit Agreement"), by and among Genco as borrower, the banks and other financial institutions named therein as lenders, Wilmington Trust, N.A., as successor administrative and successor collateral agent (the |

---

[1] For the avoidance of doubt, approval of the Definitive Documents shall be subject to the terms of section 1(b) of the Restructuring Support Agreement.

| | |
|---|---|
| | "2007 Facility Agent"), and the other mandated lead arranger and bookrunner parties thereto, by which the lenders made available to Genco a senior secured credit facility in the amount of $1,377,000,000 (as amended, the "2007 Facility"). As of the date hereof, $1,055,911,525.00 of the principal amount remains outstanding under the 2007 Facility, plus the 1.25% facility fee payable pursuant to the Amendment and Supplement No. 6 to the 2007 Credit Agreement and accrued and unpaid interest. |
| $253 Million Facility Lenders | Those lenders (collectively, the "$253 Million Facility Lenders") under that certain Loan Agreement, dated as of August 20, 2010 (as amended to date, the "$253 Million Loan Agreement"), for a loan not exceeding $253 million, among Genco as borrower, the banks and financial institutions named therein as lenders, BNP Paribas, Credit Agricole Corporate and Investment Bank, DVB Bank SE, Deutsche Bank AG Filiale Deutschlandgeschaft, and Skandinaviska Enskilda Banken AB (publ) as mandated lead arrangers, BNP Paribas, Credit Agricole Corporate and Investment Bank, DVB Bank SE, Deutsche Bank AG, and Skandinaviska Enskilda Banken AB (publ) as swap providers, and Deutsche Bank Luxembourg S.A. as agent for the lenders (the "$253 Million Facility Agent") and Deutsche Bank AG Filiale Deutschlandgeschaft as security agent (the "$253 Million Facility Security Agent") (as amended, the "$253 Million Facility"). As of the date hereof, $175,718,000.00 of the principal amount remains outstanding under the $253 Million Facility. |
| $100 Million Facility Lenders | Those lenders (collectively, the "$100 Million Facility Lenders") under that certain Loan Agreement, dated as of August 12, 2010 (as amended to date, the "$100 Million Loan Agreement"), for a loan facility of up to $100 million by and among Genco as borrower, Genco Ocean Limited and the other companies named therein as guarantors, the banks and financial institutions named therein as lenders, and Credit Agricole Corporate and Investment Bank as agent and security trustee (the "$100 Million Facility Agent" and, together with the 2007 Facility Agent, the $253 Million Facility Agent and the $253 Million Facility Security Agent, the "Prepetition Agents") (as amended, the "$100 Million Facility"). As of the date hereof, $73,561,132.60 of the principal amount remains outstanding under the $100 Million Facility. |
| Interest Rate Swap Counterparty | DNB Bank ASA (f/k/a DnB Nor Bank ASA), as counterparty under that certain ISDA Master Agreement (the "Interest Rate Swap Counterparty") as well as an interest rate swap on September 7, 2005 (the "Swap"), which provides a hedge against the three month LIBOR interest rate risk at a swap rate of 4.485% on a notional amount of $106.233 million, with an expiration date of July 29, 2015. The Swap is an Interest Rate Protection Agreement (as such term is defined in the 2007 Credit Agreement), which may give rise to claims secured by the collateral securing the 2007 Facility under, and in accordance with the priority scheme set forth in, the 2007 Facility security documents. |
| Convertible Noteholders | Those holders (collectively, the "Convertible Noteholders") of the 5.00% Convertible Senior Notes due August 15, 2015 issued pursuant to that certain Indenture, dated as of July 27, 2010, between Genco as issuer and |

2

| | |
|---|---|
| | The Bank of New York Mellon (the "Indenture Trustee") as trustee (the "Convertible Notes" and the claims thereunder, the "Convertible Note Claims").  As of the date hereof, $125 million of the principal amount remains outstanding under the Convertible Notes. |
| **The Restructuring** | |
| Overview | The Plan will provide for, among other things:<br><br>• a $100.0 million rights offering (the "Rights Offering") for 8.7% of the pro forma equity in Reorganized Genco (the "New Genco Equity"), subject to dilution by the New Genco Warrants (defined below) and the MIP Warrants (defined below).  Eligible 2007 Facility Lenders will have the right to participate in up to 80% of the Rights Offering, which portion will be backstopped by the Supporting 2007 Facility Lenders, and eligible Convertible Noteholders will have the right to participate in up to 20% of the Rights Offering, which portion will be backstopped by the Supporting Noteholders;<br><br>• conversion of the full 2007 Facility into 81.1% of the New Genco Equity (after allocation of MIP Primary Equity), subject to dilution by the New Genco Warrants and the MIP Warrants (the "2007 Equity Conversion");<br><br>• refinancing the $253 Million Facility and $100 Million Facility with new senior secured credit facilities or amending the facilities to provide for extended maturity dates through August 2019 and certain other modifications as described more fully below;<br><br>• payment of the Swap Claim (as defined below) in full through mutually acceptable treatment or other treatment consistent with the Bankruptcy Code;<br><br>• the unimpairment of all GUC Claims under section 1124 of the Bankruptcy Code, as described more fully below;<br><br>• the conversion of the Convertible Note Claims into 8.4% of the New Genco Equity (after allocation of MIP Primary Equity), subject to dilution by the New Genco Warrants and the MIP Warrants (the "Note Equity Conversion" and together with the 2007 Equity Conversion, the "Equity Conversion");<br><br>• the cancellation of all Equity Interests, with such Equity Interests receiving 7-year warrants for 6.0% of the New Genco Equity struck at $1,295 million equity valuation (the "New Genco Warrants"). |
| Rights Offering | • The Supporting 2007 Facility Lenders and the Supporting Noteholders shall execute an equity commitment agreement (the "Equity Commitment Agreement") mutually acceptable to each of the Company, the Required Supporting 2007 Facility Lenders, and the Required Supporting Noteholders providing for a backstop of the Rights Offering for 60 days.<br><br>• Under the Equity Commitment Agreement, the Supporting 2007 |

| | |
|---|---|
| | Facility Lenders shall backstop 80% of the Rights Offering and the Supporting Noteholders shall backstop 20% of the Rights Offering. |
| | • The Equity Commitment Agreement shall provide for reimbursement of the reasonable fees and expenses incurred by the Supporting 2007 Facility Lenders and the Supporting Noteholders, but shall not require a commitment fee. |
| | • The Equity Commitment Agreement shall be executed by no later than the Solicitation Commencement Date. |
| Exit Financing | • The prepetition $253 Million Facility will either be replaced with a new third-party facility, or rolled into an amended credit facility on the same terms as the prepetition $253 Million Facility, other than the modifications set forth on Annex A attached hereto (the "New $253 Million Facility"), and |
| | • The prepetition $100 Million Facility will either be replaced with a new third-party facility, or rolled into an amended credit facility on the same terms as the prepetition $100 Million Facility, other than the modifications set forth on Annex B attached hereto (the "New $100 Million Facility"). |
| | • For the avoidance of doubt, the proceeds of any new third-party facility entered into by the Company on the Effective Date must be used to pay down the $253 Million Facility and the $100 Million Facility in cash. |
| Treatment of Claims/Equity Interests | The Plan will provide that each holder of an allowed claim will receive the following on or as soon as practicable after the effective date of the Plan (the "Plan Effective Date"), unless different treatment is agreed to by the holder of such allowed claim and the Company in consultation with the Supporting Creditors: |
| | • *Administrative, Priority, and Priority Tax Claims:* Allowed administrative, priority, and tax claims will be satisfied in full, in cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| | • *2007 Facility Claims:* On the Plan Effective Date, the holders of 2007 Facility Claims shall have an allowed claim in the amount of $1,055,911,525.00 plus accrued interest and fees (including the 1.25% facility fee payable under Amendment and Supplement No. 6 to the 2007 Credit Agreement). Holders of allowed claims under the 2007 Facility (the "2007 Facility Claims") will receive their pro rata share of (i) the 2007 Equity Conversion, and (ii) the right to participate in up to 80% of the Rights Offering (for eligible holders) at a $1,128.5 million valuation. |
| | • *$253 Million Facility Claims*: At the Company's option, holders of allowed claims under the $253 Million Facility (the "$253 Million Facility Claims") will be either (i) paid in full, in cash or (ii) receive their pro rata share of the New $253 Million Facility. |
| | • *$100 Million Facility Claims*:  At the Company's option, holders of |

<table>
<tr><td></td><td>

allowed claims under the $100 Million Facility (the "<u>$100 Million Facility Claims</u>") will be either (i) paid in full, in cash or (ii) receive their pro rata share of the New $100 Million Facility.

- *Swap Claim:* On account of the allowed claim arising under the Swap (the "<u>Swap Claim</u>"), the Interest Rate Swap Counterparty shall receive payment in full pursuant to treatment acceptable to the Company, the Required Supporting 2007 Facility Lenders, and the Interest Rate Swap Counterparty, or such other treatment as is consistent with the Bankruptcy Code.

- *GUC Claims*: Allowed general unsecured claims against the Debtors (other than the Convertible Note Claims) (collectively, the "<u>GUC Claims</u>") will either be reinstated or otherwise rendered unimpaired under the Plan.

- *Convertible Note Claims*: On the Plan Effective Date, the holders of Convertible Note Claims shall have an allowed claim in the amount of $125,000,000, plus accrued interest. Holders of Convertible Notes Claims will receive their pro rata share of (i) the Note Equity Conversion, and (ii) the right to participate in up to 20% of the Rights Offering (for eligible holders) at a $1,128.5 million valuation.

- *Intercompany Claims*: At the Debtors' option, with the reasonable consent of the Required Supporting 2007 Facility Lenders, all intercompany claims and interests shall be either reinstated or receive no distribution on account of such claims and interests on the Effective Date.

- *Existing Equity*: All existing equity interests (including common stock, preferred stock and any options, warrants or rights to acquire any equity interests) shall be cancelled on the Effective Date. Holders of equity interests will receive the New Genco Warrants under the Plan.

</td></tr>
</table>

**Other Plan Terms**

| Conditions to Confirmation | Conditions precedent to Confirmation and/or the occurrence of the Effective Date, each of which may be waived in writing by the Company and the Required Supporting 2007 Facility Lenders, and subject to the consent rights of the Supporting Creditors as provided for in the Restructuring Support Agreement, shall include, without limitation, the following: |
| --- | --- |

a) Each of the Plan, Disclosure Statement, plan supplement (including, with respect to any amendments, modifications, supplements and exhibits thereto related to the foregoing) and other Definitive Documents (as applicable) shall be approved consistent with the terms of section 1(b) of the Restructuring Support Agreement;

b) The Confirmation Order shall have been entered and not stayed, and shall be approved consistent with the terms of section 1(b) of the Restructuring Support Agreement;

c) All actions, documents, certificates, and agreements necessary to

5

<table>
<tr><td></td><td>

implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable government units in accordance with applicable law;

d) The Restructuring Support Agreement shall have been assumed; and

e) All governmental or others approvals required to effectuate the terms of this Plan shall have been obtained.

</td></tr>
</table>

| Releases and Exculpation | The Plan and Confirmation Order shall provide customary release and exculpation provisions for the benefit of the Debtors, the Supporting 2007 Facility Lenders, the Supporting $253 Million Facility Lenders, the Supporting $100 Million Facility Lenders, the Prepetition Agents, the Supporting Noteholders, the Indenture Trustee, and their respective agents, affiliates, principals, officers, directors, attorneys, financial advisors or other professionals or representatives, each in their capacity as such. |
|---|---|
| Cancellation of Notes, Instruments, Certificates and Other Documents | On the Plan Effective Date, except to the extent otherwise provided under the Plan, all notes, instruments, certificates, and other documents evidencing claims against or interests in the Debtors shall be cancelled and the obligations of the Debtors related thereto shall be discharged. |
| Issuance of New Securities; Execution of Plan Documents; Registration Rights | On the Plan Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.  It is the intent of the parties that any "securities" as defined in section 2(a)(1) of the Securities Act of 1933 issued under the Plan, except with respect to any entity that is an underwriter, shall be exempt from registration under U.S. state and federal securities laws pursuant to section 1145 of the Bankruptcy Code and the Reorganized Debtors will use their commercially reasonable efforts to utilize section 1145 of the Bankruptcy Code, or to the extent that such exemption is unavailable, shall use their commercially reasonable efforts to utilize any other available exemptions from registration, as applicable.

