UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                   :

In re:                                :    Chapter 11
                                   :

GENCO SHIPPING & TRADING LIMITED, <u>et</u> <u>al.</u>,  :    Case No.  14-11108 (SHL)
                                   :

                     Debtors.    :    Jointly Administered
                                   :    Related Docket No. 14
------------------------------------------------------------------X

## NOTICE OF FILING OF PLAN SUPPLEMENT FOR THE PREPACKAGED PLAN OF REORGANIZATION OF THE DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.    On April 21, 2014 (the "**Petition Date**"), Genco Shipping & Trading Limited and certain of its direct and indirect subsidiaries, as chapter 11 debtors and debtors in possession (the "**Debtors**"[1]) filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York.

2.    On the Petition Date, the Debtors filed the *Prepackaged Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Prepack Plan**") [Docket No. 14] and the *Disclosure Statement for the Prepackaged Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Disclosure Statement**") [Docket No. 15].

---

[1] The Debtors and, if applicable, the last four digits of their taxpayer identification numbers are as follows: Genco Shipping & Trading Limited (9758), Genco Investments LLC, Genco Management (USA) LLC (3865), Genco RE Investments LLC, Genco Ship Management LLC (7604), Genco Acheron Limited (9293), Genco Aquitaine Limited (8217), Genco Ardennes Limited (8215), Genco Augustus Limited (3622), Genco Auvergne Limited (8233), Genco Avra Limited (5557), Genco Bay Limited (5558), Genco Beauty Limited (9761), Genco Bourgogne Limited (8236), Genco Brittany Limited (8237), Genco Carrier Limited (9763), Genco Cavalier LLC (9764), Genco Challenger Limited (6074), Genco Champion Limited (6073), Genco Charger Limited (6072), Genco Claudius Limited (3620), Genco Commodus Limited (3619), Genco Constantine Limited (3617), Genco Explorer Limited (9764), Genco Hadrian Limited (3608), Genco Hunter Limited (6158), Genco Knight Limited (9773), Genco Languedoc Limited (8238), Genco Leader Limited (9774), Genco Loire Limited (8239), Genco London Limited (3610), Genco Lorraine Limited (8242), Genco Mare Limited (5641), Genco Marine Limited (9775), Genco Maximus Limited (3613), Genco Muse Limited (5276), Genco Normandy Limited (8243), Genco Ocean Limited (5645), Genco Picardy Limited (8244), Genco Pioneer Limited (9767), Genco Predator Limited (6075), Genco Progress Limited (9776), Genco Prosperity Limited (9777), Genco Provence Limited (8246), Genco Pyrenees Limited (8599), Genco Raptor LLC (9767), Genco Reliance Limited (9768), Genco Rhone Limited (8248), Genco Spirit Limited (5650), Genco Success Limited (9769), Genco Sugar Limited (9778), Genco Surprise Limited (9385), Genco Thunder LLC (9769), Genco Tiberius Limited (3614), Genco Titus Limited (3615), Genco Vigour Limited (9770), Genco Warrior Limited (6076), and Genco Wisdom Limited (9771). The Debtors' business address is 299 Park Avenue, 12th Floor, New York, NY 10171. Neither Baltic Trading Limited nor its subsidiaries are Debtors.

3. Copies of the Prepack Plan and the Disclosure Statement may be accessed either through the Bankruptcy Court website at www.nysb.uscourts.gov or through the Debtors' bankruptcy website at www.GencoRestructuring.com.

4. On **June 3, 2014 at 11:00 a.m.** (prevailing New York time), a hearing will be held before the Honorable Sean H. Lane, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004 to consider the adequacy of the Debtors' Disclosure Statement and procedures for solicitation of votes to accept or reject the Prepack Plan, and confirmation of the Prepack Plan.

5. The Prepack Plan requires the Debtors to file certain additional plan supplemental documents (the "**Plan Supplement**").

6. The deadline for filing objections to the Prepack Plan and the Disclosure Statement is **May 22, 2014 at 4:00 p.m.** (prevailing New York time).

7. The Debtors hereby file the following documents that comprise the Plan Supplement, *which are subject to continued review and modification, which may be both material and substantial*:

- **Exhibit 1**: Rejection Schedule;

- **Exhibit 2**: The Amended and Restated $253 Million Credit Agreement;

- **Exhibit 3**: The Amended and Restated $100 Million Credit Agreement;

- **Exhibit 4**: The New Genco Charter;

- **Exhibit 5**: The New Genco By-Laws;

- **Exhibit 6**: The New Genco MIP Warrant Agreements;

- **Exhibit 7**: The New Genco Equity Warrant Agreement;

- **Exhibit 8**: The Identity of the Officers and Members of the New Board of Reorganized Genco;

- **Exhibit 9**: List of Retained Causes of Action;

- **Exhibit 10**: The Management Incentive Program;

- **Exhibit 11**: The New Employment Agreements; and

- **Exhibit 12**: The Registration Rights Agreement.

- 3 -

Dated: New York, New York
May 16, 2014

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/ Adam C. Rogoff
Kenneth H. Eckstein
Adam C. Rogoff
Stephen D. Zide
Anupama Yerramalli
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Proposed Counsel for the Debtors
and Debtors in Possession*

**EXHIBIT 1**

**REJECTION SCHEDULE**

**Rejection Schedule: Executory Contracts and Unexpired Leases to be Rejected**

| Name and Address of Counterparty | Contracts or Leases Being Rejected (to the extent they constitute executory contracts) | Debtor Name | Effective Date of Rejection |
|---|---|---|---|
| Thomson Reuters Governance, Risk and Compliance<br>610 Opperman Drive<br>P.O. Box 64833<br>St. Paul, MN 55164-1803 | Research and consulting services agreement. | Genco Shipping & Trading Limited | Effective Date of Prepack Plan |

## EXHIBIT 2

### THE AMENDED AND RESTATED $253 MILLION CREDIT AGREEMENT

## EXHIBIT A

### THIRD SUPPLEMENTAL AGREEMENT TO $253,000,000 SECURED LOAN FACILITY AGREEMENT DATED 20 AUGUST 2010

**Third Supplemental Agreement to $253,000,000 Secured Loan Facility Agreement dated 20 August 2010**

**Dated                                          2014**

**Genco Shipping & Trading Limited**
**(as Borrower)**

**- and -**

**BNP Paribas**
**Credit Agricole Corporate and Investment Bank**
**DVB Bank SE**
**Deutsche Bank AG Filiale Deutschlandgeschäft**
**Skandinaviska Enskilda Banken AB (publ)**
**(as Lenders)**

**- and -**

**Deutsche Bank Luxembourg S.A.**
**(as Agent)**

**- and -**

**BNP Paribas**
**Credit Agricole Corporate and Investment Bank**
**DVB Bank SE**
**Deutsche Bank AG Filiale Deutschlandgeschäft**
**Skandinaviska Enskilda Banken AB (Publ)**
**(as Mandated Lead Arrangers)**

**- and -**

**BNP Paribas**
**Credit Agricole Corporate and Investment Bank**
**DVB Bank SE**
**Deutsche Bank AG**
**Skandinaviska Enskilda Banken AB (publ)**
**(as Swap Providers)**

**- and -**

**Deutsche Bank AG Filiale Deutschlandgeschäft**
**(as Security Agent and Bookrunner)**

**- and -**

**Genco Aquitaine Limited, Genco Ardennes Limited, Genco Auvergne Limited, Genco Bourgogne Limited, Genco Brittany Limited, Genco Loire Limited, Genco Languedoc Limited, Genco Lorraine Limited, Genco Normandy Limited, Genco Picardy Limited, Genco Provence Limited, Genco Pyrenees Limited and Genco Rhone Limited (as Guarantors)**


Stephenson Harwood LLP
1 Finsbury Circus
London EC2M 7SH
Tel +44 20 7329 4422
Fax +44 20 7329 7100
DX No. 64 Chancery Lane
www.shlegal.com


**sh**
**STEPHENSON HARWOOD**

**Contents**

Page

1           Interpretation..................................................................... 3

2           Conditions ........................................................................ 5

3           Representations and Warranties ............................................... 7

4           Amendments to Original Loan Agreement ................................... 8

5           Confirmation and Undertaking ................................................. 8

6           Notices, Law and Jurisdiction.................................................. 8

Schedule 1   The Lenders ...................................................................... 9

Schedule 2   Effective Date Confirmation.................................................. 10

Schedule 3   Loan Agreement ............................................................... 11

**Supplemental Agreement**

**Dated:**                                    **2014**

**Between:**

(1)    **Genco Shipping & Trading Limited**, a corporation incorporated under the laws of the Marshall Islands whose principal place of business is at 299 Park Avenue, 20th Floor, New York, New York 10171, USA (the "**Borrower**");

(2)    the banks listed in Schedule 1 (*The Lenders*), each acting through its office at the address indicated against its name in Schedule 1 (together the "**Lenders**" and each a "**Lender**");

(3)    **Deutsche Bank Luxembourg S.A.**, acting as agent through its office at 2, Bvd Konrad Adenauer, L-1115 Luxembourg (in that capacity the "**Agent**");

(4)    **Deutsche Bank AG Filiale Deutschlandgeschäft, Frankfurt am Main, Germany** acting as mandated lead arranger through its office at Adolphsplatz 7, 20457 Hamburg, Germany (formerly Ludwig-Erhard-Strasse 1, 20459 Hamburg, Germany), **BNP Paribas** acting as mandated lead arranger through its office at 16 rue du Hanovre, 75002 Paris, France, **Credit Agricole Corporate and Investment Bank** acting as mandated lead arranger through its office at 9, quai du President Paul Doumer, 92920 Paris la Defense, France, **DVB Bank SE**, acting as mandated lead arranger through its office at Platz der Republik 6, D-60325 Frankfurt am Main, Germany, and **Skandinaviska Enskilda Banken AB (publ)** acting as mandated lead arranger through its office at Kungsträdgårdsgatan 8, 106 40 Stockholm, Sweden (in that capacity the "**Mandated Lead Arrangers**");

(5)    **Deutsche Bank AG** acting as swap provider through its office at Taunusanlage 12, 60325 Frankfurt am Main, Germany (formerly Theodor-Heuss-Allee 70, 60486 Frankfurt am Main, Germany), **BNP Paribas** acting as swap provider through its office at 10 Harewood Road, London NW1 6AA, England, **Credit Agricole Corporate and Investment Bank** acting as swap provider through its office at 9, quai du President Paul Doumer, 92920 Paris la Defense, France, **DVB Bank SE**, acting as swap provider through its office at Platz der Republik 6, D-60325 Frankfurt am Main, Germany, and **Skandinaviska Enskilda Banken AB (publ)** acting as swap provider through its office at Kungsträdgårdsgatan 8, 106 40 Stockholm, Sweden (in that capacity, the "**Swap Providers**" and each a "**Swap Provider**");

(6)    **Deutsche Bank AG Filiale Deutschlandgeschäft**, **Frankfurt am Main, Germany,** acting as security agent and bookrunner through its office at Adolphsplatz 7, 20457 Hamburg, Germany (formerly Ludwig-Erhard-Strasse 1, 20459 Hamburg, Germany) (in these capacities the "**Security Agent**" and the "**Bookrunner**"); and

(7)    **Genco Aquitaine Limited, Genco Ardennes Limited, Genco Auvergne Limited, Genco Bourgogne Limited, Genco Brittany Limited, Genco Languedoc Limited, Genco Loire Limited, Genco Lorraine Limited, Genco Normandy Limited, Genco Picardy Limited, Genco Provence Limited, Genco Pyrenees Limited** And **Genco Rhone Limited**, each a company incorporated according to the law of the Marshall Islands whose registered address is at Trust Company Complex,

Ajeltake Island Majuro, Ajeltake Road, Marshall Islands MH96960 (together the "**Collateral Owners**" and each a "**Collateral Owner**").

**Supplemental to** a secured loan agreement dated 20 August 2010 made between the Borrower, the Lenders, the Agent, the Mandated Lead Arrangers, the Swap Providers, the Bookrunner and the Security Agent as amended and supplemented by a first side letter dated 24 August 2010, as further supplemented by a letter to the Borrower dated 21 December 2011 and as amended and restated by a second supplemental agreement dated 1 August 2012 (the "**Original Loan Agreement**"), on the terms and subject to the conditions of which each of the Lenders agreed to advance to the Borrower its respective Commitment of an aggregate amount not exceeding two hundred fifty three million Dollars ($253,000,000).

**Whereas**:

(A)   On 21 April 2014, the Borrower and fifty seven (57) of its subsidiaries (including the Collateral Owners) (together, the "**Debtors**") commenced bankruptcy proceedings with case no. 14-11108-shl (the "**Cases**") pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

(B)   As part of the Plan of Reorganisation, the Borrower has requested that certain amendments be made to the Original Loan Agreement as set out in a restructuring term sheet exhibited to a restructuring support agreement dated 3 April 2014 made between the Borrower, certain of its subsidiaries and creditors of the Borrower (the "**Restructuring Support Agreement**") to enable the reorganized Debtors to, among other things, consummate the transactions contemplated by the Plan of Reorganisation and to pay related fees and expenses.

(C)   The Finance Parties have agreed to the requests referred to in Recital (B) subject to the terms and conditions of this Supplemental Agreement and of the Restructuring Support Agreement.

**It is agreed that**:

**1      Interpretation**

1.1   In this Supplemental Agreement:

"**Confirmation Order**" means the order entered into by the Bankruptcy Court confirming the Plan of Reorganisation, which order shall be acceptable in form and substance to the Debtors and the applicable Required Supporting Creditors (as defined in the Restructuring Support Agreement) in accordance with section 1(b) of the Restructuring Support Agreement, and solely with respect to any term in the order that will affect the economic interests of the Lenders or is related to this Supplemental Agreement, mutually acceptable to the Debtors and the Agent (acting on the instructions of the Majority Lenders) and shall include, inter alia, provisions (a) approving this Supplemental Agreement and related documents, (b) reaffirming the Lenders lien in all of the assets of the Borrower and the Collateral Owner subject to a Finance Document, and (c) finding that the parties negotiated this Supplemental Agreement at arm's length and in good faith and that this Supplemental Agreement

and the terms hereof constitute good and valuable consideration for the Borrower and the Collateral Owners;

"**Consummation Date**" means the Effective Date (as defined in the Plan of Reorganisation) of the confirmed Plan of Reorganisation;

"**Effective Date**" means the date on which the Agent (acting on the instructions of the Lenders) confirms to the Borrower in writing substantially in the form set out in Schedule 2 (*Effective Date Confirmation*) that all of the conditions referred to in Clause 2.1 (*Conditions*) have been satisfied, which confirmation the Agent shall be under no obligation to give if an Event of Default (excluding any Event of Default that has occurred as a result of the Cases or an Event of Default that has been notified to the Agent prior to the date of this Supplemental Agreement) shall have occurred and be continuing;

"**Fee Letters**" means any letter or letters dated on or about the date of this Supplemental Agreement between the Agent or the Security Agent and the Borrower setting out any of the fees referred to in Clauses 2.1.9 and 2.1.10;

"**Finance Parties**" means the Agent, the Security Agent, the Swap Provider and the Lenders;

"**Loan Agreement**" means the Original Loan Agreement as amended and restated pursuant to this Supplemental Agreement and as set out in Schedule 3 (*Loan Agreement*);

"**Mortgage Amendments**" means the amendment agreements to the Mortgages to be entered into on or around the date of this Deed between the Collateral Owners and the Security Agent;

"**New Documents**" means this Supplemental Agreement and the Mortgage Amendments;

"**Plan of Reorganisation**" means the Prepackaged Plan of Reorganisation of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code filed with the Bankruptcy Court on April 21, 2014 [Docket No. 14], and as it may be amended, modified, or supplemented from time to time in accordance with the terms therein and in the Restructuring Support Agreement; and

"**Security Parties**" means all parties to this Supplemental Agreement other than the Finance Parties and "**Security Party**" means any one of them.

1.2     All words and expressions defined in the Original Loan Agreement shall have the same meaning when used in this Supplemental Agreement unless the context otherwise requires, and clause 1.2 (*Definitions and Interpretation*) of the Original Loan Agreement shall apply to the interpretation of this Supplemental Agreement as if it were set out in full.

1.3     This Supplemental Agreement shall be a Finance Document.

**2**      **Conditions**

2.1      As conditions precedent for the agreement of the Finance Parties to the requests specified in Recital (B) above and for the effectiveness of Clause 4 (*Amendments to Original Loan Agreement*), the Borrower shall deliver or cause to be delivered to or to the order of the Agent the following documents and evidence:

2.1.1      a certificates of good standing in respect of each Security Party;

2.1.2      a certificate of a duly authorised officer of each Security Party (i) certifying that that Security Party is existing in good standing in the jurisdiction of its incorporation, (ii) confirming that none of the documents delivered to the Agent pursuant to clauses 2.1.1 to 2.1.3 of the second supplemental to the Loan Agreement dated 1 August 2012 have been amended or modified in any way (or copies, certified by a duly authorised officer of the Security Party in question as true, complete, accurate and neither amended nor revoked, of any such documents which have been amended or modified), (iii)  setting out the names and titles of the directors and officers of that Security Party, and (iv) attaching an incumbency certificate reflecting the name and signature of each officer authorized to execute the New Documents to which that Security Party is a party and that no proceedings are pending or contemplated for the dissolution of that Security Party;

2.1.3      a copy, certified by a director or the secretary of each Security Party as true, complete and accurate and neither amended nor revoked, of a resolution of the directors of that Security Party (together, where appropriate, with signed waivers of notice of any directors' meetings) approving, and authorising or ratifying the execution of, the New Documents to which it is a party and any document to be executed by that Security Party pursuant to such New Documents;

2.1.4      a copy of a resolution signed by all the holders of the issued shares in each Collateral Owner, approving the terms of, and the transactions contemplated by, the New Documents to which that Collateral Owner is a party;

2.1.5      an original notarised power of attorney of each Security Party under which the New Documents to which it is a party and any documents required pursuant to it are to be executed by that Security Party;

2.1.6      duly executed New Documents;

2.1.7      evidence that (i) the Mortgage Amendments will be capable of being registered against the Vessels and (ii) the discharge of the Second Mortgages will be capable of being recorded against the Vessels;

2.1.8      evidence that the second assignment of Insurances of each Vessel executed in favour of the DNB Collateral Agent to secure further the obligations of the Borrower under the DNB Credit Agreement will be released and reassigned;

2.1.9      payment to the Agent (for the account of the Lenders) on the Effective Date of an upfront fee computed at the rate of 100bps of the amount of the Loan

outstanding on the Plan Effective Date (as such term is defined in the Restructuring Support Agreement); and

2.1.10    payment to each of the Agent (for its own account) and the Security Agent (for its own account) of a fee in an amount and at the times set out in the relevant Fee Letter;

2.1.11    if a Security Party is incorporated in a jurisdiction other than England and Wales, a legal opinion of the legal advisers to the Lenders in each relevant jurisdiction, substantially in the form or forms provided to the Agent prior to signing this Agreement or confirmation satisfactory to the Agent that such an opinion will be given;

2.1.12    a copy of the supplemental agreement to the Metrostar Facility together with evidence that the amendments to the Metrostar Facility contemplated in the Restructuring Support Agreement shall become effective on or prior to the Effective Date;

2.1.13    evidence that:

(a)    the Bankruptcy Court has entered the Confirmation Order, which shall, among other things, authorise the transactions contemplated under this Supplemental Agreement;

(b)    the Confirmation Order has not been stayed, modified or vacated on appeal; and

(c)    the Confirmation Order is final order in full force and effect;

2.1.14    evidence that the effective date of the Plan of Reorganisation has occurred on or before the later of, and in each case no later than 1 August 2014:

(a)    ten (10) calendar days following the entry of the Confirmation Order;

(b)    completion of the Rights Offering (as defined in the Plan of Reorganisation); or

(c)    upon notice from the Agent (acting on the instructions of the Lenders) that the conditions in this clause 2.1 have been satisfied or waived in accordance with this Supplemental Agreement;

and that all conditions precedent to the effectiveness of the Plan of Reorganisation have been fulfilled or waived (in accordance with the provisions of the Plan of Reorganisation), including the execution, delivery and performance of all instruments, documents and agreements necessary to effectuate the Plan of Reorganisation;

2.1.15    evidence that the Collateral Owners have deposited into the Master Account the relevant amounts in order to comply with the provisions of clauses 10.4 (*Deposit*) and 12.2.1 (*Minimum Liquidity*) of the Loan Agreement.

2.2   As conditions subsequent for the agreement of the Finance Parties to the requests specified in Recital (B) above, the Borrower shall deliver or cause to be delivered to or to the order of the Agent at the times indicated below:

2.2.1   on the Effective Date, evidence that the Borrower has paid the Repayment Instalments due on 30 May 2014 together with interest thereon and interest and default interest accruing from 31 May 2014 until the Plan Effective Date (as such term is defined in the Restructuring Support Agreement); and

2.2.2   on the Effective Date, a certificate of ownership and encumbrance (or equivalent) issued by the Registrar of Ships (or equivalent official) of the Marshall Island's flag confirming that (a) the Second Mortgages have been released, (b) the Mortgage Addenda have been registered against the Vessels and (c) there are no further Encumbrances registered against the Vessels;

2.2.3   on the Effective Date, evidence that the second assignment of Insurances of each Vessel executed in favour of the DnB Collateral Agent to secure further the obligations of the Borrower under the DnB Credit Agreement have been released and reassigned;

2.2.4   on the Effective Date, evidence that the reorganisation of the Debtor pursuant to the Plan of Reorganisation has been consummated and that the Consummation Date has occurred in each case not later than [1 August 2014];

2.2.5   as soon as practicable after the Effective Date, such of the legal opinions specified in Clause 2.1.11 as have not already been provided to the Agent; and

2.2.6   as soon as practicable after the Effective Date, any updated insurance documents issued by the insurers of the Vessel taking into account the release of the Second Mortgages.

2.3   All documents and evidence delivered to the Agent pursuant to Clauses 2.1 and 2.2 shall:

2.3.1   be in form and substance reasonably acceptable to the Agent (acting on the instructions of the Lenders);

2.3.2   if required by the Agent, be certified, notarised, legalised or attested in a manner acceptable to the Agent.

**3   Representations and Warranties**

3.1   Each of the representations and warranties contained in clause 11 (*Representations*) of the Original Loan Agreement (except in respect of clauses 11.1.9 and  11.1.12 insofar as they relate to the Cases, non-compliance with the financial covenants, the Event of Default pursuant to clause 13.1.4 of the Loan Agreement and the covenant to deliver the Compliance Certificate for the quarter ending on 31 March 2014) shall be deemed repeated by the Borrower at the date of this Supplemental Agreement and at the Effective Date, by reference to the facts and circumstances then pertaining, as if references to the Finance Documents included this Supplemental

Agreement, provided that to the extent any such representation or warranty relates to an earlier date, such representation or warranty shall be true and correct in all material respects on such date.

3.2 The Borrower represents and warrants to each Finance Party that on the Effective Date, the final maturity date under the Metrostar Loan Agreement will be 31 August 2019 and the applicable margin in the Metrostar Loan Agreement will be 3.5% per annum.

**4       Amendments to Original Loan Agreement**

With effect from the Effective Date, the Original Loan Agreement shall be amended and restated in the form set out in Schedule 3 (*Loan Agreement*).

**5       Confirmation and Undertaking**

5.1 Each of the Security Parties confirms that all of its respective obligations under or pursuant to each of the Security Documents to which it is a party remain in full force and effect, despite the amendments to the Original Loan Agreement made in this Supplemental Agreement, as if all references in any of the Security Documents to the Original Loan Agreement were references to the Original Loan Agreement as amended and supplemented by this Supplemental Agreement.

5.2 The definition of any term defined in any of the Security Documents shall, to the extent necessary, be modified to reflect the amendments to the Original Loan Agreement made in or pursuant to this Supplemental Agreement.

**6       Notices, Counterparts, Law and Jurisdiction**

The provisions of clauses 18 (*Notices*), 21.5 (*Counterparts*) and 22 (*Law and jurisdiction*) of the Loan Agreement shall apply to this Supplemental Agreement as if they were set out in full herein and as if references to the Original Loan Agreement were references to this Supplemental Agreement and references to the Borrower were references to the Security Parties.

**Schedule 1**

**The Lenders**

**Deutsche Bank AG Filiale Deutschlandgeschäft**
Adolphsplatz 7
D-20457 Hamburg
Germany
Fax: +49 40 3701 4550
Attention: Dirk Niedereichholz

**DVB Bank SE**
Platz der Republik 6
D-60325 Frankfurt am Main
Germany
Fax: +49 69 9750 4875
Attention: Shipping Loans Administration Department

**Skandinaviska Enskilda Banken AB (publ)**
Kungsträdgårdsgatan 8
106 40 Stockholm
Sweden
Fax: +46 8 678 02 06
Attention: Arne Juell-Skielse

**BNP Paribas**
16 rue du Hanovre
75002 Paris
France
E-mail : tgmo.shipping@bnpparibas.com
Fax : +33 1 42 98 43 55
Attention : Transportation Group Middle Office

**Crédit Agricole Corporate and Investment Bank**
9, quai du President Paul Doumer
92920 Paris la Defense
France
Fax: +33 1 41 89 29 87
Attention: Shipping Department

with a copy to
Crédit Agricole Corporate and Investment Bank, London
Ship Finance Department
5 Appold Street
London EC2A 2DA
Fax: +44 207 214 6689
Attention: Thibaud Escoffier/Jerome Duval/Michael Coina

**Schedule 2**

**Effective Date Confirmation**

To:        **Genco Shipping & Trading Limited**,
           299 Park Avenue, 12th Floor, New York, New York 10171, USA

With copies to:

**Deutsche Bank AG Filiale Deutschlandgeschäft** (Att: Dirk Niedereichholz)
Adolphsplatz 7, D-20457 Hamburg, Germany

**DVB Bank SE**  (Att: Shipping Loans Administration Department)
Platz der Republik 6, D-60325 Frankfurt am Main, Germany

**Skandinaviska Enskilda Banken AB (publ)** (Att: Arne Juell-Skielse)
Kungsträdgårdsgatan 8, 106 40 Stockholm, Sweden

**BNP Paribas** (Att: Transportation Group Middle Office)
16 rue du Hanovre, 75002 Paris, France

**Crédit Agricole Corporate and Investment Bank** (Att: Shipping Department)
9, quai du President Paul Doumer, 92920 Paris la Defense, France
cc: Ship Finance Department, 5 Appold Street, London EC2A 2DA


We, Deutsche Bank Luxembourg S.A., refer to the third supplemental agreement dated
[       ] 2014 (the "**Third Supplemental Agreement**") relating to a secured loan
agreement dated 20 August 2010 as amended and supplemented by a first side letter dated
24 August 2010, as further supplemented by a letter to the Borrower dated 21 December
2011 and as amended and restated by a second supplemental agreement dated 1 August
2012 (the "**Loan Agreement**") made between you as the Borrower, the banks listed in it as
the Lenders, certain parties as Mandated Lead Arrangers, ourselves as the Agent, certain
parties as Swap Providers and Deutsche Bank AG Filiale Deutschlandgeschäft as the Security
Agent and the Bookrunner in respect of a loan to you from the Lenders of up to
$253,000,000.

We hereby confirm that all conditions precedent referred to in Clause 2.1 (*Conditions*) of the
Third Supplemental Agreement have been satisfied.   In accordance with Clauses 1.1
(*Interpretation*) and 4 (*Amendments to Original Loan Agreement*) of the Third Supplemental
Agreement the Effective Date is the date of this confirmation and the amendments to the
Loan Agreement are now effective.

Dated:                                        2014

Signed:_____

For and on behalf of

**Deutsche Bank Luxembourg S.A.**

**Schedule 3**

**Loan Agreement**

**In Witness** of which the parties to this Supplemental Agreement have executed this Supplemental Agreement as a deed the day and year first before written.

**The Borrower**

**Signed** and **delivered**
as a **deed**
by **Genco Shipping & Trading Limited**
(as the Borrower)
acting by

its duly authorised

in the presence of:

signature
of witness   _____

name         _____
             print name of witness

address

_____
signature

_____
print name

**The Guarantors**

**Signed** and **delivered**
as a **deed**
by **Genco Aquitaine Limited**
(as a Guarantor)
acting by

its duly authorised

in the presence of:

signature
of witness   _____

name         _____
             print name of witness

address

_____
signature

_____
print name

**Signed** and **delivered**
as a **deed**                                         _____
by **Genco Ardennes Limited**                              signature
(as a Guarantor)
acting by                                            _____
                                                           print name

its duly authorised

in the presence of:

signature
of witness    _____

name          _____
                  print name of witness

address

**Signed** and **delivered**
as a **deed**                                         _____
by **Genco Auvergne Limited**                              signature
(as a Guarantor)
acting by                                            _____
                                                           print name

its duly authorised

in the presence of:

signature
of witness    _____

name          _____
                  print name of witness

address

**Signed** and **delivered**
as a **deed**
by **Genco Bourgogne Limited**
(as a Guarantor)
acting by

_____
signature

_____
print name

its duly authorised

in the presence of:

signature
of witness  _____

name        _____
print name of witness

address


**Signed** and **delivered**
as a **deed**
by **Genco Brittany Limited**
(as a Guarantor)
acting by

_____
signature

_____
print name

its duly authorised

in the presence of:

signature
of witness  _____

name        _____
print name of witness

address

**Signed** and **delivered**
as a **deed**
by **Genco Languedoc Limited**
(as a Guarantor)
acting by

its duly authorised

in the presence of:

signature
of witness    _____

name          _____
              print name of witness

address

_____
signature

_____
print name

**Signed** and **delivered**
as a **deed**
by **Genco Loire Limited**
(as a Guarantor)
acting by

its duly authorised

in the presence of:

signature
of witness    _____

name          _____
              print name of witness

address

_____
signature

_____
print name

**Signed** and **delivered**
as a **deed**                          _____
by **Genco Lorraine Limited**                    signature
 (as a Guarantor)
acting by                              _____
                                                 print name

its duly authorised

in the presence of:

signature
of witness    _____

name          _____
                   print name of witness

address


**Signed** and **delivered**
as a **deed**                          _____
by **Genco Normandy Limited**                    signature
(as a Guarantor)
acting by                              _____
                                                 print name

its duly authorised

in the presence of:

signature
of witness    _____

name          _____
                   print name of witness

address

**Signed** and **delivered**
as a **deed**                                    _____
by **Genco Picardy Limited**                     signature
(as a Guarantor)
acting by                                        _____
                                                 print name

its duly authorised

in the presence of:

signature
of witness    _____

name          _____
              print name of witness

address


**Signed** and **delivered**
as a **deed**                                    _____
by **Genco Provence Limited**                    signature
(as a Guarantor)
acting by                                        _____
                                                 print name

its duly authorised

in the presence of:

signature
of witness    _____

name          _____
              print name of witness

address

**Signed** and **delivered**
as a **deed**                                    _____
by **Genco Pyrenees Limited**                              signature
(as a Guarantor)
acting by                                        _____
                                                          print name

its duly authorised

in the presence of:

signature
of witness    _____

name          _____
                         print name of witness

address


**Signed** and **delivered**
as a **deed**                                    _____
by **Genco Rhone Limited**                                 signature
(as a Guarantor)
acting by                                        _____
                                                          print name

its duly authorised

in the presence of:

signature
of witness    _____

name          _____
                         print name of witness

address

**The Lenders**

| | |
|---|---|
| **Signed** and **delivered** | |
| as a **deed** | _____ |
| by **Deutsche Bank AG Filiale** | signature |
| **Deutschlandgeschäft** | |
| (as a Lender) | _____ |
| acting by | print name |
| | |
| its duly authorised | |
| | |
| in the presence of: | |

signature
of witness _____

name _____
print name of witness

address


| | |
|---|---|
| **Signed** and **delivered** | |
| as a **deed** | ------------------------------------------------------------- |
| by **BNP Paribas** | signature |
| (as a Lender) | |
| acting by | _____ |
| | print name |
| its duly authorised | |
| | |
| in the presence of: | |

signature
of witness _____

name _____
print name of witness

address

**Signed** and **delivered**
as a **deed**
by **Credit Agricole Corporate and
Investment Bank**
(as a Lender)
acting by

————————————————————————
signature

————————————————————————
print name

its duly authorised

in the presence of:

signature
of witness    ————————————————————

name    ————————————————————
print name of witness

address


**Signed** and **delivered**
as a **deed**
by **DVB Bank SE**
(as a Lender)
acting by

————————————————————————
signature

————————————————————————
print name

its duly authorised

in the presence of:

signature
of witness    ————————————————————

name    ————————————————————
print name of witness

address

**Signed** and **delivered**
as a **deed**
by **Skandinaviska Enskilda Banken AB (publ)**
(as a Lender)
acting by

_____
signature

_____
print name

its duly authorised

in the presence of:

signature
of witness   _____

name         _____
             print name of witness

address

## The Mandated Lead Arrangers

**Signed** and **delivered**
as a **deed**
by **Deutsche Bank AG Filiale Deutschlandgeschäft**
(as a Mandated Lead Arranger)
acting by

_____
signature

_____
print name

its duly authorised

in the presence of:

signature
of witness   _____

name         _____
             print name of witness

address

**Signed** and **delivered**
as a **deed**
by **BNP Paribas**
(as a Mandated Lead Arranger)
acting by

_____
signature

_____
print name

its duly authorised

in the presence of:

signature
of witness   _____

name   _____
print name of witness

address

**Signed** and **delivered**
as a **deed**
by **Credit Agricole Corporate and Investment Bank**
(as a Mandated Lead Arranger)
acting by

_____
signature

_____
print name

its duly authorised

in the presence of:

signature
of witness   _____

name   _____
print name of witness

address

**Signed** and **delivered**
as a **deed**
by **DVB Bank SE**
(as a Mandated Lead Arranger)
acting by

_____
signature

_____
print name

its duly authorised

in the presence of:

signature
of witness   _____

name   _____
print name of witness

address

**Signed** and **delivered**
as a **deed**
by **Skandinaviska Enskilda Banken AB (publ)**
(as a Mandated Lead Arranger)
acting by

_____
signature

_____
print name

its duly authorised

in the presence of:

signature
of witness   _____

name   _____
print name of witness

address

**The Swap Providers**

**Signed** and **delivered**
as a **deed**
by **BNP Paribas**                              _____
(as a Swap Provider)                                    signature
acting by
                                               _____
its duly authorised                                     print name

in the presence of:

signature
of witness    _____

name          _____
                      print name of witness

address

**Signed** and **delivered**
as a **deed**
by **Credit Agricole Corporate and**            _____
**Investment Bank**                                     signature
(as a Swap Provider)
acting by                                      _____
                                                        print name
its duly authorised

in the presence of:

signature
of witness    _____

name          _____
                      print name of witness

address

**Signed** and **delivered**
as a **deed**
by **DVB Bank SE**
(as a Swap Provider)
acting by

_____
signature

_____
print name

its duly authorised

in the presence of:

signature
of witness   _____

name           _____
                       print name of witness

address

**Signed** and **delivered**
as a **deed**
by **Skandinaviska Enskilda Banken AB (publ)**
(as a Swap Provider)
acting by

_____
signature

_____
print name

its duly authorised

in the presence of:

signature
of witness   _____

name           _____
                       print name of witness

address

**Signed** and **delivered**
as a **deed**
by **Deutsche Bank AG**                     _____
(as a Swap Provider)                                        signature
acting by

                                            _____
its duly authorised                                         print name

in the presence of:

signature
of witness    _____

name          _____
                    print name of witness

address


## The Agent

**Signed** and **delivered**
as a **deed**
by **Deutsche Bank Luxembourg S.A.**        _____
(as the Agent)                                              signature
acting by

                                            _____
its duly authorised                                         print name

in the presence of:

signature
of witness    _____

name          _____
                    print name of witness

address

**The Security Agent and Book Runner**

**Signed** and **delivered**
as a **deed**
by **Deutsche Bank AG Filiale Deutschlandgeschäft**
(as the Security Agent and Bookrunner)
acting by

_____

signature

_____

print name

its duly authorised

in the presence of:

signature
of witness    _____

name    _____
print name of witness

address

## EXHIBIT B

**$253,000,000 SECURED LOAN AGREEMENT DATED 20 AUGUST 2010 AS SUPPLEMENTED BY A SIDE LETTER DATED 24 AUGUST 2010 AS FURTHER SUPPLEMENTED BY A LETTER DATED 21 DECEMBER 2011, AS FURTHER AMENDED AND RESTATED BY A SECOND SUPPLEMENTAL AGREEMENT DATED 1 AUGUST 2012 AND AS AMENDED AND RESTATED BY A THIRD SUPPLEMENTAL AGREEMENT**

**$253,000,000 Secured Loan Agreement dated 20 August 2010 as supplemented by a side letter dated 24 August 2010 as further supplemented by a letter dated 21 December 2011, as further amended and restated by a second supplemental agreement dated 1 August 2012 and as amended and restated by a third supplemental agreement dated _____ 2014**

**Genco Shipping & Trading Limited**
**(as Borrower)**

**- and -**

**BNP Paribas**
**Credit Agricole Corporate and Investment Bank**
**DVB Bank SE**
**Deutsche Bank AG Filiale Deutschlandgeschäft**
**Skandinaviska Enskilda Banken AB (publ)**
**(as Lenders)**

**- and -**

**Deutsche Bank Luxembourg S.A.**
**(as Agent)**

**- and -**

**BNP Paribas**
**Credit Agricole Corporate and Investment Bank**
**DVB Bank SE**
**Deutsche Bank AG Filiale Deutschlandgeschäft**
**Skandinaviska Enskilda Banken AB (Publ)**
**(as Mandated Lead Arrangers)**

**- and -**

**BNP Paribas**
**Credit Agricole Corporate and Investment Bank**
**DVB Bank SE**
**Deutsche Bank AG**
**Skandinaviska Enskilda Banken AB (publ)**
**(as Swap Providers)**

**- and –**

**Deutsche Bank AG Filiale Deutschlandgeschäft**
**(as Security Agent and Bookrunner)**

Stephenson Harwood Middle East LLP
Office 04, Level 12, Al Fattan Currency House
Dubai International Financial Centre
P.O. Box 482017, Dubai, UAE
Tel +971 4 386 2105
Fax +971 4 327 6714
www.shlegal.com



**STEPHENSON HARWOOD**

**Contents**

                                                                                                    Page

1          Definitions and Interpretation......................................................................... 4

2          The Loan and its Purpose.............................................................................. 24

3          Conditions of Utilisation................................................................................ 25

4          Advance ........................................................................................................ 26

5          Repayment .................................................................................................... 26

6          Prepayment ................................................................................................... 28

7          Interest .......................................................................................................... 30

8          Indemnities.................................................................................................... 33

9          Fees............................................................................................................... 36

10         Security and Application of Moneys .............................................................. 36

11         Representations............................................................................................. 39

12         Undertakings and Covenants........................................................................ 42

13         Events of Default ........................................................................................... 62

14         Assignment and Sub-Participation................................................................ 66

15         The Agent, the Security Agent and the Lenders ........................................... 67

16         Set-Off ........................................................................................................... 74

17         Payments ...................................................................................................... 75

18         Notices........................................................................................................... 76

19         Partial Invalidity ............................................................................................. 78

20         Remedies and Waivers ................................................................................. 78

21         Miscellaneous................................................................................................ 78

22         Law and Jurisdiction...................................................................................... 79

Schedule 1    : The Lenders and the Commitments.......................................................... 80
              The Lenders - The Commitments............................................................... 80

Schedule 2    : Conditions Precedent and Subsequent..................................................... 82
              Part I: Conditions precedent to a Drawdown Notice.................................. 82

Schedule 3    : Calculation of Mandatory Cost.................................................................. 88

Schedule 4    : Form of Drawdown Notice......................................................................... 90

Schedule 5     : Form of Transfer Certificate ............................................................... 91

Schedule 6     : Form of Compliance Certificate.......................................................... 94

**Loan Agreement**

**Dated 20 August 2010 as supplemented by a side letter dated 24 August 2010 as further supplemented by a letter dated 21 December 2011 as amended and restated by a second supplemental agreement dated 1 August 2012 and as amended and restated by a third supplemental agreement dated _____ 2014**

**between:**

(1)     **Genco Shipping & Trading Limited**, a corporation incorporated under the laws of the Marshall Islands whose principal place of business is at 299 Park Avenue, 12th Floor, New York, New York 10171 (the "**Borrower**"); and

(2)     the banks listed in Schedule 1 (*The Lenders and the Commitments*), each acting through its office at the address *indicated against its name* in Schedule 1 (*The Lenders and the Commitments*) (together, the "**Lenders**" and each a "**Lender**");

(3)     **Deutsche Bank Luxembourg S.A.**, acting as agent through its office at 2, Bvd Konrad Adenauer, L-1115 Luxembourg (in that capacity the "**Agent**");

(4)     **Deutsche Bank AG Filiale Deutschlandgeschäft**, Frankfurt am Main, Germany acting as mandated lead arranger through its office at Adolphsplatz 7, 20457 Hamburg, Germany, **BNP Paribas** acting as mandated lead arranger through its office at 16 rue du Hanovre, 75002 Paris, France, **Credit Agricole Corporate and Investment Bank** acting as mandated lead arranger through its office at 9, quai du President Paul Doumer, 92920 Paris la Defense, France, **DVB Bank SE**, acting as mandated lead arranger through its office at Platz der Republik 6, D-60325 Frankfurt am Main, Germany, and **Skandinaviska Enskilda Banken AB (publ)** acting as mandated lead arranger through its office at Kungsträdgårdsgatan 8, 106 40 Stockholm, Sweden (in that capacity the "**Mandated Lead Arrangers**");

(5)     **Deutsche Bank AG** acting as swap provider through its office at Theodor-Heuss-Alle 70, 60486 Frankfurt am Main, Germany, **BNP Paribas** acting as swap provider through its office at 10 Harewood Road, London NW1 6AA, England, **Credit Agricole Corporate and Investment Bank** acting as swap provider through its office at 9, quai du President Paul Doumer, 92920 Paris la Defense, France, **DVB BANK SE**, acting as swap provider through its office at Platz der Republik 6, D-60325 Frankfurt am Main, Germany, and **Skandinaviska Enskilda Banken AB (publ)** acting as swap provider through its office at Kungsträdgårdsgatan 8, 106 40 Stockholm , Sweden (in that capacity, the "**Swap Providers**" and each a "**Swap Provider**"); and

(6)     **Deutsche Bank AG Filiale Deutschlandgeschäft**, Frankfurt am Main, Germany, acting as security agent and bookrunner through its office at Adolphsplatz 7, 20457 Hamburg, Germany (in these capacities the "**Security Agent**" and the "**Bookrunner**").

**Whereas:**

(A)     Each Collateral Owner is a Wholly-Owned Subsidiary of the Borrower and has purchased or agreed to purchase the relevant Vessel from the relevant Seller on the terms of the relevant MOA and has registered or intends to register that Vessel under the relevant flag specified below in the definition of "Vessels".

(B)     Each of the Lenders has agreed to provide post-delivery finance and to advance to the Borrower its Commitment (aggregating, with all the other Commitments, up to $253,000,000) on the terms and conditions set out in this Agreement which the Borrower will use to subscribe for shares in each Collateral Owner thereby providing funding to the Collateral Owners to assist the Collateral Owners to finance or refinance (as the case may be) part of the aggregate Purchase Price of the Vessels.

**It Is Agreed** as follows:

**1     Definitions and Interpretation**

1.1     In this Agreement:

"**Account Holder**" means Deutsche Bank Trust Company Americas or any other bank or financial institution which at any time, with the Agent's prior written consent, holds the Accounts.

"**Accounts**" means the Earnings Accounts and the Master Account.

"**Account Pledges**" means each account pledge referred to in Clause 10.1.4 (*Security Documents*).

"**Additional Facility**" means a credit agreement, note purchase agreement, indenture, promissory note, letter agreement or similar agreement for borrowed money with other lenders or creditors of the Borrower (other than trade creditors) entered into by the Borrower; provided, however, that an Additional Facility shall not include an Amended Facility or any letters of credit, guarantees or similar debt instruments which are cash-collateralised.

"**Administration**" has the meaning given to it in paragraph 1.1.3 of the ISM Code.

"**Amended Facility**" means an amendment, modification, supplement or side letter entered into by the Borrower to a credit agreement, note purchase agreement, indenture, promissory note, letter agreement or similar agreement for borrowed money, in each case, which is in existence on the Effective Date, with other lenders or creditors of the Borrower (other than trade creditors).

"**Annex VI**" means Annex VI (Regulations for the Prevention of Air Pollution from Ships) to the International Convention for the Prevention of Pollution from Ships 1973 (as modified in 1978 and 1997).

"**Approved Broker**" means Clarksons, R.S. Platou Shipbrokers AS, Fearnleys AS, Simpson Spence & Young and Maersk Broker K.S. or any other experienced sale and purchase shipbroker mutually agreed upon by the Borrower and the Security Agent from time to time.

"**Approved Classification Society**" means any of American Bureau of Shipping, Nippon Kaiji Kyokai, Germanischer Lloyd, Lloyd's Register of Shipping, Bureau Veritas

and Den Norske Veritas or such other classification society as may be acceptable to the Security Agent.

"**Assignments**" means the deeds of assignment referred to in Clause 10.1.2 (*Security Documents*).

"**Availability Termination Date**" means 31 May 2011 or such later date, as the Lenders may in their discretion agree.

"**Available Cash**" means, for any period, Consolidated Net Income for such period plus Consolidated Interest Expense for such period plus, without duplication, the amortization of deferred finance charges and restricted stock expenses and Non-Cash Charges for such period and the amount of all depreciation and amortization deducted in determining Consolidated Net Income for such period.

"**Average Consolidated Net Indebtedness**" means, on any date of determination, the average of the Consolidated Net Indebtedness on the last Business Day of each calendar month during the most recently ended Test Period and on such date of determination, provided that for all purposes of this definition, Baltic Trading Limited and its Subsidiaries shall be excluded as long as the Borrower does not own more than 50% of the economic interests in Baltic Trading Limited.

"**Break Costs**" means all sums payable by the Borrower from time to time under Clause 8.3 (*Break Costs*).

"**Builder**" means Yangzhou Dayang Shipbuilding Co., Ltd, a corporation organised and existing under the laws of the People's Republic of China with registered office at Wantou Town, Yangzhou City, Jiangsu Province, 225006, the Peoples' Republic of China.

"**Building Contract**" means the contract on the terms and subject to the conditions of which the Builder has agreed to construct Vessel M for, and deliver Vessel M to, Turner Shipping Inc.

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in New York, London, Hamburg, Luxembourg, Frankfurt Stockholm, Piraeus and Paris.

"**Capitalized Lease Obligations**" of any Person means all rental obligations which, under generally accepted accounting principles, are or will be required to be capitalized on the books of such Person, in each case taken at the amount thereof accounted for as indebtedness in accordance with such principles.

"**Cash Equivalents**" means (i) securities issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof (provided that the full faith and credit of the United States of America is pledged in support thereof) having maturities of not more than one year from the date of acquisition, (ii) time deposits and certificates of deposit of any commercial bank having, or which is the principal banking subsidiary of a bank holding company having capital, surplus and undivided profits aggregating in excess of $200,000,000, with maturities of not more than one year from the date of acquisition by such Person, (iii) repurchase obligations with a term of not more than 90 days for

Page 4

underlying securities of the types described in clause (i) above entered into with any bank meeting the qualifications specified in clause (ii) above, (iv) commercial paper issued by any Person incorporated in the United States of America rated at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's and in each case maturing not more than one year after the date of acquisition by such Person, and (v) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (iv) above.

"**Change of Control**" means (a) the Borrower shall at any time and for any reason fail to own, directly or indirectly, 100% of the capital stock or other equity interests of each Collateral Owner, (b) the sale, lease or transfer of all or substantially all of the Borrower's assets to any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act of the United States of America), (c) any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), other than one or more of the Permitted Holders, shall at any time become the owner, directly or indirectly, beneficially or of record, of shares representing more than 30% of the outstanding voting or economic equity interests of the Borrower, (d) except for the appointment of directors of the Borrower on or around the Effective Date, the replacement of a majority of the directors on the board of directors of the Borrower over a two-year period from the directors who constituted the board of directors of the Borrower at the beginning of such period, and such replacement shall not have been approved by a vote of at least a majority of the board of directors of the Borrower then still in office who either were members of such board of directors at the beginning of such period or whose election as a member of such Board of Directors was previously so approved, or (e) a "change of control" or similar event of the Borrower shall occur as provided in the documentation governing any outstanding Financial Indebtedness of the Borrower or any of its Subsidiaries other than Baltic Trading Limited and its Subsidiaries.

"**Chapter 11 Proceedings**" means the bankruptcy cases commenced by the Borrower and fifty-seven (57) of its Subsidiaries (including the Collateral Owners) on 21 April 2014 in the United States Bankruptcy Court for the Southern District of New York, jointly administered as Chapter 11 case no. 14-11108-shl.

"**Collateral Owners**" means Genco Lorraine Limited, Genco Pyrenees Limited, Genco Loire Limited, Genco Bourgogne Limited, Genco Picardy Limited, Genco Aquitaine Limited, Genco Normandy Limited, Genco Auvergne Limited, Genco Provence Limited, Genco Ardennes Limited, Genco Brittany Limited, Genco Languedoc Limited and Genco Rhone Limited each a company incorporated under the laws of the Marshall Islands whose registered office is at Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Islands MH96960 and the owner of any Replacement Vessel and "**Collateral Owner**" means any one of them.

"**Commercial Managers**" means Genco Ship Management LLC, Genco Management (USA) LLC of 299 Park Avenue, 12th Floor, New York, NY 10171, United States of America, or any Subsidiary of the Borrower as the Agent may reasonably approve, or such other commercial managers of the Vessels nominated by the Borrower as the Agent may reasonably approve.

"**Commitment**" means, in relation to a Lender, the amount of the Loan which that Lender agrees to advance to the Borrower as its several liability as indicated against the name of that Lender in Schedule 1 (: The Lenders and the Commitments) and/or, where the context permits, the amount of the Loan advanced by that Lender and remaining outstanding and "**Commitments**" means more than one of them.

"**Compliance Certificate**" means a certificate substantially in the form set out in Schedule 6 (: Form of Compliance Certificate).

"**Consolidated EBIT**" means, for any period, the Consolidated Net Income for such period, before interest expense and provision for taxes based on income and without giving effect to any extraordinary gains or losses or gains or losses from sales of assets other than inventory sold in the ordinary course of business.

"**Consolidated EBITDA**" means, for any period, Consolidated EBIT, adjusted by adding thereto the amount of (i) all amortization of intangibles and depreciation, (ii) non-cash management incentive compensation, (iii) the amortization of fees and expenses paid in connection with a Transaction, and (iv) any Non-Cash Charges in each case that were deducted in arriving at Consolidated EBITDA for such period and (v) cash restructuring charges in connection with the Cases and the Plan of Reorganisations (as each such term is defined in the Third Supplemental Agreement), provided that such cash restructuring charges have been incurred during the period from the start of the Chapter 11 Proceedings and the date falling 6 months after the date of the Confirmation Order (as such term is defined in the Third Supplemental Agreement), provided that for all purposes of this definition, Baltic Trading Limited and its Subsidiaries shall be excluded as long as the Borrower does not own more than 50% of the economic interests in Baltic Trading Limited.

"**Consolidated Indebtedness**" means, as at any date of determination, the aggregate stated balance sheet amount of all Financial Indebtedness (including in any event the then outstanding principal amount of the Loan, all Capitalized Lease Obligations and all letters of credit outstanding but excluding Financial Indebtedness of a type described in clause (vii) of the definition thereof) of the Borrower and its Subsidiaries on a consolidated basis as determined in accordance with GAAP; provided that (i) Financial Indebtedness outstanding pursuant to trade payables and accrued expenses incurred in the ordinary course of business, (ii) guarantees of operating leases assigned to any of the Borrower or any Wholly-Owned Subsidiary of the Borrower to the extent such lease is not prohibited hereunder and such obligation does not exceed that which would otherwise be attributed to such Person under such operating lease and (iii) any letters of credit, guarantees or any similar debt instruments which are cash-collateralised, shall be excluded in determining Consolidated Indebtedness, provided that for all purposes of this definition, Baltic Trading Limited and its Subsidiaries shall be excluded as long as the Borrower does not own more than 50% of the economic interests in Baltic Trading Limited.

"**Consolidated Interest Coverage Ratio**" means, for any period, the ratio of (i) Consolidated EBITDA for such period to (ii) Consolidated Interest Expense for such period, provided that for all purposes of this definition, Baltic Trading Limited and its Subsidiaries shall be excluded as long as the Borrower does not own more than 50% of the economic interests in Baltic Trading Limited.

"**Consolidated Interest Expense**" means, for any period, (i) the total consolidated interest expense of the Borrower and its Subsidiaries for such period (calculated without regard to any limitations on the payment thereof) plus, without duplication, that portion of Capitalized Lease Obligations of the Borrower and its Subsidiaries representing the interest factor for such period, minus (ii) cash interest income of the Borrower and its Subsidiaries for such period and the amortization of any deferred financing costs and Non-Cash Charges incurred in connection with the Transaction to the extent otherwise included in the calculations thereof, provided that for all purposes of this definition, Baltic Trading Limited and its Subsidiaries shall be excluded as long as the Borrower does not own more than 50% of the economic interests in Baltic Trading Limited.

"**Consolidated Net Income**" means, for any period, the consolidated net after tax income of the Borrower and its Subsidiaries for such period determined in accordance with GAAP; provided that solely for any calculation of the "Consolidated EBIT", the "Consolidated Net Income" component of "Available Cash" shall not include any gains or losses arising from any Interest Rate Protection Agreement and Other Hedging Agreements, provided that for all purposes of this definition, Baltic Trading Limited and its Subsidiaries shall be excluded as long as the Borrower does not own more than 50% of the economic interests in Baltic Trading Limited.

"**Consolidated Net Indebtedness**" means, as at any date of determination, the remainder of (i) the Consolidated Indebtedness on such date minus (ii) the aggregate amount of Unrestricted cash and Cash Equivalents of the Borrower and its Subsidiaries on such date.

"**Consolidated Net Worth**" means the Net Worth of the Borrower and its Subsidiaries determined on a consolidated basis in accordance with GAAP, provided that for all purposes of this definition, Baltic Trading Limited and its Subsidiaries shall be excluded as long as the Borrower does not own more than 50% of the economic interests in Baltic Trading Limited.

"**Contingent Obligation**" means, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Financial Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefore, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business and any products warranties extended in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made (or, if the less, the maximum amount of such primary obligation

for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"**Credit Support Document**" means any document described as such in the Master Agreement and, where the context permits, any other document referred to in any Credit Support Document which has the effect of creating an Encumbrance in favour of any of the Finance Parties.

"**Credit Support Provider**" means any person (other than the Borrower) described as such in the Master Agreement.

"**Currency of Account**" means, in relation to any payment to be made to a Finance Party under a Finance Document, the currency in which that payment is required to be made by the terms of that Finance Document.

"**Default**" means an Event of Default or any event or circumstance specified in Clause 13.1 (*Events of Default*) which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default.

"**Delivery Date**" means the date of actual delivery of a Vessel to the relevant Collateral Owner by the relevant Seller under the relevant MOA.

"**Deposit Account Control Agreements**" means the deposit account control agreements referred to in Clause 10.1.6 (*Security Documents*).

"**Dividend**", with respect to any Person, means that such Person has declared or paid a dividend or returned any equity capital to its stockholders, partners or members or made any other distribution, payment or delivery of property (other than common stock or the right to purchase any of such stock of such Person) or cash to its stockholders, partners or members as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for a consideration any shares of any class of its capital stock or partnership or membership interests outstanding on or after the date of this Agreement (or any options or warrants issued by such Person with respect to its capital stock or other equity interests), or set aside any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries (other than Baltic Trading Limited and its Subsidiaries) to purchase or otherwise acquire for a consideration any shares of any class of the capital stock of, or equity interests in, such Person outstanding on or after the date of this Agreement (or any options or warrants issued by such Person with respect to its capital stock or other equity interests). Without limiting the foregoing, "Dividends" with respect to any Person shall also include all dividend payments made or required to be made by such Person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"**DOC**" means, in relation to the ISM Company, a valid Document of Compliance issued for the ISM Company by the Administration under paragraph 13.2 of the ISM Code.

"**Dollars**" and "**$**" each means available and freely transferable and convertible funds in lawful currency of the United States of America.

"**Drawdown Date**" means the date on which the relevant Drawing is advanced under Clause 4 (*Advance*).

"**Drawdown Notice**" means a notice substantially in the form set out in Schedule 4 (: Form of Drawdown Notice).

"**Drawing**" means any part of a Tranche advanced or to be advanced pursuant to a Drawdown Notice and "**Drawings**" means more than one of them.

"**Earnings**" means all hires, freights, pool income and other sums payable to or for the account of a Collateral Owner in respect of a Vessel including (without limitation) all remuneration for salvage and towage services, demurrage and detention moneys, contributions in general average, compensation in respect of any requisition for hire, and damages and other payments (whether awarded by any court or arbitral tribunal or by agreement or otherwise) for breach, termination or variation of any contract for the operation, employment or use of a Vessel.

"**Earnings Accounts**" means each bank account opened or to be opened in the name of the relevant Collateral Owner with the Account Holder and designated "[*relevant Vessel's name*] - Earnings Account" (and each, an "**Earnings Account**").

"**Effective Date**" has the meaning given to it in the Third Supplemental Agreement.

"**Encumbrance**" means a mortgage, charge, assignment, pledge, lien, or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Event of Default**" means any of the events or circumstances set out in Clause 13.1 (*Events of Default*).

"**Facility Period**" means the period beginning on the date of this Agreement and ending on the date when the whole of the Indebtedness has been paid in full and the Security Parties have ceased to be under any further actual or contingent liability to the Finance Parties under or in connection with the Finance Documents.

"**Fair Market Value**" means the market value of a Vessel to be conclusively determined by the arithmetic average of the valuations provided by two Approved Brokers appointed by the Borrower at the Borrower's cost (on the basis of a charter-free sale for prompt delivery for cash at arm's length on normal commercial terms as between a willing seller and a willing buyer).

"**Fee Letter**" means any letter or letters dated on or about the date of this Agreement between the Agent, the Security Agent, the Lenders and the Borrower setting out any of the fees referred to in Clause 9 (Fees).

"**Final Maturity Date**" means 31 August 2019.

"**Finance Documents**" means this Agreement, the Master Agreement, the Security Documents, any Fee Letter and any other document designated as such by the Agent and the Borrower and "**Finance Document**" means any one of them.

"**Finance Parties**" means the Agent, the Mandated Lead Arrangers, the Security Agent, the Bookrunner, the Swap Providers and the Lenders and "**Finance Party**" means any one of them.

"**Financial Indebtedness**" means, as to any Person, without duplication, (i) all indebtedness (including principal, interest, fees and charges) of such Person for borrowed money and debit balances at banks and other financial institutions or for the deferred purchase price of property or services, (ii) the maximum amount available to be drawn under all letters of credit issued for the account of such Person and all unpaid drawings in respect of such letters of credit, (iii) all Financial Indebtedness of the types described in clause (i), (ii), (iv), (v), (vi) or (vii) of this definition secured by any Encumbrance on any property owned by such Person, whether or not such Financial Indebtedness has been assumed by such Person (to the extent of the value of the respective property), (iv) the aggregate amount required to be capitalized under leases under which such Person is the lessee, (v) all obligations of such person to pay a specified purchase price for goods or services, whether or not delivered or accepted, i.e., take-or-pay and similar obligations, (vi) all Contingent Obligations of such Person, (vii) all obligations under any Interest Rate Protection Agreement or Other Hedging Agreement or under any similar type of agreement, provided that Financial Indebtedness shall in any event not include trade payables and expenses accrued in the ordinary course of business.

"**GAAP**" means generally accepted accounting principles in the United States of America.

"**Genco Facilities**" means the Metrostar Loan Agreement and this Agreement.

"**Guarantees**" means the guarantees and indemnities referred to in Clause 10.1.3 (*Security Documents*).

"**Guarantors**" means each Collateral Owner and/or (where the context permits) any other person who shall at any time during the Facility Period give to the Lenders or to the Security Agent a guarantee and/or indemnity or similar instrument or security for the repayment of all or part of the Indebtedness and "**Guarantor**" means any one of them.

"**IAPPC**" means a valid international air pollution prevention certificate for a Vessel issued under Annex VI.

"**Indebtedness**" means the aggregate from time to time of: the amount of the Loan outstanding; all accrued and unpaid interest on the Loan; and all other sums of any nature (together with all accrued and unpaid interest on any of those sums) payable to any of the Finance Parties under all or any of the Finance Documents.

"**Insolvency Law**" means the law relating to any proceeding of the type referred to in Clause 13.1.6 (*Insolvency proceedings*) or Title 11, U.S. Code, or any similar foreign, federal or state law for the relief of debtors.

"**Insurances**" means all policies and contracts of insurance (including all entries in protection and indemnity or war risks associations) which are from time to time taken out or entered into in respect of or in connection with a Vessel or her increased

value or her Earnings and (where the context permits) all benefits under such contracts and policies, including all claims of any nature and returns of premium.

"**Interest Payment Date**" means each date for the payment of interest in accordance with Clause 7.8 (*Accrual and payment of interest*).

"**Interest Period**" means each period for the determination and payment of interest selected by the Borrower or agreed or selected by the Agent pursuant to Clause 7 (*Interest*).

"**Interest Rate Protection Agreement**" means any interest rate swap agreement, interest rate cap agreement, interest collar agreement, interest rate hedging agreement, interest rate floor agreement or other similar agreement or arrangement.

"**Interpolated Screen Rate**" means, in relation to LIBOR, the rate which results from interpolating on a linear basis between:

(a)     the applicable Screen Rate for the longest period (for which that Screen Rate is available) which is less than the Interest Period;  and

(b)     the applicable Screen Rate for the shortest period (for which that Screen Rate is available) which exceeds the Interest Period,

each as at 11.00 a.m. (London time) on the Quotation Day.

"**ISM Code**" means the International Safety Management Code for the Safe Operation of Ships and for Pollution Prevention.

"**ISM Company**" means, at any given time, the company responsible for a Vessel's compliance with the ISM Code under paragraph 1.1.2 of the ISM Code.

"**ISPS Code**" means the International Ship and Port Facility Security Code.

"**ISPS Company**" means, at any given time, the company responsible for a Vessel's compliance with the ISPS Code.

"**ISSC**" means a valid international ship security certificate for a Vessel issued under the ISPS Code.

"**Jinhui**" means Jinhui Shipping and Transportation Limited a company limited by shares formed under the laws of Bermuda and whose capital stock is listed on the Oslo Stock Exchange.

"**Leverage Ratio**" means, at any date of determination, the ratio of Average Consolidated Net Indebtedness on such date of determination to Consolidated EBITDA for the most recently ended Test Period, .

"**LIBOR**" means:

(a)     the applicable Screen Rate; or

(b)     (if no Screen Rate is available for the Interest Period) the Interpolated Screen Rate;

(c)        (if no Screen Rate is available for any Interest Period) the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Agent at its request quoted by the Reference Banks (or by two of them if one is unable to quote) to leading banks in the London interbank market,

at 11.00 a.m. (London time) two (2) Business Days before the first day of the relevant Interest Period for the offering of deposits in Dollars in an amount comparable to the Loan (or any relevant part of the Loan) and for a period comparable to the relevant Interest Period and, if any such rate is below zero, LIBOR will be deemed to be zero.

"**Loan**" means the aggregate amount advanced or to be advanced by the Lenders to the Borrower under Clause 4 (*Advance*) or, where the context permits, the amount advanced and for the time being outstanding.

"**Majority Lenders**" means a Lender or Lenders whose Commitments aggregate equal to or more than sixty six point seven per cent (66.7%) of the aggregate of all the Commitments.

"**Management Agreements**" means the agreements for the commercial and/or technical management of the Vessels between the Collateral Owners respectively and the relevant Manager and "**Management Agreement**" means any one of them.

"**Managers**" means the Commercial Managers and the Technical Managers.

"**Mandatory Cost**" means the percentage rate per annum calculated by the Agent in accordance with Schedule 3 (*Calculation of Mandatory Cost*).

"**Margin**" means three point five per cent (3.5%) per annum.

"**Master Account**" means the bank account opened or to be opened in the joint names of the Collateral Owners with the Account Holder and designated [*Master Account*].

"**Master Agreement**" means any ISDA Master Agreement (or any other form of master agreement relating to interest or currency exchange transactions) entered into between a Swap Provider and the Borrower during the Facility Period, including each Schedule to any Master Agreement and each Confirmation exchanged pursuant to any Master Agreement.

"**Master Agreement Benefits**" means all benefits whatsoever of the Borrower under or in connection with the Master Agreement including, without limitation, all moneys payable to the Borrower under the Master Agreement and all claims for damages in respect of any breach by any Swap Provider of the Master Agreement.

"**Master Agreement Charge**" means the deed of charge referred to in Clause 10.1.7 (*Security Documents*).

"**Master Agreement Transaction**" means a transaction entered into between a Swap Provider and the Borrower governed by the Master Agreement.

"**Master Sale Agreement**" means the agreement dated 24 June 2010 made between Bourbon SA, the Borrower and the Sellers in respect of the sale of, inter alia, the Vessels to the Borrower of the Collateral Owners as its nominees.

"**Maximum Loan Amount**" means the aggregate of the Maximum Sums.

"**Maximum Sum**" means the following amounts (subject to any adjustment in accordance with Clause 3.4 *(Adjustment of Maximum Sum)*) in relation to each Vessel:

| Vessel | Amount |
| --- | --- |
| Vessel A | $20,000,000 |
| Vessel B | $21,500,000 |
| Vessel C | $20,000,000 |
| Vessel D | $21,500,000 |
| Vessel E | $15,000,000 |
| Vessel F | $20,000,000 |
| Vessel G | $16,500,000 |
| Vessel H | $20,000,000 |
| Vessel I | $14,000,000 |
| Vessel J | $20,000,000 |
| Vessel K | $21,500,000 |
| Vessel L | $21,500,000 |
| Vessel M | $21,500,000 |

"**Metrostar Loan Agreement**" means the loan agreement (as amended, supplemented or novated from time to time) dated 12 August 2010 and entered into between the Borrower, the banks and financial institutions listed in schedule 1 thereto as lenders, the companies listed in schedule 2 thereto as guarantors and Crédit Agricole Corporate and Investment Bank as agent and security trustee.

"**Minimum Consolidated Net Worth**" means seventy five per cent (75%) of the Post-Reorganization Equity Value of the Borrower plus fifty per cent (50%) of the net proceeds received as a result of any new equity issues by the Borrower after the Effective Date, provided that for all purposes of this definition, Baltic Trading Limited and its Subsidiaries shall be excluded as long as the Borrower does not own more than 50% of the economic interests in Baltic Trading Limited.

"**MOA**" means a memorandum of agreement made between the relevant Seller and the Borrower (or the relevant Collateral Owner as nominee) dated 24 June 2010 and

the Master Sale Agreement on the terms and subject to the conditions of which the relevant Seller will sell the relevant Vessel to the relevant Collateral Owner for the purchase price specified in the definition of "Vessels" below and "**MOAs**" means more than one of them.

"**Moody's**" means Moody's Investors Service, Inc. and its successors.

"**Mortgagee's Insurances**" means all policies and contracts of mortgagees interest insurance, mortgagees interest insurance additional perils (pollution) insurance and any other insurance from time to time taken out by the Security Agent in relation to a Vessel.

"**Mortgages**" means the preferred mortgages referred to in Clause 10.1.1 (*Security Documents*) and "**Mortgage**" means any one of them.

"**Net Worth**" means, as to any Person, the sum of its capital stock, capital in excess of par or stated value of shares of its capital stock, retained earnings and any other account which, in accordance with GAAP, constitutes stockholders' equity, but excluding any treasury stock.

"**Non-Cash Charges**" means the unamortized charges incurred by the Borrower associated with all Genco Facilities that are charged to expense due to the refinancing of the Genco Facilities and any non-cash loss related to the Borrower's minority investment in Jinhui.

"**Obligatory Insurances**" means the insurances and entries referred to in Clause 12.4.1 and, where applicable, those referred to in Clauses 12.4.2, 12.4.5 and/or 12.5.16.

"**Original Financial Statements**" means the audited consolidated financial statements of the Borrower for the financial year ended 31 December 2009.

"**Other Hedging Agreement**" means any foreign exchange contracts, currency swap agreements (including the Master Agreement), commodity agreements, forward freight agreements or other similar agreements or arrangements designed to protect against the fluctuations in currency or commodity values.

"**Permitted Encumbrance**" means:

>   (a)   Encumbrances created by the Security Documents;
>
>   (b)   liens for unpaid master's and crew's wages incurred in accordance with usual maritime practice;
>
>   (c)   liens for salvage;
>
>   (d)   liens arising by operation of law for not more than two (2) months' prepaid hire under any charter in relation to a Vessel not prohibited by this Agreement;
>
>   (e)   liens for master's disbursements incurred in the ordinary course of trading and any other lien arising by operation of law or otherwise in the ordinary course of the operation, repair or maintenance of a Vessel, provided such liens do not secure amounts more than thirty

(30) days overdue (unless the overdue amount is being contested by the Borrower or relevant Collateral Owner in good faith by appropriate steps) and subject, in the case of liens for repair or maintenance, to Clause 12.5.25;

(f)     any Encumbrance created in favour of a plaintiff or defendant in any proceedings or arbitration as security for costs and expenses where the Borrower or relevant Collateral Owner is actively prosecuting or defending such proceedings or arbitration in good faith; and

(g)     Encumbrances arising by operation of law in respect of taxes which are not overdue for payment or in respect of taxes being contested in good faith by appropriate steps and in respect of which appropriate reserves have been made,

up to, in case of each of the Vessels, one million Dollars ($1,000,000), and with the aggregate amount in respect of all Vessels at any time not exceeding seven million five hundred thousand Dollars ($7,500,000) excluding amounts secured by the Security Documents.

"**Permitted Holders**" means Peter Georgiopoulos (including his immediate family members and trusts for his benefit and/or for the benefit of his immediate family members), any corporation or other entity directly or indirectly controlled by Peter Georgiopoulos and any other Persons approved by the Lenders.

"**Person**" means any individual, partnership, joint venture, firm, corporation, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"**Pledgor**" means the Borrower.

"**Post-Delivery Warranties**" means all warranties and guarantees relating to Vessel M granted by the Builder to Turner Shipping Inc. pursuant to the Building Contract and assigned by Turner Shipping Inc. to the relevant Collateral Owner pursuant to a deed of assignment to be entered into pursuant to the relevant MOA together with all rights to (i) require, enforce and compel performance of such warranties and guarantees by the Builder, (ii) exercise all claims, rights and remedies under, in connection with or arising under any such warranties and guarantees and (iii) give and receive notices, reports, requests and consents, make demand and take all other action in connection with, arising from or in relation to such warranties and guarantees.

"**Post-Reorganization Equity Value**" means the post confirmation equity value of the Borrower as reflected on the Borrower's first financial statements delivered after the Effective Date.

"**Proportionate Share**" means, at any time, the proportion which a Lender's Commitment (whether or not advanced) then bears to the aggregate Commitments of all the Lenders (whether or not advanced).

"**Purchase Price**" means, in respect of each Vessel, the purchase price specified in the definition of "Vessels" below to be paid by the relevant Collateral Owner to the relevant Seller for the relevant Vessel under the relevant MOA.

"**Quotation Day**" means, in relation to any period for which an interest rate is to be determined two Business Days before the first day of that period, unless market practice differs in the London interbank market for Dollars, in which case the Quotation Day for Dollars will be determined by the Agent in accordance with market practice in the London interbank market (and if quotations would normally be given by leading banks in the London interbank market on more than one day, the Quotation Day will be the last of those days).

"**Reference Banks**" means, in relation to LIBOR, the principal London offices of Deutsche Bank AG, DVB Bank SE, Skandinaviska Enskilda Banken AP (publ) and Crédit Agricole Corporate and Investment Bank, or such other banks as may be appointed by the Agent in consultation with the Borrower.

"**Relevant Documents**" means the Finance Documents, the MOAs, the Time Charters, the Management Agreements, the Managers' confirmation specified in Part I of Schedule 2 : Conditions Precedent and Subsequent), the Account Holder's confirmation specified in Part I of Schedule 2 (: Conditions Precedent and Subsequent) and any other time charter entered into in connection with the Vessels.

"**Repayment Date**" means the date for payment of any Repayment Instalment in accordance with Clause 5.1 (*Repayment of Tranches*).

"**Repayment Instalment**" means any instalment of the Loan to be repaid by the Borrower under Clause 5.1 *(Repayment of Tranches)*.

"**Replacement Vessel**" means, a vessel which replaces a Vessel that becomes a Total Loss and:

(i)     is a supramax bulker (a) of at least the same value as the Vessel to be replaced, (b) of the same age or younger than the Vessel to be replaced and (c) with specifications substantially identical to the Vessel to be replaced, acceptable to the Lenders;

(ii)    is registered or to be registered on a flag acceptable to the Lenders; and

(iii)   has a class acceptable to the Lenders with a classification society acceptable to the Lenders.

"**Requisition Compensation**" means all compensation or other money which may from time to time be payable to a Collateral Owner as a result of a Vessel being requisitioned for title or in any other way compulsorily acquired (other than by way of requisition for hire).

"**Restricted**" means, when referring to cash or Cash Equivalents of the Borrower or any of its Subsidiaries (other than Baltic Trading Limited and its Subsidiaries), that such cash or Cash Equivalents (i) appears (or would be required to appear) as "restricted" on a consolidated balance sheet of the Borrower or of any such Subsidiary (unless such appearance is related to the Finance Documents or Encumbrances created thereunder), (ii) are subject to any Encumbrance in favour of

any Person other than the Security Agent for the benefit of the Finance Parties or (iii) are not otherwise generally available for use by the Borrower or such Subsidiary.

"**Screen Rate**" means, in relation to LIBOR, the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) for the relevant currency and period displayed on pages LIBOR01 or LIBOR02 of the Reuters screen (or any replacement Reuters page which displays that rate) or on the appropriate page such other information service which publishes that rate from time to time in place of Reuters. If such page or service ceases to be available, the Agent may specify another page or service displaying the relevant rate after consultation with the Borrower and the Lenders.

"**Second Supplemental Agreement**" means the second supplemental agreement to this Agreement dated 1 August 2012  made between the Borrower, the Lenders, the Agent, the Mandated Lead Arrangers, the Swap Providers, the Security Agent, the Bookrunner and the Collateral Owners.

"**Security Documents**" means the Mortgages, the Assignments, the Guarantees, the Account Pledges, the Share Pledges, the Deposit Account Control Agreement, the Master Agreement Charge, any other Credit Support Documents or (where the context permits) any one or more of them and any other agreement or document which may at any time be executed by any person as security for the payment of all or any part of the Indebtedness and "**Security Document**" means any one of them.

"**Security Parties**" means the Borrower, the Collateral Owners, the Guarantors, the Pledgor, any other Credit Support Provider and any other person who may at any time during the Facility Period be liable for, or provide security for, all or any part of the Indebtedness, and "**Security Party**" means any one of them.

"**Sellers**" means the persons specified as such in the definition of "**Vessels**" below and "**Seller**" means any one of them.

"**Share Pledges**" means the pledges of shares referred to in Clause 10.1.5 (Security Documents).

"**Shareholder Rights Agreement**" means a shareholders right agreement substantially similar to that shareholders right agreement entered into as of 11 April 2007 and made between the Borrower and Mellon Investor Services LLC, a New Jersey limited liability company as rights agent.

"**SMC**" means a valid safety management certificate issued for a Vessel by or on behalf of the Administration under paragraph 13.7 of the ISM Code.

"**SMS**" means a safety management system for a Vessel developed and implemented in accordance with the ISM Code.

"**Subsidiary**" means, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned

by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% equity interest at the time.

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same).

"**Technical Managers**" means V.Ships Monaco SAM of 24 avenue de Fontvieille, 98000 Monaco, Wallem Shipmanagement Limited of 12/F Warwick House East, Taikoo Place, 979 King's Road, Quarry Bay, Hong Kong, Thome Shipmanagement Pte Ltd. of 16 Raffles Quay, #43-01 Hong Leong Building, Singapore, 048581, Anglo Eastern Group, or such other technical managers of the Vessels nominated by the Borrower as the Agent may reasonably approve.

"**Test Period**" means each period of four consecutive fiscal quarters then last ended, in each case taken as one accounting period, provided that if the Consummation Date falls after 30 June 2014, then for the period ending on 30 June 2015, such test period shall mean the period commencing on the Effective Date and ending on 30 June 2015.

"**Third Supplemental Agreement**" means the third supplemental agreement to this Agreement dated _____ 2014 made between the Borrower, the Lenders, the Agent, the Mandated Lead Arrangers, the Swap Providers, the Security Agent, the Bookrunner and the Collateral Owner.

"**Threshold Amount**" means one million Dollars ($1,000,000) or its equivalent in any other currency.

"**Time Charters**" means the time charters listed in Schedule 4 (: Form of Drawdown Notice) of the Master Sale Agreement, on the terms and subject to the conditions of which the relevant Collateral Owners will time charter the relevant Vessels to the relevant time charterer and "**Time Charter**" means any one of them.

"**Total Loss**" means:

(a)    an actual, constructive, arranged, agreed or compromised total loss of a Vessel; or

(b)    the requisition for title or compulsory acquisition of a Vessel by any government or other competent authority (other than by way of requisition for hire); or

(c)    the capture, seizure, arrest, detention (including hijacking or theft) or confiscation of a Vessel by any government or by persons acting or purporting to act on behalf of any government, unless that Vessel is released and returned to the possession of the relevant Collateral Owner within one month after the capture, seizure, arrest, detention (including hijacking or theft) or confiscation in question.

"**Tranche A**" means that part of the Loan to be advanced in one Drawing to the Borrower to refinance the Purchase Price of Vessel A but in any event no later than

the Availability Termination Date which shall not exceed the Maximum Sum for Vessel A in connection with the purchase of Vessel A or, where the context permits, the amount advanced and for the time being outstanding.

"**Tranche B**" means that part of the Loan to be advanced in one Drawing to the Borrower either concurrently with the Delivery Date of Vessel B or, if the relevant Collateral Owner has already purchased Vessel B from the relevant Seller, to refinance the Purchase Price of Vessel B, but in any event no later than the Availability Termination Date which shall not exceed the Maximum Sum for Vessel B in connection with the purchase of Vessel B or, where the context permits, the amount advanced and for the time being outstanding.

"**Tranche C**" means that part of the Loan to be advanced in one Drawing to the Borrower either concurrently with the Delivery Date of Vessel C or, if the relevant Collateral Owner has already purchased Vessel C from the relevant Seller, to refinance the Purchase Price of Vessel C, but in any event no later than the Availability Termination Date which shall not exceed the Maximum Sum for Vessel C in connection with the purchase of Vessel C or, where the context permits, the amount advanced and for the time being outstanding.

"**Tranche D**" means that part of the Loan to be advanced in one Drawing to the Borrower either concurrently with the Delivery Date of Vessel D or, if the relevant Collateral Owner has already purchased Vessel D from the relevant Seller, to refinance the Purchase Price of Vessel D, but in any event no later than the Availability Termination Date which shall not exceed the Maximum Sum for Vessel D in connection with the purchase of Vessel D or, where the context permits, the amount advanced and for the time being outstanding.

"**Tranche E**" means that part of the Loan to be advanced in one Drawing to the Borrower either concurrently with the Delivery Date of Vessel E or, if the relevant Collateral Owner has already purchased Vessel E from the relevant Seller, to refinance the Purchase Price of Vessel E, but in any event no later than the Availability Termination Date which shall not exceed the Maximum Sum for Vessel E in connection with the purchase of Vessel E or, where the context permits, the amount advanced and for the time being outstanding.

"**Tranche F**" means that part of the Loan to be advanced in one Drawing to the Borrower either concurrently with the Delivery Date of Vessel F or, if the relevant Collateral Owner has already purchased Vessel F from the relevant Seller, to refinance the Purchase Price of Vessel F, but in any event no later than the Availability Termination Date which shall not exceed the Maximum Sum for Vessel F in connection with the purchase of Vessel F or, where the context permits, the amount advanced and for the time being outstanding.

"**Tranche G**" means that part of the Loan to be advanced in one Drawing to the Borrower either concurrently with the Delivery Date of Vessel G or, if the relevant Collateral Owner has already purchased Vessel G from the relevant Seller, to refinance the Purchase Price of Vessel G, but in any event no later than the Availability Termination Date which shall not exceed the Maximum Sum for Vessel G in connection with the purchase of Vessel G or, where the context permits, the amount advanced and for the time being outstanding.

"**Tranche H**" means that part of the Loan to be advanced in one Drawing to the Borrower either concurrently with the Delivery Date of Vessel H or, if the relevant Collateral Owner has already purchased Vessel H from the relevant Seller, to refinance the Purchase Price of Vessel H, but in any event no later than the Availability Termination Date which shall not exceed the Maximum Sum for Vessel H in connection with the purchase of Vessel H or, where the context permits, the amount advanced and for the time being outstanding.

"**Tranche I**" means that part of the Loan to be advanced in one Drawing to the Borrower either concurrently with the Delivery Date of Vessel I or, if the relevant Collateral Owner has already purchased Vessel I from the relevant Seller, to refinance the Purchase Price of Vessel I, but in any event no later than the Availability Termination Date which shall not exceed the Maximum Sum for Vessel I in connection with the purchase of Vessel I or, where the context permits, the amount advanced and for the time being outstanding.

"**Tranche J**" means that part of the Loan to be advanced in one Drawing to the Borrower either concurrently with the Delivery Date of Vessel J or, if the relevant Collateral Owner has already purchased Vessel J from the relevant Seller, to refinance the Purchase Price of Vessel J, but in any event no later than the Availability Termination Date which shall not exceed the Maximum Sum for Vessel J in connection with the purchase of Vessel J or, where the context permits, the amount advanced and for the time being outstanding.

"**Tranche K**" means that part of the Loan to be advanced in one Drawing to the Borrower either concurrently with the Delivery Date of Vessel K or, if the relevant Collateral Owner has already purchased Vessel K from the relevant Seller, to refinance the Purchase Price of Vessel K, but in any event no later than the Availability Termination Date which shall not exceed the Maximum Sum for Vessel K in connection with the purchase of Vessel K or, where the context permits, the amount advanced and for the time being outstanding.

"**Tranche L**" means that part of the Loan to be advanced in one Drawing to the Borrower either concurrently with the Delivery Date of Vessel L or, if the relevant Collateral Owner has already purchased Vessel L from the relevant Seller, to refinance the Purchase Price of Vessel L, but in any event no later than the Availability Termination Date which shall not exceed the Maximum Sum for Vessel L in connection with the purchase of Vessel L or, where the context permits, the amount advanced and for the time being outstanding.

"**Tranche M**" means that part of the Loan to be advanced in one Drawing to the Borrower either concurrently with the Delivery Date of Vessel M or, if the relevant Collateral Owner has already purchased Vessel M from the relevant Seller, to refinance the Purchase Price of Vessel M, but in any event no later than the Availability Termination Date which shall not exceed the Maximum Sum for Vessel M in connection with the purchase of Vessel M or, where the context permits, the amount advanced and for the time being outstanding.

"**Tranches**" means Tranche A, Tranche B, Tranche C, Tranche D, Tranche E, Tranche F, Tranche G, Tranche H, Tranche I, Tranche J, Tranche K, Tranche L, and Tranche M and "**Tranche**" means any one of them.

"**Transaction**" means, collectively, (i) the entering into of the Finance Documents and the incurrence of the Loan hereunder and performance of obligations hereunder and thereunder, (ii) the incurrence of any Financial Indebtedness of the Borrower permitted pursuant to the terms of this Agreement, (iii) the payment of all fees and expenses in connection with the foregoing, including, without limitation, in connection with any supplements, amendments, waivers and consent, and (iv) the transactions contemplated thereby.

"**Transfer Certificate**" means a certificate substantially in the form set out in Schedule 5 (: Form of Transfer Certificate) or any other form agreed between the Agent and the Borrower.

"**Transfer Date**" means, in relation to any Transfer Certificate, the later of:

(a)       the proposed Transfer Date specified in the Transfer Certificate; and

(b)       the date on which the Agent executes the Transfer Certificate.

"**Trust Property**" means:

(a)       all benefits derived by the Security Agent from Clause 10 (Security and Application of Moneys); and

(b)       all benefits arising under (including, without limitation, all proceeds of the enforcement of) each of the Security Documents,

with the exception of any benefits arising solely for the benefit of the Security Agent.

"**Unrestricted**" means, when referring to cash or Cash Equivalents of the Borrower or any of its Subsidiaries (other than Baltic Trading Limited and its Subsidiaries), that such cash or Cash Equivalents are not Restricted.

"**Vessels**" means the following vessels, and everything now or in the future belonging to them on board and ashore, registered under the respective flags set out below while in the ownership of the respective Sellers and sold or intended to be sold to the respective Collateral Owners set out below on the terms of the MOAs and, following their delivery to the Collateral Owners, registered or intended to be registered under the flag of the Marshall Islands and any Replacement Vessel and "**Vessel**" means any one of them:

| Vessel | Name of Vessel | Flag | Seller | Collateral Owner | Purchase Price |
|--------|----------------|------|--------|------------------|----------------|
| Vessel A | "NANTOR" (t.b.r. "GENCO LORRAINE") | Malta | H.S.O. Sasu | Genco Lorraine Limited | $32,400,000 |
| Vessel B | "PEARLOR" (t.b.r. "GENCO PYRENEES") | Malta | Pearlor Sasu | Genco Pyrenees Limited | $35,700,000 |
| Vessel C | "FRUCTIDOR" (t.b.r. "GENCO | Malta | Fructidor Sasu | Genco Loire Limited | $32,400,000 |

| | | | | | |
|---|---|---|---|---|---|
| | LOIRE") | | | | |
| Vessel D | "SEFOR" (t.b.r. "GENCO BOURGOGNE") | Malta | Sefor Sasu | Genco Bourgogne Limited | $35,700,000 |
| Vessel E | "DALIOR" (t.b.r. "GENCO PICARDY") | Luxembourg | Sinvrac Sasu | Genco Picardy Limited | $29,600,000 |
| Vessel F | "MAJOR" (t.b.r. "GENCO AQUITAINE") | Malta | F.B.O. Sasu | Genco Aquitaine Limited | $35,700,000 |
| Vessel G | "THERMIDOR" (t.b.r. "GENCO NORMANDY") | Luxembourg | Thermidor Sasu | Genco Normandy Limited | $30,000,000 |
| Vessel H | "MOLITOR" (t.b.r. "GENCO AUVERGNE") | Malta | Molitor Sasu | Genco Auvergne Limited | $35,700,000 |
| Vessel I | "MESSIDOR" (t.b.r. "GENCO PROVENCE") | Luxembourg | Avracs Sasu | Genco Provence Limited | $29,500,000 |
| Vessel J | "TABOR" (t.b.r. "GENCO ARDENNES") | Malta | F.B.O. Sasu | Genco Ardennes Limited | $35,700,000 |
| Vessel K | "MATADOR" (t.b.r. "GENCO BRITTANY") | Malta | Matador Sasu | Genco Brittany Limited | $35,700,000 |
| Vessel L | "TENOR" (t.b.r. "GENCO LANGUEDOC") | Malta | Tenor Sasu | Genco Languedoc Limited | $35,700,000 |
| Vessel M | "SUNOR" (t.b.r. "GENCO RHONE") | Not applicable | Setaf SAS | Genco Rhone Limited | $35,700,000 |

"**Waiver Period**" means the period between the Effective Date and 31 March 2015 (inclusive).

"**Wholly-Owned Subsidiary**" means, as to any Person, (i) any corporation 100% of whose capital stock (other than director's qualifying shares) is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time.

1.2     In this Agreement:

1.2.1     words denoting the plural number include the singular and vice versa;

1.2.2 words denoting persons include corporations, partnerships, associations of persons (whether incorporated or not) or governmental or quasi-governmental bodies or authorities and vice versa;

1.2.3 references to Recitals, Clauses and Schedules are references to recitals, clauses and schedules to or of this Agreement;

1.2.4 references to this Agreement include the Recitals and the Schedules;

1.2.5 the headings and contents page(s) are for the purpose of reference only, have no legal or other significance, and shall be ignored in the interpretation of this Agreement;

1.2.6 references to any document (including, without limitation, to all or any of the Relevant Documents) are, unless the context otherwise requires, references to that document as amended, supplemented, novated or replaced from time to time;

1.2.7 references to statutes or provisions of statutes are references to those statutes, or those provisions, as from time to time amended, replaced or re-enacted;

1.2.8 references to any Finance Party include its successors, transferees and assignees;

1.2.9 a time of day (unless otherwise specified) is a reference to London time; and

1.2.10 words and expressions defined in the Master Agreement, unless the context otherwise requires, have the same meaning.

1.3 **Offer letter**

This Agreement supersedes the terms and conditions contained in any correspondence relating to the subject matter of this Agreement exchanged between any Finance Party and the Borrower or their representatives prior to the date of this Agreement.

**2 The Loan and its Purpose**

2.1 **Amount** Subject to the terms of this Agreement, the Lenders agree to make available to the Borrower a term loan not exceeding the Maximum Loan Amount.

2.2 **Finance Parties' obligations** The obligations of each Finance Party under the Finance Documents are several. Failure by a Finance Party to perform its obligations under the Finance Documents does not affect the obligations of any other party to the Finance Documents. No Finance Party is responsible for the obligations of any other Finance Party under the Finance Documents.

2.3 **Purpose** The Borrower shall apply the Loan for the purposes referred to in Recital (B).

2.4 **Monitoring** No Finance Party is bound to monitor or verify the application of any amount borrowed under this Agreement.

**3**      **Conditions of Utilisation**

3.1      **Conditions precedent**    The Borrower is not entitled to have any Drawing advanced unless the Agent has received (i) all of the documents and other evidence listed in Part I of Schedule 2 (: Conditions Precedent and Subsequent) on or before the date of the relevant Drawdown Notice and (ii) all of the documents and other evidence listed in Part II of Schedule 2 (: Conditions Precedent and Subsequent) on or before the relevant Drawdown Date, save in each case that references in Section 2 of that Part I and that Part II to "the Vessel" or to any person or document relating to a Vessel shall be deemed to relate solely to any Vessel specified in the relevant Drawdown Notice or to any person or document relating to that Vessel respectively.

3.2      **Further conditions precedent**    The Lenders will only be obliged to advance a Drawing if on the date of the Drawdown Notice and on the proposed Drawdown Date:

     3.2.1      no Default is continuing or would result from the advance of that Drawing; and

     3.2.2      the representations made by the Borrower under Clause 11 (Representations) are true in all material respects.

3.3      **Drawing limit**    The Lenders will only be obliged to advance a Drawing if:

     3.3.1      that Drawing will not exceed the Maximum Sum of the relevant Vessel;

     3.3.2      that Drawing will not increase the Loan to a sum in excess of the Maximum Loan Amount;

     3.3.3      that Drawing will be applied in or towards payment of the purchase price under the relevant MOA to be financed or refinanced (as applicable) by the Lenders under the terms of this Agreement for that Vessel.

3.4      **Adjustment of Maximum Sum**    In the event of any reduction in the Purchase Price of a Vessel, the Agent shall by notice to the Lenders and the Borrower prior to the relevant Drawdown Date adjust the Maximum Sum in relation to that Vessel such that the Maximum Loan Amount shall be fifty seven point five per cent (57.5%) of the aggregate Purchase Price of all Vessels (taking into account, for the avoidance of doubt, any reduction referred to in this Clause 3.4).

3.5      **Conditions subsequent**    The Borrower undertakes to deliver or to cause to be delivered to the Agent on, or within forty five (45) day of (or such other period specifically stated in Part III of Schedule 2 : Conditions Precedent and Subsequent), the relevant Drawdown Date the additional documents and other evidence listed in Part III of Schedule 2 (: Conditions Precedent and Subsequent), save that references in that Part III to "the Vessel" or to any person or document relating to a Vessel shall be deemed to relate solely to any Vessel specified in the relevant Drawdown Notice or to any person or document relating to that Vessel respectively.

3.6      **No waiver**    If the Lenders in their sole discretion agree to advance a Drawing to the Borrower before all of the documents and evidence required by Clause 3.1 (*Conditions precedent*) have been delivered to or to the order of the Agent, the Borrower undertakes to deliver all outstanding documents and evidence to or to the

order of the Agent no later than thirty (30) days after the relevant Drawdown Date or such other date specified by the Agent.

The advance of a Drawing under this Clause 3.6 shall not be taken as a waiver of the Lenders' right to require production of all the documents and evidence required by Clause 3.1 (*Conditions precedent*).

3.7 **Form and content**   All documents and evidence delivered to the Agent under this Clause 3 shall:

3.7.1   be in form and substance acceptable to the Agent; and

3.7.2   if required by the Agent, be certified, notarised, legalised or attested in a manner acceptable to the Agent.

3.8 **Number of Drawings**   No more than thirteen (13) Drawings (one per Tranche) shall be advanced by the Finance Parties under this Agreement.

**4   Advance**

4.1 **Drawdown Request**   The Borrower may request a Drawing to be advanced in one amount on any Business Day prior to the Availability Termination Date by delivering to the Agent a duly completed Drawdown Notice not more than ten (10) and not fewer than three (3) Business Days before the proposed Drawdown Date.

4.2 **Lenders' participation**   Subject to Clauses 2 (*The Loan and its Purpose*) and 3 (*Conditions of Utilisation*), the Agent shall promptly notify each Lender of the receipt of a Drawdown Notice, following which each Lender shall advance its Proportionate Share of the relevant Drawing to the Borrower through the Agent on the relevant Drawdown Date.

**5   Repayment**

5.1 **Repayment of Tranches**   The Borrower agrees to repay:

5.1.1   Tranche A to the Agent for the account of the Lenders by consecutive quarterly instalments, each in the sum of three hundred eighty five thousand Dollars ($385,000) and a final instalment of the outstanding amount of Tranche A;

5.1.2   Tranche B to the Agent for the account of the Lenders by consecutive quarterly instalments each in the sum of three hundred eighty four thousand Dollars ($384,000) and a final instalment of the outstanding amount of Tranche B;

5.1.3   Tranche C to the Agent for the account of the Lenders by consecutive quarterly instalments each in the sum of three hundred eighty five thousand Dollars ($385,000) and a final instalment of the outstanding amount of Tranche C;

5.1.4   Tranche D to the Agent for the account of the Lenders by consecutive quarterly instalments each in the sum of three hundred eighty four thousand Dollars ($384,000) and a final instalment of the outstanding amount of Tranche D;

5.1.5    Tranche E to the Agent for the account of the Lenders by consecutive quarterly instalments each in the sum of four hundred seventeen thousand Dollars ($417,000) and a final instalment of the outstanding amount of Tranche E;

5.1.6    Tranche F to the Agent for the account of the Lenders by consecutive quarterly instalments each in the sum of three hundred eighty five thousand Dollars ($385,000) and a final instalment of the outstanding amount of Tranche F;

5.1.7    Tranche G to the Agent for the account of the Lenders by consecutive quarterly instalments each in the sum of three hundred seventy five thousand Dollars ($375,000) and a final instalment of the outstanding amount of Tranche G;

5.1.8    Tranche H to the Agent for the account of the Lenders by consecutive quarterly instalments each in the sum of three hundred eighty five thousand Dollars ($385,000) and a final instalment of the outstanding amount of Tranche H;

5.1.9    Tranche I to the Agent for the account of the Lenders by consecutive quarterly instalments each in the sum of four hundred thirty eight thousand Dollars ($438,000) and a final instalment of the outstanding amount of Tranche I;

5.1.10    Tranche J to the Agent for the account of the Lenders by consecutive quarterly instalments each in the sum of three hundred eighty five thousand Dollars ($385,000) and a final instalment of the outstanding amount of Tranche J;

5.1.11    Tranche K to the Agent for the account of the Lenders by consecutive quarterly instalments each in the sum of three hundred eighty four thousand Dollars ($384,000) and a final instalment of the outstanding amount of Tranche K;

5.1.12    Tranche L to the Agent for the account of the Lenders by consecutive quarterly instalments each in the sum of three hundred eighty four thousand Dollars ($384,000) and a final instalment of the outstanding amount of Tranche L; and

5.1.13    Tranche M to the Agent for the account of the Lenders by consecutive quarterly instalments each in the sum of three hundred eighty four thousand Dollars ($384,000) and a final instalment of the outstanding amount of Tranche M,

in each case:

(a)    prior to the Effective Date, with the first instalment falling due, in respect of a Tranche drawn down prior to 30 November 2010, on 30 November 2010 and, in respect of a Tranche drawn down on or after 30 November 2010, the earlier of the date which is three calendar months after the Drawdown Date

and the last day of November, February, May or August (as the case may be) that follows the relevant Drawdown Date; and

(b) after the Effective Date, with subsequent instalments falling due on a consolidated basis at consecutive intervals of three calendar months after the Effective Date and with the final instalment falling due on the Final Maturity Date.

5.2 **Reduction of Repayment Instalments**   If the aggregate amount advanced to the Borrower in relation to a Tranche is less than the relevant Maximum Sum, the amount of each Repayment Instalment in respect of that Tranche shall be reduced pro rata to the amount actually advanced.

5.3 **Reborrowing**   The Borrower may not reborrow any part of the Loan which is repaid or prepaid.

5.4 **Consolidation of Tranches**   Notwithstanding that the Loan will be made available to the Borrower in up to thirteen (13) Tranches, the Agent may, at its option after 30 June 2011, after the aligning of the Repayment Dates and the Interest Payment Dates in respect of the Tranches pursuant to, respectively, Clause 5.1 (*Repayment of Tranches*) and Clauses 7.3 (*End of Interest Periods*) and 7.4 (*Interest Periods to meet Repayment Dates*), present to the Borrower from time to time documentation in relation to the administration of the Loan as if the Loan had been made available in five (5) amounts or fewer.

## 6    Prepayment

6.1 **Illegality**   If it becomes unlawful in any jurisdiction for a Lender to perform any of its obligations as contemplated by this Agreement or to fund or maintain the Loan:

6.1.1 that Lender shall promptly notify the Agent of that event;

6.1.2 upon the Agent notifying the Borrower, the Commitment of that Lender (to the extent not already advanced) will be immediately cancelled; and

6.1.3 the Borrower shall repay that Lender's Commitment (to the extent already advanced) on the last day of the current Interest Period or, if earlier, the date specified by that Lender in the notice delivered to the Agent and notified by the Agent to the Borrower (being no earlier than the last day of any applicable grace period permitted by law) and the remaining Repayment Instalments shall be reduced pro rata.

6.2 **Voluntary prepayment of the Loan**   The Borrower may prepay the whole or any part of the Loan (but, if in part, being an amount that reduces the Loan by a minimum amount of one million Dollars ($1,000,000) or whole integral multiples thereof) subject as follows:

6.2.1 it gives the Agent not less than ten (10) Business Days' (or such shorter period as the Majority Lenders may agree) prior notice;

6.2.2 any prepayment shall be made on the last day of an Interest Period unless otherwise agreed by the Majority Lenders and then always subject to payment by the Borrower of any Break Costs;

6.2.3   no prepayment may be made until after the Availability Termination Date; and

6.2.4   any prepayment under this Clause 6.2 shall satisfy the obligations in respect of the Loan under Clause 5.1 (Repayment of Tranches) and be applied in prepayment of the Repayment Instalments in inverse order of maturity and, if more than one Repayment Instalment is payable at the same maturity date, applied to such Repayment Instalments pro rata

**Provided that** this Clause 6.2 (except Clause 6.2.2) shall not apply to the prepayment of the Loan referred to in clause 2.1.4 (*Conditions*) of the Second Supplemental Agreement, which prepayment shall be applied in accordance with clause 4.2 of the Second Supplemental Agreement (*Amendments to Original Loan Agreement*).

6.3   **Mandatory prepayment on sale or Total Loss**   If a Vessel is sold by a Collateral Owner or becomes a Total Loss, the Borrower shall, simultaneously with any such sale or, subject to Clause 6.4 (*Replacement of Vessels*) within one hundred and twenty (120) days after any such Total Loss, make a prepayment of the Loan in an amount equivalent to the greater of:

6.3.1   the relevant Tranche then outstanding;

6.3.2   an amount required to ensure that following such prepayment the Borrower complies with the provisions of Clause 10.10 (*Additional security*); and

6.3.3   an amount required to ensure that, following such prepayment, the loan to value ratio determined in accordance with Clause 10.10 (*Additional security*) is restored to the loan to value ratio determined in accordance with Clause 10.10 (*Additional security*) immediately prior to any such sale or Total Loss.

Any such prepayment shall be applied firstly in full prepayment of the relevant Tranche and secondly in prepayment of the remaining Repayment Instalments in inverse order of maturity and, if more than one Repayment Instalment is payable at the same maturity date, applied to such Repayment Instalments pro rata.

6.4   **Replacement of Vessels**   In the event that a Vessel then subject to a Mortgage becomes a Total Loss, the Borrower may, within thirty (30) days of that Vessel becoming a Total Loss, replace that Vessel with a Replacement Vessel provided that:

6.4.1   the Lenders' consent to such replacement has been obtained by the Agent no less than ten (10) Business Days before the proposed date of such replacement';

6.4.2   no Default has occurred and is continuing;

6.4.3   the relevant conditions precedent and conditions subsequent set out in Schedule 2 (: Conditions Precedent and Subsequent) in respect of the Replacement Vessel and its owner shall have been met;

6.4.4   the Replacement Vessel meets the requirements specified in the definition thereof;

6.4.5   good and valuable consideration in an amount not less than the amount of the Loan which would otherwise be prepayable pursuant to Clause 6.3 (Mandatory prepayment on sale or Total Loss) shall have been paid by the Borrower or the Collateral Owner which owned the Vessel which suffered the Total Loss to the Collateral Owner owning the Replacement Vessel;

6.4.6   any insurance proceeds received in respect of such Total Loss shall be held in escrow by the Agent for a period of ninety (90) days following the replacement of the Vessel becoming a Total Loss by the Replacement Vessel and following expiry of such ninety (90) days shall be released to the Borrower in accordance with its instructions;

6.4.7   any other conditions imposed by the Lenders have been satisfied.

If the Lenders consent to the replacement of the Vessel which has become a Total Loss with a Replacement Vessel, the amount of the Loan which would have been prepayable pursuant to Clause 6.3 (Mandatory prepayment on sale or Total Loss) but for such replacement shall not be so prepayable.

6.5   **Mandatory Prepayment on Change of Control**   In the event of a Change of Control of the Borrower at any time following the Effective Date, the Borrower shall prepay the whole of the Loan within five (5) Business Days after the date on which the Change of Control occurs together with any Break Costs.

6.6   **Prepayment in case of Increased Costs, Tax Gross Up and Tax Indemnity** Without prejudice to the Borrower's rights contained in Clause 6.2 (Voluntary prepayment of the Loan), the Borrower may cancel and prepay the Loan at any time during the Facility Period in case Clauses 8.5 (Increased costs), 8.10 (Taxes) and/or 17.3 (Grossing-up) of this Agreement apply.

6.7   **Restrictions**   Any notice of prepayment given under this Clause 6 shall be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant prepayment is to be made and the amount of that prepayment.

Any prepayment under this Agreement shall be made together with accrued interest on the amount prepaid and, subject to any Break Costs, without premium or penalty.

If the Agent receives a notice under this Clause 6 it shall promptly forward a copy of that notice to the Borrower or the Lenders, as appropriate.

**7   Interest**

7.1   **Interest Periods**   Subject to Clause 7.3 (End of Interest Periods), Clause 7.4 (Interest Periods to meet Repayment Dates) and Clause 7.7 (Failure to select Interest Period), the period during which the Loan shall be outstanding under this Agreement shall be divided into consecutive Interest Periods of three or six months' duration, as selected by the Borrower by written notice to the Agent not later than 11.00 a.m. on the third Business Day before the beginning of the Interest Period in question, or such other duration as may be agreed by the Agent (acting on the instructions of all the Lenders in their sole discretion).

7.2 **Beginning of Interest Periods**   Each Interest Period in respect of a Drawing shall start on the relevant Drawdown Date (or, if a Drawing is already advanced, on the last day of the preceding Interest Period).

7.3 **End of Interest Periods**

7.3.1 Each Interest Period in respect of a Drawing drawn down prior to 30 November 2010 shall end on, in case of the first Interest Period relating to that Drawing, 30 November 2010 and, thereafter, on the date which numerically corresponds to 30 November 2010 or the last day of the preceding Interest Period in the relevant calendar month except that, if there is no numerically corresponding date in that calendar month, the Interest Period shall end on the last Business Day in that month.

7.3.2 Each Interest Period in respect of a Drawing drawn down on or after 30 November 2010 shall end on, in case of the first Interest Period relating to that Drawing, the final date of the then current Interest Period and, thereafter, on the date which numerically corresponds to the final date of that then current Interest Period or the last day of the preceding Interest Period in the relevant calendar month except that, if there is no numerically corresponding date in that calendar month, the Interest Period shall end on the last Business Day in that month.

7.3.3 Following the Effective Date, each Interest Period shall end on the date which numerically corresponds to the final date of that then current Interest Period or the last day of the preceding Interest Period in the relevant calendar month except that, if there is no numerically corresponding date in that calendar month, the Interest Period shall end on the last Business Day in that month.

7.4 **Interest Periods to meet Repayment Dates**   If an Interest Period will expire after the next Repayment Date, there shall be a separate Interest Period for a part of the Loan equal to the Repayment Instalment due on that next Repayment Date and that separate Interest Period shall expire on that next Repayment Date but no later than the Final Maturity Date.

7.5 **Non-Business Days**   If an Interest Period would otherwise end on a day which is not a Business Day, that Interest Period will instead end on the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not).

7.6 **Interest rate**   During each Interest Period interest shall accrue on the Loan at the rate determined by the Agent to be the aggregate of (a) the Margin, (b) LIBOR and (c) the Mandatory Cost, if any.

7.7 **Failure to select Interest Period**   If the Borrower at any time fails to select or agree an Interest Period in accordance with Clause 7.1 *(Interest Periods)*, the interest rate applicable shall be the rate determined by the Agent in accordance with Clause 7.6 *(Interest rate)* for an Interest Period of such duration (not exceeding three (3)  months) as the Agent may select.

7.8 **Accrual and payment of interest**   Interest shall accrue from day to day, shall be calculated on the basis of a 360 day year and the actual number of days elapsed (or,

in any circumstance where market practice differs, in accordance with the prevailing market practice) and shall be paid by the Borrower to the Agent for the account of the Lenders on the last day of each Interest Period and, if the Interest Period is longer than three months, on the dates falling at three monthly intervals after the first day of that Interest Period.

7.9     **Default interest**   If the Borrower fails to pay any amount payable by it under a Finance Document on its due date, interest shall accrue on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which is two per cent (2%) higher than the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted the Loan in the currency of the overdue amount for successive Interest Periods, each selected by the Agent (acting reasonably).   Any interest accruing under this Clause 7.9 shall be immediately payable by the Borrower on demand by the Agent.   If unpaid, any such interest will be compounded with the overdue amount at the end of each Interest Period applicable to that overdue amount but will remain immediately due and payable.

7.10    **Alternative interest rate**   If either (a) the applicable Screen Rate is not available for any Interest Period and none or only one of the Reference Banks supplies a rate to the Agent to determine LIBOR for that Interest Period or (b) a Lender or Lenders (whose Commitments exceed fifty per cent (50%) of the Loan) inform the Agent by written notice that the cost to it or them of obtaining matching deposits for any Interest Period would be in excess of LIBOR and that notice is received by the Agent no later than close of business in London on the day LIBOR is determined for that Interest Period:

7.10.1   the Agent shall give notice to the Lenders and the Borrower of the occurrence of such event; and

7.10.2   the rate of interest on each Lender's Commitment for that Interest Period shall be the rate per annum which is the sum of:

(a)     the Margin; and

(b)     the rate notified to the Agent by that Lender as soon as practicable, and in any event before interest is due to be paid in respect of that Interest Period, to be that which expresses as a percentage rate per annum the cost to that Lender of funding its Commitment from whatever source it may reasonably select; and

(c)     the Mandatory Cost, if any, applicable to that Lender's Commitment,

**Provided that** if the resulting rate of interest on any Commitment is not acceptable to the Borrower:

7.10.3   the Agent on behalf of the Lenders will negotiate with the Borrower in good faith with a view to modifying this Agreement to provide a substitute basis for determining the rate of interest;

7.10.4   any substitute basis agreed pursuant to Clause 7.10.3 shall, subject to the prior consent of all the Lenders, be binding on all the parties to this Agreement and shall apply to all Commitments; and

7.10.5   if, within thirty (30) days of the giving of the notice referred to in Clause 7.10.1, the Borrower and the Agent fail to agree in writing on a substitute basis for determining the rate of interest, the Borrower will immediately prepay the relevant Commitment, together with any Break Costs, and the remaining Repayment Instalments shall be reduced pro rata.

7.11   **Determinations conclusive**   The Agent shall promptly notify the Borrower of the determination of a rate of interest under this Clause 7 and each such determination shall (save in the case of manifest error) be final and conclusive.

**8**   **Indemnities**

8.1   **Transaction expenses**   The Borrower will, within fourteen (14) days of the Security Agent's or the Agent's written demand, pay the Security Agent or the Agent (for the account of the Finance Parties) (as applicable) the amount of all costs and expenses (including legal fees and Value Added Tax or any similar or replacement tax if applicable) reasonably incurred by the Finance Parties or any of them in connection with:

8.1.1   the negotiation, preparation, printing, execution and registration of the Finance Documents (whether or not any Finance Document is actually executed or registered and whether or not all or any part of the Loan is advanced);

8.1.2   any amendment, addendum or supplement to any Finance Document (whether or not completed); and

8.1.3   any other document which may at any time be required by a Finance Party to give effect to any Finance Document or which a Finance Party is entitled to call for or obtain under any Finance Document (including, without limitation but subject to Clause 10.11 (*Valuations*), any valuation of the Vessels).

8.2   **Funding costs**   The Borrower shall indemnify each Finance Party, by payment to the Agent (for the account of that Finance Party) on the Agent's written demand against all losses and costs incurred or sustained by that Finance Party if, for any reason, a Drawing is not advanced to the Borrower after the relevant Drawdown Notice has been given to the Agent, or is advanced on a date other than that requested in the Drawdown Notice (unless, in either case, as a result of any default by a Finance Party).

8.3   **Break Costs**   The Borrower shall indemnify each Finance Party, by payment to the Agent (for the account of that Finance Party) on the Agent's written demand against all costs, losses, premiums or penalties incurred by that Finance Party as a result of its receiving any prepayment of all or any part of the Loan (whether pursuant to Clause 6 (Prepayment) or otherwise) on a day other than the last day of an Interest Period for the Loan or relevant part of the Loan, or any other payment under or in relation to the Finance Documents on a day other than the due date for payment of

the sum in question, including (without limitation) any losses or costs incurred in liquidating or re-employing deposits from third parties acquired to effect or maintain all or any part of the Loan, and any liabilities, expenses or losses incurred by that Finance Party in terminating or reversing, or otherwise in connection with, any Master Agreement Transaction or any other interest rate and/or currency swap, transaction or arrangement entered into by that Finance Party to hedge any exposure arising under this Agreement, or in terminating or reversing, or otherwise in connection with, any open position arising under this Agreement or the Master Agreement.

8.4    **Currency indemnity**    In the event of a Finance Party receiving or recovering any amount payable under a Finance Document in a currency other than the Currency of Account, and if the amount received or recovered is insufficient when converted into the Currency of Account at the date of receipt to satisfy in full the amount due, the Borrower shall, on the Agent's written demand, pay to the Agent for the account of the relevant Finance Party such further amount in the Currency of Account as is sufficient to satisfy in full the amount due and that further amount shall be due to the Agent on behalf of the relevant Finance Party as a separate debt under this Agreement.

8.5    **Increased costs (subject to Clause 8.6 (Exceptions to increased costs))**    If, by reason of the introduction of any law, or any change in any law, or any change in the interpretation or administration of any law, or compliance with any request or requirement from any central bank or any fiscal, monetary or other authority occurring after the date of this Agreement:

8.5.1    a Finance Party (or the holding company of a Finance Party) shall be subject to any Tax with respect to payment of all or any part of the Indebtedness (other than Tax on overall net income); or

8.5.2    the basis of Taxation of payments to a Finance Party in respect of all or any part of the Indebtedness shall be changed; or

8.5.3    any reserve requirements shall be imposed, modified or deemed applicable against assets held by or deposits in or for the account of or loans by any branch of a Finance Party; or

8.5.4    the manner in which a Finance Party allocates capital resources to its obligations under this Agreement and/or the Master Agreement or any ratio (whether cash, capital adequacy, liquidity or otherwise) which a Finance Party is required or requested to maintain shall be affected; or

8.5.5    there is imposed on a Finance Party (or on the holding company of a Finance Party) any other condition in relation to the Indebtedness or the Finance Documents;

and the result of any of the above shall be to increase the cost to a Finance Party (or to the holding company of a Finance Party) of that Finance Party making or maintaining its Commitment, or its obligations under the Master Agreement, or to cause a Finance Party to suffer (in its opinion) a material reduction in the rate of return on its overall capital below the level which it reasonably anticipated at the date of this Agreement and which it would have been able to achieve but for its

entering into this Agreement or the Master Agreement, and/or performing its obligations under this Agreement or the Master Agreement, then, subject to Clause 8.6 (*Exceptions to increased costs*), the Finance Party affected shall notify the Agent and the Borrower shall from time to time pay to the Agent on demand for the account of that Finance Party the amount which shall compensate that Finance Party (or the relevant holding company) for such additional cost or reduced return.  A certificate signed by an authorised signatory of that Finance Party setting out the amount of that payment and the basis of its calculation shall be submitted to the Borrower and shall be conclusive evidence of such amount save for manifest error.

8.6     **Exceptions to increased costs**   Clause 8.5 (*Increased costs*) does not apply to the extent any additional cost or reduced return referred to in that Clause is:

8.6.1     compensated for by a payment made under Clause 8.10 (*Taxes*); or

8.6.2     compensated for by a payment made under Clause 17.3 (*Grossing-up*); or

8.6.3     compensated for by the payment of the Mandatory Cost; or

8.6.4     attributable to the wilful breach by the relevant Finance Party (or the holding company of that Finance Party) of any law or regulation.

8.7     **Events of Default**   The Borrower shall indemnify each Finance Party from time to time, by payment to the Agent (for the account of that Finance Party) on the Agent's written demand, against all losses, costs and liabilities incurred or sustained by that Finance Party as a consequence of any Event of Default.

8.8     **Enforcement costs**   The Borrower shall pay to the Agent (for the account of each Finance Party) on the Agent's written demand the amount of all costs and expenses (including legal fees) incurred by that Finance Party in connection with the enforcement of, or the preservation of any rights under, any Finance Document including (without limitation) any losses, costs and expenses which that Finance Party may from time to time sustain, incur or become liable for by reason of that Finance Party being mortgagee of a Vessel and/or a lender to the Borrower, or by reason of that Finance Party being deemed by any court or authority to be an operator or controller, or in any way concerned in the operation or control, of a Vessel.

8.9     **Other costs**   The Borrower shall pay to the Agent (for the account of each Finance Party) on the Agent's written demand the amount of all sums which that Finance Party may pay or become actually or contingently liable for on account of a Collateral Owner in connection with a Vessel (whether alone or jointly or jointly and severally with any other person) including (without limitation) all sums which that Finance Party may pay or guarantees which it may give in respect of the Insurances, any expenses incurred by that Finance Party in connection with the maintenance or repair of a Vessel or in discharging any lien, bond or other claim relating in any way to a Vessel, and any sums which that Finance Party may pay or guarantees which it may give to procure the release of a Vessel from arrest or detention.

8.10    **Taxes**   The Borrower shall pay all Taxes to which all or any part of the Indebtedness or any Finance Document may be at any time subject (other than Tax on a Finance Party's overall net income) including without limitation all Taxes arising from or in

connection with the Chapter 11 Proceedings and shall indemnify the Finance Parties, by payment to the Agent (for the account of the Finance Parties) on the Agent's written demand, against all liabilities, costs, claims and expenses resulting from any omission to pay or delay in paying any such Taxes.

8.11    **Litigation**    The Borrower shall, promptly on the Agent's request, reimburse the Lenders for, and keep the Lenders fully indemnified in respect of all liabilities, damages, costs and claims sustained or incurred by the Lenders in connection with the Finance Documents or in connection with the Chapter 11 Proceedings or the performance of its duties and obligations, or the exercise of its rights, powers, discretions or remedies under or pursuant to any Finance Document or in connection with the Chapter 11 Proceedings including, without limitation, in connection with any litigation, arbitration or administrative proceedings or regulatory enquiry concerning the Finance Parties to the extent not paid by the Security Parties and not arising solely from the Lenders' gross negligence or wilful misconduct.

**9        Fees**

9.1     **Commitment fee**    The Borrower shall pay to the Agent (for the account of the Lenders in proportion to their Commitments) a fee computed at the rate of one point twenty five per cent (1.25%) per annum on the undrawn amount of the Loan from time to time from the date of this Agreement until the earlier of the Drawdown Date in respect of the final Drawing and the Availability Termination Date.  The accrued commitment fee is payable on the last day of each successive period of three months from the date of this Agreement and on the earlier of the Drawdown Date in respect of the final Drawing and the Availability Termination Date.

9.2     **Upfront fee**   The Borrower shall pay to the Agent (for the account of the Lenders in proportion to their Commitments) an upfront fee in the amount of two million five hundred thirty thousand Dollars ($2,530,000) on or before 20 August 2010.

9.3     **Agency fee**   The Borrower shall pay to the Agent (for its own account) an agency fee in the amount and at the times agreed in a Fee Letter.

9.4     **Security Agency fee**    The Borrower shall pay to the Security Agent (for its own account) a security agency fee in the amount and terms agreed in the Fee Letter.

9.5     **Documentation fee**    The Borrower shall pay to the Security Agent (for its own account) a documentation fee in the amount and terms agreed in the Fee Letter.

**10       Security and Application of Moneys**

10.1    **Security Documents**    As security for the payment of the Indebtedness, the Borrower shall execute and deliver to the Security Agent or cause to be executed and delivered to the Security Agent the following documents in such forms and containing such terms and conditions as the Security Agent shall require:

10.1.1   first preferred mortgages over the Vessels;

10.1.2   first priority deeds of assignment of the Insurances, the Earnings and the Requisition Compensation of the Vessels and, in respect of Vessel M, the Post-Delivery Warranties (provided the relevant Seller has assigned the Post-Delivery Warranties to the relevant Collateral Owner);

10.1.3   a guarantee and indemnity from each Guarantor;

10.1.4   a first priority account security agreement or account security agreements over the Accounts and all amounts from time to time standing to the credit of the Accounts;

10.1.5   first priority pledges of all the issued shares of each Collateral Owner;

10.1.6   deposit account control agreements in respect of the operation of the Accounts; and

10.1.7   a first priority deed of charge over the Master Agreement Benefits.

10.2   **Accounts**   The Borrower shall:

10.2.1   procure that each Collateral Owner maintains its Earnings Account with the Account Holder; and

10.2.2   procure that the Collateral Owners maintain the Master Account with the Account Holder,

each for the duration of the Facility Period free of Encumbrances and rights of set off other than those created by or under the Finance Documents.

10.3   **Earnings**   The Borrower shall procure that all Earnings and any Requisition Compensation are credited to the Earnings Accounts.

10.4   **Deposit**   The Borrower shall procure that each Collateral Owner shall deposit into the relevant Earnings Account or into the Master Account a minimum amount of seven hundred fifty thousand Dollars ($750,000) on or before the Drawdown Date of the relevant Tranche. The respective balance standing to the credit of such Earnings Account or the Master Account shall remain until 30 September 2010 and, after 30 September 2010 and at all times during the Facility Period in the Master Account to satisfy the Borrower's obligations under Clause 12.2.1 (*Loan minimum liquidity*).

10.5   **Relocation of Accounts**   At any time following the occurrence and during the continuation of a Default, the Agent may without the consent of the Borrower or the relevant Collateral Owner relocate one or all of the Accounts to any branch or any affiliate of Deutsche Bank AG, without prejudice to the continued application of this Clause 10 and the rights of the Finance Parties under the Finance Documents.

10.6   **Access to information**   The Borrower agrees that the Security Agent (and its nominees) may from time to time during the Facility Period review the records held by the Account Holder (whether in written or electronic form) in relation to the Accounts, and irrevocably waives any right of confidentiality which may exist in relation to those records.

10.7   **Application after acceleration**   From and after the giving of notice to the Borrower by the Agent under Clause 13.2 (*Acceleration*), the Borrower shall procure that all sums from time to time standing to the credit of any of the Accounts are immediately transferred to the Agent for application in accordance with Clause 10.8 (General application of moneys) and the Borrower irrevocably authorises the Agent to instruct the Account Holder to make those transfers.

10.8   **General application of moneys**   The Borrower, subject to Clause 10.9 (Application of moneys on sale or Total Loss), irrevocably authorises and shall procure that each Collateral Owner irrevocably authorises the Agent and the Security Agent to apply all sums which any of them may receive:

10.8.1   pursuant to a sale or other disposition of a Vessel or any right, title or interest in a Vessel; or

10.8.2   by way of payment of any sum in respect of the Insurances, Earnings or Requisition Compensation; or

10.8.3   by way of transfer of any sum from any of the Accounts; or

10.8.4   otherwise arising under or in connection with any Security Document,

in or towards satisfaction of the obligations of each Security Party under the Finance Documents, in the following order:

(a)   firstly, on a pari passu and pro rata basis, all costs, charges, fees and expenses (other than interest and principal) of the Agent, the Security Agent, the Mandated Lead Arrangers and the Account Holder due under the Finance Documents;

(b)   secondly, on a pari passu and pro rata basis, all costs, charges, fees and expenses (other than interest and principal) of the Lenders, the Bookrunner and the Swap Providers due under the Finance Documents;

(c)   thirdly, on a pari passu basis between the Finance Parties and pro rata basis between the Tranches, all interest due under the Finance Documents;

(d)   fourthly, on a pro rata basis between the Tranches, any principal due and unpaid under this Agreement;

(e)   fifthly, on a pro rata basis between the Tranches, any other sum due and unpaid under the Finance Documents; and

(f)   sixthly, any balance shall be paid to the Borrower.

10.9   **Application of moneys on sale or Total Loss**   The Borrower irrevocably authorises and shall procure that each Collateral Owner irrevocably authorises the Agent and the Security Agent to apply all sums which either of them may receive pursuant to a sale by that Collateral Owner of its Vessel or a Total Loss of its Vessel in or towards satisfaction of the prepayment due and payable by virtue of that sale or Total Loss under Clause 6.3 (*Mandatory prepayment on sale or Total Loss*), but the Borrower's obligation to make that prepayment shall not be affected if those sums are insufficient to satisfy that obligation.

10.10   **Additional security**   If at any time the aggregate of the Fair Market Value of the Vessels and the value of any additional security (as determined conclusively by appropriate advisers appointed by the Agent (in the case of other charged assets), and determined by the Agent in its discretion (in all other cases)) for the time being provided to the Security Agent under this Clause 10.10 is less than one hundred and thirty five per cent (135%) of the aggregate of the amount of the Loan then

outstanding and the amount certified by the Swap Providers to be the amount which would be payable by the Borrower to the Swap Providers under the Master Agreement if an Early Termination Date were to occur at that time, the Borrower shall, within thirty (30) days of the Agent's request, at the Borrower's option:

10.10.1 pay to the Security Agent or to its nominee a cash deposit in the amount of the shortfall to be secured in favour of the Security Agent as additional security for the payment of the Indebtedness; or

10.10.2 give to the Security Agent other additional security in amount and form acceptable to the Security Agent, acting upon the instructions of the Majority Lenders; or

10.10.3 prepay the amount of the Indebtedness which will ensure that the aggregate of the Fair Market Value of the Vessels and the value of any additional security is not less than one hundred and thirty five per cent (135%) of the Indebtedness.

Clauses 5.3 (*Reborrowing*), 6.2.4 (*Voluntary prepayment of Loan*) and 6.7 (*Restrictions*) shall apply, mutatis mutandis, to any prepayment made under this Clause 10.10 and the value of any additional security provided shall be determined as stated above.

10.11 **Valuations**  The Borrower shall provide at the Agent's request not less than two (2) valuations per annum from two Approved Brokers appointed by the Borrower (determined in accordance with the definition of Fair Market Value) on or around 30 June and 31 December of each calendar year (provided that two valuations provided in the same calendar year shall be (i) given with at least four (4) months' interval and (ii) at the Borrower's expense) for the purpose of determining the Fair Market Value of the Vessels and monitoring compliance with Clause 10.10 (*Additional security*).  Following an Event of Default, the Agent shall be entitled to request additional valuations (determined in accordance with the definition of Fair Market Value) at the Borrower's expense at any time.

## 11  Representations

11.1 **Representations**   The Borrower makes the representations and warranties set out in this Clause 11.1 to each Finance Party on the date of this Agreement.

11.1.1 **Status**   Each Security Party (which is not an individual) is a corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation and has the power to own its assets and carry on its business as it is being conducted.

11.1.2 **Binding obligations**   The obligations expressed to be assumed by each Security Party in each Finance Document to which it is a party are subject to any general principles of law limiting its obligations which are specifically referred to in any legal opinion delivered pursuant to Clause 3 (*Conditions of Utilisation)*, legal, valid, binding and enforceable obligations.

11.1.3   **Non-conflict with other obligations**   The entry into and performance by each Security Party of, and the transactions contemplated by, the Finance Documents do not conflict with:

(a)      any law or regulation applicable to that Security Party;

(b)      the constitutional documents of that Security Party; or

(c)      any document binding on that Security Party or any of its assets,

and in borrowing the Loan, the Borrower is acting for its own account.

11.1.4   **Power and authority**   Each Security Party has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, the Finance Documents to which it is or is to become a party and the transactions contemplated by those Finance Documents.

11.1.5   **Validity and admissibility in evidence**   All consents, licences, approvals, authorisations, filings and registrations required or desirable:

(a)      to enable each Security Party lawfully to enter into, exercise its rights and comply with its obligations in the Finance Documents to which it is a party or to enable each Finance Party to enforce and exercise all its rights under the Finance Documents; and

(b)      to make the Finance Documents to which any Security Party is a party admissible in evidence in its jurisdiction of incorporation,

have been obtained or effected and are in full force and effect, with the exception only of the registrations referred to in Part III of Schedule 2 (: *Conditions Precedent and* Subsequent).

11.1.6   **Governing law and enforcement**   The choice of a particular law as the governing law of any Finance Document expressed to be governed by that law will be recognised and enforced in the jurisdiction of incorporation of each relevant Security Party, and any judgment obtained in the jurisdiction submitted to in any Finance Document will be recognised and enforced in the jurisdiction of incorporation of each relevant Security Party.

11.1.7   **Deduction of Tax**   No Security Party is required under the law of its jurisdiction of incorporation to make any deduction for or on account of Tax from any payment it may make under any Finance Document.

11.1.8   **No filing or stamp taxes**   (a) Under the law of the jurisdiction of incorporation of each relevant Security Party it is not necessary that the Finance Documents (other than the Security Documents) be filed, recorded or enrolled with any court or other authority in that jurisdiction, (b) under the law of the jurisdiction of the flag state of a Vessel then subject to a Mortgage, it is not necessary that the Finance Documents (other than the Mortgage) be filed, recorded or enrolled with any court or other authority in that jurisdiction or (c) in either case, that any stamp, registration (other than registration fees in connection with the Mortgages) or similar tax be

paid on or in relation to the Finance Documents or the transactions contemplated by the Finance Documents.

11.1.9 **No default**   No Default or Event of Default is continuing or might reasonably be expected to result from the advance of any Drawing.

11.1.10 **No misleading information**   Any factual information provided by any Security Party to any Finance Party was true and accurate in all material respects as at the date it was provided.

11.1.11 **Pari passu ranking**   The payment obligations of each Security Party under the Finance Documents to which it is a party rank at least pari passu with the claims of all its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally.

11.1.12 **No proceedings pending or threatened**   No litigation, arbitration or administrative proceedings of or before any court, arbitral body or agency have been started or (to the best of the Borrower's knowledge threatened) which, if adversely determined, might reasonably be expected to have a materially adverse effect on the business, assets, financial condition or credit worthiness of any Security Party.

11.1.13 **Disclosure of material facts**   The Borrower is not aware of any material facts or circumstances which have not been disclosed to the Agent and which might, if disclosed, have adversely affected the decision of a person considering whether or not to make loan facilities of the nature contemplated by this Agreement available to the Borrower.

11.1.14 **No established place of business in the UK**   No Security Party has an established place of business in the United Kingdom.

11.1.15 **Completeness of Relevant Documents**   The copies of any Relevant Documents provided or to be provided by the Borrower to the Agent in accordance with Clause 3 (*Conditions of Utilisation*) are, or will be, true and accurate copies of the originals and represent, or will represent, the full agreement between the parties to those Relevant Documents in relation to the subject matter of those Relevant Documents and there are no commissions, rebates, premiums or other payments due or to become due in connection with the subject matter of those Relevant Documents other than in the ordinary course of business or as disclosed to, and approved in writing by, the Agent.

11.1.16 **Ownership and control of Collateral Owners**   Each Collateral Owner is a Wholly-Owned Subsidiary of the Borrower and is controlled by the Borrower.

11.1.17 **Money Laundering**   In relation to the borrowing by the Borrower of the Loan, the performance and discharge of its obligations and liabilities under the Security Documents and the transactions and other arrangements effected or contemplated by the Security Documents to which the Borrower or the relevant Collateral Owner is a party, the Borrower is acting for its own

account and that the foregoing will not involve or lead to a contravention of any law, official requirement or other regulatory measure or procedure which has been implemented to combat "money laundering" (as defined in Article 1 of the Directive (91/308/EEC) of the Council of the European Communities).

11.2 **Repetition** Each representation and warranty in Clause 11.1 (*Representations*) is deemed to be repeated by the Borrower by reference to the facts and circumstances then existing on the date of each Drawdown Notice and the first day of each Interest Period.

**12 Undertakings and Covenants**

The undertakings and covenants in this Clause 12 remain in force for the duration of the Facility Period.

12.1 **Information undertakings**

12.1.1 **Financial statements** The Borrower shall and shall procure that the Collateral Owners shall, supply to the Agent as soon as the same become available, but in any event within ninety (90) days after the end of each of its financial years:

(a) the Borrower's audited consolidated (so as to include inter alia the Collateral Owners and Baltic Trading Limited and its Subsidiaries) financial statements for that financial year;

(b) Baltic Trading Limited's audited consolidated financial statements for that financial year;

(c) the Borrower's unaudited financial statements for that financial year (including the Collateral Owners and the other Subsidiaries of the Borrower but excluding Baltic Trading Limited and its Subsidiaries) together with the calculations and documentation that the Agent and the Security Agent may deem necessary in order to make the necessary reconciliations and off-setting against the financial statements referred to in Clause 12.1.1 (a) and (b) above; and

(d) each Collateral Owner's financial statements for that financial year,

together with a Compliance Certificate, signed by the Chief Financial Officer of the Borrower, setting out (in reasonable detail) computations as to compliance with Clause 12.2 (*Financial covenants*) as at the date as at which those financial statements were drawn up and any further information representing its financial completion (including, but not limited to, cash flow forecasts) upon the request of the Agent.

12.1.2 **Requirements as to financial statements** Each set of financial statements delivered by the Borrower under Clause 12.1.1 (*Financial statements*):

(a) shall be certified by the chief financial officer of the Borrower as fairly representing its financial condition and that of the Collateral Owners as at the date as at which those financial statements were drawn up; and

(b) shall be prepared using GAAP, and, in relation to any financial statements delivered by the Borrower in respect of the subsequent financial years, shall be prepared using accounting practices and financial reference periods consistent with those applied in the preparation of the Original Financial Statements unless, in relation to any set of financial statements, the Borrower notifies the Agent that there has been a material change in GAAP, the accounting practices or reference periods and the Borrower's auditors deliver to the Agent:

(i) a description of any change necessary for those financial statements to reflect the GAAP, accounting practices and reference periods upon which the Original Financial Statements were prepared; and

(ii) sufficient information, in form and substance as may be reasonably required by the Agent, to enable the Agent to make an accurate comparison between the financial position indicated in those financial statements and that indicated in the Original Financial Statements.

12.1.3 **Interim financial statements**   The Borrower shall, and shall procure that each Collateral Owner shall, supply to the Agent as soon as the same become available, but in any event within forty five (45) days after the end of each quarter during each of its financial years:

(a) the Borrower's consolidated (so as to include inter alia the Collateral Owners and Baltic Trading Limited and its Subsidiaries) quarterly financial statements for that quarter;

(b) Baltic Trading Limited's unaudited consolidated financial statements for that quarter;

(c) the Borrower's unaudited financial statement for that quarter (including the Collateral Owners and the other Subsidiaries of the Borrower but excluding Baltic Trading Limited and its Subsidiaries) together with the calculations and documentation that the Agent and the Security Agent may deem necessary in order to make the necessary reconciliations and off-setting against the financial statements referred to in Clause 12.1.3 (a) and (b) above; and

(d) each Collateral Owner's unaudited financial statements for that quarter,

together with a Compliance Certificate, signed by Chief Financial Officer of the Borrower, setting out (in reasonable detail) computations as to

compliance with Clause 12.2 (*Financial covenants*) as at the date as at which those financial statements were drawn up.

12.1.4    **Information: miscellaneous**   The Borrower shall supply to the Agent:

(a)    all documents which could reasonably be expected to have a material adverse effect on the business, assets, financial condition or creditworthiness of the Borrower or any Collateral Owner or the ability of a Security Party to perform its obligations under any Finance Document, which are dispatched by the Borrower or any Collateral Owner to its shareholders (or any class of them) or its creditors generally at the same time as they are dispatched. For the avoidance of doubt, this obligation does not include circulars to shareholders of a routine and non-material nature;

(b)    promptly upon becoming aware of them, details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against any Security Party, and which (i) might have a materially adverse effect on the business, assets, financial condition or credit worthiness of that Security Party and (ii) exceed the amount of seven million five hundred thousand Dollars ($7,500,000) in respect of the Borrower and the Threshold Amount in respect of a Collateral Owner; and

(c)    promptly, such further information regarding the financial condition, business and operations of any Security Party as the Agent may reasonably request including, without limitation, cash flow analyses and details of the operating costs of any Vessel.

12.1.5    **Notification of default**

(a)    The Borrower shall notify the Agent of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence.

(b)    Promptly upon a request by the Agent, the Borrower shall supply to the Agent a certificate signed by two of its directors or senior officers on its behalf certifying that no Default is continuing (or if a Default is continuing, specifying the Default and the steps, if any, being taken to remedy it).

12.1.6    **"Know your customer" checks**   If:

(a)    the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Agreement;

(b)    any change in the status of the Borrower after the date of this Agreement; or

(c)    a proposed assignment or transfer by a Lender of any of its rights and obligations under this Agreement to a party that is not a Lender prior to such assignment or transfer,

obliges the Agent or any Lender (or, in the case of (c) above, any prospective new Lender) to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, the Borrower shall promptly upon the request of the Agent or any Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent (for itself or on behalf of any Lender) or any Lender for itself (or, in the case of (c) above, on behalf of any prospective new Lender) in order for the Agent or that Lender (or, in the case of (c) above, any prospective new Lender) to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

12.2    **Financial covenants**

12.2.1    **Minimum liquidity**   The Borrower shall:

(a)        procure that the Collateral Owners shall maintain minimum free cash of seven hundred fifty thousand Dollars ($750,000) per Vessel at all times during the Facility Period in the Master Account; and

(b)        maintain on a consolidated basis a minimum free cash of seven hundred and fifty thousand Dollars ($750,000) per any vessel owned by the Borrower or a Subsidiary of the Borrower (including the Collateral Owners in accordance with Clause 12.2.1(a) above but excluding Baltic Trading Limited and its Subsidiaries as long as the Borrower does not own more than 50% of the economic interest in Baltic Trading Limited), as at the end of each fiscal quarter during the Facility Period.

12.2.2    **Consolidated Interest Coverage Ratio** The Borrower will not permit the Consolidated Interest Coverage Ratio for any Test Period, in each case taken as one accounting period, ending on the last day of any fiscal quarter of the Borrower (commencing with the fiscal quarter ending on 30 June 2015), to be less than 2.00:1.00.

12.2.3    **Maximum Leverage Ratio** The Borrower will not permit the Leverage Ratio on the last day of any fiscal quarter of the Borrower commencing with the fiscal quarter ending on 30 June 2015, to be greater than 5.50:1.00.

12.2.4    **Minimum Consolidated Net Worth** The Borrower shall not permit its Consolidated Net Worth to be less than the Minimum Consolidated Net Worth at all times during the Facility Period (except during the Waiver Period).

12.2.5    **Consolidated Indebtedness**  During the Waiver Period, the Borrower will not permit, as of the last day of any fiscal quarter during such period,  the aggregate amount of its interest-bearing Consolidated Indebtedness to exceed seventy per cent (70%) of the aggregate amount of its interest-bearing Consolidated Indebtedness plus its Consolidated Net Worth at such time.

12.2.6   **Most Favoured Lender**   The Borrower shall not enter into any waiver, modification or amendment to the financial covenants (or to definitions pertaining to the financial covenants), interest margin or maturity date set out in the Metrostar Credit Agreement, nor enter into any Additional Facility after the Effective Date which has a maturity date earlier than the Final Maturity Date or which grants more favourable provisions or treatment to the lenders or financiers thereunder in connection with financial covenants (or to definitions pertaining to the financial covenants), interest margin or maturity date unless each of the Finance Parties receives the benefit of such more favourable provisions at the same time and on the same terms.

12.3   **General undertakings**

12.3.1   **Authorisations**   The Borrower shall, and shall procure that each Collateral Owner shall, promptly:

(a)      obtain, comply with and do all that is necessary to maintain in full force and effect; and

(b)      supply certified copies to the Agent of,

any consent, licence, approval or authorisation required under any law or regulation to enable each Security Party to perform its obligations under the Finance Documents to which it is a party and to ensure the legality, validity, enforceability or admissibility in evidence in the jurisdiction of incorporation of each relevant Security Party of any Finance Document.

12.3.2   **Compliance with laws**   The Borrower shall, and shall procure that each Collateral Owner shall, comply in all respects with all laws to which it may be subject, if failure so to comply would materially impair its ability to perform its obligations under the Finance Documents.

12.3.3   **Conduct of business**   The Borrower shall, and shall procure that each Collateral Owner shall, carry on and conduct its business in a proper and efficient manner, file all requisite tax returns and pay all tax which becomes due and payable (except where contested in good faith).]

12.3.4   **Evidence of good standing**   The Borrower will from time to time if requested by the Agent provide the Agent with evidence in form and substance satisfactory to the Agent that the Security Parties and all corporate shareholders of any Security Party remain in good standing.

12.3.5   **Negative pledge and no disposals**   The Borrower shall procure that no Collateral Owner shall, without the prior written consent of the Agent, create nor permit to subsist any Encumbrance or other third party rights (other than a Permitted Encumbrance) over any of its present or future assets or undertaking nor dispose of any of those assets or of all or part of that undertaking.

12.3.6   **Merger**   The Borrower shall procure that no Collateral Owner shall enter into any amalgamation, demerger, merger or corporate reconstruction. The

Borrower shall not, without the prior written consent of the Agent, enter into any amalgamation, demerger, merger or corporate reconstruction except, in the case of amalgamation, demerger or merger only if (a) no Event of Default has occurred and is continuing, (b) no Change of Control would result from such amalgamation, demerger or merger, (c) the surviving entity in such amalgamation, demerger or merger will be the Borrower and (d) the Borrower provides to the Agent not less than ten (10) Business Days in advance of such amalgamation, demerger or merger, an officer's certificate signed by the Chief Financial Officer of the Borrower (i) certifying that no Event of Default has occurred and is continuing (or would arise after giving effect to the intended consolidation or merger), (ii) attaching pro-forma financial statements of the Borrower demonstrating the compliance of the Borrower with all covenants under this Agreement after giving effect to such merger or consolidation, (iii) providing a summary of the proposed amalgamation, demerger or merger together with details of the legal and structural changes that will result from such amalgamation, demerger or merger and (e) the Borrower provides the Agent with any other information reasonably required in respect of such amalgamation, demerger or merger.

12.3.7   **Change of business**   The Borrower shall not, and shall procure that no Collateral Owner shall, without the prior written consent of the Agent make any substantial change to the general nature of its business from that carried on at the date of this Agreement.

12.3.8   **No other business**   The Borrower shall procure that no Collateral Owner shall without the prior written consent of the Agent engage in any business other than the ownership, operation, chartering and management of its Vessel.

12.3.9   **No place of business in UK**   The Borrower shall not have, and shall procure that no Collateral Owner shall have, an established place of business in the United Kingdom at any time during the Facility Period.

12.3.10  **No Financial Indebtedness**

(a)      The Borrower shall procure that no Collateral Owner shall, without the prior written consent of the Agent, incur any Financial Indebtedness except:

(i)      under the Finance Documents to which it is a party; or

(ii)     unsecured Financial Indebtedness from the Borrower or affiliates of the Borrower and provided that the Borrower procures that any Financial Indebtedness incurred by the Collateral Owners to the Borrower or affiliates of the Borrower shall be subordinated to the Indebtedness, in the case of any Financial Indebtedness incurred by the Collateral Owners to the Borrower, on the terms set out in Clause 12.3.10(d) and, in the case of any Financial Indebtedness incurred by the Collateral Owners to an affiliate of the Borrower, on terms acceptable to the Agent; or

(iii) Financial Indebtedness incurred by Genco Auvergne Limited by way of a counter-indemnity for an amount of $900,000 in favour of Skandinaviska Enskilda Banken AB (publ) (the "**SEB**") in order to allow the release of m.v. "GENCO AUVERGNE" from the arrest in connection with certain claims of a charterparty dated 7 August 2012 made between Genco Auvergne Limited as owner and Hamburg Bulk Carriers GmbH & Co KG as charterer.

(b) During the Waiver Period, the Borrower shall not, and shall procure that none of its Subsidiaries (other than Baltic Trading Limited and its Subsidiaries) shall, without the prior written consent of the Agent, incur any Financial Indebtedness in connection with the acquisition of a vessel exceeding sixty per cent (60%) of the lesser of (i) the contract price of such vessel and (ii) the fair market value of such vessel.

(c) The Borrower will not, and will not permit any of its Subsidiaries to, permit the principal amount of the Financial Indebtedness under the Metrostar Loan Agreement to exceed at any time the outstanding principal amount of Financial Indebtedness under the Metrostar Loan Agreement as of the Effective Date. The Borrower may replace, or refinance, the outstanding Financial Indebtedness under the Metrostar Loan Agreement provided that such replacement financing or refinancing will not result, at any time during the Waiver Period, in an increase of the principal amount of Financial Indebtedness outstanding on the effective date of such replacement financing or refinancing.

(d) The Borrower hereby subordinates any and all debts, liabilities and other obligations owed to the Borrower by any Collateral Owner (the "**Subordinated Obligations**") to the Indebtedness to the extent and in the manner hereinafter set forth in this Clause 12.3.10 (d):

(i) except when an Event of Default has occurred and is continuing (including the commencement and continuation of any proceeding under any Insolvency Law relating to any Collateral Owner), the Borrower may receive payments from any Collateral Owner on account of the Subordinated Obligations. After the occurrence of an Event of Default which is continuing (including the commencement and continuation of any proceeding under any Insolvency Law relating to any Collateral Owner), however, unless the Agent otherwise agrees, the Borrower shall not demand, accept or take any action to collect any payment on account of the Subordinated Obligations;

(ii) in the event of any proceedings under any Insolvency Law relating to any Collateral Owner, the Borrower agrees that the Agent and the other Finance Parties shall be entitled to

Page 47

receive payment in full in cash of all the Indebtedness (including all interest and expenses accruing after the commencement of proceedings under any Insolvency Law, whether or not constituting an allowed claim in such proceeding (the "**Post Claim Interest**")) before the Borrower receives payment of any Subordinated Obligations;

(iii)    upon the occurrence of an Event of Default which is continuing (including the commencement and continuation of any proceeding under any Insolvency Law relating to any Collateral Owner), the Borrower shall, if the Agent so requests, collect, enforce and receive payments on account of the Subordinated Obligations as trustee for the Agent and the other Finance Parties and deliver such payments to the Agent on account of the Indebtedness (including all Post Claim Interest), together with any necessary endorsements or other instruments of transfer, but without reducing or affecting in any manner the liability of the Borrower under the other provisions of this Agreement; and

(iv)    upon the occurrence of an Event of Default which is continuing (including the commencement and continuation of any proceeding under any Insolvency Law relating to any Collateral Owner), the Agent is authorised and empowered (but without any obligation to so do), in its discretion, (x) in the name of the Borrower, to collect and enforce, and to submit claims in respect of, Subordinated Obligations and to apply any amounts received thereon to the Indebtedness (including any and all Post Claim Interest), and (y) to require the Borrower (1) to collect and enforce, and to submit claims in respect of, Subordinated Obligations and (2) to pay any amounts received on such obligations to the Agent for application to the Indebtedness (including any and all Post Claim Interest).

12.3.11  **No substantial liabilities**   Except in the ordinary course of business and as otherwise permitted under the terms of this Agreement, the Borrower shall procure that no Collateral Owner shall, without the prior written consent of the Agent incur any liability to any third party which is in the Agent's opinion of a substantial nature.

12.3.12  **No loans or advances**  The Borrower:

(a)    shall procure that no Collateral Owner shall, without the prior written consent of the Agent, make any loan or advance to any person except for the relevant Guarantee, and provided that no Event of Default has occurred and is continuing, loans made in the ordinary course of business in connection with the chartering,

operation or repair of its Vessel and loans to other Collateral Owners or to the Borrower;

(b)     shall not, without the prior written consent of the Agent, make any loan or advances to any person except, and provided that no Event of Default has occurred and is continuing:

(i)     loans or advances to the Collateral Owners or to affiliates of the Borrower in the ordinary course of business;

(ii)    loans or advances in the ordinary course of business to its employees so long as the aggregate principal amount thereof at any time outstanding which is made on or after the date hereof (determined without regard to any write-downs or write-offs of such loans and advances) shall not exceed five hundred thousand Dollars ($500,000); and

(iii)   loans or advances to Wholly-Owned Subsidiaries of the Borrower provided that the Borrower is permitted to make such loans or advances to Wholly-Owned Subsidiaries of the Borrower under any Genco Facility and any other loan facility agreement the Borrower may, from time to time, enter into.

12.3.13  **No dividends**     The Borrower will not, and will not permit any of the Collateral Owners to, authorize, declare or pay any Dividends with respect to the Borrower or any of the Collateral Owners, except that:

(a)     any Collateral Owner may pay Dividends to the Borrower or any other Collateral Owner;

(b)     the Borrower may purchase or redeem shares of common stock in the Borrower in market purchases under Rule 10b-18 of the Securities Exchange Act 1934 or other purchases approved by the Borrower's board of directors, any committee thereof or any authorised officer; provided that:

(i)     no Event of Default has occurred and is continuing at the time of any such purchases;

(ii)    no Event of Default would arise after giving effect to any such purchases;

(iii)   there is no breach of a financial covenant set out in Clause 12.2 (*Financial Covenants*) and there will not be any breach as a result of the payment of such Dividends; and

(iv)    the Borrower in the exercise of its rights under this Clause 12.3.13 shall not be permitted to purchase or redeem shares beneficially owned directly or indirectly by Peter Georgiopoulos;

(c) so long as the Borrower is in compliance with the provisions set out in Clause 10.10 (*Additional Security*), the Borrower may authorise, declare and distribute a dividend of Rights (as such term is defined and which are convertible into other securities as set forth in the Shareholder Rights Agreement) as contemplated by the Shareholder Rights Agreement;

(d) the Borrower may make, pay or declare cash Dividends; provided that, for all Dividends paid pursuant to this Clause 12.3.13(b):

    (i) Dividends shall be paid within 90 days of the declaration thereof;

    (ii) Dividends paid in respect of a fiscal quarter shall only be paid after the date of delivery of quarterly or annual financial statements for such fiscal quarter, pursuant to Clause 12.1.1 (*Financial statements*) and on or prior to forty five (45) days after the last day of the immediately succeeding fiscal quarter;

    (iii) no Default or Event of Default has occurred and is continuing at the time of declaration;

    (iv) no Default or Event of Default has occurred and is continuing (or would arise after giving effect thereto) at the time of payment;

    (v) there is no breach of a financial covenant set out in Clause 12.2 (*Financial Covenants*) and there will not be any breach as a result of the payment of such Dividends;

    (vi) on or prior to the payment of a Dividend, the Borrower shall deliver to the Agent an officer's certificate signed by the senior financial officer of the Borrower, certifying that the requirements set forth in preceding clauses (i) through (vi) are satisfied.

Notwithstanding what is stated above, neither the Borrower nor the Collateral Owners will authorize, declare or pay any Dividends during the Waiver Period except in respect of Dividends paid pursuant to Clause 12.3.13 (a).

12.3.14 **Inspection of records**   The Borrower will permit the inspection of its financial records and accounts from time to time by the Agent or its nominee during regular business hours and under the guidance of officers of the Borrower.

12.3.15 **No change in Relevant Documents**   The Borrower shall procure that, without the prior written consent of the Agent, there shall be no termination of, alteration to (save that, in respect of the Time Charters, no prior written consent of the Agent shall be required, to the extent there is no material adverse effect to the business, assets, financial condition or creditworthiness of the Borrower or any Collateral Owner or on the ability of a Security Party

to perform its obligations under any Finance Document as a consequence of such alteration), or waiver of any term of, any of the Relevant Documents which are not Finance Documents.

12.3.16 **No dealings with Master Agreement**   The Borrower shall not assign, novate or encumber or in any other way transfer any of its rights or obligations under the Master Agreement, nor enter into any interest rate exchange or hedging agreement in respect of this Agreement with anyone other than the Swap Providers, except in accordance with the provisions of Clause 12.3.18 (*Right of first refusal*).

12.3.17 **No change in shareholding** The Borrower shall procure that no Collateral Owner shall, without prior written consent of the Agent, permit any change in its beneficial ownership or control.

12.3.18 **Right of first refusal**   The Borrower shall grant to the Swap Providers the right of first refusal on a competitive basis for entering into any form of master agreement relating to interest or currency exchange transactions in respect of the obligations under this Agreement, provided always that the Borrower's obligations under such master agreement shall be secured under the Security Documents.

12.3.19 **Hedging**   Any Master Agreement Transactions shall only be of non-speculative interest hedging nature and shall be limited to the following instruments: interest rate swaps, interest rate caps, interest rate floors and interest rate swaptions or a combination of these products on a non-leveraged basis.  The purpose of such Master Agreement Transactions shall be the hedging of the Borrower's exposure under this Agreement to fluctuations in LIBOR arising from the funding of one or more Tranches or any part thereof for a period expiring no later than the relevant Final Maturity Date.

12.3.20 **Change of name or principal place of business**   The Borrower shall procure that each Collateral Owner shall, give reasonably advance notice to the Agent of any intended change in the name or place of business of a Security Party.

12.4   **Vessel covenants and Insurance undertakings**

The following covenants shall apply in respect of any Vessel subject to a Mortgage.

12.4.1   The Borrower covenants, and shall procure that each Collateral Owner covenants, to ensure at its own expense throughout the Facility Period that:

(a)      each Vessel remains insured against marine risks and war risks (including increased value, excess risk, war risks P&I and terrorism risk) on full conditions and on an agreed value basis for an amount which is the greater from time to time of (a) her Fair Market Value and (b) an amount which equals one hundred and twenty per cent (120%) of the amount of the relevant Tranche then outstanding; and

(b)     each Vessel remains entered in a protection and indemnity association in both protection and indemnity classes, or remains otherwise insured against protection and indemnity risks and liabilities (including P&I excess war risk cover) with a club that is a member of the International Group of Protection and Indemnity Associations (IGA); and

(c)     each Vessel remains insured against oil pollution caused by that Vessel for such amounts as the Security Agent may from time to time approve unless that risk is covered to the satisfaction of the Security Agent by that Vessel's protection and indemnity entry or insurance; and

(d)     each Vessel remains insured against loss of hire for 14/180/180 at daily hire (containing an automatic reinstatement clause for such amounts as the Security Agent may from time to time approve).

12.4.2   The Lenders agree that, if and for so long as a Vessel may be laid up with the approval of the Security Agent, the relevant Collateral Owner may at its own expense take out port risk insurance on that Vessel in place of hull and machinery insurance.

12.4.3   The Borrower undertakes, and shall procure that each Collateral Owner undertakes, to place the Obligatory Insurances in such markets, in such currency, on such terms and conditions, and with such brokers, underwriters and associations as the Security Agent shall have previously approved in writing.  The Borrower shall not, and shall procure that no Collateral Owner shall, alter the terms of any of the Obligatory Insurances nor allow any person to be co-assured under any of the Obligatory Insurances without the prior written consent of the Security Agent (except for the Borrower or any Managers or any crewing agents). The Borrower shall procure that any permitted co-assured shall, if so required by the Security Agent, sign and provide a letter of subordination restricting its rights under any policy of insurance in respect of a Vessel to (i) any third party liability coverage given by that policy and then only to satisfy such third party liability claims that are made directly on it and (ii) its provable out of pocket expenses in respect of a casualty, included in a claim on underwriters, which have been accepted and paid by those underwriters. The Borrower will, and shall procure that each Collateral Owner will, supply the Security Agent from time to time on request with such information as the Security Agent may in its discretion require with regard to the Obligatory Insurances and the brokers, underwriters or associations through or with which the Obligatory Insurances are placed.  The Borrower shall, and shall procure that each Collateral Owner shall, reimburse the Security Agent on demand for all costs and expenses incurred by the Security Agent in obtaining from time to time a report on the adequacy of the Obligatory Insurances for a Vessel from an insurance adviser instructed by the Security Agent, provided such report is obtained at the time the Tranche relating to that Vessel is drawn down (or in connection with such drawing) or in the event of a material change to the insurance cover of a Vessel.

12.4.4   The Borrower undertakes, and shall procure that each Collateral Owner undertakes, duly and punctually to pay all premiums, calls and contributions, and all other sums at any time payable in connection with the Obligatory Insurances, and, at its own expense, to arrange and provide any guarantees from time to time required by any protection and indemnity or war risks association.  From time to time at the Security Agent's request, the Borrower will, and shall procure that each Collateral Owner will, provide the Security Agent with evidence satisfactory to the Security Agent that such premiums, calls, contributions and other sums have been duly and punctually paid; that any such guarantees have been duly given; and that all declarations and notices required by the terms of any of the Obligatory Insurances to be made or given by or on behalf of the Borrower or the Collateral Owners to brokers, underwriters or associations have been duly and punctually made or given.

12.4.5   The Borrower will, and shall procure that each Collateral Owner will, comply in all respects with all terms and conditions of the Obligatory Insurances and will make all such declarations to brokers, underwriters and associations as may be required to enable each Vessel to operate in accordance with the terms and conditions of the Obligatory Insurances.  The Borrower will not, and shall procure that no Collateral Owner will, do, nor permit to be done, any act, nor make, nor permit to be made, any omission, as a result of which any of the Obligatory Insurances may become liable to be suspended, cancelled or avoided, or may become unenforceable, or as a result of which any sums payable under or in connection with any of the Obligatory Insurances may be reduced or become liable to be repaid or rescinded in whole or in part.  In particular, but without limitation, the Borrower will not, and shall procure that no Collateral Owner will, permit a Vessel to be employed other than in conformity with the Obligatory Insurances without first taking out additional insurance cover in respect of that employment in all respects to the satisfaction of the Security Agent, and the Borrower will, and shall procure that the Collateral Owners, will promptly notify the Security Agent of any new requirement imposed by any broker, underwriter or association in relation to any of the Obligatory Insurances.

12.4.6   The Borrower will, and shall procure that each Collateral Owner will, no later than fourteen days (or, in the case of war risks, no later than seven days), before the expiry of any of the Obligatory Insurances renew them and shall immediately give the Security Agent such details of those renewals as the Security Agent may require.

12.4.7   The Security Agent shall be at liberty at any time to take out through its own appointed broker, in its exclusive favour, pursuant to the Security Agent's own terms and conditions and at the Borrower's expense:

(a)   Mortgagees Interest Insurance equal to 110% of the amount of the Loan outstanding from time to time,

(b)   Mortgagees Interest Insurance Additional Perils (Pollution) equal to the amount of the Loan outstanding from time to time, unless a Collateral Owner has expressly undertaken and declared in writing,

that its Vessel will not enter (i) U.S. territorial waters and/or the U.S. exclusive economic zone or (ii) provided the Security Agent has advised the Borrower of any other waters with pollution liability legislation and/or practice in force, which in the reasonable opinion of the Security Agent is equivalent to the U.S. Oil Pollution Act of 1990 - and/or the practice in force thereunder, such other waters as advised by the Security Agent,

(c) a Mortgagees Interest Insurance Additional Perils (Pollution and other P&I Risks), regardless of a Vessel's trade, if the P&I cover is less than the highest limit of indemnity offered by a club of the International Group of P&I Clubs or its possible successor.

12.4.8 The Borrower shall, and shall procure that each Collateral Owner shall, deliver to the Security Agent copies (and, if required by the Security Agent, the originals) of all policies, certificates of entry and other documents relating to the Insurances (including, without limitation, receipts for premiums, calls or contributions) and shall procure that letters of undertaking in such form as the Security Agent may reasonably approve shall be issued to the Security Agent by the brokers through which the Insurances are placed (or, in the case of protection and indemnity or war risks associations, by their managers). If a Vessel is at any time during the Facility Period insured under any form of fleet cover, the Borrower shall, and shall procure that the relevant Collateral Owner shall, procure that those letters of undertaking are in a form and content substantially the same as the standardised draft of Lloyds Market Insurance Broker's Committee including a fleet lien waiver.

12.4.9 The Borrower shall, and shall procure that each Collateral Owner shall, promptly provide the Security Agent with full information regarding any casualty or other accident or damage to any Vessel which is reasonably likely to lead to a payment or claim in excess of two million Dollars ($2,000,000) provided that the Security Agent shall have the right to request at any time upon the instructions of any Lender information regarding any casualty or other accident or damage to any Vessel.

12.4.10 The Borrower agrees that, at any time after the occurrence and during the continuation of an Event of Default, the Security Agent shall be entitled to collect from, sue for, recover from and give a good discharge to insurers for all claims in respect of any of the Insurances; to pay collecting brokers the customary commission on all sums collected in respect of those claims; to compromise all such claims or refer them to arbitration or any other form of judicial or non-judicial determination; and otherwise to deal with such claims in such manner as the Security Agent shall in its discretion think fit.

12.4.11 Whether or not an Event of Default shall have occurred or be continuing, the proceeds of any claim under any of the Insurances in respect of a Total Loss shall be paid to the Security Agent and applied by the Security Agent in accordance with Clause 10 (Security and Application of Moneys).

12.4.12 In the event of any dispute arising between any Collateral Owner and any broker, underwriter or association with respect to any obligation to make any payment to that Collateral Owner or to the Security Agent under or in connection with any of the Insurances, or with respect to the amount of any such payment, the Security Agent shall be entitled to settle that dispute directly with the broker, underwriter or association concerned.  Any such settlement shall be binding on the Borrower and the relevant Collateral Owner.

12.4.13 The Security Agent agrees that any amounts which may become due under any protection and indemnity entry or insurance shall be paid to the relevant Collateral Owner to reimburse that Collateral Owner for, and in discharge of, the loss, damage or expense in respect of which they shall have become due, unless, at the time the amount in question becomes due, an Event of Default shall have occurred and be continuing, in which event the Security Agent shall be entitled to receive the amounts in question and to apply them either in reduction of the Indebtedness or, at the option of the Security Agent, to the discharge of the liability in respect of which they were paid.

12.4.14 The Borrower shall not, and shall procure that no Collateral Owner shall, settle, compromise or abandon any claim under or in connection with any of the Insurances (other than a claim of less than two million Dollars ($2,000,000) arising other than from a Total Loss) without the prior written consent of the Security Agent.

12.4.15 If any Collateral Owner fails to effect or keep in force the Obligatory Insurances, the Security Agent may (but shall not be obliged to) effect and/or keep in force such insurances on the relevant Vessel and such entries in protection and indemnity or war risks associations as the Security Agent in its discretion considers desirable, and the Security Agent may (but shall not be obliged to) pay any unpaid premiums, calls or contributions. The Borrower will, and shall procure that each Collateral Owner will, reimburse the Security Agent from time to time on demand for all such premiums, calls or contributions paid by the Security Agent, together with interest at the Default Rate from the date of payment by the Security Agent until the date of reimbursement.

12.4.16 The Borrower shall procure that each Collateral Owner shall comply strictly with the requirements of any legislation relating to pollution or protection of the environment which may from time to time be applicable to the relevant Vessel in any jurisdiction in which that Vessel shall trade and in particular (if that Vessel is to trade in the United States of America and Exclusive Economic Zone (as defined in the Act)) the Borrower shall procure that each Collateral Owner shall comply strictly with the requirements of the United States Oil Pollution Act 1990, as amended (the "**Act**").  Before any such trade is commenced and during the entire period during which such trade is carried on, the Borrower shall procure that each Collateral Owner shall:

(a)    pay any additional premiums required to maintain protection and indemnity cover for oil pollution up to the limit available to that Borrower for its Vessel in the market; and

(b)    if applicable, make all such quarterly or other voyage declarations as may from time to time be required by its Vessel's protection and indemnity association in order to maintain such cover, and promptly deliver to the Security Agent copies of such declarations if required; and

(c)    submit its Vessel to such additional periodic, classification, structural or other surveys which may be required by its Vessel's protection and indemnity insurers to maintain cover for such trade and promptly deliver to the Security Agent copies of reports made in respect of such surveys if requested; and

(d)    implement any recommendations contained in the reports issued following the surveys referred to in Clause (c) within the relevant time limits, and, if required, provide evidence satisfactory to the Security Agent that the protection and indemnity insurers are satisfied that this has been done; and

(e)    in addition to the foregoing (if such trade is in the United States of America and Exclusive Economic Zone):

(aa)    obtain and retain a certificate of financial responsibility under the Act in form and substance satisfactory to the United States Coast Guard and provide the Lender with evidence of the same if required; and

(bb)    procure that the protection and indemnity insurances do not contain a US Trading Exclusion Clause or any other analogous provision and provide the Security Agent with evidence that this is so if required; and

(cc)    comply strictly with any operational or structural regulations issued from time to time by any relevant authorities under the Act so that at all times its Vessel falls within the provisions which limit strict liability under the Act for oil pollution.

12.5    **Vessel covenants and operation and maintenance undertakings**

The Borrower covenants with the Lenders, and shall procure that each Collateral Owner shall covenant with the Lenders, in respect of any Vessel subject to a Mortgage:

12.5.1    to keep each Vessel seaworthy and in a state of complete repair and in compliance with the requirements from time to time of all applicable laws, conventions and regulations and of her insurers; and

12.5.2    to maintain the registration of each Vessel under the flag of the Marshall Islands or such other flag acceptable to the Security Agent; to effect and

maintain the recording of the relevant Mortgage with the Maritime Administrator of the Republic of the Marshall Islands; and not cause nor permit to be done any act or omission as a result of which that registration or that recording might be defeated or imperilled; and

12.5.3    to maintain each Vessel in a condition entitling that Vessel to the highest class applicable to vessels of her age and type with an Approved Classification Society free of overdue recommendations and qualifications; and

12.5.4    to comply with all laws, conventions and regulations applicable to each Collateral Owner or to each Vessel and to carry on board each Vessel all certificates and other documents which may from time to time be required to evidence such compliance; and

12.5.5    not without the prior written consent of the Security Agent to make, nor permit nor cause to be made, any material change in the structure, type or speed of any Vessel; and

12.5.6    to procure that all repairs to each Vessel or replacements of parts or equipment of each Vessel are effected in such a way as not to diminish the value of that Vessel and with replacement parts or equipment the property of the relevant Collateral Owner and free of all Encumbrances (other than the relevant Mortgage); and

12.5.7    to permit the Security Agent and all persons appointed by the Security Agent to board each Vessel from time to time during the Facility Period, without interfering with the operation of that Vessel, to inspect that Vessel's state and condition at the cost of the Borrower in respect of one inspection per calendar year (except if an Event of Default has occurred and is continuing, in which case the Borrower shall be liable for the costs of all inspections deemed necessary by the Security Agent) and, if that Vessel shall not be in a state and condition which complies with the requirements of the relevant Mortgage, to effect such repairs as shall in the opinion of the Security Agent be desirable to ensure such compliance, without prejudice to the Security Agent's other rights under or pursuant to the relevant Mortgage; and

12.5.8    immediately to notify the Security Agent of any arrest or detention of any Vessel, and to cause that Vessel to be released from arrest or detention as quickly as possible, and in any event within fourteen days from the date of arrest or detention, and immediately to notify the Security Agent in the same manner of the release of that Vessel; and

12.5.9    from time to time on request of the Security Agent to produce to the Security Agent written evidence satisfactory to the Security Agent confirming that the master and crew of each Vessel have no claims for wages beyond the ordinary arrears and that the master has no claim for disbursements other than those properly incurred by him in the ordinary course of trading of that Vessel on the voyage then in progress; and

12.5.10 not during the Facility Period and always subject to Clause 6.3 (*Mandatory prepayment on sale or Total Loss*) to sell, agree to sell, or otherwise dispose of, or agree to dispose of, its Vessel without the prior written consent of the Security Agent; and

12.5.11 not during the Facility Period to change the name of any Vessel without the prior written consent of the Security Agent; and

12.5.12 not during the Facility Period to lay any Vessel up without the prior written consent of the Security Agent; and

12.5.13 in the event of any requisition or seizure of any Vessel, to take all lawful steps to recover possession of that Vessel as soon as it is entitled to do so; and

12.5.14 to give to the Security Agent from time to time during the Facility Period on request such information as the Security Agent may reasonably require with regard to any Vessel's employment, position and state of repair and, on the Security Agent's request, to supply the Security Agent with copies of all charterparties and other contracts of employment relating to any Vessel and copies of any Vessel's deck and engine logs; and

12.5.15 to comply with all requirements from time to time of each Vessel's classification society and to give to the Security Agent from time to time during the Facility Period on request copies of all classification certificates of each Vessel and reports of surveys required by each Vessel's classification society (the relevant Collateral Owner by its execution of the relevant Mortgage irrevocably authorising the Security Agent to obtain such information and documents from the relevant Vessel's classification society as the Security Agent may from time to time require), and to notify the Security Agent immediately of any requirement or recommendation imposed by each Vessel's classification society; and

12.5.16 not during hostilities (whether or not a state of war shall formally have been declared and including, without limitation, any civil war) to permit any Vessel to be employed in carrying any goods which may be declared to be contraband of war or which may render that Vessel liable to confiscation, seizure, detention or destruction, nor to permit any Vessel to enter any area which is declared a war zone by any governmental authority or by that Vessel's war risks insurers unless that employment or voyage is either (a) consented to in advance and in writing by the underwriters of that Vessel's war risks insurances and fully covered by those insurances or (b) (to the extent not covered by those insurances) covered by additional insurance taken out by the relevant Collateral Owner at that Collateral Owner's expense, which additional insurance shall be deemed to be part of the Insurances and of the Assigned Property (as such term is defined in the relevant Mortgage); and

12.5.17 not without the prior written consent of the Security Agent to let any Vessel on any demise charter or bareboat charter, or, after the expiry of the Time Charters, on any time charter, consecutive voyage charter or other contract of employment which (inclusive of any extension option) is capable of

exceeding thirty eight (38) months nor to employ any Vessel in any way which might impair the security created by the Finance Documents; and

12.5.18 **Intentionally left blank**

12.5.19 unless the Borrower is in full compliance with Clause 12.5.17, not without the prior written consent of the Security Agent to enter into any agreement or arrangement for sharing the Earnings of any Vessel as long as such profit sharing arrangements are made between the Borrower or a Collateral Owner and a charterer; and

12.5.20 duly to perform (unless prevented by force majeure), and to take all necessary steps to enforce the performance by charterers and shippers of, all charterparties and other contracts of employment and all bills of lading and other contracts relating to each Vessel; and

12.5.21 not following the occurrence and during the continuation of an Event of Default to let any Vessel on charter or renew or extend any charter or other contract of employment of any Vessel, nor agree to do so, without the prior written consent of the Security Agent; and

12.5.22 to pay and discharge when due from time to time all taxes, levies, duties, fines and penalties imposed on any Vessel or the Earnings, or on the Collateral Owner, its income, profits, capital gains or any of its property; and

12.5.23 not at any time during the Facility Period without the prior written consent of the Security Agent (and then subject to such conditions as the Security Agent may impose) to create nor grant nor permit to exist any Encumbrance over any Vessel or any of the Assigned Property (as such term is defined in the relevant Mortgage) other than any Permitted Encumbrances existing from time to time; and

12.5.24 to notify the Security Agent immediately when the Borrower or a Collateral Owner becomes aware of any legal proceedings or arbitration involving a Vessel or a Collateral Owner where the amount claimed by any party (ignoring any counterclaim or defence of set-off) exceeds or may reasonably be expected to exceed the Threshold Amount; and

12.5.25 not without the prior written consent of the Security Agent to put any Vessel into the possession of any person for the purpose of work or repairs estimated to cost more than, the Threshold Amount (except for repairs the cost of which is recoverable under the Insurances and in respect of which the insurers have agreed to make payment in accordance with any applicable loss payable clause and except for scheduled drydocking) unless that person shall have given an undertaking to the Security Agent on such terms as the Security Agent shall require not to exercise a lien on any Vessel for the cost of the work; and

12.5.26 to keep proper books of account in respect of each Vessel and the Earnings and as and when required by the Security Agent to make such books available for inspection on behalf of the Security Agent; and

12.5.27 to place and retain a certified copy of the relevant Mortgage on board the relevant Vessel and cause such certified copy of that Mortgage to be exhibited to any representative of the Security Agent and to place and keep displayed on each Vessel a framed printed notice in plain type reading as follows:

**"NOTICE OF MORTGAGE**

This Vessel is covered by a First Preferred Mortgage to Deutsche Bank AG Filiale Deutschlandgeschäft under authority of Title 47, Chapter 3 of the Maritime Act 1990 of the Republic of the Marshall Islands (as amended). Under the terms of the said Mortgage neither the Owner nor any charterer nor the master of this Vessel nor any other person has any right, power or authority to create, incur or permit to be imposed upon this Vessel any lien whatsoever other than for crew's wages and salvage."; and

12.5.28 not without the prior written consent of the Security Agent to appoint anyone other than the Managers as commercial or technical managers of its Vessel nor to terminate nor materially vary the arrangements for the commercial or technical management of any Vessel, nor to permit the commercial or technical management of any Vessel to be sub-contracted or delegated to any third party; and

12.5.29 to take all reasonable precautions to prevent any infringements of any anti drug legislation in any jurisdiction in which any Vessel shall trade and in particular (if that Vessel is to trade in the United States of America) to take all reasonable precautions to prevent any infringements of the Anti-Drug Abuse Act of 1986 of the United States of America; and

12.5.30 to comply, or procure that the operator of each Vessel will comply, with the ISM Code (as the same may be amended from time to time) or any replacement of the ISM Code and in particular, without limitation, to:

(a) procure that that Vessel remains for the duration of the Facility Period subject to a safety management system developed and implemented in accordance with the ISM Code; and

(b) maintain for that Vessel throughout the Facility Period a valid and current SMC and provide a copy to the Agent; and

(c) procure that the ISM Company maintains throughout the Facility Period a valid and current DOC and provide a copy to the Agent; and

(d) notify the Lender immediately in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the SMC of that Vessel or of the DOC of the ISM Company; and

12.5.31 to comply in relation to that Vessel with the ISPS Code (as the same may be amended from time to time) or any replacement of the ISPS Code and in particular, without limitation, to:

(a)     procure that that Vessel and the company responsible for that Vessel's compliance with the ISPS Code comply with the ISPS Code; and

(b)     maintain for that Vessel throughout the Facility Period a valid and current ISSC and provide a copy to the Agent; and

(c)     notify the Security Agent immediately in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the ISSC; and

12.5.32  to comply in relation to each Vessel with Annex VI (as the same may be amended from time to time) or any replacement of Annex VI and in particular, without limitation, to:

(a)     procure that that Vessel's master and crew are familiar with, and that that Vessel complies with, Annex VI; and

(b)     maintain for that Vessel throughout the Facility Period a valid and current IAPPC and provide a copy to the Agent; and

(c)     notify the Security Agent immediately in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the IAPPC.

12.5.33  to obtain and retain, if and for so long as any Vessel trades in the United States of America and Exclusive Economic Zone (as defined in the Act), a valid Certificate of Financial Responsibility for that Vessel under that Act and to provide the Security Agent (if requested) with evidence of that Certificate, and to comply strictly with the requirements of that Act.

12.5.34  to use each Vessel during the Facility Period only for civil merchant trading.

## 13      Events of Default

13.1    **Events of Default**   Each of the events or circumstances set out in this Clause 13.1 is an Event of Default.

13.1.1  **Non-payment**  A Security Party does not pay on the due date any amount payable by it under a Finance Document to which it is a party at the place at and in the currency in which it is expressed to be payable unless its failure to pay is caused by a technical or an administrative error (which is not caused by and is beyond the control of that Security Party) and payment is made within three (3) Business Days of the due date.

13.1.2  **Other obligations**  A Security Party or any other person (except a Finance Party) does not comply with any provision of any of the Relevant Documents to which that Security Party or person is a party (other than as referred to in Clause 13.1.1 (Non-payment)) which are deemed to be material at the sole determination of the Lenders or otherwise in accordance with Clause 15.4 (Limitation on authority) (as the case may be).

No Event of Default under this Clause 13.1.2 will occur if the failure to comply is capable of remedy and does not relate either to the Insurances or to compliance with Clause 10.10 (Additional security) and is remedied within ten (10) Business Days of the Agent giving notice to the Borrower or the Borrower becoming aware of the failure to comply.

13.1.3   **Misrepresentation**   Any representation, warranty or statement made or deemed to be repeated by a Security Party in any Finance Document or any other document delivered by or on behalf of a Security Party under or in connection with any Finance Document is or proves to have been incorrect or misleading in any material respect when made or deemed to be repeated.

13.1.4   **Cross default**   Any Financial Indebtedness of a Security Party other than the Borrower and, in respect of the Borrower, any Financial Indebtedness in excess of five million Dollars ($5,000,000):

(a)      is not paid when due or within any originally applicable grace period; or

(b)      is declared to be, or otherwise becomes, due and payable before its specified maturity as a result of an event of default (however described); or

(c)      is capable of being declared by a creditor to be due and payable before its specified maturity as a result of such an event of default.

13.1.5   **Insolvency**

(a)      A Security Party is unable or admits inability to pay its debts as they fall due, suspends making payments on any of its debts or, by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors with a view to rescheduling any of its Financial Indebtedness.

(b)      The value of the assets of a Security Party is less than its liabilities (taking into account contingent and prospective liabilities).

(c)      A moratorium is declared in respect of any Financial Indebtedness of a Security Party.

13.1.6   **Insolvency proceedings**   Any corporate action, legal proceedings or other procedure or step is taken for:

(a)      the suspension of payments, a moratorium of any Financial Indebtedness, winding-up, dissolution, administration, bankruptcy or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of a Security Party;

(b)      a composition, compromise, assignment or arrangement with any creditor of a Security Party;

(c)      the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager, or trustee or other similar officer in respect of any Security Party or any of its assets; or

(d)      enforcement of any Encumbrance over any assets of a Security Party,

or any analogous procedure or step is taken in any jurisdiction.

13.1.7   **Creditors' process**   Any expropriation, attachment, sequestration, distress or execution affects any asset or assets of a Security Party.

13.1.8   **Change in ownership or control of the Collateral Owners**   The Borrower ceases at any time for any reason to own or control, directly or indirectly, one hundred per cent (100%) of the capital stock or other equity interests of a Collateral Owner.

13.1.9   **Repudiation**   A Security Party or any other person (except a Finance Party) repudiates any of the Relevant Documents to which that Security Party or person is a party or evidences an intention to do so.

13.1.10  **Impossibility or illegality**   Any event occurs which would, or would with the passage of time, render performance of any of the Relevant Documents by a Security Party or any other party to any such document impossible, unlawful or unenforceable by a Finance Party or a Security Party.

13.1.11  **Conditions subsequent**   Any of the conditions referred to in Clause 3.5 (Conditions subsequent) is not satisfied within the time reasonably required by the Agent.

13.1.12  **Revocation or modification of authorisation**   Any consent, licence, approval, authorisation, filing, registration or other requirement of any governmental, judicial or other public body or authority which is now, or which at any time during the Facility Period becomes, necessary to enable a Security Party or any other person (except a Finance Party) to comply with any of its obligations under any of the Relevant Documents is not obtained, is revoked, suspended, withdrawn or withheld, or is modified in a manner which the Agent considers is, or may be, prejudicial to the interests of a Finance Party, or ceases to remain in full force and effect.

13.1.13  **Curtailment of business**   A Security Party ceases, or threatens to cease, to carry on all or a substantial part of its business or, as a result of intervention by or under the authority of any government, the business of a Security Party is wholly or partially curtailed or suspended, or all or a substantial part of the assets or undertaking of a Security Party is seized, nationalised, expropriated or compulsorily acquired.

13.1.14  **Reduction of capital**   a Security Party reduces its authorised or issued or subscribed capital.

13.1.15  **Loss of Vessel**   A Vessel suffers a Total Loss or is otherwise destroyed, abandoned, confiscated, forfeited or condemned as prize, or a similar event occurs in relation to any other vessel which may from time to time be

mortgaged to the Security Agent as security for the payment of all or any part of the Indebtedness, except that a Total Loss, or event similar to a Total Loss in relation to any other vessel, shall not be an Event of Default if:

(a)    that Vessel or other vessel is insured in accordance with the Security Documents; and

(b)    no insurer has refused to meet or has disputed the claim for Total Loss and it is not apparent to the Agent in its discretion that any such refusal or dispute is likely to occur; and

(c)    the Loan is prepaid in accordance with Clause 6.3 (Mandatory prepayment on sale or Total Loss) or payment of all insurance proceeds in respect of the Total Loss is made in full to the Security Agent within one hundred and twenty (120) days of the occurrence of the casualty giving rise to the Total Loss in question or such longer period as the Agent may in its discretion agree; or

(d)    that Vessel is replaced by a Replacement Vessel pursuant to Clause 6.4 (Replacement of Vessels).

13.1.16 **Challenge to registration**   The registration of a Vessel or a Mortgage is contested or becomes void or voidable or liable to cancellation or termination, or the validity or priority of a Mortgage is contested.

13.1.17 **War**   The country of registration of a Vessel becomes involved in war (whether or not declared) or civil war or is occupied by any other power and the Agent in its discretion considers that, as a result, the security conferred by any of the Security Documents is materially prejudiced.

13.1.18 **Master Agreement termination**   A notice is given by a Swap Provider under section 6(a) of the Master Agreement, or by any person under section 6(b)(iv) of the Master Agreement, in either case designating an Early Termination Date for the purpose of the Master Agreement, or the Master Agreement is ,without that Swap Provider's prior written consent for any other reason terminated, cancelled, suspended, rescinded, revoked or otherwise ceases to remain in full force and effect.

13.1.19 **Notice of termination**   A Collateral Owner gives notice to the Security Agent to determine its obligations under the relevant Guarantee.

13.1.20 **Material adverse change**   Any event or series of events occurs which, in the opinion of the Agent, is likely to have a materially adverse effect on the business, assets, financial condition or credit worthiness of a Security Party.

13.1.21 **Breach of financial covenants**   The Borrower or any Collateral Owner does not comply with the relevant provisions in Clause 12.2 (*Financial Covenants*).

13.2    **Acceleration**   If an Event of Default is continuing the Agent may by notice to the Borrower cancel any part of the Maximum Loan Amount not then advanced and:

13.2.1   declare that the Loan, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents are immediately due and payable, whereupon they shall become immediately due and payable; and/or

13.2.2   declare that the Loan is payable on demand, whereupon it shall immediately become payable on demand by the Agent.

**14      Assignment and Sub-Participation**

14.1    **Lenders' rights**   A Lender may, with the prior written consent of the Borrower (such consent not to be unreasonably withheld or delayed and which shall be deemed to have been given by the Borrower if no response is received by the Agent within five (5) Business Days of that Lender's request) assign any of its rights under this Agreement or transfer by novation any of its rights and obligations under this Agreement to any bank or financial institution or (for the purpose of a securitisation of that Lender's rights or obligations under the Finance Documents or a similar transaction of broadly equivalent economic effect) to any special purpose vehicle, and may grant sub-participations in all or any part of its Commitment, **provided however**, that no such consent is required if an Event of Default has occurred which is continuing or in case of an assignment, transfer by novation or sub-participation to that Lender's parent company or to a subsidiary of that Lender's parent company or to another Lender.

14.2    **Borrower's co-operation**   The Borrower will co-operate fully with a Lender in connection with any assignment, transfer or sub-participation by that Lender; will execute and procure the execution of such documents as that Lender may require in that connection; and irrevocably authorise any Finance Party to disclose to any proposed assignee, transferee or sub-participant (whether before or after any assignment, transfer or sub-participation and whether or not any assignment, transfer or sub-participation shall take place) all information relating to the Security Parties, the Loan, the Relevant Documents and the Vessels which any Finance Party may in its discretion consider necessary or desirable.

14.3    **Rights of assignee**   Any assignee or transferee of a Lender shall (unless limited by the express terms of the assignment or transfer) take the full benefit of every provision of the Finance Documents benefitting that Lender PROVIDED THAT if, as a result of circumstances existing at the date of the assignment, the Borrower would be obliged to make a payment to the assignee or transfer under Clause 8.5 (*Increased costs*) or Clause 17.3 (*Grossing-up*), then the assignee or the transferee shall only be entitled to receive payment under that Clause to the same extent as that Lender would have been if the assignment or transfer had not taken place.

14.4    **Transfer Certificates**   If a Lender wishes to transfer any of its rights and obligations under or pursuant to this Agreement, it may do so by delivering to the Agent a duly completed Transfer Certificate, in which event on the Transfer Date:

14.4.1   to the extent that that Lender seeks to transfer its rights and obligations, the Borrower (on the one hand) and that Lender (on the other) shall be released from all further obligations towards the other;

14.4.2 the Borrower (on the one hand) and the transferee (on the other) shall assume obligations towards the other identical to those released pursuant to Clause 14.4.1; and

14.4.3 the Agent, each of the Lenders and the transferee shall have the same rights and obligations between themselves as they would have had if the transferee had been an original party to this Agreement as a Lender

**Provided that** the Agent shall only be obliged to execute a Transfer Certificate once:

(a) it is satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to the transfer to the transferee; and

(b) the transferee has paid to the Agent for its own account a transfer fee of six thousand Dollars ($6,000).

The Agent shall, as soon as reasonably practicable after it has executed a Transfer Certificate, send to the Borrower a copy of that Transfer Certificate.

14.5 **Finance Documents** Unless otherwise expressly provided in any Finance Document or otherwise expressly agreed between a Lender and any proposed transferee and notified by that Lender to the Agent on or before the relevant Transfer Date, there shall automatically be assigned to the transferee with any transfer of a Lender's rights and obligations under or pursuant to this Agreement the rights of that Lender under or pursuant to the Finance Documents (other than this Agreement) which relate to the portion of that Lender's rights and obligations transferred by the relevant Transfer Certificate.

14.6 **No assignment or transfer by the Borrower** The Borrower may not, without the prior consent of all Lenders, assign any of its rights or transfer any of its rights or obligations under the Finance Documents.

14.7 **Securitisation** A Lender may disclose the size and term of the Loan and the name of each of the Security Parties to any investor or potential investor in a securitisation (or similar transaction of broadly equivalent economic effect) of that Lender's rights or obligations under the Finance Documents.

15 **The Agent, the Security Agent and the Lenders**

15.1 **Appointment**

15.1.1 Each Lender appoints the Agent to act as its agent under and in connection with the Finance Documents and each Lender and the Agent appoints the Security Agent to act as its security agent and trustee for the purpose of the Security Documents.

15.1.2 Each Lender authorises the Agent and each Lender and the Agent authorises the Security Agent to exercise the rights, powers, authorities and discretions specifically given to the Agent or the Security Agent (as the case may be) under or in connection with the Finance Documents together with any other incidental rights, powers, authorities and discretions.

15.1.3 Each Swap Provider appoints the Security Agent to act as its security agent for the purpose of the Security Documents and authorises the Security Agent to exercise the rights, powers, authorities and discretions specifically given to the Security Agent under or in connection with the Security Documents together with any other incidental rights, powers, authorities and discretions.

15.1.4 Except where the context otherwise requires, references in this Clause 15 to the "**Agent**" shall mean the Agent and the Security Agent individually and collectively.

15.2 **Authority**   Each Lender irrevocably authorises the Agent (subject to Clauses 15.4 (Limitations on authority) and 15.18 (Instructions)):

15.2.1 to execute any Finance Document (other than this Agreement) on its behalf;

15.2.2 to collect, receive, release or pay any money on its behalf;

15.2.3 acting on the instructions from time to time of the Majority Lenders to give or withhold any waivers, consents or approvals under or pursuant to any Finance Document; and

15.2.4 acting on the instructions from time to time of the Majority Lenders to exercise, or refrain from exercising, any rights, powers, authorities or discretions under or pursuant to any Finance Document.

The Agent shall have no duties or responsibilities as agent or as security agent other than those expressly conferred on it by the Finance Documents and shall not be obliged to act on any instructions from the Lenders or the Majority Lenders if to do so would, in the opinion of the Agent, be contrary to any provision of the Finance Documents or to any law, or would expose the Agent to any actual or potential liability to any third party.

15.3 **Trust**   The Security Agent agrees and declares, and each of the other Finance Parties acknowledges, that, subject to the terms and conditions of this Clause 15.3, the Security Agent holds the Trust Property on trust for the Finance Parties absolutely.  Each of the other Finance Parties agrees that the obligations, rights and benefits vested in the Security Agent shall be performed and exercised in accordance with this Clause 15.3.  The Security Agent shall have the benefit of all of the provisions of this Agreement benefiting it in its capacity as security agent for the Finance Parties, and all the powers and discretions conferred on trustees by the Trustee Act 1925 (to the extent not inconsistent with this Agreement).  In addition:

15.3.1 the Security Agent and any attorney, agent or delegate of the Security Agent may indemnify itself or himself out of the Trust Property against all liabilities, costs, fees, damages, charges, losses and expenses sustained or incurred by it or him in relation to the taking or holding of any of the Trust Property or in connection with the exercise or purported exercise of the rights, trusts, powers and discretions vested in the Security Agent or any other such person by or pursuant to the Security Documents or in respect of anything else done or omitted to be done in any way relating to the Security Documents;

15.3.2   the other Finance Parties acknowledge that the Security Agent shall be under no obligation to insure any property nor to require any other person to insure any property and shall not be responsible for any loss which may be suffered by any person as a result of the lack or insufficiency of any insurance; and

15.3.3   the Finance Parties agree that the perpetuity period applicable to the trusts declared by this Agreement shall be the period of 125 years from the date of this Agreement.

The provisions of Part I of the Trustee Act 2000 shall not apply to the Security Agent or the Trust Property.

15.4   **Limitations on authority**   Except with the prior written consent of all the Lenders, the Agent shall not be entitled to:

15.4.1   release or vary any security given for the Borrower's obligations under this Agreement; nor

15.4.2   waive the payment of any sum of money payable by any Security Party under the Finance Documents; nor

15.4.3   reduce the Margin; nor

15.4.4   change the meaning of the expression "**Majority Lenders**"; nor

15.4.5   exercise, or refrain from exercising, any right, power, authority or discretion, or give or withhold any consent, the exercise or giving of which is, by the terms of this Agreement, expressly reserved to the Lenders; nor

15.4.6   extend the due date for the payment of any sum of money payable by any Security Party under any Finance Document; nor

15.4.7   take or refrain from taking any step if the effect of such action or inaction may lead to the increase of the obligations of a Lender under any Finance Document; nor

15.4.8   agree to change the currency in which any sum is payable under any Finance Document (other than in accordance with the terms of the relevant Finance Document); nor

15.4.9   agree to amend Clause 10.8 (General application of moneys); nor

15.4.10  agree to amend this Clause 15.4.

15.5   **Liability**   Neither the Agent nor any of its directors, officers, employees or agents shall be liable to the Lenders for anything done or omitted to be done by the Agent under or in connection with any of the Relevant Documents unless as a result of the Agent's gross negligence or wilful misconduct.

15.6   **Acknowledgement**   Each Lender acknowledges that:

15.6.1   it has not relied on any representation made by the Agent or any of the Agent's directors, officers, employees or agents or by any other person

acting or purporting to act on behalf of the Agent to induce it to enter into any Finance Document;

15.6.2   it has made and will continue to make without reliance on the Agent, and based on such documents and other evidence as it considers appropriate, its own independent investigation of the financial condition and affairs of the Security Parties in connection with the making and continuation of the Loan;

15.6.3   it has made its own appraisal of the creditworthiness of the Security Parties; and

15.6.4   the Agent shall not have any duty or responsibility at any time to provide it with any credit or other information relating to any Security Party unless that information is received by the Agent pursuant to the express terms of a Finance Document.

Each Lender agrees that it will not assert nor seek to assert against any director, officer, employee or agent of the Agent or against any other person acting or purporting to act on behalf of the Agent any claim which it might have against them in respect of any of the matters referred to in this Clause 15.6.

Neither the Agent nor the Security Agent is responsible for the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by the Agent, the Security Agent, a Security Party, the Borrower's or any Lender's financial advisors or legal advisors, or any other person given in or in connection with any Relevant Document, the Chapter 11 Proceedings and the financing arrangements contemplated in the Finance Documents and any associated documentation or the transactions contemplated therein.

15.7   **Limitations on responsibility**   The Agent shall have no responsibility to any Security Party or to any Lender on account of:

15.7.1   the failure of a Lender or of any Security Party to perform any of its obligations under a Finance Document; nor

15.7.2   the financial condition of any Security Party; nor

15.7.3   the completeness or accuracy of any statements, representations or warranties made in or pursuant to any Finance Document, or in or pursuant to any document delivered pursuant to or in connection with any Finance Document; nor

15.7.4   the negotiation, execution, effectiveness, genuineness, validity, enforceability, admissibility in evidence or sufficiency of any Finance Document or of any document executed or delivered pursuant to or in connection with any Finance Document.

15.8   **The Agent's rights**   The Agent may:

15.8.1   assume that all representations or warranties made or deemed repeated by any Security Party in or pursuant to any Finance Document are true and complete, unless, in its capacity as the Agent, it has acquired actual knowledge to the contrary;

15.8.2   assume that no Default has occurred unless, in its capacity as the Agent, it has acquired actual knowledge to the contrary;

15.8.3   rely on any document or notice believed by it to be genuine;

15.8.4   rely as to legal or other professional matters on opinions and statements of any legal or other professional advisers selected or approved by it;

15.8.5   rely as to any factual matters which might reasonably be expected to be within the knowledge of any Security Party on a certificate signed by or on behalf of that Security Party; and

15.8.6   refrain from exercising any right, power, discretion or remedy unless and until instructed to exercise that right, power, discretion or remedy and as to the manner of its exercise by the Lenders (or, where applicable, by the Majority Lenders) and unless and until the Agent has received from the Lenders any payment which the Agent may require on account of, or any security which the Agent may require for, any costs, claims, expenses (including legal and other professional fees) and liabilities which it considers it may incur or sustain in complying with those instructions.

15.9    **The Agent's duties**   The Agent shall:

15.9.1   if requested in writing to do so by a Lender, make enquiry and advise the Lenders as to the performance or observance of any of the provisions of any Finance Document by any Security Party or as to the existence of an Event of Default; and

15.9.2   inform the Lenders promptly of any Event of Default of which the Agent has actual knowledge.

15.10   **No deemed knowledge**   The Agent shall not be deemed to have actual knowledge of the falsehood or incompleteness of any representation or warranty made or deemed repeated by any Security Party or actual knowledge of the occurrence of any Default unless a Lender or a Security Party shall have given written notice thereof to the Agent in its capacity as the Agent.  Any information acquired by the Agent other than specifically in its capacity as the Agent shall not be deemed to be information acquired by the Agent in its capacity as the Agent.

15.11   **Other business**   The Agent may, without any liability to account to the Lenders, generally engage in any kind of banking or trust business with a Security Party or with a Security Party's subsidiaries or associated companies or with a Lender as if it were not the Agent.

15.12   **Indemnity**   The Lenders shall, promptly on the Agent's request, reimburse the Agent in their respective Proportionate Shares, for, and keep the Agent fully indemnified in respect of all liabilities, damages, costs and claims sustained or incurred by the Agent in connection with the Finance Documents (other than the Master Agreement) or the performance of its duties and obligations, or the exercise of its rights, powers, discretions or remedies under or pursuant to any Finance Document (other than the Master Agreement) to the extent not paid by the Security Parties and not arising solely from the Agent's gross negligence or wilful misconduct.

15.13    **Employment of agents**    In performing its duties and exercising its rights, powers, discretions and remedies under or pursuant to the Finance Documents, the Agent shall be entitled to employ and pay agents to do anything which the Agent is empowered to do under or pursuant to the Finance Documents (including the receipt of money and documents and the payment of money) and to act or refrain from taking action in reliance on the opinion of, or advice or information obtained from, any lawyer, banker, broker, accountant, valuer or any other person believed by the Agent in good faith to be competent to give such opinion, advice or information.

15.14    **Distribution of payments**    The Agent shall pay promptly to the order of each Lender that Lender's Proportionate Share of every sum of money received by the Agent pursuant to the Finance Documents (with the exception of any amounts payable pursuant to Clause 9 (Fees) and/or any Fee Letter and any amounts which, by the terms of the Finance Documents, are paid to the Agent for the account of the Agent alone or specifically for the account of one or more Lenders) and until so paid such amount shall be held by the Agent on trust absolutely for that Lender.

15.15    **Reimbursement**    The Agent shall have no liability to pay any sum to a Lender until it has itself received payment of that sum.  If, however, the Agent does pay any sum to a Lender on account of any amount prospectively due to that Lender pursuant to Clause 15.14 (Distribution of payments) before it has itself received payment of that amount, that Lender will, on demand by the Agent, refund to the Agent an amount equal to the sum so paid, together with an amount sufficient to reimburse the Agent for any interest which the Agent may certify that it has been required to pay on money borrowed to fund the sum in question during the period beginning on the date of payment and ending on the date on which the Agent receives reimbursement.

15.16    **Redistribution of payments**    Unless otherwise agreed between the Lenders and the Agent, if at any time a Lender receives or recovers by way of set-off, the exercise of any lien or otherwise from any Security Party, an amount greater than that Lender's Proportionate Share of any sum due from that Security Party to the Lenders under the Finance Documents (the amount of the excess being referred to in this Clause 15.16 and in Clause 15.17 (Rescission of Excess Amount) as the "**Excess Amount**") then:

15.16.1    that Lender shall promptly notify the Agent (which shall promptly notify each other Lender);

15.16.2    that Lender shall pay to the Agent an amount equal to the Excess Amount within ten (10) days of its receipt or recovery of the Excess Amount; and

15.16.3    the Agent shall treat that payment as if it were a payment by the Security Party in question on account of the sum due from that Security Party to the Lenders and shall account to the Lenders in respect of the Excess Amount in accordance with the provisions of this Clause 15.16.

However, if a Lender has commenced any legal proceedings to recover sums owing to it under the Finance Documents and, as a result of, or in connection with, those proceedings has received an Excess Amount, the Agent shall not distribute any of that Excess Amount to any other Lender which had been notified of the proceedings and had the legal right to, but did not, join those proceedings or commence and

diligently prosecute separate proceedings to enforce its rights in the same or another court.

15.17   **Rescission of Excess Amount**   If all or any part of any Excess Amount is rescinded or must otherwise be restored to any Security Party or to any other third party, the Lenders which have received any part of that Excess Amount by way of distribution from the Agent pursuant to Clause 15.16 (*Redistribution of payments*) shall repay to the Agent for the account of the Lender which originally received or recovered the Excess Amount, the amount which shall be necessary to ensure that the Lenders share rateably in accordance with their Proportionate Shares in the amount of the receipt or payment retained, together with interest on that amount at a rate equivalent to that (if any) paid by the Lender receiving or recovering the Excess Amount to the person to whom that Lender is liable to make payment in respect of such amount, and Clause 15.16.3 (*Redistribution of payments*) shall apply only to the retained amount.

15.18   **Instructions**   Where the Agent is authorised or directed to act or refrain from acting in accordance with the instructions of the Lenders or of the Majority Lenders each of the Lenders shall provide the Agent with instructions within three (3) Business Days of the Agent's request.  If a Lender does not provide the Agent with instructions within that period, that Lender shall be bound by the decision of the Agent.  Nothing in this Clause 15.18 shall limit the right of the Agent to take, or refrain from taking, any action without obtaining the instructions of the Lenders or the Majority Lenders if the Agent in its discretion considers it necessary or appropriate to take, or refrain from taking, such action in order to preserve the rights of the Lenders under or in connection with the Finance Documents.  In that event, the Agent will notify the Lenders of the action taken by it as soon as reasonably practicable, and the Lenders agree to ratify any action taken by the Agent pursuant to this Clause 15.18.

15.19   **Payments**   All amounts payable to a Lender under this Clause 15 shall be paid to such account at such bank as that Lender may from time to time direct in writing to the Agent.

15.20   **"Know your customer" checks**   Each Lender shall promptly upon the request of the Agent supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent (for itself) in order for the Agent to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

15.21   **Resignation**   Subject to a successor being appointed in accordance with this Clause 15.21, the Agent may resign as agent and/or security agent at any time without assigning any reason by giving to the Borrower and the Lenders notice of its intention to do so, in which event the following shall apply:

15.21.1   the Lenders may within thirty (30) days after the date of the Agent's notice appoint a successor to act as agent and/or security agent or, if they fail to do so, the Agent may appoint any other bank or financial institution as its successor;

15.21.2 the resignation of the Agent shall take effect simultaneously with the appointment of its successor on written notice of that appointment being given to the Borrower and the Lenders;

15.21.3 the Agent shall thereupon be discharged from all further obligations as agent and/or security agent but shall remain entitled to the benefit of the provisions of this Clause 15; and

15.21.4 the Agent's successor and each of the other parties to this Agreement shall have the same rights and obligations amongst themselves as they would have had if that successor had been a party to this Agreement.

15.22  **Replacement of the Agent**

15.22.1 After consultation with the Borrower, the Majority Lenders may, by giving thirty (30) days' notice to the Agent replace the Agent by appointing a successor Agent;

15.22.2 The retiring Agent shall make available to the successor Agent such documents and records and provide such assistance as the successor Agent may reasonably request for the purposes of performing its functions as Agent under the Finance Documents;

15.22.3 The appointment of the successor Agent shall take effect on the date specified in the notice from the Majority Lenders to the retiring Agent. As from this date, the retiring Agent shall be discharged from any further obligation in respect of the Finance Documents but shall remain entitled to the benefit of this Clause 15 (and any agency fees for the account of the retiring Agent shall cease to accrue from (and shall be payable on) that date);

15.22.4 Any successor Agent and each of the other parties to this Agreement shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original party to this Agreement.

15.23  **No fiduciary relationship**   Except as provided in Clauses 15.3 (*Trust*) and 15.14 (Distribution of payments), the Agent shall not have any fiduciary relationship with or be deemed to be a trustee of or for any other person and nothing contained in any Finance Document shall constitute a partnership between any two or more Lenders or between the Agent and any other person.

16  **Set-Off**

16.1  **Set-off**   A Finance Party may set off any matured obligation due from the Borrower under any Finance Document (to the extent beneficially owned by that Finance Party) against any matured obligation owed by that Finance Party to the Borrower, regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, that Finance Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

16.2 **Master Agreement rights**   The rights conferred on the Swap Providers by this Clause 16 shall be in addition to, and without prejudice to or limitation of, the rights of netting and set off conferred on the Swap Providers by the Master Agreement.

**17   Payments**

17.1 **Payments**   Each amount payable by the Borrower under a Finance Document (other than the Master Agreement) shall be paid to such account at such bank as the Agent may from time to time direct to the Borrower in the Currency of Account and in such funds as are customary at the time for settlement of transactions in the relevant currency in the place of payment.   Payment shall be deemed to have been received by the Agent on the date on which the Agent receives authenticated advice of receipt, unless that advice is received by the Agent on a day other than a Business Day or at a time of day (whether on a Business Day or not) when the Agent in its discretion considers that it is impossible or impracticable for the Agent to utilise the amount received for value that same day, in which event the payment in question shall be deemed to have been received by the Agent on the Business Day next following the date of receipt of advice by the Agent.

17.2 **No deductions or withholdings**   Each payment (whether of principal or interest or otherwise) to be made by the Borrower under a Finance Document shall, subject only to Clause 17.3 (*Grossing-up*), be made free and clear of and without deduction for or on account of any Taxes or other deductions, withholdings, restrictions, conditions or counterclaims of any nature.

17.3 **Grossing-up**   If at any time any law requires (or is interpreted to require) the Borrower to make any deduction or withholding from any payment, or to change the rate or manner in which any required deduction or withholding is made, the Borrower will promptly notify the Agent and, simultaneously with that payment, will pay to the Agent whatever additional amount (after taking into account any additional Taxes on, or deductions or withholdings from, or restrictions or conditions on, that additional amount) is necessary to ensure that, after making the deduction or withholding, the relevant Finance Parties receive a net sum equal to the sum which they would have received had no deduction or withholding been made.

17.4 **Evidence of deductions**   If at any time the Borrower is required by law to make any deduction or withholding from any payment to be made by it under a Finance Document, the Borrower will pay the amount required to be deducted or withheld to the relevant authority within the time allowed under the applicable law and will, no later than thirty (30) days after making that payment, deliver to the Agent an original receipt issued by the relevant authority, or other evidence acceptable to the Agent, evidencing the payment to that authority of all amounts required to be deducted or withheld.

17.5 **Adjustment of due dates**   If any payment or transfer of funds to be made under a Finance Document, other than a payment of interest on the Loan or a payment under a Master Agreement, shall be due on a day which is not a Business Day, that payment shall be made on the next succeeding Business Day (unless the next succeeding Business Day falls in the next calendar month in which event the payment shall be made on the next preceding Business Day).   Any such variation of

time shall be taken into account in computing any interest in respect of that payment.

17.6 **Control account**   The Agent and any Swap Provider shall open and maintain on its books a control account in the name of the Borrower showing the advance of the Loan and the computation and payment of interest and all other sums due under this Agreement and the Master Agreement.  The Borrower's obligations to repay the Loan and to pay interest and all other sums due under this Agreement and the Master Agreement shall be evidenced by the entries from time to time made in the control account opened and maintained under this Clause 17.6 and those entries will, in the absence of manifest error, be conclusive and binding.

17.7 **Clawback**   The Agent shall have no liability to pay any sum to the Borrower until it has itself received payment of that sum.  If, however, the Agent does pay any sum to the Borrower on account of any amount prospectively due to the Borrower pursuant to Clause 4 (Advance) before it has itself received payment of that amount, the Borrower will, on demand by the Agent, refund to the Agent an amount equal to the sum so paid, together with an amount sufficient to reimburse the Agent for any interest which the Agent may certify that it has been required to pay on money borrowed to fund the sum in question during the period beginning on the date of payment and ending on the date on which the Agent receives reimbursement.

## 18 Notices

18.1 **Communications in writing**   Any communication to be made under or in connection with this Agreement shall be made in writing and, unless otherwise stated, may be made by fax or letter.

18.2 **Addresses**   The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each party to this Agreement for any communication or document to be made or delivered under or in connection with this Agreement are:

18.2.1   in the case of the Borrower, Genco Shipping & Trading Limited, 299 Park Avenue, 12th Floor, New York, New York 10171 (fax no: +1 646 443 8551) marked for the attention of Joe Adamo;

18.2.2   in the case of each Lender, those appearing opposite its name in Schedule 1 (: The Lenders and the Commitments);

18.2.3   in the case of the Agent, 2, Bvd Konrad Adenauer, L-1115 Luxembourg (fax no: +352 42122-95771) marked for the attention of Franz-Josef Ewerhardy / Sven Walther; and

18.2.4   in the case of the Security Agent, Ludwig-Erhard-Str. 1, 20459 Hamburg, Germany (fax no: +49 40 3701 4550 and email dirk.niedereichholz@db.com) marked for the attention of Dirk Niedereichholz;

or any substitute address, fax number, department or officer as any party may notify to the Agent (or the Agent may notify to the other parties, if a change is made by the Agent) by not less than five (5) Business Days' notice.

18.3 **Delivery**   Any communication or document made or delivered by one party to this Agreement to another under or in connection this Agreement will only be effective:

18.3.1   if by way of fax, when received in legible form; or

18.3.2   if by way of letter, when it has been left at the relevant address or five (5) Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address;

and, if a particular department or officer is specified as part of its address details provided under Clause 18.2 (Addresses), if addressed to that department or officer.

Any communication or document to be made or delivered to the Agent will be effective only when actually received by the Agent.

All notices from or to the Borrower shall be sent through the Agent.

18.4 **Notification of address and fax number**   Promptly upon receipt of notification of an address, fax number or change of address, pursuant to Clause 18.2 (Addresses) or changing its own address or fax number, the Agent shall notify the other parties to this Agreement.

18.5 **Electronic communication**   Any communication to be made between the parties to this Agreement under or in connection with the Finance Documents may be made by electronic mail or other electronic means, if the parties to this Agreement:

18.5.1   agree that, unless and until notified to the contrary, this is to be an accepted form of communication;

18.5.2   notify each other in writing of their electronic mail address and/or any other information required to enable the sending and receipt of information by that means; and

18.5.3   notify each other of any change to their address or any other such information supplied by them.

Any electronic communication made between the parties to this Agreement will be effective only when actually received in readable form and in the case of any electronic communication made by a party to another party only if it is addressed in such a manner as that other party shall specify for this purpose.

18.6 **English language**   Any notice given under or in connection with this Agreement must be in English.   All other documents provided under or in connection with this Agreement must be:

18.6.1   in English; or

18.6.2   if not in English, and if so required by the Agent, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

**19      Partial Invalidity**

If, at any time, any provision of a Finance Document is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

**20      Remedies and Waivers**

No failure to exercise, nor any delay in exercising, on the part of any Finance Party, any right or remedy under a Finance Document shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy.   The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

**21      Miscellaneous**

21.1    **No oral variations**   No variation or amendment of a Finance Document shall be valid unless in writing and signed on behalf of all the relevant Finance Parties and the relevant Security Parties.

21.2    **Further assurance**   If any provision of a Finance Document shall be invalid or unenforceable in whole or in part by reason of any present or future law or any decision of any court, or if the documents at any time held by or on behalf of the Finance Parties or any of them are considered by the Lenders for any reason insufficient to carry out the terms of this Agreement, then from time to time the Borrower will promptly, on demand by the Agent, execute or procure the execution of such further documents as in the opinion of the Lenders are necessary to provide adequate security for the repayment of the Indebtedness.

21.3    **Rescission of payments etc.**   Any discharge, release or reassignment by a Finance Party of any of the security constituted by, or any of the obligations of a Security Party contained in, a Finance Document shall be (and be deemed always to have been) void if any act (including, without limitation, any payment) as a result of which such discharge, release or reassignment was given or made is subsequently wholly or partially rescinded or avoided by operation of any law.

21.4    **Certificates**   Any certificate or statement signed by an authorised signatory of the Agent purporting to show the amount of the Indebtedness (or any part of the Indebtedness) or any other amount referred to in any Finance Document shall, save for manifest error or on any question of law, be conclusive evidence as against the Borrower of that amount.

21.5    **Counterparts**   This Agreement may be executed in any number of counterparts each of which shall be original but which shall together constitute the same instrument.

21.6    **Contracts (Rights of Third Parties) Act 1999**   A person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Agreement.

**22**     **Law and Jurisdiction**

22.1     **Governing law**    This Agreement and any non-contractual obligations arising from or in connection with it shall in all respects be governed by and interpreted in accordance with English law.

22.2     **Jurisdiction**    For the exclusive benefit of the Finance Parties, the parties to this Agreement irrevocably agree that the courts of England are to have exclusive jurisdiction to settle any dispute (a) arising from or in connection with this Agreement or (b) relating to any non-contractual obligations arising from or in connection with this Agreement and that any proceedings may be brought in those courts.

22.3     **Alternative jurisdictions**    Nothing contained in this Clause 22 shall limit the right of the Finance Parties to commence any proceedings against the Borrower in any other court of competent jurisdiction nor shall the commencement of any proceedings against the Borrower in one or more jurisdictions preclude the commencement of any proceedings in any other jurisdiction, whether concurrently or not.

22.4     **Waiver of objections**    The Borrower irrevocably waives any objection which it may now or in the future have to the laying of the venue of any proceedings in any court referred to in this Clause 22, and any claim that those proceedings have been brought in an inconvenient or inappropriate forum, and irrevocably agrees that a judgment in any proceedings commenced in any such court shall be conclusive and binding on it and may be enforced in the courts of any other jurisdiction.

22.5     **Service of process**    Without prejudice to any other mode of service allowed under any relevant law, the Borrower:

22.5.1    irrevocably appoints WFW Legal Services Limited of 15 Appold Street, London EC2A 2HB, England as its agent for service of process in relation to any proceedings before the English courts in connection with this Agreement; and

22.5.2    agrees that failure by a process agent to notify the Borrower of the process will not invalidate the proceedings concerned.

**Schedule 1** : **The Lenders and the Commitments**

**The Lenders** **The Commitments**

| | |
|---|---|
| Deutsche Bank AG Filiale Deutschlandgeschäft Adolphsplatz 7, 20457 Hamburg, Germany | $51,000,000 |

Fax: +49 40 3701 4550
Attention: Dirk Niedereichholz

| | |
|---|---|
| DVB Bank SE Platz der Republik 6 D-60325 Frankfurt am Main Germany | $51,000,000 |

Fax: +49 69 9750 4875
Attention: Shipping Loans Administration Department

| | |
|---|---|
| Skandinaviska Enskilda Banken AB (publ) Kungsträdgårdsgatan 8 106 40 Stockholm Sweden | $51,000,000 |

Fax: +46 8 678 02 06
Attention: Arne Juell-Skielse

| | |
|---|---|
| BNP Paribas 16 rue du Hanovre 75002 Paris France E-mail : tgmo.shipping@bnpparibas.com Fax : +33 1 42 98 43 55 | $50,000,000 |

Attention : Transportation Group Middle Office

| | |
|---|---|
| Crédit Agricole Corporate and Investment Bank 9, quai du President Paul Doumer 92920 Paris la Defense France | $50,000,000 |

Fax: +33 1 41 89 29 87
Attention: Shipping Department

with a copy to
Crédit Agricole Corporate and Investment Bank, London
Ship Finance Department

5 Appold Street

London EC2A 2DA

Fax: +44 207 214 6689
Attention: Thibaud Escoffier / Jerome Duval

**Schedule 2**        **: Conditions Precedent and Subsequent**

**Part I: Conditions precedent to a Drawdown Notice**

1        **Security Parties**

    (a)        **Constitutional documents**    Copies of the constitutional documents of each Security Party together with such other evidence as the Agent may reasonably require that each Security Party is duly incorporated in its country of incorporation and remains in existence with power to enter into, and perform its obligations under, the Relevant Documents to which it is or is to become a party.

    (b)        **Certificates of good standing**    The certificate of good standing in respect of each Security Party (if such a certificate can be obtained).

    (c)        **Board resolutions**    A copy of a resolution of the board of directors or its equivalent of each Security Party:

        (i)        approving the terms of, and the transactions contemplated by, the Relevant Documents to which it is a party and resolving that it execute those Relevant Documents; and

        (ii)        authorising a specified person or persons to execute those Relevant Documents (and all documents and notices to be signed and/or despatched under those documents) on its behalf.

    (d)        **Shareholder resolutions**    A copy of a resolution signed by all the holders of the issued shares in each Collateral Owner, approving the terms of, and the transactions contemplated by, the Relevant Documents to which that Collateral Owner is a party.

    (e)        **Officer's certificates**    A certificate of a duly authorised officer of each Security Party certifying that that Security Party is existing in good standing in the jurisdiction of its incorporation and that each copy document relating to it specified in this Part I of Schedule 1 (: The Lenders and the Commitments) is correct, complete and in full force and effect and setting out the names and titles of the directors, officers and shareholders of that Security Party and the proportion of shares held by each shareholder, and an incumbency certificate reflecting the name and signature of each officer authorized to execute the Relevant Documents to which that Security Party is a party and that no proceedings are pending or contemplated for the dissolution of that Security Party.

    (f)        **Evidence of registration**    Where such registration is required or permitted under the laws of the relevant jurisdiction, evidence that the names of the directors, officers and shareholders of each Security Party are duly registered in the companies registry or other registry in the country of incorporation or formation (as the case may be) of that Security Party.

(g)    **Powers of attorney**    The notarially attested and legalised power of attorney of each Security Party under which any documents are to be executed or transactions undertaken by that Security Party.

2    **Security and related documents**

(h)    **Vessel documents**    Copies, certified as true, accurate and complete by a director or the secretary of the Borrower, of, in respect of the Vessel specified in the relevant Drawdown Notice:

(i)    the MOA;

(ii)    such documents as the Agent may reasonably require to evidence the nomination of the Collateral Owner as purchaser of the Vessel pursuant to the MOA;

(iii)    any charterparty or other contract of employment of the Vessel which will be in force on the relevant Drawdown Date;

(iv)    the Management Agreement;

in each case together with all addenda, amendments or supplements.

(i)    **Survey report**    A report by a surveyor instructed by the Agent to inspect Vessel E and Vessel G confirming that the condition of the Vessel is in all respects acceptable to the Lenders.

(j)    **Valuation**    Two (2) valuations of the Vessel from two (2) Approved Brokers determined in accordance with the definition of "Fair Market Value".

(k)    **Managers' confirmation**    In respect of the Vessel specified in the relevant Drawdown Notice, the written confirmation of:

(i)    the Technical Managers that, throughout the period in which they are technical managers, they will (a) not, without the prior written consent of the Agent (such consent not to be unreasonably withheld by the Agent), sub-contract or delegate the technical management of the Vessel to any third party and (ii) following the occurrence of an Event of Default, all claims of the Technical Managers against the relevant Collateral Owner, shall be subordinated to the claims of the Finance Parties under the Finance Documents; and

(ii)    the Commercial Managers that, throughout the Facility Period unless otherwise agreed by the Agent, they will remain the commercial managers of the Vessel and that following the occurrence of an Event of Default, all claims of the Commercial Managers against the relevant Collateral Owner shall be subordinated to the claims of the Finance Parties under the Finance Documents.

(l) **No disputes**   The written confirmation of the Borrower that there is no dispute and no pending litigation under any of the Relevant Documents as between the parties to any such document.

(m) **Mandates and The Account Holder's confirmation**   Duly signed forms of mandate and the written confirmation of the Account Holder that the Accounts have been opened with the Account Holder and to its actual knowledge are free from Encumbrances and rights of set off other than as created by or pursuant to the Security Documents, and/or other evidence of the opening of the Accounts, as the Agent may require.

3       **Other documents and evidence**

(a) **Drawdown Notice**   A duly completed Drawdown Notice.

(b) **Process agent**   Evidence that any process agent referred to in Clause 22.5 (Service of process) and any process agent appointed under any other Finance Document has accepted its appointment.

(c) **Other authorisations**   A copy of any other consent, licence, approval, authorisation or other document, opinion or assurance which the Agent considers to be necessary or desirable (if it has notified the Borrower accordingly) in connection with the entry into and performance of the transactions contemplated by any of the Relevant Documents or for the validity and enforceability of any of the Relevant Documents.

(d) **Financial statements**   Copies of the Original Financial Statements of the Borrower.

(e) **Fees**   Evidence that the fees, costs and expenses then due from the Borrower under Clause 8 (Indemnities) and Clause 9 (Fees) have been paid or will be paid by the relevant Drawdown Date.

(f) **"Know your customer" documents**   Such documentation and other evidence as is reasonably requested by the Agent in order for the Lenders to comply with all necessary "know your customer" or similar identification procedures in relation to the transactions contemplated in the Finance Documents.

(g) **Ultimate beneficiary of the Collateral Owners**   Evidence that the Borrower is the ultimate legal and beneficial owner of the Collateral Owners.

(h) **Public debt**  Evidence that the Borrower has issued public debt and equity securities with minimum proceeds of one hundred and fifty million Dollars ($150,000,000) and in the case of public debt securities, that such securities have a maturity date falling after the Final Maturity Date.

**Part II: Conditions precedent to the making of a Drawing**

4        **Security Parties**

(a)      **Bringdown Officer's certificates**   If requested by the Agent, a certificate of a duly authorised officer of each Security Party confirming that none of the documents and evidence delivered to the Agent under Schedule 2 (: Conditions Precedent and Subsequent), Part I (Conditions Precedent to a Drawdown Notice) paragraph 1 has been amended, modified or revoked in any way since its delivery to the Agent.

5        **Security and related documents**

(a)      **Vessel documents**   in respect of each Vessel, photocopies, certified as true, accurate and complete by a director or the secretary of the Borrower or the relevant Collateral Owner, of:

(i)       the bill of sale transferring title in the Vessel to the Collateral Owner free of all encumbrances, maritime liens or other debts;

(ii)      the protocol of delivery and acceptance evidencing the unconditional physical delivery of the Vessel by the Seller to the Collateral Owner pursuant to the MOA;

in each case together with all addenda, amendments or supplements.

(b)      **Evidence of Seller's title for Vessel not yet delivered**   If the Vessel has not already been delivered to the relevant Collateral Owner at the time of the Drawing, a copy of the certificate of ownership and encumbrance (or equivalent) issued by the Registrar of Ships (or equivalent official) of the Vessel's current flag confirming that the Vessel is owned by the relevant Seller and free of registered Encumbrances and an undertaking by the Seller to delete the Vessel from its current flag.

(c)      **Confirmation of class**   A copy, (certified as true, accurate and complete by a director or the secretary of the Borrower), of the certificate of Confirmation of Class for hull and machinery confirming that the Vessel is classed with the highest class applicable to vessels of her type with an Approved Classification Society free of overdue recommendations affecting class other than those approved by the Agent.

(d)      **Evidence of Collateral Owner's title for Vessel not yet delivered**   If the Vessel has not already been delivered to the relevant Collateral Owner at the time of the Drawing, evidence that on the Drawdown Date (i) the Vessel will be at least provisionally registered under the Marshall Islands' flag in the ownership of the Collateral Owner and (ii) the Mortgage will be capable of being registered against the Vessel with first priority.

(e)      **Evidence of Collateral Owner's title for Vessels refinanced**   If the Vessel has already been delivered to the relevant Collateral Owner at the time of the Drawing, a certificate of ownership and encumbrance (or equivalent) issued by the Registrar of Ships (or equivalent official) of the Marshall Islands' flag confirming that (a) the Vessel is permanently

registered under that flag in the ownership of the Collateral Owner, (b) the Mortgage has been registered with first priority against the Vessel and (c) there are no further Encumbrances registered against the Vessel.

(f)     **Evidence of insurance**   Evidence that the Vessel will be insured in the manner required by the Security Documents and that letters of undertaking will be issued in the manner required by the Security Documents, together with (if required by the Agent) the written approval of the Insurances by an insurance adviser appointed by the Agent.

(g)     **Security Documents**   The Mortgage and the Assignments in respect of the Vessel, the Guarantee, the Account Pledge, the Deposit Account Control Agreement, the Share Pledges, the Master Agreement Charge and any other Credit Support Documents, together with all other documents required by any of them, including, without limitation, (i) all notices of assignment and/or charge and, (ii) to the extent the Borrower or the Collateral Owners can procure same, evidence that those notices will be duly acknowledged by the recipients, and (iii) share certificates and UCC Filings, if necessary, to perfect the security interests under the applicable Security Documents.

(h)     **Other Relevant Documents**   Copies of each of the Relevant Documents not otherwise comprised in the documents listed in this Part II of Schedule 1.

(i)     **Equity contribution**   Evidence of full payment to the relevant Seller of any part of the purchase price of the Vessel under the MOA which is payable on or before the relevant Drawdown Date and which is not being financed by the Loan.

6      **Legal opinions**

(a)     If a Security Party is incorporated or organised in a jurisdiction other than England and Wales or if any Finance Document is governed by the laws of a jurisdiction other than England and Wales, a legal opinion of the legal advisers to the Lenders in each relevant jurisdiction, substantially in the form or forms provided to the Agent prior to signing this Agreement or confirmation satisfactory to the Agent that such an opinion will be given.

**Part III: Conditions subsequent**

1     **Evidence of Collateral Owner's title**   If the Vessel has not already been delivered to the relevant Collateral Owner at the time of the Drawing, a Certificate of ownership and encumbrance (or equivalent) issued by the Registrar of Ships (or equivalent official) of the Marshall Island's flag confirming that (a) the Vessel is permanently registered under that flag in the ownership of the Collateral Owner, (b) the Mortgage has been registered with first priority against the Vessel and (c) there are no further Encumbrances registered against the Vessel.

2     **Deletion by Seller**   Evidence that the Vessel has been deleted from its previous flag.

3     **Letters of undertaking**   Evidence that the Vessel is insured in the manner required by the Security Documents and original letters of undertaking in respect of the Insurances as required by the Security Documents together with copies of the relevant policies or cover notes or entry certificates duly endorsed with the interest of the Finance Parties.

4     **Acknowledgements of notices**   To the extent the Borrower or the Collateral Owners can procure same, acknowledgements of all notices of assignment and/or charge given pursuant to any Security Documents received by the Agent pursuant to Part II of this Schedule 2 (: Conditions Precedent and Subsequent).

5     **Legal opinions**   Such of the legal opinions specified in Part II of this Schedule 2 (: Conditions Precedent and Subsequent) as have not already been provided to the Agent.

6     **Companies Act registrations**   Evidence that the Security Documents received by the Agent pursuant to Part II of this Schedule 2 (: Conditions Precedent and Subsequent) have been, if necessary, filed, recorded or enrolled with any court or other authority in the jurisdiction of incorporation or formation (as the case may be) of each relevant Security Party within any applicable statutory time limit.

7     **Insurance opinion**   Within ninety (90) days of the Drawdown Date, an insurance opinion in respect of the Vessel's insurance policy cover to be made by an independent broker at the Borrower's expense to the satisfaction of the Security Agent.

8     **Mortgagee's Insurances Fees**   Payment to the Security Agent of all fees which are owed by the Borrower or the Collateral Owners pursuant to the terms of the Finance Documents in relation to inspections, valuations, legal fees and premiums for Mortgagee's Insurances (MII and MAP).

9     **Master receipt**   The master's receipt for the Mortgage.

**Schedule 3       : Calculation of Mandatory Cost**

1       The Mandatory Cost is an addition to the interest rate to compensate the Lenders for the cost of compliance with (a) the requirements of the Bank of England and/or the Financial Services Authority (or, in either case, any other authority which replaces all or any of its functions) or (b) the requirements of the European Central Bank.

2       On the first day of each Interest Period (or as soon as possible thereafter) the Agent shall calculate, as a percentage rate, a rate (the "**Additional Cost Rate**") for each Lender in accordance with the paragraphs set out below.  The Mandatory Cost will be calculated by the Agent as a weighted average of the Lenders' Additional Cost Rates (weighted in proportion to the percentage participation of each Lender in the Loan) and will be expressed as a percentage rate per annum.

3       The Additional Cost Rate for any Lender lending from an office in the euro-zone will be the percentage notified by that Lender to the Agent to be its reasonable determination of the cost (expressed as a percentage of that Lender's participation in the Loan) of complying with the minimum reserve requirements of the European Central Bank as a result of participating in the Loan from that office.

4       The Additional Cost Rate for any Lender lending from an office in the United Kingdom will be calculated by the Agent as follows:

(a)       where the Loan is denominated in sterling:

$$\frac{BY + S(Y - Z) + F \times 0.01}{100 - (B + S)} \text{ per cent per annum}$$

(b)       where the Loan is denominated in any currency other than sterling:

$$\frac{F \times 0.01}{300} \text{ per cent per annum}$$

where:

B       is the percentage of eligible liabilities (assuming these to be in excess of any stated minimum) which that Lender is from time to time required to maintain as an interest free cash ratio deposit with the Bank of England to comply with cash ratio requirements;

Y       is the percentage rate of interest (excluding the Margin and the Mandatory Cost and, if the Loan is an overdue amount, the additional rate of interest specified in Clause 7.9 (*Default interest*)) payable for the relevant Interest Period on the Loan;

S       is the percentage (if any) of eligible liabilities which that Lender is required from time to time to maintain as interest bearing special deposits with the Bank of England;

Z       is the interest rate per annum payable by the Bank of England to that Lender on special deposits; and

F        is the charge payable by that Lender to the Financial Services Authority under paragraph 2.02 or 2.03 (as appropriate) of the Fees Regulations or the equivalent provisions in any replacement regulations (with, for this purpose, the figure for the minimum amount in paragraph 2.02b or such equivalent provision deemed to be zero), expressed in pounds per £1 million of the fee base of that Lender.

5        For the purpose of this Schedule:

(a)       "**eligible liabilities**" and "**special deposits**" have the meanings given to them at the time of application of the formula by the Bank of England;

(b)       "**fee base**" has the meaning given to it in the Fees Regulations;

(c)       "**Fees Regulations**" means the regulations governing periodic fees contained in the Financial Services Authority Fees Manual or such other law or regulation as may be in force from time to time in respect of the payment of fees for the acceptance of deposits.

6        In the application of the formula B, Y, S and Z are included in the formula as figures and not as percentages, e.g. if B = 0.5% and Y = 15%, BY is calculated as 0.5. x 15. Each rate calculated in accordance with the formula is, if necessary, rounded upward to four decimal places.

7        If a Lender does not supply the information required by the Agent to determine its Additional Cost Rate when requested to do so, the applicable Mandatory Cost shall be determined on the basis of the information supplied by the remaining Lenders.

8        If a change in circumstances has rendered, or will render, the formula inappropriate, the Agent shall notify the Borrower of the manner in which the Mandatory Cost will subsequently be calculated.  The manner of calculation so notified by the Agent shall, in the absence of manifest error, be binding on the Borrower.

**Schedule 4        : Form of Drawdown Notice**

To:     **Deutsche Bank Luxembourg S.A.**

From:    **Genco Shipping & Trading Limited**

[Date]

Dear Sirs

**Drawdown Notice**

We refer to the Loan Agreement dated                        2010 made between, amongst others, ourselves and yourselves (the "**Agreement**").

Words and phrases defined in the Agreement have the same meaning when used in this Drawdown Notice.

Pursuant to Clause 4.1 of the Agreement, we irrevocably request that you advance a Drawing in the sum of $[                                                        ] to us on                        20    , which is a Business Day, by paying the amount of the Drawing in accordance with the MOA in respect of the Vessel named [ ] to the following account:

[details of account]

We warrant that the representations and warranties contained in Clause 11.1 of the Agreement are true and correct at the date of this Drawdown Notice and will be true and correct on          20    , that no Default has occurred and is continuing, and that no Default will result from the advance of the Drawing requested in this Drawdown Notice.

[We select the period of [      ] months as the first Interest Period.]

Yours faithfully

...............................

For and on behalf of

**Genco Shipping & Trading Limited**

**Schedule 5        : Form of Transfer Certificate**

**To:        Deutsche Bank Luxembourg S.A.**

**Transfer Certificate**

This transfer certificate relates to a secured loan facility agreement (as from time to time amended, varied, supplemented or novated, the "Loan Agreement") dated                    2010, on the terms and subject to the conditions of which a secured loan facility of up to $253,000,000 was made available to Genco Shipping & Trading Limited, by a syndicate of banks on whose behalf you act as agent.

1        Terms defined in the Loan Agreement shall, unless otherwise expressly indicated, have the same meaning when used in this certificate.  The terms "**Transferor**" and "**Transferee**" are defined in the schedule to this certificate.

2        The Transferor:

   2.1      confirms that the details in the Schedule under the heading "**Transferor's Commitment**" accurately summarise its Commitment;  and

   2.2      requests the Transferee to accept by way of novation the transfer to the Transferee of the amount of the Transferor's Commitment specified in the Schedule by counter-signing and delivering this certificate to the Agent at its address for communications specified in the Loan Agreement.

3        The Transferee requests the Agent to accept this certificate as being delivered to the Agent pursuant to and for the purposes of clause 14.4 of the Loan Agreement so as to take effect in accordance with the terms of that clause on the Transfer Date specified in the Schedule.

4        The Agent confirms its acceptance of this certificate for the purposes of clause 14.4 of the Loan Agreement.

5        The Transferee confirms that:

   5.1      it has received a copy of the Loan Agreement together with all other information which it has required in connection with this transaction;

   5.2      it has not relied and will not in the future rely on the Transferor or any other party to the Loan Agreement to check or enquire on its behalf into the legality, validity, effectiveness, adequacy, accuracy or completeness of any such information;  and

   5.3      it has not relied and will not in the future rely on the Transferor or any other party to the Loan Agreement to keep under review on its behalf the financial condition, creditworthiness, condition, affairs, status or nature of any Security Party.

6        Execution of this certificate by the Transferee constitutes its representation and warranty to the Transferor and to all other parties to the Loan Agreement that it has the power to become a party to the Loan Agreement as a Lender on the terms of the

Loan Agreement and has taken all steps to authorise execution and delivery of this certificate.

7   The Transferee undertakes with the Transferor and each of the other parties to the Loan Agreement that it will perform in accordance with their terms all those obligations which by the terms of the Loan Agreement will be assumed by it after delivery of this certificate to the Agent and the satisfaction of any conditions subject to which this certificate is expressed to take effect.

8   The Transferor makes no representation or warranty and assumes no responsibility with respect to the legality, validity, effectiveness, adequacy or enforceability of any Finance Document or any document relating to any Finance Document, and assumes no responsibility for the financial condition of any Finance Party or for the performance and observance by any Security Party of any of its obligations under any Finance Document or any document relating to any Finance Document and any conditions and warranties implied by law are expressly excluded.

9   The Transferee acknowledges that nothing in this certificate or in the Loan Agreement shall oblige the Transferor to:

   9.1   accept a re-transfer from the Transferee of the whole or any part of the rights, benefits and/or obligations transferred pursuant to this certificate; or

   9.2   support any losses directly or indirectly sustained or incurred by the Transferee for any reason including, without limitation, the non-performance by any party to any Finance Document of any obligations under any Finance Document.

10   The address and fax number of the Transferee for the purposes of clause 18 of the Loan Agreement are set out in the Schedule.

11   This certificate may be executed in any number of counterparts each of which shall be original but which shall together constitute the same instrument.

12   This certificate and any non-contractual obligations arising out of or in connection with it shall be governed by and interpreted in accordance with English law.


**The Schedule**

1   **Transferor**:

2   **Transferee**:

3   **Transfer Date** (not earlier that the fifth Business Day after the date of delivery of the Transfer Certificate to the Agent):

4   **Transferor's Commitment**:

5   **Amount transferred**:

6   **Transferee's address and fax number for the purposes of clause 18 of the Loan Agreement**:

**[name of Transferor]**                          **[name of Transferee]**


By:                                               By:


Date:                                             Date:




**[Agent]** as Agent


By:


Date:

**Schedule 6          : Form of Compliance Certificate**

From: **Genco Shipping & Trading Limited** (the **"Company"**)


To: **Deutsche Bank Luxembourg S.A.** (the **"Agent"**)



Dated: [●]


Dear Sirs,

This Certificate is rendered pursuant to Clause 12.1 of the loan agreement dated [●] 2010 (as amended and supplemented from time to time, the "**Loan Agreement**") entered into by, inter alia, ourselves as borrower, each of the banks listed in Schedule 1 (: The Lenders and the Commitments) to the Loan Agreement as lenders, yourselves and others as mandated lead arrangers, Deutsche Bank Luxembourg S.A. as agent for the Lenders and yourselves as security agent and bookrunner.

Words and expressions defined in the Loan Agreement shall have the same meanings when used herein.

We hereby certify that:


1       Attached to this Certificate [are][is] the latest [audited consolidated financial statements of the Company and its subsidiaries for the financial year ending on [●]] [unaudited consolidated financial statements of the Company including cash flows] in relation to the [first] [second] [third] fiscal quarter of the financial year ending on [●]] (the "**Accounts**").

2       As at the date of this Certificate the financial covenants set out in Clause 12.2 of the Loan Agreement [are] [are not] complied with, in that as at [●]:

   (a)      Consolidated Interest Coverage Ratio is [●]

   (b)      Maximum Leverage Ratio is [●]

   (c)      Minimum Consolidated Net Worth is **[●]**

   (d)      Consolidated Indebtedness is **[●]**

   [or, as the case may be, specify in what respect any of the financial covenants are not complied with.]

3       As at [●] no Event of Default has occurred and is continuing.

The Company and each Collateral Owner are complying with the requirements under clauses 10.10 (*Additional security*) and 12.2.1 (*Minimum liquidity*) of the Loan Agreement.

[or, specify/identify any Event of Default]

4    [The Fair Market Value of the Vessels as reflected in the most recent valuations are as follows:

| Name of Vessel | Name of First Approved Ship Broker | Name of Second Approved Ship Broker | Average Fair Market Value |
|---|---|---|---|
| [●] | [●] | [●] | [●]] |

[Attached are details of the calculations for the purposes of this Certificate.]

Yours faithfully,

**Genco Shipping & Trading Limited**

By: _____

Position:  Chief Financial Officer

Name:

**In Witness** of which the parties to this Agreement have executed this Agreement the day and year first before written.

**Signed** and **delivered**
as a **deed**                                    _____
by **Genco Shipping & Trading**                         signature
**Limited**
acting by                                        _____
                                                        print name

its duly authorised

in the presence of:

signature
of witness    _____

name          _____
                     print name of witness

address

**Signed** and **delivered**
as a **deed**                                    _____
by **Deutsche Bank AG Filiale**                         signature
**Deutschlandgeschäft** (as a Lender)
acting by                                        _____
                                                        print name

its duly authorised

in the presence of:

signature
of witness    _____

name          _____
                     print name of witness

address

**Signed** and **delivered**
as a **deed**
by **BNP Paribas**  (as a Lender)
acting by

its duly authorised

in the presence of:

signature
of witness  _____

name        _____
            print name of witness

address

_____
signature

_____
print name

**Signed** and **delivered**
as a **deed**
by **Credit Agricole Corporate and
Investment Bank**  (as a Lender)
acting by

its duly authorised

in the presence of:

signature
of witness  _____

name        _____
            print name of witness

address

_____
signature

_____
print name

**Signed** and **delivered**
as a **deed**
by **DVB Bank SE** (as a Lender)
acting by

_____
signature

its duly authorised

_____
print name

in the presence of:

signature
of witness   _____

name   _____
print name of witness

address

**Signed** and **delivered**
as a **deed**
by **Skandinaviska Enskilda Banken AB (publ)** (as a Lender)
acting by

_____
signature

its duly authorised

_____
print name

in the presence of:

signature
of witness   _____

name   _____
print name of witness

address

**Signed** and **delivered**
as a **deed**
by   **Deutsche   Bank   AG   Filiale
Deutschlandgeschäft** (as a Mandated
Lead Arranger)
acting by

_____
signature

_____
print name

its duly authorised

in the presence of:

signature
of witness    _____

name         _____
             print name of witness

address


**Signed and delivered**
**as a deed**
**by BNP Paribas** (as a Mandated Lead
Arranger)
acting by

its duly authorised

in the presence of:

signature
of witness

_____
signature

_____
print name

_____    _____

name         _____
             print name of witness

address

**Signed** and **delivered**
as a **deed**
by **Credit Agricole Corporate and Investment Bank** (as a Mandated Lead Arranger)
acting by

_____
signature

_____
print name

its duly authorised

in the presence of:

signature
of witness    _____

name          _____
              print name of witness

address


**Signed** and **delivered**
as a **deed**
by **DVB Bank SE**  (as a Mandated Lead Arranger)
acting by

its duly authorised

in the presence of:

signature
of witness

                                              _____
                                              signature
                                              _____

                                              _____
                                              print name

              _____    _____

name          _____
              print name of witness

address

**Signed** and **delivered**
as a **deed**
by **Skandinaviska Enskilda Banken
AB (publ)** (as a Mandated Lead
Arranger)
acting by

_____

signature

_____

print name

its duly authorised

in the presence of:

signature
of witness    _____

name          _____

print name of witness

address

**Signed** and **delivered**
as a **deed**
by **Deutsche Bank Luxembourg S.A.**
(as the Agent)
acting by

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

signature

_____

print name

its duly authorised

in the presence of:

signature
of witness    _____

name          \-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

print name of witness

address

**Signed** and **delivered**
as a **deed**
by **BNP Paribas** (as a Swap Provider)
acting by

_____
signature

its duly authorised

_____
print name

in the presence of:

signature
of witness    _____

name        _____
                print name of witness

address


**Signed** and **delivered**
as a **deed**
by **Credit Agricole Corporate and
Investment Bank (**as a Swap
Provider)
acting by

_____
signature

_____
print name

its duly authorised

in the presence of:

signature
of witness    _____

name        _____
                print name of witness

address


Page 101

**Signed** and **delivered**
as a **deed**
by **DVB Bank SE** (as a Swap Provider)
acting by

_____
signature

its duly authorised

_____
print name

in the presence of:

signature
of witness   _____

name        _____
print name of witness

address

**Signed** and **delivered**
as a **deed**
by **Deutsche Bank AG** (as a Swap
Provider)
acting by

_____
signature

its duly authorised

_____
print name

in the presence of:

signature
of witness   _____

name        _____
print name of witness

address

**Signed** and **delivered**
as a **deed**
by **Skandinaviska Enskilda Banken AB (publ)** (as a Swap Provider)
acting by

_____
signature

_____
print name

its duly authorised

in the presence of:

signature
of witness    _____

name    _____
print name of witness

address


**Signed** and **delivered**
as a **deed**
by **Deutsche Bank AG Filiale Deutschlandgeschäft** (as Security Agent and Bookrunner)
acting by

_____
signature

_____
print name

its duly authorised

in the presence of:

signature
of witness    _____

name    _____
print name of witness

address

**EXHIBIT 3**

**THE AMENDED AND RESTATED $100 MILLION CREDIT AGREEMENT**

## EXHIBIT A

**AMENDMENT AND RESTATEMENT AGREEMENT**

**DATED**                                                    **June 2014**

(1)   **GENCO SHIPPING & TRADING LIMITED** (THE BORROWER)

(2)   **THE COMPANIES** LISTED IN SCHEDULE 2 OF APPENDIX A (THE GUARANTORS)

(3)   **THE BANKS AND FINANCIAL INSTITUTIONS** LISTED IN SCHEDULE 1 OF APPENDIX A (THE LENDERS)

(4)   **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK** (THE AGENT)

(5)   **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK** (THE SECURITY TRUSTEE)

---

**AMENDMENT AND RESTATEMENT AGREEMENT**

---



O R R I C K

ORRICK, HERRINGTON & SUTCLIFFE (EUROPE) LLP
107 CHEAPSIDE
LONDON EC2V 6DN
TEL +44 (0) 20 7862 4600
FAX +44 (0) 20 7862 4800

OHSUSA:757813060.7

**CONTENTS**

| Clause | Page |
|---|---|
| 1. DEFINITIONS AND CONSTRUCTION | 1 |
| 2. AMENDMENT AND RESTATEMENT | 2 |
| 3. WAIVERS | 2 |
| 4. CONFIRMATIONS | 2 |
| 5. REPRESENTATIONS AND WARRANTIES | 3 |
| 6. FEES AND EXPENSES | 3 |
| 7. GOVERNING LAW AND JURISDICTION | 3 |
| 8. FINANCE DOCUMENTS | 4 |
| SCHEDULE 1 CONDITIONS PRECEDENT | 5 |

**AMENDMENT AND RESTATEMENT AGREEMENT**

**DATED**                                                        June 2014

**PARTIES**

(1)     **GENCO SHIPPING & TRADING LIMITED**, a company organised and existing under the laws of the Republic of the Marshall Islands (the "**Borrower**");

(2)     The Subsidiaries of the Borrower listed in Schedule 2 of Appendix A as guarantors ( the "**Guarantors**");

(3)     The banks and financial institutions listed in Schedule 1 of Appendix A as lenders (the "**Lenders**");

(4)     **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK** as agent of the Lenders (the "**Agent**"); and

(5)     **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK** as security trustee (the "**Security Trustee**").

**BACKGROUND**

(A)     This Agreement is supplemental to and amends a US$100,000,000 loan agreement dated 12 August 2010 among the Parties (as defined in clause 1.1 of this Agreement *(Definitions)*), as amended (the "**Loan Agreement**").

(B)     The Parties have agreed to amend and restate the Loan Agreement on the terms of this Agreement.

**OPERATIVE PROVISIONS**:

**1.        DEFINITIONS AND CONSTRUCTION**

1.1     Definitions

Words and expressions defined in the Loan Agreement shall have the same meanings in this Agreement unless they are expressly defined below and, in addition, in this Agreement:

"**Agreement**" means this Amendment and Restatement Agreement;

"**Amendment and Restatement Effective Date**" means the Business Day on which the Agent notifies the Borrower that it has received, in form and substance satisfactory to it, (or that it has, with the consent of every Lender, waived the receipt of) all of the documents, fees and evidence listed in Schedule 1 attached hereto *(Conditions Precedent);*

"**Amendment Documents**" means this Agreement and the Mortgage Amendments;

OHSUSA:757813060.7                                              1

"**Crédit Agricole**" means Crédit Agricole Corporate and Investment Bank;

"**Parties**" means the parties to this Agreement; and

"**Security Documents**" means the Agency and Security Trust Deed, each Mortgage, the General Assignment Deed, the Accounts Pledge, the Share Charge, and any other document (whether creating a Security Interest or not) which is executed at any time by the Borrower or any other person as security for, or to establish any form of subordination or priorities arrangement in relation to, any amount payable to the Lenders under the Loan Agreement, as may be amended, supplemented or otherwise modified from time to time or any of the other documents referred to in this definition.

1.2     Construction

The principles of construction set out in clause 1.2 *(Construction of Certain Terms)* of the Loan Agreement shall apply to this Agreement, insofar as they are relevant to it, as they apply to the Loan Agreement.

1.3     Third Party Rights

The provisions of clause 28.4 *(Third Party Rights)* of the Loan Agreement shall apply to this Agreement as they apply to the Loan Agreement.

**2.      AMENDMENT AND RESTATEMENT**

2.1     Amendment and Restatement

With effect from the Amendment and Restatement Effective Date the Loan Agreement shall be amended and restated in the form set out in Appendix A *(Amended and Restated Loan Agreement).*

**3.      WAIVERS**

With effect from the Amendment and Restatement Effective Date the Creditor Parties waive such Events of Default under clauses 19.1(c) (*Other Obligations under this Agreement*), 19.1(e) (Financial Indebtedness), 19.1(f) *(Insolvency Proceedings)* and 19.1 (s) (*Material Adverse Change*) under the Loan Agreement as may have occurred prior to the Amendment and Restatement Effective Date.

**4.      CONFIRMATIONS**

Without prejudice to the rights of any Creditor Party which have arisen on or before the Amendment and Restatement Effective Date:

(a)     each Creditor Party and each Obligor confirms that the Loan Agreement, as amended and restated by this Agreement, remains in full force and effect on and after the Amendment and Restatement Effective Date; and

(b)     each Guarantor confirms that its guarantee and indemnity under clause 9 (*Guarantee and Indemnity*) of the Loan Agreement and its liabilities under the Security Documents to which it is a party shall have effect on and after the Amendment and Restatement Effective Date in relation to the liabilities of each Obligor under the Loan Agreement as amended and restated under this Agreement.

## 5.     REPRESENTATIONS AND WARRANTIES

Each Obligor represents and warrants that the representations and warranties in clause 11.4 of the Loan Agreement (other than in clauses 11.1(h), 11.1(i) and 11.1(j)) are deemed to be repeated by each Obligor by reference to the facts and circumstances then existing on:

(a)     the date of this Agreement; and

(b)     the Amendment and Restatement Effective Date.

*provided*, however, that to the extent any representation or warranty expressly relates to an earlier date, such representation and warranty shall be true and correct in all material respects as of such date.

## 6.     FEES AND EXPENSES

6.1     Arrangement Fee

The Borrower shall pay to the Agent (for the account of each Lender) on the Amendment and Restatement Effective Date the arrangement fee described in clause 20.1(a) of Appendix A.

6.2     Structuring Fee

The Borrower shall pay to Crédit Agricole (for its own account) on the Amendment and Restatement Effective Date the structuring fee described in clause 20.1(d) of Appendix A.

6.3     Amendment Expenses

The Borrower shall, on the Amendment and Restatement Effective Date, reimburse the Agent for the amount of all costs and expenses (including legal fees) reasonably incurred by them in connection with this Agreement pursuant to clause 20.2 of Appendix A.

## 7.     GOVERNING LAW AND JURISDICTION

7.1     Governing Law

This Agreement is governed by English law.

7.2     Enforcement

The provisions of clause 29 *(Law and Jurisdiction)* of the Loan Agreement shall apply to this Agreement as it applies to the Loan Agreement.

**8. FINANCE DOCUMENTS**

This Agreement is designated by the Parties as a Finance Document.

This Agreement has been entered into on the date stated at the beginning of this Agreement.

**SCHEDULE 1**

**CONDITIONS PRECEDENT**

The documents and other evidence referred to in the definition of "**Amendment and Restatement Effective Date**" are as follows:

1.    **Corporate Documentation**

1.1    All corporate and legal proceedings and all instruments in connection with the transactions contemplated by this Agreement and the other Finance Documents shall be satisfactory in form and substance to the Lenders, and the Lenders shall have received all information and copies of all documents which the Lenders may reasonably have requested in connection herewith and therewith, such documents where appropriate to be certified by proper corporate officials or governmental authorities; and

1.2    Copies of resolutions of directors of each Obligor:

(a)    approving and authorising the execution, delivery and performance of the Amendment Documents and affirmation of the continued enforceability and validity of each previously executed Finance Document (and of each document required to be delivered by each Finance Document);

(b)    showing that the relevant board meeting was quorate, that due consideration was given by all the relevant directors present of that Obligor's liabilities arising under this Agreement and that all declarations of interest required in connection with this Agreement were made; and

(c)    authorising any director whose name and specimen signature is set out in those minutes to sign this Agreement and any other documents to be executed or delivered pursuant to it.

2.    **Other Documentation**

2.1    Duly executed Amendment Documents;

2.2    Certificates of good standing for each Obligor;

2.3    Evidence that (i) the Mortgage Amendments will be capable of being registered against the Vessels and (ii) the discharge of the Second Security Documents will be capable of being recorded against the Vessels; and

2.4    A certificate from each of the Obligors satisfactory in form and substance to the Lenders, the statements in which shall be true and correct as to compliance with the conditions listed in this Schedule 1 and Clause 4 of Annex A.

3.    **Miscellaneous**

3.1   Certification that no statute, rule or regulation (including, without limitation, any statute, rule or regulation relating to taxation) of any governmental body shall be pending or shall have come into effect which is likely to have a material and adverse effect on the transactions contemplated by this Agreement and the other Finance Documents;

3.2   Certification that all representations and warranties of the Obligors herein (except with respect to Clause 11.1(j)) shall be true, and correct on and as of the Amendment and Restatement Effective Date with the same effect as though such representations and warranties had been made on and as of such date; *provided*, however, that to the extent any representation or warranty expressly relates to an earlier date, such representation and warranty shall be true and correct in all material respects as of such date;

3.3   Evidence that (i) the Bankruptcy Court shall have entered the Confirmation Order, which shall, among other things, authorize the transactions contemplated under this Agreement; (ii) the Confirmation Order has not  been stayed, modified or vacated on appeal; and (iii) the Confirmation Order shall be a final order in full force and effect; and

3.4   Evidence that the effective date of the Plan of Reorganization shall have occurred on or before the later of (A) ten (10) calendar days following the entry of the Confirmation Order, (B) completion of the Rights Offering (as defined in the Plan of Reorganization) or (C) upon notice from the Agent (acting upon the direction of the Lenders) that the conditions in this section have been satisfied or waived in accordance with this Agreement, and in each case, no later than 1 August 2014, and all conditions precedent to the effectiveness of the Plan of Reorganization shall have been fulfilled or waived (in accordance with the provisions of the Plan of Reorganization), including the execution, delivery and performance of all instruments, documents and agreements necessary to effectuate the Plan of Reorganization.

**BORROWER**

**SIGNED** by                                   )
for and on behalf of                           )
**GENCO SHIPPING**                             )
**& TRADING LIMITED**                          )
in the presence of                             )


**GUARANTORS**

**SIGNED** by                                   )
for and on behalf of                           )
**GENCO BAY LIMITED**                          )
in the presence of                             )


**SIGNED** by                                   )
for and on behalf of                           )
**GENCO OCEAN LIMITED**                        )
in the presence of                             )


**SIGNED** by                                   )
for and on behalf of                           )
**GENCO AVRA LIMITED**                         )
in the presence of                             )


**SIGNED** by                                   )
for and on behalf of                           )
**GENCO MARE LIMITED**                         )
in the presence of                             )


**SIGNED** by                                   )
for and on behalf of                           )
**GENCO SPIRIT LIMITED**                       )
in the presence of                             )


[Signature Page – Amendment and Restatement Agreement]

**LENDERS**

| | |
|---|---|
| **SIGNED** by | ) |
| for and on behalf of | ) |
| **CRÉDIT AGRICOLE** | ) |
| **CORPORATE AND** | ) |
| **INVESTMENT BANK** | ) |
| in the presence of | ) |

| | |
|---|---|
| **SIGNED** by | ) |
| for and on behalf of | ) |
| **CRÉDIT INDUSTRIEL** | |
| **ET COMMERCIAL** | |
| | ) |
| in the presence of | ) |

| | |
|---|---|
| **SIGNED** by | ) |
| for and on behalf of | ) |
| **SKANDINAVISKA ENSKILDA** | |
| **BANKEN AB (PUBL)** | |
| | ) |
| in the presence of | ) |

[Signature Page – Amendment and Restatement Agreement]

**AGENT**

| | |
|---|---|
| **SIGNED** by | ) |
| for and on behalf of | ) |
| **CRÉDIT AGRICOLE** | ) |
| **CORPORATE AND** | ) |
| **INVESTMENT BANK** | ) |
| in the presence of | ) |

**SECURITY TRUSTEE**

| | |
|---|---|
| **SIGNED** by | ) |
| for and on behalf of | ) |
| **CRÉDIT AGRICOLE** | ) |
| **CORPORATE AND** | ) |
| **INVESTMENT BANK** | ) |
| in the presence of | ) |

[Signature Page – Amendment and Restatement Agreement]

**Appendix A**

Amended and Restated Loan Agreement

[See attached]

OHSUSA:757813060.7

## EXHIBIT B

### AMENDED AND RESTATED LOAN AGREEMENT

Date          June    2014

**GENCO SHIPPING & TRADING LIMITED**
as Borrower

- and -

**THE BANKS AND FINANCIAL INSTITUTIONS**
**listed in Schedule 1**
as Lenders

- and -

**THE COMPANIES**
**listed in Schedule 2**
as Guarantors on a joint and several basis

- and -

**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
as Agent and Security Trustee

---

**AMENDED AND RESTATED LOAN AGREEMENT**
---

in a total amount of
up to US$100,000,000
to finance five 35,000 (approximately) DWT Bulk Carriers



ORRICK

ORRICK, HERRINGTON & SUTCLIFFE (EUROPE) LLP
107 CHEAPSIDE
LONDON EC2V 6DN
TEL +44 (0)20 7862 4600
FAX +44 (0)20 7862 4800

OHSUSA:757654574.12

**INDEX**

|  | | Page |
|---|---|---|
| 1 | INTERPRETATION | 2 |
| 2 | AVAILABILITY OF THE LOAN AND DRAWDOWN | 24 |
| 3 | DRAWDOWN | 24 |
| 4 | CONDITIONS PRECEDENT TO EFFECTIVENESS OF AMENDMENT AND RESTATEMENT | 25 |
| 5 | REPAYMENT AND PREPAYMENT | 26 |
| 6 | INTEREST | 28 |
| 7 | CHANGES TO CALCULATION OF INTEREST | 28 |
| 8 | DEFAULT INTEREST | 30 |
| 9 | GUARANTEE AND INDEMNITY | 31 |
| 10 | OPERATING ACCOUNTS | 33 |
| 11 | REPRESENTATIONS AND WARRANTIES | 35 |
| 12 | UNDERTAKINGS | 39 |
| 13 | CORPORATE UNDERTAKINGS OF THE GUARANTORS | 48 |
| 14 | INSURANCE UNDERTAKINGS | 49 |
| 15 | SHIP UNDERTAKINGS | 52 |
| 16 | SECURITY COVER | 52 |
| 17 | PAYMENTS AND CALCULATIONS | 54 |
| 18 | APPLICATION OF RECEIPTS | 55 |
| 19 | EVENTS OF DEFAULT AND ACCELERATION | 55 |
| 20 | FEES AND EXPENSES | 60 |
| 21 | TAXES; EXPENSES AND INDEMNITIES | 61 |
| 22 | ILLEGALITY, ETC | 63 |
| 23 | INCREASED COSTS | 63 |
| 24 | SET-OFF | 65 |
| 25 | TRANSFERS AND CHANGES IN LENDING OFFICES | 65 |
| 26 | VARIATIONS AND WAIVERS | 68 |
| 27 | NOTICES | 69 |
| 28 | SUPPLEMENTAL | 70 |
| 29 | LAW AND JURISDICTION | 71 |
| SCHEDULE 1 | LENDERS AND COMMITMENTS | 73 |
| SCHEDULE 2 | GUARANTORS | 74 |
| SCHEDULE 3 | FORM OF DRAWDOWN NOTICE | 75 |
| SCHEDULE 4 | [INTENTIONALLY OMITTED.] | 77 |
| SCHEDULE 5 | LOAN REPAYMENT | 78 |
| SCHEDULE 6 | TRANSFER CERTIFICATE | 83 |
| SCHEDULE 7 | MANDATORY COSTS | 87 |

-i-

OHSUSA:757654574.12

**TABLE OF CONTENTS**
(continued)

**Page**

SCHEDULE 8..............................................................................................FORM OF MORTGAGE    89

SCHEDULE 9..........................................................................FORM OF COMPLIANCE CERTIFICATE    90

-ii-

OHSUSA:757654574.12

**THIS AMENDED AND RESTATED LOAN AGREEMENT** is made on __ June 2014

**BETWEEN**

(1)   **GENCO SHIPPING & TRADING LIMITED** a company organised and existing under the laws of the Republic of the Marshall Islands (the "**Borrower**");

(2)   **THE COMPANIES** listed in Schedule 2, as **Guarantors**;

(3)   **THE BANKS AND FINANCIAL INSTITUTIONS** listed in Schedule 1, as **Lenders**;

(4)   **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**, as **Agent**; and

(5)   **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**, as **Security Trustee**.


**BACKGROUND**

(A)   On 12 August, 2010, the Borrower, the Guarantors, the Lenders, the Agent and the Security Trustee executed that certain Loan Agreement, as amended prior to the Amendment and Restatement Effective Date (the "**Prepetition Loan Agreement**") to make loans (such loans, the "**Prepetition Loans**") for the purpose of financing a portion of the Purchase Price of each Vessel.

(B)   On 21 April, 2014 (the "**Petition Date**"), the Borrower and fifty-seven of its subsidiaries, including the Guarantors, filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") commencing the chapter 11 cases which are jointly administered under case number 14-11108-shl (each a "**Case**" and, collectively, the "**Cases**").  The Borrower and the Guarantors continued in the possession and operation of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code throughout the Cases.

(C)   As part of the Plan of Reorganization, the Obligors have requested that certain amendments be made to the Prepetition Loan Agreement as set out in a restructuring term sheet attached as an exhibit to the Restructuring Support Agreement to enable the reorganized Obligors to, among other things, consummate the transactions contemplated by the Plan of Reorganization and to pay related fees and expenses, and the Lenders have agreed, subject to the terms and conditions hereof, to enter into this Agreement

(D)   The parties have negotiated to this Agreement at arm's length and in good faith, and the proposed financing constitutes good and valuable consideration for the Borrower and Guarantors.

(E)   To provide continuing security for the repayment of the Loans and the payment of other Obligations of the Borrower hereunder and under the other Finance Documents, the Obligors have provided and granted, and will continue to provide and grant to the Security Trustee, for the benefit of the Creditor Parties, certain Security Interests, as more fully described herein.

(F)   The Guarantors have guaranteed the obligations of the Borrower hereunder and secured their respective Secured Liabilities by granting to the Security Trustee, for the benefit of the Creditor Parties, a Security Interest in the Vessels described herein and the proceeds from the operation of the Vessels.

**IT IS AGREED** by the Borrower, by or on behalf of every Lender, by the Agent and the Security Trustee in their own rights, and by each Obligor, in accordance with Clause 26.2 of the Prepetition Loan Agreement, to hereby amend and restate the Prepetition Loan Agreement in its entirety in the form of this Agreement.

OHSUSA:757654574.12

**1      INTERPRETATION**

**1.1     Definitions.**  Subject to 1.4, in this Agreement:

"**Acceptable Replacement Vessel**" shall mean, with respect to a Mortgaged Vessel, any vessel with an equal or greater Appraised Value than the Appraised Value of such Mortgaged Vessel; provided that such vessel must (i) be of the same type and age as the Mortgaged Vessel it replaces, (ii) be classed with an Approved Classification Society and (iii) be registered and flagged on Liberian flag or any other jurisdiction acceptable to the Majority Lenders acting reasonably;

"**Accounts Pledge**" means a deed creating security in respect of each Operating Account;

"**Additional Facility**" means a credit agreement, note purchase agreement, indenture, promissory note, letter agreement or similar agreement for borrowed money with other lenders or creditors of the Borrower (other than trade creditors) entered into by the Borrower, excluding any letters of credit, guarantees or any similar debt instruments which collateralize the Borrower's obligations for the release from arrest of the vessel Genco Auvergne and for letters of credit in respect of rent obligations under real property leases.

"**Affected Lender**" has the meaning given in Clause 7.3;

"**Affiliate**" shall mean, with respect to any Person, any other Person (including, for purposes of Clause 12.2(j) only, all directors, officers and partners of such Person) directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person; provided, however, that for purposes of Clause 12.2(j) an Affiliate of the Borrower shall include any Person that directly or indirectly owns more than 5% of any class of the capital stock of the Borrower and any officer or director of the Borrower or any of its Subsidiaries. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding anything to the contrary contained above, for purposes of Clause 12.2(j), neither the Agent, nor the Security Trustee nor any Lender (or any of their respective affiliates) shall be deemed to constitute an Affiliate of the Borrower or its Subsidiaries in connection with the Finance Documents or its dealings or arrangements relating thereto;

"**Agency and Security Trust Deed**" means the agency and trust agreement executed or to be executed between the Borrower, the Guarantors, the Lenders, the Agent and the Security Trustee;

"**Agent**" means Crédit Agricole Corporate and Investment Bank, a *société anonyme* with a share capital of EUR 6,055,504,839 registered with SIREN number 304 187 701 at the *Registre du Commerce et des Sociétés* of Nanterre and whose registered office is 9, quai du Président Paul Doumer, 92920 Paris La Défense, France (which term includes any successors in title, its permitted assignees and transferees);

"**Agreement**" means this Loan Agreement, as amended, restated, supplemented or otherwise modified from time to time;

"**Amendment and Restatement Effective Date**" has the meaning given to that term in Clause 28.5;

"**Appraised Value**" of any Vessel at any time shall mean the value of such Vessel as determined in accordance with Clause 16.3;

"**Approved Appraiser**" means H. Clarksons & Company Limited, Fearnleys Ltd, R.S. Platou Shipbrokers A.S., Simpson Spence & Young Ltd or such other independent appraisal firm as the Agent may reasonably approve;

"**Approved Classification Society**" means any of American Bureau of Shipping, Nippon Kaiji Kyokai, Germanischer Lloyd, Lloyd's Register of Shipping, Bureau Veritas and Det Norske Veritas;

"**Availability Period**" means the period commencing on 12 August, 2010 and ending on:

(a)      in relation to the Tranche A Loan 30 September 2010;

(b)      in relation to the Tranche B Loan 20 August 2010;

(c)      in relation to the Tranche C Loan 31 July 2011;

(d)      in relation to the Tranche D Loan 30 September 2011; and

(e)      in relation to the Tranche E Loan 31 December 2011;

(or in ease case such later date as the Agent may, with the authorisation of all of the Lenders, agree with the Borrower); or if earlier, the date on which the Total Commitments are fully borrowed, cancelled or terminated;

"**Average Consolidated Net Indebtedness**" shall mean, on any date of determination, the average of the Consolidated Net Indebtedness on the last Business Day of each calendar month during the most recently ended Test Period and on such date of determination;

"**Baltic**" means Baltic Trading Limited and its subsidiaries;

"**Business Day**" means a day on which banks are open in London, Paris, Stockholm and New York;

"**Capitalized Lease Obligations**" with respect to any Person shall mean all rental obligations which, under GAAP, are or will be required to be capitalized on the books of such Person, in each case taken at the amount thereof accounted for as Indebtedness in accordance with such principles;

"**Cash Equivalents**" shall mean (i) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition, (ii) time deposits and certificates of deposit of any commercial bank having, or which is the principal banking subsidiary of a bank holding company having, capital, surplus and undivided profits aggregating in excess of $200,000,000, with maturities of not more than one year from the date of acquisition by such Person, (iii) repurchase obligations with a term of not more than 90 days for underlying securities of the types described in clause (i) above entered into with any bank meeting the qualifications specified in clause (ii) above, (iv) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or at least P-1 or the equivalent thereof by Moody's Investors Services, Inc. and in each case maturing not more than one year after the date of acquisition by such Person and (v) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (iv) above;

"**Change of Control**" means (i) the Borrower shall at any time and for any reason fail to own, directly or indirectly, 100% of the capital stock or other equity interests of each Guarantor, (ii) the sale, lease or transfer of all or substantially all of the Borrower's assets to any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), (iii) the liquidation or dissolution of the Borrower, (iv) any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), other than one or more of the Permitted Holders, shall at any time become the owner, directly or indirectly, beneficially or of record, of shares representing more than 30% of the outstanding voting or economic equity interests of the Borrower, (v) except

3

for the appointment of directors of the Borrower on or around the Consummation Date, the replacement of a majority of the directors on the board of directors of the Borrower over a two-year period from the directors who constituted the board of directors of the Borrower at the beginning of such period, and such replacement shall not have been approved by a vote of at least a majority of the board of directors of the Borrower then still in office who either were members of such board of directors at the beginning of such period or whose election as a member of such board of directors was previously so approved or (vi) a "change of control" or similar event shall occur as provided in any outstanding Indebtedness of Borrower or any of its Subsidiaries (or the documentation governing the same);

"**Charter**" means, with respect to any Vessel, the agreement to charter entered into in respect of such Vessel between the Guarantor which owns such Vessel and the Charterer, or any charter which replaces such charter (i.e. made between a Guarantor and a company other than the Charterer) during the period of the Loan;

"**Charterer**" means Cargill International S.A.;

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to the Code are to the Code as in effect at the date of this Agreement and any subsequent provisions of the Code, amendatory thereof, supplemental thereto or substituted therefore;

"**Collateral**" means each asset that in accordance with the terms of any Finance Document is intended to be subject to any Security Interest in favour of the Security Trustee or the Agent;

"**Commercial Manager**" means the Borrower, or a Wholly-Owned Subsidiary of the Borrower, or any other company which the Agent may, approve from time to time as commercial manager of a Vessel, which consent is not to be unreasonably withheld;

"**Commitment**"  means, in relation to a Lender and any Tranche, the amount set opposite such Lender's name in Schedule 1 under the heading "Tranche A Commitment" for Tranche A, "Tranche B Commitment" for Tranche B, "Tranche C Commitment" for Tranche C, "Tranche D Commitment" for Trance D and "Tranche E Commitment" for Tranche E or, as the case may require, the amount specified in the relevant Transfer Certificate, as that amount may be reduced, cancelled or terminated in accordance with this Agreement;

"**Confirmation Order**" shall mean the order entered by the Bankruptcy Court confirming the Plan of Reorganization, which order shall be acceptable in form and substance to the Debtors and the Supporting Creditors (as defined in the Restructuring Support Agreement) in accordance with section 1(b) of the Restructuring Support Agreement, and solely with respect to any term in the order that will affect the economic interests of the Lenders or is related to this Agreement, mutually acceptable to the Debtors and the Agent (acting where required pursuant to the terms of the Restructuring Support Agreement, at the direction of the Required Supporting $100 Million Facility Lenders (as defined in the Restructuring Support Agreement)), and shall include, inter alia, provisions (a) approving the Agreement and any related documents, (b) reaffirming the Lenders' liens in all of the Collateral and (c) finding that the parties negotiated this Agreement at arm's length and in good faith and that this Agreement and the terms hereof constitute good and valuable consideration for the Borrower and Guarantors;

"**Consolidated EBIT**" shall mean, for any period, the Consolidated Net Income for such period, before interest expense and provision for taxes based on income and without giving effect to any extraordinary gains or losses or gains or losses from sales of assets other than inventory sold in the ordinary course of business;

"**Consolidated EBITDA**" shall mean, for any period, Consolidated EBIT, adjusted by adding thereto the amount of (i) all amortization of intangibles and depreciation, (ii) non-cash management incentive compensation, (iii) the amortization of fees and expenses paid in

connection with the Transaction, (iv) any Non-Cash Charges in each case that were deducted in arriving at Consolidated EBITDA for such period and (v) cash restructuring charges in connection with the Cases and the Plan of Reorganization;

"**Consolidated Indebtedness**" shall mean, as at any date of determination, the aggregate stated balance sheet amount of all Indebtedness (but including in any event the then outstanding principal amount of all loans, all Capitalized Lease Obligations and all letters of credit outstanding but excluding Indebtedness of a type described in clause (vii) of the definition thereof) of the Borrower and its Subsidiaries on a consolidated basis as determined in accordance with GAAP; provided that (i) Indebtedness outstanding pursuant to trade payables and accrued expenses incurred in the ordinary course of business, (ii) guarantees of operating leases assigned to any of the Borrower or any Wholly-Owned Subsidiary of the Borrower to the extent such lease is not prohibited hereunder and such obligation does not exceed that which would otherwise be attributed to such Person under such operating lease and (iii) letters of credit, guarantees or any similar debt instruments which collateralize the Borrower's obligations for the release from arrest of the vessel Genco Auvergne and letters of credit in respect of rent obligations under real property leases shall be excluded in determining Consolidated Indebtedness;

"**Consolidated Interest Coverage Ratio**" shall mean, for any period, the ratio of (i) Consolidated EBITDA for such period to (ii) Consolidated Interest Expense for such period;

"**Consolidated Interest Expense**" shall mean, for any period, (i) the total consolidated interest expense of the Borrower and its Subsidiaries for such period (calculated without regard to any limitations on the payment thereof) plus, without duplication, that portion of Capitalized Lease Obligations of the Borrower and its Subsidiaries representing the interest factor for such period, minus (ii) cash interest income of the Borrower and its Subsidiaries for such period and the amortization of any deferred financing costs and Non-Cash Charges incurred in connection with the Transaction to the extent otherwise included in the calculations thereof;

"**Consolidated Net Income**" shall mean, for any period, the consolidated net after tax income of the Borrower and its Subsidiaries for such period determined in accordance with GAAP; provided that solely for any calculation of "Consolidated EBIT," "Consolidated Net Income" shall not include any gains or losses arising from any Interest Rate Protection Agreement and Other Hedging Agreements;

"**Consolidated Net Indebtedness**" shall mean, as at any date of determination, the remainder of (i) the Consolidated Indebtedness on such date minus (ii) the aggregate amount of Unrestricted cash and Cash Equivalents of the Borrower and its Subsidiaries on such date;

"**Consolidated Net Worth**" shall mean the Net Worth of the Borrower and its Subsidiaries determined on a consolidated basis in accordance with GAAP (and including for this purpose the Borrower's investment in Baltic Trading Limited) without deductions for losses up to an aggregate amount of $200,000,000 during such period that are attributable to the sale or other disposition of the capital stock of Baltic Trading Limited, any vessel, or any vessel impairment or other asset write downs that in each case are recognised under GAAP as a reduction of shareholders' equity;

"**Consummation Date**" shall mean the "Effective Date" (as defined in the Plan of Reorganization);

"**Contingent Obligation**" shall mean, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefore, (ii) to advance or supply funds (x) for the

purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business and any products warranties extended in the ordinary course of business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made (or, if the less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith;

"**Contribution**" means, in relation to a Lender, the part of a Drawing which is owing to that Lender;

"**Creditor Party**" means the Agent, the Security Trustee or any Lender, whether as at the date of this Agreement or at any later time;

"**DB Credit Facility**" means the amended and restated credit agreement dated as of the date hereof made or to be made between the Borrower, Deutsche Bank Luxembourg S.A. as agent and others relating to a loan facility of up to $253,000,000 (as amended and supplemented from time to time);

"**Dividend**" with respect to any Person shall mean that such Person has declared or paid a dividend or returned any equity capital to its stockholders, partners or members or made any other distribution, payment or delivery of property (other than common stock or the right to purchase any of such stock of such Person) or cash to its stockholders, partners or members as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for a consideration any shares of any class of its capital stock or partnership or membership interests outstanding on or after the Effective Date (or any options or warrants issued by such Person with respect to its capital stock or other equity interests), or set aside any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for a consideration any shares of any class of the capital stock of, or equity interests in, such Person outstanding on or after the Effective Date (or any options or warrants issued by such Person with respect to its capital stock or other equity interests). Without limiting the foregoing, "**Dividends**" with respect to any Person shall also include all payments made or required to be made by such Person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes;

"**DnB Credit Facility**" means the credit agreement among the Borrower, various lenders, Wilmington Trust, National Association, as administrative agent and collateral agent and DnB NOR Bank ASA, New York Branch as mandated lead arranger and bookrunner dated as of 20 July 2007 as amended and supplemented;

"**Dollars**" and "**$**" means the lawful currency for the time being of the United States of America;

"**Drawdown Date**" means the date requested by the Borrower for the relevant Loan to be made, or (as the context requires) the date on which such Loan is actually made;

"**Drawing**" means each advance of a Loan under this Agreement;

"**Drawdown Notice**" means a notice in the form set out in Schedule 3 (or in any other form which the Agent approves or reasonably requires);

"**Earnings**" means all moneys whatsoever which are now, or later become, payable (actually or contingently) to the Borrower, the Guarantors or the Security Trustee and which arise out of the use or operation of a Vessel, including (but not limited to):

(a)     all freight, hire and passage moneys, compensation payable to the Borrower, the Guarantors or the Security Trustee in the event of requisition of a Vessel for hire, remuneration for salvage and towage services, demurrage and detention moneys and damages for breach (or payments for variation or termination) of any charterparty or other contract for the employment of a Vessel;

(b)     all moneys which are at any time payable under Insurances in respect of loss of earnings; and

(c)     if and whenever a Vessel is employed on terms whereby any moneys falling within paragraphs (a) or (b) are pooled or shared with any other person, that proportion of the net receipts of the relevant pooling or sharing arrangement which is attributable to a Vessel;

"**Effective Date**" means the "Effective Date" as defined in the Prepetition Loan Agreement;

"**Environmental Claim**" means:

(a)     any claim by any governmental, judicial or regulatory authority which arises out of an Environmental Incident or an alleged Environmental Incident or which relates to any Environmental Law; or

(b)     any claim by any other person which relates to an Environmental Incident or to an alleged Environmental Incident;

and "**claim**" means a claim for damages, compensation, fines, penalties or any other payment of any kind whether or not similar to the foregoing; an order or direction to take, or not to take, certain action or to desist from or suspend certain action; and any form of enforcement or regulatory action, including the arrest or attachment of any asset;

"**Environmental Incident**" means:

(a)     any release of Environmentally Sensitive Material from a Vessel;

(b)     any incident in which Environmentally Sensitive Material is released from a vessel other than a Vessel under this Agreement and which involves a collision between a Vessel and such other vessel or some other incident of navigation or operation, in either case, in connection with which the Vessel is actually or potentially liable to be arrested, attached, detained or injuncted and/or the Vessel and/or the Borrower, Guarantors, the Charterer, the Technical Manager, the Commercial Manager and/or any owner, operator or manager of a Vessel is at fault or allegedly at fault or otherwise liable to any legal or administrative action; or

(c)     any other incident in which Environmentally Sensitive Material is released otherwise than from a Vessel and in connection with which a Vessel is actually or potentially liable to be arrested and/or where the Borrower the Guarantors, the Technical Manager, the Commercial Manager and/or any operator or manager of a Vessel is at fault or allegedly at fault or otherwise liable to any legal or administrative action;

"**Environmental Law**" means any law relating to pollution or protection of the environment, to the carriage of Environmentally Sensitive Material or to actual or threatened releases of Environmentally Sensitive Material;

"**Environmentally Sensitive Material**" means oil, oil products and any other substance (including any chemical, gas or other hazardous or noxious substance) which is (or is capable of being or becoming) polluting, toxic or hazardous;

"**Equity Interests**" of any Person means any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such Person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest;

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to ERISA are to ERISA, as in effect at the date of this Agreement and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefore;

"**ERISA Affiliate**" shall mean each person (as defined in Section 3(9) of ERISA) which together with the Borrower or a Subsidiary of the Borrower would be deemed to be a "single employer" within the meaning of Section 414(b), (c), (m) or (o) of the Code;

"**Event of Default**" means any of the events or circumstances described in Clause 19.1;

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended;

"**Facility**" means the term loan facility made available to the Borrower pursuant to Clause 2 by way of each Tranche;

"**Fee Letter**" means the letter made between the Borrower and the Agent setting out the fees payable by the Borrower in connection with the Facility;

"**Final Maturity Date**" means 31 August, 2019.

"**Finance Documents**" means:

(a)     this Agreement;

(b)     the Agency and Security Trust Deed;

(c)     each Mortgage;

(d)     the General Assignment Deed;

(e)     the Accounts Pledge;

(f)     the Share Charge; and

(g)     any other document (whether creating a Security Interest or not) which is executed at any time by the Borrower or any other person as security for, or to establish any form of subordination or priorities arrangement in relation to, any amount payable to the Lenders under this Agreement or any of the other documents referred to in this definition;

(each a "**Finance Document**");

"**Financial Covenant Holiday**" means the period beginning on the Amendment and Restatement Effective Date and ending on (and including) 31 March, 2015;

"**Financial Indebtedness**" means, in relation to a person (the "**debtor**"), a liability of the debtor:

(a)    for principal, interest or any other sum payable in respect of any moneys borrowed or raised by the debtor;

(b)    under any loan stock, bond, note or other security issued by the debtor;

(c)    under any acceptance credit, guarantee or letter of credit facility made available to the debtor;

(d)    under a financial lease, a deferred purchase consideration arrangement or any other agreement having the commercial effect of a borrowing or raising of money by the debtor (but for the avoidance of doubt excluding any operating lease);

(e)    under any foreign exchange transaction, any interest or currency swap or any other kind of derivative transaction entered into by the debtor or, if the agreement under which any such transaction is entered into requires netting of mutual liabilities, the liability of the debtor for the net amount; or

(f)    under a guarantee, indemnity or similar obligation entered into by the debtor in respect of a liability of another person which would fall within paragraphs (a) to (e) if the references to the debtor referred to the other person;

"**First Repayment Date**" means:

(a)    in relation to Tranche A, the last day of the calendar quarter in which the Drawing in relation to Tranche A is made;

(b)    in relation to Tranche B, the last day of the calendar quarter in which the Drawing in relation to Tranche B is made;

(c)    in relation to Tranche C, the last day of the calendar quarter in which the Drawing in relation to Tranche C is made;

(d)    in relation to Tranche D, the last day of the calendar quarter in which the Drawing in relation to Tranche D is made; and

(e)    in relation to Tranche E, the last day of the calendar quarter in which the Drawing in relation to Tranche E is made;

"**Foreign Pension Plan**" shall mean any plan, fund (including, without limitation, any superannuation fund) or other similar program established or maintained outside the United States of America by the Borrower or any one or more of its Subsidiaries primarily for the benefit of employees of the Borrower or such Subsidiaries residing outside the United States of America, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code;

"**GAAP**" means in relation to any Obligor, the generally accepted accounting principles, standards and practices in the United States of America;

"**General Assignment Deed**" means a general assignment of the Charters, the Earnings, the Insurances and any Requisition Compensation as set out therein, by the Guarantors in favour of the Security Trustee;

"**Guarantors**" means, collectively, the Vessel A Guarantor, the Vessel B Guarantor, the Vessel C Guarantor, the Vessel D Guarantor and the Vessel E Guarantor and "**Guarantor**" means any of them and any other Person who owns a Mortgaged Vessel which is exchanged for another Mortgaged Vessel pursuant to a Vessel Exchange;

"**Indebtedness**" shall mean, as to any Person, without duplication, (i) all indebtedness (including principal, interest, fees and charges) of such Person for borrowed money or for the deferred purchase price of property or services, (ii) the maximum amount available to be drawn under all letters of credit (including letters of credit) issued for the account of such Person and all unpaid drawings in respect of such letters of credit, (iii) all Indebtedness of the types described in clause (i), (ii), (iv), (v), (vi) or (vii) of this definition secured by any lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person (to the extent of the value of the respective property), (iv) the aggregate amount required to be capitalized under leases under which such Person is the lessee, (v) all obligations of such person to pay a specified purchase price for goods or services, whether or not delivered or accepted, i.e., take-or-pay and similar obligations, (vi) all Contingent Obligations of such Person and (vii) all obligations under any Interest Rate Protection Agreement or Other Hedging Agreement or under any similar type of agreement; provided that Indebtedness shall in any event not include trade payables and expenses accrued in the ordinary course of business; *provided* that for the avoidance of doubt, "Indebtedness" shall not include letters of credit, guarantees or any similar debt instruments which collateralize the Borrower's obligations for the release of the vessel Genco Auvergne and for letters of credit in respect of rent obligations under real property leases;

"**Insurances**" means:

(a)     all policies and contracts of insurance, including entries of a Vessel in any protection and indemnity or war risks association, which are effected in respect of a Vessel, its Earnings or otherwise in relation to it; and

(b)     all rights and other assets relating to, or derived from, any of the foregoing, including any rights to a return of a premium;

"**Interest Period**" means a period determined in accordance with Clause 6.1(f);

"**Interest Rate Protection Agreement**" shall mean any interest rate swap agreement, interest rate cap agreement, interest collar agreement, interest rate hedging agreement, interest rate floor agreement or other similar agreement or arrangement;

"**ISM Code**" means the International Safety Management Code (including the guidelines on its implementation), adopted by the International Maritime Organisation Assembly as Resolutions A.741 (18) and A.788 (19), as the same may be amended or supplemented from time to time (and the terms "**safety management system**", "**Safety Management Certificate**" and "**Document of Compliance**" have the same meanings as are given to them in the ISM Code);

"**Lender**" means a bank or financial institution listed in Schedule 1 and its permitted transferees, successors and assigns;

"**Leverage Ratio**" shall mean, at any date of determination, the ratio of Average Consolidated Net Indebtedness on such date of determination to Consolidated EBITDA for the most recently ended Test Period;

"**LIBOR**" means, for an Interest Period, the rate per annum determined by the Agent to be the arithmetic mean of the rates per annum notified to the Agent by each Reference Bank as the rate at which deposits in Dollars are offered to that Reference Bank by leading banks in the London Interbank Market at that Reference Bank's request at or about 11.00 a.m. (London time) on the Quotation Date for that Interest Period for a period equal to that Interest Period

and for delivery on the first Business Day of it; provided, however, that if the rate so determined by the Agent is below zero, LIBOR will be deemed to be zero;

"**Loan**" means any of the Tranche A Loan, the Tranche B Loan, the Tranche C Loan, the Tranche D Loan or the Tranche E Loan or, where the context requires, the aggregate principal amount for the time being outstanding under this Agreement in respect of all such Loans;

"**Major Casualty**" means any casualty to a Vessel in respect of which the claim or the aggregate of the claims against all insurers, before adjustment for any relevant franchise or deductible, exceeds $2,000,000 or the equivalent in any other currency;

"**Majority Lenders**" means:

(a)     before any Loan has been made, Lenders whose Commitments total 66.66 per cent. of the Total Commitments; and

(b)     after any Loan has been made, Lenders whose Contributions total 66.66 per cent. of the Loan;

"**Mandatory Costs**" means the percentage rate per annum calculated by the Agent in accordance with Schedule 7;

"**Margin**" means 3.5 per cent. per annum; *provided* that should the "Margin" (or equivalent term) at any time expressed to be at a rate higher than 3.5 per cent. per annum in the DB Credit Facility or any Additional Facility, the definition of "Margin" hereunder shall be deemed to be amended to mean such higher rate;

"**Material Adverse Effect**" shall mean a material adverse effect on the (i) transactions contemplated by the Finance Documents, (ii) business, property, assets, liabilities, condition (financial or otherwise), operations or prospects (x) of the Vessels or (y) the Borrower and the Guarantors taken as a whole, (iii) rights or remedies available to the Agent or the Lenders under the Finance Documents or (iv) ability of any Obligor to perform its obligations under the Finance Documents to which it is a party;

"**Minimum Balance**" has the meaning given to that term in Clause 10.2(c);

"**Minimum Consolidated Net Worth**" shall mean not less than 75% of the Post-Reorganization Equity Value of the Borrower plus 50% of the net proceeds received by the Borrower as a result of any new Equity Interests issued by the Borrower after the Amendment and Restatement Effective Date;

"**Mortgage**" means, with respect to each Mortgaged Vessel, the first preferred Liberian ship mortgage on that Vessel signed on the Drawdown Date of the Tranche relating to such Vessel (or, if the Mortgaged Vessel is an Acceptable Replacement Vessel, on the Vessel Exchange Date) by the relevant Guarantor in favour of the Security Trustee, in the form of Schedule 8 hereto (or, if the Vessel is registered in a jurisdiction other than Liberia with the prior written consent of the Agent acting upon the direction of the Lenders, a first preferred ship mortgage under the laws of that jurisdiction);

"**Mortgage Amendments**" shall mean the amendment agreements to the Mortgages to be entered into on or around the Amendment and Restatement Effective Date between the Guarantors and the Security Trustee;

"**Mortgaged Vessels**" shall mean, collectively, all vessels mortgaged to the Security Trustee hereunder and, individually, any of such vessels;

"**Multiemployer Plan**" shall mean a Plan which is defined in Section 3(37) of ERISA;

"**Net Worth**" shall mean, as to a Person, the sum of its capital stock, capital in excess of par or stated value of shares of its capital stock, retained earnings and other accounts which in accordance with GAAP constitutes stockholders' equity, but excluding treasury stocks;

"**Non-Cash Charges**" means the unamortized charges incurred by the Borrower associated with any credit facility of the Borrower or its Subsidiaries that is charged to expense due to the refinancing of the aforementioned, and any non-cash loss related to the Borrower's investment in Jinui Shipping and Transportation Limited;

"**Negotiation Period**" has the meaning given in Clause 7.6;

"**Notifying Lender**" has the meaning given in Clause 22.1 or Clause 23.1 as the context requires;

"**Obligors**" means the Borrower and the Guarantors and "**Obligor**" means any of them;

"**OFAC**" has the meaning given to such term in Clause 11.2(m);

"**Operating Accounts**" means the five separate accounts each in the name of a Guarantor in respect of the Vessel owned or to be owned by that Guarantor;

"**Operating Costs**" means, with respect to any Vessel, costs and expenses properly incurred in respect of the day to day operation of such Vessel;

"**Other Hedging Agreement**" shall mean any foreign exchange contracts, currency swap agreements, commodity agreements, forward freight agreements or other similar agreements or arrangements designed to protect against the fluctuations in currency or commodity values;

"**PATRIOT Act**" has the meaning given to that term in Clause 28.6;

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto;

"**Permitted Holders**" means (i) Peter Georgiopoulos (including his immediate family members and trusts for his benefit and/or for the benefit of his immediate family members) and any corporation or other entity directly or indirectly controlled by Peter Georgiopoulos and (ii) any other Persons as approved by the Majority Lenders;

"**Permitted Security Interests**" means:

(a)     Security Interests created by the Finance Documents;

(b)     liens for unpaid master's and crew's wages in accordance with usual maritime practice;

(c)     liens for salvage;

(d)     liens arising by operation of law for not more than 2 months' prepaid hire under any charter in relation to a Vessel not prohibited by this Agreement;

(e)     liens for master's disbursements incurred in the ordinary course of trading and any other lien arising by operation of law or otherwise in the ordinary course of the operation, repair or maintenance of a Vessel, provided such liens do not secure amounts more than 30 days overdue (unless the overdue amount is being contested by the Borrower in good faith by appropriate steps) and subject, in the case of liens for repair or maintenance to article II section 9(c) of each Mortgage;

(f)     any Security Interest created in favour of a plaintiff or defendant in any proceedings or arbitration as security for costs and expenses where the Borrower is actively prosecuting or defending such proceedings or arbitration in good faith; and

(g)     Security Interests arising by operation of law in respect of taxes which are not overdue for payment or in respect of taxes being contested in good faith by appropriate steps and in respect of which appropriate reserves have been made;

"**Pertinent Document**" means:

(a)     any Finance Document;

(b)     any policy or contract of insurance contemplated by or referred to in a Mortgage or any other provision of this Agreement or another Finance Document;

(c)     any other document contemplated by or referred to in any Finance Document; and

(d)     any document which has been or is at any time sent by or to a Servicing Bank in contemplation of or in connection with any Finance Document or any policy, contract or document falling within paragraphs (b) or (c);

"**Pertinent Jurisdiction**", in relation to a company, means:

(a)     the country under the laws of which the company is incorporated or formed;

(b)     a country in which the company's central management and control is or has recently been exercised;

(c)     a country in which the overall net income of the company is subject to corporation tax, income tax or any similar tax;

(d)     a country in which assets of the company (other than securities issued by, or loans to, related companies) having a substantial value are situated, in which the company maintains a permanent place of business, or in which a Security Interest created by the company must or should be registered in order to ensure its validity or priority; and

(e)     a country the courts of which have jurisdiction to make a winding up, administration or similar order in relation to the company or which would have such jurisdiction if their assistance were requested by the courts of a country referred to in paragraphs (a) or (b);

"**Pertinent Matter**" means:

(a)     any transaction or matter contemplated by, arising out of, or connection with a Pertinent Document; or

(b)     any statement relating to a Pertinent Document or to a transaction or matter falling within paragraph (a);

and covers any such transaction, matter or statement, whether entered into, arising or made at any time before the signing of this Agreement or on or at any time after that signing;

"**Plan**" shall mean any pension plan as defined in Section 3(2) of ERISA, which is maintained or contributed to by (or to which there is an obligation to contribute to) the Borrower or a Subsidiary of the Borrower or any ERISA Affiliate, and each such plan for the five-year period immediately following the latest date on which the Borrower, or a Subsidiary of the Borrower

or any ERISA Affiliate maintained, contributed to or had an obligation to contribute to such plan;

"**Plan of Reorganization**" means the Prepackaged Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code filed with the Bankruptcy Court on April 21, 2014, [Docket No. 14] as it may be amended, modified, or supplemented from time to time in accordance with the terms therein and in the Restructuring Support Agreement;

"**Post-Reorganization Equity Value**" means the post confirmation equity value of the Borrower as reflected on the Borrower's first financial statement delivered after the Amendment and Restatement Effective Date;

"**Potential Event of Default**" means an event or circumstance which, with the giving of any notice, the lapse of time, a determination of the Majority Lenders and/or the satisfaction of any other condition, would constitute an Event of Default;

"**Prepetition**" means the period before the Petition Date;

"**Prepetition Lenders**" means the Lenders party to the Prepetition Loan Agreement;

"**Purchase Price**" means $33,250,000;

"**Quotation Date**" means, in relation to any Interest Period (or any other period for which an interest rate is to be determined under any provision of a Finance Document), the day on which quotations would ordinarily be given by leading banks in the London Interbank Market for deposits in the currency in relation to which such rate is to be determined for delivery on the first day of that Interest Period or other period;

"**Reference Banks**" means the principal offices in London of Crédit Agricole Corporate, Investment Bank, Crédit Industriel et Commercial and Skandinaviska Enskilda Banken AB (publ) and such other banks as may be appointed by the Agent in consultation with the Borrower;

"**Repayment Date**" means a date on which a repayment is required to be made under Clause 5 and Schedule 5;

"**Reportable Event**" shall mean an event described in Section 4043(c) of ERISA with respect to a Plan that is subject to Title IV of ERISA other than those events as to which the 30-day notice period is waived under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4043;

"**Requisition Compensation**" includes all compensation or other moneys payable by reason of any act or event such as is referred to in paragraph (b) of the definition of "**Total Loss**";

"**Restricted"** shall mean, when referring to cash or Cash Equivalents of the Borrower or any of its Subsidiaries, that such cash or Cash Equivalents:

(a)     appears (or would be required to appear) as "Restricted" on a consolidated balance sheet of the Borrower or of any such Subsidiary (unless such appearance is related to the Finance Documents or Security Interests created thereunder);

(b)     are subject to any lien in favour of any Person other than the Security Trustee or the Agent for the benefit of the Creditor Parties; or

(c)     are not otherwise generally available for use by the Borrower or such Subsidiary;

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated 3 April, 2014, entered into by, among others, the Obligors and the Prepetition Lenders;

OHSUSA:757654574.12                                   14

"**Screen Rate**" means, in relation to LIBOR, the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) for Dollars for the relevant period displayed on pages LIBOR01 or LIBOR02 of the Reuters screen (or any replacement Reuters page which displays that rate) or  on the appropriate page of such other information service which publishes that rate from time to time in place of Reuters.  If such page or service ceases to be available, the Agent may specify another page or service displaying the relevant rate after consultation with the Borrower;

"**SEC**" means the United States Securities and Exchange Commission;

"**Second Insurance Assignment**" means, with respect to each Mortgaged Vessel, a second priority assignment of the Insurances in respect of such Mortgaged Vessel executed by the relevant Guarantor in favour of the Second Mortgagee, as security for repayment of amounts due under the DnB Credit Facility;

"**Second Mortgage**" means, with respect to each Mortgaged Vessel, a second preferred Liberian ship mortgage on that Vessel executed by the relevant Guarantor in favour of the Second Mortgagee, as security for repayment of amounts due under the DnB Credit Facility;

"**Second Mortgagee**" means DNB Bank ASA, New York Branch (formerly known as DnB NOR Bank ASA, New York Branch), as security trustee and collateral agent for the lenders under the DnB Credit Facility;

"**Second Security Documents**" means the Second Insurance Assignments and the Second Mortgages, collectively;

"**Secured Liabilities**" means all liabilities which the Borrower, the Guarantors or any of them have, at the date of this Agreement or at any later time or times, under or in connection with any Finance Document or any judgment relating to any Finance Documents; and for this purpose, there shall be disregarded any total or partial discharge of these liabilities, or variation of their terms, which is effected by, or in connection with, any bankruptcy, liquidation, arrangement or other procedure under the insolvency laws of any country;

"**Security Interest**" means:

(a)     a mortgage, charge (whether fixed or floating) or pledge, any maritime or other lien or any other security interest of any kind;

(b)     the security rights of a plaintiff under an action *in rem*; and

(c)     any arrangement entered into by a person (A) the effect of which is to place another person (B) in a position which is similar, in economic terms, to the position in which B would have been had he held a security interest over an asset of A; but this paragraph (c) does not apply to a right of set off or combination of accounts conferred by the standard terms of business of a bank or financial institution;

"**Security Period**" means the period commencing on the date of this Agreement and ending on the date on which the Agent notifies the Obligors and the other Creditor Parties that:

(a)     the Availability Period for each Loan has expired and all amounts which have become due for payment by the Borrower or any Obligor under the Finance Documents have been paid;

(b)     no amount is owing or has accrued (without yet having become due for payment) under any Finance Document;

(c)     neither the Borrower nor any Obligor has any future or contingent liability under Clause 20 or 21 or any other provision of this Agreement or another Finance Document; and

(d)     the Agent, the Security Trustee and the Majority Lenders do not consider that there is a significant risk that any payment or transaction under a Finance Document  would be set aside, or would have to be reversed or adjusted, in any present or possible future bankruptcy of the Borrower or any of the Guarantors or in any present or possible future proceeding relating to a Finance Document or any asset covered (or previously covered) by a Security Interest created by a Finance Document;

"**Security Trustee**" means Crédit Agricole Corporate and Investment Bank, a *société anonyme* with a share capital of EUR 6,055,504,839 registered with SIREN number 304 187 701 at the *Registre du Commerce et des Sociétés* of Nanterre and whose registered office is 9, quai du Président Paul Doumer, 92920 Paris La Défense, France (which term includes any successors in title, its permitted assignees and transferees) not in its individual capacity, but solely as security trustee under the Agency and Security Trust Deed;

"**Seller**" means any of the Vessel A Seller, the Vessel B Seller, the Vessel C Seller, the Vessel D Seller or the Vessel E Seller;

"**Servicing Bank**" means the Agent or the Security Trustee;

"**Share Charge**" means the share charge executed or (as the case may be) to be executed by the legal and beneficial owners of the issued share capital in the Guarantors in favour of the Security Trustee;

"**Shareholder Rights Agreement**" shall mean a shareholders rights agreement substantially similar to that certain the Shareholders Rights Agreement entered into as of March 1, 2007 by and between the Borrower and Mellon Investor Services LLC, a New Jersey limited liability company, as Rights Agent;

"**Structuring Fee Letter**" means the letter made between the Borrower and the Agent setting out the structuring fee payable by the Borrower in connection with the Facility;

"**Subsidiary**" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% equity interest at the time; *provided, however,* that "Subsidiary" or "Subsidiaries" shall not include Baltic;

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty, surcharge or interest payable in connection with any failure to pay or any delay in paying any of the same);

"**Technical Manager**"   means  the  Borrower,  Wallem  Limited,  Anglo-Eastern  Ship Management Limited, Thome Shipmanagement Pte Ltd., V Ships Limited or any other company which the Agent may approve from time to time as the technical manager of a Vessel or all of the Vessels, which consent is not to be unreasonably withheld;

"**Test Period**" shall mean each period of four consecutive fiscal quarters then last ended, in each case taken as one accounting period; *provided* that for the period ending June 30, 2015, such test period shall mean the period commencing from the Amendment and Restatement Effective Date through June 30, 2015;

"**Total Commitments**" means, collectively, the Total Tranche A Commitments, Total Tranche B Commitments, Total Tranche C Commitments, Total Tranche D Commitments and Total Tranche E Commitments;

"**Total Loss**" means in relation to any Vessel:

(a)    any actual, constructive, compromised, agreed or arranged total loss of a Vessel;

(b)    any expropriation, confiscation, requisition, condemnation, purchase, forfeiture or acquisition of  or taking title to  that Vessel, whether for full consideration, a consideration less than its proper value, a nominal consideration or without any consideration, which is effected by any government or official authority or by any person or persons claiming to be or to represent a government or official authority (excluding a requisition for hire for a fixed period not exceeding 1 year without any right to an extension), unless it is within 1 month redelivered to the relevant Guarantor's full control; or

(c)    any arrest, capture, seizure or detention of the Vessel (including any hijacking or theft) unless it is within 1 month redelivered to the relevant Guarantor's full control;

"**Total Loss Date**" means in relation to a Vessel:

(a)    in the case of an actual loss of a Vessel, the date on which it occurred or, if that is unknown, the date when the Vessel was last heard of;

(b)    in the case of a constructive, compromised, agreed or arranged total loss of the Vessel, the earliest of:

(i)    the date on which a notice of abandonment is given to the insurers; and

(ii)    the date of any compromise, arrangement or agreement made by or on behalf of the relevant Guarantor, with the Vessel's insurers in which the insurers agree to treat the Vessel as a total loss; and

(c)    in the case of any other type of total loss, on the date (or the most likely date) on which it appears to the Agent that the event constituting the total loss occurred;

"**Tranche**" means Tranche A, Tranche B, Tranche C, Tranche D or Tranche E, (as applicable);

"**Tranche A**" means the part of the Facility described in Clause 2.1(a);

"**Tranche A Commitment**" means, in relation to a Lender, the amount set opposite its name in Schedule 1 under the heading "Tranche A Commitment", or, as the case may require, the amount transferred by a Lender pursuant to Clause 25.2, as that amount may be reduced, cancelled or terminated in accordance with this Agreement (and "**Total Tranche A Commitments**" means the aggregate of the Tranche A Commitments of all the Lenders);

"**Tranche A Loan**" means the loan made or to be made under Tranche A or the principal amount outstanding for the time being of such loan;

"**Tranche B**" means the part of the Facility described in Clause 2.1(b);

"**Tranche B Commitment**" means, in relation to a Lender, the amount set opposite its name in Schedule 1 under the heading "Tranche B Commitment", or, as the case may require, the amount transferred by a Lender pursuant to Clause 25.2, as that amount may be reduced, cancelled or terminated in accordance with this Agreement (and "**Total Tranche B Commitments**" means the aggregate of the Tranche B Commitments of all the Lenders);

"**Tranche B Loan**" means the loan made or to be made under Tranche B or the principal amount outstanding for the time being of such loan;

"**Tranche C**" means the part of the Facility described in Clause 2.1(c);

"**Tranche C Commitment**" means, in relation to a Lender, the amount set opposite its name in Schedule 1 under the heading "Tranche C Commitment", or, as the case may require, the amount transferred by a Lender pursuant to Clause 25.2, as that amount may be reduced, cancelled or terminated in accordance with this Agreement (and "**Total Tranche C Commitments**" means the aggregate of the Tranche C Commitments of all the Lenders);

"**Tranche C Loan**" means the loan made or to be made under Tranche C or the principal amount outstanding for the time being of such loan;

"**Tranche D**" means the part of the Facility described in Clause 2.1(d);

"**Tranche D Commitment**" means, in relation to a Lender, the amount set opposite its name in Schedule 1 under the heading "Tranche D Commitment", or, as the case may require, the amount transferred by a Lender pursuant to Clause 25.2, as that amount may be reduced, cancelled or terminated in accordance with this Agreement (and "**Total Tranche D Commitments**" means the aggregate of the Tranche D Commitments of all the Lenders);

"**Tranche D Loan**" means the loan made or to be made under Tranche D or the principal amount outstanding for the time being of such loan;

"**Tranche E**" means the part of the Facility described in Clause 2.1(e);

"**Tranche E Commitment**" means, in relation to a Lender, the amount set opposite its name in Schedule 1 under the heading "Tranche E Commitment", or, as the case may require, the amount transferred by a Lender pursuant to Clause 25.2, as that amount may be reduced, cancelled or terminated in accordance with this Agreement (and "**Total Tranche E Commitments**" means the aggregate of the Tranche E Commitments of all the Lenders);

"**Tranche E Loan**" means the loan made or to be made under Tranche E or the principal amount outstanding for the time being of such loan;

"**Transaction**" shall mean, collectively, (i) the entering into of the Finance Documents, the incurrence of Loans hereunder and performance of obligations hereunder and thereunder, (ii) the incurrence of any Financial Indebtedness of the Borrower permitted pursuant to the terms of this Agreement, (iii) the payment of all fees and expenses in connection with the foregoing, including, without limitation, in connection with any supplements, amendments, waivers and consents and (iv) the transactions contemplated thereby;

"**Transaction Documents**" means:

(a)    this Agreement;

(b)    each Charter;

(c)    each other Finance Document;

(d)    any other document, notice, letter or instrument entered into, issued or given pursuant to the express terms of any of the foregoing; and

(e)    any other document, notice, letter or instrument designated as a Transaction Document by the Agent and the Borrower;

and "**Transaction Document**" means any of them;

OHSUSA:757654574.12                                    18

"**Transfer Certificate**" has the meaning given in Clause 25.2;

"**Trust Property**" has the meaning given in the Agency and Security Trust Deed;

"**Unfunded Current Liability**" of any Plan shall mean the amount, if any, by which the value of the accumulated plan benefits under the Plan determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions);

"**Unrestricted**" shall mean, when referring to cash or Cash Equivalents owned by the Borrower or any of its Subsidiaries, that such cash or Cash Equivalents are not Restricted;

"**Vessel**" means Vessel A, Vessel B, Vessel C, Vessel D or Vessel E, as appropriate and, where the context requires any Mortgaged Vessel exchanged for another Mortgaged Vessel pursuant to a Vessel Exchange and together the "**Vessels**";

"**Vessel A**" means the Liberian flag vessel Genco Bay, Official Number 14572;

"**Vessel A Guarantor**" means Genco Bay Limited, a company organised and existing under the laws of the Republic of the Marshall Islands;

"**Vessel A Seller**" means Hesperos Holdings S.A., the Seller of Vessel A;

"**Vessel B**" means the Liberian flag vessel Genco Ocean, Official Number 14783;

"**Vessel B Guarantor**" means Genco Ocean Limited, a company organised and existing under the laws of the Republic of the Marshall Islands;

"**Vessel B Seller**" means Princeton Shipholding S.A., the Seller of Vessel B;

"**Vessel C**" means the Liberian flag vessel Handy Avra to be renamed Genco Avra, Official Number 14797;

"**Vessel C Guarantor**" means Genco Avra Limited, a company organised and existing under the laws of the Republic of the Marshall Islands;

"**Vessel C Seller**" means Sillem Shipholding Limited, the Seller of Vessel C;

"**Vessel D**" means the Liberian flag vessel Handy Mare to be renamed Genco Mare, Official Number 14798;

"**Vessel D Guarantor**" means Genco Mare Limited, a company organised and existing under the laws of the Republic of the Marshall Islands;

"**Vessel D Seller**" means Vanderlin Maritime Inc., the Seller of Vessel D;

"**Vessel E**" means the Liberian flag vessel Hull Spirit to be renamed Genco Spirit, Official Number 14799;

"**Vessel E Guarantor**" means Genco Spirit Limited, a company organised and existing under the laws of the Republic of the Marshall Islands;

"**Vessel E Seller**" means Seafarer Shipping and Trading Company, the Seller of Vessel E;

"**Vessel Exchange**" shall mean the exchange of a Mortgaged Vessel which has suffered a Total Loss for an Acceptable Replacement Vessel and provided that the following conditions are satisfied with respect to such exchange:

(a)     On each Vessel Exchange Date, if the Subsidiary of the Borrower owning the Acceptable Replacement Vessel is not a Guarantor, (A) such Subsidiary shall execute and deliver an accession deed to this Agreement and (B) the Borrower shall pledge and deliver, or cause to be pledged and delivered, all of the capital stock of such Subsidiary to the Security Trustee;

(b)     On each Vessel Exchange Date, the Agent shall have received from counsel acceptable to the Agent consummating the relevant Vessel Exchange opinions reasonably satisfactory to the Agent practicing in those jurisdictions in which the Acceptable Replacement Vessel is registered and/or the Guarantor owning such Acceptable Replacement Vessel is organized, which opinions shall be addressed to the Agent and each of the Lenders and dated such Vessel Exchange Date, which shall (x) be in form and substance reasonably acceptable to the Agent and (y) cover the perfection of the security interests granted pursuant to the Mortgage(s) and such other matters incident thereto as the Agent may reasonably request;

(c)     On each Vessel Exchange Date, the Guarantor which is consummating a Vessel Exchange on such date shall have duly authorized, executed and delivered a General Assignment Deed and Accounts Pledge in each case together with:

   (i)     proper Financing Statements (Form UCC-1) fully executed for filing under the UCC or in other appropriate filing offices of each jurisdiction as may be necessary or, in the reasonable opinion of the Agent, desirable to perfect the security interests purported to be created by the General Assignment Deed and Accounts Pledge;

   (ii)     certified copies of Requests for Information or Copies (Form UCC-11), or equivalent reports, listing all effective financing statements that name any Guarantor as debtor and that are filed in the jurisdictions referred to in clause (A) above, together with copies of such other financing statements (none of which shall cover the Collateral except to the extent evidencing Permitted Security Interests unless in respect of which the Agent shall have received Form UCC-3 Termination Statements (or such other termination statements as shall be required by local law) fully executed for filing if required by applicable laws); and

   (iii)     evidence that all other actions necessary or, in the reasonable opinion of the Agent, desirable to perfect and protect the security interests purported to be created by the General Assignment Deed and Accounts Pledge have been taken;

(d)     On each Vessel Exchange Date, the Guarantor which is consummating a Vessel Exchange on such date shall have duly authorized, executed and delivered, and caused to be recorded in the appropriate vessel registry a Mortgage with respect to such Acceptable Replacement Vessel and such Mortgage shall be effective to create in favour of the Security Trustee and/or the Lenders a legal, valid and enforceable first priority security interest, in and lien upon such Acceptable Replacement Vessel, subject only to Permitted Security Interests. Except as specifically provided above, all filings, deliveries of instruments and other actions necessary or desirable in the reasonable opinion of the Agent to perfect and preserve such security interests shall have been duly effected and the Agent shall have received evidence thereof in form and substance reasonably satisfactory to the Agent; and

(e)    On each Vessel Exchange Date, the Agent shall have received each of the following with respect to the relevant Acceptable Replacement Vessel:

(i)    certificates of ownership from appropriate authorities showing (or confirmation updating previously reviewed certificates and indicating) the registered ownership of such Acceptable Replacement Vessel by the relevant Guarantor;

(ii)   the results of maritime registry searches with respect to such Acceptable Replacement Vessel, indicating no record Security Interests other than Permitted Security Interests;

(iii)  class certificates from an Approved Classification Society indicating that such Acceptable Replacement Vessel is classed in the highest class available for vessels of its age and type free of any conditions or recommendations other than those approved by the Agent;

(iv)   an Appraised Value from an Approved Appraiser in scope, form and substance reasonably satisfactory to the Agent; and

(v)    a report, in form and scope reasonably satisfactory to the Agent, from a firm of independent marine insurance brokers reasonably acceptable to the Agent with respect to the insurance maintained by the Guarantor in respect of such Acceptable Replacement Vessel, together with a certificate from such broker certifying that such insurances (i) are placed with such insurance companies and/or underwriters and/or clubs, in such amounts, against such risks, and in such form, as are customarily insured against by similarly situated insureds for the protection of the Agent and/or the Lenders as mortgagee and (ii) conform with the insurance requirements of this Agreement;

"**Vessel Exchange Date**" means a date not later than 60 days after the date of the Total Loss of the applicable Mortgaged Vessel, upon which a Mortgaged Vessel which has suffered a Total Loss is exchanged for an Acceptable Replacement Vessel;

"**Wholly-Owned Subsidiary**" shall mean, as to any Person, (i) any corporation 100% of whose capital stock (other than director's qualifying shares) is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time;

1.2    **Construction of certain terms.**  In this Agreement:

"**approved**" means, for the purposes of Clause 14, approved in writing by the Agent;

"**asset**" includes every kind of property, asset, interest or right, including any present, future or contingent right to any revenues or other payment;

"**company**" includes any partnership, joint venture and unincorporated association;

"**consent**" includes an authorisation, consent, approval, resolution, licence, exemption, filing, registration, notarisation and legalisation;

"**contingent liability**" means a liability which is not certain to arise and/or the amount of which remains unascertained;

"**document**" includes a deed; also a letter, fax or telex;

OHSUSA:757654574.12                                21

"**excess risks**" means the proportion of claims for general average, salvage and salvage charges not recoverable under the hull and machinery policies in respect of a Vessel in consequence of its insured value being less than the value at which the Vessel is assessed for the purpose of such claims;

"**expense**" means any kind of cost, charge or expense (including all legal costs, charges and expenses) and any applicable value added or other tax;

"**law**" includes any order or decree, any form of delegated legislation, any treaty or international convention and any regulation or resolution of the Council of the European Union, the European Commission, the United Nations or of its Security Council;

"**legal or administrative action**" means any legal proceeding or arbitration and any administrative or regulatory action or investigation;

"**liability**" includes every kind of debt or liability (present or future, certain or contingent), whether incurred as principal or surety or otherwise;

"**months**" shall be construed in accordance with Clause 1.3;

"**obligatory insurances**" means all insurances effected, or which the Borrower is obliged to effect, under Clause 14 or any other provision of this Agreement or another Finance Document;

"**Person**" or "**person**" includes any individual, firm, corporation, company or unincorporated legal entity; any state, political sub-division of a state and local or municipal authority; and any international organisation and reference to any person shall include its successors, permitted assignees and permitted transferees in accordance with their respective interests;

"**policy**", in relation to any insurance, includes a slip, cover note, certificate of entry or other document evidencing the contract of insurance or its terms;

"**protection and indemnity risks**" means the usual risks covered by a protection and indemnity association managed in London, including pollution risks and the proportion (if any) of any sums payable to any other person or persons in case of collision which are not recoverable under the hull and machinery policies by reason of the incorporation in them of Clause 1 of the Institute Time Clauses (Hulls)(1/10/83) or Clause 8 of the Institute Time Clauses (Hulls) (1/11/1995) or the Institute Amended Running Down Clause (1/10/71) or any equivalent provision;

"**regulation**" includes any regulation, rule, official directive, request or guideline (either having the force of law or compliance with which is reasonable in the ordinary course of business of the party concerned) of any governmental body, agency, department or regulatory, self-regulatory or other authority or organisation;

"**tax**" includes any present or future tax, duty, impost, levy or charge of any kind which is imposed by any state, any political sub-division of a state or any local or municipal authority (including any such imposed in connection with exchange controls), and any connected penalty, interest or fine; and

"**war risks**" includes the risk of mines and all risks excluded by Clause 23 of the Institute Time Clauses (Hulls)(1/10/83) or Clause 24 of the Institute Time Clauses (Hulls) (1/11/1995).

**1.3    Meaning of "month".**

A period of one or more "months" ends on the day in the relevant calendar month numerically corresponding to the day of the calendar month on which the period started ("the numerically corresponding day"), but:

OHSUSA:757654574.12                                           22

(a)   on the Business Day following the numerically corresponding day if the numerically corresponding day is not a Business Day or, if there is no later Business Day in the same calendar month, on the Business Day preceding the numerically corresponding day; or

(b)   on the last Business Day in the relevant calendar month, if the period started on the last Business Day in a calendar month or if the last calendar month of the period has no numerically corresponding day;

and "**month**" and "**monthly**" shall be construed accordingly.

1.4   **General Interpretation.**  In this Agreement:

(a)   references in Clause 1.1 to a Finance Document or any other document being in the form of a particular schedule include references to that form with any modifications to that form which the Agent (with the authorisation of the Majority Lenders in the case of substantial modifications) approves or reasonably requires;

(b)   references to, or to a provision of, a Finance Document or any other document are references to it as amended or supplemented, whether before the date of this Agreement or otherwise;

(c)   references to, or to a provision of, any law include any amendment, extension, re-enactment or replacement, whether made before the date of this Agreement or otherwise;

(d)   words denoting the singular number shall include the plural and vice versa; and

(e)   Clauses 1.1 to 1.4 apply unless the contrary intention appears.

1.5   **Headings.** In interpreting a Finance Document or any provision of a Finance Document, all clause, sub-clause and other headings in that and any other Finance Document shall be entirely disregarded.

1.6   **Position of the Lenders.**

(a)   Interests several. The rights of the Lenders under this Agreement are several;

(b)   Individual Lender's right of action. Any legal action brought to recover any amount which has become due and payable by the Borrower or any Guarantor under this Agreement or any other Finance Document shall, where possible, be brought by the Agent in the joint names of all the Lenders.  In case such action is required, for formal reasons, to be brought by the Lenders themselves then the Lenders shall act together, and the Agent shall co-ordinate such proceedings;

(c)   Proceedings requiring Majority Lenders' consent. No proceedings against the Borrower or any other Obligor in connection with this Agreement or any Finance Document or to recover sums payable hereunder or thereunder may be commenced without the prior consent of the Majority Lenders;

(d)   Agent's Powers. Wherever possible, action and legal proceedings to be brought under paragraphs (b) and (c) shall be brought by the Agent on behalf of all the Lenders, where applicable under the direction of the Majority Lenders;

(e)   Obligations several. The obligations of the Lenders under this Agreement are several; and a failure of a Lender to perform its obligations under this Agreement shall not result in:

(i)      the obligations of any of the other Lenders being increased;

(ii)     any Obligor or any other Lender being discharged (in whole or in part) from its obligations under this Agreement or any other Finance Document; or

(iii)    any other Lender having any responsibility for such failure.

**1.7**    **Reimbursements.**  All expenses reimbursable to a Creditor Party by the Borrower pursuant to Clauses 20 and 21 and  or other similar provisions relating to reimbursement of expenses contained elsewhere in the Finance Documents shall be properly incurred and evidenced by invoices.

**2**    **AVAILABILITY OF THE LOAN AND DRAWDOWN**

**2.1**    **Facility maximum amount.**  Subject to the other provisions of this Agreement, the Lenders shall make available to the Borrower a term loan credit facility which shall comprise a maximum aggregate amount of up to $100,000,000 (one hundred million Dollars) (i.e. $20,000,000 (twenty million Dollars) in respect of each Tranche), which shall be made available in (5) five tranches as follows:

(a)    Tranche A, available in one Drawing, in an amount equal to the lesser of (i) $20,000,000, (twenty million Dollars) and (ii) 76.92% of the valuation of Vessel A;

(b)    Tranche B, available in one Drawing, in an amount equal to the lesser of (i) $20,000,000, (twenty million Dollars) and (ii) 76.92% of the valuation of Vessel B;

(c)    Tranche C, available in one Drawing, in an amount equal to the lesser of (i) $20,000,000, (twenty million Dollars) and (ii) 76.92% of the valuation of Vessel C;

(d)    Tranche D, available in one Drawing, in an amount equal to the lesser of (i) $20,000,000, (twenty million Dollars) and (ii) 76.92% of the valuation of Vessel D; and

(e)    Tranche E, available in one Drawing, in an amount equal to the lesser of (i) $20,000,000, (twenty million Dollars) and (ii) 76.92% of the valuation of Vessel E.

**2.2**    **Purpose:**  The Borrower has applied all amounts borrowed by it under any Tranche as required under the Prepetition Loan Agreement.

**2.3**    Intentionally omitted.

**2.4**    **No duty to verify application of funds borrowed.**  No Creditor Party is bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

**2.5**    **Termination of Commitment.**  The Lenders' Commitment in respect of a Loan will terminate on the expiry of the Availability Period in respect of that Loan or, if earlier, upon the relevant Vessel becoming a Total Loss.  Any part of a Commitment undrawn at the end of the relevant Availability Period or upon the Vessel becoming a Total Loss will be immediately cancelled.

**2.6**    **Lenders' participations in Drawings.**  Subject to the other provisions of this Agreement, each Lender shall participate in each Drawing in the proportion which, as at the relevant Drawdown Date, its Commitment in respect of the relevant Tranche bears to the Total Commitments in respect of that Tranche as specified in Schedule 1.

**3      DRAWDOWN**

3.1     **Request for advance of Loan.**  Subject to the following conditions, the Borrower may request a Drawing to be made by ensuring that the Agent receives a completed Drawdown Notice not later than 10.00 a.m. (London time) 3 Business Days prior to the intended Drawdown Date.

3.2     **Availability.**  The conditions referred to in Clause 3.1 are that:

(a)     the Drawdown Date has to be a Business Day during the Availability Period applicable to that Tranche;

(b)     the Tranche to be utilised must be identified;

(c)     there shall be no more than five (5) Drawings;

(d)     the proposed currency and amount of the Drawing must comply with Clause 2.1;

(e)     subject to Clause 2.3, a Drawing shall be made upon or following the acquisition of a Vessel by a Guarantor and only one Drawing shall be made in respect of each Vessel; and

(f)     the aggregate amount of a Drawing in respect any Tranche shall not exceed the Total Commitments for such Tranche.

3.3     **Notification to Lenders of receipt of a Drawdown Notice.**  The Agent shall immediately notify the Lenders that it has received a Drawdown Notice from the Borrower in respect of its intention to make a Drawing and shall inform each Lender of:

(a)     the amount of the Drawing and the Drawdown Date;

(b)     the amount of that Lender's participation in the Drawing; and

(c)     the duration of the first Interest Period.

3.4     **Drawdown Notice irrevocable.**  A Drawdown Notice must be signed by a duly authorised person on behalf of the Borrower; and once served, a Drawdown Notice cannot be revoked without the prior consent of the Agent, acting on the authority of the Majority Lenders.

3.5     **Lenders to make available Contributions**.  Subject to the provisions of this Agreement, each Lender shall, on and with value on the Drawdown Date, make available to the Agent for the account of the Borrower the amount due from that Lender under Clause 2.6.

3.6     **Disbursement of Loan**.  Subject to the provisions of this Agreement, the Agent shall on the Drawdown Date pay to the Borrower the amounts which the Agent receives from the Lenders under Clause 3.5; and that payment to the Borrower shall be made:

(a)     to the account which the Borrower specifies in the Drawdown Notice; and

(b)     in the like funds as the Agent received the payments from the Lenders.

3.7     **Disbursement of Loan to Borrower.**  The payment by the Agent under Clause 3.6 to the Borrower shall constitute the making of the Loan and the Borrower shall at that time become indebted, as principal and direct obligor, to each Lender in an amount equal to that Lender's Contribution.

**4      CONDITIONS PRECEDENT TO EFFECTIVENESS OF AMENDMENT AND RESTATEMENT**

4.1     **Documents, fees and no default.**  The effectiveness of this amendment and restatement of the Agreement is subject to the following conditions precedent:

(a)     the documents delivered pursuant to Clause 4.1(a) of the Prepetition Loan Agreement are (i) valid and in full force and effect, and have not been modified in any way, except as otherwise certified to the Agent, or (ii) no longer applicable; and

(b)     the satisfaction of the Agent and Security Trustee in its reasonable discretion of each of the conditions precedent set forth in Schedule 1 of the Amendment and Restatement Agreement dated the date hereof among the parties hereto.

**5      REPAYMENT AND PREPAYMENT**

5.1     **Timing and amount of repayment instalments.**  The Borrower shall:

(a)     repay each Loan to the Lenders in consecutive quarterly instalments on the last day of each calendar quarter commencing on the last day of the calendar quarter in which the Drawdown Date occurs with respect to such Loan (each such quarterly payment date, a "**Repayment Date**"); and

(b)     pay to the Agent, on the Amendment and Restatement Effective Date, for the account of the applicable Lenders, any due and unpaid quarterly instalments described in Schedule 5 of the Prepetition Loan Agreement for any calendar quarter in which the Cases were pending.

5.2     **Amortization schedule.**  The Agent shall prepare an amortization schedule for the Loan advanced on each Drawdown Date, such amortization schedule to be calculated on the basis of a thirteen (13) year linear amortization of such Loan, calculated from each Drawdown Date; provided that the amount to be repaid on the First Repayment Date for each Loan shall be reduced on a pro rata basis for the number of days from (and including) the first day of the calendar quarter in which the Drawdown Date for that Loan occurs to (but excluding) such Drawdown Date. Each amortization schedule prepared by the Agent in accordance with this Clause 5.2 shall be conclusive and binding, absent manifest error, and shall be attached by the Agent to this Agreement as Schedule 5.

5.3     **Final Maturity Date.**  On the Final Maturity Date, the Borrower shall pay in full the outstanding balance of the Loans and shall additionally pay to the Agent for the account of the Creditor Parties all other sums then accrued or owing under any Finance Document.

5.4     **Voluntary Prepayment.**  Subject to the conditions set forth in Clause 5.5, the Borrower may prepay the whole or any part of a Loan.

5.5     **Conditions for voluntary prepayment.**  The conditions referred to in Clause 5.4 are that:

(a)     a partial prepayment shall be a minimum amount of $1,000,000 or an integral multiple of $1,000,000;

(b)     the Agent has received from the Borrower at least 5 Business Days' prior written notice specifying the amount to be prepaid and the date on which the prepayment is to be made; and

(c)     the Borrower has provided evidence satisfactory to the Agent that any consent required by the Borrower or any Obligor in connection with the prepayment has been obtained and remains in force, and that any regulation relevant to this Agreement which affects the Borrower or any Obligor has been complied with.

OHSUSA:757654574.12                                26

**5.6**     **Effect of notice of prepayment.**  A prepayment notice may not be withdrawn or amended without the consent of the Agent, given with the authorisation of the Majority Lenders, and the amount specified in the prepayment notice shall become due and payable by the Borrower on the date for prepayment specified in the prepayment notice.

**5.7**     **Notification of notice of prepayment.**  The Agent shall notify the Lenders promptly upon receiving a prepayment notice, and shall provide any Lender which so requests with a copy of any document delivered by the Borrower under Clause 5.5 (c).

**5.8**     **Mandatory prepayment.**  Subject to Clause 5.12, the Borrower shall be obliged to prepay the whole of any Loan:

(a)     in the case of a sale of the related Vessel by the relevant Guarantor, on or before the date on which the sale is completed;

(b)     in the case of a Total Loss of the related Vessel, on the earlier of the date falling 120 days after the Total Loss Date and the date of receipt by the Security Trustee of the proceeds of insurance relating to such Total Loss; and

(c)     if without prior approval of the Agent (on instructions of the Majority Lenders), there is a Change of Control without the Agent's consent in which case each of the Loans shall be prepaid within five (5) Business Days of such Change of Control.

**5.9**     **Amounts payable on prepayment.**  A prepayment shall be made together with accrued interest (and any other amount payable under Clause 20 or otherwise) in respect of the amount prepaid and, if the prepayment is not made on the last day of an Interest Period together with any sums payable under Clauses 21.3 and 21.4 but without premium or penalty.

**5.10**    **Application of partial prepayment.**  Each partial prepayment shall be applied against the repayment instalments specified in Clause 5.1 in inverse order of maturity. Upon any partial prepayment of a Loan, the Agent shall prepare a replacement Schedule 5 for that Loan, which replacement schedule shall be conclusive and binding, absent manifest error.  In the case of a partial prepayment under Clause 5.4, such prepayment shall be applied to the Loan designated by the Borrower in its notice of prepayment, or, if no such Loan is designated by the Borrower, shall be applied on a pro rata basis against all Loans, based on the outstanding principal balance of each Loan immediately prior to such prepayment.

**5.11**    **No reborrowing.**  No amount repaid or prepaid may be reborrowed.

**5.12**    **Exchange of Mortgaged Vessel following a Total Loss.**  In the event of Total Loss of a Mortgaged Vessel, the Borrower and each of the Guarantors shall act in accordance with Clause 5.8 or, with the prior written consent of all of the Lenders (which the Lenders may grant or withhold in their sole discretion) and so long as (i) no Potential Event of Default or Event of Default has occurred and is continuing (or would arise after giving effect thereto), and (ii) all representations and warranties made by the Obligors pursuant to Clause 11 of this Agreement are true and correct both before and after the Vessel Exchange Date, the relevant Guarantor may elect to exchange such Mortgaged Vessel for an Acceptable Replacement Vessel pursuant to a Vessel Exchange; provided further that the Borrower shall have delivered to the Agent an officer's certificate, certified by the senior financial officer of the Borrower, demonstrating pro forma compliance (giving effect to such Vessel Exchange and, in the case of calculations involving the valuation of Mortgaged Vessels, the valuations used shall be the valuations most recently delivered to or obtained by the Agent pursuant to Clause 16.8 (or, in the case of the Acceptable Replacement Vessel, pursuant to the definition of Vessel Exchange) or, at the Borrower's option, a new valuation complying with the provisions of Clause 16.3) with each of the covenants set forth in Clauses 12.2(d)-(f), inclusive, for the most recently ended Test Period (or at the time of such sale or exchange, as applicable) and projected compliance with such covenants for the one year period following such Vessel

OHSUSA:757654574.12                                27

Exchange, in each case setting forth the calculations required to make such determination in reasonable detail.

**5.13** **Dissolution of Guarantor following Vessel Exchange.**  Following a Vessel Exchange permitted by this Agreement, the Guarantor which owned the Vessel that is the subject of such Vessel Exchange may dissolve (if such Guarantor is not the owner of the Acceptable Replacement Vessel exchanged for such Vessel), <u>provided</u>, that (x) such Guarantor shall have transferred its Operating Account to the Guarantor which owns the Acceptable Replacement Vessel, (y) all of the proceeds of such dissolution shall be paid only to the Borrower and (z) no Event of Default is continuing unremedied at the time of such dissolution.

**5.14** **Escrow:**  Any insurance proceeds received in respect of the Total Loss of a Mortgaged Vessel which is being exchanged pursuant to a Vessel Exchange shall be held in escrow by the Agent for a period of 90 days following the Vessel Exchange Date.

**6** **INTEREST**

**6.1** **Payment of Interest**.

(a) **General.**  The Borrower shall pay accrued interest on each Loan free of any deductions or withholdings, at the rate and at the times determined under this Clause **Error! Reference source not found.**;

(b) **Commencement of Interest Periods.**  the first Interest Period for each Loan shall commence on the Drawdown Date for each Loan and each subsequent Interest Period shall commence on the expiry of the preceding Interest Period;

(c) **Rate of interest.**  interest on each Loan will be payable at a rate per annum which is equal to the aggregate of (i) LIBOR for the relevant Interest Period; (ii) the Margin and (iii) the Mandatory Cost (if any);

(d) **Computation of interest.**  interest will be computed in accordance with Clause 17.2.

(e) **Payment dates for interest.**  interest due under this Clause **Error! Reference source not found.** shall be paid on the last day of each relevant Interest Period; and

(f) **Interest Periods.**  for the calculation of interest, the Borrower shall select interest periods (each an "**Interest Period**") in respect of each Loan as follows:

(i) each Interest Period shall be of either one (1), three (3) or six (6) months duration, as selected by the Borrower and notified to the Agent not less than three (3) Business Days before the first day of the Interest Period or any other period mutually agreed by the Borrower and the Agent, or if the Borrower fails to so notify the Agent, of three (3) months duration;

(ii) the first Interest Period for each Loan will start on its Drawdown Date; and

(iii) prior to each Repayment Date, in determining the interest rate for a Loan, the Agent may shorten an Interest Period for any Loan to ensure that the applicable Interest Period for such Loan ends on a Repayment Date (in the case of the First Interest Period for a Loan) or the Final Maturity Date (in the case of the last Interest Period for each Loan);

in each case, the applicable rate, the amount payable, the Interest Periods and the due date for payment shall be notified by the Agent to the Borrower by letter or facsimile.

**7        CHANGES TO CALCULATION OF INTEREST**

**7.1     Obligation of Reference Banks to quote.**  A Reference Bank which is a Lender shall use all reasonable efforts to supply the quotation required of it for the purposes of fixing a rate of interest under this Agreement.

**7.2     Absence of quotations by Reference Banks.**  If any Reference Bank fails to supply a quotation, the Agent shall determine the relevant LIBOR on the basis of the quotations supplied by the remaining Reference Banks; but if (2) or more of the Reference Banks fail to provide a quotation, the relevant rate of interest shall be set in accordance with the following provisions of this Clause 7.

**7.3     Market disruption.**  The following provisions of this Clause 7 apply if:

(a)     The Screen Rate is not available and none or only one of the Reference Banks provide quotations to the Agent in order to fix LIBOR before 1.00 p.m. (London time) on the Quotation Date for an Interest Period;

(b)     at least 1 Business Day before the start of an Interest Period, Lenders having Contributions together amounting to more than 50 per cent. of the Loan notify the Agent that LIBOR fixed by the Agent would not accurately reflect the cost to those Lenders of funding their respective Contributions (or any part of them) during the Interest Period in the London Interbank Market at or about 11.00 a.m. (London time) on the Quotation Date for the Interest Period; or

(c)     at least 1 Business Day before the start of an Interest Period, the Agent is notified by a Lender (the "**Affected Lender**") that for any reason it is unable to obtain Dollars in the London Interbank Market in order to fund its Contribution (or any part of it) during the Interest Period.

**7.4     Notification of market disruption.**  The Agent shall promptly notify the Borrower and each of the Lenders stating the circumstances falling within Clause 7.3 which have caused its notice to be given.

**7.5     Suspension of drawdown**.  If the Agent's notice under Clause 7.4 is served before the Loan is made:

(a)     in a case falling within Clauses 7.3(a) or (b), the Lenders' obligations to make the Loan; and

(b)     in a case falling within Clause 7.3(c), the Affected Lender's obligation to participate in the Loan;

shall be suspended while the circumstances referred to in the Agent's notice continue.

**7.6     Negotiation of alternative rate of interest.**  If the Agent's notice under Clause 7.4 is served after the Loan is made, the Borrower, the Agent, the Lenders or (as the case may be) the Affected Lender shall use reasonable endeavours to agree, within the 30 days after the date on which the Agent serves its notice under Clause 7.4 (the "**Negotiation Period**"), an alternative interest rate or (as the case may be) an alternative basis for the Lenders or (as the case may be) the Affected Lender to fund or continue to fund their or its Contribution during the Interest Period concerned.

**7.7     Application of agreed alternative rate of interest.**  Any alternative interest rate or an alternative basis which is agreed during the Negotiation Period shall take effect in accordance with the terms agreed.

**7.8**  **Alternative rate of interest in absence of agreement.**  If an alternative interest rate or alternative basis is not agreed within the Negotiation Period, and the relevant circumstances are continuing at the end of the Negotiation Period, then the Agent shall, with the agreement of each Lender or (as the case may be) the Affected Lender, set an interest period and interest rate representing the cost of funding of the Lenders or (as the case may be) the Affected Lender in Dollars or in any available currency of their or its Contribution plus the Margin; and the procedure provided for by this Clause 7.8 shall be repeated if the relevant circumstances are continuing at the end of the interest period so set by the Agent.

**7.9**  **Notice of prepayment.**  If the Borrower does not agree with an interest rate set by the Agent under Clause 7.8, the Borrower may give the Agent not less than 15 Business Days' notice of its intention to prepay the Loan or, as the case may be, the Affected Lender's Contribution at the end of the interest period set by the Agent.

**7.10**  **Prepayment; termination of Commitments.**  A notice under Clause 7.9 shall be irrevocable; the Agent shall promptly notify the Lenders or (as the case may require) the Affected Lender of the Borrower's notice of intended prepayment and:

(a)  on the date on which the Agent serves that notice, the Total Commitments or (as the case may require) the Commitment of the Affected Lender shall be cancelled; and

(b)  on the last Business Day of the interest period set by the Agent, the Borrower shall prepay (without premium or penalty) the Loans or, as the case may be, the Affected Lender's Contribution, together with accrued interest thereon at the applicable rate plus the Margin.

**7.11**  **Application of prepayment.** The provisions of Clause 5.10 shall apply in relation to the prepayment.

**8**  **DEFAULT INTEREST**

**8.1**  **Payment of default interest on overdue amounts.**  The Borrower shall pay interest in accordance with the following provisions of this Clause 8 on any amount payable by the Borrower under any Finance Document which the Agent, the Security Trustee or the other designated payee does not receive on or before the relevant date, that is:

(a)  the date on which the Finance Documents provide that such amount is due for payment;

(b)  if a Finance Document provides that such amount is payable on demand, the date on which the demand is served; or

(c)  if such amount has become immediately due and payable under Clause 19.6 (Acceleration of Loan), the date on which it became immediately due and payable.

**8.2**  **Default rate of interest.**  Interest shall accrue on an overdue amount from (and including) the relevant date until the date of actual payment (as well after as before judgment) at the rate per annum determined by the Agent to be two (2) per cent. above:

(a)  in the case of an overdue amount of principal, the higher of the rates set out in Clauses 8.3(a) and (b); or

(b)  in the case of any other overdue amount, the rate set out at Clause 8.3(b).

**8.3**  **Calculation of default rate of interest.**  The rates referred to in Clause 8.2 are:

(a)  the rate applicable to the overdue principal amount immediately prior to the relevant date (but only for any unexpired part of any then current Interest Period); and

OHSUSA:757654574.12                                   30

(b) the Margin plus, in respect of successive periods of any duration (including at call) up to 3 months which the Agent may select from time to time:

(i) LIBOR; or

(ii) if the Agent (after consultation with the Reference Banks) determines that Dollar deposits for any such period are not being made available to any Reference Bank by leading banks in the London Interbank Market in the ordinary course of business, a rate from time to time determined by the Agent by reference to the cost of funds to the Reference Banks from such other sources as the Agent (after consultation with the Reference Banks) may from time to time determine.

**8.4**   **Notification of interest periods and default rates.**   The Agent shall promptly notify the Lenders and the Borrower of each interest rate determined by the Agent under Clause 8.3 and of each period selected by the Agent for the purposes of paragraph (b) of that Clause; but this shall not be taken to imply that the Borrower is liable to pay such interest only with effect from the date of the Agent's notification.

**8.5**   **Payment of accrued default interest.**   Subject to the other provisions of this Agreement, any interest due under this Clause shall be paid on the last day of the period by reference to which it was determined; and the payment shall be made to the Agent for the account of the Creditor Party to which the overdue amount is due.

**8.6**   **Compounding of default interest.**   Any such interest which is not paid at the end of the period by reference to which it was determined shall thereupon be compounded.

**9**   **GUARANTEE AND INDEMNITY**

**9.1**   **Guarantee and indemnity.**   Each Guarantor irrevocably and unconditionally jointly and severally:

(a) guarantees to each Creditor Party punctual payment and performance by the Borrower of all the Borrower's obligations under this Agreement and each of the other Finance Documents;

(b) undertakes with each Creditor Party that whenever the Borrower does not pay any amount when due under or in connection with this Agreement or any of the other Finance Document, that Guarantor shall immediately on demand pay that amount as if it was the principal obligor; and

(c) agrees with each Creditor Party that if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal, it will, as an independent and primary obligation, indemnify that Creditor Party immediately on demand against any cost, loss or liability it incurs as a result of the Borrower not paying any amount which would, but for such unenforceability, invalidity or illegality, have been payable by it under any Finance Document on the date when it would have been due. The amount payable by a Guarantor under this indemnity will not exceed the amount it would have had to pay under this Clause 9 if the amount claimed had been recoverable on the basis of a guarantee.

**9.2**   **Continuing Guarantee.**   This guarantee is a continuing guarantee and will extend to the ultimate balance of sums payable by any Obligor under the Finance Documents, regardless of any intermediate payment or discharge in whole or in part.

**9.3**   **Reinstatement.**   If any discharge, release or arrangement (whether in respect of the obligations of any Obligor or any security for those obligations or otherwise) is made by a Creditor Party in whole or in part on the basis of any payment, security or other disposition

which is avoided or must be restored in insolvency, liquidation, administration or otherwise, without limitation, then the liability of each Guarantor under this Clause 9 will continue or be reinstated as if the discharge, release or arrangement had not occurred.

9.4 **Waiver of defences.** The obligations of each Guarantor under this Clause 9 will not be affected by an act, omission, matter or thing which, but for this Clause, would reduce, release or prejudice any of its obligations under this Clause 9 (without limitation and whether or not known to it or any Creditor Party) including:

(a) any time, waiver or consent granted to, or composition with, any Obligor or other person;

(b) the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor of any member of the Group;

(c) the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d) any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor or any other person;

(e) any amendment, novation, supplement, extension, restatement (however fundamental and whether or not more onerous) or replacement of any Finance Document or any other document or security including without limitation any change in the purpose of, any extension of or any increase in any facility or the addition of any new facility under any Finance Document or other document or security;

(f) any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or security; or

(g) any insolvency or similar proceedings.

9.5 **Immediate Recourse.** Each Guarantor waives any right it may have of first requiring any Creditor Party (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person before claiming from that Guarantor under this Clause 9. This waiver applies irrespective of any law or any provision of a Finance Document to the contrary.

9.6 **Appropriations.** Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full, each Creditor Party (or any trustee or agent on its behalf) may:

(a) refrain from applying or enforcing any other moneys, security or rights held or received by that Creditor Party (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and no Guarantor shall be entitled to the benefit of the same; and

(b) hold in an interest-bearing suspense account any moneys received from any Guarantor or on account of any Guarantor's liability under this Clause 9.

9.7 **Deferrals of Guarantor's rights.** Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full and unless the Agent otherwise directs, no Guarantor will exercise any rights which it may

have by reason of performance by it of its obligations under the Finance Documents or by reason of any amount being payable, or liability arising, under this Clause 9:

(a)    to be indemnified by an Obligor;

(b)    to claim any contribution from any other guarantor (including any other Guarantor) of any Obligor's obligations under the Finance Documents;

(c)    to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Creditor Parties under the Finance Documents or of any other guarantee or security taken pursuant to, or in connection with, the Finance Documents by any Creditor Party;

(d)    to bring legal or other proceedings for an order requiring any Obligor to make any payment, or perform any obligation, in respect of which any Guarantor has given a guarantee, undertaking or indemnity under this Clause 9;

(e)    to exercise any right of set-off against any Obligor; and/or

(f)    to claim or prove as a creditor of any Obligor in competition with any Creditor Party.

If a Guarantor receives any benefit, payment or distribution in relation to such rights it shall hold that benefit, payment or distribution to the extent necessary to enable all amounts which may be or become payable to the Creditor Parties by the Obligors under or in connection with the Finance Documents to be repaid in full on trust for the Creditor Parties and shall promptly pay or transfer the same to the Agent or as the Agent may direct.

9.8    **Release of Guarantors' right of contribution.**  If any Guarantor (a "**Retiring Guarantor**") ceases to be a Guarantor in accordance with the terms of the Creditor Documents for the purpose of any sale or other disposal of that Retiring Guarantor then on the date such Retiring Guarantor ceases to be a Guarantor:

(a)    that Retiring Guarantor is released by each other Guarantor from any liability (whether past, present or future and whether actual or contingent) to make a contribution to any other Guarantor arising by reason of the performance by any other Guarantor of its obligations under the Finance Documents; and

(b)    each other Guarantor waives any rights it may have by reason of the performance of its obligations under the Finance Documents to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Creditor Parties under any Finance Document or of any other security taken pursuant to, or in connection with, any Finance Document where such rights or security are granted by or in relation to the assets of the Retiring Guarantor.

9.9    **Additional security.** This guarantee is in addition to and is not in any way prejudiced by any other guarantee or security now or subsequently held by any Creditor Party.

10    **OPERATING ACCOUNTS**

10.1    **Account Bank.**  The Operating Accounts referred to in this Clause 10 are opened by the Guarantors with the Agent.

10.2    **Operating Accounts.**

(a)    Each Guarantor shall maintain the following accounts in respect of each Vessel at the relevant branch of the Agent, denominated in Dollars, which shall together be the "**Operating Accounts**":

(i)      Operating Account in the name of Genco Bay Operating Account with Number 00 250 713 960;

(ii)     Operating Account in the name of Genco Ocean Operating Account with Number 00 250 714 057;

(iii)    Operating Account in the name of Genco Avra Operating Account with Number 00 250 714 154;

(iv)    Operating Account in the name of Genco Mare Operating Account with Number 00 250 714 251; and

(v)     Operating Account in the name of Genco Spirit Operating Account with Number 00 250 714 348;

(b)    each Operating Account shall be a separate account at the Agent;

(c)    each Guarantor shall ensure at all times that the aggregate balance of all of the Operating Accounts is not less than the product of $750,000 and the number of Mortgaged Vessels (the "**Minimum Balance**"). The Minimum Balance shall be maintained by the Guarantors and constituted by the Guarantors on or before the date of a Drawing in relation to a Loan;

(d)    neither the existence of an Operating Account, nor the insufficiency of funds in any of them, nor any inability to apply any funds in any of them towards the relevant payment, shall affect the obligation of the Borrower and Guarantors to make all payments required to be made to the Creditor Parties or any of them on the due date for payment in accordance with the Finance Documents; and

(e)    no sum may be credited to or withdrawn from any Operating Account except as expressly permitted by this Agreement.

**10.3    Account mandates.**

(a)    The Agent shall, save as otherwise provided herein, maintain each Operating Account in accordance with any mandate agreed with the Guarantors (from time to time); and

(b)    if there is any conflict between the Finance Documents and either any mandate agreed by the Agent or the Agent's normal practices, the provisions of the Finance Documents shall prevail but only to the extent that the Agent would not be in a breach of law as a result.

**10.4    Operation of Operating Accounts**. The Borrower shall procure and each Guarantor shall ensure during the Security Period, the payment into each Guarantor's Operating Account of:

(a)    all Earnings with respect to the Vessel owned by such Guarantor; and

(b)    any other amounts received by such Guarantor for any reason whatsoever.

**10.5    Receipts into Operating Accounts.**

(a)    Subject to Clause 17.6, the Agent shall not be obliged to make available to the Guarantors any sum which it is expecting to receive for the account of the Guarantors until it has received it; and

(b) the Guarantors shall promptly convert, or instruct the Agent to convert, into Dollars at a reasonable market rate any funds received by them in a currency other than Dollars for crediting to the relevant Operating Account on the day of conversion into Dollars.

**10.6 Withdrawals from Operating Accounts.** All requests for withdrawals from an Operating Account shall be made in accordance with the relevant Guarantor's mandate with the Agent.

**10.7** No withdrawals in certain circumstances. Notwithstanding anything else in this Clause 10, no withdrawal shall be made by any Guarantor from any Operating Account:

(i) following the occurrence and during the continuation of any Potential Event of Default or any Event of Default or if the proposed withdrawal would cause a Potential Event of Default or Event of Default;

(ii) if, prior to the date of the relevant proposed withdrawal, the Agent (either generally, or with reference to the specific withdrawal or Operating Account) notifies the applicable Guarantor that the withdrawal is not or would not be permitted under this Agreement and such notice shall specify (for the benefit of such Guarantor) the provision of this Agreement which prohibits such withdrawal; or

(iii) to the extent that the aggregate balance standing to the credit of all of the Operating Accounts is less than the Minimum Balance or would be reduced to below the Minimum Balance as a result of such withdrawal.

**10.8 Interest.**

(a) The Operating Accounts shall earn interest at such rate(s) as may be agreed from time to time by the Guarantors and the Agent. Such interest shall be credited to the relevant Operating Account; and

(b) any reference in this Agreement to the balance standing to the credit of the Operating Account includes any interest so credited to it after taking account of any Tax attributable to the interest to the extent considered appropriate by the Agent.

**11 REPRESENTATIONS AND WARRANTIES**

**11.1 General representations.** Each Obligor jointly and severally represents and warrants to each Creditor Party that:

(a) **Status:** it is duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation and has power to carry on its business as it is now being conducted and to own its property and other assets and has duly qualified to do business in all jurisdictions where such qualification is necessary to carry on its present business and operations and to own its properties and perform its obligations under the Financing Documents to which it is a party;

(b) **Corporate power:** it has the power to:

(i) execute, deliver and, as applicable, affirm the Transaction Documents to which it is a party;

(ii) comply with the provisions of and perform each of its obligations under the Transaction Documents to which it is a party; and

(iii) in the case of the Borrower to borrow under this Agreement and to make all payments contemplated by, and to comply with the Transaction Documents;

and all necessary corporate and other actions have been taken by it (to the extent it is a party) to authorise its entry into, performance and delivery of the transactions contemplated by those Transaction Documents;

(c)   **Consents in force:**   all the authorisations referred to in Clause 11.1(b) remain in force and nothing has occurred which makes any of them liable to revocation;

(d)   **No conflicts:**   the execution and performance by it of the Transaction Documents to which it is a party and in the case of the Borrower the borrowing of the full amount of each Loan does not contravene any law, regulation, judicial or administrative decree or conflict with its constitutional documents or any contractual or other obligation or restriction which is binding on it or any of its assets;

(e)   **Legal validity:**   the Transaction Documents to which it is a party are or will when executed and, where appropriate, registered, constitute its legal, valid and binding obligations, enforceable in accordance with their terms, subject to bankruptcy, insolvency and other similar laws affecting creditor's rights generally and to general principles of equity;

(f)   **No governmental approvals or consents:**   there are no governmental approvals or consents which are necessary for the execution and performance by an Obligor of this Agreement or any of the other Transaction Documents to which it is a party or for this Agreement or any of the other Transaction Documents to which it is a party to be enforceable against any Obligor, other than those which have already been obtained;

(g)   **No third party Security Interests:**   without limiting the generality of Clause 11.1**Error! Reference source not found.**, at the time of execution and delivery of each Transaction Document to which that Obligor is a party:

(i)   such Obligor will have the right to create all the Security Interests which that Transaction Document purports to create;

(ii)   no third party will have any Security Interests (except for Permitted Security Interests or, with respect to a Vessel, Security Interests permitted under the Mortgage covering such Vessel) or any other interest, right or claim over, in or in relation to any asset to which such Security Interest, by its terms relates; and

(iii)   the Security Interests in each Vessel granted, or to be granted, to the Security Trustee pursuant to the General Assignment Deed and the Mortgage in the property purported to be covered thereby, (i) constitute or will constitute upon the acquisition of such Vessel by a Guarantor (A) with respect to the General Assignment Deed, a valid and perfected first priority security interest under the UCC or other applicable law and (B) with respect to the Mortgage, a first preferred ship mortgage on the Vessel, (ii) will be entitled to all of the rights, benefits and priorities provided by the UCC or other applicable law, as applicable and (iii) will be superior and prior to the rights of all third persons or entities (other than those whose claims are mandatorily preferred by law and those that constitute Permitted Security Interests), now existing or hereafter arising whether by way of any lien or otherwise to the extent provided by the UCC or other applicable law.  All filings have been accomplished, or will be accomplished upon the mortgaging of each Vessel, with respect to the Mortgages in each jurisdiction necessary or advisable to establish and perfect the Security Trustee's rights in and to the collateral covered thereby, and any giving of notice or any other action to such end required or permitted by law has been given or taken.  All related filing or recording fees have been paid;

(h)     **No proceedings:**  there are no proceedings before any arbitration tribunal, court, government agency or administrative body pending or threatened against any Obligor, which, to the best of the Borrower's knowledge, is likely to be adversely determined, and would (if adversely determined) be likely to have a Material Adverse Effect;

(i)     **No default:**  no Obligor is in default under any Transaction Document to which it is a party or any other material agreement or obligation to which it is a party or by which it is bound;

(j)     **No Event of Default:**  no Potential Event of Default or Event of Default has occurred and is continuing; and

(k)     **No notarisations, filings, etc. required:**  there are at the date of the execution of this Agreement no notarisations, filings, recordings, registrations or enrolments in any court, public office of any jurisdiction applicable to an Obligor which are necessary in order to ensure the legality, validity, enforceability or admissibility in evidence of this Agreement or the other Transaction Documents to which it is a party and any such notarisations, filings, recordings, registrations or enrolments as may be necessary to ensure the legality, validity, enforceability or admissibility in evidence of this Agreement and the Mortgage covering the Vessel being mortgaged by a Guarantor shall have been obtained.

11.2    **Borrower representations.**  The Borrower represents and warrants to each Creditor Party (for itself and on behalf of the Guarantors) that:

(a)     **No withholding taxes:**  all payments which an Obligor is liable to make under the Finance Documents may be made without deduction or withholding for an account of any tax payable under any law of any Pertinent Jurisdiction;

(b)     **Information:**  all relevant information which has been produced in writing by or on behalf of the Obligors to any Creditor Party in connection with any Finance Document satisfied the requirements of such Finance Document; all audited and unaudited accounts which have been so provided satisfy the requirements of Clause **Error! Reference source not found.** and 12.1(c), there has been no material adverse change in the financial position or state of affairs of the Borrower from that disclosed in the latest of those accounts or financial statements;

(c)     **Taxes paid:**  each Obligor has paid or has provided adequate reserves (in accordance with GAAP) for the payment of, all material taxes applicable to, or imposed on or in relation to such Obligor, its business or the Vessel owned by it and has filed or caused to be filed all material tax returns, reports, forms or similar documents which are required to be filed by it;

(d)     **No litigation:**  no legal or administrative action involving an Obligor (including action relating to any alleged or actual breach of the ISM Code) has been commenced or taken or, to the Borrower's knowledge, is likely to be commenced or taken which, in either case, would be likely to have a Material Adverse Effect;

(e)     **Title to Vessels:**  each Guarantor which has mortgaged a Vessel has good and marketable title to that Vessel free and clear of all Security Interests other than Permitted Security Interests;

(f)     **Adequacy of disclosure:**  the representations and warranties made by each Obligor in connection with any of the transactions contemplated hereby and any other document furnished by any Obligor to any Creditor Party, or in connection with the transactions contemplated hereby are true and correct as of the date hereof.  There is

no fact which the Borrower has not disclosed to the Agent, in relation to the Obligors, in writing which may have a Material Adverse Effect;

(g) **No rebates, etc.:** there is no agreement or understanding to allow or pay any rebate, premium, commission, discount or other benefit or payment (howsoever described) to an Obligor, the Seller or a third party in connection with the purchase by the relevant Obligor of each Vessel, other than as disclosed to the Lenders in writing on or prior to the date of this Agreement;

(h) **ISM Code compliance:** all requirements of the ISM Code as they relate to each Guarantor, the Technical Manager, the Commercial Manager, and each Vessel have been complied with;

(i) **ERISA:** each Plan, other than any Multiemployer Plan (and each related trust, insurance contract or fund), is in substantial compliance with its terms and with all applicable laws, including without limitation ERISA and the Code; each Plan, other than any Multiemployer Plan (and each related trust, if any), which is intended to be qualified under Section 401(a) of the Code has received a determination letter from the Internal Revenue Service to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code; no Reportable Event has occurred; to the best knowledge of the Borrower or any of its Subsidiaries or ERISA Affiliates, no Plan which is a Multiemployer Plan is insolvent or in reorganization; no Plan has an Unfunded Current Liability in an amount material to the Borrower's operation; no Plan (other than a Multiemployer Plan) which is subject to Section 412 of the Code or Section 302 of ERISA has failed to meet minimum funding standards within the meaning of such sections of the Code or ERISA, or has applied for or received a variance from minimum funding standards within the meaning of Section 412 of the Code or Section 302 of ERISA; all contributions required to be made with respect to a Plan have been or will be timely made (except as disclosed on Schedule VI); neither the Borrower nor any of its Subsidiaries nor any ERISA Affiliate has incurred any material liability (including any indirect, contingent or secondary liability) to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 401(a)(29), 4971 or 4975 of the Code or expects to incur any such liability under any of the foregoing sections with respect to any Plan; no condition exists which presents a material risk to the Borrower or any of its Subsidiaries or any ERISA Affiliate of incurring a liability to or on account of a Plan pursuant to the foregoing provisions of ERISA and the Code; no proceedings have been instituted by the PBGC to terminate or appoint a trustee to administer any Plan (in the case of a Multiemployer Plan, to the best knowledge of the Borrower or any of its Subsidiaries or ERISA Affiliates) which is subject to Title IV of ERISA; no action, suit, proceeding, hearing, audit or investigation with respect to the administration, operation or the investment of assets of any Plan (other than routine claims for benefits) is pending, or, to the best knowledge of the Borrower or any of its Subsidiaries, expected or threatened which could reasonably be expected to have a Material Adverse Effect; using actuarial assumptions and computation methods consistent with Part 1 of subtitle E of Title IV of ERISA, the Borrower and its Subsidiaries and ERISA Affiliates would have no liabilities to any Plans which are Multiemployer Plans in the event of a complete withdrawal therefrom in an amount which could reasonably be expected to have a Material Adverse Effect; each group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) which covers or has covered employees or former employees of the Borrower, any of its Subsidiaries, or any ERISA Affiliate has at all times been operated in material compliance with the provisions of Part 6 of subtitle B of Title I of ERISA and Section 4980B of the Code; no lien imposed under the Code or ERISA on the assets of the Borrower or any of its Subsidiaries or any ERISA Affiliate exists nor has any event occurred which could reasonably be expected to give rise to any such lien on account of any Plan; and the Borrower and its Subsidiaries do not maintain or contribute to any employee welfare plan (as defined in Section 3(1) of ERISA) which

provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or any Plan the obligations with respect to which could reasonably be expected to have a Material Adverse Effect; and

(j) **OFAC:** it is not a "national" of any "designated foreign country", within the meaning of the Foreign Assets Control Regulations or the Cuban Asset Control Regulations of the U.S. Treasury Department, 31 C.F.R., Subtitle B, Chapter V, as amended, or a "specially designated national" listed by the Office of Foreign Assets Control ("**OFAC**"), the U.S. Department of the Treasury, or any regulations or rulings issued thereunder. Neither the making of the Advance nor the use of the proceeds thereof nor the performance by the Borrower of its obligations under any of the Finance Documents to which it is a party violates any statute, regulation or executive order restricting loans to, investments in, or the export of assets to, foreign countries or entities doing business there.

11.3 **Reliance on representations and warranties.**    The Obligors acknowledge that each Creditor Party has expressly entered into this Agreement in reliance on, and upon the condition that there are made, all of the declarations of the Obligors in this Clause 11.

11.4 **Repeating representations and warranties.**    The declarations made by the relevant Obligors in Clause 11.1 and 11.2 shall be deemed to be repeated on each Repayment Date and by reference to the facts and circumstances then existing.

## 12    UNDERTAKINGS

12.1 **General.**  The Borrower shall undertake with each Creditor Party that, for so long as sums are owing or may be owing under this Agreement or any of the other Finance Documents, and unless the Agent, on the instructions of the Majority Lenders, may otherwise permit, the Borrower shall:

(a) **Financial Statements:** arrange for the Agent to receive:

(i) within 90 days (or, if applicable, such shorter period as the SEC shall specify for the filing of Quarterly Reports on Form 10-Q if the Borrower is required to file such a Quarterly Report) after the end of each of the first three fiscal quarters of each fiscal year (commencing with the second fiscal quarter of 2014), a consolidated balance sheet and related statements of operations and cash flows showing the financial position of the Borrower and its Subsidiaries as of the close of such fiscal quarter and the consolidated results of its operations during such fiscal quarter and the then-elapsed portion of the fiscal year and (commencing in fiscal year 2014) setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, all of which shall be in reasonable detail and which consolidated balance sheet and related statements of operations and cash flows shall be certified by a senior financial officer of the Borrower on behalf of the Borrower as fairly presenting, in all material respects, the financial position and results of operations of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes) (it being understood that the delivery by the Borrower of Quarterly Reports on Form 10-Q of the Borrower and its consolidated Subsidiaries shall satisfy the requirements of this paragraph (b) to the extent such quarterly reports include the information specified herein); *provided*, that the Borrower shall also deliver financial statements contemplated under this Clause 12.1(a)(i) including Baltic; and

(ii) within 110 days (or, if applicable, such shorter period as the SEC shall specify for the filing of Annual Reports on Form 10-K if the Borrower is required to file such an Annual Report) after the end of each fiscal year, a

consolidated balance sheet and related statements of operations, cash flows and owners' equity showing the financial position of the Borrower and its Subsidiaries (which for these purposes shall include Baltic) as of the close of such fiscal year and the consolidated results of its operations during such fiscal year and (commencing in fiscal year 2014) setting forth in comparative form the corresponding figures for the prior fiscal year, which consolidated balance sheet and related statements of operations, cash flows and owners' equity shall be audited by independent public accountants of recognized national standing and accompanied by an opinion of such accountants (which shall not be qualified in any material respect) to the effect that such consolidated financial statements fairly present, in all material respects, the financial position and results of operations of the Borrower and its Subsidiaries (which for these purposes shall include Baltic) on a consolidated basis in accordance with GAAP (it being understood that the delivery by the Borrower of Annual Reports on Form 10-K of the Borrower and its consolidated Subsidiaries (which for these purposes shall include Baltic) shall satisfy the requirements of this paragraph (a) to the extent such Annual Reports include the information specified herein); *provided*, that the Borrower shall also deliver unaudited financial statements contemplated under this Clause 12.1(a)(ii) excluding Baltic;

(b) **Status and place of business:** maintain, and cause each Guarantor to maintain, its respective corporate existence under the laws of the jurisdiction of its incorporation and shall maintain its place of business and keep their corporate documents and records, at the address or addresses stated at the commencement of this Agreement;

(c) **Contents of Financial Statements:** the financial statements to be delivered pursuant to Clause 12.1(a) shall:

(i) be prepared in accordance with all applicable laws and GAAP consistently applied;

(ii) give a true and fair view of the state of affairs of (x) the Borrower and its consolidated Subsidiaries (including Baltic) at the date of those accounts and of profit for the period to which those accounts relate calculated in accordance with GAAP and (y) the Borrower and its consolidated Subsidiaries (excluding Baltic) at the date of those accounts and of profit for the period to which those accounts relate);

(iii) fully disclose or provide for all significant liabilities of (x) the Borrower and its consolidated Subsidiaries (including Baltic) calculated in accordance with GAAP and (y) the Borrower and its consolidated Subsidiaries (excluding Baltic); and

(iv) at the time of the delivery of the financial statements, deliver a compliance certificate of the senior financial officer of the Borrower in the form of Schedule 9 to the effect that, to the best of the Borrower's knowledge, no Potential Event of Default or Event of Default has occurred and is continuing or, if any Potential Event of Default or Event of Default has occurred and is continuing, specifying the nature and extent thereof (in reasonable detail), which certificate shall set forth the calculations required to establish whether the Borrower was in compliance with the financial obligations in Clause 12.2(d) to (f), inclusive, at the end of such fiscal quarter or year, as the case may be;

(d) **Material Adverse Effect:** promptly advise the Agent or procure that the Agent is advised of any event or circumstance which, in the reasonable opinion of the Borrower, would be likely to have a Material Adverse Effect;

OHSUSA:757654574.12

40

(e)     **Litigation:**  promptly give written notice to the Agent or procure that written notice is given to the Agent of any litigation or arbitration or administrative or other proceedings before or of any arbitration tribunal court, governmental agency or administrative body affecting any Guarantor or any Vessel (which is in respect of a claim in excess of $2,000,000) or affecting the Borrower (which is in respect of a claim in excess of $10,000,000);

(f)     **Compliance with laws:**  comply with and procure that each Guarantor will comply with the requirements of all laws, rules, regulations, orders and decrees of any administrative, governmental, or judicial authority or other organisation or body, applicable to any Obligor or to the Vessels, the non-compliance with which could have a Material Adverse Effect;

(g)     **Payment of taxes:**  pay and discharge or procure the payment and discharge of all taxes, assessments and governmental charges (being taxes, assessments or charges related to any Vessel or which, if unpaid, might result in any action being taken relating to any Vessel) imposed on any Obligor by any competent authority on or before the date the same shall become due unless the same are being contested in good faith by due action on the part of the relevant Obligor which do not give rise to any risk of seizure or arrest of any Vessel which the relevant Obligor or the relevant Obligor would be unable to lift or have discontinued promptly following imposition thereof;

(h)     **ERISA:**  as soon as reasonably possible and, in any event, within ten (10) days after the Borrower or any of its Subsidiaries or any ERISA Affiliate knows or has reason to know of the occurrence of any of the following, the Borrower will deliver to the Agent, with sufficient copies for each of the Lenders, a certificate of the senior financial officer of the Borrower setting forth the full details as to such occurrence and the action, if any, that the Borrower, such Subsidiary or such ERISA Affiliate is required or proposes to take, together with any notices required or proposed to be given to or filed with or by the Borrower, the Subsidiary, the ERISA Affiliate, the PBGC, a Plan participant or the Plan administrator with respect thereto: that a Reportable Event has occurred (except to the extent that the Borrower has previously delivered to the Administrative Agent a certificate and notices (if any) concerning such event pursuant to the next clause hereof); that a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan subject to Title IV of ERISA is subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof), and an event described in subsection .62, .63, .64, .65, .66, .67 or .68 of PBGC Regulation Section 4043 is reasonably expected to occur with respect to such Plan within the following 30 days; that a failure to satisfy minimum funding standards, within the meaning of Section 412 of the Code or Section 302 of ERISA, has occurred or an application may be or has been made for a waiver or modification of the minimum funding standard (including any required instalment payments) under Section 412 of the Code or Section 302 of ERISA with respect to a Plan; that any contribution required to be made with respect to a Plan or Foreign Pension Plan has not been timely made and such failure could result in a material liability for the Borrower or any of its Subsidiaries; that a Plan (in the case of a Multiemployer Plan, to the best knowledge of the Borrower or any of its Subsidiaries or ERISA Affiliates) has been or may be reasonably expected to be terminated, reorganized, partitioned or declared insolvent under Title IV of ERISA with a material amount of unfunded benefit liabilities; that a Plan (in the case of a Multiemployer Plan, to the best knowledge of the Borrower or any of its Subsidiaries or ERISA Affiliates) has a material Unfunded Current Liability; that proceedings may be reasonably expected to be or have been instituted by the PBGC to terminate or appoint a trustee to administer a Plan which is subject to Title IV of ERISA; that a proceeding has been instituted pursuant to Section 515 of ERISA to collect a material delinquent contribution to a Plan; that the Borrower, any of its Subsidiaries or any ERISA Affiliate will or may reasonably expect to incur any material liability (including

any indirect, contingent, or secondary liability) to or on account of the termination of or withdrawal from a Plan under Section 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or with respect to a Plan under Section 401(a)(29), 4971, 4975 or 4980 of the Code or Section 409 or 502(i) or 502(l) of ERISA or with respect to a group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) under Section 4980B of the Code; or that the Borrower, or any of its Subsidiaries may incur any material liability pursuant to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or any Plan or any Foreign Pension Plan;

upon request, the Borrower will deliver to the Agent with sufficient copies to the Lenders (i) a complete copy of the annual report (on Internal Revenue Service Form 5500-series) of each Plan (including, to the extent required, the related financial and actuarial statements and opinions and other supporting statements, certifications, schedules and information) required to be filed with the Internal Revenue Service and (ii) copies of any records, documents or other information that must be furnished to the PBGC with respect to any Plan pursuant to Section 4010 of ERISA.  In addition to any certificates or notices delivered to the Lenders pursuant to the first sentence hereof, copies of annual reports and any records, documents or other information required to be furnished to the PBGC, and any notices received by the Borrower, any of its Subsidiaries or any ERISA Affiliate with respect to any Plan or Foreign Pension Plan with respect to any circumstances or event that could reasonably be expected to result in a material liability shall be delivered to the Lenders no later than ten (10) days after the date such annual report has been filed with the Internal Revenue Service or such records, documents and/or information has been furnished to the PBGC or such notice has been received by the Borrower, such Subsidiary or such ERISA Affiliate, as applicable;

(i)     **Know your client:**  upon the Agent's request, promptly supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent in order for each Lender to carry out and be satisfied with the results of all necessary "know your client" or other checks which it is required to carry out in relation to the transactions contemplated by this Agreement and the other Finance Documents and to the identity of any parties to the Finance Documents (other than the Lenders) and their directors and officers; and

(j)     **OFAC:**  shall to the best of its knowledge and ability:

(i)     ensure that no person who owns a controlling interest in or otherwise controls the Borrower or any Subsidiary thereof is or shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by OFAC or included in any Executive Orders;

(ii)    comply, and cause each of its Subsidiaries to comply, with all applicable Bank Secrecy Act laws and regulations, as amended;

(iii)   not use or permit the use of the proceeds of the Loan to violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto; and

OHSUSA:757654574.12                                42

(k)   **Vessel Documents:** provide, to the Security Trustee's reasonable satisfaction, evidence of (i) the release or termination or discharge of all liens granted to, created or purported to be created under the Second Security Documents, (ii) the registration of the Mortgage Amendments and (iii) no further Security Interests (other than Permitted Encumbrances) being registered against the Vessels other than the Mortgages within [30] days after the Amendment and Restatement Effective Date.

12.2    **Negative Undertakings.** The Borrower further undertakes with each Creditor Party that, for so long as sums are owing or may be owing under this Agreement or any other Finance Document, and unless otherwise expressly permitted by the Majority Lenders, the Borrower shall:

(a)   **No amendment to any Transaction Document:** not agree and procure that the Guarantors do not agree to any material amendment or supplement to, or waive or fail to enforce, any Transaction Document to which any Obligor is a party;

(b)   **No disposal of the Vessels:** subject to Clause 5.12, and except pursuant to the relevant Finance Documents, not make and procure that the Guarantors shall not make any act of disposal of any nature whatever of any of the Vessels, whether gratuitous or otherwise, or enter into any commitment to third parties affecting the ownership of any Vessel (unless the effectiveness of such commitment is itself expressed to be conditional upon the prior mandatory prepayment of the relevant Loan pursuant to Clauses 5.8 (a) and 5.9);

(c)   **No change in Technical Manager or Commercial Manager:** not change and shall procure that there is no change to, the Technical Manager or the Commercial Manager without the prior written consent of the Agent, acting upon instruction of the Majority Lenders (with such consent not to be unreasonably withheld);

(d)   **Maximum Leverage Ratio:** not permit the Leverage Ratio on the last day of any fiscal quarter of the Borrower ended on or after the Amendment and Restatement Effective Date, to be greater than 5.50:1.00; *provided* that such requirement shall not apply during the Financial Covenant Holiday; and *provided further* that, if, under the DB Credit Facility or any Additional Facility (a) the maximum "Leverage Ratio" (or equivalent ratio) covenant is at any time set at a level less than 5.50:1.00, the "Maximum Leverage Ratio" covenant level hereunder shall be automatically amended to mean such lower ratio and (b) if, in the Agent's reasonable discretion, the definition of "Leverage Ratio" (or equivalent term) is defined more favourably to any lender under the DB Credit Facility or any Additional Facility, the definition of "Leverage Ratio" hereunder shall be automatically amended to mean such more favourable ratio.

(e)   **Minimum Consolidated Interest Coverage Ratio:** not permit the Consolidated Interest Coverage Ratio on the last day of any fiscal quarter of the Borrower ended on or after the Amendment and Restatement Effective Date, to be less than 2.00:1.00; *provided* that such requirement shall not apply during the Financial Covenant Holiday; and *provided further* that, if, under the DB Credit Facility or any Additional Facility (a) the minimum "Consolidated Interest Coverage Ratio" (or equivalent ratio) covenant is at any time set at a level greater than 2.00:1.00, the "Minimum Consolidated Interest Coverage Ratio" covenant level hereunder shall be automatically amended to mean such higher ratio and (b) if, in the Agent's reasonable discretion, the definitions of "Consolidated EBITDA" or "Consolidated Interest Expense" (or equivalent terms) are defined more favourably to any lender under the DB Credit Facility or any Additional Facility, the respective definitions of "Consolidated EBITDA" and "Consolidated Interest Expense" hereunder shall be automatically amended to mean such more favourable terms.

(f)    **Consolidated Net Worth:**  not permit its Consolidated Net Worth at any time to be less than the Minimum Consolidated Net Worth; *provided* that such requirement shall not apply during the Financial Covenant Holiday; and *provided further* that, if, under the DB Credit Facility or any Additional Facility, in the Agent's reasonable discretion, the definition of "Minimum Consolidated Net Worth" (or equivalent term) is defined more favourably to any lender under the DB Credit Facility or any Additional Facility, the definition of "Minimum Consolidated Net Worth" hereunder shall be automatically amended to mean such more favourable term.

(g)    **Dividends:**  not, and will not permit any of the Guarantors to, authorize, declare or pay any Dividends with respect to the Borrower or any of the Guarantors, except that, after the Financial Covenant Holiday, other than with respect to clauses (i) and (iv) below, which shall be allowed at all times:

(i)    (x) any Subsidiary (including Baltic) of the Borrower which is not a Guarantor may pay Dividends to the Borrower or any Wholly-Owned Subsidiary of the Borrower (including Baltic), (y) any Guarantor may pay Dividends to the Borrower or any other Guarantor and (z) if the respective Subsidiary is not a Wholly-Owned Subsidiary of the Borrower, such Subsidiary (including Baltic) may pay cash dividends to its shareholders generally so long as the Borrower and/or its respective Subsidiaries which own equity interests in the Subsidiary paying such Dividends receive at least their proportionate share thereof (based upon their relative holdings of the equity interests in the Subsidiary paying such Dividends and taking into account the relative preferences, if any, of the various classes of equity interests of such Subsidiary);

(ii)    so long as no Potential Event of Default or Event of Default has occurred and is continuing, the Borrower may make, pay or declare cash Dividends; provided that, for all Dividends paid pursuant to this clause (ii), (A) Dividends shall be paid within 90 days of the declaration thereof; (B) Dividends paid in respect of a fiscal quarter shall only be paid after the date of delivery of quarterly or annual financial statements for such fiscal quarter, pursuant to Clause 12.1(a) and on or prior to 45 days after the last day of the immediately succeeding fiscal quarter, (C) no Potential Event of Default or Event of Default has occurred and is continuing at the time of declaration, (D) no Potential Event of Default or Event of Default has occurred and is continuing (or would arise after giving effect thereto) at the time of payment and (E) on or prior to the declaration and payment of a Dividend, the Borrower shall deliver to the Agent an officer's certificate signed by the senior financial officer of the Borrower certifying that the requirements set forth in this clause (ii) are satisfied;

(iii)    so long as no Potential Event of Default or Event of Default has occurred and is continuing, the Borrower may purchase or redeem shares of common stock in the Borrower in market purchases under Rule 10b-18 or other purchases approved by the Borrower's board of directors, any committee thereof or any authorized officer for the immediately preceding fiscal quarter; provided that, (A) no Potential Event of Default or Event of Default has occurred and is continuing at the time of any such purchases, (B) no Potential Event of Default or Event of Default would arise after giving effect to any such purchases and (C) the Borrower in the exercise of its rights under this Clause 12.2 shall not be permitted to purchase or redeem shares beneficially owned directly or indirectly by Peter Georgiopoulos; and

(iv)    the Borrower may authorize, declare and distribute a dividend of Rights (as such term is defined and which are convertible into other securities as set forth in the Shareholder Rights Agreement) as contemplated by the Shareholder Rights Agreement.

OHSUSA:757654574.12                        44

(h) **Indebtedness.** not, and will not permit any of the Guarantors to, contract, create, incur, assume or suffer to exist any Indebtedness (other than Indebtedness incurred pursuant to this Agreement and the other Finance Documents) except:

(i) the Borrower may incur Indebtedness so long as no Potential Event of Default or Event of Default has occurred and is continuing, such Indebtedness would not cause any Potential Event of Default or Event of Default, either on a pro forma basis to include earnings that would have resulted from such Indebtedness for the most recently ended Test Period reported to the Agent, or on a projected basis for the one year period following such incurrence, with each of the covenants set forth in Clause 12.2(d)-(f) inclusive;

(ii) the Borrower may enter into and remain liable under Interest Rate Protection Agreements and Other Hedging Agreements entered into in the ordinary course of business and not for speculative purposes;

(iii) Indebtedness of the Borrower arising under the DB Credit Facility and Indebtedness to the extent permitted under 12.2(l); and

(iv) Indebtedness (other than Financial Indebtedness) of the Guarantors reasonably incurred in the course of operating or chartering a Vessel;

(i) **Advances, Investments and Loans.** will not, and will not permit any of the Guarantors to, directly or indirectly, lend money or credit or make advances to any Person, or purchase or acquire any Equity Interests, or make any capital contribution to any other Person (each of the foregoing an "Investment" and, collectively, "Investments") except that the following shall be permitted:

(i) the Borrower and the Guarantors may acquire and hold accounts receivable owing to any of them;

(ii) so long as no Event of Default exists or would result therefrom, the Borrower may make loans and advances in the ordinary course of business to its employees so long as the aggregate principal amount thereof at any time outstanding (determined without regard to any write-downs or write-offs of such loans and advances) shall not exceed $500,000;

(iii) the Guarantors may make intercompany loans and advances to the Borrower and between or among one another, and Subsidiaries of the Borrower (including Baltic) other than the Guarantors may make intercompany loans and advances to the Borrower or any other Subsidiary of the Borrower (including Baltic), provided that any loans or advances to the Borrower or any Guarantors pursuant to this Clause 12.2(i) shall be subordinated to the obligations of the respective Obligor under this Agreement on the following terms:

(A) **Prohibited Payments.** Except when an Event of Default has occurred and is continuing, the Guarantor or Subsidiary (the "**Subordinated Lender**") which made such loan or advance (the "**Subordinated Obligations**") may receive payments on account of the Subordinated Obligations. After the occurrence and during the continuation of an Event of Default, except with the prior written consent of the Security Trustee, the Subordinated Lender shall not demand, accept or take any action to collect any payment on account of the Subordinated Obligations;

(B) **Prior Payment of Loan Indebtedness**. In the event of the occurrence of any event described in Clause 19.1(f) (*Insolvency Proceedings*) relating to any Obligor (an **"Insolvency Proceeding"**), the Subordinated Lender agrees that the Security Trustee and the other Credit Parties shall be entitled to receive payment in full of the Secured Liabilities (including all interest and expenses accruing after the commencement of any Insolvency Proceeding, whether or not constituting an allowed claim in such proceeding (the "**Post Claim Interest**")) before the Subordinated Lender receives payment of any Subordinated Obligations;

(C) **Turn-Over**. Upon the occurrence and during the continuation of an Event of Default, the Subordinated Lender shall, if the Security Trustee so requests, collect, enforce and receive payment on account of the Subordinated Obligations as trustee for the Security Trustee and the other Credit Parties and deliver such payments to the Security Trustee on account of the Secured Liabilities (including all Post Claim Interest), together with any necessary endorsements or other instruments of transfer, but without reducing or affecting in any manner the liability of the Subordinated Lender under the other provisions of this Agreement;

(D) **Security Trustee's Authorization**. Upon the occurrence and during the continuation of an Event of Default, the Security Trustee is authorized and empowered (but without any obligation to so do), in its discretion, (i) in the name and on behalf of the Subordinated Lender, to collect and enforce, and to submit claims in respect of, Subordinated Obligations and to apply any amounts received thereon to the Secured Liabilities (including any and all Post Claim Interest), and (ii) to require the Subordinated Lender (a) to collect and enforce, and to submit claims in respect of, Subordinated Liabilities and (b) to pay any amounts received on such obligations to the Security Trustee for application to the Secured Liabilities (including any and all Post Claim Interest); and

(E) **Confirmation of Subordination.** The Borrower and the Guarantors hereby agree that all existing and future Subordinated Obligations (i) of the Borrower to any Guarantor, and (ii) of one Guarantor to another Guarantor, are hereby subordinated to the obligations of the respective Obligor under this Agreement on the foregoing terms;

(iv) the Borrower may make Investments in the Guarantors and, so long as no Event of Default exists and is continuing, the Borrower may make Investments in its other Wholly-Owned Subsidiaries (including Baltic) so long as management of the Borrower in good faith believe that, after giving effect to such Investment, the Borrower shall be able to meet its payment obligations in respect of this Agreement;

(v) so long as no Event of Default exists or could reasonably be expected to result therefrom, the Borrower and its Subsidiaries (other than the Guarantors but including Baltic) may make Investments in joint ventures in the ordinary course of business; and

(vi) so long as no Event of Default exists or could reasonably be expected to result therefrom, the Borrower and its Subsidiaries (other than the Guarantors but including Baltic) may make Investments in a Person engaged in drybulk shipping operations;

46

(j)   **Transactions with Affiliates.**  will not, and will not permit any of the Guarantors to, enter into any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate of such Person, other than on terms and conditions no less favourable to such Person as would be obtained by such Person at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except that:

    (i)   Dividends may be paid to the extent provided in Clause 12.2(g);

    (ii)   loans and other Investments may be made and other transactions may be entered into between the Borrower and its Subsidiaries (including Baltic) to the extent permitted by Clauses 12.2(h) and 12.2(i);

    (iii)   the Borrower may pay customary director's fees;

    (iv)   the Borrower and its Subsidiaries (including Baltic) may enter into employment agreements or arrangements with their respective officers and employees in the ordinary course of business;

    (v)   the Borrower and its Subsidiaries (including Baltic) may pay management fees to Wholly-Owned Subsidiaries of the Borrower (including Baltic) in the ordinary course of business; and

    (vi)   in the event that the Borrower or any of its Subsidiaries (other than a Guarantor but including Baltic) owns, operates or uses an aircraft for business purposes, the foregoing will not prevent arrangements (and such arrangements shall for this purpose be deemed to be arm's length arrangements) for use of such aircraft when not required for business purposes by directors or officers of the Borrower so long as such travel is authorized pursuant to the Borrower's applicable policies and such directors or officers either: (i) pay pursuant to a time sharing arrangement, a charter or similar arrangements no less than the incremental out of pocket cost to the Borrower and such Subsidiaries of the use of the aircraft; or (ii) pay or are imputed the applicable standard industry fare level for the flight under Internal Revenue Service regulations, in each case as determined by the Borrower;

(k)   **Merger.**  not sell, transfer or dispose of all or substantially all of its assets whether by one transaction or a series of related transactions and shall not consolidate or merge with any other Person unless (A) at the time of such transaction and after giving effect thereto, no Potential Event of Default or Event of Default shall have occurred and be continuing and (B) the surviving entity in such consolidation or merger shall be the Borrower and the Borrower shall have delivered to the Agent, not less than ten (10) Business Days in advance of such consolidation or merger, an officer's certificate signed by a senior financial officer of the Borrower, certifying (i) that no Potential Event of Default or Event of Default has occurred and is continuing (or would arise after giving effect to the intended consolidation or merger) and (ii) pro forma financial statements of the Borrower demonstrating the compliance of the Borrower with all covenants under this Agreement after giving effect to such merger or consolidation;

(l)   **Vessel Acquisition Indebtedness.**  not, and will not permit any of its Subsidiaries to, contract, create, incur, assume or suffer to exist any Indebtedness in connection with the acquisition of a vessel in excess of 60% of the acquisition cost of such vessel; provided that such requirement shall not apply after the Financial Covenant Holiday;

(m)   **Fleet Minimum Liquidity**.  will maintain, with its Subsidiaries on a consolidated basis, at the end of each fiscal quarter, a minimum free cash amount of seven hundred and fifty thousand Dollars ($750,000) per any vessel owned by the Borrower

or a Subsidiary of the Borrower at the end of each fiscal quarter and if the DB Credit Facility or any Additional Facility requires an amount of free cash greater than $750,000 per vessel, this Clause 12.2(m) shall be automatically amended to include such greater amount; and

(n)     **Consolidated Indebtedness Limit**.  not permit, and will procure that its Subsidiaries will not permit, the interest-bearing portion of the Consolidated Indebtedness to exceed 70% of the aggregate amount of the interest-bearing portion of the Consolidated Indebtedness plus Consolidated Net Worth; provided that such requirement shall not apply after the Financial Covenant Holiday; and *provided, further,* that if, under the DB Credit Facility or any Additional Facility, in the Agent's reasonable discretion, (a) the maximum level of such ratio (or equivalent term) is less than 70%, the maximum level for such ratio hereunder shall be automatically amended to such lower ratio and (b) if, in the Agent's reasonable discretion, the definitions of "Consolidated Indebtedness" or "Consolidated Net Worth" (or equivalent terms) are defined more favourably to any lender under the DB Credit Facility or any Additional Facility, the definitions of "Consolidated Indebtedness" or "Consolidated Net Worth" hereunder shall be automatically amended to mean such more favourable terms.

12.3     **Title; negative pledge.**  The Borrower will not and will procure that the Guarantors shall not create or permit to arise any Security Interest (except for Permitted Security Interests) over any Vessel or any other asset of any Guarantor, present or future.

12.4     **Information provided to be accurate.**  The Borrower shall ensure that all financial and other information which is provided in writing by or on behalf of any Obligor under or in connection with any Finance Document will be true and not misleading and will not omit any material fact or consideration.

12.5     Intentionally omitted.

12.6     **Confirmation of no default.**  The Borrower will, within 2 Business Days after service by the Agent of a written request thereof, serve on the Agent a notice which is signed by the Chief Financial Officer and which states that:

(a)     no Event of Default or Potential Event of Default has occurred; or

(b)     no Event of Default or Potential Event of Default has occurred, except for a specified event or matter, of which all material details are given;

the Agent may serve requests under this Clause 12.6 from time to time if asked to do so by any Lender.

12.7     **Notification of default.**  The Borrower will notify the Agent as soon as the Borrower becomes aware of:

(a)     the occurrence of an Event of Default or a Potential Event of Default; or

(b)     any matter which indicates that an Event of Default or a Potential Event of Default may have occurred;

and will keep the Agent fully up-to-date with all developments.

12.8     **Provision of further information.**  The Borrower will, as soon as practicable after receiving the request, provide the Agent with any additional financial or other information as the Agent or any Lender may (from time to time) reasonably request relating:

(a)     to the Borrower, the Vessels, the Earnings or the Insurances; or

(b)      to any other matter relevant to, or to any provision of, a Finance Document;

which may be requested by the Agent, the Security Trustee or any Lender at any time.

## 13      CORPORATE UNDERTAKINGS OF THE GUARANTORS

13.1    **General.**  The Guarantors undertake (and the Borrower undertakes to cause each Guarantor to) comply with the following provisions of this Clause 13 at all times during the Security Period.

13.2    **Negative undertakings.**  The Guarantors will not (and the Borrower undertakes to procure that the Guarantors do not):

(a)      carry on any business other than the ownership, chartering and operation of the Vessels;

(b)      pay any Dividend or make any other form of distribution or effect any form of redemption, purchase or return of share capital (other than as permitted under clause 12.2(g));

(c)      other than as permitted under Clause 12.2(i), provide any form of credit or financial assistance to:

(i)      a person who is directly or indirectly interested in the Guarantor's share or loan capital; or

(ii)     any company in or with which such a person is directly or indirectly interested or connected;

or, subject to Clause 12.2(j), enter into any transaction with or involving such a person or company on terms which are, in any respect, less favourable to any Guarantor than those which it could obtain in a bargain made at arms' length;

(d)      issue, allot or grant any person a right to any shares in its capital or repurchase or reduce its issued share capital;

(e)      acquire any shares or other securities other than US or UK Treasury bills and certificates of deposit issued by major North American or European banks;

(f)      enter into any form of amalgamation, merger or de-merger or any form of reconstruction or reorganisation;

(g)      make any loans or advances to any person other than in accordance with Clause 12.2(i); or

(h)      except for (i) Financial Indebtedness under this Agreement and the other Transaction Documents to which it is a party, (ii) Financial Indebtedness to the Borrower and any Guarantor permitted under Clause 12.2(i) and (iii) Financial Indebtedness permitted under Clause 12.2(l), not incur or agree to incur or issue any Financial Indebtedness, nor make any commitments, other than Security Interests to be created under such Transaction Documents except, with respect to any Guarantor Financial Indebtedness and liabilities arising in the ordinary course of its ownership and chartering of the Vessel that it owns.

OHSUSA:757654574.12                                    49

**14   INSURANCE UNDERTAKINGS**

(a) **General.** The Borrower also undertakes with each Creditor Party to comply with the following provisions of this Clause 14 at all times during the Security Period except as the Agent (on the instructions of the Majority Lenders) may otherwise permit;

(b) **Maintenance of obligatory insurances.** each Mortgaged Vessel shall be kept insured against:

    (i) fire and usual marine risks (including hull and machinery and excess risks);

    (ii) war risks; and

    (iii) protection and indemnity risks;

(c) **Terms of obligatory insurances.** such insurances shall be effected:

    (i) in United States Dollars for the insurances referred to in below;

    (ii) in the case of fire and usual marine risks and war risks, in an amount on an agreed value basis at least one hundred and thirty per cent (130%) of the relevant amount of the Loan;

    (iii) in the case of oil pollution liability risks, for an aggregate amount equal to the highest level of cover from time to time available under basic protection and indemnity club entry and in the international marine insurance market and including freight, demurrage and defence;

    (iv) in relation to protection and indemnity risks for an aggregate amount equal to the highest level of cover afforded by a member of the International Group of Protection and Indemnity Associations;

    (v) on approved terms; and

    (vi) through approved brokers and with approved insurance companies and/or underwriters or, in the case of war risks and protection and indemnity risks, in approved war risks and protection and indemnity risks associations;

(d) **Further protections.** in addition to the terms set out in Clause 14(c), the obligatory insurances shall:

    (i) intentionally omitted;

    (ii) name the Security Trustee as sole loss payee with a loss payable clause for endorsement in the form annexed to the General Assignment Deed;

    (iii) provide that all payments by or on behalf of the insurers under the obligatory insurances to the Security Trustee shall and, to the extent the applicable persons referred to in Clause 14(c)(vi) are willing to agree, be made without set-off, counterclaim or deductions or condition whatsoever;

    (iv) provide that such obligatory insurances shall be primary without right of contribution from other insurances which may be carried by the Security Trustee or any other Creditor Party; and

    (v) provide that the Security Trustee may make proof of loss if the Borrower or a Guarantor fails to do so;

(e)     **Renewal of obligatory insurances.**  in relation to obligatory insurances:

   (i)     at least 14 (fourteen) days before the expiry of any obligatory insurances, the Security Trustee shall be notified of the brokers (or other insurers) and any protection and indemnity or war risks association through or with whom it is proposed that insurance shall be renewed and of the proposed terms of renewal, and the Majority Lenders' agreement shall be obtained that such insurances will comply with the requirements of Clause 14(c);

   (ii)    no later than 7 days before the expiry of any obligatory insurance, the obligatory insurances shall be renewed, in accordance with the requirements of Clause 14(c); and

   (iii)   the approved brokers and/or the war risks and protection and indemnity associations with which such a renewal is effected shall promptly after the renewal notify the Security Trustee in writing of the terms and conditions of the renewal;

(f)     **Copies of policies; letters of undertaking.**  the Borrower shall procure that each Guarantor shall ensure that all approved brokers provide the Agent with pro-forma copies of all policies relating to the relevant obligatory insurances which they are to effect or renew and of a letter or letters of undertaking addressed to the Security Trustee and in the form customary for the market from time to time;

(g)     **Copies of certificates of entry.**  any protection and indemnity and/or war risks associations in which the Mortgaged Vessels are entered shall provide the Security Trustee with:

   (i)     a copy of the certificates of entry for the Mortgaged Vessels;

   (ii)    a letter or letters of undertaking addressed to the Security Trustee in such form as is customary for the market from time to time; and

   (iii)   to the extent applicable, a copy of each certificate of financial responsibility for pollution by oil or other Environmentally Sensitive Material issued by the relevant certifying authority in relation to the Mortgaged Vessel owned by it;

(h)     **Deposit of original policies.** all policies relating to obligatory insurances are deposited with the approved brokers through which the insurances are effected or renewed;

(i)     **Payment of premiums.**  all premiums or other sums payable in respect of the obligatory insurances shall be paid punctually and that all relevant receipts are produced when so required by the Security Trustee;

(j)     **Guarantees.**  any guarantees required by a protection and indemnity or war risks association are promptly issued and remain in full force and effect;

(k)     **Restrictions on employment.**  the Mortgaged Vessels shall not be employed or permit to be employed outside the cover provided by any obligatory insurances without first obtaining the consent of the insurers and complying with any requirements (as to extra premiums or otherwise) which the insurers specify;

(l)     **Compliance with terms of insurances**.  no act or thing shall be done or be omitted which would or might render any obligatory insurance invalid, void, voidable or unenforceable or render any sum payable thereunder repayable in whole or in part; and, in particular:

OHSUSA:757654574.12                            51

(i)      all necessary action shall be taken and all requirements which may from time to time be applicable to the obligatory insurances shall be complied with (without limiting the obligation contained in Clause 14(c) above) to ensure that the obligatory insurances are not made subject to any exclusions or qualifications to which the Security Trustee has not given its prior approval; and

(ii)     no changes relating to the classification or classification society or manager or operator of each Mortgaged Vessel shall be made unless approved by the underwriters of the obligatory insurances;

(m)    **Alteration to terms of insurances.**  no alteration to the terms of any obligatory insurance shall be made or agreed and no right relating to any obligatory insurance shall be waived, as long as the required minimums are maintained;

(n)    **Settlement of claims.**  without the prior written consent of the Agent, there shall not be any settlement, compromise or abandonment of any claim under any obligatory insurance for Total Loss or for a Major Casualty, and all things necessary shall be done and all documents, evidence and information shall be provided to enable the Security Trustee to collect or recover any moneys which become payable at any time in respect of the obligatory insurances; provided, however, that in the case of a Major Casualty, the Agent shall not unreasonably withhold its consent to any such settlement, compromise or abandonment of any claim;

(o)    **Provision of copies of communications.**  the Security Trustee, at the time of each such communication, shall be provided with copies of all written communications which could be considered material in the context of any Finance Document with:

(i)      the approved brokers;

(ii)     the approved protection and indemnity and/or war risks associations; and

(iii)    the approved insurance companies and/or underwriters;

which relate directly or indirectly to:

(i)      the obligations of the Borrower relating to the obligatory insurances including, without limitation, all requisite declarations and payments of additional premiums or calls; or

(ii)     any credit arrangements made between the Borrower and any of the persons referred to in paragraphs (i) and/or (ii) above relating wholly or partly to the effecting or maintenance of the obligatory insurances;

(p)    **Provision of information.**  in addition, there shall be provided to the Security Trustee (or any persons which it may designate) any information which the Security Trustee (or any such designated person) reasonably requests for the purpose of:

(i)      obtaining or preparing any report from an independent marine insurance broker as to the adequacy of the obligatory insurances effected or proposed to be effected; provided always that the Agent shall only require any such report at the time of making the relevant Loan for the Vessel for which such report relates and thereafter if there is a material change to the insurances of a Mortgaged Vessel to those which a report has been previously obtained or prepared; and/or

(ii)    effecting, maintaining or renewing any such insurances as are referred to in Clause 14**Error! Reference source not found.** below or dealing with or considering any matters relating to any such insurances;

and the Borrower shall indemnify the Security Trustee forthwith upon demand, in respect of all fees and other expenses incurred by or for the account of the Security Trustee in connection with any such report as is referred to in paragraph (i) above; and

(q)    **Mortgagee's interest.**  the Agent shall, subject as provided below, be entitled from time to time to effect, maintain, and renew a mortgagee's interest marine insurance in relation to each Mortgaged Vessel in an amount equal to one hundred and ten per cent (110%) of the relevant Loan on such terms, through such insurers and generally in such manner as the Agent (on the instructions of the Majority Lenders) may from time to time consider appropriate.  The Borrower upon demand shall indemnify the Agent fully in respect of all premiums and other expenses which are incurred in connection with or with a view to effecting, maintaining or renewing any such insurance or dealing with, or considering any matter arising out of any such insurance. It is further agreed that, to the extent any surplus funds remain after applying amounts received in respect of a claim on the mortgagee's interest marine insurance, such surplus funds may be paid to the Borrower or other person entitled to it.

## 15    SHIP UNDERTAKINGS

**General.**  The Borrower also undertakes with each Creditor Party to comply with, or cause each Guarantor to comply with, each of the covenants set forth in each of the Mortgages.

## 16    SECURITY COVER

**16.1    Minimum required security cover.**  The Borrower will not permit the aggregate Appraised Value of all Mortgaged Vessels (plus the value of any additional security provided pursuant to Clause 16.2) at any time to equal less than 130% of the aggregate principal amount of outstanding Loans at such time; provided that a default under this Clause 16.1 shall not constitute an Event of Default if the Borrower complies with Clause 16.2 within the time specified therein (it being understood that any action taken under Clause 16.2 in respect of this proviso shall only be effective to cure such default pursuant to this Clause 16.1 to the extent that no Potential Event of Default or Event of Default exists hereunder immediately after giving effect thereto); and provided, further, that if, under the DB Credit Facility or any Additional Facility, in the Agent's reasonable discretion, (a) the minimum level of such ratio (or equivalent term) is greater than 130%, the minimum level for such ratio hereunder shall be automatically amended to such higher ratio and (b) if, in the Agent's reasonable discretion, the definition of "Appraised Value" (or similar term) is defined more favourably to any lender under the DB Credit Facility or any Additional Facility, the definition of "Appraised Value" hereunder shall be automatically amended to mean such more favourable term.

**16.2    Provision of additional security; prepayment.**  If the Agent serves a notice on the Borrower stating that a default exists under Clause 16.1, the Borrower shall, within thirty (30) days after the date on which the Agent's notice is served, either:

(a)    provide, or ensure that a third party provides, additional security which, in the opinion of the Majority Lenders, has a net realisable value at least equal to the shortfall and is documented in such terms as the Agent may, with the authorisation of the Majority Lenders, approve or require; or

(b)    prepay such part (at least) of the Loans as will eliminate the shortfall.

**16.3    Valuation of Vessel.**    The Appraised Value of a Vessel at any date is that shown by a valuation prepared:

(a)    as at a date not more than 14 days previously;

(b)    by an Approved Appraiser;

(c)    with or without physical inspection of a Vessel (as the Agent may require); and

(d)    on the basis of a sale for prompt delivery for cash on normal arm's length commercial terms as between a willing seller and a willing buyer, free of any existing charter or other contract of employment.

**16.4    Value of additional vessel security.**    The net realisable value of any vessel pledged as additional security under Clause 16.2 shall be its Appraised Value.

**16.5    Valuations binding.**    Any valuation under Clause 16.3 or 16.4 shall be binding and conclusive as regards the Borrower, as shall be any valuation which the Majority Lenders make of any additional security which does not consist of or include a Security Interest.

**16.6    Provision of information.**    The Borrower shall promptly provide the Agent and any Approved Appraiser with any information which the Agent or the Approved Appraiser may request for the purposes of the valuation; and, if the Borrower fails to provide the information by the date specified in the request, the valuation may be made on any basis and assumptions which the shipbroker or the Majority Lenders (or the expert appointed by them) consider prudent.

**16.7    Payment of valuation expenses.**    Without prejudice to the generality of the Borrower's obligations under Clauses 20 and 21, the Borrower shall, on demand, pay the Agent the reasonable amount of the fees and expenses of any shipbroker or expert instructed by the Agent under this Clause and all reasonable legal and other expenses incurred by any Creditor Party in connection with any matter arising out of this Clause 16.7.

**16.8    Appraisal of the Vessels.**    The Borrower shall procure, at its own expense, that a valuation of the Vessels in accordance with Clause 16.3 is undertaken on the six month anniversary of the first Drawdown Date and on each six month anniversary thereafter, starting from the date of this Agreement. During any calendar year, the Borrower shall procure one appraisal in addition to those required by the preceding sentence of this Clause 16.8, if the Agent or any Lender in good faith determines that current market or other conditions affecting the value of the Vessels (or any of them) merit the delivery of such appraisal and the Agent so notifies the Borrower.    Any additional valuation which the Agent or any Lender requires, shall be undertaken at the Agent's or such Lender's expense.

**16.9    Intentionally omitted.**

**16.10    Application of prepayment.**    Clause 5.10 shall apply in relation to any prepayment pursuant to Clause 16.2(b).

**17    PAYMENTS AND CALCULATIONS**

**17.1    Payment on non-Business Day.**    If any payment by the Borrower under a Finance Document would otherwise fall due on a day which is not a Business Day:

(a)    the due date shall be extended to the next succeeding Business Day; or

(b)    if the next succeeding Business Day falls in the next calendar month, the due date shall be brought forward to the immediately preceding Business Day;

and interest shall be payable during any extension under paragraph (a) at the rate payable on the original due date.

**17.2    Basis for calculation of periodic payments.**  All interest and commitment fee and any other payments under any Finance Document which are of an annual or periodic nature shall accrue from day to day and shall be calculated on the basis of the actual number of days elapsed and a 360 day year.

**17.3    Distribution of payments to Creditor Parties.**  Subject to Clauses 17.4, 17.5 and 17.6:

(a)    any amount received by the Agent under a Finance Document for distribution or remittance to a Lender, or the Security Trustee shall be made available by the Agent to that Lender, or, as the case may be, the Security Trustee by payment, with funds having the same value as the funds received, to such account as the Lender and or the Security Trustee may have notified to the Agent not less than 5 Business Days previously; and

(b)    amounts to be applied in satisfying amounts of a particular category which are due to the Lenders generally shall be distributed by the Agent to each Lender pro rata to the amount in that category which is due to it.

**17.4    Permitted deductions by Agent.**  Notwithstanding any other provision of this Agreement or any other Finance Document, the Agent may, before making an amount available to a Lender, deduct and withhold from that amount any sum which is then due and payable to the Agent from that Lender under any Finance Document or any sum which the Agent is then entitled under any Finance Document to require that Lender to pay on demand.

**17.5    Agent only obliged to pay when monies received.**  Notwithstanding any other provision of this Agreement or any other Finance Document, the Agent shall not be obliged to make available to the Borrower or any Lender any sum which the Agent is expecting to receive for remittance or distribution to the Borrower or that Lender until the Agent has satisfied itself that it has received that sum.

**17.6    Refund to Agent of monies not received.**  If and to the extent that the Agent makes available a sum to the Borrower or a Lender, without first having received that sum, the Borrower or (as the case may be) the Lender concerned shall, on demand:

(a)    refund the sum in full to the Agent; and

(b)    pay to the Agent the amount (as certified by the Agent) which will indemnify the Agent against any funding or other loss, liability or expense incurred by the Agent as a result of making the sum available before receiving it.

**17.7    Agent may assume receipt.**  Clause 17.6 shall not affect any claim which the Agent has under the law of restitution, and applies irrespective of whether the Agent had any form of notice that it had not received the sum which it made available.

**17.8    Agent's memorandum account.**  The Agent shall maintain a memorandum account showing the amounts advanced by the Lenders and all other sums owing to the Agent, the Security Trustee and each Lender from the Borrower and each Obligor under the Finance Documents and all payments in respect of those amounts made by the Borrower and any Obligor.

**17.9    Accounts prima facie evidence.**  If any accounts maintained under Clause 17.8 show an amount to be owing by the Borrower or an Obligor to a Creditor Party, those accounts shall be prima facie evidence that that amount is owing to that Creditor Party.

**18      APPLICATION OF RECEIPTS**

**18.1    Normal order of application.**  Any sums which are received or recovered by any Creditor Party under or by virtue of any Finance Document after service of notice on the Borrower under Clause 19.2 shall be applied:

(a)      FIRST: in or towards satisfaction of any amounts then due and payable under the Finance Documents in the following order and proportions:

(i)      first, in or towards satisfaction pro rata of all amounts then due and payable to the Creditor Parties under the Finance Documents other than those amounts referred to at paragraphs (ii) and (iii) (including, but without limitation, all amounts payable by the Borrower under Clauses 20 and 21 of this Agreement or by the Borrower or any Obligor under any corresponding or similar provision in any other Finance Document);

(ii)     secondly, in or towards satisfaction pro rata of any and all amounts of interest or default interest payable to the Creditor Parties under the Finance Documents; and

(iii)    thirdly, in or towards satisfaction pro rata of the Loans;

(b)      SECONDLY: in retention of an amount equal to any amount not then due and payable under any Finance Document but which the Agent, by notice to the Obligors and the other Creditor Parties, states in its reasonable opinion will or may become due and payable in the future and, upon those amounts becoming due and payable, in or towards satisfaction of them in accordance with the provisions of sub-paragraph (a); and

(c)      THIRDLY: any surplus shall be paid to the Borrower or to any other person appearing to be entitled to it.

**18.2    Appropriation rights overridden.**  This Clause 18 shall override any right of appropriation possessed, and any appropriation made, by the Borrower or any Obligor provided such variation does not change the overall amount being applied.

**19      EVENTS OF DEFAULT AND ACCELERATION**

**19.1    Events of Default.**  No Drawing under this Agreement may be requested from the Lenders and the Agent may, and if instructed by the Majority Lenders shall, terminate the Commitments of the Lenders and all of their obligations towards the Borrower and/or require immediate payment of the full amount of the Loan, all accrued interest and all other amounts accrued or owing under or in connection with this Agreement, if any one of the following Events of Default occurs and is continuing:

(a)      **Non-payment in respect of repayment of any Loan or payment of interest on any Loan:**  the Borrower is in default in the repayment of any sum due in respect of any Loan or any part thereof under Clause 5 and/or in respect of any payment of interest due under Clause 6 when and as the same shall become due and payable as therein and herein provided and such default shall continue for five (5) Business Days after the due date;

(b)      **Non-payment of other amounts:**  an Obligor is in default in the payment of any other amounts payable under this Agreement or any other Finance Document and such default shall not have been cured within five (5) Business Days from the receipt of a demand for payment from the Agent;

(c) **Other obligations under this Agreement:** any Obligor fails to perform any of its obligations (other than those referred to elsewhere in this Clause 19) under this Agreement and (if such failure is capable of remedy) such failure remains unremedied thirty (30) Business Days after the Borrower has received notice of such failure;

(d) **Other Finance Documents:** (i) at any time after the execution and delivery thereof, any of the other Finance Documents shall cease to be in full force and effect, or shall cease in any material respect to give the Security Trustee or the Agent, as applicable, the Security Interests, rights, powers and privileges purported to be created thereby, in favour of the Security Trustee or the Agent, as applicable, superior to and prior to the rights of all third Persons (except in connection with Permitted Security Interests), and subject to no other Security Interests (except Permitted Security Interests), or (ii) following the expiry of any applicable grace period, an "event of default" (as defined in any Mortgage) shall have occurred under any Mortgage, or (iii) any Obligor shall have defaulted in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to any of the Security Documents (other than the Mortgages) and (in the case of clause (iii) only) (if such default is capable of remedy) such default remains unremedied for ten (10) days after the relevant Obligor has received notice of such default;

(e) **Financial Indebtedness:** any of the following occurs in relation to any Financial Indebtedness of any Obligor (in relation to the Borrower only, which Financial Indebtedness exceeds $5,000,000):

(i) any of its Financial Indebtedness is not paid when due or, if so payable, on demand;

(ii) any of its Financial Indebtedness becomes due and payable or capable of being declared due and payable prior to its stated maturity date as a consequence of any event of default;

(iii) a lease, hire purchase agreement or charter creating any of its Financial Indebtedness is terminated by the lessor or owner or becomes capable of being terminated as a consequence of any termination event;

(iv) any overdraft, loan, note issuance, acceptance credit, letter of credit, guarantee, foreign exchange or other facility, or any swap or other derivative contract or transaction, relating to any of its Financial Indebtedness ceases to be available or becomes capable of being terminated as a result of any event of default, or cash cover is required, or becomes capable of being required, in respect of such a facility as a result of any event of default; or

(v) any Security Interest securing any of its Financial Indebtedness becomes unenforceable;

(f) **Insolvency proceedings:** any of the following occurs in relation to any Obligor:

(i) it becomes unable to pay its debts as they fall due within the meaning of section 123(1)(e) of the Insolvency Act 1986;

(ii) a winding-up or administration order is made in any jurisdiction;

(iii) any administrative or other receiver is appointed over any of its assets;

(iv) it makes any formal declaration of bankruptcy or any formal statement to the effect that it is insolvent or likely to become insolvent, or a winding up or administration order is made in relation to it, or its members or directors pass

a resolution to the effect that it should be wound up, placed in administration or cease to carry on business, save that this paragraph does not apply to a fully solvent winding up of any Obligor other than the Borrower or any Guarantor which is, or is to be, effected for the purposes of an amalgamation or reconstruction previously approved by the Majority Lenders and effected not later than 3 months after the commencement of the winding up;

(v)    a petition is presented in any Pertinent Jurisdiction for the winding up or administration, or the appointment of a provisional liquidator, of any Obligor unless the petition is being contested in good faith and on substantial grounds and is dismissed or withdrawn within 60 days of the presentation of the petition;

(vi)   any Obligor petitions a court, or presents any proposal for, any form of judicial or non-judicial suspension or deferral of payments, reorganisation of its debt (or certain of its debt) or arrangement with all or a substantial proportion (by number or value) of its creditors or of any class of them or any such suspension or deferral of payments, reorganisation or arrangement is effected by court order, contract or otherwise;

(vii)  any meeting of the members or directors of any Obligor is summoned for the purpose of considering a resolution or proposal to authorise or take any action of a type described in paragraphs (iii), (iv), (v) or (vi); or

(viii) in a Pertinent Jurisdiction other than England, any event occurs or any procedure is commenced which is similar to any of the foregoing;

(g)    **Corporate modification**:  without the prior consent of the Majority Lenders, there is a merger, splitting-up or dissolution of any Obligor not otherwise permitted under this Agreement, or transfer of the registered office of any Obligor to another country, or a modification of the corporate purpose or the corporate form of any Obligor;

(h)    **Incorrect or misleading representation or warranty:**  any representation, warranty or statement made by, or by an officer of any Obligor in a Finance Document or in a Drawdown Notice or other notice or document relating to a Finance Document shall have been incorrect or misleading when made in any material respect;

(i)    **Cessation of business; disposal of assets:**  any Obligor ceases to carry on business or disposes of all or substantially all of its business, property and/or assets;

(j)    **Governmental measures or other impediment:**  (i) any governmental measure or decision, whether applying generally or solely to an Obligor or any Vessel is taken in the jurisdiction of incorporation of the relevant Obligor or any other country from or through which payments hereunder are made by the relevant Obligor or (ii) any other event occurs in the jurisdiction of the relevant Obligor or any other country from or through which payments hereunder are made by the relevant Obligor which, in either case, might reasonably be expected to impede the performance of this Agreement by any Obligor;

(k)    **Illegality:**  it becomes unlawful in any Pertinent Jurisdiction or impossible:

(i)    for any Obligor to discharge any liability under a Transaction Document or to comply with any other obligation which the Majority Lenders consider material under a Transaction Document; or

(ii)   for the Agent, the Security Trustee or any of the Lenders to exercise or enforce any right under, or to enforce any Security Interest created by, a Finance Document;

(l) **Absence of consents:**  any official consent necessary to enable the relevant Guarantor to own, lease or charter its Vessel or to enable any Obligor to comply with any provision of any Transaction Document which is not granted, expires without being renewed, is revoked or becomes liable to revocation or any condition of such a consent is not fulfilled;

(m) **Invalidity, unenforceability of Transaction Documents or Security Interests:** any material provision proves to have been or becomes invalid or unenforceable, or a Security Interest created by a Transaction Document proves to have been or becomes invalid or unenforceable;

(n) **Repudiation and rescission of agreements:**  any party (other than the Agent, the Security Trustee or a Lender) to a Transaction Document (other than the Charters) rescinds or purports to rescind or repudiates or purports to repudiate that Transaction Document or any of the Security Interests or evidences an intention to rescind or repudiate a Transaction Document or any Security Interest or amends a Transaction Document (without the consent of the Majority Lenders) where to do so has or is likely to have a Material Adverse Effect on the interests of the Creditor Parties under the Finance Documents;

(o) **Security imperilled:**  the security constituted by a Finance Document is in any way imperilled or in jeopardy;

(p) **Early termination of Charter**:   the early termination of any Charter where no alternative employment for the relevant Vessel is found within 30 days of such termination;

(q) **ERISA.**  Any Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof under Section 412 of the Code or Section 302 of ERISA or a waiver of or variance from such standard is sought or granted under Section 412 of the Code or Section 302 of ERISA, a Reportable Event shall have occurred, a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan subject to Title IV of ERISA shall be subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof) and an event described in subsection .62, .63, .64, .65, .66, .67 or .68 of PBGC Regulation Section 4043 shall be reasonably expected to occur with respect to such Plan within the following 30 days, any Plan which is subject to Title IV of ERISA shall have had or is reasonably likely to have a trustee appointed to administer such Plan, any Plan which is subject to Title IV of ERISA is, shall have been or is reasonably likely to be terminated or to be the subject of termination proceedings under ERISA, any Plan shall have an Unfunded Current Liability, a contribution required to be made with respect to a Plan or a Foreign Pension Plan is not timely made, the Borrower or any of its Subsidiaries or any ERISA Affiliate has incurred or events have happened, or reasonably expected to happen, that will cause it to incur any liability to or on account of a Plan under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 401(a)(29), 4971 or 4975 of the Code or on account of a group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) under Section 4980B of the Code, or the Borrower, or any of its Subsidiaries, has incurred or is reasonably likely to incur liabilities pursuant to one or more employee welfare benefit plans (as defined in Section 3(1) of ERISA) that provide benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or Plans or Foreign Pension Plans; (b) there shall result from any such event or events the imposition of a lien, the granting of a security interest, or a liability or a material risk of incurring a liability; and (c) such lien, security interest or liability, either individually and/or in the aggregate, in the reasonable opinion of the Required Lenders, has had, or could reasonably be expected to have, a Material Adverse Effect;

(r) **Insurance:**  any Insurance is not, or ceases to be, maintained in full force and effect or is unavailable or unobtainable or any of the provisions of paragraphs (b), (c), (d), (e), (i), (j), (k), (l), (m) or (n) of Clause 14 are not complied with; or

(s) **Material adverse change:**  any event occurs or any other circumstances arise or develop which might in the reasonable opinion of the Majority Lenders, result in a material adverse change in the financial condition of any Obligor.

19.2 **Notice of Event of Default or acceleration of the Loan**.  Notice of any Event of Default and/or acceleration of the Loan shall be given by the Agent to the Borrower in accordance with Clause 27.

19.3 **Other action by Agent.**  The Agent may, and if so instructed by the Majority Lenders shall, take any other action which, as a result of the Event of Default or any notice served under Clause **Error! Reference source not found.**, any Creditor Party is entitled to take under any Finance Document or any applicable law.

19.4 **Other action by Security Trustee.**  The Security Trustee may, and if so instructed by the Majority Lenders shall, take any other action which, as a result of the Event of Default or any notice served under Clause **Error! Reference source not found.**, any Creditor Party is entitled to take under any Finance Document or any applicable law.

19.5 **Termination of Commitments.**  On the service of a notice under Clause **Error! Reference source not found.**, the Commitments and all other obligations of each Lender to the Obligors under this Agreement shall terminate.

19.6 **Acceleration of Loan.**  On the service of a notice under Clause **Error! Reference source not found.**, the Loans, all accrued interest and all other amounts accrued or owing from the Obligors or any other Obligor under this Agreement and every other Finance Document shall become immediately due and payable, or, as the case may be, payable on demand.

19.7 **Delay in exercise of rights.**  In no event shall any delay in exercising any Creditor Party's right to require advance repayment be interpreted as a waiver of this right.

19.8 **Lenders' rights unimpaired.**   Nothing in this Clause 19 shall be taken to impair or restrict the exercise of any right given to individual Lenders under a Finance Document or the general law; and, in particular, this Clause 19 is without prejudice to Clause 1.6 (a).

19.9 **Exclusion of Creditor Party liability.**  No Creditor Party, and no receiver or manager appointed by the Security Trustee, shall have any liability to the Borrower or any Obligor:

(a) for any loss caused by an exercise of rights under, or enforcement of a Security Interest created by, a Finance Document or by any failure or delay to exercise such a right or to enforce such a Security Interest; or

(b) as mortgagee in possession or otherwise, for any income or principal amount which might have been produced by or realised from any asset comprised in such a Security Interest or for any reduction (however caused) in the value of such an asset.

19.10 **Interpretation.**  In Clause 19.1(e) references to an event of default or a termination event include any event, howsoever described, which is similar to an event of default in a facility agreement or a termination event in a finance lease; and in Clause 19.1(f) "**petition**" includes an application.

## 20   FEES AND EXPENSES

**20.1**   **Arrangement fees.**  The Borrower shall pay to the Agent:

(a)   on the Amendment and Restatement Effective Date, an arrangement fee of 1.00% of the outstanding principal balance of the Loans on the Amendment and Restatement Effective Date, for distribution among the Lenders pro rata to their Loans;

(b)   intentionally omitted;

(c)   an agency fee in the amount and at the times agreed in the Fee Letter; and

(d)   a structuring fee in the amount and at the time agreed in the Structuring Fee Letter.

**20.2**   **Costs of negotiation, preparation etc.**  The Borrower shall pay to the Agent on its demand the amount of all reasonable expenses incurred by the Agent or the Security Trustee in connection with:

(a)   the negotiation, preparation, execution or registration of any Finance Document or any related document or with any transaction contemplated by a Finance Document or a related document; and

(b)   the registration, filing or discharge of the Finance Documents, including without limitation in each case the reasonable fees and expenses of legal advisers and insurance experts of the Agent or the Security Trustee, the cost of registration and discharge of Security Interests.

**20.3**   **Costs of variations, amendments, enforcement etc.**  The Borrower shall pay to the Agent, on the Agent's demand, for the account of the Creditor Party concerned, the amount of all reasonable expenses incurred by a Creditor Party in connection with:

(a)   any amendment or supplement to a Finance Document, or any proposal for such an amendment to be made;

(b)   any consent or waiver by the Lenders, the Majority Lenders or the Creditor Party concerned under or in connection with a Finance Document, or any request for such a consent or waiver;

(c)   the valuation of any security provided or offered under Clause 16 or any other matter relating to such security; and

(d)   any step taken by the Lender concerned with a view to the protection, exercise or enforcement of any right or Security Interest created by a Finance Document or for any similar purpose;

there shall be recoverable under paragraph (d) the full amount of all legal expenses, whether or not such as would be allowed under rules of court or any taxation or other procedure carried out under such rules.

**20.4**   **Extraordinary management time.**  The Borrower shall pay to the Agent on its demand compensation in respect of the reasonable and documented amount of time which the management of the Agent has spent in connection with a matter covered by Clause 20.3 and which exceeds the amount of time which would ordinarily be spent in the performance of the Agent's routine functions.  Any such compensation shall be based on such reasonable daily or hourly rates as the Agent may notify to the Borrower and is in addition to any fee paid or payable to the Agent.

**20.5**   **Documentary taxes.**  The Borrower shall promptly pay any tax payable on or by reference to any Finance Document, and shall, on the Agent's demand, fully indemnify each Creditor Party against any claims, expenses, liabilities and losses resulting from any failure or delay by the Borrower to pay such a tax.

**21**   **TAXES; EXPENSES AND INDEMNITIES**

**21.1**   **Taxes.**  All present and/or future taxes, levies and duties whatsoever legally payable in connection with the Borrower's repayment and interest payment liabilities under this Agreement (other than taxes payable by any Creditor Party on its overall net income) resulting from the signature or performance of this Agreement or any other Finance Document shall be paid by the Borrower.

**21.2**   **No deductions or withholdings; gross-up.**

(a)   All repayments of and payments in respect of principal and interest on the Loans, interest on late payments, compensation, costs, fees, expenses and related charges, due in connection with this Agreement or any other Finance Document shall be made:

(i)   without any form of set-off, cross-claim or condition; and

(ii)   free and clear of any tax deduction except a tax deduction which the Borrower or any Guarantor is required by law to make;

(b)   if the Borrower or any Guarantor is required by law to make a tax deduction from any payment:

(i)   the Borrower or such Guarantor shall notify the Agent as soon as it becomes aware of the requirement;

(ii)   the Borrower or such Guarantor shall pay the tax deducted to the appropriate taxation authority promptly, and in any event before any fine or penalty arises; and

(iii)   the amount due in respect of the payment shall be increased by the amount necessary to ensure that each Creditor Party receives and retains (free from any liability relating to the tax deduction) a net amount which, after the tax deduction, is equal to the full amount which it would otherwise have received;

(c)   within 1 (one) month after making any tax deduction under Clause 21.2(b) the Borrower shall deliver to the Agent documentary evidence satisfactory to the Agent that the tax had been paid to the appropriate taxation authority; and

(d)   in this Clause 21.2 "tax deduction" means any deduction or withholding for or on account of any present or future tax except tax on a Creditor Party's overall net income.

**21.3**   **Indemnities regarding borrowing and repayment of the Loan.**  The Borrower shall fully indemnify each Creditor Party in the manner described in Clause 21.6 on its demand in respect of all claims, costs, expenses, liabilities and losses which are made or brought against or incurred by that Creditor Party, or which that Creditor Party estimates reasonably and with due diligence that it will incur, subject to them being properly justified by that Creditor Party, as a result of or in connection with:

(a)   any Drawing not being borrowed on the date specified in the relevant Drawdown Notice for any reason other than a default by the Lender claiming the indemnity;

(b) the receipt or recovery of all or any part of the Loan or an overdue sum otherwise than on the last day of an Interest Period or other relevant period;

(c) any failure (for whatever reason) by the Borrower to make payment of any amount due under a Finance Document on the due date or, if so payable, on demand (after giving credit for any default interest paid on the amount concerned under Clause 8);

(d) the occurrence and/or continuance of an Event of Default and/or the acceleration of repayment of the Loan under Clause 19; and

(e) any tax (other than tax on its overall net income) for which a Creditor Party is liable in connection with any amount paid or payable to that Creditor Party (whether for its own account or otherwise) under any Finance Document.

21.4 **Breakage costs.**  Without limiting its generality, Clause 21.3 covers any claim, cost, liability, expense or loss incurred by a Lender in liquidating or employing deposits from third parties acquired or arranged to fund or maintain all or any part of the Loan and/or any overdue amount (or an aggregate amount which includes the Drawings or any overdue amount).

21.5 **Currency indemnity.**  Dollars shall be the currency of account and of payment of all amounts due hereunder in all events. If any payment is made or received by a Creditor Party, including pursuant to any judgment or order rendered by a competent court or tribunal, in a currency other than Dollars or at a location other than that stipulated herein for payment and such payment after conversion into Dollars and/or transfer to the location stipulated herein for payment does not result in the payment of the amount of Dollars due hereunder, the relevant Creditor Party shall be entitled to demand immediate payment of, and shall have a separate cause of action for, such sums as are necessary exactly to compensate the deficiency and the Borrower shall immediately pay such sums on such demand by the Agent.

21.6 **Miscellaneous indemnities.**   The Borrower shall fully indemnify each Creditor Party (including any officers, employees and agents of such Creditor Party) on its demand in respect of all claims, demands, proceedings, liabilities, taxes (other than taxes on the relevant Creditor Party's overall net income), losses and expenses of every kind which may be made or brought against, or incurred by, a Creditor Party, in any country, subject to them being properly justified by the relevant Creditor Party, in relation to:

(a) any action taken, or omitted or neglected to be taken, under or in connection with any Finance Document by the Agent, the Security Trustee or any other Creditor Party (or any of their respective representatives) under a Finance Document; and

(b) any other event, matter or question which occurs or arises at any time during the term of this Agreement and which has any connection with, or any bearing on, any Finance Document, any payment or other transaction relating to a Finance Document or any asset covered (or previously covered) by any security interest created (or intended to be created) by a Finance Document;

without prejudice to its generality, this Clause 21.6 covers any claims, expenses, liabilities and losses which arise, or are asserted, under or in connection with any law relating to safety at sea, the ISM Code, the ISPS Code or any Environmental Law.

## 22   ILLEGALITY, ETC

22.1 **Illegality.**  This Clause 22 applies if a Lender (the "**Notifying Lender**") notifies the Agent that it has become, or will with effect from a specified date, become:

(a) unlawful or prohibited as a result of the introduction of a new law, an amendment to an existing law or a change in the manner in which an existing law is or will be interpreted or applied; or

(b)     contrary to, or inconsistent with, any regulation;

for the Notifying Lender to maintain or give effect to any of its obligations under this Agreement in the manner contemplated by this Agreement.

**22.2**    **Notification of illegality.**  The Agent shall promptly notify the Obligors, the Security Trustee and the other Lenders of the notice under Clause 22.1 which the Agent receives from the Notifying Lender.

**22.3**    **Prepayment; termination of Commitment.**  On the Agent notifying the Borrower under Clause 22.2, the Notifying Lender's Commitment shall terminate; and thereupon or, if later, on the date specified in the Notifying Lender's notice under Clause 22.1 as the date on which the notified event would become effective the Borrower shall prepay the Notifying Lender's Contribution in accordance with Clause 5.

**22.4**    **Mitigation**.  If circumstances arise which would result in a notification under Clause 22.1 then, without in any way limiting the rights of the Notifying Lender under Clause 22.3, the Notifying Lender shall use reasonable endeavours to transfer its obligations, liabilities and rights under this Agreement and the Finance Documents to another office or financial institution not affected by the circumstances but the Notifying Lender shall not be under any obligation to take any such action if, in its opinion, to do would or might:

(a)     have an adverse effect on its business, operations or financial condition;

(b)     involve it in any activity which is unlawful or prohibited or any activity that is contrary to, or inconsistent with, any regulation; or

(c)     involve it in any expense (unless indemnified to its satisfaction) or tax disadvantage.

## 23    INCREASED COSTS

**23.1**    **Increased costs.**  This Clause 23 applies if a Lender (the "**Notifying Lender**") notifies the Agent that the Notifying Lender considers that as a result of:

(a)     the introduction or alteration after the date of this Agreement of a law or an alteration after the date of this Agreement in the manner in which a law is interpreted or applied (disregarding any effect which relates to the application to payments under this Agreement of a tax on the Lender's overall net income); or

(b)     complying with any regulation (including any which relates to capital adequacy or liquidity controls or which affects the manner in which the Notifying Lender allocates capital resources to its obligations under this Agreement) which is introduced, or altered, or the interpretation or application of which is altered, after the date of this Agreement;

the Notifying Lender (or a parent company of it) has incurred or will incur an "**increased cost**".

**23.2**    **Meaning of "increased costs".**  In this Clause 23, "increased costs" means, in relation to a Notifying Lender:

(a)     an additional or increased cost incurred as a result of, or in connection with, the Notifying Lender having entered into, or being a party to, this Agreement or having taken an assignment of rights under this Agreement, of funding or maintaining its Commitment or Contribution or performing its obligations under this Agreement, or of having outstanding all or any part of its Contribution or other unpaid sums;

64

(b)     a reduction in the amount of any payment to the Notifying Lender under this Agreement or in the effective return which such a payment represents to the Notifying Lender or on its capital;

(c)     an additional or increased cost of funding all or maintaining all or any of the advances comprised in a class of advances formed by or including the Notifying Lender's Contribution or (as the case may require) the proportion of that cost attributable to the Contribution; or

(d)     a liability to make a payment, or a return foregone, which is calculated by reference to any amounts received or receivable by the Notifying Lender under this Agreement;

but not an item attributable to a change in the rate of tax on the overall net income of the Notifying Lender (or a parent company of it) or an item covered by the indemnity for tax in Clause 20.5 or by Clause 21 or an item arising directly out of the implementation by the applicable authorities having jurisdiction over the Notifying Lender of the matters set out in the statement of the Basle Committee on Banking Regulations and Supervisory Practices dated July, 1988 and entitled "International Convergence of Capital Measurement and Capital Structures", to the extent and according to the timetable provided for in the statement;

for the purposes of this Clause 23.2 the Notifying Lender may in good faith allocate or spread costs and/or losses among its assets and liabilities (or any class of its assets and liabilities) on such basis as it considers appropriate.

23.3    **Notification to Borrower of claim for increased costs.**  The Agent shall promptly notify the Obligors of the notice which the Agent received from the Notifying Lender under Clause 23.1.

23.4    **Payment of increased costs.**  The Borrower shall pay to the Agent, on the Agent's demand, for the account of the Notifying Lender the amounts which the Agent from time to time notifies the Borrower that the Notifying Lender has specified to be necessary to compensate the Notifying Lender for the increased cost.

23.5    **Notice of prepayment.**  If the Borrower is not willing to continue to compensate the Notifying Lender for the increased cost under Clause 23.4, the Borrower may give the Agent not less than 14 days' notice of its intention to prepay the Notifying Lender's Contribution at the end of an Interest Period.

23.6    **Prepayment; termination of Commitment.**  A notice under Clause 23.5 shall be irrevocable; the Agent shall promptly notify the Notifying Lender of the Borrower's notice of intended prepayment and:

(a)     on the date on which the Agent serves that notice, the Commitment of the Notifying Lender shall be cancelled; and

(b)     on the date specified in its notice of intended prepayment, the Borrower shall prepay (without premium or penalty) the Notifying Lender's Contribution, together with accrued interest thereon at the applicable rate plus the Margin.

23.7    **Application of prepayment.**  Clause 5.10 shall apply in relation to the prepayment.

24      **SET-OFF**

24.1    **Application of credit balances.**  Following the occurrence and during the continuation of an Event of Default, each Creditor Party may without prior notice:

(a)     apply any balance (whether or not then due) which at any time stands to the credit of any account in the name of any Guarantor at any office in any country of that Creditor

Party in or towards satisfaction of any sum then due from that Guarantor to that Creditor Party under any of the Finance Documents; and

(b)    for that purpose:

(i)    break, or alter the maturity of, all or any part of a deposit of any Guarantor;

(ii)    convert or translate all or any part of a deposit or other credit balance into Dollars; and/or

(iii)    enter into any other transaction or make any entry with regard to the credit balance which the Creditor Party concerned considers appropriate.

**24.2    Existing rights unaffected.**  No Creditor Party shall be obliged to exercise any of its rights under Clause 24.1; and those rights shall be without prejudice and in addition to any right of set-off, combination of accounts, charge, lien or other right or remedy to which a Creditor Party is entitled (whether under the general law or any document).

**25        TRANSFERS AND CHANGES IN LENDING OFFICES**

**25.1    Transfer by Borrower.**  Neither the Borrower nor any Guarantor may, without the consent of the Agent, given on the instructions of all the Lenders transfer any of its rights, liabilities or obligations under any Finance Document.

**25.2    Transfer by a Lender.**  Subject to Clause 25.7, a Lender (the "**Transferor Lender**") may at any time, without needing the consent of the Borrower or any Obligor, cause:

(a)    its rights in respect of all or part of its Contribution;

(b)    its obligations in respect of all or part of its Commitment; or

(c)    a combination of (a) and (b);

to be (in the case of its rights) transferred to, or (in the case of its obligations) assumed by, another bank or financial institution (a "**Transferee Lender**") by delivering to the Agent a completed certificate in the form set out in Schedule 6 with any modifications approved or required by the Agent (a "**Transfer Certificate**") executed by the Transferor Lender and the Transferee Lender;

however, any rights and obligations of the Transferor Lender in its capacity as Agent or Security Trustee will have to be dealt with separately in accordance with the Agency and Security Trust Deed.

**25.3    Transfer Certificate, delivery and notification.**  As soon as reasonably practicable after a Transfer Certificate is delivered to the Agent, it shall (unless it has reason to believe that the Transfer Certificate may be defective):

(a)    sign the Transfer Certificate on behalf of itself, the Obligors, the Security Trustee and each of the other Lenders;

(b)    on behalf of the Transferee Lender, send to the Borrower and each Obligor letters or faxes notifying them of the Transfer Certificate and attaching a copy of it; and

(c)    send to the Transferee Lender copies of the letters or faxes sent under paragraph (b).

**25.4    Effective Date of Transfer Certificate.**  A Transfer Certificate becomes effective on the date, if any, specified in the Transfer Certificate as its effective date **provided that** it is signed by the Agent under Clause 25.3 on or before that date.

**25.5**    **No transfer without Transfer Certificate.**    No assignment or transfer of any right or obligation of a Lender under any Finance Document is binding on, or effective in relation to, the Borrower, any Obligor, the Agent or the Security Trustee unless it is effected, evidenced or perfected by a Transfer Certificate.

**25.6**    **Lender re-organisation; waiver of Transfer Certificate.**    However, if a Lender enters into any merger, de-merger or other reorganisation as a result of which all its rights or obligations vest in a successor, the Agent may, if it sees fit, by notice to the successor and the Borrower and the Security Trustee waive the need for the execution and delivery of a Transfer Certificate; and, upon service of the Agent's notice, the successor shall become a Lender with the same Commitment and Contribution as were held by the predecessor Lender.

**25.7**    **Effect of Transfer Certificate.**    A Transfer Certificate takes effect in accordance with English law as follows:

(a)    to the extent specified in the Transfer Certificate, all rights and interests (present, future or contingent) which the Transferor Lender has under or by virtue of the Finance Documents are assigned to the Transferee Lender absolutely, free of any defects in the Transferor Lender's title and of any rights or equities which the Borrower or any Obligor had against the Transferor Lender;

(b)    the Transferor Lender's Commitment is discharged to the extent specified in the Transfer Certificate;

(c)    the Transferee Lender becomes a Lender with the Contribution previously held by the Transferor Lender and a Commitment of an amount specified in the Transfer Certificate;

(d)    the Transferee Lender becomes bound by all the provisions of the Finance Documents which are applicable to the Lenders generally, including those about pro-rata sharing and the exclusion of liability on the part of, and the indemnification of, the Agent and the Security Trustee and, to the extent that the Transferee Lender becomes bound by those provisions (other than those relating to exclusion of liability), the Transferor Lender ceases to be bound by them;

(e)    any part of the Loan which the Transferee Lender advances after the Transfer Certificate's effective date ranks in point of priority and security in the same way as it would have ranked had it been advanced by the transferor, assuming that any defects in the transferor's title and any rights or equities of the Borrower or any Obligor against the Transferor Lender had not existed;

(f)    the Transferee Lender becomes entitled to all the rights under the Finance Documents which are applicable to the Lenders generally, including but not limited to those relating to the Majority Lenders and those under Clause 7.3 and Clause 19, and to the extent that the Transferee Lender becomes entitled to such rights, the Transferor Lender ceases to be entitled to them; and

(g)    in respect of any breach of a warranty, undertaking, condition or other provision of a Finance Document or any misrepresentation made in or in connection with a Finance Document, the Transferee Lender shall be entitled to recover damages by reference to the loss incurred by it as a result of the breach or misrepresentation, irrespective of whether the original Lender would have incurred a loss of that kind or amount;

the rights and equities of the Borrower or any Obligor referred to above include, but are not limited to, any right of set off and any other kind of cross-claim.

**25.8**    **Maintenance of register of Lenders.**    During the Security Period the Agent shall maintain a register in which it shall record the name, Commitment, Contribution and administrative

details (including the lending office) from time to time of each Lender holding a Transfer Certificate and the effective date (in accordance with Clause 23.4) of the Transfer Certificate; and the Agent shall make the register available for inspection by any Lender, the Security Trustee and the Borrower during normal banking hours, subject to receiving at least 3 Business Days prior notice.

25.9    **Reliance on register of Lenders.**   The entries on that register shall, in the absence of manifest error, be conclusive in determining the identities of the Lenders and the amounts of their Commitments and Contributions and the effective dates of Transfer Certificates and may be relied upon by the Agent and the other parties to the Finance Documents for all purposes relating to the Finance Documents.

25.10   **Authorisation of Agent to sign Transfer Certificates.**   The Borrower, the Security Trustee, and each Lender irrevocably authorises the Agent to sign Transfer Certificates on its behalf.

25.11   **Registration fee.**   In respect of any Transfer Certificate, the Agent shall be entitled to recover a registration fee of $3,500 from the Transferor Lender or (at the Agent's option) the Transferee Lender.

25.12   **Sub-participation; subrogation assignment.**   A Lender may sub-participate all or any part of its rights and/or obligations under or in connection with the Finance Documents without the consent of, or any notice to, the Borrower, any Obligor, the Agent or the Security Trustee; and the Lenders may assign, in any manner and terms agreed by the Majority Lenders, the Agent and the Security Trustee, all or any part of those rights to an insurer or surety who has become subrogated to them.

25.13   **Disclosure of information.**   A Lender may disclose to a potential Transferee Lender or sub-participant any information which the Lender has received in relation to the Borrower, any Guarantor, any Obligor or their affairs under or in connection with any Finance Document, unless the information is clearly of a confidential nature.

25.14   **Change of lending office.**   A Lender may change its lending office by giving notice to the Agent and the change shall become effective on the later of:

(a)     the date on which the Agent receives the notice; and

(b)     the date, if any, specified in the notice as the date on which the change will come into effect.

25.15   **Notification.**   On receiving such a notice, the Agent shall notify the Borrower and the Security Trustee; and, until the Agent receives such a notice, it shall be entitled to assume that a Lender is acting through the lending office of which the Agent last had notice.

25.16   **Replacement of Reference Bank.**   If any Reference Bank ceases to be a Lender or is unable on a continuing basis to supply quotations for the purposes of Clause 6 then, unless the Borrower, the Agent and the Majority Lenders otherwise agree, the Agent, acting on the instructions of the Majority Lenders, and after consulting the Borrower, shall appoint another bank (whether or not a Lender) to be a replacement Reference Bank; and, when that appointment comes into effect, the first-mentioned Reference Bank's appointment shall cease to be effective.

## 26      VARIATIONS AND WAIVERS

26.1    **Variations, waivers etc. by Majority Lenders.**   Subject to Clause 26.2, a document shall be effective to vary, waive, suspend or limit any provision of a Finance Document, or any Creditor Party's rights or remedies under such a provision or the general law, only if the document is signed, or specifically agreed to by fax or telex, by the Borrower, by the Agent on

OHSUSA:757654574.12                                    68

behalf of the Majority Lenders, by the Agent and the Security Trustee in their own rights, and, if the document relates to a Finance Document to which an Obligor is a party, by that Obligor.

26.2 **Variations, waivers etc. requiring agreement of all Lenders.**  However, as regards the following, Clause 26.1 applies as if the words "by the Agent on behalf of the Majority Lenders" were replaced by the words "by or on behalf of every Lender":

(a)     a change in the Margin or in the definition of LIBOR;

(b)     a change to the date for, the amount of, any payment of principal, interest, fees, or other sum payable under this Agreement;

(c)     a change to any Lender's Commitment;

(d)     an extension of Availability Period;

(e)     a change to the definition of "Majority Lenders" or "Finance Documents";

(f)     a change to the preamble;

(g)     a change to this Clause 26;

(h)     any release of, or material variation to, a Security Interest, guarantee, indemnity or subordination arrangement set out in a Finance Document; and

(i)     any other change or matter as regards which this Agreement or another Finance Document expressly provides that each Lender's consent is required.

26.3 **Exclusion of other or implied variations.**  Except for a document which satisfies the requirements of Clauses 26.1 and 26.2, no document, and no act, course of conduct, failure or neglect to act, delay or acquiescence on the part of the Creditor Parties or any of them (or any person acting on behalf of any of them) shall result in the Creditor Parties or any of them (or any person acting on behalf of any of them) being taken to have varied, waived, suspended or limited, or being precluded (permanently or temporarily) from enforcing, relying on or exercising:

(a)     a provision of this Agreement or another Finance Document;

(b)     an Event of Default;

(c)     a breach by the Borrower or an Obligor of an obligation under a Finance Document or the general law; or

(d)     any right or remedy conferred by any Finance Document or by the general law;

and there shall not be implied into any Finance Document any term or condition requiring any such provision to be enforced, or such right or remedy to be exercised, within a certain or reasonable time.

27  **NOTICES**

27.1 **General.**  Unless otherwise specifically provided, any notice under or in connection with any Finance Document shall be given by letter, fax or telex; and references in the Finance Documents to written notices, notices in writing and notices signed by particular persons shall be construed accordingly.

OHSUSA:757654574.12                              69

**27.2    Addresses for communications.**  A notice shall be sent:

(a)    to the Borrower:    c/o Genco Shipping & Trading Limited
299 Park Avenue, 12th Floor,
New York, New York 10171
Fax No:+ 1 646 443 8551

(b)    to a Lender:    At the address below its name in Schedule 1
or (as the case may require) in the relevant Transfer
Certificate.

(c)    to the Agent:    CA-CIB,
9 quai du Président Paul Doumer,
92920 Paris,
La Défense Cedex, France,
Fax: (+33) 1 41 89 29 87
Attn: Shipping Department

        Copy to:    CA-CIB, New York Ship Finance,
1301 Avenue of the Americas,
New York, NY 10019
Attn: Jerome Duval (jerome.duval@ca-cib.com)
        Michael Choina (michael.choina@ca-cib.com)

(d)    to the Security Trustee:    CA-CIB,
9 quai du Président Paul Doumer,
92920 Paris, La Défense Cedex,
France,
Fax: (+33) 1 41 89 29 87,
Attn: Shipping Department,

        Copy to:    CA-CIB, New York Ship Finance,
1301 Avenue of the Americas,
New York, NY 10019
Attn: Jerome Duval (jerome.duval@ca-cib.com)
        Michael Choina (michael.choina@ca-cib.com)

(e)    to any Guarantor    c/o Genco Shipping & Trading Limited
299 Park Avenue, 20th  Floor,
New York, New York 10171,
United States
Fax No:+ 1646 443 8551

or to such other address as the relevant party may notify the Agent or, if the relevant party is the
Agent or the Security Trustee, the Obligors and the Lenders.

**27.3    Effective date of notices.**  Subject to Clauses 27.4 and 27.5:

(a)    a notice which is delivered personally or posted shall be deemed to be served, and
shall take effect, at the time when it is delivered; and

(b)    a notice which is sent by telex or fax shall be deemed to be served, and shall take
effect, 2 hours after its transmission is completed.

**27.4    Service outside business hours.** However, if under Clause 27.3 a notice would be deemed
to be served:

(a)    on a day which is not a Business Day in the place of receipt; or

(b)     on such a Business Day, but after 5 p.m. local time;

the notice shall (subject to Clause 27.5) be deemed to be served, and shall take effect, at 9 a.m. on the next day which is a Business Day.

27.5    **Illegible notices.**  Clauses 27.3 and 27.4 do not apply if the recipient of a notice notifies the sender within 1 hour after the time at which the notice would otherwise be deemed to be served that the notice has been received in a form which is illegible in a material respect.

27.6    **Valid notices.**  A notice under or in connection with a Finance Document shall not be invalid by reason that its contents or the manner of serving it do not comply with the requirements of this Agreement or, where appropriate, any other Finance Document under which it is served if:

(a)     the failure to serve it in accordance with the requirements of this Agreement or other Finance Document, as the case may be, has not caused any party to suffer any significant loss or prejudice; or

(b)     in the case of incorrect and/or incomplete contents, it should have been reasonably clear to the party on which the notice was served what the correct or missing particulars should have been.

27.7    **English language.**  Any notice under or in connection with a Finance Document shall be in English.

27.8    **Meaning of "notice".**    In this Clause 27, "**notice**" includes any demand, consent, authorisation, approval, instruction, waiver or other communication.

28      **SUPPLEMENTAL**

28.1    **Rights cumulative, non-exclusive.**  The rights and remedies which the Finance Documents give to each Creditor Party are:

(a)     cumulative;

(b)     may be exercised as often as appears expedient; and

(c)     shall not, unless a Finance Document explicitly and specifically states so, be taken to exclude or limit any right or remedy conferred by any law.

28.2    **Severability of provisions.**  If any provision of a Finance Document is or subsequently becomes void, unenforceable or illegal, that shall not affect the validity, enforceability or legality of the other provisions of that Finance Document or of the provisions of any other Finance Document.

28.3    **Counterparts.**  A Finance Document may be executed in any number of counterparts.

28.4    **Third party rights.**  A person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Agreement.

28.5    **Effectiveness.**  This amendment and restatement of the Prepetition Loan Agreement shall become effective on the date (the "**Amendment and Restatement Effective Date**") on which the conditions set forth in Clause 4.1 shall all be either satisfied or waived and the Borrower, the Agent, the Security Trustee, each of the Lenders who are party to the Prepetition Loan Agreement on the Amendment and Restatement Effective Date and each Obligor shall have signed a counterpart hereof (whether the same or different counterparts) and shall have delivered the same to the Agent in accordance with Clause 27. The Agent will give the

Borrower and each Lender prompt written notice of the occurrence of the Amendment and Restatement Effective Date.

**28.6**   **USA PATRIOT Act Notice**.  Each Lender hereby notifies each Creditor Party that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub: 107-56 (signed into law October 26, 2001)) (the "**PATRIOT Act**"), it is required to obtain, verify, and record information that identifies each Creditor Party, which information includes the name of each Creditor Party and other information that will allow such Lender to identify each Creditor Party in accordance with the PATRIOT Act, and each Creditor Party agrees to provide such information from time to time to any Lender.

**29**   **LAW AND JURISDICTION**

**29.1**   **English law.**  This Agreement shall be governed by, and construed in accordance with, English law.

**29.2**   **Exclusive English jurisdiction.**  Subject to Clause 29.3, the courts of England shall have exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Agreement.

**29.3**   **Choice of forum for the exclusive benefit of Creditor Parties.**  Clause 29.2 is for the exclusive benefit of the Creditor Parties, each of which reserves the rights:

(a)   to commence proceedings in relation to any matter which arises out of or in connection with this Agreement in the courts of any country other than England and which have or claim jurisdiction to that matter; and

(b)   to commence such proceedings in the courts of any such country or countries concurrently with or in addition to proceedings in England or without commencing proceedings in England;

the Borrower shall not commence any proceedings in any country other than England in relation to a matter which arises out of or in connection with this Agreement.

**29.4**   **Process agent.**   The Borrower and each Guarantor irrevocably appoints WFW Legal Services Limited at its registered office for the time being, presently at 15 Appold Street, London EC2A 2HB, to act as its agent to receive and accept on its behalf any process or other document relating to any proceedings in the English courts which are connected with this Agreement.

**29.5**   **Creditor Party rights unaffected.**  Nothing in this Clause 29 shall exclude or limit any right which any Creditor Party may have (whether under the law of any country, an international convention or otherwise) with regard to the bringing of proceedings, the service of process, the recognition or enforcement of a judgment or any similar or related matter in any jurisdiction.

**29.6**   **Meaning of "proceedings".**  In this Clause 29, "**proceedings**" means proceedings of any kind, including an application for a provisional or protective measure.

**THIS AGREEMENT** has been entered into on the date stated at the beginning of this Agreement.

## SCHEDULE 1

## LENDERS AND COMMITMENTS

| **Lender** | Lending Office | Tranche A Commitment | Tranche B Commitment | Tranche C Commitment | Tranche D Commitment | Tranche E Commitment |
|---|---|---|---|---|---|---|
| Crédit Agricole Corporate and Investment Bank 9 quai du Président Paul Doumer 92920 Paris La Défense France | Paris | 6,666,666.68 | 6,666,666.68 | 6,666,666.68 | 6,666,666.68 | 6,666,666.68 |
| Crédit Industriel et Commercial 520 Madison Avenue, New York, NY 10022 | New York | 6,666,666.66 | 6,666,666.66 | 6,666,666.66 | 6,666,666.66 | 6,666,666.66 |
| Skandinaviska Enskilda Banken AB (publ) Kungsträdgårdsgatan 8 SE-106 40 Stockholm | Stockholm | 6,666,666.66 | 6,666,666.66 | 6,666,666.66 | 6,666,666.66 | 6,666,666.66 |

## SCHEDULE 2

## GUARANTORS

(1) **GENCO BAY LIMITED,** a company incorporated in the Marshall Islands whose registered office is at trust company complex, Ajeltake road, Ajeltake island, P.O. Box 1405, Majuro, Marshall Islands MH96960, Guarantor in respect of Vessel A, GENCO BAY;

(2) **GENCO OCEAN LIMITED**, a company incorporated in the Marshall Islands whose registered office is at trust company complex, Ajeltake road, Ajeltake island, P.O. Box 1405, Majuro, Marshall Islands MH96960, Guarantor in respect of Vessel B, GENCO OCEAN;

(3) **GENCO AVRA LIMITED,** a company incorporated in the Marshall Islands whose registered office is at trust company complex, Ajeltake road, Ajeltake island, P.O. Box 1405, Majuro, Marshall Islands MH96960, Guarantor in respect of Vessel C, GENCO AVRA;

(4) **GENCO MARE LIMITED,** a company incorporated in the Marshall Islands whose registered office is at trust company complex, Ajeltake road, Ajeltake island, P.O. Box 1405, Majuro, Marshall Islands MH96960, Guarantor in respect of Vessel D, GENCO MARE; and

(5) **GENCO SPIRIT LIMITED,** a company incorporated in the Marshall Islands whose registered office is at trust company complex, Ajeltake road, Ajeltake island, P.O. Box 1405, Majuro, Marshall Islands MH96960, Guarantor in respect of Vessel E, GENCO SPIRIT.

## SCHEDULE 3

## FORM OF DRAWDOWN NOTICE

To:    Crédit Agricole Corporate and Investment Bank
9 quai du Président Paul Doumer
92920 Paris La Défense
France

Attention:
Reference:  [•]

cc:    [Crédit Agricole Corporate and Investment Bank
Broadwalk House
5 Appold Street
London EC2A 2DA
England

Attention:
Reference: [•]]

[Date]

**DRAWDOWN NOTICE**

1    We refer to the amended and restated loan agreement (the "**Loan Agreement**") dated [●] 2014 and made between, among others, ourselves as the Borrower, the Guarantors (listed in Schedule 2 therein), Crédit Agricole Corporate and Investment Bank, Agent and Security Trustee and the banks and financial institutions listed therein as Lenders in connection with a loan facility in the maximum amount of US $100,000,000. Terms defined in the Loan Agreement have their defined meanings when used in this Drawdown Notice.

2    We request to borrow a Drawing as follows:

(a)    Tranche: [●]

(b)    Amount: US$ [●];

(c)    Vessel: [●];

(d)    Guarantor: [●]

(e)    Drawdown Date: [●];

(f)    Duration of the first Interest Period shall be [●] months;

(g)    Payment instructions: [●].

3    We represent and warrant that:

(a)    the representations and warranties in Clause 11 which are repeated pursuant to Clause 11.4 of the Loan Agreement would remain true and not misleading if repeated on the date of this notice with reference to the circumstances now existing; and

(b)    no Event of Default or Potential Event of Default has occurred or will result from the borrowing of the Drawing.

OHSUSA:757654574.12               75

**4**       This notice cannot be revoked.

_____

for and on behalf of
Genco Shipping & Trading Limited

**SCHEDULE 4**

**[INTENTIONALLY OMITTED.]**

**SCHEDULE 5**

**LOAN REPAYMENT**

**Part A (Repayment of Tranche A)**

| | Tranche A - Genco Bay | | |
|---|---|---|---|
| | Calendar Quarter | Outstanding | Repayment |
| 2/18/2014 | 0 | $13,852,347 | |
| 6/30/2014 | 1 | $13,467,732 | $384,615 |
| 9/30/2014 | 2 | $13,083,117 | $384,615 |
| 12/31/2014 | 3 | $12,698,502 | $384,615 |
| 3/31/2015 | 4 | $12,313,887 | $384,615 |
| 6/30/2015 | 5 | $11,929,272 | $384,615 |
| 9/30/2015 | 6 | $11,544,657 | $384,615 |
| 12/31/2015 | 7 | $11,160,042 | $384,615 |
| 3/31/2016 | 8 | $10,775,427 | $384,615 |
| 6/30/2016 | 9 | $10,390,812 | $384,615 |
| 9/30/2016 | 10 | $10,006,197 | $384,615 |
| 12/31/2016 | 11 | $9,621,582 | $384,615 |
| 3/31/2017 | 12 | $9,236,967 | $384,615 |
| 6/30/2017 | 13 | $8,852,352 | $384,615 |
| 9/30/2017 | 14 | $8,467,737 | $384,615 |
| 12/31/2017 | 15 | $8,083,122 | $384,615 |
| 3/31/2018 | 16 | $7,698,507 | $384,615 |
| 6/30/2018 | 17 | $7,313,892 | $384,615 |
| 9/30/2018 | 18 | $6,929,277 | $384,615 |
| 12/31/2018 | 19 | $6,544,662 | $384,615 |
| 3/31/2019 | 20 | $6,160,047 | $384,615 |
| 6/30/2019 | 21 | $5,775,432 | $384,615 |
| 8/31/2019 | 22 | $0 | $5,775,432 |

**Part B (Repayment of Tranche B)**

| | Tranche B - Genco Ocean | | |
|---|---|---|---|
| | Calendar Quarter | Outstanding | Repayment |
| 2/18/2014 | 0 | $13,827,263 | |
| 6/30/2014 | 1 | $13,442,648 | $384,615 |
| 9/30/2014 | 2 | $13,058,033 | $384,615 |
| 12/31/2014 | 3 | $12,673,418 | $384,615 |
| 3/31/2015 | 4 | $12,288,803 | $384,615 |
| 6/30/2015 | 5 | $11,904,188 | $384,615 |
| 9/30/2015 | 6 | $11,519,573 | $384,615 |
| 12/31/2015 | 7 | $11,134,958 | $384,615 |
| 3/31/2016 | 8 | $10,750,343 | $384,615 |
| 6/30/2016 | 9 | $10,365,728 | $384,615 |
| 9/30/2016 | 10 | $9,981,113 | $384,615 |
| 12/31/2016 | 11 | $9,596,498 | $384,615 |
| 3/31/2017 | 12 | $9,211,883 | $384,615 |
| 6/30/2017 | 13 | $8,827,268 | $384,615 |
| 9/30/2017 | 14 | $8,442,653 | $384,615 |
| 12/31/2017 | 15 | $8,058,038 | $384,615 |
| 3/31/2018 | 16 | $7,673,423 | $384,615 |
| 6/30/2018 | 17 | $7,288,808 | $384,615 |
| 9/30/2018 | 18 | $6,904,193 | $384,615 |
| 12/31/2018 | 19 | $6,519,578 | $384,615 |
| 3/31/2019 | 20 | $6,134,963 | $384,615 |
| 6/30/2019 | 21 | $5,750,348 | $384,615 |
| 8/31/2019 | 22 | $0 | $5,750,348 |

**Part C (Repayment of Tranche C)**

| | Tranche C - Genco Avra | | |
|---|---|---|---|
| | Calendar Quarter | Outstanding | Repayment |
| 2/18/2014 | 0 | $14,945,228 | |
| 6/30/2014 | 1 | $14,560,613 | $384,615 |
| 9/30/2014 | 2 | $14,175,998 | $384,615 |
| 12/31/2014 | 3 | $13,791,383 | $384,615 |
| 3/31/2015 | 4 | $13,406,768 | $384,615 |
| 6/30/2015 | 5 | $13,022,153 | $384,615 |
| 9/30/2015 | 6 | $12,637,538 | $384,615 |
| 12/31/2015 | 7 | $12,252,923 | $384,615 |
| 3/31/2016 | 8 | $11,868,308 | $384,615 |
| 6/30/2016 | 9 | $11,483,693 | $384,615 |
| 9/30/2016 | 10 | $11,099,078 | $384,615 |
| 12/31/2016 | 11 | $10,714,463 | $384,615 |
| 3/31/2017 | 12 | $10,329,848 | $384,615 |
| 6/30/2017 | 13 | $9,945,233 | $384,615 |
| 9/30/2017 | 14 | $9,560,618 | $384,615 |
| 12/31/2017 | 15 | $9,176,003 | $384,615 |
| 3/31/2018 | 16 | $8,791,388 | $384,615 |
| 6/30/2018 | 17 | $8,406,773 | $384,615 |
| 9/30/2018 | 18 | $8,022,158 | $384,615 |
| 12/31/2018 | 19 | $7,637,543 | $384,615 |
| 3/31/2019 | 20 | $7,252,928 | $384,615 |
| 6/30/2019 | 21 | $6,868,313 | $384,615 |
| 8/31/2019 | 22 | $0 | $6,868,313 |

**Part D (Repayment of Tranche D)**

| | Tranche D - Genco Mare | | |
| --- | --- | --- | --- |
| | Calendar Quarter | Outstanding | Repayment |
| 2/18/2014 | 0 | $15,227,763 | |
| 6/30/2014 | 1 | $14,843,148 | $384,615 |
| 9/30/2014 | 2 | $14,458,533 | $384,615 |
| 12/31/2014 | 3 | $14,073,918 | $384,615 |
| 3/31/2015 | 4 | $13,689,303 | $384,615 |
| 6/30/2015 | 5 | $13,304,688 | $384,615 |
| 9/30/2015 | 6 | $12,920,073 | $384,615 |
| 12/31/2015 | 7 | $12,535,458 | $384,615 |
| 3/31/2016 | 8 | $12,150,843 | $384,615 |
| 6/30/2016 | 9 | $11,766,228 | $384,615 |
| 9/30/2016 | 10 | $11,381,613 | $384,615 |
| 12/31/2016 | 11 | $10,996,998 | $384,615 |
| 3/31/2017 | 12 | $10,612,383 | $384,615 |
| 6/30/2017 | 13 | $10,227,768 | $384,615 |
| 9/30/2017 | 14 | $9,843,153 | $384,615 |
| 12/31/2017 | 15 | $9,458,538 | $384,615 |
| 3/31/2018 | 16 | $9,073,923 | $384,615 |
| 6/30/2018 | 17 | $8,689,308 | $384,615 |
| 9/30/2018 | 18 | $8,304,693 | $384,615 |
| 12/31/2018 | 19 | $7,920,078 | $384,615 |
| 3/31/2019 | 20 | $7,535,463 | $384,615 |
| 6/30/2019 | 21 | $7,150,848 | $384,615 |
| 8/31/2019 | 22 | $0 | $7,150,848 |

**Part E (Repayment of Tranche E)**

| | Tranche E - Genco Spirit | | |
|---|---|---|---|
| | Calendar Quarter | Outstanding | Repayment |
| 2/18/2014 | 0 | $15,708,532 | |
| 6/30/2014 | 1 | $15,323,917 | $384,615 |
| 9/30/2014 | 2 | $14,939,302 | $384,615 |
| 12/31/2014 | 3 | $14,554,687 | $384,615 |
| 3/31/2015 | 4 | $14,170,072 | $384,615 |
| 6/30/2015 | 5 | $13,785,457 | $384,615 |
| 9/30/2015 | 6 | $13,400,842 | $384,615 |
| 12/31/2015 | 7 | $13,016,227 | $384,615 |
| 3/31/2016 | 8 | $12,631,612 | $384,615 |
| 6/30/2016 | 9 | $12,246,997 | $384,615 |
| 9/30/2016 | 10 | $11,862,382 | $384,615 |
| 12/31/2016 | 11 | $11,477,767 | $384,615 |
| 3/31/2017 | 12 | $11,093,152 | $384,615 |
| 6/30/2017 | 13 | $10,708,537 | $384,615 |
| 9/30/2017 | 14 | $10,323,922 | $384,615 |
| 12/31/2017 | 15 | $9,939,307 | $384,615 |
| 3/31/2018 | 16 | $9,554,692 | $384,615 |
| 6/30/2018 | 17 | $9,170,077 | $384,615 |
| 9/30/2018 | 18 | $8,785,462 | $384,615 |
| 12/31/2018 | 19 | $8,400,847 | $384,615 |
| 3/31/2019 | 20 | $8,016,232 | $384,615 |
| 6/30/2019 | 21 | $7,631,617 | $384,615 |
| 8/31/2019 | 22 | $0 | $7,631,617 |

OHSUSA:757654574.12                    82

**SCHEDULE 6**

**TRANSFER CERTIFICATE**

**The Transferor and the Transferee accept exclusive responsibility for ensuring that this Certificate and the transaction to which it relates comply with all legal and regulatory requirements applicable to them respectively.**

To:    [ Name of Agent] for itself and for and on behalf of the Borrower, [each Obligor], the Security Trustee and each Lender as defined in the Loan Agreement referred to below.

**1**    This Certificate relates to an Amended and Restated  Loan Agreement ("the "**Agreement**") dated [●] and made between (1) [●] (the "**Borrower**"), (2) the banks and financial institutions named therein as Lenders, (3) the Companies named therein as Guarantors, (4) [●] as Agent and (5) [●] as Security Trustee for a loan facility of up to $100,000,000.

**2**    In this Certificate, terms defined in the Agreement shall, unless the contrary intention appears, have the same meanings when used in this Certificate and:

"**Relevant Parties**" means the Agent, the Borrower, the Guarantors, the Security Trustee and each Lender;

"**Transferor**" means [full name] of [lending office];

"**Transferee**" means [full name] of [lending office].

**3**    The effective date of this Certificate is [●]  Provided that this Certificate shall not come into effect unless it is signed by the Agent on or before that date.

**4**    [The Transferor assigns to the Transferee absolutely all rights and interests (present, future or contingent) which the Transferor has as Lender under or by virtue of the Agreement and every other Finance Document in relation to [●] per cent. of its Contribution, which percentage represents $[●].

**5**    [By virtue of this Certificate and Clause 25 of the Agreement, the Transferor is discharged [entirely from its Commitment which amounts to $[●]] [from [●] per cent. of its Commitment, which percentage represents $[●]] and the Transferee acquires a Commitment of $[●].]

**6**    The Transferee undertakes with the Transferor and each of the Relevant Parties that the Transferee will observe and perform all the obligations under the Finance Documents which Clause 25 of the Agreement provides will become binding on it upon this Certificate taking effect.

**7**    The Agent, at the request of the Transferee (which request is hereby made) accepts, for the Agent itself and for and on behalf of every other Relevant Party, this Certificate as a Transfer Certificate taking effect in accordance with Clause 25 of the Agreement.

**8**    The Transferor:

(a)    warrants to the Transferee and each Relevant Party that:

(i)    the Transferor has full capacity to enter into this transaction and has taken all corporate action and obtained all consents which are required in connection with this transaction; and

        (ii)        this Certificate is valid and binding as regards the Transferor;

(b)      warrants to the Transferee that the Transferor is absolutely entitled, free of encumbrances, to all the rights and interests covered by the assignment in paragraph 4; and

(c)      undertakes with the Transferee that the Transferor will, at its own expense, execute any documents which the Transferee reasonably requests for perfecting in any relevant jurisdiction the Transferee's title under this Certificate or for a similar purpose.

9      The Transferee:

(a)      confirms that it has received a copy of the Agreement and each of the other Finance Documents;

(b)      agrees that it will have no rights of recourse on any ground against either the Transferor, the Agent, the Security Trustee or any Lender in the event that:

        (i)        any of the Finance Documents prove to be invalid or ineffective;

        (ii)        the Borrower or any Obligor fails to observe or perform its obligations, or to discharge its liabilities, under any of the Finance Documents;

        (iii)       it proves impossible to realise any asset covered by a Security Interest created by a Finance Document, or the proceeds of such assets are insufficient to discharge the liabilities of the Borrower or any Obligor under any of the Finance Documents;

(c)      agrees that it will have no rights of recourse on any ground against the Agent, the Security Trustee or any Lender in the event that this Certificate proves to be invalid or ineffective;

(d)      warrants to the Transferor and each Relevant Party that:

        (i)        it has full capacity to enter into this transaction and has taken all corporate action and obtained all consents which it needs to take or obtain in connection with this transaction; and

        (ii)       that this Certificate is valid and binding as regards the Transferee;

(e)      confirms the accuracy of the administrative details set out below regarding the Transferee.

10     The Transferor and the Transferee each undertake with the Agent and the Security Trustee severally, on demand, fully to indemnify the Agent and/or the Security Trustee in respect of any claim, proceeding, liability or expense (including all legal expenses) which they or either of them may incur in connection with this Certificate or any matter arising out of it, except such as are shown to have been mainly and directly caused by the gross and culpable negligence or dishonesty of the Agent's or the Security Trustee's own officers or employees.

11     The Transferee shall repay to the Transferor on demand so much of any sum paid by the Transferor under paragraph 9 as exceeds one-half of the amount demanded by the Agent or the Security Trustee in respect of a claim, proceeding, liability or expense which was not reasonably foreseeable at the date of this Certificate; but nothing in this paragraph shall affect the liability of each of the Transferor and the Transferee to the Agent or the Security Trustee for the full amount demanded by it.

[Name of Transferor]                                              [Name of Transferee]

By:                                                              By:

Date:                                                            Date:

**AGENT**

Signed for itself and for and on behalf of itself
as Agent and for every other Relevant Party

[Name of Agent]

By:

Date:

**Administrative Details of Transferee**

Name of Transferee:

Lending Office:

Contact Person
(Loan Administration Department):

Telephone:

Telex:

Fax:

Contact Person
(Credit Administration Department):

Telephone:

Telex:

Fax:

Account for payments:

**Note**:   This Transfer Certificate alone may not be sufficient to transfer a proportionate share of the Transferor's interest in the security constituted by the Finance Documents in the Transferor's or Transferee's jurisdiction.  It is the responsibility of each Lender to ascertain whether any other documents are required for this purpose.

**SCHEDULE 7**

**MANDATORY COSTS**

12    The Mandatory Cost is an addition to the interest rate to compensate the Lenders for the cost of compliance with (a) the requirements of the Bank of England and/or the Financial Services Authority (or, in either case, any other authority which replaces all or any of its functions) or (b) the requirements of the European Central Bank.

13    On the first day of each Interest Period (or as soon as possible thereafter) the Agent shall calculate, as a percentage rate, a rate (the "**Additional Cost Rate**") for each Lender in accordance with the paragraphs set out below.  The Mandatory Cost will be calculated by the Agent as a weighted average of the Lenders' Additional Cost Rates (weighted in proportion to the percentage participation of each Lender in the Loan) and will be expressed as a percentage rate per annum.

14    The Additional Cost Rate for any Lender lending from an office in the euro-zone will be the percentage notified by that Lender to the Agent to be its reasonable determination of the cost (expressed as a percentage of that Lender's participation in the Loan) of complying with the minimum reserve requirements of the European Central Bank as a result of participating in the Loan from that office.

15    The Additional Cost Rate for any Lender lending from an office in the United Kingdom will be calculated by the Agent as follows:

(a)    where the Loan is denominated in sterling:

$$\frac{BY + S(Y - Z) + F \times 0.01}{100 - (B + S)} \text{ per cent per annum}$$

(b)    where the Loan is denominated in any currency other than sterling:

$$\frac{F \times 0.01}{300} \text{ per cent per annum}$$

where:

B    is the percentage of eligible liabilities (assuming these to be in excess of any stated minimum) which that Lender is from time to time required to maintain as an interest free cash ratio deposit with the Bank of England to comply with cash ratio requirements;

Y    is the percentage rate of interest (excluding the Margin and the Mandatory Cost and, if the Loan is an overdue amount, the additional rate of interest specified in Clause 8 (*Default interest*)) payable for the relevant Interest Period on the Loan;

S    is the percentage (if any) of eligible liabilities which that Lender is required from time to time to maintain as interest bearing special deposits with the Bank of England;

Z    is the interest rate per annum payable by the Bank of England to that Lender on special deposits; and

F    is the charge payable by that Lender to the Financial Services Authority under paragraph 2.02 or 2.03 (as appropriate) of the Fees Regulations or the equivalent provisions in any replacement regulations (with, for this purpose, the figure for the minimum amount in paragraph 2.02b or such equivalent provision deemed to be zero), expressed in pounds per £1 million of the fee base of that Lender.

16      For the purpose of this Schedule:

(a)      "**eligible liabilities**" and "**special deposits**" have the meanings given to them at the time of application of the formula by the Bank of England;

(b)      "**fee base**" has the meaning given to it in the Fees Regulations;

(c)      "**Fees Regulations**" means the regulations governing periodic fees contained in the Financial Services Authority Fees Manual or such other law or regulation as may be in force from time to time in respect of the payment of fees for the acceptance of deposits.

17      In the application of the formula B, Y, S and Z are included in the formula as figures and not as percentages, e.g. if B = 0.5% and Y = 15%, BY is calculated as 0.5. x 15.  Each rate calculated in accordance with the formula is, if necessary, rounded upward to four decimal places.

18      If a Lender does not supply the information required by the Agent to determine its Additional Cost Rate when requested to do so, the applicable Mandatory Cost shall be determined on the basis of the information supplied by the remaining Lenders.

19      If a change in circumstances has rendered, or will render, the formula inappropriate, the Agent shall notify the Borrower of the manner in which the Mandatory Cost will subsequently be calculated.  The manner of calculation so notified by the Agent shall, in the absence of manifest error, be binding on the Borrower.

**SCHEDULE 8**

**FORM OF MORTGAGE**

**SCHEDULE 9**

**FORM OF COMPLIANCE CERTIFICATE**

This Compliance Certificate (this "**Certificate**") is delivered to you on behalf of the Company (as hereinafter defined) pursuant to Clause 12.1(c)(iv) of the Loan Agreement, dated [ ] (as amended, supplemented, restated or modified from time to time, the "**Loan Agreement**"), among Genco Shipping & Trading Limited, a corporation organized under the laws of the Marshall Islands (the "Company"), the Guarantors listed on Schedule 2 thereto, the Lenders from time to time party thereto, and Crédit Agricole Corporate and Investment, as Agent and Security Trustee. Terms defined in the Loan Agreement and not otherwise defined herein are used herein as therein defined.

20      I am the duly elected, qualified and acting Chief Financial Officer of the Company.

21      I have reviewed and am familiar with the contents of this Certificate. I am providing this Certificate solely in my capacity as an officer of the Company.  The matters set forth herein are true to the best of my knowledge after diligent inquiry.

22      I have reviewed the terms of the Loan Agreement and the other Finance Documents and have made or caused to be made under my supervision, a review in reasonable detail of the transactions and financial condition of the Company during the accounting period covered by the financial statements attached hereto as ANNEX 1 (the "Financial Statements").  The Financial Statements have been prepared in accordance with the requirements of the Loan Agreement.

23      Attached hereto as ANNEX 2 are the computations showing (in reasonable detail) compliance with the covenants specified therein.  All such computations are true and correct.

24      On the date hereof, the representations and warranties contained in the Loan Agreement and in the other Finance Documents are true and correct in all material respects with the same effect as though such representations and warranties had been made on the date hereof, unless stated to relate to a specific earlier date, in which case such representations and warranties were true and correct in all material respects as of such earlier date.

25      [On the date hereof, no Default or Event of Default has occurred and is continuing.][1]

---

[1] If any Default or Event of Default exists, include a description thereof, specifying the nature and extent thereof (in reasonable detail).

ANNEX I to
Compliance Certificate

IN WITNESS WHEREOF, I have executed this Certificate on behalf of the Company this ____ day of [DATE], 201__.

GENCO SHIPPING & TRADING LIMITED

By_____

CONSOLIDATED FINANCIAL STATEMENTS

ANNEX 2 to
Compliance Certificate

COMPLIANCE WORKSHEET

The calculations described herein are as of _____ (the "<u>Computation Date</u>") and pertains
to the period from _____ to _____ (the "<u>Test Period</u>").

**Part A. Consolidated Interest Coverage Ratio**

1.  Consolidated Net Income Attributable to the Company for the    $
    Test Period.

2.  Provisions for taxes based on income for the Test              $
    Period.

3.  Consolidated interest expense for the Test Period.             $

4.  Amortization or write off of deferred financing costs to the   $
    extent deducted in determining Consolidated Net Income for
    the Test Period.

5.  Depreciation expense of the Company and its Subsidiaries
    for the Test Period                                            $

6.  Amortization expense (including non-cash management
    incentive compensation) of the Company and its                $
    Subsidiaries for the Test Period.

7   Cash restructuring charges in connection with the Cases and    $
    the Plan of Reorganization

8.  Losses on sales of assets (excluding sales in the
    ordinary course of business) and other extraordinary
    losses for the Test Period. – Non-Cash Losses                 $

9.  Gains on sales of assets (excluding sales in the ordinary
    course of business) and other extraordinary gains for the
    Test Period.                                                  $

10. (Gains)/Losses from Interest Rate Protection Agreements
    and other Hedging Agreements                                  $

11. Consolidated EBITDA (sum of Items 1 through 8, and 10
    <u>minus</u> Item 9).                                         $

12. Consolidated Interest Expense for the four immediately
    preceding fiscal quarters.                                    $

13. Consolidated Interest Coverage Ratio (Item 11:Item 12).

14. Minimum Interest Coverage Ratio on the Computation Date.

OHSUSA:757654574.12                    92

**Part B. Maximum Leverage Ratio**

1.      Average Consolidated Net Indebtedness(*) on the $
Computation Date.

2.      Consolidated EBITDA on the Computation        Date.      $

3.      Leverage Ratio (Item 1:Item 2) on the Computation
Date.

4.      Maximum Leverage Ratio pursuant to Clause 12.2(d) of the
Loan Agreement:

$^{(*)}$ In calculating the amount of Average Consolidated Net Indebtedness, the Borrower used the aggregate stated balance sheet amount of convertible Indebtedness as determined in accordance with GAAP.   The parenthetical in the definition of Consolidated Indebtedness refers to "all loans," which the Borrower understands to refer to "Loans" as defined in the Facility.   This is consistent with the terms of the DB Credit Facility (the corresponding language under each of which refers only to loans under those respective Facilities) and with the intention of the parties to the Loan Agreement that the financial covenants would be identical in the Loan Agreement and the DB Credit Facility.

**Part C.  Security Cover**

1.      Aggregate principal amount of outstanding Loans on the                 $
Computation Date.

2.      Aggregate Appraised Value on the Computation Date.                 $

3.      Minimum permitted Aggregate Appraised Value (Item 1                 $
multiplied by 1.30).

**Part D.  Minimum Consolidated Net Worth**

1. Consolidated Net Worth on the Computation Date, must be
greater than 75% of the Post-Reorganization Equity Value of
the Company <u>plus</u> 50% of the net proceeds received by the                 $
Company as a result of any new Equity Interests issued by
the Company after the Amendment and Restatement Effective
Date, as required pursuant to Clause 12.2(f) of the Loan
Agreement.

**Part E. Ratio of interest-bearing Consolidated Indebtedness to the aggregate of interest-bearing Consolidated Indebtedness plus Consolidated Net Worth (as defined below)**

1.  Amount of interest-bearing Consolidated Indebtedness        $

2.  Consolidated Net Worth (whereby the Consolidated Net Worth includes its Subsidiaries (including the Company's investment in Baltic Trading Limited) determined on a consolidated basis in accordance to GAAP without any deduction for minority interests in Subsidiaries) and as amended through the Test Period.        $

3.  Amount of interest-bearing Consolidated Indebtedness plus Consolidated Net Worth (whereby the Consolidated Net Worth includes its Subsidiaries (including the Company's investment in Baltic Trading Limited) determined on a consolidated basis in accordance to GAAP without any deduction for minority interests in Subsidiaries) (1. Plus 2.).        $

4.  Ratio of interest-bearing Consolidated Indebtedness to the aggregate of interest-bearing Consolidated Indebtedness plus Consolidated Net Worth (1. divided by 3.)

5.  Requirement - Ratio of interest-bearing Consolidated Indebtedness to the aggregate of interest-bearing Consolidated Indebtedness plus Consolidated Net Worth cannot exceed 70%

**EXECUTION PAGE[S]**

**BORROWER**

**SIGNED** by )
for and on behalf of )
**GENCO SHIPPING** )
**& TRADING LIMITED** )
in the presence of )


**GUARANTORS**

**SIGNED** by )
for and on behalf of )
**GENCO BAY LIMITED** )
in the presence of )


**SIGNED** by )
for and on behalf of )
**GENCO OCEAN LIMITED** )
in the presence of )


**SIGNED** by )
for and on behalf of )
**GENCO AVRA LIMITED** )
in the presence of )


**SIGNED** by )
for and on behalf of )
**GENCO MARE LIMITED** )
in the presence of )


**SIGNED** by )
for and on behalf of )
**GENCO SPIRIT LIMITED** )
in the presence of )


**LENDERS**

**SIGNED** by )
for and on behalf of )
**CRÉDIT AGRICOLE** )
**CORPORATE AND** )
**INVESTMENT BANK** )
in the presence of )


**SIGNED** by )
for and on behalf of )

OHSUSA:757654574.12                    95

**CRÉDIT INDUSTRIEL
ET COMMERCIAL**

                               )

in the presence of               )

**SIGNED** by                  )
for and on behalf of         )
**SKANDINAVISKA ENSKILDA
BANKEN AB (PUBL)**

                               )

in the presence of               )

## AGENT

**SIGNED** by                  )
for and on behalf of         )
**CRÉDIT AGRICOLE
CORPORATE AND
INVESTMENT BANK**        )
in the presence of               )

## SECURITY TRUSTEE

**SIGNED** by                  )
for and on behalf of         )
**CRÉDIT AGRICOLE
CORPORATE AND
INVESTMENT BANK**        )
in the presence of               )

## EXHIBIT 4

### THE NEW GENCO CHARTER

SECOND AMENDED AND RESTATED
ARTICLES OF INCORPORATION

OF

GENCO SHIPPING & TRADING LIMITED

PURSUANT TO THE MARSHALL ISLANDS BUSINESS CORPORATIONS ACT

A.      The name of the Corporation (herein the "Corporation") shall be:

GENCO SHIPPING & TRADING LIMITED

B.      The purpose of the Corporation is to engage in any lawful act or activity for which corporations may now or hereafter be organized under the Marshall Islands Business Corporations Act (the "BCA"). Capitalized terms that are not otherwise defined in these Articles of Incorporation shall have the meaning set forth in Article R below.

C.      The registered address of the Corporation in the Marshall Islands is Trust Company Complex, Ajeltake Road, Ajeltake Island, P.O. Box 1405, Majuro, Marshall Islands MH96960. The name of the Corporation's registered agent at such address is The Trust Company of the Marshall Islands, Inc.

D.      The aggregate number of shares of stock that the Corporation is authorized to issue is Two Hundred Fifty Million (250,000,000) registered shares, all of which shall be designated common shares with a par value of one United States cent (US$0.01) per share (herein referred to as the "Common Shares"). No holder of shares of the capital stock of the Corporation shall be entitled to preemptive or subscriptive rights.

The Corporation shall not issue any non-voting equity securities as and to the extent prohibited by Section 1123(a)(6) of Chapter 11 Title 11 of the United States Code  as in effect on the date of these Articles of Incorporation; provided, however, that the foregoing (a) will not have any further force or effect beyond that required under Section, (b) will have such force and effect only for so long as such Section is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law from time to time in effect.

E.      The Corporation shall have every power which a corporation now or hereafter organized under the BCA may have.

F.      The name and address of the incorporator is:

| Name | Post Office Address |
|------|--------------------|
| Majuro Nominees Ltd. | P.O. Box 1405 |
|  | Majuro |
|  | Marshall Islands |

G.      Corporate existence began upon filing the initial Articles of Incorporation with the Registrar of Corporations on September 27, 2004.

H.      (a)      The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors of the Corporation (the "Board").  In addition to the powers and authority expressly conferred upon them by statute or by these Articles of Incorporation or the bylaws of the Corporation, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation.

KL2 2845178.7

(b)      The number of directors constituting the Whole Board shall be seven (7). The Board shall be divided into two (2) classes of directors, which are hereby designated as Class I and Class II, respectively. The members of the initial Board shall be elected pursuant to the Chapter 11 Plan, and the number of Class II directors shall be five (5), with the initial Class II directors comprised of the two (2) directors selected by Centerbridge Partners, L.P. ("Centerbridge") pursuant to the Chapter 11 Plan and two (2) of the four (4) directors selected by the Board Selection Committee (as defined in the Chapter 11 Plan) pursuant to the Chapter 11 Plan and Peter C. Georgiopoulos; provided, however, that in the event that the Corporation is unable to satisfy the applicable listing requirements of both the New York Stock Exchange and NASDAQ due to such classified board structure, Mr. Georgiopoulos shall thereupon automatically cease to be a Class II director and thereafter the number of Class II directors shall be four (4) and the Class II directors shall thereafter be comprised of the two (2) directors selected by Centerbridge pursuant to the Chapter 11 Plan and two (2) of the four (4) directors selected by the Board Selection Committee pursuant to the Chapter 11 Plan; provided, further, that in the event that the Corporation is unable to satisfy the applicable listing requirements of both the New York Stock Exchange and NASDAQ due to the classified board structure set forth in the immediately preceding proviso, the Board shall be de-classified, provided, that prior to or simultaneous with such de-classification the Corporation shall have taken such actions, to the reasonable satisfaction of each of the members of the Board Selection Committee (in each case so long as such member owns a number of Common Shares equal to at least 6.25% of the total Common Shares issued as of the Plan Effective Date), as are necessary to provide Centerbridge and the Board Selection Committee with substantially equivalent Board representation rights as they would otherwise have pursuant to the immediately preceding proviso. The term of office of each initial Class I director shall expire at the first annual meeting of shareholders following the Plan Effective Date, and that of each initial Class II director shall expire at the second annual meeting of shareholders following the Plan Effective Date. Upon the conclusion of the second annual meeting of shareholders following the Plan Effective Date, the Board shall automatically cease to be divided into classes and thereafter all directors shall be elected at each subsequent annual meeting of shareholders for a term expiring at the next succeeding annual meeting of shareholders. At each annual meeting of shareholders, directors to succeed those whose term expire at such annual meeting shall be elected to hold office for a term expiring at the next succeeding annual meeting of shareholders and until their respective successors are elected and have qualified or until their respective death, resignation, removal or earlier termination of office. Any vacancies in the Board for any reason shall be filled by the vote of a majority of the members of the Board then in office, although less than a quorum, and any directors so chosen shall hold office for the unexpired term of his predecessor. Any directorship resulting from an increase in the number of directors shall be filled by the vote of a majority of the members of the Board then in office, although less than a quorum. No decrease in the number of directors shall shorten the term of any incumbent director. Directors shall be elected by a plurality of the votes cast at a meeting of shareholders by the holders of shares entitled to vote in the election.

(c)      Advance notice of shareholder nominations for the election of directors and of business to be brought by shareholders before any meeting of the shareholders of the Corporation shall be given in the manner provided in the bylaws of the Corporation.

(d)      Directors shall be elected by a plurality of the votes cast at a meeting of shareholders by the holders of shares entitled to vote in the election. Cumulative voting, as defined in Division 7, Section 71(2) of the BCA, shall not be used to elect directors.

(e)      Notwithstanding any other provisions of these Amended and Restated Articles of Incorporation or the bylaws of the Corporation (and notwithstanding the fact that some lesser percentage may be specified by law, these Amended and Restated Articles of Incorporation or the bylaws of the Corporation), any director or the entire Board may be removed at any time, but only (i) for cause, by the affirmative vote of the holders of a majority of the outstanding Common Shares entitled to vote generally in the election of directors cast at a meeting of the shareholders called for that purpose or by a majority of the members of the Board then in office or (ii) at any time following the conclusion of the second annual

2

meeting of shareholders following the Plan Effective Date, with or without cause by the affirmative vote of the holders of a majority of the outstanding Common Shares entitled to vote generally in the election of directors cast at a meeting of the shareholders called for that purpose.

I.       The Board is expressly authorized to make, alter, amend or repeal the bylaws of the Corporation by a vote of not less than a majority of the Whole Board. The shareholders shall also have power to adopt, amend or repeal the bylaws of the Corporation; provided, however, that, in addition to any vote of the holders of any class or series of stock of the Corporation required by law or by these Articles of Incorporation, the affirmative vote of the holders of at least sixty-six and two-thirds percent ($66^{2/3}$%) of the voting power of all of the then-outstanding registered shares of the Corporation entitled to vote thereon, voting together as a single class, shall be required to adopt, amend or repeal any provision of the bylaws of the Corporation.

J.       Except as provided in this Article J, special meetings of the shareholders shall be called by (a) the Chairman, President or Secretary of the Corporation, at the request in writing or by resolution, by a majority of the Board or (b) by the Secretary at the request in writing by any one or more shareholders that hold, in the aggregate, at least a majority of the outstanding registered shares of the Corporation entitled to vote at such meeting. The Chairman, President or Secretary of the Corporation upon receiving the written demand shall give notice of such meeting, not less than fifteen (15) nor more than sixty (60) days before the date of such meeting. Such notice shall state the purpose or purposes of the proposed special meeting. The business transacted at any special meeting shall be limited to the purposes stated in the notice of such meeting.

(a)       Any action required or permitted to be taken by the shareholders of the Corporation must be effected at a duly called annual or special meeting of the shareholders of the Corporation, except that any action required to be taken or which may be taken at any annual or special meeting of shareholders of the Corporation may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by all of the shareholders entitled to vote with respect to the subject matter thereof.

K.       The Corporation may transfer its corporate domicile from the Marshall Islands to any other place in the world.

L.       A director of the Corporation shall not be personally liable to the Corporation or its shareholders for monetary damages for any breach of fiduciary duty in such capacity except that the liability of a director shall not be eliminated or limited (i) for any breach of such director's duty of loyalty to the Corporation or its shareholders; (ii) for acts or omissions not undertaken in good faith or which involve intentional misconduct or a knowing violation of law; or (iii) for any transaction from which such director derived an improper personal benefit.  If the BCA hereafter is amended to authorize the further elimination or limitation of the liability of directors for actions taken or omitted to be taken then the liability of a director of the Corporation, in addition to the limitation on personal liability provided herein, shall be limited to the fullest extent permitted by the amended BCA in respect of actions or omissions to act which occurred during any period to which the BCA's amended provisions pertain.  Any repeal or modification of this Article L by the shareholders of the Corporation shall be prospective only, and shall not adversely affect any limitation on the personal liability of the director existing at the time of such repeal or modification.

M.       Except for transactions contemplated by these Articles of Incorporation or as otherwise approved by either (i) a majority of the Board (excluding any directors that have or are designated by a party that has a material interest in the transaction); or (ii) the holders of a majority of the then outstanding shares of capital stock of the Corporation (excluding any shareholders that have a material interest in the transaction), neither the Corporation nor any of its subsidiaries or Affiliates shall enter into any Affiliate Transaction.

N.       To the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, and as may be set forth more fully in the bylaws of the Corporation, the Corporation shall indemnify and hold harmless, and advance expenses to any person who was or is made or is threatened to be made a party or is otherwise

3

involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans maintained or sponsored by the Corporation (a "Covered Person"), against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Covered Person.

O.        In recognition and anticipation that (i) Centerbridge and each of the other members of the Board Selection Committee (the "Specified Shareholders") and/or other Specified Persons (as defined below) and/or (ii) members of the Board who are not employees of the Corporation ("Non-Employee Directors") and their Affiliates (as defined below) may now engage, may continue to engage, or may, in the future, decide to engage, in the same or similar activities or related lines of business as those in which the Corporation, directly or indirectly, may engage and/or other business activities that overlap with or compete with those in which the Corporation, directly or indirectly, may engage in the same or similar activities or related lines of business as those in which the Corporation, directly or indirectly, may engage and/or other business activities that overlap with or compete with those in which the Corporation, directly or indirectly, may engage, the provisions of this Article O are set forth to regulate and define the conduct of certain affairs of the Corporation with respect to certain classes or categories of business opportunities as they may involve the Specified Persons, the Non-Employee Directors or their Affiliates and the powers, rights, duties and liabilities of the Corporation and its directors, officers and shareholders in connection therewith.  Solely for purposes of this Article O, "Affiliate" shall mean (i) in respect of any specified person other than the Corporation, any other person that, directly or indirectly, is controlled by, controls or is under common control with such specified person, and (ii) in respect of the Corporation, any person that, directly or indirectly, is controlled by the Corporation.

(a)        None of (i) the Specified Shareholders nor any of their Affiliates or Related Funds, nor any of their respective portfolio companies, nor any directors, officers, employees, principals, members, partners, equity holders, control persons, agents and other representatives of any of the foregoing (collectively, "Specified Persons") or (ii) any Non-Employee Director or any of his or her Affiliates shall have any duty to refrain, directly or indirectly, from (x) engaging in a corporate opportunity in the same or similar business activities or lines of business in which the Corporation or any of its Affiliates now engages or proposes to engage or (y) otherwise competing with the Corporation or any of its Affiliates, and, to the fullest extent permitted by the BCA, no Specified Person or Non-Employee Director shall be liable to the Corporation or any of its Affiliates or their respective shareholders for breach of any fiduciary duty solely by reason of the fact that such Specified Person or Non-Employee Director engages in any such activities or lines of business.  The Corporation hereby renounces any interest or expectancy in, or in being offered an opportunity to participate in, any business opportunity which may be a corporate opportunity for both a Specified Person or Non-Employee Director and the Corporation or any of its Affiliates, except as specifically provided in paragraph c below.

(b)        In the event that any Specified Person or Non-Employee Director acquires knowledge of a potential transaction or other business opportunity which may be a corporate opportunity both for itself or himself and the Corporation or any of its Affiliates, such Specified Person or Non-Employee Director shall have no duty to communicate or offer such transaction or other business opportunity to the Corporation or any of its Affiliates and, to the fullest extent permitted by the BCA, shall not be liable to the Corporation or its shareholders for breach of any fiduciary duty as a shareholder, director or officer of the Corporation or otherwise solely by reason of the fact that such Specified Person or Non-Employee Director pursues or acquires such corporate opportunity for itself or himself, or offers or directs such corporate opportunity to another person.

(c)        The Corporation does not renounce its interest in any corporate opportunity offered to any Non-Employee Director if such opportunity is expressly offered to such person solely in his or her capacity

4

KL2 2845178.7

as a director of the Corporation and the provisions of paragraphs a and b above shall not apply to any such corporate opportunity.  Notwithstanding the foregoing provisions of this Article O, a corporate opportunity shall be deemed not to be a potential corporate opportunity for the Corporation if it is a business opportunity that the Corporation and its Affiliates are not financially able or contractually permitted or legally able to undertake, or that is, from its nature, not in the line of the Corporation's and its Affiliates' business or is of no practical advantage to the Corporation and its Affiliates or that is one in which they have no interest or reasonable expectancy.

P.       Unless the Corporation consents in writing to the selection of an alternative forum, the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's shareholders, (iii) any action asserting a claim against the Corporation, its directors, officers and/or employees arising pursuant to any provision of the BCA or the Corporation's articles of incorporation or bylaws, as such articles and bylaws may be amended or amended and restated and in effect from time to time, or (iv) any other action asserting a claim against the Corporation, its directors, officers and/or employees that is governed by the internal affairs doctrine, shall be the United States District Court for the Southern District of New York and any New York State court sitting in New York County, State of New York of the United States of America (the "Chosen Courts"), except for any such action or proceeding as to which a Chosen Court determines that there is an indispensable party not subject to the jurisdiction of the Chosen Courts (and the indispensable party does not consent to the personal jurisdiction of a Chosen Court within ten days following such determination).  If any provision or provisions of this Article P shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Article P (including, without limitation, each portion of any sentence of this Article P containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.  Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article P.

Q.       The Corporation reserves the right to amend or repeal any provision contained in these Articles of Incorporation in the manner prescribed by the laws of the Marshall Islands and all rights conferred upon shareholders are granted subject to this reservation; provided, however, that, notwithstanding any other provision of these Articles of Incorporation or any provision of law that might otherwise permit a lesser vote or no vote, but in addition to any vote of the holders of any class or series of the stock of this corporation required by law or by these Articles of Incorporation, and the affirmative vote of the holders of at least sixty six and two-thirds percent ($66^{2/3}\%$) of the voting power of all of the then-outstanding registered shares of the Corporation entitled to vote thereon, voting together as a single class, shall be required to amend or repeal this Article Q, Article H, Article I, Article J, and Article L through Article P.

R.       As used in these Articles of Incorporation, the following terms shall have the following meanings:

(a)       "Affiliate" means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, another Person, where "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

(b)       "Affiliate Transaction" means any transaction, agreement, or arrangement between or among the (a) Corporation or any of its direct or indirect subsidiaries, on the one hand, and (b) any director or executive officer of the Corporation or any of its direct or indirect subsidiaries, any shareholder of the Corporation, or any Affiliate, partner or family member of any such person, or any executive officer,

5

director or employee of any shareholder, on the other hand, other than employment, service, or compensation arrangements in the ordinary course of business consistent with past practice.

(c)     "beneficially own" shall have the meaning given to such term in Rule 13d-3 under the U.S. Securities Exchange Act of 1934, as amended, and any Person's beneficial ownership of securities shall be calculated in accordance with the provisions of such Rule.

(d)     "Chapter 11 Plan" means the Prepackaged Plan of Reorganization of the Corporation and certain of its debtor affiliates under Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (including all exhibits and schedules thereto and the plan supplement(s) filed with respect thereto), as confirmed by that certain order, dated [_____], 2014, of the United States Bankruptcy Court for the Southern District of New York.

(e)     "Code" means the United States Internal Revenue Code of 1986, as amended.

(f)     "Disinterested Director" means, with respect to any matter, any director other than a director that has, directly or indirectly, any pecuniary or other interest in such matter (other than any interest arising solely as a result of the ownership of Common Shares), and that is not employed by or affiliated with, and does not serve on the Board of, and is not employed by or affiliated with any portfolio company of, any other person (other than the Company or any of its direct or indirect subsidiaries) that has, directly or indirectly, any pecuniary or other material interest in such matter.

(g)     "Person" means any individual, corporation, trust, partnership, limited liability company, joint venture, association, joint-stock company, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

(h)     "Related Fund" means with respect to any person, any fund, account or investment vehicle that is controlled or managed by such person, by any Affiliate of such person, or, if applicable, such person's investment manager.

(i)     "Securities Act" means the Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.  Any reference herein to a specific section, rule or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

(j)     "Transfer" means any direct or indirect sale, transfer, assignment, pledge, mortgage, exchange, hypothecation, grant of a security interest or other direct or indirect disposition or encumbrance of an interest whether with or without consideration, whether voluntarily or involuntarily or by operation of law) or the acts thereof.  The terms "Transferee," "Transferred," and other forms of the word "Transfer" shall have correlative meanings.

(k)     "Voting Shares" means the Common Shares and of any other class or series of capital stock of the Corporation  entitled to vote generally in the election of directors of the Corporation.

(l)     "Whole Board" means the total number of authorized directors whether or not there exist any vacancies in previously authorized directorships.

IN WITNESS WHEREOF, I have executed this instrument on _____, 2014.

6

[Name]


by: _____

KL2 2845178.7

**EXHIBIT 5**

**THE NEW GENCO BY-LAWS**

**GENCO SHIPPING & TRADING LIMITED**

**AMENDED AND RESTATED BY-LAWS**

**AS ADOPTED _____, 2014**

ARTICLE I
OFFICES

The principal place of business of GENCO SHIPPING & TRADING LIMITED (herein sometime the "Corporation") shall be at such place or places as the Directors shall from time to time determine.  The Corporation may also have an office or offices at such other places within or without the Marshall Islands as the Board of Directors of the Corporation (the "Board") may from time to time appoint or the business of the Corporation may require.

ARTICLE II
SHAREHOLDERS

Section 1      Annual Meeting:  The annual meeting of shareholders of the Corporation shall be held on such day and at such time and place within or without the Marshall Islands as the Board may determine for the purpose of electing Directors and of transacting such other business as may properly be brought before the meeting.

Section 2      Nature of Business at Annual Meetings of Shareholders:  No business may be transacted at an annual meeting of shareholders, other than business that is either (a) specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board (or any duly authorized committee thereof); (b) otherwise properly brought before the annual meeting by or at the direction of the Board (or any duly authorized committee thereof), or (c) otherwise properly brought before the annual meeting by any shareholder of the Corporation (i) who is a shareholder of record on the date of the giving of the notice provided for in this Section 2 of this Article II and has remained a shareholder of record through the record date for the determination of shareholders entitled to vote at such annual meeting and (ii) who complies with the notice procedures set forth in this Section 2 of this Article II.

In addition to any other applicable requirements, for business to be properly brought before an annual meeting by a shareholder, such shareholder must have given timely notice thereof in proper written form to the Secretary of the Corporation (the "Secretary").

To be timely, a shareholder's notice to the Secretary of the Corporation must be delivered to or mailed and received at the principal executive offices of the Corporation not less than one hundred twenty (120) days nor more than one hundred fifty (150) days prior to the one (1) year anniversary of the immediately preceding annual meeting of shareholders.

To be in proper written form, a shareholder's notice to the Secretary must set forth as to each matter such shareholder proposes to bring before the annual meeting (A) a brief description of the business desired to be brought before the annual meeting and the reasons for conducting such business at the annual meeting, (B) the name and record address of such shareholder and the name and address of any other beneficial owner on whose behalf the proposal is being made, (C) the class or series and number of shares of capital stock of the Corporation which are owned beneficially or of record by such shareholder, (D) a description of any agreement, arrangement or understanding (including any derivative or short positions, profit interests, options, warrants, stock appreciation or similar rights, hedging transactions, and borrowed or loaned shares) that has been entered into as of the date of the shareholder's notice by, or on behalf of, such shareholder or any such beneficial owner, the effect or intent of which is to mitigate loss to, manage risk or benefit of share price changes for, or increase or decrease the voting power of, such shareholder and such beneficial owner, with respect to shares of capital stock of the Corporation, (E) a description of all arrangements or understandings between such shareholder and any other person or persons (including their names) in connection with the proposal of such business by such shareholder and any material interest of such shareholder in such business and (F) a representation that such shareholder intends to appear in

person or by proxy at the annual meeting to bring such business before the meeting.  In addition, notwithstanding anything in Section 2 of this Article II to the contrary, a shareholder intending to nominate one or more persons for election as a Director at an annual meeting must comply with Article III Section 3 of these By-Laws for such nomination or nominations to be properly brought before such meeting.

No business shall be conducted at the annual meeting of shareholders except business brought before the annual meeting in accordance with the procedures set forth in this Section 2 of this Article II; provided, however, that, once business has been properly brought before the annual meeting in accordance with such procedures, nothing in this Section 2 of this Article II shall be deemed to preclude discussion by any shareholder of any such business.  If the Chairman of an annual meeting determines that business was not properly brought before the annual meeting in accordance with the foregoing procedures, the Chairman of the meeting shall declare to the meeting that the business was not properly brought before the meeting and such business shall not be transacted.

Section 3     Special Meeting:  A special meeting of shareholders may be called at any time by (a) the Chairman of the Board, the President or the Secretary at the request in writing, or by resolution, of a majority of the Board or (b) by the Secretary at the request in writing by any one or more shareholders that hold, in the aggregate, at least a majority of the outstanding registered shares of the Corporation entitled to vote at such meeting.  No other person or persons are permitted to call a special meeting. The business transacted at any special meeting shall be limited to the purposes stated in the notice of such meeting.

Section 4     Notice of Meetings:  Notice of every annual and special meeting of shareholders, other than any meeting the giving of notice of which is otherwise prescribed by law, stating the date, time, place and purpose thereof, and in the case of special meetings, the name of the person or persons at whose direction the notice is being issued, shall be given personally or sent by mail, telegraph, cablegram, telex or teleprinter at least fifteen (15) but not more than sixty (60) days before such meeting, to each shareholder of record entitled to vote thereat and to each shareholder of record who, by reason of any action proposed at such meeting would be entitled to have his shares appraised if such action were taken, and the notice shall include a statement of that purpose and to that effect.  If mailed, notice shall be deemed to have been given when deposited in the mail, directed to the shareholder at his address as the same appears on the record of shareholders of the Corporation or at such address as to which the shareholder has given notice to the Secretary.  Notice of a meeting need not be given to any shareholder who submits a signed waiver of notice, whether before or after the meeting, or who attends the meeting without protesting prior to the conclusion thereof that he did not receive notice of such meeting.

Section 5     Adjournments:  Any meeting of shareholders, annual or special, may adjourn from time to time to reconvene at the same or some other place, and notice need not be given of any such adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.  At the adjourned meeting the Corporation may transact any business which might have been transacted at the original meeting.  If the meeting is adjourned for lack of quorum, notice of the new meeting shall be given to each shareholder of record entitled to vote at the meeting.  If after an adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each shareholder of record on the new record date entitled to notice in Section 4 of this Article II.

Section 6     Quorum:  At all meetings of shareholders, except as otherwise expressly provided by law, there must be present either in person or by proxy shareholders holding at least a majority of the shares issued and outstanding and entitled to vote at such meetings in order to constitute a quorum, but if less than a quorum is present, a majority of those shares present either in person or by proxy shall have power to adjourn any meeting until a quorum shall be present.

Section 7     Voting:  If a quorum is present, and except as otherwise expressly provided by law, the affirmative vote of a majority of the shares of capital stock represented at the meeting shall be the act of the shareholders.  At any meeting of shareholders each shareholder entitled to vote any shares on any matter to be voted upon at such meeting shall be entitled to one (1) vote on such matter for each such share, and may exercise such voting right either in person or by proxy.  However, no proxy shall be valid after the expiration of eleven (11) months from the date such proxy was authorized unless otherwise provided in the proxy.  A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as it is coupled with an interest sufficient in law of the Marshall Islands to support an irrevocable proxy.  A shareholder may revoke any proxy which is not

2

irrevocable by attending the meeting and voting in person or by filing an instrument in writing revoking the proxy or another duly executed proxy bearing a later date with the Secretary. Shareholders may act by way of written consent in accordance with the provisions of Section 67 of the Marshall Islands Business Corporations Act (the "BCA"). Any action required or permitted to be taken at a meeting, may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by all of the shareholders entitled to vote with respect to the subject matter thereof.

Section 8        Fixing of Record Date: The Board may fix a time not more than sixty (60) nor less than fifteen (15) days prior to the date of any meeting of shareholders, or more than sixty (60) days prior to the last day on which the consent or dissent of shareholders may be expressed for any purpose without a meeting, as the time as of which shareholders entitled to notice of and to vote at such a meeting or whose consent or dissent is required or may be expressed for any purpose, as the case may be, shall be determined, and all persons who were holders of record of voting shares at such time and no others shall be entitled to notice of and to vote at such meeting or to express their consent or dissent, as the case may be. The Board may fix a time not exceeding sixty (60) days preceding the date fixed for the payment of any dividend, the making of any distribution, the allotment of any rights or the taking of any other action, as a record time for the determination of the shareholders entitled to receive any such dividend, distribution, or allotment or for the purpose of such other action. If no record date is fixed for the determination of shareholders entitled to notice of or to vote at a meeting of shareholders, the close of business on the day next preceding the date on which notice of the meeting is given (or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held) shall be the record date for such determination of shareholders. The provisions of this Article II, Section 8 do not apply to the determination of the record date for shareholders entitled to consent to corporate action in writing without a meeting.

Section 9      Organization: Meetings of shareholders shall be presided over by the Chairman of the Board, if any, or in the absence of the Chairman of the Board by the President, or in the absence of the President by the Secretary, or in the absence of the Secretary by any Director or officer of the Corporation selected by a majority of members of the Board present at such meeting. The Secretary, or in the absence of the Secretary an Assistant Secretary, shall act as Secretary of the meeting, but in the absence of the Secretary and any Assistant Secretary, the Chairman of the meeting may appoint any person to act as Secretary of the meeting.

ARTICLE III
DIRECTORS

Section 1        Board of Directors: The affairs, business, and property of the Corporation shall be managed by a Board of Directors, and the Board shall be comprised as set forth in the Articles of Incorporation of the Corporation (as amended, the "Articles of Incorporation"). The Directors need not be residents of the Marshall Islands or shareholders of the Corporation.

Section 2        How Elected: Except as otherwise provided by law or Section 4 of this Article, the Directors shall be elected at the annual meeting of shareholders. Directors shall be elected by a plurality of the votes cast at a meeting of shareholders by the holders of shares entitled to vote in the election. Cumulative voting, as defined in Division 7, Section 71(2) of the BCA, shall not be used to elect Directors. Each Director shall be elected to serve until the next annual meeting of shareholders and until his successor shall have been duly elected and qualified, except in the event of his death, resignation, removal, or the earlier termination of his term of office.

Section 3      Nomination of Directors: Only persons who are nominated in accordance with the following procedures shall be eligible for election as Directors of the Corporation at a meeting of shareholders, except as may be otherwise provided in the Articles of Incorporation of the Corporation with respect to the right of holders of preferred stock of the Corporation to nominate and elect a specified number of Directors in certain circumstances. Nominations of persons for election to the Board may be made at any annual meeting of shareholders (a) by or at the direction of the Board (or any duly authorized committee thereof) or (b) by any shareholders of the Corporation (i) who is a shareholder of record on the date of the giving of the notice provided for in this Section 3 of this Article III and on the record date for the determination of shareholders entitled to vote at such meeting and (ii) who complies with the notice procedures set forth in this Section 3 of this Article III.

3

In addition to any other applicable requirements, for a nomination to be made by a shareholder, such shareholder must have given timely notice thereof in proper written form to the Secretary of the Corporation.  To be timely, a shareholder's notice to the Secretary must be delivered to or mailed and received at the principal executive offices of the Corporation not less than one hundred twenty (120) days nor more than one hundred fifty (150) days prior to the anniversary date of the immediately preceding annual meeting of shareholders.

To be in proper written form, a shareholder's notice to the Secretary must set forth: (a) as to each person whom the shareholder proposes to nominate for election as a Director (i) the name, age, business address and residence address of the person, (ii) the principal occupation or employment of the person, (iii) the class or series and number of shares of capital stock of the Corporation which are owned beneficially or of record by the person and (iv) any other information relating to the person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of Directors pursuant to Section 14 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations promulgated thereunder applicable to issuers that are not foreign private issuers; and (b) as to the shareholder giving the notice (i) the name and record address of such shareholder, (ii) the class or series and number of shares of capital stock of the Corporation which are owned beneficially and of record by such shareholder, (iii) a description of all arrangements or understandings between such shareholder and each proposed nominee and any other person and persons (including their names) pursuant to which the nomination(s) are to be made by such shareholder, (iv) a representation that such shareholder intends to appear in person or by proxy at the meeting to nominate the person or persons named in its notice and (v) any other information relating to such shareholder that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of Directors pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder.  Such notice must be accompanied by a written consent of each proposed nominee to being named as a nominee and to serve as a Director if elected.

No person shall be eligible for election as a Director of the Corporation unless nominated in accordance with the procedures set forth in this Section 3 of this Article III.  If the Chairman of the meeting determines that a nomination was not made in accordance with the foregoing procedures, the Chairman shall declare to the meeting that the nomination was defective and such defective nomination shall be disregarded.

Section 4    Removal:  Any or all of the Directors may be removed, at any time, but only (i) for cause, by the affirmative vote of the holders of a majority of the outstanding Common Shares entitled to vote generally in the election of directors cast at a meeting of the shareholders called for that purpose or by a majority of the members of the Board then in office or (ii) at any time following the conclusion of the second annual meeting of shareholders following the Plan Effective Date, with or without cause by the affirmative vote of the holders of a majority of the outstanding Common Shares entitled to vote generally in the election of directors cast at a meeting of the shareholders called for that purpose.  Except as otherwise provided by applicable law, cause for the removal of a Director shall be deemed to exist only if the Director whose removal is proposed: (a) has been convicted, or has been granted immunity to testify in any proceeding in which another has been convicted, of a felony by a court of competent jurisdiction and that conviction is no longer subject to direct appeal; (b) has been found to have been negligent or guilty of misconduct in the performance of his duties to the Corporation in any matter of substantial importance to the Corporation by (i) the affirmative vote of at least 80% of the Directors then in office at any meeting of the Board called for that purpose or (ii) a court of competent jurisdiction; or (c) has been adjudicated by a court of competent jurisdiction to be mentally incompetent, which mental incompetence directly affects his ability to serve as a Director of the Corporation.

No proposal by a shareholder to remove a Director shall be voted upon at a meeting of the shareholders unless such shareholder has given timely notice thereof in proper written form to the Secretary.  To be timely, a shareholder's notice to the Secretary must be delivered to or mailed and received at the principal executive offices of the Corporation not less than one-hundred and twenty (120) days nor more than one hundred fifty (150) days prior to the anniversary date of the immediately preceding annual meeting of the shareholders.  To be in proper written form, a shareholder's notice must set forth: (A) a statement of the grounds, if any, on which such Director is proposed to be removed; (B) evidence reasonably satisfactory to the Secretary, of such shareholder's status as such and of the number of shares of each class of capital stock of the Corporation beneficially owned by such shareholder; and (C) a list of the names and addresses of other shareholders of the Corporation, if any, with whom such shareholder is

4

acting in concert, and the number of shares of each class of capital stock of the Corporation beneficially owned by each such shareholder.

No shareholder proposal to remove a Director shall be voted upon at an annual meeting of the shareholders unless proposed in accordance with the procedures set forth in Section 4 of this Article III. If the Chairman of the meeting determines, based on the facts, that a shareholder proposal to remove a Director was not made in accordance with the foregoing procedures, the Chairman shall declare to the meeting that a proposal to remove a Director of the Corporation was not made in accordance with the procedures prescribed by these By-Laws, and such defective proposal shall be disregarded.

All of the foregoing provisions of Section 4 of this Article III are subject to the terms of any preferred stock with respect to the Directors to be elected solely by the holders of such preferred stock.

Section 5        Vacancies:  Vacancies in the Board occurring by death, resignation, creation of new directorships, failure of the shareholders to elect the Whole Board (as defined below) at any annual election of Directors, or for any other reason, including any removal of Directors for cause, may be filled either by the affirmative vote of a majority of the remaining Directors then in office, although less than a quorum, at any special meeting called for that purpose or at any regular meeting of the Board, except as otherwise prescribed by law or unless the Articles of Incorporation provide that such vacancies or newly created directorships shall be filled by vote of the shareholders. Vacancies occurring by removal of Directors without cause may be filled only by vote of the shareholders. As used in these By-Laws, the term "Whole Board" means the total number of authorized Directors whether or not there exist any vacancies in previously authorized directorships.

Section 6     Regular Meetings:  Regular meetings of the Board may be held at such time and place as may be determined by resolution of the Board and no notice shall be required for any regular meeting. Except as otherwise provided by law, any business may be transacted at any regular meeting.

Section 7     Special Meeting:  Special meetings of the Board may, unless otherwise prescribed by law, be called from time to time by the Chairman, the President, or any officer of the Corporation who is also a Director. The President or the Secretary shall call a special meeting of the board upon written request directed to either of them by any two (2) Directors stating the time, place and purpose of such special meeting. Special meetings of the board shall be held on a date and at such time and at such place as may be designated in the notice thereof by the officer calling the meeting.

Section 8     Notice of Special Meeting:   Notice of the special date, time and place of each special meeting of the Board shall be given to each Director at least forty-eight (48) hours prior to such meeting, unless the notice is given orally or delivered in person, in which case it shall be given at least twenty-four (24) hours prior to such meeting. For the purpose of this section, notice shall be deemed to be duly given to a Director if given to him personally (including by telephone) or if such notice be delivered to such Director by mail, next-day delivery courier service, facsimile or electronic mail to such Director's address, telephone number, facsimile number, or electronic mail address, as the case may be, as shown on the Corporation's records. Notice of a meeting need not be given to any Director who submits a signed waiver of notice, whether before or after the meeting, or who attends the meeting without protesting, prior to the conclusion thereof, the lack of notice to him.

Section 9        Quorum:  A majority of the Directors at the time in office, present in person or by proxy or by communication equipment, shall constitute a quorum for the transaction of business.

Section 10    Interested Directors.  No contract or transaction between the Corporation and one or more of its Directors or officers, or between the Corporation and any other corporation, partnership, association or other organization in which one or more of its Directors or officers are Directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the Director or officer is present at or participates in the meeting of the Board or committee thereof which authorizes the contract or transaction, or solely because his or her or their votes are counted for such purpose, if: (a) the material facts as to his or her relationship or interest and as to the contract or transaction are disclosed or are known to the Board or the committee and the Board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested Directors, or, if the votes of the disinterested Directors are insufficient to constitute an act of the Board

5

as defined in Section 55 of the BCA, by unanimous vote of the disinterested Directors; or (b) the material facts as to his relationship or interest and as to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or (c) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified, by the Board, a committee thereof or the shareholders. Common or interested Directors may be counted in determining the presence of a quorum at a meeting of the Board or of a committee which authorizes the contract or transaction.

Section 11       Voting:  The vote of the majority of the Directors, present in person or by proxy, in communication by e-mail or conference telephone, at a meeting at which a quorum is present shall be the act of the Directors.  Any action required or permitted to be taken at a meeting may be taken without a meeting if all members of the Board consent thereto in writing.

Section 12    Compensation of Directors and Members of Committees:  The Board may from time to time, in its discretion, fix the compensation which shall be payable to Directors and to members of any committee, which may include without limitation a fixed sum paid for attendance at the meetings of the Board or of such committee and a stated salary or other compensation for services rendered to the Corporation.  Directors and members of any committee may be paid their expenses, if any, of attendance at each meeting of the Board or committee, as applicable.  No such payment shall preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

## ARTICLE IV
## COMMITTEES

Section 1       Committees:  The Board may, by resolution or resolutions passed by a majority of the Whole Board, designate from among its members one or more committees to consist of three (3) or more of the Directors of the Corporation, each of which shall, to the extent permitted by law, perform such function and have such authority and powers as shall be delegated to it by said resolution or resolutions or as provided for in these By-Laws; provided, however, that no committee shall have the power or authority to (a) fill a vacancy in the Board or in a committee thereof, (b) amend or repeal any By-law or adopt any new By-law, (c) amend or repeal any resolution of the entire Board, (d) or increase the number of Directors on the Board, or (e) remove any Director.  Members of any committee shall hold office for such period as may be prescribed by the vote of a majority of the entire Board, subject, however, to removal at any time by the vote of the Board.  Vacancies in membership of such committees shall be filled by vote of the Board.  Committees may adopt their own rules of procedure and may meet at stated times or on such notice as they may determine.  Each committee shall keep a record of its proceedings and report the same to the Board when requested.

## ARTICLE V
## OFFICERS

Section 1     Number and Designation:  The Board shall appoint either (a) a Chairman, President, Secretary and Treasurer, or (b) a Managing Director and Secretary.  In addition, the Board may appoint such other officers as it may deem necessary.  Officers may be of any nationality, need not be residents of the Marshall Islands and may be, but are not required to be, Directors.  Officers of the Corporation shall be natural persons.  Any two (2) or more offices may be held by the same natural person.

The officers shall be appointed annually by the Board at its first meeting following the annual election of Directors, but in the event of the failure of the Board to so appoint any officer, such officer may be appointed at any subsequent meeting of the Board.  The salaries of the officers and any other compensation paid to them shall be fixed from time to time by the Board.  The Board may at any meeting appoint additional officers.  Each officer shall hold office until the first meeting of the Board following the next annual election of Directors and until his successor shall have been duly appointed and qualified, except in the event of the earlier termination of his term of office, through death, resignation, removal or otherwise.  Any officer may be removed by the Board at any time with or without cause.  Any vacancy in an office may be filled for the unexpired portion of the term of such office by the Board at any regular or special meeting.

KL2 2845180.6

Section 2    Chairman:  The Chairman of the Board shall have and may exercise such powers as may, from time to time, be assigned to him by the Board.

Section 3    President:  The President shall be the chief executive officer of the Corporation and shall have general management of the affairs of the Corporation together with the powers and duties usually incident to the office of President, except as specifically limited by appropriate written resolution of the Board and shall have such other powers and perform such other duties as may be assigned to him by the Board.

Section 4    Treasurer:  The Treasurer shall have general supervision over the care and custody of the funds, securities, and other valuable effects of the Corporation and shall deposit the same or cause the same to be deposited in the name of the Corporation in such depositories as the Board may designate, shall disburse the funds of the Corporation as may be ordered by the Board, shall have supervision over the accounts of all receipts and disbursements of the Corporation, shall, whenever required by the Board, render or cause to be rendered financial statements of the Corporation, shall have the power and perform the duties usually incident to the office of Treasurer, and shall have such powers and perform such other duties as may be assigned to him by the Board, Managing Director or President.

Section 5    Secretary:  The Secretary shall act as Secretary of all meetings of the shareholders and of the Board at which he is present, shall have supervision over the giving and serving of notices of the Corporation, shall be the custodian of the corporate records and of the corporate seal of the Corporation, shall be empowered to affix the corporate seal to those documents, the execution of which, on behalf of the Corporation under its seal, is duly authorized and when so affixed may attest the same, and shall exercise the powers and perform such other duties as may be assigned to him by the Board, Managing Director or the President.

Section 6    Other Officers:  Officers other than those set forth in Section 2 through 5 of this Article shall exercise such powers and perform such duties as may be assigned to them by the Board or the President.

Section 7    Attorneys-in-Fact:  The Corporation, may appoint an attorney or attorneys-in-fact as shall from time to time be necessary to act for and on behalf of GENCO SHIPPING & TRADING LIMITED in accordance with authority vested by the Board and which shall be evidenced by resolutions of the Board or power of attorney duly executed by an Officer or Managing Director of GENCO SHIPPING & TRADING LIMITED as authorized by the Board.

Section 8    Bond:  The Board shall have power to the extent permitted by law, to require any officer, agent or employee of the Corporation to give bond for the faithful discharge of his duties in such form and with such surety or sureties as the Board may deem advisable.

ARTICLE VI
CERTIFICATES FOR SHARES

Section 1    Form and Issuance:  The shares of the Corporation may be issued in book-entry form or represented by certificates in a form meeting the requirements of law and approved by the Board.  Certificates shall be registered in the name of the respective owner of shares and shall be signed by the Chairman of the Board, President, or a Vice President, and by the Secretary or an Assistant Secretary or the Treasurer or an Assistant Treasurer.  These signatures may be facsimiles if the certificate is countersigned by a transfer agent or registered by a registrar other than the Corporation itself or its employee.  The Corporation is not authorized to issue any certificate to the order of bearer.

Section 2    Transfer:  The Board shall have power and authority to make such rules and regulations as it may deem expedient concerning the issuance, registration and transfer of certificates representing shares of the Corporation's capital stock, and may appoint transfer agents and registrars thereof.

Section 3    Loss of Stock Certificates:  The Board may direct a new certificate or certificates of stock to be issued in place of any certificate or certificates theretofore issued by the Corporation alleged to have been lost or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost or

7

destroyed.  When authorizing such issue of a new certificate or certificates, the Board may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost or destroyed certificate or certificates, or his legal representative, to advertise the same in such manner as it shall require and/or give the Corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost or destroyed.

ARTICLE VII
PROHIBITIONS

Section 1      Unauthorized Acts:  GENCO SHIPPING & TRADING LIMITED will not engage in any business or activity not authorized by the laws of the Republic of the Marshall Islands, or by the laws of any jurisdiction where it may apply for authorization or qualification to conduct business.

ARTICLE VIII
DIVIDENDS

Section 1        Declaration and Form:  Dividends may be declared in conformity with law by, and at the discretion of, the Board at any regular or special meeting.  Dividends may be declared and paid in cash, stock, or other property of the Corporation.

ARTICLE IX
INDEMNIFICATION

Section 1      Indemnification:

(a)  The Corporation shall indemnify and hold harmless, any person who is or was a party or is threatened to be made a party to or is otherwise involved (including, without limitation, as a witness or potential witness) in any threatened, pending or completed action, suit or proceeding whether civil, criminal, administrative or investigative by reason of the fact that he is or was a Director or officer of the Corporation, or is or was serving at the request of the Corporation as a Director or officer of another corporation, partnership, joint venture, trust or other enterprise, against all expenses (including attorney's fees), liabilities, losses, judgments, fines ERISA excise taxes or penalties, and amounts paid in settlement, actually and reasonably incurred or suffered by such indemnitee in connection with such action, suit or proceeding, to the fullest extent permitted by Marshall Islands law, as the same exists or may hereafter be amended (but in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment); provided, however, that, except as provided in Section 3(d) of this Article IX with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Board.

(b)  The indemnification and advancement or expenses provided by, or granted pursuant to, this Article IX shall (i) not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under these By-Laws or any agreement, vote of shareholders or disinterested Directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office; and (ii) continue as to a person who has ceased to be a Director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

(d)  The Corporation may indemnify any person, including any employee or agent of the Corporation, to whom the Corporation is permitted by applicable law to provide indemnification or the advancement of expenses, whether pursuant to rights granted pursuant to, or provided by, the BCA or other rights created by (i) a resolution of the shareholders, (ii) a resolution of Directors, or (iii) an agreement providing for such indemnification, it being expressly intended that these By-Laws authorize the creation of other rights in any such manner. The right to be indemnified and to the reimbursement or advancement of expenses incurred in defending a proceeding in advance of its final disposition authorized by this Article IX shall not be exclusive of any other right which any

8

person may have or hereafter acquire under any statute, common law, provision of the Articles of Incorporation, these By-Laws, agreement, vote of shareholders or disinterested Directors or otherwise.

(e)   The right to indemnification conferred by Section 1(a) or Section 3(b) of this Article IX shall, and any indemnification extended under Section 1(c) of this Article IX may, be retroactive to events occurring prior to the adoption of this Article IX and shall continue to exist after the rescission or restrictive modification hereof with respect to events occurring prior thereto, to the fullest extent permitted by applicable law.

(f)   Any person entitled to be indemnified as a matter of right pursuant to this Article IX may elect, to the extent permitted by law, to have the right to indemnification interpreted on the basis of the applicable law in effect at the time of the occurrence of the event or events giving rise to the action or proceeding, or on the basis of the applicable law in effect at the time indemnification is sought.

Section 2   Insurance:  The Corporation shall have the power to purchase and maintain insurance on behalf of any person whether or not the Corporation would have the power to indemnify such person against such liability by law or under Section 1 of this Article IX.

Section 3   Costs and Expenses:

(a)   Notwithstanding the other provisions of this Article IX, to the extent that a Director or officer of the Corporation has been successful on the merits or otherwise, including, without limitation, the dismissal of an action without prejudice, in defense of any action, suit or proceeding referred to in Section 1 of this Article IX, or in the defense of any claim, issue or matter therein, he shall be indemnified against all costs, charges and expenses (including attorneys' fees) actually and reasonably incurred by him or on his behalf in connection therewith.

(b)   Any indemnification under Section 1(a) of this Article IX (unless ordered by a court) shall be paid by the Corporation unless a determination is made (i) by the Board by a majority vote or a quorum consisting of Directors who were not parties to such action, suit or proceeding, or (ii) if such a quorum is not obtainable, or even if obtainable a quorum of disinterested Directors so directs, by independent legal counsel in a written opinion that indemnification of the Director or officer is not proper in the circumstances because he had not met the applicable standards of conduct under Marshall Islands law.

(c)   The right to be indemnified pursuant to this Article IX shall be a contract right and shall include the right to be paid by the Corporation expenses incurred in defending any action, suit or proceeding (including investigations by any governmental or quasi-governmental agency and all costs, charges and expenses incurred in preparing for any threatened action, suit or proceeding) in advance of its final disposition; provided, however, that the payment of such expenses incurred by a Director or officer in his capacity as a Director or officer (and not in any other capacity in which service was or is rendered by such person while a Director or officer, including without limitation, service to an employee benefit plan) in advance of the final disposition of such action, suit or proceeding, shall be made only upon delivery to the Corporation of an undertaking, by or on behalf of such Director or officer, to repay all amounts so advanced if it should ultimately be determined by final judicial decision from which there is no further right to appeal that such Director or officer is not entitled to be indemnified under this provision. No security shall be required for such undertaking and such undertaking shall be accepted without reference to the recipient's financial ability to make repayment. The repayment of such charges and expenses incurred by other employees and agents of the Corporation which are paid by the Corporation in advance of the final disposition of such action, suit or proceeding as permitted by this Article IX may be required upon such terms and conditions, if any, as the Board deems appropriate. The Board may, in the manner set forth above, and subject to the approval of the person entitled to be indemnified, authorize the Corporation's counsel to represent such person, in any action, suit or proceeding, whether or not the Corporation is a party to such action, suit or proceeding.

(d)   Any indemnification under Sections 1(a) or (b) or Section 3(a) of this Article IX or advancement of costs, charges and expenses under Section 3(c) of this Article IX shall be made promptly, and in any event within sixty (60) days, upon the written request of the Director or officer, directed to the Secretary of the Corporation. The right to indemnification or advances as granted by Section 3(d) of this Article IX shall be enforceable by the Director or officer in any court of competent jurisdiction if the Corporation denies such request,

9

in whole or in part, or if no disposition thereof is made within sixty (60) days. Such person's costs and expenses incurred in connection with successfully establishing his right to indemnification or advances, in whole or in part, in any such action shall also be indemnified by the Corporation. It shall be a defense to any such action (other than an action brought to enforce a claim for the advance of costs, charges and expenses under Section 3(d) where the required undertaking, if any, has been received by the Corporation) that the claimant has not met the standard of conduct under applicable law, but the burden of proving that such standard of conduct has not been met shall be on the Corporation. Neither the failure of the Corporation (including its Board, its independent legal counsel and its shareholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he has met the applicable standard of conduct under applicable law, nor the fact that there has been an actual determination by the Corporation (including its Board, its independent legal counsel and its shareholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct.

Section 4    Interpretation:  For purposes of this Article IX:

(a)  "Corporation" shall include any predecessor of the Corporation and any constituent corporation (including any constituent of a constituent) absorbed by the Corporation in a consolidation or merger. Any Director or officer of the Corporation serving (i) another corporation, partnership, joint venture, trust, or other enterprise, of which a majority of the equity interests entitled to vote in the election of its Directors or the equivalent is controlled by the Corporation, or (i) any employee benefit plan of the Corporation or any entity referred to in the preceding clause (ii), in any capacity shall be deemed to be doing so at the request of the Corporation and action by a person with respect to any employee benefit plan which such person reasonably believes to be in the interest of the participants and beneficiaries of such plan shall be deemed to be action not opposed to the best interests of the Corporation;

(b)  "Fines" shall include any penalties and any excise or similar taxes assessed on a person with respect to an employee benefit plan;

(c)  A person who acted in good faith and in a manner he reasonably believed to be in the interest of the participants and beneficiaries of any employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Corporation" as referred to in  Section 1(a) and (b) of this Article IX;

(d)  Service as a partner, trustee or member of management or similar committee of a partnership or joint venture, or as a Director, officer, employee or agent of a corporation which is a partner, trustee or joint venturer, shall be considered service as a Director, officer, employee or agent of the partnership, joint venture, trust or other enterprise.

Section 5    Savings Clause:  If this Article IX or any portion hereof shall be invalidated on any ground by a court of competent jurisdiction, then the Corporation shall nevertheless indemnify each Director and officer of the Corporation as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement and above expenses with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, including an action by or in the right of the Corporation, to the full extent permitted by any applicable portion of this Article IX that shall not have been invalidated and to the full extent permitted by applicable law.

ARTICLE X
CORPORATE SEAL

Section 1    The seal of the Corporation, if any, shall be circular in form, with the name of the Corporation in the circumference, the year of incorporation and the words "Marshall Islands" in the center, or such other appropriate legend as the Board may from time to time determine.

10

KL2 2845180.6

ARTICLE XI
FISCAL YEAR

Section 1    The fiscal year of the Corporation shall be such period of twelve (12) consecutive months as the Board may by resolution designate.

ARTICLE XII
AMENDMENTS

Section 1    By the Shareholders:  Except as otherwise provided herein, these By-Laws may be amended, added to, altered or repealed or new By-Laws may be adopted, at any meeting of shareholders of the Corporation by the affirmative vote of the holders of at least sixty-six and two-thirds percent ($66^{2/3}$%) of the voting power of all of the then-outstanding registered shares of the Corporation entitled to vote thereon, voting together as a single class, provided that notice that an amendment to the By-Laws is to be considered and acted upon at such meeting shall have been included in the notice or waiver of notice of such meeting.

Section 2    By the Directors:  These By-Laws may be amended, added to, altered or repealed, or new By-Laws may be adopted, solely at any regular or special meeting of the Board by the affirmative vote of not less than of a majority of the Whole Board.  The phrase "a majority of the Whole Board" shall be deemed to refer to a majority of the number of Directors constituting the Board as set forth in accordance with Article III, without regard to any vacancies, or if the number of Directors constituting a majority of the entire Board is greater than the number of members of the Board then in office, the unanimous vote of the Directors in office.

ARTICLE XIII
FORUM FOR ADJUDICATION OF DISPUTES

Unless the Corporation consents in writing to the selection of an alternative forum, the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Corporation, (b) any action asserting a claim of breach of a fiduciary duty owed by any Director, officer or other employee of the Corporation to the Corporation or the Corporation's shareholders, (c) any action asserting a claim against the Corporation, its Directors, officers and/or employees arising pursuant to any provision of the BCA or the Articles of Incorporation or By-Laws, as the same may be amended or amended and restated and in effect from time to time, or (d) any other action asserting a claim against the Corporation, its Directors, officers and/or employees that is governed by the internal affairs doctrine, shall be the United States District Court for the Southern District of New York and any New York State court sitting in New York County, State of New York of the United States of America (the "Chosen Courts"), except for any such action or proceeding as to which a Chosen Court determines that there is an indispensable party not subject to the jurisdiction of the Chosen Courts (and the indispensable party does not consent to the personal jurisdiction of a Chosen Court within ten (10) days following such determination).  If any provision or provisions of this Article XIII shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Article XIII (including, without limitation, each portion of any sentence of this Article XIII containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby. Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock the Corporation shall be deemed to have notice of and consented to the provisions of this Article XIII.

11

KL2 2845180.6

## EXHIBIT 6

### THE NEW GENCO MIP WARRANT AGREEMENTS

<u>**EXHIBIT A**</u>

**MIP WARRANT AGREEMENT – STANDARD FORM OF GRANT**

THIS WARRANT CERTIFICATE WILL BE VOID IF NOT EXERCISED PRIOR TO
5:00 P.M., NEW YORK CITY TIME, ON [__], 2020

## WARRANT TO PURCHASE

## [__] SHARES OF COMMON STOCK OF

## GENCO SHIPPING & TRADING LIMITED

## PURSUANT TO THE GENCO SHIPPING & TRADING LIMITED 2014
## MANAGEMENT INCENTIVE PLAN

ISSUE DATE:  **[__], 2014**

No. W-[__]

This certifies that, for value received, [__] (the "Holder"), is entitled to purchase from Genco Shipping & Trading Limited, a Marshall Islands corporation (the "Company"), subject to the terms and conditions hereof and the Plan, at any time before 5:00 p.m., New York time, on [__], 2020, the number of fully paid and non-assessable shares of common stock of the reorganized Company authorized and issued pursuant to the Prepack Plan and the articles of incorporation of the reorganized Company ("Common Stock") set forth above at the Exercise Price (as defined herein).  The Exercise Price and the number and kind of shares purchasable hereunder are subject to adjustment from time to time as provided in Article III of this Warrant Certificate.  The initial Exercise Price shall be $[__].  In the event of any conflict between the terms hereof and the Plan, the terms of the Plan shall control.

## ARTICLE I

## DEFINITIONS

Section 1.1   Definition of Terms.  As used in this Warrant Certificate, the following capitalized terms shall have the following respective meanings:

(a)   "Affiliate" has the meaning set forth in Rule 12b-2 of the Exchange Act.

(b)   "Business Day" means any day on which commercial banks are not authorized or permitted to close in the City of New York, Borough of Manhattan.

(c)   "Closing Sale Price" of the Common Stock on any date of determination means:

(i)   if the Common Stock is listed on the New York Stock Exchange or The NASDAQ Stock Market on such date, the average closing sale price per share of the Common Stock (or if no closing sale price is reported, the average of the closing bid and closing ask prices or, if more than one in either case, the average of the average closing bid and the average closing ask prices) for the 10 consecutive trading days immediately prior to such date of

KL3 2970943.6

determination, as reported by the New York Stock Exchange or The NASDAQ Stock Market, as applicable;

(ii)    if the Common Stock is not listed on the New York Stock Exchange or The NASDAQ Stock Market on such date, the average closing sale price per share of the Common Stock (or if no closing sale price is reported, the average of the high bid and low asked prices or, if more than one in either case, the average of the average high bid and low asked prices) for the 10 consecutive trading days immediately prior to such date of determination, as reported in composite transactions for the principal U.S. national or regional securities exchange on which the Common Stock is traded;

(iii)    if the Common Stock is not listed on a U.S. national or regional securities exchange, the average last quoted sale price for the Common Stock (or, if no sale price is reported, the average of the high bid and low asked price for such date) for the 10 consecutive trading days immediately prior to such date of determination, in the over-the-counter market as reported by OTC Markets Group Inc. or other similar organization; or

(iv)    in all other cases, as determined in good faith by the Board of Directors of the Company.

The Closing Sale Price shall be determined without reference to early hours, after hours or extended market trading.

The Closing Sale Price shall be appropriately adjusted by the Company in good faith if the "ex date" (as hereinafter defined) for any event (other than the issuance or distribution requiring such computation) occurs during the ten consecutive trading days immediately prior to the day as of which "Current Sale Price" is being determined.

For these purposes the term "ex date", when used:

(i)    with respect to any issuance or distribution, means the first date on which the Common Stock trades regular way on the relevant exchange or in the relevant market from which the Closing Price was obtained without the right to receive such issuance or distribution;

(ii)    with respect to any subdivision or combination of shares of Common Stock, means the first date on which the Common Stock trades regular way on such exchange or in such market after the time at which such subdivision or combination becomes effective; and

(iii)    with respect to any tender or exchange offer, means the first date on which the Common Stock trades regular way on such exchange or in such market after the expiration time of such offer.

Whenever such adjustments shall be made to the Current Sale Price as may be necessary or appropriate to effectuate the intent of this Warrant and to avoid unjust or inequitable results as determined in good faith by the Board of Directors.

KL3 2970943.6                                                         2

(d)  "Common Stock" has the meaning set forth in the preamble, and shall include any successor security as a result of any recapitalization, reorganization, reclassification or similar transaction involving the Company.

(e)  "Company" has the meaning set forth in the preamble.

(f)  "Date of Issuance" means [__].

(g)  "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(h)  "Exercise Date" means any date, on or prior to the expiration of the Exercise Period, on which the Holder exercises the right to purchase the Warrant Exercise Shares, in whole or in part, pursuant to and in accordance with the terms and conditions described herein.

(i)  "Exercise Form" has the meaning set forth in Section 2.4(b) hereof.

(j)  "Exercise Period" has the meaning set forth in Section 2.2(c) hereof.

(k)  "Exercise Price" has the meaning set forth in Section 2.1(a) hereof.

(l)  "Fully Diluted" means all Common Stock outstanding as of the applicable measurement date together with all Common Stock then issuable upon (i) the conversion of convertible securities of the Company at the then applicable conversion rate, and (ii) the exercise of any options or warrants then exercisable for Common Stock; provided that, for purposes of clauses (i) and (ii), all conditions to the convertibility and/or exercisability of convertible securities, options and warrants of the Company, shall be deemed to have been satisfied.

(m)  "Governmental Authority" means any (i) government, (ii) governmental or quasi- governmental authority of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal) or (iii) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature, in each case, whether federal, state, local, municipal, foreign, supranational or of any other jurisdiction.

(n)  "Holder" has the meaning set forth in the preamble.

(o)  "Immediate Family Members"  has the meaning set forth in Section 4.1 hereof.

(p)  "Initial Per Share Value" has the meaning set forth in Section 3.1(e) hereof.

(q)  "Law" means all laws, statutes, rules, regulations, codes, injunctions, decrees, orders, ordinances, registration requirements, disclosure requirements and other pronouncements having the effect of law of the United States, the Republic of the Marshall

KL3 2970943.6

3

Islands, any foreign country or any domestic or foreign state, county, city or other political subdivision or of any Governmental Authority.

(r)    "Organic Change" means any recapitalization, reorganization, reclassification, consolidation, merger, sale of a majority of the Company's assets or other transaction, in each case which is effected in such a way that the holders of Common Stock are entitled to receive (either directly or upon subsequent liquidation) cash, stock, securities or other assets or property with respect to or in exchange for Common Stock, other than a transaction which triggers an adjustment pursuant to Sections 3.1(a), (b) or (c).

(s)    "Person" means any individual, firm, corporation, partnership, limited partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, governmental unit or any political subdivision thereof, or any other entity (as such term is defined in the Bankruptcy Code).

(t)    "Plan" means the 2014 Management Incentive Plan of the Company, as amended from time to time.

(u)    "Prepack Plan" means the "Prepackaged Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code," dated April 16, 2014 (as such plan may be modified, amended or supplemented from time to time).

(v)    "Pro Rata Portion of the Warrant" has the meaning set forth in Section 2.3(b)(i).

(w)    "Pro Rata Repurchase Offer" means any offer to purchase shares of Common Stock by the Company or any Affiliate thereof pursuant to (i) any tender offer or exchange offer subject to Section 13(e) or 14(e) of the Exchange Act or Regulation 14E promulgated thereunder or (ii) any other offer available to substantially all holders of Common Stock to purchase or exchange their shares of Common Stock, in the case of both (i) or (ii), whether for cash, shares of capital stock of the Company, other securities of the Company, evidences of indebtedness of the Company or any other Person or any other property (including, without limitation, shares of capital stock, other securities or evidences of indebtedness of a Subsidiary), or any combination thereof, effected while the Warrant is outstanding.  The "effective date" of a Pro Rata Repurchase Offer shall mean the date of acceptance of shares for purchase or exchange by the Company under any tender or exchange offer which is a Pro Rata Repurchase Offer or the date of purchase with respect to any Pro Rata Repurchase Offer that is not a tender or exchange offer.

(x)    "Securities Act" means the Securities Act of 1933, as amended.

(y)    "Service" means a continuous time period during which the Holder is at least one of the following:  an employee or a director of, or a consultant to, the Company.

(z)    "Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors is at the time owned or controlled, directly or

indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a partnership, limited liability company or other business entity (other than a corporation), a majority of the partnership, limited liability company or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.  For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, limited liability company or other business entity if such Person or Persons shall be allocated a majority of partnership, limited liability company or other business entity gains or losses or shall be or control the general partner, the managing member or entity performing similar functions of such partnership, limited liability company or other business entity.

(aa)    "Third Party Cash Sale" means in any such case with a purchaser that is not an Affiliate of the Company: (i) any merger, consolidation, or other similar transaction or series of transactions to which the Company is a party and pursuant to which the Company is not the surviving Person in such transaction and the consideration received by the Company's shareholders (directly or indirectly) consists solely of cash or (ii) the sale or other disposition of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole and the consideration received by the Company's shareholders (directly or indirectly) consists solely of cash.

(bb)    "Third Party Sale Price" means, with respect to any Third Party Cash Sale, the quotient of (x) the aggregate cash consideration received by the shareholders (directly or indirectly) in connection with the applicable Third Party Cash Sale, divided by (y) the number of Fully Diluted Shares of Common Stock outstanding immediately before the Third Party Sale Closing.

(cc)    "Warrant Exercise Shares" means the shares of Common Stock issued upon the applicable exercise of a Warrant.

Section 1.2    Rules of Construction.

(a)    The singular form of any word used herein, including the terms defined in Section 1.1 hereof, shall include the plural, and vice versa.  The use herein of a word of any gender shall include correlative words of all genders.

(b)    Unless otherwise specified, references to Articles, Sections and other subdivisions of this Warrant are to the designated Articles, Sections and other subdivision of this Warrant as originally executed.  The words "hereof," "herein," "hereunder" and words of similar import refer to this Warrant as a whole.

(c)    References to "$" are to dollars in lawful currency of the United States of America.

(d)    The Exhibits attached hereto are an integral part of this Warrant.

KL3 2970943.6                                           5

## ARTICLE II

## TERMS AND EXERCISE OF WARRANT

Section 2.1    Exercise Price.  Each Warrant shall entitle the Holder to, subject to the provisions of the Plan and of this Warrant Certificate, the right to purchase from the Company the number of shares of Common Stock, at the price of $[__] per share (as the same may be hereafter adjusted in accordance herewith, the "Exercise Price"), specified on the first page of this Warrant Certificate.

Section 2.2    Exercise Period.  Subject to the further provisions of this Warrant Certificate, the Warrant shall be exercisable as follows:

(a)    Subject to Section 2.2(b), the Warrant shall become exercisable with respect to a number of whole shares equal to 1/3 of the shares subject to the Warrant on each of the first three (3) anniversaries of the Date of Issuance (rounding down to the nearest whole share on each of the first two anniversaries and rounding up on the third anniversary).  Each such anniversary is referred to as a "Vesting Date."

(b)    In the event of a Change in Control of the Company, as defined in the Plan, the Warrant shall become exercisable in full on the effective date of the Change in Control.

(c)    The Warrant may be exercised by the Holder thereof, in whole or in part (but not as to a fractional share of Common Stock), at any time and from time to time after the Warrant becomes exercisable in accordance with Sections 2.2(a) and 2.2(b) hereof and prior to 5:00 P.M., New York time on the sixth (6th) anniversary hereof, unless terminated earlier pursuant to this Warrant Certificate or the Plan (the "Exercise Period").   To the extent that the Warrant or portion thereof is not exercised prior to the expiration of the Exercise Period, it shall be automatically cancelled with no action by any Person, and with no further rights thereunder, upon such expiration.

Section 2.3    Termination of Service

(a)    If the Holder's Service is terminated for cause, as defined in the Plan, or if the Holder resigns without the Company's prior consent, the Warrant, to the extent not theretofore exercised, shall terminate upon the commencement of business on the date of the Holder's termination of Service.

(b)    If the Holder's Service is terminated due to the Holder's death or disability (as defined below), then the Pro Rata Portion of the Warrant (as defined below) shall become exercisable as of such date in addition to the portion of the Warrant which is already exercisable as of such date.  The Warrant, to the extent exercisable as of the date of termination (including, but not limited to, the Pro Rata Portion of the Warrant), shall remain exercisable until the one year anniversary of such termination (but in no event beyond the expiration of the Exercise Period), and the Warrant, to the extent not exercisable as of the date of termination, shall expire as of the date of termination.  For the purposes of this Section 2.3(b):

KL3 2970943.6                                    6

(i)    The "Pro Rata Portion of the Warrant" shall mean that number of shares with respect to which the Warrant that would become exercisable on the next Vesting Date multiplied by a fraction, the denominator of which is 12 and the numerator of which is the number of completed months (measured from the day of the month of the Vesting Date to the same day of the following month) between the immediately preceding Vesting Date (or the Date of Issuance, if there is no preceding Vesting Date) and the date of termination of Service.

(ii)    "Disability" shall mean any physical or mental condition that would qualify the Holder for a disability benefit under the long-term disability plan maintained by the Company or, if there is no such plan, a physical or mental condition that prevents the Holder from performing the essential functions of the Holder's position (with or without reasonable accommodation) for a period of six consecutive months.  The existence of a disability shall be determined by the Company.

(c)    If the Holder's Service is terminated other than as set forth above, the Holder may exercise the Warrant (i) only to the extent that the Holder was entitled to exercise the Warrant on the termination of Service date; and (ii) exercise must occur within three months after termination of Service but in no event after the original expiration date of the Warrant.

Section 2.4    Method of Exercise.

(a)    In connection with the exercise of the Warrant, the Exercise Price shall be paid as provided in this Section 2.4(a).  In connection with the exercise of the Warrant, the Holder of such Warrant shall exchange the Common Stock purchase rights represented thereby by surrendering such Warrant to the Company, together with a written notice to the Company that the Holder is exchanging the Warrant (or a portion thereof) for the number of Warrant Exercise Shares being exercised, up to the aggregate number of Warrant Exercise Shares for which this Warrant Certificate is exercisable, specified in the notice, from which the Company shall withhold and not issue to such Holder, in payment of the Exercise Price thereof, a number of such Warrant Exercise Shares equal to (x) the number of Warrant Exercise Shares for which the Warrant is being exercised, multiplied by (y) the Exercise Price, and divided by (z) the Closing Sale Price on the Exercise Date (and such withheld shares shall no longer be issuable under the Warrant, and the Holder shall not have any rights or be entitled to any payment with respect to such withheld shares); provided, however, that the shares withheld, when valued based on the fair market value determined under Treasury Regulation 1.409A-1(b)(5)(iv)(A), shall have a value not less than the aggregate Exercise Price.  The issuance of any shares shall be subject to Section 3.6 of the Plan with respect to withholding of taxes and the Company may appropriately reduce the number of Warrant Exercise Shares in order to satisfy any withholding obligation.

(b)    Subject to the terms and conditions of the Plan and this Warrant Certificate, the Holder of a Warrant may exercise, in whole or in part, such Holder's right to purchase the Warrant Exercise Shares issuable upon exercise of such Warrant, by providing an exercise form for the election to exercise such Warrant ("Exercise Form") substantially in the form of Exhibit A hereto, properly completed and duly executed by the Holder thereof to the Company.

(c)     Any exercise of the Warrant pursuant to the terms of this Warrant Certificate shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms.

(d)     Upon receipt of an Exercise Form pursuant to <u>Section 2.4(a)</u>, the Company shall:

(i)     examine such Exercise Form and all other documents delivered to it by or on behalf of Holder as contemplated hereunder to ascertain whether or not, on its face, such Exercise Form and any such other documents have been executed and completed in accordance with their terms and the terms hereof; and

(ii)     if an Exercise Form or other document appears, on its face, to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrant exists, endeavor to inform the appropriate parties (including the person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled.

(e)     The Company reserves the right to reasonably reject any and all Exercise Forms that it determines, in its sole discretion, are not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful. Any such determination by the Company shall be final and binding on the Holder, absent manifest error. Moreover, the Company reserves the absolute right to waive any of the conditions to any particular exercise of Warrant or any defects in the Exercise Form(s) with regard to any particular exercise of the Warrant. The Company shall not be under any duty to give notice to the Holder of any irregularities in any exercise of the Warrant, nor shall it incur any liability for the failure to give such notice.

Section 2.5     <u>Issuance of Common Stock</u>.

(a)     Upon exercise of the Warrant pursuant to <u>Section 2.4</u>, the Company shall promptly at its expense, and in no event later than five (5) Business Days thereafter, cause to be issued to the Holder of the Warrant the total number of whole shares of Common Stock for which the Warrant is being exercised, subject to <u>Section 2.4(a)</u> (as the same may be hereafter adjusted pursuant to <u>Article III</u>) in such denominations as are requested by the Holder.

(b)     Notwithstanding the five (5) Business Day period described in <u>Section 2.5(a)</u>, the Warrant Exercise Shares shall be deemed to have been issued to the Holder at the time at which all of the conditions to such exercise have been fulfilled, and the Holder shall be deemed for all purposes to have become the holder of such Warrant Exercise Shares at such time.

(c)     If less than all of the shares evidenced by the Warrant Certificate are exercised at any time prior to the termination of the Exercise Period, a new Warrant Certificate or Warrant Certificates shall be issued for the remaining number of shares evidenced by the Warrant Certificate.

Section 2.6    Reservation of Shares.    The Company shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock solely for the purpose of issuance upon the exercise of the Warrant, a number of shares of Common Stock equal to the aggregate Warrant Exercise Shares issuable upon the exercise of the Warrant.  The Company shall use commercially reasonable efforts to take all such actions as may be necessary to assure that all such shares of Common Stock may be so issued without violating the Company's governing documents or any requirements of any national securities exchange upon which shares of Common Stock may be listed.  The Company shall not take any action which would cause the number of authorized but unissued shares of Common Stock to be less than the number of such shares required to be reserved hereunder for issuance upon exercise of the Warrant.

Section 2.7    Fractional Shares.    Notwithstanding any provision to the contrary contained in this Warrant Certificate, the Company shall not be required to issue any fraction of a share of its capital stock in connection with the exercise of the Warrant, and in any case where the Holder would, except for the provisions of this Section 2.7, be entitled under the terms of the Warrant to receive a fraction of a share upon the exercise of the Warrant, the Company shall, upon the exercise of the Warrant, issue or cause to be issued only the largest whole number of Warrant Exercise Shares issuable upon such exercise (and such fraction of a share will be disregarded, and the Holder shall not have any rights to be entitled to any payment with respect to such fraction of a share); provided, that if more than one Warrant is presented for exercise at the same time by the same Holder, the number of whole Warrant Exercise Shares which shall be issuable upon the exercise thereof shall be computed on the basis of the aggregate number of Warrant Exercise Shares issuable upon exercise of all such Warrants.

Section 2.8    Public Offering.    Notwithstanding any other provision hereof, if an exercise of any portion of a Warrant is to be made in connection with a registered public offering or the sale of the Company, the exercise of any portion of such Warrant may, at the election of the holder thereof, be conditioned upon the consummation of such registered public offering or sale of the Company, in which case such exercise shall be deemed to be effective concurrently with the consummation of such transaction.

Section 2.9    Close of Books; Par Value.    The Company shall not close its books against the transfer of any Warrant or any Warrant Exercise Shares in any manner which interferes with the timely exercise of such Warrant.  The Company shall use commercially reasonable efforts to, from time to time, take all such action as may be necessary to assure that the par value per share of the unissued shares of Common Stock acquirable upon exercise of each Warrant is at all times equal to or less than the Exercise Price then in effect.

Section 2.10    Payment of Taxes.    The Company shall not be required to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of any shares of Common Stock (including certificates therefor) or payment of cash or other property to any recipient other than the Holder of the Warrant surrendered upon the exercise of a Warrant, and in case of such transfer or payment, the Company shall not be required to issue or deliver any shares or pay any cash until (a) such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Company or (b) it has been established to the Company's satisfaction that any such tax or other charge that is or may become due has been paid.

KL3 2970943.6                                      9

## ARTICLE III

## ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF
## WARRANT EXERCISE SHARES

In order to prevent dilution of the rights granted under each Warrant, the Exercise Price shall be subject to adjustment from time to time as provided in this Article III, and the number of shares of Common Stock obtainable upon exercise of each Warrant shall be subject to adjustment from time to time as provided in this Article III; provided, however, that no such adjustment shall be made to the extent that it would cause the Warrant to be subject to tax under Section 409A of the Internal Revenue Code of 1986, as amended.

Section 3.1    Adjustments.

(a)    Subdivision or Combination of Common Stock. If the Company at any time after the issuance of the Warrant but prior to the expiration of the Exercise Period subdivides (by any stock split, stock dividend or reclassification) the Common Stock into a greater number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately reduced, and the number of Warrant Exercise Shares issuable upon exercise of the Warrant shall be proportionately increased.  If the Company at any time prior to the expiration of the Exercise Period combines (by reverse stock split, or reclassification) the Common Stock into a smaller number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately increased and the number of Warrant Exercise Shares issuable upon exercise of the Warrant shall be proportionately decreased. Any adjustment under this Section 3.1(a) shall become effective immediately upon the effectiveness of such subdivision or combination.

(b)    Distributions. If the Company at any time after the issuance of the Warrant but prior to the expiration of the Exercise Period fixes a record date for the making of a distribution to all holders of shares of the Common Stock of securities, evidences of indebtedness, assets, cash, rights or warrants (excluding dividends or distributions referred to in Section 3.1(a)), then, in each such case, the Exercise Price in effect prior to such record date shall be adjusted thereafter to the price determined by the following formula:

$$EP_1 = EP_0 \ x \ (CP_0 - FV)/CP_0$$

where

$EP_1$    =    the Exercise Price in effect immediately following the application of the adjustments in this Section 3.1(b);

$EP_0$    =    the Exercise Price in effect immediately prior to the application of the adjustments in this Section 3.1(b);

$CP_0$    =    the Closing Sale Price of the Common Stock on the last trading day preceding the first date on which the Common Stock trades

regular way without the right to receive such distribution; and

$FV$ = the amount of cash and/or the fair market value of the securities, evidences of indebtedness, assets, rights or warrants to be so distributed in respect of one share of Common Stock, as determined by the Board of Directors of the Company, acting in good faith.

Such adjustment shall be made successively whenever such a record date is fixed. In such event, the number of Warrant Exercise Shares issuable upon the exercise of the Warrant represented by this Warrant Certificate shall be increased to the number obtained by dividing (x) the product of (1) the number of Warrant Exercise Shares issuable upon the exercise of the Warrant represented by this Warrant Certificate before such adjustment, and (2) the Exercise Price in effect immediately prior to the adjustment by (y) the new Exercise Price immediately following such adjustment.

In the event that such distribution is not so made, the Exercise Price and the number of Warrant Exercise Shares issuable upon exercise of the Warrant then in effect shall be readjusted, effective as of the date when the Board of Directors of the Company determines not to distribute such shares, evidences of indebtedness, assets, rights, cash or warrants, as the case may be, to the Exercise Price that would then be in effect and the number of Warrant Exercise Shares that would then be issuable upon exercise of the Warrant if such record date had not been fixed.

(c)    Pro Rata Repurchase Offer of Common Stock.  If at any time after the issuance of the Warrant but prior to the expiration of the Exercise Period the Company consummates a Pro Rata Repurchase Offer of Common Stock, then the Exercise Price shall be reduced to the price determined by the following formula:

$$EP_1 = EP_0 \ x \ \frac{(OS_0 \ x \ CP_0) - AP}{(OS_0 - SP) \ x \ CP_0}$$

where

$EP_1$ = the Exercise Price in effect immediately following the application of the adjustments in this Section 3.1(c) (but in no event greater than $EP_0$);

$EP_0$ = the Exercise Price in effect immediately prior to the application of the adjustments in this Section 3.1(c);

$OS_0$ = the number of Fully Diluted shares of Common Stock outstanding immediately before consummation of such Pro Rata Repurchase Offer;

$CP_0$ = the Closing Sale Price of a share of Common Stock on the trading day immediately preceding the first public announcement by the Company or any of its Affiliates of the intent to effect such Pro Rata Repurchase Offer;

KL3 2970943.6                                        11

AP   =   the aggregate purchase price (including the fair market value, as determined in good faith by the Board of Directors of the Company, of any non-cash consideration included therein) paid for the shares of Common Stock repurchased in the Pro Rata Repurchase Offer; and

SP   =   the number of shares of Common Stock so repurchased in the Pro Rata Repurchase Offer.

In such event, the Warrant Exercise Shares issuable upon the exercise of the Warrant shall be increased to the number obtained by dividing (x) the product of (1) the Warrant Exercise Shares issuable upon the exercise of the Warrant before such adjustment, and (2) the Exercise Price in effect immediately prior to the adjustment by (y) the new Exercise Price immediately following such adjustment. For the avoidance of doubt, no increase to the Exercise Price or decrease in the Warrant Exercise Shares issuable upon exercise of the Warrant shall be made pursuant to this Section 3.1(c).

(d)   Reorganization, Reclassification, Consolidation, Merger or Sale.   In connection with any Organic Change prior to the expiration of the Exercise Period, the Company shall make appropriate provision to ensure that the Holder of the Warrant shall have the right to acquire and receive, upon exercise of such Warrant, such cash, stock, securities or other assets or property as would have been issued or payable in such Organic Change (if the holder had exercised such Warrant immediately prior to such Organic Change) with respect to or in exchange, as applicable, for the number of Warrant Exercise Shares that would have been issued upon exercise of such Warrant, if such Warrant had been exercised immediately prior to the occurrence of such Organic Change.

(e)   Notwithstanding Section 3.1(d) or anything contained in this Warrant Certificate, in the event of any Third Party Cash Sale, the Company shall pay (or cause to be paid) to the Holders, with respect to each unexercised Warrant outstanding immediately prior to the consummation of such Third Party Cash Sale (the "Third Party Sale Closing"), cash in an amount equal to the excess, if any, of the Third Party Sale Price over the Exercise Price; provided, however, that no Holder shall be entitled to any payment hereunder with respect to any portion of the Third Party Sale Price that is contingent, deferred or escrowed unless and until such amounts are actually paid to the holders of Common Stock or to the Company or its Subsidiaries, as applicable.  Upon the occurrence of a Third Party Sale Closing, all unexercised Warrants outstanding immediately prior to the Third Party Sale Closing shall automatically be terminated and cancelled and the Company shall thereupon cease to have any further obligations or liability with respect to the Warrants, except as required by this Section 3.1(e).  For the avoidance of doubt, the Holders shall not be entitled to any payment or consideration with respect to any Third Party Cash Sale with respect to which the Third Party Sale Price is equal to or less than the Exercise Price.

(f)   Ordinary Dividends.  The Closing Sale Price of a share of Common Stock as of the Date of Issuance is $[__] (the "Initial Per Share Value").  In the event that the Exercise Price is adjusted pursuant to Section 3.1(a) hereof, the Initial Per Share Value shall be similarly

KL3 2970943.6

12

adjusted. To the extent that the adjustment under Section 3.1(b) with respect to ordinary dividends would reduce the Exercise Price below the Initial Per Share Value, as adjusted from time to time, such adjustment shall not be made unless otherwise permitted under Section 409A of the Code.

Section 3.2    Notices. Whenever the number and/or kind of Warrant Exercise Shares or the Exercise Price is adjusted as herein provided, the Company shall prepare and deliver, or cause to be prepared and delivered, forthwith to the Holder a written statement setting forth the adjusted number and/or kind of shares purchasable upon the exercise of the Warrant and the Exercise Price of such shares after such adjustment, the facts requiring such adjustment and the computation by which adjustment was made, and give written notice to the Holder in the manner provided in Section 6.2 below, of the record date or the effective date of the event. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event.

Section 3.3    Form of Warrant After Adjustments. The form of the Warrant Certificate need not be changed because of any adjustments in the Exercise Price or the number or kind of the Common Stock, and Warrants theretofore or thereafter issued may continue to express the same price and number and kind of shares as are stated in Warrants, as initially issued. The Company, however, may at any time in its sole discretion make any change in the form of Warrant Certificate that it may deem appropriate to give effect to such adjustments and that does not affect the substance of the Warrant Certificate, and any Warrant Certificate thereafter issued, whether in exchange or substitution for an outstanding Warrant Certificate, may be in the form so changed.

Section 3.4    Deferral or Exclusion of Certain Adjustments. No adjustment to the Exercise Price or the number of Warrant Exercise Shares shall be required hereunder unless such adjustment together with other adjustments carried forward as provided below, would result in an increase or decrease of at least one percent (1%) of the applicable Exercise Price or the number of Warrant Exercise Shares; provided, that any adjustments which by reason of this Section 3.4 are not required to be made shall be carried forward and taken into account in any subsequent adjustment. No adjustment need be made for a change in the par value of the shares of Common Stock. All calculations under this Section shall be made to the nearest one one thousandth (1/1,000 ) of one cent ($0.01) or to the nearest one one thousandth (1/1,000 ) of a share, as the case may be.

## ARTICLE IV

## TRANSFER AND EXCHANGE
## OF WARRANTS

Section 4.1    Transfer of the Warrant. The Warrant shall only be assignable or transferable by will or by the laws of descent and distribution, subject to any transfer restrictions set forth in the Company's Articles of Incorporation; provided, that the Holder may transfer all or a portion of the Warrant to (A) the Holder's spouse, children or grandchildren ("Immediate Family Members"), (B) a trust or trusts for the exclusive benefit of such Immediate Family Members, or (C) other parties approved by the Company, provided, however, that no such transfer may be for consideration.

KL3 2970943.6                                    13

Section 4.2    Obligations with Respect to Transfers and Exchanges of the Warrant.

(a)    All Warrant Certificates issued upon any registration of transfer or exchange of Warrant Certificates shall be the valid obligations of the Company, entitled to the same benefits under this Warrant Certificate as the Warrant Certificates surrendered upon such registration of transfer or exchange.

(b)    No service charge shall be made to the Holder for any registration, transfer or exchange but the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed on the Holder in connection with any such exchange or registration of transfer.

Section 4.3    Registry of Warrants.

(a)    The Company shall maintain a registry showing the name and address of the Holder as the registered holder of this Warrant Certificate. This Warrant Certificate may be surrendered for exchange or exercise, in accordance with its terms, at the office of the Company, and the Company shall be entitled to rely in all respects, prior to written notice to the contrary, upon such registry.

(b)    The Company shall register the transfer of any portion of this Warrant Certificate in the registry upon the Holder's compliance with this Article IV, provided that such transfer is made in compliance with the Securities Act and state securities laws.

Section 4.4    Fractional Warrants.    The Company shall not be required to effect any registration of transfer or exchange which will result in the issuance of a warrant certificate for a fraction of a Warrant.

**ARTICLE V**

**OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANTS**

Section 5.1    No Rights or Liability as Stockholder.    Nothing contained in the Warrant shall be construed as conferring upon the Holder or his, her or its transferees the right to vote or to receive dividends or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or of any other matter, or any rights whatsoever as stockholders of the Company.    The consent of any Holder shall not be required with respect to any action or proceeding of the Company and no Holder shall have any right not expressly conferred hereunder. No holder, by reason of the ownership or possession of this Warrant shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions paid, allotted or distributed or distributable to the holders of Common Stock prior to, or for which the relevant record date preceded, the date of the exercise of this Warrant.    No provision hereof and no mere enumeration herein of the rights or privileges of the Holder shall give rise to any liability of such holder for the Exercise Price hereunder or as a stockholder of the Company, whether such liability is asserted by the Company or by creditors of the Company.

KL3 2970943.6

14

Section 5.2   <u>Notice to Holders.</u>  The Company shall give notice to Holders by regular mail or press release if at any time prior to the expiration or exercise in full of the Warrants, any of the following events shall occur:

(a)   the payment of any dividend payable in any securities upon shares of Common Stock or the making of any distribution (other than a regular quarterly cash dividend) to all holders of Common Stock;

(b)   the issuance to all holders of Common Stock of any additional shares of Common Stock or of rights, options or warrants to subscribe for or purchase Common Stock or of any other subscription rights, options or warrants;

(c)   a Pro Rata Repurchase Offer;

(d)   a dissolution, liquidation or winding up of the Company;

(e)   an Organic Change; or

(f)   the consummation of a Third Party Cash Sale.

Such giving of notice shall be initiated at least ten (10) days prior to the date fixed as the record date or the date of closing of the Company's stock transfer books for the determination of the stockholders entitled to such dividend, distribution or subscription rights, or of the stockholders entitled to vote on such Organic Change, dissolution, liquidation or winding up, or of the proposed date of such Third Party Sale Closing or the proposed effective date of such Pro Rata Repurchase Offer, as applicable.  Such notice shall specify such record date or the date of closing the stock transfer books or proposed effective date, as the case may be.  Failure to provide such notice shall not affect the validity of any action taken in connection with any such dividend, distribution or subscription rights, Pro Rata Repurchase Offer, Third Party Cash Sale, or proposed merger, consolidation, sale, conveyance, dissolution, liquidation or winding up.  For the avoidance of doubt, no such notice shall supersede or limit any adjustment called for by <u>Section 3.1</u> by reason of any event as to which notice is required by this Section.

Section 5.3   <u>Lost, Stolen, Mutilated or Destroyed Warrant Certificates</u>.  If this Warrant Certificate is lost, stolen, mutilated or destroyed, the Company shall issue and, if provided with all necessary information and documents, deliver, in exchange and substitution for and upon cancellation of the mutilated Warrant Certificate, or in lieu of and substitution for the Warrant Certificate lost, stolen or destroyed, a new Warrant Certificate of like tenor and representing an equivalent number of Warrants, but only upon receipt of evidence and an affidavit reasonably satisfactory to the Company of the loss, theft or destruction of such Warrant Certificate, and, if requested by either the Company, a bond sufficient to indemnify the Company against any claim that may be made against the Company on account of the loss, theft, mutilation or destruction of any such Warrant Certificate or the issuance of such new certificate.  Applicants for such substitute Warrant Certificates shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company may prescribe and as required by Section 8-405 of the Uniform Commercial Code as in effect in the State of New York.

KL3 2970943.6

15

Section 5.4    <u>No Restrictive Legends</u>.  No legend shall be stamped or imprinted on any stock certificate for Common Stock issued upon the exercise of any Warrant and or stock certificate issued upon the direct or indirect transfer of any such Common Stock.

Section 5.5    <u>Cancellation of the Warrant</u>.  If the Company shall purchase or otherwise acquire the Warrant, this Warrant Certificate shall thereupon be delivered to the Company to be cancelled by it and retired.  The Company shall cancel all Warrant Certificates surrendered, and accepted, for exchange, substitution, transfer or exercise in whole or in part.

Section 5.6    <u>Reduction in Benefits</u>.    Unless the Holder and the Company agree otherwise in writing, in the event that the Holder would incur an Excise Tax on any payments or benefits under this Warrant Certificate as a result of a Change of Control (or any other change described in Section 280G(b)(2) of the Code), the Company shall reduce the payments or benefits to be paid to or granted to Holder hereunder to the greater of (i) the maximum amount payable to the Holder without the imposition of any Excise Tax with respect to the Restricted Stock and (ii) the amount that yields the Holder the greatest after-tax amount of benefits under this Warrant Certificate after taking into account any Excise Tax imposed on Holder, whether due to payments and benefits under this Warrant Certificate or otherwise.  "Excise Tax" means the tax imposed by Section 4999 of the Code and any successor tax.  The determination of whether the Holder's payments and benefits should be reduced and the amount of any such reduction shall be made by independent counsel selected by the Company ("Independent Counsel").  For purposes of such determination, (x) the total amount of payments and benefits received by the Holder as a result of such Change in Control (or such other change) shall be treated as "parachute payments" within the meaning of Section 280G(b)(2) of the Code, and all "excess parachute payments" within the meaning of Section 280G(b)(1) of the Code shall be treated as subject to the Excise Tax, except to the extent that, in the opinion of Independent Counsel, a payment or benefit hereunder (in whole or in part) does not constitute a "parachute payment" within the meaning of Section 280G(b)(2) of the Code and the Treasury Regulations under Section 280G of the Code (the "Regulations"), or such "excess parachute payments" (in whole or in part) are not subject to the Excise Tax; (y) the amount of the payments and benefits hereunder that shall be treated as subject to the Excise Tax shall be equal to the lesser of (A) the total amount of such payments and benefits or (B) the amount of "excess parachute payments" within the meaning of Section 280G(b)(1) of the Code (after applying clause (x) hereof); and (z) the value of any noncash benefits or any deferred payment or benefit shall be determined by Independent Counsel in accordance with the principles of Sections 280G(d)(3) and (4) of the Code.  All fees and expenses of Independent Counsel shall be borne by the Company.

### ARTICLE VI

### MISCELLANEOUS PROVISIONS

Section 6.1    <u>Binding Effects; Benefits</u>.    This Warrant Certificate shall inure to the benefit of and shall be binding upon the Company and the Holder and their respective heirs, legal representatives, successors and assigns.  Nothing in this Warrant Certificate, expressed or implied, is intended to or shall confer on any person other than the Company and the Holder, or their respective heirs, legal representatives, successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Warrant Certificate.

KL3 2970943.6                                                16

Section 6.2    Notices.    Unless a provision herein permits notice by way of a press release, any notice or other communication required or which may be given hereunder shall be in writing and shall be sent by certified or regular mail (return receipt requested, postage prepaid), by private national courier service, by personal delivery or by facsimile transmission.  Such notice or communication shall be deemed given (i) if mailed, two days after the date of mailing, (ii) if sent by national courier service, one Business Day after being sent, (iii) if delivered personally, when so delivered, or (iv) if sent by facsimile transmission, on the Business Day after such facsimile is transmitted, in each case as follows:

if to the Company, to:

Genco Shipping & Trading Limited
299 Park Avenue
New York, New York 10171
Facsimile: (646) 443-8551
Attention: John C. Wobensmith

with copies (which shall not constitute notice) to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Facsimile: (212) 715-8100
Attention: Thomas E. Molner

if to Holder, at its address or facsimile number as appears on the books of the Company maintained for such purpose or as specified in a notice given in accordance with this Section 6.2.

Section 6.3    Persons Having Rights under this Warrant Certificate.    Nothing in this Warrant Certificate expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any person or corporation other than the parties hereto and the Holder, any right, remedy, or claim under or by reason of this Warrant Certificate or of any covenant, condition, stipulation, promise, or agreement hereof.  All covenants, conditions, stipulations, promises, and agreements contained in this Warrant Certificate shall be for the sole and exclusive benefit of the parties hereto, their successors and assigns and the Holder.

Section 6.4    Counterparts.  This Warrant Certificate may be executed in any number of original or facsimile or electronic PDF counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

Section 6.5    Effect of Headings.  The section headings herein are for convenience only and are not part of this Warrant Certificate and shall not affect the interpretation hereof.

Section 6.6    Amendments.

KL3 2970943.6

17

(a)     Subject to <u>Section 6.6(b)</u> below, this agreement may not be amended except in writing signed by both parties hereto.

(b)     The Company may from time to time supplement or amend this Warrant Certificate or the Warrant –

(i)     without the approval of the Holder in order to cure any ambiguity, manifest error or other mistake in this Warrant Certificate or the Warrant, or to correct or supplement any provision contained herein or in the Warrant that may be defective or inconsistent with any other provision herein or in the Warrant, or to make any other provisions in regard to matters or questions arising hereunder that the Company may deem necessary or desirable and that shall not adversely affect, alter or change the interests of the Holder in any material respect, or

(ii)     with the prior written consent of the Holder.

(c)     Any amendment, modification or waiver effected pursuant to and in accordance with the provisions of this <u>Section 6.6</u> will be binding upon the Holder and upon each future Holder and the Company.  In the event of any amendment, modification or waiver, the Company will give prompt notice thereof to the Holder and, if appropriate, notation thereof will be made on all Warrant Certificates thereafter surrendered for registration of transfer or exchange. Any failure of the Company to give such notice or any defect therein, shall not, however, in any way impair or affect the validity of any such amendment.

Section 6.7     <u>No Inconsistent Agreements; No Impairment</u>.  The Company shall not, on or after the date hereof, enter into any agreement with respect to its securities which conflicts with the rights granted to the Holder in the Warrant or the provisions hereof.  The Company represents and warrants to the Holder that the rights granted hereunder do not in any way conflict with the rights granted to holders of the Company's securities under any other agreements.  The Company shall not, by amendment of its Articles of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of the Warrant and in the taking of all such action as may be necessary in order to preserve the exercise rights of the Holder against impairment.

Section 6.8     <u>Integration/Entire Agreement</u>.  This Warrant Certificate is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Company and the Holder in respect of the subject matter contained herein.  There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein, with respect to the Warrant.  This Warrant Certificate and the Warrant supersede all prior agreements and understandings between the parties with respect to such subject matter.

Section 6.9     <u>Governing Law, Etc</u>.  This Warrant Certificate and each Warrant issued hereunder shall be deemed to be a contract made under the Laws of the State of New York and for all purposes shall be governed by and construed in accordance with the Laws of such State.

KL3 2970943.6                                    18

Each party hereto consents and submits to the jurisdiction of the courts of the State of New York and of the federal courts of the Southern District of New York in connection with any action or proceeding brought against it that arises out of or in connection with, that is based upon, or that relates to this Warrant Certificate or the transactions contemplated hereby.  In connection with any such action or proceeding in any such court, each party hereto hereby waives personal service of any summons, complaint or other process and hereby agrees that service thereof may be made in accordance with the procedures for giving notice set forth in Section 6.2 hereof. Each party hereto hereby waives any objection to jurisdiction or venue in any such court in any such action or proceeding and agrees not to assert any defense based on forum *non conveniens* or lack of jurisdiction or venue in any such court in any such action or proceeding.

Section 6.10    Termination.  This Warrant Certificate will terminate on the earlier of (i) such date when the Warrant has been exercised with respect to all shares subject thereto, or (ii) the expiration of the Exercise Period.  The provisions of this Article VI shall survive such termination.

Section 6.11    Waiver of Trial by Jury.  Each party hereto hereby irrevocably and unconditionally waives the right to a trial by jury in any action, suit, counterclaim or other proceeding (whether based on contract, tort or otherwise) arising out of, connected with or relating to this Warrant Certificate and the transactions contemplated hereby.

Section 6.12    Remedies.  The Company hereby agrees that, in the event that the Company violates any provisions of a Warrant (including the obligation to deliver shares of Common Stock upon the exercise thereof), the remedies at law available to the Holder may be inadequate.  In such event, the Holder shall have the right, in addition to all other rights and remedies any of them may have, to specific performance and/or injunctive or other equitable relief to enforce the provisions of this Warrant Certificate.

Section 6.13    Severability.  In the event that any one or more of the provisions contained in this Warrant Certificate, or the application thereof in any circumstances, is held invalid, illegal or unenforceable, the validity, legality and enforceability of any such provisions in every other respect and of the remaining provisions contained herein and therein shall not be affected or impaired thereby.

[Signature Page Follows]

KL3 2970943.6

19

IN WITNESS WHEREOF, the Company has caused this Warrant Certificate to be duly executed by a duly authorized officer as of the day and year first above written.

GENCO SHIPPING & TRADING LIMITED

By: _____
    Name:
    Title:

                                                                    **EXHIBIT A**


EXERCISE FORM FOR HOLDER
(To be executed upon exercise of Warrant)

          The undersigned, being the holder of the Warrant Certificate issued by Genco Shipping & Trading Limited identified below, hereby irrevocably elects to exercise the right to purchase the number of shares of Common Stock indicated below pursuant to the net issuance exercise provisions of Section 2.4(a) of the Warrant Certificate.

| | |
|---|---|
| Warrant Certificate Number | _____ |
| Number of Shares of Common Stock | _____ |
| | (Total number of shares of Common Stock for which the Warrant is being exercised, before withholding for the Exercise Price.  Not to exceed the number of shares of Common Stock for which such Warrant is exercisable in the aggregate.) |

Signature of Holder: _____

By: _____

Name: _____

Title: _____

Date: _____

KL3 2970943.6

## EXHIBIT B

**MIP RESTRICTED STOCK GRANT AGREEMENT – STANDARD FORM OF GRANT**

**FORM**

## Genco Shipping & Trading Limited
## Employee Restricted Stock Grant Agreement

THIS AGREEMENT, made as of **[Month] [Day], [Year]**, between GENCO SHIPPING & TRADING LIMITED (the "Company") and **[Participant]** (the "Participant").

WHEREAS, the Prepackaged Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code, dated April 16, 2014 (as such plan may be modified, amended or supplemented from time to time, the "Prepack Plan") pertaining to the Company has become effective;

WHEREAS, pursuant to and in furtherance of the Prepack Plan, the Company has adopted the Genco Shipping & Trading Limited 2014 Management Incentive Plan (the "MIP"), effective as of the "Effective Date" of the Prepack Plan (as defined in the Prepack Plan), in order to grant warrants to purchase shares of shares of common stock of the reorganized Company ("Common Stock") and to grant restricted shares of Common Stock;

WHEREAS, the MIP provides that the Board of Directors of the Company or its delegatee (collectively, the "Board of Directors") shall administer the MIP and determine the key persons to whom awards shall be granted and the amount and type of such awards; and

WHEREAS, pursuant to the Prepack Plan, the Board of Directors has determined to grant the Participant an award under the MIP as set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter set forth, the parties hereto hereby agree as follows:

1.      Grant of Restricted Stock. Pursuant to, and subject to, the terms and conditions set forth herein (including without limitation Section 17 hereof) and in the MIP, the Board of Directors hereby grants to the Participant **[Number of Shares]** restricted shares (the "Restricted Stock") of Common Stock.

2.      Grant Date. The Grant Date of the Restricted Stock is **[Month] [Day], [Year]**.

3.      Incorporation of MIP. All terms, conditions and restrictions of the MIP are incorporated herein and made part hereof as if stated herein.  If there is any conflict between the terms and conditions of the MIP and this Agreement, the terms and conditions of the MIP, as interpreted by the Board of Directors, shall govern. Except as otherwise provided herein, all capitalized terms used herein shall have the meaning given to such terms in the MIP.

4.      Vesting.

(a)      Subject to Section 4(b) hereof and the further provisions of this Agreement, a number of whole shares of Restricted Stock equal to 1/3 of the total number of shares granted hereunder shall vest on each of the first three anniversaries of the Grant Date

KL3 2971155.4

(rounding down to the nearest whole share on each of the first two anniversaries and rounding up on the third anniversary) (each such date, a "Vesting Date").

(b)    In the event of the occurrence of a Change in Control, as defined in Section 3.8(a) of the MIP, as in effect on the date of such occurrence, the Restricted Stock shall become vested in full on the date of such Change in Control.

5.    Restrictions on Transferability.  Until a share of Restricted Stock vests, the Participant shall not transfer the Participant's rights to such share of Restricted Stock or to any rights related thereto.  In addition, any transfers shall also be subject to the transfer restrictions set forth in the Company's Articles of Incorporation.  Any attempt to transfer unvested shares of Restricted Stock or any rights related thereto, whether by transfer, pledge, hypothecation or otherwise and whether voluntary or involuntary, by operation of law or otherwise, shall not vest the transferee with any interest or right in or with respect to such shares of Restricted Stock or such related rights.

6.    Termination of Service.

(a)    In the event that the Participant's Service with the Company terminates before all the shares of Restricted Stock are vested for any reason other than the Participant's death or disability (as defined in the MIP), all unvested shares of Restricted Stock, together with any property received in respect of such shares, as set forth in Section 9 hereof, shall be forfeited as of the date such Service terminates, and the Participant promptly shall return to the Company any certificates evidencing such shares, together with any cash dividends or other property received in respect of such shares.  For purposes hereof, "Service" means a continuous time period during which the Participant is at least one of the following:  an employee or a director of the Company.

(b)    In the event that, before all the shares of Restricted Stock are vested, the Participant's Service with the Company terminates for reason of the Participant's death or disability (as defined in the MIP), a Pro Rata Portion of the shares of Restricted Stock shall become vested immediately prior to the date such Service terminates in addition to the portion of the shares of Restricted Stock which have already become vested as of such date, and all other shares of Restricted Stock which have not become vested, together with any property received in respect of such shares, as set forth in Section 9 hereof, shall be forfeited as of the date such Service terminates, and the Participant promptly shall return to the Company any certificates evidencing such shares, together with any cash dividends or other property received in respect of such shares.  For purposes hereof, "Pro Rata Portion" shall mean that number of shares of Restricted Stock that would become vested on the next Vesting Date multiplied by a fraction, the denominator of which is 12 and the numerator of which is the number of completed months (measured from the day of the month of the Vesting Date to the same day of the following month) between the immediately preceding Vesting Date (or the Grant Date if there is no preceding Vesting Date) and the date of termination of Service.

- 2 -

KL3 2971155.4

7.      Issuance of Shares.

(a)     Reasonably promptly after the Grant Date, the Company shall issue and deliver to the Participant stock certificates, registered in the name of the Participant, evidencing the shares of Restricted Stock or shall instruct its transfer agent to issue shares of Restricted Stock which shall be maintained in book entry form on the books of the transfer agent.  The Restricted Stock, if certificated, shall bear the following legend:

"THE SALE, TRANSFER, ASSIGNMENT, PLEDGE, HYPOTHECATION ENCUMBRANCE OR OTHER DISPOSAL OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS OF THE GENCO SHIPPING & TRADING LIMITED 2014 MANAGEMENT INCENTIVE PLAN AND A RESTRICTED STOCK GRANT AGREEMENT BETWEEN GENCO SHIPPING & TRADING LIMITED AND THE HOLDER OF RECORD OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE.  NO TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IN CONTRAVENTION OF SUCH PLAN AND RESTRICTED STOCK GRANT AGREEMENT SHALL BE VALID OR EFFECTIVE.  COPIES OF SUCH AGREEMENT MAY BE OBTAINED BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD OF THE CERTIFICATE TO THE SECRETARY OF GENCO SHIPPING & TRADING LIMITED."

If the Restricted Stock is in book entry form, it shall be subject to electronic coding or stop order indicating that such shares of Restricted Stock are restricted by the terms of this Agreement and the MIP.  Such legend, electronic coding or stop order shall not be removed until such shares of Restricted Stock vest.

(b)     Reasonably promptly after any such shares of Restricted Stock vest pursuant to Section 4 hereof, (i) in the case of certificated shares, in exchange for the surrender to the Company of the certificates evidencing the Restricted Stock, delivered to the Participant under Section 7(a) hereof, and the certificates evidencing any other securities received in respect of such shares, if any, the Company shall issue and deliver to the Participant (or the Participant's legal representative, beneficiary or heir) certificates evidencing such shares of Restricted Stock and such other securities, free of the legend provided in Section 7(a) hereof and (ii) in the case of book entry shares, the Company shall cause to be lifted and removed any electronic coding or stop order established pursuant to Section 7(a) hereof.

(c)     The Company may require as a condition of the delivery of stock certificates or the removal of any electronic coding or stop order, pursuant to Section 7(b) hereof, that the Participant remit to the Company an amount sufficient in the opinion of the Company to satisfy any federal, state and other governmental tax withholding requirements related to the vesting of the applicable shares.  The Board of Directors, in its sole discretion, may permit the Participant to satisfy such obligation by delivering shares of Common Stock or by directing the Company to withhold from delivery shares of Common Stock, in either case valued at their Fair Market Value on the Vesting Date with fractional shares being settled in cash.

- 3 -

(d)     The Participant shall not be deemed for any purpose to be, or have rights as, a shareholder of the Company by virtue of the grant of Restricted Stock, except to the extent a stock certificate is issued therefor or an appropriate book entry is made on the books of the transfer agent reflecting the issuance thereof pursuant to Section 7(a) hereof, and then only from the date such certificate is issued or such book entry is made.  Upon the issuance of a stock certificate or the making of an appropriate book entry on the books of the transfer agent, the Participant shall have the rights of a shareholder with respect to the Restricted Stock, including the right to vote the shares, subject to the restrictions on transferability and the forfeiture provisions, as set forth in this Agreement.

8.     Securities Matters.  The Company shall be under no obligation to effect the registration pursuant to the Securities Act of 1933, as amended (the "1933 Act") of any interests in the MIP or any shares of Common Stock to be issued thereunder or to effect similar compliance under any state laws.  The Company shall not be obligated to cause to be issued any shares, whether by means of stock certificates or appropriate book entries, unless and until the Company is advised by its counsel that the issuance of such shares is in compliance with all applicable laws, regulations of governmental authority and the requirements of any securities exchange on which shares of Common Stock are traded.  The Board of Directors may require, as a condition of the issuance of shares of Common Stock pursuant to the terms hereof, that the recipient of such shares make such covenants, agreements and representations, and that any certificates bear such legends and any book entries be subject to such electronic coding, as the Board of Directors, in its sole discretion, deems necessary or desirable. The Participant specifically understands and agrees that the shares of Common Stock, if and when issued, may be "restricted securities," as that term is defined in Rule 144 under the 1933 Act and, accordingly, the Participant may be required to hold the shares indefinitely unless they are registered under such Act or an exemption from such registration is available.

9.     Dividends, etc.  Any cash dividends or other property (but not including securities) received by a Participant with respect to a share of Restricted Stock shall be returned to the Company in the event such share of Restricted Stock is forfeited, subject to Section 2.7(e) of the MIP.  Any securities received by a Participant with respect to a share of Restricted Stock as a result of any dividend, recapitalization, merger, consolidation, combination, exchange of shares or otherwise will not vest until such share of Restricted Stock vests and shall be forfeited if such share of Restricted Stock is forfeited, subject to Section 2.7(e) of the MIP.  Unless the Board of Directors otherwise determines, such securities shall bear the legend or be subject to the electronic coding or stop order set forth in Section 7(a) hereof.

10.     Delays or Omissions. No delay or omission to exercise any right, power or remedy accruing to any party hereto upon any breach or default of any party under this Agreement, shall impair any such right, power or remedy of such party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party or any provisions or conditions of this Agreement, must be in a writing signed by such party and shall be effective only to the extent specifically set forth in such writing.

- 4 -

KL3 2971155.4

11.     Right of Discharge Preserved.  Nothing in this Agreement shall confer upon the Participant the right to continue in the employ or other service of the Company, or affect any right which the Company may have to terminate such employment or service.

12.     Integration. This Agreement contains the entire understanding of the parties with respect to its subject matter. There are no restrictions, agreements, promises, representations, warranties, covenants or undertakings with respect to the subject matter hereof other than those expressly set forth herein. This Agreement, including, without limitation, the MIP, supersedes all prior agreements and understandings between the parties with respect to its subject matter.

13.     Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

14.     Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, without regard to the provisions governing conflict of laws.

15.     Obligation to Notify.  If the Participant makes the election permitted under Section 83(b) of the Internal Revenue Code of 1986, as amended (that is, an election to include in gross income in the year of transfer the amounts specified in Section 83(b)), the Participant shall notify the Company of such election within 10 days of filing notice of the election with the Internal Revenue Service and shall within the same 10-day period remit to the Company an amount sufficient in the opinion of the Company to satisfy any federal, state and other governmental tax withholding requirements related to such inclusion in Participant's income. The Participant should consult with his or her tax advisor to determine the tax consequences of acquiring the Restricted Stock and the advantages and disadvantages of filing the Section 83(b) election.  The Participant acknowledges that it is his or her sole responsibility, and not the Company's, to file a timely election under Section 83(b), even if the Participant requests the Company or its representatives to make this filing on his or her behalf.

16.     Reduction in Benefits.  Unless the Participant and the Company agree otherwise in writing, in the event that the Participant would incur an Excise Tax on any payments or benefits under this Agreement as a result of a Change of Control (or any other change described in Section 280G(b)(2) of the Code), the Company shall reduce the payments or benefits to be paid to or granted to Participant hereunder to the greater of (i) the maximum amount payable to the Participant without the imposition of any Excise Tax with respect to the Restricted Stock and (ii) the amount that yields the Participant the greatest after-tax amount of benefits under this Agreement after taking into account any Excise Tax imposed on Participant, whether due to payments and benefits under this Agreement or otherwise.  "Excise Tax" means the tax imposed by Section 4999 of the Code and any successor tax.  The determination of whether the Participants payments and benefits should be reduced and the amount of any such reduction shall be made by independent counsel selected by the Company ("Independent Counsel").  For purposes of such determination, (x) the total amount of payments and benefits received by the Participant as a result of such Change in Control (or such other change) shall be treated as "parachute payments" within the meaning of Section 280G(b)(2) of the Code, and all

- 5 -

KL3 2971155.4

"excess parachute payments" within the meaning of Section 280G(b)(1) of the Code shall be treated as subject to the Excise Tax, except to the extent that, in the opinion of Independent Counsel, a payment or benefit hereunder (in whole or in part) does not constitute a "parachute payment" within the meaning of Section 280G(b)(2) of the Code and the Treasury Regulations under Section 280G of the Code (the "Regulations"), or such "excess parachute payments" (in whole or in part) are not subject to the Excise Tax; (y) the amount of the payments and benefits hereunder that shall be treated as subject to the Excise Tax shall be equal to the lesser of (A) the total amount of such payments and benefits or (B) the amount of "excess parachute payments" within the meaning of Section 280G(b)(1) of the Code (after applying clause (x) hereof); and (z) the value of any noncash benefits or any deferred payment or benefit shall be determined by Independent Counsel in accordance with the principles of Sections 280G(d)(3) and (4) of the Code.  All fees and expenses of Independent Counsel shall be borne by the Company.

17.    Participant Acknowledgment. The Participant hereby acknowledges receipt of a copy of the MIP. The Participant hereby acknowledges that all decisions, determinations and interpretations of the Board of Directors in respect of the MIP, this Agreement and the Restricted Stock shall be final and conclusive.

IN WITNESS WHEREOF, the Company has caused this Agreement to be duly executed by its duly authorized officer, and the Participant has hereunto signed this Agreement on his own behalf, thereby representing that he has carefully read and understands this Agreement and the MIP as of the day and year first written above.

GENCO SHIPPING & TRADING LIMITED

By:    _____

Name:

Title:

_____
**[Participant]**

- 6 -

KL3 2971155.4

**E**XHIBIT **C**

**MIP W**ARRANT **A**GREEMENT **– P**ETER **C. G**EORGIOPOULOS

THIS WARRANT CERTIFICATE WILL BE VOID IF NOT EXERCISED PRIOR TO
5:00 P.M., NEW YORK CITY TIME, ON [__], 2020

## WARRANT TO PURCHASE

## [__] SHARES OF COMMON STOCK OF

## GENCO SHIPPING & TRADING LIMITED

## PURSUANT TO THE GENCO SHIPPING & TRADING LIMITED 2014 MANAGEMENT INCENTIVE PLAN

## ISSUE DATE:  **[__], 2014**

No. W-[__]

This certifies that, for value received, Peter C. Georgiopoulos (the "Holder"), is entitled to purchase from Genco Shipping & Trading Limited, a Marshall Islands corporation (the "Company"), subject to the terms and conditions hereof and the Plan, at any time before 5:00 p.m., New York time, on [__], 2020, the number of fully paid and non-assessable shares of common stock of the reorganized Company authorized and issued pursuant to the Prepack Plan and the articles of incorporation of the reorganized Company ("Common Stock") set forth above at the Exercise Price (as defined herein).  The Exercise Price and the number and kind of shares purchasable hereunder are subject to adjustment from time to time as provided in Article III of this Warrant Certificate.  The initial Exercise Price shall be $[__].  In the event of any conflict between the terms hereof and the Plan, the terms of the Plan shall control.

## ARTICLE I

## DEFINITIONS

Section 1.1    Definition of Terms.  As used in this Warrant Certificate, the following capitalized terms shall have the following respective meanings:

(a)    "Affiliate" has the meaning set forth in Rule 12b-2 of the Exchange Act.

(b)    "Business Day" means any day on which commercial banks are not authorized or permitted to close in the City of New York, Borough of Manhattan.

(c)    "Closing Sale Price" of the Common Stock on any date of determination means:

(i)    if the Common Stock is listed on the New York Stock Exchange or The NASDAQ Stock Market on such date, the average closing sale price per share of the Common Stock (or if no closing sale price is reported, the average of the closing bid and closing ask prices or, if more than one in either case, the average of the average closing bid and the average closing ask prices) for the 10 consecutive trading days immediately prior to such date of

KL3 2970838.5

determination, as reported by the New York Stock Exchange or The NASDAQ Stock Market, as applicable;

(ii)     if the Common Stock is not listed on the New York Stock Exchange or The NASDAQ Stock Market on such date, the average closing sale price per share of the Common Stock (or if no closing sale price is reported, the average of the high bid and low asked prices or, if more than one in either case, the average of the average high bid and low asked prices) for the 10 consecutive trading days immediately prior to such date of determination, as reported in composite transactions for the principal U.S. national or regional securities exchange on which the Common Stock is traded;

(iii)     if the Common Stock is not listed on a U.S. national or regional securities exchange, the average last quoted sale price for the Common Stock (or, if no sale price is reported, the average of the high bid and low asked price for such date) for the 10 consecutive trading days immediately prior to such date of determination, in the over-the-counter market as reported by OTC Markets Group Inc. or other similar organization; or

(iv)     in all other cases, as determined in good faith by the Board of Directors of the Company.

The Closing Sale Price shall be determined without reference to early hours, after hours or extended market trading.

The Closing Sale Price shall be appropriately adjusted by the Company in good faith if the "ex date" (as hereinafter defined) for any event (other than the issuance or distribution requiring such computation) occurs during the ten consecutive trading days immediately prior to the day as of which "Current Sale Price" is being determined.

For these purposes the term "ex date", when used:

(i)     with respect to any issuance or distribution, means the first date on which the Common Stock trades regular way on the relevant exchange or in the relevant market from which the Closing Price was obtained without the right to receive such issuance or distribution;

(ii)     with respect to any subdivision or combination of shares of Common Stock, means the first date on which the Common Stock trades regular way on such exchange or in such market after the time at which such subdivision or combination becomes effective; and

(iii)     with respect to any tender or exchange offer, means the first date on which the Common Stock trades regular way on such exchange or in such market after the expiration time of such offer.

Whenever such adjustments shall be made to the Current Sale Price as may be necessary or appropriate to effectuate the intent of this Warrant and to avoid unjust or inequitable results as determined in good faith by the Board of Directors.

KL3 2970838.5

2

(d) "Common Stock" has the meaning set forth in the preamble, and shall include any successor security as a result of any recapitalization, reorganization, reclassification or similar transaction involving the Company.

(e) "Company" has the meaning set forth in the preamble.

(f) "Date of Issuance" means [__].

(g) "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(h) "Exercise Date" means any date, on or prior to the expiration of the Exercise Period, on which the Holder exercises the right to purchase the Warrant Exercise Shares, in whole or in part, pursuant to and in accordance with the terms and conditions described herein.

(i) "Exercise Form" has the meaning set forth in Section 2.4(b) hereof.

(j) "Exercise Period" has the meaning set forth in Section 2.2(c) hereof.

(k) "Exercise Price" has the meaning set forth in Section 2.1(a) hereof.

(l) "Fully Diluted" means all Common Stock outstanding as of the applicable measurement date together with all Common Stock then issuable upon (i) the conversion of convertible securities of the Company at the then applicable conversion rate, and (ii) the exercise of any options or warrants then exercisable for Common Stock; provided that, for purposes of clauses (i) and (ii), all conditions to the convertibility and/or exercisability of convertible securities, options and warrants of the Company, shall be deemed to have been satisfied.

(m) "Governmental Authority" means any (i) government, (ii) governmental or quasi- governmental authority of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal) or (iii) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature, in each case, whether federal, state, local, municipal, foreign, supranational or of any other jurisdiction.

(n) "Holder" has the meaning set forth in the preamble.

(o) "Immediate Family Members" has the meaning set forth in Section 4.1 hereof.

(p) "Initial Per Share Value" has the meaning set forth in Section 3.1(e) hereof.

(q) "Law" means all laws, statutes, rules, regulations, codes, injunctions, decrees, orders, ordinances, registration requirements, disclosure requirements and other pronouncements having the effect of law of the United States, the Republic of the Marshall

Islands, any foreign country or any domestic or foreign state, county, city or other political subdivision or of any Governmental Authority.

(r)      "Organic Change" means any recapitalization, reorganization, reclassification, consolidation, merger, sale of a majority of the Company's assets or other transaction, in each case which is effected in such a way that the holders of Common Stock are entitled to receive (either directly or upon subsequent liquidation) cash, stock, securities or other assets or property with respect to or in exchange for Common Stock, other than a transaction which triggers an adjustment pursuant to Sections 3.1(a), (b) or (c).

(s)      "Person" means any individual, firm, corporation, partnership, limited partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, governmental unit or any political subdivision thereof, or any other entity (as such term is defined in the Bankruptcy Code).

(t)      "Plan" means the 2014 Management Incentive Plan of the Company, as amended from time to time.

(u)      "Prepack Plan" means the "Prepackaged Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code," dated April 16, 2014 (as such plan may be modified, amended or supplemented from time to time).

(v)      "Pro Rata Repurchase Offer" means any offer to purchase shares of Common Stock by the Company or any Affiliate thereof pursuant to (i) any tender offer or exchange offer subject to Section 13(e) or 14(e) of the Exchange Act or Regulation 14E promulgated thereunder or (ii) any other offer available to substantially all holders of Common Stock to purchase or exchange their shares of Common Stock, in the case of both (i) or (ii), whether for cash, shares of capital stock of the Company, other securities of the Company, evidences of indebtedness of the Company or any other Person or any other property (including, without limitation, shares of capital stock, other securities or evidences of indebtedness of a Subsidiary), or any combination thereof, effected while the Warrant is outstanding.  The "effective date" of a Pro Rata Repurchase Offer shall mean the date of acceptance of shares for purchase or exchange by the Company under any tender or exchange offer which is a Pro Rata Repurchase Offer or the date of purchase with respect to any Pro Rata Repurchase Offer that is not a tender or exchange offer.

(w)      "Securities Act" means the Securities Act of 1933, as amended.

(x)      "Service" means a continuous time period during which the Holder is at least one of the following:  an employee or a director of, or a consultant to, the Company.

(y)      "Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a partnership, limited liability company or other business entity (other than a corporation), a majority of the partnership, limited liability company or other

KL3 2970838.5                                          4

similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.  For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, limited liability company or other business entity if such Person or Persons shall be allocated a majority of partnership, limited liability company or other business entity gains or losses or shall be or control the general partner, the managing member or entity performing similar functions of such partnership, limited liability company or other business entity.

(z)     "Third Party Cash Sale" means in any such case with a purchaser that is not an Affiliate of the Company: (i) any merger, consolidation, or other similar transaction or series of transactions to which the Company is a party and pursuant to which the Company is not the surviving Person in such transaction and the consideration received by the Company's shareholders (directly or indirectly) consists solely of cash or (ii) the sale or other disposition of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole and the consideration received by the Company's shareholders (directly or indirectly) consists solely of cash.

(aa)     "Third Party Sale Price" means, with respect to any Third Party Cash Sale, the quotient of (x) the aggregate cash consideration received by the shareholders (directly or indirectly) in connection with the applicable Third Party Cash Sale, divided by (y) the number of Fully Diluted Shares of Common Stock outstanding immediately before the Third Party Sale Closing.

(bb)     "Warrant Exercise Shares" means the shares of Common Stock issued upon the applicable exercise of a Warrant.

Section 1.2     Rules of Construction.

(a)     The singular form of any word used herein, including the terms defined in Section 1.1 hereof, shall include the plural, and vice versa.  The use herein of a word of any gender shall include correlative words of all genders.

(b)     Unless otherwise specified, references to Articles, Sections and other subdivisions of this Warrant are to the designated Articles, Sections and other subdivision of this Warrant as originally executed.  The words "hereof," "herein," "hereunder" and words of similar import refer to this Warrant as a whole.

(c)     References to "$" are to dollars in lawful currency of the United States of America.

(d)     The Exhibits attached hereto are an integral part of this Warrant.

## ARTICLE II

## TERMS AND EXERCISE OF WARRANT

Section 2.1     Exercise Price.  Each Warrant shall entitle the Holder to, subject to the provisions of the Plan and of this Warrant Certificate, the right to purchase from the Company

the number of shares of Common Stock, at the price of $[__] per share (as the same may be hereafter adjusted in accordance herewith, the "Exercise Price"), specified on the first page of this Warrant Certificate.

Section 2.2    Exercise Period.   Subject to the further provisions of this Warrant Certificate, the Warrant shall be exercisable as follows:

(a)    Subject to Section 2.2(b), the Warrant shall become exercisable with respect to a number of whole shares equal to 1/3 of the shares subject to the Warrant on each of the first three (3) anniversaries of the Date of Issuance (rounding down to the nearest whole share on each of the first two anniversaries and rounding up on the third anniversary).

(b)    In the event of a Change in Control of the Company, as defined in the Plan, the Warrant shall become exercisable in full on the effective date of the Change in Control.

(c)    The Warrant may be exercised by the Holder thereof, in whole or in part (but not as to a fractional share of Common Stock), at any time and from time to time after the Warrant becomes exercisable in accordance with Sections 2.2(a) and 2.2(b) hereof and prior to 5:00 P.M., New York time on the sixth (6th) anniversary hereof, unless terminated earlier pursuant to this Warrant Certificate or the Plan (the "Exercise Period").   To the extent that the Warrant or portion thereof is not exercised prior to the expiration of the Exercise Period, it shall be automatically cancelled with no action by any Person, and with no further rights thereunder, upon such expiration.

Section 2.3    Termination of Service

(a)    If the Holder's Service is terminated for cause (as defined in Article III, Section 4 of the Amended and Restated By-Laws of the Company), or if the Holder voluntarily terminates his Service, the Warrant, to the extent not theretofore exercised, shall terminate upon the commencement of business on the date of the Holder's termination of Service.

(b)    If the Holder's Service is terminated for any reason (including without limitation the Holder's death or disability (as defined below)) other than (i) removal as a director for cause (as defined in Article III, Section 4 of the Amended and Restated By-Laws of the Company) or (ii) due to the Holder's voluntary termination of his Service, then the Warrant shall fully vest and become immediately exercisable as of the date of such termination of Service and shall remain exercisable until the one year anniversary of such termination (but in no event beyond the expiration of the Exercise Period).   For this purpose "disability" shall mean any physical or mental condition that would qualify the Holder for a disability benefit under the long-term disability plan maintained by the Company or, if there is no such plan, a physical or mental condition that prevents the Holder from performing the essential functions of the Holder's position (with or without reasonable accommodation) for a period of six consecutive months.  The existence of a disability shall be determined by the Company.

Section 2.4    Method of Exercise.

(a)    In connection with the exercise of the Warrant, the Exercise Price shall be paid as provided in this Section 2.4(a).  In connection with the exercise of the Warrant, the

Holder of such Warrant shall exchange the Common Stock purchase rights represented thereby by surrendering such Warrant to the Company, together with a written notice to the Company that the Holder is exchanging the Warrant (or a portion thereof) for the number of Warrant Exercise Shares being exercised, up to the aggregate number of Warrant Exercise Shares for which this Warrant Certificate is exercisable, specified in the notice, from which the Company shall withhold and not issue to such Holder, in payment of the Exercise Price thereof, a number of such Warrant Exercise Shares equal to (x) the number of Warrant Exercise Shares for which the Warrant is being exercised, multiplied by (y) the Exercise Price, and divided by (z) the Closing Sale Price on the Exercise Date (and such withheld shares shall no longer be issuable under the Warrant, and the Holder shall not have any rights or be entitled to any payment with respect to such withheld shares); provided, however, that the shares withheld, when valued based on the fair market value determined under Treasury Regulation 1.409A-1(b)(5)(iv)(A), shall have a value not less than the aggregate Exercise Price.  The issuance of any shares shall be subject to Section 3.6 of the Plan with respect to withholding of taxes and the Company may appropriately reduce the number of Warrant Exercise Shares in order to satisfy any withholding obligation.

(b)     Subject to the terms and conditions of the Plan and this Warrant Certificate, the Holder of a Warrant may exercise, in whole or in part, such Holder's right to purchase the Warrant Exercise Shares issuable upon exercise of such Warrant, by providing an exercise form for the election to exercise such Warrant ("Exercise Form") substantially in the form of Exhibit A hereto, properly completed and duly executed by the Holder thereof to the Company.

(c)     Any exercise of the Warrant pursuant to the terms of this Warrant Certificate shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms.

(d)     Upon receipt of an Exercise Form pursuant to Section 2.4(a), the Company shall:

(i)     examine such Exercise Form and all other documents delivered to it by or on behalf of Holder as contemplated hereunder to ascertain whether or not, on its face, such Exercise Form and any such other documents have been executed and completed in accordance with their terms and the terms hereof; and

(ii)     if an Exercise Form or other document appears, on its face, to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrant exists, endeavor to inform the appropriate parties (including the person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled.

(e)     The Company reserves the right to reasonably reject any and all Exercise Forms that it determines, in its sole discretion, are not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful.  Any such determination by the Company shall be final and binding on the Holder, absent manifest error.  Moreover, the Company reserves the absolute right to waive any of the

conditions to any particular exercise of Warrant or any defects in the Exercise Form(s) with regard to any particular exercise of the Warrant. The Company shall not be under any duty to give notice to the Holder of any irregularities in any exercise of the Warrant, nor shall it incur any liability for the failure to give such notice.

Section 2.5    Issuance of Common Stock.

(a)    Upon exercise of the Warrant pursuant to Section 2.4, the Company shall promptly at its expense, and in no event later than five (5) Business Days thereafter, cause to be issued to the Holder of  the Warrant the total number of whole shares of Common Stock for which the Warrant is being exercised, subject to Section 2.4(a) (as the same may be hereafter adjusted pursuant to Article III) in such denominations as are requested by the Holder.

(b)    Notwithstanding the five (5) Business Day period described in Section 2.5(a), the Warrant Exercise Shares shall be deemed to have been issued to the Holder at the time at which all of the conditions to such exercise have been fulfilled, and the Holder shall be deemed for all purposes to have become the holder of such Warrant Exercise Shares at such time.

(c)    If less than all of the shares evidenced by the Warrant Certificate are exercised at any time prior to the termination of the Exercise Period, a new Warrant Certificate or Warrant Certificates shall be issued for the remaining number of shares evidenced by the Warrant Certificate.

Section 2.6    Reservation of Shares.   The Company shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock solely for the purpose of issuance upon the exercise of the Warrant, a number of shares of Common Stock equal to the aggregate Warrant Exercise Shares issuable upon the exercise of the Warrant.  The Company shall use commercially reasonable efforts to take all such actions as may be necessary to assure that all such shares of Common Stock may be so issued without violating the Company's governing documents or any requirements of any national securities exchange upon which shares of Common Stock may be listed.  The Company shall not take any action which would cause the number of authorized but unissued shares of Common Stock to be less than the number of such shares required to be reserved hereunder for issuance upon exercise of the Warrant.

Section 2.7    Fractional Shares.   Notwithstanding any provision to the contrary contained in this Warrant Certificate, the Company shall not be required to issue any fraction of a share of its capital stock in connection with the exercise of the Warrant, and in any case where the Holder would, except for the provisions of this Section 2.7, be entitled under the terms of the Warrant to receive a fraction of a share upon the exercise of the Warrant, the Company shall, upon the exercise of the Warrant, issue or cause to be issued only the largest whole number of Warrant Exercise Shares issuable upon such exercise (and such fraction of a share will be disregarded, and the Holder shall not have any rights to be entitled to any payment with respect to such fraction of a share); provided, that if more than one Warrant is presented for exercise at the same time by the same Holder, the number of whole Warrant Exercise Shares which shall be issuable upon the exercise thereof shall be computed on the basis of the aggregate number of Warrant Exercise Shares issuable upon exercise of all such Warrants.

Section 2.8    Public Offering.   Notwithstanding any other provision hereof, if an exercise of any portion of a Warrant is to be made in connection with a registered public offering or the sale of the Company, the exercise of any portion of such Warrant may, at the election of the holder thereof, be conditioned upon the consummation of such registered public offering or sale of the Company, in which case such exercise shall be deemed to be effective concurrently with the consummation of such transaction.

Section 2.9    Close of Books; Par Value.   The Company shall not close its books against the transfer of any Warrant or any Warrant Exercise Shares in any manner which interferes with the timely exercise of such Warrant.   The Company shall use commercially reasonable efforts to, from time to time, take all such action as may be necessary to assure that the par value per share of the unissued shares of Common Stock acquirable upon exercise of each Warrant is at all times equal to or less than the Exercise Price then in effect.

Section 2.10   Payment of Taxes.   The Company shall not be required to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of any shares of Common Stock (including certificates therefor) or payment of cash or other property to any recipient other than the Holder of the Warrant surrendered upon the exercise of a Warrant, and in case of such transfer or payment, the Company shall not be required to issue or deliver any shares or pay any cash until (a) such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Company or (b) it has been established to the Company's satisfaction that any such tax or other charge that is or may become due has been paid.

## ARTICLE III

### ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF WARRANT EXERCISE SHARES

In order to prevent dilution of the rights granted under each Warrant, the Exercise Price shall be subject to adjustment from time to time as provided in this Article III, and the number of shares of Common Stock obtainable upon exercise of each Warrant shall be subject to adjustment from time to time as provided in this Article III; provided, however, that no such adjustment shall be made to the extent that it would cause the Warrant to be subject to tax under Section 409A of the Internal Revenue Code of 1986, as amended.

Section 3.1    Adjustments.

(a)    Subdivision or Combination of Common Stock.   If the Company at any time after the issuance of the Warrant but prior to the expiration of the Exercise Period subdivides (by any stock split, stock dividend or reclassification) the Common Stock into a greater number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately reduced, and the number of Warrant Exercise Shares issuable upon exercise of the Warrant shall be proportionately increased.   If the Company at any time prior to the expiration of the Exercise Period combines (by reverse stock split, or reclassification) the Common Stock into a smaller number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately increased and the number of Warrant Exercise Shares

issuable upon exercise of the Warrant shall be proportionately decreased. Any adjustment under this Section 3.1(a) shall become effective immediately upon the effectiveness of such subdivision or combination.

(b)    Distributions. If the Company at any time after the issuance of the Warrant but prior to the expiration of the Exercise Period fixes a record date for the making of a distribution to all holders of shares of the Common Stock of securities, evidences of indebtedness, assets, cash, rights or warrants (excluding dividends or distributions referred to in Section 3.1(a)), then, in each such case, the Exercise Price in effect prior to such record date shall be adjusted thereafter to the price determined by the following formula:

$$EP_1 = EP_0 \; x \; (CP_0 - FV)/CP_0$$

where

| | | |
|---|---|---|
| $EP_1$ | = | the Exercise Price in effect immediately following the application of the adjustments in this Section 3.1(b); |
| $EP_0$ | = | the Exercise Price in effect immediately prior to the application of the adjustments in this Section 3.1(b); |
| $CP_0$ | = | the Closing Sale Price of the Common Stock on the last trading day preceding the first date on which the Common Stock trades regular way without the right to receive such distribution; and |
| $FV$ | = | the amount of cash and/or the fair market value of the securities, evidences of indebtedness, assets, rights or warrants to be so distributed in respect of one share of Common Stock, as determined by the Board of Directors of the Company, acting in good faith. |

Such adjustment shall be made successively whenever such a record date is fixed. In such event, the number of Warrant Exercise Shares issuable upon the exercise of the Warrant represented by this Warrant Certificate shall be increased to the number obtained by dividing (x) the product of (1) the number of Warrant Exercise Shares issuable upon the exercise of the Warrant represented by this Warrant Certificate before such adjustment, and (2) the Exercise Price in effect immediately prior to the adjustment by (y) the new Exercise Price immediately following such adjustment.

In the event that such distribution is not so made, the Exercise Price and the number of Warrant Exercise Shares issuable upon exercise of the Warrant then in effect shall be readjusted, effective as of the date when the Board of Directors of the Company determines not to distribute such shares, evidences of indebtedness, assets, rights, cash or warrants, as the case may be, to the Exercise Price that would then be in effect and the number of Warrant Exercise Shares that would then be issuable upon exercise of the Warrant if such record date had not been fixed.

(c)    Pro Rata Repurchase Offer of Common Stock.  If at any time after the issuance of the Warrant but prior to the expiration of the Exercise Period the Company

10

consummates a Pro Rata Repurchase Offer of Common Stock, then the Exercise Price shall be reduced to the price determined by the following formula:

$$EP_1 = EP_0 \ x \ \frac{(OS_0 \ x \ CP_0) - AP}{(OS_0 - SP) \ x \ CP_0}$$

where

| | | |
|---|---|---|
| $EP_1$ | = | the Exercise Price in effect immediately following the application of the adjustments in this <u>Section 3.1(c)</u> (but in no event greater than $EP_0$); |
| $EP_0$ | = | the Exercise Price in effect immediately prior to the application of the adjustments in this <u>Section 3.1(c)</u>; |
| $OS_0$ | = | the number of Fully Diluted shares of Common Stock outstanding immediately before consummation of such Pro Rata Repurchase Offer; |
| $CP_0$ | = | the Closing Sale Price of a share of Common Stock on the trading day immediately preceding the first public announcement by the Company or any of its Affiliates of the intent to effect such Pro Rata Repurchase Offer; |
| AP | = | the aggregate purchase price (including the fair market value, as determined in good faith by the Board of Directors of the Company, of any non-cash consideration included therein) paid for the shares of Common Stock repurchased in the Pro Rata Repurchase Offer; and |
| SP | = | the number of shares of Common Stock so repurchased in the Pro Rata Repurchase Offer. |

In such event, the Warrant Exercise Shares issuable upon the exercise of the Warrant shall be increased to the number obtained by dividing (x) the product of (1) the Warrant Exercise Shares issuable upon the exercise of the Warrant before such adjustment, and (2) the Exercise Price in effect immediately prior to the adjustment by (y) the new Exercise Price immediately following such adjustment. For the avoidance of doubt, no increase to the Exercise Price or decrease in the Warrant Exercise Shares issuable upon exercise of the Warrant shall be made pursuant to this <u>Section 3.1(c)</u>.

(d) <u>Reorganization, Reclassification, Consolidation, Merger or Sale</u>. In connection with any Organic Change prior to the expiration of the Exercise Period, the Company shall make appropriate provision to ensure that the Holder of the Warrant shall have the right to acquire and receive, upon exercise of such Warrant, such cash, stock, securities or other assets or property as would have been issued or payable in such Organic Change (if the holder had exercised such Warrant immediately prior to such Organic Change) with respect to or in exchange, as applicable, for the number of Warrant Exercise Shares that would have been issued

upon exercise of such Warrant, if such Warrant had been exercised immediately prior to the occurrence of such Organic Change.

(e)    Notwithstanding Section 3.1(d) or anything contained in this Warrant Certificate, in the event of any Third Party Cash Sale, the Company shall pay (or cause to be paid) to the Holders, with respect to each unexercised Warrant outstanding immediately prior to the consummation of such Third Party Cash Sale (the "Third Party Sale Closing"), cash in an amount equal to the excess, if any, of the Third Party Sale Price over the Exercise Price; provided, however, that no Holder shall be entitled to any payment hereunder with respect to any portion of the Third Party Sale Price that is contingent, deferred or escrowed unless and until such amounts are actually paid to the holders of Common Stock or to the Company or its Subsidiaries, as applicable. Upon the occurrence of a Third Party Sale Closing, all unexercised Warrants outstanding immediately prior to the Third Party Sale Closing shall automatically be terminated and cancelled and the Company shall thereupon cease to have any further obligations or liability with respect to the Warrants, except as required by this Section 3.1(e). For the avoidance of doubt, the Holders shall not be entitled to any payment or consideration with respect to any Third Party Cash Sale with respect to which the Third Party Sale Price is equal to or less than the Exercise Price.

(f)    Ordinary Dividends. The Closing Sale Price of a share of Common Stock as of the Date of Issuance is $[__] (the "Initial Per Share Value"). In the event that the Exercise Price is adjusted pursuant to Section 3.1(a) hereof, the Initial Per Share Value shall be similarly adjusted. To the extent that the adjustment under Section 3.1(b) with respect to ordinary dividends would reduce the Exercise Price below the Initial Per Share Value, as adjusted from time to time, such adjustment shall not be made unless otherwise permitted under Section 409A of the Code.

Section 3.2    Notices. Whenever the number and/or kind of Warrant Exercise Shares or the Exercise Price is adjusted as herein provided, the Company shall prepare and deliver, or cause to be prepared and delivered, forthwith to the Holder a written statement setting forth the adjusted number and/or kind of shares purchasable upon the exercise of the Warrant and the Exercise Price of such shares after such adjustment, the facts requiring such adjustment and the computation by which adjustment was made, and give written notice to the Holder in the manner provided in Section 6.2 below, of the record date or the effective date of the event. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event.

Section 3.3    Form of Warrant After Adjustments. The form of the Warrant Certificate need not be changed because of any adjustments in the Exercise Price or the number or kind of the Common Stock, and Warrants theretofore or thereafter issued may continue to express the same price and number and kind of shares as are stated in Warrants, as initially issued. The Company, however, may at any time in its sole discretion make any change in the form of Warrant Certificate that it may deem appropriate to give effect to such adjustments and that does not affect the substance of the Warrant Certificate, and any Warrant Certificate thereafter issued, whether in exchange or substitution for an outstanding Warrant Certificate, may be in the form so changed.

KL3 2970838.5                                                12

Section 3.4    Deferral or Exclusion of Certain Adjustments.  No adjustment to the Exercise Price or the number of Warrant Exercise Shares shall be required hereunder unless such adjustment together with other adjustments carried forward as provided below, would result in an increase or decrease of at least one percent (1%) of the applicable Exercise Price or the number of Warrant Exercise Shares; provided, that any adjustments which by reason of this Section 3.4 are not required to be made shall be carried forward and taken into account in any subsequent adjustment. No adjustment need be made for a change in the par value of the shares of Common Stock. All calculations under this Section shall be made to the nearest one one thousandth (1/1,000 ) of one cent ($0.01) or to the nearest one one thousandth (1/1,000 ) of a share, as the case may be.

**ARTICLE IV**

**TRANSFER AND EXCHANGE
OF WARRANTS**

Section 4.1    Transfer of the Warrant.  The Warrant shall only be assignable or transferable by will or by the laws of descent and distribution, subject to any transfer restrictions set forth in the Company's Articles of Incorporation; provided, that the Holder may transfer all or a portion of the Warrant to (A) the Holder's spouse, children or grandchildren ("Immediate Family Members"), (B) a trust or trusts for the exclusive benefit of such Immediate Family Members, or (C) other parties approved by the Company, provided, however, that no such transfer may be for consideration.

Section 4.2    Obligations with Respect to Transfers and Exchanges of the Warrant.

(a)    All Warrant Certificates issued upon any registration of transfer or exchange of Warrant Certificates shall be the valid obligations of the Company, entitled to the same benefits under this Warrant Certificate as the Warrant Certificates surrendered upon such registration of transfer or exchange.

(b)    No service charge shall be made to the Holder for any registration, transfer or exchange but the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed on the Holder in connection with any such exchange or registration of transfer.

Section 4.3    Registry of Warrants.

(a)    The Company shall maintain a registry showing the name and address of the Holder as the registered holder of this Warrant Certificate. This Warrant Certificate may be surrendered for exchange or exercise, in accordance with its terms, at the office of the Company, and the Company shall be entitled to rely in all respects, prior to written notice to the contrary, upon such registry.

(b)    The Company shall register the transfer of any portion of this Warrant Certificate in the registry upon the Holder's compliance with this Article IV, provided that such transfer is made in compliance with the Securities Act and state securities laws.

KL3 2970838.5                                    13

Section 4.4    Fractional Warrants.   The Company shall not be required to effect any registration of transfer or exchange which will result in the issuance of a warrant certificate for a fraction of a Warrant.

## ARTICLE V

## OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANTS

Section 5.1    No Rights or Liability as Stockholder.   Nothing contained in the Warrant shall be construed as conferring upon the Holder or his, her or its transferees the right to vote or to receive dividends or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or of any other matter, or any rights whatsoever as stockholders of the Company.   The consent of any Holder shall not be required with respect to any action or proceeding of the Company and no Holder shall have any right not expressly conferred hereunder. No holder, by reason of the ownership or possession of this Warrant shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions paid, allotted or distributed or distributable to the holders of Common Stock prior to, or for which the relevant record date preceded, the date of the exercise of this Warrant.   No provision hereof and no mere enumeration herein of the rights or privileges of the Holder shall give rise to any liability of such holder for the Exercise Price hereunder or as a stockholder of the Company, whether such liability is asserted by the Company or by creditors of the Company.

Section 5.2    Notice to Holders.   The Company shall give notice to Holders by regular mail or press release if at any time prior to the expiration or exercise in full of the Warrants, any of the following events shall occur:

(a)    the payment of any dividend payable in any securities upon shares of Common Stock or the making of any distribution (other than a regular quarterly cash dividend) to all holders of Common Stock;

(b)    the issuance to all holders of Common Stock of any additional shares of Common Stock or of rights, options or warrants to subscribe for or purchase Common Stock or of any other subscription rights, options or warrants;

(c)    a Pro Rata Repurchase Offer;

(d)    a dissolution, liquidation or winding up of the Company;

(e)    an Organic Change; or

(f)    the consummation of a Third Party Cash Sale.

Such giving of notice shall be initiated at least ten (10) days prior to the date fixed as the record date or the date of closing of the Company's stock transfer books for the determination of the stockholders entitled to such dividend, distribution or subscription rights, or of the stockholders entitled to vote on such Organic Change, dissolution, liquidation or winding up, or of the proposed date of such Third Party Sale Closing or the proposed effective date of such Pro

KL3 2970838.5                                           14

Rata Repurchase Offer, as applicable.  Such notice shall specify such record date or the date of closing the stock transfer books or proposed effective date, as the case may be.  Failure to provide such notice shall not affect the validity of any action taken in connection with any such dividend, distribution or subscription rights, Pro Rata Repurchase Offer, Third Party Cash Sale, or proposed merger, consolidation, sale, conveyance, dissolution, liquidation or winding up.  For the avoidance of doubt, no such notice shall supersede or limit any adjustment called for by Section 3.1 by reason of any event as to which notice is required by this Section.

Section 5.3     Lost, Stolen, Mutilated or Destroyed Warrant Certificates.  If this Warrant Certificate is lost, stolen, mutilated or destroyed, the Company shall issue and, if provided with all necessary information and documents, deliver, in exchange and substitution for and upon cancellation of the mutilated Warrant Certificate, or in lieu of and substitution for the Warrant Certificate lost, stolen or destroyed, a new Warrant Certificate of like tenor and representing an equivalent number of Warrants, but only upon receipt of evidence and an affidavit reasonably satisfactory to the Company of the loss, theft or destruction of such Warrant Certificate, and, if requested by either the Company, a bond sufficient to indemnify the Company against any claim that may be made against the Company on account of the loss, theft, mutilation or destruction of any such Warrant Certificate or the issuance of such new certificate.  Applicants for such substitute Warrant Certificates shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company may prescribe and as required by Section 8-405 of the Uniform Commercial Code as in effect in the State of New York.

Section 5.4     No Restrictive Legends.  No legend shall be stamped or imprinted on any stock certificate for Common Stock issued upon the exercise of any Warrant and or stock certificate issued upon the direct or indirect transfer of any such Common Stock.

Section 5.5     Cancellation of the Warrant.  If the Company shall purchase or otherwise acquire the Warrant, this Warrant Certificate shall thereupon be delivered to the Company to be cancelled by it and retired.  The Company shall cancel all Warrant Certificates surrendered, and accepted, for exchange, substitution, transfer or exercise in whole or in part.

Section 5.6     Reimbursement for Excise Tax.  In the event that the Holder incurs any Excise Tax (as defined in the Holder's Restricted Stock Grant Agreement with the Company dated as of March 5, 2010 (the "Prior Agreement")) on any payments or benefits under this Warrant Certificate, the Company shall gross-up the Holder the amount of such Excise Tax incurred in accordance with the provisions of Section 16 of the Prior Agreement (such provisions to apply irrespective of whether the Prior Agreement continues in effect at the time of such Excise Tax) and such Section 16 of the Prior Agreement relating to the Gross-Up Payment (as defined in the Prior Agreement) shall be incorporated with full effect into this Agreement, provided that any reference to "this Agreement" in such Section 16 shall be deemed to refer to this Warrant Certificate.

KL3 2970838.5                                          15

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.1    Binding Effects; Benefits.    This Warrant Certificate shall inure to the benefit of and shall be binding upon the Company and the Holder and their respective heirs, legal representatives, successors and assigns.    Nothing in this Warrant Certificate, expressed or implied, is intended to or shall confer on any person other than the Company and the Holder, or their respective heirs, legal representatives, successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Warrant Certificate.

Section 6.2    Notices.    Unless a provision herein permits notice by way of a press release, any notice or other communication required or which may be given hereunder shall be in writing and shall be sent by certified or regular mail (return receipt requested, postage prepaid), by private national courier service, by personal delivery or by facsimile transmission.    Such notice or communication shall be deemed given (i) if mailed, two days after the date of mailing, (ii) if sent by national courier service, one Business Day after being sent, (iii) if delivered personally, when so delivered, or (iv) if sent by facsimile transmission, on the Business Day after such facsimile is transmitted, in each case as follows:

> if to the Company, to:
>
> Genco Shipping & Trading Limited
> 299 Park Avenue
> New York, New York 10171
> Facsimile: (646) 443-8551
> Attention: John C. Wobensmith
>
> with copies (which shall not constitute notice) to:
>
> Kramer Levin Naftalis & Frankel LLP
> 1177 Avenue of the Americas
> New York, New York 10036
> Facsimile: (212) 715-8100
> Attention: Thomas E. Molner
>
> if to Holder, at its address or facsimile number as appears on the books of the Company maintained for such purpose or as specified in a notice given in accordance with this Section 6.2.

Section 6.3    Persons Having Rights under this Warrant Certificate.    Nothing in this Warrant Certificate expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any person or corporation other than the parties hereto and the Holder, any right, remedy, or claim under or by reason of this Warrant Certificate or of any covenant, condition, stipulation, promise, or agreement hereof.    All covenants, conditions, stipulations, promises, and agreements contained in this Warrant Certificate shall be for the sole and exclusive benefit of the parties hereto, their successors and assigns and the Holder.

KL3 2970838.5

16

Section 6.4    Counterparts.  This Warrant Certificate may be executed in any number of original or facsimile or electronic PDF counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

Section 6.5    Effect of Headings.  The section headings herein are for convenience only and are not part of this Warrant Certificate and shall not affect the interpretation hereof.

Section 6.6    Amendments.

(a)    Subject to Section 6.6(b) below, this agreement may not be amended except in writing signed by both parties hereto.

(b)    The Company may from time to time supplement or amend this Warrant Certificate or the Warrant –

(i)    without the approval of the Holder in order to cure any ambiguity, manifest error or other mistake in this Warrant Certificate or the Warrant, or to correct or supplement any provision contained herein or in the Warrant that may be defective or inconsistent with any other provision herein or in the Warrant, or to make any other provisions in regard to matters or questions arising hereunder that the Company may deem necessary or desirable and that shall not adversely affect, alter or change the interests of the Holder in any material respect, or

(ii)    with the prior written consent of the Holder.

(c)    Any amendment, modification or waiver effected pursuant to and in accordance with the provisions of this Section 6.6 will be binding upon the Holder and upon each future Holder and the Company.  In the event of any amendment, modification or waiver, the Company will give prompt notice thereof to the Holder and, if appropriate, notation thereof will be made on all Warrant Certificates thereafter surrendered for registration of transfer or exchange. Any failure of the Company to give such notice or any defect therein, shall not, however, in any way impair or affect the validity of any such amendment.

Section 6.7    No Inconsistent Agreements; No Impairment.  The Company shall not, on or after the date hereof, enter into any agreement with respect to its securities which conflicts with the rights granted to the Holder in the Warrant or the provisions hereof.  The Company represents and warrants to the Holder that the rights granted hereunder do not in any way conflict with the rights granted to holders of the Company's securities under any other agreements.  The Company shall not, by amendment of its Articles of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of the Warrant and in the taking of all such action as may be necessary in order to preserve the exercise rights of the Holder against impairment.

Section 6.8    Integration/Entire Agreement.  This Warrant Certificate is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive

statement of the agreement and understanding of the Company and the Holder in respect of the subject matter contained herein.  There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein, with respect to the Warrant.  This Warrant Certificate and the Warrant supersede all prior agreements and understandings between the parties with respect to such subject matter.

Section 6.9   <u>Governing Law, Etc</u>.  This Warrant Certificate and each Warrant issued hereunder shall be deemed to be a contract made under the Laws of the State of New York and for all purposes shall be governed by and construed in accordance with the Laws of such State. Each party hereto consents and submits to the jurisdiction of the courts of the State of New York and of the federal courts of the Southern District of New York in connection with any action or proceeding brought against it that arises out of or in connection with, that is based upon, or that relates to this Warrant Certificate or the transactions contemplated hereby.  In connection with any such action or proceeding in any such court, each party hereto hereby waives personal service of any summons, complaint or other process and hereby agrees that service thereof may be made in accordance with the procedures for giving notice set forth in <u>Section 6.2</u> hereof. Each party hereto hereby waives any objection to jurisdiction or venue in any such court in any such action or proceeding and agrees not to assert any defense based on forum *non conveniens* or lack of jurisdiction or venue in any such court in any such action or proceeding.

Section 6.10   <u>Termination</u>.  This Warrant Certificate will terminate on the earlier of (i) such date when the Warrant has been exercised with respect to all shares subject thereto, or (ii) the expiration of the Exercise Period.  The provisions of this <u>Article VI</u> shall survive such termination.

Section 6.11   <u>Waiver of Trial by Jury</u>.  Each party hereto hereby irrevocably and unconditionally waives the right to a trial by jury in any action, suit, counterclaim or other proceeding (whether based on contract, tort or otherwise) arising out of, connected with or relating to this Warrant Certificate and the transactions contemplated hereby.

Section 6.12   <u>Remedies</u>.  The Company hereby agrees that, in the event that the Company violates any provisions of a Warrant (including the obligation to deliver shares of Common Stock upon the exercise thereof), the remedies at law available to the Holder may be inadequate.  In such event, the Holder shall have the right, in addition to all other rights and remedies any of them may have, to specific performance and/or injunctive or other equitable relief to enforce the provisions of this Warrant Certificate.

Section 6.13   <u>Severability</u>.  In the event that any one or more of the provisions contained in this Warrant Certificate, or the application thereof in any circumstances, is held invalid, illegal or unenforceable, the validity, legality and enforceability of any such provisions in every other respect and of the remaining provisions contained herein and therein shall not be affected or impaired thereby.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the Company has caused this Warrant Certificate to be duly executed by a duly authorized officer as of the day and year first above written.

GENCO SHIPPING & TRADING LIMITED

By: _____
    Name:
    Title:

**EXHIBIT A**

EXERCISE FORM FOR HOLDER
(To be executed upon exercise of Warrant)

The undersigned, being the holder of the Warrant Certificate issued by Genco Shipping & Trading Limited identified below, hereby irrevocably elects to exercise the right to purchase the number of shares of Common Stock indicated below pursuant to the net issuance exercise provisions of <u>Section 2.4(a)</u> of the Warrant Certificate.

| | |
|---|---|
| Warrant Certificate Number | _____ |
| Number of Shares of Common Stock | _____ |
| | (Total number of shares of Common Stock for which the Warrant is being exercised, before withholding for the Exercise Price.  Not to exceed the number of shares of Common Stock for which such Warrant is exercisable in the aggregate.) |

Signature of Holder: _____

By: _____

Name: _____

Title: _____

Date: _____

KL3 2970838.5

## EXHIBIT D

### MIP RESTRICTED STOCK AGREEMENT – PETER C. GEORGIOPOULOS

**FORM**

**Genco Shipping & Trading Limited**
**Restricted Stock Grant Agreement**

THIS AGREEMENT, made as of **[Month] [Day], [Year]**, between GENCO SHIPPING & TRADING LIMITED (the "Company") and **Peter C. Georgiopoulos** (the "Participant").

WHEREAS, the Prepackaged Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code, dated April 16, 2014 (as such plan may be modified, amended or supplemented from time to time, the "Prepack Plan") pertaining to the Company has become effective;

WHEREAS, pursuant to and in furtherance of the Prepack Plan, the Company has adopted the Genco Shipping & Trading Limited 2014 Management Incentive Plan (the "MIP"), effective as of the "Effective Date" of the Prepack Plan (as defined in the Prepack Plan), in order to grant warrants to purchase shares of shares of common stock of the reorganized Company ("Common Stock") and to grant restricted shares of Common Stock;

WHEREAS, the MIP provides that the Board of Directors of the Company or its delegatee (collectively, the "Board of Directors") shall administer the MIP and determine the key persons to whom awards shall be granted and the amount and type of such awards; and

WHEREAS, pursuant to the Prepack Plan, the Board of Directors has determined to grant the Participant an award under the MIP as set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter set forth, the parties hereto hereby agree as follows:

1.      Grant of Restricted Stock. Pursuant to, and subject to, the terms and conditions set forth herein (including without limitation Section 17 hereof) and in the MIP, the Board of Directors hereby grants to the Participant **[Number of Shares]** restricted shares (the "Restricted Stock") of Common Stock.

2.      Grant Date. The Grant Date of the Restricted Stock is **[Month] [Day], [Year]**.

3.      Incorporation of MIP. All terms, conditions and restrictions of the MIP are incorporated herein and made part hereof as if stated herein. If there is any conflict between the terms and conditions of the MIP and this Agreement, the terms and conditions of the MIP, as interpreted by the Board of Directors, shall govern. Except as otherwise provided herein, all capitalized terms used herein shall have the meaning given to such terms in the MIP.

4.      Vesting.

(a)      Subject to Section 4(b) hereof and the further provisions of this Agreement, a number of whole shares of Restricted Stock equal to 1/3 of the total number of shares granted hereunder shall vest on each of the first three anniversaries of the Grant Date

KL3 2971041.4

(rounding down to the nearest whole share on each of the first two anniversaries and rounding up on the third anniversary) (each such date, a "Vesting Date").

(b)     In the event of the occurrence of a Change in Control, as defined in Section 3.8(a) of the MIP, as in effect on the date of such occurrence, the Restricted Stock shall become vested in full on the date of such Change in Control.

5.     Restrictions on Transferability.  Until a share of Restricted Stock vests, the Participant shall not transfer the Participant's rights to such share of Restricted Stock or to any rights related thereto.  In addition, any transfers shall also be subject to the transfer restrictions set forth in the Company's Articles of Incorporation. Any attempt to transfer unvested shares of Restricted Stock or any rights related thereto, whether by transfer, pledge, hypothecation or otherwise and whether voluntary or involuntary, by operation of law or otherwise, shall not vest the transferee with any interest or right in or with respect to such shares of Restricted Stock or such related rights.

6.     Termination of Service.

(a)     In the event that the Participant's Service with the Company terminates before all the shares of Restricted Stock are vested for any reason (including without limitation the Participant's death or disability, as defined in the MIP) other than (i) removal as a Director for cause (as defined in Article III, Section 4 of the Amended and Restated By-Laws of the Company) or (ii) due to the Participant's voluntary termination of his Service, all shares of Restricted Stock shall become vested immediately prior to such termination of Service.  For purposes hereof, "Service" means a continuous time period during which the Participant is at least one of the following:  an employee or a director of, or a consultant to, the Company.

(b)     In the event that the Participant's Service with the Company terminates before all the shares of Restricted Stock are vested (i) due to removal as a Director for cause (as defined in Article III, Section 4 of the Amended and Restated By-laws of the Company) or (ii) due to the Participant's voluntary termination of his Service, all unvested shares of Restricted Stock, together with any property received in respect of such shares, subject to and as set forth in Section 9 hereof, shall be forfeited as of the date such Service terminates, and the Participant promptly shall return to the Company any certificates evidencing such shares, together with any cash dividends or other property received in respect of such shares.

7.     Issuance of Shares.

(a)     Reasonably promptly after the Grant Date, the Company shall issue and deliver to the Participant stock certificates, registered in the name of the Participant, evidencing the shares of Restricted Stock or shall instruct its transfer agent to issue shares of Restricted Stock which shall be maintained in book entry form on the books of the transfer agent.  The Restricted Stock, if certificated, shall bear the following legend:

"THE SALE, TRANSFER, ASSIGNMENT, PLEDGE, HYPOTHECATION ENCUMBRANCE OR OTHER DISPOSAL OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS OF THE GENCO SHIPPING & TRADING LIMITED 2014

- 2 -

KL3 2971041.4

MANAGEMENT INCENTIVE PLAN AND A RESTRICTED STOCK GRANT AGREEMENT BETWEEN GENCO SHIPPING & TRADING LIMITED AND THE HOLDER OF RECORD OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE.  NO TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IN CONTRAVENTION OF SUCH PLAN AND RESTRICTED STOCK GRANT AGREEMENT SHALL BE VALID OR EFFECTIVE.  COPIES OF SUCH AGREEMENT MAY BE OBTAINED BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD OF THE CERTIFICATE TO THE SECRETARY OF GENCO SHIPPING & TRADING LIMITED."

If the Restricted Stock is in book entry form, it shall be subject to electronic coding or stop order indicating that such shares of Restricted Stock are restricted by the terms of this Agreement and the MIP.  Such legend, electronic coding or stop order shall not be removed until such shares of Restricted Stock vest.

(b)    Reasonably promptly after any such shares of Restricted Stock vest pursuant to Section 4 hereof, (i) in the case of certificated shares, in exchange for the surrender to the Company of the certificates evidencing the Restricted Stock, delivered to the Participant under Section 7(a) hereof, and the certificates evidencing any other securities received in respect of such shares, if any, the Company shall issue and deliver to the Participant (or the Participant's legal representative, beneficiary or heir) certificates evidencing such shares of Restricted Stock and such other securities, free of the legend provided in Section 7(a) hereof and (ii) in the case of book entry shares, the Company shall cause to be lifted and removed any electronic coding or stop order established pursuant to Section 7(a) hereof.

(c)    The Company may require as a condition of the delivery of stock certificates or the removal of any electronic coding or stop order, pursuant to Section 7(b) hereof, that the Participant remit to the Company an amount sufficient in the opinion of the Company to satisfy any federal, state and other governmental tax withholding requirements related to the vesting of the applicable shares.  The Board of Directors, in its sole discretion, may permit the Participant to satisfy such obligation by delivering shares of Common Stock or by directing the Company to withhold from delivery shares of Common Stock, in either case valued at their Fair Market Value on the Vesting Date with fractional shares being settled in cash.

(d)    The Participant shall not be deemed for any purpose to be, or have rights as, a shareholder of the Company by virtue of the grant of Restricted Stock, except to the extent a stock certificate is issued therefor or an appropriate book entry is made on the books of the transfer agent reflecting the issuance thereof pursuant to Section 7(a) hereof, and then only from the date such certificate is issued or such book entry is made.  Upon the issuance of a stock certificate or the making of an appropriate book entry on the books of the transfer agent, the Participant shall have the rights of a shareholder with respect to the Restricted Stock, including the right to vote the shares, subject to the restrictions on transferability and the forfeiture provisions, as set forth in this Agreement.

8.    Securities Matters.  The Company shall be under no obligation to effect the registration pursuant to the Securities Act of 1933, as amended (the "1933 Act") of any

- 3 -

interests in the MIP or any shares of Common Stock to be issued thereunder or to effect similar compliance under any state laws. The Company shall not be obligated to cause to be issued any shares, whether by means of stock certificates or appropriate book entries, unless and until the Company is advised by its counsel that the issuance of such shares is in compliance with all applicable laws, regulations of governmental authority and the requirements of any securities exchange on which shares of Common Stock are traded. The Board of Directors may require, as a condition of the issuance of shares of Common Stock pursuant to the terms hereof, that the recipient of such shares make such covenants, agreements and representations, and that any certificates bear such legends and any book entries be subject to such electronic coding, as the Board of Directors, in its sole discretion, deems necessary or desirable. The Participant specifically understands and agrees that the shares of Common Stock, if and when issued, may be "restricted securities," as that term is defined in Rule 144 under the 1933 Act and, accordingly, the Participant may be required to hold the shares indefinitely unless they are registered under such Act or an exemption from such registration is available.

9.    Dividends, etc.  Any cash dividends or other property (but not including securities) received by a Participant with respect to a share of Restricted Stock shall be returned to the Company in the event such share of Restricted Stock is forfeited, subject to Section 2.7(e) of the MIP.  Any securities received by a Participant with respect to a share of Restricted Stock as a result of any dividend, recapitalization, merger, consolidation, combination, exchange of shares or otherwise will not vest until such share of Restricted Stock vests and shall be forfeited if such share of Restricted Stock is forfeited, subject to Section 2.7(e) of the MIP.  Unless the Board of Directors otherwise determines, such securities shall bear the legend or be subject to the electronic coding or stop order set forth in Section 7(a) hereof.

10.    Delays or Omissions.  No delay or omission to exercise any right, power or remedy accruing to any party hereto upon any breach or default of any party under this Agreement, shall impair any such right, power or remedy of such party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party or any provisions or conditions of this Agreement, must be in a writing signed by such party and shall be effective only to the extent specifically set forth in such writing.

11.    Right of Discharge Preserved.  Nothing in this Agreement shall confer upon the Participant the right to continue in the employ or other service of the Company, or affect any right which the Company may have to terminate such employment or service.

12.    Integration. This Agreement contains the entire understanding of the parties with respect to its subject matter. There are no restrictions, agreements, promises, representations, warranties, covenants or undertakings with respect to the subject matter hereof other than those expressly set forth herein. This Agreement, including, without limitation, the MIP, supersedes all prior agreements and understandings between the parties with respect to its subject matter.

- 4 -

KL3 2971041.4

13. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

14. Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, without regard to the provisions governing conflict of laws.

15. Obligation to Notify. If the Participant makes the election permitted under Section 83(b) of the Internal Revenue Code of 1986, as amended (that is, an election to include in gross income in the year of transfer the amounts specified in Section 83(b)), the Participant shall notify the Company of such election within 10 days of filing notice of the election with the Internal Revenue Service and shall within the same 10-day period remit to the Company an amount sufficient in the opinion of the Company to satisfy any federal, state and other governmental tax withholding requirements related to such inclusion in Participant's income. The Participant should consult with his or her tax advisor to determine the tax consequences of acquiring the Restricted Stock and the advantages and disadvantages of filing the Section 83(b) election. The Participant acknowledges that it is his or her sole responsibility, and not the Company's, to file a timely election under Section 83(b), even if the Participant requests the Company or its representatives to make this filing on his or her behalf.

16. Reimbursement for Excise Tax. In the event that the Participant incurs any Excise Tax (as defined in the Participant's Restricted Stock Grant Agreement with the Company dated as of March 5, 2010 (the "Prior Agreement")) on any payments or benefits under this Agreement, the Company shall gross-up the Participant the amount of such Excise Tax incurred in accordance with the provisions of Section 16 of the Prior Agreement (such provisions to apply irrespective of whether the Prior Agreement continues in effect at the time of such Excise Tax) and such Section 16 of the Prior Agreement relating to the Gross-Up Payment (as defined in the Prior Agreement) shall be incorporated with full effect into this Agreement, provided that any reference to "this Agreement" in such Section 16 shall be deemed to refer to this Restricted Stock Grant Agreement.

17. Participant Acknowledgment. The Participant hereby acknowledges receipt of a copy of the MIP. The Participant hereby acknowledges that all decisions, determinations and interpretations of the Board of Directors in respect of the MIP, this Agreement and the Restricted Stock shall be final and conclusive.

KL3 2971041.4

IN WITNESS WHEREOF, the Company has caused this Agreement to be duly executed by its duly authorized officer, and the Participant has hereunto signed this Agreement on his own behalf, thereby representing that he has carefully read and understands this Agreement and the MIP as of the day and year first written above.

GENCO SHIPPING & TRADING LIMITED

By: _____

Name:   John C. Wobensmith

Title:   Chief Financial Officer

_____

Peter C. Georgiopoulos

- 6 -

KL3 2971041.4

**EXHIBIT E**

**MIP WARRANT AGREEMENT – JOHN C. WOBENSMITH**

THIS WARRANT CERTIFICATE WILL BE VOID IF NOT EXERCISED PRIOR TO
5:00 P.M., NEW YORK CITY TIME, ON [__], 2020

## WARRANT TO PURCHASE

## [__] SHARES OF COMMON STOCK OF

## GENCO SHIPPING & TRADING LIMITED

## PURSUANT TO THE GENCO SHIPPING & TRADING LIMITED 2014 MANAGEMENT INCENTIVE PLAN

### ISSUE DATE:  [__], 2014

No. W-[__]

This certifies that, for value received, John C. Wobensmith (the "Holder"), is entitled to purchase from Genco Shipping & Trading Limited, a Marshall Islands corporation (the "Company"), subject to the terms and conditions hereof and the Plan, at any time before 5:00 p.m., New York time, on [__], 2020, the number of fully paid and non-assessable shares of common stock of the reorganized Company authorized and issued pursuant to the Prepack Plan and the articles of incorporation of the reorganized Company ("Common Stock") set forth above at the Exercise Price (as defined herein).  The Exercise Price and the number and kind of shares purchasable hereunder are subject to adjustment from time to time as provided in Article III of this Warrant Certificate.  The initial Exercise Price shall be $[__].  In the event of any conflict between the terms hereof and the Plan, the terms of the Plan shall control.

## ARTICLE I

## DEFINITIONS

Section 1.1    Definition of Terms.  As used in this Warrant Certificate, the following capitalized terms shall have the following respective meanings:

(a)    "Affiliate" has the meaning set forth in Rule 12b-2 of the Exchange Act.

(b)    "Business Day" means any day on which commercial banks are not authorized or permitted to close in the City of New York, Borough of Manhattan.

(c)    "Closing Sale Price" of the Common Stock on any date of determination means:

(i)    if the Common Stock is listed on the New York Stock Exchange or The NASDAQ Stock Market on such date, the average closing sale price per share of the Common Stock (or if no closing sale price is reported, the average of the closing bid and closing ask prices or, if more than one in either case, the average of the average closing bid and the average closing ask prices) for the 10 consecutive trading days immediately prior to such date of

determination, as reported by the New York Stock Exchange or The NASDAQ Stock Market, as applicable;

(ii)     if the Common Stock is not listed on the New York Stock Exchange or The NASDAQ Stock Market on such date, the average closing sale price per share of the Common Stock (or if no closing sale price is reported, the average of the high bid and low asked prices or, if more than one in either case, the average of the average high bid and low asked prices) for the 10 consecutive trading days immediately prior to such date of determination, as reported in composite transactions for the principal U.S. national or regional securities exchange on which the Common Stock is traded;

(iii)     if the Common Stock is not listed on a U.S. national or regional securities exchange, the average last quoted sale price for the Common Stock (or, if no sale price is reported, the average of the high bid and low asked price for such date) for the 10 consecutive trading days immediately prior to such date of determination, in the over-the-counter market as reported by OTC Markets Group Inc. or other similar organization; or

(iv)     in all other cases, as determined in good faith by the Board of Directors of the Company.

The Closing Sale Price shall be determined without reference to early hours, after hours or extended market trading.

The Closing Sale Price shall be appropriately adjusted by the Company in good faith if the "ex date" (as hereinafter defined) for any event (other than the issuance or distribution requiring such computation) occurs during the ten consecutive trading days immediately prior to the day as of which "Current Sale Price" is being determined.

For these purposes the term "ex date", when used:

(i)     with respect to any issuance or distribution, means the first date on which the Common Stock trades regular way on the relevant exchange or in the relevant market from which the Closing Price was obtained without the right to receive such issuance or distribution;

(ii)     with respect to any subdivision or combination of shares of Common Stock, means the first date on which the Common Stock trades regular way on such exchange or in such market after the time at which such subdivision or combination becomes effective; and

(iii)     with respect to any tender or exchange offer, means the first date on which the Common Stock trades regular way on such exchange or in such market after the expiration time of such offer.

Whenever such adjustments shall be made to the Current Sale Price as may be necessary or appropriate to effectuate the intent of this Warrant and to avoid unjust or inequitable results as determined in good faith by the Board of Directors.

KL3 2971415.6                                    2

(d)     "Common Stock" has the meaning set forth in the preamble, and shall include any successor security as a result of any recapitalization, reorganization, reclassification or similar transaction involving the Company.

(e)     "Company" has the meaning set forth in the preamble.

(f)     "Date of Issuance" means [__].

(g)     "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(h)     "Exercise Date" means any date, on or prior to the expiration of the Exercise Period, on which the Holder exercises the right to purchase the Warrant Exercise Shares, in whole or in part, pursuant to and in accordance with the terms and conditions described herein.

(i)     "Exercise Form" has the meaning set forth in Section 2.4(b) hereof.

(j)     "Exercise Period" has the meaning set forth in Section 2.2(c) hereof.

(k)     "Exercise Price" has the meaning set forth in Section 2.1(a) hereof.

(l)     "Fully Diluted" means all Common Stock outstanding as of the applicable measurement date together with all Common Stock then issuable upon (i) the conversion of convertible securities of the Company at the then applicable conversion rate, and (ii) the exercise of any options or warrants then exercisable for Common Stock; provided that, for purposes of clauses (i) and (ii), all conditions to the convertibility and/or exercisability of convertible securities, options and warrants of the Company, shall be deemed to have been satisfied.

(m)     "Governmental Authority" means any (i) government, (ii) governmental or quasi- governmental authority of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal) or (iii) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature, in each case, whether federal, state, local, municipal, foreign, supranational or of any other jurisdiction.

(n)     "Holder" has the meaning set forth in the preamble.

(o)     "Immediate Family Members" has the meaning set forth in Section 4.1 hereof.

(p)     "Initial Per Share Value" has the meaning set forth in Section 3.1(e) hereof.

(q)     "Law" means all laws, statutes, rules, regulations, codes, injunctions, decrees, orders, ordinances, registration requirements, disclosure requirements and other pronouncements having the effect of law of the United States, the Republic of the Marshall

Islands, any foreign country or any domestic or foreign state, county, city or other political subdivision or of any Governmental Authority.

(r)    "Organic Change" means any recapitalization, reorganization, reclassification, consolidation, merger, sale of a majority of the Company's assets or other transaction, in each case which is effected in such a way that the holders of Common Stock are entitled to receive (either directly or upon subsequent liquidation) cash, stock, securities or other assets or property with respect to or in exchange for Common Stock, other than a transaction which triggers an adjustment pursuant to Sections 3.1(a), (b) or (c).

(s)    "Person" means any individual, firm, corporation, partnership, limited partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, governmental unit or any political subdivision thereof, or any other entity (as such term is defined in the Bankruptcy Code).

(t)    "Plan" means the 2014 Management Incentive Plan of the Company, as amended from time to time.

(u)    "Prepack Plan" means the "Prepackaged Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code," dated April 16, 2014 (as such plan may be modified, amended or supplemented from time to time).

(v)    "Pro Rata Portion of the Warrant" has the meaning set forth in Section 2.3(b)(i).

(w)    "Pro Rata Repurchase Offer" means any offer to purchase shares of Common Stock by the Company or any Affiliate thereof pursuant to (i) any tender offer or exchange offer subject to Section 13(e) or 14(e) of the Exchange Act or Regulation 14E promulgated thereunder or (ii) any other offer available to substantially all holders of Common Stock to purchase or exchange their shares of Common Stock, in the case of both (i) or (ii), whether for cash, shares of capital stock of the Company, other securities of the Company, evidences of indebtedness of the Company or any other Person or any other property (including, without limitation, shares of capital stock, other securities or evidences of indebtedness of a Subsidiary), or any combination thereof, effected while the Warrant is outstanding.  The "effective date" of a Pro Rata Repurchase Offer shall mean the date of acceptance of shares for purchase or exchange by the Company under any tender or exchange offer which is a Pro Rata Repurchase Offer or the date of purchase with respect to any Pro Rata Repurchase Offer that is not a tender or exchange offer.

(x)    "Securities Act" means the Securities Act of 1933, as amended.

(y)    "Service" means a continuous time period during which the Holder is at least one of the following:  an employee or a director of, or a consultant to, the Company.

(z)    "Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors is at the time owned or controlled, directly or

indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a partnership, limited liability company or other business entity (other than a corporation), a majority of the partnership, limited liability company or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.  For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, limited liability company or other business entity if such Person or Persons shall be allocated a majority of partnership, limited liability company or other business entity gains or losses or shall be or control the general partner, the managing member or entity performing similar functions of such partnership, limited liability company or other business entity.

(aa)    "Third Party Cash Sale" means in any such case with a purchaser that is not an Affiliate of the Company: (i) any merger, consolidation, or other similar transaction or series of transactions to which the Company is a party and pursuant to which the Company is not the surviving Person in such transaction and the consideration received by the Company's shareholders (directly or indirectly) consists solely of cash or (ii) the sale or other disposition of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole and the consideration received by the Company's shareholders (directly or indirectly) consists solely of cash.

(bb)    "Third Party Sale Price" means, with respect to any Third Party Cash Sale, the quotient of (x) the aggregate cash consideration received by the shareholders (directly or indirectly) in connection with the applicable Third Party Cash Sale, divided by (y) the number of Fully Diluted Shares of Common Stock outstanding immediately before the Third Party Sale Closing.

(cc)    "Warrant Exercise Shares" means the shares of Common Stock issued upon the applicable exercise of a Warrant.

Section 1.2    Rules of Construction.

(a)    The singular form of any word used herein, including the terms defined in Section 1.1 hereof, shall include the plural, and vice versa.  The use herein of a word of any gender shall include correlative words of all genders.

(b)    Unless otherwise specified, references to Articles, Sections and other subdivisions of this Warrant are to the designated Articles, Sections and other subdivision of this Warrant as originally executed.  The words "hereof," "herein," "hereunder" and words of similar import refer to this Warrant as a whole.

(c)    References to "$" are to dollars in lawful currency of the United States of America.

(d)    The Exhibits attached hereto are an integral part of this Warrant.

KL3 2971415.6                                        5

# ARTICLE II

## TERMS AND EXERCISE OF WARRANT

Section 2.1    Exercise Price.  Each Warrant shall entitle the Holder to, subject to the provisions of the Plan and of this Warrant Certificate, the right to purchase from the Company the number of shares of Common Stock, at the price of $[__] per share (as the same may be hereafter adjusted in accordance herewith, the "Exercise Price"), specified on the first page of this Warrant Certificate.

Section 2.2    Exercise Period.   Subject to the further provisions of this Warrant Certificate, the Warrant shall be exercisable as follows:

(a)    Subject to Section 2.2(b), the Warrant shall become exercisable with respect to a number of whole shares equal to 1/3 of the shares subject to the Warrant on each of the first three (3) anniversaries of the Date of Issuance (rounding down to the nearest whole share on each of the first two anniversaries and rounding up on the third anniversary).  Each such anniversary is referred to as a "Vesting Date."

(b)    In the event of a Change in Control of the Company, as defined in the Plan, the Warrant shall become exercisable in full on the effective date of the Change in Control.

(c)    The Warrant may be exercised by the Holder thereof, in whole or in part (but not as to a fractional share of Common Stock), at any time and from time to time after the Warrant becomes exercisable in accordance with Sections 2.2(a) and 2.2(b) hereof and prior to 5:00 P.M., New York time on the sixth (6th) anniversary hereof, unless terminated earlier pursuant to this Warrant Certificate or the Plan (the "Exercise Period").   To the extent that the Warrant or portion thereof is not exercised prior to the expiration of the Exercise Period, it shall be automatically cancelled with no action by any Person, and with no further rights thereunder, upon such expiration.

Section 2.3    Termination of Service

(a)    If the Holder's Service is terminated for cause, as defined in the Plan, or if the Holder resigns without Good Reason (as defined in the Holder's Employment Agreement with the Company dated as of September 21, 2007, as amended   (the "Employment Agreement"), the Warrant, to the extent not theretofore exercised, shall terminate upon the commencement of business on the date of the Holder's termination of Service.

(b)    If the Holder's Service is terminated by the Company without cause, as defined in the Plan, or by the Holder for Good Reason, then the Warrant shall fully vest and become immediately exercisable as of the date of such termination of Service and shall remain exercisable until the expiration of the Exercise Period.

(c)    If the Holder's Service is terminated due to the Holder's death or disability (as defined below), then the Pro Rata Portion of the Warrant (as defined below) shall become exercisable as of such date in addition to the portion of the Warrant which is already exercisable as of such date.  The Warrant, to the extent exercisable as of the date of termination (including,

KL3 2971415.6                                          6

but not limited to, the Pro Rata Portion of the Warrant), shall remain exercisable until the one year anniversary of such termination (but in no event beyond the expiration of the Exercise Period), and the Warrant, to the extent not exercisable as of the date of termination, shall expire as of the date of termination.  For the purposes of this Section 2.3(c):

(i)      The "Pro Rata Portion of the Warrant" shall mean that number of shares with respect to which the Warrant that would become exercisable on the next Vesting Date multiplied by a fraction, the denominator of which is 12 and the numerator of which is the number of completed months (measured from the day of the month of the Vesting Date to the same day of the following month) between the immediately preceding Vesting Date (or the Date of Issuance, if there is no preceding Vesting Date) and the date of termination of Service.

(ii)      "Disability" shall mean any physical or mental condition that would qualify the Holder for a disability benefit under the long-term disability plan maintained by the Company or, if there is no such plan, a physical or mental condition that prevents the Holder from performing the essential functions of the Holder's position (with or without reasonable accommodation) for a period of six consecutive months.  The existence of a disability shall be determined by the Company.

(d)      If the Holder's Service is terminated other than as set forth above, the Holder may exercise the Warrant (i) only to the extent that the Holder was entitled to exercise the Warrant on the termination of Service date; and (ii) exercise must occur within three months after termination of Service but in no event after the original expiration date of the Warrant.

Section 2.4      Method of Exercise.

(a)      In connection with the exercise of the Warrant, the Exercise Price shall be paid as provided in this Section 2.4(a).  In connection with the exercise of the Warrant, the Holder of such Warrant shall exchange the Common Stock purchase rights represented thereby by surrendering such Warrant to the Company, together with a written notice to the Company that the Holder is exchanging the Warrant (or a portion thereof) for the number of Warrant Exercise Shares being exercised, up to the aggregate number of Warrant Exercise Shares for which this Warrant Certificate is exercisable, specified in the notice, from which the Company shall withhold and not issue to such Holder, in payment of the Exercise Price thereof, a number of such Warrant Exercise Shares equal to (x) the number of Warrant Exercise Shares for which the Warrant is being exercised, multiplied by (y) the Exercise Price, and divided by (z) the Closing Sale Price on the Exercise Date (and such withheld shares shall no longer be issuable under the Warrant, and the Holder shall not have any rights or be entitled to any payment with respect to such withheld shares); provided, however, that the shares withheld, when valued based on the fair market value determined under Treasury Regulation 1.409A-1(b)(5)(iv)(A), shall have a value not less than the aggregate Exercise Price.  The issuance of any shares shall be subject to Section 3.6 of the Plan with respect to withholding of taxes and the Company may appropriately reduce the number of Warrant Exercise Shares in order to satisfy any withholding obligation.

(b)      Subject to the terms and conditions of the Plan and this Warrant Certificate, the Holder of a Warrant may exercise, in whole or in part, such Holder's right to

purchase the Warrant Exercise Shares issuable upon exercise of such Warrant, by providing an exercise form for the election to exercise such Warrant ("Exercise Form") substantially in the form of Exhibit A hereto, properly completed and duly executed by the Holder thereof to the Company.

(c)     Any exercise of the Warrant pursuant to the terms of this Warrant Certificate shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms.

(d)     Upon receipt of an Exercise Form pursuant to Section 2.4(a), the Company shall:

(i)     examine such Exercise Form and all other documents delivered to it by or on behalf of Holder as contemplated hereunder to ascertain whether or not, on its face, such Exercise Form and any such other documents have been executed and completed in accordance with their terms and the terms hereof; and

(ii)     if an Exercise Form or other document appears, on its face, to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrant exists, endeavor to inform the appropriate parties (including the person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled.

(e)     The Company reserves the right to reasonably reject any and all Exercise Forms that it determines, in its sole discretion, are not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful.  Any such determination by the Company shall be final and binding on the Holder, absent manifest error.  Moreover, the Company reserves the absolute right to waive any of the conditions to any particular exercise of Warrant or any defects in the Exercise Form(s) with regard to any particular exercise of the Warrant.  The Company shall not be under any duty to give notice to the Holder of any irregularities in any exercise of the Warrant, nor shall it incur any liability for the failure to give such notice.

Section 2.5     Issuance of Common Stock.

(a)     Upon exercise of the Warrant pursuant to Section 2.4, the Company shall promptly at its expense, and in no event later than five (5) Business Days thereafter, cause to be issued to the Holder of  the Warrant the total number of whole shares of Common Stock for which the Warrant is being exercised, subject to Section 2.4(a) (as the same may be hereafter adjusted pursuant to Article III) in such denominations as are requested by the Holder.

(b)     Notwithstanding the five (5) Business Day period described in Section 2.5(a), the Warrant Exercise Shares shall be deemed to have been issued to the Holder at the time at which all of the conditions to such exercise have been fulfilled, and the Holder shall be deemed for all purposes to have become the holder of such Warrant Exercise Shares at such time.

(c)    If less than all of the shares evidenced by the Warrant Certificate are exercised at any time prior to the termination of the Exercise Period, a new Warrant Certificate or Warrant Certificates shall be issued for the remaining number of shares evidenced by the Warrant Certificate.

Section 2.6    Reservation of Shares.    The Company shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock solely for the purpose of issuance upon the exercise of the Warrant, a number of shares of Common Stock equal to the aggregate Warrant Exercise Shares issuable upon the exercise of the Warrant.  The Company shall use commercially reasonable efforts to take all such actions as may be necessary to assure that all such shares of Common Stock may be so issued without violating the Company's governing documents or any requirements of any national securities exchange upon which shares of Common Stock may be listed.  The Company shall not take any action which would cause the number of authorized but unissued shares of Common Stock to be less than the number of such shares required to be reserved hereunder for issuance upon exercise of the Warrant.

Section 2.7    Fractional Shares.    Notwithstanding any provision to the contrary contained in this Warrant Certificate, the Company shall not be required to issue any fraction of a share of its capital stock in connection with the exercise of the Warrant, and in any case where the Holder would, except for the provisions of this Section 2.7, be entitled under the terms of the Warrant to receive a fraction of a share upon the exercise of the Warrant, the Company shall, upon the exercise of the Warrant, issue or cause to be issued only the largest whole number of Warrant Exercise Shares issuable upon such exercise (and such fraction of a share will be disregarded, and the Holder shall not have any rights to be entitled to any payment with respect to such fraction of a share); provided, that if more than one Warrant is presented for exercise at the same time by the same Holder, the number of whole Warrant Exercise Shares which shall be issuable upon the exercise thereof shall be computed on the basis of the aggregate number of Warrant Exercise Shares issuable upon exercise of all such Warrants.

Section 2.8    Public Offering.    Notwithstanding any other provision hereof, if an exercise of any portion of a Warrant is to be made in connection with a registered public offering or the sale of the Company, the exercise of any portion of such Warrant may, at the election of the holder thereof, be conditioned upon the consummation of such registered public offering or sale of the Company, in which case such exercise shall be deemed to be effective concurrently with the consummation of such transaction.

Section 2.9    Close of Books; Par Value.    The Company shall not close its books against the transfer of any Warrant or any Warrant Exercise Shares in any manner which interferes with the timely exercise of such Warrant.  The Company shall use commercially reasonable efforts to, from time to time, take all such action as may be necessary to assure that the par value per share of the unissued shares of Common Stock acquirable upon exercise of each Warrant is at all times equal to or less than the Exercise Price then in effect.

Section 2.10    Payment of Taxes.    The Company shall not be required to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of any shares of Common Stock (including certificates therefor) or payment of cash or other property to any recipient other than the Holder of the Warrant surrendered upon the exercise of a Warrant, and in

case of such transfer or payment, the Company shall not be required to issue or deliver any shares or pay any cash until (a) such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Company or (b) it has been established to the Company's satisfaction that any such tax or other charge that is or may become due has been paid.

## ARTICLE III

### ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF WARRANT EXERCISE SHARES

In order to prevent dilution of the rights granted under each Warrant, the Exercise Price shall be subject to adjustment from time to time as provided in this Article III, and the number of shares of Common Stock obtainable upon exercise of each Warrant shall be subject to adjustment from time to time as provided in this Article III; provided, however, that no such adjustment shall be made to the extent that it would cause the Warrant to be subject to tax under Section 409A of the Internal Revenue Code of 1986, as amended.

Section 3.1    Adjustments.

(a)    Subdivision or Combination of Common Stock.  If the Company at any time after the issuance of the Warrant but prior to the expiration of the Exercise Period subdivides (by any stock split, stock dividend or reclassification) the Common Stock into a greater number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately reduced, and the number of Warrant Exercise Shares issuable upon exercise of the Warrant shall be proportionately increased.  If the Company at any time prior to the expiration of the Exercise Period combines (by reverse stock split, or reclassification) the Common Stock into a smaller number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately increased and the number of Warrant Exercise Shares issuable upon exercise of the Warrant shall be proportionately decreased. Any adjustment under this Section 3.1(a) shall become effective immediately upon the effectiveness of such subdivision or combination.

(b)    Distributions. If the Company at any time after the issuance of the Warrant but prior to the expiration of the Exercise Period fixes a record date for the making of a distribution to all holders of shares of the Common Stock of securities, evidences of indebtedness, assets, cash, rights or warrants (excluding dividends or distributions referred to in Section 3.1(a)), then, in each such case, the Exercise Price in effect prior to such record date shall be adjusted thereafter to the price determined by the following formula:

$$EP_1 = EP_0 \ x \ (CP_0 - FV)/CP_0$$

where

$EP_1$    =    the Exercise Price in effect immediately following the application of the adjustments in this Section 3.1(b);

$EP_0$    =    the Exercise Price in effect immediately prior to the application

of the adjustments in this Section 3.1(b);

$CP_0$ = the Closing Sale Price of the Common Stock on the last trading day preceding the first date on which the Common Stock trades regular way without the right to receive such distribution; and

FV = the amount of cash and/or the fair market value of the securities, evidences of indebtedness, assets, rights or warrants to be so distributed in respect of one share of Common Stock, as determined by the Board of Directors of the Company, acting in good faith.

Such adjustment shall be made successively whenever such a record date is fixed. In such event, the number of Warrant Exercise Shares issuable upon the exercise of the Warrant represented by this Warrant Certificate shall be increased to the number obtained by dividing (x) the product of (1) the number of Warrant Exercise Shares issuable upon the exercise of the Warrant represented by this Warrant Certificate before such adjustment, and (2) the Exercise Price in effect immediately prior to the adjustment by (y) the new Exercise Price immediately following such adjustment.

In the event that such distribution is not so made, the Exercise Price and the number of Warrant Exercise Shares issuable upon exercise of the Warrant then in effect shall be readjusted, effective as of the date when the Board of Directors of the Company determines not to distribute such shares, evidences of indebtedness, assets, rights, cash or warrants, as the case may be, to the Exercise Price that would then be in effect and the number of Warrant Exercise Shares that would then be issuable upon exercise of the Warrant if such record date had not been fixed.

(c)    Pro Rata Repurchase Offer of Common Stock.  If at any time after the issuance of the Warrant but prior to the expiration of the Exercise Period the Company consummates a Pro Rata Repurchase Offer of Common Stock, then the Exercise Price shall be reduced to the price determined by the following formula:

$$EP_1 = EP_0 \ x \ \frac{(OS_0 \ x \ CP_0) - AP}{(OS_0 - SP) \ x \ CP_0}$$

where

$EP_1$ = the Exercise Price in effect immediately following the application of the adjustments in this Section 3.1(c) (but in no event greater than $EP_0$);

$EP_0$ = the Exercise Price in effect immediately prior to the application of the adjustments in this Section 3.1(c);

$OS_0$ = the number of Fully Diluted shares of Common Stock outstanding immediately before consummation of such Pro Rata Repurchase Offer;

$CP_0$ = the Closing Sale Price of a share of Common Stock on the trading day immediately preceding the first public announcement by the Company or any of its Affiliates of the intent to effect such Pro Rata Repurchase Offer;

AP = the aggregate purchase price (including the fair market value, as determined in good faith by the Board of Directors of the Company, of any non-cash consideration included therein) paid for the shares of Common Stock repurchased in the Pro Rata Repurchase Offer; and

SP = the number of shares of Common Stock so repurchased in the Pro Rata Repurchase Offer.

In such event, the Warrant Exercise Shares issuable upon the exercise of the Warrant shall be increased to the number obtained by dividing (x) the product of (1) the Warrant Exercise Shares issuable upon the exercise of the Warrant before such adjustment, and (2) the Exercise Price in effect immediately prior to the adjustment by (y) the new Exercise Price immediately following such adjustment. For the avoidance of doubt, no increase to the Exercise Price or decrease in the Warrant Exercise Shares issuable upon exercise of the Warrant shall be made pursuant to this Section 3.1(c).

(d)     Reorganization, Reclassification, Consolidation, Merger or Sale.   In connection with any Organic Change prior to the expiration of the Exercise Period, the Company shall make appropriate provision to ensure that the Holder of the Warrant shall have the right to acquire and receive, upon exercise of such Warrant, such cash, stock, securities or other assets or property as would have been issued or payable in such Organic Change (if the holder had exercised such Warrant immediately prior to such Organic Change) with respect to or in exchange, as applicable, for the number of Warrant Exercise Shares that would have been issued upon exercise of such Warrant, if such Warrant had been exercised immediately prior to the occurrence of such Organic Change.

(e)     Notwithstanding Section 3.1(d) or anything contained in this Warrant Certificate, in the event of any Third Party Cash Sale, the Company shall pay (or cause to be paid) to the Holders, with respect to each unexercised Warrant outstanding immediately prior to the consummation of such Third Party Cash Sale (the "Third Party Sale Closing"), cash in an amount equal to the excess, if any, of the Third Party Sale Price over the Exercise Price; provided, however, that no Holder shall be entitled to any payment hereunder with respect to any portion of the Third Party Sale Price that is contingent, deferred or escrowed unless and until such amounts are actually paid to the holders of Common Stock or to the Company or its Subsidiaries, as applicable.  Upon the occurrence of a Third Party Sale Closing, all unexercised Warrants outstanding immediately prior to the Third Party Sale Closing shall automatically be terminated and cancelled and the Company shall thereupon cease to have any further obligations or liability with respect to the Warrants, except as required by this Section 3.1(e). For the avoidance of doubt, the Holders shall not be entitled to any payment or consideration with respect to any Third Party Cash Sale with respect to which the Third Party Sale Price is equal to or less than the Exercise Price.

KL3 2971415.6                                          12

(f)     Ordinary Dividends.  The Closing Sale Price of a share of Common Stock as of the Date of Issuance is $[__] (the "Initial Per Share Value").  In the event that the Exercise Price is adjusted pursuant to Section 3.1(a) hereof, the Initial Per Share Value shall be similarly adjusted.  To the extent that the adjustment under Section 3.1(b) with respect to ordinary dividends would reduce the Exercise Price below the Initial Per Share Value, as adjusted from time to time, such adjustment shall not be made unless otherwise permitted under Section 409A of the Code.

Section 3.2     Notices.  Whenever the number and/or kind of Warrant Exercise Shares or the Exercise Price is adjusted as herein provided, the Company shall prepare and deliver, or cause to be prepared and delivered, forthwith to the Holder a written statement setting forth the adjusted number and/or kind of shares purchasable upon the exercise of the Warrant and the Exercise Price of such shares after such adjustment, the facts requiring such adjustment and the computation by which adjustment was made, and give written notice to the Holder in the manner provided in Section 6.2 below, of the record date or the effective date of the event.  Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event.

Section 3.3     Form of Warrant After Adjustments.  The form of the Warrant Certificate need not be changed because of any adjustments in the Exercise Price or the number or kind of the Common Stock, and Warrants theretofore or thereafter issued may continue to express the same price and number and kind of shares as are stated in Warrants, as initially issued.  The Company, however, may at any time in its sole discretion make any change in the form of Warrant Certificate that it may deem appropriate to give effect to such adjustments and that does not affect the substance of the Warrant Certificate, and any Warrant Certificate thereafter issued, whether in exchange or substitution for an outstanding Warrant Certificate, may be in the form so changed.

Section 3.4     Deferral or Exclusion of Certain Adjustments.  No adjustment to the Exercise Price or the number of Warrant Exercise Shares shall be required hereunder unless such adjustment together with other adjustments carried forward as provided below, would result in an increase or decrease of at least one percent (1%) of the applicable Exercise Price or the number of Warrant Exercise Shares; provided, that any adjustments which by reason of this Section 3.4 are not required to be made shall be carried forward and taken into account in any subsequent adjustment. No adjustment need be made for a change in the par value of the shares of Common Stock. All calculations under this Section shall be made to the nearest one one thousandth (1/1,000 ) of one cent ($0.01) or to the nearest one one thousandth (1/1,000 ) of a share, as the case may be.

## ARTICLE IV

## TRANSFER AND EXCHANGE
## OF WARRANTS

Section 4.1     Transfer of the Warrant.  The Warrant shall only be assignable or transferable by will or by the laws of descent and distribution, subject to any transfer restrictions set forth in the Company's Articles of Incorporation; provided, that the Holder may transfer all or a portion of the Warrant to (A) the Holder's spouse, children or grandchildren ("Immediate

Family Members"), (B) a trust or trusts for the exclusive benefit of such Immediate Family Members, or (C) other parties approved by the Company, provided, however, that no such transfer may be for consideration.

Section 4.2    Obligations with Respect to Transfers and Exchanges of the Warrant.

(a)    All Warrant Certificates issued upon any registration of transfer or exchange of Warrant Certificates shall be the valid obligations of the Company, entitled to the same benefits under this Warrant Certificate as the Warrant Certificates surrendered upon such registration of transfer or exchange.

(b)    No service charge shall be made to the Holder for any registration, transfer or exchange but the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed on the Holder in connection with any such exchange or registration of transfer.

Section 4.3    Registry of Warrants.

(a)    The Company shall maintain a registry showing the name and address of the Holder as the registered holder of this Warrant Certificate. This Warrant Certificate may be surrendered for exchange or exercise, in accordance with its terms, at the office of the Company, and the Company shall be entitled to rely in all respects, prior to written notice to the contrary, upon such registry.

(b)    The Company shall register the transfer of any portion of this Warrant Certificate in the registry upon the Holder's compliance with this Article IV, provided that such transfer is made in compliance with the Securities Act and state securities laws.

Section 4.4    Fractional Warrants.  The Company shall not be required to effect any registration of transfer or exchange which will result in the issuance of a warrant certificate for a fraction of a Warrant.

**ARTICLE V**

**OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANTS**

Section 5.1    No Rights or Liability as Stockholder.  Nothing contained in the Warrant shall be construed as conferring upon the Holder or his, her or its transferees the right to vote or to receive dividends or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or of any other matter, or any rights whatsoever as stockholders of the Company.  The consent of any Holder shall not be required with respect to any action or proceeding of the Company and no Holder shall have any right not expressly conferred hereunder. No holder, by reason of the ownership or possession of this Warrant shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions paid, allotted or distributed or distributable to the holders of Common Stock prior to, or for which the relevant record date preceded, the date of the exercise of this Warrant.  No provision hereof and no mere enumeration herein of the rights or privileges of the Holder shall give rise to any liability of such holder for the Exercise Price hereunder or as a

KL3 2971415.6

14

stockholder of the Company, whether such liability is asserted by the Company or by creditors of the Company.

Section 5.2    Notice to Holders.  The Company shall give notice to Holders by regular mail or press release if at any time prior to the expiration or exercise in full of the Warrants, any of the following events shall occur:

(a)    the payment of any dividend payable in any securities upon shares of Common Stock or the making of any distribution (other than a regular quarterly cash dividend) to all holders of Common Stock;

(b)    the issuance to all holders of Common Stock of any additional shares of Common Stock or of rights, options or warrants to subscribe for or purchase Common Stock or of any other subscription rights, options or warrants;

(c)    a Pro Rata Repurchase Offer;

(d)    a dissolution, liquidation or winding up of the Company;

(e)    an Organic Change; or

(f)    the consummation of a Third Party Cash Sale.

Such giving of notice shall be initiated at least ten (10) days prior to the date fixed as the record date or the date of closing of the Company's stock transfer books for the determination of the stockholders entitled to such dividend, distribution or subscription rights, or of the stockholders entitled to vote on such Organic Change, dissolution, liquidation or winding up, or of the proposed date of such Third Party Sale Closing or the proposed effective date of such Pro Rata Repurchase Offer, as applicable.  Such notice shall specify such record date or the date of closing the stock transfer books or proposed effective date, as the case may be.  Failure to provide such notice shall not affect the validity of any action taken in connection with any such dividend, distribution or subscription rights, Pro Rata Repurchase Offer, Third Party Cash Sale, or proposed merger, consolidation, sale, conveyance, dissolution, liquidation or winding up.  For the avoidance of doubt, no such notice shall supersede or limit any adjustment called for by Section 3.1 by reason of any event as to which notice is required by this Section.

Section 5.3    Lost, Stolen, Mutilated or Destroyed Warrant Certificates.  If this Warrant Certificate is lost, stolen, mutilated or destroyed, the Company shall issue and, if provided with all necessary information and documents, deliver, in exchange and substitution for and upon cancellation of the mutilated Warrant Certificate, or in lieu of and substitution for the Warrant Certificate lost, stolen or destroyed, a new Warrant Certificate of like tenor and representing an equivalent number of Warrants, but only upon receipt of evidence and an affidavit reasonably satisfactory to the Company of the loss, theft or destruction of such Warrant Certificate, and, if requested by either the Company, a bond sufficient to indemnify the Company against any claim that may be made against the Company on account of the loss, theft, mutilation or destruction of any such Warrant Certificate or the issuance of such new certificate.  Applicants for such substitute Warrant Certificates shall also comply with such other reasonable regulations and pay

such other reasonable charges as the Company may prescribe and as required by Section 8-405 of the Uniform Commercial Code as in effect in the State of New York.

Section 5.4   No Restrictive Legends.  No legend shall be stamped or imprinted on any stock certificate for Common Stock issued upon the exercise of any Warrant and or stock certificate issued upon the direct or indirect transfer of any such Common Stock.

Section 5.5   Cancellation of the Warrant.  If the Company shall purchase or otherwise acquire the Warrant, this Warrant Certificate shall thereupon be delivered to the Company to be cancelled by it and retired.  The Company shall cancel all Warrant Certificates surrendered, and accepted, for exchange, substitution, transfer or exercise in whole or in part.

Section 5.6   Reimbursement of Excise Tax.  In the event that the Holder incurs any Excise Tax (as defined in the Holder's Employment Agreement) on any payments or benefits under this Warrant Certificate, the Company shall gross-up the Holder the amount of such Excise Tax incurred in accordance with the provisions of Section 7(b) of the Employment Agreement (such provisions to apply irrespective of whether the Employment Agreement or its Term continues in effect at the time of such Excise Tax) and such Section 7(b) of the Employment Agreement relating to the Gross-Up Payment (as defined in the Employment Agreement) shall be incorporated with full effect into this Agreement, provided that any reference to "you" and to "this Agreement" in such Section 7(b) shall be deemed to refer to the Holder and this Warrant Certificate, respectively.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.1   Binding Effects; Benefits.  This Warrant Certificate shall inure to the benefit of and shall be binding upon the Company and the Holder and their respective heirs, legal representatives, successors and assigns.  Nothing in this Warrant Certificate, expressed or implied, is intended to or shall confer on any person other than the Company and the Holder, or their respective heirs, legal representatives, successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Warrant Certificate.

Section 6.2   Notices.  Unless a provision herein permits notice by way of a press release, any notice or other communication required or which may be given hereunder shall be in writing and shall be sent by certified or regular mail (return receipt requested, postage prepaid), by private national courier service, by personal delivery or by facsimile transmission.  Such notice or communication shall be deemed given (i) if mailed, two days after the date of mailing, (ii) if sent by national courier service, one Business Day after being sent, (iii) if delivered personally, when so delivered, or (iv) if sent by facsimile transmission, on the Business Day after such facsimile is transmitted, in each case as follows:

if to the Company, to:

Genco Shipping & Trading Limited
299 Park Avenue
New York, New York 10171

KL3 2971415.6                                                        16

Facsimile: (646) 443-8551
Attention: John C. Wobensmith

with copies (which shall not constitute notice) to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Facsimile: (212) 715-8100
Attention: Thomas E. Molner

if to Holder, at its address or facsimile number as appears on the books of the Company maintained for such purpose or as specified in a notice given in accordance with this Section 6.2.

Section 6.3    Persons Having Rights under this Warrant Certificate.  Nothing in this Warrant Certificate expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any person or corporation other than the parties hereto and the Holder, any right, remedy, or claim under or by reason of this Warrant Certificate or of any covenant, condition, stipulation, promise, or agreement hereof.  All covenants, conditions, stipulations, promises, and agreements contained in this Warrant Certificate shall be for the sole and exclusive benefit of the parties hereto, their successors and assigns and the Holder.

Section 6.4    Counterparts.  This Warrant Certificate may be executed in any number of original or facsimile or electronic PDF counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

Section 6.5    Effect of Headings.  The section headings herein are for convenience only and are not part of this Warrant Certificate and shall not affect the interpretation hereof.

Section 6.6    Amendments.

(a)    Subject to Section 6.6(b) below, this agreement may not be amended except in writing signed by both parties hereto.

(b)    The Company may from time to time supplement or amend this Warrant Certificate or the Warrant –

(i)    without the approval of the Holder in order to cure any ambiguity, manifest error or other mistake in this Warrant Certificate or the Warrant, or to correct or supplement any provision contained herein or in the Warrant that may be defective or inconsistent with any other provision herein or in the Warrant, or to make any other provisions in regard to matters or questions arising hereunder that the Company may deem necessary or desirable and that shall not adversely affect, alter or change the interests of the Holder in any material respect, or

(ii)        with the prior written consent of the Holder.

(c)        Any amendment, modification or waiver effected pursuant to and in accordance with the provisions of this Section 6.6 will be binding upon the Holder and upon each future Holder and the Company.  In the event of any amendment, modification or waiver, the Company will give prompt notice thereof to the Holder and, if appropriate, notation thereof will be made on all Warrant Certificates thereafter surrendered for registration of transfer or exchange. Any failure of the Company to give such notice or any defect therein, shall not, however, in any way impair or affect the validity of any such amendment.

Section 6.7    No Inconsistent Agreements; No Impairment.  The Company shall not, on or after the date hereof, enter into any agreement with respect to its securities which conflicts with the rights granted to the Holder in the Warrant or the provisions hereof.  The Company represents and warrants to the Holder that the rights granted hereunder do not in any way conflict with the rights granted to holders of the Company's securities under any other agreements.  The Company shall not, by amendment of its Articles of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of the Warrant and in the taking of all such action as may be necessary in order to preserve the exercise rights of the Holder against impairment.

Section 6.8    Integration/Entire Agreement.  This Warrant Certificate is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Company and the Holder in respect of the subject matter contained herein.  There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein, with respect to the Warrant.  This Warrant Certificate and the Warrant supersede all prior agreements and understandings between the parties with respect to such subject matter.

Section 6.9    Governing Law, Etc.  This Warrant Certificate and each Warrant issued hereunder shall be deemed to be a contract made under the Laws of the State of New York and for all purposes shall be governed by and construed in accordance with the Laws of such State. Each party hereto consents and submits to the jurisdiction of the courts of the State of New York and of the federal courts of the Southern District of New York in connection with any action or proceeding brought against it that arises out of or in connection with, that is based upon, or that relates to this Warrant Certificate or the transactions contemplated hereby.  In connection with any such action or proceeding in any such court, each party hereto hereby waives personal service of any summons, complaint or other process and hereby agrees that service thereof may be made in accordance with the procedures for giving notice set forth in Section 6.2 hereof. Each party hereto hereby waives any objection to jurisdiction or venue in any such court in any such action or proceeding and agrees not to assert any defense based on forum *non conveniens* or lack of jurisdiction or venue in any such court in any such action or proceeding.

Section 6.10   Termination.  This Warrant Certificate will terminate on the earlier of (i) such date when the Warrant has been exercised with respect to all shares subject thereto, or (ii)

KL3 2971415.6                                          18

the expiration of the Exercise Period. The provisions of this <u>Article VI</u> shall survive such termination.

Section 6.11 <u>Waiver of Trial by Jury</u>. Each party hereto hereby irrevocably and unconditionally waives the right to a trial by jury in any action, suit, counterclaim or other proceeding (whether based on contract, tort or otherwise) arising out of, connected with or relating to this Warrant Certificate and the transactions contemplated hereby.

Section 6.12 <u>Remedies</u>. The Company hereby agrees that, in the event that the Company violates any provisions of a Warrant (including the obligation to deliver shares of Common Stock upon the exercise thereof), the remedies at law available to the Holder may be inadequate. In such event, the Holder shall have the right, in addition to all other rights and remedies any of them may have, to specific performance and/or injunctive or other equitable relief to enforce the provisions of this Warrant Certificate.

Section 6.13 <u>Severability</u>. In the event that any one or more of the provisions contained in this Warrant Certificate, or the application thereof in any circumstances, is held invalid, illegal or unenforceable, the validity, legality and enforceability of any such provisions in every other respect and of the remaining provisions contained herein and therein shall not be affected or impaired thereby.

[Signature Page Follows]

KL3 2971415.6

19

IN WITNESS WHEREOF, the Company has caused this Warrant Certificate to be duly executed by a duly authorized officer as of the day and year first above written.

GENCO SHIPPING & TRADING LIMITED

By: _____

Name:

Title:

**EXHIBIT A**

EXERCISE FORM FOR HOLDER
(To be executed upon exercise of Warrant)

       The undersigned, being the holder of the Warrant Certificate issued by Genco Shipping & Trading Limited identified below, hereby irrevocably elects to exercise the right to purchase the number of shares of Common Stock indicated below pursuant to the net issuance exercise provisions of Section 2.4(a) of the Warrant Certificate.

| | |
|---|---|
| Warrant Certificate Number | _____ |
| Number of Shares of Common Stock | _____ |
| | (Total number of shares of Common Stock for which the Warrant is being exercised, before withholding for the Exercise Price.  Not to exceed the number of shares of Common Stock for which such Warrant is exercisable in the aggregate.) |

Signature of Holder: _____

By: _____

Name: _____

Title: _____

Date: _____

KL3 2971415.6

## EXHIBIT F

**MIP RESTRICTED STOCK AGREEMENT – JOHN C. WOBENSMITH**

**FORM**

**Genco Shipping & Trading Limited**
**Executive Officer Restricted Stock Grant Agreement**

THIS AGREEMENT, made as of **[Month] [Day], [Year]**, between GENCO SHIPPING & TRADING LIMITED (the "Company") and **John C. Wobensmith** (the "Participant").

WHEREAS, the Prepackaged Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code, dated April 16, 2014 (as such plan may be modified, amended or supplemented from time to time, the "Prepack Plan") pertaining to the Company has become effective;

WHEREAS, pursuant to and in furtherance of the Prepack Plan, the Company has adopted the Genco Shipping & Trading Limited 2014 Management Incentive Plan (the "MIP"), effective as of the "Effective Date" of the Prepack Plan (as defined in the Prepack Plan), in order to grant warrants to purchase shares of shares of common stock of the reorganized Company ("Common Stock") and to grant restricted shares of Common Stock;

WHEREAS, the MIP provides that the Board of Directors of the Company or its delegatee (collectively, the "Board of Directors") shall administer the MIP and determine the key persons to whom awards shall be granted and the amount and type of such awards; and

WHEREAS, pursuant to the Prepack Plan, the Board of Directors has determined to grant the Participant an award under the MIP as set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter set forth, the parties hereto hereby agree as follows:

1.      Grant of Restricted Stock. Pursuant to, and subject to, the terms and conditions set forth herein (including without limitation Section 17 hereof) and in the MIP, the Board of Directors hereby grants to the Participant **[Number of Shares]** restricted shares (the "Restricted Stock") of Common Stock.

2.      Grant Date. The Grant Date of the Restricted Stock is **[Month] [Day], [Year]**.

3.      Incorporation of MIP. All terms, conditions and restrictions of the MIP are incorporated herein and made part hereof as if stated herein. If there is any conflict between the terms and conditions of the MIP and this Agreement, the terms and conditions of the MIP, as interpreted by the Board of Directors, shall govern. Except as otherwise provided herein, all capitalized terms used herein shall have the meaning given to such terms in the MIP.

4.      Vesting.

(a)      Subject to Section 4(b) hereof and the further provisions of this Agreement, a number of whole shares of Restricted Stock equal to 1/3 of the total number of shares granted hereunder shall vest on each of the first three anniversaries of the Grant Date

KL3 2971426.5

(rounding down to the nearest whole share on each of the first two anniversaries and rounding up on the third anniversary) (each such date, a "Vesting Date").

(b)      In the event of the occurrence of a Change in Control, as defined in Section 3.8(a) of the MIP, as in effect on the date of such occurrence, the Restricted Stock shall become vested in full on the date of such Change in Control.

5.      Restrictions on Transferability.  Until a share of Restricted Stock vests, the Participant shall not transfer the Participant's rights to such share of Restricted Stock or to any rights related thereto.  In addition, any transfers shall also be subject to the transfer restrictions set forth in the Company's Articles of Incorporation.  Any attempt to transfer unvested shares of Restricted Stock or any rights related thereto, whether by transfer, pledge, hypothecation or otherwise and whether voluntary or involuntary, by operation of law or otherwise, shall not vest the transferee with any interest or right in or with respect to such shares of Restricted Stock or such related rights.

6.      Termination of Service.

(a)      In the event that the Participant's Service with the Company terminates before all the shares of Restricted Stock are vested for any reason other than a termination by the Company without cause (as defined in the MIP), by the Participant for Good Reason (as defined in the Participant's Employment Agreement with the Company dated as of September 21, 2007, as amended  (the "Employment Agreement")), or the Participant's death or disability (as defined in the MIP), all unvested shares of Restricted Stock, together with any property received in respect of such shares, as set forth in Section 9 hereof, shall be forfeited as of the date such Service terminates, and the Participant promptly shall return to the Company any certificates evidencing such shares, together with any cash dividends or other property received in respect of such shares.  For purposes hereof, "Service" means a continuous time period during which the Participant is at least one of the following:  an employee or a director of, or a consultant to, the Company.

(b)      In the event that, before all the shares of Restricted Stock are vested, the Participant's Service with the Company is terminated by the Company without cause (as defined in the MIP) or by the Participant for Good Reason, all shares of Restricted Stock shall become vested immediately prior to such termination of Service.

(c)      In the event that, before all the shares of Restricted Stock are vested, the Participant's Service with the Company terminates for reason of the Participant's death or disability (as defined in the MIP), a Pro Rata Portion of the shares of Restricted Stock shall become vested immediately prior to the date such Service terminates in addition to the portion of the shares of Restricted Stock which have already become vested as of such date, and all other shares of Restricted Stock which are not and have not become vested, together with any property received in respect of such shares, as set forth in Section 9 hereof, shall be forfeited as of the date such Service terminates, and the Participant promptly shall return to the Company any certificates evidencing such shares, together with any cash dividends or other property received in respect of such shares.  For purposes hereof, "Pro Rata Portion" shall mean that number of shares of Restricted Stock that would become vested on the next Vesting Date multiplied by a

- 2 -

KL3 2971426.5

fraction, the denominator of which is 12 and the numerator of which is the number of completed months (measured from the day of the month of the Vesting Date to the same day of the following month) between the immediately preceding Vesting Date (or the Grant Date if there is no preceding Vesting Date) and the date of termination of Service.

7.    Issuance of Shares.

(a)    Reasonably promptly after the Grant Date, the Company shall issue and deliver to the Participant stock certificates, registered in the name of the Participant, evidencing the shares of Restricted Stock or shall instruct its transfer agent to issue shares of Restricted Stock which shall be maintained in book entry form on the books of the transfer agent.  The Restricted Stock, if certificated, shall bear the following legend:

"THE SALE, TRANSFER, ASSIGNMENT, PLEDGE, HYPOTHECATION ENCUMBRANCE OR OTHER DISPOSAL OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS OF THE GENCO SHIPPING & TRADING LIMITED 2014 MANAGEMENT INCENTIVE PLAN AND A RESTRICTED STOCK GRANT AGREEMENT BETWEEN GENCO SHIPPING & TRADING LIMITED AND THE HOLDER OF RECORD OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE.  NO TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IN CONTRAVENTION OF SUCH PLAN AND RESTRICTED STOCK GRANT AGREEMENT SHALL BE VALID OR EFFECTIVE.  COPIES OF SUCH AGREEMENT MAY BE OBTAINED BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD OF THE CERTIFICATE TO THE SECRETARY OF GENCO SHIPPING & TRADING LIMITED."

If the Restricted Stock is in book entry form, it shall be subject to electronic coding or stop order indicating that such shares of Restricted Stock are restricted by the terms of this Agreement and the MIP.  Such legend, electronic coding or stop order shall not be removed until such shares of Restricted Stock vest.

(b)    Reasonably promptly after any such shares of Restricted Stock vest pursuant to Section 4 hereof, (i) in the case of certificated shares, in exchange for the surrender to the Company of the certificates evidencing the Restricted Stock, delivered to the Participant under Section 7(a) hereof, and the certificates evidencing any other securities received in respect of such shares, if any, the Company shall issue and deliver to the Participant (or the Participant's legal representative, beneficiary or heir) certificates evidencing such shares of Restricted Stock and such other securities, free of the legend provided in Section 7(a) hereof and (ii) in the case of book entry shares, the Company shall cause to be lifted and removed any electronic coding or stop order established pursuant to Section 7(a) hereof.

(c)    The Company may require as a condition of the delivery of stock certificates or the removal of any electronic coding or stop order, pursuant to Section 7(b) hereof, that the Participant remit to the Company an amount sufficient in the opinion of the Company to satisfy any federal, state and other governmental tax withholding requirements related to the

- 3 -

vesting of the applicable shares. The Board of Directors, in its sole discretion, may permit the Participant to satisfy such obligation by delivering shares of Common Stock or by directing the Company to withhold from delivery shares of Common Stock, in either case valued at their Fair Market Value on the Vesting Date with fractional shares being settled in cash.

(d)     The Participant shall not be deemed for any purpose to be, or have rights as, a shareholder of the Company by virtue of the grant of Restricted Stock, except to the extent a stock certificate is issued therefor or an appropriate book entry is made on the books of the transfer agent reflecting the issuance thereof pursuant to Section 7(a) hereof, and then only from the date such certificate is issued or such book entry is made. Upon the issuance of a stock certificate or the making of an appropriate book entry on the books of the transfer agent, the Participant shall have the rights of a shareholder with respect to the Restricted Stock, including the right to vote the shares, subject to the restrictions on transferability and the forfeiture provisions, as set forth in this Agreement.

8.     Securities Matters. The Company shall be under no obligation to effect the registration pursuant to the Securities Act of 1933, as amended (the "1933 Act") of any interests in the MIP or any shares of Common Stock to be issued thereunder or to effect similar compliance under any state laws. The Company shall not be obligated to cause to be issued any shares, whether by means of stock certificates or appropriate book entries, unless and until the Company is advised by its counsel that the issuance of such shares is in compliance with all applicable laws, regulations of governmental authority and the requirements of any securities exchange on which shares of Common Stock are traded. The Board of Directors may require, as a condition of the issuance of shares of Common Stock pursuant to the terms hereof, that the recipient of such shares make such covenants, agreements and representations, and that any certificates bear such legends and any book entries be subject to such electronic coding, as the Board of Directors, in its sole discretion, deems necessary or desirable. The Participant specifically understands and agrees that the shares of Common Stock, if and when issued, may be "restricted securities," as that term is defined in Rule 144 under the 1933 Act and, accordingly, the Participant may be required to hold the shares indefinitely unless they are registered under such Act or an exemption from such registration is available.

9.     Dividends, etc. Any cash dividends or other property (but not including securities) received by a Participant with respect to a share of Restricted Stock shall be returned to the Company in the event such share of Restricted Stock is forfeited, subject to Section 2.7(e) of the MIP. Any securities received by a Participant with respect to a share of Restricted Stock as a result of any dividend, recapitalization, merger, consolidation, combination, exchange of shares or otherwise will not vest until such share of Restricted Stock vests and shall be forfeited if such share of Restricted Stock is forfeited, subject to Section 2.7(e) of the MIP. Unless the Board of Directors otherwise determines, such securities shall bear the legend or be subject to the electronic coding or stop order set forth in Section 7(a) hereof.

10.     Delays or Omissions. No delay or omission to exercise any right, power or remedy accruing to any party hereto upon any breach or default of any party under this Agreement, shall impair any such right, power or remedy of such party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be

- 4 -

deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party or any provisions or conditions of this Agreement, must be in a writing signed by such party and shall be effective only to the extent specifically set forth in such writing.

11.     Right of Discharge Preserved.  Nothing in this Agreement shall confer upon the Participant the right to continue in the employ or other service of the Company, or affect any right which the Company may have to terminate such employment or service.

12.     Integration. This Agreement contains the entire understanding of the parties with respect to its subject matter. There are no restrictions, agreements, promises, representations, warranties, covenants or undertakings with respect to the subject matter hereof other than those expressly set forth herein. This Agreement, including, without limitation, the MIP, supersedes all prior agreements and understandings between the parties with respect to its subject matter.

13.     Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

14.     Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, without regard to the provisions governing conflict of laws.

15.     Obligation to Notify.  If the Participant makes the election permitted under Section 83(b) of the Internal Revenue Code of 1986, as amended (that is, an election to include in gross income in the year of transfer the amounts specified in Section 83(b)), the Participant shall notify the Company of such election within 10 days of filing notice of the election with the Internal Revenue Service and shall within the same 10-day period remit to the Company an amount sufficient in the opinion of the Company to satisfy any federal, state and other governmental tax withholding requirements related to such inclusion in Participant's income. The Participant should consult with his or her tax advisor to determine the tax consequences of acquiring the Restricted Stock and the advantages and disadvantages of filing the Section 83(b) election.  The Participant acknowledges that it is his or her sole responsibility, and not the Company's, to file a timely election under Section 83(b), even if the Participant requests the Company or its representatives to make this filing on his or her behalf.

16.     Reimbursement for Excise Tax.  In the event that the Participant incurs any Excise Tax (as defined in the Employment Agreement) on any payments or benefits under this Agreement, the Company shall gross-up the Participant the amount of such Excise Tax incurred in accordance with the provisions of Section 7(b) of the Employment Agreement (such provisions to apply irrespective of whether the Employment Agreement or its Term continues in effect at the time of such Excise Tax) and such Section 7(b) of the Employment Agreement relating to the Gross-Up Payment (as defined in the Employment Agreement) shall be incorporated with full effect into this Agreement, provided that any reference to "you" and to

KL3 2971426.5

"this Agreement" in such Section 7(b) shall be deemed to refer to the "Participant" and this Agreement, respectively.

17. Participant Acknowledgment. The Participant hereby acknowledges receipt of a copy of the MIP. The Participant hereby acknowledges that all decisions, determinations and interpretations of the Board of Directors in respect of the MIP, this Agreement and the Restricted Stock shall be final and conclusive.

IN WITNESS WHEREOF, the Company has caused this Agreement to be duly executed by its duly authorized officer, and the Participant has hereunto signed this Agreement on his own behalf, thereby representing that he has carefully read and understands this Agreement and the MIP as of the day and year first written above.

GENCO SHIPPING & TRADING LIMITED

By: _____

Name: _____

Title: _____


_____

**John C. Wobensmith**

KL3 2971426.5

## EXHIBIT G

### MIP WARRANT AGREEMENT – ROBERT GERALD BUCHANAN

THIS WARRANT CERTIFICATE WILL BE VOID IF NOT EXERCISED PRIOR TO
5:00 P.M., NEW YORK CITY TIME, ON [__], 2020

## WARRANT TO PURCHASE

## [__] SHARES OF COMMON STOCK OF

## GENCO SHIPPING & TRADING LIMITED

## PURSUANT TO THE GENCO SHIPPING & TRADING LIMITED 2014 MANAGEMENT INCENTIVE PLAN

## ISSUE DATE:  [__], 2014

No. W-[__]

This certifies that, for value received, Robert Gerald Buchanan (the "Holder"), is entitled to purchase from Genco Shipping & Trading Limited, a Marshall Islands corporation (the "Company"), subject to the terms and conditions hereof and the Plan, at any time before 5:00 p.m., New York time, on [__], 2020, the number of fully paid and non-assessable shares of common stock of the reorganized Company authorized and issued pursuant to the Prepack Plan and the articles of incorporation of the reorganized Company ("Common Stock") set forth above at the Exercise Price (as defined herein).  The Exercise Price and the number and kind of shares purchasable hereunder are subject to adjustment from time to time as provided in Article III of this Warrant Certificate.  The initial Exercise Price shall be $[__].  In the event of any conflict between the terms hereof and the Plan, the terms of the Plan shall control.

## ARTICLE I

## DEFINITIONS

Section 1.1   Definition of Terms.  As used in this Warrant Certificate, the following capitalized terms shall have the following respective meanings:

(a)   "Affiliate" has the meaning set forth in Rule 12b-2 of the Exchange Act.

(b)   "Business Day" means any day on which commercial banks are not authorized or permitted to close in the City of New York, Borough of Manhattan.

(c)   "Closing Sale Price" of the Common Stock on any date of determination means:

(i)   if the Common Stock is listed on the New York Stock Exchange or The NASDAQ Stock Market on such date, the average closing sale price per share of the Common Stock (or if no closing sale price is reported, the average of the closing bid and closing ask prices or, if more than one in either case, the average of the average closing bid and the average closing ask prices) for the 10 consecutive trading days immediately prior to such date of

KL3 2970900.6

determination, as reported by the New York Stock Exchange or The NASDAQ Stock Market, as applicable;

(ii) if the Common Stock is not listed on the New York Stock Exchange or The NASDAQ Stock Market on such date, the average closing sale price per share of the Common Stock (or if no closing sale price is reported, the average of the high bid and low asked prices or, if more than one in either case, the average of the average high bid and low asked prices) for the 10 consecutive trading days immediately prior to such date of determination, as reported in composite transactions for the principal U.S. national or regional securities exchange on which the Common Stock is traded;

(iii) if the Common Stock is not listed on a U.S. national or regional securities exchange, the average last quoted sale price for the Common Stock (or, if no sale price is reported, the average of the high bid and low asked price for such date) for the 10 consecutive trading days immediately prior to such date of determination, in the over-the-counter market as reported by OTC Markets Group Inc. or other similar organization; or

(iv) in all other cases, as determined in good faith by the Board of Directors of the Company.

The Closing Sale Price shall be determined without reference to early hours, after hours or extended market trading.

The Closing Sale Price shall be appropriately adjusted by the Company in good faith if the "ex date" (as hereinafter defined) for any event (other than the issuance or distribution requiring such computation) occurs during the ten consecutive trading days immediately prior to the day as of which "Current Sale Price" is being determined.

For these purposes the term "ex date", when used:

(i) with respect to any issuance or distribution, means the first date on which the Common Stock trades regular way on the relevant exchange or in the relevant market from which the Closing Price was obtained without the right to receive such issuance or distribution;

(ii) with respect to any subdivision or combination of shares of Common Stock, means the first date on which the Common Stock trades regular way on such exchange or in such market after the time at which such subdivision or combination becomes effective; and

(iii) with respect to any tender or exchange offer, means the first date on which the Common Stock trades regular way on such exchange or in such market after the expiration time of such offer.

Whenever such adjustments shall be made to the Current Sale Price as may be necessary or appropriate to effectuate the intent of this Warrant and to avoid unjust or inequitable results as determined in good faith by the Board of Directors.

(d)     "Common Stock" has the meaning set forth in the preamble, and shall include any successor security as a result of any recapitalization, reorganization, reclassification or similar transaction involving the Company.

(e)     "Company" has the meaning set forth in the preamble.

(f)     "Date of Issuance" means [__].

(g)     "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(h)     "Exercise Date" means any date, on or prior to the expiration of the Exercise Period, on which the Holder exercises the right to purchase the Warrant Exercise Shares, in whole or in part, pursuant to and in accordance with the terms and conditions described herein.

(i)     "Exercise Form" has the meaning set forth in Section 2.4(b) hereof.

(j)     "Exercise Period" has the meaning set forth in Section 2.2(c) hereof.

(k)     "Exercise Price" has the meaning set forth in Section 2.1(a) hereof.

(l)     "Fully Diluted" means all Common Stock outstanding as of the applicable measurement date together with all Common Stock then issuable upon (i) the conversion of convertible securities of the Company at the then applicable conversion rate, and (ii) the exercise of any options or warrants then exercisable for Common Stock; provided that, for purposes of clauses (i) and (ii), all conditions to the convertibility and/or exercisability of convertible securities, options and warrants of the Company, shall be deemed to have been satisfied.

(m)     "Governmental Authority" means any (i) government, (ii) governmental or quasi- governmental authority of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal) or (iii) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature, in each case, whether federal, state, local, municipal, foreign, supranational or of any other jurisdiction.

(n)     "Holder" has the meaning set forth in the preamble.

(o)     "Immediate Family Members"  has the meaning set forth in Section 4.1 hereof.

(p)     "Initial Per Share Value" has the meaning set forth in Section 3.1(e) hereof.

(q)     "Law" means all laws, statutes, rules, regulations, codes, injunctions, decrees, orders, ordinances, registration requirements, disclosure requirements and other pronouncements having the effect of law of the United States, the Republic of the Marshall

Islands, any foreign country or any domestic or foreign state, county, city or other political subdivision or of any Governmental Authority.

(r)    "Organic Change" means any recapitalization, reorganization, reclassification, consolidation, merger, sale of a majority of the Company's assets or other transaction, in each case which is effected in such a way that the holders of Common Stock are entitled to receive (either directly or upon subsequent liquidation) cash, stock, securities or other assets or property with respect to or in exchange for Common Stock, other than a transaction which triggers an adjustment pursuant to Sections 3.1(a), (b) or (c).

(s)    "Person" means any individual, firm, corporation, partnership, limited partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, governmental unit or any political subdivision thereof, or any other entity (as such term is defined in the Bankruptcy Code).

(t)    "Plan" means the 2014 Management Incentive Plan of the Company, as amended from time to time.

(u)    "Prepack Plan" means the "Prepackaged Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code," dated April 16, 2014 (as such plan may be modified, amended or supplemented from time to time).

(v)    "Pro Rata Portion of the Warrant" has the meaning set forth in Section 2.3(b)(i).

(w)    "Pro Rata Repurchase Offer" means any offer to purchase shares of Common Stock by the Company or any Affiliate thereof pursuant to (i) any tender offer or exchange offer subject to Section 13(e) or 14(e) of the Exchange Act or Regulation 14E promulgated thereunder or (ii) any other offer available to substantially all holders of Common Stock to purchase or exchange their shares of Common Stock, in the case of both (i) or (ii), whether for cash, shares of capital stock of the Company, other securities of the Company, evidences of indebtedness of the Company or any other Person or any other property (including, without limitation, shares of capital stock, other securities or evidences of indebtedness of a Subsidiary), or any combination thereof, effected while the Warrant is outstanding.  The "effective date" of a Pro Rata Repurchase Offer shall mean the date of acceptance of shares for purchase or exchange by the Company under any tender or exchange offer which is a Pro Rata Repurchase Offer or the date of purchase with respect to any Pro Rata Repurchase Offer that is not a tender or exchange offer.

(x)    "Securities Act" means the Securities Act of 1933, as amended.

(y)    "Service" means a continuous time period during which the Holder is at least one of the following:  an employee or a director of, or a consultant to, the Company.

(z)    "Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors is at the time owned or controlled, directly or

indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a partnership, limited liability company or other business entity (other than a corporation), a majority of the partnership, limited liability company or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, limited liability company or other business entity if such Person or Persons shall be allocated a majority of partnership, limited liability company or other business entity gains or losses or shall be or control the general partner, the managing member or entity performing similar functions of such partnership, limited liability company or other business entity.

(aa)    "Third Party Cash Sale" means in any such case with a purchaser that is not an Affiliate of the Company: (i) any merger, consolidation, or other similar transaction or series of transactions to which the Company is a party and pursuant to which the Company is not the surviving Person in such transaction and the consideration received by the Company's shareholders (directly or indirectly) consists solely of cash or (ii) the sale or other disposition of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole and the consideration received by the Company's shareholders (directly or indirectly) consists solely of cash.

(bb)    "Third Party Sale Price" means, with respect to any Third Party Cash Sale, the quotient of (x) the aggregate cash consideration received by the shareholders (directly or indirectly) in connection with the applicable Third Party Cash Sale, divided by (y) the number of Fully Diluted Shares of Common Stock outstanding immediately before the Third Party Sale Closing.

(cc)    "Warrant Exercise Shares" means the shares of Common Stock issued upon the applicable exercise of a Warrant.

Section 1.2    Rules of Construction.

(a)    The singular form of any word used herein, including the terms defined in Section 1.1 hereof, shall include the plural, and vice versa. The use herein of a word of any gender shall include correlative words of all genders.

(b)    Unless otherwise specified, references to Articles, Sections and other subdivisions of this Warrant are to the designated Articles, Sections and other subdivision of this Warrant as originally executed. The words "hereof," "herein," "hereunder" and words of similar import refer to this Warrant as a whole.

(c)    References to "$" are to dollars in lawful currency of the United States of America.

(d)    The Exhibits attached hereto are an integral part of this Warrant.

KL3 2970900.6                                                    5

## ARTICLE II

## TERMS AND EXERCISE OF WARRANT

Section 2.1    Exercise Price.  Each Warrant shall entitle the Holder to, subject to the provisions of the Plan and of this Warrant Certificate, the right to purchase from the Company the number of shares of Common Stock, at the price of $[__] per share (as the same may be hereafter adjusted in accordance herewith, the "Exercise Price"), specified on the first page of this Warrant Certificate.

Section 2.2    Exercise Period.  Subject to the further provisions of this Warrant Certificate, the Warrant shall be exercisable as follows:

(a)    Subject to Section 2.2(b), the Warrant shall become exercisable with respect to a number of whole shares equal to 1/3 of the shares subject to the Warrant on each of the first three (3) anniversaries of the Date of Issuance (rounding down to the nearest whole share on each of the first two anniversaries and rounding up on the third anniversary).  Each such anniversary is referred to as a "Vesting Date."

(b)    In the event of a Change in Control of the Company, as defined in the Plan, the Warrant shall become exercisable in full on the effective date of the Change in Control.

(c)    The Warrant may be exercised by the Holder thereof, in whole or in part (but not as to a fractional share of Common Stock), at any time and from time to time after the Warrant becomes exercisable in accordance with Sections 2.2(a) and 2.2(b) hereof and prior to 5:00 P.M., New York time on the sixth (6th) anniversary hereof, unless terminated earlier pursuant to this Warrant Certificate or the Plan (the "Exercise Period").   To the extent that the Warrant or portion thereof is not exercised prior to the expiration of the Exercise Period, it shall be automatically cancelled with no action by any Person, and with no further rights thereunder, upon such expiration.

Section 2.3    Termination of Service

(a)    If the Holder's Service is terminated for cause, as defined in the Plan, or if the Holder resigns without the Company's prior consent, the Warrant, to the extent not theretofore exercised, shall terminate upon the commencement of business on the date of the Holder's termination of Service.

(b)    If the Holder's Service is terminated due to the Holder's death or disability (as defined below) or by the Company without cause, as defined in the Plan, then the Pro Rata Portion of the Warrant (as defined below) shall become exercisable as of such date in addition to the portion of the Warrant which is already exercisable as of such date.  The Warrant, to the extent exercisable as of the date of termination (including, but not limited to, the Pro Rata Portion of the Warrant), shall remain exercisable until the one year anniversary of such termination (but in no event beyond the expiration of the Exercise Period), and the Warrant, to the extent not exercisable as of the date of termination, shall expire as of the date of termination. For the purposes of this Section 2.3(b):

(i)       The "Pro Rata Portion of the Warrant" shall mean that number of shares with respect to which the Warrant that would become exercisable on the next Vesting Date multiplied by a fraction, the denominator of which is 12 and the numerator of which is the number of completed months (measured from the day of the month of the Vesting Date to the same day of the following month) between the immediately preceding Vesting Date (or the Date of Issuance, if there is no preceding Vesting Date) and the date of termination of Service.

(ii)       "Disability" shall mean any physical or mental condition that would qualify the Holder for a disability benefit under the long-term disability plan maintained by the Company or, if there is no such plan, a physical or mental condition that prevents the Holder from performing the essential functions of the Holder's position (with or without reasonable accommodation) for a period of six consecutive months.  The existence of a disability shall be determined by the Company.

(c)       If the Holder's Service is terminated other than as set forth above, the Holder may exercise the Warrant (i) only to the extent that the Holder was entitled to exercise the Warrant on the termination of Service date; and (ii) exercise must occur within three months after termination of Service but in no event after the original expiration date of the Warrant.

Section 2.4    Method of Exercise.

(a)       In connection with the exercise of the Warrant, the Exercise Price shall be paid as provided in this Section 2.4(a).  In connection with the exercise of the Warrant, the Holder of such Warrant shall exchange the Common Stock purchase rights represented thereby by surrendering such Warrant to the Company, together with a written notice to the Company that the Holder is exchanging the Warrant (or a portion thereof) for the number of Warrant Exercise Shares being exercised, up to the aggregate number of Warrant Exercise Shares for which this Warrant Certificate is exercisable, specified in the notice, from which the Company shall withhold and not issue to such Holder, in payment of the Exercise Price thereof, a number of such Warrant Exercise Shares equal to (x) the number of Warrant Exercise Shares for which the Warrant is being exercised, multiplied by (y) the Exercise Price, and divided by (z) the Closing Sale Price on the Exercise Date (and such withheld shares shall no longer be issuable under the Warrant, and the Holder shall not have any rights or be entitled to any payment with respect to such withheld shares); provided, however, that the shares withheld, when valued based on the fair market value determined under Treasury Regulation 1.409A-1(b)(5)(iv)(A), shall have a value not less than the aggregate Exercise Price.  The issuance of any shares shall be subject to Section 3.6 of the Plan with respect to withholding of taxes and the Company may appropriately reduce the number of Warrant Exercise Shares in order to satisfy any withholding obligation.

(b)       Subject to the terms and conditions of the Plan and this Warrant Certificate, the Holder of a Warrant may exercise, in whole or in part, such Holder's right to purchase the Warrant Exercise Shares issuable upon exercise of such Warrant, by providing an exercise form for the election to exercise such Warrant ("Exercise Form") substantially in the form of Exhibit A hereto, properly completed and duly executed by the Holder thereof to the Company.

KL3 2970900.6                                    7

(c)       Any exercise of the Warrant pursuant to the terms of this Warrant Certificate shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms.

(d)       Upon receipt of an Exercise Form pursuant to Section 2.4(a), the Company shall:

(i)       examine such Exercise Form and all other documents delivered to it by or on behalf of Holder as contemplated hereunder to ascertain whether or not, on its face, such Exercise Form and any such other documents have been executed and completed in accordance with their terms and the terms hereof; and

(ii)      if an Exercise Form or other document appears, on its face, to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrant exists, endeavor to inform the appropriate parties (including the person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled.

(e)       The Company reserves the right to reasonably reject any and all Exercise Forms that it determines, in its sole discretion, are not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful.  Any such determination by the Company shall be final and binding on the Holder, absent manifest error.  Moreover, the Company reserves the absolute right to waive any of the conditions to any particular exercise of Warrant or any defects in the Exercise Form(s) with regard to any particular exercise of the Warrant.  The Company shall not be under any duty to give notice to the Holder of any irregularities in any exercise of the Warrant, nor shall it incur any liability for the failure to give such notice.

Section 2.5     Issuance of Common Stock.

(a)       Upon exercise of the Warrant pursuant to Section 2.4, the Company shall promptly at its expense, and in no event later than five (5) Business Days thereafter, cause to be issued to the Holder of  the Warrant the total number of whole shares of Common Stock for which the Warrant is being exercised, subject to Section 2.4(a) (as the same may be hereafter adjusted pursuant to Article III) in such denominations as are requested by the Holder.

(b)       Notwithstanding the five (5) Business Day period described in Section 2.5(a), the Warrant Exercise Shares shall be deemed to have been issued to the Holder at the time at which all of the conditions to such exercise have been fulfilled, and the Holder shall be deemed for all purposes to have become the holder of such Warrant Exercise Shares at such time.

(c)       If less than all of the shares evidenced by the Warrant Certificate are exercised at any time prior to the termination of the Exercise Period, a new Warrant Certificate or Warrant Certificates shall be issued for the remaining number of shares evidenced by the Warrant Certificate.

KL3 2970900.6                                                    8

Section 2.6    Reservation of Shares.    The Company shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock solely for the purpose of issuance upon the exercise of the Warrant, a number of shares of Common Stock equal to the aggregate Warrant Exercise Shares issuable upon the exercise of the Warrant.  The Company shall use commercially reasonable efforts to take all such actions as may be necessary to assure that all such shares of Common Stock may be so issued without violating the Company's governing documents or any requirements of any national securities exchange upon which shares of Common Stock may be listed.  The Company shall not take any action which would cause the number of authorized but unissued shares of Common Stock to be less than the number of such shares required to be reserved hereunder for issuance upon exercise of the Warrant.

Section 2.7    Fractional Shares.    Notwithstanding any provision to the contrary contained in this Warrant Certificate, the Company shall not be required to issue any fraction of a share of its capital stock in connection with the exercise of the Warrant, and in any case where the Holder would, except for the provisions of this Section 2.7, be entitled under the terms of the Warrant to receive a fraction of a share upon the exercise of the Warrant, the Company shall, upon the exercise of the Warrant, issue or cause to be issued only the largest whole number of Warrant Exercise Shares issuable upon such exercise (and such fraction of a share will be disregarded, and the Holder shall not have any rights to be entitled to any payment with respect to such fraction of a share); provided, that if more than one Warrant is presented for exercise at the same time by the same Holder, the number of whole Warrant Exercise Shares which shall be issuable upon the exercise thereof shall be computed on the basis of the aggregate number of Warrant Exercise Shares issuable upon exercise of all such Warrants.

Section 2.8    Public Offering.    Notwithstanding any other provision hereof, if an exercise of any portion of a Warrant is to be made in connection with a registered public offering or the sale of the Company, the exercise of any portion of such Warrant may, at the election of the holder thereof, be conditioned upon the consummation of such registered public offering or sale of the Company, in which case such exercise shall be deemed to be effective concurrently with the consummation of such transaction.

Section 2.9    Close of Books; Par Value.    The Company shall not close its books against the transfer of any Warrant or any Warrant Exercise Shares in any manner which interferes with the timely exercise of such Warrant.  The Company shall use commercially reasonable efforts to, from time to time, take all such action as may be necessary to assure that the par value per share of the unissued shares of Common Stock acquirable upon exercise of each Warrant is at all times equal to or less than the Exercise Price then in effect.

Section 2.10    Payment of Taxes.    The Company shall not be required to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of any shares of Common Stock (including certificates therefor) or payment of cash or other property to any recipient other than the Holder of the Warrant surrendered upon the exercise of a Warrant, and in case of such transfer or payment, the Company shall not be required to issue or deliver any shares or pay any cash until (a) such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Company or (b) it has been established to the Company's satisfaction that any such tax or other charge that is or may become due has been paid.

## ARTICLE III

## ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF
## WARRANT EXERCISE SHARES

In order to prevent dilution of the rights granted under each Warrant, the Exercise Price shall be subject to adjustment from time to time as provided in this Article III, and the number of shares of Common Stock obtainable upon exercise of each Warrant shall be subject to adjustment from time to time as provided in this Article III; provided, however, that no such adjustment shall be made to the extent that it would cause the Warrant to be subject to tax under Section 409A of the Internal Revenue Code of 1986, as amended.

Section 3.1    Adjustments.

(a)    Subdivision or Combination of Common Stock.  If the Company at any time after the issuance of the Warrant but prior to the expiration of the Exercise Period subdivides (by any stock split, stock dividend or reclassification) the Common Stock into a greater number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately reduced, and the number of Warrant Exercise Shares issuable upon exercise of the Warrant shall be proportionately increased.  If the Company at any time prior to the expiration of the Exercise Period combines (by reverse stock split, or reclassification) the Common Stock into a smaller number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately increased and the number of Warrant Exercise Shares issuable upon exercise of the Warrant shall be proportionately decreased. Any adjustment under this Section 3.1(a) shall become effective immediately upon the effectiveness of such subdivision or combination.

(b)    Distributions. If the Company at any time after the issuance of the Warrant but prior to the expiration of the Exercise Period fixes a record date for the making of a distribution to all holders of shares of the Common Stock of securities, evidences of indebtedness, assets, cash, rights or warrants (excluding dividends or distributions referred to in Section 3.1(a)), then, in each such case, the Exercise Price in effect prior to such record date shall be adjusted thereafter to the price determined by the following formula:

$$EP_1 = EP_0 \; x \; (CP_0 - FV)/CP_0$$

where

$EP_1$    =    the Exercise Price in effect immediately following the application of the adjustments in this Section 3.1(b);

$EP_0$    =    the Exercise Price in effect immediately prior to the application of the adjustments in this Section 3.1(b);

$CP_0$    =    the Closing Sale Price of the Common Stock on the last trading day preceding the first date on which the Common Stock trades regular way without the right to receive such distribution; and

$$FV \quad = \quad$$ the amount of cash and/or the fair market value of the securities, evidences of indebtedness, assets, rights or warrants to be so distributed in respect of one share of Common Stock, as determined by the Board of Directors of the Company, acting in good faith.

Such adjustment shall be made successively whenever such a record date is fixed. In such event, the number of Warrant Exercise Shares issuable upon the exercise of the Warrant represented by this Warrant Certificate shall be increased to the number obtained by dividing (x) the product of (1) the number of Warrant Exercise Shares issuable upon the exercise of the Warrant represented by this Warrant Certificate before such adjustment, and (2) the Exercise Price in effect immediately prior to the adjustment by (y) the new Exercise Price immediately following such adjustment.

In the event that such distribution is not so made, the Exercise Price and the number of Warrant Exercise Shares issuable upon exercise of the Warrant then in effect shall be readjusted, effective as of the date when the Board of Directors of the Company determines not to distribute such shares, evidences of indebtedness, assets, rights, cash or warrants, as the case may be, to the Exercise Price that would then be in effect and the number of Warrant Exercise Shares that would then be issuable upon exercise of the Warrant if such record date had not been fixed.

(c)  Pro Rata Repurchase Offer of Common Stock.  If at any time after the issuance of the Warrant but prior to the expiration of the Exercise Period the Company consummates a Pro Rata Repurchase Offer of Common Stock, then the Exercise Price shall be reduced to the price determined by the following formula:

$$EP_1 = EP_0 \ x \ \frac{(OS_0 \ x \ CP_0) - AP}{(OS_0 - SP) \ x \ CP_0}$$

where

$$EP_1 \quad = \quad$$ the Exercise Price in effect immediately following the application of the adjustments in this Section 3.1(c) (but in no event greater than $EP_0$);

$$EP_0 \quad = \quad$$ the Exercise Price in effect immediately prior to the application of the adjustments in this Section 3.1(c);

$$OS_0 \quad = \quad$$ the number of Fully Diluted shares of Common Stock outstanding immediately before consummation of such Pro Rata Repurchase Offer;

$$CP_0 \quad = \quad$$ the Closing Sale Price of a share of Common Stock on the trading day immediately preceding the first public announcement by the Company or any of its Affiliates of the intent to effect such Pro Rata Repurchase Offer;

$$AP \quad = \quad$$ the aggregate purchase price (including the fair market value, as

determined in good faith by the Board of Directors of the Company, of any non-cash consideration included therein) paid for the shares of Common Stock repurchased in the Pro Rata Repurchase Offer; and

SP    =    the number of shares of Common Stock so repurchased in the Pro Rata Repurchase Offer.

In such event, the Warrant Exercise Shares issuable upon the exercise of the Warrant shall be increased to the number obtained by dividing (x) the product of (1) the Warrant Exercise Shares issuable upon the exercise of the Warrant before such adjustment, and (2) the Exercise Price in effect immediately prior to the adjustment by (y) the new Exercise Price immediately following such adjustment. For the avoidance of doubt, no increase to the Exercise Price or decrease in the Warrant Exercise Shares issuable upon exercise of the Warrant shall be made pursuant to this Section 3.1(c).

(d)    Reorganization, Reclassification, Consolidation, Merger or Sale.    In connection with any Organic Change prior to the expiration of the Exercise Period, the Company shall make appropriate provision to ensure that the Holder of the Warrant shall have the right to acquire and receive, upon exercise of such Warrant, such cash, stock, securities or other assets or property as would have been issued or payable in such Organic Change (if the holder had exercised such Warrant immediately prior to such Organic Change) with respect to or in exchange, as applicable, for the number of Warrant Exercise Shares that would have been issued upon exercise of such Warrant, if such Warrant had been exercised immediately prior to the occurrence of such Organic Change.

(e)    Notwithstanding Section 3.1(d) or anything contained in this Warrant Certificate, in the event of any Third Party Cash Sale, the Company shall pay (or cause to be paid) to the Holders, with respect to each unexercised Warrant outstanding immediately prior to the consummation of such Third Party Cash Sale (the "Third Party Sale Closing"), cash in an amount equal to the excess, if any, of the Third Party Sale Price over the Exercise Price; provided, however, that no Holder shall be entitled to any payment hereunder with respect to any portion of the Third Party Sale Price that is contingent, deferred or escrowed unless and until such amounts are actually paid to the holders of Common Stock or to the Company or its Subsidiaries, as applicable. Upon the occurrence of a Third Party Sale Closing, all unexercised Warrants outstanding immediately prior to the Third Party Sale Closing shall automatically be terminated and cancelled and the Company shall thereupon cease to have any further obligations or liability with respect to the Warrants, except as required by this Section 3.1(e). For the avoidance of doubt, the Holders shall not be entitled to any payment or consideration with respect to any Third Party Cash Sale with respect to which the Third Party Sale Price is equal to or less than the Exercise Price.

(f)    Ordinary Dividends. The Closing Sale Price of a share of Common Stock as of the Date of Issuance is $[__] (the "Initial Per Share Value"). In the event that the Exercise Price is adjusted pursuant to Section 3.1(a) hereof, the Initial Per Share Value shall be similarly adjusted. To the extent that the adjustment under Section 3.1(b) with respect to ordinary dividends would reduce the Exercise Price below the Initial Per Share Value, as adjusted from

KL3 2970900.6                                        12

time to time, such adjustment shall not be made unless otherwise permitted under Section 409A of the Code.

Section 3.2    Notices.  Whenever the number and/or kind of Warrant Exercise Shares or the Exercise Price is adjusted as herein provided, the Company shall prepare and deliver, or cause to be prepared and delivered, forthwith to the Holder a written statement setting forth the adjusted number and/or kind of shares purchasable upon the exercise of the Warrant and the Exercise Price of such shares after such adjustment, the facts requiring such adjustment and the computation by which adjustment was made, and give written notice to the Holder in the manner provided in Section 6.2 below, of the record date or the effective date of the event.  Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event.

Section 3.3    Form of Warrant After Adjustments.  The form of the Warrant Certificate need not be changed because of any adjustments in the Exercise Price or the number or kind of the Common Stock, and Warrants theretofore or thereafter issued may continue to express the same price and number and kind of shares as are stated in Warrants, as initially issued.  The Company, however, may at any time in its sole discretion make any change in the form of Warrant Certificate that it may deem appropriate to give effect to such adjustments and that does not affect the substance of the Warrant Certificate, and any Warrant Certificate thereafter issued, whether in exchange or substitution for an outstanding Warrant Certificate, may be in the form so changed.

Section 3.4    Deferral or Exclusion of Certain Adjustments.  No adjustment to the Exercise Price or the number of Warrant Exercise Shares shall be required hereunder unless such adjustment together with other adjustments carried forward as provided below, would result in an increase or decrease of at least one percent (1%) of the applicable Exercise Price or the number of Warrant Exercise Shares; provided, that any adjustments which by reason of this Section 3.4 are not required to be made shall be carried forward and taken into account in any subsequent adjustment. No adjustment need be made for a change in the par value of the shares of Common Stock. All calculations under this Section shall be made to the nearest one one thousandth (1/1,000 ) of one cent ($0.01) or to the nearest one one thousandth (1/1,000 ) of a share, as the case may be.

## ARTICLE IV

## TRANSFER AND EXCHANGE
## OF WARRANTS

Section 4.1    Transfer of the Warrant.  The Warrant shall only be assignable or transferable by will or by the laws of descent and distribution, subject to any transfer restrictions set forth in the Company's Articles of Incorporation; provided, that the Holder may transfer all or a portion of the Warrant to (A) the Holder's spouse, children or grandchildren ("Immediate Family Members"), (B) a trust or trusts for the exclusive benefit of such Immediate Family Members, or (C) other parties approved by the Company, provided, however, that no such transfer may be for consideration.

Section 4.2    Obligations with Respect to Transfers and Exchanges of the Warrant.

(a)      All Warrant Certificates issued upon any registration of transfer or exchange of Warrant Certificates shall be the valid obligations of the Company, entitled to the same benefits under this Warrant Certificate as the Warrant Certificates surrendered upon such registration of transfer or exchange.

(b)      No service charge shall be made to the Holder for any registration, transfer or exchange but the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed on the Holder in connection with any such exchange or registration of transfer.

Section 4.3      Registry of Warrants.

(a)      The Company shall maintain a registry showing the name and address of the Holder as the registered holder of this Warrant Certificate. This Warrant Certificate may be surrendered for exchange or exercise, in accordance with its terms, at the office of the Company, and the Company shall be entitled to rely in all respects, prior to written notice to the contrary, upon such registry.

(b)      The Company shall register the transfer of any portion of this Warrant Certificate in the registry upon the Holder's compliance with this Article IV, provided that such transfer is made in compliance with the Securities Act and state securities laws.

Section 4.4      Fractional Warrants.  The Company shall not be required to effect any registration of transfer or exchange which will result in the issuance of a warrant certificate for a fraction of a Warrant.

## ARTICLE V

## OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANTS

Section 5.1      No Rights or Liability as Stockholder.  Nothing contained in the Warrant shall be construed as conferring upon the Holder or his, her or its transferees the right to vote or to receive dividends or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or of any other matter, or any rights whatsoever as stockholders of the Company.  The consent of any Holder shall not be required with respect to any action or proceeding of the Company and no Holder shall have any right not expressly conferred hereunder. No holder, by reason of the ownership or possession of this Warrant shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions paid, allotted or distributed or distributable to the holders of Common Stock prior to, or for which the relevant record date preceded, the date of the exercise of this Warrant.  No provision hereof and no mere enumeration herein of the rights or privileges of the Holder shall give rise to any liability of such holder for the Exercise Price hereunder or as a stockholder of the Company, whether such liability is asserted by the Company or by creditors of the Company.

Section 5.2      Notice to Holders.  The Company shall give notice to Holders by regular mail or press release if at any time prior to the expiration or exercise in full of the Warrants, any of the following events shall occur:

KL3 2970900.6                                          14

        (a)     the payment of any dividend payable in any securities upon shares of Common Stock or the making of any distribution (other than a regular quarterly cash dividend) to all holders of Common Stock;

        (b)     the issuance to all holders of Common Stock of any additional shares of Common Stock or of rights, options or warrants to subscribe for or purchase Common Stock or of any other subscription rights, options or warrants;

        (c)     a Pro Rata Repurchase Offer;

        (d)     a dissolution, liquidation or winding up of the Company;

        (e)     an Organic Change; or

        (f)     the consummation of a Third Party Cash Sale.

Such giving of notice shall be initiated at least ten (10) days prior to the date fixed as the record date or the date of closing of the Company's stock transfer books for the determination of the stockholders entitled to such dividend, distribution or subscription rights, or of the stockholders entitled to vote on such Organic Change, dissolution, liquidation or winding up, or of the proposed date of such Third Party Sale Closing or the proposed effective date of such Pro Rata Repurchase Offer, as applicable. Such notice shall specify such record date or the date of closing the stock transfer books or proposed effective date, as the case may be. Failure to provide such notice shall not affect the validity of any action taken in connection with any such dividend, distribution or subscription rights, Pro Rata Repurchase Offer, Third Party Cash Sale, or proposed merger, consolidation, sale, conveyance, dissolution, liquidation or winding up. For the avoidance of doubt, no such notice shall supersede or limit any adjustment called for by Section 3.1 by reason of any event as to which notice is required by this Section.

Section 5.3    Lost, Stolen, Mutilated or Destroyed Warrant Certificates. If this Warrant Certificate is lost, stolen, mutilated or destroyed, the Company shall issue and, if provided with all necessary information and documents, deliver, in exchange and substitution for and upon cancellation of the mutilated Warrant Certificate, or in lieu of and substitution for the Warrant Certificate lost, stolen or destroyed, a new Warrant Certificate of like tenor and representing an equivalent number of Warrants, but only upon receipt of evidence and an affidavit reasonably satisfactory to the Company of the loss, theft or destruction of such Warrant Certificate, and, if requested by either the Company, a bond sufficient to indemnify the Company against any claim that may be made against the Company on account of the loss, theft, mutilation or destruction of any such Warrant Certificate or the issuance of such new certificate. Applicants for such substitute Warrant Certificates shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company may prescribe and as required by Section 8-405 of the Uniform Commercial Code as in effect in the State of New York.

Section 5.4    No Restrictive Legends. No legend shall be stamped or imprinted on any stock certificate for Common Stock issued upon the exercise of any Warrant and or stock certificate issued upon the direct or indirect transfer of any such Common Stock.

Section 5.5    Cancellation of the Warrant.  If the Company shall purchase or otherwise acquire the Warrant, this Warrant Certificate shall thereupon be delivered to the Company to be cancelled by it and retired.  The Company shall cancel all Warrant Certificates surrendered, and accepted, for exchange, substitution, transfer or exercise in whole or in part.

Section 5.6    Reduction in Benefits.  Unless the Holder and the Company agree otherwise in writing, in the event that the Holder would incur an Excise Tax on any payments or benefits under this Warrant Certificate as a result of a Change of Control (or any other change described in Section 280G(b)(2) of the Code), the Company shall reduce the payments or benefits to be paid to or granted to Holder hereunder to the greater of (i) the maximum amount payable to the Holder without the imposition of any Excise Tax with respect to the Restricted Stock and (ii) the amount that yields the Holder the greatest after-tax amount of benefits under this Warrant Certificate after taking into account any Excise Tax imposed on Holder, whether due to payments and benefits under this Warrant Certificate or otherwise.  "Excise Tax" means the tax imposed by Section 4999 of the Code and any successor tax.  The determination of whether the Holder's payments and benefits should be reduced and the amount of any such reduction shall be made by independent counsel selected by the Company ("Independent Counsel").  For purposes of such determination, (x) the total amount of payments and benefits received by the Holder as a result of such Change in Control (or such other change) shall be treated as "parachute payments" within the meaning of Section 280G(b)(2) of the Code, and all "excess parachute payments" within the meaning of Section 280G(b)(1) of the Code shall be treated as subject to the Excise Tax, except to the extent that, in the opinion of Independent Counsel, a payment or benefit hereunder (in whole or in part) does not constitute a "parachute payment" within the meaning of Section 280G(b)(2) of the Code and the Treasury Regulations under Section 280G of the Code (the "Regulations"), or such "excess parachute payments" (in whole or in part) are not subject to the Excise Tax; (y) the amount of the payments and benefits hereunder that shall be treated as subject to the Excise Tax shall be equal to the lesser of (A) the total amount of such payments and benefits or (B) the amount of "excess parachute payments" within the meaning of Section 280G(b)(1) of the Code (after applying clause (x) hereof); and (z) the value of any noncash benefits or any deferred payment or benefit shall be determined by Independent Counsel in accordance with the principles of Sections 280G(d)(3) and (4) of the Code.  All fees and expenses of Independent Counsel shall be borne by the Company.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.1    Binding Effects; Benefits.  This Warrant Certificate shall inure to the benefit of and shall be binding upon the Company and the Holder and their respective heirs, legal representatives, successors and assigns.  Nothing in this Warrant Certificate, expressed or implied, is intended to or shall confer on any person other than the Company and the Holder, or their respective heirs, legal representatives, successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Warrant Certificate.

Section 6.2    Notices.  Unless a provision herein permits notice by way of a press release, any notice or other communication required or which may be given hereunder shall be in writing and shall be sent by certified or regular mail (return receipt requested, postage prepaid),

KL3 2970900.6                              16

by private national courier service, by personal delivery or by facsimile transmission. Such notice or communication shall be deemed given (i) if mailed, two days after the date of mailing, (ii) if sent by national courier service, one Business Day after being sent, (iii) if delivered personally, when so delivered, or (iv) if sent by facsimile transmission, on the Business Day after such facsimile is transmitted, in each case as follows:

> if to the Company, to:
>
> Genco Shipping & Trading Limited
> 299 Park Avenue
> New York, New York 10171
> Facsimile: (646) 443-8551
> Attention: John C. Wobensmith
>
> with copies (which shall not constitute notice) to:
>
> Kramer Levin Naftalis & Frankel LLP
> 1177 Avenue of the Americas
> New York, New York 10036
> Facsimile: (212) 715-8100
> Attention: Thomas E. Molner
>
> if to Holder, at its address or facsimile number as appears on the books of the Company maintained for such purpose or as specified in a notice given in accordance with this Section 6.2.

Section 6.3   Persons Having Rights under this Warrant Certificate. Nothing in this Warrant Certificate expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any person or corporation other than the parties hereto and the Holder, any right, remedy, or claim under or by reason of this Warrant Certificate or of any covenant, condition, stipulation, promise, or agreement hereof. All covenants, conditions, stipulations, promises, and agreements contained in this Warrant Certificate shall be for the sole and exclusive benefit of the parties hereto, their successors and assigns and the Holder.

Section 6.4   Counterparts. This Warrant Certificate may be executed in any number of original or facsimile or electronic PDF counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

Section 6.5   Effect of Headings. The section headings herein are for convenience only and are not part of this Warrant Certificate and shall not affect the interpretation hereof.

Section 6.6   Amendments.

(a)   Subject to Section 6.6(b) below, this agreement may not be amended except in writing signed by both parties hereto.

KL3 2970900.6

17

(b)    The Company may from time to time supplement or amend this Warrant Certificate or the Warrant –

(i)    without the approval of the Holder in order to cure any ambiguity, manifest error or other mistake in this Warrant Certificate or the Warrant, or to correct or supplement any provision contained herein or in the Warrant that may be defective or inconsistent with any other provision herein or in the Warrant, or to make any other provisions in regard to matters or questions arising hereunder that the Company may deem necessary or desirable and that shall not adversely affect, alter or change the interests of the Holder in any material respect, or

(ii)    with the prior written consent of the Holder.

(c)    Any amendment, modification or waiver effected pursuant to and in accordance with the provisions of this Section 6.6 will be binding upon the Holder and upon each future Holder and the Company.  In the event of any amendment, modification or waiver, the Company will give prompt notice thereof to the Holder and, if appropriate, notation thereof will be made on all Warrant Certificates thereafter surrendered for registration of transfer or exchange. Any failure of the Company to give such notice or any defect therein, shall not, however, in any way impair or affect the validity of any such amendment.

Section 6.7    No Inconsistent Agreements; No Impairment.  The Company shall not, on or after the date hereof, enter into any agreement with respect to its securities which conflicts with the rights granted to the Holder in the Warrant or the provisions hereof.  The Company represents and warrants to the Holder that the rights granted hereunder do not in any way conflict with the rights granted to holders of the Company's securities under any other agreements.  The Company shall not, by amendment of its Articles of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of the Warrant and in the taking of all such action as may be necessary in order to preserve the exercise rights of the Holder against impairment.

Section 6.8    Integration/Entire Agreement.  This Warrant Certificate is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Company and the Holder in respect of the subject matter contained herein.  There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein, with respect to the Warrant.  This Warrant Certificate and the Warrant supersede all prior agreements and understandings between the parties with respect to such subject matter.

Section 6.9    Governing Law, Etc.  This Warrant Certificate and each Warrant issued hereunder shall be deemed to be a contract made under the Laws of the State of New York and for all purposes shall be governed by and construed in accordance with the Laws of such State. Each party hereto consents and submits to the jurisdiction of the courts of the State of New York and of the federal courts of the Southern District of New York in connection with any action or proceeding brought against it that arises out of or in connection with, that is based upon, or that

KL3 2970900.6                                    18

relates to this Warrant Certificate or the transactions contemplated hereby.  In connection with any such action or proceeding in any such court, each party hereto hereby waives personal service of any summons, complaint or other process and hereby agrees that service thereof may be made in accordance with the procedures for giving notice set forth in Section 6.2 hereof.  Each party hereto hereby waives any objection to jurisdiction or venue in any such court in any such action or proceeding and agrees not to assert any defense based on forum *non conveniens* or lack of jurisdiction or venue in any such court in any such action or proceeding.

Section 6.10    Termination.  This Warrant Certificate will terminate on the earlier of (i) such date when the Warrant has been exercised with respect to all shares subject thereto, or (ii) the expiration of the Exercise Period.  The provisions of this Article VI shall survive such termination.

Section 6.11    Waiver of Trial by Jury.  Each party hereto hereby irrevocably and unconditionally waives the right to a trial by jury in any action, suit, counterclaim or other proceeding (whether based on contract, tort or otherwise) arising out of, connected with or relating to this Warrant Certificate and the transactions contemplated hereby.

Section 6.12    Remedies.  The Company hereby agrees that, in the event that the Company violates any provisions of a Warrant (including the obligation to deliver shares of Common Stock upon the exercise thereof), the remedies at law available to the Holder may be inadequate.  In such event, the Holder shall have the right, in addition to all other rights and remedies any of them may have, to specific performance and/or injunctive or other equitable relief to enforce the provisions of this Warrant Certificate.

Section 6.13    Severability.  In the event that any one or more of the provisions contained in this Warrant Certificate, or the application thereof in any circumstances, is held invalid, illegal or unenforceable, the validity, legality and enforceability of any such provisions in every other respect and of the remaining provisions contained herein and therein shall not be affected or impaired thereby.

**[Signature Page Follows]**

KL3 2970900.6                                  19

IN WITNESS WHEREOF, the Company has caused this Warrant Certificate to be duly executed by a duly authorized officer as of the day and year first above written.

GENCO SHIPPING & TRADING LIMITED

By: _____
       Name:
       Title:

**EXHIBIT A**

EXERCISE FORM FOR HOLDER
(To be executed upon exercise of Warrant)

   The undersigned, being the holder of the Warrant Certificate issued by Genco Shipping & Trading Limited identified below, hereby irrevocably elects to exercise the right to purchase the number of shares of Common Stock indicated below pursuant to the net issuance exercise provisions of Section 2.4(a) of the Warrant Certificate.

| | |
|---|---|
| Warrant Certificate Number | _____ |
| Number of Shares of Common Stock | _____ |
| | (Total number of shares of Common Stock for which the Warrant is being exercised, before withholding for the Exercise Price.  Not to exceed the number of shares of Common Stock for which such Warrant is exercisable in the aggregate.) |

Signature of Holder: _____

By: _____

Name: _____

Title: _____

Date: _____

KL3 2970900.6

## EXHIBIT H

**MIP RESTRICTED STOCK AGREEMENT – ROBERT GERALD BUCHANAN**

FORM

**Genco Shipping & Trading Limited**
**Executive Officer Restricted Stock Grant Agreement**

THIS AGREEMENT, made as of **[Month] [Day], [Year]**, between GENCO SHIPPING & TRADING LIMITED (the "Company") and **Robert Gerald Buchanan** (the "Participant").

WHEREAS, the Prepackaged Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code, dated April 16, 2014 (as such plan may be modified, amended or supplemented from time to time, the "Prepack Plan") pertaining to the Company has become effective;

WHEREAS, pursuant to and in furtherance of the Prepack Plan, the Company has adopted the Genco Shipping & Trading Limited 2014 Management Incentive Plan (the "MIP"), effective as of the "Effective Date" of the Prepack Plan (as defined in the Prepack Plan), in order to grant warrants to purchase shares of shares of common stock of the reorganized Company ("Common Stock") and to grant restricted shares of Common Stock;

WHEREAS, the MIP provides that the Board of Directors of the Company or its delegatee (collectively, the "Board of Directors") shall administer the MIP and determine the key persons to whom awards shall be granted and the amount and type of such awards; and

WHEREAS, pursuant to the Prepack Plan, the Board of Directors has determined to grant the Participant an award under the MIP as set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter set forth, the parties hereto hereby agree as follows:

1.    <u>Grant of Restricted Stock</u>. Pursuant to, and subject to, the terms and conditions set forth herein (including without limitation Section 17 hereof) and in the MIP, the Board of Directors hereby grants to the Participant **[Number of Shares]** restricted shares (the "Restricted Stock") of Common Stock.

2.    <u>Grant Date</u>. The Grant Date of the Restricted Stock is **[Month] [Day], [Year]**.

3.    <u>Incorporation of MIP</u>. All terms, conditions and restrictions of the MIP are incorporated herein and made part hereof as if stated herein. If there is any conflict between the terms and conditions of the MIP and this Agreement, the terms and conditions of the MIP, as interpreted by the Board of Directors, shall govern. Except as otherwise provided herein, all capitalized terms used herein shall have the meaning given to such terms in the MIP.

4.    <u>Vesting</u>.

(a)    Subject to Section 4(b) hereof and the further provisions of this Agreement, a number of whole shares of Restricted Stock equal to 1/3 of the total number of shares granted hereunder shall vest on each of the first three anniversaries of the Grant Date

KL3 2971150.4

(rounding down to the nearest whole share on each of the first two anniversaries and rounding up on the third anniversary) (each such date, a "Vesting Date").

(b)    In the event of the occurrence of a Change in Control, as defined in Section 3.8(a) of the MIP, as in effect on the date of such occurrence, the Restricted Stock shall become vested in full on the date of such Change in Control.

5.    Restrictions on Transferability.  Until a share of Restricted Stock vests, the Participant shall not transfer the Participant's rights to such share of Restricted Stock or to any rights related thereto.  In addition, any transfers shall also be subject to the transfer restrictions set forth in the Company's Articles of Incorporation.  Any attempt to transfer unvested shares of Restricted Stock or any rights related thereto, whether by transfer, pledge, hypothecation or otherwise and whether voluntary or involuntary, by operation of law or otherwise, shall not vest the transferee with any interest or right in or with respect to such shares of Restricted Stock or such related rights.

6.    Termination of Service.

(a)    In the event that the Participant's Service with the Company terminates before all the shares of Restricted Stock are vested for any reason other than a termination by the Company without cause (as defined in the MIP) or the Participant's death or disability (as defined in the MIP), all unvested shares of Restricted Stock, together with any property received in respect of such shares, as set forth in Section 9 hereof, shall be forfeited as of the date such Service terminates, and the Participant promptly shall return to the Company any certificates evidencing such shares, together with any cash dividends or other property received in respect of such shares.  For purposes hereof, "Service" means a continuous time period during which the Participant is at least one of the following:  an employee or a director of, or a consultant to, the Company.

(b)    In the event that, before all the shares of Restricted Stock are vested, the Participant's Service with the Company is terminated by the Company without cause (as defined in the MIP) or for reason of the Participant's death or disability (as defined in the MIP), a Pro Rata Portion of the shares of Restricted Stock shall become vested immediately prior to the date such Service terminates in addition to the portion of the shares of Restricted Stock which have already become vested as of such date, and all other shares of Restricted Stock which are not and have not become vested, together with any property received in respect of such shares, as set forth in Section 9 hereof, shall be forfeited as of the date such Service terminates, and the Participant promptly shall return to the Company any certificates evidencing such shares, together with any cash dividends or other property received in respect of such shares.  For purposes hereof, "Pro Rata Portion" shall mean that number of shares of Restricted Stock that would become vested on the next Vesting Date multiplied by a fraction, the denominator of which is 12 and the numerator of which is the number of completed months (measured from the day of the month of the Vesting Date to the same day of the following month) between the immediately preceding Vesting Date (or the Grant Date if there is no preceding Vesting Date) and the date of termination of Service.

- 2 -

7.    Issuance of Shares.

(a)    Reasonably promptly after the Grant Date, the Company shall issue and deliver to the Participant stock certificates, registered in the name of the Participant, evidencing the shares of Restricted Stock or shall instruct its transfer agent to issue shares of Restricted Stock which shall be maintained in book entry form on the books of the transfer agent.  The Restricted Stock, if certificated, shall bear the following legend:

"THE SALE, TRANSFER, ASSIGNMENT, PLEDGE, HYPOTHECATION ENCUMBRANCE OR OTHER DISPOSAL OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS OF THE GENCO SHIPPING & TRADING LIMITED 2014 MANAGEMENT INCENTIVE PLAN AND A RESTRICTED STOCK GRANT AGREEMENT BETWEEN GENCO SHIPPING & TRADING LIMITED AND THE HOLDER OF RECORD OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE.  NO TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IN CONTRAVENTION OF SUCH PLAN AND RESTRICTED STOCK GRANT AGREEMENT SHALL BE VALID OR EFFECTIVE.  COPIES OF SUCH AGREEMENT MAY BE OBTAINED BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD OF THE CERTIFICATE TO THE SECRETARY OF GENCO SHIPPING & TRADING LIMITED."

If the Restricted Stock is in book entry form, it shall be subject to electronic coding or stop order indicating that such shares of Restricted Stock are restricted by the terms of this Agreement and the MIP.  Such legend, electronic coding or stop order shall not be removed until such shares of Restricted Stock vest.

(b)    Reasonably promptly after any such shares of Restricted Stock vest pursuant to Section 4 hereof, (i) in the case of certificated shares, in exchange for the surrender to the Company of the certificates evidencing the Restricted Stock, delivered to the Participant under Section 7(a) hereof, and the certificates evidencing any other securities received in respect of such shares, if any, the Company shall issue and deliver to the Participant (or the Participant's legal representative, beneficiary or heir) certificates evidencing such shares of Restricted Stock and such other securities, free of the legend provided in Section 7(a) hereof and (ii) in the case of book entry shares, the Company shall cause to be lifted and removed any electronic coding or stop order established pursuant to Section 7(a) hereof.

(c)    The Company may require as a condition of the delivery of stock certificates or the removal of any electronic coding or stop order, pursuant to Section 7(b) hereof, that the Participant remit to the Company an amount sufficient in the opinion of the Company to satisfy any federal, state and other governmental tax withholding requirements related to the vesting of the applicable shares.  The Board of Directors, in its sole discretion, may permit the Participant to satisfy such obligation by delivering shares of Common Stock or by directing the Company to withhold from delivery shares of Common Stock, in either case valued at their Fair Market Value on the Vesting Date with fractional shares being settled in cash.

- 3 -

(d)      The Participant shall not be deemed for any purpose to be, or have rights as, a shareholder of the Company by virtue of the grant of Restricted Stock, except to the extent a stock certificate is issued therefor or an appropriate book entry is made on the books of the transfer agent reflecting the issuance thereof pursuant to Section 7(a) hereof, and then only from the date such certificate is issued or such book entry is made.  Upon the issuance of a stock certificate or the making of an appropriate book entry on the books of the transfer agent, the Participant shall have the rights of a shareholder with respect to the Restricted Stock, including the right to vote the shares, subject to the restrictions on transferability and the forfeiture provisions, as set forth in this Agreement.

8.      Securities Matters.  The Company shall be under no obligation to effect the registration pursuant to the Securities Act of 1933, as amended (the "1933 Act") of any interests in the MIP or any shares of Common Stock to be issued thereunder or to effect similar compliance under any state laws.  The Company shall not be obligated to cause to be issued any shares, whether by means of stock certificates or appropriate book entries, unless and until the Company is advised by its counsel that the issuance of such shares is in compliance with all applicable laws, regulations of governmental authority and the requirements of any securities exchange on which shares of Common Stock are traded.  The Board of Directors may require, as a condition of the issuance of shares of Common Stock pursuant to the terms hereof, that the recipient of such shares make such covenants, agreements and representations, and that any certificates bear such legends and any book entries be subject to such electronic coding, as the Board of Directors, in its sole discretion, deems necessary or desirable. The Participant specifically understands and agrees that the shares of Common Stock, if and when issued, may be "restricted securities," as that term is defined in Rule 144 under the 1933 Act and, accordingly, the Participant may be required to hold the shares indefinitely unless they are registered under such Act or an exemption from such registration is available.

9.      Dividends, etc.  Any cash dividends or other property (but not including securities) received by a Participant with respect to a share of Restricted Stock shall be returned to the Company in the event such share of Restricted Stock is forfeited, subject to Section 2.7(e) of the MIP.  Any securities received by a Participant with respect to a share of Restricted Stock as a result of any dividend, recapitalization, merger, consolidation, combination, exchange of shares or otherwise will not vest until such share of Restricted Stock vests and shall be forfeited if such share of Restricted Stock is forfeited, subject to Section 2.7(e) of the MIP.  Unless the Board of Directors otherwise determines, such securities shall bear the legend or be subject to the electronic coding or stop order set forth in Section 7(a) hereof.

10.      Delays or Omissions.  No delay or omission to exercise any right, power or remedy accruing to any party hereto upon any breach or default of any party under this Agreement, shall impair any such right, power or remedy of such party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party or any provisions or conditions of this Agreement, must be in a writing signed by such party and shall be effective only to the extent specifically set forth in such writing.

- 4 -

11.     <u>Right of Discharge Preserved</u>.   Nothing in this Agreement shall confer upon the Participant the right to continue in the employ or other service of the Company, or affect any right which the Company may have to terminate such employment or service.

12.     <u>Integration</u>. This Agreement contains the entire understanding of the parties with respect to its subject matter. There are no restrictions, agreements, promises, representations, warranties, covenants or undertakings with respect to the subject matter hereof other than those expressly set forth herein. This Agreement, including, without limitation, the MIP, supersedes all prior agreements and understandings between the parties with respect to its subject matter.

13.     <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

14.     <u>Governing Law</u>.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, without regard to the provisions governing conflict of laws.

15.     <u>Obligation to Notify</u>.  If the Participant makes the election permitted under Section 83(b) of the Internal Revenue Code of 1986, as amended (that is, an election to include in gross income in the year of transfer the amounts specified in Section 83(b)), the Participant shall notify the Company of such election within 10 days of filing notice of the election with the Internal Revenue Service and shall within the same 10-day period remit to the Company an amount sufficient in the opinion of the Company to satisfy any federal, state and other governmental tax withholding requirements related to such inclusion in Participant's income. The Participant should consult with his or her tax advisor to determine the tax consequences of acquiring the Restricted Stock and the advantages and disadvantages of filing the Section 83(b) election.   The Participant acknowledges that it is his or her sole responsibility, and not the Company's, to file a timely election under Section 83(b), even if the Participant requests the Company or its representatives to make this filing on his or her behalf.

16.     <u>Reduction in Benefits</u>.  Unless the Participant and the Company agree otherwise in writing, in the event that the Participant would incur an Excise Tax on any payments or benefits under this Agreement as a result of a Change of Control (or any other change described in Section 280G(b)(2) of the Code), the Company shall reduce the payments or benefits to be paid to or granted to Participant hereunder to the greater of (i) the maximum amount payable to the Participant without the imposition of any Excise Tax with respect to the Restricted Stock and (ii) the amount that yields the Participant the greatest after-tax amount of benefits under this Agreement after taking into account any Excise Tax imposed on Participant, whether due to payments and benefits under this Agreement or otherwise.   "Excise Tax" means the tax imposed by Section 4999 of the Code and any successor tax.   The determination of whether the Participants payments and benefits should be reduced and the amount of any such reduction shall be made by independent counsel selected by the Company ("Independent Counsel").   For purposes of such determination, (x) the total amount of payments and benefits received by the Participant as a result of such Change in Control (or such other change) shall be treated as "parachute payments" within the meaning of Section 280G(b)(2) of the Code, and all

- 5 -

"excess parachute payments" within the meaning of Section 280G(b)(1) of the Code shall be treated as subject to the Excise Tax, except to the extent that, in the opinion of Independent Counsel, a payment or benefit hereunder (in whole or in part) does not constitute a "parachute payment" within the meaning of Section 280G(b)(2) of the Code and the Treasury Regulations under Section 280G of the Code (the "Regulations"), or such "excess parachute payments" (in whole or in part) are not subject to the Excise Tax; (y) the amount of the payments and benefits hereunder that shall be treated as subject to the Excise Tax shall be equal to the lesser of (A) the total amount of such payments and benefits or (B) the amount of "excess parachute payments" within the meaning of Section 280G(b)(1) of the Code (after applying clause (x) hereof); and (z) the value of any noncash benefits or any deferred payment or benefit shall be determined by Independent Counsel in accordance with the principles of Sections 280G(d)(3) and (4) of the Code. All fees and expenses of Independent Counsel shall be borne by the Company.

17. <u>Participant Acknowledgment</u>. The Participant hereby acknowledges receipt of a copy of the MIP. The Participant hereby acknowledges that all decisions, determinations and interpretations of the Board of Directors in respect of the MIP, this Agreement and the Restricted Stock shall be final and conclusive.

IN WITNESS WHEREOF, the Company has caused this Agreement to be duly executed by its duly authorized officer, and the Participant has hereunto signed this Agreement on his own behalf, thereby representing that he has carefully read and understands this Agreement and the MIP as of the day and year first written above.

GENCO SHIPPING & TRADING LIMITED

By: _____

Name: _____

Title: _____

_____
Robert Gerald Buchanan

- 6 -

KL3 2971150.4

**EXHIBIT 7**

**THE NEW GENCO EQUITY WARRANT AGREEMENT**

## WARRANT AGREEMENT

THIS WARRANT AGREEMENT (this "Agreement") is made as of the [__] day of [__], 2014 between Genco Shipping & Trading Limited, a Marshall Islands corporation (the "Company"), and Computershare Inc., a Delaware corporation ("Computershare"), and its wholly owned subsidiary Computershare Trust Company N.A., a federally chartered trust company (together with Computershare, the "Warrant Agent").

WHEREAS, on April 21, 2014, the Company and its debtor affiliates (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under the lead case 14-11108 (SHL);

WHEREAS, on April 21, 2014, the Debtors filed the *Prepackaged Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, the "Plan of Reorganization");

WHEREAS, on [__], 2014, the Bankruptcy Court entered an order confirming the Plan of Reorganization, and the Company emerged from its chapter 11 bankruptcy proceedings on [__], 2014 (the "Effective Date");

WHEREAS, pursuant to the Plan of Reorganization, the Company will issue on or as soon as practicable after the Effective Date, warrants (the "Warrants") to purchase, in the aggregate, 3,938,298 shares of the common stock of the reorganized Company, authorized and issued pursuant to the Plan of Reorganization and the articles of incorporation ("Common Stock"), at an exercise price of $20.99, to all holders of any "equity security" as such term is defined in section 101(16) of the Bankruptcy Code, or any other instrument evidencing an ownership in the Company, whether or not transferable, and any claim subordinated pursuant to section 510(b) of the Bankruptcy Code in the Company, in exchange for the cancellation or surrender of such equity securities pursuant to the Plan of Reorganization;

WHEREAS, the Company desires to provide for the form and provisions of the Warrants, the terms upon which they shall be issued and exercised, and the respective rights, limitation of rights, and immunities of the Company, the Warrant Agent, and the holders of the Warrants;

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company, and the Warrant Agent is willing to so act, in connection with the issuance, registration, transfer, exchange, call, exercise and cancellation of the Warrants; and

WHEREAS, all acts and things have been done and performed which are necessary to make the Warrants, when executed on behalf of the Company and countersigned, either by manual or facsimile signature, by or on behalf of the Warrant Agent, as provided herein, the valid, binding and legal obligations of the Company, and to authorize the execution and delivery of this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements herein contained, the parties hereto agree as follows:

KL2 2841155.13

## ARTICLE I

## DEFINITIONS

Section 1.1    Definition of Terms.  As used in this Agreement, the following capitalized terms shall have the following respective meanings:

(a)    "Affiliate" has the meaning set forth in Rule 12b-2 of the Exchange Act.

(b)    "Appropriate Officer" has the meaning set forth in Section 3.2(a) hereof.

(c)    "Beneficial Holder" means, with respect to any Warrants represented by a Global Warrant Certificate, any person or entity that "beneficially owns" (as such term is defined under and determined pursuant to Rule 13d-3 promulgated under the Exchange Act) such Warrants.

(d)    "Book-Entry Warrants" has the meaning set forth in Section 3.1(c) hereof.

(e)    "Business Day" shall mean any day on which commercial banks are not authorized or permitted to close in the City of New York, Borough of Manhattan and the State of New Jersey.

(f)    "Closing Sale Price" of the Common Stock on any date of determination means:

(i)    if the Common Stock is listed on the New York Stock Exchange or The NASDAQ Stock Market on such date, the average closing sale price per share of the Common Stock (or if no closing sale price is reported, the average of the closing bid and closing ask prices or, if more than one in either case, the average of the average closing bid and the average closing ask prices) for the 10 consecutive trading days immediately prior to such date of determination, as reported by the New York Stock Exchange or The NASDAQ Stock Market, as applicable;

(ii)    if the Common Stock is not listed on the New York Stock Exchange or The NASDAQ Stock Market on such date, the average closing sale price per share of the Common Stock (or if no closing sale price is reported, the average of the high bid and low asked prices or, if more than one in either case, the average of the average high bid and low asked prices) for the 10 consecutive trading days immediately prior to such date of determination, as reported in composite transactions for the principal U.S. national or regional securities exchange on which the Common Stock is traded;

(iii)    if the Common Stock is not listed on a U.S. national or regional securities exchange, the average last quoted sale price for the Common Stock (or, if no sale price is reported, the average of the high bid and low asked price for such date) for the 10 consecutive trading days immediately prior to such date of determination, in the over-the-counter market as reported by OTC Markets Group Inc. or other similar organization; or

(iv)    in all other cases, as determined in good faith by the Board of Directors of the Company.

The Closing Sale Price shall be determined without reference to early hours, after hours or extended market trading.

The Closing Sale Price shall be appropriately adjusted by the Company in good faith if the "ex date" (as hereinafter defined) for any event (other than the issuance or distribution requiring such computation) occurs during the ten consecutive trading days immediately prior to the day as of which "Current Sale Price" is being determined.

For these purposes the term "ex date", when used:

(i)    with respect to any issuance or distribution, means the first date on which the Common Stock trades regular way on the relevant exchange or in the relevant market from which the Closing Price was obtained without the right to receive such issuance or distribution;

(ii)    with respect to any subdivision or combination of shares of Common Stock, means the first date on which the Common Stock trades regular way on such exchange or in such market after the time at which such subdivision or combination becomes effective; and

(iii)    with respect to any tender or exchange offer, means the first date on which the Common Stock trades regular way on such exchange or in such market after the expiration time of such offer.

Whenever such adjustments shall be made to the Current Sale Price as may be necessary or appropriate to effectuate the intent of this Warrant Agreement and to avoid unjust or inequitable results as determined in good faith by the Board of Directors.

(g)    "Common Stock" has the meaning set forth in the Recitals, and shall include any successor security as a result of any recapitalization, reorganization, reclassification or similar transaction involving the Company.

(h)    "Computershare" has the meaning set forth in the preamble.

(i)    "Date of Issuance" has the meaning set forth in Section 3.1(a) hereof.

(j)    "Depositary" has the meaning set forth in Section 3.1(c) hereof.

(k)    "Direct Registration Warrants" has the meaning set forth in Section 3.1(c) hereof.

(l)     "Effective Date" has the meaning set forth in the Recitals.

(m)    "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(n)   "Exercise Date" means any date, on or prior to the expiration of the Exercise Period, on which the Registered Holder exercises the right to purchase the Warrant Exercise Shares, in whole or in part, pursuant to and in accordance with the terms and conditions described herein.

(o)   "Exercise Form" has the meaning set forth in Section 4.3(b) hereof.

(p)   "Exercise Price" has the meaning set forth in Section 4.1 hereof.

(q)   "Exercise Period" has the meaning set forth in Section 4.2 hereof.

(r)   "Fully Diluted" means all Common Stock outstanding as of the applicable measurement date together with all Common Stock then issuable upon (i) the conversion of convertible securities of the Company at the then applicable conversion rate, and (ii) the exercise of any options or warrants then exercisable for Common Stock; provided that, for purposes of clauses (i) and (ii), all conditions to the convertibility and/or exercisability of convertible securities, options and warrants of the Company, shall be deemed to have been satisfied.

(s)   "Global Warrant Certificates" has the meaning set forth in Section 3.1(c) hereof.

(t)   "Governmental Authority" means any (i) government, (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal) or (iii) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature, in each case, whether federal, state, local, municipal, foreign, supranational or of any other jurisdiction.

(u)   "Holder" has the meaning set forth in Section 4.1 hereof.

(v)   "Law" means all laws, statutes, rules, regulations, codes, injunctions, decrees, orders, ordinances, registration requirements, disclosure requirements and other pronouncements having the effect of law of the United States, the Republic of the Marshall Islands, any foreign country or any domestic or foreign state, county, city or other political subdivision or of any Governmental Authority.

(w)   "Organic Change" means any recapitalization, reorganization, reclassification, consolidation, merger, sale of a majority of the Company's assets or other transaction, in each case which is effected in such a way that the holders of Common Stock are entitled to receive (either directly or upon subsequent liquidation) cash, stock, securities or other assets or property with respect to or in exchange for Common Stock, other than a transaction which triggers an adjustment pursuant to Sections 5.1(a), (b) or (c).

(x)   "Person" means any individual, firm, corporation, partnership, limited partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, governmental unit or any political subdivision thereof, or any other entity (as such term is defined in the Bankruptcy Code).

KL2 2841155.13                          4

(y)    "Plan of Reorganization" has the meaning set forth in the Recitals.

(z)    "Pro Rata Repurchase Offer" means any offer to purchase shares of Common Stock by the Company or any Affiliate thereof pursuant to (i) any tender offer or exchange offer subject to Section 13(e) or 14(e) of the Exchange Act or Regulation 14E promulgated thereunder or (ii) any other offer available to substantially all holders of Common Stock to purchase or exchange their shares of Common Stock, in the case of both (i) or (ii), whether for cash, shares of capital stock of the Company, other securities of the Company, evidences of indebtedness of the Company or any other Person, or any other property (including, without limitation, shares of capital stock, other securities or evidences of indebtedness of a Subsidiary), or any combination thereof, effected while the Warrants are outstanding.  The "effective date" of a Pro Rata Repurchase Offer shall mean the date of acceptance of shares for purchase or exchange by the Company under any tender or exchange offer which is a Pro Rata Repurchase Offer or the date of purchase with respect to any Pro Rata Repurchase Offer that is not a tender or exchange offer.

(aa)    "Registered Holder" has the meaning set forth in Section 3.4(d) hereof.

(bb)    "Requisite Holders" means Registered Holders of Warrants exercisable for a majority of the Common Stock issuable upon exercise of all Warrants then outstanding.

(cc)    "SEC" means the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act or the Exchange Act.

(dd)    "Securities Act" means the Securities Act of 1933, as amended.

(ee)    "Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a partnership, limited liability company or other business entity (other than a corporation), a majority of the partnership, limited liability company or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.  For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, limited liability company or other business entity if such Person or Persons shall be allocated a majority of partnership, limited liability company or other business entity gains or losses or shall be or control the general partner, the managing member or entity performing similar functions of such partnership, limited liability company or other business entity.

(ff)    "Third Party Cash Sale" means in any such case with a purchaser that is not an Affiliate of the Company: (i) any merger, consolidation, or other similar transaction or series of transactions to which the Company is a party and pursuant to which the Company is not the surviving Person in such transaction and the consideration received by the Company's shareholders (directly or indirectly) consists solely of cash or (ii) the sale or other disposition of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole and the

KL2 2841155.13                                    5

consideration received by the Company's shareholders (directly or indirectly) consists solely of cash.

(gg)    "Third Party Sale Price" means, with respect to any Third Party Cash Sale, the quotient of (x) the aggregate cash consideration received by the shareholders (directly or indirectly) in connection with the applicable Third Party Cash Sale, divided by (y) the number of Fully Diluted Shares of Common Stock outstanding immediately before the Third Party Sale Closing.

(hh)    "Warrant Agent" has the meaning set forth in the preamble and shall include any successor to the Warrant Agent pursuant to Section 8.1 hereof.

(ii)    "Warrant Exercise Shares" means the shares of Common Stock issued upon the applicable exercise of a Warrant.

(jj)    "Warrant Register" has the meaning set forth in Section 3.4(c) hereof.

(kk)    "Warrant Restrictions" has the meaning set forth in Section 3.1(c) hereof.

(ll)    "Warrant Statements" has the meaning set forth in Section 3.1(c) hereof.

(mm)    "Warrants" has the meaning set forth in the Recitals.

Section 1.2    Rules of Construction.

(a)    The singular form of any word used herein, including the terms defined in Section 1.1 hereof, shall include the plural, and vice versa.  The use herein of a word of any gender shall include correlative words of all genders.

(b)    Unless otherwise specified, references to Articles, Sections and other subdivisions of this Agreement are to the designated Articles, Sections and other subdivision of this Agreement as originally executed.  The words "hereof," "herein," "hereunder" and words of similar import refer to this Agreement as a whole.

(c)    References to "$" are to dollars in lawful currency of the United States of America.

(d)    The Exhibits attached hereto are an integral part of this Agreement.

## ARTICLE II

### APPOINTMENT OF WARRANT AGENT

Section 2.1    Appointment.  The Company hereby appoints the Warrant Agent to act as agent for the Company for the Warrants in accordance with the express terms and subject to the conditions set forth in this Agreement (and no implied terms or conditions), and the Warrant Agent hereby accepts such appointment and agrees to perform the same in accordance with the express terms and conditions set forth in this Agreement.

KL2 2841155.13                                              6

## ARTICLE III

## WARRANTS

Section 3.1    <u>Issuance of Warrants</u>.

(a)    On the terms and subject to the conditions of this Agreement and in accordance with the terms of the Plan of Reorganization, on or as soon as practicable after the Effective Date (such date, the "<u>Date of Issuance</u>"), the Company will issue and distribute the Warrants.

(b)    The maximum number of shares of Common Stock issuable pursuant to exercise of the Warrants shall be 3,938,298 shares, as such amount may be adjusted from time to time pursuant to this Agreement.

(c)    Unless otherwise provided in this Agreement, the Warrants (such Warrants being referred to as "<u>Book-Entry Warrants</u>") shall be issued through the book-entry facilities of The Depository Trust Company, as depositary (the "<u>Depositary</u>"), in the form of one or more global warrant certificates ("<u>Global Warrant Certificates</u>"), duly executed on behalf of the Company and countersigned, either by manual or facsimile signature, by the Warrant Agent, in the manner set forth in <u>Section 3.2(b)</u> below, which the Company shall deliver, or cause to be delivered to the Depositary, on or promptly after the Effective Date.   Notwithstanding the foregoing, any Warrants which are not issuable through the mandatory reorganization function of the Depositary shall be issued by book-entry registration on the books of the Warrant Agent ("<u>Direct Registration Warrants</u>") and shall be reflected on statements issued by the Warrant Agent from time to time to the holders thereof (the "<u>Warrant Statements</u>"); <u>provided</u> that any Direct Registration Warrant that is not subject to any restriction on transfer or exercise, or is not subject to any vesting requirements (such restrictions or requirements, "<u>Warrant Restrictions</u>"), may be exchanged at any time for a Book-Entry Warrant, in accordance with <u>Section 6.1(c)</u> and the applicable procedures of the Depositary and the Warrant Agent.

Section 3.2    <u>Form of Warrant</u>.

(a)    Subject to <u>Section 6.1</u> of this Agreement, the Global Warrant Certificates, with the forms of election to exercise and of assignment printed on the reverse thereof, shall be in substantially the form set forth in <u>Exhibit A</u> attached hereto.   The Global Warrant Certificates may bear such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement, and may have such letters, numbers or other marks of identification or designation and such legends, summaries, or endorsements placed thereon as may be required by the Depositary or to comply with any Law or with any rules or regulations made pursuant thereto or with any rules of any securities exchange or as may, consistently herewith, or, be determined by the Chief Executive Officer or Chief Financial Officer of the Company (each, an "<u>Appropriate Officer</u>") executing such Global Warrant Certificates, as evidenced by their execution of the Global Warrant Certificates, <u>provided</u> any such insertions, omissions, substitutions or variations shall be reasonably acceptable to the Warrant Agent; and provided further, in each case, that they do not affect the rights, duties, obligations, responsibilities, liabilities or indemnities of the Warrant Agent.

(b)     The Global Warrant Certificates shall be deposited on or after the Date of Issuance with the Warrant Agent and registered in the name of Cede & Co., as the nominee of the Depositary.  Each Global Warrant Certificate shall represent such number of the outstanding Warrants as specified therein, and each shall provide that it shall represent the aggregate amount of outstanding Warrants from time to time endorsed thereon and that the aggregate amount of outstanding Warrants represented thereby may from time to time be reduced or increased, as appropriate, in accordance with the terms of this Agreement.

Section 3.3     Execution of Global Warrant Certificates.

(a)     The Global Warrant Certificates shall be signed on behalf of the Company by an Appropriate Officer.  Each such signature upon the Global Warrant Certificates may be in the form of a facsimile signature of any such Appropriate Officer and may be imprinted or otherwise reproduced on the Global Warrant Certificates and for that purpose the Company may adopt and use the facsimile signature of any Appropriate Officer.

(b)     If any Appropriate Officer who shall have signed any of the Global Warrant Certificates shall cease to be such Appropriate Officer before the Global Warrant Certificates so signed shall have been countersigned, either by manual or facsimile signature, by the Warrant Agent or delivered or disposed of by or on behalf of the Company, such Global Warrant Certificates nevertheless may be countersigned and delivered or disposed of with the same force and effect as though such Appropriate Officer had not ceased to be such Appropriate Officer of the Company; and any Global Warrant Certificate may be signed on behalf of the Company by any person who, at the actual date of the execution of such Global Warrant Certificate, shall be a proper Appropriate Officer of the Company to sign such Global Warrant Certificate, although at the date of the execution of this Agreement any such person was not such Appropriate Officer.

(c)     A Global Warrant Certificate shall be, and shall remain, subject to the provisions of this Agreement until such time as all of the Warrants evidenced thereby shall have been duly exercised or shall have expired or been canceled in accordance with the terms hereof.

Section 3.4     Registration and Countersignature.

(a)     Upon receipt of a written order of the Company signed by an Appropriate Officer instructing the Warrant Agent to do so, the Warrant Agent shall (i) register in the Warrant Register the Direct Registration Warrants in the names of the initial Registered Holders thereof, and (ii) upon receipt of the Global Warrant Certificates duly executed on behalf of the Company, countersign, either by manual or facsimile signature, such Global Warrant Certificates evidencing Warrants.  Such written order of the Company shall specifically state the number of Warrants that are to be issued as Direct Registration Warrants and the name of the Registered Holders thereof, and the number of Warrants that are to be issued as Book-Entry Warrants, and the Warrant Agent may rely conclusively on such written order.

(b)     No Global Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable, until such Global Warrant Certificate has been countersigned by the manual or facsimile signature of the Warrant Agent.  Such signature by the

KL2 2841155.13                                    8

Warrant Agent upon any Global Warrant Certificate executed by the Company shall be conclusive evidence that such Global Warrant Certificate so countersigned has been duly issued hereunder.

(c)     The Warrant Agent shall keep or cause to be kept, at an office designated for such purpose, books (the "Warrant Register") in which, subject to such reasonable regulations as it may prescribe, it shall register the Direct Registration Warrants as well as the Global Warrant Certificates, and exchanges, cancellations and transfers of outstanding Warrants in accordance with the procedures set forth in Section 6.1 of this Agreement, all in a form satisfactory to the Company and the Warrant Agent.  No service charge shall be made for any exchange or registration of transfer of the Warrants, but the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed on any Registered Holder in connection with any such exchange or registration of transfer.  The Warrant Agent shall have no obligation to effect an exchange or register a transfer unless and until it is satisfied that any payments required by the immediately preceding sentence have been made.

(d)     Prior to due presentment for registration of transfer or exchange of any Warrant in accordance with the procedures set forth in this Agreement, the Company and the Warrant Agent may deem and treat the person in whose name any Warrant is registered upon the Warrant Register (the "Registered Holder" of such Warrant) as the absolute owner of such Warrant, for all purposes including, without limitation, for the purpose of any exercise thereof, any distribution to the holder thereof and for all other purposes, and neither the Warrant Agent nor the Company shall be affected by notice to the contrary. Neither the Company nor the Warrant Agent will be liable or responsible for any registration or transfer of any Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary.

**ARTICLE IV**

**TERMS AND EXERCISE OF WARRANTS**

Section 4.1     Exercise Price.  Each Warrant shall entitle (i) in the case of the Direct Registration Warrants, the Registered Holder thereof and (ii) in the case of Book-Entry Warrants, the Beneficial Holder thereof ((i) and (ii) collectively, the "Holder"), subject to the provisions of such Warrant and of this Agreement, the right to purchase from the Company the number of shares of Common Stock, at the price of $20.99 per share (as the same may be hereafter adjusted in accordance herewith, the "Exercise Price"), specified in such Warrant.

Section 4.2     Exercise Period.  Warrants may be exercised by the Holder thereof, in whole or in part (but not as to a fractional share of Common Stock), at any time and from time to time after the Date of Issuance and prior to 5:00 P.M., New York time on the seventh (7th) anniversary of the Effective Date (the "Exercise Period").  To the extent that a Warrant or portion thereof is not exercised prior to the expiration of the Exercise Period, it shall be automatically cancelled with no action by any Person, and with no further rights thereunder, upon such expiration.

Section 4.3     Method of Exercise.

(a)     In connection with the exercise of any Warrant, the Exercise Price shall be paid as provided in this Section 4.3(a).  In connection with the exercise of any Warrant, the Holder of such Warrant shall exchange the Common Stock purchase rights represented thereby by surrendering such Warrant (or portion thereof) to the Warrant Agent for the number of Warrant Exercise Shares being exercised, up to the aggregate number of Warrant Exercise Shares for which the Warrant is exercisable, from which the Company shall withhold and not issue to such Holder, in payment of the Exercise Price thereof, a number of such Warrant Exercise Shares equal to (x) the number of Warrant Exercise Shares for which the Warrant is being exercised, multiplied by (y) the Exercise Price, and divided by (z) the Closing Sale Price on the Exercise Date (and such withheld shares shall no longer be issuable under the Warrant, and the Holder shall not have any rights or be entitled to any payment with respect to such withheld shares).  Upon exercise of any Warrant, the Warrant Agent will promptly deliver written notice to the Company to confirm the number of shares of Common Stock issuable in connection with the cashless exercise. The Company shall calculate and transmit to the Warrant Agent in a written notice, and the Warrant Agent shall have no duty, responsibility or obligation to calculate, the number of shares of Common Stock issuable in connection with any cashless exercise.  The Warrant Agent shall be entitled to rely conclusively on any such written notice provided by the Company, and the Warrant Agent shall not be liable for any action taken, suffered or omitted to be taken by it in accordance with such written instructions or pursuant to this Agreement.  Such written notice from the Company shall also set forth the cost basis for such shares of Common Stock issued pursuant to such cashless exercise.

(b)     Subject to the terms and conditions of the Warrants and this Agreement, the Holder of a Warrant may exercise, in whole or in part, such Holder's right to purchase the Warrant Exercise Shares issuable upon exercise of such Warrant,  by: (x) in the case of Direct Registration Warrants, providing an exercise form for the election to exercise such Warrant ("Exercise Form") substantially in the form of Exhibit B hereto, properly completed and duly executed by the Registered Holder thereof, to the Warrant Agent, and (y) in the case of Book-Entry Warrants, providing an Exercise Form substantially in the form of Exhibit C hereto or otherwise complying with the practices and procedures of the Depositary and its direct and indirect participants, as applicable.

(c)     Any exercise of a Warrant pursuant to the terms of this Agreement shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms.

(d)     In the case of Direct Registration Warrants, upon receipt of an Exercise Form pursuant to Section 4.3(b), the Warrant Agent shall:

(i)     examine the Exercise Form and all other documents delivered to it by or on behalf of Holders as contemplated hereunder to ascertain whether or not, on their face, such Exercise Form and any such other documents have been executed and completed in accordance with their terms and the terms hereof;

(ii)     if an Exercise Form or other document appears, on its face, to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrants exists, endeavor to inform the appropriate parties (including the

KL2 2841155.13

10

person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii)  inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between the information provided on any Exercise Form received and the information on the Warrant Register;

(iv)  advise the Company no later than three (3) Business Days after receipt of an Exercise Form, of (A) the receipt of such Exercise Form and the number of Warrant Exercise Shares in respect of which the Warrant is requested to be exercised in accordance with the terms and conditions of this Agreement, (B) the instructions with respect to delivery of the Common Stock deliverable upon such exercise, subject to timely receipt of such information by the Warrant Agent, and (C) such other information as the Company shall reasonably request; and

(v)  subject to Common Stock being made available to the Warrant Agent by or on behalf of the Company for delivery to the Depositary, and written instructions from the Company, liaise with the Depositary and endeavor to effect such delivery to the relevant accounts at the Depositary in accordance with its customary requirements.

The Company reserves the right to reasonably reject any and all Exercise Forms that it determines, in its sole discretion, are not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful. Any such determination by the Company shall be final and binding on the Holders of the Warrants, absent manifest error.  Moreover, the Company reserves the absolute right to waive any of the conditions to any particular exercise of Warrants or any defects in the Exercise Form(s) with regard to any particular exercise of Warrants.  The Company shall provide prompt written notice to the Warrant Agent of any such rejection or waiver.

(e)  In the case of Book-Entry Warrants, the Company and the Warrant Agent shall cooperate with the Depositary and its direct and indirect participants in order to effectuate the exercise of such Warrants, in accordance with the applicable practices and procedures of the Depositary and such participants, including the manner of delivery of notice of exercise by the Beneficial Holders thereof, which may be substantially in the form of Exhibit C or in such other form as shall be prescribed by such participants, as applicable.

(f)  Neither the Company nor the Warrant Agent shall be under any duty to give notice to the Holders of the Warrants of any irregularities in any exercise of Warrants, nor shall it incur any liability for the failure to give such notice.

Section 4.4    Issuance of Common Stock.

(a)  Upon the effectiveness of any exercise of any Warrants pursuant to Section 4.3, the Company shall promptly at its expense, and in no event later than five (5) Business Days thereafter, cause to be issued to the Holder of such Warrants the total number of whole shares of Common Stock for which such Warrants are being exercised, subject to Section

KL2 2841155.13                                11

4.5 (as the same may be hereafter adjusted pursuant to Article V) in such denominations as are requested by the Holder as set forth below:

(i)      in the case of the exercise of any Direct Registration Warrants by the Registered Holder thereof, a book-entry interest in the Common Stock registered on the books of the Company's transfer agent, and

(ii)      in the case of the exercise of any Book-Entry Warrants by the Beneficial Holder thereof, by same-day or next-day credit to the Depositary for the account of such Beneficial Holder or for the account of a participant in the Depositary the number of Common Stock to which such person is entitled, in each case registered in such name and delivered to such account as directed in accordance with the practices and procedures of the Depositary and such participant.

(b)      Notwithstanding the five (5) Business Day period set forth in Section 4.4(a), the Warrant Exercise Shares shall be deemed to have been issued to the Holder at the time at which all of the conditions to such exercise have been fulfilled, and the Holder shall be deemed for all purposes to have become the holder of such Warrant Exercise Shares at such time.

Section 4.5   Reservation of Shares.   The Company shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock solely for the purpose of issuance upon the exercise of the Warrants, a number of shares of Common Stock equal to the aggregate Warrant Exercise Shares issuable upon the exercise of all outstanding Warrants.  The Company shall use commercially reasonable efforts to take all such actions as may be necessary to assure that all such shares of Common Stock may be so issued without violating the Company's governing documents or any requirements of any national securities exchange upon which shares of Common Stock may be listed.  The Company shall not take any action which would cause the number of authorized but unissued shares of Common Stock to be less than the number of such shares required to be reserved hereunder for issuance upon exercise of the Warrants.

Section 4.6   Fractional Shares.   Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to issue any fraction of a share of its capital stock in connection with the exercise of any Warrants, and in any case where a Registered Holder of Warrants would, except for the provisions of this Section 4.6, be entitled under the terms thereof to receive a fraction of a share upon the exercise of such Warrants, the Company shall, upon the exercise of such Warrants, issue or cause to be issued only the largest whole number of Warrant Exercise Shares issuable upon such exercise (and such fraction of a share will be disregarded, and the Holder shall not have any rights or be entitled to any payment with respect to such fraction of a share); provided that if more than one Warrant is presented for exercise at the same time by the same Registered Holder, the number of whole Warrant Exercise Shares which shall be issuable upon the exercise thereof shall be computed on the basis of the aggregate number of Warrant Exercise Shares  issuable upon exercise of all such Warrants.

Section 4.7   Close of Books; Par Value.   The Company shall not close its books against the transfer of any Warrant or any Warrant Exercise Shares in any manner which

interferes with the timely exercise of such Warrant.  The Company shall use commercially reasonable efforts to, from time to time, take all such action as may be necessary to assure that the par value per share of the unissued shares of Common Stock acquirable upon exercise of each Warrant is at all times equal to or less than the Exercise Price then in effect.

Section 4.8    Payment of Taxes.   The Company shall not be required to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of any shares of Common Stock (including certificates therefor) or payment of cash or other property to any recipient other than the Holder of the Warrant surrendered upon the exercise of a Warrant, and in case of such transfer or payment, the Warrant Agent and the Company shall not be required to issue or deliver any shares or pay any cash until (a) such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Warrant Agent or the Company or (b) it has been established to the Company's and the Warrant Agent's satisfaction that any such tax or other charge that is or may become due has been paid. For the avoidance of doubt, the Warrant Agent shall not have any duty or obligation to take any action under any section of this Agreement that requires the payment of taxes or charges, unless and until the Warrant Agent is satisfied that all such taxes and/or charges have been paid.

## ARTICLE V

## ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF
## WARRANT EXERCISE SHARES

In order to prevent dilution of the rights granted under each Warrant, the Exercise Price shall be subject to adjustment from time to time as provided in this Article V, and the number of shares of Common Stock obtainable upon exercise of each Warrant shall be subject to adjustment from time to time as provided in this Article V.

Section 5.1    Adjustments.

(a)    Subdivision or Combination of Common Stock.  If the Company at any time after the issuance of the Warrants but prior to the expiration of the Exercise Period subdivides (by any stock split, stock dividend or reclassification) the Common Stock into a greater number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately reduced, and the number of Warrant Exercise Shares issuable upon exercise of each Warrant shall be proportionately increased.  If the Company at any time prior to the expiration of the Exercise Period combines (by reverse stock split or reclassification) the Common Stock into a smaller number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately increased, and the number of Warrant Exercise Shares issuable upon exercise of each Warrant shall be proportionately decreased.  Any adjustment under this Section 5.1(a) shall become effective immediately upon the effectiveness of such subdivision or combination.

(b)    Distributions. If the Company at any time after the issuance of the Warrants but prior to the expiration of the Exercise Period fixes a record date for the making of a distribution to all holders of shares of the Common Stock of securities, evidences of indebtedness, assets, cash, rights or warrants (excluding dividends or distributions referred to

in Section 5.1(a)), then, in each such case, the Exercise Price in effect prior to such record date shall be adjusted thereafter to the price determined by the following formula:

$$EP_1 = EP_0 \; x \; (CP_0 - FV)/CP_0$$

where

| | | |
|---|---|---|
| $EP_1$ | = | the Exercise Price in effect immediately following the application of the adjustments in this Section 5.1(b); |
| $EP_0$ | = | the Exercise Price in effect immediately prior to the application of the adjustments in this Section 5.1(b); |
| $CP_0$ | = | the Closing Sale Price of the Common Stock on the last trading day preceding the first date on which the Common Stock trades regular way without the right to receive such distribution; and |
| $FV$ | = | the amount of cash and/or the fair market value of the securities, evidences of indebtedness, assets, rights or warrants to be so distributed in respect of one share of Common Stock, as determined by the Board of Directors of the Company, acting in good faith. |

Such adjustment shall be made successively whenever such a record date is fixed. In such event, the number of Warrant Exercise Shares issuable upon the exercise of the Warrants represented by this Agreement shall be increased to the number obtained by dividing (x) the product of (1) the number of Warrant Exercise Shares issuable upon the exercise of the Warrants represented by this Agreement before such adjustment, and (2) the Exercise Price in effect immediately prior to the adjustment by (y) the new Exercise Price immediately following such adjustment.

In the event that such distribution is not so made, the Exercise Price and the number of Warrant Exercise Shares issuable upon exercise of the Warrants then in effect shall be readjusted, effective as of the date when the Board of Directors of the Company determines not to distribute such shares, evidences of indebtedness, assets, rights, cash or warrants, as the case may be, to the Exercise Price that would then be in effect and the number of Warrant Exercise Shares that would then be issuable upon exercise of the Warrants if such record date had not been fixed.

(c)      Pro Rata Repurchase Offer of Common Stock.  If at any time after the issuance of the Warrants but prior to the expiration of the Exercise Period the Company consummates a Pro Rata Repurchase Offer of Common Stock, then the Exercise Price shall be reduced to the price determined by the following formula:

$$EP_1 = EP_0 \; x \; \frac{(OS_0 \, x \, CP_0) - AP}{(OS_0 - SP) \, x \, CP_0}$$

where

| | | |
|---|---|---|
| $EP_1$ | = | the Exercise Price in effect immediately following the application of the adjustments in this Section 5.1(c) (but in no |

event greater than $EP_0$);

| | | |
|---|---|---|
| $EP_0$ | = | the Exercise Price in effect immediately prior to the application of the adjustments in this <u>Section 5.1(c)</u>; |
| $OS_0$ | = | the number of Fully Diluted shares of Common Stock outstanding immediately before consummation of such Pro Rata Repurchase Offer; |
| $CP_0$ | = | the Closing Sale Price of a share of Common Stock on the trading day immediately preceding the first public announcement by the Company or any of its Affiliates of the intent to effect such Pro Rata Repurchase Offer; |
| $AP$ | = | the aggregate purchase price (including the fair market value, as determined in good faith by the Board of Directors of the Company, of any non-cash consideration included therein) paid for the shares of Common Stock in the Pro Rata Repurchase Offer; and |
| $SP$ | = | the number of shares of Common Stock so repurchased in the Pro Rata Repurchase Offer. |

In such event, the Warrant Exercise Shares issuable upon the exercise of the Warrants shall be increased to the number obtained by dividing (x) the product of (1) the Warrant Exercise Shares issuable upon the exercise of the Warrants before such adjustment, and (2) the Exercise Price in effect immediately prior to the adjustment by (y) the new Exercise Price immediately following such adjustment. For the avoidance of doubt, no increase to the Exercise Price or decrease in the Warrant Exercise Shares issuable upon exercise of the Warrants shall be made pursuant to this <u>Section 5.1(c)</u>.

(d)     <u>Reorganization, Reclassification, Consolidation, Merger or Sale</u>.  In connection with any Organic Change prior to the expiration of the Exercise Period, the Company shall make appropriate provision to ensure that each Holder of a Warrant shall have the right to acquire and receive, upon exercise of such Warrant, such cash, stock, securities or other assets or property as would have been issued or payable in such Organic Change (if the holder had exercised such Warrant immediately prior to such Organic Change) with respect to or in exchange, as applicable, for the number of Warrant Exercise Shares that would have been issued upon exercise of such Warrant, if such Warrant had been exercised immediately prior to the occurrence of such Organic Change.

(e)     <u>Third Party Sale</u>.  Notwithstanding Section 5.1(d) or anything contained in this Agreement,  in the event of any Third Party Cash Sale, the Company shall pay (or cause to be paid) to the Holders, with respect to each unexercised Warrant outstanding immediately prior to the consummation of such Third Party Cash Sale (the "<u>Third Party Sale Closing</u>"), cash in an amount equal to the excess, if any, of the Third Party Sale Price over the Exercise Price; <u>provided</u>, <u>however</u>, that no Holder shall be entitled to any payment hereunder with respect

15

to any portion of the Third Party Sale Price that is contingent, deferred or escrowed unless and until such amounts are actually paid to the holders of Common Stock or to the Company or its Subsidiaries, as applicable.  Upon the occurrence of a Third Party Sale Closing, all unexercised Warrants outstanding immediately prior to the Third Party Sale Closing shall automatically be terminated and cancelled and the Company shall thereupon cease to have any further obligations or liability with respect to the Warrants, except as required by this Section 5.1(e).  For the avoidance of doubt, the Holders shall not be entitled to any payment or consideration with respect to any Third Party Cash Sale with respect to which the Third Party Sale Price is equal to or less than the Exercise Price.

Section 5.2     Notices.  Whenever the number and/or kind of Warrant Exercise Shares or the Exercise Price is adjusted as herein provided, the Company shall (i) prepare and deliver, or cause to be prepared and delivered, forthwith to the Warrant Agent a written statement setting forth the adjusted number and/or kind of shares purchasable upon the exercise of Warrants and the Exercise Price of such shares after such adjustment, the facts requiring such adjustment and the computation by which adjustment was made, and (ii) cause the Warrant Agent to give written notice to each Registered Holder in the manner provided in Section 9.2 below, of the record date or the effective date of the event.  Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event.  The Warrant Agent shall be fully protected in relying upon any such written notice delivered in accordance with this Section 5.2, and on any adjustment therein contained, and shall not be deemed to have knowledge of any such adjustment unless and until it shall have received such written notice.  Notwithstanding anything to the contrary contained herein, the Warrant Agent shall have no duty or obligation to investigate or confirm whether the information contained in any such written notice complies with the terms of this Agreement or any other document, including the Global Warrant Certificates.  The Warrant Agent shall have no duty to determine when an adjustment under this Article V should be made, how any such adjustment should be calculated, or the amount of any such adjustment.

Section 5.3     Form of Warrant After Adjustments.  The form of the Global Warrant Certificate need not be changed because of any adjustments in the Exercise Price or the number or kind of the Common Stock, and Warrants theretofore or thereafter issued may continue to express the same price and number and kind of shares as are stated in Warrants, as initially issued.  The Company, however, may at any time in its sole discretion make any change in the form of Global Warrant Certificate that it may deem appropriate to give effect to such adjustments and that does not affect the substance of the Global Warrant Certificate (including the rights, duties, liabilities or obligations of the Warrant Agent), and any Global Warrant Certificate thereafter issued, whether in exchange or substitution for an outstanding Global Warrant Certificate, may be in the form so changed.

Section 5.4     Deferral or Exclusion of Certain Adjustments  No adjustment to the Exercise Price or the number of Warrant Exercise Shares shall be required hereunder unless such adjustment together with other adjustments carried forward as provided below, would result in an increase or decrease of at least one percent (1%) of the applicable Exercise Price or the number of Warrant Exercise Shares; provided that any adjustments which by reason of this Section 5.4 are not required to be made shall be carried forward and taken into account in any subsequent adjustment. No adjustment need be made for a change in the par value of the shares of Common

KL2 2841155.13

16

Stock. All calculations under this Section shall be made to the nearest one one-thousandth (1/1,000) of one cent ($0.01) or to the nearest one one-thousandth (1/1,000) of a share, as the case may be.

## ARTICLE VI

## TRANSFER AND EXCHANGE
## OF WARRANTS

Section 6.1    Registration of Transfers and Exchanges.

(a)    *Transfer and Exchange of Book-Entry Warrants.*  The Transfer (as defined below) and exchange of Book-Entry Warrants shall be effected through the Depositary and its direct and indirect participants, in accordance with the practices and procedures therefor of the Depositary and such participants.   As used herein, "Transfer" means any transfer, sale, assignment or other disposition.

(b)    *Exchange of Book-Entry Warrants for Direct Registration Warrants.*  If at any time:

(i)    the Depositary for the Global Warrant Certificates notifies the Company that the Depositary is unwilling or unable to continue as Depositary for the Global Warrant Certificates and a successor Depositary for the Global Warrant Certificates is not appointed by the Company within 90 days after delivery of such notice; or

(ii)    the Company, in its sole discretion, notifies the Warrant Agent in writing that it elects to exclusively cause the issuance of Direct Registration Warrants under this Agreement, then  upon written instructions signed by an Appropriate Officer of the Company, the Warrant Agent shall register Direct Registration Warrants, in an aggregate number equal to the number of Book-Entry Warrants represented by the Global Warrant Certificates, in accordance with such written instructions.   Such written instructions provided by the Company shall state that Direct Registration Warrants issued in exchange for Book-Entry Warrants pursuant to this Section 6.1(b) shall be registered in such names and in such amounts as the Depositary, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Warrant Agent.

(c)    *Transfer and Exchange of Direct Registration Warrants.*  When Direct Registration Warrants are presented to the Warrant Agent with a written request:

(i)    to register the Transfer of the Direct Registration Warrants; or

(ii)    to exchange such Direct Registration Warrants for an equal number of Direct Registration Warrants of other authorized denominations,

the Warrant Agent shall register the Transfer or make the exchange as requested if its customary requirements for such transactions are met, provided, that (A) the Warrant Agent shall have received (x) a written instruction of Transfer in form satisfactory to the

Warrant Agent, duly executed by the Registered Holder thereof or by his attorney, duly authorized in writing and (y) a written order of the Company signed by an Appropriate Officer authorizing such exchange.

(d)      *Exchange of a Direct Registration Warrant for Book-Entry Warrants*.  A Direct Registration Warrant that is not subject to any Warrant Restrictions or subject to the restrictions set forth in Section 6.4, may be exchanged for Book-Entry Warrants upon satisfaction of the requirements set forth below.  Upon receipt by the Warrant Agent of appropriate written instruments of transfer with respect to a Direct Registration Warrant, in form satisfactory to the Warrant Agent, together with written instructions directing the Warrant Agent to make, or to direct the Depositary to make, an endorsement on the Global Warrant Certificate to reflect an increase in the number of Warrants represented by the Global Warrant Certificate equal to the number of Warrants represented by such Direct Registration Warrant, then the Warrant Agent shall cancel such Direct Registration Warrant on the Warrant Register and cause, or direct the Depositary to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Warrant Agent, the number of Book-Entry Warrants represented by the Global Warrant Certificate to be increased accordingly.  If no Global Warrant Certificates are then outstanding, or if the Global Warrant Certificates then outstanding cannot be used for such purposes, the Company shall issue and the Warrant Agent shall countersign, by either manual or facsimile signature, a new Global Warrant Certificate representing the appropriate number of Book-Entry Warrants.  Any such transfer shall be subject to the Company's prior written approval.

(e)      *Restrictions on Transfer and Exchange of Global Warrant Certificates*.  Notwithstanding any other provisions of this Agreement (other than the provisions set forth in Section 6.1(f)), unless and until it is exchanged in whole for a Direct Registration Warrant, a Global Warrant Certificate may not be transferred as a whole except by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the Depositary or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary.

(f)      *Restrictions on Transfer*.  No Warrants or Warrant Exercise Shares shall be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities Laws or the Company's articles of incorporation.

(g)      *Exchange of Global Warrant Certificate*.  A Global Warrant Certificate may be exchanged for another Global Warrant Certificate of like or similar tenor for purposes of complying with the practices and procedures of the Depositary.

(h)      *Cancellation of Global Warrant Certificate*.  At such time as all beneficial interests in a Global Warrant Certificates have either been exchanged for Direct Registration Warrants, redeemed, repurchased or cancelled, the Global Warrant Certificate shall be returned to, or retained and cancelled pursuant to applicable Law by, the Warrant Agent, upon written instructions from the Company satisfactory to the Warrant Agent.

Section 6.2      Obligations with Respect to Transfers and Exchanges of Warrants.

(a)    All Direct Registration Warrants issued upon any registration of transfer or exchange of Direct Registration Warrants shall be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Direct Registration Warrants surrendered upon such registration of Transfer or exchange. No service charge shall be made to a Registered Holder for any registration, transfer or exchange of a Direct Registration Warrant, but the Company or the Warrant Agent may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed on the Registered Holder in connection with any such exchange or registration of transfer. The Warrant Agent shall forward any such sum collected by it to the Company or to such persons as the Company shall specify by written notice.  The Warrant Agent shall have no obligation to effect an exchange or register a transfer unless and until it is satisfied that all such taxes and/or charges have been paid.

(b)    So long as the Depositary, or its nominee, is the registered owner of a Global Warrant Certificate, the Depositary or such nominee, as the case may be, shall be considered by the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent as the sole owner or holder of the Warrants represented by such Global Warrant Certificate for all purposes under this Agreement.  Upon the exchange of a beneficial interest in a Global Warrant Certificate for Direct Registration Warrants as provided in Section 6.1(b), Beneficial Holders will not be entitled to have any Warrants registered in their names, and will under no circumstances be entitled to receive physical delivery of any such Warrants and will not be considered the Registered Holder thereof under the Warrants or this Agreement.  Neither the Company nor the Warrant Agent, in its capacity as registrar for such Warrants, will have any responsibility or liability for any aspect of the records relating to beneficial interests in a Global Warrant Certificate or for maintaining, supervising or reviewing any records relating to such beneficial interests. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent, or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy, or other authorization furnished by the Depository or impair the operation of customary practices of the Depository governing the exercise of the rights of a holder of a beneficial interest in a Global Warrant Certificate.

(c)    Subject to Sections 6.1 (c), and this Section 6.2, the Warrant Agent shall, upon receipt of all information required to be delivered hereunder, from time to time register the transfer of any outstanding Direct Registration Warrants in the Warrant Register,  upon delivery by the Registered Holder thereof, at the Warrant Agent's office designated for such purpose, of a form of assignment substantially in the form of Exhibit D hereto, properly completed and duly executed by the Registered Holder thereof or by the duly appointed legal representative thereof or by a duly authorized attorney, such signature to be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Warrant Agent.  Upon any such registration of transfer, a new Direct Registration Warrant shall be issued to the transferee.

Section 6.3    Fractional Warrants.  The Warrant Agent shall not be required to effect any registration of Transfer or exchange which will result in the issuance of a warrant certificate for a fraction of a Warrant.

Section 6.4    Restricted Warrants; Legends.  Notwithstanding anything contained in this Agreement, the Company will cause any Warrants that are distributed or issued under the Plan of Reorganization to any Person that the Company, in its sole discretion, determines may be

deemed an "underwriter" under section 1145(b) of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), will be issued in the form of registered warrant certificates bearing a legend in substantially the following form, and the Warrant Exercise Shares issued upon exercise of any such Warrant shall be issued in the form of registered stock certificates bearing a legend indicating that transfer may be restricted under United States federal and state securities laws:

> THE WARRANTS REPRESENTED BY THIS CERTIFICATE WERE ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND HAVE NOT BEEN REGISTERED PURSUANT TO THE SECURITIES ACT OR OTHER APPLICABLE SECURITIES LAWS. THESE WARRANTS (AND THE SHARES OF COMMON STOCK ISSUABLE UPON EXERCISE THEREOF) MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, OR OTHERWISE DISPOSED EXCEPT (A) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER.

The Holder (or its transferee, as applicable) of any such Warrants or Warrant Shares, as applicable, shall be entitled to receive from the Company, without expense, new securities of like tenor not bearing the restrictive legend set forth above when (a) such Warrants or Warrant Exercise Shares, as applicable, shall have been (i) effectively registered under the Securities Act and disposed of in accordance with a registration statement covering such securities, (ii) disposed of pursuant to the provisions of Rule 144 or any comparable rule under the Securities Act or (iii) when, in the written reasonable opinion of independent counsel for such Holder (which counsel shall be experienced in Securities Act matters and which counsel and opinion shall be reasonably satisfactory to the Company), such restrictions are no longer required in order to insure compliance with the Securities Act (including, without limitation, when the provisions of Rule 144(k) or any comparable rule under the Securities Act shall have been satisfied).

## ARTICLE VII

## OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANTS

Section 7.1    No Rights or Liability as Stockholder.  Nothing contained in the Warrants shall be construed as conferring upon the Holder or his, her or its transferees the right to vote or to receive dividends or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or of any other matter, or any rights whatsoever as stockholders of the Company.  The consent of any Holder shall not be required with respect to any action or proceeding of the Company and no Holder shall have any right not expressly conferred hereunder or under, or by applicable Law with respect to, the Warrants or Global Warrant Certificate held by such Holder. No Holder, by reason of the ownership or possession of a Warrant or a Global Warrant Certificate representing the same, shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions paid, allotted or distributed or distributable to the holders of Common Stock prior to, or for which the relevant record date preceded, the date of the exercise of such Warrant. No provision

KL2 2841155.13

thereof and no mere enumeration therein of the rights or privileges of the Holder shall give rise to any liability of such holder for the Exercise Price hereunder or as a stockholder of the Company, whether such liability is asserted by the Company or by creditors of the Company.

Section 7.2    Notice to Registered Holders.    The Company shall give notice to Registered Holders by regular mail or press release, and prompt written notice thereof to the Warrant Agent, if at any time prior to the expiration or exercise in full of the Warrants, any of the following events shall occur:

(a)    the payment of any dividend payable in any securities upon shares of Common Stock or the making of any distribution (other than a regular quarterly cash dividend) to all holders of Common Stock;

(b)    the issuance to all holders of Common Stock of any additional shares of Common Stock or of rights, options or warrants to subscribe for or purchase Common Stock or of any other subscription rights, options or warrants;

(c)    a Pro Rata Repurchase Offer;

(d)    a dissolution, liquidation or winding up of the Company;

(e)    an Organic Change; or

(f)    the consummation of a Third Party Sale.

Such giving of notice shall be initiated at least ten (10) days prior to the date fixed as the record date or the date of closing of the Company's stock transfer books for the determination of the stockholders entitled to such dividend, distribution or subscription rights, or of the stockholders entitled to vote on such Organic Change, dissolution, liquidation or winding up, or of the proposed date of such Third Party Sale Closing or the proposed effective date of such Pro Rata Repurchase Offer, as applicable. Such notice shall specify such record date or the date of closing the stock transfer books or proposed effective date, as the case may be. Failure to provide such notice shall not affect the validity of any action taken in connection with any such dividend, distribution or subscription rights, Pro Rata Repurchase Offer, Third Party Cash Sale, or proposed merger, consolidation, sale, conveyance, dissolution, liquidation or winding up. For the avoidance of doubt, no such notice shall supersede or limit any adjustment called for by Section 5.1 by reason of any event as to which notice is required by this Section.

Section 7.3    Lost, Stolen, Mutilated or Destroyed Global Warrant Certificates.    If any Global Warrant Certificate is lost, stolen, mutilated or destroyed, the Company may issue, and upon written request by the Company, the Warrant Agent shall countersign, either by manual or facsimile signature, and deliver, in exchange and substitution for and upon cancellation of the mutilated Global Warrant Certificate, or in lieu of and substitution for the Global Warrant Certificate lost, stolen or destroyed, a new Global Warrant Certificate of like tenor in accordance with written instructions from the Company.

Section 7.4    Cancellation of Warrants.    If the Company shall purchase or otherwise acquire Warrants, such Warrants shall be cancelled and retired, in the case of Direct Registration

KL2 2841155.13                                        21

Warrants, by appropriate notation on the Warrant Register, and, in the case of Book-Entry Warrants, in accordance with the practices and procedures of the Depositary, including if required by such practices and procedure by appropriate notation on the applicable, Global Warrant Certificate.

## ARTICLE VIII

## CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 8.1    Resignation, Consolidation or Merger of Warrant Agent.

(a)    *Appointment of Successor Warrant Agent*.  The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving sixty (60) days' notice in writing to the Company.  If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor Warrant Agent in place of the Warrant Agent.  If the Company shall fail to make such appointment within a period of sixty (60) days after it has been notified in writing of such resignation or incapacity by the Warrant Agent or by the Registered Holder of a Warrant, then the Registered Holder of any Warrant may apply to the Supreme Court of the State of New York for the County of New York for the appointment of a successor Warrant Agent at the Company's cost.  Any successor Warrant Agent, whether appointed by the Company or by such court, shall be a Person organized and existing under the Laws of the United States of America, or any state thereunder, in good standing.  After appointment, any successor Warrant Agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor Warrant Agent with like effect as if originally named as Warrant Agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor Warrant Agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor Warrant Agent all the authority, powers, rights, immunities, duties and obligations of such predecessor Warrant Agent hereunder; and upon request of any successor Warrant Agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing for more fully and effectually vesting in and confirming to such successor Warrant Agent all such authority, powers, rights, immunities, duties and obligations.

(b)    *Notice of Successor Warrant Agent*.  In the event a successor Warrant Agent shall be appointed, the Company shall (i) give notice thereof to the predecessor Warrant Agent and the transfer agent for the Common Stock not later than the effective date of any such appointment, and (ii) cause written notice thereof to be delivered to each Registered Holder at such Holder's address appearing on the Warrant Register.  Failure to give any notice provided for in this Section 8.1(b) or any defect therein shall not affect the legality or validity of the removal of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

(c)    *Merger, Consolidation or Name Change of Warrant Agent*.

(i)    Any Person into which the Warrant Agent may be merged or with which it may be consolidated or any Person resulting from any merger or consolidation to

which the Warrant Agent shall be a party shall be the successor Warrant Agent under this Agreement, without any further act or deed, if such person would be eligible for appointment as a successor Warrant Agent under the provisions of Section 8.1(a). If any of the Global Warrant Certificates have been countersigned but not delivered at the time such successor to the Warrant Agent succeeds under this Agreement, any such successor to the Warrant Agent may adopt the countersignature of any previous Warrant Agent; and if at that time any of the Global Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Global Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases such Global Warrant Certificates shall have the full force provided in the Global Warrant Certificates and in this Agreement.

(ii)     If at any time the name of the Warrant Agent is changed and at such time any of the Global Warrant Certificates have been countersigned but not delivered, the Warrant Agent whose name has changed may adopt the countersignature under its prior name; and if at that time any of the Global Warrant Certificates have not been countersigned, the Warrant Agent may countersign such Global Warrant Certificates either in its prior name or in its changed name; and in all such cases such Global Warrant Certificates shall have the full force provided in the Global Warrant Certificates and in this Agreement.

Section 8.2     Fees and Expenses of Warrant Agent.

(a)     *Remuneration*.  The Company agrees to pay the Warrant Agent reasonable remuneration for its services as Warrant Agent and will reimburse the Warrant Agent upon demand for all reasonable and documented out-of-pocket expenses (including reasonable counsel fees and expenses), taxes and governmental charges and other charges of any kind and nature incurred by the Warrant Agent in connection with the negotiation, preparation, delivery, administration, execution, modification, waiver, delivery, enforcement or amendment of this of this Agreement and the exercise and performance of its duties hereunder.

(b)     *Further Assurances*.   The Company agrees to perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments, and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Agreement.

Section 8.3     Duties of Warrant Agent.

(a)     *Covered Persons*. References to the Warrant Agent in this Section 8.3 shall include the Warrant Agent and its affiliates, principles, directors, officers, employees, agents, representatives, attorneys, accountants, advisors and other professionals.

(b)     *Liability*.

(i)     The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Agreement, the Warrant Statements or in the Global Warrant Certificates (except, in each case, its countersignature thereof) or be required to verify the same, but all such statements and recitals are and shall be

KL2 2841155.13                                      23

deemed to have been made by the Company only. The Warrant Agent shall not be under any responsibility in respect of the validity or sufficiency of this Agreement or the execution and delivery hereof or in respect of the validity or execution of any Global Warrant Certificate (except, in each case, its countersignature thereof); nor shall the Warrant Agent be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Global Warrant Certificate to be complied with by the Company; nor shall the Warrant Agent be responsible for the making of any adjustment in the Exercise Price or the number of shares issuable upon the exercise of a Warrants required under the provisions of Article V or be responsible for the manner, method or amount of any such change or the ascertaining of the existence of facts that would require any such change; nor shall the Warrant Agent by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Warrant Exercise Shares to be issued pursuant to this Agreement or any Warrant or as to whether any Warrant Exercise Shares will, when issued, be validly issued and fully paid and non-assessable.  The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any Global Warrant Certificate authenticated by the Warrant Agent and delivered by it to the Company pursuant to this Agreement or for the application by the Company of the proceeds of the issue and sale, or exercise, of the Warrants.

(ii)    The Warrant Agent shall have no liability under, and no duty to inquire as to, the provisions of any agreement, instrument or document other than this Agreement, including any Global Warrant Certificate.

(iii)    The Warrant Agent may rely on and shall incur no liability or responsibility to the Company, any Holder, or any other Person for any action taken, suffered or omitted to be taken by it upon any notice, instruction, request, resolution, waiver, consent, order, certificate, affidavit, statement, or other paper, document or instrument furnished to the Warrant Agent hereunder and believed by it to be genuine and to have been signed, sent or presented by the proper party or parties. The Warrant Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such notice, instruction, request, resolution, waiver, consent, order, certificate, affidavit, statement, or other paper, document or instrument.  The Warrant Agent shall not take any instructions or directions except those given in accordance with this Agreement.

(iv)    The Warrant Agent shall act hereunder solely as agent for the Company and in a ministerial capacity and does not assume any obligation or relationship of agency or trust with any of the owners or holders of the Warrants, and its duties shall be determined solely by the provisions hereof. The Warrant Agent shall not be liable for any action taken, suffered or omitted to be taken in connection with this Agreement except to the extent that a court of competent jurisdiction determines that its own gross negligence, willful misconduct or bad faith (as each is determined by a final, nonappealable judgment) was the primary cause of any loss.

(v)    Anything in this Agreement to the contrary notwithstanding, in no event shall the Warrant Agent be liable for any special, incidental, punitive, indirect or

KL2 2841155.13                                    24

consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Warrant Agent has been advised of the likelihood of such loss or damage. Any liability of the Warrant Agent under this Agreement shall be limited to the amount of annual fees paid by the Company to the Warrant Agent hereunder.

(vi) All rights and obligations contained in this Section 8.3 shall survive the termination of this Agreement and the resignation, replacement, incapacity or removal of the Warrant Agent. All fees and expenses incurred by the Warrant Agent prior to the resignation, replacement, incapacity or removal of the Warrant Agent shall be paid by the Company in accordance with this Section 8.3 of this Agreement notwithstanding such resignation, replacement, incapacity or removal of the Warrant Agent.

(vii) The Warrant Agent shall not be under any liability for interest on any monies at any time received by it pursuant to the provisions of this Agreement.

(viii) In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

(ix) In the event the Warrant Agent believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the Warrant Agent hereunder, the Warrant Agent, may, in its sole discretion, refrain from taking any action, and shall be fully protected and shall not be liable in any way to the Company or any Holder or other person or entity for refraining from taking such action, unless the Warrant Agent receives written instructions signed by the Company which eliminates such ambiguity or uncertainty to the satisfaction of Warrant Agent.

(c) *Reliance on Company Statement*. Whenever in the performance of its duties under this Agreement, the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement signed by an Appropriate Officer of the Company and delivered to the Warrant Agent. The Warrant Agent may rely upon such statement for any action taken or suffered by it pursuant to the provisions of this Agreement. The Company will perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing by the Warrant Agent of the provisions of this Agreement.

(d) *Indemnity*. The Company agrees to indemnify, defend, protect and save the Warrant Agent and hold it harmless from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations,

costs or expenses, including without limitation reasonable fees and disbursements of counsel, that may be imposed on, incurred by, or asserted against such Person, at any time, and in any way relating to or arising out of or in connection with, directly or indirectly, the execution, delivery or performance of this Agreement, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of such Person; provided, however, that no such Person shall be entitled to be so indemnified, defended, protected, saved and kept harmless to the extent such loss was caused by its own gross negligence, bad faith or willful misconduct, each as determined by a final judgment of a court of competent jurisdiction. Notwithstanding the foregoing, the Company shall not be responsible for any settlement made without its written consent, which written consent shall not be unreasonably conditioned, withheld or delayed.

(e)     *Exclusions*. The Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant (except, in each case, its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant; nor shall it be responsible to make any adjustments required under the provisions of Article V hereof or responsible for the manner, method or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Common Stock to be issued pursuant to this Agreement or any Warrant or as to whether any Common Stock will, when issued, be valid and fully paid and nonassessable. The Warrant Agent will not be under any duty or responsibility to ensure compliance with any applicable federal or state securities laws in connection with the issuance, transfer or exchange of Warrants.

(f)     The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys, agents or employees, and the Warrant Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorneys, agents or employees or for any loss to the Company resulting from such neglect or misconduct, provided that the Warrant Agent acts without gross negligence, willful misconduct or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in connection with the selection of such attorneys, agents or employees.

(g)     The Warrant Agent may consult at any time with legal counsel satisfactory to it (who may be legal counsel for the Company) and the advice of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by such parties in accordance with such advice.

(h)     The Warrant Agent may buy, sell, or deal in any of the Warrants or other securities of the Company freely as though it was not Warrant Agent under this Agreement. Nothing contained herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other Person.

(i)     The Warrant Agent shall not be required to use or risk its own funds in the performance of any of its obligations or duties or the exercise of any of its rights or powers, and shall not be required to take any action which, in the Warrant Agent's sole and absolute

judgment, could involve it in expense or liability unless furnished with security and indemnity satisfactory to it.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

Section 9.1    Binding Effects; Benefits.    This Agreement shall inure to the benefit of and shall be binding upon the Company, the Warrant Agent and the Holders and their respective heirs, legal representatives, successors and assigns.    Nothing in this Agreement, expressed or implied, is intended to or shall confer on any person other than the Company, the Warrant Agent and the Holders, or their respective heirs, legal representatives, successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 9.2    Notices.    Unless a provision herein permits notice by way of a press release, any notice or other communication required or which may be given hereunder shall be in writing and shall be sent by certified or regular mail (return receipt requested, postage prepaid), by private national courier service, by personal delivery or by facsimile transmission.    Such notice or communication shall be deemed given (i) if mailed, two days after the date of mailing, (ii) if sent by national courier service, one Business Day after being sent, (iii) if delivered personally, when so delivered, or (iv) if sent by facsimile transmission, on the Business Day after such facsimile is transmitted, in each case as follows:

if to the Warrant Agent, to:

> Computershare Inc.
> 480 Washington Boulevard, 29th Floor
> Jersey City, New Jersey 07310
> Facsimile: (201) 680-4606
> Attention: Eliesee Guardiola

with copies (which shall not constitute notice) to:

> Computershare Inc.
> 480 Washington Boulevard, 29th Floor
> Jersey City, New Jersey 07310
> Facsimile: (201) 680-4610
> Attention: Legal Department

if to the Company, to:

> Genco Shipping & Trading Limited
> 299 Park Avenue
> New York, New York 10171
> Facsimile: (646) 443-8551
> Attention: John C. Wobensmith

with copies (which shall not constitute notice) to:

KL2 2841155.13                                                27

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Facsimile: (212) 715-8100
Attention: Thomas E. Molner

if to Registered Holders, at their addresses as they appear in the Warrant Register or in the records of the transfer agent or registrar for the Common Stock.

Section 9.3    Persons Having Rights under this Agreement.  Nothing in this Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any person or corporation other than the parties hereto and the Holders, any right, remedy, or claim under or by reason of this Agreement or of any covenant, condition, stipulation, promise, or agreement hereof.  All covenants, conditions, stipulations, promises, and agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties hereto, their successors and assigns and the Holders.

Section 9.4    Examination of this Agreement.  A copy of this Agreement shall be available at all reasonable times at an office designated for such purpose by the Warrant Agent, for examination by the Registered Holder of any Warrant.  Prior to such examination, the Warrant Agent may require any such Holder to submit evidence that such Holder is a Registered Holder of a Warrant.

Section 9.5    Counterparts.  This Agreement may be executed in any number of original or facsimile or electronic PDF counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

Section 9.6    Effect of Headings.  The section headings herein are for convenience only and are not part of this Agreement and shall not affect the interpretation hereof.

Section 9.7    Amendments.

(a)    Subject to Section 9.7(b) below, this agreement may not be amended except in writing signed by the Company and the Warrant Agent.

(b)    The Company and the Warrant Agent may from time to time supplement or amend this Agreement or the Warrants—

(i)    without the approval of any Holder in order to cure any ambiguity, manifest error or other mistake in this Agreement or the Warrants, or to correct or supplement any provision contained herein or in the Warrants that may be defective or inconsistent with any other provision herein or in the Warrants, or to make any other provisions in regard to matters or questions arising hereunder that the Company may deem necessary or desirable and that shall not adversely affect, alter or change the interests of the Holders in any material respect, or

(ii)    with the prior written consent of Requisite Holders.

KL2 2841155.13                                    28

(c)      Notwithstanding anything to the contrary herein, upon the delivery of a certificate from an Appropriate Officer which states that the proposed supplement or amendment is in compliance with the terms of this Section 9.7, the Warrant Agent shall execute such supplement or amendment; provided, that the Warrant Agent may, but shall not be obligated to, execute any amendment or supplement that affects Warrant Agent's rights, duties, immunities, liabilities or obligations hereunder.  Any amendment, modification or waiver effected pursuant to and in accordance with the provisions of this Section 9.7 shall be binding upon all Holders and upon each future Holder, the Company and the Warrant Agent.  In the event of any amendment, modification or waiver, the Company shall give prompt notice thereof to all Registered Holders and, if appropriate, notation thereof shall be made on all Global Warrant Certificates thereafter surrendered for registration of transfer or exchange.  Any failure of the Company to give such notice or any defect therein shall not, however, in any way impair or affect the validity of any such amendment.

Section 9.8      No Inconsistent Agreements; No Impairment.  The Company shall not, on or after the date hereof, enter into any agreement with respect to its securities which conflicts with the rights granted to the Holders in the Warrants or the provisions hereof.  The Company represents and warrants to the Holders that the rights granted hereunder do not in any way conflict with the rights granted to holders of the Company's securities under any other agreements.  The Company shall not, by amendment of its articles of incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of the Warrants and in the taking of all such action as may be necessary in order to preserve the exercise rights of the Holders against impairment.

Section 9.9      Integration/Entire Agreement.  This Agreement (and solely with respect to the Warrants), is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Company, the Warrant Agent and the Holders in respect of the subject matter contained herein.  There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein, with respect to the Warrants.  This Agreement and the Warrants supersede all prior agreements and understandings between the parties with respect to such subject matter.

Section 9.10    Governing Law, Etc.  This Agreement and each Warrant issued hereunder shall be deemed to be a contract made under the Laws of the State of New York and for all purposes shall be governed by and construed in accordance with the Laws of such State.  Each party hereto consents and submits to the jurisdiction of the courts of the State of New York and of the federal courts of the Southern District of New York in connection with any action or proceeding brought against it that arises out of or in connection with, that is based upon, or that relates to this Agreement or the transactions contemplated hereby.  In connection with any such action or proceeding in any such court, each party hereto hereby waives personal service of any summons, complaint or other process and hereby agrees that service thereof may be made in accordance with the procedures for giving notice set forth in Section 9.2 hereof.  Each party hereto hereby waives any objection to jurisdiction or venue in any such court in any such action

KL2 2841155.13

29

or proceeding and agrees not to assert any defense based on forum *non conveniens* or lack of jurisdiction or venue in any such court in any such action or proceeding.

Section 9.11   Termination.  This Agreement will terminate on the earlier of (i) such date when all Warrants have been exercised with respect to all shares subject thereto, or (ii) the expiration of the Exercise Period.  The provisions of Section 8.3 and this Article IX shall survive such termination and the resignation, replacement or removal of the Warrant Agent.

Section 9.12   Waiver of Trial by Jury.  Each party hereto, including each Holder by its receipt of a Warrant, hereby irrevocably and unconditionally waives the right to a trial by jury in any action, suit, counterclaim or other proceeding (whether based on contract, tort or otherwise) arising out of, connected with or relating to this Agreement and the transactions contemplated hereby.

Section 9.13   Remedies.   The Company hereby agrees that, in the event that the Company violates any provisions of a Warrant (including the obligation to deliver shares of Common Stock upon the exercise thereof), the remedies at law available to the Holder of such Warrant may be inadequate.  In such event, the Requisite Holders and, with the prior written consent of the Requisite Holders, the holder of such Warrant, shall have the right, in addition to all other rights and remedies any of them may have, to specific performance and/or injunctive or other equitable relief to enforce the provisions of this Agreement and the Warrants.

Section 9.14   Severability.  In the event that any one or more of the provisions contained in this Agreement or in the Warrants, or the application thereof in any circumstances, is held invalid, illegal or unenforceable, the validity, legality and enforceability of any such provisions in every other respect and of the remaining provisions contained herein and therein shall not be affected or impaired thereby; provided, however, that if any such excluded provision shall adversely affect the rights, immunities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to immediately resign.

Section 9.15   Customer Identification Program.  The Company acknowledges that the Warrant Agent is subject to the customer identification program ("Customer Identification Program") requirements under the USA PATRIOT Act and its implementing regulations, and that the Warrant Agent must obtain, verify and record information that allows the Warrant Agent to identify the Company.  Accordingly, prior to accepting an appointment hereunder, the Warrant Agent may request information from the Company that will help the Warrant Agent to identify the Company, including without limitation the Company's physical address, tax identification number, organizational documents, certificate of good standing, license to do business, or any other information that the Warrant Agent deems necessary.  The Company agrees that the Warrant Agent cannot accept an appointment hereunder unless and until the Warrant Agent verifies the Company's identity in accordance with the Customer Identification Program requirements.

[Signature Page Follows]

KL2 2841155.13

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the day and year first above written.

GENCO SHIPPING & TRADING LIMITED


By: _____

      Name:

      Title:


COMPUTERSHARE INC., as Warrant Agent


By: _____

      Name:

      Title:

**EXHIBIT A**

FACE OF GLOBAL WARRANT CERTIFICATE

VOID AFTER 5:00 P.M., NEW YORK CITY TIME, ON [___], 2021

This Global Warrant Certificate is held by The Depository Trust Company (the "Depositary") or its nominee in custody for the benefit of the beneficial owners hereof, and is not transferable to any person under any circumstances except that (i) this Global Warrant Certificate may be exchanged in whole but not in part pursuant to Section 6.1(g) of the Warrant Agreement, (ii) this Global Warrant Certificate may be delivered to the Warrant Agent for cancellation pursuant to Section 6.1(h) of the Warrant Agreement and (iii) this Global Warrant Certificate may be transferred to a successor Depositary with the prior written consent of the Company.

Unless this Global Warrant Certificate is presented by an authorized representative of the Depositary to the Company or the Warrant Agent for registration of transfer, exchange or payment and any certificate issued is registered in the name of Cede & Co. or such other entity as is requested by an authorized representative of the Depositary (and any payment hereon is made to Cede & Co. or to such other entity as is requested by an authorized representative of the Depositary), any transfer, pledge or other use hereof for value or otherwise by or to any person is wrongful because the registered owner hereof, Cede & Co., has an interest herein.

Transfers of this Global Warrant Certificate shall be limited to transfers in whole, but not in part, to nominees of the Depositary or to a successor thereof or such successor's nominee.

No registration or transfer of the securities issuable pursuant to the Warrant will be recorded on the books of the Company until such provisions have been complied with.

KL2 2841155.13

THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE (INCLUDING THE SECURITIES ISSUABLE UPON EXERCISE OF THE WARRANT) ARE SUBJECT TO ADDITIONAL AGREEMENTS SET FORTH IN THE WARRANT AGREEMENT DATED AS OF [__], 2014, BY AND BETWEEN THE COMPANY AND THE WARRANT AGENT (THE "WARRANT AGREEMENT").

THIS WARRANT WILL BE VOID IF NOT EXERCISED PRIOR TO
5:00 P.M., NEW YORK CITY TIME, ON [__], 2021

**WARRANT TO PURCHASE**

**_____ SHARES OF COMMON STOCK OF**

**GENCO SHIPPING & TRADING LIMITED***

CUSIP # [__]
**ISSUE DATE:  [__], 2014**

No. W-1

This certifies that, for value received, Cede & Co. and its registered assigns (collectively, the "Registered Holder"), is entitled to purchase from Genco Shipping & Trading Limited, a Marshall Islands corporation (the "Company"), subject to the terms and conditions hereof, at any time before 5:00 p.m., New York time, on [__], 2021, the number of fully paid and non-assessable shares of Common Stock of the Company set forth above at the Exercise Price (as defined in the Warrant Agreement).  The Exercise Price and the number and kind of shares purchasable hereunder are subject to adjustment from time to time as provided in Article V of the Warrant Agreement.  The initial Exercise Price shall be $20.99.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

IN WITNESS WHEREOF, this Warrant has been duly executed by the Company under its corporate seal as of the [__] day of [__], 2014.

GENCO SHIPPING & TRADING LIMITED

By: _____

Print Name: _____

Title: _____

Attest: _____
Secretary

Computershare Inc.,
as Warrant Agent

By: _____
    Name:
    Title:

---

\*    Exercisable for 3,938,298 shares of Common Stock for all Warrants in the aggregate, subject to adjustment in accordance with Article V of the Warrant Agreement.

KL2 2841155.13

Address of Registered Holder for Notices (until changed in accordance with this Warrant):
Cede & Co.
55 Water Street
New York, New York 10041

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF.  SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

KL2 2841155.13

FORM OF REVERSE OF WARRANT

The Warrant evidenced by this Warrant Certificate is a part of a duly authorized issue of Warrants to purchase _____¤ shares of Common Stock issued pursuant to that the Warrant Agreement, a copy of which may be inspected at the office of the Warrant Agent designated for such purpose.  The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the Warrants.  All capitalized terms used on the face of this Warrant herein but not defined that are defined in the Warrant Agreement shall have the meanings assigned to them therein.

The Company shall not be required to issue fractions of Common Stock or any certificates that evidence fractional Common Stock.

No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

This Warrant does not entitle the Registered Holder to any of the rights of a stockholder of the Company.

The Company and Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

---

¤   Exercisable for 3,938,298 shares of Common Stock for all Warrants in the aggregate, subject to adjustment in accordance with Article V of the Warrant Agreement.

KL2 2841155.13

**EXHIBIT B**

EXERCISE FORM FOR REGISTERED HOLDERS
HOLDING DIRECT REGISTRATION WARRANTS
(To be executed upon exercise of Warrant)

NOTE:  THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., EASTERN TIME, ON THE EXPIRATION DATE.

The undersigned Registered Holder, being the holder of a Direct Registration Warrant of Genco Shipping and Trading Limited, hereby irrevocably elects to exercise the right to purchase the number of shares of Common Stock indicated below pursuant to the net issuance exercise provisions of Section 4.3(a) of the Warrant Agreement.

Number of Shares of Common Stock:    _____

(Total number of shares of Common Stock for which the Direct Registration Warrant is being exercised, before withholding for the Exercise Price.  Not to exceed the number of shares of Common Stock for which such Direct Registration Warrant is exercisable in the aggregate.)

The undersigned requests that the net number of shares of Common Stock issuable upon exercise be registered, and a statement in respect thereof be delivered, as follows:

Name    _____

Address    _____

_____

Delivery Address (if different)

_____

_____

If said number of shares shall not be all the shares of Common Stock purchasable under the Direct Registration Warrant, the undersigned requests that a new Direct Registration Warrant exercisable for the balance of such shares shall be registered, with the appropriate Warrant Statement delivered, as follows:

Name    _____

Address    _____

_____

Delivery Address (if different)

_____

_____

Signature    _____

_____
Social Security or Other Taxpayer
Identification Number of Holder

Note: If the Common Stock, or a new Direct Registration Warrant representing any portion of the Direct Registration Warrant not exercised, is to be registered in a name other than that in which the Direct Registration Warrant is registered, the signature of the holder hereof must be guaranteed.

KL2 2841155.13

SIGNATURE GUARANTEED BY:

_____

Signatures must be guaranteed by a participant in a
Medallion Signature Guarantee Program at a guarantee
level acceptable to the Company's Warrant Agent.

Countersigned:
Dated: [_____]

Computershare Inc.,
as Warrant Agent

Signature_____
            Authorized Signatory

**EXHIBIT C**

EXERCISE FORM FOR BENEFICIAL HOLDERS
HOLDING WARRANTS THROUGH THE DEPOSITORY TRUST COMPANY

TO BE COMPLETED BY DIRECT PARTICIPANT
IN THE DEPOSITORY TRUST COMPANY

(To be executed upon exercise of Warrant)

NOTE:  THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., EASTERN TIME, ON THE EXPIRATION DATE.

The undersigned hereby irrevocably elects to exercise the right, represented by Book-Entry Warrants of Genco Shipping and Trading Limited held for its benefit through the book-entry facilities of The Depository Trust Company (the "Depositary"), to purchase the number of shares of Common Stock indicated below pursuant to the net issuance exercise provisions of Section 4.3(a) of the Warrant Agreement.

Number of Shares of Common Stock:    _____

(Total number of shares of Common Stock for which the Book-Entry Warrant is being exercised before withholding for the Exercise Price.)

The undersigned requests that the shares of Common Stock issuable upon exercise of the Warrants be delivered the account at the Depositary specified below.

THE WARRANT AGENT SHALL NOTIFY YOU (THROUGH THE CLEARING SYSTEM) OF (1) THE WARRANT AGENT'S ACCOUNT AT THE DEPOSITARY TO WHICH YOU MUST DELIVER YOUR WARRANTS ON THE EXERCISE DATE AND (2) THE ADDRESS, PHONE NUMBER AND FACSIMILE NUMBER WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

| | |
|---|---|
| AUTHORIZED SIGNATURE: | _____ |
| NAME: | _____ |
| CAPACITY IN WHICH SIGNING: | _____ |
| DATED: | _____ |
| NAME OF PARTICIPANT: | _____ |
| ADDRESS: | _____ |
| CONTACT NAME (if different than above): | _____ |
| TELEPHONE (INCLUDING INTERNATIONAL CODE): | _____ |
| FAX (INCLUDING INTERNATIONAL CODE): | _____ |
| E-MAIL ADDRESS: | _____ |
| DEPOSITARY ACCOUNT NO.: | _____ |

KL2 2841155.13

**EXHIBIT D**

FORM OF ASSIGNMENT

FOR REGISTERED HOLDERS
HOLDING DIRECT REGISTRATION WARRANTS
(To be executed only upon assignment of Warrant)

For value received, _____ hereby sells, assigns and transfers unto the Assignee(s) named below the rights represented by Direct Registration Warrant of Genco Shipping and Trading Limited to purchase number of shares of Common Stock listed opposite the respective name(s) of the Assignee(s) named below and all other rights of the Registered Holder under the within Direct Registration Warrant to the extent exercisable for such shares, and does hereby irrevocably constitute and appoint _____ attorney, to transfer said Direct Registration Warrant, as and to the extent set forth below, on the Warrant Register maintained for the purpose of registration thereof, with full power of substitution in the premises:

| Name(s) of Assignee(s) | Address of Assignee(s) | Number of Shares of Common Stock for which Exercisable |
|---|---|---|
| _____ | _____ | _____ |

If said number of shares shall not be all the shares of Common Stock purchasable under the Direct Registration Warrant, the undersigned requests that a new Direct Registration Warrant exercisable for the balance of such shares shall be registered in the name of the undersigned:

Dated:                                          _____ , 20__

Signature                                     _____

Name:                                          _____

Note: The above signature and name should correspond exactly with the name of the Holder of the Direct Registration Warrant as it appears on the Warrant Register.

SIGNATURE GUARANTEED BY:

_____

**EXHIBIT D**

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's Warrant Agent.

Countersigned:
Dated: [_____]

Computershare Inc.
as Warrant Agent

Signature_____

            Authorized Signatory

# EXHIBIT 8

## THE IDENTITY OF THE OFFICERS AND MEMBERS OF THE NEW BOARD OF REORGANIZED GENCO

## Identity of Officers and Members of New Board of Reorganized Genco[1]

The officers and members of the New Board shall be selected in accordance with Article V.B of the Prepack Plan. The identities of the officers and members of the New Board of Reorganized Genco will be filed in advance of the Confirmation Hearing.

---

[1] All capitalized terms used but not defined herein shall have the meaning ascribed to them in the *Prepackaged Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 14] (as may be amended from time to time, the "**Prepack Plan**").

**EXHIBIT 9**

**LIST OF RETAINED CAUSES OF ACTION**

## **Retained Causes of Action**

The following lists remains subject to further revision. The Debtors expressly reserve the right to alter, modify, amend, remove, augment or supplement the following lists at any time in accordance with the Prepack Plan (as defined below).  In addition to the following general list of retained causes of action, a specific list of pending litigation to which the Debtors are party, which is subject to the aforementioned reservations, is attached as **Exhibit 1**.

Article VI.E of the *Prepackaged Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 14] (as may be amended, the "**Prepack Plan**") provides as follows:[1]

### *I.      Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, and except as expressly provided herein (including Article VI.J.1), the Reorganized Debtors shall retain all Causes of Action, including those Causes of Action listed as retained Causes of Action on an exhibit to the Plan Supplement.  Nothing contained in this Plan, the Plan Supplement or the Confirmation Order shall be deemed a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense of the Debtors that is not specifically waived or relinquished by this Plan.  The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses that the Debtors had immediately before the Petition Date as fully as if the Chapter 11 Case had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any claim that is not specifically waived or relinquished by this Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Case had not been commenced.  No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against such Person.  The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, in accordance with the Plan.  From and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any Cause of Action and to decline to do any of the foregoing without further notice to or action, order or approval of the Court.  The Reorganized Debtors are deemed representatives of the Estates for the purpose of prosecuting any Claim or Cause of Action and any objections to Claims pursuant to 11 U.S.C. § 1123(b)(3)(B).

Without limiting the scope of Article VI.E of the Prepack Plan, the Debtors have identified below certain specific Causes of Action, including (a) claims related to contracts and leases; (b) claims related to pending and possible litigation; and (c) claims related to accounts receivable and accounts payable.

---

[1] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Prepack Plan.

## Claims Related to Contracts and Leases

Unless otherwise expressly released by the Prepack Plan, the Debtors reserve all Causes of Action based in whole or in part upon any and all contracts and/or leases to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, regardless of whether such contract and/or lease is specifically identified herein. The claims and Causes of Action reserved include Causes of Action against charterers, vendors, suppliers of goods and services, financial institutions or any other parties including, without limitation: (a) for overpayments, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, recoupment or setoff; (b) for breach of contract, wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts and/or leases with any one or more of the Debtors or Reorganized Debtors; (d) for payments, back charges, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, service provider, lessor or other party; (e) for any liens, including mechanic's, artisan's, materialmen's, possessory or statutory liens held by any one or more of the Debtors or Reorganized Debtors; (f) arising out of environmental or contaminant exposure matters against owners, landlords, lessors, lessees, environmental consultants or contractors, environmental or other governmental agencies or suppliers of environmental services or goods, including any solid or hazardous waste haulers, transporters or arrangers; (g) counterclaims and defenses related to any contractual obligations; (h) any turnover actions arising under section 542 or 543 of the Bankruptcy Code; (i) for unfair competition, interference with contract or potential business advantage, infringement of intellectual property or any tort claims; (j) for demurrage claims due from charterers and (k) for any claims against the Debtors' or Reorganized Debtors' insurance carriers, including for payments or other amounts owed by such insurance carrier.

**Claims, Defenses, Cross-Claims and**
**Counter-Claims Related to Litigation and Possible Litigation**

       The Debtors are party to or believe they may become party to litigation, arbitration or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial. Unless otherwise expressly released by the Prepack Plan, the Debtors reserve all Causes of Action against or related to all entities that are party to or that may in the future become party to litigation, arbitration or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial.

- 5 -

## **Claims Related to Accounts Receivable and Accounts Payable**

Unless otherwise expressly released by the Prepack Plan, the Debtors reserve all Causes of Action against or related to all entities that owe or that may in the future owe money to the Debtors or Reorganized Debtors regardless of whether such entity is explicitly identified in this Plan Supplement and any amendments thereto. Furthermore, the Debtors expressly reserve all Causes of Action against or related to all entities that assert or may assert that the Debtors or Reorganized Debtors owe money to them.

**Exhibit 1**

**List of Pending Causes of Action**

| Vessel | Debtor is the Plaintiff / Defendant | Plaintiff / Defendant | Jurisdiction | Date of Occurrence Giving Rise to Claim/Cause of Action | Opposing Counsel | Description |
|---|---|---|---|---|---|---|
| Genco Marine | Both | NYK Bulkship (Atlantic) NV (charterer) | | | Soto Skinitis Skinitis Maritime Law Firm 95, Griva Digeni, 3101, Limassol Cyprus Tel: +357 222 32100 Mob.: +30 694 702 4846 (GR) Mob.: +44 771 470 4011 (UK) | Disputes with charterer and sub-charterers regarding damages were brought and will be adjudicated in arbitration. |
| Genco Picardy | Plaintiff | Rizzo-Bottiglieri-de Carlini Armatori SpA (charterer) | | | Victor Sotunde at Studio Castaldo v.sotunde@studiocastaldo.net

Stephen Kirkpatrick Partner skirkpatrick@reedsmith.com +44 (0)20 3116 3423 +44 (0)7767 640847 (mob)

Reed Smith The Broadgate Tower 20 Primrose Street London EC2A 2RS T:  +44 (0)20 3116 3000 F:  +44 (0)20 3116 3999 DX1066 City / DX18 London reedsmith.com | Dispute with charterer regarding deductions taken.  Charterer, based in Italy, had financial difficulties and obtained local court protection. Charterer assigned its claims against sub-charterers to the Debtor.  Debtor is in settlement discussions with the sub-charterers. |

| Vessel | Debtor is the Plaintiff / Defendant | Plaintiff / Defendant | Jurisdiction | Date of Occurrence Giving Rise to Claim/Cause of Action | Opposing Counsel | Description |
|---|---|---|---|---|---|---|
| Genco Cavalier | Plaintiff | Dadi Impex Pct Ltd (charterer) | | | | Debtor commenced arbitration proceedings against charterer because the bunkers on the ship when it returned were not at the correct specifications.  Debtors had the bunkers removed and are seeking reimbursement of expenses for the time to debunker the ship. Charterer brought a counterclaim against the Debtor for the debunkering of ship. |
| Genco Normandy | Plaintiff | d'Amico Shipping Singaport Pte | | | Ince & Co. International House 1 St Katharine's Way London E1W 1AY, United Kingdom DX 1070 London City  Tel +44 (0) 20 7481 0010 Fax +44 (0) 20 7481 4968 | Debtors are prepared to proceed in arbitration to recover costs of surveyors and off hire and other expenses against the Charterer |
| Genco Success | Plaintiff | Korea Line Corporation | | | | Genco Success asserted a claim in the bankruptcy of Korea Line for amounts owed. |
| Genco Cavalier | Plaintiff | Samsun Logix Coporation | | | | Genco Cavalier asserted a claim in the bankruptcy of Samsun and there is equity (deferred rehabilitation claim) and payments due to Debtor. |

| Vessel | Debtor is the Plaintiff / Defendant | Plaintiff / Defendant | Jurisdiction | Date of Occurrence Giving Rise to Claim/Cause of Action | Opposing Counsel | Description |
|---|---|---|---|---|---|---|
| Genco Ardennes | Defendant | Hamburg Bulk Carriers GmbH & Co KG | | | William Cawley Principal Loudouns www.loudouns.com tel +44 (20) 3178 4136 fax +44 (20) 3178 4137 15 Old Bailey, London, EC4M 7EF | The vessel owned by Genco Auvergne Limited was arrested in South Africa by the Charterer over a claim relating to Genco Ardennes. Charterer claimed damages for lost income on voyage. $900,000 was placed as security for the claim. |

**EXHIBIT 10**

**THE MANAGEMENT INCENTIVE PROGRAM**

**GENCO SHIPPING & TRADING LIMITED**
**2014 MANAGEMENT INCENTIVE PLAN**

**ARTICLE I**
**General**

**1.1**     ***Purpose***

The Genco Shipping & Trading Limited 2014 Management Incentive Plan (the "Plan") is designed to provide certain key persons, on whose initiative and efforts the successful conduct of the business of Genco Shipping & Trading Limited (as reorganized pursuant to the Prepack Plan (as defined below), the "Company") depends, with incentives to: (a) enter into and remain in the service of the Company (b) acquire a proprietary interest in the success of the Company, (c) maximize their performance and (d) enhance the long-term performance of the Company.  This Plan is being implemented pursuant to and in furtherance of the Prepackaged Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code, dated April 16, 2014 (as such plan may be modified, amended or supplemented from time to time, the "Prepack Plan").

**1.2**     ***Administration***

(a)     <u>Administration by Board of Directors</u>.  The Plan shall be administered by the Company's Board of Directors (the "Board of Directors" or "Board").  The term "Administrator" shall refer to the Board or any committee or person to whom the Board has delegated its authority pursuant to Section 1.2(c) hereof.  The Administrator shall have the authority (i) to exercise all of the powers granted to it under the Plan, (ii) to construe, interpret and implement the Plan and any Award Agreements executed pursuant to Section 2.1, (iii) to prescribe, amend and rescind rules and regulations relating to the Plan, including rules governing its own operations, (iv) to make all determinations necessary or advisable in administering the Plan, and (v) to correct any defect, supply any omission and reconcile any inconsistency in the Plan.

(b)     <u>Administrator Action</u>.  Actions of the Administrator shall be taken by the vote of a majority of its members.  Any action may be taken by a written instrument signed by a majority of the Administrator members, and action so taken shall be fully as effective as if it had been taken by a vote at a meeting.  Except to the extent prohibited by applicable law or the applicable rules of a stock exchange, the Administrator may allocate all or any portion of its responsibilities and powers to any one or more of its members and may delegate all or any part of its responsibilities to any person or persons selected by it, and may revoke any such allocation or delegation at any time.

(c)     <u>Deemed Delegation to Committee</u>.  To the extent permitted by law and except when the Company's Board of Directors elects to act as the Administrator or to delegate its responsibilities and powers to another person or persons, the Board of Directors shall be deemed to have delegated all of its responsibilities and powers under the Plan, other than the authority to amend or terminate the Plan, to the Compensation Committee of the Board of Directors or such other committee or subcommittee as the Board may designate or as shall be formed by the abstention or recusal of a non-Qualified Member (as defined below) of such committee (the "Committee").  The members of the Committee shall be appointed by, and serve at the pleasure of, the Board of Directors.  While it is intended that at all times that the Committee acts in connection with the Plan, the Committee shall consist solely of Qualified Members, the number of whom shall not be less than two, the fact that the Committee is not so comprised will not invalidate any grant hereunder that otherwise satisfies the terms of the Plan.  For purposes of the foregoing, a "Qualified Member" is a "non-employee director" within the meaning of Rule 16b-3 promulgated under the Securities Exchange Act of 1934 (the "1934 Act").

(d)     <u>Determinations Final</u>.  The Administrator shall act in its sole discretion with respect to all matters relating to the Plan and any Award Agreement, and the determination of the Administrator on all such matters shall be final, binding and conclusive.

KL3 2968387.12                                          A-1

(e)        Limit on Administrator's Liability.  Neither the Administrator nor any member of the Administrator shall be liable for any action or determination made in good faith with respect to the Plan or any award thereunder.

**1.3     *Persons Eligible for Awards***

The persons eligible to receive awards under the Plan are those officers, directors and employees of the Company, (collectively, "key persons") as the Administrator shall select, taking into account the duties of the respective employees, their present and potential contributions to the success of the Company, and such other factors as the Administrator shall deem relevant in connection with accomplishing the purpose of the Plan. Notwithstanding the foregoing, the grants made pursuant to the terms of this Plan shall be made only to those persons listed on Schedule A hereto and the Award Agreements for such grants shall be in the forms of Exhibits A through H hereto, as applicable.

**1.4     *Types of Awards Under Plan***

Awards may be made under the Plan in the form of (a) warrants which qualify as incentive stock options ("incentive warrants"), (b) warrants that do not qualify as incentive stock options ("non-qualified warrants") and (c) restricted stock, all as more fully set forth in Article II.  The term "award" means any of the foregoing.  No incentive warrant may be granted to a person who is not an employee of the Company on the date of grant.

**1.5     *Shares Available for Awards***

(a)        Subject to the provisions of Section 1.5(c), the aggregate number of shares of common stock of the Company ("Common Stock") with respect to which awards may at any time be granted under the Plan are _____[1] shares of Common Stock (the "Maximum Amount") .  Within 30 days of the effective date of the Prepack Plan, the Administrator shall allocate and issue awards for the Maximum Amount as contemplated by the Prepack Plan.

(b)        Shares issued pursuant to the Plan may be authorized but unissued Common Stock.  The Administrator may direct that any stock certificate evidencing shares issued pursuant to the Plan shall bear a legend setting forth such restrictions on transferability as may apply to such shares.

(c)        Adjustment Upon Changes in Common Stock.  Upon certain changes in Common Stock, the number of shares of Common Stock available for issuance with respect to awards that may be granted under the Plan pursuant to Section 1.5(a), shall be adjusted pursuant to Section 3.7(a).

(d)        Certain Shares to Become Available Again.  The following shares of Common Stock shall again become available for awards under the Plan: any shares that are subject to an award under the Plan and that remain unissued upon the cancellation or termination of such award for any reason whatsoever; any shares of restricted stock forfeited pursuant to Section 2.7(e), provided that any dividends paid on such shares are also forfeited pursuant to such Section 2.7(e).

(e)        Individual Limit.  Except for the limits set forth in this Section 1.5(e) , no provision of this Plan shall be deemed to limit the number or value of shares with respect to which the Administrator may make awards to any eligible person.  Subject to adjustment as provided in Section 3.7(a), the total number of shares of Common Stock with respect to which awards may be granted to any one employee of the Company during any one calendar year shall not exceed _____ shares.  Warrants granted and subsequently canceled or deemed to be canceled in a calendar year count against this limit even after their cancellation.  The provisions of this Section 1.5(e) shall not apply in any circumstance with respect to which the Administrator determines that compliance with Section 162(m) is not necessary.

---

[1]  To equal 13.8% of the new Genco equity.

KL3 2968387.12

**1.6**     ***Definitions of Certain Terms***

(a)     The term "cause" in connection with a termination of employment for cause shall mean:

(i)     with respect to a member of the Board, cause shall consist of those acts or omissions that would constitute "cause" under Article III, Section 4 of the Amended and Restated By-Laws of the Company;

(ii)     with respect to an employee, to the extent that there is an employment, severance or other agreement governing the relationship between the grantee and the Company, which agreement contains a definition of "cause," cause shall consist of those acts or omissions that would constitute "cause" under such agreement or document; and otherwise,

(iii)     the grantee's termination of employment by the Company or an affiliate on account of any one or more of the following:

(A)     any failure by the grantee to substantially perform the grantee's employment or other duties;

(B)     any excessive unauthorized absenteeism by the grantee;

(C)     any refusal by the grantee to obey the lawful orders of the Board or any other person to whom the grantee reports;

(D)     any act or omission by the grantee that is or may be injurious to the Company, monetarily or otherwise;

(E)     any act by the grantee that is inconsistent with the best interests of the Company;

(F)     the grantee's material violation of any of the Company's policies, including, without limitation, those policies relating to discrimination or sexual harassment;

(G)     the grantee's unauthorized (a) removal from the premises of the Company or an affiliate of any document (in any medium or form) relating to the Company or an affiliate or the customers or clients of the Company or an affiliate or (b) disclosure to any person or entity of any of the Company's, or its affiliates' confidential or proprietary information;

(H)     the grantee's commission of any felony, or any other crime involving moral turpitude; and

(I)     the grantee's commission of any act involving dishonesty or fraud.

Any rights the Company may have hereunder in respect of the events giving rise to cause shall be in addition to the rights the Company may have under any other agreement with a grantee or at law or in equity. Any determination of whether a grantee's employment is (or is deemed to have been) terminated for cause shall be made by the Administrator, which determination shall be final, binding and conclusive on all parties. If, subsequent to a grantee's voluntary termination of employment or involuntary termination of employment without cause, it is discovered that the grantee's employment could have been terminated for cause, the Administrator may deem such grantee's employment to have been terminated for cause. A grantee's termination of employment for cause shall be effective as of the date of the occurrence of the event giving rise to cause, regardless of when the determination of cause is made.

(b)     The term "Code" means the Internal Revenue Code of 1986, as amended.

KL3 2968387.12

(c)      The terms "employment" and "employed" shall be deemed to mean an employee's employment with, or a consultant's provision of services to, the Company, and each Board member's service as a Board member.

(d)      The "Fair Market Value" of a share of Common Stock on any day shall be as follows:

(i)      if the Common Stock is listed on the New York Stock Exchange or The NASDAQ Stock Market on such date, the closing sale price per share of the Common Stock (or if no closing sale price is reported, the average of the closing bid and closing ask prices or, if more than one in either case, the average of the average closing bid and the average closing ask prices) as reported by the New York Stock Exchange or The NASDAQ Stock Market, as applicable;

(ii)      if the Common Stock is not listed on the New York Stock Exchange or The NASDAQ Stock Market on such date, the closing sale price per share of the Common Stock (or if no closing sale price is reported, the average of the high bid and low asked prices or, if more than one in either case, the average of the average high bid and low asked prices) as reported in composite transactions for the principal U.S. national or regional securities exchange on which the Common Stock is traded;

(iii)      if the Common Stock is not listed on a U.S. national or regional securities exchange, the last quoted sale price for the Common Stock on such date (or, if no sale price is reported, the average of the high bid and low asked price for such date) in the over-the-counter market as reported by OTC Markets Group Inc. or other similar organization; or

(iv)      in all other cases, as determined in good faith by the Board of Directors of the Company.

(e)      The term "incentive warrant" means a warrant that is intended to qualify for special federal income tax treatment pursuant to sections 421 and 422 of the Code as now constituted or subsequently amended, or pursuant to a successor provision of the Code, and which is so designated in the applicable Award Agreement.  Any warrant that is not specifically designated as an incentive warrant shall under no circumstances be considered an incentive warrant.  Any warrant that is not an incentive warrant is referred to herein as a "non-qualified warrant."

(f)      A grantee shall be deemed to have terminated employment upon (i) the date the grantee ceases to be employed by, or to provide consulting services for, the Company or any corporation (or any of its subsidiaries) which assumes the grantee's award in a transaction to which section 424(a) of the Code applies (a "424 Corporation"); or (ii) the date the grantee ceases to be a Board member or the member of the board of directors of a 424 Corporation, provided, however, that in the case of a grantee (x) who is, at the time of reference, both an employee or consultant and a Board member, or (y) who ceases to be engaged as an employee, consultant or Board member and immediately is engaged in another of such relationships with the Company or a 424 Corporation, the grantee shall be deemed to have a "termination of employment" upon the later of the dates determined pursuant to subparagraphs (i) and (ii) above.  The Administrator may determine whether any leave of absence constitutes a termination of employment for purposes of the Plan and the impact, if any, of any such leave of absence on awards theretofore made under the Plan.

### ARTICLE II
### Awards Under The Plan

**2.1**      *Agreements Evidencing Awards*

Each award granted under the Plan shall be evidenced by a written certificate or such other form of documentation as the Committee determines to be appropriate ("Award Agreement") which shall contain such provisions as the Administrator may deem necessary or desirable.  By executing an Award Agreement pursuant to the Plan, a grantee thereby agrees that the award shall be subject to all of the terms and provisions of the Plan and the applicable Award Agreement.

4

**2.2**     *Grant of Warrants*

(a)     <u>Warrant Grants.</u>  The Administrator may grant incentive warrants and non-qualified warrants ("warrants") to purchase shares of Common Stock from the Company, to such key persons, and in such amounts and subject to such vesting and forfeiture provisions and other terms and conditions, as the Administrator shall determine, subject to the provisions of the Plan.  The Administrator may grant incentive warrants only to employees, and any grants of warrants to any other key persons shall only be non-qualified warrants.

(b)     <u>Warrant Exercise Price.</u>  Each Award Agreement with respect to a warrant shall set forth the amount (the "warrant exercise price") payable by the grantee to the Company upon exercise of the warrant evidenced thereby.  The warrant exercise price per share shall be determined by the Administrator; provided, however, that the warrant exercise price of a warrant shall be at least 100% of the Fair Market Value of a share of Common Stock on the date the warrant is granted, and provided further that in no event shall the warrant exercise price be less than the par value of a share of Common Stock.

(c)     <u>Exercise Period.</u>  Each Award Agreement with respect to a warrant shall set forth the periods during which the award evidenced thereby shall be exercisable, whether in whole or in part.  Such periods shall be determined by the Administrator; provided, however, that no warrant shall be exercisable more than 10 years after the date of grant. (See Section 2.3 for additional provisions relating to the exercise of warrants.)

(d)     <u>Incentive Warrant Limitations</u>.

(i)     <u>Exercisability</u>.  To the extent that the aggregate Fair Market Value (determined as of the time the warrant is granted) of the stock with respect to which incentive warrants are first exercisable by any employee during any calendar year shall exceed $100,000, or such higher amount as may be permitted from time to time under section 422 of the Code, such warrants shall be treated as non-qualified warrants.

(ii)     <u>10% Owners</u>.  Notwithstanding the provisions of this Section 2.2, an incentive warrant may not be granted under the Plan to an individual who, at the time the warrant is granted, owns stock possessing more than 10% of the total combined voting power of all classes of stock of his employer corporation or of its parent or subsidiary corporations (as such ownership may be determined for purposes of section 422(b) (6) of the Code) unless (i) at the time such incentive warrant is granted the warrant exercise price is at least 110% of the Fair Market Value of the shares subject thereto and (ii) the incentive warrant by its terms is not exercisable after the expiration of 5 years from the date it is granted.

**2.3**     *Exercise of Warrants*

Subject to the other provisions of this Article II, each warrant granted under the Plan shall be exercisable as follows:

(a)     <u>Timing and Extent of Exercise.</u>  Unless the applicable Award Agreement otherwise provides, a warrant may be exercised from time to time as to all or part of the shares as to which such award is then exercisable.

(b)     <u>Notice of Exercise.</u>  A warrant shall be exercised by the filing of a written notice with the Company or the Company's designated exchange agent (the "exchange agent"), on such form and in such manner as the Administrator shall prescribe.

(c)     <u>Payment of Exercise Price</u>.  Any written notice of exercise of a warrant shall be accompanied by payment for the shares being purchased.  Such payment shall be made by delivery of shares of Common Stock having a Fair Market Value (determined as of the exercise date) equal to all or part of the warrant exercise price and a certified or official bank check (or the equivalent thereof acceptable to the Company or its exchange agent) for any remaining portion of the full warrant exercise price.

KL3 2968387.12

(d)      Delivery of Certificates Upon Exercise.  Subject to the provisions of section 2.3(e) and 3.2, promptly after receiving payment of the full warrant exercise price, the Company or its exchange agent shall deliver to the grantee or to such other person as may then have the right to exercise the award, a certificate or certificates for the shares of Common Stock for which the award has been exercised.  If the method of payment employed upon warrant exercise so requires, and if applicable law permits, a warrant holder may direct the Company or its exchange agent, as the case may be, to deliver the stock certificate(s) to the warrant holder's stockbroker.

(e)      Investment Purpose and Legal Requirements.  Notwithstanding the foregoing, at the time of the exercise of any warrant, the Company may, if it shall deem it necessary or advisable for any reason, require the holder of such warrant (i) to represent in writing to the Company that it is the warrant holder's then intention to acquire the Shares with respect to which the warrant is to be exercised for investment and not with a view to the distribution thereof, or (ii) to postpone the date of exercise until such time as the Company has available for delivery to the warrant holder a prospectus meeting the requirements of all applicable securities laws; and no shares shall be issued or transferred upon the exercise of any warrant unless and until all legal requirements applicable to the issuance or transfer of such Shares have been complied with to the satisfaction of the Company.  The Company shall have the right to condition any issuance of shares to any warrant holder hereunder on such warrant holder's undertaking in writing to comply with such restrictions on the subsequent transfer of such shares as the Company shall deem necessary or advisable as a result of any applicable law, regulation or official interpretation thereof, and certificates representing such shares may contain a legend to reflect any such restrictions.

(f)      No Stockholder Rights.  No grantee of a warrant (or other person having the right to exercise such award) shall have any of the rights of a stockholder of the Company with respect to shares subject to such award until the issuance of a stock certificate to such person for such shares.  Except as otherwise provided in Section 1.5(c), no adjustment shall be made for dividends, distributions or other rights (whether ordinary or extraordinary, and whether in cash, securities or other property) for which the record date is prior to the date such stock certificate is issued.

### 2.4      *Compensation in Lieu of Exercise of a Warrant*

Upon written application of the grantee of a warrant, the Administrator may determine to substitute, for the exercise of such warrant, compensation to the grantee not in excess of the difference between the warrant exercise price and the Fair Market Value of the shares covered by such written application on the date of such application.  Such compensation may be in cash, in shares of Common Stock, or both, and the payment thereof may be subject to conditions, all as the Administrator shall determine.  In the event compensation is substituted pursuant to this Section 2.4 for the exercise, in whole or in part, of a warrant, the number of shares subject to the warrant shall be reduced by the number of shares for which such compensation is substituted.

### 2.5      *Termination of Employment*

(a)      General Rule.  Except to the extent otherwise provided herein, including in paragraphs (b), (c), (d) or (e) of this Section 2.5, or by the Administrator in an Award Agreement or otherwise, a grantee whose employment terminates may exercise any outstanding warrant on the following terms and conditions: (i) exercise may be made only to the extent that the grantee was entitled to exercise the award on the termination of employment date; and (ii) exercise must occur within six months after termination of employment but in no event after the original expiration date of the award.

(b)      Termination for Cause; Resignation.  If a grantee's employment is terminated for cause or if a grantee resigns without the Company's prior consent, all warrants not theretofore exercised shall terminate upon the commencement of business on the date of the grantee's termination of employment.

(c)      Disability.  If a grantee's employment is terminated due to disability (as defined below), then any outstanding warrant which is exercisable on the date of such termination shall continue to be exercisable for one year following such termination, but in no event after the original expiration date of the award.  For this purpose "disability" shall mean any physical or mental condition that would qualify a grantee for a disability benefit under the long-term disability plan maintained by the Company or, if there is no such plan, a physical or mental condition that prevents the grantee from performing the essential functions of the grantee's position (with or without

6

reasonable accommodation) for a period of six consecutive months.  The existence of a disability shall be determined by the Administrator.

(d)       Death.

(i)       Termination of Employment as a Result of Grantee's Death.  If a grantee's employment terminates due to his death, then any outstanding warrant which is exercisable on the date of such termination shall continue to be exercisable for one year following such termination, but in no event after the original expiration date of the award.

(ii)      Restrictions on Exercise Following Death.  Any such exercise of an award following a grantee's death shall be made only by the grantee's executor or administrator or other duly appointed representative reasonably acceptable to the Administrator, unless the grantee's will specifically disposes of such award, in which case such exercise shall be made only by the recipient of such specific disposition.  If a grantee's personal representative or the recipient of a specific disposition under the grantee's will shall be entitled to exercise any award pursuant to the preceding sentence, such representative or recipient shall be bound by all the terms and conditions of the Plan and the applicable Award Agreement which would have applied to the grantee.

(e)       Special Rules for Incentive Warrants.  No warrant that remains exercisable for more than three months following a grantee's termination of employment for any reason other than death (including death within three months after termination of employment or within one year after a termination of employment due to disability) or disability, or for more than one year following a grantee's termination of employment as the result of his becoming disabled, may be treated as an incentive warrant.

### 2.6       *Transferability of Warrants*

Except as otherwise provided by the Administrator, in an applicable Award Agreement or otherwise, during the lifetime of a grantee, each warrant granted to a grantee shall be exercisable only by the grantee and no warrant shall be assignable or transferable otherwise than by will or by the laws of descent and distribution, subject to any transfer restrictions set forth in the Company's Articles of Incorporation.  The Administrator may, in any applicable Award Agreement evidencing a warrant or otherwise permit a grantee to transfer all or some of the warrants to (A) the grantee's spouse, children or grandchildren ("Immediate Family Members"), (B) a trust or trusts for the exclusive benefit of such Immediate Family Members, or (C) other parties approved by the Administrator, provided, however, that no such transfer may be for consideration.  Following any such transfer, any transferred warrants shall continue to be subject to the same terms and conditions as were applicable immediately prior to the transfer.

### 2.7       *Grant of Restricted Stock*

(a)       Restricted Stock Grants.  The Administrator may grant restricted shares of Common Stock to such key persons, in such amounts, and subject to such vesting and forfeiture provisions and other terms and conditions as the Administrator shall determine, subject to the provisions of the Plan.  Restricted stock awards may be made independently of or in connection with any other award under the Plan.  A grantee of a restricted stock award shall have no rights with respect to such award unless such grantee accepts the award within such period as the Administrator shall specify by accepting delivery of an Award Agreement in such form as the Administrator shall determine and, in the event the restricted shares are newly issued by the Company, makes payment to the Company or its exchange agent as required by the Administrator and in accordance with the Marshall Islands Business Corporations Act.

(b)       Issuance of Stock Certificate(s).  Promptly after a grantee accepts a restricted stock award, the Company or its exchange agent shall issue to the grantee a stock certificate or stock certificates for the shares of Common Stock covered by the award or shall establish an account evidencing ownership of the stock in uncertificated form.  Upon the issuance of such stock certificate(s), or establishment of such account, the grantee shall have the rights of a stockholder with respect to the restricted stock, including, without limitation, the right to

7

vote such shares and receive dividends, subject to: (i) the nontransferability restrictions and forfeiture provision described in paragraphs (d) and (e) of this Section 2.7; (ii) if so directed by the Administrator, a requirement that any dividends paid on such shares shall be held in escrow until all restrictions on such shares have lapsed; and (iii) any other restrictions and conditions contained in the applicable Award Agreement.

(c)     Custody of Stock Certificate(s).  Unless the Administrator shall otherwise determine, any stock certificates issued evidencing shares of restricted stock shall remain in the possession of the Company until such shares are free of any restrictions specified in the applicable restricted stock agreement.  The Administrator may direct that such stock certificate(s) bear a legend setting forth the applicable restrictions on transferability.

(d)     Vesting/Nontransferability.  Until they vest, shares of restricted stock may not be sold, assigned, transferred, pledged or otherwise encumbered or disposed of except as otherwise specifically provided in this Plan or the applicable Award Agreement.  The Administrator at the time of grant shall specify the date or dates (which may depend upon or be related to the achievement of performance goals and other conditions) on which the nontransferability of the restricted stock shall lapse.

(e)     Consequence of Termination of Employment.  Except as may otherwise be provided by the Administrator in the applicable Award Agreement or otherwise, a grantee's termination of employment for any reason shall cause the immediate forfeiture of all shares of restricted stock that have not yet vested as of the date of such termination of employment.  All dividends paid on such shares also shall be forfeited, whether by termination of any escrow arrangement under which such dividends are held, by the grantee's repayment of dividends he received directly, or otherwise, unless the Administrator determines otherwise in the applicable Award Agreement or otherwise.

**ARTICLE III**
**Miscellaneous**

**3.1     *Amendment of the Plan; Modification of Awards***

(a)     Amendment of the Plan.  Subject to Section 3.1(b), the Board may from time to time suspend, discontinue, revise or amend the Plan in any respect whatsoever, except that no such amendment shall materially impair any rights or materially increase any obligations of the grantee under any award theretofore made under the Plan without the consent of the grantee (or, upon the grantee's death, the person having the right to exercise the award).  For purposes of this Section 3.1, any action of the Board or the Administrator that in any way alters or affects the tax treatment of any award or that the Board determines is necessary to prevent an award from being subject to tax under Section 409A of the Code shall not be considered to materially impair any rights of any grantee.

(b)     Stockholder Approval Requirement.  Stockholder approval shall be required with respect to any amendment to the Plan that (i) increases the aggregate number of shares that may be issued pursuant to incentive warrants or changes the class of employees eligible to receive such warrants; (ii) materially increases the benefits under the Plan to persons whose transactions in Common Stock are subject to section 16(b) of the 1934 Act or increases the benefits under the Plan or materially increases the number of shares which may be issued to such persons, or materially modifies the eligibility requirements affecting such persons, (iii) to the extent required by applicable stock exchange rules, or (iv) to the extent the Board determines that stockholder approval is appropriate and necessary to enable awards under the Plan to comply with Sections 422 or 162(m) of the Code.

(c)     Modification of Awards.  The Administrator may cancel any award under the Plan  The Administrator also may amend any outstanding Award Agreement, including, without limitation, by amendment which would: (i) accelerate the time or times at which the award becomes unrestricted or may be exercised; (ii) waive or amend any goals, restrictions or conditions set forth in the Agreement; or (iii) waive or amend the operation of Section 2.5 with respect to the termination of the award upon termination of employment, provided however, that the Administrator may not (w) lower the exercise price of an outstanding warrant, (x) cancel a warrant in exchange for a new warrant with a lower exercise price, (y) cancel a warrant in exchange for a different type of award under the Plan that has a value that is greater than the excess of the fair market value of the applicable shares on the date of such payment over the exercise price or (z) authorize the payment of cash in lieu of the exercise of a warrant in an amount that is greater than the excess of the fair market value of the applicable shares on the date of

8

KL3 2968387.12

such payment over the exercise price.  Notwithstanding any other provision of this Plan, any cancellation or amendment (other than an amendment pursuant to Sections 3.7 or 3.8(b)) that materially impairs the rights or materially increases the obligations of a grantee under an outstanding award shall be made only with the consent of the grantee (or, upon the grantee's death, the person having the right to exercise the award).

### 3.2    *Consent Requirement*

(a)    <u>No Plan Action Without Required Consent.</u>  If the Administrator shall at any time determine that any Consent (as hereinafter defined) is necessary or desirable as a condition of, or in connection with, the granting of any award under the Plan, the issuance or purchase of shares or other rights thereunder, or the taking of any other action thereunder (each such action being hereinafter referred to as a "Plan Action"), then such Plan Action shall not be taken, in whole or in part, unless and until such Consent shall have been effected or obtained to the full satisfaction of the Administrator.

(b)    <u>Consent Defined.</u>  The term "Consent" as used herein with respect to any Plan Action means (i) any and all listing on any securities exchange or any registrations or qualifications under any federal, state or local law, rule or regulation, (ii) any and all written agreements and representations by the grantee with respect to the disposition of shares, or with respect to any other matter, which the Administrator shall deem necessary or desirable to comply with the terms of any such listing, registration or qualification or to obtain an exemption from the requirement that any such listing, qualification or registration be made and (iii) any and all consents, clearances and approvals in respect of a Plan Action by any governmental or other regulatory bodies.

### 3.3    *Nonassignability*

Except as otherwise provided herein, (a) no award or right granted to any person under the Plan or under any Award Agreement shall be assignable or transferable other than by will or by the laws of descent and distribution; and (b) all rights granted under the Plan or any Award Agreement shall be exercisable during the life of the grantee only by the grantee or the grantee's legal representative.

### 3.4    *Requirement of Notification of Election Under Section 83(b) of the Code*

If any grantee shall, in connection with the acquisition of shares of Common Stock under the Plan, make the election permitted under section 83(b) of the Code (i.e., an election to include in gross income in the year of transfer the amounts specified in section 83(b)), such grantee shall notify the Company of such election within 10 days of filing notice of the election with the Internal Revenue Service, in addition to any filing and notification required pursuant to regulations issued under the authority of Code section 83(b).

### 3.5    *Requirement of Notification Upon Disqualifying Disposition Under Section 421(b) of the Code*

Each grantee of an incentive warrant shall notify the Company of any disposition of shares of Common Stock issued pursuant to the exercise of such warrant under the circumstances described in section 421(b) of the Code (relating to certain disqualifying dispositions), within 10 days of such disposition.

### 3.6    *Withholding Taxes*

(a)    <u>With Respect to Cash Payments.</u>  Whenever cash is to be paid pursuant to an award under the Plan, the Company shall be entitled to deduct therefrom an amount sufficient in its opinion to satisfy all federal, state and other governmental tax withholding requirements related to such payment.

(b)    <u>With Respect to Delivery of Common Stock or Other Non-Cash Property.</u>  Whenever shares of Common Stock or other non-cash property are to be delivered pursuant to an award under the Plan, the Company shall be entitled to require as a condition of delivery that the grantee remit to the Company an amount sufficient in the opinion of the Company to satisfy all federal, state and other governmental tax withholding requirements related thereto.  With the approval of the Administrator, the grantee may satisfy the foregoing condition by electing to have

9

the Company withhold from delivery shares having a value equal to the amount of tax to be withheld. Such shares shall be valued at their Fair Market Value as of the date on which the amount of tax to be withheld is determined. Fractional share amounts shall be settled in cash.  Such a withholding election may be made with respect to all or any portion of the shares to be delivered pursuant to an award.

### 3.7   *Adjustment Upon Changes in Common Stock*

(a)      The warrants will be subject to certain anti-dilution provisions set forth in the applicable Award Agreement.  In the event of any change in the number of shares of Common Stock outstanding by reason of any stock dividend or split, reverse stock split, recapitalization, merger, consolidation, combination or exchange of shares or similar corporate change (collectively referred to as "corporate events"), the Administrator shall make the following adjustments:

(i)      Shares Available for Grants.  The maximum number of shares of Common Stock with respect to which the Administrator may grant awards under Article II hereof, as described in Section 1.5(a), and the individual annual limit described in Section 1.5(e), shall be appropriately adjusted by the Administrator.

(ii)      Restricted Stock.  Unless the Administrator otherwise determines, any securities or other property (including dividends paid in cash) received by a grantee with respect to a share of restricted stock as a result of a corporate event will not vest until such share of restricted stock vests, and shall be promptly deposited with the Company or another custodian designated by the Company.

(b)      No Other Rights. Except as expressly provided in the Plan or in an Award Agreement, no grantee shall have any rights by reason of any subdivision or consolidation of shares of stock of any class, the payment of any dividend, any increase or decrease in the number of shares of stock of any class or any dissolution, liquidation, merger or consolidation of the Company or any other corporation. Except as expressly provided in the Plan or in an Award Agreement, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number of shares of Common Stock subject to an award or the exercise price of any warrant.

### 3.8   *Change in Control*

(a)      Change in Control Defined.  For purposes of this Section 3.8, "Change in Control" shall mean the occurrence of any of the following:

(i)      any person or "group" (within the meaning of Section 13(d)(3) of the 1934 Act), other than Peter C. Georgiopoulos, or Centerbridge Partners, L.P. and/or any one or more of its affiliates or Related Funds acquiring "beneficial ownership" (as defined in Rule 13d-3 under the 1934 Act), directly or indirectly, of fifty percent (50%) or more of the aggregate voting power of the capital stock ordinarily entitled to elect directors of the Company;

(ii)      the sale of all or substantially all of the Company's assets in one or more related transactions to a person other than such a sale to (x) a subsidiary of the Company which does not involve a change in the equity holdings of the Company, (y) an entity which Peter C. Georgiopoulos directly or indirectly controls or (z) Centerbridge Partners, L.P. and/or any one or more of its affiliates or Related Funds; or

(iii)      any merger, consolidation, reorganization or similar event of the Company or any of its subsidiaries, as a result of which the holders of the voting stock of the Company immediately prior to such merger, consolidation, reorganization or similar event do not directly or indirectly hold at least fifty-one percent (51%) of the aggregate voting power of the capital stock of the surviving entity.

10

KL3 2968387.12

"Related Fund" means with respect to any person, any fund, account or investment vehicle that is controlled or managed by such person, by any affiliate of such person, or, if applicable, such person's investment manager.

Notwithstanding the foregoing, for each award subject to Section 409A of the Code, a Change in Control shall be deemed to occur under this Plan with respect to such Award only if a change in the ownership or effective control of the Company or a change in the ownership of a substantial portion of the assets of the Company shall also be deemed to have occurred under Section 409A of the Code.

(b)    Effect of a Change in Control.  Unless the Administrator provides otherwise in an Award Agreement, upon the occurrence of a Change in Control:

(i)    notwithstanding any other provision of this Plan, any award then outstanding shall become fully vested and any award in the form of a warrant shall be immediately exercisable; and

(ii)    to the extent permitted by law, the Administrator may amend any Award Agreement in such manner as it deems appropriate.

(c)    Miscellaneous.  Whenever deemed appropriate by the Administrator, any action referred to in paragraph (b)(ii) of this Section 3.8 may be made conditional upon the consummation of the applicable Change in Control transaction.

### 3.9    *Right of Discharge Reserved*

Nothing in the Plan or in any Award Agreement shall (i) confer upon any grantee the right to continue his employment with the Company, (ii) affect any right that the Company may have to terminate such employment, or (iii) be deemed to determine an individual's status as an employee or consultant.

### 3.10    *Non-Uniform Determinations*

The Administrator's determinations under the Plan need not be uniform and may be made by it selectively among persons who receive, or who are eligible to receive, awards under the Plan (whether or not such persons are similarly situated).  Without limiting the generality of the foregoing, the Administrator shall be entitled, among other things, to make non-uniform and selective determinations, and to enter into non-uniform and selective Award Agreements, as to (a) the persons to receive awards under the Plan, and (b) the terms and provisions of awards under the Plan.

### 3.11    *Other Payments or Awards*

Nothing contained in the Plan shall be deemed in any way to limit or restrict the Company from making any award or payment to any person under any other plan, arrangement or understanding, whether now existing or hereafter in effect.

### 3.12    *Headings*

Any section, subsection, paragraph or other subdivision headings contained herein are for the purpose of convenience only and are not intended to expand, limit or otherwise define the contents of such subdivisions.

### 3.13    *Effective Date and Term of Plan*

(a)    Adoption; Effective Date.  The Plan is being adopted pursuant to the terms of the Prepack Plan and the effective date of the Plan shall be subject to the occurrence of the "Effective Date" of the Prepack Plan (as defined therein).  All awards under the Plan prior to such "Effective Date" are subject in their entirety to the occurrence of the "Effective Date" of the Prepack Plan.  If the "Effective Date" of the Prepack Plan does not occur

11

KL3 2968387.12

prior to the first anniversary of the adoption of the Plan, the Plan and all awards thereunder shall terminate on that date.

(b)    Termination of Plan.  Unless sooner terminated by the Board or pursuant to Paragraph (a) above, the provisions of the Plan respecting the grant of incentive warrants shall terminate on the tenth anniversary of the adoption of the Plan by the Board, and no incentive warrant awards shall thereafter be made under the Plan.  All such awards made under the Plan prior to its termination shall remain in effect until such awards have been satisfied or terminated in accordance with the terms and provisions of the Plan and the applicable Award Agreements.

### 3.14    *Restriction on Issuance of Stock Pursuant to Awards*

The Company shall not permit any shares of Common Stock to be issued pursuant to Awards granted under the Plan unless such shares of Common Stock are fully paid and non-assessable under applicable law.

### 3.15    *Governing Law*

Except to the extent preempted by any applicable federal law, the Plan will be construed and administered in accordance with the laws of the State of New York, without giving effect to principles of conflict of laws.

### 3.16    *Deferred Compensation*

The Plan is intended to be exempt from, and if not exempt, to comply with the requirements of Section 409A of the Code so as not to be subject to tax under Section 409A, and shall be interpreted accordingly. Notwithstanding anything else herein to the contrary, any payment scheduled to be made to the grantee after the grantee's termination of employment shall not be made until the date six months after the date of the termination of employment to the extent necessary to comply with Section 409A(a)(2)(B)(i) and applicable Treasury Regulations. Following any such six-month delay, all such delayed payments will be paid in a single lump sum on the date six months after such termination of employment.  Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Plan comply with Section 409A and in no event shall the Company be liable for all or any portion of any taxes, penalties, interest or other expenses that may be incurred by any recipient of an award on account of non-compliance with Section 409A.

12

Schedule A

Peter C. Georgiopoulos
John C. Wobensmith
Robert G. Buchanan
Apostolos Zafolias
Joseph Adamo
Matthew Doherty
James Vatis
Five (5) other employees to be identified by the post-Effective Date management

## EXHIBIT 11

### THE NEW EMPLOYMENT AGREEMENTS

## New Employment Agreements

As of May 15, 2014, there are no New Employment Agreements.[1]   The New Employment Agreements, if any, will be filed in advance of the Confirmation Hearing.

---

[1] All capitalized terms used but not defined herein shall have the meaning ascribed to them in the *Prepackaged Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 14] (as may be amended from time to time, the "**Prepack Plan**").

## EXHIBIT 12

### THE REGISTRATION RIGHTS AGREEMENT

**REGISTRATION RIGHTS AGREEMENT**

This Registration Rights Agreement (this "*Agreement*") is made and entered into as of [●], 2014, by and among Genco Shipping & Trading Limited, a Marshall Islands corporation (the "*Company*"), and the other parties signatory hereto and any additional parties identified on the signature pages of any joinder agreement executed and delivered pursuant hereto (each a "*Holder*" and collectively, the "*Holders*").

WHEREAS, the Company and certain affiliated debtors filed a Prepackaged Plan of Reorganization filed pursuant to Chapter 11 of the United States Bankruptcy Code, on April 21, 2014, which, as amended, was confirmed by the United States Bankruptcy Court for the Southern District of New York on [●], 2014  (including all exhibits, schedules and supplements thereto, the "*Plan*"); and

WHEREAS, the Plan provides that any recipient of shares of common stock of the Company that (together with its Affiliates and Related Funds) receives 10% or more of the common stock under the Plan or who otherwise reasonably believes that it may be an "affiliate" of the Company following its organization under the Plan, together with its affiliated funds, on or as soon as practicable after the effective date under the Plan will enter into a registration rights agreement having the terms set forth in Article IV.E.2 of the Plan, and the Equity Commitment Agreement provides that any purchaser of Equity Commitment Shares will be party to such registration rights agreement; and

WHEREAS, the Company and the Holders are entering into this Agreement in furtherance of the aforesaid provisions of the Plan and Equity Commitment Agreement.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and each of the Holders agree as follows:

1.      <u>Definitions</u>. Capitalized terms used and not otherwise defined herein that are defined in the Plan have the meanings given such terms in the Plan. As used in this Agreement, the following terms shall have the following meanings:

"*Advice*" has the meaning set forth in <u>Section 14(c)</u>.

"*Affiliate*" means, with respect to any person, any other person which directly or indirectly controls, is controlled by, or is under common control with, such person.

"*Agreement*" has the meaning set forth in the Preamble.

"*Automatic Shelf Registration Statement*" means an "automatic shelf registration statement" as defined in Rule 405 promulgated under the Securities Act.

"*beneficially own*" shall have the meaning given to such term in Rule 13d-3 under the Exchange Act, and any Person's beneficial ownership of securities shall be calculated in accordance with the provisions of such Rule.

"*Board*" means the Board of Directors of the Company.

"*Business Day*" means a day, other than a Saturday or Sunday, on which banks in New York City are open for the general transaction of business.

"*Commission*" means the Securities and Exchange Commission.

"*Common Stock*" means the common stock of the Company, par value $0.01 per share, and any securities into which such shares of common stock may hereinafter be reclassified.

"*Company*" has the meaning set forth in the Preamble.

"*Conversion Shares*" means shares of Common Stock issuable to holders of Class 3 (Prepetition 2007 Facility) Claims and to holders of Class 8 (Convertible Note) Claims under the Plan.

"*Counsel to the Holders*" means (i) with respect to any Demand Registration, the counsel selected by the Holders of a majority of the Registrable Securities initially requesting such Demand Registration and (ii) with respect to any Underwritten Takedown or Piggyback Registration, the counsel selected by the Majority Holders.

"*Demand Holder*" means each Holder who, together with its Affiliates and Related Funds, has received or holds shares of Common Stock constituting ten percent (10%) or more of the total number of shares of Common Stock issuable under the Plan (including the Conversion Shares, the Rights Offering Shares, Equity Commitment Shares, MIP Shares and the MIP Warrant Shares issuable as of the Plan Effective Date), which persons are identified on Schedule A to this Agreement.

"*Demand Registration Request*" has the meaning set forth in Section 3(a).

"*Effective Date*" means the date that a Registration Statement filed pursuant to this Agreement is first declared effective by the Commission.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"*Equity Commitment Agreement*" means that certain Equity Commitment, dated as of April 16, 2014, by and among the Company and the Commitment Parties party thereto.

"*Equity Commitment Shares*" means the shares of Common Stock issued pursuant to a commitment to backstop the Rights Offering, in accordance with the terms of the Equity Commitment Agreement.

"*Form S-1*" means form S-1 under the Securities Act, or any other form hereafter adopted by the Commission for the general registration of securities under the Securities Act.

"*Form S-3*" means form S-3 under the Securities Act, or any other form hereafter adopted by the Commission having substantially the same usage as Form S-3.

2

"*FINRA*" has the meaning set forth in Section 8.

"*Grace Period*" has the meaning set forth in Section 5(a).

"*Holder*" or "*Holders*" has the meaning set forth in the Preamble. A Person shall cease to be a Holder hereunder at such time as it ceases to hold any Registrable Securities.

"*Indemnified Party*" has the meaning set forth in Section 10(c).

"*Indemnifying Party*" has the meaning set forth in Section 10(c).

"*Initial Registrable Securities Number*" means the number of Registrable Securities beneficially owned by all Holders (including Warrant Shares and MIP Warrant Shares), appropriately adjusted for any stock splits, reverse stock splits, stock dividends or similar transactions involving the Company's Common Stock.

"*Initial Shelf Registration Statement*" has the meaning set forth in Section 2(a).

"*Losses*" has the meaning set forth in Section 10(a).

"*Majority Holders*" means, with respect to any Underwritten Offering, the holders of a majority of the Registrable Securities to be included in such Underwritten Offering held by all Holders that have made the request requiring the Company to conduct such Underwritten Offering (but not including any Holders that have exercised "piggyback" rights hereunder to be included in such Underwritten Offering).

"*Management Incentive Plan*" means the equity-based management incentive program described in Article V.E of the Plan.

"*MIP Shares*" means shares of Common Stock issued pursuant to the Management Incentive Plan.

"*MIP Warrant Shares*" means shares of Common Stock issuable upon the exercise of the warrants issued to directors, officers, and other management of the Company under the terms of the Management Incentive Plan.

"*Non-Demand Holder*" means a Holder that is not a Demand Holder.

"*Other Holder*" has the meaning set forth in Section 6(c).

"*Person*" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"*Piggyback Notice*" has the meaning set forth in Section 6(b).

"*Piggyback Offering*" has the meaning set forth in Section 6(b).

"*Plan*" has the meaning set forth in the Preamble.

3

KL2 2845173.6

"*Plan Effective Date*" shall mean the date on which the Plan becomes effective.

"*Proceeding*" means an action, claim, suit, investigation or proceeding (including, without limitation, an investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"*Prospectus*" means the prospectus included in a Registration Statement (including, without limitation, a prospectus that includes any information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by a Registration Statement, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"*Registrable Securities*" means, collectively, as of the Plan Effective Date, (a) all shares of Common Stock that constitute Equity Commitment Shares and (b) all Conversion Shares, Rights Offering Shares, Equity Commitment Shares, Warrant Shares, MIP Shares and MIP Warrant Shares  issued to any Person who, together with its Affiliates and Related Funds, beneficially owns, in the aggregate, 10% or more of the total amount of all such shares, and any additional shares of Common Stock acquired by any such Person in open market or other purchases after the Effective Date and (c) any additional shares of Common Stock paid, issued or distributed in respect of any such shares by way of a stock dividend, stock split or distribution, or in connection with a combination of shares, and any security into which such Common Stock shall have been converted or exchanged in connection with a recapitalization, reorganization, reclassification, merger, consolidation, exchange, distribution or otherwise; provided, however, that as to any Registrable Securities, such securities shall cease to constitute Registrable Securities upon the earliest to occur of: (x) the date on which such securities are disposed of pursuant to an effective Registration Statement; (y) the date on which such securities are disposed of pursuant to Rule 144 (or any similar provision then in effect) promulgated under the Securities Act; and (z) the date on which such Registrable Securities may be sold pursuant to Rule 144 (or any similar provision then in effect) without regard for any volume or manner of sale restrictions.

"*Registration Statement*" means any one or more registration statements of the Company filed under the Securities Act that covers the resale of any of the Registrable Securities pursuant to the provisions of this Agreement (including without limitation any Shelf Registration Statement), amendments and supplements to such Registration Statements, including post-effective amendments, all exhibits and all material incorporated by reference or deemed to be incorporated by reference in such Registration Statements.

"*Related Fund*" means, with respect to any Person, any fund, account or investment vehicle that is controlled or managed by such Person, by any Affiliate of such Person, or, if applicable, such Person's investment manager.

"*Rights Offering*" means the rights offering of the Company to acquire shares of Common Stock conducted under the terms of the Plan.

4

"*Rights Offering Shares*" means shares of Common Stock acquired upon exercise of rights, including oversubscription rights, in the Rights Offering.

"*Rule 144*" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"*Rule 158*" means Rule 158 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"*Rule 415*" means Rule 415 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"*Rule 424*" means Rule 424 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"*Selling Stockholder Questionnaire*" means a questionnaire reasonably adopted by the Company from time to time.

"*Shelf Registration Statement*" means a Registration Statement filed with the Commission in accordance with the Securities Act for the offer and sale of Registrable Securities by Holders on a continuous or delayed basis pursuant to Rule 415.

"*Trading Day*" means a day during which trading in the Common Stock occurs in the Trading Market, or if the Common Stock is not listed on a Trading Market, a Business Day.

"*Trading Market*" means whichever of the New York Stock Exchange, the NYSE Amex, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board, or OTC Markets Group marketplace on which the Common Stock is listed or quoted for trading on the date in question.

"*Transfer*" has the meaning set forth in Section 12.

"*Underwritten Offering*" means an offering Registrable Securities under a Registration Statement in which the Registrable Securities are sold to an underwriter for reoffering to the public.

"*Underwritten Takedown*" has the meaning set forth in Section 2(e).

"*Well-Known Seasoned Issuer*" means a "well-known seasoned issuer" as defined in Rule 405 promulgated under the Securities Act and which (i) is a "well-known seasoned issuer" under paragraph (1)(i)(A) of such definition or (ii) is a "well-known seasoned issuer" under

5

paragraph (1)(i)(B) of such definition and is also eligible to register a primary offering of its securities relying on General Instruction I.B.1 of Form S-3 or Form F-3 under the Securities Act.

2.      Initial Shelf Registrations.

(a)      The Company shall prepare a Shelf Registration Statement (the "*Initial Shelf Registration Statement*"), and shall include in the Initial Shelf Registration Statement the Registrable Securities of each Holder who shall request inclusion therein of some or all of their Registrable Securities by checking the appropriate box on the signature page of such Holder hereto or by written notice to the Company no later than seventy-five (75) days after the Plan Effective Date.   The Company shall file the Initial Shelf Registration Statement with the Commission on or prior the ninetieth (90th) day following the Plan Effective Date; *provided, however,* that the Company shall not be required to file or cause to be declared effective the Initial Shelf Registration Statement unless Holders request (and have not by the seventy-fifth day after the Plan Effective Date revoked such request by written notice to the Company) the inclusion in the Initial Shelf Registration Statement of Registrable Securities constituting at least fifteen percent (15%) of all Registrable Securities, and such Holders otherwise timely comply with the requirements of this Agreement with respect to the inclusion of such Registrable Securities in the Initial Shelf Registration Statement.

(b)      The Company shall include in the Initial Shelf Registration Statement all Registrable Securities whose inclusion has been timely requested as aforesaid; *provided, however,* that the Company shall not be required to include an amount of Registrable Securities in excess of the amount as may be permitted to be included in such Registration Statement under the rules and regulations of the Commission and the applicable interpretations thereof by the staff of the Commission.

(c)      The Initial Shelf Registration Statement shall be on Form S-1; provided, however, that, if the Company becomes eligible to register the Registrable Securities for resale by the Holders on Form S-3 (including without limitation as a Well-Known Seasoned Issuer eligible to use an Automatic Shelf Registration Statement), the Company shall be entitled to amend the Initial Shelf Registration Statement to a Shelf Registration Statement on Form S-3 or file a Shelf Registration Statement on Form S-3 in substitution of the Initial Shelf Registration Statement as initially filed.

(d)      The Company shall use its reasonable best efforts to cause the Initial Shelf Registration Statement to be declared effective by the Commission as promptly as practicable, and shall use its commercially reasonable efforts to keep such Shelf Registration Statement continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission, until the earlier of (i) the expiration of one (1) year following Effective Date of the Initial Shelf Registration Statement, *provided* that if at the time the Company is eligible to register the Registrable Securities for resale by the Holders on Form S-3, such date shall be extended to three (3) years following the Effective Date of the Initial Shelf Registration Statement; and (ii) the date that all securities covered by such Shelf Registration Statement shall cease to be Registrable Securities. In the event of any stop order, injunction or other similar order or requirement of the Commission relating to any Registration Statement, the period during which the Initial Shelf Registration Statement shall be required to

6

remain effective will be extended by the number of days during which such stop order, injunction or similar order or requirement is in effect.

(e)    Upon the demand of one or more Holders, the Company shall facilitate a "takedown" of Registrable Securities in the form of an Underwritten Offering (each, an *"Underwritten Takedown"*), in the manner described in this Agreement, *provided* that either (i) the number of shares included in such "takedown" shall equal at least fifteen percent (15%) of the Initial Registrable Securities Number, or (ii) the Registrable Securities requested to be sold by the Holders in such "takedown" shall have an anticipated aggregate offering price (before deducting underwriting discounts and commission) of at least $50 million.

3.    Demand Registration

(a)    At any time and from time to time on or following the Plan Effective Date, any Demand Holder or group of Demand Holders may request in writing ("*Demand Registration Request*") that the Company effect the registration of all or part of such Demand Holder's or Demand Holders' Registrable Securities with the Commission under and in accordance with the provisions of the Securities Act.  The Company will file a Registration Statement covering such Demand Holder's or Demand Holders' Registrable Securities requested to be registered, and shall use its reasonable commercial efforts to cause such Registration Statement to be declared effective, as promptly as practicable after receipt of such request; *provided, however*, that the Company will not be required to file a Registration Statement pursuant to this Section 3:

(A)    unless either (i) the number of Registrable Securities requested to be registered on such Registration Statement  equals at least fifteen percent (15%) of the Initial Registrable Securities Number, or (ii) the Registrable Securities requested to be sold by the Demand Holders pursuant to such Registration Statement shall have an anticipated aggregate offering price (before deducting underwriting discounts and commission) of at least $50 million.

(B)    if the Registrable Securities requested to be registered are already covered by an existing and effective Registration Statement and such Registration Statement may be utilized for the offering and sale of the Registrable Securities requested to be registered;

(C)    if a Registration Statement shall have previously been initially declared effective by the Commission within the one hundred eighty (180) days preceding the date of such Demand Registration Request is made; and

(D)    if the number of Demand Registration Requests previously made pursuant to this Section 3(a) shall exceed three; *provided* that a Demand Registration Request shall not be considered made for purposes of this clause (D) unless the requested Registration Statement has been declared effective by the Commission for substantially the full amount of Registrable Securities for which registration has been requested.

(b)    A Demand Registration Request shall specify (i) the then-current name and address of such Demand Holder or Demand Holders, (ii) the aggregate number of Registrable Securities requested to be registered, (iii) the total number of Registrable Securities then

7

KL2 2845173.6

beneficially owned by such Demand Holder or Demand Holders and (iv) the intended means of distribution.  If at the time the Demand Registration Request is made the Company shall be eligible to use Form S-3, the Demand Holder or Demand Holders making such request may specify that the registration be in the form of a Shelf Registration Statement.

(c)     The Company may satisfy its obligations under Section 3(a) hereof by amending (to the extent permitted by applicable law) any registration statement previously filed by the Company under the Securities Act, so that such amended registration statement will permit the disposition (in accordance with the intended methods of disposition specified as aforesaid) of all of the Registrable Securities for which a demand for registration has been properly made under Section 3(b) hereof. If the Company so amends a previously filed registration statement, it will be deemed to have effected a registration for purposes of Section 3(a) hereof; *provided* that the date such registration statement is amended pursuant to this Section 3(c) shall be the "the first day of effectiveness" of such Registration Statement for purposes of determining the period during which the Registration Statement is required to be maintained effective in accordance with Section 3(e) hereof.

(d)     Within ten (10) days after receiving a Demand Registration Request, the Company shall give written notice of such request to all other Holders and shall, subject to the provisions of Section 4(c) in the case of an Underwritten Offering, include in such registration all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within fifteen (15) days after the Company's giving of such notice, *provided* that such Registrable Securities are not already covered by an existing and effective Registration Statement that may be utilized for the offering and sale of the Registrable Securities requested to be registered in the manner so requested.

(e)     The Company will use its reasonable efforts to keep a Registration Statement that has become effective as contemplated by this Section 3 continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission:

(A)     in the case of a Registration Statement other than a Shelf Registration Statement, until all Registrable Securities registered thereunder have been sold pursuant to such Registration Statement, but in no event later than two hundred seventy (270) days from the Effective Date of such Registration Statement; and

(B)     in the case of a Shelf Registration Statement, the earlier of (x) three (3) years following the Effective Date of the Initial Shelf Registration Statement; and (y) the date that all the remaining securities covered by such Shelf Registration Statement shall cease to be Registrable Securities;

*provided, however,* that in the event of any stop order, injunction or other similar order or requirement of the Commission relating to any Registration Statement, the period during which the Initial Shelf Registration Statement shall be required to remain effective will be extended by the number of days during which such stop order, injunction or similar order or requirement is in effect.

8

(f)     The Demand Holder or Demand Holders making a Demand Registration Request may, at any time prior to the Effective Date of the Registration Statement relating to such registration, revoke their request for the Company to effect the registration of all or part of such Demand Holder's or Demand Holders' Registrable Securities by providing a written notice to the Company. If, pursuant to the preceding sentence, the entire Demand Registration Request is revoked, then, at the option of the Demand Holder or Demand Holders who revoke such request, either (i) such Demand Holder or Demand Holders shall reimburse the Company for all of its reasonable and documented out-of-pocket expenses incurred in the preparation, filing and processing of the Registration Statement, which out-of-pocket expenses, for the avoidance of doubt, shall not include overhead expenses. or (ii) the requested registration that has been revoked will be deemed to have been effected for purposes of Section 3(a).

(g)     If a Registration Statement filed pursuant to this Section 3 is a Shelf Registration Statement, then upon the demand of one or more Demand Holders, the Company shall facilitate a "takedown" of Registrable Securities in the form of an Underwritten Offering, in the manner described in this Agreement, *provided* that either (i) the number of shares included in such "takedown" shall equal at least fifteen percent (15%) of the Initial Registrable Securities Number or (ii) the Registrable Securities requested to be sold by the Demand Holders in such "takedown" shall have an anticipated aggregate offering price (before deducting underwriting discounts and commission) of at least $50 million.

4.     Procedures for Underwritten Offerings.   The following procedures shall govern Underwritten Offerings pursuant to Section 2 or Section 3, whether in the case of an Underwritten Takedown or otherwise.

(a)     (i) The Majority Holders shall select one or more investment banking firm(s) of national standing to be the managing underwriter or underwriters for any Underwritten Offering pursuant to a Demand Registration Request or an Underwritten Takedown with the consent of the Company, which consent shall not be unreasonably withheld, conditioned or delayed and (ii) The Company shall select one or more investment banking firms of national standing to be the managing underwriter or underwriters for any other Underwritten Offering with the consent of the Majority Holders, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)     All Holders proposing to distribute their securities through an Underwritten Offering, as a condition for inclusion of their Registrable Securities therein, shall agree to enter into an underwriting agreement with the underwriters; *provided* that the underwriting agreement is in customary form and reasonably acceptable to the Majority Holders and *provided, further* that no Holder of Registrable Securities included in any underwritten registration shall be required to make any representations or warranties to the Company or the underwriters (other than representations and warranties regarding (i) such Holder's ownership of its Registrable Securities to be sold or transferred, (ii) such Holder's power and authority to effect such transfer and (iii) such matters pertaining to compliance with securities laws as may be reasonably requested) or to undertake any indemnification obligations to the Company with respect thereto, except as otherwise provided in Section 10(b) hereof, or to the underwriters with respect thereto, except to the extent of the indemnification being given to the Company and its controlling persons in Section 10(b) hereof.

9

(c)      If the managing underwriter or underwriters for an Underwritten Offering advises the Holders that the total amount of Registrable Securities or other shares of Common Stock permitted to be registered is such as to adversely affect the success of such Underwritten Offering, the number of Registrable Securities or other shares of Common Stock to be registered on such Registration Statement will be reduced as follows: *first*, the Company shall reduce or eliminate the securities of the Company to be included by any Person other than a Holder or the Company; *second*, the Company shall reduce or eliminate any securities of the Company to be included by the Company; *third*, the Company shall reduce the number of Registrable Securities to be included by Non-Demand Holders on a pro rata basis based on the total number of Registrable Securities requested by Non-Demand Holders to be included in the Underwritten Offering; and *fourth* the Company shall reduce the number of Registrable Securities to be included by Demand Holders on a pro rata basis based on the total number of Registrable Securities requested by the Demand Holders to be included in the Underwritten Offering; *provided* that in the case of an Underwritten Takedown pursuant to Section 2(e), in lieu of the reduction in clauses *third* and *fourth*, any such reduction shall be made pro rata among the Demand Holders and the Non-Demand Holders based on the total number of Registrable Securities requested by all such Holders to be included in the Underwritten Offering

(d)      Within ten (10) days after receiving a request for an Underwritten Offering constituting a "takedown" from a Shelf Registration Statement, the Company shall give written notice of such request to all other Holders, and subject to the provisions of Section 4(e) hereof, include in such Underwritten Offering all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within fifteen (15) days after the Company's giving of such notice, *provided* that such Registrable Securities are covered by an existing and effective Shelf Registration Statement that may be utilized for the offering and sale of the Registrable Securities requested to be registered.

(e)      The Company will not be required to undertake an Underwritten Offering pursuant to Section 2 or Section 3:

(A)      if the Company has undertaken an Underwritten Offering, whether for its own account or pursuant to this Agreement, within the one hundred eighty (180) days preceding the date of the request for such Underwritten Offering is given to the Company; and

(B)      if the number of Underwritten Offerings previously made pursuant to Section 2 or Section 3 shall exceed three.

5.      Grace Periods.

(a)      Notwithstanding anything to the contrary herein—

(A)      the Company shall be entitled to postpone the filing or effectiveness of, or suspend the use of, a Registration Statement if in the good faith judgment of the Board, such registration, offering or use would reasonably be expected to materially affect in an adverse manner or materially interfere with any bona fide material financing of the

10

Company or any material transaction under consideration by the Company or would require the disclosure of information that has not been, and is not otherwise required to be, disclosed to the public and the premature disclosure of which would materially affect the Company in an adverse manner, *provided*, that in the event such Registration Statement relates to a Demand Registration Request, the Demand Holders initiating such Demand Registration Request shall be entitled to withdraw the Demand Registration Request and, if such request is withdrawn, it shall not count as one of the permitted Demand Registration Requests hereunder and the Company shall pay all registration expenses in connection with such registration; and

(B)    at any time after a Registration Statement has been declared effective by the Commission, the Company may delay the disclosure of material non-public information concerning the Company if the disclosure of such information at the time would, in the good faith judgment of the Board, adversely affect the Company (the period of a postponement or suspension as described in clause (A) and/or a delay described in this clause (B), a "*Grace Period*").

(b)    The Company shall promptly (i) notify the Holders in writing of the existence of the event or material non-public information giving rise to a Grace Period (provided that the Company shall not disclose the content of such material non-public information to the Holders) or the need to file a post-effective amendment, as applicable, and the date on which such Grace Period will begin, (ii) use commercially reasonable efforts to terminate a Grace Period as promptly as practicable and (iii) notify the Holders in writing of the date on which the Grace Period ends.

(c)    The aggregate of any one Grace Period, or of all Grace Periods in total during any three hundred sixty-five (365) day period, shall not exceed an aggregate of one hundred twenty (120) days. For purposes of determining the length of a Grace Period, the Grace Period shall be deemed to begin on and include the date the Holders receive the notice referred to in clause (ii) of Section 5(b) and shall end on and include the later of the date the Holders receive the notice referred to in clause (iii) of Section 5(b) and the date referred to in such notice.  In the event the Company declares a Grace Period, the period during which the Company is required to maintain the effectiveness of an Initial Shelf Registration Statement or Registration Statement filed pursuant to a Demand Registration Request shall be extended by the number of days during which such Grace Period is in effect.

6.    Piggyback Registration

(a)    If at any time, and from time to time, when Registrable Securities are not already covered by an existing and effective Registration Statement, the Company proposes to—

(A)    file a registration statement under the Securities Act with respect to an Underwritten Offering of any class of equity securities of the Company or any securities convertible or exercisable into shares of any equity securities of the Company (other than with respect to a registration statement (i) on Form S-8 or any successor form thereto, (ii) on Form S-4 or any successor form thereto, (iii) another form not available for registering

11

KL2 2845173.6

the Registrable Securities for sale to the public or (iv) a registration statement filed pursuant to Rule 415), whether or not for its own account; or

(B)     conduct an underwritten offering constituting a "takedown" of a class of equity securities of the Company or any securities convertible or exercisable into shares of any equity securities of the Company registered under a shelf registration statement previously filed by the Company.

(b)     The Company shall give written notice (the "*Piggyback Notice*") of such proposed filing or underwritten offering to the Holders at least ten (10) Business Days before the anticipated filing date. Such notice shall include the number and class of securities proposed to be registered or offered, the proposed date of filing of such registration statement or the conduct of such underwritten offering, any proposed means of distribution of such securities, any proposed managing underwriter of such securities and a good faith estimate by the Company of the proposed maximum offering price of such securities as such price is proposed to appear on the facing page of such registration statement, and shall offer the Holders the opportunity to register such amount of Registrable Securities as each Holder may request on the same terms and conditions as the registration of the Company's and/or the holders of other securities of the Company securities, as the case may be (a "*Piggyback Offering*"). Subject to Section 6(c), the Company will include in each Piggyback Offering all Registrable Securities for which the Company has received written requests for inclusion within five (5) Business Days after the date the Piggyback Notice is given; *provided, however,* that in the case of the filing of a registration statement, such Registrable Securities are not otherwise registered pursuant to an existing and effective Shelf Registration Statement under this Agreement, but in such case, the Company shall include such Registrable Securities in such underwritten offering if the Shelf Registration Statement may be utilized for the offering and sale of the Registrable Securities requested to be offered; and *provided further* that, in the case of an underwritten offering in the form of a "takedown" under a shelf registration statement, such Registrable Securities are covered by an existing and effective Shelf Registration Statement that may be utilized for the offering and sale of the Registrable Securities requested to be offered.

(c)     The Company will cause the managing underwriter of the proposed offering to permit the Holders that have requested Registrable Securities to be included in the Piggyback Offering to include all such Registrable Securities on the same terms and conditions as any similar securities, if any, of the Company. Notwithstanding the foregoing, if the managing underwriter or underwriters of such underwritten offering advises the Company and the selling Holders in writing that, in its view, the total amount of securities that the Company, such Holders and any other holders entitled to participate in such offering ("*Other Holders*") propose to include in such offering is such as to adversely affect the success of such underwritten offering, then:

(A)     if such Piggyback Offering is an underwritten primary offering by the Company for its own account, the Company will include in such Piggyback Offering: (i) *first*, all securities to be offered by the Company; and (ii) *second*, up to the full amount of securities requested to be included in such Piggyback Offering by the Holders and all Other Holders, allocated pro rata among such Holders and such Other Holders on the basis of the amount of securities requested to be included therein by each of them;

12

(B)    if such Piggyback Offering is an underwritten secondary offering for the account of Other Holders exercising "demand" rights (including pursuant to a Demand Registration Request), the Company will include in such registration: (i) *first*, all securities of the Other Holder exercising "demand" rights (including pursuant to a Demand Registration Request) requested to be included therein; (ii) *second*, up to the full amount of securities proposed to be included in the registration by the Company; and (C) *third*, up to the full amount of securities requested to be included in such Piggyback Offering by the Holders and any Other Holders entitled to participate therein, allocated pro rata among such Holders and Other Holders on the basis of the amount of securities requested to be included therein by each such Holder or Other Holder;

such that, in each case, the total amount of securities to be included in such Piggyback Offering is the full amount that, in the view of such managing underwriter, can be sold without adversely affecting the success of such Piggyback Offering.

(d)    If at any time after giving the Piggyback Notice and prior to the time sales of securities are confirmed pursuant to the Piggyback Offering, or in the case the Company determines for any reason not to register or delay the registration of the Piggyback Offering, the Company may, at its election, give notice of its determination to all Holders, and in the case of such a determination, will be relieved of its obligation to register any Registrable Securities in connection with the abandoned or delayed Piggyback Offering, without prejudice.

(e)    Any Holder of Registrable Securities requesting to be included in a Piggyback Offering may withdraw its request for inclusion by giving written notice to the Company, at least three (3) Business Days prior to the anticipated Effective Date of the Registration Statement filed in connection with such Piggyback Offering, or in the case of a Piggyback Offering constituting a "takedown" off of a shelf registration statement, at least three (3) Business Days prior to the anticipated date of the filing by the Company under Rule 424 of a supplemental prospectus with respect to such offering, of its intention to withdraw from that registration; *provided*, *however*, that (i) the Holder's request be made in writing and (ii) the withdrawal will be irrevocable and, after making the withdrawal, a Holder will no longer have any right to include its Registrable Securities in that Piggyback Offering.

7.    <u>Registration Procedures</u>. If and when the Company is required to effect any registration under the Securities Act as provided in <u>Sections 2(a)</u>, <u>3(a)</u> or <u>4</u> of this Agreement, the Company shall use its reasonable best efforts to:

(a)    prepare and file with the Commission the requisite Registration Statement to effect such registration and thereafter use its reasonable best efforts to cause such Registration Statement to become and remain effective, subject to the limitations contained herein;

(b)    prepare and file with the Commission such amendments and supplements to such Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement effective and to comply with the provisions of the Securities Act and the Exchange Act with respect to the disposition of all Registrable Securities covered by such Registration Statement until such time as all of

13

such Registrable Securities have been disposed of in accordance with the method of disposition set forth in such Registration Statement, subject to the limitations contained herein;

(c)      (i) before filing a Registration Statement or Prospectus or any amendments or supplements thereto, at the Company's expense, furnish to the Holders whose securities are covered by the Registration Statement copies of all such documents, other than documents that are incorporated by reference, proposed to be filed and such other documents reasonably requested by such Holders (which may be furnished by email), and afford Counsel to the Holders a reasonable opportunity to review and comment on such documents; and (ii) in connection with the preparation and filing of each such Registration Statement pursuant to this Agreement, (A) upon reasonable advance notice to the Company, give each of the foregoing such reasonable access to all financial and other records, corporate documents and properties of the Company as shall be necessary, in the reasonable opinion of counsel to such Holders and such underwriters, to conduct a reasonable due diligence investigation for purposes of the Securities Act, and (B) upon reasonable advance notice to the Company and during normal business hours, provide such reasonable opportunities to discuss the business of the Company with its officers, directors, employees and the independent public accountants who have certified its financial statements as shall be necessary, in the reasonable opinion of such counsel to such Holders and such underwriters, to conduct a reasonable due diligence investigation for purposes of the Securities Act;

(d)      notify each selling Holder of Registrable Securities, promptly after the Company receives notice thereof, of the time when such Registration Statement has been declared effective or a supplement to any Prospectus forming a part of such Registration Statement has been filed;

(e)      furnish to each selling Holder of Registrable Securities, and the managing underwriters, without charge, such number of copies of the applicable Registration Statement, each amendment and supplement thereto, the Prospectus included in such Registration Statement (including each preliminary Prospectus, final Prospectus, and any other Prospectus (including any Prospectus filed under Rule 424, Rule 430A or Rule 430B promulgated under the Securities Act and any "issuer free writing prospectus" as such term is defined under Rule 433 promulgated under the Securities Act), all exhibits and other documents filed therewith and such other documents as such seller or such managing underwriters may reasonably request including in order to facilitate the disposition of the Registrable Securities owned by such seller, and upon request, a copy of any and all transmittal letters or other correspondence to or received from, the Commission or any other governmental authority relating to such offer;

(f)      (i) register or qualify all Registrable Securities and other securities, if any, covered by such Registration Statement under such other securities or blue sky laws of such states or other jurisdictions of the United States of America as the Holders covered by such Registration Statement shall reasonably request in writing, (ii) keep such registration or qualification in effect for so long as such Registration Statement remains in effect and (iii) take any other action that may be necessary or reasonably advisable to

14

enable such Holders to consummate the disposition in such jurisdictions of the securities to be sold by such Holders, except that the Company shall not for any such purpose be required to qualify generally to do business as a foreign corporation in any jurisdiction wherein it would not but for the requirements of this subsection (f) be obligated to be so qualified, to subject itself to taxation in such jurisdiction or to consent to general service of process in any such jurisdiction;

(g)     cause all Registrable Securities included in such Registration Statement to be registered with or approved by such other federal or state governmental agencies or authorities as necessary upon the opinion of counsel to the Company or Counsel to the Holders of Registrable Securities included in such Registration Statement to enable such Holder or Holders thereof to consummate the disposition of such Registrable Securities in accordance with their intended method of distribution thereof;

(h)     obtain and, if obtained, furnish to each Holder that is named as an underwriter in the offering and each other underwriter thereof, a signed

(A)     opinion of counsel for the Company, dated the date of the closing under the underwriting agreement and addressed to the underwriters, reasonably satisfactory (based on the customary form and substance of opinions of issuers' counsel customarily given in such an offering) in form and substance to such Holder and such underwriters, if any, and

(B)     "cold comfort" letter, dated the Effective Date of such Registration Statement (and, if such registration is an Underwritten Offering, dated the date of the closing under the underwriting agreement and addressed to the underwriters) and signed by the independent public accountants who have certified the Company's financial statements included or incorporated by reference in such registration statement, reasonably satisfactory (based on the customary form and substance of "cold comfort" letters of issuers' independent public accountant customarily given in such an offering) in form and substance to such Holder and such underwriters, if any, in each case, covering substantially the same matters with respect to such Registration Statement (and the Prospectus included therein) and, in the case of the accountants' comfort letter, with respect to events subsequent to the date of such financial statements, as are customarily covered in opinions of issuer's counsel and in accountants' comfort letters delivered to underwriters in such types of offerings of securities;

(i)     notify each Holder of Registrable Securities included in such Registration Statement and other securities covered by such Registration Statement, if any, at any time when a Prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made and for which the Company chooses to suspend the use of the Registration Statement and Prospectus in accordance with the

15

terms of this Agreement, at the written request of any such Holder, promptly prepare and furnish to it a reasonable number of copies of a supplement to or an amendment of such Prospectus as may be necessary so that, as thereafter delivered to the purchasers of such securities, such Prospectus, as supplemented or amended, shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made;

(j)      notify the Holders of Registrable Securities included in such Registration Statement and other securities covered by such Registration Statement promptly of any request by the Commission for the amending or supplementing of such Registration Statement or Prospectus or for additional information;

(k)      advise the Holders of Registrable Securities included in such Registration Statement and other securities covered by such Registration Statement, promptly after it shall receive notice or obtain knowledge thereof and promptly use its reasonable best efforts to obtain the withdrawal of any order suspending the effectiveness of a registration statement relating to the Registrable Securities at the earliest practicable moment;

(l)      otherwise comply with all applicable rules and regulations of the Commission and any other governmental agency or authority having jurisdiction over the offering, and make available to its stockholders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve (12) months, but not more than eighteen (18) months, beginning with the first (1st) full calendar month after the Effective Date of such Registration Statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 promulgated thereunder, and furnish to each Holder and to the managing underwriter, if any, at least ten (10) days prior to the filing thereof (or such shorter time period reasonably necessary in light of applicable legal requirements) a copy of any amendment or supplement to such Registration Statement or Prospectus;

(m)     cause all Registrable Securities included in a Registration Statement (i) to be listed on a national securities exchange on which similar securities issued by the Company are then listed, if the listing of such Registrable Securities is then permitted under the rules of such exchange, or (ii) if the Company is not required pursuant to clause (i) above to list Registrable Securities on a specific national securities exchange, use its reasonable best efforts to list the Registrable Securities on a national securities exchange;

(n)      provide and cause to be maintained a transfer agent and registrar for the Registrable Securities included in a Registration Statement no later than the Effective Date thereof;

(o)      enter into such agreements (including an underwriting agreement in customary form) and take such other actions as the Holders beneficially owning a majority of the Registrable Securities included in a Registration Statement or the underwriters, if any, shall reasonably request in order to expedite or facilitate the

16

KL2 2845173.6

disposition of such Registrable Securities, including customary indemnification; and provide reasonable cooperation, including causing appropriate officers to attend and participate in "road shows" and other information meetings organized by the underwriters, if any, as reasonably requested; *provided, that* the Company shall have no obligation to participate in more than two (2) "road shows" in any twelve (12)-month period and such participation shall not unreasonably interfere with the business operations of the Company;

(p)    if requested by the managing underwriter(s) or the Holders beneficially owning a majority of the Registrable Securities being sold in connection with an Underwritten Offering, promptly incorporate in a prospectus supplement or post-effective amendment such information relating to the plan of distribution for such shares of Registrable Securities provided to the Company in writing by the managing underwriters) and the Holders of a majority of the Registrable Securities being sold and that is required to be included therein relating to the plan of distribution with respect to such Registrable Securities, including without limitation, information with respect to the number of Registrable Securities being sold to such underwriters, the purchase price being paid therefor by such underwriters and with respect to any other terms of the Underwritten Offering of the Registrable Securities to be sold in such offering, and make any required filings with respect to such information relating to the plan of distribution as soon as practicable after notified of the information;

(q)    cooperate with the Holders of Registrable Securities included in a Registration Statement and the managing underwriter(s), if any, to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be sold and not bearing any restrictive legends, and enable such Registrable Securities to be in such share amounts and registered in such names as the managing underwriters, or, if none, the Holders beneficially owning a majority of the Registrable Securities being offered for sale, may reasonably request at least three (3) Business Days prior to any sale of Registrable Securities to the underwriters; and

(r)    otherwise use its reasonable best efforts to take all other steps necessary to effect the registration of such Registrable Securities contemplated hereby.

In addition, at least ten (10) Trading Days prior to the first anticipated filing date of a Registration Statement for any registration under this Agreement, the Company will notify each Holder of the information the Company requires from that Holder, including any update to or confirmation of the information contained in the Selling Stockholder Questionnaire, if any, which shall be completed and delivered to the Company promptly upon request and, in any event, within five (5) Trading Days prior to the applicable anticipated filing date. Each Holder further agrees that it shall not be entitled to be named as a selling securityholder in the Registration Statement or use the Prospectus for offers and resales of Registrable Securities at any time, unless such Holder has returned to the Company a completed and signed Selling Stockholder Questionnaire and a response to any requests for further information as described in the previous sentence and, if an Underwritten Offering, entered into an underwriting agreement with the underwriters in accordance with Section 4(b) and Section 9. If a Holder of Registrable Securities returns a Selling Stockholder Questionnaire or a request for further information, in

17

either case, after its respective deadline, the Company shall be permitted to exclude such Holder from being a selling security holder in the Registration Statement or any pre-effective or post-effective amendment thereto. Each Holder acknowledges and agrees that the information in the Selling Stockholder Questionnaire or request for further information as described in this Section 7 will be used by the Company in the preparation of the Registration Statement and hereby consents to the inclusion of such information in the Registration Statement.

8.      Registration Expenses. All fees and expenses incident to the Company's performance of or compliance with its obligations under this Agreement (excluding any underwriting discounts, fees or selling commissions or broker or similar commissions or fees of any Holder) shall be borne by the Company whether or not any Registrable Securities are sold pursuant to a Registration Statement. The fees and expenses referred to in the foregoing sentence shall include, without limitation, (i) all registration and filing fees (including, without limitation, fees and expenses (A) with respect to filings required to be made with any Trading Market on which the Common Stock is then listed for trading, (B) with respect to compliance with applicable state securities or Blue Sky laws (including, without limitation, fees and disbursements of counsel for the Company in connection with Blue Sky qualifications or exemptions of the Registrable Securities and determination of the eligibility of the Registrable Securities for investment under the laws of such jurisdictions as requested by the Holders) and (C) if not previously paid by the Company in connection with an Issuer Filing, with respect to any filing that may be required to be made by any broker through which a Holder intends to make sales of Registrable Securities with the Financial Industry Regulatory Authority ("*FINRA*") pursuant to the FINRA Rule 5110, so long as the broker is receiving no more than a customary brokerage commission in connection with such sale, (ii) printing expenses (including, without limitation, expenses of printing certificates for Registrable Securities and of printing prospectuses if the printing of prospectuses is reasonably requested by the Holders of a majority of the Registrable Securities included in the Registration Statement), (iii) messenger, telephone and delivery expenses, (iv) fees and disbursements of counsel for the Company, (v) the reasonable fees and expenses incurred in connection with any road show for underwritten offerings, (vi) Securities Act liability insurance, if the Company so desires such insurance, and (vii) fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement.  In addition, the Company will pay the reasonable fees and disbursements of the Counsel to the Holders, including, for the avoidance of doubt, any expenses of Counsel to the Holders in connection with the filing or amendment of any Registration Statement, Prospectus or free writing prospectus hereunder.

9.      Lockups.  In connection with any Underwritten Takedown or underwritten registration pursuant to a Demand Registration Request or other underwritten public offering of equity securities by the Company, except with the written consent of the underwriters managing such offering, no Holder who participates in such offering or beneficially owns five percent (5%) or more of the outstanding shares of Common Stock at such time and a number of Registrable Securities that exceeds one percent (1%) of the Initial Registrable Securities Number shall effect any public sale or distribution (including sales pursuant to Rule 144) of equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, without prior written consent from the Company, during the seven (7) days prior to and the ninety (90)-day period beginning on the date of closing of such offering (the "*Lockup Period*"), except as part of such offering, provided, that such Lockup Period restrictions are

18

KL2 2845173.6

applicable on substantially similar terms to the Company and all of its and its subsidiaries' executive officers and directors; provided that nothing herein will prevent any Holder from making a distribution of Registrable Securities to any of its partners, members or stockholders thereof or a transfer of Registrable Securities to an Affiliate or Related Fund that is otherwise in compliance with the applicable securities laws, so long as such distributees or transferees, as applicable, agree to be bound by the restrictions set forth in this Section 9. Each Holder agrees to execute a lock-up agreement in favor of the Company's underwriters to such effect and, in any event, that the Company's underwriters in any relevant offering shall be third party beneficiaries of this Section 9. The provisions of this Section 9 will no longer apply to a Holder once such Holder ceases to hold Registrable Securities.

10.    Indemnification.

(a)    Indemnification by the Company. The Company shall, notwithstanding any termination of this Agreement, indemnify, defend and hold harmless each Holder, the officers, directors, agents, partners, members, managers, stockholders, Affiliates and employees of each of them, each Person who controls any such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, partners, members, managers, stockholders, agents and employees of each such controlling Person, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, reasonable costs of preparation and investigation and reasonable attorneys' fees) and expenses (collectively, "*Losses*"), to which any of them may become subject, that arise out of or are based upon (i) any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus or (ii) any omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or form of prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading, except to the extent, but only to the extent, that (A) such untrue statements, alleged untrue statements, omissions or alleged omissions are based upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein, or to the extent that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was provided by such Holder expressly for use in the Registration Statement, such Prospectus or such form of Prospectus or in any amendment or supplement thereto, or (B) in the case of an occurrence of an event of the type specified in Section 7(i), related to the use by a Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of the Advice contemplated and defined in Section 14(c) below, but only if and to the extent that following the receipt of the Advice the misstatement or omission giving rise to such Loss would have been corrected. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an Indemnified Party (as defined in Section 9(c)), shall survive the transfer of the Registrable Securities by the Holders, and shall be in addition to any liability which the Company may otherwise have.

(b)    Indemnification by Holders. Each Holder shall, severally and not jointly, indemnify and hold harmless the Company, its directors, officers, agents and employees, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and

19

Section 20 of the Exchange Act), and the directors, officers, agents or employees of such controlling Persons, to the fullest extent permitted by applicable law, from and against all Losses, as incurred, arising out of or are based upon any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus, or any form of prospectus, or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus, or any form of prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading (i) to the extent, but only to the extent, that such untrue statements or omissions are based upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein or (ii) to the extent, but only to the extent, that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was provided by such Holder expressly for use in a Registration Statement, such Prospectus or such form of Prospectus or in any amendment or supplement thereto or (iii) in the case of an occurrence of an event of the type specified in Section 7(i), to the extent, but only to the extent, related to the use by such Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of the Advice contemplated in Section 14(c), but only if and to the extent that following the receipt of the Advice the misstatement or omission giving rise to such Loss would have been corrected. In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation.

(c)     Conduct of Indemnification Proceedings. If any Proceeding shall be brought or asserted against any Person entitled to indemnity hereunder (an "*Indemnified Party*"), such Indemnified Party shall promptly notify the Person from whom indemnity is sought (the "*Indemnifying Party*") in writing, and the Indemnifying Party shall have the right to assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all reasonable fees and expenses incurred in connection with defense thereof; *provided*, that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that such failure shall have materially and adversely prejudiced the Indemnifying Party.

An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless: (1) the Indemnifying Party has agreed in writing to pay such fees and expenses; (2) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding; or (3) the named parties to any such Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by counsel that in the reasonable judgment of such counsel a conflict of interest exists if the same counsel were to represent such Indemnified Party and the Indemnifying Party; *provided*, that the Indemnifying Party shall not be liable for the reasonable and documented fees and expenses of more than one separate firm of attorneys at any time for all Indemnified Parties. The Indemnifying Party shall not be liable for any settlement of any such Proceeding effected without its written consent,

20

KL2 2845173.6

which consent shall not be unreasonably withheld, delayed or conditioned. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding.

Subject to the terms of this Agreement, all reasonable and documented fees and expenses of the Indemnified Party (including reasonable and documented fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section 10(c)) shall be paid to the Indemnified Party, as incurred, with reasonable promptness after receipt of written notice thereof to the Indemnifying Party; *provided*, that the Indemnified Party shall promptly reimburse the Indemnifying Party for that portion of such fees and expenses applicable to such actions for which such Indemnified Party is finally judicially determined to not be entitled to indemnification hereunder. The failure to deliver written notice to the Indemnifying Party within a reasonable time of the commencement of any such action shall not relieve such Indemnifying Party of any liability to the Indemnified Party under this Section 10, except to the extent that the Indemnifying Party is materially and adversely prejudiced in its ability to defend such action.

(d)     Contribution. If a claim for indemnification under Section 10(a) or 10(b) is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless for any Losses, then each Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 10(d) were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this Section 10(d), no Holder shall be required to contribute, in the aggregate, any amount in excess of the amount by which the net proceeds actually received by such Holder from the sale of the Registrable Securities subject to the Proceeding exceeds the amount of any damages that such Holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

11.     Rule 144 and Rule 144A; Other Exemptions. With a view to making available to the Holders of Registrable Securities the benefits of Rule 144 and Rule 144A promulgated under

21

KL2 2845173.6

the Securities Act and other rules and regulations of the Commission that may at any time permit a Holder of Registrable Securities to sell securities of the Company to the public without registration, until the later of (a) the first anniversary hereof and (b) such time as the Company is no longer subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, the Company covenants that it will (i) file in a timely manner all reports and other documents required, if any, to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted thereunder or (ii) make available information necessary to comply with Rule 144 and Rule 144A, if available with respect to resales of the Registrable Securities under the Securities Act, at all times, all to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by (x) Rule 144 and Rule 144A promulgated under the Securities Act (if available with respect to resales of the Registrable Securities), as such rules may be amended from time to time or (y) any other rules or regulations now existing or hereafter adopted by the Commission.  Upon the reasonable request of any Holder of Registrable Securities, the Company will deliver to such Holder a written statement as to whether it has complied with such information requirements, and, if not, the specific reasons for non-compliance.

12.     <u>Transfer of Registration Rights</u>.   Any Holder may freely assign its rights hereunder on a pro rata basis in connection with any sale, transfer, assignment, or other conveyance (any of the foregoing, a "<u>Transfer</u>") of Registrable Securities to any transferee or assignee; <u>provided</u> that all of the following additional conditions are satisfied:  (a) such Transfer is effected in accordance with applicable securities laws; (b) such transferee or assignee agrees in writing to become subject to the terms of this Agreement; and (c) the Company is given written notice by such Holder of such Transfer, stating the name and address of the transferee or assignee and identifying the Registrable Securities with respect to which such rights are being transferred or assigned; and further provided, that (i) any rights assigned hereunder shall apply only in respect of the Registrable Securities that are Transferred and not in respect of any other securities that the transferee or assignee may hold, (ii) any Registrable Securities that are Transferred may cease to constitute Registrable Securities following such Transfer in accordance with the terms of this Agreement ,and (iii) no rights pursuant to <u>Section 3</u> hereof may be assigned by a Holder except (A) to an Affiliate of such Holder or (B) in connection with the Transfer by such Holder of ten percent (10%) or more of the outstanding Common Stock of the Company to a single transferee in a private placement.

13.     <u>Further Assurances</u>.   Each of the parties hereto shall execute all such further instruments and documents and take all such further action as any other party hereto may reasonably require in order to effectuate the terms and purposes of this Agreement.

14.     <u>Miscellaneous</u>.

(a)     <u>Remedies</u>. Any Person having rights under any provision of this Agreement shall be entitled to enforce such rights specifically to recover damages caused by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or other

22

security) for specific performance and for other injunctive relief in order to enforce or prevent violation of the provisions of this Agreement.

(b)        Compliance. Each Holder covenants and agrees that it will comply with the prospectus delivery requirements of the Securities Act as applicable to it (unless an exemption therefrom is available) in connection with sales of Registrable Securities pursuant to any Registration Statement and shall sell the Registrable Securities only in accordance with a method of distribution described in each Registration Statement

(c)        Discontinued Disposition. By its acquisition of Registrable Securities, each Holder agrees that, upon receipt of a notice from the Company of the occurrence of a Grace Period or any event of the kind described in Section 7(i), such Holder will forthwith discontinue disposition of such Registrable Securities under a Registration Statement until it is advised in writing (the "*Advice*") by the Company that the use of the applicable Prospectus (as it may have been supplemented or amended) may be resumed. The Company may provide appropriate stop orders to enforce the provisions of this paragraph.

(d)        Preservation of Rights.  The Company shall not grant any registration rights to third parties which are more favorable than or inconsistent with the rights granted hereunder unless any such more favorable rights are concurrently added to the rights granted hereunder.

(e)        No Inconsistent Agreements. The Company shall not hereafter enter into any agreement with respect to its securities which is inconsistent with or violates the rights granted to the Holders in this Agreement.

(f)        Amendments and Waivers. The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, or waived unless the same shall be in writing and signed by the Company and Holders holding at least a majority of the then outstanding Registrable Securities; *provided, however,* that any party may give a waiver as to itself; *provided further* that no amendment, modification, supplement, or waiver that disproportionately and adversely affects, alters, or changes the interests of any Holder shall be effective against such Holder without the prior written consent of such Holder; and *provided further* that the waiver of any provision with respect to any Registration Statement or offering may be given by Holders holding at least a majority of the then outstanding Registrable Securities entitled to participate in such offering or, if such offering shall have been commenced, having elected to participate in such offering.  Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of certain Holders (e.g., Demand Holders) and that does not directly or indirectly affect the rights of other Holders may be given by Holders of a majority of the Registrable Securities to which such waiver or consent relates; *provided, however*, that the provisions of this sentence may not be amended, modified, or supplemented except in accordance with the provisions of the immediately preceding sentence.  No waiver of any terms or conditions of this Agreement shall operate as a waiver of any other breach of such terms and conditions or any other term or condition, nor shall any failure to enforce any provision hereof operate as a waiver of such provision or of any other provision hereof.  No written waiver hereunder, unless it by its own terms explicitly provides to the contrary, shall be construed to effect a continuing waiver of the provisions being waived and no such waiver in any instance shall constitute a waiver in any other

23

instance or for any other purpose or impair the right of the party against whom such waiver is claimed in all other instances or for all other purposes to require full compliance with such provision. The failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of such provision and shall not affect the right of such party thereafter to enforce each provision of this Agreement in accordance with its terms.

(g)     Notices. Any notice or other communication required or which may be given hereunder shall be in writing and shall be sent by certified or regular mail, by private national courier service (return receipt requested, postage prepaid), by personal delivery or by facsimile transmission. Such notice or communication shall be deemed given (i) if mailed, two days after the date of mailing, (ii) if sent by national courier service, one Business Day after being sent, (iii) if delivered personally, when so delivered, or (iv) if sent by facsimile transmission, on the Business Day after such facsimile is transmitted, in each case as follows:

(A)     If to the Company:

Genco Shipping & Trading Limited
299 Park Avenue, 12th Floor
New York, New York 10171
Facsimile: (646) 443-8551
Attention: John C. Wobensmith

with a copy (which shall not constitute notice) to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Facsimile: (212) 715-8000
Attention: Thomas E. Molner

(B)     If to the Holders (or to any of them), at their addresses as they appear in the in the records of the Company or the records of the transfer agent or registrar, if any, for the Common Stock.

If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the State of New York or the jurisdiction in which the Company's principal office is located, the time period shall automatically be extended to the Business Day immediately following such Saturday, Sunday or legal holiday.

(h)     Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns (including any trustee in bankruptcy). In addition, and whether or not any express assignment shall have been made, the provisions of this Agreement which are for the benefit of the Holders of Registrable Securities (or any portion thereof) as such shall be for the benefit of and enforceable by any subsequent holder of any Registrable Securities (or of such portion thereof); *provided*, that such subsequent holder of Registrable Securities shall be required to execute a joinder to this Agreement in form and substance reasonably satisfactory to the Company

24

KL2 2845173.6

agreeing to be bound by its terms. No assignment or delegation of this Agreement by the Company, or any of the Company's rights, interests or obligations hereunder, shall be effective against any Holder without the prior written consent of such Holder.

(i)        Execution and Counterparts. This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same Agreement.

(j)        Delivery by Facsimile. This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other electronic means, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

(k)        Governing Law; Venue. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) to the extent such rules or provisions would cause the application of the laws of any jurisdiction other than the State of New York. Each of the parties to this Agreement consents and agrees that any action to enforce this Agreement or any dispute, whether such dispute arises in law or equity, arising out of or relating to this Agreement shall be brought exclusively in the United States District Court for the Southern District of New York or any New York State Court sitting in New York City. The parties hereto consent and agree to submit to the exclusive jurisdiction of such courts. Each of the parties to this Agreement waives and agrees not to assert in any such dispute, to the fullest extent permitted by applicable law, any claim that (i) such party and such party's property is immune from any legal process issued by such courts or (ii) any litigation or other proceeding commenced in such courts is brought in an inconvenient forum. The parties hereby agree that mailing of process or other papers in connection with any such action or proceeding to an address provided in writing by the recipient of such mailing, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof and hereby waive any objections to service in the manner herein provided.

(l)        Waiver of Jury Trial. Each of the parties to this Agreement hereby agrees to waive its respective rights to a jury trial of any claim or cause of action based upon or arising out of this Agreement. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this Agreement, including contract claims, tort claims and all other common law and statutory claims. Each party hereto acknowledges that this waiver is a material inducement to enter into this Agreement, that each has already relied on this waiver in entering into this Agreement, and that each will

25

KL2 2845173.6

continue to rely on this waiver in their related future dealings.  Each party hereto further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 14(l) AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.  In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

(m)     Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(n)     Descriptive Headings; Interpretation; No Strict Construction.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement.  Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns, pronouns, and verbs shall include the plural and vice versa.  Reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and, if applicable, hereof.  The words "include", "includes" or "including" in this Agreement shall be deemed to be followed by "without limitation".  The use of the words "or," "either" or "any" shall not be exclusive.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  All references to laws, rules, regulations and forms in this Agreement shall be deemed to be references to such laws, rules, regulations and forms, as amended from time to time or, to the extent replaced, the comparable successor thereto in effect at the time.  All references to agencies, self-regulatory organizations or governmental entities in this Agreement shall be deemed to be references to the comparable successors thereto from time to time.

(o)     Entire Agreement.  This Agreement and any certificates, documents, instruments and writings that are delivered pursuant hereto, constitutes the entire agreement and understanding of the parties in respect of the subject matter hereof and supersedes all prior understandings, agreements or representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter hereof.

(p)     Termination.  The obligations of the Company and of any Holder, other than those obligations contained in Section 10 and this Section 14, shall terminate with respect to the Company and such Holder as soon as such Holder no longer beneficially owns any Registrable Securities.

26

KL2 2845173.6

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

**GENGO SHIPPING & TRADING LIMITED**

By:    _____
Name:
Title:

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK,
SIGNATURE PAGES OF HOLDERS TO FOLLOW]

27

IN WITNESS WHEREOF, the undersigned parties have executed this Registration Rights Agreement as of the date first written above.

HOLDERS:[1]

**[Holder Name]**

By:_____
Name:
Title:

☐    By checking this box, the Holder signing above hereby requests the inclusion of **all** of its Registrable Securities in the Initial Shelf Registration Statement.

☐    By checking this box, the Holder signing above hereby requests the inclusion of _____ of its Registrable Securities in the Initial Shelf Registration Statement, constituting **less than all** of its Registrable Securities.

---

[1] Peter Georgiopoulos and Fleet Acquisition LLC to be added as non-Demand Holders; backstop parties under the Equity Commitment Agreement also to be added (unless they elect not to be).

28

KL2 2845173.6