UNITED STATES BANKRUPTCY COURT                    FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

In re:                                            Chapter 11

GENCO SHIPPING & TRADING LIMITED, *et al.*,       Case No. 14-11108 (SHL)

                          Debtors.                (Jointly Administered)

--------------------------------------------------------------------X

**MEMORANDUM OPINION GRANTING DEBTORS' MOTION FOR ENTRY OF AN
ORDER (A) AUTHORIZING THE ASSUMPTION OF THE RESTRUCTURING
SUPPORT AGREEMENT; (B) APPROVING PAYMENT OF THE TERMINATION
FEE; AND (C) GRANTING RELATED RELIEF**

**A P P E A R A N C E S :**

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
*Counsel for the Debtors*
1177 Avenue of the Americas
New York, NY 10036
By:    Kenneth H. Eckstein, Esq.
       Adam C. Rogoff, Esq.
       Stephen D. Zide, Esq.
       Anupama Yerramalli, Esq.

**AKIN GUMP STRAUSS HAUER & FELD LLP**
*Counsel for Informal Convertible Noteholder Group*
One Bryant Park
New York, NY 10036
By:    Michael S. Stamer, Esq.
       Sarah Link Schultz, Esq.

**MILBANK, TWEED, HADLEY & MCCLOY LLP**
*Counsel for Wilmington Trust Company*
One Chase Manhattan Plaza
New York, NY 10005
By:    Brian Kinney
       Dennis F. Dunne
       Samuel A. Khalil

**KIRKLAND & ELLIS LLP**
*Counsel for Och-Ziff Management LP*
601 Lexington Avenue
New York, NY 10022
By:    Christopher J. Marcus, Esq.
       Paul M. Basta, Esq.
       Eric F. Leon, Esq.

**BROWN RUDNICK LLP**
*Counsel for Ad Hoc Consortium of Equity Holders*
Seven Times Square
New York, NY 10036
By:    William R. Baldiga, Esq.

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
*Counsel for Deutsche Bank as Pre-Petition Lender, and Credit Agricole, Corporate Investment
Bank, as Post-Petition Bankruptcy Lender*
1152 15th Street, NW
Washington, DC 20005
By:    Douglas S. Mintz, Esq.

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
*Counsel for Agents for the Pre-Petition $100 Million and $253 Million Credit Facilities*
1285 Avenue of the Americas
New York, NY 10019
By:    Alan W. Kornberg, Esq.
       Sarah Harnett, Esq.

**UNITED STATES DEPARTMENT OF JUSTICE**
*Office of the United States Trustee*
201 Varick Street
Suite 1006
New York, NY 10014
By:    Andrew Velez-Rivera
       Michael T. Driscoll

**DECHERT LLP**
*Counsel for Entities Managed by Aurelius Capital Management, LP*
1095 Avenue of the Americas
New York, NY 10036
By:    Allan S. Brilliant, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRRTUPCY JUDGE**

Before the Court is the motion (the "Motion") (ECF No. 13) of the above-captioned

debtors (the "Debtors") seeking authorization to assume a restructuring support agreement (the

"RSA"). The RSA forms the basis of the Debtors' prepackaged plan of reorganization by

providing for a global resolution of this bankruptcy. The RSA is an agreement among the

Debtors and the majority of their creditors, including their secured creditors who are owed more

than $1 billion. It also embodies a settlement with the Debtors' unsecured note holders, while

leaving unimpaired the Debtors' unsecured trade creditors and providing for some recovery to

equity holders. For the reasons stated below, the Court grants the Motion because it finds that

the RSA is a valid exercise of the Debtors' business judgment. This ruling is without prejudice

to any party's right to object to the plan at confirmation.[1]

## BACKGROUND

Genco Shipping and Trading Limited and its affiliated Debtors (collectively, "Genco") is

one of the world's largest drybulk shippers, operating with a fleet of 53 shipping vessels. Genco

has a highly leveraged capital structure, with over $1.3 billion of senior secured debt and $125

million of unsecured convertible notes. The senior secured debt is held in three separate credit

facilities. The first is known as the "2007 Credit Facility," with Wilmington Trust, National

Association serving as agent, under which the Debtors owe approximately $1.056 billion

(exclusive of interest). The 2007 Credit Facility holds a first and second lien on substantially all

of the Debtors' assets. The second facility is referred to as the "$100 Million Credit Facility,"

with Credit Agricole serving as agent, under which approximately $73.6 million is owed

(exclusive of interest). The $100 Million Credit Facility holds a first lien on the five vessels

---

[1]    This written decision memorializes the bench ruling issued after a hearing on April 23, 2014. Because it
originated as an oral decision, it has a more conversational tone.

purchased with the proceeds of its loan.  Finally, there is the "$253 Million Credit Facility," with

Deutsche Bank serving as agent, under which approximately $175.7 million is owed (exclusive

of interest).  The $253 Million Credit Facility is secured by liens on thirteen vessels purchased

with the proceeds of the loan.  In addition to these three levels of secured debt, Genco also has

convertible unsecured notes, in the amount of $125 million, that reach maturity in August 2015.

