KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
Stephen D. Zide
Anupama Yerramalli
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                      :
In re:                                :   Chapter 11
                                      :
GENCO SHIPPING & TRADING LIMITED, et al.,  :   Lead Case No. 14-11108 (SHL)
                                      :
              Debtors.                :   Jointly Administered
                                      :
-----------------------------------------------------------------X
```

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF ENTRY OF AN
ORDER (I) APPROVING (A) THE DEBTORS' DISCLOSURE
STATEMENT PURSUANT TO SECTIONS 1125 AND 1126(B) OF THE
BANKRUPTCY CODE, AND (B) THE SOLICITATION PROCEDURES, AND
(II) CONFIRMING THE PREPACKAGED PLAN OF REORGANIZATION OF
THE DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... iv

PRELIMINARY STATEMENT ................................................................................. 2

BACKGROUND .......................................................................................................... 4

    A.     General Background ................................................................................ 4

    B.     Summary of the Prepack Plan ............................................................... 6

    C.     Solicitation of the Prepack Plan ........................................................... 7

ARGUMENT ............................................................................................................. 11

I.     The Court Should Approve The Debtors' Disclosure Statement ...................... 11

II.    The Court Should Approve The  Debtors' Solicitation Procedures ................. 14

    A.     The Debtors' Prepetition Solicitation Complies with the Requirements of
Sections 1125(g) and 1126(b) of the Bankruptcy Code........................ 14

    B.     The Debtors' Solicitation Package and Solicitation Procedures Comply with
the Requirements of Bankruptcy Rules 3017(d), 3017(e) and 3018(c) ............... 16

          1.     Solicitation Packages and Combined Notice ............................ 17

          2.     Ballots ...................................................................................... 18

          3.     The Solicitation Period Complied with Applicable Law and was
Reasonable Under Bankruptcy Rule 3018(b) ........................... 18

          4.     The Voting Tabulation Procedures Are Appropriate................ 19

    C.     No Solicitation is Required of Classes Presumed to Accept the Prepack Plan .... 20

    D.     No Solicitation is Required of Classes Deemed to Reject the Prepack Plan ........ 21

III.   The Prepack Plan Satisfies Each  Requirement for Confirmation ................... 22

    A.     The Prepack Plan Complies with the Applicable Provisions  of the
Bankruptcy Code (11 U.S.C. § 1129(a)(1))......................................... 23

          1.     The Prepack Plan Satisfies the Classification Requirements of Section
1122 of the Bankruptcy Code ................................................... 23

2. The Prepack Plan Satisfies the Seven Mandatory Plan Requirements of 11 U.S.C. §§ 1123(a)(1)-(a)(7) ............................................................. 27

B. The Debtors, as Plan Proponents, Have Complied with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2)) .............................. 30

C. The Prepack Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law (11 U.S.C. § 1129(a)(3)) ......................................... 31

D. The Prepack Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments (11 U.S.C. § 1129(a)(4)) .............................................. 33

1. All Payments to be made by the Debtors are Subject to Court Approval as Reasonable .............................................................. 33

2. The Management Incentive Program is Reasonable and Appropriate ...... 34

E. Post-Emergence Directors and Officers Have Been Disclosed and Their Appointment is Consistent with Public Policy (11 U.S.C. § 1129(a)(5)) ............. 36

F. The Prepack Plan Does Not Require Governmental Regulatory Approval of Rate Changes (11 U.S.C. § 1129(a)(6)) .................................................. 38

G. The Prepack Plan Is in the Best Interests of Creditors and Equity Interest Holders (11 U.S.C. § 1129(a)(7)) ......................................................... 38

H. Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(8)). .................................. 41

I. The Prepack Plan Complies with Statutorily Mandated Treatment of Administrative and Priority Tax Claims (11 U.S.C. § 1129(a)(9)). .................... 42

J. At Least One Impaired Class of Claims Has Accepted the Prepack Plan, Excluding the Acceptances of Insiders (11 U.S.C. § 1129(a)(10)) ..................... 44

K. The Prepack Plan is Feasible (11 U.S.C. § 1129(a)(11)) ...................................... 44

L. The Prepack Plan Provides for the Payment of All Fees under 28 U.S.C. § 1930 (11 U.S.C. § 1129(a)(12)) ........................................................... 47

M. The Prepack Plan Provides for the Payment of Retiree Benefits (11 U.S.C. § 1129(a)(13)) ........................................................................ 48

N. Sections 1129(a)(14) and 1129(a)(15) Do Not Apply to the Prepack Plan .......... 48

O. The Prepack Plan Does Not Provide for the Transfer of Property by Any Nonprofit Entities Not In Accordance with Applicable Nonbankruptcy Law (11 U.S.C. § 1129(a)(16)) ...................................................................... 49

- ii -

P.    The Prepack Plan Satisfies the "Cram Down" Requirements of 11 U.S.C.
§ 1129(b) ............................................................................................................. 49

    1.    The Prepack Plan Does Not Discriminate Unfairly ................................. 50

    2.    The Prepack Plan Is Fair and Equitable ................................................... 51

Q.    The Principal Purpose of the Prepack Plan is  Not Avoidance of Taxes (11
U.S.C. § 1129(d)) ................................................................................................ 52

IV.    The Discretionary Contents of the Prepack Plan Should Be Approved .......................... 52

A.    The General Settlement of Claims and Interests under the Prepack Plan is
Fair and Reasonable ............................................................................................ 53

B.    The Assumption and Assignment or Rejection of the Executory Contracts
and Unexpired Leases Under the Prepack Plan Should Be  Approved ................ 56

C.    The Prepack Plan's Release, Injunction and Exculpation  Provisions Are
Appropriate and Should be Approved .................................................................. 57

    1.    The Estate Releases .................................................................................... 57

    2.    Third Party Releases .................................................................................. 62

        (a)    The Third Party Releases are Largely Consensual ....................... 64

        (b)    The Non-Consensual Releases are Appropriate Under the
Circumstances and Should be Approved ...................................... 66

    3.    The Exculpation Provision ......................................................................... 71

    4.    Injunction .................................................................................................. 73

CONCLUSION ................................................................................................................................ 74

# TABLE OF AUTHORITIES<sup>*</sup>

CASES                                                                                                    Page(s)

*Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*,
    184 B.R. 648 (S.D.N.Y. 1995) ..................................................................................74

*Aetna Cas. & Sur. Co. v. Clerk U.S. Bankr. Ct., New York, N.Y. (In re Chateaugay
    Corp.)*,
    89 F.3d 942 (2d Cir. 1996) ........................................................................................24

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N LaSalle St. P'ship*,
    526 U.S. 434 (1999) ..................................................................................38, 39, 51

*Blackacre Bridge Capital LLC v. Korff (In re River Center Holdings, LLC)*,
    288 B.R. 59 (Bankr. S.D.N.Y. 2003) .........................................................................63

*Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship)*,
    21 F.3d 477 (2d Cir. 1994) ........................................................................................24

*Cadle Co. II, Inc. v. PC Liquidation Corp. (In re PC Liquidation Corp.)*,
    383 B.R. 856 (E.D.N.Y. 2008) ..................................................................................12

*Cartalemi v. Karta Corp. (In re Karta Corp.)*,
    342 B.R. 45 (S.D.N.Y. 2006) ....................................................................................68

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
    699 F.2d 599 (2d Cir. 1983) ................................................................................54, 61

*Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re
    Metromedia Fiber Network, Inc.)*,
    416 F.3d 136 (2d Cir. 2005) ...............................................................................63, 67

*Frito-Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*,
    10 F.3d 944 (2d Cir. 1993) ........................................................................................24

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)*,
    994 F.2d 1160 (5th Cir. 1993) .............................................................................22, 45

*HSBC Bank USA, Nat'l Ass'n v. Fane (In re MF Global Inc.)*,
    466 B.R. 244 (Bankr. S.D.N.Y. 2012) .......................................................................55

*IIG Capital LLC v. Wollmuth Maher & Deutsch, LLP (In re Amanat)*,
    338 B.R. 574 (Bankr. S.D.N.Y. 2005) .......................................................................63

---

<sup>*</sup>  Due to the volume of the unreported decisions and pleadings cited herein, copies of any such decisions or pleadings will be provided to chambers and are available upon request.

*In re 500 Fifth Ave. Assocs.*,
    148 B.R. 1010 (Bankr. S.D.N.Y. 1993) ........................................................................24

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007), *appeal dismissed*, 371 B.R. 660 (S.D.N.Y.
    2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008) ....................................................... passim

*In re Almatis, B.V.*,
    No. 10-12308 (MG) (Bankr. S.D.N.Y. Sept. 20, 2010) ...............................61, 73, 74

*In re AMR Corp.*,
    11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) ........................................61, 73

*In re AMR Corp.*,
    497 B.R. 690 (Bankr. S .D.N.Y. 2013) ...................................................................36

*In re Aztec Co.*,
    107 B.R. 585 (Bankr. M.D. Tenn. 1989) ...............................................................50

*In re Bally Total Fitness of Greater N.Y., Inc.*,
    No. 07-12395, 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007)........................... passim

*In re Bally Total Fitness of Greater N.Y., Inc.*,
    No. 07-12395 (RJL) (Bankr. S.D.N.Y. Sept. 17, 2007)........................................15

*In re Best Prods. Co.*,
    168 B.R. 35 (Bankr. S.D.N.Y. 1994) .....................................................................54

*In re Borders Grp.*,
    No. 11-10614 (MG) (Bankr. S.D.N.Y. Dec. 21, 2011) ........................................73

*In re Buttonwood Partners, Ltd.*,
    111 B.R. 57 (Bankr. S.D.N.Y. 1990) .....................................................................50

*In re Calpine Corp.*,
    No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 19, 2007) ...................................61, 66

*In re Cellular Info. Sys., Inc.*,
    171 B.R. 926 (Bankr. S.D.N.Y. 1994) ...................................................................31

*In re CHL Ltd.*,
    No. 12- 12437 (KJC) (Bankr. D. Del. Oct. 4, 2012)...............................................15

*In re Conseco*,
    301 B.R. 525 (Bankr. N.D. Ill. 2003) ....................................................................66

*In re Copy Crafters Quickprint, Inc.*,
    92 B.R. 973 (Bankr. N.D.N.Y. 1988) ....................................................................12

*In re DBSD N. Am., Inc.*,
    419 B.R. 179 (Bankr. S.D.N.Y. 2009), *aff'd in part and rev'd in part*, 627 F. 3d 496
    (2d Cir. 2010), *aff'd in part and rev'd in part*, 634 F. 3d 79 (2d Cir. 2011) ...............58, 64, 66

*In re Dewey & LeBoeuf LLP*,
    478 B.R. 627 (Bankr. S.D.N.Y. 2012) ...................................................................................55

*In re DJK Residential LLC*,
    No. 08-10375 (JMP) (Bankr. S.D.N.Y. May 2, 2008) ............................................................19

*In re DJK Residential LLC*,
    No. 08-10375 (JMP) (Bankr. S.D.N.Y. May 7, 2008) ............................................................61

*In re Drexel Burnham Lambert Grp., Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) .....................................................................24, 25, 33

*In re Eagle Bus Mfg., Inc.*,
    134 B.R. 584 (Bankr. S.D. Tex. 1991), *aff'd*, 158 B.R. 421 (S.D. Tex. 1993) .......................37

*In re Eagle-Picher Indus., Inc.*,
    203 B.R. 256 (Bankr. S.D. Ohio 1996) ...................................................................................32

*In re Eastman Kodak Co.*,
    No. 12-10202 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2013) .........................................................36

*In re Eddington Thread Mfg. Co.*,
    181 B.R. 826 (Bankr. E.D. Pa. 1995) ...................................................................................45

*In re Egan*,
    142 B.R. 730 (Bankr. E.D. Pa. 1992) ...................................................................................21

*In re El Charro, Inc.*,
    No. 05-60294, 2007 WL 2174911 (Bankr. D. Kan. July 26, 2007) ........................................22

*In re Elsinore Shore Assocs.*,
    91 B.R. 238 (Bankr. D.N.J. 1988) .........................................................................................33

*In re Enron Corp.*,
    No. 01-16034 (AJG) (Bankr. S.D.N.Y. July 15, 2004) ..........................................................44

*In re FairPoint Commc'ns, Inc.*,
    452 B.R. 21 (S.D.N.Y. 2011)..................................................................................................63

*In re Ferretti*,
    128 B.R. 16 (Bankr. D.N.H. 1991) .................................................................................11, 12

*In re Freymiller Trucking, Inc.*,
    190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................................50

*In re Gen. Mar. Corp.*,
No. 11-15285 (MG) (Bankr. S.D.N.Y. May 7, 2012).......................................................72, 74

*In re Genco Shipping & Trading Ltd.*,
No. 14-11108 (SHL) (Bankr. S.D.N.Y. Apr. 24, 2014).......................................................2, 72

*In re Genco Shipping & Trading Ltd.*,
No. 14-11108, 2014 Bankr. LEXIS 2183 (Bankr. S.D.N.Y. 2014)................................. passim

*In re Granite Broad. Corp.*,
369 B.R. 120 (Bankr. S.D.N.Y. 2007) ....................................................................................72

*In re Gucci*,
193 B.R. 411 (S.D.N.Y. 1996)................................................................................................56

*In re Heritage Org., L.L.C.*,
375 B.R. 230 (Bankr. N.D. Tex. 2007)...................................................................................24

*In re Hibbard Brown & Co., Inc.*,
217 B.R. 41 (Bankr. S.D.N.Y. 1998) ......................................................................................54

*In re Indianapolis Downs LLC*,
486 B.R. 286 (Bankr. D. Del. 2013) .......................................................................................69

*In re Insight Health Servs. Holdings Corp.*,
No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 28, 2011)...........................................................15

*In re Ion Media Networks, Inc.*,
No. 09-13125 (JMP) (Bankr. S.D.N.Y. 2009) ........................................................................61

*In re Ionosphere Clubs, Inc.*,
179 B.R. 24 (Bankr. S.D.N.Y. 1995)......................................................................................11

*In re Ionosphere Clubs, Inc.*,
98 B.R. 174 (Bankr. S.D.N.Y. 1989) ......................................................................................24

*In re Jersey City Med. Ctr.*,
817 F.2d 1055 (3d Cir. 1987)..................................................................................................24

*In re Jobson Med. Info. Holdings LLC*,
No. 12-10434 (SHL) (Bankr. S.D.N.Y. Mar. 5, 2012) ...........................................................63

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78
B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville Corp. (In re Johns-Manville
Corp.*), 843 F.2d 636 (2d Cir. 1988) .......................................................................................31

*In re Journal Register Co.*,
    407 B.R. 520 (Bankr. S.D.N.Y. 2009) ...................................................................36

*In re Kaiser Aluminum Corp.*,
    No. 02-10429, 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006) ............................25

*In re Leslie Fay Cos.*,
    207 B.R. 764 (Bankr. S.D.N.Y. 1997) ..............................................................32, 45

*In re Melcher*,
    329 B.R. 865 (Bankr. N.D. Cal. 2005) ...................................................................21

*In re Mesa Air Grp.*,
    No. 10-10018 (MG) (Bankr. S.D.N.Y. Jan. 20, 2011)............................................74

*In re Mirant Corp.*,
    No. 03-46590, 2007 WL 1258932 (Bankr. N.D. Tex. Apr. 27, 2007) .............23, 24

*In re Momentum Mfg. Corp.*,
    25 F.3d 1132 (2d Cir. 1994).....................................................................................11

*In re Movie Gallery, Inc.*,
    No. 10-30696, 2010 Bankr. LEXIS 5778 (Bankr. E.D. Va. Oct. 29, 2010) ...........66

*In re Oldco M Corp. (f/k/a Metaldyne Corp.)*,
    No. 09-13412 (MG) (Bankr. S.D.N.Y. Jan. 10, 2010).....................................64, 74

*In re Oneida Ltd.*,
    351 B.R. 79 (Bankr. S.D.N.Y. 2006) .......................................................................58

*In re Phoenix Petroleum Co.*,
    278 B.R. 385 (Bankr. E.D. Pa. 2001) ......................................................................12

*In re Prudential Energy Co.*,
    58 B.R. 857 (Bankr. S.D.N.Y. 1986) .......................................................................45

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000).....................................................................................72

*In re Repurchase Corp.*,
    332 B.R. 336 (Bankr. N.D. Ill. 2005) ......................................................................45

*In re Sbarro LLC*,
    No. 14-10557 (MG) (Bankr. S.D.N.Y. Mar. 13, 2014) ..........................................19

*In re Scioto Valley Mortgage Co.*,
    88 B.R. 168 (Bankr. S.D. Ohio 1988).......................................................................12

*In re SGPA, Inc.*,
No. 1-01-02609 (Bankr. M.D. Pa. Sept. 28, 2001) ....................................................44

*In re Spiegel, Inc.*,
No. 03-11540, 2005 WL 1278094 (Bankr. S.D.N.Y. May 25, 2005) .....................................59

*In re Sylvan I-30 Enters.*,
No. 05-86708, 2006 WL 2539718 (Bankr. N.D. Tex. Sept. 1, 2006).....................................22

*In re Texaco, Inc.*,
84 B.R. 893 (Bankr. S.D.N.Y. 1988),
*appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1998) ...................................31, 37, 45, 56

*In re Tower Auto., Inc.*,
No. 05-10578 (ALG) (Bankr. S.D.N.Y. July 12, 2007) ........................................61

*In re Toy & Sports Warehouse, Inc.*,
37 B.R. 141 (Bankr. S.D.N.Y. 1984)......................................................31

*In re Trans World Airlines, Inc.*,
No. 01-00056 (PJW) (Bankr. D. Del. 2001) ................................................66

*In re UAL Corp.*,
No. 02-48191 (ERW) (Bankr. N.D. Ill. Jan. 20, 2006).........................................66

*In re Union County Wholesale Tobacco & Candy Co.*,
8 B.R. 442 (Bankr. D. N.J. 1981) .......................................................21

*In re Uno Rest. Holdings Corp.*,
No. 10-10209 (MG) (Bankr. S.D.N.Y. July 6, 2010) ......................................61, 73

*In re Washington Mutual, Inc.*,
No. 08-12229 (MFW) (Bankr. D. Del. Feb. 24, 2012) .........................................61

*In re Winn-Dixie Stores*,
356 B.R. 239 (Bankr. M.D. Fla. 2006) ...................................................72

*In re WorldCom, Inc.*,
No. 02-13533, 2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. Oct. 31, 2003) ................... passim

*Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd. (In re Ion Media Networks, Inc.)*,
419 B.R. 585 (Bankr. S.D.N.Y. 2009)....................................................27

*Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*,
517 F.3d 52 (2d Cir. 2008) ...........................................................63

*JPMorgan Chase Bank, N.A. v Charter Commc'ns Operating, LLC (In re Charter Commc'ns, Inc.),*
419 B.R. 221 (Bankr. S.D.N.Y. 2009) ...............................................................59, 67

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),*
843 F.2d 636 (2d Cir. 1988)..................................................................23, 31, 45

*Kirk v. Texaco, Inc.,*
82 B.R. 678 (S.D.N.Y. 1988)............................................................................12

*Krystal-Cadillac-Oldsmobile GMC Truck Inc. v. Gen. Motors Corp.,*
337 F.3d 314 (3d Cir. 2003)..............................................................................11

*Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.),*
930 F.2d 1132 (6th Cir. 1991) ...........................................................................63

*Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC),*
478 F.3d 452 (2d Cir. 2007)........................................................................55, 59

*N.Y.C. Emps. Ret. Sys. V. Ebbers (In re WorldCom, Inc. Sec. Litig.),*
293 B.R. 308 (S.D.N.Y. 2003)............................................................................63

*NLRB v. Bildisco & Bildisco,*
465 U.S. 513 (1984)............................................................................................56

*Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.),*
78 F.3d 18 (2d Cir. 1996) ....................................................................................56

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),*
4 F.3d 1095 (2d Cir. 1993)..................................................................................56

*Pfizer Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co.),*
676 F.3d 45 (2d Cir. 2012), *cert. denied sub nom. Pfizer, Inc. v. Law Offices of Peter G. Angelos,* 133 S. Ct. 2849 (2013) .............................................................62

*Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,*
390 U.S. 414 (1968)............................................................................................54

*Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.),*
330 B.R. 394 (Bankr. S.D.N.Y. 2005) ......................................................67, 68, 71

*SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.),*
960 F.2d 285 (2d Cir. 1992)................................................................. passim

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.),*
800 F.2d 581 (6th Cir. 1986) ............................................................................45

