KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
Stephen D. Zide
Anupama Yerramalli
1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| GENCO SHIPPING & TRADING LIMITED, et al., | : | Lead Case No. 14-11108 (SHL) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

------------------------------------------------------------------X

**DEBTORS' REPLY TO THE OBJECTIONS OF (I) THE**
**OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS AND**
**(II) THE OFFICE OF THE UNITED STATES TRUSTEE TO**
**CONFIRMATION OF THE PREPACKAGED PLAN OF REORGANIZATION**
**OF THE DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

## TABLE OF CONTENTS

                                                                              **Page**

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ........................................................................... 2

RESPONSE TO OBJECTIONS .......................................................................... 6

I.     THE PREPACK PLAN IS FAIR AND EQUITABLE TO EQUITY HOLDERS ........... 6

       A.     The Most Relevant Valuation Methodology, Net Asset Value, Shows
              Irrefutably That Genco Is Insolvent ................................................. 8

       B.     Other Methodologies Confirm Genco's Insolvency ........................... 15

              1.     "Comparable Transactions" ................................................. 15

              2.     "Comparable Companies" .................................................... 16

              3.     Discounted Cash Flow ........................................................ 18

       C.     The "Evidence" Relied on by the Equity Committee Is Inadmissible or Not
              Probative ...................................................................................... 23

II.    THE PREPACK PLAN WAS PROPOSED IN GOOD FAITH AND WAS NOT
       THE PRODUCT OF MANIPULATION AND ENGINEERING .................................. 25

III.   OTHER OBJECTIONS TO THE PREPACK PLAN SHOULD BE OVERRULED ...... 30

       A.     The Third Party Release Is Supported by Second Circuit Law ............ 30

       B.     Off-Market Modification to the Warrants Is Wholly Unwarranted ..... 32

       C.     Payment of Supporting Creditors' Professionals Fees Are Appropriate ............. 32

IV.    THE TECHNICAL MODIFICATIONS TO THE PREPACK PLAN ARE NOT
       MATERIAL ................................................................................................ 34

V.     WAIVER OF THE STAY IS WARRANTED HERE ...................................... 37

VI.    RESERVATION OF RIGHTS ...................................................................... 37

CONCLUSION ...................................................................................................... 38

KL2 2850573.1

# TABLE OF AUTHORITIES[*]

**Cases**                                                                                      **Page(s)**

*In re Adelphia Communs. Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007)..................................................................................29

*Adelphia Recovery Trust v. FPL Group, Inc. (In re Adelphia Communs. Corp.)*,
   Case No. 02-41729, 2014 Bankr. LEXIS 2011 (Bankr. S.D.N.Y. May 6, 2014)............17, 18

*In re Am. Solar King Corp.*,
   90 B.R. 808 (Bankr. W.D. Tex. 1988)..................................................................................33

*In re Bellanca Aircraft Corp.*,
   56 B.R. 339 (Bankr. D. Minn. 1985) ...................................................................................12

*by Casey v. Merck & Co.*,
   653 F.3d 95 (2d Cir.2011)...................................................................................................19

*In re Cellular Info Sys., Inc.*,
   171 B.R. 926 (Bankr. S.D.N.Y. 1994).................................................................................24

*In re Charter Commc'ns, Inc.*,
   No. 09-11435 (JMP), Disclosure Statement, ECF No. 319, 4-8 (Bankr.
   S.D.N.Y. May 7, 2009)........................................................................................................30

*Citicorp Acceptance Co., Inc. v. Ruti-Sweetwater (In re Sweetwater)*,
   57 B.R. 354 (D. Utah 1985)................................................................................................34

*Consol. Rock Prod. Co. v. DuBois*,
   312 U.S. 510 (1941).............................................................................................................7

*In re DBSD North Am., Inc.*,
   419 B.R. 179 (Bankr. S.D.N.Y. 2009), *aff'd in part and rev'd in part*, 634
   F.3d 79 (2d Cir. 2011)........................................................................................................18

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*,
   279 F. Supp. 2d 235 (S.D.N.Y. 2003), *aff'd as modified*, 411 F.3d 384 (2d Cir.
   2005) ...................................................................................................................................20

*Enron Corp. v. New Power Co. (In re New Power Co.)*,
   438 F.3d 1113 (11th Cir. 2006) ..........................................................................................33

*In re Excel Maritime Carriers Ltd.*,
   No. 13-23060 (RDD), Disclosure Statement (Bankr. S.D.N.Y. Dec. 10, 2013) ..............11, 18

---

[*]  Due to the volume of the unreported sources cited herein, copies of such materials will be provided to chambers and are available upon request.

*In re Exide Technologies,*
   303 B.R. 48 (Bankr. D. Del. 2003) ......................................................................12

*In re Genco Shipping & Trading, Ltd.,*
   Case No. 11-11108 (SHL), 2014 Bankr. LEXIS 2183 (Bankr. S.D.N.Y. May
   16, 2014) ....................................................................................................1, 26

*In re General Maritime Corp.,*
   No. 11-15286 (MG), Notice of Filing Solicitation Version of the First
   Amended Disclosure Statement (Bankr. S.D.N.Y. Mar. 1, 2012) .........................11

*In re Global Ocean Carriers Ltd.,*
   251 B.R. 31 (Bankr. D. Del. 2000) ......................................................................11

*In re Ion Media Networks, Inc.,*
   No. 09-13125 (JMP), Disclosure Statement for The Debtors' First Modified
   Joint Plan of Reorganization, ECF No. 289, 3, 5 (Bankr. S.D.N.Y. Sept. 30,
   2009) ....................................................................................................................30

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),*
   843 F.2d 636 (2d Cir. 1988)................................................................................24

*In re Mt. Vernon Plaza Cmty. Urban Redevelopment Corp. I,*
   79 B.R. 305 (Bankr. S.D. Ohio 1987)..................................................................33

*Muskegon Motor Stockholders Prot. Comm. v. Davis (In re Muskegon Motor
   Specialties),*
   366 F.2d 522 (6th Cir. 1966) ................................................................................7

*In re Overseas Shipholding Grp., Inc.,*
   Case No. 12-20000 (PJW) ...................................................................................10

*Primavera Familienstifung v. Askin,*
   130 F.Supp.2d 450 (S.D.N.Y. 2001)....................................................................19

*Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,*
   390 U.S. 414 (1968).............................................................................................12

*Prudential Ins. Co. of Am. v. SW Boston Hotel Venture, LLC (In re SW Boston
   Hotel Venture, LLC),*
   No. 12-9008, 2014 U.S. App. LEXIS 6768 (1st Cir. Apr. 11, 2014) ......................7

*In re Reader's Digest Ass'n, Inc.,*
   No. 09-23529, 2010 Bankr. LEXIS 5550 (Bankr. S.D.N.Y. Jan. 19, 2010)............6

*In re Residential Capital, LLC,*
   No. 12-12020 (MG), Disclosure Statement for the Joint Chapter 11 ....................29

*In re Rivers End Apartments, Ltd.*,
   167 B.R. 470 (Bankr. S.D. Ohio 1994)..................................................................12

*In re SGPA, Inc.*,
   No. 1-01-02609, 2001 Bankr. LEXIS 2291 (Bankr. M.D. Pa. Sept. 28, 2001).........7

*In re Spansion, Inc.*,
   426 B.R. 114 (Bankr. D. Del. 2010) .......................................................................7

*In re Toy & Sports Warehouse*,
   37 B.R. 141 (Bankr. S.D.N.Y. 1984) .......................................................................6

*In re Trans World Airlines, Inc.*,
   180 B.R. 389 (Bankr. D. Del. 1994), *aff'd in part, rev'd in part on other
   grounds*, 203 B.R. 890 (D. Del. 1996), *rev'd on other grounds*, 134 F.3d 188
   (3d Cir. 1998).....................................................................................................11, 17

*Westpointe v. Paririe Props. (In re Westpointe)*,
   241 F.3d 1005 (8th Cir. 2001) .................................................................................6

## Statutes

11 U.S.C. § 1124 ...........................................................................................................30

11 U.S.C. §§ 1127(a), (d)..............................................................................................33

*Chapter 11 of the Bankruptcy Code*............................................................... *passim*

Sections 1122 and 1123 of the Bankruptcy Code .........................................................34

Section 1124 of the Bankruptcy Code ..........................................................................30

Sections 1125 and 1126 of the Bankruptcy Code ..........................................................1

Section 1127 of the Bankruptcy Code ..........................................................................32

Section 1127(d) of the Bankruptcy Code................................................................33, 34

Section 1129(a)(3) of the Bankruptcy Code .........................................................5, 23, 24

Section 1129(b) of the Bankruptcy Code........................................................................5

Jones Act, 46 U.S.C. § 55101 ..................................................................................9, 10

## Other Authorities

Bankruptcy Rule 3019 ..................................................................................................33

Bankruptcy Rules 3020 and 7062 .................................................................................35

KL2 2850573.1

Fed. R. Bankr. P. 3019 ...........................................................................................33

Richard A. Brealey et al., *Principles of Corporate Finance*
(11th ed. 2014)………...............................................................................9, 15,16

James R. Hitchner, *Financial Valuation: Applications and Models* (3d ed. 2011).......................12

Joe B. Stamford, *Principal Maritime To Be Viability Test Case for New York
Crude IPOs* .......................................................................................................11

Joe B. Stamford, *Signals Still Unclear on Failure of Diamond S Shipping IPO* .........................11

Martin Stopford, *Maritime Economics* (3d ed. 2009).................................................8, 9

