**UNITED STATES BANKRUPTCY COURT**            **FOR PUBLICATION**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X

In re:                                        Chapter 11

GENCO SHIPPING & TRADING LIMITED, *et al.*,   Case No. 14-11108 (SHL)

              Debtors.                        (Jointly Administered)

------------------------------------------------------------------X

## <u>MEMORANDUM OPINION ON CONFIRMATION ISSUES</u>

**A P P E A R A N C E S :**

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
*Counsel for the Debtors*
1177 Avenue of the Americas
New York, NY 10036
By:    Kenneth H. Eckstein, Esq.
       P. Bradley O'Neill, Esq.
       Philip S. Kaufman, Esq.
       Adam C. Rogoff, Esq.
       Stephen D. Zide, Esq.
       Natan Hamerman, Esq.
       Anupama Yerramalli, Esq.

**SIDLEY AUSTIN LLP**
*Counsel for the Official Committee of Equity Holders of the Debtors*
787 Seventh Avenue
New York, NY 10019
By:    Steven M. Bierman, Esq.
       Benjamin R. Nagin, Esq.
       Michael G. Burke, Esq.
       Andrew D. Hart, Esq.
       James D. Arden, Esq.

-and-

One South Dearborn
Chicago, IL 60603
By:    Larry J. Nyhan, Esq.

**MILBANK, TWEED, HADLEY & MCCLOY LLP**
*Counsel for Wilmington Trust Company, as agent for the 2007 Credit Facility*
One Chase Manhattan Plaza
New York, NY 10005
By:    Dennis F. Dunne, Esq.
       Samuel A. Khalil, Esq.


-and-

International Square Building
1850 K Street, NW
Washington, D.C. 20006
By:    Aaron Renenger, Esq.

**CURTIS MALLET-PREVOST, COLT & MOSLE LLP**
*Conflicts Counsel for Debtors*
101 Park Avenue
New York, NY 10178
By:    Theresa A. Foudy, Esq.

**AKIN GUMP STRAUSS HAUER & FELD LLP**
*Counsel for Informal Convertible Noteholder Group*
One Bryant Park
New York, NY 10036
By:    Michael S. Stamer, Esq.
       Sean E. O'Donnell, Esq.
       Sarah Link Schultz, Esq.

**MORGAN, LEWIS & BOCKIUS LLP**
*Counsel for Bank of New York Mellon*
101 Park Avenue
New York, NY 10178
By:    Glenn E. Siegel, Esq.

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
*Counsel for Agents for the Pre-Petition $100 Million and $253 Million Credit Facilities*
1285 Avenue of the Americas
New York, NY 10019
By:    Elizabeth R. McColm, Esq.
       Sarah Harnett, Esq.

**UNITED STATES DEPARTMENT OF JUSTICE**
*Office of the United States Trustee*
201 Varick Street, Suite 1006
New York, NY 10014
By:    Andrew Velez-Rivera, Esq.

2

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is a dispute over the Debtors' proposed plan of reorganization, with the parties primarily disagreeing about the value of the Debtors, a dry bulk shipping company. Using four different valuation methods and their many component parts, the Debtors and the Official Committee for the Equity Holders (the "Equity Committee") arrive at significantly different values for the Debtors' estate. Based on their differing approaches, the Equity Committee appointed in this case argues that there is enough value in this company that the proposed plan of reorganization should not be confirmed because it does not give a sufficient recovery to equity holders, whose recovery comes only after all creditors have been paid. As a related matter, the Equity Committee contends that the plan is not proposed in good faith given the problematic valuation methods used by the Debtors' management. The Debtors and supporting creditors counter that the proper valuation here demonstrates that equity is entirely out of the money and is fortunate to receive the recovery contemplated by the plan, which is based on the restructuring support agreement negotiated by the majority of creditors prior to the filing of these cases.

For the reasons set forth below and based on the evidence at trial,[1] the Court agrees for the most part with the Debtors' views on valuation and concludes that the equity holders are not entitled to any recovery. The Court also rejects the Equity Committee's arguments regarding good faith. Finally, the Court addresses objections to the third party releases proposed in the

---

[1]        As is customary in cases where the evidence is heavily numeric or technical, direct testimony of the witnesses was submitted by declaration. The witnesses were present at the trial for live cross-examination and re-direct. The direct testimony was admitted with limited or no objection. Citations to the direct testimony will be in the following format: "[Witness' Last Name] Decl." The experts' reports and rebuttal reports were attached as exhibits to the declarations. Although the reports are technically hearsay, no party objected on such grounds. As the parties referred to the reports during written and live testimony, some references to these reports will be made in this decision. Citations to the Debtors' exhibits are denoted "DX" and the Equity Committee's exhibits as "ECX."

plan, concluding that the releases are permissible only where they comport with established precedent.

## BACKGROUND

Genco Shipping and Trading Limited together with its affiliated Debtors (collectively, "Genco" or "the Company") is one of the world's largest dry bulk shippers, operating with a fleet of 53 shipping vessels. Genco has a highly leveraged capital structure, with over $1.3 billion of senior secured debt and $125 million of unsecured convertible notes. Wobensmith Decl. ¶ 7. The senior secured debt is held in three separate credit facilities. The first is referred to as the "2007 Credit Facility," with Wilmington Trust, National Association serving as agent, under which the Debtors owe approximately $1.069 billion (exclusive of interest). Wobensmith Decl. ¶ 6; Coleman Decl. ¶ 27, n.20. The 2007 Credit Facility holds a first and second lien on substantially all of the Debtors' assets. Wobensmith Decl. ¶ 6, n.4. The second facility is referred to as the "$100 Million Credit Facility," with Credit Agricole serving as agent, under which approximately $74 million is owed (exclusive of interest). Wobensmith Decl. ¶ 6; Coleman Decl. ¶ 27, n.20. The $100 Million Credit Facility holds a first lien on the five vessels purchased with the proceeds of its loan. Wobensmith Decl. ¶ 6, n.5. Finally, there is the "$253 Million Credit Facility," with Deutsche Bank serving as agent, under which approximately $176 million is owed (exclusive of interest). Wobensmith Decl. ¶ 6; Coleman Decl. ¶ 27, n.20. The $253 Million Credit Facility is secured by liens on thirteen vessels purchased with the proceeds of the loan. Wobensmith Decl. ¶ 6, n.6. In addition to these three levels of secured debt, Genco also has convertible unsecured notes, in the amount of $125 million, that reach maturity in August 2015. Wobensmith Decl. ¶ 7. Genco also owes various ordinary course creditors, including charterers, vendors and suppliers, all of whom are unsecured.

4

On April 21, 2014, the Debtors filed voluntary petitions in this Court seeking relief under Chapter 11 of the Bankruptcy Code (ECF No. 1). The filing is a prepackaged Chapter 11 case, pursuant to which Genco seeks to implement a consensual debt conversion restructuring that is supported by the majority of the Debtors' lenders.

Prior to the petition date, Genco negotiated a restructuring support agreement ("the RSA"), which established the framework for a prepackaged plan of reorganization that would deleverage Genco's balance sheet and provide new liquidity through a fully backstopped $100 million rights offering. *See generally* RSA (ECF No. 13, Ex. 2). The RSA was executed on April 3, 2014, by the Debtors and approximately 98% of the lenders under the 2007 Credit Facility, 100% of the lenders under the $100 Million Credit Facility and the $253 Million Credit Facility, and approximately 82% of the holders of the convertible notes (the "Noteholders"). First Day Decl. ¶ 4 (ECF No. 3); Wobensmith Decl. ¶ 67.

The parties to the RSA were required to support approval of the Prepack Plan. Through the RSA, the Debtors also obtained agreement for consensual use of cash collateral. First Day Decl. ¶ 71 (ECF No. 3). At a hearing held on April 23, 2014, the Debtors established that, absent the use of cash collateral, they would have insufficient funds to pay employees, maintain business relationships with vendors and suppliers, and otherwise could not finance their operations. Apr. 23 Hr'g Tr. 69:25–71:23 (ECF No. 51). The Court entered an interim order approving the use of cash collateral on April 23, 2014 (ECF No. 37), and a final order on May 16, 2014 (ECF No. 170).

The RSA includes a fiduciary out for Genco. It provides: "in order to fulfill the Company Parties' fiduciary obligations, the Company may receive (but not solicit) proposals or offers for Alternative Transactions from other parties and negotiate, provide due diligence,

discuss, and/or analyze such Alternative Transactions received without breaching or terminating

this agreement . . . ."  *See* RSA § 11(b)(iii).  If Genco announces its intention to pursue an

alternative transaction, however, the RSA may be terminated by two-thirds of the supporting

creditors on five days' notice.  *See* RSA § 11(c).  If the RSA is terminated to allow Genco to

pursue an alternative transaction, and that alternative transaction is consummated, the RSA

requires that Genco pay to the supporting 2007 Credit Facility lenders and supporting

Noteholders a termination fee of $26.5 million plus expense reimbursements.  *See* RSA § 11(f).

The termination fee will be treated as an administrative expense and will serve as the sole and

exclusive remedy of the supporting 2007 Credit Facility lenders and the Noteholders under the

RSA.  *Id.*

        In accordance with the terms of the RSA, the Debtors and the Supporting Creditors

finalized the terms of the Prepack Plan and disclosure statement.  The Prepack Plan, as

contemplated by the RSA, converts approximately $1.2 billion of debt to equity in the

reorganized Genco, provides the Debtors with $100 million of additional new money through a

fully backstopped rights offering, and extends the maturity dates of the $253 and $100 Million

Credit Facilities.  Wobensmith Decl. ¶ 66.  In exchange for the conversion of debt to equity, the

2007 Credit Facility will receive 81.1% of the reorganized Genco equity and the right to

participate in 80% of the rights offering.  Wobensmith Decl. ¶ 27.  The Noteholders will receive

8.4% of the equity and the right to participate in up to 20% of the rights offering.  *Id.*  Under the

RSA, the Debtors will reinstate allowed general unsecured claims and pay them in the ordinary

course of business.  *Id.*  The Plan also provides for existing equity holders to receive warrants in

exchange for the surrender or cancellation of their equity interests.[2]  *Id.*  The warrants cover 6%

---

[2]        Warrants "in corporate jargon . . . [are] an option to purchase stock at a given price."  *Lehtonen v. Time
Warner, Inc. (In re PurchasePro.Com, Inc.)*, 332 B.R. 417, 425 (Bankr. D. Nev. 2005) (citing *Carrieri v. Jobs.com,*

of the new equity.  Coleman Decl. ¶ 79; RSA Term Sheet at 3 (ECF No. 13, Ex. A).

The Debtors began solicitation of votes on the Prepack Plan on April 16, 2014.  First Day

Decl. ¶ 75.  At the time of filing on April 21, 2014, 100% of the Credit Facility claims had voted

to accept the Plan, but the Debtors were still accepting votes from the Noteholders.  The Court

authorized the assumption of the RSA in May.  *See In re Genco Shipping & Trading Ltd.*, 509

B.R. 455 (Bankr. S.D.N.Y. 2014).  In approving the RSA, the Court concluded that the Debtors

were overleveraged, that they needed to restructure their debt, and that a Chapter 11 proceeding

was an appropriate vehicle for doing so.  *Id.* at 463–64.  The Court found that the RSA could

accomplish those goals through a comprehensive restructuring of the Debtors on a consensual

basis, while avoiding a long, drawn out Chapter 11 process and the attendant costs.  *Id.*  For

those reasons, among others, the Court approved assumption of the RSA because it met the

business judgment standard under Section 365 of the Bankruptcy Code.  *Id.*

On May 9, 2014, the United States Trustee appointed the Equity Committee, consisting

of three equity holders: (i) Aurelius Capital Partners LP, (ii) Mohawk Capital LLC, and (iii) OZ

Domestic Partners, LP[3] (ECF No. 139).

The Court held a confirmation hearing and trial on June 12, 13, 23, and 24, 2014,[4] during

which the parties presented a variety of evidence, most of it concerning valuation.  The Debtors

called Harry Perrin, a Genco board member; John James O'Connell, of Blackstone Advisory

Partners LP ("Blackstone"); and John Wobensmith, CEO of Genco, as fact witnesses.  The

Debtors relied on three expert witnesses to further support their case:  (1) Dr. Adam Kent, of

---

*Inc.*, 301 B.R. 187, 193 (N.D. Tex. 2003); *Breeden v. L.I. Bridge Fund, LLC (In re The Bennett Funding Group, Inc.)*, 232 B.R. 565, 568 n.3 (Bankr. N.D.N.Y. 1999)).

[3]     OZ Domestic Partners, LP also has been colloquially referred to in this case as "Och Ziff."

[4]     The trial transcripts will be cited as "June [day] Hr'g Tr."

Maritime Strategies International Limited ("MSI"), who conducted a valuation of each vessel in the Debtors' fleet; (2) Dr. Arlie Sterling, of Marsoft, Inc. ("Marsoft"), who testified regarding projected dry bulk shipping rates; and (3) Timothy Coleman, of Blackstone, who testified regarding the valuation methods used by the Debtors. The Equity Committee called two experts: Neil Augustine, of Rothschild Inc. ("Rothschild"), to testify regarding his opinion on the valuation of Genco; and Morton Arntzen, of CMG Advisory Services LLC ("CMG"),[5] who testified regarding the shipping industry and market predictions.[6]

## DISCUSSION

### A.    The Applicable Law

#### 1.    Section 1129(a)(8) – Cramdown

The Debtors, as the proponents of the Plan, bear the burden of establishing by a preponderance of the evidence that the Plan meets the requirements of Section 1129 of the Bankruptcy Code. *See JPMorgan Chase Bank, N.A. v. Charter Commc'n Operating, LLC (In re Charter Commc'n)*, 419 B.R. 221, 243 (Bankr. S.D.N.Y. 2009) (citing *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1165 (5th Cir. 1993); *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401, at *136 (Bankr. S.D.N.Y. Oct. 31, 2003)).

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests under a plan have either accepted the plan or be unimpaired by the plan. Thus, the affirmative consent of all impaired classes is required for the consensual confirmation of a plan. *See* 7 Collier on Bankruptcy (Alan N. Resnick & Henry J. Sommer) (16th Edition), ¶ 1129.02[8].

---

[5]    The Debtors objected to the admission of Mr. Arntzen's testimony, challenging his credentials as an expert witness. At trial, the Court allowed the testimony and concluded that the Debtors' arguments went to the weight of Mr. Arntzen's testimony. June 23 Hr'g Tr. 195:24–196:3.

[6]    In addition to these seven witnesses, the parties also designated the deposition testimony of another five witnesses: Peter Georgiopoulos, chairman of the board of Genco; Richard Morgner, managing director and global joint head of restructuring and recapitalizations at Jefferies, LLC; Jason Scheir, of Apollo Management Holdings LP; Bao Truong, of Centerbridge Partners LP; and Scott Vogel, of Midtown Acquisitions, LP.

However, if a plan meets all of the other confirmation criteria in Section 1129(a), it may still be confirmed over the rejection of a class of claims or interests, so long as the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(1).

