| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | **NOT FOR PUBLICATION** |
| -------------------------------------------------------------------X | |
| In re: | Chapter 11 |
| GENCO SHIPPING & TRADING LIMITED, *et al.*, | Case No. 14-11108 (SHL) |
| Reorganized Debtors. | (Jointly Administered) |
| -------------------------------------------------------------------X | |

# MEMORANDUM OPINION GRANTING DEBTORS' OBJECTION TO CLAIM NUMBERS 69 AND 70

**A P P E A R A N C E S:**

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
*Counsel for the Reorganized Debtors*
1177 Avenue of the Americas
New York, NY 10036
By:    Adam C. Rogoff, Esq.
         Natan Hamerman, Esq.
         Anupama Yerramalli, Esq.

**PAUL HASTINGS LLP**
*Counsel for Fisher Brothers Management Co. LLC and*
 *Fisher-Park Lane Owner LLC*
75 East 55th Street
New York, NY 10022
By:    Harvey A. Strickon, Esq.


**SEAN H. LANE**
**UNITED STATES BANKRTUPCY JUDGE**

Before the Court is the objection [ECF No. 462] of the above-captioned reorganized

debtors (collectively, the "Debtors") to claim numbers 69 and 70 (together, the "Claims").  For

the reasons set forth below, the Court grants the Debtors' objection to the Claims.

**BACKGROUND**

All the facts relevant to this matter are undisputed. Genco Shipping & Trading Limited ("Genco"), one of the Debtors, was a tenant of landlord Fisher-Park Lane Owner LLC (the "Owner") pursuant to a lease dated September 22, 2005 (the "Master Lease") for a portion of the 20th floor of the building located at 299 Park Avenue in Manhattan (the "Leased Premises"). By its terms, the Master Lease was not set to expire until July 31, 2021. Objection ¶ 17. Genco decided to move its corporate offices from the Leased Premises to a new location on the 12th Floor of the same building. For its 20th floor Leased Premises, Genco entered into a sublease with Fisher Brothers Management Co. LLC ("Fisher Management") on November 1, 2013 (the "Sublease"). The Sublease provided for an annual sub-rent that was approximately 60% below the annual rent provided in the Master Lease and payable by Genco to the Owner.[1]

In connection with the Sublease, Genco also entered into a Subordination, Nondisturbance and Attornment Agreement (the "SNDA") and a letter agreement (the "Consent") with the Owner and Fisher Management, both of which are dated the same day as the Sublease. The SNDA and the Consent essentially provide two guarantees that notwithstanding any termination of the Master Lease: (a) Fisher Management would always be assured that its tenancy would not be disturbed, and (b) the Owner would always be assured of collecting the full rent reserved under the Master Lease.

From the effective date of the Sublease to the filing of the Chapter 11 petition, Genco paid to the Owner the full rent due under the Master Lease totaling $312,987.64, but it collected only $182,722.58 in rent due under the Sublease from Fisher Management. On the Petition Date,

---

[1] The parties represent that the annual rent payable to Genco by Fisher Management under the Sublease was approximately $178,000 less than the annual rent payable by Genco to the Owner under the Master Lease, although the exact amount of the difference is not relevant for purposes of ruling on this objection.

2

the Debtors filed a motion to reject the Master Lease, the Sublease, the SNDA and the Consent. That motion was granted by order in May 2015.

During the Chapter 11 case, the landlord Owner and the subtenant Fisher Management filed two claims in these Chapter 11 Cases. The first claim (Claim Number 70) was filed by the Owner seeking an unspecified amount of damages from rejection of the Master Lease— essentially the rent they contracted for under the Master Lease, subject to the statutory cap under Section 502(b)(6) of the Bankruptcy Code. The second claim (Claim Number 69) was filed by the subtenant Fisher Management seeking an amount representing the increased rent that it is obligated to pay given Genco's termination of the Master Lease and Sublease—that is, the difference between the 60% it had been paying and the 100% it now must pay.