On the Plan Effective Date, the Company and any recipient of shares who (together with its affiliates and related funds) receives 10% or more of the New Genco Equity issued under the Plan or who otherwise reasonably believes that it may be an "affiliate" of Reorganized Genco (such stockholders executing the agreement, the "Registration Rights Parties") will enter into a registration rights agreement. The registration rights agreement shall provide Registration Rights Parties who receive 10% or more of New Genco Equity issued under the Plan with demand and piggyback registration rights. All other shareholders party thereto shall have piggyback registration rights only.  The registration rights agreement will also provide that on or before the date that is 90 days after the Effective Date, the Company shall file, and shall thereafter use its reasonable best efforts to cause to be declared effective as promptly as practicable, a Registration Statement on Form S-1 for the registration and sale of the New Genco Equity received by the Registration Rights Parties under the Plan pursuant to the public secondary offering (which offering shall be, if requested by one or more selling Registration Rights Parties |

6

| | |
|---|---|
| | holding at least 15% of the outstanding shares held by all Registration Rights Parties, an underwritten public offering); provided that the Company shall not be required to file such Registration Statement unless at least the Registration Rights Parties, in the aggregate, choose to include at least 15% of the outstanding shares held by all Registration Rights Parties in such Registration Statement. The registration rights agreement shall contain customary terms and conditions, including, but not limited to, the ability by one or more selling Registration Rights Parties holding a majority of the outstanding shares held by all Registration Rights Parties to waive or postpone the filing of the Registration Statement upon the Company's request and provisions with respect to blackout periods. |
| Executory Contracts/Unexpired Leases | The Plan will provide that the executory contracts and unexpired leases that are not assumed or rejected as of the Plan Effective Date pursuant to the Plan or a separate motion will be deemed *assumed*. |
| Management Incentive Plan | The Plan will provide for the establishment of a management equity incentive plan (the "MIP") pursuant to which the directors, officers, and other management of Reorganized Genco will receive the following: (i) 1.8% of the shares of the New Genco Equity (the "MIP Primary Equity"), subject to dilution by the MIP Warrants (as defined below) and the New Genco Warrants, and (ii) the following three tiers of warrants (the "MIP Warrants"): (a) 6-year warrants struck at a $1,618 million equity valuation exercisable for a number of shares equal to 3.5% of the New Genco Equity outstanding (calculated on a fully-diluted basis) as of the Plan Effective Date, (b) 6-year warrants struck at a $1,810 million equity valuation, exercisable for a number of shares equal to 3.5% of the New Genco Equity outstanding (calculated on a fully-diluted basis) as of the Plan Effective Date, and (c) 6-year warrants struck at a $2,195 million equity valuation, exercisable for a number of shares equal to 5.0% of the New Genco Equity outstanding (calculated on a fully-diluted basis) as of the Plan Effective Date. The New Genco Equity issued under the MIP and the MIP Warrants will vest over three years in equal proportions. The holder of any MIP Primary Equity will be entitled to receive all dividends paid with respect to such shares as if such MIP Primary Equity had vested on the grant date (subject to forfeiture by the holder in the event that such grant is terminated prior to vesting unless the administrator of the MIP determines otherwise). The MIP Warrants will be exercisable on a cashless basis and will contain customary anti-dilution provisions (including, but not limited to, dilution as a result of stock-splits, stock dividends, stock buybacks and cash dividends), but will be subject to dilution by future equity issuances including the exercise of subsequent tranches of warrants. |
| Corporate Governance | The terms and conditions of the new corporate governance documents of the Reorganized Debtors (including the bylaws, certificates of incorporation, among other governance documents) shall be approved in accordance with section 1(b) of the Restructuring Support Agreement. For the avoidance of doubt, the new corporate governance documents shall provide for a requirement that affiliate transactions be approved by a majority of the non-affiliated directors or shares (as the case may be). The Plan will provide that upon the Plan Effective Date, the organizational documents of Reorganized Genco shall not provide for transfer restrictions |

|  | or limitations, provided, however that such corporate governance documents may include (a) customary restrictions intended to ensure that transfers will not violate applicable securities laws (but shall not require a legal opinion from the transferor or transferee unless Reorganized Genco reasonably believes that it may involve a transfer to or from an affiliate) and (b) any transfer restrictions deemed reasonably necessary to preserve, to the maximum extent possible, the value of any net operating losses, credits and other tax attributes, and Reorganized Genco's qualification for exemption under Section 883 of the Internal Revenue Code and the Treasury Regulations promulgated thereunder. |
|---|---|
|  | The Plan will provide that (a) in the event that Reorganized Genco ceases to be a reporting Company at any time following the Plan Effective Date, then until the date that is 12 months after such event, Reorganized Genco will use commercially reasonable efforts to make the following information available to common stockholders who beneficially own at least 1.0% of the total outstanding shares of Reorganized Genco's common stock (and who provide evidence of such ownership that is reasonably satisfactory to Reorganized Genco), in each case solely to the extent that such information is otherwise available, by posting such information to a secure website or data site to which such stockholders (and potential transferees of such stockholders who affirmatively agree to the terms of a "click through" confidentiality agreement posted by Reorganized Genco on such website or data site) are given access: (i) within 120 days after the end of Reorganized Genco's fiscal year, audited consolidated annual financial statements, and (ii) within 45 days after the end of each of the first three calendar quarters of Reorganized Genco's fiscal year, unaudited quarterly financial statements and (b) until the date that is 12 months after the Plan Effective Date, such provision cannot be amended or modified in any respect without the prior consent of holders of a majority of the outstanding shares of Reorganized Genco's common stock that are held by non-affiliates of Reorganized Genco. |
| Board of Directors | The initial directors of the New Board shall consist of Peter C. Georgiopoulos and 6 other directors to be disclosed in the plan supplement, including (a) 2 directors selected by Centerbridge Partners, L.P., on behalf of one or more of its affiliated investment funds ("Centerbridge"); provided, that if at any time prior to the Plan Effective Date Centerbridge's aggregate holdings (together with its affiliated funds and managed accounts) would not entitle it to a pro forma allocation of (i) at least 20% but more than 10% of the New Genco Equity, then Centerbridge shall only be entitled to select 1 initial director and the 4 directors referenced in subparagraph (b) shall be increased to 5 and (ii) at least 10% of the New Genco Equity, then  Centerbridge shall not be entitled to select any directors and the 4 directors referenced in subparagraph (b) shall be increased to 6 and (b) 4 directors selected by a committee consisting of the following entities that own, manage, direct, or have investment authority with respect to indebtedness under the 2007 Credit Facility: (a) Apollo Management Holdings LP; (b) Centerbridge; (c) Midtown Acquisitions L.P.; (d) Panning Capital Management, LP; and (e) Solus Alternative Asset Management LP (collectively, the "Board Selection Committee"), in consultation with the Company and the |

|  | Supporting Noteholders, by majority vote, with each member of the Board Selection Committee having one vote with respect to each initial board seat; provided, that in the event that at any time prior to the Plan Effective Date, any member of the Board Selection Committee's aggregate holdings (together with its affiliated funds and managed accounts) under the 2007 Facility and the Convertible Notes would not entitle such member (together with its affiliated funds and managed accounts) to a pro forma allocation of at least 6.25% of the New Genco Equity, such member shall thereupon automatically cease to be a member of the Board Selection Committee. |
|---|---|
| Management Agreements | The Plan will provide that, on the Plan Effective Date, members of the Debtors' current management team will either (i) continue to be employed under the terms of any existing employment agreements (as assumed) or enter into a new employment agreement on terms no less favorable to such individual than the current employment agreement, or (ii) in the event of a new employment agreement for any member of the management team who is not presently subject to a management agreement, then any such new employment agreement shall be mutually acceptable to the Required Supporting 2007 Facility Lenders and the Debtors, in consultation with the Supporting Noteholders. |
| Initial Officers | All initial officers of Reorganized Genco shall be disclosed in the plan supplement, shall be mutually acceptable to the Debtors and the Required Supporting 2007 Facility Lenders, and shall include John C. Wobensmith. |
| Indemnity | The treatment of all of the Company's indemnification provisions currently in place (whether in the bylaws, certificates of incorporation or employment contracts) for the current directors, officers, employees, managing agents, and attorneys, and such current directors and officers respective affiliates will be assumed by the Company. |
| SEC Registration and Stock Listing | As of the Plan Effective Date, Reorganized Genco will be a reporting company under the Securities Exchange Act and the parties intend that Reorganized Genco will remain a reporting company under the Securities Exchange Act. In the event that, during the one-year period immediately following the Plan Effective Date, Reorganized Genco meets the applicable listing standards, then Reorganized Genco will use commercially reasonable efforts to cause the New Genco Equity to be listed on the New York Stock Exchange or the NASDAQ Stock Market within a reasonable time after the Plan Effective Date. |
| Tax Issues | The Company, in a manner satisfactory to the Required Supporting 2007 Facility Lenders and after consultation with the Supporting Noteholders, will seek to effectuate the terms and conditions outlined herein in a tax efficient manner. |

PWRW&G DRAFT 3/31/14
PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408
FOR DISCUSSION PURPOSES ONLY

**GENCO SHIPPING AND TRADING LIMITED**
**NEW $253 MILLION FACILITY**
**ANNEX A TO RESTRUCTURING TERM SHEET[1]**

| | |
|---|---|
| Final Maturity Date | August 31, 2019[2] |
| Repayment Installments | Quarterly repayment installments in accordance with the terms of the $253 Million Facility, except any repayment(s) missed during the Chapter 11 Cases shall be paid on the effective date of the Plan, which shall be the same date as the effective date of the New $253 Million Facility (as used in this Term Sheet, the "Effective Date"). |
| Financial Covenants (clauses 12.2.1-12.2.5) | (a) The Consolidated Interest Coverage Ratio (clause 12.2.2), Maximum Leverage Ratio (clause 12.2.3) and the Minimum Consolidated Net Worth (clause 12.2.4) shall: <br><br> (i) be waived during the period between the Effective Date and March 31, 2015 (the "Financial Covenant Holiday"); and <br><br> (ii) after the Financial Covenant Holiday, be effective as follows (for the avoidance of doubt, the first test will occur on June 30, 2015): <br><br> (A) Consolidated Interest Coverage Ratio to continue at a minimum of 2.00:1.00;[3] <br> (B) Maximum Leverage Ratio to continue at a maximum of 5.5x;[4] and <br> (C) Minimum Consolidated Net Worth covenant to apply as per clause 12.2.4, except the definition of Minimum Consolidated Net Worth shall be amended as follows: "**Minimum Consolidated Net Worth** shall mean not less than 75% of the Post-Reorganization Equity Value plus 50% of the Net Proceeds received as a result of any new equity issues by the Borrower after the Effective Date." <br><br> (b) With respect to interest-bearing Consolidated Indebtedness (clause 12.2.5), during the Financial Covenant Holiday, interest-bearing Consolidated Indebtedness to be amended so that it cannot exceed 70% of the aggregate amount of interest-bearing Consolidated Indebtedness plus Consolidated Net Worth.  Such |

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet or the $253 Million Facility, as applicable.

[2]    Subject to most favored lender provision as set forth below.

[3]    Calculation to be determined and be mutually acceptable.

[4]    Calculation to be determined and be mutually acceptable.

|  | covenant shall not apply after the Financial Covenant Holiday. |
|  | (c) For the avoidance of doubt, the Minimum Liquidity requirement (clause 12.2.1) to remain in effect at all times from and after the Effective Date. |
|  | (d) New fleet-wide minimum liquidity covenant:   New requirement for free cash of at least $750K per vessel for all vessels owned by the Company to be added (with the $750K for each of the 13 vessels pledged as security under the New $253 Million Facility counting toward this calculation). |
|  | (e) For the avoidance of doubt, the definitions, calculations and methodology in the $253 Million Facility to apply with respect to the financial covenants described above unless otherwise provided herein, except for changes which are mutually acceptable. |
| Financial Indebtedness | Clause 12.3.10(b):  Restriction on Financial Indebtedness in connection with the acquisition of a vessel to continue to apply during the Financial Covenant Holiday.  Such restriction not to apply thereafter. |
| Vessels Required to be Under Fixed Rate Time Charters | Delete clause 12.5.18 requiring at least 4 vessels to be under fixed rate time charters. |
| Dividends | No dividends by Genco shall be payable during the Financial Covenant Holiday, and thereafter dividends by Genco shall only be payable if the Company is in compliance with the financial covenants and no breach of the financial covenants will result from such dividend payment. |
|  | Clause 12.3.13(b) shall be modified to reflect that dividends are only permitted if no Default or Event of Default has occurred and is continuing at the time of declaration or payment (clause 12.3.13(b)), with such modifications being acceptable to the Supporting $253 Million Facility Lenders. |
|  | All limitations based on the Permitted Dividend Amount to be deleted. |
|  | Delete clause 12.3.13(a)(iv) regarding Capped Call Arrangements. |
| Interest Rate | LIBOR + 350 bps |
| Upfront Fee | The lenders under the New $253 Million Facility will receive on the Effective Date an upfront fee of 100 bps and Deutsche Bank Luxembourg S.A., as agent, and Deutsche Bank AG Filiale Deutschlandgeschäft, as security agent (together, and in such capacities, the "<u>DB Term Loan Agents</u>") will receive a structuring fee on the Effective Date as detailed in a separate fee letter, each based on the principal amount of the Loans outstanding |

| | immediately prior to effectiveness of the New $253 Million Facility. |
|---|---|
| Most Favored Lender Provision (clause 12.2.6) | Modify to reflect most favored lender provision applicable to financial covenants and interest margin to be set forth in the New $100 Million Facility or any Additional Facility entered into by the Company. Additional modifications to reflect that this provision is applicable to the maturity dates set forth in the New $100 Million Facility or any new third-party facility entered into by Genco as of the Effective Date. As of the Effective Date, no credit agreement or other debt instrument shall mature prior to the New $253 Million Facility. Delete references to Waiver Period in clause 12.2.6 and any related definitions, including Additional Facility. |
| Loans or Advances (clause 12.3.12.(b)) | Delete clause 12.3.12(b)(iii) regarding loans or advances in connection with any joint venture and/or dry bulk shipping operation. |
| Second Liens | Release second liens on any collateral securing the New $253 Million Facility. |
| Other Modifications | Additional modifications to the $253 Million Facility which are necessary, and which shall be in form and substance reasonably acceptable to the Supporting $253 Million Facility Lenders and the Borrower, solely to reflect the occurrence of the Chapter 11 Cases and the terms described herein. |

PWRW&G DRAFT 3/31/14
PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408
FOR DISCUSSION PURPOSES ONLY

**GENCO SHIPPING AND TRADING LIMITED**
**NEW $100 MILLION FACILITY**
**ANNEX B TO RESTRUCTURING TERM SHEET[1]**

| | |
|---|---|
| Final Maturity Date | August 31, 2019[2] |
| Repayment Installments | Quarterly repayment installments in accordance with the terms of the $100 Million Facility, except any repayment(s) missed during the Chapter 11 Cases shall be paid on the effective date of the Plan, which shall be the same date as the effective date of the New $100 Million Facility (as used in this Term Sheet, the "Effective Date"). |
| Financial Covenants (clauses 12.2(d)-(f); 10.2(c)) | (a) The Minimum Consolidated Interest Coverage Ratio (clause 12.2(e)), Maximum Leverage Ratio (clause 12.2(d)) and the Minimum Consolidated Net Worth (clause 12.2(f)) shall:<br><br>(i) be waived during the period between the Effective Date and March 31, 2015 (the "Financial Covenant Holiday"); and<br><br>(ii) after the Financial Covenant Holiday, be effective as follows (for the avoidance of doubt, the first test will occur on June 30, 2015):<br><br>    (A) Minimum Consolidated Interest Coverage Ratio to continue at a minimum of 2.00:1.00;[3]<br>    (B) Maximum Leverage Ratio to continue at a maximum of 5.5x[4]; and<br>    (C) Minimum Consolidated Net Worth covenant to apply as per clause 12.2(f), except the definition of Minimum Consolidated Net Worth shall be amended as follows: "**Minimum Consolidated Net Worth** shall mean not less than 75% of the Post-Reorganization Equity Value plus 50% of the Net Proceeds received as a result of any new equity issues by the Borrower after the Effective Date."<br><br>(b) With respect to interest-bearing Consolidated Indebtedness (clause 4(b) of First Amendment to $100 Million Facility), during the Financial Covenant Holiday, interest-bearing Consolidated Indebtedness to be amended so that it cannot exceed 70% of the |

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet or the $100 Million Facility, as appropriate.