Genco also owes various ordinary course creditors, including charterers, vendors and suppliers,

all of whom are unsecured.

On April 21, 2014, the Debtors filed voluntary petitions in this Court seeking relief under

Chapter 11 of the Bankruptcy Code (ECF No. 1).  The filing is a prepackaged Chapter 11 case,

pursuant to which Genco seeks to implement a consensual debt conversion restructuring that is

supported by the majority of the Debtors' lenders.  In the instant Motion, the Debtors seek court

approval to assume the RSA.

**The RSA**

Prior to the petition date, Genco negotiated the RSA, establishing the framework for a

prepackaged plan of reorganization that would deleverage Genco's balance sheet and provide

new liquidity through a fully backstopped $100 million rights offering.  *See generally* RSA, Ex.

2 to Motion (ECF No. 13).  The RSA was executed on April 3, 2014, by the Debtors and

approximately 98% of the lenders under the 2007 Credit Facility, 100% of the $100 Million

Facility Lenders and $253 Million Facility Lenders, and approximately 82% of the holders of

Convertible Notes.

Under the RSA, Genco is required to: (i) support and use commercially reasonable efforts

to complete the restructuring contemplated under the RSA; (ii) take no action that is inconsistent

with the RSA, the Restructuring Term Sheet, the Prepack Plan,[2] or that would cause

unreasonable delays; (iii) not to support any other plan or transaction (unless covered by the

Debtors' fiduciary out, which is discussed below); (iv) pay the reasonable and documented fees

and expenses of certain advisors to the supporting noteholders and lenders; and (v) take no action

that would be reasonably expected to breach the RSA or interfere with the restructuring.  *See*

RSA § 2(a).  In turn, the supporting creditors are required to: (i) support approval of the Prepack

Plan, disclosure statement, and the restructuring; (ii) timely vote to accept the Prepack Plan and

not later withdraw or change their vote; (iii) take no actions in opposition to the Prepack Plan or

the solicitation of it; (iv) waive and release any rights to exercise remedies against any collateral

of the Debtors in connection with the applicable debt instruments or otherwise applicable non-

bankruptcy law as of the effective date of the Prepack Plan (except as provided in the Plan); and

(v) take no action against the Debtors or any collateral that constitutes an enforcement action or

remedy.  *See* RSA § 2(b).

    Through the RSA, the Debtors also obtained agreement for consensual use of cash

collateral.  At the hearing held on April 23, 2014, the Debtors established that, absent the use of

cash collateral, they would have insufficient funds to pay employees, maintain business

relationships with vendors and suppliers, and otherwise could not finance their operations.  The

Court entered an order approving the use of cash collateral on April 23, 2014 (ECF No. 37).

    The RSA includes a fiduciary out for Genco.  It provides: "in order to fulfill the

Company Parties' fiduciary obligations, the Company may receive (but not solicit) proposals or

offers for Alternative Transactions from other parties and negotiate, provide due diligence,

discuss, and/or analyze such Alternative Transactions received without breaching or terminating

---

[2]    Certain capitalized terms not otherwise defined in this decision are taken from the RSA and have the same
meaning as in the RSA.

this agreement . . . ."  *See* RSA § 11(b)(iii).  If Genco announces its intention to pursue an alternative transaction, however, the RSA may be terminated by two-thirds of the supporting creditors on five days' notice.  *See* RSA § 11(c).  If the RSA is terminated to allow Genco to pursue an alternative transaction, and that alternative transaction is consummated, the RSA requires that Genco pay to the Supporting 2007 Facility Lenders and Supporting Noteholders a termination fee of $26.5 million plus expense reimbursements.  *See* RSA § 11(f).  The termination fee will be treated as an administrative expense and will serve as the sole and exclusive remedy of the Supporting 2007 Facility Lenders and Convertible Noteholders under the RSA.  *Id.*

In accordance with the terms of the RSA, the Debtors and the Supporting Creditors finalized the terms of the Prepack Plan and disclosure statement.  The Prepack Plan, as contemplated by the RSA, converts approximately $1.2 billion of debt to equity in the reorganized Genco, provides the Debtors with $100 million of additional new money through a fully backstopped rights offering, and extends the maturity dates of the $253 and $100 Million Credit Facilities.  In exchange for the conversion of debt to equity, the 2007 Credit Facility will receive 81.1% of the Reorganized Genco equity and the right to participate in 80% of the rights offering.  The Convertible Noteholders will receive 8.4% of the equity and the right to participate in up to 20% of the rights offering.  Under the RSA, the Debtors will reinstate allowed general unsecured claims and pay them in the ordinary course of business.  The Plan also provides for existing equity holders to receive warrants in exchange for the surrender or cancellation of their equity interests.  The warrants cover 6% of the new equity.