*The Mut. Life Ins. Co. of N.Y. v. Patrician St. Joseph Partners Ltd. P'ship* (*In re Patrician St. Joseph Partners Ltd. P'ship*),
169 B.R. 669 (D. Ariz. 1994) ........................................................................... 45

*Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.),*
326 B.R. 497 (S.D.N.Y. 2005) ........................................................... 61, 72, 73

*Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc. (In re Source Enters., Inc.),*
392 B.R. 541 (S.D.N.Y. 2008) ........................................................................... 24

**STATUTES**

11 U.S.C. § 101(31) .............................................................................. 35, 37

11 U.S.C. § 365 .............................................................................................. 56

11 U.S.C. § 507(a) .............................................................................. 42, 43

11 U.S.C. § 1122 .............................................................................. 23, 24

11 U.S.C. § 1123(a) ........................................................................... 27-31

11 U.S.C. § 1123(b) ........................................................... 53, 55, 56, 59

11 U.S.C. § 1123(b)(3) ....................................................... 53, 60, 63

11 U.S.C. § 1125 ........................................................... 11, 14, 15, 31

11 U.S.C. § 1126(b) ............................................................... passim

11 U.S.C. § 1126(c) .......................................................................... 41

11 U.S.C. § 1126(d) .......................................................................... 41

11 U.S.C. § 1126(f) ............................................................... passim

11 U.S.C. § 1126(g) ........................................................... 17, 21, 22, 41

11 U.S.C. § 1129(a)(1) .................................................................... 23

11 U.S.C. § 1129(a)(2) ............................................................... 30, 31

11 U.S.C. § 1129(a)(3) ............................................................... 31, 33

11 U.S.C. § 1129(a)(4) ............................................................... 33, 35

11 U.S.C. § 1129(a)(5) .................................................................... 36

11 U.S.C. § 1129(a)(6) .................................................................................................38

11 U.S.C. § 1129(a)(7) ............................................................................................38, 42

11 U.S.C. § 1129(a)(8) ......................................................................................41, 42, 51

11 U.S.C. § 1129(a)(9) ............................................................................................43, 45

11 U.S.C. § 1129(a)(10) .............................................................................................44

11 U.S.C. § 1129(a)(11) .............................................................................................44

11 U.S.C. § 1129(a)(12) .............................................................................................48

11 U.S.C. § 1129(a)(13) .............................................................................................48

11 U.S.C. §§ 1129(a)(14) ...........................................................................................48

11 U.S.C. §§ 1129(a)(15) ...........................................................................................48

11 U.S.C. § 1129(a)(16) .......................................................................................49, 51

11 U.S.C. § 1129(b)(1) ...............................................................................................49

11 U.S.C. § 1129(b)(2)(C)(ii) .................................................................................51, 53

11 U.S.C. § 1129(d) ...................................................................................................52

15 U.S.C. § 77d(2) .....................................................................................................15

28 U.S.C. § 1930 .......................................................................................................47

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 3017 ......................................................................................16, 17, 18

Fed. R. Bankr. P. 3018 ......................................................................................16, 17, 18

Fed. R. Bankr. P. 3019 ...............................................................................................78

Fed. R. Bankr. P. 9019 .........................................................................................56, 60

H.R. Rep. No. 109-31 (2005) ......................................................................................49

H.R. Rep. No. 595, 95th Cong., 1st Sess. (1977) ..............................................12, 23, 31

S. Rep. No. 95-989 (1978) ................................................................................23, 31, 41

Genco Shipping & Trading Limited ("**Genco**") and certain of its direct and indirect subsidiaries, as chapter 11 debtors and debtors in possession (each a "**Debtor**" and collectively the "**Debtors**"[2] or the "**Company**") in the above-referenced chapter 11 cases (the "**Chapter 11 Cases**"), submit this memorandum of law (the "**Memorandum**") in support of entry of an order (the "**Confirmation Order**") (i) approving (a) the *Disclosure Statement for the Prepackaged Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (as amended from time to time, the "**Disclosure Statement**") [Docket No. 15], pursuant to sections 1125 and 1126 of the Bankruptcy Code, and (b) the solicitation procedures (the "**Solicitation Procedures**") used in connection with the Debtors' prepetition solicitation of the Prepack Plan (defined below), and (ii) confirming the *Prepackaged Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (as amended from time to time, the "**Prepack Plan**") [Docket No. 14].[3]  In further support of entry of the Confirmation Order, the Debtors respectfully represent as follows:

---

[2]  The Debtors and, if applicable, the last four digits of their taxpayer identification numbers are as follows: Genco Shipping & Trading Limited (9758), Genco Investments LLC, Genco Management (USA) LLC (3865), Genco RE Investments LLC, Genco Ship Management LLC (7604), Genco Acheron Limited (9293), Genco Aquitaine Limited (8217), Genco Ardennes Limited (8215), Genco Augustus Limited (3622), Genco Auvergne Limited (8233), Genco Avra Limited (5557), Genco Bay Limited (5558), Genco Beauty Limited (9761), Genco Bourgogne Limited (8236), Genco Brittany Limited (8237), Genco Carrier Limited (9763), Genco Cavalier LLC (9764), Genco Challenger Limited (6074), Genco Champion Limited (6073), Genco Charger Limited (6072), Genco Claudius Limited (3620), Genco Commodus Limited (3619), Genco Constantine Limited (3617), Genco Explorer Limited (9764), Genco Hadrian Limited (3608), Genco Hunter Limited (6158), Genco Knight Limited (9773), Genco Languedoc Limited (8238), Genco Leader Limited (9774), Genco Loire Limited (8239), Genco London Limited (3610), Genco Lorraine Limited (8242), Genco Mare Limited (5641), Genco Marine Limited (9775), Genco Maximus Limited (3613), Genco Muse Limited (5276), Genco Normandy Limited (8243), Genco Ocean Limited (5645), Genco Picardy Limited (8244), Genco Pioneer Limited (9767), Genco Predator Limited (6075), Genco Progress Limited (9776), Genco Prosperity Limited (9777), Genco Provence Limited (8246), Genco Pyrenees Limited (8599), Genco Raptor LLC (9767), Genco Reliance Limited (9768), Genco Rhone Limited (8248), Genco Spirit Limited (5650), Genco Success Limited (9769), Genco Sugar Limited (9778), Genco Surprise Limited (9385), Genco Thunder LLC (9769), Genco Tiberius Limited (3614), Genco Titus Limited (3615), Genco Vigour Limited (9770), Genco Warrior Limited (6076), and Genco Wisdom Limited (9771). The Debtors' business address is 299 Park Avenue, 12th Floor, New York, NY 10171. Neither Baltic Trading Limited nor its subsidiaries are Debtors.

[3]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Prepack Plan.

## PRELIMINARY STATEMENT

1.      The Prepack Plan is the culmination of months of hard-fought negotiations among the Debtors, their secured lenders, and the Debtors' largest unsecured creditor constituency – the ad hoc group of Convertible Noteholders.  It enjoys the full support of the Debtors' creditors, with both the Debtors' secured lenders and Convertible Noteholders voting *unanimously* in support of the Prepack Plan.

2.      This overwhelming creditor support will enable the Debtors to confirm the Prepack Plan expeditiously and secure the many benefits of prepackaged plans recognized by Congress and by this Court at the first day hearing.  Those benefits include, among others, preventing lengthy and costly chapter 11 proceeding and preserving value for the Debtors and their stakeholders through prompt emergence from bankruptcy.[4]  The Court has acknowledged that "a prolonged bankruptcy case would threaten Genco's continued operations with foreign charterers and vendors" and that Genco could appropriately "avoid these pitfalls" by pursuing "a prepack plan with succinct milestones, . . . consistent with other prepack cases in this district."[5]

3.      The overarching purpose of the Prepack Plan is to restructure the Debtors' liabilities to maximize recovery to all stakeholders and enhance the financial viability of the Reorganized Debtors.  Through the Prepack Plan, the Debtors will emerge from bankruptcy as a healthier and more viable competitor in the drybulk shipping industry.  The Prepack Plan provides for a balance sheet restructuring of the Debtors in which the holders of secured debt

---

[4]  *See In re Genco Shipping & Trading Ltd.*, No. 14-11108, 2014 Bankr. LEXIS 2183, at *10 (Bankr. S.D.N.Y. 2014) ("A successful prepack can cut down the duration of a bankruptcy case and, therefore, the incredible cost associated with a long, drawn out bankruptcy process. When a Chapter 11 case is not concluded quickly, debtors and their stakeholders can be grievously injured by the destruction of value."); Hr'g Tr. at 13:13-15, 22-24, *In re Genco Shipping & Trading Ltd.*, No. 14-11108 (SHL) (Bankr. S.D.N.Y. Apr. 24, 2014) (the "**Bench Decision**") ("Recent amendments to the Bankruptcy Code demonstrate that Congress has contemplated prepacks as a viable and beneficial procedure in certain bankruptcy cases. . . . The beneficial value of such prepack cases has been widely recognized, including by UNCITRAL and by this Court in issuing guidelines for prepacked cases.").

[5]  *In re Genco Shipping & Trading Limited*, 2014 Bankr. LEXIS 2183 at *28-29.

outstanding under the Prepetition 2007 Facility will receive 81.1% of the Reorganized Debtors' equity (subject to dilution) and the holders of the Debtors' Convertible Notes will receive 8.4% of the Reorganized Debtors' equity (subject to dilution), in addition to the opportunity to participate in the Rights Offering.  The effect of the Prepack Plan will be to (i) cut the Debtors' debt by at least $1.2 billion, (ii) reduce the Debtors' annual interest payment obligations by more than $40 million, (iii) eliminate over $192.8 million annually in amortization payments, and (iv) facilitate a new capital infusion of approximately $100 million through the fully backstopped Rights Offering.

4.      Importantly, the Prepack Plan provides for the reinstatement of all General Unsecured Claims and a distribution of warrants to holders of Equity Interests in Genco from the consideration that would otherwise be provided to holders of Prepetition 2007 Facility Claims and Convertible Note Claims.  Neither of these treatments would have been available absent an agreement by the Prepetition 2007 Facility Lenders and the Convertible Noteholders to forego value to which they would otherwise be entitled – notwithstanding the intent of the Equity Committee to object to the Plan in an attempt to extract even greater value.

5.      In short, the Prepack Plan maximizes recoveries to *all* of the Debtors' stakeholders and will enhance the financial viability of the Company post-emergence. Accordingly, as set forth herein, the Solicitation Procedures and Disclosure Statement should be approved under sections 1125 and 1126(b) of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018, and the Prepack Plan should be confirmed under section 1129 of the Bankruptcy Code.

## BACKGROUND

### A.    General Background

6.    On April 21, 2014 (the "**Petition Date**"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Each Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

7.    The Company is one of the world's largest drybulk shippers, with a fleet of fifty-three (53) vessels (each a "**Vessel**") traversing the globe and a combined carrying capacity of approximately 3,810,000 deadweight tons.  Operating in over 1,000 ports of call located in over 110 countries, including in the Far East, South and Central America, Europe, West Africa, and the United States, the Company charters its sizable fleet worldwide to third-party customers through fixed-rate and spot-market related time charters, the latter of which makes the Company's revenues susceptible to rate fluctuations in the drybulk shipping market. Along with its thirty-three (33) direct employees based out of its New York headquarters, the Company relies upon third-party technical ship managers to crew, manage, supply, and maintain the Vessels.

8.    Substantially all of the Company's liabilities consist of funded debt (*i.e.*, non-trade debt and derivative liability).  As of the date hereof, the Company had more than $1.3 billion outstanding under its secured and unsecured debt facilities, comprised of the following: (a) a $1.377 billion senior secured credit facility with Wilmington Trust, National Association as successor administrative agent and successor collateral agent, which matures on July 20, 2017 (as amended, the "**Prepetition 2007 Facility**"); (b) a $100 million senior secured credit facility with Crédit Agricole Corporate and Investment Bank, as agent and security trustee, which

matures on August 17, 2017 (as amended, the **"Prepetition $100 Million Facility"**); (c) a $253 million senior secured credit facility with Deutsche Bank Luxembourg S.A. as agent, which matures on August 14, 2015 (as amended, the "**Prepetition $253 Million Facility**" together with the 2007 Credit Facility and the $100 Million Credit Facility, the "**Prepetition Credit Facilities**"); and (d) $125 million of unsecured 5% Convertible Senior Notes due 2015 (the "**Convertible Notes**") under an indenture dated July 27, 2010, with the Bank of New York Mellon as indenture trustee.  The Vessels – which constitute substantially all of the Company's tangible material assets – are pledged under the Prepetition Credit Facilities pursuant to the terms of the applicable credit and security documents relating to such facilities.

9.     In the months prior to the Petition Date, the Company evaluated, in consultation with its advisors, options to restructure the Company's liabilities and deleverage its balance sheet while increasing liquidity through a new capital investment.  The Company engaged in extensive discussions and negotiations with representatives of the prepetition agents and the majority of the lenders under each of the Credit Facilities, as well as an ad hoc group of holders of Convertible Notes, on the terms of a consensual restructuring.

10.     On April 3, 2014, the Company entered into a Restructuring Support Agreement (the "**RSA**") with over 98% of the lenders holding claims under the 2007 Credit Facility,[6] 100% of the lenders holding claims under the $100 Million Credit Facility, 100% of the lenders holding claims under the $253 Million Credit Facility, and over 82% of the holders of claims under the Convertible Notes.

---

[6]  Although slightly less than 100% of the lenders under the Prepetition 2007 Credit Facility signed the RSA, 100% of the lenders under that facility voted to accept the Prepack Plan.

11.     On April 25, 2014, the Court entered an order authorizing the assumption of the RSA.  The RSA provides for certain heavily negotiated "Milestones" (as defined in the RSA), including milestones for confirmation of the Prepack Plan.

12.     On May 9, 2014, the U.S. Trustee appointed a three-member official committee of equity security holders (the "**Equity Committee**"), consisting of: (i) Aurelius Capital Partners LP, (ii) Mohawk Capital LLC, and (iii) OZ Domestic Partners, LP.

**B.      Summary of the Prepack Plan**

13.     The Prepack Plan designates 11 different classes of creditors and equity interest holders as either impaired or unimpaired.  Most significantly:

- Holders of Allowed General Unsecured Claims, including Allowed Claims of trade vendors, suppliers, customers, charterers, and charterer's customers, will not be affected by the filing of the bankruptcy cases and are anticipated to be paid in full in the ordinary course of business during the pendency of the Chapter 11 Cases or have their claims reinstated and left unimpaired under the Prepack Plan in accordance with the terms of their prepetition contracts.

- Holders of all Allowed Administrative Claims, Priority Tax Claims, statutory fees, Other Priority Claims, and Other Secured Claims will be paid in full.

- Holders of Prepetition 2007 Facility Claims will receive 81.1% of Reorganized Genco's new common stock, in aggregate (subject to dilution by the warrants issued under the Prepack Plan), and will also be entitled to subscribe to and purchase up to 80% of the New Genco Common Stock being offered under the Rights Offering.

- Holders of Prepetition $100 Million Credit Facility Claims and Prepetition $253 Million Credit Facility Claims will retain claims under the Amended and Restated $100 Million Facility and the Amended and Restated $253 Million Facility, respectively, which extend the maturity dates of those prepetition facilities through August 2019 and provide other modifications to the existing credit agreements.

- Eligible holders of Convertible Note Claims will receive 8.4% of Reorganized Genco's new common stock, in aggregate (subject to dilution by the warrants issued under the Prepack Plan), and will also be entitled to subscribe to and purchase up to 20% of the New Genco Common Stock being offered under the Rights Offering.  Non-eligible holders of Convertible Note Claims will

receive cash of a value equal to what they would have received if they were eligible holders.

- Holders of Equity Interests in Genco will receive the New Genco Equity Warrants from amounts otherwise distributable to the Prepetition 2007 Facility Lenders and the holders of the Convertible Notes in exchange for the cancellation or surrender of Equity Interests in Genco.

14.     The Disclosure Statement provides a more detailed discussion of the Prepack Plan's treatment of the various classes of Claims and Equity Interests and estimated recoveries on account of such Claims and Equity Interests.

### C.      Solicitation of the Prepack Plan

15.     The only Impaired Classes entitled to vote on the Prepack Plan are Classes 3, 4, 5, and 8, consisting of the Prepetition 2007 Facility Claims, Prepetition $253 Million Facility Claims, Prepetition $100 Million Facility Claims and Convertible Note Claims, respectively (the "**Voting Classes**").  Claims and Equity Interests in Classes 1, 2, 6, 7, 9, and 10 are Unimpaired under the Prepack Plan and are therefore deemed to accept the Prepack Plan in accordance with section 1126(f) of the Bankruptcy Code.  Equity Interests in Genco in Class 11 are deemed to reject the Prepack Plan.

16.     On April 16, 2014, prior to commencing the Chapter 11 Cases, the Company delivered a copy of the Prepack Plan, the Disclosure Statement, and the Ballots to all holders of Claims in the Voting Classes.  In consultation with the Prepetition Agents and the Supporting Noteholders, the Company established: (a) April 18, 2014 at 10:00 a.m. (prevailing New York time) as the deadline for the receipt of votes to accept or reject the Prepack Plan from the holders of Claims in Voting Classes 3, 4, and 5 (the "**Lender Voting Deadline**"); and (b) May 16, 2014 at 4:00 p.m. (prevailing New York time) as the deadline for the receipt of votes to accept or reject the Prepack Plan from the holders of Claims in Voting Class 8 (the "**Noteholder Voting Deadline**" and, collectively, the "**Voting Deadlines**").

17.     GCG, Inc. (the "**Balloting Agent**") collected and tabulated the Ballots received on or before the applicable Voting Deadlines.  As of the Lender Voting Deadline, the Prepack Plan was unanimously accepted by Voting Classes 3, 4, and 5.[7]  Following the Petition Date, the Balloting Agent continued collecting and tabulating Ballots received from the Convertible Noteholders.  As of the Noteholder Voting Deadline, 100% in amount and 100% in number of the voting holders of Convertible Note Claims voting, voted to accept the Prepack Plan.[8]  None of the holders of Convertible Note Claims voted to reject the Prepack Plan and, therefore, none opted out of the releases.

18.     On the Petition Date, the Debtors filed, among other pleadings, the Debtors' motion, inter alia, for an order scheduling a combined hearing on the adequacy of the Disclosure Statement and the Solicitation Procedures, and confirmation of the Prepack Plan (the "**Scheduling Motion**") [Docket No. 18] and on April 25, 2014, this Court entered an order granting the relief requested therein (the "**Scheduling Order**") [Docket No. 46].

19.     Pursuant to the Scheduling Order, this Court established (i) 4:00 p.m., prevailing Eastern Time on May 22, 2014 as the deadline by which objections to the Solicitation Procedures, Disclosure Statement, or Prepack Plan were to be filed, and (ii) 11:00 a.m., prevailing Eastern Time on June 3, 2014 as the time and date for the combined hearing to consider approval of the Solicitation Procedures and Disclosure Statement and confirmation of the Prepack Plan.

---

[7] *Declaration of Craig E. Johnson of GCG, Inc. Certifying the Methodology for the Tabulation of Votes on and Results of Voting for Classes 3, 4 and 5 with Respect to the Prepackaged Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 52], at ¶ 16 (the "**Lender Voting Certification**").

[8] *Declaration of Craig E. Johnson of GCG, Inc. Certifying the Methodology for the Tabulation of Votes on and Results of Voting for Class 8 with Respect to the Prepackaged Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 222], at ¶19.

20.     Pursuant to the Scheduling Order, commencing on April 24, 2014 the Debtors served a notice (the "**Combined Notice**") of, among other things, (i) the commencement of these Chapter 11 Cases, (ii) the date, time, and place of the Combined Hearing, (iii) the deadline and procedures for filing objections to the adequacy of the Disclosure Statement, and confirmation of the Prepack Plan, (iv) instructions for obtaining copies of the Disclosure Statement and the Prepack Plan, and (v) the establishment of the Limited Bar Dates, upon (a) all of the Debtors' known creditors and equity interest holders, (b) the Office of the United States Trustee (the "**U.S. Trustee**") for the Southern District of New York; (c) counsel to Wilmington Trust, National Association, solely in its capacity as successor administrative and collateral agent under the Prepetition 2007 Facility; (d) counsel to (i) Crédit Agricole Corporate & Investment Bank, as agent and as security trustee under the $100 Million Facility and (ii) Deutsche Bank Luxembourg S.A., as agent and Deutsche Bank AG Filiale Deutschlandgeschäft, as security agent and bookrunner under the $253 Million Facility; (e) the indenture trustee for the Convertible Notes, The Bank of New York Mellon; (f) counsel for the Supporting Noteholders; (g) the holders of the forty (40) largest unsecured claims against the Company; (h) the Internal Revenue Service; (i) the United States Attorney for the Southern District of New York; and (j) the United States Securities and Exchange Commission.