S. Rep. No. 95-989 (1978).................................................................................6, 9

Genco Shipping & Trading Limited ("**Genco**") and certain of its direct and indirect subsidiaries, as chapter 11 debtors and debtors in possession (each a "**Debtor**" and collectively the "**Debtors**"[2] or the "**Company**") in the above-referenced chapter 11 cases (the "**Chapter 11 Cases**"), submit this omnibus reply memorandum (the "**Reply**") in support of entry of an order (the "**Confirmation Order**") (i) approving (a) the *Disclosure Statement for the Prepackaged Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (as amended from time to time, the "**Disclosure Statement**") [Docket No. 15], pursuant to sections 1125 and 1126 of the Bankruptcy Code, and (b) the solicitation procedures (the "**Solicitation Procedures**") used in connection with the Debtors' prepetition solicitation of the Prepack Plan (defined below); (ii) confirming the *Prepackaged Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (as amended from time to time, the "**Prepack Plan**") [Docket No. 14]; and (iii) overruling the objections of the Official Committee of Equity Security Holders (the "**Equity Objection**") [Docket No. 262] and the Office of the United States

---

[2]  The Debtors and the last four digits of their taxpayer identification numbers (where applicable) are as follows: Genco Shipping & Trading Limited (9758), Genco Investments LLC, Genco Management (USA) LLC (3865), Genco RE Investments LLC, Genco Ship Management LLC (7604), Genco Acheron Limited (9293), Genco Aquitaine Limited (8217), Genco Ardennes Limited (8215), Genco Augustus Limited (3622), Genco Auvergne Limited (8233), Genco Avra Limited (5557), Genco Bay Limited (5558), Genco Beauty Limited (9761), Genco Bourgogne Limited (8236), Genco Brittany Limited (8237), Genco Carrier Limited (9763), Genco Cavalier LLC (9764), Genco Challenger Limited (6074), Genco Champion Limited (6073), Genco Charger Limited (6072), Genco Claudius Limited (3620), Genco Commodus Limited (3619), Genco Constantine Limited (3617), Genco Explorer Limited (9764), Genco Hadrian Limited (3608), Genco Hunter Limited (6158), Genco Knight Limited (9773), Genco Languedoc Limited (8238), Genco Leader Limited (9774), Genco Loire Limited (8239), Genco London Limited (3610), Genco Lorraine Limited (8242), Genco Mare Limited (5641), Genco Marine Limited (9775), Genco Maximus Limited (3613), Genco Muse Limited (5276), Genco Normandy Limited (8243), Genco Ocean Limited (5645), Genco Picardy Limited (8244), Genco Pioneer Limited (9767), Genco Predator Limited (6075), Genco Progress Limited (9776), Genco Prosperity Limited (9777), Genco Provence Limited (8246), Genco Pyrenees Limited (8599), Genco Raptor LLC (9767), Genco Reliance Limited (9768), Genco Rhone Limited (8248), Genco Spirit Limited (5650), Genco Success Limited (9769), Genco Sugar Limited (9778), Genco Surprise Limited (9385), Genco Thunder LLC (9769), Genco Tiberius Limited (3614), Genco Titus Limited (3615), Genco Vigour Limited (9770), Genco Warrior Limited (6076), and Genco Wisdom Limited (9771). The Debtors' business address is 299 Park Avenue, 12th Floor, New York, NY 10171. Neither Baltic Trading Limited nor its subsidiaries are Debtors.

KL2 2850573.1

Trustee (together with the Equity Objection, the "**Objections**") [Docket No. 264].[3]  This Reply will be supplemented by declarations of the Debtors' witnesses and evidence adduced at the confirmation hearing.

## PRELIMINARY STATEMENT

1.     The Prepack Plan is the result of months of extensive and intense negotiations among the Debtors and their secured and unsecured creditors and represents a major accomplishment, especially in the severely distressed dry bulk shipping industry.  The effect of the Prepack Plan will be to (i) cut the Debtors' debt by at least $1.2 billion, (ii) reduce the Debtors' annual interest payment obligations by more than $40 million, (iii) eliminate over $192.8 million annually in amortization payments, and (iv) facilitate a new capital infusion of approximately $100 million through the fully backstopped Rights Offering.  As a result, the Debtors will emerge from bankruptcy as a healthy company with a solid and feasible balance sheet.

2.     Only two objections were filed opposing confirmation of the Prepack Plan, which remarkably enjoys the unanimous support of the Debtors' voting creditors.  The primary objection is a lengthy tirade by the Official Committee of Equity Security Holders (the "**Equity Committee**"), which attempts to dress up a garden variety valuation dispute with unsubstantiated allegations of foul play and thereby deflect attention from the following dispositive points:

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the (a) Prepack Plan, (b) Scheduling Motion; or (c) *Debtors' Memorandum of Law in Support of Entry of an Order (I) Approving (A) the Debtors' Disclosure Statement Pursuant to Sections 1125 and 1126(b) of the Bankruptcy Code, and (B) the Solicitation Procedures, and (II) Confirming the Prepackaged Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code* ("**Confirmation Brief**") [Docket No. 223].

- 2 -

3.      First, Blackstone Advisory Partners L.P. ("**Blackstone**"), the Debtors' restructuring advisor, correctly determined that the Debtors are insolvent using a net asset value ("**NAV**") analysis based principally on multiple objective appraisals of the Company's 53 vessels.   This is the methodology used in virtually all financing, M&A, and restructuring transactions in the dry bulk shipping industry, based on unique industry characteristics that cause value to reside mainly in the vessels themselves.   Dry bulk shipping is conducted in a highly competitive and fragmented market, with low barriers to entry and generic, commoditized services.   As a result, over the long haul, the industry struggles to generate returns above the cost of capital, and there is little or no resultant value in infrastructure, brand recognition, or economies of scale – the value is in the assets.

4.      Second, the Equity Committee does not seriously challenge the merits of Blackstone's NAV analysis, merely arguing for application of other methodologies, including a discounted cash flow ("**DCF**") analysis and analysis of comparable companies and transactions. However, these other methodologies are less appropriate in this industry due to the difficulty of generating reliable cash flow projections or identifying apples to apples comparisons, and in any event an objective application of these methodologies by Blackstone (adapted to the realities of the industry) yielded even *lower* valuations than the NAV approach. Under any methodology, the Debtors are insolvent and the $32.9 million gift being provided to Genco shareholders (the "**Equity Holders**") constitutes fair and even generous treatment – and correspondingly increases the degree of solvency that would have to be demonstrated before they would be entitled to a *greater* recovery.

5.      Third, the accuracy of Blackstone's valuation – and the absence of any transaction that could yield a greater recovery for equity – is confirmed by the absence of any

competing bids or even expressions of potential interest by *any* party, including the members of

the Equity Committee, in the many months the Debtors' financial plight has been common

knowledge in the marketplace. If the Equity Committee's view of valuation were correct, *some*

party would surely have surfaced to offer more for the Company's assets.

6.    Fourth, the Equity Committee's accusation that management and

Blackstone "manipulated" business projections to deprive Equity Holders of value is baseless

and, in any case, beside the point. The Debtors responsibly hired Marsoft, a respected third party

rate forecaster, to provide a more rigorous basis for testing the viability of restructuring

proposals than the Debtors' contemplated use of unreliable historical ten-year averages. Marsoft

provided the Debtors with the same projections on which Marsoft's many other clients

throughout the marketplace rely. The Equity Committee accuses management and Blackstone of

manipulation because the Marsoft forecasts were offered as an alternative case in a January 6,

2014 board presentation and supposedly as the base case in a lender presentation four days later

(although, as explained below, the Marsoft forecasts actually were used as the base case only for

two years of projections). As will be demonstrated at trial, that difference simply reflects that

management became more comfortable with Marsoft's expert approach to long-term projections

than the unscientific reliance on historical averages in the days immediately following Marsoft's

retention. In any event, Marsoft's forecasts to date have been materially more accurate than

historical averages or analyst estimates. And these forecasts are irrelevant to NAV valuation –

they are used for confirmation purposes mainly to support a feasibility finding, including debt

capacity, and to inform cash flow projections for Blackstone's less relevant DCF analysis.

7.    Fifth, there is not a shred of evidence that the Debtors acted in bad faith or

intentionally distorted their valuation in an improper attempt to rob equity of value. To the

contrary, the process by which the Company and its professionals painstakingly negotiated with each constituency until they built unanimous creditor support for the Prepack Plan was open, honest, transparent, and arm's-length. Far from selling equity down the river, the Company bargained for concessions from the major creditor constituencies to provide a meaningful recovery to shareholders who are out-of-the-money under any objective measure of value. In fact, the Board immediately and consistently pressed the lenders and noteholders to ensure that Equity Holders received the maximum possible recovery. This occurred even though Equity Holders never organized to participate in negotiations.

8. In short, the Prepack Plan will maximize recoveries to all stakeholders and represents the Company's only viable path out of bankruptcy. If it fails, all parties, including the Equity Holders, will suffer greater losses. Knowing all this, the members of the Equity Committee – all of which bought their stakes at the same time the Restructuring Support Agreement was announced or thereafter with the apparent intention of litigating valuation – are recklessly seeking to create and exploit hold-up value by attempting to derail the Prepack Plan. The Court should not succumb to these tactics.

9. The Debtors' insolvency defeats the Equity Committee's argument that the Prepack Plan is not "fair and equitable" under Section 1129(b) of the Bankruptcy Code. For the same reasons (and in light of the painstaking arms'-length negotiations that led to the Prepack Plan), the Equity Committee cannot establish that the Debtors are not good-faith plan proponents under Section 1129(a)(3) of the Bankruptcy Code.