The Debtors' Plan classifies Equity Interests in Class 11.  Class 11 is impaired under the Plan and holders of Equity Interests are deemed to reject the Plan pursuant to Section 1126(g) of the Bankruptcy Code.[7]  Plan § III.D.11.  Because the requirements of Section 1129(a)(8) have not been met with respect to Class 11, the Debtors must establish that the Plan is fair and equitable and does not unfairly discriminate against the holders of Equity Interests.  *See* 11 U.S.C. § 1129(b)(1).

Neither the Bankruptcy Code nor legislative history provides clear guidance for determining what constitutes "unfair discrimination."  *See In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986).  "Generally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes . . . ."  *Id.* (internal citations and quotations omitted).  Thus, a plan will be found to unfairly discriminate "where similarly situated classes are treated differently without a reasonable basis for the disparate treatment."  *WorldCom*, 2003 Bankr. LEXIS 1401, at *174 (citing *In re Buttonwood Partners, Ltd.,* 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990); *Johns-Manville,* 68 B.R. at 636).  "[I]f under the facts and circumstances of a particular case, there is a reasonable basis for disparate treatment of two similarly situated classes of claims or two similarly situated classes of equity interests, there is no unfair discrimination."  *WorldCom*, 2003 Bankr. LEXIS 1401, at *174 (citing *Buttonwood Partners,* 111 B.R. at 63).  "To determine whether a plan discriminates

---

[7]     "[A] class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests."  11 U.S.C. § 1126(g).

unfairly, courts consider whether (1) there is a reasonable basis for discriminating, (2) the debtor

cannot consummate the plan without the discrimination, (3) the discrimination is proposed in

good faith, and (4) the degree of discrimination is in direct proportion to its rationale."

*WorldCom*, 2003 Bankr. LEXIS 1401, at *175 (citing *Buttonwood Partners,* 111 B.R. at 63); *In*

*re Ambanc La Mesa Ltd. P'ship,* 115 F.3d 650, 656 (9th Cir. 1997); *In re Rochem, Ltd.,* 58 B.R.

641, 643 (Bankr. D.N.J. 1985)).

A plan is considered to be fair and equitable to a class of equity holders if it provides that

each equity holder in the class "receive or retain on account of such interest property of a value,

as of the effective date of the plan, equal to the . . . value of such interest; or the holder of any

interest that is junior to the interests of such class will not receive or retain under the plan on

account of such junior interest any property." 11 U.S.C. § 1129(b)(2)(C). "It's undisputed that

the 'fair and equitable' requirement encompasses a rule that a senior class cannot receive more

than full compensation for its claims." *Chemtura*, 439 B.R. 561, 592 (Bankr. S.D.N.Y. 2010)

(citing *In re Exide Techs.*, 303 B.R. 48, 61, 66 (Bankr. D. Del. 2003); *In re MCorp Fin., Inc.*, 137

B.R. 219, 235 (Bankr. S.D. Tex. 1992); *In re Future Energy Corp.*, 83 B.R. 470, 495 n. 39

(Bankr. S.D.N.Y. 1988); *In re Walat Farms, Inc.*, 70 B.R. 330, 335 (Bankr. E.D. Mich. 1987));

*see also In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007); *In re Oneida*

*Ltd.*, 351 B.R. 79, 87 (Bankr. S.D.N.Y. 2006). Courts will therefore deny confirmation "if a plan

undervalues a debtor and therefore would have resulted in paying senior creditors more than full

compensation for their allowed claims." *Chemtura*, 439 B.R. at 592; *see generally Exide Techs.*,

303 B.R. 48 (denying confirmation due to low valuation because, *inter alia*, debtor could not

meet requirements of Section 1129(b)). Therefore, "[a] determination of the Debtor's value

10

directly impacts the issues of whether the proposed plan is 'fair and equitable,' as required by 11

U.S.C. § 1129(b)." *Exide Techs.*, 303 B.R. at 60–61.

### 2.    <u>Valuation Methodologies</u>

Valuation is not an exact science. *In re AMR Corp.*, 477 B.R. 384, 436–37 (S.D.N.Y.

2012); *In re SGPA, Inc.*, 2001 Bankr. LEXIS 2291, at *35 (Bankr. M.D. Pa. Sept. 28, 2001) (the

matter of valuation of an ongoing business in economic distress is far from an exact science);

*WorldCom,* 2003 Bankr. LEXIS 1401, at *121 ("no precise formula to determine solvency"); *In*

*re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 297 (S.D.N.Y. 1990) (valuation is not "a

product of mere calculation . . . [I]t is an imprecise tool."); *In re Spansion, Inc.*, 426 B.R. 114,

130 (Bankr. D. Del. 2010) ("It has been aptly observed that entity valuation is much like a guess

compounded by an estimate.") (internal quotations omitted).

"Fair valuation for a company that can continue day-to-day operations is based on a

'going concern' or 'market price' valuation." *Iridium IP LLC v. Motorola, Inc.* (*In re Iridium*

*Operating LLC*), 373 B.R. 283, 344 (S.D.N.Y. 2007) (citing *In re PWS Holding Corp.*, 228 F.3d

223, 233 (3d Cir. 2000)).  There are three main methodologies commonly used to determine

reorganization value:  (1) discounted cash flow analysis ("DCF"); (2) market multiple approach;

and (3) comparable transaction approach.  *See SGPA,* 2001 Bankr. LEXIS 2291, at *36; *see also*

*Iridium*, 373 B.R. at 344.  But courts have "broad discretion to determine the extent and method

of inquiry necessary for a valuation . . . depend[ing] on the facts of each case."  *SGPA*, 2001

Bankr. LEXIS 2291, at *36 (quotations omitted); 7 Collier on Bankruptcy ¶ 1129.05[3][a]

("there are many competing ways to value a company . . . .");  *see also Adelphia Recovery Trust*

*v. FPL Group, Inc. (In re Adelphia Commc'ns Corp.)*, 2014 Bankr. LEXIS 2011, at *127

(S.D.N.Y. May 6, 2014) ("Insolvency is a question of fact, and a court has broad discretion when

considering evidence to support a finding of insolvency."); *Lawson v. Ford Motor Co.* (*In re Roblin Indus.*), 78 F.3d 30, 35 (2d Cir. 1996). "The goal of all methods is the same: to determine the 'present worth of future anticipated earnings' of the debtor corporation." *SGPA*, 2001 Bankr. LEXIS 2291, at *36 (citations omitted).

The first method, DCF, estimates the net present value of a company by:

(i)     projecting unlevered free cash flows over a given fixed forecast period, then discounting those cash flows back to the present using an estimated discount rate based upon the company's weighted average cost of capital ("WACC"); and

(ii)    deriving the value of all unlevered free cash flows beyond the explicit forecast period—the 'terminal value'—and then discounting that terminal value back to the present by applying the estimated discount rate. The enterprise value is determined by adding the numbers derived from (i) and (ii).

*Chemtura*, 439 B.R. at 574. DCF analysis may be problematic where management's projections are inaccurate or unreliable. *See, e.g., Adelphia*, 2014 Bankr. LEXIS 2011, at *33; *see also In re DBSD N. Am., Inc.*, 419 B.R. 179, 197 (S.D.N.Y. 2009) (noting serious problems with DCF analysis based on negative cash flows).

The second method, the market multiple or comparable company analysis, estimates the value of a company by using the value of comparable companies as an indicator of the subject company. *Chemtura*, 439 B.R. at 575–76. "Values are standardized using one or more common variables such as revenue, earnings, or cash flow, with the expert then applying a multiple of the financial metric or metrics that yields the market's valuation of these comparable companies." *Id.* The key to this analysis is the choice of appropriate comparable companies relative to the company in question. *Id.*

The third method, precedent transactions, looks at the purchase prices of comparable companies in recent transactions and uses the subject company's earnings, cash flow, or earnings

before interest, taxes, depreciation, and amortization ("EBITDA") to determine a range of total

enterprise value, or TEV.  *Id.* at 577.  "This method requires qualitative judgments in light of the

unique circumstances of each precedent transaction and inherent differences between the

precedent acquired companies and the subject company."  *Id.*

The Debtors maintain that a fourth methodology, net asset value ("NAV"), is the

appropriate methodology to value a dry bulk shipping company.  NAV is "based on independent

appraisals that incorporate an impartial assessment of the broadest, most concrete consensus

regarding future earnings."  Coleman Decl. ¶ 25.  NAV is a method that adds together the

appraisal values and any other assets, such as ownership stakes in other companies, service

contracts, and cash on hand.  Coleman Decl. ¶ 31.

## B.     The Value of Genco

The question before the Court is whether Genco's value, as calculated using these various

methodologies, exceeds $1.48 billion, the amount that would entitle equity holders to any

recovery.[8]  *See Chemtura*, 439 B.R. at 579 (to determine that a plan does not violate Section

1129(b)'s "fair and equitable" requirement by paying creditors more than in full, the Court need

only find that that the Debtors' total enterprise value does not exceed the TEV underlying the

plan).  In addressing this question, the Debtors urge the Court to adopt a NAV analysis, which

---

[8]      This $1.48 billion figure is comprised of the following claims that must be paid in full before equity holders
could recover anything under the rule of absolute priority:  $1.069 billion due under the 2007 Credit Facility; $176
million due under the $253 Million Credit Facility; $74 million due under the $100 Million Credit Facility, $125
million of Convertible Notes; $4 million of accrued interest; $6 million in swap liability; $1 million owed under
lease agreements; and $26 million of other administrative claims.  Coleman Decl. ¶ 27, n.20.  Rothschild claimed
that this number should be $1.443 billion, because they subtracted $37 million cash on hand from the $1.48 billion
claims total.  Augustine Decl. ¶ 29.  Given the Court's conclusion that Mr. Coleman provided credible testimony
and that he provided a convincing detailed breakdown of the required cash on hand for each vessel, *see* Coleman
Decl. ¶ 32, the Court adopts Mr. Coleman's $1.48 billion figure.

The Debtors also point out that, when taking into account the value of the warrants being gifted to the
equity holders, that $1.48 billion figure rises even higher.  Coleman Decl. ¶ 27.  Although the Equity Committee
disputes the value of the warrants, as discussed in further detail below, the Debtors value the warrants at $32.9
million, which would mean that the value of Genco would have to exceed $1.51 billion for equity holders to recover
more than they will receive under the Plan.  *Id.*

the Debtors contend is between $1.36 billion to $1.44 billion.  Coleman Decl. ¶ 27.  The Equity

Committee, however, advocates using all four valuation methods and then assigning a weight to

each; the Committee weighs DCF and comparable companies most heavily at 37.5%, NAV is

weighed at 15%, and precedent transactions is given only a 10% value.  Augustine Decl. ¶ 30.

Using the Equity Committee's analysis, Genco's value ranges from $1.54 billion to $1.91 billion,

with a midpoint of $1.725 billion.  Augustine Decl. ¶ 32.

     As explained below, the Court concludes that NAV should not be the exclusive basis for

valuation in this case, but nonetheless should be given substantial weight given the nature of the

dry bulk shipping industry.  The Court finds that a comparable companies analysis is equally

useful in determining Debtors' value and that the precedent transaction analysis is of some

limited utility.  But the Court concludes that the DCF analysis is not an appropriate method of

valuation, largely due to the highly speculative nature of rate projections for the dry bulk

shipping industry.  The Court also concludes that there are other significant flaws with

Rothschild's DCF analysis.  Turning to the three remaining methodologies other than DCF, none

produces a valuation figure above the $1.48 billion mark that would entitle the equity holders to

a recovery.  In other words, using NAV and the comparable companies analysis—and to a lesser

extent the precedent transactions methodology—the Court concludes that the Debtors have

established by a preponderance of the evidence that the Debtors' value does not exceed the $1.48

billion figure.

1.    __NAV Method__

To determine NAV, the Debtors engaged four third party appraisal firms to conduct asset-level valuations of Genco's fleet.[9]  Coleman Decl. ¶ 31.  The Debtors also used VesselsValue[10] as a fifth indication of value.  *Id.*  The resulting fleet appraisals ranged from $1.182 billion to $1.262 billion.  *Id.*  MSI's valuation, completed by Dr. Kent, was the median of these valuations.  Coleman Decl. ¶ 32.  Dr. Kent opined that the aggregate value of the Debtors' vessels, as of May 12, 2014, was $1.211 billion.  Kent Decl. ¶ 18.  At trial, the Debtors relied on the testimony of Dr. Kent to provide expert analysis for vessel valuation.  "Market valuation is undoubtedly the dominant and most widely accepted approach [to ascertain vessel price] in the industry."  Kent Decl. ¶ 19.  Dr. Kent used three techniques to determine the total market value of the vessels through a vessel-by-vessel assessment:  (i) econometric modeling approach; (ii) time series analysis approach; and (iii) last done approach.  *Id.*

The econometric modeling approach calculates valuation based upon MSI's proprietary models and algorithms that depict the relationship between historical earnings and depreciation curves in the shipping markets based on historical data since 1980 for each vessel sector, size, and class.  Kent Decl. ¶ 21.  Shipyard prices effectively impose a ceiling or upper boundary on secondhand prices for vessels.[11]  Kent Decl. ¶ 21(b).  The residual scrap value of any ship effectively sets the floor for a vessel's resale value.  Kent Decl. ¶ 21(c).  Under the modeling approach, vessels are valued on the basis of their earning power, which changes depending on

---

[9]      As described above, MSI's valuation was $1.211 billion, which was the median of the five values used. Marsoft valued the fleet at $1.198 billion; VesselsValue was $1.182 billion; and two unnamed shipbrokers valued it at $1.227 billion and $1.262 billion.  Coleman Decl. ¶ 32.

[10]     VesselsValue is "an internationally recognized provider of vessel sale and valuation information." Coleman Decl. ¶ 11.

[11]     The price for a secondhand vessel, with a shorter working life, is unlikely to exceed the price of a new vessel.  Kent Decl. ¶ 21(b).

market fundamentals.  Kent Decl. ¶ 21(i).  Using the modeling approach, Dr. Kent calculated the

aggregate value of the Debtors' vessels to be $1.215 billion.  Kent Decl. ¶ 33.

The time series approach "analyzes a sequence of data points, measured at successive

points in time to extract characteristics of the data."  Kent Decl. ¶ 22.  For this approach, Dr.

Kent used the April average price of certain vessels, such as a five-year-old Handymax vessel.

Using the time series approach, Dr. Kent calculated the aggregate value of the Debtors' vessels

to be $1.26 billion. Kent Decl. ¶ 33.

The last done approach derives valuations from recent sales and market intelligence on

vessels comparable to the Debtors' vessels.  Dr. Kent made adjustments for time between sale

and valuation assessment, age, and vessel specifications.  Kent Decl. ¶ 29.  He also removed

outlier transactions, such as those involving Jones Act vessels or those not done at arm's length.

*Id.*  Using the last done approach, Dr. Kent calculated the aggregate value of the Debtors' vessels

to be $1.121 billion. Kent Decl. ¶ 33.