## DISCUSSION

Section 502(a) of the Bankruptcy Code provides that a filed proof of claim is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). If the claim is properly filed, it is prima facie evidence that the claim is valid. *See* FED. R. BANKR. P. 3001(f). A party in interest may object to a proof of claim, and once an objection is made, the court must determine whether the objection is well founded. *See* 4 COLLIER ON BANKRUPTCY ¶ 502.02[2] (16th ed. rev. 2013).

Although Rule 3001(f) establishes the initial evidentiary effect of a filed claim, the burden of proof rests on different parties at different times. *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). Claims objections have a shifting burden of proof. Correctly filed proofs of claim "constitute prima facie evidence of the validity of the claim . . . . To overcome this prima facie evidence, an objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (B.A.P. 2d Cir. 2000). By producing "evidence equal in force to the

prima facie case," an objector can negate a claim's presumptive legal validity, thereby shifting the burden back to the claimant to "prove by a preponderance of the evidence that under applicable law the claim should be allowed." *Creamer v. Motors Liquidation Co. GUC Trust (In re Motors Liquidation Co.)*, 2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013) (internal quotation marks omitted); *see In re MF Global Holdings Ltd.*, 2012 WL 5499847, at *3 (Bankr. S.D.N.Y. Nov. 13, 2012) ("A proof of claim is prima facie evidence of the validity and amount of a claim, and the objector bears the initial burden of persuasion. The burden then shifts to the claimant if the objector produces evidence equal in force to the prima facie case . . . which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.") (citing *In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009)). If the objector does not "introduce[] evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the claim." 4 COLLIER ON BANKRUPTCY ¶ 502.02 (16th ed. rev. 2013); *see also In re Residential Capital, LLC*, 507 B.R. 477, 490 (Bankr. S.D.N.Y. 2014).

Federal pleading standards apply when assessing the validity of a proof of claim. *See, e.g.*, *In re Residential Capital, LLC*, 518 B.R. 720, 731 (Bankr. S.D.N.Y. 2014); *In re DJK Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) ("In determining whether a party has met their burden in connection with a proof of claim, bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules of Civil Procedure.") (citations omitted). Accordingly, a claimant must allege "enough facts to state a claim for relief that is plausible on its face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Section 502(b)(1) of the Bankruptcy Code provides that claims may be disallowed if "unenforceable against the debtor and property of the debtor, under any agreement or applicable

4

law. . . ." To determine whether a claim is allowable by law, bankruptcy courts look to "applicable nonbankruptcy law." *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006).

In their objection, the Debtors argue that the two Claims should be expunged because neither the landlord nor the subtenant is entitled under the relevant agreements to any additional compensation from Genco. All parties agree that there is a threshold legal issue that the Court can determine based on the undisputed facts here: namely, whether the Owner or Fisher Management has a claim under the applicable documents, including the Master Lease, the Sublease and the SNDA.

As a practical matter, the claimants' counsel conceded at the hearing held on April 28, 2015 that the subtenant Fisher Management has been paying the full rent due under the Master Lease, rather than the 60% that was being paid before Genco rejected these agreements. *See* Hr'g Tr. 8: 2-4, April 28, 2015; *see also* Claimants' Response ¶ 7 [ECF No. 467]. Thus, the question becomes whether the increase in the rent paid by the subtenant Fischer Management from 60% to the full amount creates a claim—that is an entitlement to payment from Genco for this difference in the rent.

In addressing this question, there are two provisions of the agreements that are of particular relevance. Both of these provisions compel the conclusion that Genco is not obligated to pay any amounts sought in the two Claims.