[2]    Subject to, as of the Effective Date, any new third-party facility not maturing prior to the New $100 Million Facility and the New $253 Million Facility (if any).

[3]    Calculation to be determined and mutually acceptable.

[4]    Calculation to be determined and mutually acceptable

|  | aggregate amount of interest-bearing Consolidated Indebtedness plus Consolidated Net Worth. Such covenant shall not apply after the Financial Covenant Holiday.<br><br>(c) For the avoidance of doubt, the Minimum Liquidity requirement (clause 10.2(c)) to remain in effect at all times from and after the Effective Date.<br><br>(d) New fleet-wide minimum liquidity covenant:   New requirement for free cash of at least $750K per vessel for all vessels owned by the Company to be added (with the $750K for each of the 5 vessels pledged as security under the New $100 Million Facility counting toward this calculation).<br><br>(e) For the avoidance of doubt, the definitions, calculations and methodology in the $100 Million Facility to apply with respect to the financial covenants described above unless otherwise provided herein, except for changes which are mutually acceptable. |
|---|---|
| Financial Indebtedness | Clause 12.2(l):  Restriction on Financial Indebtedness in connection with the acquisition of a vessel to continue to apply during the Financial Covenant Holiday.  Such restriction not to apply thereafter. |
| Dividends | No dividends by Genco shall be payable during the Financial Covenant Holiday.  Thereafter, revert to existing dividend formulation in $100 Million Facility, except that all limitations based on the Permitted Dividend Amount shall be eliminated.  For the avoidance of doubt, after the Financial Covenant Holiday dividends by Genco shall only be payable if the Company is in compliance with the financial covenants and no breach of financial covenants will result from such dividend payment.<br><br>Delete clause 12.2(g)(v) regarding Capped Call Arrangements. |
| Interest Rate | LIBOR + 350 bps |
| Upfront Fee | The lenders under the New $100 Million Facility will receive on the Effective Date an upfront fee of 100 bps and Credit Agricole Corporate and Investment Bank, as agent and security trustee, will receive a structuring fee on the Effective Date as detailed in a separate fee letter, each based on the principal amount of the Loans outstanding immediately prior to effectiveness of the New $100 Million Facility. |
| Most Favored Lender Provision | Add most favored lender provision applicable to financial covenants and interest margin, to be set forth in the New $253 Million Facility or any other Additional Facility entered into by the Company.  Delete references to "Ratio Suspension Period" or "Amended Facility" in the definition of Additional Facility.  For the avoidance of doubt, as of the Effective Date, no credit |

2

| | agreement or other debt instrument shall mature prior to the New $100 Million Facility. |
|---|---|
| Second Liens | Release of second liens on any collateral securing the New $100 Million Facility. |
| Other Modifications | Additional modifications to the $100 Million Facility which are necessary, and which shall be in form and substance reasonably acceptable to the Supporting $100 Million Facility Lenders and to the Borrower , solely to reflect the occurrence of the Chapter 11 Cases and the terms described herein. |

**<u>Exhibit B</u>**

**Form of Plan**

<u>**EXHIBIT E TO THE DISCLOSURE STATEMENT**</u>

**RIGHTS OFFERING PROCEDURES**

## RIGHTS OFFERING PROCEDURES

### 1.    Introduction

On April [21], 2014, Genco Shipping & Trading Ltd. ("Genco") and its affiliated debtors and debtors in possession (collectively, the "Debtors") filed a *Prepackaged Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (as it may be amended, modified or supplemented from time to time, the "Plan")[1] and a *Disclosure Statement in Support of the Plan* (the "Disclosure Statement");

On [   ], 2014, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an order (the "Rights Offering Procedures Order") approving, among other things, these procedures (these "Rights Offering Procedures") for the conduct of, and participation in, a rights offering (the "Rights Offering") to acquire shares of New Genco Common Stock (the "Rights Offering Shares") being made to holders of Prepetition 2007 Facility Claims and Convertible Note Claims.  The Rights Offering, including the issuance of the Rights Offering Shares, is being conducted pursuant to the Plan and the Rights Offering Procedures Order.

The Debtors and the Backstop Parties have entered into an Equity Commitment Agreement, dated as of April 16, 2014, pursuant to which the Backstop Parties have severally (but not jointly) agreed, subject to the terms and conditions therein, to purchase any Rights Offering Shares that are not properly subscribed for pursuant to these Rights Offering Procedures.

The Debtors have designated GCG, Inc. as the subscription agent for the Rights Offering (the "Subscription Agent").

*The Disclosure Statement sets forth important information that should be carefully read and considered prior to making a decision to participate in the Rights Offering, including the Sections entitled "Financial Projections and Valuation" and "Certain Risk Factors to be Considered."  A copy of the Disclosure Statement has been distributed to each holder of a Prepetition 2007 Facility Claim and of a Convertible Note Claim and is also available from the Subscription Agent and at the Debtors' restructuring website www.GencoRestructuring.com. Holders of Rights may wish to seek legal advice concerning the Rights Offering.*

### 2.    Overview of the Rights Offering

*(a)    General*

The Rights are being distributed to holders of Prepetition 2007 Facility Claims and of Convertible Note Claims, in each case, that are Eligible Participants (as defined below) as pre-confirmation distributions under the Plan.  Each such holder of a Prepetition 2007 Facility Claims or of a Convertible Note Claim has the right, but not the obligation, to purchase New Genco Common Stock pursuant to the Rights Offering upon exercise of the Rights.

---

[1]   Capitalized terms used without definition have the meanings assigned to them in the Plan.

Each Right can be exercised for one share of New Genco Common Stock at an exercise price of $18.62537 per share (the "Subscription Price"). Fractional shares of New Genco Common Stock will not be issued and any such fractional shares will be adjusted down to the nearest whole number. No compensation will be payable in respect of such adjustment.

The Rights will be issued to Eligible Participants as of [    ], 2014 (the "Rights Offering Record Date"). The Rights may be transferred only together with the Prepetition 2007 Facility Claim or Convertible Noteholder Claim with respect to which they were issued, as described below.

The Rights Offering is being conducted separately to holders of the Prepetition 2007 Facility Claims and to holders of the Convertible Note Claims, as described below.

*(b)    Eligible Participants*

Only Eligible Participants may participate in the Rights Offering.

An "Eligible Participant" means a Person that—

(i)    was the beneficial owner of a Prepetition 2007 Facility Claim or a Convertible Note Claim, as applicable, as of the Rights Offering Record Date or a direct or indirect transferee of such a beneficial owner in a transfer that complies with these Rights Offering Procedures; and

(ii)    is either a "qualified institutional buyer" within the meaning of Rule 144A (a "QIB") under the Securities Act of 1933, as amended (the "Securities Act") or an "accredited investor" within the meaning of Rule 501(a) under the Securities Act (an "Accredited Investor").

*(c)    Lender Rights*

An aggregate of 4,295,217 shares of New Genco Common Stock will be offered in the Rights Offering to holders of Prepetition 2007 Facility Claims (the "Lender Rights Offering Shares").

Each holder of a Prepetition 2007 Facility Claim as of the Rights Offering Record Date will receive a number of Rights ("Lender Rights") equal to the aggregate number of the Prepetition 2007 Facility Claims Rights Offering Shares *multiplied by* a fraction, the numerator of which is the amount of the Prepetition 2007 Facility Claims held by such holder and the denominator of which is the aggregate amount of all Prepetition 2007 Facility Claims (rounded down to the nearest whole Right).

Each holder of a Prepetition 2007 Facility Claim exercising its Lender Rights in full will also have the right ("Lender Oversubscription Rights") to elect to purchase additional shares of New Genco Common Stock in the event that any Lender Rights Offering Shares remain unsubscribed at the Subscription Deadline (as defined below) (such unsubscribed shares, the "Unsubscribed Lender Rights Offering Shares" and, such election, a "Lender Oversubscription Election"). In the event the aggregate Lender Rights Offering Shares issuable pursuant to the

2

exercise of the Lender Oversubscription Rights exceeds the number of Unsubscribed Lender Rights Offering Shares, the Unsubscribed Lender Rights Offering Shares will be allocated among the holders of Prepetition 2007 Facility Claims who have made a Lender Oversubscription Election pro rata, taking into account only the Prepetition 2007 Facility Claims of the holders that have made a Lender Oversubscription Election.

The Debtors understand that all holders of Prepetition 2007 Facility Claims are or will be Eligible Participants.  However, the Debtors shall undertake appropriate procedures to confirm that any holder of a Prepetition 2007 Facility Claim is in fact an Eligible Participant, including, but not limited to, requiring certifications by such holder to that effect, and which may include applying minimum Claim thresholds and other diligence measures as the Debtors deem necessary.

*(d)    Noteholder Rights*

An aggregate of 1,073,804 shares of New Genco Common Stock will be offered in the Rights Offering to holders of Convertible Note Claims (the "<u>Noteholder Rights Offering Shares</u>").

Each holder of a Convertible Note Claim as of the Rights Offering Record Date will receive a number of Rights ("<u>Noteholder Rights</u>" and, together with the Lender Rights, the "<u>Rights</u>") equal to the aggregate number of the Noteholder Rights Offering Shares *multiplied by* a fraction, the numerator of which is the amount of the Convertible Note Claims held by such holder and the denominator of which is the aggregate amount of all Convertible Note Claims (rounded down to the nearest whole Right).

Each holder of a Convertible Note Claim that exercises Noteholder Rights will be required to certify that it is either a QIB or an Accredited Investor.  If a holder of a Convertible Note Claim does not make this certification, or such holder is in fact not a QIB or an Accredited Investor, the exercise by such holder of its Noteholder Rights will be void.

Holders of Noteholder Rights will have no oversubscription rights.

**3.    Rights Offering Procedures**

*These Rights Offering Procedures, the Subscription Form and the accompanying Instructions should be read carefully before exercise of the Rights, as strict compliance with their terms is required.*

*(a)    Subscription Forms*

In order to exercise Lender Rights, a holder of a Prepetition 2007 Facility Claim  must duly complete and timely deliver a subscription form (a "<u>Lender Subscription Form</u>"), along with its Subscription Price in accordance with these Rights Offering Procedures.  The Lender Subscription Form is being sent to the holders of Prepetition 2007 Facility Claims together with these Rights Offering Procedures.   Instructions with respect to completing the Lender Subscription Form accompanies the form.

3

In order to exercise Noteholder Rights, a holder of a Convertible Note Claim  must duly complete and timely deliver a subscription form (a "Noteholder Subscription Form" and, together with Lender Subscription Form, the "Subscription Forms"), along with its Subscription Purchase Price (as defined below) in accordance with these Rights Offering Procedures.  The Noteholder Subscription Form is being sent to the holders of Convertible Note Claims together with these Rights Offering Procedures.  Instructions with respect to completing the Noteholder Subscription Form accompanies the form.

(b)     *Subscription Period*

The Rights Offering will commence on April [_], 2014  and will expire at 5:00 pm. (New York City time) on May [_], 2014  (the "Subscription Deadline").

The Debtors may extend the Subscription Deadline, from time to time, with the consent of the Required Supporting 2007 Facility Lenders and the Required Supporting Noteholders. The Debtors shall promptly notify the holders of Prepetition 2007 Facility Claims and Convertible Note Claims in writing of any extension and of the date of the new Subscription Deadline.

(c)     *Exercise of Rights*

In order to validly exercise Lender Rights or Noteholder Rights, as applicable, at or before the Subscription Deadline, the holder of such Rights must:

(i)     return a completed and signed Subscription Form to the Subscription Agent electing to exercise all or a portion of such Rights; and

(ii)    pay, by wire transfer of immediately available funds to the account designated on the Instructions to the Subscription Forms (the "Escrow Account"), the amount equal to the product of the Subscription Price and the number of shares the holder of such Rights elects to purchase (a "Rights Offering Payment"), which amount shall be held in escrow and shall not become property of the Debtors' Estates until the Effective Date.

The Rights Offering Shares are expected to be delivered to Eligible Participants that have properly exercised their rights through, and in accordance with the practices and procedures of, the Depository Trust Company ("DTC") on or as soon as practicable following the Effective Date.  See Section 7(c).

*The method of delivery of its Subscription Form and any other required documents by an Eligible Participant is at such Eligible Participant's option and sole risk, and delivery will be considered made only when such Subscription Form and other documentation are actually received by the Subscription Agent.  If delivery is by mail, the use of registered mail with return receipt requested, properly insured, is encouraged and strongly recommended.  In all cases, holders exercising their Rights should allow sufficient time to ensure timely delivery prior to the Subscription Deadline.*

4

*The risk of non-delivery of any documents sent or payments remitted to the Subscription Agent in connection with the exercise of Rights lies solely with the exercising holders of the Rights, and none of the Debtors, Reorganized Debtors, Supporting Creditors, or any of their respective officers, directors, employees, agents or advisors, including the Subscription Agent, assume the risk of such non-delivery under any circumstance whatsoever.*

(d)     *Failure to Exercise Rights*

*Unexercised Rights will be cancelled on the Subscription Deadline*.   An Eligible Participant shall be deemed to have relinquished and waived all rights to participate in the Rights Offering to the extent the Subscription Agent for any reason does not receive from such Eligible Participant, on or before the Subscription Deadline, (i) a duly completed Subscription Form and (ii) immediately available funds by wire transfer for payment of the Subscription Price with respect to the Rights being exercised.