The Debtors began solicitation of votes on the Prepack Plan on April 16, 2014.  At the time of filing on April 21, 2014, 100% of the Credit Facility claims had voted to accept the Plan.

The Debtors are still accepting votes from Convertible Noteholders; as 82% are party to the RSA, the Debtors anticipate that they will have sufficient votes from that class to accept the plan as well.

The Court held a first day hearing in this case on April 23, 2014, at which the Court considered, among other things, the RSA Motion. Counsel for the Credit Facilities and the Noteholders expressed their support for the Motion and the RSA. Only two parties present at the hearing objected—an equity holder named Och-Ziff and a so-called Ad Hoc Consortium of Equity Holders. Subsequent to the hearing, Aurelius Capital Management, LP , acting on behalf of other equity holders, filed a two-page notice of joinder to the RSA objections (ECF No. 43).

Counsel for Och-Ziff raised a number of arguments, including: (1) the circumstances of the case didn't justify the speed requested by the Debtors and the supporting creditors; (2) the equity holders were entitled to receive more value; and (3) there would be no irreparable harm if the RSA was not approved. Counsel for the Ad Hoc Consortium took specific issue with the termination fee, asserting that the Debtors did not provide evidence or case law to establish on the record that the fee amount was reasonable. For reasons explained below, the Court overrules the objections and approves the RSA.

### DISCUSSION

"A 'prepackaged' plan of reorganization—referred to colloquially in the bankruptcy community as a 'prepack'—is one where acceptances of the plan have been sought and obtained before the bankruptcy case is even filed."[3] *In re Houghton Mifflin Harcourt Publishing Co.*, 474

---

[3]    By contrast, a "pre-arranged" plan of reorganization contains terms that were negotiated among interested parties prior to the filing of the petition, but acceptances are solicited after the Chapter 11 filing. A "free-fall" case refers to instances where a debtor files a Chapter 11 case with no clear way out. *Houghton Mifflin*, 474 B.R. at 125 n.5. The Debtors here began soliciting votes prior to the petition date, but have not yet concluded collecting votes from the Convertible Noteholders. Although this case presents a sort of hybrid, it most closely resembles a prepack, rather than a "pre-arranged" case.

B.R. 122, 125 n.5 (Bankr. S.D.N.Y. 2012).  The idea behind prepack plans is to make a Chapter 11 case "as quick and painless" as possible for creditors, and especially for trade creditors.  *Id*. at 127.

A successful prepack can cut down the duration of a bankruptcy case and, therefore, the incredible cost associated with a long, drawn out bankruptcy process.  When a Chapter 11 case is not concluded quickly, debtors and their stakeholders can be grievously injured by the destruction of value.  *See Houghton Mifflin*, 474 B.R. at 127 (citing *In re General Motors Corp.*, 407 B.R. 463, 479–80, 484–85, 491, 493 (Bankr. S.D.N.Y. 2009)).  "Those concerns are even more applicable with respect to prepacks, which are agreed to by creditors on the assumption that they will proceed through bankruptcy with the unusual speed for prepackaged plans for which the Bankruptcy Code provides."  *Houghton Mifflin*, 474 B.R. at 138.

The Bankruptcy Code clearly contemplates the use of prepack plans.  For example, Section 1121(a) permits a debtor to file a plan with its petition.  11 U.S.C. § 1121(a); *see also* 11 U.S.C. § 341(e) (permitting court, for cause, to order the United States Trustee not to convene a meeting of the creditors in cases where debtor filed a plan for which it solicited acceptances prior to the petition date).  In the 2005 BAPCA Amendments, Congress also added Section 1125(g) to the Code, which specifically provides for the solicitation of votes prior to filing a petition. Section 1126(b) provides that any votes solicited prepetition may be counted so long as solicitation complied with the requirements for adequate disclosure.  11 U.S.C. § 1126(b).  The beneficial value of prepack cases has also been widely recognized, including by UNCITRAL and by this Court in issuing guidelines for such prepack cases.[4]  Indeed, prepack plans are consistent with the general public policy in favor of out-of-court restructuring and settlement agreements.