21.     On April 25, 2014, the Debtors filed a Form 8-K with the Securities Exchange Commission summarizing the terms of the Combined Notice, including all relevant dates and deadlines relating to confirmation.

22.     In addition, in accordance with the Scheduling Order, the Debtors caused the Combined Notice to be published in the global edition of *The Wall Street Journal* on April 30, 2014, and in *Tradewinds* on May 2, 2014.

23.    On May 15, 2014, the Debtors filed the Plan Supplement [Docket No. 166] which includes the following documents:

- the Rejection Schedule (**Exhibit 1** to the Plan Supplement)

- the Amended and Restated $253 Million Credit Agreement (**Exhibit 2** to the Plan Supplement)

- the Amended and Restated $100 Million Credit Agreement (**Exhibit 3** to the Plan Supplement);

- the New Genco Charter (**Exhibit 4** to the Plan Supplement);

- the New Genco By-Laws (**Exhibit 5** to the Plan Supplement);

- the New Genco MIP Warrant Agreements (**Exhibit 6** to the Plan Supplement);

- the New Genco Equity Warrant Agreement (**Exhibit 7** to the Plan Supplement);

- the identity of the officers and members of the New Board of Reorganized Genco (**Exhibit 8** to the Plan Supplement);[9]

- a list of retained Causes of Action (**Exhibit 9** to the Plan Supplement);

- the Management Incentive Program (**Exhibit 10** to the Plan Supplement)

- the New Employment Agreements, if any (**Exhibit 11** to the Plan Supplement);[10] and

- The Registration Rights Agreement (**Exhibit 12** to the Plan Supplement).

24.    At a hearing on May 23, 2014, the Court adjourned the combined hearing on the adequacy of the Disclosure Statement, the Solicitation Procedures, and confirmation of the Prepack Plan to June 12, 2014 at 9:30 a.m. (the "**Combined Hearing**"), continuing on June 13, 2014, and resuming on June 23-24, 2014.  The Court set the objection deadline for all parties

---

[9]  Exhibit 8 to the Plan Supplement states that the officers and members of the New Board shall be selected in accordance with Article V.B of the Prepack Plan, and will be filed in advance of the Combined Hearing (defined below).

[10]  Exhibit 11 to the Plan Supplement states that as of May 15, 2014, there are no New Employment Agreements, and the New Employment Agreements, if any, will be filed in advance of the Combined Hearing (defined below).

other than the Equity Committee for May 30, 2014, and the objection deadline for the Equity

Committee as June 5, 2014 (collectively, the "**Objection Deadlines**").

<u>ARGUMENT</u>

I.    **THE COURT SHOULD APPROVE THE
      DEBTORS' DISCLOSURE STATEMENT**

25.    Under section 1126(b) of the Bankruptcy Code, a disclosure statement

must disclose "adequate information."[11]    Section 1125(a)(1) of the Bankruptcy Code defines

"adequate information" to mean:

> [I]nformation of a kind, and in sufficient detail, as far as is
> reasonably practicable in light of the nature and history of the
> debtor and the condition of the debtor's books and records,
> including a discussion of the potential material Federal tax
> consequences of the plan to the debtor, any successor to the debtor,
> and a hypothetical investor typical of the holders of claims or
> interests in the case, that would enable such a hypothetical investor
> of the relevant class to make an informed judgment about the
> plan . . . .[12]

26.    Thus, a debtor's disclosure statement must, as a whole, provide

information that is reasonably practicable to permit an informed judgment by impaired creditors

entitled to vote on the plan.[13]    The disclosure statement "must clearly and succinctly inform the

average unsecured creditor what it is going to get, when it is going to get it, and what

contingencies there are to getting its distribution."[14]

---

[11]  11 U.S.C. § 1126(b).

[12]  *See id.* § 1125(a)(1).

[13]  *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994); *see also In re Ionosphere Clubs, Inc.*, 179 B.R.
24, 29 (Bankr. S.D.N.Y. 1995) (the adequacy of a disclosure statement "is to be determined on a case-specific basis
under a flexible standard that can promote the policy of Chapter 11 towards fair settlement through a negotiation
process between informed interested parties" (internal citation omitted)); *Krystal-Cadillac-Oldsmobile GMC Truck
Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 322 (3d Cir. 2003).

[14]  *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

27.    The Bankruptcy Court has broad discretion to determine the adequacy of the information contained in a disclosure statement.[15]  This discretion permits courts to tailor disclosures made in connection with the solicitation of votes on a plan of reorganization in a broad range of businesses and circumstances.[16]  Congress granted bankruptcy courts discretion in order to facilitate effective reorganizations in the broad range of businesses in which chapter 11 debtors engage and the broad range of circumstances that accompany chapter 11 cases.[17]  Accordingly, the determination of whether a disclosure statement contains adequate information is to be made on a case-by-case basis, focusing on the unique facts and circumstances of each case.[18]

28.    In that regard, courts generally examine a number of factors to determine whether the disclosure statement contains adequate information.[19]  The factors are not meant to be comprehensive, and a debtor need not provide information on all factors. Rather, the bankruptcy court must decide what is appropriate in each case.[20]

29.    Here, the Disclosure Statement contains adequate information with respect to the relevant factors, including, but not limited to, the following key sections and information contained therein:

---

[15] *See Kirk v. Texaco, Inc.*, 82 B.R. 678, 682 (S.D.N.Y. 1988).

[16] *Id.*

[17] *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 408-09 (1977); *see also In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988) (adequacy of disclosure statement "is to be determined on a case-specific basis under a flexible standard that can promote the policy of chapter 11 towards fair settlement through a negotiation process between informed interested parties").

[18] *See Kirk*, 82 B.R. at 682; *see also Cadle Co. II, Inc. v. PC Liquidation Corp.* (*In re PC Liquidation Corp.*), 383 B.R. 856, 865 (E.D.N.Y. 2008).

[19] *See, e.g.*, *In re Scioto Valley Mortgage Co.*, 88 B.R. 168, 170-71 (Bankr. S.D. Ohio 1988) (listing factors); *see also In re Ferretti*, 128 B.R. at 18-19 (similar list).

[20]  *In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (considering list of factors but cautioning that "no one list of categories will apply in every case").

a) *Executive Summary*:   An overview of chapter 11, a brief summary of the Prepack Plan, as well as an overview of the Classes of Claims and Interests and voting rights under the Prepack Plan.  *See* Disclosure Statement, Art. I.

b) *Summary of Treatment*:   A summary of the proposed treatment of Classes of Claims and Equity Interests under the Prepack Plan.   *See* Disclosure Statement, Art. II.

c) *Company Background*: The history of the Debtors, their businesses, and their prepetition capital structure.  *See* Disclosure Statement, Art. III.

d) *Summary of Events Leading to the Chapter 11 Cases*:  A description of the Debtors' industry and summary of significant events leading to the commencement of the Chapter 11 Cases, including negotiations with the Prepetition Secured Lenders and Convertible Noteholders.  *See* Disclosure Statement, Art. IV.

e) *Anticipated Chapter 11 Cases*: The expected timetable for the Chapter 11 Cases and significant first day motions.  *See* Disclosure Statement, Art. V.

f) *Plan Summary and Alternatives*: Information concerning the Prepack Plan and alternatives thereto.  *See* Disclosure Statement, Arts. VI and XI.

g) *Confirmation of the Prepack Plan*: Information to assist the Court in determining whether the Prepack Plan complies with the Bankruptcy Code. *See* Disclosure Statement, Arts. VII-VIII.

h) *Projections and Valuation*: Certain financial projections and valuation of the Reorganized Debtors. See Disclosure Statement, Art. IX.

i) *Risk Factors*: A description of certain risk factors that may affect the Prepack Plan and risks associated with the Debtors' businesses, as well as certain risks associated with forward-looking statements and an overall disclaimer as to the information provided by and set forth in the Disclosure Statement.  *See* Disclosure Statement, Art. IX.

j) *Certain Securities Laws Matters*:  A description of the applicability of section 1145 of the Bankruptcy Code and the issuance of the New Genco Equity Warrants, New Genco Common Stock, New Genco MIP Primary Equity, and New Genco MIP Warrants under the Prepack Plan, and information regarding participation in the Rights Offering.  *See* Disclosure Statement, Art. XII.

k) *Certain U.S. Federal Income Tax and Marshall Islands Tax Consequences of the Prepack Plan:*  A description of certain U.S. federal income tax law consequences of the Prepack Plan and Marshall Islands tax law consequences of the Prepack Plan.  *See* Disclosure Statement, Arts. XIII-XIV.

- 13 -

l) *Recommendation*:  A recommendation by the Debtors that holders of Claims and Equity Interests in the voting classes vote to accept the Prepack Plan.  *See* Disclosure Statement, Art. XV.

30.     In addition, the Prepack Plan and Disclosure Statement were subject to the review and comment of the Supporting Lenders and the Supporting Noteholders before the commencement of the solicitation process, and the terms thereof were the subject of extensive arms'-length negotiations.

31.     Accordingly, the Disclosure Statement contains more than sufficient information typically found by bankruptcy courts to be adequate and complies with all aspects of section 1125 of the Bankruptcy Code.  Therefore, this Court should approve the Disclosure Statement as containing "adequate information" as defined by section 1125(a) and as required by section 1126(b) of the Bankruptcy Code.

## II.      THE COURT SHOULD APPROVE THE DEBTORS' SOLICITATION PROCEDURES

32.     To determine whether a solicitation of votes to accept or reject a plan should be approved, this Court must determine whether the solicitation complied with sections 1125(g) and 1126(b) of the Bankruptcy Code, and Bankruptcy Rules 3017(d), (e), and 3018(b) and (c).  For the reasons set forth herein and in the Scheduling Motion, the Debtors' Solicitation Procedures comply with the Bankruptcy Code, Bankruptcy Rules and applicable nonbankruptcy law, and should be approved.

### A.      The Debtors' Prepetition Solicitation Complies with the Requirements of Sections 1125(g) and 1126(b) of the Bankruptcy Code

33.     Sections 1125(g) and 1126(b) of the Bankruptcy Code govern the acceptance of a plan of reorganization by a holder of a claim or interest prior to the commencement of a chapter 11 case.  Section 1125(g) provides:

> Notwithstanding subsection (b), an acceptance or rejection of the
> plan may be solicited from a holder of a claim or interest if such
> solicitation complies with applicable nonbankruptcy law and if
> such holder was solicited before the commencement of the case in
> a manner complying with applicable nonbankruptcy law.[21]

34.    Section 1126(b) of the Bankruptcy Code provides that a holder of a claim

or interest that has accepted or rejected the plan before the commencement of the chapter 11 case

is deemed to have accepted or rejected such plan if:

> (1) the solicitation of such acceptance or rejection was in
> compliance with any applicable nonbankruptcy law, rule or
> regulation governing the adequacy of disclosure in connection with
> such solicitation; or
>
> (2) if there is not any such law, rule or regulation, such acceptance
> or rejection was solicited after disclosure to such holder of
> adequate information, as defined in section 1125(a) of this title.

35.    Here, the Debtors' prepetition solicitation of votes on the Prepack Plan

complies with the sections 1125(g) and 1126(b) of the Bankruptcy Code. *First*, to the extent that

the Debtors' solicitation of acceptances of the Prepack Plan in accordance with the Solicitation

Procedures (the "**Solicitation**") is deemed to constitute an offer of new securities, the Debtors

are exempt from the registration requirements of the Securities Act (and of any equivalent state

securities or "blue sky" laws) with respect to such offering under section 4(a)(2) of the Securities

Act and Regulation D promulgated thereunder ("**Regulation D**"). Regulation D exempts from

registration under the Securities Act all "transactions by an issuer not involving any public

offering." 15 U.S.C. § 77d(2).[22]   To the extent applicable, the Debtors may also rely on the "safe

harbor" provisions set forth in section 506 of Regulation D with respect to Voting Classes 3

---

[21]  11 U.S.C. § 1125(g).

[22]  Other debtors have used sections 4(a)(2) of the Securities Act to exempt their prepetition solicitation from the
registration and disclosure requirements under otherwise applicable nonbankruptcy law. *See, e.g., In re CHL Ltd.*,
No. 12- 12437 (KJC) (Bankr. D. Del. Oct. 4, 2012); *In re Insight Health Servs. Holdings Corp.*, No. 10-16564
(AJG) (Bankr. S.D.N.Y. Jan. 28, 2011); *In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395 (RJL) (Bankr.
S.D.N.Y. Sept. 17, 2007).

(Prepetition 2007 Facility Claims) and 8 (Convertible Note Claims).   To comply with the requirements of Section 506, the Company has undertaken reasonable steps to verify that persons receiving shares of New Genco Common Stock under the Prepack Plan qualify as Accredited Investors or QIBs.   Pursuant to the terms of the Prepack Plan, holders of Claims that are neither Accredited Investors nor QIBs will receive Cash in an amount equal to the value of the distribution they would have received if they were eligible holders.

36.     *Second*, to the extent that the Solicitation did not constitute an offer or sale of securities, there is no applicable nonbankruptcy law governing such solicitation under section 1126(b) of the Bankruptcy Code. In such cases, the Solicitation must include disclosure of adequate information as defined in section 1125(a) of the Bankruptcy Code.[23]   As discussed in Section I, *supra*, the Debtors' Disclosure Statement contains adequate information as required in section 1125(a) of the Bankruptcy Code.

**B.     The Debtors' Solicitation Package and Solicitation Procedures Comply with the Requirements of Bankruptcy Rules 3017(d), 3017(e) and 3018(c)**

37.     Bankruptcy Rule 3017(d) sets forth the materials that must be provided to holders of claims and equity interests for the purpose of soliciting their votes and providing adequate notice of the hearing on confirmation of a plan of reorganization.[24]   Bankruptcy Rule 3017(e) requires that this Court "consider the procedures for transmitting the documents and information required by subdivision (d) of this rule to the beneficial holders of stock, bonds, debentures, notes and other securities, determine the adequacy of [such] procedures, and enter any orders the court deems appropriate."[25]   Bankruptcy Rule 3018(c) provides that "[a]n acceptance or rejection shall be in writing, identify the plan or plans accepted or rejected, be

---

[23]  *See* 11 U.S.C. § 1126(b)(2).

[24]  *See* Fed. R. Bankr. P. 3017(d).

[25]  *Id.* 3017(e).

signed by the creditor or equity security holder or an authorized agent, and conform to the appropriate Official Form."[26]

38.     The Debtors' Solicitation Package, Ballots and Solicitation Procedures comply with the requirements of the Bankruptcy Code and the Bankruptcy Rules.

### 1.     Solicitation Packages and Combined Notice

39.     As required by Bankruptcy Rule 3017(d), the Solicitation Packages included the Disclosure Statement, the Prepack Plan and the notice of the deadline to submit Ballots to accept or reject the Prepack Plan.[27]  Holders of Claims against the Debtors in Classes 1, 2, 6, 7, 9, and 10 (*i.e.*, the Unimpaired Classes) were not provided with Solicitation Packages because such Holders of Claims are Unimpaired and presumed to accept the Prepack Plan pursuant to section 1126(f) of the Bankruptcy Code.  In addition, the holders of Equity Interests in Genco in Class 11 were not provided with Solicitation Packages because such Holders are deemed to reject the Prepack Plan pursuant to section 1126(g) of the Bankruptcy Code.  For the reasons set forth herein and in the Scheduling Motion, the Debtors request a waiver of the Bankruptcy Rule requirement that the Debtors mail a copy of the Prepack Plan and Disclosure Statement to creditors or equity interest holders presumed to accept or deemed to reject the Prepack Plan.

40.     In addition, the Debtors distributed the Combined Notice to creditors and equity holders in compliance with the Scheduling Order, and published the Combined Notice in *The Wall Street Journal* and *Tradewinds*.  The Combined Notice provided that copies of the Prepack Plan and the Disclosure Statement could be obtained upon request of the Debtors' counsel, are on file with the Clerk of the Bankruptcy Court, and are available for inspection on

---

[26] *Id.* 3018(c).

[27] Lender Voting Certification, at ¶ 6.

the Debtors' restructuring website at www.GencoRestructuring.com.  The Combined Notice also described the procedures and deadline for submitting an objection to the Disclosure Statement or confirmation of the Prepack Plan.

### 2.    Ballots

41.    Bankruptcy Rules 3017(d) and 3018(c) require a form of ballot substantially conforming to Official Form No. 14.  The Ballots are based on Official Form No. 14, but were modified to address the particular aspects of these Chapter 11 Cases.  To be counted as votes to accept or reject the Prepack Plan, the Ballot stated that all Ballots had to be properly executed, completed and delivered to GCG so that they would be received no later than the applicable Voting Deadline.

### 3.    The Solicitation Period Complied with Applicable Law and was Reasonable Under Bankruptcy Rule 3018(b)

42.    Bankruptcy Rule 3018(b) provides that prepetition acceptances or rejections of a prepackaged plan are valid only if the plan was transmitted to substantially all of the holders of claims or interests in each class, and only if the time for voting was not "unreasonably short."[28]  The voting periods of: (a) two (2) Business Days for the holders of Claims under the Prepetition Credit Facilities, which lasted from April 16, 2014 through April 18, 2014 at 10:00 a.m. (prevailing New York time) (the "**Lender Voting Period**"); and (b) thirty (30) days for holders of Convertible Notes, which lasted from April 16, 2014 through May 16, 2014 at 4:00 p.m. (prevailing New York time) (the "**Noteholder Voting Period**"), were both negotiated with the relevant creditor constituencies, are adequate under the particular facts and circumstances of these Chapter 11 Cases and were not "unreasonably short."

---

[28] Bankruptcy Rule 3018(b) also requires that the solicitation comply with section 1126(b) of the Bankruptcy Code, in that it must comply with applicable nonbankruptcy law or contain "adequate information."  As discussed in further detail herein, the Debtors' solicitation complies with section 1126(b) of the Bankruptcy Code in all respects.

43.    With respect to the Lender Voting Period, the two (2) day voting period for holders of claims in Classes 3, 4, and 5 was justified here because the timeframe for voting was formulated in consultation with and approved by the Prepetition Agents and is consistent with other prepackaged cases in this district.[29]  The holders of Claims in Classes 3, 4, and 5 were clearly able to provide such votes within that time period, as evidenced by the fact that 100% of the Claims in Classes 3, 4, and 5 submitted Ballots to accept the Prepack Plan during the Lender Voting Period. The Noteholder Voting Period of thirty (30) days likewise complies with the Prepack Guidelines, which require only a twenty-one (21) day voting period for publicly traded securities such as the Convertible Notes.  Accordingly, the Voting Classes had adequate and reasonable voting periods.

### 4.    The Voting Tabulation Procedures Are Appropriate

44.    The voting tabulation procedures used in the Chapter 11 Cases are appropriate, and the Court should approve the voting tabulation methodology used by the Debtors and the Balloting Agent.  The Balloting Agent did not count or consider, for any purpose in determining whether the Prepack Plan was accepted or rejected, the following Ballots, as applicable:

a) any Ballot received after the applicable Voting Deadline;

b) any Ballot that is illegible, contains insufficient information to identify the holder, lacking necessary information, or damaged;

c) any Ballot cast by a person or entity that does not hold a Claim or Equity Interest in the Voting Classes;

d) any unsigned Ballot;

---

[29]  *See, e.g.*, *In re Sbarro LLC*, No. 14-10557 (MG) (Bankr. S.D.N.Y. Mar. 13, 2014) (approving solicitation of prepetition secured lender claims in connection with a prepackaged plan with a voting period of three (3) days); *In re DJK Residential LLC*, No. 08-10375 (JMP) (Bankr. S.D.N.Y. May 2, 2008) (approving solicitation of prepetition facility claims in connection with an amended prepackaged plan, with a voting period of two (2) days, following the prepackaged solicitation of the original prepackaged plan, with a voting period of five (5) days).

e)  any Ballot not marked to accept or reject the Prepack Plan, or marked both to accept and reject the Prepack Plan;

f)  any Ballot submitted by a party not entitled to cast a vote with respect to the Prepack Plan;

g)  any Beneficial Ballot returned to GCG as opposed to the appropriate Nominee (or Nominee's agent); and

h)  any Ballot (other than a Master Ballot) that casts part of its vote in the same class to accept the Prepack Plan and part to reject the Prepack Plan.