10. The Equity Committee also objects to the plan releases and seeks modifications to the Equity Warrants. Both requests are without legal foundation and should be denied. Similarly, the concerns stated in the limited objection filed by the United States Trustee

- 5 -

– the only other objection to the Prepack Plan – regarding certain releases by unimpaired creditors and the grounds on which the Debtors will pay the Supporting Creditors' fees should be overruled. As set forth in the Confirmation Brief and in more detail below, the releases of unimpaired creditors satisfy the requirements applicable in this Circuit, and the payments of the fees for the Supporting Creditors are not only reasonable under the Prepack Plan, but have already been authorized by prior orders of the Court and will in any case be assumed by the Debtors under the Prepack Plan.[4]

## RESPONSE TO OBJECTIONS

## I.   THE PREPACK PLAN IS FAIR AND EQUITABLE TO EQUITY HOLDERS

11.    The Equity Committee's principal objection to confirmation is that Equity Holders cannot be crammed down because the Prepack Plan overpays creditors and thus "deprives holders of Equity Interests of significant value to which they are entitled." Equity Obj. at 16. Equity holders logically may assert such an argument only when a debtor is solvent and there is some possibility of value going to equity as a matter of right. The Debtors thus may justify cramdown simply by demonstrating that Genco is insolvent – and they need do this only by a preponderance of the evidence.[5] *See Westpointe v. Paririe Props. (In re Westpointe)*, 241 F.3d 1005, 1007 (8th Cir. 2001) ("The other primary consideration for determining whether a plan which extinguishes equity interests is fair and equitable is whether the debtor is solvent."); *In re Toy & Sports Warehouse*, 37 B.R. 141, 153 (Bankr. S.D.N.Y. 1984) ("The equity shareholders may be crammed down in this case simply because the debtors are insolvent and the

---

[4]   The Debtors also received informal objections from certain parties in interest. Non-material changes to the Prepack Plan were made to address these concerns, as described in section IV below.

[5]   *See In re Reader's Digest Ass'n, Inc.*, No. 09-23529, 2010 Bankr. LEXIS 5550, at *49 (Bankr. S.D.N.Y. Jan. 19, 2010) (satisfaction of cram-down standard need be demonstrated only by preponderance of the evidence).

shares in question have no value."); *see also* S. Rep. No. 95-989 (1978) ("If the interests are

'under water' then they will be valueless and the plan may be confirmed notwithstanding the

dissent of that class of interests even if the plan provides that the holders of such interests will

not receive any property on account of such interests.").

12.     At trial, the preponderance of the evidence will show that the Debtors are

insolvent and therefore the Prepack Plan does not deprive Equity Holders of any value to which

they are entitled.   This conclusion is based, first and foremost, on the valuation prepared by

Blackstone on the basis of NAV – the definitive and most widely accepted indicator of value in

the dry bulk shipping industry.   Other valuation methodologies – metrics based on DCF,

"comparable companies," and "comparable transactions" – are less suited to these circumstances.

But they too show that the Debtors are insolvent.   Moreover, these methods indicate even deeper

insolvency than does the NAV approach.[6]

13.     Specifically, the evidence will show that the total distributable value of the

reorganized Genco based on NAV is between $1.36 billion and $1.44 billion, which is less than

the $1.48 billion in value required to pay the claims of all creditors in full before the holders of

---

[6]  The most appropriate method or methods of valuation in a given case will depend on the circumstances.  *See, e.g.,*
*In re SGPA, Inc.,* No. 1-01-02609, 2001 Bankr. LEXIS 2291 at *36 (Bankr. M.D. Pa. Sept. 28, 2001) ("Bankruptcy
Courts have been given broad discretion to determine the 'extent and method of inquiry necessary for a valuation . . .
dependent on the facts of each case.'") (quotation omitted); *Prudential Ins. Co. of Am. v. SW Boston Hotel Venture,*
*LLC (In re SW Boston Hotel Venture, LLC),* No. 12-9008, 2014 U.S. App. LEXIS 6768 at *30 (1st Cir. Apr. 11,
2014) ("Allowing bankruptcy courts to select the appropriate valuation method on a case-by-case basis allows the
bankruptcy court, using its informed discretion and applying historic principles of equity, to adopt in each case the
valuation method that is fairest given the prevailing circumstances.").

This flexibility fits the inexact nature of any valuation exercise; mathematical certainty is neither expected nor
possible.  *See, e.g., Consol. Rock Prod. Co. v. DuBois,* 312 U.S. 510, 526 (1941) (observing that in projecting future
value, "an estimate, as distinguished from mathematical certitude, is all that can be made"); *Muskegon Motor*
*Stockholders Prot. Comm. v. Davis (In re Muskegon Motor Specialties),* 366 F.2d 522, 530 (6th Cir. 1966) ("The
valuation of a business remains an art based on the use of informed, careful judgment (including that of the court),
and it cannot be expected to yield mathematically precise results."); *In re Spansion, Inc.,* 426 B.R. 114, 130 (Bankr.
D. Del. 2010) ("It has been aptly observed that entity valuation is much like a guess compounded by an estimate.")
(internal quotation marks omitted).

the Genco's equity would receive a recovery.[7]  Moreover, the very methodologies advocated by

the Equity Committee lead to an even lower total distributable value of reorganized Genco of

between $1.12 billion and $1.418 billion.  When further taking into account the Equity Warrants

that impaired creditors are gifting to Equity Holders under the Prepack Plan, valued at $32.9

million, the Equity Committee would need to establish an even higher valuation before Equity

Holders would be entitled to any additional recovery.

### A.    The Most Relevant Valuation Methodology, Net Asset Value, Shows Irrefutably That Genco Is Insolvent

14.    Blackstone employed NAV as its principal methodology to value the

Debtors because (a) particular characteristics of the dry bulk shipping industry make it the most

appropriate and reliable means of determining value, and (b) it is, in fact, the method customarily

applied to determine value in this industry.  The Equity Committee's unsupported suggestion that

Blackstone selected this methodology to engineer a lower valuation ignores these realities.

Importantly, Blackstone's conclusion that the Debtors' NAV, taken alone, does not support any

recovery for Equity Holders is not seriously disputed by the Equity Committee.  Therefore, if the

Court concludes that the Debtors' determination to employ NAV is appropriate, it may easily

overrule the Equity Committee's objection.

15.    The features of the dry bulk shipping industry that support the use of NAV

are readily apparent and will be detailed by the witnesses at trial.  Dry bulk shipping is a highly

fragmented industry with low barriers to entry and commoditized assets and services.   In

industries with these characteristics, it is difficult to build enterprise value independent of asset

---

[7]  This claims total comprises $1,069 million under the 2007 Credit Facility, $176 million under the DB Facility, $74 million under the CA Facility, $125 million of Convertible Notes, $4 million of accrued interest, $6 million in swap liability, $1 million owed under lease agreements, and $26 million of other administrative claims.  The Equity Committee understates these liabilities by misreporting the amount owed under the 2007 Credit Facility and omitting over $25 million of administrative claims.  *See* Equity Obj. at 10-11.

value, and thus NAV comes close to capturing all value in the enterprise.  In dry bulk shipping, for example, investors can readily assemble fleets (or buy an individual vessel), engage third-party ship managers, and compete with incumbents to provide the standardized services on which the industry is based.[8]  A lack of existing operations infrastructure, brand recognition, or scale is not a significant hindrance – and thus little value resides in such features.  Indeed, the marketplace has become increasingly fragmented in recent years, with over 10,000 vessels operated by over 1,700 independent dry bulk carriers, and with little concentration of ownership. *See* Clarkson PLC, Shipping Intelligence Network 2010 (May 21, 2014) (listing vessels by owners).  Since 2011, over 240 shipyards have constructed and delivered more than 3,500 dry bulk vessels.  *See id*. (listing vessels by shipyard).  In the last five years, the number of vessel owners has increased by 30%.  The services provided by these competitors are not readily distinguishable.  At the same time, there is a liquid and active market for the purchase of dry bulk vessels.  Since 2013, over 600 vessel sales have been reported.  *See* Clarkson PLC, Shipping Intelligence Networks 2010 (May 21, 2014) (describing sales).  This uncommonly competitive environment approaches "perfect competition" that drives down profit margins and causes virtually all value to reside in the operating assets themselves – the vessels.[9]  Put

---

[8]  *See* Martin Stopford, *Maritime Economics* 324 (3d ed. 2009) ("In many ways shipping companies are very similar to the 'firms' which classical economists had in mind when they developed their theory of perfect competition. . . . Over 5,000 companies compete fiercely in a market place where barriers to free competition such as tariffs, transport costs and product branding hardly exist."); Richard A. Brealey et al., *Principles of Corporate Finance* 286 (11th ed. 2014) (without specific regard for industry, advising suspicion of "any investment proposal that predicts a stream of economic rents into the indefinite future.  Try to estimate *when* competition will drive the NPV down to zero, and think of what that implies for the price of your product.").

[9]  *See* Stopford at 338 (observing that shipping (dry bulk and otherwise) is vulnerable to weak profits due to hallmarks of "the perfect competition model," *e.g.*, "new entrants bring new capacity and seek market share, pushing down margins, whilst powerful buyers or suppliers bargain away the profits for themselves.  The presence of close substitute products limits the price competitors can charge without inducing substitution. . . . Anyone who has studied the shipping market knows how vulnerable it is in these respects."); Brealey at 281 ("Positive NPVs are suspect without some long-run competitive advantage.").

differently, values reflect the reality that a vessel will likely be just as valuable in the hands of one owner as those of its rivals.

16.     These characteristics distinguish dry bulk shipping from other markets – including industries that may appear similar at first glance, but involve services that are less commoditized or feature more barriers to entry and less competition.[10]   For example, the shipping of containers, as opposed to dry bulk goods, requires sophisticated logistical services in order to carry thousands of customers' containers simultaneously and efficiently deliver individual containers to their individual destinations throughout the world.  Similarly, shipping companies that operate between U.S. ports under the Jones Act – which is limited to American-made ships, owned by Americans, with American crews – face limited competition from new entrants.  *See, e.g.*, *In re Overseas Shipholding Grp., Inc.*, Case No. 12-20000 (PJW), First Day Affidavit at 11 (Bankr. D. Del. Nov. 14. 2012) [Docket No. 2, 11] (noting that shipping under Jones Act "is highly concentrated and has high barriers to entry").  Companies in these industries may well generate enterprise value independent of the value of operating assets and achieve more significant profit margins over the long haul.  *See* Brealey at 274 ("Many capital assets are traded in a competitive market, so it makes sense to *start* with the market price and then ask why these assets should earn more in your hands than in your rivals'.").  In contrast, dry bulk shipping has historically failed to sustain returns in excess of its cost of capital – consistent with its exceptional features of "perfect competition," fixed costs, and highly volatile revenue streams.  As a result, virtually all value is captured through NAV analysis.  Where an industry fails to earn its cost of capital, asset value provides the best and highest estimation of value.