Dr. Kent analyzed each of the Debtors' vessels separately, assessing each methodology as

it related to each vessel.  Kent Decl. ¶ 37.  He also considered the impact of several other factors

on the value of the Debtors' vessels, including: historical cargo routes, detentions and

deficiencies, chartering history, class of vessel, special and intermediate surveys, engine make

and model, fuel consumption, country and yard of build, vessel design and specification, and a

cohort analysis.  Kent Decl. ¶ 38.  Of these, Dr. Kent only made adjustments (specifically,

discounts) for the proximity of special and intermediate surveys,[12] engine make and model,[13]

---

[12]     Vessels must undergo special surveys every five years and intermediate surveys as required for the vessel's
class renewal process. Kent Decl. ¶ 44.  Special surveys can cost hundreds of thousands of dollars and typically
require an out-of-water examination.  Kent Decl. ¶ 45.  Within the next six months, six of the Debtors' vessels are
due to undergo special surveys, and three others are scheduled for dry docking for intermediate surveys within the
next five months.  Kent Decl. ¶ 46.

country and yard of build,[14] vessel design,[15] and the cohort analysis.[16]  After making these

adjustments, Dr. Kent concluded that the aggregate "charter free market value" of the Debtors'

vessels is $1.211 billion.  Kent Decl. ¶ 63.

Taking the value of the fleet, Blackstone then added the value of Genco's other assets

including:

(i)      $40 million for net working capital;
(ii)     $56 million for Genco's stake in Jinhui;
(iii)    $42 million for Genco's stake in Baltic Trading;[17]
(iv)     $40 million for service contracts; and
(v)      $4 million for other fixed assets.

Coleman Decl. ¶ 32.  Thus, Blackstone's ultimate NAV ranged from $1.364 billion to $1.444

billion, none of which correspond to a recovery for equity holders.  *Id.*  The median was $1.393

billion, which leaves equity "out of the money" by $87 million.[18]  *Id.*

---

[13]      Most ship owners prefer B&W or MAN B&W engines because of the availability of extra parts and the ability to service and repair the engines easily.  Kent Decl. ¶ 48.  Six of the Debtors' vessels have engines other than the preferred B&W, so Dr. Kent applied a minor discount to those vessels.  Kent Decl. ¶ 49.

[14]      Japanese and South Korean shipyards are regarded as superior to Chinese shipyards and their affiliated shipyards in the Philippines.  Kent Decl. ¶¶ 52–53.  Dr. Kent applied a discount to 21 of the Debtors' vessels, which were manufactured by Chinese and affiliated Philippines shipyards.  Kent Decl. ¶¶ 56–57; Kent Decl., Table A.4.  The discount was based on a comparative analysis of recent vessel sales.  *See* Kent Decl., Table 2.
[15]      The Debtors own six log fitted vessels, which enables log cargoes to be carried efficiently.  Kent Decl. ¶ 58(a); Kent Decl., Table A.4.  Dr. Kent applied a small increase to the price of these vessels.  Kent Decl. ¶ 58(a); Kent Decl., Table A.4.  *Id.*  The Debtors also own four Chinese built 53,000 Dwt Supramax vessels, to which Dr. Kent applied a discount because of their unpopularity in the industry.  Kent. Decl. ¶ 58(b); Kent Decl., Table A.4.

[16]      Dr. Kent applied a discount to four of the Debtor's Capesize vessels because they are below the median size of the industry's Capesize vessel fleet.  Kent Decl. ¶ 61.

[17]      The parties dispute whether the value of Genco's stake in Baltic Trading should reflect a control premium, an increase based on an ability to have control over the decisions of a company.  Genco owns only 11.1% of the economic interest in Baltic, but has majority voting power so long as it retains at least 10% of the equity interest in Baltic.  Coleman Decl. ¶ 73(f); Augustine Decl. ¶ 75.  Rothschild opined that Genco could amend Baltic's shareholders' rights agreement to realize a control premium if it ever sold its interest in Baltic, and accordingly assigned a control premium.  Augustine Decl. ¶ 75.  Rothschild concluded that the value of Genco's stake in Baltic ranged from $54.7 million to $57.7 million.  Augustine Decl. ¶¶ 76–77.  Blackstone claimed that the articles of incorporation, not the shareholders' agreement, restricted Genco's ability to realize a control premium and therefore did not assign one in this case.  Coleman Decl. ¶ 73(f).  The Court need not determine the issue of whether to apply a control premium.  Rather the Court notes that, by a preponderance of the evidence, the Debtors have shown that even if Blackstone's NAV analysis included the control premium (a difference of $12.7 million to $15.7 million), the overall value still falls short of the $1.48 billion required for equity to recover anything.

The Equity Committee did not question Dr. Kent's methodology, and the Court finds his testimony to be persuasive.  *See* June 12 Hr'g Tr. at 56 (ECF No. 303).  Rather than challenge the substance on his NAV opinion, the Equity Committee instead contends that NAV is simply the wrong method to use when valuing an ongoing business.  *See* Equity Committee Objection to Confirmation ("Objection") at 25 (ECF No. 262).  It argues that NAV fails to take into account the value of Debtors' management[19] and other intangibles associated with the business.  Augustine Decl. ¶ 17 ("[T]he Debtors' exclusively asset-based focused approach undervalues Genco because it does not fully account for all of the tangible and intangible value of Genco's corporate franchise, experienced management team, and future cash flows, which are the hallmarks of true going-concern enterprise valuations derived from the traditional methodologies . . . .").  The Court agrees with the Equity Committee but only in limited part.

On the one hand, the preponderance of the evidence establishes that it is appropriate to look to NAV as highly probative of the Debtors' value.  While other industries lend themselves to using only the three standard valuation methodologies, the features of the dry bulk shipping industry counsel for a different approach.  The industry is competitive, highly fragmented, and has low barriers to entry.  Coleman Decl. ¶¶ 16–18; *see also* Martin Stopford, *Maritime Economics* (3d ed. 2009), at 338 ("Entry into even the most specialized services is relatively easy, requiring capital and expertise which can usually be acquired fairly easily.").  There is little brand loyalty or other features to distinguish competitors.  Coleman Decl. ¶ 17.  In this way, the dry bulk shipping industry is similar to the classic economic model of "perfect competition."

---

[18]    The Debtors contend that NAV is the sole valuation methodology necessary, but nonetheless go through the other methodologies as a "sanity check" to confirm the outcome of the NAV methodology.

[19]    The parties mentioned the Debtors' Management Incentive Program ("MIP") in their briefs.  *See* Objection at 7, 28; Debtors' Reply Brief ("Reply") at 30 n.23 (ECF No. 278).  The Equity Committee argued that the MIP suggests that there must be some value in a company's management team.  The Court concludes that the existence of the MIP is another fact that supports the consideration of other methodologies in addition to NAV.

18

Coleman Decl. ¶ 21; *see also* Stopford at 338, 342.  As explained in the treatise *Maritime Economics*: "Although few modern industries conform to the famous perfect competition model developed by the classical economists in the nineteenth century, it fits shipping like a glove . . . Basically companies keep investing until marginal cost equals price and in the long term marginal cost is the cost of capital."  Stopford at 342.  Because of this, the shipping industry is vulnerable to weak profits.  Stopford at 338.  "[N]ew entrants bring new capacity and seek market share, pushing down margins, whilst powerful buyers or suppliers bargain away the profits for themselves.  The presence of close substitute products limits the price competitors can charge without inducing substitution."  Stopford at 338.  When rates are attractive, investors can enter the market with relative ease, leading to increased supply that in turn forces chartering rates down.  Coleman Decl. ¶¶ 21–22.  Thus, ship owners and operators struggle to consistently produce returns in excess of the cost of capital.  Coleman Decl. ¶¶ 21–22.

The Equity Committee's dismissive attitude regarding NAV ignores the nature of dry bulk shipping.  The Committee does not dispute Mr. Coleman's characterization of the industry, but nonetheless stubbornly insists on according little weight to NAV in the overall valuation analysis.  But as discussed below, only three comparable transactions were identified in the past ten years for the entire industry, with each of those transactions at or very near NAV.  Meanwhile, over 4,000 transactions involving ships occurred in the same time period.  Mr. Augustine claimed that this fact had no significance.  June 23 Hr'g Tr. 336:20–337:3.  At the very least, though, this stark contrast in numbers confirms the Debtors' characterization of the market for ships being highly liquid and the relative ease with which owners can acquire or sell ships so as to enter the dry bulk business.[20]

---

[20]    The Equity Committee's position also ignores evidence contained in its own exhibits.  As discussed more fully below, the Equity Committee relied on fairness opinions contained in two SEC filings for other shipping

On the other hand, the Court is not convinced that NAV should be the sole basis for evaluating the ongoing business of the Debtors.  For example, the comparable companies analysis requires only the identification of companies with similar attributes to the Debtors.  There has been no evidence or argument that there are no such comparable companies.  In fact, the parties agree on four such comparable companies.  Similarly, the parties agree that there have been three transactions involving change-of-control that can be reviewed for a precedent transaction analysis, although both agree that the small sample size limits the ultimate utility of such an analysis.  For these reasons and those explained below, therefore, the Court finds it is appropriate to examine other valuation methodologies presented in this case.

### 2.    **Comparable Companies**

Blackstone and Rothschild used essentially the same methodology for their comparable companies analyses.  They also pulled their data from the same sources—Clarksons[21] and VesselsValue.[22]  Some of their numbers differed slightly, but there are really two material differences in the respective analyses: the determination of the peer group and the adjustment of the EBITDA multiples for fleet age.  Rothschild excluded from its peer group two companies, Jinhui Shipping and Paragon Shipping, while Blackstone deemed them comparable enough to include in the analysis.  Rothschild also determined that it was not necessary to adjust the

---

companies.  Those fairness opinions go through each valuation methodology, including NAV.  As explained below, the fairness opinions are created in a different context than a valuation, but they still support the conclusion that NAV is a recognized valuation method in the dry bulk shipping industry.

[21]    Clarksons is "a leading provider of integrated shipping services."  Coleman Decl. ¶ 11.  Its research division provides "data on over 100,000 vessels either in service or on order, as well as extensive trade and commercial data."  *Id.*

[22]    Blackstone used VesselsValue data for Genco and each of the comparable companies so the valuation was consistent across the board.  Blackstone Report at 31.

EBITDA multiples for age.  Before addressing these two disputes, it is useful to briefly recap the

comparable company analysis of each expert.

Blackstone evaluated six criteria to identify a set of comparable companies:

(a) Business Model
(b) Charter Coverage
(c) Fleet Age
(d) Newbuild Orders
(e) Capital Structure
(f) Size and Market Capitalization.

Coleman Decl. ¶ 38.

Using these criteria, Blackstone identified six companies that were comparable enough to

Genco to include in its analysis: Baltic Trading, Diana Shipping, Jinhui Shipping, Paragon

Shipping, Safe Bulkers, and Star Bulk Carriers.  Coleman Decl. ¶ 39.  Seven other companies

were considered but excluded from the peer group because they were not comparable enough.

Coleman Decl. ¶39, n.26.

Blackstone completed two comparisons using this peer group set: TEV/NAV analysis

and TEV/EBITDA analysis.  Coleman Decl. ¶¶ 40–41.  The first method—TEV/NAV—is used

to determine "whether market participants assign value to pure-play dry bulk operators in excess

of the value of the assets."  Coleman Decl. ¶ 40.

Blackstone calculated the NAV for each comparable company using information

obtained from VesselsValue.  Blackstone used publicly available information to determine the

TEV of the comparable companies.[23]  Coleman Decl. ¶ 40.  These two values were then used to

derive a multiple (the "TEV/NAV Multiple") for each company as summarized below:

Jinhui Shipping        0.60x
Paragon Shipping       0.88x

---

[23]      It appears that Mr. Coleman calculated TEV by adding together each company's market capitalization and
financial liabilities and preferred stock, and then subtracting the non-operating assets.  Blackstone Report at 34.

| | |
|---|---|
| Star Bulkers | 0.92x |
| Diana Shipping | 0.92x |
| Safe Bulkers | 1.17x |
| Baltic Trading | 1.18x |

Coleman Decl. ¶ 40.  Blackstone used the median multiple—0.92x— as the "mid" multiple, and also calculated a low case using 0.87x and a high case with 0.97x.  *Id.*  This produced a valuation of Genco ranging from $1.202 billion to $1.324 billion.  *Id.*  In other words, there was no residual money for equity holders, and they were actually "out of the money" by $156 million to $278 million.

The second comparable companies methodology derives a multiple from TEV and EBITDA.  Coleman Decl. ¶ 43.  Blackstone adjusted each EBITDA multiple to account for the difference between Genco's average fleet age and the comparable companies' average fleet ages.  Coleman Decl. ¶ 42.  The low case used a 6.5% depreciation rate, the mid case used 4.5%, and the high case assumed there was no depreciation.[24]  Coleman Decl. ¶ 43.  The corresponding adjusted EBITDA multiples used were 5.9x, 6.5x, and 7.3x.  *Id.*  Applying those multiples to Genco's 2015E EBITDA of $175 million, Blackstone found that the total value of Genco ranged from $1.170 billion to $1.418 billion.  Coleman Decl. ¶ 44.  In other words, equity was out of the money by $62 million to $310 million.

Turning to the Equity Committee's analysis, Rothschild considered the corporate profile, fleet composition, and size of companies in defining its peer group set.  Augustine Decl. ¶ 60.  Rothschild created a chart to summarize these considerations for each company, using pie charts to illustrate the comparability for each consideration.  An empty circle signified "non-

---

[24]        Blackstone calculated the fleet depreciation by pulling historical time series data regarding vessel prices from Clarksons.  *See* Coleman Decl. at 23, Chart; *see also* Blackstone Report at 41.

comparable"; a quarter-filled circle denoted "mildly comparable" to Genco.[25]  Augustine Decl. ¶ 60; Rothschild Report at 38.  Rothschild determined that Jinhui was not a comparable company because it was smaller in size and had significant transparency and governance issues. Augustine Decl. ¶ 61; Rothschild Report at 39.  As for Paragon, Rothschild excluded it from the comparable set primarily because of its size, and specifically its TEV.[26]  June 23 Hr'g Tr. 272:7–16.  Rothschild determined that Paragon's smaller TEV and a public float of $97.5 million implied a limited liquidity.  Augustine Decl. ¶ 61.

The Court agrees with the Equity Committee that Jinhui should be excluded as a comparable company.  In due diligence meetings with Rothschild, Genco's own management admitted to being concerned that the controlling shareholders of Jinhui were siphoning cash for its benefit at the expense of other shareholders.  Augustine Decl. ¶ 61; June 23 Hr'g Tr. 335:2–14.  At trial, the Debtors did not provide any evidence disputing this issue.  Given this fact, there is a legitimate concern that Jinhui's financial situation may be materially affected by these corporate governance issues so as render it dissimilar to the other companies included in the analysis.

But as for Paragon, the Court reaches the opposite conclusion.  The Court finds that the credible evidence supports Paragon's inclusion as a comparable company and the adoption of Blackstone's overall comparable company analysis.  Rothschild excluded Paragon based on size, but that determination is at odds with Mr. Augustine's own statement that one should review all the facts before making a determination regarding what is a comparable company.  June 23 Hr'g

---

[25]     A half-filled circle meant "moderately comparable," three-quarters was "highly comparable," and a full circle meant "near perfect."  Rothschild Report at 38.