First, Section 2 of the SNDA specifically addresses the exact circumstance now before the Court. It makes clear that, where the Master Lease is terminated, but the subtenant Fischer Management stays in the premises, the subtenant must pay the full amount of the rent. Section 2 provides as follows:

5

> In the event the [Master Lease] terminates for any reason other than (i) the occurrence of a casualty or condemnation that results in the exercise by [the Owner] of a termination right under the [Master Lease] or (ii) a default by [Fisher Management] or breach of [Fisher Management's] obligations under the Sublease, then so long as [Fisher Management] is not then in default in the performance of any of its obligations under the Sublease (after any required notice and beyond the applicable period of grace set forth in the Sublease) and the Consent . . .
> …
> (b) [Fisher Management's] subleasehold estate in the Subleased Premises under the Sublease shall not be terminated or disturbed and the Sublease shall continue in full force and effect with respect to the Subleased Premises as a direct lease between [Fisher Management] and [the Owner] upon all of the same terms, covenants, conditions and obligations of the Sublease (subject, however, to the other provisions of this Agreement) relative to the Subleased Premises only, for the balance of the term thereof with the same force as if the Sublease were a direct lease between [the Owner] and [Fisher Management]; *provided, however, that, commencing on the [date on which Fisher Management attorns to the Owner and the Owner recognizes the tenancy of Fisher Management], [Fisher Management] shall pay the greater of (x) the fixed annual rent and additional rent as provided in the Sublease, or (y) the fixed annual rent and additional rent as provided in the [Master Lease].* . . .

SNDA, Section 2(b) (emphasis added).

It is noteworthy that this SNDA was signed by all the parties, including Genco, the landlord Owner and the subtenant Park Management. It clearly sets forth each of the parties' respective obligations under the agreements. As the Debtors correctly observe, all three parties thus planned what would occur if Genco's prime tenancy ended early; notably, the parties agreed that Fisher Management would have a right to continued and undisturbed occupancy, albeit at a higher rental rate. But as part of this bargain, Genco gave up something: it agreed to sublet the Leased Premises at a loss by accepting a sublease rent below the amount it was required to pay on its prime lease. Thus, Fisher Management has no claim for damages from having to now pay the full prime lease rent because that is precisely what it agreed to in the SNDA to obtain the benefit of its undisturbed occupancy, rather than face potential eviction from the Leased Premises.

6

This result also is consistent with Section 5.1 of the Sublease, which explicitly absolves Genco of any liability under the Sublease in the event that the Master Lease ends early. Section 5.1 provides, in relevant part:

> [i]f the [Master Lease] shall terminate for any reason this Sublease shall also terminate as of the date of termination of the [Master Lease], unless [the Owner] otherwise agrees, *and in no event shall [Genco] be liable therefor*.

Sublease, Section 5.1 (emphasis added). Thus, both the SNDA and the Sublease support the conclusion that Genco has no obligation to pay the additional rent sought by the claimants under these circumstances.

The consistency of the result under these two agreements—executed at the same time and related to the same sublease by Fisher Management—supports Genco's position here. Indeed, the claimants conceded at the hearing that the result they urge would appear to place the provisions in the SNDA and Sublease in conflict, which is problematic. *See* Hr'g Tr. 22:23-24:3, April 28, 2015*; see also Production Resource Group, L.L.C. v. Martin Professional, A/S*, 907 F. Supp. 2d 401, 413 (S.D.N.Y. 2012) ("When interpreting contracts, it is accepted that separate agreements executed contemporaneously and that are part of a single transaction are to be read together.") (citing *This Is Me, Inc. v. Taylor,* 157 F.3d 139, 143 (2d Cir. 1998) (applying New York law); *Kelso Enters. Ltd. v. A.P. Moller–Maersk A/S,* 375 Fed. App'x. 48, 49 (2d Cir. 2010) (summary order) ("[W]hen interpreting a contract or multiple contracts in a transaction, we strive to give effect to all of the terms of the relevant documents, reading them together."); *Gordon v. Vincent Youmans, Inc.,* 358 F.2d 261, 263 (2d Cir. 1965) ("[I]t is both good sense and good law that these closely integrated and nearly contemporaneous documents be construed together.") (internal quotations omitted); *Nau v. Vulcan Rail & Constr. Co.,* 286 N.Y. 188, 197 (N.Y. 1941) (agreements at issue "were executed at substantially the same time, related to the same subject-matter, were contemporaneous writings and must be read together as

7

one."); *Neal v. Hardee's Food Sys., Inc.,* 918 F.2d 34, 37 (5th Cir. 1990) ("Under general principles of contract law, separate agreements executed contemporaneously by the same parties, for the same purposes, and as part of the same transaction, are to be construed together.")).