Any attempt to exercise any Rights after the Subscription Deadline will be null and void, and the Debtors will not be required to honor any Subscription Form or other documentation received by the Subscription Agent relating to such purported exercise after the Subscription Deadline, regardless of when such Subscription Form or other documentation was sent.

(e)     *Oversubscription by Holders of Lender Rights*

Oversubscription rights are available only with respect to the Lender Rights.

In order for a holder of Lender Rights to validly exercise Lender Oversubscription Rights, in addition to complying with the procedures for validly exercising its Lender Rights in full, a holder of Lender Rights must—

(i)     make a Lender Oversubscription Election by specifying on its Lender Subscription Form the number of Unsubscribed Lender Rights Offering Shares that such holder wishes to purchase; and

(ii)     pay, by wire transfer of immediately available funds to the Escrow Account, the amount equal to the product of the Subscription Price and the number of Unsubscribed Lender Rights Offering Shares the holder of such Rights elects to purchase (an "Oversubscription Payment"), which amount shall be held in escrow and shall not become property of the Debtors' Estates until the Effective Date.

In the event that the Subscription Agent determines that the number of Unsubscribed Lender Rights Offering Shares allocated to the holder of Lender Rights is less than the number of Unsubscribed Lender Rights Offering Shares for which such holder has subscribed, the Subscription Agent shall return to the holder the excess Oversubscription Payment as promptly as practicable after such determination is made.

4.        **Transfer Restriction and Revocation.**

(a)        *Transferability Restrictions prior to Exercise of Rights*

The Lender Rights, including the Lender Oversubscription Rights, and the Noteholder Rights shall not be transferable, assignable or detachable, other than in connection with the transfer by the holder thereof of the corresponding Claims in respect of which such Rights were issued, as evidenced by delivery of a Transfer Notice to the Subscription Agent or other procedure acceptable to the Debtors and the Subscription Agent.  In addition, the Rights shall not be transferable other than to a QIB or an Accredited Investor.

A "Transfer Notice" is a notice delivered to the Subscription Agent notifying the Subscription Agent of the transfer of a Claim by the holder of the corresponding Rights through the Subscription Deadline, which indicates (i) the name of the transferor, the name of the transferee, the type of Claim being transferred  and the principal amount of such Claims; and (ii) certifies that such transferee is a QIB or an Accredited Investor.

(b)        *Prohibition on Transfer following Exercise of Rights*

Following the exercise of any Rights, the holder thereof shall be prohibited from transferring or assigning the Claim corresponding to such Rights until the earlier of (i) the Effective Date, (ii) the termination of the Rights Offering and (iii) the revocation of exercise of the Rights to the extent permitted by these Rights Offering Procedures, below.  By its execution of the Subscription Form, the holder of the Rights will be deemed to have represented and warranted to the Debtors and the Reorganized Debtors that the holder is the beneficial owner of the Claims corresponding to the Rights and will be the holder of such Claims as of the Effective Date.

If and to the extent that a holder of any Rights transfers or assigns a corresponding Claims in violation of these provisions, the exercise of the Rights by the holder shall be null and void, and the holder shall be liable to the Debtors, Reorganized Debtors and the Subscription Agent for any claims, damages or losses incurred by them as a result of such transfer or assignment.

(c)        *Revocation*

Once an Eligible Participant has properly exercised its Rights, such exercise will not be permitted to be revoked until the date that is 45 days following the Subscription Deadline, if the Effective Date has not occurred on or before such date.  Thereafter an Eligible Participant shall be permitted to revoke such exercise so long as the Effective Date has not occurred.  An Eligible Participant electing to revoke the exercise of its Rights must deliver written notice to the Subscription Agent (i) stating that the Eligible Participant revokes its Rights, (ii) stating the type and number of Rights being revoked, and (iii) certifying that the Rights being revoked are the only Rights exercised by such Eligible Participant (the "Revocation Notice").  Upon receipt of a properly completed and timely returned Revocation Notice by an Eligible Participant, the Subscription Agent will use its reasonable efforts to return as promptly as practicable the Rights Offering Payment and Oversubscription Payment, if any, contributed by such Eligible Participant and held in the Escrow Account, without any interest.

6

5.     **Validity of Exercise of the Rights**

   (a)     *Defects*

Subscription Forms shall be deemed not to have been properly completed until all defects and irregularities have been waived or cured within such time as the Debtors determine in their reasonable discretion and in good faith, in consultation with the Required Supporting 2007 Facility Lenders, with respect to the Lender Rights, and the Required Supporting Noteholders, with respect to the Noteholder Rights.    The Debtors reserve the right, but are under no obligation, to give notice to any Eligible Participant regarding any defect or irregularity in connection with any purported exercise of Rights by such Eligible Participant.    The Debtors may, but are under no obligation to, permit such defect or irregularity in any Subscription Form to be cured; provided, however, that none of the Debtors and the Reorganized Debtors (including any of their respective officers, directors, employees, agents or advisors) or the Subscription Agent shall incur any liability for any failure to give such notification.

   (b)     *Disputes*

Any and all disputes concerning the timeliness, viability, form and eligibility of any exercise of Rights shall be addressed in good faith by the Debtors in consultation with the Required Supporting 2007 Facility Lenders, with respect to the Lender Rights or the Lender Oversubscription Rights, and the Required Supporting Noteholders, with respect to the Noteholder Rights.    Any determination made by the Debtors with respect to such disputes shall be final and binding.

   (c)     *Waivers*

The Debtors, in consultation with the Required Supporting 2007 Facility Lenders, with respect to the Lender Rights or the Lender Oversubscription Rights, and the Required Supporting Noteholders, with respect to the Noteholder Rights, may (i) waive any defect or irregularity, or permit such a defect or irregularity to be corrected, within such times as the Debtors may determine in consultation with the Required Supporting 2007 Facility Lenders and the Required Supporting Noteholders, as aforesaid, to be appropriate, or (ii) reject the purported exercise of any Rights for which the Subscription Form, the exercise thereof and/or payment of the Subscription Price includes defects or irregularities.

6.     **Funds**

All funds in connection with the exercise of the Rights, including the Lender Oversubscription Rights, will be deposited when made, and held in escrow by the Subscription Agent pending the Effective Date, in the Escrow Account.

The Escrow Account will be separate and apart from the Subscription Agent's general operating funds and from any other funds subject to any lien or any cash collateral arrangements, and will be segregated and maintained for the sole purpose of holding the  Rights Offering Payments and Oversubscription Payments, if any (the "<u>Rights Offering Funds</u>").

7

The Subscription Agent shall not use the Rights Offering Funds for any purpose other than to release such funds as directed by the Debtors pursuant to the Plan on the Effective Date and shall not encumber or permit the Rights Offering Funds to be encumbered by any lien or similar encumbrance.  No interest will be paid to Eligible Participants on account of any Rights Offering Funds or other amounts paid in connection with their exercise of Rights under any circumstances.  The Rights Offering Funds shall not be property of the Debtors' estates until the occurrence of the Effective Date.

## 7.    Miscellaneous

### (a)    Eligible Participant Release

Upon the Effective Date of the Plan, each Eligible Participant that elects to exercise Rights shall be deemed, by virtue of such election, to have waived and released, to the fullest extent permitted under applicable law, all rights, claims or causes of action against the Debtors, Reorganized Debtors, the Supporting Creditors, and each of their respective affiliates, officers, directors, counsel and advisors, arising out of or related to the Rights Offering and the receipt, delivery, disbursements, calculations, transmission or segregation of cash, Rights and Rights Offering Shares, except to the extent such rights, claims or causes of action arise from any act of gross negligence or willful or intentional misconduct or fraud.

*The Rights Offering is being conducted in good faith and in compliance with the Bankruptcy Code.  In accordance with section 1125(e) of the Bankruptcy Code, if a debtor or any of its agents that participates, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale, or purchase of securities.*

### (b)    Exemption From Securities Act Registration; Absence of Listing

The Rights are being distributed by the Debtors, and the Rights Offering Shares will be issued by the Reorganized Debtor, without registration under the Securities Act or any state securities laws, in reliance upon the exemption provided in section 1145(a) of the Bankruptcy Code, except with respect to any Person who may be deemed to be an underwriter under section 1145(b) of the bankruptcy Code.  As to any person who may be deemed to be such an underwriter, the Rights are being distributed by the Debtors, and the Rights Offering Shares will be issued, pursuant to another applicable exemption from registration under the Securities Act and state securities laws.  *Please refer to Section XII, "Securities Law Matters," of the Disclosure Statement for a more detailed discussion regarding the applicability of federal and state securities laws to the Rights Offering and the issuance of Rights Offering Shares.*

The Rights will not be listed on any national securities exchange or listed or quoted in any over-the-counter market.

    (c)     *Practices and Procedures of DTC; Issuance of Rights Offering Shares Through DTC*

The Convertible Notes are held in book-entry form in accordance with the practices and procedures of the DTC.  To the extent that the Rights Offering with respect to the Noteholder Rights is conducted through DTC, the Reorganized Debtors intend to comply with the practices and procedures of DTC for these purposes, and these Rights Offering Procedures will be deemed appropriately modified to achieve such compliance.

The Reorganized Debtors intend that the Rights Offering Shares will be issued in book-entry form, except with respect to persons that may be deemed underwriters under section 1145(b) of the Bankruptcy Code, and that DTC, or its nominee, will be the holder of record of such Rights Offering Shares. The ownership interest of each holder of such Rights Offering Shares, and transfers of ownership interests therein, will be recorded on the records of the direct and indirect participants in DTC.  Holders who exercise the Rights may be required to furnish the Reorganized Debtors or their agents information regarding their broker, bank or other securities nominee in order that the Rights Offering Shares for which they have subscribed can be properly credited to their securities account.  To the extent required, the Reorganized Debtors intend to solicit such information on a timely basis, so that the Rights Offering Shares may be delivered to the holders exercising their Rights on or as promptly as practicable after the Effective Date.

    (d)     *Rights Offering Conditioned on Plan Confirmation; Return of Rights Offering Funds*

All exercises of Rights are subject to and conditioned upon confirmation of the Plan and the occurrence of the Effective Date.

In the event that the Rights Offering is terminated for any reason, all Rights Offering Funds held by the Subscription Agent will be refunded, without interest, to each respective Eligible Participant as soon as reasonably practicable.

    (e)     *Reservation of Rights*

Notwithstanding anything contained herein, the Disclosure Statement or the Plan to the contrary, the Debtors, with the consent of the Required Supporting 2007 Facility Lenders, insofar as affecting the Lender Rights or the Lender Oversubscription Rights, and the Required Supporting Noteholders, insofar as affecting the Noteholder Rights, reserve the right to adopt additional procedures to more efficiently administer the Rights Offering or make such other changes to the Rights Offering, including the criteria for eligibility to participate in the Rights Offering, as necessary in the Debtors' or Reorganized Debtors' business judgment to more efficiently administer the distribution and exercise of the Rights, to comply with the practices and procedures of DTC or to comply with applicable law.

9

(f)      *Inquiries and Documentation*

Questions relating to these Rights Offering Procedures, the proper completion of the Subscription Forms or any of the requirements for exercising Rights or otherwise participating in the Rights Offering should be directed to the Subscription Agent at:

**GCG, Inc.**
**(888) 213-9318**

All documents relating to the Rights Offering are available from the Subscription Agent at this address.  In addition, these documents, together with all filings made with the Bankruptcy Court by the Debtors, are available free of charge from the Debtors' restructuring website (www.GencoRestructuring.com).

## EXHIBIT F TO THE DISCLOSURE STATEMENT

## AMENDED AND RESTATED $253 MILLION FACILITY TERM SHEET

**GENCO SHIPPING AND TRADING LIMITED**
**NEW $253 MILLION FACILITY**
**ANNEX A TO RESTRUCTURING TERM SHEET[1]**

| | |
|---|---|
| Final Maturity Date | August 31, 2019[2] |
| Repayment Installments | Quarterly repayment installments in accordance with the terms of the $253 Million Facility, except any repayment(s) missed during the Chapter 11 Cases shall be paid on the effective date of the Plan, which shall be the same date as the effective date of the New $253 Million Facility (as used in this Term Sheet, the "Effective Date"). |
| Financial Covenants (clauses 12.2.1-12.2.5) | (a) The Consolidated Interest Coverage Ratio (clause 12.2.2), Maximum Leverage Ratio (clause 12.2.3) and the Minimum Consolidated Net Worth (clause 12.2.4) shall: <br><br> (i) be waived during the period between the Effective Date and March 31, 2015 (the "Financial Covenant Holiday"); and <br><br> (ii) after the Financial Covenant Holiday, be effective as follows (for the avoidance of doubt, the first test will occur on June 30, 2015): <br><br>    (A) Consolidated Interest Coverage Ratio to continue at a minimum of 2.00:1.00;[3] <br>    (B) Maximum Leverage Ratio to continue at a maximum of 5.5x;[4] and <br>    (C) Minimum Consolidated Net Worth covenant to apply as per clause 12.2.4, except the definition of Minimum Consolidated Net Worth shall be amended as follows: "**Minimum Consolidated Net Worth** shall mean not less than 75% of the Post-Reorganization Equity Value plus 50% of the Net Proceeds received as a result of any new equity issues by the Borrower after the Effective Date." <br><br> (b) With respect to interest-bearing Consolidated Indebtedness (clause 12.2.5), during the Financial Covenant Holiday, interest-bearing Consolidated Indebtedness to be amended so that it cannot exceed 70% of the aggregate amount of interest-bearing Consolidated Indebtedness plus Consolidated Net Worth. Such covenant shall not apply after the Financial Covenant Holiday. <br><br> (c) For the avoidance of doubt, the Minimum Liquidity |

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet or the $253 Million Facility, as applicable.

[2]   Subject to most favored lender provision as set forth below.

[3]   Calculation to be determined and be mutually acceptable.