---

[4]    The Southern District of New York Procedural Guidelines for Prepackaged Chapter 11 Cases, last updated June 27, 2013, can be found at http://www.nysb.uscourts.gov/sites/default/files/3018-2-guidelines.pdf.

*See, e.g., In re Pengo Indus., Inc.,* 962 F.2d 543, 549 (5th Cir. 1992) ("Bankruptcy policy

strongly favors the 'speedy, inexpensive, negotiated' adjustment of creditor-company relations

afforded by out-of-court [workouts and settlements]"); *In re Cheeks*, 167 B.R. 817, 819 (Bankr.

D.S.C. 1994) (noting public policy in favor of encouraging out of court restructuring and

settlements).  Given this backdrop, the Court now turns to the issue of assumption of the RSA,

the basic framework of Genco's bankruptcy case.

## Assumption of the RSA Pursuant to Section 365

Under Section 365(a), a debtor-in-possession "subject to the court's approval, may

assume or reject any executory contract or unexpired lease."  11 U.S.C. § 365(a).  A court will

normally approve the assumption of an executory contract "upon a showing that the debtor's

decision to take such action will benefit the debtor's estate and is an exercise of sound business

judgment."  *In re MF Global Holdings Ltd.*, 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012); *see also

NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (stating that section 365 is traditionally

subject to the "business judgment" standard); *Orion Pictures Corp. v. Showtime Networks, Inc.

(In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098–99 (2d Cir. 1993) (stating that section 365

"permits the trustee or debtor-in-possession,  subject to the approval of the bankruptcy court, to

go through the inventory of executory contracts of the debtor and decide which ones it would be

beneficial to adhere to and which ones it would be beneficial to reject"); *In re Gucci*, 193 B.R.

411, 415 (S.D.N.Y. 1996) ("A bankruptcy court reviewing a trustee's decision to assume or

reject an executory contract should apply its 'business judgment' to determine if it would be

beneficial or burdensome to the estate to assume it.")).

A court will generally not second-guess a debtor's business judgment regarding whether

the assumption or rejection of a contract will benefit the debtor's estate.  *See MF Global*, 466

B.R. at 242; *see also In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions."); *In re Balco Equities Ltd., Inc.*, 323 B.R. 85, 98 (Bankr. S.D.N.Y. 2005) ("A court 'should defer to a debtor's decision that rejection of a contract would be advantageous.'"); *Phar-Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 951–52 (Bankr. N.D. Ohio 1997) ("Whether an executory contract is 'favorable' or 'unfavorable' is left to the sound business judgment of the debtor . . . Courts should generally defer to debtor's decision whether to reject an executory contract.").

Under the "business judgment" test, a debtor must simply put forth a showing that assumption or rejection of the executory contract or unexpired lease will benefit the Debtor's estate.  *See MF Global*, 466 B.R. at 242; *see also Bregman v. Meehan (In re Meehan)*, 59 B.R. 380, 385 (E.D.N.Y. 1986) ("The primary issue under the business judgment test is whether rejection of the contract would benefit general unsecured creditors."); *In re Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006) ("To meet the business judgment test, the debtor in possession must establish that rejection will benefit the estate.").

A debtor "must support the motion with evidence—usually in the form of a declaration or affidavit—demonstrating that [assumption] of the contract falls within the proper exercise of the [debtors'] business judgment."  *MF Global*, 466 B.R. at 242.  Yet, "a motion to assume should be considered a summary proceeding, intended to efficiently review the trustee's or debtor's decision to adhere to or reject a particular contract in the course of the swift administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a lengthy trial with disputed issues."  *Orion Pictures*, 4 F.3d at 1098–99.

The Debtors' decision to assume the RSA clearly meets the "business judgment" standard. This conclusion is supported by evidence in the form of the Declaration of John C. Wobensmith (ECF No. 3) and Mr. Wobensmith's proffer read into the record at the April 23, 2014 hearing.[5] That evidence establishes that the Debtors are overleveraged, that they need to restructure their debt, and that a Chapter 11 proceeding is an appropriate vehicle for doing so. The RSA accomplishes these goals through a comprehensive restructuring of the Debtors on a consensual basis, while avoiding a long, drawn out Chapter 11 process and the attendant costs. Additionally, the RSA results in enhanced liquidity through the secured lenders' consent to the use of cash collateral without a protracted, contested legal proceeding, thereby preserving the Debtors' going-concern value. Furthermore, the RSA provides for a meaningful recovery for all of the Debtors' stakeholders, including their old equity holders and the full payment of trade creditors through the voluntary agreement by secured lenders to convert their debt to equity as well as a fully backstopped rights offering of $100 million, with the handover of value to unsecured creditors and equity. This is in contrast to the usual practice of secured creditors adhering to a strict waterfall with respect to recovery. Additionally, the RSA provides a fiduciary out that gives the Debtors the ability to receive, review and negotiate unsolicited proposals for any better alternative transaction.