45.     Furthermore, the Debtors required that each voting creditor vote the full amount of each Claim to either accept or reject the Prepack Plan; and that each voting creditor who holds multiple Claims within a particular class vote all such Claims to either accept or reject the Prepack Plan.  Additionally, if two or more Ballots or Master Ballots, as applicable, were submitted by or on behalf of the same creditor or Nominee, and were inconsistent in whole or in part, the last valid Ballot or Master Ballot received prior to the applicable Voting Deadline, to the extent of such inconsistency, superseded and revoked any prior Ballot or Master Ballot.

**C.     No Solicitation is Required of Classes Presumed to Accept the Prepack Plan**

46.     The holders of Claims in each of the Unimpaired Classes are conclusively presumed to have accepted the Prepack Plan and are not entitled to vote to accept or reject the Prepack Plan.  The Bankruptcy Code does not require the solicitation of votes from such holders.  Specifically, section 1126(f) of the Bankruptcy Code provides:

> Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.[30]

---

[30]  11 U.S.C. § 1126(f).

47.     Accordingly, pursuant to section 1126(f) of the Bankruptcy Code, the holders of Claims in each of the Unimpaired Classes are conclusively presumed to accept the Prepack Plan and have not been solicited.

### D.     No Solicitation is Required of Classes Deemed to Reject the Prepack Plan

48.     Under the Prepack Plan, holders of Class 11 Equity Interests in Genco are deemed to reject the Prepack Plan and their votes were not solicited.[31]  As set forth in further detail below, the Debtors do not intend to confirm the Prepack Plan with respect to Class 11 under section 1129(a) of the Bankruptcy Code; rather, the Debtors are seeking to confirm the Prepack Plan with respect to Class 11 under the "cram down" provisions of section 1129(b).  IN a "cram down" context, the results from any solicitation of votes from the holders of Class 11 Equity Interests in Genco would be irrelevant.  Indeed, courts have found it appropriate for debtors to deem a class to reject a plan and forego solicitation of such class when they intend to pursue confirmation pursuant to the "cramdown" provisions of 1129(b) with respect to that class – thereby avoiding the cost and delay associated with soliciting votes from such holders.[32]  Thus, consistent with the language in Section 1126(g) of the Bankruptcy Code, the Debtors deemed

---

[31] Section 1126(g) of the Bankruptcy Code provides:

> Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.

11 U.S.C. § 1126(g) (emphasis added).

[32] *See In re Melcher*, 329 B.R. 865, 875-76 (Bankr. N.D. Cal. 2005) (debtor not required to solicit votes of creditors that were receiving distributions under plan on account of such claims or interests but deemed to reject the plan); *In re Union County Wholesale Tobacco & Candy Co.*, 8 B.R. 442, 443 (Bankr. D. N.J. 1981) (holding that debtor need not solicit classes subject to "cramdown" treatment nor provide members of such classes with disclosure statement); *In re Egan*, 142 B.R. 730, 733 (Bankr. E.D. Pa. 1992) (permitting debtors not to resolicit class previously deemed to reject debtor's original plan but receiving nominal distribution under debtor's revised plan).

Class 11 to reject the Prepack Plan and the Debtors need not solicit votes from holders of Equity

Interests in Genco.[33]

49.     Moreover, holders of Class 11 Equity Interests in Genco have had more

than a sufficient opportunity to object to or be heard with respect to the Prepack Plan.  Such

holders were provided with the Combined Notice at the outset of these Chapter 11 Cases, and

provided additional notice through the filing of the 8-K summarizing the dates and deadlines in

the Combined Notice.  In addition, in response to a request from the Equity Committee for

additional time to analyze the terms of the Prepack Plan, the Court adjourned the Combined

Hearing by over a week, and adjourned the Equity Committee's Objection Deadline by two full

weeks.  Thus, holders of Equity Interests in Genco will have sufficient time and notice to object

to and be heard with respect to the Prepack Plan and the Debtors' determination to "cram down"

Class 11 under section 1129(b) of the Bankruptcy Code.  As such, their votes with respect to the

Prepack Plan need not be solicited.

## III.    THE PREPACK PLAN SATISFIES EACH
## <u>REQUIREMENT FOR CONFIRMATION</u>

50.     To confirm the Prepack Plan, the Debtors must demonstrate by a

preponderance of the evidence that they have satisfied the provisions of section 1129 of the

Bankruptcy Code.[34]  The Prepack Plan complies with all relevant sections of the Bankruptcy

---

[33] Nothing in Section 1126(g) of the Bankruptcy Code prohibits a debtor from deeming a class to have rejected a plan in circumstances such as those presented here.  In the present case, because certain holders of both secured and unsecured claims are not being paid in full, the holders of Equity Interests in Genco are not "entitled" under the Bankruptcy Code's absolute priority rule to any distribution on account of their Equity Interests. Rather, such holders are receiving a distribution from the consideration that would otherwise be distributable to holders of Prepetition 2007 Facility Claims and Convertible Note Claims in exchange for the cancellation or surrender of their Equity Interests, as a result of the vigorously negotiated settlements embodied in the RSA.

[34]  *See In re Bally Total Fitness*, 2007 WL 2779438, at *3 ("The Debtors, as proponents of the Plan, have the burden of proving the satisfaction of the elements of Sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence."); *see also Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's

Code (including sections 1122, 1123, 1125, 1126, 1127, and 1129) as well as the Bankruptcy

Rules and applicable nonbankruptcy law.   This memorandum addresses each requirement

individually, as well as the permissive elements of the Prepack Plan.

### A.    The Prepack Plan Complies with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(1))

51.    Section 1129(a)(1) of the Bankruptcy Code requires that a chapter 11 plan

"compl[y] with the applicable provisions of [the Bankruptcy Code]."[35]  The legislative history of

section 1129(a)(1) of the Bankruptcy Code explains that this provision encompasses the

requirements of sections 1122 and 1123 of the Bankruptcy Code including, principally, rules

governing classification of claims and interests and the contents of a plan of reorganization.[36]  As

explained below, the Prepack Plan complies with sections 1122 and 1123 of the Bankruptcy

Code in all respects.

### 1.    The Prepack Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code

52.    The classification requirements of section 1122 provide:

(a)    Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

---

appropriate standard of proof both under § 1129(a) and in a cramdown."); *In re El Charro, Inc.*, No. 05-60294, 2007 WL 2174911, at *4 n.4 (Bankr. D. Kan. July 26, 2007) (preponderance of evidence standard applies to valuation and every element governing confirmation); *In re Sylvan I-30 Enters.*, No. 05-86708, 2006 WL 2539718, at *6 (Bankr. N.D. Tex. Sept. 1, 2006) (applying preponderance of evidence standard to confirmation in context of feasibility).

[35]  11 U.S.C. § 1129(a)(1).

[36]  S. Rep. No. 95-989, at 126 (1978); H.R. Rep. No. 95-595, at 412 (1977); *see also Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636, 648-49 (2d Cir. 1988) (suggesting Congress intended the phrase "'applicable provisions' in [section 1129(a)(1)] to mean provisions of Chapter 11 . . . such as section 1122"); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) (noting that "[t]he legislative history of § 1129(a)(1) explains that this provision embodies the requirements of §§ 1122 and 1123, respectively, governing classification of claims and the contents of the Plan"); *see also In re Mirant Corp.*, No. 03-46590, 2007 WL 1258932, at *7 (Bankr. N.D. Tex. Apr. 27, 2007) (noting that objective of 1129(a)(1) is to assure compliance with sections of Bankruptcy Code governing classification and contents of a plan of reorganization).

(b)     A plan may designate a separate class of claims consisting
only of every unsecured claim that is less than or reduced
to an amount that the court approves as reasonable and
necessary for administrative convenience.

53.     The Second Circuit has recognized that, under section 1122 of the

Bankruptcy Code, plan proponents have significant flexibility to place similar claims into

different classes, provided there is a rational basis for doing so.[37]   For example, courts have

allowed separate classification:  (a) where members of a class possess different legal rights;[38] and

(b) where there are good business reasons for separate classification.[39]

54.     The Prepack Plan provides for the separate classification of Claims and

Equity Interests into 11 different Classes based upon differences in the legal or factual nature of

those Claims and Equity Interests or other relevant and objective criteria.  Additionally, each of

the Claims or Equity Interests in a particular Class under the Prepack Plan is substantially similar

---

[37]   *See Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc. (In re Source Enters., Inc.)*, 392 B.R. 541, 556
(S.D.N.Y. 2008) ("[A] plan proponent is afforded significant flexibility in classifying claims under § 1122(a) if there
is a reasonable basis for the classification scheme and if all claims within a particular class are substantially
similar.") (internal quotation marks omitted); *Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd.
P'ship)*, 21 F.3d 477, 483 (2d Cir. 1994) (holding that similar claims may be separately classified unless sole
purpose is to engineer an assenting impaired class); *Frito-Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*,
10 F.3d 944, 956-57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a
rational basis; separate classification based on bankruptcy court approval of Debtors' reimbursement of guarantors
for payment of certain claimants' indemnity claims); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr.
S.D.N.Y. 1993) (although discretion is not unlimited, "the proponent of a plan of reorganization has considerable
discretion to classify claims and interests according to the facts and circumstances of the case") (internal quotation
marks omitted); *Drexel*, 138 B.R. at 757 ("Courts have found that the Bankruptcy Code only prohibits the identical
classification of dissimilar claims.  It does not require that similar classes be grouped together . . . ."); *In re
Ionosphere Clubs, Inc.*, 98 B.R. 174, 177-78 (Bankr. S.D.N.Y. 1989) ("[A] debtor may place claimants of the same
rank in different classes and thereby provide different treatment for each respective class."); *see also In re Jersey
City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987) (recognizing that a plan proponent may group similar claims
in different classes if separate classes of claims are reasonable); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303
(Bankr. N.D. Tex. 2007) ("[T]he only express prohibition on separate classification is that it may not be done to
gerrymander an affirmative vote on a reorganization plan.").

[38]   *See Drexel*, 138 B.R. at 715; *see also Heritage*, 375 B.R. at 299 n.86 (finding that if creditors had different legal
rights under equitable subordination, then separate classification would be appropriate); *Mirant Corp.*, 2007 WL
1258932, at *7 (permitting separate classification because holders of claims had different legal interests in debtor's
estate); *In re Kaiser Aluminum Corp.*, No. 02-10429, 2006 WL 616243, at *5 (Bankr. D. Del. Feb. 6, 2006)
(permitting classification scheme after consideration of creditors' legal rights).

[39]   *See Aetna Cas. & Sur. Co. v. Clerk U.S. Bankr. Ct., New York, N.Y. (In re Chateaugay Corp.)*, 89 F.3d 942, 949
(2d Cir. 1996) (finding that debtor must have a legitimate business reason supported by credible proof to justify
separate classification of unsecured claims).

to the other Claims or Equity Interests in such Class, and the classification structure is necessary to implement certain aspects of the Prepack Plan.  Administrative Claims, Fee Claims, Priority Tax Claims and Fee Claims (the "**Unclassified Claims**") are not classified and are separately treated.

55.     The Prepack Plan's classification scheme follows the Debtors' capital structure.  More specifically:

- Class 1 provides for the separate classification of all Other Priority Claims;

- Class 2 provides for the separate classification of all Other Secured Claims;

- Class 3 provides for the separate classification of all Prepetition 2007 Facility Claims;

- Class 4 provides for the separate classification of all Prepetition $253 Million Facility Claims;

- Class 5 provides for the separate classification of all $100 Million Facility Claims;

- Class 6 provides for the separate classification of all Prepetition Swap Claims;

- Class 7 provides for the separate classification of all General Unsecured Claims against the Debtors;

- Class 8 provides for the separate classification of all Convertible Note Claims against the Debtors;

- Class 9 provides for the separate classification of all Intercompany Claims;

- Class 10 provides for the separate classification of all Equity Interests in each of the Debtor Subsidiaries; and

- Class 11 provides for the separate classification of all Equity Interests in Genco.

56.    The Prepetition 2007 Facility Claims, the Prepetition $253 Million Facility Claims, and the $100 Million Facility Claims are separately classified into three Classes according to relative priority and the collateral securing such claims, while all General Unsecured Claims against the Debtors are classified in Class 7 to reflect the unsecured status of such Claims.

57.    Prepetition Swap Claims are classified separately, even though they are secured by the same collateral securing the Prepetition 2007 Facility Claims, because the terms of the Prepetition 2007 Credit Agreement provide that the Prepetition 2007 Facility Lenders are entitled to receive payment in full from their collateral before any payments are made on account of the Prepetition Swap.  The Convertible Note Claims are classified separately in Class 8 to implement the agreed-upon treatment of such Claims as set forth in the RSA.

58.    Intercompany Claims are unique in their relationship to the Company's business operations and are thus separately classified in Class 9.  As disclosed in the Prepack Plan, Intercompany Claims are being reinstated and are therefore unimpaired under the Prepack Plan.

59.    Equity Interests are classified separately from Claims and are divided into two separate Classes: Subsidiary Equity Interests (Class 10) and Equity Interests in Genco (Class 11).  The Equity Interests in Genco reflect the true "old equity" of the Company because Genco, as the corporate parent, was the owner – either directly or indirectly – of all of the Debtor Subsidiaries.  Therefore, to implement the restructuring, all of the Equity Interests in Genco are being cancelled and discharged under the Prepack Plan.[40]   The Subsidiary Equity Interests,

---

[40] Equity Interests in Genco are receiving New Genco Equity Warrants in exchange for the cancellation or surrender of those Equity Interests from consideration that otherwise would have been distributed to holders of Prepetition 2007 Facility Claims and Convertible Note Claims.

however, do not constitute "old equity" and are classified separately from the Equity Interests in Genco. Under the Prepack Plan, the Subsidiary Equity Interests will remain in place to maintain the Debtors' corporate structure for the administrative benefit of the Reorganized Debtors, and are therefore Unimpaired.[41]

60.    Finally, the classification structure was not designed to gerrymander the Classes to create an Impaired consenting Class. Accordingly, the Prepack Plan fully complies with and satisfies the requirements of section 1122 of the Bankruptcy Code.

### 2.    The Prepack Plan Satisfies the Seven Mandatory Plan Requirements of 11 U.S.C. §§ 1123(a)(1)-(a)(7)

61.    Section 1123(a) of the Bankruptcy Code requires that the contents of a chapter 11 plan: (i) designate classes of claims and interests; (ii) specify unimpaired classes of claims and interests; (iii) specify treatment of impaired classes of claims and interests; (iv) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim agrees to a less favorable treatment of such particular claim or interest; (v) provide adequate means for the plan's implementation; (vi) provide for the prohibition of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and (vii) contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors.[42]

62.    The Prepack Plan satisfies the mandatory plan requirements set forth in section 1123(a) of the Bankruptcy Code. Article III of the Prepack Plan satisfies the *first three requirements* of section 1123(a) of the Bankruptcy Code by designating Classes of Claims and

---

[41] *See Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd. (In re Ion Media Networks, Inc.)*, 419 B.R. 585, 600-01 (Bankr. S.D.N.Y. 2009).

[42] *See* 11 USC §§ 1123(a)(1)-(a)(7).

Equity Interests, as required by section 1123(a)(1) of the Bankruptcy Code; specifying the Classes of Claims and Equity Interests that are Unimpaired under the Prepack Plan, as required by section 1123(a)(2) of the Bankruptcy Code; and specifying the treatment of each Class of Claims and Equity Interests that is Impaired, as required by section 1123(a)(3) of the Bankruptcy Code.[43]

63.    The Prepack Plan also satisfies section 1123(a)(4) of the Bankruptcy Code – the *fourth* mandatory requirement – because the treatment of each Allowed Claim or Equity Interest within a Class is the same as the treatment of each other Allowed Claim or Interest in that Class, unless the Holder of a Claim or Equity Interest consents to less favorable treatment on account of its Claim or Interest.  With respect to the holders of Convertible Note Claims in Class 8, the Prepack Plan provides that holders who demonstrate they are Accredited Investors or QIBs will receive their share of the Noteholder Rights and the Noteholder Equity Distribution, and holders who are not Accredited Investors or QIBs will receive cash *of equal value* to what they would have received if they were an Accredited Investor or QIB.  Thus, while they are receiving differing currency based on their status as Accredited Investors or QIBs to comply with certain securities laws, all holders of Convertible Note Claims will be receiving equal treatment.

64.    The provisions of the Prepack Plan provide adequate means for the Prepack Plan's implementation, thus satisfying the *fifth* requirement of section 1123(a) of the Bankruptcy Code.[44]  The provisions of Article IV and V of the Prepack Plan relate to, among other things:

---

[43]  Prepack Plan, Art. III.

[44]  Section 1123(a)(5) of the Bankruptcy Code specifies that adequate means for implementation of a plan may include: retention by the debtor of all or part of its property; the transfer of property of the estate to one or more entities; cancellation or modification of any indenture; curing or waiving of any default; amendment of the debtor's charter; or issuance of securities for cash, for property, for existing securities, in exchange for claims or interests or for any other appropriate purpose.  11 U.S.C. § 1123(a)(5).

- the general settlement of Claims and Equity Interests and other specific Prepack Plan settlements;

- entry into, at the Debtors' option, either (i) the New Exit Financing Facility Agreement or (ii) the Amended and Restated $253 Million Credit Agreement and the Amended and Restated $100 Million Credit Agreement;

- the cancellation of certain securities and agreements and the surrender of existing securities;

- commencement and consummation of the Rights Offering for holders of the Prepetition 2007 Facility Claims and Eligible Noteholders;

- the issuance of new equity consisting of New Genco Common Stock and New Genco Equity Warrants and entry into the Registration Rights Agreement;

- issuance of the New Genco Equity Warrants;

- the continuation of the Debtors' corporate existence and the vesting of assets in each of the Reorganized Debtors;

- amendments to the Articles of Incorporation, New Genco By-Laws for Reorganized Genco and each of the other Reorganized Debtors and adoption of the Management Incentive Program;

- the appointment of officers and directors of Reorganized Genco and the Reorganized Debtors;

- the maintenance of Causes of Action and the preservation of all Causes of Action not expressly settled or released.

65.    The *sixth* requirement of section 1123(a) – *i.e.*, that a plan prohibit the issuance of nonvoting equity securities – is also met.  Pursuant to the terms of the New Genco Charter, the issuance of nonvoting equity securities is prohibited.[45]

---

[45]  *See* Prepack Plan, Art. V.A.1; New Genco Charter, Plan Supplement, Ex. 4.  Pursuant to the Prepack Plan, the charter and by-laws of the other Reorganized Debtors will be amended to prohibit the issuance of nonvoting equity securities after the Effective Date. *See* Prepack Plan, Art. V.A.2.

66.    Finally, the Prepack Plan fulfills the *seventh* requirement in section 1123(a), which requires that the Prepack Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy" with respect to the manner of selection of any officer, director, or trustee.[46]    Article V.B of the Prepack Plan provides for the selection of the New Board, which will consist of Peter C. Georgiopoulos and six (6) other directors, who will be selected by Centerbridge (depending on Centerbridge's aggregate holdings as of the Effective Date) and a Board Selection Committee consisting of holders of claims under the Prepetition 2007 Facility.    Consistent with Article V.B of the Prepack Plan, the Debtors will be disclosing the identities and biographical information of members of the New Boards for Genco and each of the other Debtors prior to the Combined Hearing as part of the Plan Supplement.[47]    In light of the fact that holders of Prepetition 2007 Facility Claims will own 81.1% of the equity in Reorganized Genco as a result of the conversion of their prepetition debt, and will own an additional 7% through the Rights Offering (subject to dilution), the manner of selection of officers and directors is consistent with public policy and the interests of creditors and the Debtors' new equity owners.

67.    Accordingly, the Prepack Plan satisfies the mandatory plan requirements set forth in section 1123(a) of the Bankruptcy Code.

**B.    The Debtors, as Plan Proponents, Have Complied with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2))**

68.    Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a chapter 11 plan comply with the applicable provisions of the Bankruptcy Code.    The legislative history to section 1129(a)(2) reflects that this provision is intended to encompass the disclosure

---

[46]  11 U.S.C. § 1123(a)(7).

[47]  *See* The Identity of Officers and Members of the New Board of Reorganized Genco, Plan Supplement, Ex. 8.

and solicitation requirements set forth in section 1125 of the Bankruptcy Code and the plan

acceptance requirements set forth in section 1126 of the Bankruptcy Code.[48]  The Debtors have

complied with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as

well as Bankruptcy Rules 3017 and 3018, as discussed in detail above, and accordingly, the

Debtors have satisfied the requirement of section 1129(a)(2) of the Bankruptcy Code.