---

[10]   *See id*. ("Admittedly, the specialized markets (see Chapter 12) and the liner business (see Chapter 13) do not fit this description so well, but bulk shipping certainly fits the classical economic model.").

17.    The Equity Committee denies that this could be true, because otherwise "the industry would not have attracted the amount of capital it has seen in recent years." *See* Equity Obj. at 8.  But whether one subset of investors – the "long" side of the market – believe they can buy low and sell high at a particular moment is not probative of the long term economics of the shipping industry or the appropriate method of valuation.  Regardless of whether a given company or investor profits from time to time, the historical reality is that returns approximate the cost of capital in this subsector of the shipping industry.  *See* Stopford at 342 ("Although few modern industries conform to the famous perfect competition model developed by the classical economists in the nineteenth century, it fits shipping like a glove. . . . Basically companies keep investing until marginal cost equals price and in the long term marginal cost is the cost of capital.  Interestingly, over the last fifty years [return on shipping investment] has fluctuated around the cost of interest.")  As a result, cash flow or EBITDA provides an unreliable basis for valuation; rather, the most reliable measure of the value is asset-based.

18.    For all of these reasons, the use of NAV as a metric for valuation is widely accepted in the dry bulk shipping sector.  Investors, financing providers, and equity research analysts commonly value dry bulk companies based on asset value.  The Company historically used NAV in each of its acquisitions, in negotiating each of the outstanding debt facilities, and throughout all negotiations with creditors in respect of the current restructuring.  Likewise, Blackstone's analysis shows that public transactions involving competitors with a sole focus on dry bulk have occurred near asset value.  And investors in shipping sectors have generally been unwilling to invest at or above NAV.  For example, the pending IPO of Diamond S Shipping, a shipping company with highly regarded management and a prominent sponsor in Wilbur Ross,

was aborted in March 2014 when the underwriter determined that proceeds would fall below

NAV. *See* Joe B. Stamford, *Signals Still Unclear on Failure of Diamond S Shipping IPO*,

TRADEWINDS, Mar. 14, 2014 (also citing preceding IPO that succeeded only at below NAV); *cf.*

Joe B. Stamford, *Principal Maritime To Be Viability Test Case for New York Crude IPOs*,

TRADEWINDS, Apr. 17, 2014 (reporting that in shipping IPOs (outside gas and limited partnership

sector) "wary investors seem to be demanding a discount to the IPO company's net asset value

(NAV)."). To be clear, NAV is *not* the same as liquidation value, which tends to reflect a

discount to NAV for various reasons. *See, e.g.*, Ian L. London, *Creditors of Deiulemar Shipping*

*Ponder Block of Bulker Fleet Sale*, TRADEWINDS, Feb. 7, 2014 (12 bunkers sold through

liquidation at 60% of market value).

19.     As a result, it is unsurprising that an asset-based approach has been

employed in appropriate cases. *See In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 43-44

(Bankr. D. Del. 2000) (valuing shipping company based, in part, on vessel value, with reference

to third-party appraisals); *see also In re General Maritime Corp.*, No. 11-15286 (MG), Notice of

Filing Solicitation Version of the First Amended Disclosure Statement (Bankr. S.D.N.Y. Mar. 1,

2012) [Docket No. 351 at 107]; *In re Excel Maritime Carriers Ltd.*, No. 13-23060 (RDD),

Disclosure Statement (Bankr. S.D.N.Y. Dec. 10, 2013) [Docket No. 482 at 72]; *In re Trans*

*World Airlines, Inc.*, 180 B.R. 389, 418-19 (Bankr. D. Del. 1994) (valuing debtor-airline based,

in part, on aircraft value, with reference to third party appraisals), *aff'd in part, rev'd in part on*

*other grounds*, 203 B.R. 890 (D. Del. 1996), *rev'd on other grounds*, 134 F.3d 188 (3d Cir.

1998).  The Equity Committee cites several cases in an effort to foreclose the use of NAV, but

each case is inapposite; none involve shipping or actually criticize using asset-based valuations.[11]

20.    NAV also has the benefit of being particularly straightforward.

Blackstone relied on independent appraisals from four well known third-party appraisal firms.

These independent appraisals are appraisals of the fair market value of vessels and therefore

reflect views on what the future earning capacity of that vessel will be.  Blackstone further

consulted VesselsValue.com, which estimates the value of vessels through an algorithm that

accounts for vessel type (such as Capesize), age, capacity, and features, as well as current market

conditions.  These sources are regularly relied upon by shipping companies, their lenders, and

other knowledgeable players.  The resulting fleet valuations ranged from $1.182 billion to $1.262

billion, with a median value of $1.211 billion.  Blackstone also accounted for the fair market

value of the Debtors' other assets: ownership stakes in two publicly traded companies (Baltic

Trading and Jinhui); service contracts with MEP and Baltic Trading; cash; net working capital;

and minimal fixed assets.

---

[11]  The Equity Committee cites *In re Exide Technologies*, 303 B.R. 48 (Bankr. D. Del. 2003), for the assertion that asset-based valuation is inappropriate for valuing a going concern.  The case says no such thing; it did not involve asset-based valuation at all.  *See id.* at 61-66 (competing experts agreed on valuation methods for battery maker; court rejected post-hoc reduction of results to align with market prices that were depressed by "taint" of bankruptcy).  Likewise, *In re Bellanca Aircraft Corp.*, 56 B.R. 339 (Bankr. D. Minn. 1985), involved a preferential transfer and a dispute over whether specific assets should be assigned value in the solvency analysis.  *Id.* at 387-88 (certain contracts not includable as assets where assignment effectively prohibited).  In *In re Rivers End Apartments, Ltd.*, 167 B.R. 470 (Bankr. S.D. Ohio 1994), the valuation of an apartment complex – which had clear, steady future income – was not in dispute.  *Id.* at 480 (rejecting claim that plan was not fair and equitable).  In *Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968), the Supreme Court found the projection of future earnings relied on by the lower court lacked merit.  Finally, the Equity Committee selectively quotes an academic text for the notion that asset-based approaches are "seldom used," (Equity Obj. at 8, 27), but that textbook does not mention shipping or vessel valuation *even once* – and the Equity Committee edited out the explanation for the observation, which does not apply here.  James R. Hitchner, FINANCIAL VALUATION: APPLICATIONS AND MODELS (3d ed. 2011) (observing generally that "[t]he time and costs  involved in valuing individual tangible and intangible assets typically is not justified, because there is little, if any, increase in the accuracy of the valuation").  None of these sources supports the rejection of a rigorous asset-based valuation that reflects earnings capacity, among other considerations.

21.    This analysis shows that Genco's current stock has no residual value, regardless of which appraisal is used.    The lowest appraisal shows that Equity Holders are underwater by $116 million.    The highest shows a deficiency of $36 million.    And the midpoint of the five appraisal data points shows that claims against the Debtors exceed the Debtors' value by $87 million.    As a result, the Equity Committee's claim that the Prepack Plan provides a windfall to creditors is false.    Even under the most generous valuation, Equity Holders are out-of-the-money and not entitled to any distribution.    Moreover, since equity *is* being provided with a distribution, the valuation necessary to support any *further* recovery would be correspondingly higher.

22.    The Equity Committee does not seriously challenge this analysis.    For all the colorful accusations that Blackstone "manipulated" the process or "engineered" its result (Equity Obj. at 5, 6), Blackstone's NAV is based on the transparent incorporation of appraisals from reputable independent sources.    The Equity Committee raises no concerns about the expert analysis produced by Dr. Adam Kent of MSI regarding fleet value, or the other appraisals.    Nor does it dispute the conclusion that the Debtors' fleet has a present value of $1.2 billion.    Instead, the Equity Committee vaguely complains that the appraisals fail to properly account for "forecasts of future cash flows" from "consensus forecasts of industry analysts."    Equity Obj. at 14.    In reality, however, *earnings are taken into consideration in vessel appraisals*, along with various other considerations like resale and scrap values (which establish the floor for the market).    *See, e.g.*, *General Maritime*, Disclosure Statement at 109 ("The market value of vessels are based on a number of factors, including, among others, the type and age of the vessel, the day rate environment and market outlook for the vessel-type, and the market's judgment on the vessel's ability to generate a stream of future earnings.").    Nor does the Equity Committee

- 14 -

establish that any "consensus" forecasts among credible experts exist.  But even if it did, the Equity Committee does not attempt to show how the five appraisals employed by Blackstone wrongly disregard that view.  The Equity Committee thus offers no reason to question the accuracy of the appraisals.  In short, it is not seriously disputed that the valuation method most commonly applied in the dry bulk shipping industry leaves Equity Holders decisively out-of-the-money.[12]

### B.      Other Methodologies Confirm Genco's Insolvency

23.     To confirm that the appraisal-based valuation accurately reflected the Debtors' value, Blackstone has also employed four other valuation assessments.  Each shows values near or below NAV and all show that Equity Holders are out-of-the-money.

### 1.      "Comparable Transactions"

24.     A valuation based on comparable precedent transactions merely underscores the merit of using NAV to value a dry bulk shipping business.  As an initial matter, virtually all transactions in this industry are based on vessel sales.  Blackstone has identified only one public change-of-control transaction involving share purchases for a dry bulk shipper since 2011 – a transaction, tellingly, that was priced at a discount to NAV.  In contrast, Clarksons has recorded no fewer than *1,115* dry bulk vessel sales during that same period.  Blackstone therefore identified six fleet sale transactions for comparison purposes.  In each case, the sale was effectuated at a price that matched or nearly matched the aggregate vessel value –

---

[12]  The Equity Committee also insists that a control premium should be applied to the value of the Debtors' interest in Baltic Trading. Equity Obj. at 8, 14.  But it is doubtful that control premiums may be realized in this sector, given that a company's value could be recreated by purchasing identical ships at their NAV.  In any case, even an illustrative 15% control premium would only increase the Company's value by roughly $6 million; the difference would not significantly change NAV.