[26]     Paragon had a TEV of $299 million.  Augustine Decl. ¶ 61.  By comparison, Baltic Trading had a TEV of $510.1 million and Star Bulk Carriers was $564.4 million.  Rothschild Report at 41.

Tr. 300:2–6. The exclusion of Paragon is also undercut by the fact that Mr. Augustine's chart assigned the same value of "mildly comparable" size to both Paragon and Baltic Trading; one would expect that Rothschild would differentiate between the sizes of the two companies if size was to be the main reason to exclude Paragon. *See* June 23 Hr'g Tr. 300:14–301:24; Rothschild Report at 38, 40. The only other explanation offered about Paragon's exclusion was that its size and market capitalization indicated "institutional buyers are effectively not in the market, given the illiquidity . . . ." June 23 Hr'g Tr. 334:14–23. But the Noteholders successfully demonstrated that there really is not a lack of institutional buyers in the market.[27] Given the nature of the dry bulk industry, there is also good reason to think that size alone would be of less significance in selecting comparable companies than it would be in other industries. There would seem to be little reason for a customer to choose to use the ships of a larger company than a smaller company, assuming that the ships, service and rates were the same. Indeed, no evidence was presented that established any such reason, other than the liquidity point that was effectively rebutted by the Noteholders.

Adjusting for the inclusion of Paragon and the exclusion of Jinhui, the Court now looks as the impact of these changes. Turning first to Blackstone, the exclusion of Jinhui does not appear to have a material impact on the TEV/NAV outputs because the median would still be

---

[27] The Noteholders did so by examining information about the institutional ownership of various dry bulk shippers. Rothschild concluded that Eagle Bulk was nearly perfect in terms of a size comparison to Genco. Rothschild Report at 39. Information obtained from the Standard and Poor Capital IQ website indicates that institutions own 24.15% of the total shares outstanding for Eagle Bulk. DX 295 at 1. By contrast, the Capital IQ website indicates that the institutional ownership of Paragon is 21.98%. DX 299 at 1. When confronted with this evidence, Mr. Augustine complained in a conclusory way about the reliability of Capital IQ as a source of information, but the Equity Committee did not revisit this point. *See* June 23 Hr'g Tr. 341:9–11 (noting errors found in Capital IQ information); *Id.* at 347:14 (Equity Committee counsel indicated "nothing further" after re-cross-examination on this point). But the Court rejects that argument given that Rothschild had relied upon Capital IQ as a data source, both in its expert report in this case and in pitch material Rothschild had prepared relating to Debtors before the bankruptcy was ever filed. *See* Rothschild Report at 83; DX 264 at 24; DX 265 at 24.

0.92x, which Blackstone used as the mid value in its analysis.[28]  Therefore, by this methodology, the equity holders would still be out of the money.  With respect to the TEV/EBITDA analysis, the base median would also remain the same at 7.3x.  This was used as the high case multiple after adjusting for age for the low and mid cases.  But as described above, even Blackstone's high case leaves the equity holders out of the money by some $62 million.  Thus, the Court concludes that, in adopting Blackstone's overall methodology, the removal of Jinhui from the comparison set does not have a material impact on the overall conclusions drawn from the comparable companies analysis.  Simply put, equity would remain out of the money.

On the other hand, the inclusion of Paragon in Rothschild's list of comparable companies would have a material impact on its analysis.  At trial, the Court specifically asked about the impact of including Paragon in Rothschild's comparable set.  One view, presented by the Noteholders, explained how it would drastically change Rothschild's numbers and bring them into a range more consistent with Blackstone's values.  June 24 Hr'g Tr. 94:25–101:13.  While admitting the numbers are not perfect, counsel for the Noteholders demonstrated that, utilizing Rothschild's prior data on Paragon, the inclusion of Paragon would reduce Rothschild's low case by about $275 million, or to roughly $1.21 billion.[29]  The Equity Committee provided no answer to the Court's inquiry about the impact of including Paragon, and did not attempt to rebut the analysis on this issue presented by the Noteholders.  The Court does not adopt the Noteholders' numbers *per se*, but rather uses it as a common sense check to confirm that the valuation of Rothschild under a comparable company analysis would be significantly reduced when using the appropriate comparison set.

---

[28]      Both parties' experts rely heavily on the median rather than the average because there is not enough data to make use of the average appropriate.

[29]      When including Paragon, Rothschild's TEV/EBITDA and TEV/GAV values would decrease by $368 million and $182 million respectively.  June 24 Hr'g Tr. 98:22–24; 101:6–9.

The other point on which the experts diverged is the adjustment of the TEV/EBITDA multiples to account for the average fleet age. Blackstone expressed concern that EBITDA does not take adequate account of the different ages of each comparable company's fleet. Coleman Decl. ¶ 71. At trial, Mr. Coleman provided a common sense explanation of why this is so:

> We adjusted, in this case, the multiples, because it's a very specific kind of industry. These ships are around for about twenty-five years . . . [If] one company has one ship that's two years old, and one company has one ship that is twenty years old, and you were doing a comp analysis, you would have to adjust that analysis for the age. You know, if you buy a new car or if you have an old car, they have a different valuation, they have a different valuation methodology. So it is our view that that's the right thing to do, and that's what we did do.

June 23 Hr'g Tr. 145:8–22. The Equity Committee presented little evidence on this issue, instead arguing simply that such an adjustment was inappropriate in a comparable company analysis. June 24 Hr'g Tr. 171:22–172:19. The Court agrees with Blackstone that, as a matter of common sense, some adjustment for fleet age is appropriate given the nature of the dry bulk shipping industry.

For all these reasons, the Court accepts Blackstone's methodology for comparable companies overall, adjusting it only to exclude Jinhui from the comparable set.

### 3.    Precedent Transactions

Both Blackstone and Rothschild provided valuations using a precedent transactions analysis. Under this method, Blackstone values the Company at $1.297 billion to $1.404 billion, leaving the Debtors with nothing to pay equity. Coleman Decl. ¶ 28. Using the precedent transactions analysis, Rothschild values the Company at $1.54 billion to $1.62 billion, with a midpoint of $1.58 billion, leaving a value above claims of $97 million to $177 million, with a midpoint of $137 million. Augustine Decl. ¶ 67. Rothschild weighted the precedent transaction

26

analysis at 10% when compared to the other valuation methods it undertook.  June 23 Hr'g Tr. 328:11–17; Augustine Decl. ¶ 30.

Neither side disputes that there are few change-in-control transactions in the dry bulk shipping industry over the last few years.  Virtually all of the transactions in the industry have instead been in the form of vessel sales.  Specifically, Marsoft recorded at least 4,422 dry bulk vessel sales over the last ten years, whereas there have been only three public change-in-control transactions that the parties have been able to identify to the Court.  Coleman Decl. ¶ 34; June 23 Hr'g  Tr. 138:1–11.

Because of this, the Debtors approach their analysis by using what they refer to as six comparable "fleet sale" transactions that have taken place over the last five years.  Coleman Decl. ¶ 35.  But on cross-examination, Mr. Coleman conceded that five of these six transactions were fleet acquisitions and not change-in-control transactions.  June 23 Hr'g Tr. 96:25–99:9. Rothschild criticized this methodology because it believes that "[b]y definition, fleet value acquisitions tend to be at or around NAV because NAV is established by broker estimates of fleet value, which is driven by the last vessel sale."  Augustine Decl. ¶ 66.  Rothschild maintained that to properly assess the precedent transactions metrics for Genco, "it is essential to consider what buyers would pay for a full business, inclusive of an operating platform, management, and expected future cash flows, not simply the value of the assets."  *Id*.  Mr. Coleman himself conceded that precedent transactions typically involve a change-in-control. June 23 Hr'g Tr. 95:17–20.

For these reasons, the Court finds it more instructive to look at the actual change-in-control transactions that the parties have identified.  There are three.  They are the Excel Maritime Carriers Ltd. acquisition of Quintana Maritime Limited in January 2008, the DryShips

Inc. acquisition of OceanFreight Inc. in July 2011, and the Star Bulk Carriers Corp. acquisition

of Oceanbulk Shipping LLC and Oceanbulk Carriers LLC, which was announced in June 2014.

Tellingly, these three transactions took place at or extremely close to NAV.  Specifically, the

DryShips transaction took place at 0.94x NAV, the Star Bulk transaction took place at 1.0x NAV

and the Excel Maritime transaction took place at 1.04x NAV.  Coleman Decl. ¶ 34.  Rothschild

also analyzed only pure change-in-control transactions, though it relied solely on the transactions

from Excel Maritime and DryShips because they were the only dry bulk acquisitions publicly

available.  June 23 Hr'g Tr. 277:10–23.  But taking either grouping, the NAV for comparable

transactions confirms use of NAV as a reliable source of valuation.

     The Court also notes that the Excel Maritime transaction, which was the only transaction

completed above NAV, took place at the height of the dry bulk shipping rate boom January

2008, when dry bulk shipping rates were anomalously high and prior to the time of the financial

crisis.  June 23 Hr'g Tr. 279:6–21.  Blackstone expressed concern that Rothschild gave a weight

of 75% to the Excel Maritime transaction due to the absence of an NTM (or "next twelve

months") EBITDA multiple for DryShips.  Coleman Decl. ¶ 62; June 23 Hr'g Tr. 279:22–

282:20; Augustine Decl. ¶ 68; Rothschild Report at 45–46.  Mr. Augustine justified this by

stating that the information was not available at the time.  June 23 Hr'g Tr. 280:12-16.  But

regardless of the reason, this decision affords the Excel Maritime transaction significantly more

weight in the Equity Committee's valuation analysis despite taking place in anomalous market

conditions.  The Court is convinced that such a skewed weighting is inappropriate because it

distorts the results, particularly given the very small number of transactions involved.  Indeed, to

the extent that one transaction would be entitled to greater weight, the Court believes that the

Star Bulk transaction is the most relevant comparable transaction, as it is the most recent change-in-control transaction.

 With respect to Star Bulk, Rothschild pointed to a fairness opinion written by Evercore Group LLC as the financial advisor on behalf of Star Bulk in the transaction. In the fairness opinion, Evercore used standard methodologies in addition to an asset based valuation. ECX 217 at 110–111. The Court, however, credits the testimony of Mr. Coleman, who stated that fairness opinions are not meant to take the place of valuation and are generally not relied upon in the context of a valuation proceeding. June 23 Hr'g Tr. 143:3–16. Additionally, the Court is persuaded by the press release issued by Star Bulk on June 16, 2014, which stated unequivocally: "The Transaction Committee negotiated the Transaction value on a net asset value for net asset value basis using the average of three reputable appraisal providers." Coleman Decl. ¶ 34 n.22. In any case, the Star Bulk fairness opinion concluded that NAV was a fair price. June 23 Hr'g Tr. 143:17–23.

 Due to the lack of true change-in-control transactions that have taken place in the dry bulk shipping industry over the last ten years, the Court finds a precedent transaction analysis to be of limited utility in the valuation of the Debtors. But the few transactions that exist appear to confirm the NAV valuation advocated by the Debtors. Moreover, the limited number of precedent transactions confirms that valuation in the dry bulk shipping industry is vastly different from other industries. As noted by Mr. Coleman, there would be a far greater amount of transactions in other industries involving a change of control as compared to transactions involving the sale of hard assets. June 23 Hr'g Tr. 138:21–25. Mr. Coleman credibly testified that in dry bulk, however, when a party wishes to take control, it will simply take control of ships

because there is no added value in buying the stock.  June 23 Hr'g Tr. 138:21–25.  All of these

facts further confirm the validity of Blackstone's valuation conclusions.

### 4.    Discounted Cash Flow

The last of the valuation methodologies here is the DCF method, which takes the sum of

two future cash flow streams to determine the net present value of a company.  *Adelphia,* 2014

Bankr. LEXIS 2011, at *33.  The DCF method can be summed up as follows:

> A discounted cash flow analysis entails estimating the periodic
> cash flow that a company will generate over a discrete time period,
> determining the 'terminal value' of the company at the end of the
> period, and discounting each of the cash flows and terminal value
> to determine the total value as of the relevant date.

*Dietz v. Jacobs,* 2014 U.S. Dist. LEXIS 37144, at *35 (D. Minn., Mar. 21, 2014) (citing *Bank of*

*Am. v. 203 N. LaSalle St. Pshp.,* 195 B.R. 692, 696 (N.D. Ill., 1996); *Tronox Inc. v. Kerr McGee*

*Corp. (In re Tronox Inc.)*, 503 B.R. 239, 316–17 (Bankr. S.D.N.Y. 2013)).

In applying the DCF method, Rothschild relied on adjusted rate projections provided by

the Equity Committee's expert CMG to calculate Genco's terminal value using both the

EBITDA exit multiple approach and the perpetuity growth rate approach.[30]  The DCF results

generated by Rothschild's inputs are significantly higher than those from the other three

methodologies that Rothschild applied.  Augustine Decl. ¶ 32 (DCF analysis with low-high range

of $1.661 to $2.274 billion and midpoint of $1.967 billion); *see also* Augustine Report at 53.[31]

---

[30]    The cash flows were discounted applying a weighted average cost of capital ("WACC") range, which considers the cost of capital of the peer group in the comparable companies analysis and certain company specific factors.  Augustine Decl. ¶ 69.  The Court notes that at the trial, there was little discussion of the WACC ranges applied in both the Rothschild and Blackstone analyses, although it appears the respective WACC rates actually applied by both experts varied.  (Rothschild's WACC was 8.5% to 10.5%, while Blackstone used 10.1% "sensitized to 9.1% and 11.1%.").  *See* Augustine Decl. ¶ 71; Coleman Decl. ¶ 48.

[31]    There is a slight differences between the numbers reported in the Augustine Declaration and the Augustine Expert Report, but the Court assumes that variance is attributable merely to rounding and is, in turn, immaterial for the purposes of this discussion.

But the Court concludes that there are many good reasons that the DCF method should

not be applied here.  Although DCF is a traditional methodology used in valuation exercises,

courts have recognized its limitations, particularly when the assumptions are unreliable or

difficult to ascertain.  As Judge Gerber of this Court has observed, "DCF works best (and,

arguably, only) when a company has accurate projections of future cash flows . . . ." *Adelphia*,

2014 Bankr. LEXIS 2011, at *57.  When "the factual underpinnings of the DCF computation

become unreliable . . . the propriety of any use of DCF (and the weight DCF conclusions should

be given) becomes debatable at best." *Id.* at *57–58.  Other courts have reached similar

conclusions.  In *In re JCC Holding Co., Inc. Shareholders Litigation,* for example, the court

rejected the argument that a particular corporation was obliged to perform a DCF analysis in

determining the fairness of a proposed merger transaction to satisfy its requirement of "fair

disclosures." *In re JCC Holding Co., Inc. S'holders Litig.*, 843 A.2d 713, 721 (Del. Ch. 2003).

The court noted that there were no "reliable recent long-term projections from which [the

financial advisor] could perform a DCF valuation analysis." *Id.*

      In another case, the Delaware Chancery court noted:

> The utility of a DCF analysis, however, depends on the validity
> and reasonableness of the data relied upon . . . The problem in this
> case is that the most fundamental input used by the experts—the
> projections of future revenues, expenses, and cash flows—were not
> shown to be reasonably reliable.