In their opposition, the claimants make several arguments but none of them is persuasive. For example, the claimants argue that the agreements are silent as to whether Genco must compensate Fisher Management for the increased rent and thus the Court should default to the normal rule that a breaching party is liable for damages. But the agreements are not silent. Rather, Section 2(b) of the SNDA and Section 5.1 of the Sublease make clear what each party's obligations are under these circumstances. As such, the Court agrees with Genco that this case is similar to the result reached in *Health Insurance Plan of Greater New York v. Photobition New York, Inc.*, 884 N.Y.S.2d 713 (N.Y. App. Div. 1st Dep't 2009), where the court recognized that a subtenant suffers no damages from breach of contract by paying an increased rent when the subtentant previously consented to such an increase in order to be able to remain in possession of the premises if the prime tenant's tenancy ended early.

The claimants also argue that Section 5.1 of the Sublease does not apply here because it only relates to the subordination of the Sublease to any leases, mortgages and other rights or encumbrances to which the Master Lease itself was subject and subordinate. They state that "if the [Master Lease] was for any reason terminated as a result of the exercise of rights and remedies granted to any superior interest holders, such as superior lessees, mortgagees or encumbrancers to which the [Master Lease] was made subordinate, which by operation of law resulted in the termination of the Sublease, Genco would have had no liability to Fisher Management." Claimants' Response ¶ 12. But the language of Section 5.1 contains no such limitation. Indeed, it explicitly states that "if the [Master Lease] shall terminate *for any reason*"

8

then the Sublease terminates and "in no event shall [Genco] be liable therefor." Sublease, Section 5.1 (emphasis added).

The Court also rejects the claimants' reliance on Section 55.1 of Corbin on Contracts, which claimants cite for the unremarkable proposition that a breaching party owes damages to a counterparty. But a party is not entitled to contract damages where, as here, a contingency was contemplated and addressed by an agreement negotiated by the parties. *See, e.g. Levine v. Yokell*, 665 N.Y.S.2d 962, 962 (N.Y. App. Div. 1st Dep't 1997); *Duane Reade v. I.G. Second Generation Partners, L.P.*, 721 N.Y.S.2d 42, 44 (N.Y. App. Div. 1st Dep't 2001).

The claimants also cite Rasch's Landlord and Tenant, Section 28:76 about the damages due to an unlawfully evicted tenant. Fischer Management was not evicted, however, but rather stayed in the premises consistent with the rights it had bargained for in the SDNA, an agreement that provides that it must pay the full amount of the rent under these circumstances.

Finally, the claimants cite the case of *Henry v. Lewis*, 478 N.Y.S.2d 263, 268 (N.Y. App. Div. 1st Dept. 1984) for the proposition that a contractual waiver must be strictly construed. While that statement of law is correct, that proposition does not apply here. In reaching the result here, the Court is simply applying the terms of the relevant agreements, not relying on waiver.[2]

---

[2] Given the Court's ruling, the Court does not need to address the question of whether the subtenant's damages might be capped pursuant to Section 502(b)(6) of the Bankruptcy Code and whether the discount rate applied to Claim No. 69 is appropriate.

## **CONCLUSION**

For the reasons set forth above, the Court grants Genco's objection to the Claims. Genco should submit an order on three days' notice. The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice. A copy of the notice and proposed order shall also be served upon opposing counsel.

Dated:   May 21, 2015
           New York, New York

                                              */s/ Sean H. Lane*
                                              UNITED STATES BANKRUPTCY JUDGE