[4]   Calculation to be determined and be mutually acceptable.

| | |
|---|---|
| | requirement (clause 12.2.1) to remain in effect at all times from and after the Effective Date. |
| | (d) New fleet-wide minimum liquidity covenant:   New requirement for free cash of at least $750K per vessel for all vessels owned by the Company to be added (with the $750K for each of the 13 vessels pledged as security under the New $253 Million Facility counting toward this calculation). |
| | (e) For the avoidance of doubt, the definitions, calculations and methodology in the $253 Million Facility to apply with respect to the financial covenants described above unless otherwise provided herein, except for changes which are mutually acceptable. |
| Financial Indebtedness | Clause 12.3.10(b):  Restriction on Financial Indebtedness in connection with the acquisition of a vessel to continue to apply during the Financial Covenant Holiday.  Such restriction not to apply thereafter. |
| Vessels Required to be Under Fixed Rate Time Charters | Delete clause 12.5.18 requiring at least 4 vessels to be under fixed rate time charters. |
| Dividends | No dividends by Genco shall be payable during the Financial Covenant Holiday, and thereafter dividends by Genco shall only be payable if the Company is in compliance with the financial covenants and no breach of the financial covenants will result from such dividend payment. |
| | Clause 12.3.13(b) shall be modified to reflect that dividends are only permitted if no Default or Event of Default has occurred and is continuing at the time of declaration or payment (clause 12.3.13(b)), with such modifications being acceptable to the Supporting $253 Million Facility Lenders. |
| | All limitations based on the Permitted Dividend Amount to be deleted. |
| | Delete clause 12.3.13(a)(iv) regarding Capped Call Arrangements. |
| Interest Rate | LIBOR + 350 bps |
| Upfront Fee | The lenders under the New $253 Million Facility will receive on the Effective Date an upfront fee of 100 bps and Deutsche Bank Luxembourg S.A., as agent, and Deutsche Bank AG Filiale Deutschlandgeschäft, as security agent (together, and in such capacities, the "DB Term Loan Agents") will receive a structuring fee on the Effective Date as detailed in a separate fee letter, each based on the principal amount of the Loans outstanding immediately prior to effectiveness of the New $253 Million Facility. |

| | |
|---|---|
| Most Favored Lender Provision (clause 12.2.6) | Modify to reflect most favored lender provision applicable to financial covenants and interest margin to be set forth in the New $100 Million Facility or any Additional Facility entered into by the Company.  Additional modifications to reflect that this provision is applicable to the maturity dates set forth in the New $100 Million Facility or any new third-party facility entered into by Genco as of the Effective Date.  As of the Effective Date, no credit agreement or other debt instrument shall mature prior to the New $253 Million Facility.  Delete references to Waiver Period in clause 12.2.6 and any related definitions, including Additional Facility. |
| Loans or Advances (clause 12.3.12.(b)) | Delete clause 12.3.12(b)(iii) regarding loans or advances in connection with any joint venture and/or dry bulk shipping operation. |
| Second Liens | Release second liens on any collateral securing the New $253 Million Facility. |
| Other Modifications | Additional modifications to the $253 Million Facility which are necessary, and which shall be in form and substance reasonably acceptable to the Supporting $253 Million Facility Lenders and the Borrower, solely to reflect the occurrence of the Chapter 11 Cases and the terms described herein. |

## <u>EXHIBIT G TO THE DISCLOSURE STATEMENT</u>

**AMENDED AND RESTATED $100 MILLION FACILITY TERM SHEET**

**GENCO SHIPPING AND TRADING LIMITED**
**NEW $100 MILLION FACILITY**
**ANNEX B TO RESTRUCTURING TERM SHEET[1]**

| | |
|---|---|
| Final Maturity Date | August 31, 2019[2] |
| Repayment Installments | Quarterly repayment installments in accordance with the terms of the $100 Million Facility, except any repayment(s) missed during the Chapter 11 Cases shall be paid on the effective date of the Plan, which shall be the same date as the effective date of the New $100 Million Facility (as used in this Term Sheet, the "Effective Date"). |
| Financial Covenants (clauses 12.2(d)-(f); 10.2(c)) | (a) The Minimum Consolidated Interest Coverage Ratio (clause 12.2(e)), Maximum Leverage Ratio (clause 12.2(d)) and the Minimum Consolidated Net Worth (clause 12.2(f)) shall: <br><br> (i) be waived during the period between the Effective Date and March 31, 2015 (the "Financial Covenant Holiday"); and <br><br> (ii) after the Financial Covenant Holiday, be effective as follows (for the avoidance of doubt, the first test will occur on June 30, 2015): <br><br>     (A) Minimum Consolidated Interest Coverage Ratio to continue at a minimum of 2.00:1.00;[3] <br>     (B) Maximum Leverage Ratio to continue at a maximum of 5.5x[4]; and <br>     (C) Minimum Consolidated Net Worth covenant to apply as per clause 12.2(f), except the definition of Minimum Consolidated Net Worth shall be amended as follows: "**Minimum Consolidated Net Worth** shall mean not less than 75% of the Post-Reorganization Equity Value <u>plus</u> 50% of the Net Proceeds received as a result of any new equity issues by the Borrower after the Effective Date." <br><br> (b) With respect to interest-bearing Consolidated Indebtedness (clause 4(b) of First Amendment to $100 Million Facility), during the Financial Covenant Holiday, interest-bearing Consolidated Indebtedness to be amended so that it cannot exceed 70% of the aggregate amount of interest-bearing Consolidated Indebtedness plus Consolidated Net Worth. Such covenant shall not apply after |

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet or the $100 Million Facility, as appropriate.

[2]    Subject to, as of the Effective Date, any new third-party facility not maturing prior to the New $100 Million Facility and the New $253 Million Facility (if any).

[3]    Calculation to be determined and mutually acceptable.

[4]    Calculation to be determined and mutually acceptable.

| | |
|---|---|
| | the Financial Covenant Holiday. |
| | (c) For the avoidance of doubt, the Minimum Liquidity requirement (clause 10.2(c)) to remain in effect at all times from and after the Effective Date. |
| | (d) New fleet-wide minimum liquidity covenant:   New requirement for free cash of at least $750K per vessel for all vessels owned by the Company to be added (with the $750K for each of the 5 vessels pledged as security under the New $100 Million Facility counting toward this calculation). |
| | (e) For the avoidance of doubt, the definitions, calculations and methodology in the $100 Million Facility to apply with respect to the financial covenants described above unless otherwise provided herein, except for changes which are mutually acceptable. |
| Financial Indebtedness | Clause 12.2(l):  Restriction on Financial Indebtedness in connection with the acquisition of a vessel to continue to apply during the Financial Covenant Holiday.  Such restriction not to apply thereafter. |
| Dividends | No dividends by Genco shall be payable during the Financial Covenant Holiday.  Thereafter, revert to existing dividend formulation in $100 Million Facility, except that all limitations based on the Permitted Dividend Amount shall be eliminated.  For the avoidance of doubt, after the Financial Covenant Holiday dividends by Genco shall only be payable if the Company is in compliance with the financial covenants and no breach of the financial covenants will result from such dividend payment.  Delete clause 12.2(g)(v) regarding Capped Call Arrangements. |
| Interest Rate | LIBOR + 350 bps |
| Upfront Fee | The lenders under the New $100 Million Facility will receive on the Effective Date an upfront fee of 100 bps and Credit Agricole Corporate and Investment Bank, as agent and security trustee, will receive a structuring fee on the Effective Date as detailed in a separate fee letter, each based on the principal amount of the Loans outstanding immediately prior to effectiveness of the New $100 Million Facility. |
| Most Favored Lender Provision | Add most favored lender provision applicable to financial covenants and interest margin, to be set forth in the New $253 Million Facility or any other Additional Facility entered into by the Company.  Delete references to "Ratio Suspension Period" or "Amended Facility" in the definition of Additional Facility.  For the avoidance of doubt, as of the Effective Date, no credit agreement or other debt instrument shall mature prior to the New $100 Million Facility. |

| Second Liens | Release of second liens on any collateral securing the New $100 Million Facility. |
| --- | --- |
| Other Modifications | Additional modifications to the $100 Million Facility which are necessary, and which shall be in form and substance reasonably acceptable to the Supporting $100 Million Facility Lenders and to the Borrower , solely to reflect the occurrence of the Chapter 11 Cases and the terms described herein. |

## EXHIBIT H TO THE DISCLOSURE STATEMENT

## FINANCIAL PROJECTIONS

# FINANCIAL PROJECTIONS

The Company, with the assistance of its advisors, developed a set of financial projections (as summarized in **Exhibit H**, the "Financial Projections") for the purposes set forth below. The Financial Projections reflect the Company's most recent estimates of the financial position, results of operations and cash flows after confirmation of the Plan, based upon the Company's assumptions and judgments as to future market and business conditions, expected future operating performance, and the occurrence or nonoccurrence of certain future events, all of which are subject to change. Actual operating results and values may vary.

A.     **Financial Projections**

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Company's management has, through the development of the Financial Projections, analyzed the Debtors' ability to meet its obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct its business subsequent to its emergence from these Chapter 11 Cases. The Financial Projections were prepared to assist those holders of Allowed Claims entitled to vote on the Plan in determining whether to accept or reject the Plan.

A Chapter 11 proceeding is viewed as a significant threat to the continuing operations of our international business. The Company has recently experienced dislocation in its business operations caused by the uncertainty of its financial restructuring process and the potential of a bankruptcy filing and there is no assurance that we will be able to avert loss or reduction in business from our customers. Furthermore, the drybulk industry has historically been and continues to be subject to significant volatility due to continuously evolving dynamics as they relate to the supply of vessels and demand for shipping services. The unpredictable nature of factors, such as weather, seasonal demand for resources and asymmetrical timing of vessel deliveries results in significant freight rate volatility and could cause actual results to differ.

For the purpose of demonstrating Plan feasibility, the Company prepared the Financial Projections with the assistance of its professional advisors. The Financial Projections present, to the best of the Company's knowledge, the Reorganized Debtors' projected financial position, results of operations, and cash flows from 2014 through 2018 and reflect the Debtors' assumptions and judgments as of April 2014.

THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE COMPANY'S INDEPENDENT ACCOUNTANT HAS NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND,

ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE COMPANY DOES NOT INTEND TO, AND DISCLAIMS ANY OBLIGATION TO (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO HOLDERS OF NEW GENCO COMMON STOCK OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, (B) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC, OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THESE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE COMPANY'S MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE COMPANY'S CONTROL. THE COMPANY CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO THE COMPANY'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER.

### *Scope of Financial Projections*

The Financial Projections are based on the assumption that the Effective Date will occur on or about June 30, 2014. If the Effective Date is significantly delayed, additional expenses, including professional fees, may be incurred and operating results may be negatively impacted. It is also assumed that the Reorganized Debtors will conduct operations substantially similar to their current businesses.

The Financial Projections do not fully reflect the application of fresh start accounting. Any formal fresh-start reporting adjustments that may be required in accordance with Statement of Position 90-7 Financial Reporting by Entities in Reorganization under the Bankruptcy Code, including any allocation of the Company's reorganization value to the Company's assets in accordance with the procedures specified in Financial Accounting Standards Board Statement 141, will be made after the Company emerges from bankruptcy.

The Financial Projections include the (i) Projected Consolidated Balance Sheet of Reorganized Genco, (ii) Projected Consolidated Cash Income Statement of Reorganized Genco, and (iii) Projected Consolidated Cash Flow Statement of Reorganized Genco.

The Financial Projections are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Factors that could cause actual results to differ

- 2 -

materially include, but are not limited to: the ability of Reorganized Genco to operate its business consistent with its projections generally, including the ability to maintain or increase revenue and cash flow to satisfy its liquidity needs, service its indebtedness and finance the ongoing obligations of its business, and to manage its future operating expenses and make necessary capital expenditures; the ability of the Reorganized Genco to comply with the covenants and conditions under its credit facilities; the loss or reduction in business from Reorganized Genco's significant customers or the failure of Reorganized Genco's significant customers to perform their obligations; the loss or material downtime of major suppliers; material declines in demand for drybulk shipping services or the rates in the drybulk shipping market; changes in production of, or demand for, iron ore, coal, steel, grain or other drybulk, either generally or in particular regions; greater than anticipated levels of vessel new building orders; changes in the typical seasonal variations in drybulk charter rates; increases in costs including, without limitation, crew wages, insurance, provisions, repairs and maintenance; changes in rules and regulations applicable to the drybulk industry including, without limitation, legislation adopted by international organizations such as the IMO and the European Union or by individual countries; actions by the courts, the United States Coast Guard, the U.S. Department of Justice or other governmental or regulatory authorities, and the results of the legal proceedings to which the Reorganized Debtors or any of their affiliated vessels may be subject; changes in the condition of the Debtors' vessels or applicable maintenance or regulatory standards (which may affect, among other things, the Debtors' anticipated drydocking or maintenance and repair costs); the Reorganized Debtors' ability to attract and maintain key executives, managers and employees; changes in general domestic and international political conditions; and adverse changes in foreign currency exchange rates affecting the Reorganized Debtors' expenses. See also Section X ("Certain Risk Factors to be Considered," generally and in particular "Additional Factors to be Considered--Forward-Looking Statements are not Assured, and Actual Results May Vary").

### Overview of the Debtors

The Debtors are a leading provider of worldwide seaborne transportation services for dry bulk cargo including, among others, iron ore, coal and grain, collectively referred to as "major bulks," and steel products, fertilizers, cement, bauxite, sugar and scrap metal, collectively referred to as "minor bulks". The Debtors' fleet currently consists of 53 drybulk carriers, including nine Capesize, eight Panamax, 17 Supramax, six Handymax and 13 Handysize drybulk carriers, with an aggregate carrying capacity of approximately 3,810,000 deadweight tons ("dwt"). The average age of the Debtors' current fleet is approximately 8.9 years, as compared to the average age for the world fleet of approximately 9 years for the drybulk shipping segments in which Debtors compete. Most of the Debtors' vessels are chartered to well-known charterers, including Cargill International S.A, Swissmarine Services S.A., Pacific Basin Chartering Ltd., Klaveness Chartering and Lauritzen Bulkers A/S.

## KEY ASSUMPTIONS TO FINANCIAL PROJECTIONS

### Methodology

The Debtors' current business plan incorporates assumptions related to certain economic and business conditions for the forecast period of 2014-2017. These assumptions are based upon historic seasonality and industry experience as well forecasts from Marsoft, a leading maritime

industry consultant, regarding projected industry supply/demand/capacity indicators and the estimated directions of specific markets.