**The Termination Fee and Section 363**

As for the termination fee, the objectors argued that the appropriate standard for approving the fee is not Section 365, but rather Section 363 of the Bankruptcy Code. Indeed, the Debtors' own papers cite to Section 363 in discussing the termination fee. *See, e.g.,* Motion at 18 (ECF No. 13). Section 363 provides that the "trustee, after notice and a hearing, may use,

---

[5]      The proffer was modified slightly after the hearing by letter dated April 23, 2014 (ECF No. 53). The modification does not affect this Court's decision on the Motion.

sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11

U.S.C. § 363(b)(1).

The standard used for judicial approval of the use of estate property outside of the

ordinary course of business is also the business judgment of the debtor.  *See In re Global*

*Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *see also Comm. of Equity Sec.*

*Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).  Thus, as with

Section 365, there "is a presumption that in making a business decision the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the action

taken was in the best interests of the company."  *Official Comm. of Subordinated Bondholders v.*

*In re Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656 (S.D.N.Y.

1992) (internal citations omitted).  The case law under Section 363 provides that "[t]he business

judgment rule's presumption shields corporate decision-makers and their decisions from judicial

second-guessing when the following elements are present: (1) a business decision, (2)

disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and

commentators, no abuse of discretion or waste of corporate assets."  *Id.*  "Courts are loath to

interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence

. . . Courts will uphold the board's decisions as long as they are attributable to any rational

business purpose . . . Parties opposing the proposed exercise of a debtor's business judgment

have the burden of rebutting the presumption of validity."  *Id.*

Courts in this jurisdiction have generally questioned the disinterestedness of a debtor

when the transaction in question is with an insider of the debtor.  *See In re Innkeepers USA*

*Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010); *In re Bidermann Indus. USA Inc.*, 203 B.R.

547, 552 (Bankr. S.D.N.Y. 1997).  But this is not a concern here.  The RSA was clearly an arms-

length transaction between the Debtors, their secured lenders and their noteholders.  At the

hearing, the objecting parties did raise an issue with respect to the disinterestedness of the

Debtors' board of directors.  Specifically, they alleged that the Debtors' current directors would

benefit if the RSA were approved because they would receive up to 1.8% of the stock of the

reorganized debtors through a management incentive program contemplated under the Debtors'

plan of reorganization.  *See* Prepackaged Plan of Reorganization of the Debtors, Article V.E

(ECF No. 14).  However, the subsequent proffer of Mr. Wobensmith provided by the Debtors

made clear that the board is not compromised.  Of the seven current members of the board, six

are independent directors in accordance with the rules promulgated by the New York Stock

Exchange.  These six independent directors have no material relationship with Genco or an

economic interest in the transaction.  The management incentive program, if approved under the

plan, will be available only to the participants of the new Reorganized Genco.  The balance of

the new board has not yet been selected, but when the time comes to do so, their selection would

take place in accordance with the provisions of the Chapter 11 Plan by the secured lenders under

a formula set out in the RSA and the Plan.  In the face of this proffer—which was not

contested—the objectors did not present any additional allegations or make any additional

argument on this point.

The objectors are correct that case law in this jurisdiction has established a standard

under Section 363 for approval of a break-up fee for a stalking horse bidder in the sale of a

debtor's assets.[6]  Specifically, there are "three questions for courts to consider in assessing [such]

break-up fees: (1) is the relationship of the parties who negotiated the break-up fee tainted by

---

[6]        A "stalking horse bidder" refers to a preliminary bidder whose offer can be "shopped around" to attract
higher bids.  *See In re Integrated Resources*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650
(S.D.N.Y. 1992).  Break-up fees can be used to overcome bidders' reluctance "to make the first bid for fear that it
will be shopped around and 'topped' by an entity relying on the initial offeror's due diligence."  *Id.*

self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; (3) is the amount of the fee unreasonable relative to the proposed purchase price?" *Integrated Resources*, 147 B.R. at 657; *see also In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009). "Bidder protections are granted when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer." *Metaldyne*, 409 B.R. at 670 (citing *Integrated Resources*, 147 B.R. at 659).