> ### C. The Prepack Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law (11 U.S.C. § 1129(a)(3))

69.    Section 1129(a)(3) of the Bankruptcy Code requires a bankruptcy court to

deny confirmation of a plan if it is not proposed in "good faith" or is "forbidden by law."[49]  The

Second Circuit has construed the good faith standard as requiring a showing that "the plan was

proposed with honesty and good intentions and with a basis for expecting that reorganization can

be effected."[50]  Additionally, courts generally hold that "good faith" should be evaluated in light

of the totality of the circumstances surrounding confirmation.[51]

70.    Courts in this district have described the goals and policies associated with

the "good faith" requirement of section 1129(a)(3) of the Bankruptcy Code as follows:

> The primary goal of chapter 11 is to promote the rehabilitation of
> the debtor.  Congress has recognized that the continuation of the

---

[48]    *In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636 (2d Cir. 1988) ("Objections to confirmation raised under § 1129(a)(2) generally involve the alleged failure of the plan proponent to comply with § 1125 and § 1126 of the [Bankruptcy] Code."); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) (stating that to comply with section 1129(a)(2), "the proponent must comply with the ban on post-petition solicitation of the plan unaccompanied by a written disclosure statement approved by the court in accordance with [Bankruptcy] Code §§ 1125 and 1126."); *see also* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978) ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.").

[49]    11 U.S.C. § 1129(a)(3).

[50]    *Johns-Manville*, 843 F.2d at 649 (internal quotation marks omitted); *see also In re Texaco, Inc.*, 84 B.R. 893, 907 (Bankr. S.D.N.Y. 1988), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1998) ("[I]n the context of a [Chapter 11] reorganization . . . a plan is considered proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.") (internal quotation marks omitted).

[51]    *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) (citing cases).

operation of a debtor's business as a viable entity benefits the national economy through the preservation of jobs and continued production of goods and services. The Supreme Court similarly has recognized that "the fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."[52]

71.     The Debtors proposed the Prepack Plan in good faith and with a desire to effectuate a full and feasible financial restructuring of their enterprises while maximizing value for the benefit of all stakeholders. More specifically, the Prepack Plan is the result of significant arm's-length and oftentimes contentious negotiations culminating in the RSA among the Debtors, the Supporting Lenders (representing the holders of over 93% of the principal amount of the Prepetition 2007 Facility and 100% of the principal amounts of the Prepetition $253 Million Facility and the Prepetition $100 Million Facility) and the Supporting Noteholders (consisting of over 82% of the holders of Convertible Note Claims). This Court has already recognized that the RSA and the transactions contemplated therein were negotiated in good faith and at arm's-length.[53] The resulting Prepack Plan contains a series of compromises that represent a good faith effort to provide the highest available recoveries in the totality of the circumstances. As a result of these compromises, the Prepack Plan has the unanimous support of the Prepetition 2007 Facility Lenders, the Prepetition $253 Million Facility Lenders, and the Prepetition $100 Million Facility Lenders and support from an overwhelming majority of the Convertible Noteholders.[54]

---

[52]   *In re WorldCom, Inc.*, No. 02-13533, 2003 Bankr. LEXIS 1401, at *152 (Bankr. S.D.N.Y. Oct. 31, 2003) (citations omitted).

[53]   *In re Genco Shipping & Trading Limited*, 2014 Bankr. LEXIS 2183 at *14 ("The transaction in the RSA, including the termination fee, was negotiated in good faith and at arms-length.").

[54]   *See In re Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) ("The fact that the plan is proposed by the committee as well as the debtors is strong evidence that the plan is proposed in good faith."); *In re Eagle-Picher Indus., Inc.*, 203 B.R. 256, 274 (Bankr. S.D. Ohio 1996) (finding that plan of reorganization was proposed in good faith when, among other things, it was based on extensive arm's-length negotiations among plan proponents and other parties-in-interest).

72.    The Prepack Plan proposes to implement (i) a deleveraging of the Debtors' balance sheet by converting approximately $1.2 billion of debt into equity in Reorganized Genco and provides the Company with $100 Million of additional liquidity through a fully-backstopped rights offering, and (ii) the entry into the Amended and Restated Term Loan Facilities.  By providing for the successful reorganization of the Debtors, the Prepack Plan achieves the fundamental purpose of chapter 11.  Thus, the Prepack Plan satisfies section 1129(a)(3) of the Bankruptcy Code by enabling the Reorganized Debtors to continue to operate as a viable business post-emergence.

D.    **The Prepack Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments (11 U.S.C. § 1129(a)(4))**

1.    **All Payments to be made by the Debtors are Subject to Court Approval as Reasonable**

73.    Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, by the debtor, or by a person issuing securities or acquiring property under a plan, be subject to approval of the Court as reasonable.[55] Here, the Prepack Plan mandates that all payments made by the Debtors for services, costs, or expenses in connection with these Chapter 11 Cases before the Effective Date, including all Claims for Accrued Professional Compensation, must be approved by, or are subject to the approval of, the Bankruptcy Court as reasonable.[56] Pursuant to the Prepack Plan, Professionals asserting a Claim for Accrued Professional Compensation for services rendered before the Effective Date must file a request for final allowance of such Claim for Accrued Professional

---

[55] *See, e.g.*, *WorldCom*, 2003 Bankr. LEXIS 1401, at *160; *Drexel*, 138 B.R. at 760; *In re Elsinore Shore Assocs.*, 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (holding that requirements of section 1129(a)(4) were satisfied where plan provided for payment of only "allowed" administrative expenses).

[56] Prepack Plan, Art. II.B.

Compensation with the Bankruptcy Court no later than forty-five (45) days after the Effective Date.[57]

74.    Furthermore, payments to the Supporting Creditors have either been approved by this Court pursuant to the Cash Collateral Order [Docket No. 170] (in the case of the Prepetition Agents), or the *Order Granting The Motion For An Order (A) Authorizing The Assumption Of The Restructuring Support Agreement, (B) Approving Payment Of The Termination Fee And (C) Granting Related Relief* [Docket No. 47] (in the case of the Supporting Creditors) and/or are subject to the approval of this Court pursuant to the Prepack Plan.

### 2.    The Management Incentive Program is Reasonable and Appropriate

75.    The Prepack Plan provides for a Management Incentive Program to be adopted by Reorganized Genco, which will provide management of Reorganized Genco with 1.8% of the New Genco Common Stock along with three (3) tiers of warrants with staggered strike prices based on increasing equity values.[58] The terms of the Management Incentive Program were disclosed in the Disclosure Statement and Prepack Plan, and the form of the Management Incentive Program was filed as an exhibit to the Plan Supplement.[59]   The Management Incentive Program was developed by the Debtors, in consultation with their advisors, and the terms, conditions, and payment structures were extensively negotiated with the Supporting Creditors as part of the negotiations surrounding the RSA. The Management Incentive Program was reviewed and recommended by an independent compensation committee and ultimately approved by the independent directors comprising 6 of the 7 members of the Genco board of directors, none of whom have any economic stake in the Management Incentive

---

[57] *Id.*

[58] *Id.* Art. I.A.85.

[59] *See* Management Incentive Program, Plan Supplement, Ex. 10.

Program.  The Management Incentive Program is expressly supported by the Supporting 2007

Facility Lenders (who reflect the future majority owners of the equity in the Reorganized

Debtors), and the Supporting Noteholders (who will also own a portion of the Reorganized

Debtors' equity).

76.    The Management Incentive Program is a post-Effective Date

compensation plan.  Based on discussions with the Supporting 2007 Facility Lenders and the

Supporting Noteholders, awards thereunder will be determined after the Effective Date by the

New Board and will be available only to the post-effective date directors, officers, and other

management of Reorganized Genco disclosed as part of the Plan Supplement.  All awards under

the Management Incentive Program will vest equally over three years, commencing on the first

anniversary of the Effective Date (*i.e.*, if an eligible participant voluntarily leaves the

Reorganized Company or is terminated for cause prior to the first anniversary of the Effective

Date, such participant will forfeit his or her awards under the Management Incentive Program,

subject to certain exceptions set forth therein).  The only legal requirement applicable to the

Management Incentive Program is that it be disclosed pursuant to section 1129(a)(5) of the

Bankruptcy Code.  By including the Management Incentive Program in the Prepack Plan and the

Disclosure Statement, however, the Debtors have gone beyond mere disclosure and have

subjected the Management Incentive Program to the more rigorous process of creditor approval.

77.    To the extent that the requirements of section 1129(a)(4) apply to the

Management Incentive Program in this case – though the Debtors do not concede that they do –

they are easily satisfied.  The Management Incentive Program is reasonable and consistent with

market practice, is supported by the key stakeholders in the Reorganized Company, and has been

accepted by creditors through the overwhelming support for the Prepack Plan.  In addition,

courts in this jurisdiction and others have approved similar incentive programs as reasonable in connection with confirmation of chapter 11 plans of reorganization.[60]  Accordingly, the awards to be made under the Management Incentive Program are reasonable and comply with section 1129(a)(4) of the Bankruptcy Code.[61]

### E.   Post-Emergence Directors and Officers Have Been Disclosed and Their Appointment is Consistent with Public Policy (11 U.S.C. § 1129(a)(5))

78.   Section 1129(a)(5)(A) of the Bankruptcy Code requires that, before confirmation, the proponent of a plan must disclose the identities and affiliations of the proposed officers and directors of the reorganized debtors and that the appointment or continuance of such officers and directors must be consistent with the interests of creditors and equity security holders and with public policy.[62]  In addition, section 1129(a)(5)(B) requires a plan proponent to disclose the identity of any "insider" (as defined by 11 U.S.C. § 101(31)) to be employed or retained by the reorganized debtor and the "nature of any compensation for such insider."[63]  A

---

[60]  *See, e.g.*, *In re Journal Register Co.*, 407 B.R. 520, 538 (Bankr. S.D.N.Y. 2009) (overruling objections to the proposed incentive plan, and confirmed the plan as reasonable because it (i) was disclosed in the disclosure statement (such that it could be factored in voting on the plan – and the creditors overwhelmingly accepted the plan), (ii) would be paid post-effective date, (iii) was supported by the debtors' CEO and the creditors' committee as reasonable, and (iv) was in line with the market for compensation of executives at similar companies); Hr'g Tr. at 146:11-15, *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2013) (compensation plan was reasonable given that it was approved by an independent board committee (at the recommendation of the debtors' independent compensation consultant), and consistent with the market for compensation of executives at similar companies, and those bearing the burden of the plan found it reasonable).

[61]  Certain parties in both *Journal Register* and *Kodak* objected to a management compensation program proposed in a chapter 11 plan on the grounds that it must comply with the requirements of section 503(c) of the Bankruptcy Code, which prohibits retention or severance payments to management, unless they satisfy certain enumerated standards.  In each case, those objections were overruled and the Court found that the requirements of section 503(c) need not be met.  *In re Journal Register Co.*, 407 B.R. 520, 537 (Bankr. S.D.N.Y. 2009); Hr'g Tr. at 146, *In re Eastman Kodak, Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2013).  For the reasons set forth above, and similar to *Journal Register* and *Kodak* the awards under the Management Incentive Program do not implicate section 503(c) of the Bankruptcy Code.  Nor does the Management Incentive Program contemplate any severance payments. *Compare In re AMR Corp.*, 497 B.R. 690, 697 (Bankr. S .D.N.Y. 2013) (applying the 503(c) standards to severance payments to be made under a plan).  The Debtors, however, reserve the right to argue that the Management Incentive Program is nevertheless permissible even under section 503(c) of the Bankruptcy Code.

[62]  11 U.S.C. § 1129(a)(5)(A).

[63]  *Id.* § 1129(a)(5)(B).

plan may also contemplate the retention of the debtor's existing officers and directors to serve post-effective date.[64]

79.    Article V.B of the Prepack Plan provides that the New Board of Reorganized Genco will be comprised of Peter C. Georgiopoulos (a current director) and six (6) other directors, including two (2) directors selected by Centerbridge and four (4) directors selected by the Board Selection Committee, consisting of four holders of Prepetition 2007 Credit Facility Claims, as identified in the Plan Supplement.[65]   The Prepack Plan also provides that officers of the Reorganized Debtors will serve in accordance with applicable bankruptcy law, and will include John C. Wobensmith, who currently serves as Chief Financial Officer of Genco and certain Debtor Subsidiaries and Manager of certain other Debtor subsidiaries.[66]   In accordance with the terms of the Prepack Plan, the Plan Supplement will disclose prior to the Combined Hearing, to the extent known: (a) the identity of the members of the New Boards of Reorganized Genco and each of the other Reorganized Debtor Subsidiaries;[67] and (b) the identity of the officers of Reorganized Genco and each of the Reorganized Debtors.[68]

80.    Accordingly, the appointment or continuation in such offices of each individual or entity who will serve as an officer or director of Reorganized Genco or the Reorganized Debtor Subsidiaries is consistent with the interests of creditors and with public

---

[64] *See, e.g.*, *Texaco*, 84 B.R. at 908 (determining that a plan satisfied 1129(a)(5) by disclosing directors and officers who would serve post-confirmation).

[65] Prepack Plan, Art. V.B provides further that Centerbridge's allocation of two (2) selections is subject to change based on a reduction in its aggregate holdings prior to the Effective Date.

[66] Prepack Plan, Art. V.B.

[67] The nature and compensation for any member who is an "insider" under section 101(31) of the Bankruptcy Code will be disclosed prior to the Confirmation Hearing.

[68] *In re Eagle Bus Mfg., Inc.*, 134 B.R. 584, 599 (Bankr. S.D. Tex. 1991) (finding sufficient disclosure of officer and director identities "to the extent known as of the Hearing."), *aff'd*, 158 B.R. 421 (S.D. Tex. 1993).

policy.   As a result, the Debtors have satisfied the requirements of section 1129(a)(5) of the

Bankruptcy Code.

### F.    The Prepack Plan Does Not Require Governmental Regulatory Approval of Rate Changes (11 U.S.C. § 1129(a)(6))

81.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation of a

chapter 11 plan only if any regulatory commission that will have jurisdiction over the debtor

after confirmation has approved any rate change provided for in the plan.[69]   Section 1129(a)(6)

of the Bankruptcy Code is inapplicable here because the Prepack Plan does not provide for any

rate changes.

### G.    The Prepack Plan Is in the Best Interests of Creditors and Equity Interest Holders (11 U.S.C. § 1129(a)(7))

82.    Section 1129(a)(7) of the Bankruptcy Code is often referred to as the "best

interests test" or the "liquidation test," and provides, in relevant part:   With respect to each

impaired class of claims or interests –

> (A)    Each holder of a claim or interest of such class –
>
>> (i)    has accepted the plan; or
>>
>> (ii)    will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date. . .[70]

83.    The best interests test focuses on individual creditors who voted against a

plan rather than classes of claims.[71]   Under the best interests test, the court must find that each

---

[69]  11 U.S.C. § 1129(a)(6).

[70]  *Id.* § 1129(a)(7).

[71]  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N LaSalle St. P'ship*, 526 U.S. 434, 441 (1999).

non-accepting creditor will receive or retain value in an amount equal to at least as much as it would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.[72]

84.    The best interests test is satisfied because, as discussed below, **all** Classes – Impaired or Unimpaired, accepting or rejecting – will receive at least as much under the Prepack Plan as they would in a chapter 7 liquidation.[73]

85.    To determine the value that holders of Claims and Equity Interests would receive in a hypothetical liquidation, the Debtors and their advisors analyzed the estimated the dollar amount that each of the Debtors' estates would have available from a liquidation of its assets under chapter 7 of the Bankruptcy Code (the "**Liquidation Analysis**").[74] The Liquidation Analysis estimates that in a chapter 7 liquidation, gross proceeds at each Debtor would consist (as applicable) of (a) cash, (b) accounts receivable, (c) prepaid expenses and other assets, (d) vessels, (e) other fixed assets, (f) the value of the Company's stake in Baltic Trading Limited, (g) the value of the Company's stake in Jinhui Shipping and Transportation and (h) unencumbered assets.

86.    In estimating these amounts, the Debtors made several key assumptions, including that a conversion of the Chapter 11 Cases to cases under chapter 7 would require the Debtors to cease substantially all of the Debtors' operations in an orderly manner after the Petition Date and use their cash position to liquidate their assets and pay claims in accordance with the priority scheme set forth in the Bankruptcy Code.  The Liquidation Analysis further

---

[72] *Id.* at 441; *United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213, 228 (1996); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007), *appeal dismissed*, 371 B.R. 660 (S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008) (the "**Adelphia Confirmation Decision**") ("In determining whether the best interests standard is met, the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7.").

[73] Because Classes 3, 4, 5 and 8 voted unanimously to accept the Prepack Plan, the best interests test does not apply to those Classes, but nevertheless is satisfied, as set forth below.

[74] Disclosure Statement, Ex. I.

assumed that the majority of the wind-down of their businesses would be accomplished in approximately 90 days, but that the liquidation would be expected to take six months to fully complete. The Liquidation Analysis also assumed that the proceeds from the sale of assets would be consistent across jurisdictions, and that expenses incurred to sell assets outside the United States would be comparable to those incurred for assets located within the United States.

87.   The following table provides a consolidated overview of recoveries to holders of Claims and Equity Interests under the Liquidation Analysis on an aggregate basis:

| Class | Estimated Aggregate Claims | Estimated Percentage of Recovery | |
|---|---|---|---|
| | | Prepack Plan[75] | Liquidation |
| Class 1 – Other Priority Claims | De Minimis/None | 100% | 100% |
| Class 2 – Other Secured Claims | De Minimis/ None | 100% | 100% |
| Class 3 – Prepetition 2007 Facility Claims | $1,055,911,525.00 | 91.5% | 54.7 – 78.6% |
| Class 4 – Prepetition $253 Million Facility Claims | $175,718,000.00 | 100% | 100% |
| Class 5 – Prepetition $100 Million Facility Claims | $73,561,132.60 | 100% | 100% |
| Class 6 – Prepetition Swap Claims | $6,689,041 | 100% | 1.7 – 2.1% |
| Class 7 – General Unsecured Claims | $1,000,000 | 100% | 1.7 – 2.1% |
| Class 8 – Convertible Note Claims | $125,000,000 | 80.3% | 1.7 – 2.1% |
| Class 9 – Intercompany Claims | N/A | 100% | 0% |
| Class 10 – Subsidiary Equity Interests | N/A | 100% | 0% |
| Class 11 – Equity Interests in Genco | 44,449,407 Outstanding Shares | $32,900,000 | $0 |

88.   The Liquidation Analysis plainly establishes that under the Prepack Plan all holders of Claims or Equity Interests will receive or retain property valued at an amount greater than or equal to the value of what they would receive if the Debtors were liquidated under chapter 7. Accordingly, the Prepack Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

---

[75]  The projected recoveries described herein account for dilution from the New Genco Equity Warrants but are prior to dilution from the warrants issued under the Management Incentive Program.

**H.       Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(8)).**

89.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept the plan or be unimpaired.[76]  Pursuant to section 1126(c) of the Bankruptcy Code, a class of ***claims*** accepts a plan if holders of at least two-thirds in amount and more than one-half in number of the allowed claims in that class vote to accept the plan.[77] Pursuant to section 1126(d) of the Bankruptcy Code, a class of ***interests*** accepts a plan if holders of at least two-thirds in amount of the allowed interests in that class vote to accept the plan.[78]  A class that is not impaired under a plan is presumed to have accepted the plan.[79]  On the other hand, a class is deemed to reject a plan if the plan provides that the claims or interests of that class do not receive or retain any property under the plan on account of such claims or interests.[80] Here, all Classes of Claims and Equity Interests either accepted the Prepack Plan or were deemed to accept the Prepack Plan, other than Class 11, Equity Interests in Genco, which has been deemed to reject the Prepack Plan.

90.     *First*, Classes 1, 2, 6, 7, 9 and 10 are Unimpaired by the Prepack Plan and thus are deemed to accept the Prepack Plan.  *Second*, the Debtors have received the requisite acceptances from all Impaired Classes other than Class 11, Equity Interests in Genco.  The Prepack Plan has been unanimously accepted by Classes 3, 4, 5 and 8 evidenced by the voting

---

[76]  11 U.S.C. § 1129(a)(8).

[77]  *Id.* § 1126(c).

[78]  *Id.* § 1126(d).

[79]  *Id.* § 1126(f); *see also SEC v. Drexel Burnham Lambert Grp., Inc.* (*In re Drexel Burnham Lambert Grp., Inc.*), 960 F.2d 285, 290 (2d Cir. 1992) (noting that an unimpaired class is presumed to have accepted plan); *see also* S. Rep. 95-989, at 123 (1978) (section 1126(f) of the Bankruptcy Code "provides that no acceptances are required from any class whose claims or interests are unimpaired under the Plan or in the order confirming the Plan.").