KL2 2850573.1

confirming the controlling significance of NAV in this industry.[13]  The largest premium above vessel valuation in the cohort of transactions is 1%; the largest discount is 8%; and the average pricing reflects a 2% discount.  Even based on the most optimistic price-to-fleet ratio evidenced by this sample, Genco is insolvent by $76 million.  Based on the "low" scenario, the deficiency grows to $183 million.

25.    The Equity Committee complains that "Blackstone's selection of comparable companies and transactions are also asset-based – for example, it selected transactions involving ship sales, rather than assessing the sale of going-concern shipping companies with full operating infrastructure."  Equity Obj. at 26.  But this objection ignores that virtually *all* transactions in this sector are vessel-based – which itself reflects the reality that "infrastructure" is not a major factor in a commoditized industry with low barriers to entry and no appreciable economies of scale.  *See* above at ¶ 15; Stopford at 338.  The Equity Committee articulates no other issues with Blackstone's comparable transaction analysis.

## 2.    "Comparable Companies"

26.    Expert testimony will show that valuations based on "comparable companies," while sometimes used by equity analysts to value dry bulk companies, require numerous adjustments before they will yield useful comparisons.  For example, fleet age varies among shipping firms, causing variance in overall fleet earnings capacity and the remaining duration of such capacity.  Companies also have different "charter coverage," *i.e.*, exposure to

---

[13]  The most recent transaction, an acquisition of 25 vessels by Knightsbridge that was announced in April 2014, was expressly based on NAV using March 31, 2014 broker values.  Another Knightsbridge transaction announced in March 2014 reflected only a 1% premium over an aggregation of the vessel values reported by VesselsValue.com on the day before the deal was unveiled.  Two fleet acquisition transactions conducted by Genco – for 13 and five vessels, respectively – were priced based on third-party appraisals performed for the company at the time of the transaction.  The purchase of 13 vessels reflected a 5% discount to aggregate vessel value; the smaller purchase matched the appraised prices exactly.

fluctuating market rates based on when their existing charters expire.  Charter coverage in a given year can dramatically affect EBITDA and create large value disparities between otherwise similar firms.  But such EBITDA may not be probative of a fleet's long-term earnings capacity. Genco, in particular, does not have any fixed charters extending beyond October 2014.  This not only complicates post-confirmation projections; it also means that an EBITDA multiplier cannot produce reliable evidence of value.

27.     To address these shortcomings, Blackstone selected six companies with relatively low charter coverage in 2015 and adjusted multiples to account for fleet age, among other considerations.  Seven companies were considered and excluded from the cohort due to their lack of comparability – for reasons that Blackstone transparently describes in detail in its expert report.  Blackstone then assessed the trading multiples of the "comparable" firms to ascertain whether they trade at a premium or discount to asset value.  This analysis revealed that investors tend to value pure-play dry bulk shipping operations at a discount to asset value, not a premium.[14]  Based on this total enterprise value ("**TEV**")/NAV analysis, Genco is insolvent by at least $156 million and as much as $278 million.

28.     Blackstone also utilized TEV/EBITDA multiples.  In doing so, Blackstone recognized that older fleets with fewer remaining years of service should trade at a discount to younger fleets – even though both types of fleets may have similar EBITDA in a given year – because younger ships have additional years of earnings capacity.   Following the adjustment for fleet age in the "low" scenario, Blackstone identified EBITDA multiples of 5.9x in that scenario. For the "high" scenario, Blackstone did not adjust for fleet age and found multiples of 7.3x.

---

[14]  Of the six companies in the cohort, Baltic and Safe Bulkers have a TEV equal to 118% and 117% of NAV, respectively (based on values from VesselsValue.com).  The other four companies – Paragon Shipping, Jinhui, Star Bulkers, and Diana Shipping – trade at discounts of 40% to 8%.  The median TEV/NAV ratio is 94% and the median is 92%.

Application of those multiples to the $175 million EBITDA projected for 2015 in the Debtors'

business plan shows Genco to be insolvent by $62 million to $310 million.  The mix of vessel

types and charter coverage may also distort comparisons based on EBITDA, but a model is not

readily adjusted for these features – highlighting the deficiencies of this method.

29.    The Equity Committee alleges that Blackstone's comparables reflect

"selection bias" (Equity Obj. at 29) but fails to explain how they do so in even the most general

terms.  In contrast, Blackstone provided a detailed explanation as to why each of the 13 dry bulk

companies it considered was included or excluded.  The Equity Committee also complains that

Blackstone "relies on comps that management has indicated are not in fact comparable."  *Id.*

What this means is also a mystery, because the Equity Committee does not support the claim.

Finally, with respect to EBITDA multiples, the Equity Committee complains that Blackstone

adjusted for fleet age – stating, with no support, that this variable has "limited, if any correlation"

to market value.  *Id.*  The Equity Committee thus irrationally implies that a brand new vessel

should be assigned the same value as a 24 year-old ship with one remaining year of expected use

before it is scrapped.  Nevertheless, even omitting depreciation for age, the Debtors would still

be insolvent by $62 million under this methodology, as noted above.  The Debtors will respond

further if the Equity Committee attempts to substantiate its vague and illogical criticisms at trial.

### 3.    <u>Discounted Cash Flow</u>

30.    Blackstone's DCF analysis also yields results consistent with the other

methods discussed above.  DCF valuation calls for forecasted cash flows to be discounted to

present value using a company's weighted average cost of capital ("**<u>WACC</u>**").  A terminal value

is calculated to capture the value of the enterprise beyond the projection period. Though DCF

analysis is frequently included along with other valuation methods, courts avoid or deemphasize

KL2 2850573.1

it when cash flow projections are speculative or subject to high volatility.  *See Adelphia Recovery Trust v. FPL Group, Inc. (In re Adelphia Commc'ns Corp.)*, Case No. 02-41729 (REG), 2014 Bankr. LEXIS 2011, at *56 (Bankr. S.D.N.Y. May 6, 2014) (noting that DCF is inappropriate when the underlying assumptions are "arbitrary and speculative").  As Judge Gerber has noted, "DCF works best (and, arguably, only) when a company has accurate projections of future cash flows." *Id*. at *57.  Otherwise, "the factual underpinnings of the DCF computation become unreliable . . . [and] the propriety of any use of DCF (and the weight DCF conclusions should be given) becomes debatable at best." *Id*. at *58.  Similarly, the court in *In re DBSD North Am., Inc.*, 419 B.R. 179 (Bankr. S.D.N.Y. 2009), *aff'd in part and rev'd in part*, 634 F.3d 79, 108 (2d Cir. 2010), directed the parties to omit DCF from their analyses where experts had based their computations on negative cash flows and unfeasible contingencies.  418 B.R. at 197.

31.     Here, DCF is ill-suited to the valuation task because the extreme volatility in shipping rates makes cash flow forecasts highly speculative.[15]  Indeed, the Equity Committee does not cite any recent bankruptcy case involving a shipping company in which value was determined by DCF – nor are the Debtors aware of any.[16]  For the sake of completeness, however, Blackstone included this method in its valuation.  Cash flow projections were extracted from the Debtors' business plan, which in part relied on the expert charter rate forecasts provided by Marsoft.  To address the problems with using traditional methods to calculate terminal value,

---

[15]  The Debtors' negative cash flow further calls the reliability of DCF into question. *See Adelphia*, 2014 Bankr. LEXIS 2011 at 57-58* (noting that negative projections can undermine DCF analysis).

[16]  In *Excel Maritime*, as here, negotiations were based on vessel value and other valuation methodologies, including DCF, were used at confirmation to cross-check the asset-based valuation.  *See Excel Maritime*, No. 13-23060 (RDD), Disclosure Statement [Docket No. 482 at 72-73].

Blackstone used projected future asset values.[17]  The analysis assumes that the Debtors' fleet will depreciate by 4.5-6.5% per year, based on published sales data.  The results showed that Genco is insolvent by $145 million in the "high" scenario and $374 million in the "low."

32.  The Equity Committee attempts to dismiss this analysis by attacking the expert forecasts produced by Marsoft.  Indeed, although these forecasts were used principally in connection with this final, minimally useful methodology, the Equity Committee makes these attacks the centerpiece of its objection.  *See* Equity Obj. at 5-7, 17-24.  This appears to be a technique to minimize its focus on the more relevant NAV analysis, which it essentially fails to challenge on the merits.

33.  Evidently, the Equity Committee has no rate experts of its own.  Instead, it refers vaguely to "leading industry analysts," touts the ten-year historical average of shipping rates as the "standard" forecasting method, and suggests that Company management has its own contradictory forecast that it credits over Marsoft's.  *See* Equity Obj. at 18-19, 20-21.  Tellingly, the Equity Committee articulates only one purported criticism of Marsoft's work: that its projections "improperly assume that vessel order activity in the fourth quarter of 2013 will continue at the same rate going forward through this year."  Equity Obj. at 19.