*Doft & Co. v. Travelocity.com Inc.*, 2004 Del. Ch. LEXIS 75, at *20–21 (Del. Ch. May 21,

2004).  The court's primary reason for rejecting DCF was that there was an absence of

"reasonably reliable contemporaneous projections." *Id.* at *32.  More specifically, the court

explained that the "degree of speculation and uncertainty characterizing the future prospects of

[the company] and the industry in which it operates make a DCF analysis of marginal utility . . .

31

." *Id.* at *32. "[T]he industry was so new and volatile that reliable projections were impossible . . . it was difficult to forecast the next quarter, let alone five years out." *Id.* at *22–23 (quotations omitted).

No accurate projections exist in this case. Despite the numerous disputed issues at trial, all parties agree that dry bulk shipping rates are extremely volatile and difficult to predict. Rothschild conceded, for example, that "shipping rates are volatile and the industry can be characterized as cyclical . . . ." Augustine Decl. ¶ 70. The Equity Committee's shipping expert, Mr. Arntzen, similarly testified that "[i]t is difficult to accurately forecast freight rates in drybulk shipping . . . . [and that] the drybulk market is dynamic and volatile. . . ." Arntzen Decl. ¶¶ 23– 24; *see* June 23 Hr'g Tr. 185:10–11. Blackstone agreed, concluding that:

> In the global drybulk shipping industry, charter rates are inherently volatile and can change drastically on a daily basis. This makes charter rates difficult to predict and cash flow projections inherently unreliable. . . . As a result, DCF analyses are fundamentally unreliable for valuing companies in the drybulk shipping industry. . . .

Coleman Decl. ¶ 45.[32]

This unpredictability in rates is consistent with the credible evidence at trial that the dry bulk market is highly fragmented, with low barriers to entry, and affords market participants little, if any, opportunity to differentiate themselves. Coleman Decl. ¶¶ 16–17. Little if any of that evidence was disputed. Thus, the dry bulk shipping market parallels what classical economists would call "perfect competition," Coleman Decl. ¶ 21, where "rates are determined

---

[32]     Blackstone ran a DCF analysis to stress test its valuation conclusion, determining it to be between $1.106 billion and $1.335 billion. Coleman Decl. ¶ 28. But throughout the trial, Blackstone made abundantly clear its view that DCF is an unreliable and inappropriate basis to determine the value of Genco. *See* Coleman Decl. ¶ 45; Coleman Report at 20; June 23 Hr'g Tr.138:12–25.

on a daily basis by supply and demand in the market . . . [and] [c]onsequently, a company's

ability to predict long term revenues is severely constrained." *Id.* ¶ 17.[33]

      While the volatility of the industry is a sufficient basis by itself to reject a DCF analysis,

there are other problems with Rothschild's analysis.  Notably, Rothschild's heavy reliance on

DCF is inconsistent with other aspects of its own analysis.  For example, Rothschild relied on a

survey of thirteen equity analysts for its views of the future of the dry bulk shipping industry.

Augustine Report at 32.  But only five of these analysts rely on the DCF method in making their

assessments.  *Id*.  Indeed, Rothschild conceded that the DCF method is less frequently used in

the dry bulk shipping industry.  Augustine Decl. ¶ 52; Augustine Report at 32.  Rothschild did

not present any facts or analysis that credibly resolved these inconsistencies in its approach.

      Similarly, Rothschild's reliance on DCF is undercut by the views it expressed on Genco

prior to the bankruptcy filing.  In March 2014, Rothschild discussed Genco with equity holder

Och Ziff.  June 23 Hr'g Tr. 243:10–244:7.  As part of these discussions, Rothschild provided

written presentations to Och Ziff.  *See generally* DX 264; June 23 Hr'g Tr. 243:13–244:13.  In

comments on two recent shipping cases, Rothschild's written presentation to Och Ziff noted that

(1) "neither OSG nor General Maritime used traditional [valuation] methodologies;" (2) "more

emphasis was placed on fleet valuation and a market indication of value based on financing and

M&A transaction proposals from interested parties;" and (3) "some market commentators also

dismiss traditional valuation methodologies given the highly cyclical nature of the shipping

---

[33]     This is even more so in the case of Genco, a company that has no long-term charters to rely upon into the future.  Long term charters give a company a steady stream on income at predictable rates into the future.  But Genco is expected to have 100% exposure to spot (i.e. short term) rates later this year, as any current charters it has are set to expire by October 2014.  Coleman Decl. ¶ 37.

industry." DX 264 at 18.[34]  All of these comments are consistent with the position Debtors have

taken regarding valuation.[35]

In its efforts to persuade the Court that DCF should be used, the Equity Committee spent

considerable time on "fairness opinions"—in both its cross examination of Mr. Coleman, and its

re-direct examination of Mr. Augustine.  The Equity Committee introduced evidence from two

---

[34]     March 2014 was not the first time that Rothschild had examined Genco's situation.  In November of 2013, Rothschild had discussions about the possibility of serving as Debtors' financial advisor, a position ultimately filled by Blackstone.  Wobensmith Decl. ¶ 14; June 23 Hr'g Tr. 233:1–8; *see generally* DX 263 (Rothschild presentation to Genco dated November 25, 2013).  In its pitch materials at that time to Debtors, Rothschild went so far as to indicate that it estimated a shortfall in collateral value.  *Id.*at 17.  ("Based on preliminary analysis of the collateral values supporting each tranche of Genco's secured debt, the Term Loans appear to be well covered while there appears to be a $283.2 million (26.8%) collateral value shortfall based on direct collateral and a $138.5 million (13.1%) collateral value shortfall based on total collateral for the 2007 facility.").  At trial, Rothschild explained that it had not done any actual valuation of Debtors' assets until it was retained by the Equity Committee after the filing of the bankruptcy.  June 23 Hr'g Tr. 320:14–16.  While the Court has no reason to doubt this fact, the Court observes that Rothschild volunteered its earlier opinion on valuation to Genco management, despite being under no obligation to do so.  In any event, it is not necessary for the Court to rely on this fact in reaching its decision today.

[35]     Rothschild's overall position is undermined by other statements made prior to the filing of the bankruptcy.  Rothschild laid out a strategy for Och Ziff to pursue a valuation fight without contributing new money to the restructuring.  DX 264 at 36.  Rothschild noted that "Och Ziff can utilize an equity position in Genco's capital structure to gain leverage and take control of the restructuring process."  *Id.* at 35; *see also* June 23 Hr'g Tr. 244:21–24 (Och Ziff informing Rothschild that it held shares in Genco and was considering "making a play in the equity" with respect to the reorganization).  Rothschild recommended that "[e]quity holders can opt to organize and present valuation arguments to the court to ensure the plan or reorganization gives shareholders value recovery."  DX 264 at 36.  Rothschild believed that key drivers to successful implementation of this strategy included (1) "acquir[ing] a meaningful equity position and make compelling arguments to convince the judge to appoint an equity committee;" (2) "demonstrating equity value to the court, including by arguing for the use of forward multiples, highlighting the cyclical nature of the industry in recovery mode and pointing towards debt trading levels at or above par;" and (3)"arguing that the creditor plan is flawed and provides for greater than claim recoveries for the creditors."  *Id.*  The benefits of such a strategy included that there was "limited further downside beyond initial equity investment" and "costs may also be recoverable in the event that the appointment of an equity committee is approved . . . ."  *Id.*  Rothschild also touted its "extensive experience providing expert testimony with respect to valuation disputes."  *Id.* at 42.  It described itself as being "battle tested in all major courthouses" and believed that its "long history and experience will provide instant credibility to the process."  *Id.*  In April 2014, after the announcement of the RSA, Rothschild provided an additional presentation to Och Ziff and others that discussed this same strategy, though this presentation included a proposed engagement letter and the statement that Rothschild was "looking forward to working with K&E and delivering real value to the shareholders as compared to what's on the table from the Company.  DX 265 at OCH00002164; June 23 Hr'g Tr. 252:18–254:20.

In fact, the strategy laid out by Rothschild appears to have been adopted in this bankruptcy case.  The day after the Rothschild presentation, Och Ziff began buying up what amount to approximately 3.2 million shares in Genco stock and subsequently became a member of the Equity Committee.  June 23 Hr'g Tr. 250:15–251:18.  Thus, there is evidence suggesting that Rothschild essentially pitched and sold a strategy to Och Ziff and then presumably was retained by the equity holders on the basis of such strategy, despite not having yet conducted a full valuation analysis.  This creates a troubling impression that Rothschild might be wedded to such a strategy and corresponding valuation as a foregone conclusion.  But even without making any such finding, these statements prior to the bankruptcy undermine Rothschild's credibility on valuation.

34

transactions in the shipping industry, where documents filed with the SEC include a fairness

opinion.  In both of these referenced at trial, the Equity Committee suggested that DCF was

relied upon in determining the fairness of such transactions.  *See* June 23 Hr'g Tr. 109:14–

121:20.[36]

> Mr. Augustine similarly emphasized fairness opinions.

>> The standard for reputable valuations of public company
>> transactions, regardless of the industry involved, is the "fairness
>> opinion" . . . While Rothschild is providing a valuation of Genco
>> here in the context of a contested confirmation hearing, the
>> question at issue is the same addressed in a fairness opinion—is
>> the transaction fair to shareholders from a financial point of view.

Augustine Decl. ¶ 14.  But for each of the transactions where Equity Committee pointed to the

use of DCF in the fairness opinion, there is other evidence to suggest that those transactions

focused more on the NAV methodology for purposes of valuation.  For instance, in the Star Bulk

acquisition of Oceanbulk Shipping referenced earlier, the Equity Committee pointed to the

fairness opinion of Evercore Group as using standard methodologies in addition to asset based

valuation.  ECX 217 at 110–111.  But as Mr. Coleman explained, "[t]he Transaction Committee

[for that acquisition] negotiated the Transaction value on a net asset value for net asset value

basis using the average of three reputable appraisal providers."  Coleman Decl. ¶ 34 n.22.  The

Equity Committee also relies on the fairness opinion issued in the General Maritime Corporation

merger transaction with Arlington Tankers Ltd., in which UBS Securities, on behalf of General

Maritime, performed a selected public-company analysis and DCF analysis.  ECX 232 at 156 of

506, 159 of 506.  Yet in the same transaction, Jefferies & Company served as Arlington's

---

[36]    During cross examination, counsel for the Equity Committee referred to two transactions, and documents
publicly filed with the SEC for each that contained the fairness opinion reports of the financial advisors to the parties
in those transactions.  See June 23 Hr'g Tr. at 111:1–114:23 (discussing ECX 217, Form 6-K proxy statement for
Star Bulk transaction); June 23 Hr'g Tr. at 115:19–121:16 (discussing ECX 232, Form 14A for General Maritime
transaction).

financial advisor and stated in its opinion that it "considered a discounted cash flow analysis but determined that it was of limited benefit given the inherent difficulty of projecting spot and charter rates over the medium- to long-term."  ECX 232 at 186 of 506.

In fact, there are numerous references throughout that same proxy statement making clear that NAV was a key metric for assessing the transaction.  ECX 232 at 124–25 of 506 ("This proposal suggested a merger of Arlington and General Maritime with any exchange ratio based on the relative asset values of the two companies."); *id.* at 126 of 506 ("General Maritime proposed that an exchange ratio would be based on the relative net asset values of the two companies.  General Maritime also indicated that it would be prepared to consider alternative, tax-efficient transaction structures that could create value for the shareholders of both companies."); *id.* at 128 of 506 ("During this final phase, the parties would seek to reach an agreement in principle on valuation (based primarily on the respective fleet NAV) and other key deal terms so that a final party could be selected for negotiation of a definitive agreement."); *id.* at 142 of 506 (positive factors include "the fact that the exchange ratios in the proposed transaction were determined based on the respective net asset values of General Maritime and Arlington.").  Indeed, none of the fairness opinions referenced by the Equity Committee found that the use of NAV is unfair or inappropriate.

Additionally, there is conflicting testimony on the usefulness of fairness opinions in this context.  While the Equity Committee and Mr. Augustine emphasized the importance of fairness opinions, Mr. Coleman had an entirely different perspective.  Mr. Coleman testified that Blackstone had not relied on fairness opinions in its valuation analysis and that he had never seen them used in the context of a court hearing on valuation.  June 23 Hr'g Tr. 143:11–16. Moreover, Mr. Coleman noted that a fairness opinion will traditionally use all methodologies due

to the legal ramifications of such opinions and the desire to avoid liability, but they are not

valuations *per se*.  June 23 Hr'g Tr. 144:13–15.  The Court credits Mr. Coleman's testimony on

this issue.

Last but not least, the data used by Rothschild to compute DCF is flawed.  One key input

of cash flow projections in the dry bulk shipping industry are the relevant shipping rates.

Coleman Decl. ¶ 47 ("To apply DCF analysis here, cash flow projections were extracted from

the Debtors' business plan, which in part relied on the expert rate forecasts provided by

Marsoft.").  The parties used different experts to compute these rates and arrived at different

conclusions.  The Debtors employed Dr. Arlie Sterling of Marsoft, while the Equity Committee

hired Morten Arntzen, of CMG.  The Court finds Marsoft to be far more persuasive than CMG

for a variety of reasons.

Marsoft was founded almost 30 years ago and employs 25 individuals who service over

one hundred clients in the maritime industry, providing ongoing evaluation and forecasting of

market conditions including a quarterly report on the dry bulk market.  Sterling Decl. ¶¶ 4–6; *see*

*e.g.*, DX 234 (the January 2014 report prepared by Marsoft); DX 283 (April 2014 report).

Marsoft has developed "advanced modelling and . . . planning techniques for the shipping

markets—building its business on a foundation of timely, objective, and reliable market research

and forecasts."  Sterling Decl. ¶ 6.  Marsoft has staked its reputation—and the success of its

business—on providing objective, non-biased forecasting in the dry bulk industry.  June 23 Hr'g

Tr. 65:20–66:11.

On the other hand, CMG was formed just a few weeks prior to the hearing.  June 23 Hr'g

Tr. 173:25–174:1.  Mr. Arntzen has never previously been paid for his rate forecasts, and any

that he did perform were not subject to review by others (i.e.—analysts or other market

participants).  June 23 Hr'g Tr. 174:5–23.  It is not clear from Mr. Arntzen's testimony exactly

the nature of CMG's services.  Rather, the qualifications described in his declaration focus solely

on Mr. Arntzen's 35 years of experience in the shipping industry, which includes his tenure as

CEO of a shipping company and various positions held in maritime lending.  Arntzen Decl. ¶¶

4–7.  While Mr. Arntzen clearly has a wealth of experience in and knowledge of the shipping

industry (and managing shipping companies), his credentials and experience in the specific area

of forecasting rates were less impressive.