The Financial Projections represent selected income statement, balance sheet and cash flow accounts from 2014 through 2017. The financial statements included herein reflect the projected core operating performance of the Debtors and as such exclude the impact of any cash flows related to the Debtors' ownership interests in Baltic Trading and Jinhui Shipping. The Financial Projections were developed on a vessel-by-vessel, bottom-up basis and incorporate multiple sources of information including general business and economic conditions as well as industry and competitive trends.

### *Revenue*

The Financial Projections forecast Net Voyage Revenue from both Time Charter and Voyage Charter contracts (described below). Net Voyage revenue represents the income associated with providing freight services to the Debtors' customers less Voyage Expenses and third-party commissions. Voyage Expenses consist of fuel, canal tolls, and port charges. In the dry bulk industry, it is customary to report revenue on a net basis, also known as a Time Charter Equivalent basis ("TCE Basis"), to enable comparability between differing contract structures. A Time Charter Equivalent rate ("TCE Rate") is calculated by dividing Net Voyage Revenue by vessel operating days.

A Time Charter can either be structured with a fixed daily rate or a floating daily rate that is tied to the relevant index (e.g., the Baltic Panamax Index, or "BPI"). Alternatively, a Voyage Charter is structured such that the customer pays a transportation charge for the movement of a specific cargo between two or more specified ports. Under a Time Charter, all voyage expenses are borne by the customer. Under a Voyage Contract, all voyage expenses are paid by the vessel owner.

The Debtors primarily contract revenue using Time Charters. The Debtors' projected time charters as of June 30, 2014 are listed in the following table.

| Vessel | Type | Basis | Index Adjustment | Gross Rate | Commission | Charter Min Expiry |
|--------|------|-------|-----------------|-----------|-----------|--------------------|
| Augustus | Capesize | BCI | 104.0% | | 5.0% | May-14 |
| Tiberius | Capesize | BCI | 102.0% | | 5.0% | Jan-14 |
| London | Capesize | BCI | 100.0% | | 5.0% | Sep-11 |
| Titus | Capesize | BCI | 100.0% | | 5.0% | Jan-11 |
| Constantine | Capesize | BCI | 102.0% | | 5.0% | Jan-14 |
| Hadrian | Capesize | BCI | 98.5% | | 5.0% | Oct-12 |
| Commodus | Capesize | BCI | 100.0% | | 5.0% | May-14 |
| Maximus | Capesize | BCI | 100.0% | | 5.0% | Mar-14 |
| Claudius | Capesize | BCI | 99.0% | | 5.0% | Mar-14 |
| Knight | Panamax | BPI | 99.0% | | 5.0% | Apr-14 |
| Leader | Panamax | BPI | 100.0% | | 5.0% | Jan-11 |
| Vigour | Panamax | BPI | 98.0% | | 5.0% | Apr-14 |
| Acheron | Panamax | BPI | 100.0% | | 5.0% | Jan-14 |
| Surprise | Panamax | BPI | 100.0% | | 5.0% | Dec-13 |
| Thunder | Panamax | BPI | 100.0% | | 5.0% | Mar-14 |
| Predator | Supramax | BSI | 101.0% | | 5.0% | May-13 |
| Hunter | Supramax | BSI | 107.0% | | 5.0% | Oct-13 |
| Lorraine | Supramax | flat rate | | $7,500 | 5.0% | Aug-13 |
| Auvergne | Supramax | BSI | 100.0% | | 5.0% | May-12 |
| Bourgogne | Supramax | flat rate | | $10,250 | 5.0% | Dec-13 |
| Brittany | Supramax | BSI | 100.0% | | 5.0% | May-12 |
| Languedoc | Supramax | BSI | 100.0% | | 5.0% | Mar-13 |
| Picardy | Supramax | BSI | 101.0% | | 5.0% | Jan-11 |
| Rhone | Supramax | BSI | 100.0% | | 5.0% | Mar-11 |
| Wisdom | Handymax | BSI | 90.0% | | 5.0% | Apr-14 |
| Marine | Handymax | flat rate | | $10,000 | 5.0% | Feb-14 |
| Charger | Handysize | BHSI | 100.0% | | 5.0% | Jan-11 |
| Challenger | Handysize | BHSI | 100.0% | | 5.0% | Mar-13 |
| Champion | Handysize | BHSI | 100.0% | | 5.0% | Apr-11 |
| Ocean | Handysize | BHSI | 107.0% | | 5.0% | Jul-10 |
| Bay | Handysize | BHSI | 107.0% | | 5.0% | Mar-10 |
| Avra | Handysize | BHSI | 107.0% | | 5.0% | Apr-14 |
| Mare | Handysize | BHSI | 115.0% | | 5.0% | Jul-11 |
| Spirit* | Handysize | BHSI | 115.0% | | 5.0% | Nov-11 |

* The rate for this index-linked time charter has a floor of $8,500 and a ceiling of $13,500
  daily with a 50% profit sharing arrangement to apply to any amount above the ceiling.

If a vessel is not contracted, the Financial Projections assume the vessel earns revenue as if it were on an index-linked charter, with an adjustment that accounts for differences in size, age and condition of the vessel. Forecasted future index rates ("Spot Rates") for 2014-2015 are based on research rate estimates of equity research analysts from financial institutions that cover the shipping sector. The Financial Projections use the average of the "bottom half" of such estimates, consistent with management's historical methodology. For 2016-2017, the Financial Projections use Spot Rates based on Marsoft's base case Baltic Index projections as of the first quarter of 2014.

To calculate revenue, the Financial Projections assume a utilization of 98% when vessels are not undergoing drydocking (described further below), which takes into account unplanned off-hire due to maintenance, repairs and repositioning. Additionally, industry standard commissions of 5.0%, payable to third-parties, are subtracted from revenues derived in the spot market.

The Company's projections for service revenue were estimated based on continued service revenue from Baltic Trading Limited ("Baltic Trading") and Maritime Equity Partners LLC ("MEP") throughout the projection period. While the Reorganized Genco intends to continue performing under its agreements with Baltic Trading and MEP, there can be no assurance that these contracts will remain in place after the Reorganization.

### Vessel Operating Expenses

Vessel operating expenses include crew wages and related costs, the cost of insurance, expenses relating to repairs and maintenance (excluding drydocking), the costs of spares and consumable stores, tonnage taxes and other miscellaneous expenses. The Financial Projections assume vessel operating expenses based on historical operating expenses per vessel class, estimates provided by independent technical managers, and management's view of continued cost-efficient operations, and assume inflation of 2.0% per year. The assumed operating expense per vessel per day in 2014 is $6,000 for Capesize vessels, $5,300 for Panamax vessels, $5,200 for Supramax vessels, $5,000 for Handymax vessels, and $4,900 for Handysize vessels.

### General and Administrative Expenses

General and Administrative Expenses ("G&A") include payroll expenses, rent, legal, auditing, and other professional expenses. The Financial Projections for general and administrative expenses are estimated based on historical general and administrative expenses and management's view of continued lean operations.

### Technical Management Fees

Technical management involves the day-to-day management of vessels, including performing routine maintenance, attending to vessel operations, and arranging for crews and supplies. The Debtors currently contract with three independent technical managers to provide technical management, and Management oversees the activities of these independent technical managers. The Financial Projections for technical management fees are based on management's budget and current arrangements with the aforementioned third-party independent managers.

*Drydock Expense*

Drydock expenses are based on expected maintenance requirements corresponding to the age of the Company's fleet. Costs associated with drydockings are capitalized as they occur and amortized on a straight- line basis over the period between drydockings.

The Financial Projections also include the future installation of ballast water treatment systems during each vessel's first drydock after January 1, 2016 at an estimated cost of $950,000 per Capesize vessel, $800,000 per Panamax vessel, $750,000 per Supramax vessel, $700,000 per Handymax vessel, and $650,000 per Handysize vessel. Lastly, drydock projections include the installation of fuel-efficiency upgrades on 17 of the Debtors' vessels over the projection period at a cost of $250,000 to $500,000 per vessel. Expenditures for fuel-efficiency upgrades and ballast water treatment systems are capitalized as they occur and amortized on a straight-line basis over the remaining useful life of the vessel.

*Purchase of Vessels*

The Financial Projections include a fleet renewal program, pursuant to which the Company projects purchasing comparable re-sale vessels whenever a currently owned vessel reaches its 20th birthday. The Company estimates that 4 vessels currently fall under this category. Accordingly, the Financial Projections contemplate the purchase of four new Supramax vessels over course of the forecast period. The vessel purchases are assumed to be financed with 50% debt ("New Vessel Financing") and 50% equity, assumed to be raised at the time of purchase. The New Vessel Financing is assumed to amortize evenly over 15 years and bear interest at a rate of LIBOR plus 3.0%.

*Taxes*

The Company's projections for taxes were estimated based on the income from the service revenues described above.

*Post-Effective Date Capital Structure*

The Plan contemplates a restructured capital structure for the reorganized Debtors that consists of the Amended and Restated $253 Million Facility and the Amended and Restated $100 Million facility. Both of the aforementioned facilities are assumed to be extended through August 2019, bear interest at a rate of LIBOR plus 3.50%, and resume amortization payments upon emergence from bankruptcy. Further, the aforementioned facilities shall receive one-time "catch-up" payments in lieu of amortization payments foregone during the pendency of the chapter 11 cases. The Financial Projections also assume the incurrence of New Vessel Financing, as described above.

## INCOME STATEMENT

| ($ in millions) | Q3-Q4 | Year Ended December 31, | | |
| --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2017 |
| Net Voyage Revenue | $121 | $303 | $216 | $198 |
| Service Revenue | 5 | 10 | 9 | 9 |
| Vessel Operating Expenses | (51) | (104) | (107) | (112) |
| General & Administrative Expense | (9) | (19) | (19) | (20) |
| Technical Management Fees | (3) | (7) | (7) | (7) |
| **EBITDA** | **$62** | **$183** | **$91** | **$67** |
| | | | | |
| Depreciation of Vessels | (34) | (67) | (68) | (69) |
| Amortization of Drydock | (1) | (4) | (7) | (11) |
| Depreciation of Other Assets | (0) | (1) | (1) | (1) |
| **EBIT** | **$27** | **$111** | **$16** | **($14)** |
| | | | | |
| Net Interest Expense | (4) | (7) | (5) | (3) |
| Taxes | (1) | (3) | (2) | (2) |
| **Net Income** | **$22** | **$102** | **$9** | **($19)** |

## CASH FLOW STATEMENT

| ($ in millions) | Q3-Q4 | Year Ended December 31, | | |
| --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2017 |
| Net Voyage Revenues | $121 | $303 | $216 | $198 |
| Service Revenue | 5 | 10 | 9 | 9 |
| **Cash Revenues** | **$126** | **$312** | **$225** | **$206** |
| | | | | |
| Vessel Operating Expenses | (51) | (104) | (107) | (112) |
| General & Administrative Expense | (11) | (18) | (19) | (19) |
| Technical Management Fees | (3) | (7) | (7) | (7) |
| **Cash EBITDA** | **$60** | **$183** | **$92** | **$68** |
| | | | | |
| Drydock Expense | (9) | (13) | (24) | (19) |
| Purchase of Vessels (pre-financing) | – | – | (30) | (90) |
| Taxes | (1) | (3) | (2) | (2) |
| **Unlevered Free Cash Flow** | **$50** | **$167** | **$36** | **($44)** |
| | | | | |
| Cash Interest Expense | (4) | (8) | (9) | (10) |
| Repayment of Debt | (14) | (28) | (28) | (30) |
| New Vessel Equity Issuance | – | – | 15 | 45 |
| New Vessel Debt Issuance | – | – | 15 | 45 |
| Interest Income | 0 | 1 | 4 | 7 |
| **Levered Free Cash Flow** | **$32** | **$133** | **$33** | **$13** |
| | | | | |
| Beginning Total Cash | $106 | $138 | $271 | $304 |
| Change in Cash | 32 | 133 | 33 | 13 |
| **Ending Total Cash** | **$138** | **$271** | **$304** | **$317** |

**BALANCE SHEET**

| ($ in millions) | Projected | | | Pro Forma | Year Ended December 31, | | | |
|---|---|---|---|---|---|---|---|---|
| | 6/30/14 | Adjustment | Note | 6/30/14 | 2014 | 2015 | 2016 | 2017 |
| Cash and Cash equivalents | $37 | $70 | A | $106 | $138 | $271 | $304 | $317 |
| Due from Charterers | 8 | – | | 8 | 8 | 8 | 8 | 8 |
| Due from Baltic | 1 | – | | 1 | 1 | 1 | 1 | 1 |
| Prepaid Expenses & Other | 17 | – | | 17 | 17 | 17 | 17 | 17 |
| Deferred Drydocking | 12 | (12) | B | – | 8 | 17 | 34 | 41 |
| Vessels | 2,134 | (889) | B | 1,245 | 1,211 | 1,144 | 1,106 | 1,127 |
| Other Fixed / Long-Term Assets | 22 | (18) | C | 4 | 4 | 4 | 3 | 3 |
| Investment in Jinhui | 59 | – | | 59 | 59 | 59 | 59 | 59 |
| Investment in Baltic | 39 | – | | 39 | 39 | 39 | 39 | 39 |
| **Total Assets** | **$2,328** | **($850)** | | **$1,479** | **$1,485** | **$1,559** | **$1,570** | **$1,611** |
| | | | | | | | | |
| Accounts payable and accrued liabilities | $22 | $ – | | $22 | $20 | $20 | $20 | $20 |
| Other | 4 | – | | 4 | 4 | 4 | 5 | 5 |
| $253 Million Facility (DB) | 176 | (5) | D | 171 | 160 | 140 | 120 | 100 |
| $100 Million Facility (CA) | 74 | (2) | D | 72 | 68 | 60 | 52 | 45 |
| New Vessel Financing | – | – | | – | – | – | 15 | 57 |
| **Liabilities Subject to Compromise** | | | | | | | | |
| Lease Obligation | 1 | (1) | E | – | – | – | – | – |
| Swap Liability | 7 | (7) | F | – | – | – | – | – |
| Convertible Notes | 125 | (125) | G | – | – | – | – | – |
| 2007 Credit Facility | 1,056 | (1,056) | G | – | – | – | – | – |
| 2007 Credit Facility - Interest Payable | 13 | (13) | G | – | – | – | – | – |
| **Total Liabilities** | **$1,476** | **($1,209)** | | **$268** | **$252** | **$224** | **$211** | **$226** |
| | | | | | | | | |
| Shareholders Equity | $852 | $359 | H | $1,211 | $1,233 | $1,335 | $1,359 | $1,384 |
| | | | | | | | | |
| **Liabilities & Shareholders Equity** | **$2,328** | **($850)** | | **$1,479** | **$1,485** | **$1,559** | **$1,570** | **$1,611** |

## *Balance Sheet Adjustments*

A. Represents $100 Million New Investment net of settlement of swap liability and payment of lease rejection claim, "catch-up" payments under the $253 Million and $100 Million Facilities, and estimated restructuring expenses.