The termination fee here is simply one component of a much larger negotiated transaction embodied in the RSA that creates tremendous value for the estate. Considered in this light, it is clearly satisfies the business judgment test. This is true even if the Court were to consider the termination fee contained in this prepack and RSA to be akin to a break-up fee—an imperfect analogy at best. The Court finds that it would meet the three-part test under *Integrated Resources*. To begin with, as noted above, there is no evidence that the relationship between the board of directors, the secured lenders and the unsecured noteholders is subject to self-dealing or manipulation. In fact, just the opposite is the case, as shown by the proffer of Mr. Wobensmith. The transaction in the RSA, including the termination fee, was negotiated in good faith and at arms-length. Secondly, the Court does not find that the amount of the termination fee, $26.5 million, would unduly hamper the Debtors' efforts to maximize value for the estate given the fiduciary out, or that it is unreasonable when compared to the value of the overall transaction contemplated by the RSA.

The Debtors note that the value of the transaction includes not on the value of the fully back-stopped $100 million rights offering, but also the $1.05 billion debt-for-equity exchange of the 2007 Facility Lenders and the $125 million debt-for-equity exchange of the noteholders. The

Debtors therefore argue that the $26.5 million termination fee is approximately 2.2% of the

committed amount of over $1.2 billion.

The objecting parties counter that the amount of the termination fee should be compared

to only the $100 million rights offering itself, without taking into account any other value

provided by the RSA.  Specifically, Och-Ziff argues that the conversion of debt to equity

provides no value to the company.  In support of its position, Och-Ziff cites *In re Bidermann*,

203 B.R. 547 (Bankr. S.D.N.Y. 1997).  In *Bidermann*, the court dealt with the approval of a

success fee, topping fee and expense reimbursement in connection with a leveraged buyout

transaction.  In determining whether the amount of the fee is unreasonable relative to the

proposed purchase price, the court excluded from the value the monies that were generated from

the debtors' own assets.  *See Bidermann*, 203 B.R. at 553.  In support of this argument, the

*Bidermann* court cited *Integrated Resources*, 147 B.R. 650 (S.D.N.Y. 1992), in which the

debtor's cash on hand was excluded from the calculation of value.  *See id.*

But, the circumstances in *Bidermann* are easily distinguishable from this case.  That case

involved a "free-fall" bankruptcy and obvious instances of self-dealing.  As the court in

*Bidermann* made clear, the debtors' CEO and the majority shareholder were conflicted.  More

specifically, the debtors' turnaround consultant, who was the acting CEO, was hopelessly

conflicted in recommending a transaction that involved the same consultant's firm, Alvarez &

Marsal.  Also problematic in that case was that the debtors had not even hired an investment

banker to provide an independent evaluation of their options.  Here, the Debtors are clearly

making their own decisions through an independent board of directors.  Moreover, Mr.

Wobensmith's proffer noted that the board has consulted with and is advised by counsel and by

Blackstone as the company's financial advisor.

Moreover, the objectors' position ignores the unique circumstances of this prepack, which favorably resolves the claims of the Debtors' three secured lenders totaling over $1 billion as well as all unsecured debt. Thus, the RSA creates value for the estate on many different levels. It illustrates how a prepack differs from a sale under Section 363, in that a prepack constitutes one-stop shopping to solve the financial difficulties of a. Not only is the RSA providing value to the estate, it is also resolving the claims of creditor constituencies on a consensual basis. Indeed, as noted by counsel to Wilmington Trust, the secured lenders in this prepack are not simply following a typical waterfall recovery. Rather they are converting their debt to equity, thereby receiving approximately 90 cents on the dollar, while at the same time providing value to the unsecured creditors and equity who would otherwise be receiving little or no recovery at all. *See Loiselle v. CIT Group Inc.* (*In re CIT Group Inc.*), 2011 Bankr. LEXIS 40 (Bankr. S.D.N.Y. Jan. 4, 2011) (after confirming prepack plan that converted debt to equity and eliminated all prior interests of preferred and common shareholders, court dismissed old equity holders' adversary complaint seeking to reinstate their equity interests because debtors demonstrated at confirmation that there was no value for equity). It is notable that the debt-to-equity conversion contemplated by the RSA is not something that can be imposed upon a secured creditor in bankruptcy, but rather an outcome that can only be reached on a consensual basis.