[80]  11 U.S.C. § 1126(g).

certifications and reports filed on April 28, 2014 [Docket No. 52] and May 28, 2014 [Docket No. 222].

91.    Despite the fact that Class 11 is deemed to reject the Prepack Plan, and therefore the requirements of section 1128(a)(8) are not satisfied, the Prepack Plan nevertheless may be confirmed over such non-acceptance pursuant to the "cram down" provisions of section 1129(b)(1) of the Bankruptcy Code.[81]   As set forth in further detail below, the Prepack Plan satisfies the "cram down" requirements under section 1129(b), and therefore should be confirmed.

## I.    The Prepack Plan Complies with Statutorily Mandated Treatment of Administrative and Priority Tax Claims (11 U.S.C. § 1129(a)(9)).

92.    Unless the holder of a claim entitled to priority under section 507(a) of the Bankruptcy Code – including administrative claims allowed under section 503(b) of the Bankruptcy Code pursuant to section 507(a)(2) – agrees to a different treatment with respect to such claim, section 1129(a)(9) of the Bankruptcy Code requires a plan to provide as follows:

(A)    with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of [the Bankruptcy Code], on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B)    with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of [the Bankruptcy Code], each holder of a claim of such class will receive –

(i)    if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii)    if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

---

[81]   The condition to confirmation contained in section 1129(a)(8) is the only condition of section 1129(a) that is not necessary for confirmation of a plan of reorganization.

(C)   with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim regular installment payments in cash –

   (i)   of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

   (ii)   over a period ending not later than five years after the date of the order for relief under section 301, 302, or 303; and

   (iii)   in a manner not less favorable than the most favored non-priority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)).[82]

93.   The Prepack Plan provides for no less favorable treatment for Administrative Claims and Priority Tax Claims than that required by section 1129(a)(9). Specifically, the Prepack Plan provides that each holder of an Allowed Administrative Claim – except with respect to Administrative Claims that are Claims for Accrued Professional Compensation and except to the extent that a holder of an Allowed Administrative Claim and the applicable Debtor or Reorganized Debtor agrees to less favorable treatment to such holder – shall receive Cash in an amount equal to the amount of such Allowed Administrative Claim as soon as practicable after the later of:  (a) the Effective Date; (b) thirty (30) days after the date the Administrative Claim is allowed if it is a disputed claim as of the Effective Date; and (c) the date the Administrative Claim becomes due and payable by its terms.[83]

94.   In addition, the Prepack Plan provides that each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Effective Date, at the option of the Reorganized Debtors, one of the following treatments:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim plus statutory

---

[82]  11 U.S.C. § 1129(a)(9).

[83]  Prepack Plan, Art. II.A.

interest on any outstanding balance from the Effective Date; (b) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date; or (c) such other treatment as may be agreed upon by such holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.[84]

### J.     At Least One Impaired Class of Claims Has Accepted the Prepack Plan, Excluding the Acceptances of Insiders (11 U.S.C. § 1129(a)(10))

95.     Section 1129(a)(10) provides that, if a class of claims is impaired under a plan, at least one impaired class of claims must accept the plan, excluding acceptance by any insider.[85]  As set forth above, Impaired Classes 3, 4, 5 and 8 have voted to accept the Prepack Plan.  Therefore, the Debtors have satisfied section 1129(a)(10) of the Bankruptcy Code.

### K.     The Prepack Plan is Feasible (11 U.S.C. § 1129(a)(11))

96.     Section 1129(a)(11) of the Bankruptcy Code requires that a plan be feasible to be confirmed.  Specifically, the Court must determine: "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[86]

97.     To demonstrate that a plan is feasible, it is not necessary that success be guaranteed.  Rather, the standard is that a debtor must demonstrate a reasonable assurance that

---

[84] *Id.* Art. II.C.

[85] 11 U.S.C. § 1129(a)(10).  This is a per-plan requirement, not a per-debtor requirement.  *See, e.g.*, *JPMorgan Chase Bank, N.A. v Charter Commc'ns Operating, LLC* (*In re Charter Commc'ns, Inc.*), 419 B.R. 221, 266 (Bankr. S.D.N.Y. 2009) ("[I]t is appropriate to test compliance with section 1129(a)(10) on a per-plan basis, not, as [objecting parties] argue, on a per-debtor basis."); *In re Enron Corp.*, No. 01-16034 (AJG) (Bankr. S.D.N.Y. July 15, 2004) (order confirming joint chapter 11 plan where each debtor did not have an impaired accepting class); *In re SGPA, Inc.*, No. 1-01-02609 (Bankr. M.D. Pa. Sept. 28, 2001) (joint chapter 11 plan complied with section 1129(a)(10) because at least one class of impaired creditors accepted plan, notwithstanding fact that each debtor entity did not have accepting impaired class).

[86] 11 U.S.C. § 1129(a)(11).

consummation of the plan will not likely be followed by a further need for financial reorganization.[87]  In evaluating feasibility, courts have identified the following probative factors:

- the prospective earnings of the business or its earning power;

- the soundness and adequacy of the capital structure and working capital for the business which the debtor will engage in post-confirmation;

- the prospective availability of credit;

- whether the debtor will have the ability to meet its requirements for capital expenditures;

- economic and market conditions;

- the ability of management, and the likelihood that the same management will continue; and

- any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[88]

98.    Application of these factors here strongly indicates that the Prepack Plan is feasible.  As set forth in more detail below, the Debtors have thoroughly analyzed their ability to meet their obligations under the Prepack Plan following the Effective Date, and submit that confirmation of the Prepack Plan is not likely to be followed by liquidation or the need for further reorganization.

---

[87]    *See Johns-Manville*, 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *see also Briscoe*, 994 F.2d at 1166 ("Only a reasonable assurance of commercial viability is required.") (internal quotation marks omitted); *In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 832-33 (Bankr. E.D. Pa. 1995) (finding plan is feasible "so long as there is a reasonable prospect for success and a reasonable assurance that the proponents can comply with the terms of the plan."); *The Mut. Life Ins. Co. of N.Y. v. Patrician St. Joseph Partners Ltd. P'ship* (*In re Patrician St. Joseph Partners Ltd. P'ship*), 169 B.R. 669, 674 (D. Ariz. 1994) ("A plan meets this feasibility standard if the plan offers a reasonable prospect of success and is workable").

[88]    *See, e.g.*, *WorldCom*, 2003 Bankr. LEXIS 1401, at *170; *Leslie Fay Cos.*, 207 B.R. at 789; *Texaco*, 84 B.R. at 910; *In re Prudential Energy Co.*, 58 B.R. 857, 862-63 (Bankr. S.D.N.Y. 1986); *see also Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc.* (*In re U.S. Truck Co., Inc.*), 800 F.2d 581, 589 (6th Cir. 1986); *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005).

99.  *First*, among the primary reasons the Debtors sought chapter 11 protection was their large debt burden and looming debt maturities.  As of the Petition Date, the Debtors' total funded debt obligations were in excess of $1.4 billion, consisting of amounts outstanding under the Prepetition 2007 Credit Facility, the Prepetition $100 Million Credit Facility, the Prepetition $253 Million Credit Facility and the Convertible Notes.  The chart below summarizes the Debtors' prepetition indebtedness, including approximate outstanding amounts as of the Petition Date.

| Debt Obligation | Approximate Principal Amount Outstanding[89] as of the Petition Date | Maturity Date | Security Status |
|---|---|---|---|
| Prepetition 2007 Credit Facility | $1.056 billion | July 2017 | Secured |
| Prepetition $253 Million Credit Facility | $175.7 million | August 2015 | Secured |
| Prepetition $100 Million Credit Facility | $73.6 million | August 2017 | Secured |
| Convertible Notes | $125 million | August 2015 | Unsecured |

100.  The Prepack Plan significantly reduces this debt burden by approximately $1.2 billion of secured and unsecured debt.  Additionally, the Prepack Plan provides the Company with $100 million of new liquidity through the fully-backstopped Rights Offering.  The proposed post confirmation capital structure is summarized in the chart below:

| Debt Obligation | Principal Amount | Maturity Date | Security Status |
|---|---|---|---|
| Amended and Restated $100 Million Facility | $73.6 mm | August 2019 | Secured |
| Amended and Restated $253 Million Facility | $175.7 mm | August 2019 | Secured |

---

[89]  These amounts exclude any unamortized discounts, premiums or interest.

101.    *Second*, income and revenue from ongoing operations will provide the Reorganized Debtors with sufficient cash to fund the distributions contemplated by the Prepack Plan and pay all other Claims, costs and expenses contemplated by the Prepack Plan.  Following the payments to be made under the Prepack Plan and the completion of the Rights Offering, the Debtors anticipate that they will have approximately $106 million of cash on hand.

102.    *Third*, the Prepack Plan's feasibility is underscored by the support of the Debtors' key creditor constituencies.   The extensive review of the Prepack Plan by the Supporting Creditors and the Supporting Noteholders, many of whom directly benefit by the Reorganized Debtors emerging from these Chapter 11 Cases as healthy entities that can meet their obligations to creditors and drive value for post-emergence shareholders, further supports the finding that feasibility of the Prepack Plan has been scrutinized and ratified by parties with vested interests in ensuring the Prepack Plan's success.

**L.      The Prepack Plan Provides for the Payment of All Fees under  28 U.S.C. § 1930 (11 U.S.C. § 1129(a)(12))**

103.    Section 1129(a)(12) of the Bankruptcy Code requires that, as a condition precedent to the confirmation of a plan of reorganization, "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan."[90]  The Prepack Plan complies with section 1129(a)(12) by providing that the Debtors shall pay in full, in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation.[91]  The Prepack Plan further provides that, on and after the Effective Date, the Reorganized Debtors shall pay the applicable U.S. Trustee fees for each of the Reorganized Debtors when due in the ordinary

---

[90]  11 U.S.C. § 1129(a)(12).

[91]  Prepack Plan, Art. II.D.

course until such time as the Bankruptcy Court enters a final decree in such Reorganized

Debtors' Chapter 11 Case or until each Chapter 11 Case is converted or dismissed.[92]

> **M.     The Prepack Plan Provides for the Payment of Retiree
> Benefits (11 U.S.C. § 1129(a)(13))**

104.     Section 1129(a)(13) of the Bankruptcy Code requires that all retiree

benefits continue to be paid post-confirmation at any levels established in accordance with

section 1114 of the Bankruptcy Code.[93]  The Prepack Plan provides that on or after the Effective

Date of the Prepack Plan, the payment of all retiree benefits, as defined in section 1114 of the

Bankruptcy Code, will continue to be paid in accordance with applicable law.[94]  The Prepack

Plan thus satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

> **N.     Sections 1129(a)(14) and 1129(a)(15) Do Not
> Apply to the Prepack Plan**

105.     Section 1129(a)(14) of the Bankruptcy Code relates to the payment of

domestic support obligations and section 1129(a)(15) of the Bankruptcy Code applies only in

cases in which the debtor is an "individual" as defined in the Bankruptcy Code.[95]  Neither of

these provisions applies to the Debtors.  The Debtors are not subject to any domestic support

obligations, and therefore, the requirements of section 1129(a)(14) of the Bankruptcy Code do

not apply.  Further, none of the Debtors are an "individual" and, therefore, the requirements of

section 1129(a)(15) of the Bankruptcy Code do not apply.

---

[92]  *Id.*

[93]  11 U.S.C. § 1129(a)(13).

[94]  Prepack Plan, Art. V.D.

[95]  11 U.S.C. §§ 1129(a)(14), (a)(15).

**O.**  **The Prepack Plan Does Not Provide for the Transfer of
Property by Any Nonprofit Entities Not In Accordance with
Applicable Nonbankruptcy Law (11 U.S.C. § 1129(a)(16))**

106.    Section 1129(a)(16) of the Bankruptcy Code provides that applicable non-bankruptcy law will govern all transfers of property under a plan to be made by "a corporation or trust that is not a moneyed, business, or commercial corporation or trust."[96] The legislative history of section 1129(a)(16) of the Bankruptcy Code demonstrates that this section was intended to "restrict the authority of a trustee to use, sell, or lease property by a nonprofit corporation or trust."[97]  Although the Debtors – none of which are nonprofit entities – do not believe that any transfers of property under the Prepack Plan will be made by a nonprofit corporation or trust, to the extent that any such transfers are contemplated by the Prepack Plan, such transfers will be made in accordance with applicable non-bankruptcy law.  Accordingly, the Prepack Plan satisfies the requirements of section 1129(a)(16) of the Bankruptcy Code.

**P.**    **The Prepack Plan Satisfies the "Cram Down"
Requirements of 11 U.S.C. § 1129(b)**

107.    Section 1129(b) of the Bankruptcy Code provides a mechanism (referred to as "cram down") for confirmation of a plan of reorganization despite the rejection of the plan by a class or classes of claims or equity interests.[98]  Specifically, if a chapter 11 plan satisfies all applicable requirements of section 1129(a) other than section 1129(a)(8)'s requirement that all impaired classes accept the plan, the plan may be confirmed so long as it does not discriminate unfairly and is fair and equitable with respect to each class of claims and interests that is impaired and has not accepted the plan.[99]

---

[96] *Id.* § 1129(a)(16).

[97] H.R. Rep. No. 109-31, at 145 (2005).

[98] 11 U.S.C. § 1129(b)(1).

[99] *Id.*

108.    As discussed above, of the five Classes that are Impaired under the Prepack Plan, four have accepted the Prepack Plan, and one (Equity Interests in Genco in Class 11) is deemed to reject the Prepack Plan.  Thus, the requirements of section 1129(a)(8) are not met with respect to Class 11.[100]  Nevertheless, the Prepack Plan is confirmable with respect to Class 11 as it satisfies the requirements of section 1129(b).

### 1.    The Prepack Plan Does Not Discriminate Unfairly

109.    Section 1129(b)(1) of the Bankruptcy Code does not prohibit discrimination between classes under a plan of reorganization.  Rather, it prohibits discrimination that is "unfair," based on the facts and circumstances of the case.[101]  At a minimum, the unfair discrimination standard prevents creditors and interest holders with *similar* legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so.[102]  Courts in the Second Circuit have ruled that "[u]nder section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment."[103]

110.    Holders of Equity Interests in Genco are junior in priority to all other Claims and Equity Interests. Thus, the Prepack Plan does not unfairly discriminate against Class 11 because there is no Class of Claims or Equity Interests similarly situated to Class 11.

---

[100]  Prepack Plan, Art. III.D.

[101]  *See In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that determination of unfair discrimination requires court to "consider all aspects of the case and the totality of all the circumstances."); *In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) (noting that courts "have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination").

[102]  *See WorldCom*, 2003 Bankr. LEXIS 1401, at *174-75 (requiring a reasonable basis to justify disparate treatment).

[103]  *Id.*; *See also In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) (courts assess whether "(i) there is a reasonable basis for discriminating, (ii) the debtor cannot consummate the plan without discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion to its rationale," but also noting that second prong assessing whether the debtor cannot consummate plan without discrimination is not dispositive of question of unfair discrimination).

## 2.      The Prepack Plan Is Fair and Equitable

111.      For a plan to be "fair and equitable" with respect to a Class of Equity Interests, such as Class 11, the Debtors must satisfy the requirements of section 1129(b)(2)(C). Section 1129(b)(2)(C)(ii) sets forth the "absolute priority rule" with respect to interests, which requires that if the holders of interests in a particular class receive less than full value for their interests, no holders of interests in a junior class may receive any property under the plan.[104]

112.      The Prepack Plan satisfies the absolute priority rule of section 1129(b)(2)(C)(ii) with respect to Class 11 because there are no Classes of Claims or Equity Interests junior to Class 11 that are retaining any property under the Prepack Plan on account of their Claims or Equity Interests.  In fact, no junior classes of claims or interests exist.  Further, as part of the settlements embodied in the RSA, holders of Prepetition 2007 Facility Claims and Convertible Note Claims have agreed to forego consideration that they would otherwise be entitled to receive to allow for the distribution of New Genco Equity Warrants to holders of Equity Interests in Genco in Class 11 in exchange for the cancellation or surrender of their Equity Interests.  Because the Debtors are insolvent, senior creditors are not receiving more than what they are entitled to under the Prepack Plan.  Thus, the Prepack Plan is fair and equitable with respect to Class 11 and should be confirmed over the deemed rejection of that Class.  As set forth in the Disclosure Statement, holders of Prepetition 2007 Facility Claims are estimated to be receiving only a 91.5% recovery on account of their Claims, and holders of Convertible Note Claims are estimated to be receiving an 80.3% recovery on account of their Claims.[105]  These recovery amounts are based on an estimated post-confirmation enterprise value of the

---

[104] 11 U.S.C. § 1129(b)(2)(C)(ii); *see also Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 441-42 (1999).

[105] *See* Disclosure Statement, Art. II.A.  Projected recovery percentages account for dilution from the New Genco Equity Warrants, but do not account for dilution from the warrants issued under the Management Incentive Program.

Reorganized Debtors of approximately $1.48 billion, with approximately 61.7 million primary shares of New Genco Common Stock valued at $20.00 per share (prior to dilution) to be issued in order to satisfy Claims pursuant to the Prepack Plan.[106]

**Q.      The Principal Purpose of the Prepack Plan is
Not Avoidance of Taxes (11 U.S.C. § 1129(d))**

113.      Section 1129(d) of the Bankruptcy Code states "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."[107]  The purpose of the Prepack Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.  Moreover, no Governmental Unit, or any other entity, has thus far raised issues with the Prepack Plan on these grounds, and the Debtors do not anticipate any objections will be filed on these grounds, particularly as all tax Claims will be paid in full pursuant to the Prepack Plan.  The Debtors therefore submit that the Prepack Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**IV.      THE DISCRETIONARY CONTENTS OF
THE PREPACK PLAN SHOULD BE APPROVED**

114.      Section 1123(b) of the Bankruptcy Code identifies additional provisions that may be included in a chapter 11 plan.  For example, a plan may impair or leave unimpaired any classes of claims or interests and provide for the assumption or rejection of executory contracts and unexpired leases.  A plan may also provide for the (a) "settlement or adjustment of any claim or interest belonging to the debtor or to the estate" or (b) "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such

---

[106]  *See Id.* Art. IX.B.

[107]  11 U.S.C. § 1129(d).

purpose, of any such claim or interest."[108]  Lastly, a plan may "modify the rights of holders of secured claims…or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims" and may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[109]

115.    The Prepack Plan includes a number of provisions under section 1123(b) of the Bankruptcy Code.  For example, the Prepack Plan provides for a general settlement of claims and interests, as well as the assumption and rejection of certain executory contracts and unexpired leases.[110]  Furthermore, the Prepack Plan seeks to implement release, exculpation and injunction provisions.[111]  As discussed in further detail below, such provisions of the Prepack Plan are in the best interests of the Debtors and all parties in interest in these Chapter 11 Cases.

### A.    The General Settlement of Claims and Interests under the Prepack Plan is Fair and Reasonable

116.    The Prepack Plan and the treatment of Claims and Equity Interests thereunder constitute a good faith compromise and settlement among the Debtors, the Supporting Creditors, and the Backstop Parties, which is an essential foundation of the Prepack Plan and will ensure that the Debtors will be able to quickly and expeditiously exit chapter 11.  Specifically, the Prepack Plan constitutes a settlement of disputes regarding: (i) the Prepetition 2007 Facility Claims, (ii) the Prepetition $253 Million Facility Claims and the Prepetition $100 Million Facility Claims, (iii) the total enterprise value of the Debtors' estates and the Reorganized Debtors for allocation purposes under the Prepack Plan, (iv) the Convertible Note Claims, and (v) the treatment and distribution to holders of Equity Interests.  The resolution of these issues

---

[108] *Id.* § 1123(b)(3)(A)-(B).

[109] *Id.* § 1123(b)(5)-(6).

[110] Prepack Plan, Art. IX.

[111] *Id.*, Art. VI.K.

facilitated the formulation of the Prepack Plan, thereby avoiding the expense and delay associated with a "freefall" bankruptcy case.

117.    When evaluating plan settlements pursuant to section 1123(b) of the Bankruptcy Code, courts in the Second Circuit typically consider the standards used to evaluate settlements under Bankruptcy Rule 9019, i.e., the settlement must be "fair and equitable" and in the best interests of the estate.[112]   The benchmark is whether or not the terms of the proposed compromise "fall[] below the lowest point in the range of reasonableness."[113] A court may also exercise its discretion "in light of the general public policy favoring settlements."[114]

118.    Courts have set forth the list of so-called "Iridium factors" to consider in evaluating whether a settlement satisfies such standards:

a)  the balance between the litigation's possibility of success and the settlement's future benefits;

b)  the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment;

c)  the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement;

d)  whether other parties-in-interest support the settlement;

e)  the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement;

f)  the nature and breadth of releases to be obtained by officers and directors; and

---

[112]  *See Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968); *In re Best Prods. Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) ("[W]hether the claim is compromised as part of the plan or pursuant to a separate motion, the standards for approval of the compromise are the same.  The settlement must be 'fair and equitable,' . . . and be in the best interest of the estate.") (internal citations omitted).