34.  In truth, Marsoft and MSI are two of the leading sources for impartial expert rate forecasts – and the Company chose to use Marsoft after it had projected *higher* rates than MSI, contrary to the Equity Committee's conspiracy theory.  The Equity Committee's

---

[17]  Because multiples in this industry are so volatile and vessels are fixed-life assets, a terminal multiple approach – in which it is assumed that operations will be worth a multiple of the EBITDA generated in the last year of the projection period – is problematic.  Assuming that growth will occur at a steady state during the terminal period is problematic too: vessels have a limited lifespan, they do not have "steady-state" earnings, and it is difficult to predict future fleet renewal costs.  Notably, the alternative approach adopted by Blackstone reflects an implied multiple between 18x and 22.2x, itself a very high multiple for a fleet with only 12.5 years of average remaining life.

reference to "industry analysts" likely refers to sell-side equity analysts, who answer to their brokerages (not the investors that they advise) and are inherently bullish to drive trading volumes and IPOs.  In any case, such views are inexpert and inadmissible hearsay.[18]  Assuming that rates in the next decade will match rates from the last one is an even worse approach; it is a plug assumption – not a forecasting method – that may be adequate for certain purposes, but not for establishing value or even feasibility based on actual evidence and rigorous analysis.

35.    Unlike sell-side equity analysts, expert firms like Marsoft do not have an economic interest in driving up trading volumes in the equity of dry bulk companies, nor are they bound by the naïve assumption that the marketplace has not changed in the last ten years.  Unsurprisingly, Marsoft has a track record of superior accuracy – its business depends on it.[19]  For example, from February to June 2014 – the first months of the Company's business plan – Marsoft's supposedly pessimistic projections were actually 9% *higher* than realized rates.  In contrast, ten-year averages (excluding two outlier years) were 85.2% too high.  If the two outliers, 2007 and 2008, were included, the inaccuracy of ten-year averages would be even greater.  The Company relies on analyst estimates for the years 2014 and 2015, but the enthusiasm on Wall Street is not only inexpert and self-interested.  Therefore, the Company uses the bottom half of such estimates.  Even still, the lower half is still too exuberant by 39.7%.  Had

---

[18]  *See, e.g., Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 279 F. Supp. 2d 235, 241 (S.D.N.Y. 2003) (declining to admit email discussing account's review as "both double hearsay and hopelessly vague"), *aff'd as modified*, 411 F.3d 384 (2d Cir. 2005); *Primavera Familienstifung v. Askin*, 130 F. Supp.2d 450, 530 (S.D.N.Y. 2001) (expert report was inadmissible, as factual conclusions "are offered without benefit of citation to research, studies, or other generally accepted support for expert testimony"), *abrogated on other grounds by Casey v. Merck & Co.*, 653 F.3d 95 (2d Cir. 2011).

[19]  Mr. Sterling will testify that Marsoft's regular reports and forecasts are widely relied upon by customers seeking accurate and objective forecasts, including a core of over 100 clients.  An extensive list of financial institutions, leading charter companies, and fleet owners rely on Marsoft for the same expertise and analysis that the Company requested.

KL2 2850573.1

the Company used Marsoft for the first few months of 2014, its business plan would have been materially more accurate.

36.    As for the Company, it is not in the business of forecasting; management historically adopted readily available proxies for rate forecasts for short-term projections, tax accounting, and other day-to-day business purposes, but they would not claim to have ever made their own analytically rigorous projections and responsibly sought out more rigorous and reliable forecasts when the time came to value the Company in reorganization.[20]

37.    As for the Equity Committee's accusation that Marsoft has assumed that vessel ordering will "continue at the same rate going forward through this year" (Equity Obj. at 19), Mr. Sterling in fact stated the *opposite* in his expert report.  He will reiterate his actual position at trial: that momentum from late 2013 carried into January 2014, indicating that orders for the first six months may remain high, but he expects activity to subside thereafter due to rising newbuilding prices and the realization by owners that a rising orderbook could spell trouble in the future.

38.    The Equity Committee also assails Blackstone for using an asset-based terminal value and for taking account of vessel depreciation even though "vessels purchased at low points in the business cycle can actually appreciate in value as they age."  Equity Obj. at 30. Once again, the Equity Committee either ignores the attributes of the dry bulk shipping industry

---

[20]  The accusation that management does not believe in Marsoft's work is baseless and will be refuted at trial. Equity Obj. at 20.  That the business plan contemplates the purchase of future vessels – to be financed by the issuance of additional debt or equity – does not reflect any contrary view of market trends.  Aged vessels must be replaced.  The business plan shows that the Company expects to be able to do so if warranted at the time.

The claim that management would be moving to long-term charters if they accepted Marsoft's projection for the "out" years (Equity Obj. at 20) is also without foundation.  Among other things, the Equity Committee falsely assumes that long-term charters are available and that no other business considerations apply.

Finally, the claims that management will not use Marsoft's rates in the future is outright false.  *See* Equity Obj. at 19.  No such determination has been made.

KL2 2850573.1

or distorts the facts.  In attempting to apply a methodology that it believed was unsuited to the industry because of the difficulty of generating accurate long term projections, Blackstone attempted to place its DCF calculation on firmer ground by using terminal values that could be more readily calculated based on dry bulk vessel life cycles.  Tellingly, the Equity Committee does not challenge the manner in which Blackstone calculated average depreciation rates based on published historical data.

39.    The Equity Committee's last argument that DCF analysis is appropriate because dry bulk shipping firms use internal modeling to confirm that the purchase price for a vessel is supported by its value (Equity Obj. at 30) does nothing to validate using DCF to value a dry bulk enterprise.  If anything, it confirms the merit of NAV, which accounts for earnings capacity on a ship by ship basis.

### C.    The "Evidence" Relied on by the Equity Committee Is Inadmissible or Not Probative

40.    Rather than articulate a competing valuation of the Company, the Equity Committee seeks to undercut the Debtors' valuation based on cherry-picked discovery that the Court has deemed inadmissible and "market prices" that the Court has deemed non-probative on several occasions in this case.  In the April 24, 2014 bench ruling, the Court observed that "trading prices are not . . . a reliable measure of value" and do not constitute "competent evidence." *See* Hr'g Tr. at 18 (April 24, 2014).  Yet the Equity Committee once again rests its case for higher values on a few bids and asks for the Company's debt.  Additional reasons why this is inappropriate are detailed in the Debtors' motion to disband the Equity Committee.  *See* Disbandment Motion at 21.

REDACTED

41.    Similarly, the Court has stated that internal evaluations of the Debtors' upside potential at selected investors may not be cognizable evidence of value and are especially unhelpful in projecting cash flow. Hr'g Tr. at 66 (June 3, 2014). The Court also advised that valuation should be based on expert testimony (*see id.* at 61, 66), which surely does not include hearsay from a handful of Wall Street analysts of unknown experience, expertise, and motivation.

42.    Indeed, the comments that the Equity Committee unearthed are unreliable on their face. For example, ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ ██ █████████████████████

██████████████████████████████████████████ ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████.[21]

43.    In short, the Equity Committee has identified no evidence that undercuts the clear, bottom-line result of Blackstone's objective application of every available valuation methodology: the Debtors are insolvent, and thus cramdown does not deprive Equity Holders of

---

[21] The Debtors reserve the right to respond more thoroughly to the statements and analysis reflected in the internal analyst emails if they are ultimately admitted into evidence.

any value to which they are legally entitled. To the contrary, equity is being treated fairly and generously.

## II.   THE PREPACK PLAN WAS PROPOSED IN GOOD FAITH AND WAS NOT THE PRODUCT OF MANIPULATION AND ENGINEERING

44.   The Equity Committee argues that the Prepack Plan was not proposed in good faith pursuant to Section 1129(a)(3) of the Bankruptcy Code, rehashing in two paragraphs accusations appearing throughout its objection to the effect that the Debtors and their advisors relied on "sandbagged" projections and a "manipulated low valuation" to deprive Equity Holders of their rightful recoveries, in violation of the Debtors' fiduciary duty to shareholders. *See* Equity Obj. at 38-39.

45.   This argument fails because the Prepack Plan – and the process used by the Company and management to build consensus for the compromises it embodies – are fair, the product of arms'-length negotiations, and reflect both "honesty and good intentions" and the sincere expectation of an effective reorganization – the hallmarks of good faith under Section 1129(a)(3). *See Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.*), 843 F.2d 636, 649 (2d Cir. 1988). As noted in the Confirmation Brief, the primary goals of chapter 11 are the rehabilitation of debtors, preservation of jobs, and continuation of the debtor's business. *See In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994). The Prepack Plan is crafted to serve those goals, and the details of the negotiation process further confirm the Debtors' good faith:

46.   Beginning in December 2013, the Company and Blackstone recognized that the Company's business plan and financial projections would play a role in any restructuring. Charter rates in the dry bulk sector are notoriously volatile and difficult to predict.

- 25 -

For that reason, management had historically been reluctant to forecast charter rates for business purposes. Although it occasionally produced longer term projections when requested, for internal use, management prepared only informal one to two-year projections, based on equity analyst reports or non-subjective measures that typically covered similar periods (and no further) and were deemed adequate for this purpose. These data were not used for valuation purposes, but rather to test liquidity, debt capacity, and covenant compliance, among other things.

47.     As seasoned restructuring professionals, Blackstone recognized that stakeholders in a restructuring would demand more rigor and recommended that the Company create four-year projections to demonstrate the feasibility of restructuring proposals. Blackstone also recommended that the Company retain Marsoft or MSI to provide independent and deeply analytical rate forecasts to inform these projections. The Company elected to engage Marsoft, which provided its forecast and ultimately a report prepared specifically for the Company. Notably, Marsoft's forecast was the very same product it provides to its dozens of other customers and was higher than MSI's forecast.

48.     On January 6, 2014, shortly after retaining Marsoft and while it was still evaluating Marsoft's rate forecasting approach, the Company prepared a draft business plan that was presented to the Board of Directors. The business plan provided both a base case and a low case for rate projections covering the years 2014 to 2017. For the base case, the Company used a hybrid of the average of the lower half of analyst estimates for years 2014 and 2015 (the only years for which they were available) and the ten year historical average rates (excluding the historic market spike and collapse in 2007 and 2008) for the remaining two years. For the low case, the Company used Marsoft for all four years.