Turning to the substance of Mr. Arntzen's opinion, the Court is not convinced that his

conclusions are the result of applying rigorous scientific or other specialized methods.  To

forecast rates for the years 2014 to 2016, for example, Mr. Arntzen merely took an average of ten

shipping industry equity analysts plus the Marsoft projected rates.  Arntzen Decl. ¶ 47 (and

charts contained therein); s*ee also* June 23 Hr'g Tr. 176:22–177:11.  Mr. Arntzen's selection

criterion for such analysts was primarily anecdotal.  Arnzten Decl. ¶ 46 ("I know all the analysts

whose reports contribute to the consensus forecast and regard them as thoughtful industry

participants with deep knowledge of the shipping business"); *see also* June 23 Hr'g Tr. 178:12–

179:18.

Even more troubling, Mr. Arntzen merely took a straight average of those analyst reports

without providing any independent testing or adjustments to those results.  Arntzen Decl. ¶¶ 33–

36 (explaining how industry analysts and one bank examine the supply and demand market, and

then providing charts that essentially summarize the findings of those third parties).  He also did

not examine the underlying data used by the analysts to stress-test the results.  June 23 Hr'g Tr.

213:10–16.  Thus, Mr. Arntzen's actual analysis does not provide much more information than a

court could itself discern if provided with the projections from the analysts in question.  *See* Fed.

R. Evid. 702 (expert should provide scientific, technical, or other specialized knowledge to help

trier of fact understand the evidence or determine a fact at issue).  Moreover, Mr. Arntzen's

analysis does not address the concern about the bias of the industry analysts on whom he relied,

all of whom have an incentive to be unduly bullish because they are trying to sell securities in the

shipping industry.  *See* Sterling Decl. ¶ 60 (discussing inherent bias of equity analysts'

projections);[37] Coleman Decl. ¶¶ 64–65 ("CMG ignores the easily observed upward bias that is

prevalent in equity research.").

In contrast to the equity analysts, Marsoft has nothing to sell other than its accuracy.  It

has been forecasting shipping rates for many years, so long in fact that it has taken time to

analyze its accuracy when compared with these equity analysts and industry performance.  *See,*

*e.g.,* Sterling Decl. ¶¶ 46–54.  Marsoft helpfully provided a table demonstrating the historical

accuracy of its own projected rates, compared with the accuracy of the ten-year average rates.

*See* Sterling Decl. at 21, Fig. 7.[38]

In sum, while the Court admitted Mr. Arntzen's testimony, it nonetheless finds Mr.

Arntzen's methodology to be unpersuasive and less credible than that of Dr. Sterling of Marsoft.

June 23 Hr'g Tr. 189:9–21; 196:1–10; *see Tedone v. H.J. Heinz Co.,* 686 F. Supp. 2d 300, 310–

11 (S.D.N.Y. 2009) (court found that although the expert could not personally examine various

---

[37]     Dr. Sterling also referenced several academic sources on this issue.  Sterling Decl. ¶ 60 n.32.  Specifically, he referred to *Do Analysts Trade off Bias and Uncertainty/ Analyst Earnings Expectations at Different Forecast Horizons* by Marco Aiolfi (Platinum Grove Asset Management), Marius Rodriguez (Federal Reserve Board), and Allan Timmermann (UCSD); September 23, 2008, and *Conflict-of-Interest Reforms and Investment Bank Analysts' Research Biases*, by Yuyan Guan, Hai Lu, and M. H. Franco Wong, Journal of Accounting, Auditing & Finance 27(4) 443–470, July 2011), noting that financial analysts' earnings forecasts are upwards biased and that the bias increases the longer the forecast horizon.

[38]     The Court is also not persuaded by Mr. Arntzen's criticism of Marsoft's forecast.  He argues, for example, that Marsoft's assumptions about vessel orders are too high, citing a recent Clarksons report.  Arntzen Decl. ¶¶ 56–57; June 23 Hr'g Tr. 216:1-4.  But as Dr. Sterling explained, Clarksons' initial estimates about vessel orders are frequently revised and actual orders since the beginning of 2013 have been consistently and substantially higher than estimated.  Sterling Decl. ¶¶ 66–71.  Thus, Marsoft takes Clarksons' initial ordering estimates "with a grain of salt."  June 23 Hr'g Tr. 55:25-56:12.

pieces of evidence relating to the case, the expert's examination of photographs and other anecdotal evidence were enough to satisfy FRE 702, but nonetheless went to the weight of the evidence for the trier of fact to decide).

### 5.    Other Factors Relevant to Genco's Value

The Court finds it telling that no equity holder, including large hedge funds on the Equity Committee, has expressed any interest in investing its own money in a transaction involving the Debtors.  *See Chemtura*, 439 B.R. at 587 (noting that it was meaningful that no members of the Equity Committee were prepared to invest their own money into the Debtors at prices within the valuation range advanced); *see also Granite Broad.*, 369 B.R. at 140–41 ("[T]here is no question that in appropriate circumstances, 'People who must back their beliefs with their purses are more likely to assess the value of the [asset] accurately than are people who simply seek to make an argument.'") (quoting *In re Central Ice Cream Co.*, 836 F.2d 1068, 1072 n.3 (7th Cir. 1987)).  As Mr. Coleman noted, there has been no inquiry or expression of interest by any other party about buying Genco, including from any of the equity holders.  June 23 Hr'g Tr. 153:1–8.  He explained, "if you had a valuation such as Rothschild's that suggest almost a half billion dollars of potential difference[] [from] our valuation . . . I would think we would have a line out the door like a Starbucks where people would be clamoring to take advantage of this situation.  In particular, I would have thought Och-Ziff and Aurelius would be standing there with their checkbooks buying this company and we don't have that."  June 23 Hr'g Tr. 153:15–22.

Even Mr. Augustine seemed aware of this tension.  In its early conversations with Och Ziff, Rothschild recognized that it would be "difficult to establish credibility in [a] valuation fight if [the equity holders are] unwilling to 'buy into' [the] capital structure at a higher valuation post-emergence."  DX 264 at 36.  Thus, although equity holders are not required to put up any

money, the Debtors' views on value are supported by the lack of interest in the Debtors' assets by equity holders and the market.

Finally, the Equity Committee complains that the warrants they will receive under the Plan are inadequate. They seek anti-dilution protections to guard against future decreases in value of those warrants and a compensatory feature for "loss of time value" if a sale of the Reorganized Debtors occurs prior to the end of the seven-year tenor. Objection at 42–43. But the warrants offered under the Plan contain terms that are customary for public company warrants and there is evidence that the anti-dilution protections are indeed not appropriate for public companies. Reply ¶¶ 62–64; Wilmington Trust Reply ¶¶ 28–30 (ECF No. 275); *see also* June 12 Hr'g Tr. 169:17–22. In any event, the Equity Committee's argument fails given the Court's conclusion that Genco is insolvent and, therefore, the equity holders are not entitled to any recovery. *See Dish Network Corp. v. DBSD N. Am., Inc.* (*In re DBSD N. Am., Inc.*), 634 F.3d 79, 94 (2d Cir. 2011) (It is "well settled that stockholders are not entitled to any share of the capital stock nor to any dividend of the profits until all the debts of the corporation are paid.") (citations omitted); *see also In re Adelphia Commc'ns. Corp.*, 544 F.3d 420, 426 (2d Cir. 2008) ("In fact, because equity holders were entitled to nothing, the Plan—which gave interests in the litigation trust to equity holders—gave them *more* than their legal entitlement.") (citations omitted).

## C.    <u>Section 1129(a)(3) – Good Faith</u>

Section 1129(a)(3) requires that plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The "good faith" standard requires a showing that the plan "was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *Argo Fund Ltd. v. Bd. of Dirs. of Telecom Argentina, S.A. (In re*

*Bd. of Dirs. of Telecom Argentina, S.A.)*, 528 F.3d 162, 174 (2d Cir. 2008) (quoting *In re Koelbl*,

751 F.2d 137, 139 (2d Cir. 1984)).  It "must be viewed in light of the totality of the

circumstances surrounding the establishment of a chapter 11 plan . . . ."  *In re Leslie Fay Cos.

Inc.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) (citations omitted); *see also Johns-Manville*, 68

B.R. at 631.  Thus, "the requirement of Section 1129(a)(3) speaks more to the process of plan

development than the content of the plan."  *Chemtura*, 439 B.R. at 608 (citation omitted).

"Generally, a plan is proposed in good faith if there is a likelihood that the plan will

achieve a result consistent with the standards prescribed under the Code."  *Leslie Fay*, 207 B.R.

at 781 (citations omitted).  "The primary goal of chapter 11 is to promote the restructuring of the

debtor's obligations so as to preserve the business and avoid liquidation."  *Id.* (citations omitted).

Thus, good faith is shown when the plan has been proposed for the purpose of reorganizing the

debtor, preserving the value of the bankruptcy estate, and delivering that value to creditors.

Good faith has been found to be lacking if a plan is proposed with ulterior motives.

*Koelbl*, 751 F.2d at 139 (citing *Gonzalez Hernandez v. Borgos*, 343 F.2d 802, 805 (1st Cir. 1965)

("[A] Chapter XII proceeding may not be used as a vehicle to place a debtor's assets beyond the

reach of his dependent children."); *In re Weathersfield Farms, Inc.*, 14 B.R. 572, 574 (Bankr. D.

Vt. 1981) (bankruptcy cannot be used to thwart foreclosure); 5 Collier on Bankruptcy, ¶

1129.02)).

In arguing that the Debtors lack good faith, the Equity Committee argues that

management presented a business plan to the Genco board using different projections than those

used for the business plan presented to the supporting creditors and other lenders four days later.

The Equity Committee further argues that the Plan relies on projections and a valuation that have

42

purposely been manipulated.[39]  But the Court rejects these arguments as the credible evidence
establishes that the Plan was the result of a reasonable process and not the result of improper
manipulation or bad faith.

Turning first to the process, the Court finds that the Plan was proposed with honesty and
good intentions when viewed in light of the circumstances surrounding the plan development
process.  It was clearly meant to achieve a result consistent with Chapter 11, that is, to preserve
the business and avoid liquidation.  While the Equity Committee suggests that Genco and its
management deliberately acted at the expense and to the detriment of shareholders, the evidence
shows the opposite to be true.

The process of formulating the Plan was thorough, well-reasoned and conducted at arms-
length.  John Wobensmith, Genco's Chief Financial Officer, testified on the Company's pre-
petition process leading up to the Plan.  Mr. Wobensmith testified that during the years leading
up to Genco's bankruptcy filing, the Company took several approaches to dealing with its debt
and liquidity concerns.  These included the negotiation of amendments and waivers under the
Company's loan agreements, an unsuccessful capital raise, an attempt to refinance its existing
debt, and the consideration of a sale or merger transaction.  Wobensmith Decl. ¶¶ 9–12.  During
2013, turnover in the lender group for the 2007 Credit Facility led to participants that were more
receptive to restructuring discussions.  Wobensmith Decl. ¶ 13.  The Company, therefore,
determined to pursue a comprehensive and consensual restructuring and hired Blackstone to
work with its long-time counsel, Kramer Levin Naftalis & Frankel, as the Company's
restructuring advisors.  Wobensmith Decl. ¶ 14.

---

[39]        The Equity Committee also complains that the Plan provides creditors with distributions in excess of their
allowed claims at the expense of equity.  But given the Court's valuation analysis above, the Court rejects this
argument.

The restructuring negotiations between the Company and its creditors involved approximately thirty principals and advisors.  Wobensmith Decl. ¶ 26.  From January 1, 2014 through April 21, 2014, the Company, the Prepetition 2007 Credit Facility lenders and the Noteholders exchanged approximately fifteen restructuring proposals and business plans and held frequent meetings and calls to negotiate the terms of a consensual comprehensive restructuring.  Wobensmith Decl. ¶ 26.  The final agreed-upon terms of the restructuring are embodied in the RSA and the Plan.  Wobensmith Decl. ¶ 27.

Harry A. Perrin, an independent member of Genco's Board of Directors (the "Board") since 2005, testified as to his experience and knowledge regarding the Debtors' restructuring process.  Due to his prior experience as a restructuring and reorganization attorney, Mr. Perrin was chosen to lead the restructuring effort on behalf of the directors.  Perrin Decl. ¶ 8.  Mr. Perrin testified that the Board was discussing the Company's liquidity issues as early as February 2013.  Perrin Decl. ¶ 5.  The Board recognized that it needed a financial advisor.  Perrin Decl. ¶ 7.  After interviewing five candidates, the Board settled on Blackstone due in part to its extensive experience and knowledge in the shipping industry.  Perrin Decl. ¶ 7.  The Board was active in the restructuring process, meeting at least twelve times just between January and April 2014 alone.  Perrin Decl. ¶ 9.  Because it was impossible for the Company to sustain its debt service burden, the Board focused on a consensual restructuring and understood that the principal purpose of restructuring would be to deleverage the balance sheet and improve liquidity through a conversion of debt to equity.  Perrin Decl. ¶ 10.

Additionally, management and the Board actively advocated on the part of shareholders during the negotiation process.  Mr. Wobensmith testified that the Company and Blackstone worked together to develop a framework for restructuring negotiations with the secured lenders.

44

Wobensmith Decl. ¶ 15.  The framework was based upon a valuation founded upon the Debtors'

NAV, principally the value of their fleet.  Wobensmith Decl. ¶ 16.  Mr. Wobensmith testified

that during his nine years at Genco, he analyzed and closed many potential and actual shipping

transactions and that in each of these situations they based their purchase on the NAV of the

entities or assets involved.  Wobensmith Decl. ¶ 16.  Blackstone advised Mr. Wobensmith that

its experience with dry bulk shipping transactions was similar.  Wobensmith Decl. ¶ 16.

In January 2014, Genco obtained two valuations of its fleet from separate ship brokers.

Based upon these valuations, the Debtors determined that the $100 Million and $253 Million

Credit Facilities were oversecured but the Prepetition 2007 Credit Facility lenders were

undersecured and would not recover in full.  Wobensmith Decl. ¶ 18.  Under these valuations,

unsecured creditors such as the Noteholders would only receive a partial recovery and no value

would be left for equity.  *Id*.  A restructuring framework based on NAV was used throughout

negotiations with the Company's secured lenders and the Noteholders.  Wobensmith Decl. ¶¶

18–25.  The Debtors repeatedly advocated for a recovery for equity in the form of a "gift" from

senior creditors.  Wobensmith Decl. ¶¶ 21–23, 25–26.  The concept was initially rejected

outright by the Prepetition 2007 Credit Facility lenders but, at the insistence of the Company, the

parties deferred the issue for future discussions.  Wobensmith Decl. ¶ 21.  Throughout the

following months, the Company's position did not change with respect to equity but, because of

resistance from the lenders, the issue was repeatedly left as "to be determined."  Wobensmith

Decl. ¶¶ 22–23.

In the beginning of March 2014, Mr. Wobensmith noted that vessel market values were

increasing.  Wobensmith Decl. ¶ 24.  He independently obtained updated appraisals on or about

March 13, 2014, which reflected an increase from the valuations obtained in January and implied

an 11% increase in the projected post-reorganization equity value of the Company. Wobensmith
Decl. ¶ 24. While equity was still out of the money, the increased recoveries available to the
Prepetition 2007 Credit Facility lenders and Noteholders facilitated an agreement and allowed
for more meaningful negotiations with the Company's lenders regarding an equity recovery.[40]
Wobensmith Decl. ¶¶ 24–25.