B. Adjustment to reduce carrying value of vessels to appraised value.

C. Removal of deferred financing fees.

D. One-time "catch-up" payments in lieu of amortization payments foregone during the pendency of the chapter 11 cases.

E. Settlement of lease rejection claim.

F. Settlement of swap liability.

G. Conversion of debt to equity.

H. Book equity does not capitalize potential future unearned income from Baltic Trading and MEP contracts.

## EXHIBIT I TO THE DISCLOSURE STATEMENT

## LIQUIDATION ANALYSIS

**Liquidation Analysis[1]**

Pursuant to Section 1129(a)(7) of the Bankruptcy Code (often called the "**Best Interests Test**"), holders of Allowed Claims and Equity Interests must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Plan's assumed Effective Date, that is not less than the value such non-accepting holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code ("**Chapter 7**").

In determining whether the Best Interests Test has been met, the first step is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets under Chapter 7. The Debtors, with assistance of their financial advisor, have prepared this hypothetical Liquidation Analysis (the "**Liquidation Analysis**") in connection with the Disclosure Statement. The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation-related costs, that would be available to the Debtors' creditors if the Debtors were to be liquidated under Chapter 7 as an alternative to continued operation of the Debtors businesses under the Plan. Accordingly, asset values discussed herein may be different than amounts referred to in the Plan. The Liquidation Analysis is based upon the assumptions discussed herein and in the Disclosure Statement. All capitalized terms not defined in this Liquidation Analysis have the meanings ascribed to them in the Disclosure Statement.

UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND ITS ADVISORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTOR AND ITS MANAGEMENT. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, LIQUIDATED, AND ACTUAL RESULTS COULD MATERIALLY DIFFER FROM THE RESULTS SET FORTH HEREIN.

GENERAL ASSUMPTIONS

*Overview of the Liquidation Process*
The Debtors prepared this Liquidation Analysis in connection with its solicitation of votes to accept or reject its Plan, which contemplates a prepackaged chapter 11 case of Genco Shipping & Trading Limited ("**Genco**"), along with 57 of its direct and indirect subsidiaries (the "**Debtor Subsidiaries**"). Under the hypothetical Chapter 7 scenario in this Liquidation Analysis, Genco and its Debtor Subsidiaries are collectively referred to as the "**Chapter 7 Debtors**."

In a hypothetical Chapter 7, a trustee (the "**Chapter 7 Trustee**") would be appointed to manage the Chapter 7 Debtors' affairs and to conduct a liquidation of the Chapter 7 Debtors' assets. The Chapter 7 Debtors' assets would be liquidated, rather than liquidating Genco's equity interest in the Non-Debtor Subsidiaries in order to provide for a sale "free and clear" to purchasers. The Liquidation Analysis assumes that the Chapter 7 Debtors would be forced to cease substantially all operations in an orderly manner and use their cash position to liquidate their assets and pay claims in accordance with the priority scheme set forth in the Bankruptcy Code. Given the international nature of the Debtors' businesses, it is possible that in a liquidation scenario multiple international insolvency proceedings would need to be commenced to protect the Debtors' assets physically located outside of the United States (like the Vessels) which would increase the cost of the liquidation. This Liquidation Analysis does not account for any such international proceedings.

*Hypothetical Liquidation Period*
The Chapter 7 Debtors assume an expedited, but orderly wind-down of their operations to maximize recovery values. The hypothetical Chapter 7 liquidation is assumed to commence following the conversion to a Chapter 7. While the Chapter 7 Debtors assume the majority of the wind-down would be accomplished in approximately 90 days, the liquidation is likely to take up to six months to be completed fully for various reasons including the following:

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Plan.

1

- The Chapter 7 Debtors' revenues are primarily derived by employing their Vessels on short-term fixed-rate and spot-market related time charters. Commencement of a Chapter 7 liquidation is likely to cause customers to seek other drybulk transportation sources, making it highly unlikely that a Chapter 7 Trustee could maintain many of the existing customers for any significant period of time following the end of the already ongoing voyages. Lost customers are unlikely to be replaced by new customers.
- A Chapter 7 liquidation would likely cause the Chapter 7 Debtors' vendors to be keenly aware of any unpaid claims and would significantly increase the risk of ship arrests in foreign jurisdictions where enforcement of the automatic stay is uncertain, thereby complicating the process associated with an orderly liquidation of those assets in a reasonable timeframe. Arrested Vessels could also result in breach of contract or damage claims by charterers impacted by such arrests. Arrested Vessels may also force a sale of such Vessel under the law of a foreign jurisdiction and outside of the supervision and control of the Chapter 7 Trustee and the Court.
- With the Debtor facing liquidation, employees would likely leave the Chapter 7 Debtors to the extent there were employment opportunities elsewhere. The loss of employees would hinder the pursuit of going concern sales. Instead, executing a liquidation through sale of the Chapter 7 Debtors' individual vessels would be difficult over a long period of time due to the loss of institutional and industry knowledge.

### Estimate of Net Proceeds

The estimated cash proceeds that could be realized in a liquidation are approximated by evaluating the Chapter 7 Debtors' assets. The Chapter 7 Debtors' assets primarily consist of (i) their fleet of dry bulk vessels, (ii) equity interests in Baltic Trading Limited ("**Baltic Trading**") and Jinhui Shipping & Transportation Limited ("**Jinhui Shipping**"), and (iii) any additional operating assets such as customer receivables and other current assets. The net proceeds estimated in the Liquidation Analysis are based on unaudited asset and liability account balances for the Debtors as of the latest available date, December 31, 2013.[2]

The Liquidation Analysis does not include any net proceeds associated with the management services contracts with Baltic Trading or Maritime Equity Partners LLC because the Debtors assume in the event of a liquidation, the two management agreements would terminate because of the Debtors' inability to perform under such agreements.

### Estimate of Costs

The estimated liquidation costs include fees payable to a Chapter 7 trustee as well as those to attorneys and other professionals that the trustee may engage. Further, priority expenses would include any obligations and unpaid expenses the Genco incurred both during the Chapter 11 case and from the start and until the conclusion of the Chapter 7 case. In a Chapter 7 case, the wind-down expenses may be greater or less than the estimated amount. Such expenses are in part dependent on the length of time of the liquidation. In addition, while the Chapter 7 Debtors' assets are located outside of the United States, the proceeds from the sale of these assets are assumed to be consistent across jurisdictions. Further, it is assumed that the expenses incurred to sell assets located outside of the United States would be comparable to the expenses incurred to sell such assets if they were located in the United States.

### Distribution of Net Proceeds

The proceeds available represent the sum of the disposition of the Chapter 7 Debtors' assets and cash on the balance sheet at the commencement of the hypothetical Chapter 7 liquidation.

Available proceeds from the liquidation of assets and cash would be first applied to the payment of postpetition Administrative Expense claims, first claims arising from the wind-down of the Chapter 7 Debtors' business during the Chapter 7 liquidation process and thereafter to any postpetition expenses associated with the Chapter 11 reorganization process. Following the payment of Administrative Expense claims, net proceeds attributable to the liquidation of the Chapter 7 Debtors' Vessels would first be applied to the satisfaction of prepetition maritime liens or claims with respect to services rendered on account of the Chapter 7 Debtors' Vessels, followed by the

---

[2] For the purposes of the liquidation analysis, (i) the Company's cash balance as of March 31, 2014 is used, (ii) the values of the Company's interests in Baltic Trading and Jinhui Shipping are based on the closing market prices as of April 10, 2014 and (iii) the Company's Vessels are valued based on appraisals as of March 11 and 12, 2014.

satisfaction of debt obligations secured by the Chapter 7 Debtors' various assets. Any remaining liquidated proceeds and cash would be available for the satisfaction of General Unsecured Claims.

The holders of the Prepetition $100 Million Facility have first priority liens or mortgages on, security interests in, and assignments, charges, or pledges on certain property, including, without limitation, five (5) Vessels owned by five (5) Debtor Subsidiaries and $9.4 million of Cash Collateral that will partially fund the Chapter 11 and Chapter 7 processes.

The holders of the Prepetition $253 Million Facility have first priority liens or mortgages on, security interests in, and assignments, charges, or pledges on certain property, including, without limitation, thirteen (13) Vessels owned by thirteen (13) Debtor Subsidiaries and $22.4 million of Cash Collateral that will partially fund the Chapter 11 and Chapter 7 processes.

The holders of the Prepetition 2007 Credit Facility have first priority liens or mortgages on, security interests in, and assignments, charges, or pledges on certain property, including, without limitation, thirty-five (35) Vessels owned by thirty-five (35) Debtor Subsidiaries, the Chapter 7 Debtors' equity stakes in Baltic Trading and Jinhui Shipping, and $24.8 million of Cash Collateral, that will partially fund the Chapter 11 and Chapter 7 processes. The holders of the 2007 Facility have second priority liens or mortgages on, security interest in, and charges or assignments of certain Vessels and insurances owned by the Debtor Subsidiaries' Vessels securing the Prepetition $100 Million Facility and the Prepetition $253 Million Facility.

DnB, the interest rate swap counterparty, is secured by the same collateral as the Prepetition 2007 Credit Facility. However, the security documents provide that the Prepetition 2007 Facility Lenders receive payment in full from their collateral before any payments are made under the swap. As of March 31, 2014 the estimated swap liability was approximately $6.7 million. Any secured claims that are not satisfied by the liquidation of the underlying collateral securing the claims would represent an unsecured deficiency claim.

The table below summarizes the estimated proceeds that would be available for distribution to the Chapter 7 Debtors' creditors and equity interest holders in a hypothetical liquidation of the estates under Chapter 7 of the Bankruptcy Code. The estimated recoveries do not reflect any potential negative impact on the distributable value available to the Chapter 7 Debtors' creditors on account of any potential unknown and contingent liabilities. Additional assumptions with respect to the Liquidation Analysis are provided below.

| Liquidation Analysis of Genco Shipping & Trading, Ltd. | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | **% Recovery** | | | **Liquidation Proceeds** | | **See** |
| | **Amount** | **Low** | **Mid** | **High** | **Low** | **Mid** | **High** | **Note** |
| Cash & Cash Equivalents | 62.3 | 100.0% | 100.0% | 100.0% | $62.3 | $62.3 | $62.3 | 1 |
| Accounts Receivable | 10.0 | 60.0% | 70.0% | 80.0% | 6.0 | 7.0 | 8.0 | 2 |
| Prepaid Expenses and Other Assets | 15.0 | 60.0% | 70.0% | 80.0% | 9.0 | 10.5 | 12.0 | 3 |
| Value of Vessels | 1,244.6 | 58.7% | 68.7% | 78.7% | 730.6 | 855.1 | 979.5 | 4 |
| Other Fixed Assets | 4.4 | 4.8% | 9.7% | 14.5% | 0.2 | 0.4 | 0.6 | 5 |
| Baltic Trading Ltd. Equity Stake | 38.6 | 72.3% | 81.0% | 90.3% | 27.9 | 31.3 | 34.8 | 6 |
| Jinhui Shipping & Transportation Equity Stake | 58.6 | 85.0% | 90.0% | 95.0% | 49.8 | 52.7 | 55.6 | 7 |
| **Proceeds Available for Post-Petition Administrative Claims** | | | | | **$885.8** | **$1,019.2** | **$1,152.9** | |
| Less: Chapter 7 Trustee and Other Liquidator Fees (3% of Gross Proceeds) | | | | | (26.6) | (30.6) | (34.6) | 8 |
| Less: Corporate Wind-Down Costs & Other Profesional Fees | | | | | (14.2) | (15.7) | (17.2) | 9 |
| **Estimated Proceeds Available for Allocation After Administrative Claims** | | | | | **$845.0** | **$973.0** | **$1,101.2** | |
| Less: Accrued Maritime Payables | | | | | (9.1) | (9.1) | (9.1) | 10 |
| **Estimated Proceeds Available After Maritime Payables** | | | | | **$836.0** | **$964.0** | **$1,092.1** | |
| **CA Term Loan** | | | | | | | | |
| Estimated Collateral Proceeds Available to CA Term Loan Holders | | | | | $77.7 | $89.1 | $100.5 | |
| Less:  CA Term Loan Share of Administrative Expense | | | | | (3.6) | (4.0) | (4.5) | 11 |
| Less:  CA Term Loan Share of Maritime Payables | | | | | (0.8) | (0.8) | (0.8) | 11 |
| Estimated Net Proceeds Available to CA Term Loan Holders | | | | | $73.3 | $84.2 | $95.2 | |
| Less: CA Term Loan | | | | | (73.6) | (73.6) | (73.6) | 12 |
| **Estimated Net Proceeds After Distribution to CA Term Loan** | | | | | $– | $10.7 | $21.6 | |
| *CA Term Loan Recovery from Collateral* | | | | | *99.7%* | *100.0%* | *100.0%* | |
| *CA Term Loan Recovery from Unencumbered Assets* | | | | | *0.3%* | *–* | *–* | |
| ***CA Term Loan Total Recovery*** | | | | | *100.0%* | *100.0%* | *100.0%* | |
| **DB Term Loan** | | | | | | | | |
| Estimated Coalteral Proceeds Available to DB Term Loan Holders | | | | | $211.3 | $242.8 | $274.3 | |
| Less: DB Term Loan Share of Administrative Expense | | | | | (9.7) | (11.0) | (12.3) | 11 |
| Less: DB Term Loan Share of Maritime Payables | | | | | (2.3) | (2.3) | (2.3) | 11 |
| Estimated Net Proceeds Available to DB Term Loan Holders | | | | | $199.3 | $229.5 | $259.7 | |
| Less: DB Term Loan | | | | | (175.7) | (175.7) | (175.7) | 12 |
| **Estimated Net Proceeds After Distribution to DB Term Loan** | | | | | $23.5 | $53.7 | $83.9 | |
| *DB Term Loan Recovery from Collateral* | | | | | *100.0%* | *100.0%* | *100.0%* | |
| *DB Term Loan Recovery from Unencumbered Assets* | | | | | *–* | *–* | *–* | |
| ***DB Term Loan Total Recovery*** | | | | | *100.0%* | *100.0%* | *100.0%* | |
| **2007 Facility** | | | | | | | | |
| Estimated 1st Lien Collateral Proceeds Available to 2007 Facility Holders | | | | | $575.8 | $663.7 | $751.8 | |
| Estimated 2nd Lien Collateral Proceeds Available to 2007 Facility Holders | | | | | 23.5 | 64.4 | 105.5 | |
| Less: 2007 Facility Share of Administrative Expense | | | | | (26.5) | (30.1) | (33.7) | 11 |
| Less: 2007 Facility Share of Maritime Payables | | | | | (5.9) | (5.9) | (5.9) | 11 |
| Estimated Net Proceeds Available to 2007 Facility Holders | | | | | $567.1 | $692.2 | $817.7 | |
| Less: 2007 Facility | | | | | (1,069.1) | (1,069.1) | (1,069.1) | 12 |
| **Estimated Net Proceeds After Distribution to 2007 Facility** | | | | | $– | $– | $– | |
| *2007 Facility Recovery from Collateral* | | | | | *53.0%* | *64.7%* | *76.5%* | |
| *2007 Facility Recovery from Unencumbered Assets* | | | | | *1.7%* | *1.9%* | *2.1%* | |
| ***2007 Facility Total Recovery*** | | | | | *54.7%* | *66.6%* | *78.6%* | |
| **DnB Swap** | | | | | | | | |
| Estimated Collateral Proceeds Available to DnB Swap | | | | | $– | $– | $– | |
| Less:  DnB Swap Share of Administrative Expense | | | | | – | – | – | 11 |
| Estimated Net Proceeds Available to DnB Swap Holders | | | | | $– | $– | $– | |
| Less: DnB Swap | | | | | (6.7) | (6.7) | (6.7) | |
| **Estimated Net Proceeds After Distribution to DnB Swap** | | | | | $– | $– | $– | |
| *DnB Swap Recovery from Collateral* | | | | | *–* | *–* | *–* | |
| *DnB Swap Recovery from Unencumbered Assets* | | | | | *1.7%* | *1.9%* | *2.1%* | |
| ***DnB Swap Total Recovery*** | | | | | *1.7%* | *1.9%* | *2.1%* | |
| **Unsecured Claims** | | | | | | | | |
| Unencumbered Assets | | | | | $20.8 | $23.6 | $26.3 | 12 |
| Plus: Estimated Excess Value from Secured Collateral | | | | | – | – | – | |
| Less: Unsecured Share of Administrative Expense | | | | | (1.0) | (1.1) | (1.2) | |
| Estimated Net Proceeds Available for Unsecured Claims[1] | | | | | $19.9 | $22.5 | $25.1 | |