The Court also finds that the termination fee would not unduly chill other financial options. For any competing bid to succeed, it would likely not only have to pay all secured debt, but would also have to provide a full recovery to unsecured creditors and value to equity in excess of what is currently being allocated. The overall value of such a proposal would easily

16

dwarf the $26.5 million fee, making it highly unlikely that the fee would chill any other financial
options.[7]

Thus, given all of the provisions of the RSA, the monetary benefits to the estate, the
ability to pass through Chapter 11 rapidly and consensually, and the resolution of disputes
regarding recoveries to the creditor constituencies, the Court finds that the termination fee is fair
and reasonable and meets the *Integrated Resources* standard.  While some of the equity holders
may want a larger distribution than they would receive under the RSA—a topic discussed further
below—given all of the facts and circumstances of this case, it is hard to argue that assumption
of the RSA, including the termination fee, is not a reasonable exercise of the Debtors' business
judgment.

**The Remaining Objections**

The objectors presented other arguments against approval of the RSA, which fall into
three broad categories: (1) the circumstances of the case don't justify the speed requested by the
Debtors and the supporting creditors; (2) the equity holders are entitled to receive more value;
and (3) there would be no irreparable harm if the RSA was not approved.

As a threshold matter, these arguments overlook the procedural posture of this case of the
Debtors have filed a prepackaged restructuring before the Court.  Genco and many of the
Debtors' creditors worked out a consensual solution, embodied in the RSA, which provides
many benefits to the estate and its creditors while using the vehicle of a prepack to prevent a
lengthy and costly Chapter 11 proceeding.  Indeed, the Debtors and the other parties to the RSA
have expressed great concern about time degrading the enterprise value in this case.  Genco has
also specifically identified the need for expeditious proceedings, with the most notable of these

---

[7]       The Court notes that the outstanding balance of the existing secured debt and unsecured notes alone totals
at least $1.37 billion, making $26.5 million less than two percent of that amount.

17

found in the Wobensmith Declaration admitted into evidence by this Court. The Wobensmith Declaration also sets forth the financial need for filing this case. *See* ¶¶ 56–62. Industry volatility and uncertainty made it difficult for Genco to maintain its existing debt structure and highlighted the need for restructuring. Moreover, the Debtors faced significant debt payments starting in 2014, with $55.2 million coming due in the first quarter. The Debtors projected that they would have breached their minimum liquidity covenants under their Credit Facilities by the first quarter of 2014, and they would have completely used their cash balances by the second quarter of 2014. Decl. ¶ 62. Based on all the evidence contained in the Wobensmith Declaration and arguments of counsel, the Court is convinced that a prolonged bankruptcy case would threaten Genco's continued operations with foreign charterers and vendors, who have expressed concerns about vessels being arrested or other disruptions interfering with the timely delivery of cargo. Decl. ¶¶ 76–79. These concerns recognize the fact that, while a bankruptcy court has authority to issue a worldwide bankruptcy stay as to the debtors, the effectuation of the stay can be very uncertain in cases involving foreign creditors and activity. In fact, Genco does the vast majority of its shipping in foreign ports of call and, as evidenced by the Debtors' motion to pay certain vendors, most of its creditors are in fact foreign.

To avoid these pitfalls, Genco chose to pursue a prepack plan with succinct milestones, planning for a 45-day period from the petition date to the confirmation hearing. Those milestones are, in fact, quite consistent with other prepack cases in this district. *See, e.g., In re Newland Int'l Props.*, Case No. 13-11396 (MG) (30 days from petition date to entry of confirmation order); *In re Houghton Mifflin*, Case No. 12-12171 (REG) (31 days); *In re Jobson Medical Information, LLC*, Case No. 12-10434 (SHL) (33 days); *In re American Roads LLC*, Case No. 13-12412 (BRL) (36 days); *In re LodgeNet Interactive Corp.*, Case No. 13-10238

(SCC) (42 days); *In re TBS Shipping Svcs.*, (RDD) (52 days); *In re 205 East 45 LLC*, (ALG) (57

days).[8]

The second of the objections to the RSA—that more value should be provided to equity

holders—is more appropriately raised as an objection to plan confirmation.  The Court today has

not been asked to approve the terms of the Plan itself.  At this point, the Court need only evaluate

whether the RSA is a valid exercise of Debtors' business judgment: does it make economic

sense?  As Judge Glenn recognized in his *ResCap* decision, approval of the RSA does not assure

that a plan embodying its terms will be confirmed.  *See In re Residential Capital, LLC*, 2013

Bankr. LEXIS 2601, at *8 (Bankr. S.D.N.Y. June 27, 2013).  That issue will be addressed at the

confirmation hearing in a distinct inquiry which examines whether the plan satisfies the

applicable standard under the Bankruptcy Code.  *Id.*  In fact, the objectors retain their right to

object to the plan for any and all reasons.  *Id.*  This includes the objectors' arguments about

valuation and whether old equity is recovering appropriate value.  What approval of the RSA

does do, however, is allow the Debtors' prepack plan a chance to be considered for confirmation.