[113]  *See, e.g., Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (internal quotation marks omitted).

[114]  *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

g) the extent to which the settlement is the product of arm's-length bargaining.[115]

119.    Application of these factors confirms that the settlements of Claims and Equity Interests under the Prepack Plan facilitated by the RSA are fair and equitable, in the best interests of the Debtors' estates and should be approved:

- Each of the issues among the Debtors, the Supporting Creditors, and the Backstop Parties settled pursuant to the Prepack Plan was heavily negotiated between and among the Debtors and their key creditor constituents.  In particular, the agreed-upon distributions to holders of General Unsecured Claims and Equity Interests, and the scope of the releases set forth in the Prepack Plan, were the product of extensive negotiations and represent a carefully balanced agreement based on the Debtors' extensive valuation analysis and each party's assessment of the merits and risks associated with any alternative treatment.  Importantly, each aspect of the Prepack Plan is a necessary component to the overall resolution among the parties.

- Absent the resolutions embodied in the Prepack Plan, the Debtors' restructuring goals might well be unobtainable, absent significant and expensive litigation.  Any one of the issues resolved through the Prepack Plan could potentially involve complex and protracted litigation, the ultimate disposition of which would be uncertain, resulting in a longer, costlier, and more uncertain chapter 11 process.[116]

- The settlements embodied in the Prepack Plan are in the best interests of the Debtors' creditors and estates, evidenced by support for the Prepack Plan from each of the Prepetition 2007 Facility Lenders, the Prepetition $253 Million Facility Lenders, and the Prepetition $100 Million Facility Lenders, and overwhelming support for the Prepack Plan from the Convertible Noteholders, the Debtors' largest unsecured creditor constituency.

- Each of the Debtors, the Supporting Creditors, and the Backstop Parties were advised during the negotiations by experienced and independent attorneys and financial advisors, and the negotiations leading to the Prepack Plan were conducted at arm's-length and in good faith.

- Pursuant to the RSA, the parties to the RSA agree to support the releases provided to the Released Parties, including the Debtors and Reorganized Debtors' directors

---

[115] *Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007); *see also Adelphia Confirmation Decision*, 368 B.R. at 251 (citing *Texaco*, 84 B.R. at 901).

[116] *See, e.g.*, *In  re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012) ("As a general matter, '[s]ettlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate.'") (quoting *In re MF Global Inc.*, No. 11-2790, 2012 WL 3242513, at *5 (Bankr. S.D.N.Y. Aug. 10, 2012)); *HSBC Bank USA, Nat'l Ass'n v. Fane (In re MF Global Inc.)*, 466 B.R. 244, 247 (Bankr. S.D.N.Y. 2012).

and officers, under the Prepack Plan.  For the reasons described herein, these releases are appropriate and justified because they were essential to the formulation of the Prepack Plan and are supported by substantial contribution.

**B.**    **The Assumption and Assignment or Rejection of the Executory Contracts and Unexpired Leases Under the Prepack Plan Should Be  Approved**

120.    Article IX.A of the Prepack Plan provides for the assumption of all executory contracts and unexpired leases that exist between the Debtors and any other person or entity prior to the Petition Date except for contracts and leases that are identified on the Rejection Schedule filed as Exhibit 1 to the Plan Supplement, or is otherwise rejected by a separate motion and order of the Bankruptcy Court.

121.    Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease."[117]  Courts routinely approve motions to assume and assign or reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment.[118]

122.    The Debtors reviewed and analyzed their executory contracts and unexpired leases.  In their business judgment, the Debtors have scheduled only one executory contract to be rejected under the Prepack Plan, and reserve the right to seek to reject any other executory contracts and unexpired leases in advance of confirmation.

---

[117] 11 U.S.C. § 365(a).

[118] *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (stating that section 365 of the Bankruptcy Code "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject."); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (stating that the traditional standard applied by courts to authorize the rejection of an executory contract is that of "business judgment"); *In re Gucci*, 193 B.R. 411, 414-15 (S.D.N.Y. 1996) ("business judgment" test should be applied to assumption and rejection decisions); *Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996) (same).

123.     Accordingly, for all of the foregoing reasons, the proposed assumption or rejection of executory contracts and unexpired leases should be approved in connection with confirmation.

### C.   The Prepack Plan's Release, Injunction and Exculpation Provisions Are Appropriate and Should be Approved

124.     Section 1123(b)(6) of the Bankruptcy Code provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[119]

125.     The Prepack Plan provides for:  (a) a release by the Debtors and Reorganized Debtors against certain parties in interest (the "**Debtor Release**"); (b) releases by holders of Claims and Equity Interests of certain parties in interest (the "**Third Party Release**"); (c) an exculpation provision for Released Parties (the "**Exculpation**"); and (d) a customary injunction provision intended to implement the Debtor Release, Third Party Release, Exculpation, and discharge provided by the Prepack Plan (the "**Injunction**").[120]  As described below, these provisions are proper because, among other things, they are the product of arm's-length negotiations and have been critical to obtaining the support of various constituencies for the Prepack Plan.

### 1.   The Estate Releases

126.     Pursuant to the terms of the Prepack Plan, the Debtors and the Reorganized Debtors shall release the Released Parties from all claims the Debtors, the Reorganized Debtors, their estates or affiliates would have been entitled to assert on their own or on behalf of a holder of a Claim or Equity Interest or other Entity against the Released Parties,

---

[119]  11 U.S.C. § 1123(b)(6).

[120]  Prepack Plan, Art. VI.K.

except for claims or liabilities arising out of willful misconduct or gross negligence (the "**Estate**

**Releases**").[121]   The Released Parties include the Supporting Prepetition 2007 Facility Lenders,

the Supporting Prepetition $253 Million Facility Lenders, the Supporting Prepetition $100

Million Facility Lenders, the Backstop Parties, the Supporting Noteholders, the Convertible

Notes Indenture Trustee, the Prepetition Agents and the predecessors, Professionals, successors

and assigns, subsidiaries, funds, portfolio companies, current and former officers, directors,

employees, managers, attorneys, financial advisors, accountants, investment bankers,

consultants, management companies or other professionals or representatives of each, each

solely in their capacity as such.

127.    It is well-established that debtors are authorized to settle or release their

claims in a chapter 11 plan.[122]   Section 1123(b)(3)(A) of the Bankruptcy Code specifically

provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or

interest belonging to the debtor or to the estate."[123]   A plan that proposes to release a claim or

cause of action belonging to a debtor is considered a "settlement" for purposes of satisfying

section 1123(b)(3)(A) of the Bankruptcy Code.   As discussed above, settlements pursuant to a

plan are generally subject to the same "reasonable business judgment" standard applied to

settlements under Bankruptcy Rule 9019.[124]   "In determining whether to approve a proposed

---

[121]   *Id.* Art. VI.K.1.

[122]   *See In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) ("Section 1123(b)(3) permits a debtor to include a settlement of any claims it might own as a discretionary provision in its plan…"), *aff'd in part and rev'd in part*, 627 F. 3d 496 (2d Cir. 2010), *aff'd in part and rev'd in part*, 634 F. 3d 79 (2d Cir. 2011); *Adelphia Confirmation Decision*, 368 B.R. at 263 n.289 (holding that a debtor may release its own claims); *In re Oneida Ltd.*, 351 B.R. 79, 94 n.21 (Bankr. S.D.N.Y. 2006) (noting that a debtor's release of its own claims is permissible).

[123]   11 U.S.C. § 1123(b)(3)(A).

[124]   *See In re Charter Commc'ns*, 419 B.R. at 252 ("[W]hile the approval of a settlement rests in the Court's sound discretion, the debtor's business judgment should not be ignored.") (quotations and citations omitted); *In re Bally Total Fitness*, 2007 WL 2779438, at *12 ("To the extent that a release or other provision in the Plan constitutes a

settlement, a bankruptcy court need not decide the numerous issues of law and fact raised by the settlement, but rather, should 'canvas the issues and see whether the settlement fall[s] below the lowest point in the range of reasonableness.'"[125]  Factors to be considered include:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining."[126]

128.    Applying this standard here, the Estate Releases are in the best interests of the estates and represent an appropriate exercise of the Debtors' business judgment.  *First*, the Debtors are not aware of any colorable estate claims or causes of action that may exist against any of the Released Parties. Therefore, it is not possible to place any probability of success on such litigation given that no viable litigation has even been identified.  In contrast, the Estate Release provisions will eliminate the costs and risks of possible litigation – along with its attendant costs in both time and expense – and allow management and the officers and directors of the Reorganized Debtors to focus on operations after emergence, as opposed to being distracted by litigation (either as a party to such litigation themselves or the stakeholders who

---

compromise of a controversy, this Confirmation Order shall constitute an order under Bankruptcy Rule 9019 approving such compromise."); *In re Spiegel, Inc.*, No. 03-11540, 2005 WL 1278094, at *11 (Bankr. S.D.N.Y. May 25, 2005) (approving releases pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a)).

[125]  *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401 at *113 (quoting *In re W.T. Grant Co.*, 699 F.2d at 608) (other quotations and citations omitted).

[126]  *In re Iridium Operating LLC*, 478 F.3d at 462 (quoting *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006)).

will bear the burdens of the Debtors' investigation, prosecution or participation in such litigation).

129.    *Second*, the paramount interest of creditors is best served by the approval of the Prepack Plan, including the Estate Releases.  In the absence of any viable claims against any of the Released Parties, pursuing claims against the Released Parties would be a costly and futile exercise that would only distract the officers and directors of the Reorganized Debtors from their primary obligation of managing the Reorganized Debtors.  The Estate Releases will eliminate the potential for post-effective date litigation against directors and officers that could threaten the viability of the reorganized company both directly (by virtue of indemnification agreements) and indirectly (through the cost and distraction of potential third-party discovery).

130.    *Third*, the Estate Releases have the support of the major secured and unsecured creditor constituencies in these Chapter 11 Cases.  The Prepack Plan reflects the settlement and resolution of several complex issues, including the substantial deleveraging of the Company's balance sheet and the treatment provided to all stakeholders under the Prepack Plan, and the releases are an integral part of the consideration to be provided in exchange for the compromises and resolutions embodied therein.

131.    *Fourth*, each of the Released Parties contributed significant value to the Debtors' estates and aided in the reorganization process.  As discussed in further detail below, the Released Parties each played an integral role in the formulation of the Prepack Plan and the RSA and expended significant time and resources analyzing and negotiating the issues involved therein and working with the Company through a complex reorganization case.  When parties, such as the Released Parties, constructively participate in a debtors' restructuring process, it is

appropriate to offer protection in the form of a release.[127]  Importantly, parties often participate

in the creation of a debtor's plan of reorganization with the understanding that "they would

receive some limited protection for participating" in the debtor's restructuring process.[128]

132.    *Finally*, the Estate Releases are similar in scope to those approved by this

Court and courts in this and other districts and include a carve-out for gross negligence and

willful misconduct.[129]

133.    Accordingly, the Estate Releases are consistent with applicable law,

represent a valid settlement of whatever Claims the Debtors may have against the

Released Parties pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, represent a valid

exercise of the Debtors' business judgment, and should be approved.

---

[127]  *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401 at *84 (finding that "[t]he inclusion of the [release provisions] was an essential element of the [p]lan formulation process and negotiations with respect to each of the settlements contained in the [p]lan [and] . . . [t]he inclusion of the [release provisions] were vital to the successful negotiation of the terms of [p]lan in that without such provisions, the [released parties] would have been less likely to negotiate the terms of the settlements and the [p]lan.").

[128]  *Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (stating that "[p]arties participated in the creation of the [p]lan under the guarantee that they would receive some limited protection for participating in one of the largest and most complex bankruptcy filings in history . . . To pull away this string would thus tend to unravel the entire fabric of the [p]lan, and would be inequitable to all those who participated in good faith to bring it to fruition.").

[129]  *See, e.g.*, *In re Jobson Med. Info. Holdings LLC*, No. 12-10434 (SHL) (Bankr. S.D.N.Y. Mar. 5, 2012) (confirming a prepackaged chapter 11 plan containing releases of members, directors, officers and employees of the debtors as well as prepetition lenders that were party to a restructuring support agreement); *In re AMR Corp.*, 11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) (confirming chapter 11 plan containing releases of directors and officers of the debtors as well as general unsecured creditors that were party to a support and settlement agreement); *In re Almatis*, No. 10-12308 (MG) (Bankr. S.D.N.Y. Sept. 20, 2010) (chapter 11 plan contained estate releases for directors, officers and employees as well as prepetition and postpetition lenders, committee members, and noteholders); *In re Uno Rest. Holdings Corp.*, No. 10-10209 (MG) (Bankr. S.D.N.Y. July 6, 2010) (same); *In re Ion Media Networks, Inc.*, No. 09-13125 (Bankr. S.D.N.Y. 2009) (confirming plan that provided for releases by the debtor of the debtors' directors and officers in addition to parties to a global settlement, including the creditors' committee and certain consenting first lien lenders); *In re DJK Residential LLC*, No. 08-10375 (JMP) (Bankr. S.D.N.Y. May 7, 2008) (finding that releases and discharges of claims and causes of action by the Debtors were a valid exercise of the Debtors' business judgment); *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Dec. 19, 2007) (same); *In re Tower Auto., Inc.*, No. 05-10578 (ALG) (Bankr. S.D.N.Y. July 12, 2007) (finding that debtor releases represented a valid settlement of whatever claims Debtors may have against the Debtor Releasees); *see also In re Washington Mutual, Inc.*, No. 08-12229 (MFW) (Bankr. D. Del. Feb. 24, 2012) (confirming plan premised on global settlement that provided for a debtor release of plan supporters).

2.   **Third Party Releases**

134.    In addition to the Estate Releases, the Prepack Plan also provides for a release of certain claims and causes of action against the Released Parties held by the Releasing Parties.[130]  The Releasing Parties include (a) the Prepetition Agents and the Convertible Notes Indenture Trustee, (b) the holders of Impaired Claims other than those who voted to reject the Prepack Plan and have also affirmatively indicated that they opt not to grant the releases provided in the Prepack Plan, (c) the Supporting Creditors, (d) to the fullest extent permissible under applicable law (i) holders of Unimpaired Claims, and (ii) holders of Equity Interests, and (e) with respect to the foregoing entities in clauses (a) through (d), such entity's subsidiaries, officers, directors, principals, members, employees, agents, financial advisors, professionals, representatives, etc.[131] The Third Party Releases do ***not*** release claims by governmental agencies, except to the extent such claims may otherwise be subject to the discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.

135.    The Second Circuit has held that a bankruptcy court may enjoin claims against non-debtors in certain circumstances where the injunction "plays an important part in the debtor's reorganization plan."[132]  Two considerations generally apply:  whether a bankruptcy court has subject matter jurisdiction over the claims to be released, which turns on whether the claims might have "any conceivable effect" on the bankruptcy estate;[133] and whether the release

---

[130] Prepack Plan, Art. VI.K.2.

[131] *Id.*, Art. I.A.132.

[132] *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d at 293.

[133] *Pfizer Inc. v. Law Offices of Peter G. Angelos* (*In re Quigley Co.*), 676 F.3d 45, 57 (2d Cir. 2012) ("[T]he touchstone for bankruptcy jurisdiction remains 'whether [a third party action] might have any 'conceivable effect' on the bankruptcy estate.'") (citations omitted), *cert. denied sub nom. Pfizer, Inc. v. Law Offices of Peter G. Angelos*, 133 S. Ct. 2849 (2013); *Johns-Manville Corp. v. Chubb Indem. Ins. Co.* (*In re Johns-Manville Corp.*), 517 F.3d 52, 66 (2d Cir. 2008) ("[A] bankruptcy court only has jurisdiction to enjoin third party non-debtor claims that directly affect the res of the bankruptcy estate.").

is "important" to the success of the chapter 11 plan due to "unusual circumstances."[134] While the requisite circumstances are not defined by a fixed test of "factors and prongs," the Second Circuit has observed that third party releases have been approved where one or more of the following applied:

- the estate received substantial consideration;

- the enjoined claims were channeled to a settlement fund rather than extinguished;

- the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution;

- the plan otherwise provided for the full payment of the enjoined claims; or

- the affected creditors consented.[135]

136.    Here, jurisdiction exists because the claims covered by the Third Party Release could affect the bankruptcy estate, if permitted to proceed, through indemnity and/or contribution claims that could be asserted by the Released Parties.[136] The Third Party Releases are also important to the Chapter 11 Cases and satisfy *Metromedia* as they are overwhelmingly *consensual*, and the estates have received full and fair consideration from the Released Parties for the releases that has benefitted *all* stakeholders and would not be available absent the release.

---

[134] *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141-43 (2d Cir. 2005).

[135] *See Metromedia*, 416 F.3d at 142-43.

[136] *See, e.g.*, *In re FairPoint Commc'ns, Inc.*, 452 B.R. 21, 29 (S.D.N.Y. 2011) ("[A] bankruptcy court has 'related to' jurisdiction to enjoin non-debtor litigation if the bankruptcy estate may be obligated to indemnify or contribute to the losing party."); *N.Y.C. Emps. Ret. Sys. V. Ebbers (In re WorldCom, Inc. Sec. Litig.)*, 293 B.R. 308, 318-19 (S.D.N.Y. 2003) (collecting cases); *IIG Capital LLC v. Wollmuth Maher & Deutsch, LLP (In re Amanat)*, 338 B.R. 574, 579 (Bankr. S.D.N.Y. 2005) (jurisdiction over third party actions may be based on implied indemnity or contribution claim); *Blackacre Bridge Capital LLC v. Korff (In re River Center Holdings, LLC)*, 288 B.R. 59, 63-65 (Bankr. S.D.N.Y. 2003) (jurisdiction existed because debtor was contractually obligated to indemnify guarantor who was third party defendant); *see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1143 (6th Cir. 1991) (indemnification provision supported jurisdiction even though debtor "would not be affected until and unless [the third party] invoked the indemnification").

(a)      **The Third Party Releases are Largely Consensual**

137.    As noted above, the Second Circuit has held that third-party releases are permissible under certain circumstances, including where the affected creditors consent.[137] Creditor consent can be established through the express consent of the creditors, or the use of an "opt-out" provision in the voting ballots, provided that creditors submitting a ballot and either voting on the plan or abstaining from voting were given proper notice that they would be granting the third-party release by failing to opt out.[138]   Moreover, if a third party release is adequately disclosed, a vote in favor of the plan may constitute consent to the release.[139]   Courts inferring consent have focused on the highlighting of a release provision in the disclosure statement, ballot, and plan itself; where the release is properly disclosed courts have approved such releases on a consensual basis.[140]

138.    Here, in conformance with the law in the Second Circuit, the Third Party Releases are overwhelmingly consensual.   With respect to the Supporting Creditors, each of the Supporting Creditors expressly consented to the third party releases as parties to the RSA.   In addition, the Third Party Release was extensively disclosed, given that the Prepack Plan, Disclosure Statement, Ballots, and the Combined Notice contained conspicuous language discussing the third party release to ensure that all parties voting on the Prepack Plan were

---

[137] *Adelphia Confirmation Decision*, 368 B.R. at 268 (finding that third-party releases are permissible if affected creditors consent) (citing *Metromedia*, 416 F.3d at 142).

[138] *DBSD*, 419 B.R. at 218 (Bankr. S.D.N.Y. 2009) (finding creditor consent if creditor did not opt out of release provisions provided they "were given adequate notice that they would be granting the release by acting in such a manner").

[139] *See Adelphia Confirmation Decision*, 368 B.R. at 268 (applying consensual third party release to creditors that voted to support plan); *In re Oldco M Corp. (f/k/a Metaldyne Corp.)*, No. 09-13412 (MG) (Bankr. S.D.N.Y. Feb. 23, 2010) (same).

[140] *See DBSD*, 419 B.R. at 218-19 (Bankr. S.D.N.Y. 2009) ("[A]dequate notice [of the third party release] is provided in this case, as both the Plan and Disclosure Statement have the third party release provision set off in bold font, and the ballots set forth in both capitalized and bold text the effect of consenting to the Plan or abstaining without opting out of the release."), *aff'd*, No. 09-13061, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *rev'd on other grounds*, 627 F.3d 496 (2d Cir. 2010).