49.     In the days that followed, the Company determined that the Marsoft forecasts would provide a more rigorous and credible basis for projecting rates in 2016 and 2017 than ten-year historical averages, which rely on the bare, unsupported assumption that charter rates in the coming decade would match rates in the one before it.  This updated approach was the basis for the first meeting with the Prepetition 2007 Facility Lenders on January 10, 2014.  At the meeting, the Company used Marsoft's rates as the base case for 2016 and 2017 instead of the historical average, but it retained the projections based on the lower half of analyst estimates for the base case in 2014 and 2015.  The Company also continued to show a lower case based solely on Marsoft's estimates.  Thus, the allegation that the Company manipulated the inputs to lower the projections ignores the fact that the base case rate forecasts for 2014 and 2015 never changed.  The Company just revised the base case for 2016 and 2017 to reflect the Company's good faith determination to use a third-party expert over an unscientific plug in number.  Far from the nefarious manipulation imagined by the Equity Committee, it was a sound exercise of business judgment for management to make itself comfortable with Marsoft's approach before committing to it as the principal basis for testing the feasibility of restructuring proposals.  Marsoft's forecast remained the benchmark *for feasibility* in all negotiations that followed.

50.     Moreover, the evidence will show that, even in the face of valuations demanding that creditors accept discounts on their claims, the Company's Board consistently sought to convince creditors to accept a voluntary allocation for equity holders.  The Debtors' management also took affirmative steps to increase – not depress – valuations to augment the consideration available for junior stakeholders.  For example, in March 2014, in the midst of negotiations among the Company, Prepetition 2007 Facility Lenders and the Convertible Noteholders, the Company recognized that vessel values were increasing and ordered updated

vessel appraisals, which showed that vessel values increased by 11%. These updated appraisals fundamentally transformed the negotiating dynamics between the Prepetition 2007 Facility Lenders and the Convertible Noteholders and led directly to a distribution to the prepetition equity.

51.     The Company's Board oversaw this process throughout, holding more than twelve meetings of the full Board (during some of which the independent directors met in executive sessions), four meetings of the Board committees comprising independent directors, and one separate meeting of the independent directors over the course of four months. Maximizing value for all stakeholders was the focus at every step. Even after the creditor groups had agreed to accept impairments, the Company and its Board continued to insist that out-of-the-money equity holders receive a recovery. After several rounds of negotiations, the Company obtained seven-year warrants for 6% of equity in the reorganized company for Equity Holders. To provide this value, the Prepetition 2007 Facility Lenders and the Convertible Noteholders voluntarily allocated a portion of their distributions to equity. This series of compromises was embodied in the Restructuring Support Agreement, which was approved by the Court. *In re Genco Shipping & Trading, Ltd.*, Case No. 11-11108 (SHL), 2014 Bankr. LEXIS 2183 at *22 (Bankr. S.D.N.Y. May 16, 2014) (finding Restructuring Support Agreement to have been "negotiated in good faith and at arms-length").

52.     The record confirms that no better outcome was or is available. As the Court has recognized, the Debtors' deteriorating financial condition was broadcast through SEC filings and other public statements and well covered in the press in the years prior to the Petition Date. See *Genco Shipping*, 2014 Bankr. LEXIS 2183 at *33. But no investors stepped forward during the months of negotiations to present any viable alternative to the Prepack Plan, much less

a superior proposal. *Id*. Nor have any emerged since the terms of the Prepack Plan were publicly disclosed on April 3, 2014 in an SEC filing that attached the Restructuring Support Agreement. Most glaringly, neither the Equity Committee nor its constituents have proposed an alternative that would provide a greater benefit to the Debtors and their stakeholders than the Prepack Plan, let alone a greater recovery to equity holders. The Debtors were always open to such an offer – they expressly retained the ability to receive and negotiate proposals for an alternative to the Prepack Plan and highlighted that right on many occasions.[22] The absence of any indication of interest during this months'-long period underscores that the Prepack Plan embodies the best achievable outcome for all stakeholders.

53. It is now even clearer that the value awarded to equity is a gift because vessel values have declined since the Company obtained new valuations in March 2014. *See* Clarkson PLC, Shipping Intelligence Network 2010 (June 8, 2014). Nevertheless, the Company continues to use the March appraisals as the basis for the Prepack Plan and has managed to hold together the fragile agreement whereby senior constituencies agreed to forgo part of their recovery to permit unimpairment of trade creditors and a voluntary distribution to equity holders. Indeed, if the Prepack Plan were to fail, the Debtors have serious concerns about their ability to obtain *any* recovery for Equity Holders.

---

[22] *See, e.g.*, Genco Shipping & Trading Ltd., Annual Report (Form 10-K at 4) (Apr. 7, 2014); Genco Shipping & Trading Ltd., Current Report (Form 8-K at 3) (Apr. 3, 2014); H'rg Tr. at 27, 83 Apr. 23, 2014; Motion for Entry of an Order (A) Authorizing the Assumption of the Restructuring Support Agreement; (B) Approving Payment of the Termination Fee; and (C) Granting Related Relief at 4, 12 [Docket No. 13]; Motion of Debtors for an Order (A) Disbanding the Official Committee of Equity Holders, or (B) Limiting the Fees and Expenses Which May Be Incurred by Such Committee at 14 [Docket No. 153].

- 29 -

54.     In short, the Equity Committee's attempt to cast aspersions on the Debtors' good faith should be rejected.[23]

## III.   OTHER OBJECTIONS TO THE PREPACK PLAN SHOULD BE OVERRULED

### A.     The Third Party Release Is Supported by Second Circuit Law

55.     The US Trustee objects to the release and exculpation provisions of the Prepack Plan as applied to creditors that had the right to vote but did not do so, and creditors that were deemed to accept the Prepack Plan because they are unimpaired.  *See* UST Obj. at 4-10.  Also, the Equity Committee objects to the release of unidentified claims that shareholders might have, in theory, against Supporting Creditors or the Company's directors and officers.  See Equity Obj. at 39-42.  Both objections are misplaced.

56.     As an initial matter, neither the Equity Committee, the US Trustee, nor any other party has identified an actual third-party claim that is being released by the parties that were not entitled to vote or did not do so.  In fact, it is difficult to imagine what claim an Unimpaired Creditor could purport to have that will not be extinguished by the full payment provided under the Prepack Plan.  The fact that no Unimpaired Creditor has stepped forward to object to the releases, despite ample notice, confirms that no such claims exist.  *See* Confirmation Brief at 64-66 (noting disclosure of releases in plan and disclosure statement and case law regarding deemed consent).  And any theoretical claim that Equity Holders *might* have against

---

[23] Although not included in the Equity Committee's 1129(a)(3) argument, the Objection also features a couple of gratuitous swipes at the Debtors' Management Incentive Plan ("**MIP**").  *See* Equity Obj. at 7, 28.  As will be established at trial, the MIP is not a "windfall," but rather a necessary component of the Prepack Plan, under which sophisticated investors are accepting conversion of their debt to equity in reliance, among other things, on the continued involvement of existing management.  Moreover, a large component of the MIP is tiered warrants that are exercised at multiples of plan value.  Therefore, management is directly incentivized to maximize plan value, which is upside shared by all new equity and warrant holders in the Reorganized Genco.  Finally, the fact that the cost of the MIP will exceed the distribution to Equity Holders shows nothing.  Bankruptcy plans in which equity holders receive nothing frequently include a MIP, which has a purpose unrelated to plan distributions.

- 30 -

directors and officers or the Supporting Creditors is almost certain to be an estate cause of action that will be released by the Debtors, without regard for third-party releases.

57.    Furthermore, the Prepack Plan would only release third-party claims held by holders of Unimpaired Claims or Equity Interests "to the fullest extent permissible under applicable law."  *See* Prepack Plan, Art. I, ¶ 131(d) (definition of "Releasing Parties").  Courts in this District have recognized that this qualification means that even an *impermissible* non-consensual third-party release would not hinder plan confirmation.  *See In re Adelphia Communs. Corp.*, 368 B.R. 140, 266 (Bankr. S.D.N.Y. 2007) ("Since the third-party releases and exculpation . . . apply only 'to the extent permitted by applicable law,' the Plan is confirmable without change, and without resolicitation of votes" despite unenforceable releases).  The absence of any actual, identified released claims further confirms that the Releasing Parties are not being prejudiced.  For both of these reasons, the US Trustee's and Equity Committee's objections are purely academic and should not hinder confirmation of the Prepack Plan.

58.    But the release provisions also are proper on the merits, in accordance with the high standards applicable to non-consensual non-debtor releases in the Second Circuit, for the reasons set forth in detail in the Confirmation Brief.  *See* Confirmation Brief at 66-71.  Namely, the releases are overwhelmingly consensual.  *Id*. at 64-66.  All creditors who have not consented to the Prepack Plan will recover in full.  *Id*. at 66-67.  That generous treatment, and the gift provided to Equity Holders, would not exist absent concessions from the Supporting Creditors, nor would the Prepack Plan.  *Id*. at 67-69.  And the Released Parties have rights of indemnification and contribution that both provide the Court subject-matter jurisdiction and constitute additional "unique circumstances" that justify non-consensual releases in the Second Circuit.  *Id*. at 70.

- 31 -

KL2 2850573.1

59.     With respect to the US Trustee's concern that the releases will bind Unimpaired Creditors when they did not vote on the Prepack Plan, this is an unremarkable feature of any non-consensual third-party release. *See, e.g.*, *In re Residential Capital, LLC*, No. 12-12020 (MG), Disclosure Statement for the Joint Chapter 11 Plan, Docket No. 4819-1, 9-14 (Bankr. S.D.N.Y. Aug. 8, 2013) (identifying classes of unimpaired creditors and impaired equity holders that were deemed to consent and dissent, respectively, but were nevertheless bound by third-party release); *In re Ion Media Networks, Inc.*, No. 09-13125 (JMP), Disclosure Statement for The Debtors' First Modified Joint Plan of Reorganization, Docket No. 289, 3, 5 (Bankr. S.D.N.Y. Sept. 30, 2009) (same); *In re Charter Commc'ns, Inc.*, No. 09-11435 (JMP), Disclosure Statement, Docket No. 319, 4-8 (Bankr. S.D.N.Y. May 7, 2009) (same).  The US Trustee's concern that imposing releases on unimpaired creditors is contrary to section 1124 of the Bankruptcy Code (UST Obj. at 10) is thus unsupported by any case law and in fact contradicts provisions routinely approved as part of confirmed plans.