The information the Board was provided by management and the Company's advisors
indicated that the Company's secured and unsecured debt exceeded the value of its assets. Perrin
Decl. ¶ 10. Despite recognizing that creditors would not be paid in full on their claims, the
Board was insistent that a consensual restructuring involve a recovery for equity holders. Perrin
Decl. ¶ 10. The Board pursued this goal on several occasions, despite pushback from secured
lenders and warnings from advisors regarding the difficulty of this objective in a situation where
creditors were not being paid in full. Perrin Decl. ¶¶ 10–12, 13, 15–19. Indeed, the Board voted
to trade the right to conduct a formal marketing process in exchange for a warrant package for
equity holders. Perrin Decl. ¶¶ 15–16. The Board, however, insisted on a broad fiduciary out,
which included the right to perform diligence and evaluate unsolicited alternatives. Perrin Decl.
¶ 17.

The Company initially requested a warrant package for equity in the amount of 15% of
the new Genco common stock. Perrin Decl. ¶ 17. The 2007 Credit Facility lenders countered
with 1.5%. *Id.* When the full Board ultimately voted at the March 30, 2014 meeting on the
RSA, which provided for the 6% warrant package for equity, every Board member voted in favor
of the plan, save Mr. Perrin, who abstained. Perrin Decl. ¶ 18. Mr. Perrin testified, however,
that his abstention was based on a "gut" feeling that there was more room to negotiate, but he

---

[40]    It is Mr. Wobensmith's understanding that vessel valuations have decreased since March, but despite this,
the Debtors continue to support the Plan. Wobensmith Decl. ¶ 42.

fully recognized that equity was out of the money according to all information that the Board

was provided. June 12 Hr'g Tr. 53:19–54:15. The Court found Mr. Perrin's testimony to be

particularly credible given that he is an equity holder himself and thus was unhappy about equity

being out of the money. June 12 Hr'g Tr. 53:23–25. Mr. Perrin ultimately voted in favor of

authorizing the bankruptcy and the filing of the Plan, realizing that it was unlikely that any other

transaction would provide a greater recovery to all stakeholders and that without a consensual

process, equity would probably receive nothing. Perrin Decl. ¶ 20. Thus, it is clear from Mr.

Perrin and Mr. Wobensmith's testimony that both management and the Board actively advocated

for an increased recovery for equity holders. Without this assistance, it is possible that equity

would be receiving no recovery at all.

  The Court reaches the same conclusion when it comes to the good faith of the business

plan. The Equity Committee notes that Genco's management presented a version of their

business plan to the Board on January 6, 2014, using both a "base case" that was based on the

Company's historical process and a "low case" that was based on calculations from Marsoft.

The Company then presented a new version of the business plan to certain of its secured

creditors and other lenders on January 10, 2014, using solely the Marsoft "low case." The

Equity Committee also complains that the updated business plan purposely relied on the

projections of Marsoft, which the Committee characterizes as ultra-conservative and

manipulated, as opposed to following the Debtors' prior practice of relying on historical

averages. The Equity Committee points to all of this as evidence that the Debtors purposely

engineered what the Committee believes to be an unreasonably low valuation. The Court,

however, finds the explanation provided by Blackstone and the Debtors with respect to the

business plan and the choice of Marsoft to be very credible.

John James O'Connell, a Senior Managing Director in the Restructuring &
Reorganization Group of Blackstone, testified on his advice to the Company concerning the
restructuring process. Upon Blackstone's retention in December 2013, it informed the Company
that Genco would need to formulate a long-term business plan that included a multi-year
financial forecast supported by detailed operating assumptions, noting that creditors and their
advisors typically expected such a plan as part of the restructuring negotiation process.
O'Connell Decl. ¶ 11; Wobensmith Decl. ¶ 35. Blackstone stated that this was important
because stakeholders needed to assess both the liquidity of the Company and the amount of
leverage that the Company should consider retaining post-restructuring, and that the Company
would need the creditors' consensus to voluntarily impair their claims. Wobensmith Decl. ¶ 35;
June 13 Hr'g Tr. 39:21–40:2 (ECF No. 304).

Prior to this point, the Company had not regularly prepared long-term business plans or
financial forecasts, but rather compiled financial projections of varying durations for particular
purposes or to respond to specific requests. O'Connell Decl. ¶ 12; June 13 Hr'g Tr. 37:25–
38:13. Mr. Wobensmith testified that the Company had never used rate projections to value the
Company, but rather to look at the feasibility of projecting cash flows, assess its ability to meet
debt service, amortization and other future expenses, as well as to assess future liquidity,
leverage capacity and covenant compliance under the Company's financing agreements.
Wobensmith Decl. ¶¶ 30–31; June 13 Hr'g Tr. 37:14–20. Mr. Wobensmith stated that he has
consistently valued dry bulk shipping assets through an analysis of NAV. Wobensmith Decl. ¶
30; June 13 Hr'g Tr. 63:20–64:1. Mr. Wobensmith testified that no one at the Company was an
expert in forecasting dry bulk charter rates and, therefore, in preparing projections, the Company
would use objective third party sources. Wobensmith Decl. ¶ 32. For short-term forecasts, the

48

Company used measures such as the FFA Curve, which is a publicly available index of freight future contract rates. For medium-term forecasts of one to two years, the Company looked to equity research analysts covering the dry bulk shipping market. Wobensmith Decl. ¶ 32. The Company used the bottom half of the equity market analysts' rates for rate projections because Mr. Wobensmith believed that the rate forecasts were inherently biased. Wobensmith Decl. ¶ 33. Mr. Wobensmith believed that doing so would be a reasonable method to eliminate potential "sell-side" upward bias in the analysts' projections that could cause their forecasts to exceed realized rates. *Id.* For longer-term projections, the Company used the assumption that rates would return to the average of dry bulk shipping rates over the last ten years (excluding the outliers of 2007 and 2008) as a "simplistic plug." Wobensmith Decl. ¶ 34. Mr. Wobensmith stated that this was an assumption without basis, lacking any specific analytical foundation or detailed appraisal of future conditions of supply and demand. Wobensmith Decl. ¶ 34. Because the preparation of longer-term forecasts was not routine, the Company did not consider it necessary to base such projections upon more analytical data points. Wobensmith Decl. ¶ 34. So, while the Company had never before used the services of a rate forecaster such as Marsoft, this was because it never felt that it had a need for one.

In response to Blackstone's advice, the Company prepared a draft financial forecast covering 2014 through 2017. O'Connell Decl. ¶ 13. Management used its own estimates for the operating expenses, general and administrative expenses, and the dry dock costs included in the forecast. O'Connell Decl. ¶ 13. Management calculated projected revenues by using the average of the bottom half of equity research analyst rate estimates for 2014 and 2015. O'Connell Decl. ¶ 13; Wobensmith Decl. ¶ 36. Because only one of six analysts had published rate estimates beyond 2015, management made an assumption for the years of 2016 and 2017

that rates would return to the average of the preceding ten years (excluding abnormal movements in 2007 and 2008). O'Connell Decl. ¶¶ 13, 15; Wobensmith Decl. ¶ 36. As work on the forecast continued, Blackstone advised that the assumption of a return to historical average rates for 2016 and 2017 lacked a sufficient analytical foundation and that a third party rate expert could provide more credible projections of future rates based on supply and demand. O'Connell Decl. ¶ 15; Wobensmith Decl. ¶ 36. Mr. Wobensmith agreed that a third party firm would provide objective rigor to rate forecasts for the longer-term projections. Wobensmith Decl. ¶ 37. Mr. Perrin also concluded that this was a reasonable approach. June 12 Hr'g Tr. 52:15–53:7. Blackstone recommended Marsoft and MSI, based on their reputation for shipping market knowledge and analytical strength and Mr. O'Connell's experience on prior transactions. O'Connell Decl. ¶¶ 16, 17; Wobensmith Decl. ¶ 37; June 12 Hr'g Tr. 82:2–22, 87:23–88:10. Mr. Wobensmith also knew both firms, and he understood them to be well-known and highly reputable with their clients in the dry bulk shipping industry. Wobensmith Decl. ¶ 37; June 13 Hr'g Tr. 49:4–10.

Ultimately, both Marsoft and MSI provided multi-year projections of charter rates in the dry bulk market. O'Connell Decl. ¶ 18. Both sets of projections were not far apart, with the projected charter rates of Marsoft being slightly higher than those of MSI over most classes of benchmark vessels and years. O'Connell Decl. ¶ 18; Wobensmith Decl. ¶ 38. The Equity Committee argues that the Debtors and Blackstone specifically used Marsoft's rates to drive down value. But in reality, the Debtors chose to retain Marsoft as opposed to MSI in January 2014, based in part on the higher rates that Marsoft had provided. O'Connell Decl. ¶ 18; Wobensmith Decl. ¶ 38.

On January 4, 2014, Genco's management presented the Board with an initial draft of the business plan, for its consideration at the Board's January 6, 2014 meeting. O'Connell Decl. ¶

19; Wobensmith Decl. ¶ 39; Perrin Decl. ¶ 10.  It was a working draft and was meant to be

preliminary.  Wobensmith Decl. ¶ 39.  At the same time, the Board was presented with a draft of

the restructuring framework that outlined the terms of the overall restructuring the Company

proposed to accomplish.  Wobensmith Decl. ¶ 39; Perrin Decl. ¶ 10.  The business plan

discussed the Company, its businesses/operations, debt structure and a supporting "feasibility"

analysis.  Wobensmith Decl. ¶ 35 n.14.  The restructuring framework focused on NAV to

support a restructuring on a consensual basis.  Wobensmith Decl. ¶¶ 35 n.14, 39.  Based upon his

discussions with the Company's advisors, Mr. Wobensmith understood that the key discussion

with the Board during the January 6th meeting involved review and approval of the restructuring

framework and the proposal for the lenders to convert secured debt to equity.  Wobensmith Decl.

¶ 39; Perrin Decl. ¶ 10; June 13 Hr'g Tr. 42:4–23.  Mr. Wobensmith also understood that the

final (as opposed to the preliminary) versions of these presentations would ultimately be

discussed with the legal and financial advisors for the creditors.  Wobensmith Decl. ¶ 39.

     The draft of the business plan included a "base case" and a "low case."  The base case

consisted of (i) an average of the lower half of the equity analysts' projected rates for 2014–2015

and (ii) for 2017, the ten-year historical average of charter rates, with 2016 forecast at the

midpoint between 2015 and 2017.  O'Connell Decl. ¶ 19; Wobensmith Decl. ¶ 39.  The low case

was based exclusively on Marsoft's projections and was lower than the base case projections for

each year.  O'Connell Decl. ¶ 19; Wobensmith Decl. ¶ 39.  Mr. Wobensmith testified that he had

specifically asked for the low case because, at the time, the Company was contemplating taking

on $600 million of debt and it was important for him to understand that the Company could

sustain the debt structure in a lower rate environment.  June 13 Hr'g Tr. 43:11–18.

After preparation of the draft, management concluded upon the advice of Blackstone that the unsupported historical assumptions included in the base case lacked sufficient analytical foundation and could be seen by stakeholders as lacking credibility.  O'Connell Decl. ¶ 20; Wobensmith Decl. ¶ 40; June 13 Hr'g Tr. 44:2–15.  As Marsoft was only retained by the Company in January 2014, Mr. Wobensmith hadn't had the opportunity prior to January 4th to consider in detail Marsoft's projections and methodology, and knew that the working draft was subject to further changes before it would be presented to the creditors.  Wobensmith Decl. ¶¶ 38, 40.  Blackstone and management for the Company discussed the issue between January 6, 2014, and January 9, 2014, and ultimately revised the business plan to focus on a single base case that combined (i) the average of the lower half of analyst rate estimates for 2014 and 2015 and (ii) Marsoft's forecasted rates for 2016 and 2017.  O'Connell Decl. ¶ 20; Wobensmith Decl. ¶ 40.  On January 9, 2014, the revised version of the business plan was provided by Blackstone to the financial advisors for the 2007 Facility and was presented to the 2007 Facility Lenders themselves in a proposal on January 10, 2014.  O'Connell Decl. ¶ 21; Wobensmith Decl. ¶ 40. In January 2014, Blackstone also provided the revised business plan to the financial advisor for the Convertible Notes.  O'Connell Decl. ¶ 21.  Mr. Wobensmith testified that the Board was provided updates on both the business plans and the restructuring framework proposals as negotiations progressed.  Wobensmith Decl. ¶ 43.

In February 2014, when Marsoft updated its quarterly rate forecast, Blackstone updated the business plan to incorporate Marsoft's first quarter 2014 rates.  O'Connell Decl. ¶ 22; Wobensmith Decl. ¶ 43.  These were used in the financial projections in the Disclosure Statement, which was sent to creditors on April 16, 2014.  O'Connell Decl. ¶ 22; Wobensmith Decl. ¶ 43.  Marsoft next updated its quarterly projections in mid-May 2014.  O'Connell Decl. ¶

22; Wobensmith Decl. ¶ 43.  The Equity Committee implies that the Debtors purposely chose not

to use the May projections.  But by the time that Marsoft issued the updated report, the Debtors

had already included the prior version of the business plan in the Disclosure Statement and

solicited acceptances on the Plan from its creditors.  O'Connell Decl. ¶ 22; Wobensmith Decl. ¶

43.

      In conclusion, the Court finds that the Equity Committee has failed to provide any

evidence of bad faith on the part of the Debtors in formulating the Plan.  The process of

formulating the Plan was thorough, well-reasoned and conducted at arms-length.  Furthermore,

the Court finds that the Debtors' change in approach to valuation and reliance on Marsoft is not

indicative of bad faith.  Rather, the Debtors simply chose to change their forecasting method

based on the advice of its financial advisor.  The Equity Committee intimated at closing that this

change was the result of a litigation strategy on the part of the Debtors and their advisors.  But in

reality, the change took place in January in preparation for negotiations with the secured lenders

during which the Company and the Board actively advocated on behalf of a recovery for equity.

As to the valuations themselves, while individuals can hold legitimately different opinions on the

value of a company and the process by which such value was measured, this in and of itself is

not evidence of bad faith.  For the foregoing reasons, therefore, the Court finds that the Debtors

have met the requirements of Section 1129(a)(3) and that the Plan was "proposed in good faith

and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).