(1) Analysis does not take into account any right the secured lenders may have to adequate protection liens on unencumbered assets.

| | | | Low | Mid | High |
|---|---|---|---|---|---|
| Estimated Net Proceeds Available for Unsecured Claims[1] | | | $19.9 | $22.5 | $25.1 |

| Unsecured Claims (Note 13) | Estimated Claim | | | Proceeds | | | % Recovery | | |
|---|---|---|---|---|---|---|---|---|---|
| | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| CA Term Loan | $73.6 | $– | $– | $0.2 | $– | $– | 0.3% | – | – |
| DB Term Loan | – | – | – | – | – | – | – | – | – |
| 2007 Facility | 1,044.3 | 1,044.3 | 1,044.3 | 17.3 | 19.8 | 22.1 | 1.7% | 1.9% | 2.1% |
| DNB Swap | 6.7 | 6.7 | 6.7 | 0.1 | 0.1 | 0.1 | 1.7% | 1.9% | 2.1% |
| Convertible Notes | 125.8 | 125.8 | 125.8 | 2.1 | 2.4 | 2.7 | 1.7% | 1.9% | 2.1% |
| Other Liquidation GUC | 10.0 | 10.0 | 10.0 | 0.2 | 0.2 | 0.2 | 1.7% | 1.9% | 2.1% |
| Total Unsecured Claims | $1,260.3 | $1,186.7 | $1,186.7 | $19.9 | $22.5 | $25.1 | 1.6% | 1.9% | 2.1% |
| Estimated Net Proceeds Available for Equity | | | $ - | $ - | $ - | | | |

(1) Analysis does not take into account any right the secured lenders may have to adequate protection liens on unencumbered asse

## SPECIFIC ASSUMPTIONS

### Note 1- Cash and Equivalents
As of March 31, 2014 there was approximately $62.3 million in cash and equivalents at Genco and its Debtor Subsidiaries. Of the $62.3 million in total cash, approximately $24.8 million is pledged to the 2007 Credit Facility, approximately $22.4 million is pledged to the Prepetition $253 Million Facility Lenders, approximately $9.4 million is pledged to the Prepetition $100 Million Facility Lenders, and approximately $5.6 million is unencumbered.

### Note 2 – Accounts Receivable
Estimated proceeds realized from accounts receivable under a liquidation are based on management's estimate of collectability and the assumption that every reasonable effort will be made by the Chapter 7 Trustee to collect receivables from customers, a number of whom may be in various foreign jurisdictions. Accounts Receivable include amounts due from charterers and amounts due from Baltic Trading.

### Note 3 – Prepaid Expenses and Other Assets
Prepaid expenses and inventories include bunker inventory, lubricants inventory and prepaid insurance. Bunker and lubricants inventory, which is used to operate Vessels, is stored on-board the Vessels at the time of purchase and, depending on the flag of the Vessel, may also be pledged to the Credit Facility lenders. Prepaid insurance includes insurance premiums paid in advance which cover a period of time which has not elapsed. The Liquidation Analysis does not take into account any right the Secured Lenders may have to assert secured claims on some of the Prepaid Expenses and Other Assets.

### Notes 4 – Value of Debtors' Vessels
The Liquidation Analysis assumes that the Chapter 7 Debtors' Vessels will be sold in the secondary market over an accelerated 90-day time period. The Debtors have received appraisals from two independent ship brokerage firms, who conducted an asset-level appraisal of the fleet as of March 11 and 12, 2014. These appraisals and indications of value are based on macroeconomic forecasts, industry conditions and recent asset transactions observed in the market and assume Vessels to be in sound condition, free of average damage, free of charter commitments, and the existence of a willing seller and willing buyer. Given that the charters are largely short-term and susceptible to spot market rate fluctuation, the Liquidation Analysis does not assume any liquidation value for the assignment of any of the charters. The Chapter 7 Debtors may not be able to enjoy the benefit of any charter agreement due to customer refusal to use of their Vessels. The Liquidation Analysis applies a discount of 20% to 50% to each Vessel's appraised value to account for the Vessel's age, the forced nature of the transaction, the expedited time frame (90 days) and the magnitude of supply (53 Vessels) being sold into the market. The individual discounts applied to each Vessel imply a blended recovery on the Vessels that ranges from approximately 59% to 79%.

*Note 5 – Other Fixed Assets*

Other fixed assets include vessel equipment, furniture, fixtures, computer equipment, software and other assets. Vessel equipment includes capital goods aboard the Vessels. A large portion of these items are significantly depreciated and may not result in significant liquidation value, particularly since the potential universe of buyers for these assets is narrow and is primarily comprised of competing companies.

*Note 6 – Value of Baltic Trading Ltd. Stake*

Through its wholly-owned subsidiary Genco Investments LLC, Genco indirectly owns 6,356,472 shares of Baltic Trading's Class B Stock. Genco's ownership stake represents an approximately 11.1% ownership interest in Baltic Trading and 65.1% of the aggregate voting power of Baltic Trading's outstanding shares of voting stock. Baltic Trading is listed on the New York Stock Exchange under the symbol "BALT." As of April 10, 2014, the share price of Baltic Trading was $6.07 per share, implying an approximate value of $38.6 million for the Debtor's stake in Baltic Trading. Additionally, given Baltic Trading's average daily trading volume of less than 1 million shares over the past 90 days, a liquidation would likely require that Genco's indirect stake in Baltic Trading be sold through a block sale. Underwriter fees and offering discounts in typical block sales would potentially decrease the realizable proceeds of the sale by 5-15%. Thus, the Liquidation Analysis assumes an incremental 5% to 15% discount after taking into account potential business disruption.

*Note 7 – Value of Jinhui Shipping and Transportation Stake*

Through Genco Investments LLC, Genco also indirectly holds an investment in the capital stock of Jinhui Shipping. Jinhui Shipping is a drybulk shipping owner and operator focused on the Supramax segment of drybulk shipping. Jinhui Shipping is listed on the Oslo Børs under the symbol "JIN." As of April 10, 2014, the share price of Jinhui Shipping was 21.20 NOK and exchange rate was approximately 5.91 NOK per USD, implying a value of approximately $58.6 for the 16,335,100 shares of Jinhui Shipping capital stock indirectly owned by Genco. These shares represent approximately 20% of the outstanding stock of Jinhui Shipping. Over the last 90 days, Jinhui Shipping's average daily trading volume was less than 200,000 shares. In light of the limited liquidity in Jinhui Shipping stock, a liquidation would likely require that Genco's indirect stake in Jinhui Shipping be sold through a block sale. Underwriter fees and offering discounts in typical block sales would decrease the realizable proceeds of a sale by 5-15%.

*Note 8 – Chapter 7 Trustee and Other Liquidator Fees*

The Chapter 7 Debtors estimate that they would incur Chapter 7 Trustee fees of approximately $26.6 million to $34.6 million in aggregate calculated as 3.0% of the gross proceeds available for distribution. This Liquidation Analysis assumes that one Chapter 7 Trustee is appointed for all of the Debtors. However, it is possible that if all of the Debtors were to liquidate under Chapter 7, 58 Chapter 7 Trustees could be appointed resulting in additional costs than what is presented herein. This does not account for possible fees by foreign administrators or liquidators in the event of a foreign insolvency proceeding.

*Note 9 – Corporate Wind-Down Costs and Other Professional Fees*

Corporate wind-down costs consist of corporate overhead, occupancy costs and professional fees to be incurred during the Chapter 11 reorganization and Chapter 7 liquidation processes. It is assumed that the liquidation would occur over a six-month period following the conversion of the Chapter 11 case to a Chapter 7 and that such expenses, costs and overhead would decrease over time. Any positive income from operating businesses during this time is assumed to offset corporate wind-down costs.

*Note 10 – Maritime Payables*

Maritime Payables arise from claims related to providing "necessaries" associated with vessel operations and include crew wages, vessel repairs and voyage supplies such as bunkers. These Maritime Payables are frequently secured by maritime liens. The Liquidation Analysis assumes that maritime liens, in the form of trade accounts payable at the individual vessel-owning subsidiaries, are senior to the secured loan claims at the Debtors' Vessel-owning subsidiaries and therefore are satisfied first through net proceeds available to the Debtors after the payment of Administrative Claims.

*Note 11 – Allocation of Administrative and Maritime Payable Expenses*

6

The Liquidation Analysis assumes that administrative expenses are allocated amongst all stakeholders pro rata based on the gross proceeds available to that stakeholder. Maritime Payables are allocated pro rata amongst the three Prepetition Credit Facilities based on the gross value received for each loan's respective collateral Vessels.

### Note 12 –Unencumbered Assets

Unencumbered Assets include unencumbered Cash, Accounts Receivable, Prepaid Expenses and Other Assets, and Other Fixed Assets. The Liquidation Analysis distributes these assets pro rata amongst all Unsecured Claims and does not take into account that some of these assets may reside at Vessel-owning subsidiaries that guarantee the indebtedness owed to the Secured Lenders.

### Note- 13 Prepetition Indebtedness

As of March 31, 2014, the principal outstanding under the Credit Facilities consisted of (i) $73.6 million of funded debt owed to the Prepetition $100 Million Facility Lenders, (ii) $175.7 million of funded debt owed to the Prepetition $253 Million Facility Lenders and (iii) $1,069.1 million[3] of funded debt owed to the Prepetition 2007 Facility Lenders. The Liquidation Analysis does not take into account any of the aforementioned secured lenders' potential right to postpetition interest once the case is converted into a Chapter 7. The Debtor also owed approximately $6.7 million to DnB on account of the swap. As described above, the DnB Swap Holder is subordinated in payment priority to the Prepetition 2007 Facility Lenders  The Liquidation Analysis assumes that the secured debt claims are satisfied following the payment of Administrative Claims and any Maritime Payables secured by maritime liens.

Prepetition, non-priority, general unsecured claims include (i) the Convertible Notes, (ii) other General Unsecured Claims (the "**Other Liquidation GUC**") and (iii) any deficiency claims related to the prepetition secured debt obligations. The Convertible Notes claim consists of principal amount of $125 million plus accrued prepetition interest of $.8 million. Other Liquidation GUC, which may consist of, among other claims, prepetition accrued liabilities and contract rejection claims, is assumed to be $10.0 million. In situations in which the lenders under the Prepetition $100 Million Facility, the Prepetition $253 Million Facility, the Prepetition 2007 Facility and the Prepetition Swap are undersecured, these secured lenders are assumed to assert deficiency claims in the full amount of their claim at Genco less any value received on account of their collateral at Genco, with 100% cap on recovery.

---

[3] Includes $1,055.9 million principal outstanding and $13.2 million owed per the August 2012 amendment, in which the Company paid a fee equal to 1.25% of principal then outstanding which would become due at the earlier of maturity or retirement.

7