Without approval of the RSA, the settlements embodied in the RSA are not binding on those

parties.  As such, the basis for the prepack case would be gone, and the parties would be left in

the world of a traditional free fall bankruptcy.  This result would be anomalous, given that a key

goal of a bankruptcy in a mega Chapter 11 such as this is for creditors to negotiate to reach a

consensus—exactly the kind of consensus embodied in the RSA and prepack plan here.

This objection also flies in the face of other facts here.  All parties agree that a

restructuring is necessary for Genco.  All parties agree that the Debtors are significantly

overleveraged.  All parties agree that the Debtors are in need of a bankruptcy process.  All

---

[8]         These cases and several others were identified in a useful chart provided by the Debtors' counsel
comparing the precedent in other recent prepackaged bankruptcy cases in the Southern District of New York, and
setting forth the time lines for resolution of those prepack bankruptcies.

parties agree that the Debtors are facing near-term problems in honoring their financial

commitments.  *See* Wobensmith Decl. at ¶ 62.  The RSA offers a consensual approach to such a

restructuring.  The RSA was publicly disclosed several weeks prior to the petition date, so the

information was available to equity holders at that point.  There is no evidence that any other

party or equity holder approached Genco with an alternative transaction.  Even with the RSA in

effect, Genco can still discuss alternative approaches if some other party proposes one.  At the

hearing, counsel for Och-Ziff expressed a desire for more time to essentially find an alternative

transaction that provides more value for equity holders.  But counsel for Och-Ziff could not,

however, identify any reason why the RSA—the agreement before the Court—was

unreasonable.  In fact, counsel admitted that he didn't know if the RSA would be worse than any

other alternative.[9]  Notwithstanding that fact, the logical consequence of the objectors' position

would be to destroy the Prepack Plan now in favor of the unknown.

        In any event, the objection regarding value is insufficient to overcome the Debtors' valid

business judgment.  While counsel for Och-Ziff argued that there is more value here that equity

is not getting, he did not present any competent evidence to establish this point.  The very first

thing Och-Ziff's counsel said during his objection was that the lenders are recovering 91.5% in

this case.  This concession is flatly inconsistent with the rest of his argument where he claimed

that equity is entitled to receive more because the credit facilities are getting paid more than in

full.  Moreover, the only thing cited as to value by Och-Ziff was trading prices.  But as discussed

in *Visteon*, Case No. 09-11786 (Bankr. D. Del.) and other cases, trading prices are not

necessarily a reliable measure of intrinsic value for a variety of reasons.  Indeed, Och-Ziff's

---

[9]        Counsel for Och-Ziff also complained of the lack of due process for equity holders.  That argument,
however, overlooks the fact that equity holders are represented by the board of directors that chose to enter the RSA.
This puts objecting equity holders in a much different posture than a creditor in a bankruptcy case, who can often
legitimately complain that it has never had a seat at the bargaining table.

claim about the additional value available is difficult to square with the fact that no other party has come forward at any point to make an offer, even though the dire financial straits of the company have been known for some time (as evidenced by numerous recent public SEC filings made by the Debtors)..

Finally, at the hearing, counsel for Och-Ziff suggested that this Motion could only be granted if the Debtors demonstrated immediate and irreparable harm.  *See* FRBP 6003 ("Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting . . . a motion to assume or assign an executory contract . . . in accordance with § 365.").  But the record clearly establishes immediate and irreparable harm will occur if the Motion is not granted.  If the RSA is not assumed, the framework for prompt resolution of this case will be removed and the Debtors will be in a free-fall bankruptcy with all those attendant risks.  Failure to act now may also irreparably harm other stakeholders in the case senior to equity—such as unsecured creditors— whose recovery may be jeopardized if the Debtors' secured creditors insist on payment in full on their claims.  Moreover, termination of the RSA constitutes an event of default under the Cash Collateral Order entered on April 23, 2014.  (*See* Order at p. 28).  Without this use of cash collateral, the Debtors will be unable to fund their continued operations

Indeed, the logical consequence of Och-Ziff's position would be to effectively preclude the use of prepack cases, by preventing parties from negotiating the economic terms of a plan prior to the filing of the bankruptcy.

## <u>CONCLUSION</u>

For all of the above reasons, the Court approves assumption of the RSA and overrules all

of the objections raised.

Dated:  May 16, 2014
  New York, New York

*/s/ Sean H. Lane*        
**UNITED STATES BANKRUPTCY JUDGE**