adequately informed of their ability to reject the Prepack Plan and opt out of the third party

release.    Specifically, the introductory section of the Disclosure Statement contained the

following language:

> **EACH BALLOT ADVISES CREDITORS THAT, IF THEY VOTE TO REJECT THE PLAN AND <u>DO NOT ELECT</u> TO OPT OUT OF THE RELEASE PROVISIONS CONTAINED IN ARTICLE VI OF THE PLAN, THEY SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN. CREDITORS WHO VOTE TO ACCEPT THE PLAN SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN. EACH BALLOT ALSO ADVISES CREDITORS THAT, IF THEY <u>FAIL TO RETURN A BALLOT</u> VOTING EITHER TO ACCEPT OR REJECT THE PLAN, THEY SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN.**

139.    Likewise, the Ballots provided, in addition to the release language from

the Prepack Plan itself, that:

- If you return a Ballot and vote to accept the Plan, you are automatically deemed to have accepted the release provisions of the Plan.

- If you vote to reject the Plan, you may check the box below to opt out of the release provisions of the Plan.

- If you elect not to return this Ballot, you are automatically deemed to have accepted the release provisions of the Plan.

140.    The solicitation and disclosure process, therefore, has featured all of the

hallmarks of adequate disclosure, and the Court may regard all votes in favor of the Prepack Plan

as consent to the Third Party Release.  Furthermore, creditors were on notice that the only way to

refute the inference of consent was to vote against the Prepack Plan and opt out of the Third

Party Release.  In response to this notification, creditors overwhelmingly voted to support the

Prepack Plan: each of the Prepetition 2007 Facility Lenders, the Prepetition $253 Million Facility

Lenders, and the Prepetition $100 Million Facility Lenders voted in favor of the Prepack Plan,

and of the Convertible Noteholders who voted, 100% of those Convertible Noteholders voted in

favor of the Prepack Plan.

141.    With respect to those creditors who failed to return a Ballot to accept to

reject the Prepack Plan, numerous courts have viewed such non-voting creditors as consenting to

third party releases, where all voting creditors were given the opportunity to opt out of the

releases and such releases were well-publicized, as they were here.[141]  Thus, the Debtors have

garnered significant consent to the Third Party Release.

### (b)    The Non-Consensual Releases are Appropriate Under the Circumstances and Should be Approved

142.    The Prepack Plan also provides for a release of the Released Parties by

holders of Unimpaired Claims and Equity Interests, to the fullest extent permitted by applicable

law.

143.    *First*, with respect to holders of Unimpaired Claims, one of the

enumerated circumstances in *Metromedia* under which third party releases are appropriate is

---

[141]  *See, e.g.*, *In re Movie Gallery, Inc.*, No. 10-30696, 2010 Bankr. LEXIS 5778, at *20-22 (Bankr. E.D. Va. Oct. 29, 2010) ("consensual" release approved for claimants that voted in favor of plan, abstained from voting, or otherwise consented); *DBSD*, 419 B.R. at 218-19 (same); *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 19, 2007) (approving third party release that provided for releases by creditors entitled to vote on the plan who either (i) vote to accept the Plan, or (ii) abstain from voting and elect not to opt out of the release); *see also In re Conseco*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) (holding that release provision that bound those who "agreed to be bound, either by voting for the [p]lan or by choosing not to opt out of the release" to be "purely consensual"); *In re Trans World Airlines, Inc.*, No. 01-00056 (PJW) (Bankr. D. Del. 2001), Hearing Tr., June 14, 2002, 13: 8-11 ("In this case, the claimants agreed by the simple act of not saying no; i.e., not registering an objection in writing to the debtor."); *In re UAL Corp.*, No. 02-48191 (ERW) (Bankr. N.D. Ill. Jan. 20, 2006) (Plan Confirmation order approving third-party release provision binding those who vote to accept the plan or abstain from voting and fail to opt out of the release provision).

where the plan "otherwise provides for the full payment of the enjoined claims."[142]  Thus, deeming holders of Unimpaired Claims to accept the Third Party Release is appropriate and consistent with the Second Circuit case law.

144.    *Second*, the Released Parties' contributions to these Chapter 11 Cases provide a compelling justification for the Third Party Releases, particularly the release by holders of Equity Interests.  Courts in this district have repeatedly approved third party releases in favor of a non-debtor whose contributions to the case were "important" to its success, as contemplated by *Metromedia*.    For example, in *JPMorgan Chase Bank, N.A. v Charter Commc'ns Operating, LLC* (*In re Charter Commc'ns, Inc.*), 419 B.R. 221 (Bankr. S.D.N.Y. 2009), the court approved a release where the third party had contributed "substantial financial and non-financial consideration" that "no other party could have done."[143]  And the court in *Rosenberg v. XO Commc'ns, Inc.* (*In re XO Commc'ns, Inc.*), 330 B.R. 394 (Bankr. S.D.N.Y. 2005), granted a release to third parties whose "contributions will provide for certain distributions that would not have been made available but for these nondebtor parties' contributions."[144]

145.    The Third Party Releases provided for in the Prepack Plan are a vital part of the Prepack Plan, the Debtors' ability to reorganize, and the Debtors' ability to emerge from bankruptcy.  Each of the Released Parties has provided substantial contributions to the Chapter 11 Cases, without which the distributions to be made under the Prepack Plan–especially the

---

[142]  *See Metromedia* at 142; *see also In re Indianapolis Downs LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013) (deemed acceptance by holders of unimpaired claims is permissible because such creditors were being paid in full and therefore were receiving consideration in exchange for granting the release).

[143]  *In re Charter Commc'ns, Inc.*, 419 B.R. at 258-59.

[144]  *Rosenberg v. XO Commc'ns, Inc.* (*In re XO Commc'ns, Inc.*), 330 B.R. 394, 438 (Bankr. S.D.N.Y. 2005); *see also Cartalemi v. Karta Corp.* (*In re Karta Corp.*), 342 B.R. 45, 54-55 (S.D.N.Y. 2006) (approving a release where the third parties' operational support was necessary for the debtors to "fund the Plan [and] comply with other Plan obligations.").

distributions to holders of Equity Interests in Genco – would not be possible.  In addition, the Released Parties made the substantial contributions in contemplation of the releases provided for in the Prepack Plan, and absent these contributions, the Debtors would be unable to reorganize and emerge from chapter 11 expeditiously.

146.    Pursuant to the Prepack Plan, the Supporting 2007 Facility Lenders agreed to convert 100% of their prepetition secured debt into equity in the Reorganized Company, and agreed to backstop 80% of the $100 million Rights Offering.  Without the consent of the Supporting 2007 Facility Lenders, the Debtors would not otherwise be able to satisfy the Prepetition 2007 Facility Claims with equity in the Reorganized Debtors.  Likewise, under the Prepack Plan the Supporting Noteholders have agreed to convert 100% of their prepetition unsecured debt into equity in the Reorganized Company and backstop 20% of the $100 million Rights Offering.  Moreover, the Backstop Parties have agreed to backstop the Rights Offering without a backstop fee.[145]  Absent the concessions by the Supporting 2007 Facility Lenders and the Supporting Noteholders and the Backstop Parties' agreement to backstop the Rights Offering, the Debtors believe they would face a longer, costlier and more uncertain chapter 11 process, which could materially delay the Debtors' emergence from chapter 11 and ultimately reduce distributions to all creditors.

147.    Importantly, however, through negotiations for an overall consensual restructuring of the Debtors by the Debtors' officers and directors, the Supporting 2007 Facility Lenders and the Supporting Noteholders, the Prepetition 2007 Facility Lenders and Convertible Noteholders have agreed to forego consideration to which they would otherwise be entitled, to reinstate or pay in full all General Unsecured Claims and provide a distribution of warrants to

---

[145] The prepetition secured lenders also consented to the use of their cash collateral during the pendency of the Chapter 11 Cases.

holders of Equity Interests in Genco in exchange for the cancellation or surrender of their Equity Interests. Thus, it is clear that absent the substantial contributions by the Released Parties, the reinstatement of General Unsecured Claims and the distributions of warrants to holders of Equity Interests would not be possible.

148.     The Supporting $253 Million Facility Lenders and the Supporting $100 Million Facility Lenders have also made substantial contributions to these Chapter 11 Cases by agreeing to a significant compromise of their prepetition secured claims by agreeing to amend and extend their prepetition secured credit facilities, extending maturity dates to August 2019, providing a financial covenant holiday through the first quarter of 2015 and, thereafter, amending the financial covenants thereunder. As such, the Amended and Restated Term Loan Facilities provide the Debtors with the necessary exit financing to emerge from bankruptcy and continue operations post-emergence.

149.     Moreover, the Debtors, and the Debtors' officers and directors made invaluable substantial contributions both prior to and during these Chapter 11 Cases. The Debtors' officers and directors were instrumental in navigating the Debtors through prepetition negotiations with the Supporting Creditors and the commencement of the Chapter 11 Cases, and have continued to play an integral role in the Debtors' restructuring efforts by working towards an expeditious emergence from bankruptcy that provides a recovery for all stakeholders regardless of their entitlement to such distribution under a strict application of the absolute priority rule.[146]    Their efforts in formulating and negotiating the RSA, Equity Commitment

---

[146]  In fact, the Court recognized these efforts by noting that "the RSA provides for a meaningful recovery for all of the Debtors' stakeholders, including their old equity holders and the full payment of trade creditors through the voluntary agreement by secured lenders to convert their debt to equity as well as a fully backstopped rights offering of $100 million, with the handover of value to unsecured creditors and equity. This is in contrast to the usual practice of secured creditors adhering to a strict waterfall with respect to recovery." *In re Genco Shipping & Trading Limited*, 2014 Bankr. LEXIS 2183 at *11; *see also id.* at 16 ("Indeed, as noted by counsel to Wilmington Trust, the secured lenders in this prepack are not simply following a typical waterfall recovery. Rather they are

Agreement, the Prepack Plan, Disclosure Statement, and all plan-related documents will enable the Debtors to emerge from bankruptcy in a short timeframe during what this Court has already recognized is a difficult time for the shipping industry.[147]

150.    With respect to the Prepetition Agents, the Supporting Creditors, and those officers and directors remaining with the Debtors post-emergence, such parties will have indemnity rights against the Debtors for lawsuits by third parties for pre- or post-petition acts. Any lawsuits against such parties would effectively be actions against the Debtors estates and adverse judgments could deplete estate assets if they exceed applicable insurance policy limits. While the Debtors do not believe any material claims exist against such parties, the release of claims held by third parties will not only reduce the Debtors' obligations following the Effective Date, but will prevent any frivolous litigation from being brought against directors and officers that would divert attention and resources from the ultimate goal of a successful consummation of the Prepack Plan.

151.    The importance of these contributions to the Debtors' reorganization is confirmed by the creditors' reaction to the Prepack Plan.  Not only is the Prepack Plan unanimously supported by the Debtors' secured lenders, but was unanimously accepted by those Convertible Noteholders who voted on the Prepack Plan.  As a result of the negotiations, compromises, and other contributions by the Released Parties, the *only* class of Claims or Equity Interests rejecting the Prepack Plan are holders of Equity Interests in Genco in Class 11 who,

---

converting their debt to equity, thereby receiving approximately 90 cents on the dollar, while at the same time providing value to the unsecured creditors and equity who would otherwise be receiving little or no recovery at all.").

[147] Bench Decision, at 13:7-8 (suggestions that additional time was needed to assess alternatives or form an equity committee "overlook[] the nature of a prepack case; it also overlooks the difficult time that shipping companies appear to be having in emerging from Chapter 11 in other proceedings"); *see also In re Genco Shipping & Trading Limited*, 2014 Bankr. LEXIS 2183 at *18 ("To avoid [pitfalls from business disruptions] Genco chose to pursue a prepack plan with succinct milestones, planning for a 45-day period from the petition date to the confirmation hearing.").

despite being deemed to reject the Prepack Plan, will be receiving a distribution of warrants from the consideration that would otherwise have been distributed to holders of Prepetition 2007 Facility Claims and Convertible Note Claims.[148]

152.    Accordingly, the Third Party Releases are appropriate and consistent with prior case law in this district.

### 3.    The Exculpation Provision

153.    Pursuant to the terms of the Prepack Plan, the Released Parties are protected from liability for, among other things, actions taken or omitted in connection with, arising out of, or related to the Chapter 11 Cases or the preparation and filing of the Chapter 11 Cases (collectively, the "**Exculpation Provision**").[149]  The scope of the Exculpation Provision is limited to the Released Parties' participation in these Chapter 11 Cases or matters relating to these Chapter 11 Cases or the preparation and filing of the Chapter 11 Cases and related documents and has no effect on liability that results from gross negligence or willful misconduct.

154.    Courts in the Second Circuit evaluate the appropriateness of exculpation provisions based upon a number of factors, including whether the plan was proposed in good faith, whether the provision is integral to the plan, and whether the exculpation provision was necessary for plan negotiations.[150]  In general, the effect of an appropriate exculpation provision

---

[148]   In addition, the third party release by holders of Unimpaired Claims and Equity Interests is qualified by the phrase "to the fullest extent permissible under applicable law" Prepack Plan Art. I.A.132. Thus, any release granted by these parties will only be enforced where a Court finds such a release complies with applicable law. *See In re XO Commc'ns, Inc.*, 330 B.R. at 441-42 (applying "fullest extent permissible under applicable law" limitation post-confirmation in determining permissibility of non-consensual, non-debtor release under Metromedia).

[149]   Prepack Plan, Art. VI.K.3.

[150]   *See, e.g., In re Bally Total Fitness*, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were necessary to successful reorganization, and integral to the plan); *In re Enron Corp.*, 326 B.R. at 501, 503-04 (affirming approval of an exculpation provision where it was necessary to effectuate the plan and excluded gross negligence and willful misconduct; also noting that excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition"); *WorldCom*, 2003 Bankr. LEXIS 1401, at *85 (approving an exculpation provision where it "was an essential element of the Plan formulation process and negotiations"); *see*

is to set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring.[151] Exculpated parties may include fiduciaries of the estate and entities that provide substantial contributions to the reorganization.[152]

155.    In addition, courts have found that exculpation for participating in the plan process and chapter 11 cases is appropriate where the plan has been proposed in good faith and otherwise meets the requirements for plan confirmation, and plan negotiations could not have occurred without protection from liability for parties involved in those negotiations.[153]  Indeed, failing to include an exculpation clause in a plan of reorganization could chill the critical participation of the debtor's management and advisors, as well as essential creditor groups, in the process of formulating and negotiating consensual chapter 11 plans.[154]  Accordingly, exculpation provisions appropriately prevent collateral attacks against parties that have made substantial contributions to a debtor's reorganization and have negotiated a plan of reorganization that is

---

*also In re Drexel Burnham Lambert Grp.*, 960 F.2d at 293; *In re Winn-Dixie Stores*, 356 B.R. 239, 260-61 (Bankr. M.D. Fla. 2006) (approving an exculpation provision where beneficiaries made significant contributions and expected that an exculpation provision would be included in plan).

[151]  *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (holding that an exculpation provision is "apparently a commonplace provision in Chapter 11 plan, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Enron Corp.*, 326 B.R. at 501 (finding that exculpation provision was appropriate where such provision excluded gross negligence and willful misconduct); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation provision that excluded gross negligence and intentional misconduct); *In re Bally Total Fitness*, 2007 WL 2779438, at *8 (approving an exculpation provision that excluded gross negligence and willful misconduct and exculpated, among others, prepetition noteholders and new investors). In this regard, exculpation provisions are unlike third-party releases because they do not affect the liability of third parties *per se* but merely set the standard of liability for future litigation by a non-releasing party against an exculpated party for acts arising out of the restructuring.

[152]  *See, e.g., In re Gen. Mar. Corp.*, No. 11-15285 (MG) (Bankr. S.D.N.Y. May 7, 2012) (approving releases, exculpations and related injunctions based on, among other things, certain released parties' substantial contributions to the debtors).

[153]  *See In re Drexel Burnham Lambert Grp.*, 960 F.2d at 293 (finding that where a debtor's plan of reorganization requires the settlement of numerous, complex issues, protection of third parties against legal exposure may be a key component of the settlement).

[154]  *See, e.g., id.; In re Enron Corp.*, 326 B.R. at 503 (finding that without such protection from liability, key constituents might not actively participate in plan process or abandon efforts to help a debtor follow through on plan and wind up its affairs).

ultimately confirmed by the court. Parties to be exculpated from liability may include those that are indemnified by a debtor or that provide substantial contributions to the debtor and the reorganization.[155]

156.    Here, the Exculpation Provision is appropriate under applicable law because it is part of the Prepack Plan which was proposed in good faith, vital to the Chapter 11 Cases and Prepack Plan formulation process, and is appropriately limited in scope. As discussed above, negotiation and compromise were crucial to the formulation of a feasible and consensual Prepack Plan, and could not have occurred without the protection from liability that the Exculpation Provision provides to the Released Parties. Moreover, each of the Released Parties covered under the Exculpation Provision is either entitled to be indemnified by the Debtors or has made substantial contributions to the reorganization effort. Finally, the Exculpation Provision, including its carve-out for gross negligence and willful misconduct, is entirely consistent with established practice in this jurisdiction.[156]   Accordingly, the Exculpation Provision is reasonable, consistent with prior case law in this district, and should be approved.

### 4.    Injunction

157.    Article VI of the Prepack Plan includes a provision enjoining parties from pursuing Claims released under the Prepack Plan (the "**Injunction Provision**").[157] The Injunction Provision is necessary to preserve and enforce the Estate Releases, the Third Party Releases and the Exculpation Provision, and is narrowly tailored to achieve that purpose.

---

[155] *See, e.g.*, *In re Almatis, B.V.*, No. 10-12308 (MG) (Bankr. S.D.N.Y. Sept. 20, 2010); *In re Uno Rest. Holdings Corp.*, No. 10-10209 (MG) (Bankr. S.D.N.Y. July 6, 2010); *In re Borders Grp.*, No. 11-10614 (MG) (Bankr. S.D.N.Y. Dec. 21, 2011); *In re AMR Corp.*, 11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013).

[156]   *See, e.g.*, *DBSD*, 419 B.R. at 217-18 ("[E]xculpation provisions . . . may be used . . . where . . . the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution; [and where] the released party provides substantial consideration . . . "); *Adelphia Confirmation Decision*, 368 B.R. at 267 (same).

[157] Prepack Plan, Art. VI.D.

Further, the Injunction Provision is a key component of the ultimate reorganization,[158] and is similar to those previously approved by this Court.[159] Thus, this Court should approve the Injunction Provision together with the Estate Releases, the Third Party Releases and the Exculpation Provision.

## CONCLUSION

For the reasons set forth herein, the Solicitation Procedures and Disclosure Statement satisfy the applicable requirements of the Bankruptcy Code and Bankruptcy Rules, and the Prepack Plan fully satisfies all applicable requirements of the Bankruptcy Code.  Therefore this Court should approve the Solicitation Procedures and Disclosure Statement and confirm the Prepack Plan pursuant to section 1129 of the Bankruptcy Code.


Dated:    New York, New York
          May 28, 2014

                                        KRAMER LEVIN NAFTALIS & FRANKEL LLP
                                        /s/ Adam C. Rogoff
                                        Kenneth H. Eckstein
                                        Adam C. Rogoff
                                        Stephen D. Zide
                                        Anupama Yerramalli
                                        1177 Avenue of the Americas
                                        New York, New York 10036
                                        Telephone: (212) 715-9100
                                        Facsimile: (212) 715-8000
                                        *Counsel for the Debtors*
                                        *and Debtors in Possession*

---

[158] *See In re Bally Total Fitness*, 2007 WL 2779438, at *8 (finding that exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re Drexel Burnham Lambert Grp.*, 960 F.2d at 293 (finding that bankruptcy court has jurisdiction and power to approve release and injunction in a plan, where such releases and injunction play an important part in plan of reorganization); *Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 184 B.R. 648, 655 (S.D.N.Y. 1995) ("[C]ourts may issue injunctions enjoining creditors from suing third parties . . . in order to resolve finally all claims in connection with the estate and to give finality to a reorganization plan.").

[159] *See, e.g., In re Gen. Mar. Corp.*, No. 11-15285 (MG) (Bankr. S.D.N.Y. May 7, 2012); *In re Mesa Air Grp.*, No. 10-10018 (MG) (Bankr. S.D.N.Y. Jan. 20, 2011); *In re Almatis, B.V.*, No. 10-12308 (MG) (Bankr. S.D.N.Y. Sept. 20, 2010); *In re Oldco M Corp. (f/k/a Metaldyne Corp.)*, No. 09-13412 (MG) (Bankr. S.D.N.Y. Jan. 10, 2010).