60.     The novel theory that the application of third-party releases to "unimpaired" creditors runs afoul of section 1124 (UST Obj. at 10), is also unsupported by the text of section 1124, which applies to "a class of claims or interests" *against the debtor* and the "rights to which such [classified] claim or interest entitles the holder." *See* 11 U.S.C. 1124. Third-party claims are not claims against the debtor and thus are not implicated by section 1124.

**B.     <u>Off-Market Modification to the Warrants Is Wholly Unwarranted</u>**

61.     The Equity Committee also argues that the warrants provided to Equity Holders under the Prepack Plan should be amended to include: (a) anti-dilution protection for future stock issuances below the warrant  exercise price and (b) compensation for loss of the

- 32 -

remaining time value upon a "quick" sale of Reorganized Genco prior to the end of the seven-year term.

62.     As an initial matter, the contention that fundamental protections for warrant holders are absent is simply wrong.  The warrants include customary anti-dilution protections for public company warrants in the event of  stock splits, reverse stock splits, stock dividends, reclassifications, dividends or other distribution, and business combination transactions.  *See* Prepack Plan at 32; New Genco Equity Warrant Agreement at 13-17 [Docket No. 166].

63.     The Equity Committee cites no authority for the proposition that exercise price protection is fundamental or even appropriate for public company warrants.  In fact, the opposite is true.  Public company warrants typically do not anti-dilute for equity issuances below the exercise price because this would give warrant holders protection that is not enjoyed by shareholders.  Here, the warrants have an exercise price of $20.99.  If the Company were to issue new equity below this value, shareholders and warrant holders would be similarly diluted.  The corporate model presumes that the New Board would not authorize such an issuance unless, in the business judgment of the New Board, it were in the interests of the reorganized company and all of its equity stakeholders.  In contrast, the interests of shareholders and warrant holders do diverge with respect to anti-dilution events enumerated in the warrants, such as a distribution to current shareholders, and it is for that reason that special protection is afforded to the warrant holders in these circumstances

64.     The demand of the Equity Committee for compensation for loss of time value of the warrants in the event of a sale of Reorganized Genco prior to the end of the seven-year term is similarly unfounded.  The Equity Committee has again cited no authority for the

- 33 -

proposition that such protection is common in public company warrants, and for good reason.  A survey of publicly filed warrant agreements would show that provisions of this sort are only infrequently found in public company warrants.  The reason is not hard to understand.  When a board, acting in the exercise of its fiduciary duty and sound business judgment, determines to sell a company, it is presumed that the sale price reflects corporate value, taking account of both current operations and future prospects.  Providing warrant holders with compensation that is additional to this value would constitute a windfall, in which the shareholders do not participate.

65.      Accordingly, the Equity Committee's unsupported request for additional protections is not reasonable and should be rejected.

### C.      Payment of Supporting Creditors' Professionals Fees Are Appropriate

66.      The Supporting Creditors' contributions to the Prepack Plan and its development process allowed for a consensual deleveraging of the Debtors' balance sheet by approximately $1.2 billion.   To facilitate restructuring discussions, the Debtors entered into engagement and fee letters with each creditor group or its advisors.  These letters are executory contracts that the Debtors are assuming on the Effective Date.  Therefore, any outstanding fees must be cured.  The Debtors need not and are not in fact relying on section 1129(a)(4) to make these payments.[24]    Moreover, the Court has already authorized the payments of these professional fees pursuant to the final order authorizing use of cash collateral and the order authorizing the assumption of the Restructuring Support Agreement.  Thus, the United States Trustee's objection should be overruled as moot.

### IV.      THE TECHNICAL MODIFICATIONS TO THE PREPACK PLAN ARE NOT MATERIAL

---

[24]  After discussions with the Office of the United States Trustee, the Debtors' proposed order makes clear that these payments are not made pursuant to section 1129(a)(4).

67.     In the interest of clarifying and consensually resolving outstanding issues and informal objections to Confirmation of the Prepack Plan, the Debtors have made certain non-material modifications to the Prepack Plan (the "**Technical Modifications**"). Contemporaneously with the filing of this reply, the Debtors filed a revised version of the Prepack Plan to reflect certain non-material and technical changes that do not materially or adversely affect the treatment of any holder of a Claim or an Equity Interest under the Prepack Plan.

68.     Section 1127 of the Bankruptcy Code provides a plan proponent the right to modify the plan "at any time" before confirmation.   Specifically, section 1127 of the Bankruptcy Code provides:

> The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of the title.  After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan . . . .

> Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection.[25]

69.     Accordingly, bankruptcy courts have typically allowed a plan proponent to make non-material changes to a plan without any special procedures or vote resolicitation.[26]

---

[25] 11 U.S.C. §§ 1127(a), (d).

[26] *See, e.g.*, *In re Am. Solar King Corp.*, 90 B.R. 808, 826 (Bankr. W.D. Tex. 1988) (stating that "if a modification does not 'materially' impact a claimant's treatment, the change is not adverse and the court may deem that prior acceptances apply to the amended plan as well.") (citation omitted); *see also Enron Corp. v. New Power Co. (In re New Power Co.)*, 438 F.3d 1113, 1117-18 (11th Cir. 2006) ("[T]he bankruptcy court may deem a claim or interest holder's vote for or against a plan as a corresponding vote in relation to a modified plan unless the modification materially and adversely changes the way that claim or interest holder is treated."); *In re Mt. Vernon Plaza Cmty. Urban Redevelopment Corp. I*, 79 B.R. 305, 306 (Bankr. S.D. Ohio 1987) (all creditors were deemed to have accepted plan as modified because "[n]one of the changes negatively affects the repayment of creditors, the length of the [p]lan, or the protected property interests of parties in interest.").

70.     In addition, Bankruptcy Rule 3019, designed to implement section 1127(d) of the Bankruptcy Code, in turn, provides in relevant part that:

> In a . . . chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan.  If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.[27]

71.     The Technical Modifications primarily consist of the following changes:

- The inclusion of the Backstop Parties as Releasing Parties;

- Technical revisions to the mechanics for the payment of the Convertible Notes Indenture Trustee Expenses that have no impact on the distributions to holders Convertible Note Claims;

- Additional procedures for contacting holders of Convertible Note Claims to determine their status as Accredited Investors or QIBs;

- Clarifications to the Third Party Release and Exculpation provisions to reflect negotiations with the U.S. Trustee; and

- Minor technical revisions.

72.     Because all creditors in these Chapter 11 Cases have notice of the Combined Hearing, and will have an opportunity to review the Technical Modifications prior to the Combined Hearing, the requirements of section 1127(d) of the Bankruptcy Code have been satisfied.[28]  Moreover, in accordance with the terms of the Restructuring Support Agreement, the Debtors have obtained the requisite consent, as necessary, of the Supporting Creditors to the Technical Modifications.

---

[27] Fed. R. Bankr. P. 3019.

[28] *See Citicorp Acceptance Co., Inc. v. Ruti-Sweetwater (In re Sweetwater)*, 57 B.R. 354, 358 (D. Utah 1985) (creditors who had knowledge of pending confirmation hearing had sufficient opportunity to raise objections to modification of the plan).

73.     Accordingly, because the Technical Modifications (and those that may be made prior to or at the Combined Hearing), are non-material and do not materially or adversely affect the treatment of any creditor that has previously voted to accept the Prepack Plan, and the Prepack Plan, as modified, continues to comply with the requirements of sections 1122 and 1123 of the Bankruptcy Code, no further solicitation is required.

## V.   WAIVER OF THE STAY IS WARRANTED HERE

74.     As part of the arms'-length negotiations to achieve consensus, the Debtors and the Supporting Creditors also agreed to a milestone in the Restructuring Support Agreement that the Effective Date occur on the later of (i) ten days following the Confirmation Date; (ii) completion of the Rights Offering, or (iii) the waiver or satisfaction of the closing conditions of the Amended and Restated Term Loan Facilities.  The Debtors and the Supporting Creditors seek to quickly consummate the restructuring contemplated under the Prepack Plan and exit chapter 11 so that the Company can resume its normal operations and end the dislocation that the bankruptcy process has caused for its global operations.   Therefore, to the extent that the Effective Date can occur prior to the end of the 14-day period after entry of the Confirmation Order, the Debtors seek a limited waiver of the stay period under Bankruptcy Rules 3020 and 7062.

## VI.   RESERVATION OF RIGHTS

75.     As fact and expert discovery continues after the commencement of the Combined Hearing, the Debtors reserve all of their rights to supplement their responses to the Objections and supplement their statements in support of confirmation of the Prepack Plan at the Combined Hearing.

KL2 2850573.1

## <u>CONCLUSION</u>

For the foregoing reasons and the reasons set forth in the Confirmation Brief, the Debtors

respectfully request that the Court overrule the Objections and enter the Confirmation Order and

grant such other or further relief as is just and proper.


Dated:   New York, New York
         June 10, 2014

                              KRAMER LEVIN NAFTALIS & FRANKEL LLP

                              /s/ Kenneth H. Eckstein

                              Kenneth H. Eckstein
                              Adam C. Rogoff
                              Stephen D. Zide
                              Anupama Yerramalli
                              1177 Avenue of the Americas
                              New York, New York  10036
                              Telephone: (212) 715-9100
                              Facsimile: (212) 715-8000

                              *Counsel for the Debtors*
                              *and Debtors in Possession*

KL2 2850573.1