**D.**    **<u>Releases</u>**

      The Debtors have sought a variety of standard releases and exculpations in the Plan,

including releases being granted by the Debtors, exculpation for released parties and an

injunction provision to implement the releases, exculpations and discharge provided under the

Plan. These are all uncontested. Two objections have been lodged, however, against the

releases being given by non-debtor third parties (the "Third Party Releases").[41]

---

[41]     The Third Party Releases under the Plan are as follows:

> On the Effective Date, and notwithstanding any other provisions of the Plan, (i)
> each Releasing Party will be deemed to have forever released and covenanted
> with the Released Parties not to sue or otherwise seek recovery from any
> Released Party on account of any Claim, including any Claim or Cause of
> Action based upon tort, breach of contract, violations of federal or state
> securities laws or otherwise, based upon any act, occurrence, or failure to act
> from the beginning of time through the Effective Date in any way related to the
> Debtors or their businesses and affairs and (ii) each Releasing Party will be
> deemed to have forever released and covenanted with the Released Parties not to
> assert against any Released Party any Claim, obligation, right, Cause of Action
> or liability that any holder of a Claim may be entitled to assert, whether known
> or unknown, foreseen or unforeseen, existing or hereafter arising, based in
> whole or in part on any act or omission, transaction, or occurrence from the
> beginning of time through the Effective Date in any way relating to the Debtors,
> the purchase, sale, or rescission of the purchase or sale of any security of the
> Debtors or the Reorganized Debtors, the subject matter of, or the transactions or
> events giving rise to, any Claim or Equity Interest that is treated under the Plan,
> the Chapter 11 Cases, the documents included in the Plan Supplement, the
> Rights Offering, the Equity Commitment Agreement, the Restructuring Support
> Agreement, the Plan, or the Disclosure Statement or related agreements,
> instruments or other documents, provided, however, the foregoing release will
> not (i) apply to obligations arising under the Plan, (ii) apply to obligations
> arising under the Amended and Restated Term Loan Facilities or the New Exit
> Financing Facility, as applicable, (iii) be construed to prohibit a party in interest
> from seeking to enforce the terms of the Plan, and (iv) apply to any act or
> omission that constitutes gross negligence or willful misconduct as determined
> by a Final Order. The foregoing releases apply to the Released Parties solely in
> their respective capacities described herein. For the avoidance of doubt, nothing
> in this Article VI.K.2 will be deemed to release any Claim that is unrelated to (a)
> the Debtors, (b) the purchase, sale, or rescission of the purchase or sale of any
> security of the Debtors or the Reorganized Debtors, (c) the subject matter of, or
> the transactions or events giving rise to, any Claim or Equity Interest that is
> treated under the Plan, (d) the Chapter 11 Cases, (e) the documents included in
> the Plan Supplement, (f) the Rights Offering, (g) the Equity Commitment
> Agreement, (h) the Restructuring Support Agreement, (i) the Plan, or (j) the
> Disclosure Statement or related agreements, instruments or other documents.

Plan § VI.K.2.

    The Plan defines the relevant parties as follows:

> Released Parties: the Debtors and reorganized debtors, the 2007 Facility
> Lenders, Supporting $253 Million Facility Lenders, Supporting $100 Million
> Facility Lenders, the Backstop Parties, Supporting Noteholders, Convertible
> Notes Indenture Trustee, Prepetition Agents; AND with respect to each of those
> parties, their predecessors, successors, assigns, subsidiaries, funds, portfolio
> companies, former and current officers and directors, employees, managers,
> attorneys, financial advisors, accountants, investment bankers, consultants,

Non-debtor releases and exculpations "are permissible under some circumstances, but not as a routine matter." *DBSD*, 419 B.R. at 217–18 (citing *In re Adelphia Commc'ns. Corp.*, 368 B.R. 140, 267 (Bankr. S.D.N.Y. 2007)).  Indeed, the Second Circuit has instructed that such releases are "proper only in rare cases." *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141 (2d Cir. 2005) (citations omitted). They are permissible when the provisions are important to a debtor's plan; where the claims are "channeled" to a settlement fund, rather than extinguished; where the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution; where the released party provides substantial consideration; where the plan otherwise provides for the full payment of the enjoined claims; or where the creditors consent. *See Chemtura*, 439 B.R. at 611; *Adelphia,* 368 B.R. at 268; *In re St. Vincent's Catholic Med. Ctrs.,* 417 B.R. 688, 696–97 (Bankr. S.D.N.Y. 2009); *Metromedia*, 416 F.3d at 142.  The Second Circuit in *Metromedia* counseled that analyzing non-debtor releases is not "a matter of factors and prongs," but rather requires a finding of unique circumstances. *Adelphia,* 368 B.R. at 362 (citing *Metromedia*, 416 F.3d at

---

management companies, "or other professionals or representatives, in each case in their capacity as such."

Plan § I.A.131.

> Releasing parties: (a) the Prepetition Agents and the Convertible Notes Indenture Trustee, (b) the holders of Impaired Claims other than those who voted to reject the Plan and have also checked the box on the applicable Ballot indicating that they opt not to grant the releases provided in the Plan, (c) the Supporting Creditors, (d) the Backstop Parties (e) to the fullest extent permissible under applicable law (i) holders of Unimpaired Claims, and (ii) holders of Equity Interests, and (f) with respect to the foregoing entities in clauses (a) through (e), such entity's current subsidiaries, officers, directors, principals, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, equity holders, partners, and other professionals, in each case solely in their capacity as such.

Plan § I.A.132.

142).  Applying these legal principles to the facts here, the Court will approve some, but not all, of the Third Party Releases.

The United States Trustee (the "UST") objects to the Third Party Releases "to the extent that holders of claims do not affirmatively consent to these provisions."  UST Objection at 9–10 (ECF 264).  The UST focuses specifically on the unimpaired creditors and equity holders, who "are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote."  Plan, Art. III(d); Discl. Statement, Art. I(B), (C).  The UST argues that a release granted based solely upon a party's status as unimpaired under the Plan would violate Section 1124 of the Bankruptcy Code because "the Plan divests unimpaired creditors of certain important legal rights without giving those creditors either the right to vote on the Plan, or specifically exercise an option to opt out of the releases and exculpation."  UST Objection at 10 (citing 11 U.S.C. § 1124(1)).[42]  At the hearing, the UST confirmed that there is no case law addressing this issue.  *See* June 12 Hr'g Tr. 159:16–160:6.[43]

---

[42]       Section 1124(1) of the Code provides, in relevant part

> [A] class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan —
>
> (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124(1).

[43]       The UST noted at the hearing:

> Indeed, the issue we brought to the attention of the Court is indeed novel . . . [w]e don't have any published case law on our side on this issue.  The debtors haven't propounded any either. . . . it stems from the notion . . . that creditors . . . which are deemed by the debtors to be unimpaired aren't unimpaired after all if they're relinquishing a series of legal rights. . . . we simply believe that the deemed consent provisions of this particular plan . . . don't run deep enough. That is to say, by virtue of not receiving an express hard paper copy ballot on which they could opt out, those releases by those classes should not be granted.

June 12 Hr'g Tr. 159:16–160:6.

The Debtors highlight the overwhelming creditor support for the Plan and that "no Unimpaired Creditor has stepped forward to object to the releases, despite ample notice," supporting the notion that "no such claims exist."  Reply ¶ 56.  The Debtors also suggest that binding unimpaired creditors to the releases, despite their inability to vote is "an unremarkable feature of any non-consensual third party release."  Reply ¶ 59 (citing to *In re Residential Capital, LLC*, No. 12-12020 (MG), Disclosure Statement for the Joint Chapter 11 Plan, Docket No. 4819-1, 9-14 (Bankr. S.D.N.Y. Aug. 8, 2013) (identifying classes of unimpaired creditors and impaired equity holders that were deemed to consent and dissent, respectively, but were nevertheless bound by third party release); *In re Ion Media Networks, Inc.*, No. 09-13125 (JMP), Disclosure Statement for The Debtors' First Modified Joint Plan of Reorganization, Docket No. 289, 3, 5 (Bankr. S.D.N.Y. Sept. 30, 2009) (same); *In re Charter Commc'ns, Inc.*, No. 09-11435 (JMP), Disclosure Statement, Docket No. 319, 4–8 (Bankr. S.D.N.Y. May 7, 2009) (same)). Lastly, the Debtors point out that the Third Party Releases are qualified by the phrase "to the extent permissible under applicable law," and thus overcomes any problem regarding over-breadth.  Reply ¶ 57 (citing *Adelphia*, 368 B.R. at 266) ("Since the third-party releases and exculpation in Sections 16(a) and 16(d) apply only 'to the extent permitted by applicable law,' the Plan is confirmable without change, and without resolicitation of votes.  But I think I need to say now what I regard as permitted, and not permitted, 'under applicable law.'").

The Court agrees that simply classifying a party as unimpaired does not mean that they should be somehow automatically deemed to grant a release where the requirements of *Metromedia* have not been met.  Indeed, the Debtors point to no case law for the proposition that a party's unimpaired status, in and of itself, somehow replaces the *Metromedia* standard regarding the permissibility of releases.  Therefore, the Court returns to the *Metromedia* test to

see whether "the provisions are important to a debtor's plan; the claims are 'channeled' to a settlement fund rather than extinguished; the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution; the released party provides substantial contribution; and where the plan otherwise provides for full payment of the enjoined claims." *DBSD*, 419 B.R. at 217 (citing *Metromedia*, 416 F.3d at 142; *Adelphia*, 368 B.R. at 266–67).

The Equity Committee argues that because equity holders were not given the opportunity to vote, the releases are non-consensual and otherwise fail to satisfy the requirements under Second Circuit law to permit approval of the releases. *See* Objection at 40–41.[44]  The Court agrees with the Equity Committee that the Released Parties, as currently defined, are too broad. But the Court will approve the Third Party Releases where they comport with the Second Circuit's guidance in *Metromedia*.  These instances can be roughly divided into three groups in this case.

First, the Court will permit releases with respect to any affected party that consented to grant the releases or may be deemed to have done so through its ability to "check the box" on the Plan ballots.  *DBSD*, 419 B.R. at 218 (citing *Adelphia*, 368 B.R. at 267; *In re Specialty Equip. Cos., Inc.*, 3 F.3d 1043, 1047 (7th Cir. 1993)).  That includes those parties who voted in favor of

---

[44]     The Equity Committee explained in its objection:

> [T]he Debtors did not establish any other mechanism by which holders of Equity Interests could exercise a right to opt-out of the third party releases . . . there are no unique circumstances . . . and the Debtors have not articulated any such basis under which the Court may approve the releases . . . an agreement by a released party to support a plan of reorganization is not a legitimate basis for approving a non-consensual third-party release . . . there has been no representation that any of the third-party releases form an important component of the Plan.

Objection at 40–41.

the Plan and those who voted to reject the Plan but failed to opt out from granting the release

provisions.  *See, e.g.,Adelphia*, 368 B.R. at 268.

Second, the Court will permit Third Party Releases for claims that would trigger

indemnification or contribution claims against the Debtors and thus impact the Debtors'

reorganization.  As Judge Gerber of this Court has cogently explained,

> Some people and entities (e.g., by employment contracts, corporate
> bylaws, or retention or loan agreements) must be indemnified by
> the estate with respect to their services.  To the extent that the third
> party releases are congruent with the indemnification obligations,
> and the Debtors would be liable for any liability imposed on such
> persons, third-party releases are acceptable.  That is so even if they
> involve professionals for, or lenders to, the estate.

*Adelphia*, 368 B.R. at 268.  Thus, the Court will approve third party releases to align with

indemnification obligations of the Debtors that existed before the filing of these bankruptcy

cases by virtue of employment agreements, bylaws, retentions, or other loan agreements.  *See*

*Adelphia*, 368 B.R. at 268; *DBSD*, 419 B.R. at 217.  Indeed, the Debtors represented that certain

pre-petition credit agreements as well as bylaws covering the directors and officer, which, if

respected, would eradicate many of the benefits of the Plan.  As counsel for the Debtors stated at

the hearing:

> This is a case where we have a credit agreement with 1.1 billion
> dollars of pre-petition debt, where in the credit agreement there is
> an indemnity—contractual indemnity claim against the debtor that
> is fully enforceable and where the debtor was paying its claims in
> full.  That indemnity claim is going to have to be respected, and
> frankly, would have to be respected before equity would get a
> recovery.  And so I frankly think that the way to facilitate the
> distribution to equity is to eliminate that indemnity claim. . . .
> bylaws are in place as well which contain indemnities for officers
> and directors.

June 12 Hr'g Tr. 162:16–24; 166:9–11.  But the Court does not extend this ruling to

indemnification obligations that arose out of the RSA or Plan negotiations.  The Debtors and the

Released Parties should not be able to create indemnification obligations simply to gain the protection of a third party release. *See, e.g., Adelphia*, 368 B.R. at 269 ("It would set the law on its head if parties could get around it by making a third party release a *sine qua non* of their deal, to establish a foundation for an argument that the injunction is essential to the reorganization, or even 'an important part' of the reorganization.").

Third and finally, the Court will approve Third Party Releases as to those parties who have provided substantial consideration to the reorganization. There are three actions which the Court believes, when taken together, amount to substantial consideration to the estate and unique circumstances that justify enjoining a creditor from suing a non-debtor party. *See Adelphia*, 368 B.R. at 267.

The first action is the agreement of certain creditors to forego consideration to which they would otherwise be entitled and to provide a distribution of warrants to existing equity holders. Using the valuation already approved by the Court, the projected recovery for the Prepetition 2007 Credit Facility Claims is 91.5% and for the Convertible Note Claims is 80.3%. *See* Discl. Statement, Art. II(A). The second is the agreement of certain creditors to provide new value to the Debtors in form of an agreement to backstop the $100 million Rights Offering, which ensures that the Company will have sufficient liquidity upon emerging from bankruptcy. *See* Discl. Statement, Art. V(C), VI(B)(6). Those parties that have agreed to backstop the Rights Offering include certain of the supporting 2007 Credit Facility lenders and supporting Noteholders. *See id.* The third is the agreement by certain of the prepetition creditors to receive equity in exchange for debt. *See* Discl. Statement, Art. IV(F). These concessions represent a significant financial contribution to the estate in the form of deleveraging the Debtors' balance sheet in the amount of approximately $120 million. *See id.* Indeed, the secured creditors in this case have

agreed to convert the entirety of their secured debt into equity of the reorganized Debtors, relief

that is not available to the Debtors under the Bankruptcy Code.  Together, all of these

concessions represent precisely the unique types of circumstances and "give-ups" that meet the

requirements of *Metromedia*, in return for which it is appropriate to grant the Third Party

Releases.  *See, e.g.*, *Adelphia*, 368 B.R. at 268 (holding that the Buyers in that case who had "put

in $17.5 billion into this estate, and agreed to rework their agreements to take the Debtors' assets

in a section 363 sale, when creditor feuding made it impossible to confirm the reorganization

plan that the Buyers originally bargained for had provided substantial consideration); *DBSD*, 419

B.R. at 219 (upholding the exculpation provisions for parties who were providing new funding to

the Debtors as part of the New Financing Facility).

These three actions amount to concessions that would not be achieved without the

compromise set forth in the RSA and the Plan, of which the Third Party Releases are a part.

Release of these parties is therefore important to implementation of the Plan.  *See Metromedia*,

416 F.3d at 141–42.

## CONCLUSION

For all of the reasons set forth above, the Court overrules the Equity Committee's

objections to confirmation regarding valuation of Genco and good faith.  The Court approves the

third party releases subject to the limitations described above.  The remaining requirements for

approval of the Disclosure Statement and confirmation of the Plan will be addressed separately.

Dated:   July 2, 2014
    New York, New York

                                       */s/ Sean H. Lane*
                                       **UNITED STATES BANKRUPTCY JUDGE**